**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 16-122-LPS-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC., | ) ) ) | |
| Defendant. | ) | |

**ANSWER TO COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Groupon, Inc. ("Groupon") answers Plaintiff International Business Machines Corporation's ("IBM") Complaint for Patent Infringement (D.I. No. 1) ("Complaint") as follows:

**INTRODUCTION**[1]

1.  Groupon is without sufficient information to form a belief as to the truth of the first two sentences of this paragraph and therefore denies them. The third and fourth sentences contain legal conclusions to which no response is required, but for the avoidance of doubt, Groupon denies them. Groupon denies the remaining allegations of Paragraph 1 of the Complaint and specifically denies that it uses IBM's intellectual property.

**NATURE OF THE CASE**

2.  Groupon admits that this action purports to be an action for patent infringement arising under 35 U.S.C. § 271. Groupon denies that it has infringed any claim of the United

---

[1] To the extent that IBM intends the headings in its Complaint to constitute allegations, Groupon denies them. The headings in Groupon's answer do not constitute responses to them.

States Patent Nos. 5,796,967 (the "'967 patent"), 7,072,849 (the "'849 patent"), 5,961,601 (the "'601 patent"), or 7,631,346 (the "'346 patent") (collectively the "Patents-In-Suit").

## THE PARTIES

3. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 3 of the Complaint and therefore denies them.

4. Groupon admits the allegations of Paragraph 4 of the Complaint.

5. Groupon admits the allegations of Paragraph 5 of the Complaint, except to the extent it is inconsistent with any representations Groupon has made publicly to any government agency, such as the Securities and Exchange Commission.

## JURISDICTION AND VENUE

6. Groupon admits that this action purports to allege a claim of patent infringement arising under the patent laws of the United States and that this Court has subject matter jurisdiction over patent infringement actions.

7. Solely for purposes of this case, Groupon does not contest that venue is proper in this judicial district, but Groupon denies that this district is the most convenient forum for this action.

8. Solely for purposes of this case, Groupon does not contest that this Court has personal jurisdiction. Groupon admits that it is organized under the laws of Delaware and that it conducts business in Delaware through websites and mobile applications that are accessible in Delaware. The first sentence of Paragraph 8 contains a legal conclusion to which no response is required, but which, for the avoidance of doubt, Groupon denies.

# FACTUAL BACKGROUND

A. **IBM's Alleged Recognition of Innovation**

9. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 9 of the Complaint and therefore denies them.

10. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 10 of the Complaint and therefore denies them.

B. **IBM's Alleged Commitment to Patent Protection**

11. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 11 of the Complaint and therefore denies them.

12. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 12 of the Complaint and therefore denies them.

C. **IBM's Alleged Licensing Activities**

13. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 13 of the Complaint and therefore denies them.

14. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 14 of the Complaint and therefore denies them.

D. **IBM's Allegation that It Invented Methods for Presenting Applications and Advertisements in an Interactive Service while Developing the PRODIGY Online Service**

15. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 15 of the Complaint and therefore denies them.

16. Groupon denies that the named inventors of the '967 and '849 patents developed novel methods for presenting applications and advertisements in an interactive service. Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 16 of the Complaint and therefore denies them.

17. Groupon denies that the alleged technological innovations embodied in the '967 and '849 patents are fundamental to the efficient communication of Internet content. Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 17 of the Complaint and therefore denies them.

**E.   IBM's Allegation that It Invented Methods of Preserving State Information in a Continuing Conservation [sic] Between a Client and Server Networked Via a Stateless Protocol**

18. Groupon admits that HTTP is stateless and does not have a built-in mechanism to keep track of state information. Groupon further admits that state information can be used by clients and servers to keep track of prior communications during a session. Groupon admits that at the time the '601 patent was filed, cookies were used to preserve state information, but denies that cookies had significant drawbacks. Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 18 of the Complaint and therefore denies them.

19. Groupon denies that the named inventor of the '601 patent developed novel methods of recursively embedding state information into communications between clients and servers. Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 19 of the Complaint and therefore denies them.

**F.   IBM's Allegation that It Invented Methods for a Runtime User Account Creation Operation Using a Single-Sign-On Process in a Federated Computer Environment**

20. Groupon lacks information sufficient to form a belief as to the truth of the allegations of Paragraph 22 of the Complaint and therefore denies them.

21. Groupon denies that the named inventors of the '346 patent developed novel methods for systems interacting within a federated computing environment to trigger a single-sign-on operation on behalf of a user that would obtain access to a protected resource and create

an account for the user.  Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 21 of the Complaint and therefore denies them.

    **G.**    **IBM's Allegations Against Groupon**

    22.    Groupon admits that it is a well-known company that has grown to now earn more than one billion dollars of gross revenue per year, except to the extent it is inconsistent with any representations Groupon has made publicly to any government agency, such as the Securities and Exchange Commission.  Groupon admits that it operates online local commerce marketplaces that connect merchants with consumers and that these services are available on its website www.groupon.com and mobile applications, except to the extent it is inconsistent with any representations Groupon has made publicly to any government agency, such as the Securities and Exchange Commission.  Groupon denies the remaining allegations of Paragraph 22 of the Complaint.

    23.    Groupon denies the allegations of Paragraph 23 of the Complaint.

    24.    Groupon admits that IBM sent an email to inform Groupon that it was allegedly practicing the inventions of the '967 and '849 patents on November 1, 2011.  Groupon admits that it and IBM have had discussions regarding IBM's allegations and patents.  Groupon admits that IBM has alleged that Groupon practices the invention of the '346 patent.  Groupon denies the remaining allegations of Paragraph 24 of the Complaint.

    25.    Groupon denies the allegations of Paragraph 25 of the Complaint.

    26.    Groupon denies the allegations of Paragraph 26 of the Complaint.

    27.    Groupon denies the allegations of Paragraph 27 of the Complaint.

## COUNT ONE
### (Alleged Infringement of the '967 Patent)

28. Groupon admits that the '967 patent on its face identifies August 18, 1998 as its issue date and IBM as its assignee. Groupon admits that a purported copy of the '967 patent is attached to the Complaint as Exhibit A. Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28 of the Complaint and therefore denies them.

29. Groupon denies the allegations of Paragraph 29 of the Complaint.

30. Groupon denies the allegations of Paragraph 30 of the Complaint.

31. Groupon denies the allegations of Paragraph 31 of the Complaint.

32. Groupon denies the allegations of Paragraph 32 of the Complaint.

## COUNT TWO
### (Alleged Infringement of the '849 Patent)

33. Groupon admits that the '849 patent on its face identifies July 4, 2006 as its issue date and IBM as its assignee. Groupon admits that a purported copy of the '849 patent is attached to the Complaint as Exhibit B. Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 33 of the Complaint and therefore denies them.

34. Groupon denies the allegations of Paragraph 34 of the Complaint.

35. Groupon denies the allegations of Paragraph 35 of the Complaint.

36. Groupon denies the allegations of Paragraph 36 of the Complaint.

37. Groupon denies the allegations of Paragraph 37 of the Complaint.

38. Groupon denies the allegations of Paragraph 38 of the Complaint.

## COUNT THREE
## (Alleged Infringement of the '601 Patent)

39. Groupon admits that the '601 patent on its face identifies October 5, 1999 as its issue date and IBM as its assignee. Groupon admits that a purported copy of the '601 patent is attached to the Complaint as Exhibit C. Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 39 of the Complaint and therefore denies them.

40. Groupon denies the allegations of Paragraph 40 of the Complaint.

41. Groupon denies the allegations of Paragraph 41 of the Complaint.

42. Groupon denies the allegations of Paragraph 42 of the Complaint.

43. Groupon denies the allegations of Paragraph 43 of the Complaint.

## COUNT FOUR
## (Alleged Infringement of the '346 Patent)

44. Groupon admits that the '346 patent on its face identifies July 4, 2006 as its issue date and IBM as its assignee. Groupon admits that a purported copy of the '346 patent is attached to the Complaint as Exhibit D. Groupon lacks information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 44 of the Complaint and therefore denies them.

45. Groupon denies the allegations of Paragraph 45 of the Complaint.

46. Groupon denies the allegations of Paragraph 46 of the Complaint.

47. Groupon denies the allegations of Paragraph 47 of the Complaint.

48. Groupon denies the allegations of Paragraph 48 of the Complaint.

49. Groupon denies the allegations of Paragraph 49 of the Complaint.

## RELIEF REQUESTED

Groupon denies that IBM is entitled to any of the relief requested in the Complaint.

Groupon denies all allegations in the Complaint that have not been specifically admitted.

## DEMAND FOR JURY TRIAL

Groupon admits that IBM has requested a trial by jury.

## ADDITIONAL DEFENSES

Groupon asserts the following additional defenses to the Complaint. In doing so, Groupon does not assume any burden of proof on any issue that is IBM's burden as a matter of law. Groupon also reserves the right to amend or supplement these defenses as additional facts become known.

### FIRST ADDITIONAL DEFENSE
### (Failure to State a Cause of Action)

The Complaint fails to state a plausible claim against Groupon for which relief can be granted and/or fails to plead factual allegations with the sufficiency and particularity required to state a plausible claim.

### SECOND ADDITIONAL DEFENSE
### (Non-infringement)

Groupon does not infringe and has not infringed, either directly or indirectly, literally or under the doctrine of equivalents, any valid claim of any of the Patents-In-Suit and is not liable for any infringement.

### THIRD ADDITIONAL DEFENSE
### (Invalidity)

The claims of the Patents-In-Suit are invalid for failure to meet one of the conditions for patentability specified in Title 35, U.S.C., or the rules, regulations, and law thereto, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and/or one or more paragraphs of § 112, or, in the case of the '967 and/or '849 patents, because they do not claim patentably distinct inventions from other commonly owned claims.

## FOURTH ADDITIONAL DEFENSE
### (Prosecution History Estoppel and Disclaimer)

The relief sought by IBM is barred, in whole or in part, under the doctrines of prosecution history estoppel and prosecution disclaimer due to amendments and/or statements made during prosecution related to the Patents-In-Suit and/or in the specification and claims of the Patents-In-Suit.

## FIFTH ADDITIONAL DEFENSE
### (Dedication to the Public)

The relief sought by IBM is barred, in whole or in part, because IBM dedicated to the public all methods, systems, and products disclosed in the Patents-In-Suit but not literally claimed therein.

## SIXTH ADDITIONAL DEFENSE
### (No Injunctive Relief)

IBM is not entitled to any injunctive relief, as a matter of law, and cannot satisfy the requirements applicable to its request for injunctive relief in any form.

## SEVENTH ADDITIONAL DEFENSE
### (License)

IBM's claims against Groupon are barred because some or all of Groupon's accused products and/or services are licensed by IBM under prior licenses and agreements to which IBM is a party.

## EIGHTH ADDITIONAL DEFENSE
### (Patent Exhaustion)

IBM's claims against Groupon are barred, in whole or in part, by the doctrines of full compensation, exhaustion, implied license, and/or first sale.

## NINTH ADDITIONAL DEFENSE
### (Limitation on Damages and Costs)

IBM's claim for damages is barred, in whole or in part, by 35 U.S.C. §§ 286 or 287. To the extent any claim of IBM's patents is invalid, IBM is barred from recovering costs by 35 U.S.C. § 288.

## TENTH ADDITIONAL DEFENSE
### (Marking)

To the extent that IBM, any former assignee, or any of IBM's licensees failed to properly mark any of its relevant products as required by 35 U.S.C. § 287 or otherwise give proper notice that Groupon's actions allegedly infringed any claim of the Patents-In-Suit, Groupon is not liable to IBM for the acts alleged to have been performed before Groupon received such notice.

## ELEVENTH ADDITIONAL DEFENSE
### (Unenforceability)

During prosecution of the '967 and '849 patents, the inventors, the assignee, and their attorneys failed to disclose to, withheld from, and concealed from the United States Patent and Trademark Office prior events and art that was highly material to the patentability of the claims of the '967 and '849 patents, and which they knew and should have known would have been important to a reasonable examiner. Upon information and belief, the applicants did that with an intent to deceive the Patent Office.

The '849 patent and the '967 patent are each a division of Application Serial No. 07/388,156, filed July 28, 1989, now U.S. Patent No. 5,347,632. U.S. Patent No. 5,347,632 is a continuation-in-part of Application Serial No. 07/328,790 filed March 23, 1989 and abandoned. Application Serial No. 07/328,790 is a continuation-in-part of Application Serial No. 07/219,931 filed July 15, 1988 and abandoned. The earliest priority date that the '967 patent or '849 patent

can claim is July 15, 1988. Thus, the earliest possible critical date for the '967 and '849 patents is July 15, 1987. Both patents were assigned to IBM prior to their issuance.

IBM alleges that the '967 and '849 patents are directed to technology developed as part of the Prodigy online service. (Complaint at ¶ 15.) Prodigy was founded as Trintex. Trintex was developed by a joint venture between IBM, CBS and Sears in the 1980s. (*See* Michael Weinstein, System Flexibility Held Key to Videotex Success; Officer of Consortium About to Enter Field Assesses the Service's Prospects, AMERICAN BANKER, Oct. 2, 1984, at 8; *see also* Bill Saporito, Are IBM and Sears Crazy? Or Canny?, FORTUNE, Sep. 28, 1987.) IBM alleges that the technology of the '967 and '849 patents (i.e. technology related to the Trintex/Prodigy service) is "for presenting applications and advertisements in an interactive service." (Complaint at ¶ 16.)

As early as 1984, IBM began to line up advertisers for Trintex. (*See* Weinstein, at 8 ("Mr. Warwick's presence on the speaker's rostrum at the National Retail Merchants Association conference indicates that Trintex is already trying to increase its visibility among department stores and specialty stores.").) By April 6, 1987, IBM was "approaching advertisers with the promise of a 1988 start-up." (Cleveland Horton, IBM, Sears Shooting for '88 Entry; New Life for Videotex, ADVERTISING AGE, Apr. 6, 1987, at 1.) At that time, IBM as part of the Trintex venture was "soliciting charter advertisers" and had already signed "[a]t least one major food company." (*Id.*) These solicitations included specific terms for the delivery of advertisements. (*See id.* ((reporting that Trintex was basing its advertising rate model "on the number of subscribers viewing a particular ad").)

At the same time, IBM as part of the Trintex venture also offered a special program for direct marketers, based "on the number of orders placed through the service," and touted the

platform's ability to partition the user's screen to display advertisements alongside content. (*Id.* (noting "about 20% of the screen is occupied by a teaser, or 'leader ad'" that the user can interact with "to reveal additional screens of advertising").)

IBM as part of the Trintex venture also "approach[ed] national advertisers, financial services and retailers as potential advertisers." (*Id.*; *see also* Trintex to Aim On-Line Ads at Demographic Segments, AMERICAN BANKER, Jun. 30, 1987, at 10 (describing benefits of the Trintex system from the company's presentation at a retailers' conference in May 1987, including how the interface is partitioned so that "ads are displayed as subscribers view the editorial sections").)

An announcement in May 1987 stated that Trintex would feature a flat monthly fee to encourage greater consumer interest, and that Trintex would be able to subsidize that fee because "[t]he service [would] be supported largely by commercial clients and advertisers." (David O. Tyson, Meter Won't Run on Trintex Videotex; IBM-Sears Partnership Will Charge Only Flat Monthly Fee, AMERICAN BANKER, May 20, 1987, at 6.)

By May 26, 1987, Trintex announced that it had signed 42 advertisers, which included "Aetna, Buick, Carnation, Dean Witter Reynolds, Field Publications, Florsheim, Ford, Nestle, NEC Home Electronics, Showtime/The Movie Chanel, and Volkswagen of America/Audi of America." (Trintex lines up 42 advertisers, ADVERTISING AGE, May 25, 1987, at 1.) By June 3, 1987, Trintex acknowledged that Bally had also committed to purchase advertisements. (Janet Key, Trintex's Aim: Retail Revolution, CHICAGO TRIBUNE, Jun. 3, 1987.)

By June 15, 1987, Trintex had entered into numerous multi-year agreements with its initial advertising clients. All in all, prior to the earliest possible critical date of July 15, 1987,

IBM's online Prodigy/Trintex venture had attained approximately 60 advertising clients for its initial launch.

The named inventors of the '967 and '849 patents had a duty of candor and good faith in dealing with the Patent Office. That duty included a duty to disclose to the Patent Office all information known to be material to patentability. IBM alleges that the inventors of the '967 and '849 patents "developed the patented technology as part of the efforts to launch the PRODIGY online service," also known as Trintex. (Complaint at ¶ 15.) The named inventors' knowledge, therefore, necessarily included knowledge of the development of Trintex. On information and belief, the named inventors had knowledge of IBM's efforts to launch and commercialize the Trintex service that later became Prodigy before July 15, 1987. The inventors did not disclose these efforts to the Patent Office during prosecution of the two patents, and on information and belief, did so with intent to deceive the Patent Office and obtain allowance of the patents, avoiding the Patent Office rejecting then-pending applications based upon the invalidating public disclosures to third parties, including potential advertisers, and/or public use by those third parties or others.

Further, attorney Paul Scifo prosecuted the '967 patent from application to issuance and the '849 patent from application until 2002. In this capacity, Scifo had a duty of candor and good faith in dealing with the Patent Office in connection with both patent applications. That duty included a duty to disclose to the Patent Office all information known to be material to patentability.

Scifo had knowledge of IBM and Trintex ventures' pre-critical date efforts to promote the Trintex service at least by October 21, 1994, when he submitted a 34-page Information Disclosure Statement to the Patent Office describing the development and commercialization of the

Trintex service. On information and belief, Scifo intentionally drafted the Information Disclosure Statement to misleadingly omit the details of any pre-July 15, 1987 efforts relating to the promotion of the Trintex service to advertisers and, instead, focusing solely on end-user purchases through the service that occurred after July 15, 1987.

The Information Disclosure Statement did not contain information relating to the 60 advertising clients that were secured by IBM as part of the Trintex venture prior to the critical date. Instead, in the Information Disclosure Statement, Scifo claimed that all commercial activity before the filing of the patent applications was "minimal and wholly incidental to the experimental nature of testing." He omitted numerous disclosures of the Trintex system that were made before the critical date to potential advertisers.

The disclosures were material to the patentability of the '967 patent and the '849 patents. This was confirmed by the Patent Office itself. During prosecution of the '849 patent, the Board of Patent Appeals and Interferences ("BPAI") independently located the following articles describing just a few exemplary public disclosures of the Trintex online service:

a. Paul Hurly et al., The Videotex and Teletext Handbook (Harper & Row, Publ. 1985), pp. i-xi, 11-93 (Chaps. 1-3), 130-159 (Chap. 5), 231-255 (part of Chap. 9), 282-291 (part of Chap. 10), and 380-381 (Appendix B);

b. Cleveland Horton, IBM, Sears Shooting for '88 entry; New Life for Videotex, Advertising Age, April 6, 1987, p. 1;

c. Ellen Forman, Surge Seen for Electronic Shopping, Women's Wear Daily, Vol. 153, p. 1, May 21, 1987;

d. Jerrold Ballinger, Trintex Signs up 42 Advertising Clients; Is Hoping for Launch in Early '88, VP Says, DM News, June 1, 1987, p. 8;

e. Cleveland Horton, Big Advertisers Link to Videotex Venture, Advertising Age, June 15, 1987, p. 72;

f. Arthur Markowitz, Trintex Interactive Videotex Service Will Feature Magazine-Type Format, Discount Store News, Vol. 26, p. 2, June 22, 1987;

    g. Trintex to Aim On-Line Ads At Demographic Segments, The American Banker, June 30, 1987, p. 10;

    h. Inside Trintex; Technology & Operations supplement, Women's Wear Daily, Vol. 154, p. S1, September 8, 1987;

    i. David Kiley, Trintex: Videotex ·Gets Personalized, Adweek, October 12, 1987, Eastern Edition;

    j. Scott Mace, Trintex System Offers Access to Variety of Consumer Services, InfoWorld, p. 5, November 30, 1987 (collectively, the "Trintex NEXIS Articles").

The BPAI recognized that the Trintex NEXIS Articles it discovered were material to patentability, and rejected numerous pending claims in light of the articles. The BPAI further expressed the following concerns:

> In addition to the value of the [Trintex] NEXIS articles for what they teach on their face as prior art, the [Trintex] NEXIS articles, especially those published before the critical date, which cannot be sworn back of or otherwise overcome, raise questions of what else may have been publicly disclosed or on sale that has not been disclosed to the U.S. Patent and Trademark Office (USPTO).
>
> ****
>
> **These articles raise a question of exactly what else was disclosed about the Trintex service to the public** in these speeches before the critical date, apparently without any conditions of confidentiality (since the information found its way into some [Trintex] NEXIS articles), which would have a bearing on the issue of public use. **Appellants have not disclosed these presentations to the USPTO or what else was disclosed at the presentations.** ('849 Prosecution History – Feb. 27, 2002 BPAI Opn. at 34-35 (emphases added).)

In response to these concerns, IBM replaced its prosecuting attorney Scifo and filed a petition to expunge the BPAI's concerns related to the Trintex NEXIS Articles and the withheld information. Specifically, the individuals at IBM who controlled prosecution and selection of counsel, and thus owned a duty of candor to the Patent Office, along with the prosecuting attorneys, sought to expunge from the file history the BPAI's concern regarding IBM's failure to disclose pre-critical date public presentations regarding the subject matter of the '849 patent. ('849

Prosecution History – Apr. 29, 2002 Petition to Commission in the Person of the Chairman of the Board of Appeals and Interferences.)  Not only did IBM and the prosecuting attorneys seek to bury these expressed concerns, but none of IBM, the prosecuting attorneys, or named inventors ever disclosed the actual pre-critical date presentations during the prosecution of the '967 patent or '849 patent.

The inventor Robert Filepp was a Senior Manager at Prodigy before the critical date of the '967 and '849 patents and he participated in the design and development of the Trintex/Prodigy technology.  (*See, e.g.*, Robert Filepp, LinkedIn Profile Page (2016, August 14), https://www.linkedin.com/in/robert-filepp-14a6bb5; Ben J. Edwards, Where Online Services Go When They Die: Rebuilding Prodigy, One Screen at a Time, THE ATLANTIC (July 12, 2014), http://www.theatlantic.com/technology/archive/2014/07/where-online-servicesgo-when-they-die/374099/ (the "Atlantic Article").)  As alleged by IBM in its complaint, Filepp knew of the efforts to launch the Trintex/Prodigy service.  It is reasonable to infer that he also had knowledge of the Trintex/Prodigy trials and the published articles and public presentations regarding the Trintex/Prodigy technology that predated the critical date of the '967 and '849 patents.  Filepp owed a duty of candor to the Patent Office, yet he did not disclose the trial described in the Atlantic Article or the Trintex NEXIS Articles in connection with the prosecution of the '967 and '849 patents to the Patent Office.  Nor did anyone else associated with IBM who owed a duty of candor to the Patent Office in connection with the prosecution of the '967 and '849 patents disclose such information to the Patent Office.

The only reasonable inference from IBM, the prosecuting attorneys, and the inventors' failure to disclose information regarding the efforts to promote Trintex/Prodigy before the critical date to the Patent Office was that these entities and individuals intended to deceive the Patent

Office and the examiners. Indeed, despite active promotion of the Trintex/Prodigy service before the critical date and numerous public documents and presentations describing the service, these entities and individuals failed to provide and withheld from the Patent Office and the examiners such documents and information about the efforts to promote the service before the critical date. Instead, the prosecuting attorney misled the Patent Office by suggesting in an information disclosure statement that the only efforts prior to the critical date were experimental in nature.

Upon information and belief, IBM, the prosecuting attorneys, and the inventors were motivated to conceal information about the public disclosures relating to the Trintex/Prodigy system before the critical date of the '967 and '849 patents in order to secure allowance of the patents. Upon information and belief, IBM had strong financial and non-financial interests in obtaining the patent, as evidenced by this lawsuit demanding monetary damages from Groupon for its purported infringement of the patents as well as by IBM's pending lawsuit against Kayak, OpenTable, and Priceline and its prior lawsuit against Amazon.com.

For these reasons, the '967 and '849 patents are unenforceable under the doctrine of inequitable conduct due to repeated breaches of the duty of candor by those who owed a duty of candor to the Patent Office, including prosecuting attorney Scifo, inventor Filepp, IBM, and IBM's employees controlling prosecution and selection of prosecution counsel, made with the intent to deceive the Patent Office in conjunction with the prosecution of the applications that issued as the '967 and '849 patents.

## RESERVATION OF ADDITIONAL DEFENSES

Groupon reserves the right to assert additional defenses in the event that discovery or other analysis indicates that additional defenses are appropriate.

## PRAYER FOR RELIEF

Groupon prays for judgment with respect to IBM's Complaint and Groupon's defenses as follows:

a. A judgment in favor of Groupon denying IBM all relief requested in its Complaint and dismissing its Complaint with prejudice;

b. A judgment against IBM finding that Groupon has not infringed, does not infringe, and is not liable for any infringement of any valid and enforceable claim of any of the Patents-In-Suit;

c. A judgment that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Groupon its reasonable attorneys' fees;

d. An award of costs to Groupon; and

e. Such other relief as the Court shall deem just and proper.

## DEMAND FOR TRIAL BY JURY

Groupon demands trial by jury on all claims and issues so triable including specifically on IBM's claims and Groupon's defenses thereto.

ASHBY & GEDDES

*Of counsel:*

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
Adam M. Lewin
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA  94041
(650) 988-8500

Dated:  August 15, 2016

*/s/ John G. Day*
_____
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Defendant Groupon, Inc.*