# EXHIBIT A

Exhibit A
(Adapted From '969 Patent, Fig. 2, 1:40-45, 2:19-38, '849 Patent Fig. 2, 1:37-42, 2:20-44)
Prior Art Interactive Applications Using "Dumb Terminals"



Sequentially Supplying Responses Back To Users

# EXHIBIT B

Exhibit B (Adapted From '967 And '849 Patents, Fig. 3a)
Preferred Embodiment With Stored Objects (Highlighted In Blue) And Unavailable
Objects (Highlighted In Green)

Header Partition 250

Body Partition 260

Body Partition 260

Window Partition 275

AD Partition 280

Next | Back | Path | Menu | Action | Jump | Help | Exit

FIG. 3a

# EXHIBIT C

Exhibit C (Adapted From '967 and '849 Patents, Figs. 2, 3a)
Preferred Embodiment With Objects Retrieved From Stored Objects (Highlighted In Blue)
Or From The Network (Highlighted In Green) Used To Display Applications



# EXHIBIT D

$\mathcal{210}.,\mathcal{26}$     $\mathcal{2301}$

#3

11-9-94

mjc

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Appln. of: Robert Filepp et al.     Group Art Unit: 2301

Serial No.: 08/158,031                    Examiner: H. R. Herndon

Filed: November 26, 1993

Title:     METHOD FOR PRESENTING APPLICATIONS
           IN AN INTERACTIVE SERVICE

NOV 0 9 1994

### DISCLOSURE STATEMENT UNDER 37 C.F.R. 1.97

Commissioner of Patents and Trademarks
Washington, D.C.   20231

Sir:

In the course of prosecuting the parent of the current divisional application, Applicants became aware of certain information concerning use of their invention that occurred prior to the filing of the parent application that could be regarded as material to examination of the current divisional application.  While this information was fully described to the Patent and Trademark Office during prosecution of the parent application now issued as U.S. patent 5,347,632, consistent with their duty under 37 C.F.R. 1.56, Applicants would like to bring that information to the attention of the Patent and Trademark Office for consideration during prosecution of their divisional application.

### USE INFORMATION

As originally conceived, the PRODIGY® Service (Service) to which this invention relates, called for a new approach to distributed data processing; a new approach that subsequently proved to require almost two years to test and implement.

1

In formulating the framework for the Service, Applicants believed that to be commercial viable, the Service would have to handle user populations in the millions.  Further, it was also believed that to be successful, the Service would have to provide user populations of such size with low response time to requests for information and transactions and do so at low cost. Still further, it was felt that to achieve the desired low response times while maintaining attractive service pricing, it would be necessary to simplify the Service architecture so as to speed system operation and hold equipment capital and operating cost low.  Accordingly, Applicants believed the "dumb" terminal approach commonly used in conventional systems with it reliance on host size and complexity for performance would not be suitable.

In light of these considerations, Applicants proposed to structure the Service so that a subscriber could use a personal computer (PC) to access the Service.  This would permit the subscriber to bring the computing power of his or her PC to the Service, thereby reducing demand on the Service computing resources and allowing the Service hardware to be simplified. Further, in order to configure the Service so that it could be handled by a subscriber's PC, it was proposed the applications offered on the Service be partitioned; i.e., structured as separable units of data and program code capable of being processed by the PC.  Additionally, Applicants recognized that if the partitioned application units were made up of separable units of data and program code; i.e., "objects", the Service database needed to support the applications would be organized based on these objects, and the objects distributed and stored at various levels in the system so that application display time could be minimized as a function of the storage capacity of the

2

PC; i.e., optimize Service performance relative to the subscriber equipment capacity.

More specifically, Applicants reasoned that if the application to be disposed at the subscriber's PC could be composed on the fly at run time from objects stored at the PC, the applications could be presented quickly and with minimal reliance on the Service resources. Further, if the subscriber's PC lacked the capacity to store all the objects required for an application to be displayed, those objects in excess of the PC storage capacity could be obtained from the Service network as needed to assure maximum local support from the available PC resources.

However, to accommodate this intended role for the reception system, the Service software, i.e., software for the host, cache/concentrator system and reception system, together with the other support facilities - and the software for the various applications to be run on the Service had to be originally designed and created. And, since these software designs would be new, a substantial test and development period for the Service software was anticipated.

As events proved, that period extended over almost two years and progressed through three phases. As will be appreciated, throughout the three phases, parallel and intertwined efforts were undertaken to develop and test all components of the Service hardware and software; i.e., host, cache/concentrator system, reception system, etc. However, since this disclosure statement is being filed in connection with a patent application primarily directed to the Service reception system, to the extent possible, discussion will be focused on that aspect.

The first phase of the test and development period extended from approximately January 1987 through September 1987. During that period efforts were directed to establishing the viability of the general concepts underlying the Service and reception system noted above. In this phase, testing was conducted confidentially by Prodigy employees and outside consultants either at the Prodigy facilities or from the homes of the Prodigy employees, the employees acting as pseudo-subscribers.

Once it was determined that the basic approach to the Service and reception System was workable, testing entered a second phase. In the second phase, Prodigy sought to determine if the service and reception system would continue to operate in the hands of users who, while experienced with computer technology as a result of either occupation or interest, had not contributed to or participated in the design of the Service or reception system. Additionally, Prodigy sought to determine if the reception system would continue to operate as changes were made in it to fix problems encountered and to encompass the broader range of subscriber hardware and operating system configurations that existed in the subscriber population Prodigy intended to serve. Still further, Prodigy sought to test whether the reception system would continue to operate with the growing number of applications of increased object complexity being added to the Service.

To digress briefly, from its inception Prodigy believed its Service would have to provide a broad range of transactional and informational applications to be accepted by the public. For example, it was felt that to be viable, the Service would have to include transactional application such as electronic banking, financial management, at home grocery shopping, travel reservations and department store shopping, among others. In

4

addition, Prodigy felt it would be essential to provide informational and entertainment applications such as current events, sports and business news, games and such items as expert commentary on a variety of subjects as well as special features and the like. As will be appreciated, this range of applications requires a broad scope of objects that vary in number and technical complexity. Accordingly, the objects for these applications present a significantly varying level of load on the reception system and Service, load that had to be tested before the reception system and Service could be commercially offered to the public. Further, since the range of applications called for a diversity of sponsorship and required a significant number of man hours to create, they were not all immediately available for testing as development of the reception went forward. Accordingly, reception system testing had to be coordinated in time with the expanding complexity of the Service, a coordination that extended through both the second and third phases of test and development.

The second phase of testing and development extended from approximately the beginning of October 1987 through the end of March 1988. During this phase, Prodigy organized three small groups of approximately 100 individuals each, the groups being located at select point in the Country corresponding to the extent of the communication links setup for the Service. To foster interest and confidentially, individuals selected for each of the groups either had some relation to Prodigy or were likely to have technical interest and familiarity with computer technology that would enable them to test the reception system and Service.

As noted, all testing was conducted on a confidential basis. Additionally, the reception system software and use of

5

the Service were provided to the users free of charge. Still further, Prodigy maintained control over usage of the reception system and Service by issuing identification numbers that the users had to present, and that Prodigy had to accept, each time the user sought access to the Service. Additionally, and as will be appreciated, due to the unique nature of the reception system software, it had no use other than to facilitate interaction with the Service. Thus, by controlling access to the Service, Prodigy also controlled usage of the reception system software by the user. Yet further, Prodigy retained ownership of the reception system software, providing only a license for its use. Additionally, in accordance with the terms of the license, the user was obliged not to attempt to reverse compile or otherwise reverse engineer the source code, the source code for the reception system not having been supplied. As well, Prodigy monitored activity of these individuals by tracking identification numbers and noting frequency of use, type of applications viewed and duration of use sessions. Also, Prodigy maintained technical support telephone lines so users could report all problems encountered. In addition, Prodigy also monitored the effect of usage on network performance. Still further, Prodigy periodically met with representatives of the various groups to discuss the users' experiences and problems. And, as the reception system software was revised, the later versions were provided to the users in order to retire the earlier versions.

Concerning the makeup of the various groups, the first group that participated in the testing included approximately 100 IBM employees located in the Hartford, Connecticut area, IBM being one of the founders of Prodigy. This group first became involved in October of 1987 when the Prodigy host and Service

were established for external access.  In the course of the testing, the IBM-Hartford group remained substantially stable in size, the group growing only slightly from 100 to 109 individuals over the 6 month period from October 1987 to the end of March 1988.

The second group established in phase two of the test period included a panel of individuals from the Atlanta, Georgia and San Francisco, California areas.  These individuals where typically employees of companies who were sponsoring or planning to sponsor applications on the Service, or who maintained some other relation with Prodigy; e.g., employees of the company that provided modems that were to be offered by Prodigy to future subscribers.  This group began in approximately November of 1987 with some 30 individuals and grew to approximately 160 individuals by the end of March 1988.

Finally, the third group included members of the Connecticut Computer Society located in West Hartford, Connecticut, and comprised approximately 80 individuals in January 1988 when it first became active.  Subsequently, the group expanded to approximately 90 individuals by the end of March 1988.

Following the second phase of test and development, these groups continued to operate into and through the third phase of test, growing only slightly in size.  Ultimately, when Prodigy began to close out the final phase of testing in early August 1988, the three groups comprised approximately 110 Hartford IBM employees, approximately 165 panel members and approximately 100 Connecticut Computer Society members.

As a result of problems encountered in the second phase of test, the broadening range of PC hardware and operating system combinations required to be supported in the anticipated

7

subscriber population, and the continuing increase in the number and complexity of the Service applications, the reception system software was changed during the second phase of test and a new version created. While Applicants believed they were approaching a form of the reception system that could be used to support a commercial offering of the Service, they still had not as yet tested in an environment having subscribers in sufficient numbers and low enough level of technical understanding as would show whether the reception system and Service were sufficiently complete to permit the reception system and Service to be offered to the public, or whether further changes would have to be made before the reception system and Service would perform as intended.

As will be recalled, the reception system is a integral part of a compound and sophisticated computer network and must perform in harmony with the Service host, cache/concentrator system, application objects and the user's PC environment if applications are to be composed and displayed from objects locally stored and supplied by the network at run time. Still further, because the demand of the many reception systems of the subscriber population are funneled up to the common cache/concentrator and host, and because the Service as structured was substantially a pioneer system, it was by no means certain what the consequences would be on the reception system and Service performance if the subscriber population was dramatically increased by unrestricted supply of the reception system and Service to the public.

Moreover, because the public generally perceived videotex as a still emerging technology, Prodigy believed that if the reception system and Service were prematurely released and experienced technical difficulties, adverse public reaction

8

would result that would severely retard acceptance, and put at risk the substantial amount of money and man hours that were being expended on development. Accordingly, Prodigy elected to test the reception system and Service over a broader user base to see if the reception system and Service would continue to operate. For these tests, Prodigy proposed to gradually increase load levels by progressively adding groups of individuals secured from the public sector. This public testing constituted the third phase of the test and development period.

The third phase of the test period started at the beginning of April 1988 and extended through the beginning of August 1988. For the third phase, Prodigy began by progressively securing approximately 2,600 individuals in the three regions Prodigy had been testing with the approximately 300 individuals of phase two; i.e., Hartford, Connecticut, Atlanta, Georgia and San Francisco, California.

Once again, the reception system software and Service were provided free of charge. More specifically, a select list of individuals and groups likely to be interested in the Service the were approached by mail and telephone and offered the reception system and Service as so called "Founding Members" of the Service. As part of the program, the participating new users would receive revisions of the reception system software produced during phase two testing, along with six months use of the Service for free. Additionally, if at the end of the six-month free period, the users wished to continue the Service, they can do so at a reduced rate that would extend for up to a year thereafter. Still further, if the prospective new users did not have a modem to access the Service, Prodigy proposed to sell one to them at a reduced price.

As in the case of phase two of the testing, Prodigy retained ownership of the reception system software, providing only a license to the prospective users. As before, under the terms of the license, Prodigy required the users not attempt to reverse compile or otherwise reverse engineer the source code, the source code not having been provided. Also, Prodigy again controlled use of the reception system software and access to the Service by issuing identification numbers that were required to be presented by the individual users at log on. And, as in phase two testing, Prodigy compiled and maintained extensive records concerning the frequency, duration and character of use. Again, Prodigy also maintained a user telephone support line for the report of any problems. Still further, as before, Prodigy monitored the consequence of the increased usage on all levels of the Service network. However, while the internal operation of the reception system software was not disclosed to the new users, the new users rather receiving only instruction on use of the Service, no prohibition of confidentiality was imposed.

Distribution of the reception system software in the new version that emerged from the second phase of the test period began on March 29, 1988. Use by Founding Members thereafter grew from approximately 50 members at the beginning of April 1988, to approximately 2,600 by the end of May 1988.

At the beginning of June 1988, in accordance with its plan of gradual increase in system loading, Prodigy again sought to broaden the user population to assure that when ultimately offered to the public, the reception system and Service would operate as intended. Accordingly, at the beginning of June, a still further revision of the reception system software and a period of Service were offered to perspective users for free. Specifically, perspective users were offered a further revision

10

of the reception system and a three month period of use of the Service for free as so called "Charter Members." Here, however, no continuation of the Service at a reduced rate following the free period was offered. Additionally, while a modem was again offered at a reduced price to those who might require it, the price reduction was not as large as offered to the Founding Members.

Once again, Prodigy retained ownership of the reception system software, the new members receiving only a license to use it. And as before, in accordance with the terms of the license, the new users were obliged not to attempt to reverse compile or otherwise reverse engineer the source code, source code not having been provided. Prodigy again controlled use of the reception system software and access to the Service by issuing identification numbers that were required to be presented by the users at log on to the Service. As well, Prodigy again complied and maintained extensive records concerning frequency, duration and character of use together with any problems that arose. Prodigy additionally maintained a user support telephone line to enable the new users to report any problems. As in the case of the first group of users that were given access to the reception system software and Service, in third phase of testing, the operation and structure of the reception system was not disclosed to this second group of users in the third phase of test. Rather, there users were again only given the reception system diskette and instruction on how to run the Service. Confidentiality, however, was not sought in connection with use of the reception system or the Service. In the third phase of test, from approximately June 1988, the number of users grew from approximately 2,600 Founding Members to a total of

11

approximately 6,500 Founding and Charter Members at the beginning of August 1988.

Following distribution of the revised version of the reception system software to the Charter Members in June of 1988, Prodigy recognized that a still further revision of the reception system would be required. However, it was believed that if this further revision would perform as intended, it would be adequate to support release of the reception system and the Service to the general public. Accordingly, following continued internal development of the further revision of the reception system, Prodigy on or about August 5, 1988, approved release of the further revised version of the software to support the public offering of the Service.

Following approval in early August of 1988, efforts went forward to distribute the final version of the reception system software to existing users, thus marking the end of the third phase of testing. Thereafter, the existing user base continued to grow as the Charter Members program ran its course. Accordingly, by the beginning of September 1988, the number of subscribers had grown to approximately 11,000, and in early October, following introduction of the Service in selected cities throughout the Country, the user base jumped to approximately 16,000.

Since Prodigy provided transactional as well as informational applications on the Service, it was necessary during the test and development period to allow users to purchase goods and services offered in certain application in order to determine if the transactional aspects of the Service and the reception system would operate as intended. More particularly, in the second phase of test, during the months of

12

January, February and March of 1988, users of the Service purchased a total of approximately $650 worth of goods and services. Thereafter, in the four month period from April 1988 to the beginning of August of 1988, that constituted the third phase of testing, users purchased approximately $28,000 of goods and services. These amounts are to be contrasted with the purchase goods and services in the 10 day interval from August 25, 1988 to September 5, 1988, following the end of experimental period where purchases were approximately $121,000.

Moreover, it is to be noted the amounts of money paid for the goods and services purchased ultimately were paid to the sponsors of the applications that offered them. Further, while these sponsors did pay a fee to Prodigy to create and display the applications and advertisements that were run on the sponsor's behalf, such amounts were paid to Prodigy to offset the cost of production, operating expense and development cost for the Service. And, Prodigy realized no profit from these activities during the experimental period.

Continuing, also during the test period, as is customary in connection with software development, Prodigy held discussions with retailers who were to support retail sale of the reception system software at the end of September 1988 when the software was offered to the general public. By the beginning of February 1988, Prodigy had reached understandings with approximately 6 chain distributors in various channels of distribution; e.g., computer stores, software stores, specialty electronics stores and department stores, who indicated they would handle the software when it became available. In these discussions, Prodigy advised that the reception system and Service were under development, but were expected to become generally available

13

between September and October of 1988.  In addition, Prodigy expressly reserved the right not to supply the reception system software until Prodigy felt it was ready for release to the Public.  By the end of April 1988, the number of distribution chains with whom Prodigy had reached such understandings had increased to approximately 8.

As well, in the early part of April 1988, Prodigy attended a computer faire in California at which it demonstrated the Service as it then existed.  More specifically, between April 7-10, 1988, Prodigy attended the West Coast Faire held in San Francisco, California.  At the Faire, Prodigy gave a demonstration of the Service as it then existed; i.e., lacking a number of the transactional applications such as at home banking, grocery shopping and travel reservations.  For the demonstration, Prodigy used the version of the reception system software that was then available, that version being revised twice more during the third phase of the test and development period.  Additionally, the observers were told that while the service was not yet generally available, it was expected to be provided in the San Francisco area by the fall or 1988.  Still further, the nature of the application that were expected ultimately to be available on the Service; e.g. many of the transactional applications, were described and a demonstration diskette distributed that displayed certain segments of the service without support of the network.  Still further, the observers were invited to fill out a follow-up cards if they felt they wanted Prodigy to contact them when the Service became publicly available in the San Francisco area in the fall.  Approximately 4,000 cards were filled out and submitted.

14

In light of the above, and based on the novelty of the invention, the uncertainty typically associated with newly developed software and the inability to adequately simulate the intended use environment in the laboratory, it was necessary for Applicants to undertake a period of test and experimentation to determine whether their reception system would perform as intended.  Accordingly, Applicants would respectfully submit that their invention was not in public use or on sale under the terms of 35 U.S.C. 102(b) before the end of the test and experiment period on or about before August 5, 1988, when approval for release of the reception system was given.

## DISCUSSION

Section 102 of title 35 of the United States Code provides in pertinent part:

A person shall be entitled to a patent unless -

. . .

(b) the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States;

35 U.S.C. 102 (1988).

While the diversity of opinion expressed by the regional federal circuit courts in the past had given rise to questions concerning what activity is permitted and what activity is not permitted under the "public use" and "on sale" provision of 35 U.S.C. 102(b), the Court of Appeals for the Federal Circuit has now resolved those questions.

Since its inception in 1982, the Federal Circuit has sought to clarify this area of the law by reference to and reliance on

15

the policies underlying the statue.   In its decisions, the Federal Circuit has developed a procedure and guidelines that call for application of the statutory objectives of section 102(b) to the totality of circumstances that make up the case under review.  As pointed out by the Federal Circuit on numerous occasions, the seeming infinite variety of factual situations presented by section-102(b) cases make it impossible to attempt to resolve the issues presented based on application of rigid, per se rules that emphasis one or another factor.

Most recently the Federal Circuit articulated these principles in its holding in *Manville Sales Corp. v. Paramount Systems, Inc.*, 16 USPQ2d 587 (Fed. Cir. 1990), where it noted:

> In order to determine whether an invention was on sale or in public use, we must consider how the totality of the circumstances compare with the policies underlying the on sale and public use bars. This is necessary because "the policies or purposes underlying the on sale bar, in effect, define it ." *Envirotech [Corp. v. Westech Engineering, Inc.]*, ... 15 USPQ2d at 1232 (quoting from *RCA Corp. v. Data General Corp.* ... 12 USPQ2d 1449, 1454 (Fed. Cir. 1989)).

*Id.*, at 1591.   See also *TP Laboratories v. Professional Positioners, Inc.*, 220 USPQ 577, 582 (Fed. Cir. 1984); *Baker Oil Tools, Inc. Geo Vann, Inc.*, 4 USPQ2d 1210, 1213 (Fed. Cir. 1987); and *A.B. Chance Co. v. RTE Corp.*, 7 USPQ2d 1881, 1884 (Fed. Cir. 1988).

The court went on to note that it had enumerated the policies underlying 35 U.S.C. 102(b) in its holding in *King Instruments Corp. v. Otari Corp.*, 226 USPQ 402 (Fed. Cir. 1985) *cert. denied* 475 U.S. 1016 (1966), where it explained those policies as including:

16

(1) discouraging removal of inventions from the public domain which the public justifiably comes to believe are freely available;

(2) favoring prompt and widespread disclosure of inventions;

(3) giving the inventor a reasonable amount of time following the sales activity to determine the value of a patent; ... and

(4) prohibiting an extension of the period for exploiting the invention.

*Id.*, at 406.   See also *Manville Sales Corp. v. Paramount Systems, Inc.*, 16 USPQ2d 1587, 1591 (Fed. Cir. 1990); *Envirotech Corp. v. Westech Engineering, Inc.*, 15 USPQ2d 1230, 1232 (Fed. Cir. 1990); and *TP Laboratories v. Professional Positioners, Inc.*, 220 USPQ 577, 580 (Fed. Cir. 1984).

Applicants respectfully submit that comparison of the statutory policies articulated by the Federal Circuit with the totality of circumstances surrounding the test and development of Applicants' invention shows that Applicants' activities were consistent with those policies and well within the bounds of permissible conduct.

As the Federal Circuit described in the *Manville, Envirotech* and *King Instrument* cases *supra,* a first concern of the statute is to discourage removal of inventions from the public domain that the public justifiably believes are freely available.

At no time in the course of Prodigy's test and development period could the public have considered the Applicants' reception system to be in the public domain.  In the first phase of test and development that extending from January 1987 to the end of September 1987, all activities concerning the reception

17

system were confidential and handled exclusively by either Prodigy employees or outside consultants bound by express terms of confidentiality.    Further,  all  documents  and  materials relating to the reception system were marked confidential and treated accordingly.  As a result, the public had no access to or knowledge of the reception system during this phase of testing, and thus could, not have come to believe the reception system was in the public domain.

During the second phase of test and development; i.e., from the beginning of October 1987 to the end of March 1988, Prodigy continued to mark and maintain all documents and materials relating to the reception system as confidential. Further, while the non-employee testers who participated in testing the reception system and Service during this phase, as described above, did receive prototype versions of the reception system software, no disclosure of the source code, or the structure or internal operation of the reception system was made to them.   Rather, Prodigy merely licensed the software to the non-employee test users on terms that required them not to attempt to reverse compile or otherwise reverse engineer the source code.   Still further the users were required to handle the reception system software and Service on a confidential basis.   Accordingly, there was no conduct by Prodigy in the second phase of the test and development period that could lead the public to believe the reception was in the public domain.

Finally, in the third phase of the test and development that extended from beginning in of April 1988, to the beginning of August 1988, Prodigy, again, continued to mark and maintain confidential all documents and materials that disclosed the source code, and the structure and internal operation of the

18

reception system. While as described, copies of the reception system software were distributed to the select groups of users secured in the third phase of testing, again, no disclosure of the reception system source code, its structure or internal operation was made. Rather, as in the second phase of test, the distribution of the reception system consisted of the distribution of diskettes on which the reception software was provided in object code only, a form substantially unintelligible to the user. Also, Prodigy retained ownership of the reception system software and merely licensed its use to these individuals. And, in accordance with the terms of the license, the recipients were obligated not to reverse compile or otherwise reverse engineer the reception system source code. Thus, Prodigy again took all reasonable and usual steps under the circumstance to keep the structure and operation of the reception system secret, and put the public on notice that Prodigy had reserved its right in the reception system. Accordingly, Prodigy engaged in no conduct in the third phase of the test and development period that would permit anyone to believe the reception system had been put in the public domain.

The second concern underlying 35 U.S.C. 102(b) as articulated by the Federal Circuit in *King Instrument, supra,* is the "prompt and widespread disclosure of the invention." As pointed out by the Federal Circuit in *Manville, supra,* at 1592, prompt and widespread disclosure permits an inventor to undertake any testing necessary to enable the inventor to conclude whether or not the invention will perform as intended.

In accordance with this aspect of the statue, it has been recognized for over a hundred years that an inventor is free to test his invention to a point where he is persuaded it will work

19

as intended.  As explained in the Supreme Court in the landmark case of *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126 (1877) where the Court discussed the inventor's experimental installation of the pavement block he had invented:

> That the use of the pavement in question was public in one sense cannot be disputed. But, can it said that the invention was in public use? The use of an invention by the inventor himself or any other person under his direction by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a use. [citation omitted]
>
> Now, the nature of a street pavement is such that it cannot be experimented upon satisfactorily except on a highway, which is always public.
>
> When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors.  In either case, such use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not.  His experiments will reveal the fact whether any and what alterations may be necessary.  If durability is one of the qualities to be attained, a long period, perhaps years, may be necessary to enable the inventor to discover whether his purpose is accomplished. And though, during all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experiment; and no one would say that such a use pursued with a bona fide intent of testing the qualities of the machine, would be a public use, within the meaning of the statute. So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control and does not lose his title to a patent.
>
> It would not be necessary, in such case, that the machine should be put up and

20

> used only in the inventor's own shop or premises. He may have it put up and used in the premise of another, and the use may inure to the benefit of the owner of the establishment.  Still, if used under the surveillance of the inventor, and for the purpose of enabling him to test the machine and ascertain whether it will answer the purpose intended and make such alterations and improvements as experience demonstrates to be necessary, it will still be mere experimental use, and not a public use, within the meaning of the statute.
>
> Whilst the supposed machine is in such experimental use, the public may be incidentally deriving a benefit from it.  If it be a grist mill, or carding-machine, customers from the surrounding country may enjoy the use of it by having their grain made into flour, or their wool into rolls, and still it will not be in public use, within the meaning of the law.

*Id.*, at 134-35.   See also *TP Laboratories v. Professional Positioners, Inc.*, 220 USPQ 577, 581-2 (Fed. Cir. 1984).   *Grain Processing v. American Maize*, 5 USPQ2d 1788, 1792 (Fed. Cir. 1988); and *Manville Sales Corp. v. Paramount Systems, Inc.*, 16 USPQ2d 1587, 1592 (Fed. Cir. 1990).

Throughout the three phases of the test and development period, in accordance with the principles laid down in *City of Elizabeth, TP Laboratories,* and *Manville,* cases *supra,* Prodigy sought to ascertain whether the reception system was suitable for its intended purpose.  Since the primary requirement for the reception system was to enable very large user populations to manipulate the partitioned applications available on the Service,  Prodigy sought from the first to the third phase of testing to determine, first, whether the reception would be capable of automatically staging and processing partitioned applications at all, and, second, whether that capability would

21

be sustained as user levels were progressively increased toward the levels anticipated for the intended environment.

Further, once it was recognized as essential to expand user population in order to asses whether the reception system would perform in its intended environment, Prodigy further recognized that in view of the particular nature of the invention, and in accord with the observations expressly noted in *City of Elizabeth, supra,* regarding special need of certain inventions, that at least a portion of the experimental testing would have to be public.   As pointed out earlier, the design of the reception system and other elements of the Service network required development of substantial amounts of new and original software.   Moreover, not only were the individual elements of the network software new, but also, the Service called for the multiple software elements to be coordinated and harmonized for cooperative operation within the Service network.   Further, by their nature, software and software combinations, at least while in their initial stages of development, are inherently unpredictable, it being difficult, if not impossible to foretell how such combination will operate and interact.  Accordingly, it was deemed essential that some testing be undertaken in an environment approximating the environment the reception system was intended to operate in.

However, a meaningful approximation of the intended use environment for the reception system and Service was not readily attainable in a conventional laboratory or test facility.   As noted, user populations in the millions were anticipated as necessary for the Service.   Accordingly, laboratory testing of even a fraction of such numbers, if realizable at all, would have been physically and economically impossible to achieve at

22

the Prodigy facilities.   As a result, the nature of the reception system and Service dictated that some testing be public. Accordingly, public testing of the reception system was undertaken in the third phase of the test and development period.

Further, in order to minimize the amount and duration of public testing, Prodigy sought to advance basic viability study of the reception system as far as possible in the first and second phase of test, and leave expanded population; i.e., stress, testing to the end. As noted above, the duration of the third phase of testing was the shortest of the test and development period, lasting only approximately 4 months.

Continuing, also in accord with the *City of Elizabeth, TP Laboratories,* and *Manville,* cases *supra,* Prodigy maintained control of the testing and created substantial records of the experience during the period.   As pointed out above, Prodigy controlled testing with the identification numbers that were given to the users and required to be presented at log on in order to access the Service.   As also previously noted, the reception system had no other significant use than to access the Service, no other partitioned application videotex service to Applicants' knowledge being available at the time in the Country.   In addition, for all the users who were active, during the test period, Prodigy maintained records of the frequency and duration of use as well as the applications accessed.   Still further, Prodigy kept careful record of any and all problems that were experienced, and revised the reception system software during the several phases of the test and development period accordingly.

23

Therefore, since Applicants' most recent filing has a date of less that a year from the end of the test and development period, Applicants would respectfully submitted that the filing is consistent with the policy of prompt and wide spread disclosure of the invention underlying the 35 U.S.C. 102(b).

The third and fourth policy articulated in *King Instrument*, *supra*, as underlying Section 102(b) concern commercial exploitation of the invention, and can be considered together. Specifically, the third and fourth articulated policies, respectively, require the inventor be given a reasonable time to determine the value of a patent, but that the inventor not extend the period for exploiting the invention. As construed by the Federal Circuit in *Manville*, *supra* at 1591-92, and other cases, these sections have the effect of prohibiting commercial exploitation of the invention more than a year before the filing date of a patent application, the year period representing the articulated "reasonable time" beyond which exploitation of the invention would be considered impermissible extension.   Or stated otherwise, where an experimental period extends for more than a year before an application filing date, there must be no impermissible commercialization of the invention during that portion of the experimental period that extends beyond the one year limit.

Applicants would respectfully submit that their invention was not commercially exploited until after the close of the test and development period; i.e., after August 5, 1988.  As noted above in connection with the description of the test period, at no time did Prodigy charge for the copies of the reception system software that were distributed or for access to and use of the Service.

24

While as noted above, users, during the second and third phase of the test period, did pay for goods or services they purchased in the course of accessing certain of the transactional applications, the purchase prices for those items were paid to the sponsors of the applications that offered them. Accordingly, the payments were merely incidental to the testing of the reception system. As also noted above, during the test period, Prodigy received fees from sponsors of applications that were running on, or in the process of being created to run on the Service. However, again as noted above, those amounts were paid for producing the applications and for maintaining them on the Service. Accordingly, the fees received for creating and maintaining the applications on the Service were wholly incidental to the required testing of the reception system.

The Federal Circuit has established that presence of payment in connection with experimental testing does not, of itself establish a section 102(b) bar, but rather, is merely a factor to be considered. For example, in *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 4 USPQ2d 1210 (Fed. Cir. 1987), the Federal Circuit held that payments for oil well packing installed in the course of testing an inventive packing device did not, of itself, destroy the experimental nature of the device testing or establish a section 102(b) bar. In noting that payment in the course of testing is not determinative of a statutory bar, the court said:

> .The circumstances of payment, it is well established, are factors to be weighed, but payment does not *per se* make a section 102(b) bar.[citing *TP Laboratories, supra*]

*Id.*, at 1214. See also *Ushakoff v. United States*, 140 USPQ 341, 343-44 (C.C.P.A. 1964); *A.B. Chance Co. v. RTE Corp.*, 7 USPQ2d

25

1881, 1884 (Fed. Cir. 1988); *Manville Sales Corp. v. Paramount Systems, Inc.*, 16 USPQ2d 1587, 1592 (Fed. Cir. 1990).

Moreover, the Federal Circuit has established that where the payment is merely incidental to the experimental testing, no bar will be found. For example, the Federal Circuit in the *TP Laboratories* case *supra*, held payment by dental patients for services rendered in fitting them with free, experimental tooth positioning appliance that were the subject of the invention, were incidental to the testing of the appliances, and neither destroyed the experimental nature of the test, nor establish a bar under 102(b).

The incidental nature of the payments in Applicants' case is apparent on review of the circumstances surrounding them. With respect to the payments by the users for items purchased, as noted these amounts were paid by the users to sponsors for sales that were facilitated by employing the reception system. As such the sales and resulting payments are not compensation to Prodigy for use of Applicants' invention. Rather, they represent benefit to the sponsor that arose from experimentation. And, this is expressly the incidental benefit the Supreme Court approved in *City of Elizabeth, supra*, when it noted an invention could be experimentally "used on the premises of another and the use inure to the benefit of the owner" of the premises (*infra* at p 33, last paragraph). Accordingly, payments by the reception system users to application sponsors were only incidental to the testing and could not change the experimental nature of Applicants' testing, or create a section 102(b) bar.

Further, with respect to the fees paid to Prodigy for creation of applications and their maintenance on the Service, here also the payments are inadequate to change the character of

the reception system testing. First, it is to be noted that the reception plays no part in either the creation of applications or their maintenance on the Service. Rather, the role of the reception system is to facilitate access by users to applications that already have been produced and which are already being maintained on the Service. Accordingly, there is no direct relation between use of the reception system and the purpose for which the sponsors made their payments; i.e., creation and maintenance of applications.

Moreover, even if some relation between the use of the reception system and creation and maintenance of application were to be contended, under the principles articulated by the Supreme Court in *Smith & Griggs Manufacturing Co. v. Sprague*, 123 U.S. 249 (1887), such payment would be considered incidental and unable to establishing a bar. In the *Smith and Griggs* case, the Supreme Court expressly acknowledged that payment received from use of an experimental invention in the course of business will not change the experimental use to commercial use unless the business is established and successful and use extends over a prolonged period time.

More specifically, in the *Smith and Griggs* case, after having acknowledged that if a product is produced or disposed of as an incident to the testing, the profit derived would not change the character of use from experimental to commercial, the Supreme Court held that because the inventive buck lever making machine in the case at bar had been used for over a two years, to make some 50,000 gross of buckle levers, all of which levers were sold by the invention owner, the invention had been used in an established and successful business for an extended period,

27

during which the experimental use had been transformed to a commercial use, and a bar created.

By contrast, however, the Service at the time of the reception system testing and development could not have been considered an established and successful business. Rather, it was a fledgling and pioneer enterprise with an uncertain future that had yet to offer its Service to the general public. Accordingly, any payments made to it for work unrelated to reception testing could not be considered to establish a section 102(b) bar.

As also noted, in accordance with the custom in the software industry, during the test and development period, Prodigy had discussions with a number of retail chain stores regarding future distribution of the reception system software. More specifically, by the beginning of February 1988, Prodigy reached understandings, some oral and some in writing, with a total of approximately 6 such chain retailers, Further, by the end of April 1988, that number had grown to 8. In accordance with he understandings, Prodigy proposed to supply start-up kits for the Service that would include reception system software in approximately the early fall when the reception system and Service was expected to be available for public distribution. However, since the reception system and Service were still in test and development stage, during the time of those discussions, Prodigy expressly reserved the right to withhold the kits and reception system software until it felt they were suitable for their intended purposes; i.e., at least until completion of the test and development period.

As pointed out by the Federal Circuit, sales related arrangements in and of themselves do not establish a 102(b) bar

28

especially where it has not yet been determined if the invention will operate acceptably in its intended environment. Specifically, in *Shatterproof Glass Corp. v. Libby-Owens Ford Co.*, 225 USPQ 634, 640 (Fed. Cir. 1985) the court found that where the patent owner had solicited orders for specially coated glass while the development and design work for the inventive coating equipment and method were still in progress, a bar under section 102(b) would not arise. The court said:

> The clear weight of authority is that a bare offer to sell does not ipso facto satisfy the "on sale" bar and the surrounding circumstances must be considered. ... In *In re Dybel*, ... 187 USPQ 593, 598 (C.C.P.A. 1975) where as here a sales contract had been entered into before the critical date, the court held that "for an invention of the type involved here to be 'on sole', it must be complete at least to such an extent that the purchaser knows how it will perform." As stated in *General Electric Co., v. United States*, ... 211 USPQ 867, 872, n.8 (Ct. Cl. 1981), the invention must have been "sufficiently tested to demonstrate that it will work for its intended purpose."

*Id.*, at 639-40. See also, *A.B. Chance Co. v. RTE Corp.*, 7 USPQ2d 1881, 1884 (Fed. Cir. 1988); *Manville Sales Corp. v. Paramount Systems, Inc.*, 16 USPQ2d 1587, 1592 (Fed. Cir. 1990).

Accordingly, since at the time of discussion with the chain store retailers testing was still in progress to ascertain whether the reception system would perform as intended; i.e., perform all of the functions of the reception system and continue to operate satisfactorily as the user population, application inventory and PC/operating system combinations were expanded, such discussions could not have changed the

29

experimental character of the test and development period or established a bar under section 102(b).

Finally, as also noted, in the early part of April 1988, Prodigy demonstrated the Service with the use of the a prototype version of the reception system a computer faire in San Francisco, California.  Those who witnessed the demonstration were told that the service was not yet publicly available, but was expected to be offered in the San Francisco area in the fall.  Additionally, materials were distributed that described the type of applications that could be expected to be accessible on the Service when the Service did become publicly available.  Also, stand-alone diskettes compatible with certain PC machines and operating systems were handed out that previewed portions of the Service without support of a host or the network.

However, Prodigy did not attempt to sell the service or the reception system software to any of the faire attendees. Rather, the attendees who witnessed the demonstration were advised to fill out a follow-up card if they were interested in being contacted when the Service became available in the fall. Prodigy's purpose at the faire was to assess the public reaction to the Service as it then existed and the plans for its future development.  As noted, Prodigy originally believed that to be successful, the Service would have to include transactional applications such as at home banking, stock brokerage, travel reservations and grocery shopping.  However, those applications were as yet not available on the Service due to production complexity and associated difficulties.  Accordingly, Prodigy wanted to assess what the public reaction to the Service would be with such applications missing, and whether Prodigy's plan to provide such applications when the service was released would

30

meet with public approval.   In effect, Prodigy sought a mid-course check of its plans for service development. Additionally, Prodigy was interested in obtaining the reaction of a broad cross section of potential future users to the aesthetic aspects of the service; e.g., screen design, screen sequencing, category arrangement, etc.

Accordingly, the demonstration was not an attempt to exploit the reception system.   Since the demonstration was focused on showing the content of the Service and plans for its future development, only several terminals were used for the demonstration, each requiring only a prototype form of the reception system software.  Because the demonstration would only entail use of several terminals and a limited range of applications, the major transactional application, as noted, not yet being available, the reception was not called upon to exhibit certain features that were fundamental to its intended commercial form.  Specifically, the reception was not to be used to demonstrate its ability to operate with large user populations, or to full range of applications intended for the commercial form of the Service, or the range of PC hardware and operating system combination it would be required to support when released. As noted these were the features the reception system was still being tested for compliance with and for which the reception system would be revised for at least twice more before its release to support a general offering of the Service. As a result, the computer faire demonstration could not de considered an attempt to exploit the reception system, since the reception system was not yet in a commercially acceptable form suitable for sale.

Still further, at the time of the demonstration, the Service as noted above, was still at best a fledgling enterprise with an uncertain future.  Accordingly, even if use of the reception system to support the demonstration of the service could be considered to have some commercial aspect, the Supreme Court's holding in *Smith & Griggs, supra,* approving incidental commercial consequence of experimental activity except were the activity was in connection with an established and successful business for a prolonged period, would foreclose the arising of a section 102(b) bar in this case.

In summary, Applicants' would respectfully submit that use of the reception system during the test period was wholly experimental.  Further, the wholly experimental nature of that use is evidenced by the fact that:

> - Public testing of the reception system was made necessary by virtue of the software related nature of the invention, its pioneer character and the inability to reasonably ascertain whether the reception system would operate as intended without public testing;

> - Throughout the test period, the Prodigy retained title to the reception system, the users receiving only a license to use the reception system;

> - Throughout the test period, Prodigy maintained control of the testing by issuing identification numbers to the users that had to be supplied each time the reception system was used;

- Throughout the test period, Prodigy maintained extensive and detailed records of all reception system use;

- Throughout the test period Prodigy continued to modify the reception system to render it capable of performing as intended;

- Throughout the test period, the reception system source code, structure and internal operation remained confidential;

- Prodigy reserved the public portion of the reception system testing to the last portion of the test to restrict public testing to approximately 4 months;

- Throughout the test period, no charges were imposed for the receipt of the reception system software or for use of the Service; and

- Throughout the test period all commercial activity was minimal and wholly incidental the experimental nature of the testing.

In view of the above, Applicants' would respectfully submit that all activities relating to their invention were consistent with the policies underlying 35 U.S.C. 102(b), and when viewed as a whole, those activities do not constitute a bar to the grant of a patent for their invention.

In submitting this report, Applicants, consistent with their duty under 37 C.F.R. 1.56 have disclosed to the Patent and Trademark Office information that they are aware of which may be relevant to the evaluation of their application. Applicants, however, make no representation that an independent search of the art would not produce more relevant information, or that

33

others reviewing the disclosure information might not have a different opinion as to its significance.

In view of cited patents, technical matter and use information and associated discussion, Applicants would respectfully submit that their invention as described and claimed is distinct and entitled to be patented. Accordingly, Applicants request favorable treatment of their application and allowance of their invention as claimed.

Respectfully submitted
Robert Filepp et al.

Date: October 21, 1994,        By: _____

Paul C. Scifo
Reg. No.: 27,089
Attorney for the Applicants
233 Broadway, Suite 4703
New York, New York 10279
1-212-513-1122

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope having the required postage and addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231, on October 21, 1994.

Name of Registered Representative:  Paul C. Scifo, Esq.

Signature:

Date: October 21, 1994

# EXHIBIT E

Trials@uspto.gov                                        Paper 15
Tel: 571-272-7822                         Entered: December 15, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

KAYAK SOFTWARE CORP., OPENTABLE, INC.,
PRICELINE.COM LLC, and THE PRICELINE GROUP INC.,
Petitioner,

v.

INTERNATIONAL BUSINESS MACHINES CORP.,
Patent Owner.

———————————————

Case CBM2016-00077
Patent 5,796,967

———————————————

Before MICHAEL W. KIM, CHRISTOPHER M. KAISER,
and KEVIN W. CHERRY, *Administrative Patent Judges.*

Opinion for the Board filed by *Administrative Patent Judge* KAISER.

Concurring Opinion filed by *Administrative Patent Judge* KIM.

DECISION
Denying Institution of Covered Business Method Patent Review
*37 C.F.R. § 42.208*

CBM2016-00077
Patent 5,796,967

## INTRODUCTION

### A. Background

This is a preliminary proceeding to decide whether, under section 18 of the Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284, 331 (2011) ("AIA"), a covered business method patent review of U.S. Patent No. 5,796,967 (Ex. 1001, "the '967 patent") should be instituted under 35 U.S.C. § 324(a).[1]  KAYAK Software Corp., OpenTable, Inc., Priceline.com LLC, and The Priceline Group Inc. ("Petitioner") filed a Corrected Petition (Paper 11, "Pet.") requesting a covered business method patent review of claims 1–9 and 12–17 of the '967 patent.  International Business Machines Corp. ("Patent Owner") filed a Preliminary Response.  Paper 12 ("Prelim. Resp.").  A covered business method patent review may not be instituted "unless . . . the information presented in the petition . . . , if such information is not rebutted, would demonstrate that it is more likely than not that at least 1 of the claims challenged in the petition is unpatentable."  35 U.S.C. § 324(a); *see* 37 C.F.R. § 42.208.

For reasons that follow, we determine that Petitioner has not established that the challenged patent qualifies as a covered business method patent.  Accordingly, we do not institute a covered business method patent review of any of the challenged claims.

---

[1] *GTNX, Inc. v. INTTRA, Inc.*, 789 F.3d 1309, 1310 (Fed. Cir. 2015) (describing transitional program for review of covered business method patents under 35 U.S.C. §§ 321–329, pursuant to the AIA, as subject to "the standards and procedures of[] a post-grant review under . . .  35 U.S.C. §§ 321–329," absent exceptions not applicable here).

CBM2016-00077
Patent 5,796,967

*B. Related Matters*

The parties identify two related pieces of litigation: *International Business Machines Corp. v. The Priceline Group Inc.*, C.A. No. 1:15-cv-00137 (D. Del.), and *International Business Machines Corp. v. Groupon, Inc.*, C.A. No. 1:16-cv-00122 (D. Del.). Pet. 4–5; Paper 9, 1. Petitioner also challenges the claims of the '967 patent in CBM2016-00078, and the parties identify several other pending matters that may be affected by the result here, including CBM2016-00075 and CBM2016-00076 (both challenging related U.S. Patent No. 7,072,849), as well as IPR2016-00604, IPR2016-00605, IPR2016-00608, and IPR2016-00609, which challenge other related patents. Pet. 4–5; Paper 9, 1–2.

*C. The Asserted Grounds of Unpatentability*

Petitioner contends that claims 1–9 and 12–17 of the '967 patent are unpatentable for lack of patent-eligible subject matter under 35 U.S.C. § 101. Pet. 26–44. Petitioner's arguments rely on a Declaration from David Eastburn. Ex. 1002 ("the Eastburn Declaration" or "Eastburn Decl.").

In addition, Petitioner argues that claims 1–9, 12, 14, 15, and 17 are unpatentable under 35 U.S.C. § 103 as obvious over the combination of Morris[2] and Smith.[3] Pet. 59–89. Petitioner also argues that claim 13 is

---

[2] James H. Morris, et al., *Andrew: A Distributed Personal Computing Environment*, 29 COMMUNICATIONS OF THE ACM 184, 184–201 (March 1986) (Ex. 1004, "Morris").

[3] David Canfield Smith, et al., *The Star User Interface: An Overview*, in NATIONAL COMPUTER CONFERENCE, 1982, 515, 515–28 (1982) (Ex. 1005, "Smith").

CBM2016-00077
Patent 5,796,967

obvious over the combination of Morris, Smith, and Salomon,[4] and that claim 16 is obvious over the combination of Morris, Smith, and admitted prior art.  *Id.* at 89–92.

### D.  The '967 Patent

The '967 patent relates to "[a] method for presenting applications in an interactive service featuring steps for generating screen displays of the service applications at the reception systems of the respective users." Ex. 1001, at [57].  This method of presentation involves storing and processing applications or parts of applications at a user's local personal computer rather than at a remote server.  *Id.* at 6:16–22, 6:33–34, 8:48–53. This helps avoid possible server bandwidth issues that can be caused by the server being required to serve too much data to multiple users simultaneously.  *Id.* at 10:38–49, 10:54–57.  The '967 patent lists many applications that can take advantage of this method of presentation, including games, news, weather, movie reviews, banking, investments, home shopping, messaging, and advertising.  *Id.* at 1:16–34, 1:58–59, 4:57–61, 7:13–15, 7:19–40, 20:61–63, 22:16–17.

### E.  Illustrative Claims

Of the challenged claims in the '967 patent, claim 1 is independent and illustrative.  It recites:

> 1. A method for presenting interactive applications on a computer network, the network including a multiplicity of user reception systems at which respective users may request a multiplicity of available applications, the respective reception systems

---

[4] Gitta B. Salomon, *Design and Implementation of an Electronic Special Interest Magazine* (Aug. 29, 1986) (M.S. thesis, Massachusetts Institute of Technology) (Ex. 1007, "Salomon").

CBM2016-00077
Patent 5,796,967

including a monitor at which the applications requested can be presented as one or more screens of display, the method comprising the steps of:

a. generating a screen display at a respective reception system for a requested application, the screen display being generated by the respective reception system from data objects having a prescribed data structure, at least some of which objects may be stored at the respective reception system, the screen display including a plurality of partitions, the partitions being constructed from objects, the objects being retrieved from the objects stored at the respective reception system, or if unavailable from the objects stored at the respective reception system, then from the network, such that at least some of the objects may be used in more than one application;

b. generating at least a first partition for presenting applications; and

c. generating concurrently with the first partition at least a second partition for presenting a plurality of command functions, the command functions including at least a first group which are selectable to permit movement between applications.

Ex. 1001, 39:35–61.

## ANALYSIS

### A. Claim Construction

In a covered business method patent review, we construe claim terms in an unexpired patent according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.200(b); *see Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard). Claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the

context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). An inventor, however, may define specific terms used to describe an invention, but must do so "with reasonable clarity, deliberateness, and precision" and must "'set out his uncommon definition in some manner within the patent disclosure' so as to give one of ordinary skill in the art notice of the change" in meaning. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (quoting *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387–88 (Fed. Cir. 1992)).

The parties disagree about the proper construction of "applications." Petitioner proposes that we construe this term as "information events composed of a sequence of one or more pages opened at a screen to provide requested information and/or transaction operations." Pet. 21. Patent Owner proposes that "applications" be construed as "information events composed of a sequence of one or more pages opened at a screen." Prelim. Resp. 18. As discussed more completely below, under either of these constructions, Petitioner has not shown that any claim of the '967 patent "claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service." AIA § 18(d)(1). Accordingly, we conclude that no term needs to be construed expressly in order for us to decide whether to institute trial. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (only terms in controversy need to be construed, and only to the extent necessary to resolve the controversy).

### B. Covered Business Method Patent

Section 18 of the AIA provides for the creation of a transitional program for reviewing covered business method patents. A "[c]overed

CBM2016-00077
Patent 5,796,967

business method patent" is a patent that "claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions." AIA § 18(d)(1); *see* 37 C.F.R. § 42.301(a).  For purposes of determining whether a patent is eligible for a covered business method patent review, the focus is on the claims.  *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1340 (Fed. Cir. 2016) (stating that "§ 18(d)(1) directs us to examine *the claims* when deciding whether a patent is a [covered business method] patent").

### 1. *Effect of Statutory Disclaimer*

Petitioner identifies three claims that it contends satisfy the financial-product-or-service requirement on the basis of their claim language.  Pet. 6.  Specifically, Petitioner identifies claims 1, 13, and 16.  *Id.*  Patent Owner argues, however, that neither claim 13 nor claim 16 may provide the basis for eligibility for covered business method patent review ("CBM eligibility"), because each of these claims has been disclaimed pursuant to 35 U.S.C. § 253(a) and 37 C.F.R. § 1.321(a).  Prelim. Resp. 9–10; Ex. 2001, 10.

The disclaimer of a claim "shall . . . be considered as part of the original patent."  35 U.S.C. § 253(a).  The language "considered as part of the original patent" means that a patent subject to a disclaimer under § 253(a) "is treated as though the disclaimed claims never existed."  *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1383 (Fed. Cir. 1998) (citing *Altoona Publix Theatres v. American Tri-Ergon Corp.*, 294 U.S. 477, 492 (1935); *Guinn v. Kopf*, 96 F.3d 1419, 1422 (Fed. Cir. 1996)).  Accordingly,

CBM2016-00077
Patent 5,796,967

even though claims 13 and 16 of the '967 patent existed at the time the Petition here was filed, we must now treat the '967 patent as if it had never included those claims.  Under this legal rubric, claims 13 and 16 cannot provide the basis for the '967 patent's CBM eligibility.  Although previous non-precedential decisions of the Board are not binding on us, we note that this result has been reached by several other panels confronted with the issue of CBM eligibility on the basis of disclaimed claims.  *See, e.g.*, *CoreLogic, Inc. v. Boundary Solutions, Inc.*, Case CBM2016-00016, slip op. at 6–7 (Paper 9) ("[T]he disclaimed claims should not be consulted when determining whether the patent is a covered business method patent."); *AT&T Mobility LLC v. Intellectual Ventures II LLC*, Case CBM2015-00185, slip op. at 10 (PTAB May 4, 2016) (Paper 10) ("[W]e will not consider the now-statutorily disclaimed claims in our determination."); *Great West Casualty Co. v. Intellectual Ventures II LLC*, Case CBM2015-00171, slip op. at 7 (PTAB Feb. 9, 2016) (Paper 10) ("[F]or the purposes of whether or not to institute a covered business method patent review, we treat [the disclaimed claims] as never having existed."); *Google Inc. v. SimpleAir, Inc.*, Case CBM2015-00019, slip op. at 14–15 (PTAB May 19, 2015) (Paper 11) ("[W]e treat the [challenged] patent as though [the disclaimed claim] never existed.").

Some panels of the Board have held that a disclaimed dependent claim that includes finance-related subject matter may be considered for purposes of CBM eligibility to the extent that a remaining claim from which the disclaimed claim depends must include limitations that encompass the finance-related subject matter of the disclaimed claim.  *See, e.g.*, *American Express Co. v. Maxim Integrated Prods., Inc.*, Case CBM2015-00098, slip

CBM2016-00077
Patent 5,796,967

op. at 8–13 (PTAB Sept. 22, 2015) (Paper 17) (finding CBM eligibility
where Petition used subsequently disclaimed claim as an example of
financial uses of invention recited in remaining claims); *J.P. Morgan Chase
& Co. v. Intellectual Ventures II LLC*, Case CBM2014-00157, slip op. at 2–
3 (PTAB Feb. 18, 2015) (Paper 11) ("[S]tanding for covered business
method patent review remains at least because disclaimer of claim 12 does
not change the scope of independent claim 1, from which it depends.").
Under this theory, although claims 13 and 16 have been disclaimed, the
broader claims from which they depend, claims 1, 12, 14, and 15, must be
broad enough in scope to encompass their subject matter. Thus, because
claims 13 and 16 included finance-related subject matter, claims 1, 12, 14, or
15 must also encompass finance-related subject matter. We understand the
logic of this position, but we do not agree that it means that claims 1, 12, 14,
or 15 can provide CBM eligibility.

It is not enough that a claim of general applicability, such as claims 1,
12, 14, and 15, has some scope that may be described as finance-related.
Rather, to find CBM eligibility, we should "focus[] on the claim language at
issue" and determine whether there is anything "explicitly or inherently
financial in the construed claim language." *Blue Calypso*, 815 F.3d at 1340.
"It is not enough that a sale . . . may occur, or even that the specification
speculates such a potential sale might occur." *Unwired Planet, LLC v.
Google Inc.*, No. 2015-1812, 2016 WL 6832978, at *5 (Fed. Cir. Nov. 21,
2016). Under *Unwired Planet* and *Blue Calypso*, to provide CBM
eligibility, a claim must be limited, explicitly or inherently, to "a method or
corresponding apparatus for performing data processing or other operations
used in the practice, administration, or management of a financial product or

service."  AIA § 18(d)(1).  The fact that a claim is broad enough to encompass a finance-related activity does not necessarily mean that the claim, as a whole, is limited to that finance-related activity.  Accordingly, we do not rely on claims 13 or 16, nor do we rely on the dependence of those claims from any remaining claims, in deciding whether or not to institute trial.

### 2.  *Claims Remaining After the Statutory Disclaimer*

"'[F]inancial product or service' should be interpreted broadly." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1323–26 (Fed. Cir. 2015).  "[B]roadly" in this context, however, does not mean without limits. As the Federal Circuit explained, "[t]he plain text of the statutory definition contained in § 18(d)(1)—'performing . . . operations used in the practice, administration, or management of a financial product or service'—on its face covers a wide range of *finance-related activities*."  *Id.* at 1325 (emphasis added).

With respect to the claims of the '967 patent left after Patent Owner's statutory disclaimer, Petitioner presents CBM eligibility arguments only as to claim 1.  Pet. 12–14.  Specifically, Petitioner argues that, because claim 1 recites a "method for presenting interactive applications" and "generating at least a first partition for presenting applications," and because those applications may be financial in nature, claim 1 is financial in nature.  *Id.* As an example, Petitioner points to one application described in the '967 patent, the purpose of which appears to be to permit a user to purchase apples.  *Id.* at 12–13.  This application is illustrated in Figure 3b of the '967 patent, reproduced below:

10

CBM2016-00077
Patent 5,796,967



FIG. 3b

Figure 3b of the '967 patent depicts a page displayed on a monitor screen. Ex. 1001, 9:35–37. Partitions 250, 260, 280, and 290 each are "made up of a page element which defines the content of the partition." *Id.* at 9:44–46. Partition 250 "typically conveys information on the page's topic or sponsor," and partition 260 "gives the informational and transactional content of the page." *Id.* at 9:47–53. In the example application depicted in Figure 3b, partition 260 presents the user with the question "How many apples do you wish to order?" *Id.* at Fig. 3b. In addition, partition 280 is described as containing advertising, which "may be included in any partition of a page." *Id.* at 9:63–66.

We agree with Petitioner that the application depicted in Figure 3b is financial in nature, given that it gives the user the option to purchase apples and that it is described as presenting advertising to the user. But the

CBM2016-00077
Patent 5,796,967

presence of a financial application in the specification of the '967 patent does not limit the claims of the '967 patent to financial applications.  As noted above, we must examine the language of the claims, not merely the specification, for any explicit or inherent limitation to finance-related activity.  *Unwired Planet*, 2016 WL 6832978, at \*5; *Blue Calypso*, 815 F.3d at 1340.  Claim 1 contains limitations that recite "[a] method for presenting interactive applications" and "generating at least a first partition for presenting applications."  Ex. 1001, 39:35–61.  Petitioner argues that this claim is limited to financial contexts because the recited "applications" can be financial in nature.  Pet. 12–14.  As demonstrated by the application depicted in Figure 3b of the '967 patent and discussed above, we agree with Petitioner that the "applications" in question may be financial.  But the question that *Blue Calypso* requires us to answer is not whether the applications may be financial, but rather whether they must be financial.  Petitioner does not even argue, much less prove, that they must be.

In fact, the record demonstrates that the "applications" recited in claim 1 may be non-financial.  First, the specification of the '967 patent describes several non-financial applications in addition to the financial application depicted in Figure 3b.  These other applications include the display of information such as "movie reviews" and "the latest news."  Ex. 1001, 7:29–31.  Other types of information that can be displayed by applications include "hobbies and cultural interests," *id.* at 7:13–15, as well as "weather," *id.* at 22:16–17.

Second, under either party's proposed construction of "applications," the applications that claim 1 recites displaying are not limited to those that have financial purposes or operate in a financial context.  As discussed

CBM2016-00077
Patent 5,796,967

above, Patent Owner proposes that "applications" be construed as "information events composed of a sequence of one or more pages opened at a screen." Prelim. Resp. 18. This construction places no limit on the purpose or content of the applications, so it provides no reason to conclude that "applications" are limited to financial contexts. Petitioner proposes a construction that does place some limits on the purpose or content of "applications": "information events composed of a sequence of one or more pages opened at a screen to provide requested information and/or transaction operations." Pet. 21. But, even if the phrase "transaction operations" in Petitioner's proposed construction is interpreted as limited to financial transactions, Petitioner's construction allows for applications that "provide requested information" and do not perform "transaction operations." *Id.* As we have noted, "provid[ing] requested information" can constitute providing information about news, weather, movie reviews, and hobbies and cultural interests, none of which has been shown by Petitioner to be either explicitly or inherently financial. Given the failure of Petitioner to establish that any claim of the '967 patent is explicitly or inherently limited to financial contexts, we conclude that the claims of the '967 patent are claims of general utility.

Several earlier non-binding Board decisions have determined that a patent is not CBM eligible when it has only claims of general utility with no explicit or inherent finance-related terminology or limitations. *See, e.g.*, *Qualtrics, LLC v. OpinionLab, Inc.*, Case CBM2015-00164, slip op. at 5–6 (PTAB Feb. 3, 2016) (Paper 8) ("*Qualtrics*") (determining that a claim that "solicit[s] feedback from website visitors across a variety of sectors" is of general utility and, therefore, is not directed to a covered business method

CBM2016-00077
Patent 5,796,967

patent eligible for review); *ServiceNow, Inc. v. Hewlett-Packard Co.*, Case CBM2015-00077, slip op. at 5–7 (PTAB Sept. 17, 2015) (Paper 12) (determining that a claim reciting "a system for managing a Web service" is of general utility and, therefore, is not directed to a covered business method patent eligible for review); *ServiceNow, Inc. v. BMC Software, Inc.*, Case CBM2015-00107, slip op. at 10–15 (PTAB Sept. 11, 2015) (Paper 12) (determining that a claim that performs "fault analysis" is of general utility and, therefore, is not directed to a covered business method patent eligible for review).  Thus, claims of general utility are not converted into finance-related claims merely because the Specification of the challenged patent suggests that the scope of the claims is broad enough to encompass some finance-related activities.  *See Qualtrics*, slip op. at 5–6.  Here, other than the disclaimed claims discussed above, Petitioner has not alleged that any claim of the '967 patent is anything other than a claim of general utility, so the mere fact that the Specification contains some discussion of financial activities is of little moment.

Of course, if the Specification were to make clear that the claims should be interpreted as limited to finance-related contexts, the presence of general-utility claim language would not preclude a finding of CBM eligibility, but, as discussed above, Petitioner has not established that such is the case here.  Accordingly, we are not persuaded that the language of the remaining claims of the '967 patent has any particular connection to finance-related activities, because these claims are of general utility with no explicit or inherent finance-related terminology or limitations.

CBM2016-00077
Patent 5,796,967

### 3. Conclusion

In view of the foregoing, we conclude that Petitioner has not established that the '967 patent is a covered business method patent under AIA § 18(d)(1).

## CONCLUSION

Upon consideration of the Petition, the Preliminary Response, and the evidence presently before us, we determine that Petitioner has not demonstrated that the '967 patent is eligible for review under the transitional covered business method patent review program.

## ORDER

It is hereby

ORDERED that the Petition is denied, and no covered business method patent review is instituted.

CBM2016-00077
Patent 5,796,967

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

KAYAK SOFTWARE CORP., OPENTABLE, INC.,
PRICELINE.COM LLC, and THE PRICELINE GROUP INC.,
Petitioner,

v.

INTERNATIONAL BUSINESS MACHINES CORP.,
Patent Owner.

———————————————

Case CBM2016-00077
Patent 5,796,967

———————————————

KIM, *Administrative Patent Judge*, CONCURRING

My esteemed colleagues have identified the appropriate facts and law
relevant to this issue, the general characterizations of which I concur.
Ultimately, my only disagreement is whether there is a bright line test that
the relevant claims must be explicitly or inherently limited to financial
contexts in order for them to considered "financial."  Generally, the Supreme
Court disfavors bright line tests in patent contexts.  *See In re Bilski*, 545 F.3d
943 (2008) (rejecting the "machine-or-transformation" test as the only test
for determining subject matter eligibility); *KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007) (rejecting the rigid application of the teaching-
suggestion-motivation test for obviousness).  Instead, I believe all
appropriate factors should be weighed in determining whether or not the
relevant claims are financial.  *Cf. eBay v. MercExchange, LLC*, 547 U.S. 338

CBM2016-00077
Patent 5,796,967

(2005) (traditional four factor test should be used to determine appropriateness of an injunction); *Graham v. John Deere Co.*, 383 U.S. 1 (1966) (listing factors to be weighed in determining obviousness).

To that end, here, certain factors, such as the informational nature of the disclaimed claims and certain embodiments in the '967 patent, weigh in favor of a determination that the relevant claims are financial.  Nevertheless, when all the factors set forth herein are considered in the aggregate, in particular that the specification discloses significantly more "non-financial" than "financial" examples related to the claim term "application," I concur that the Petitioner has not met its burden.

CBM2016-00077
Patent 5,796,967

PETITIONER:

Richard S. Zembek
Gilbert A. Greene
Daniel S. Leventhal
Daniel A. Prati
NORTON ROSE FULBRIGHT US LLP
richard.zembek@nortonrosefulbright.com
bert.greene@nortonrosefulbright.com
daniel.leventhal@nortonrosefulbright.com
dan.prati@nortonrosefulbright.com


PATENT OWNER:

Kevin K. McNish
Andrew G. Heinz
DESMARAIS LLP
kmcnish@desmaraisllp.com
aheinz@desmaraisllp.com

# EXHIBIT F

Trials@uspto.gov                                                    Paper 16
Tel: 571-272-7822                                    Entered: December 15, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

KAYAK SOFTWARE CORP., OPENTABLE, INC.,
PRICELINE.COM LLC, and THE PRICELINE GROUP INC.,
Petitioner,

v.

INTERNATIONAL BUSINESS MACHINES CORP.,
Patent Owner.
_____

Case CBM2016-00075
Patent 7,072,849

_____

Before MICHAEL W. KIM, CHRISTOPHER M. KAISER, and
KEVIN W. CHERRY, *Administrative Patent Judges*.

KIM, *Administrative Patent Judge*.

DECISION
Declining to Institute Covered Business Method Patent Review
*35 U.S.C. § 324(a) and 37 C.F.R. § 42.208*

CBM2016-00075
Patent 7,072,849

## I.     INTRODUCTION

### A.     Background

KAYAK Software Corp., OpenTable, Inc., Priceline.com LLC, and
The Priceline Group Inc. ("Petitioner") filed a Corrected Petition to institute
a covered business method patent review of claims 1–25 of U.S. Patent No.
7,072,849 (Ex. 1001, "the '849 patent").  Paper 12 ("Pet.").  International
Business Machines Corp. ("Patent Owner") filed a Preliminary Response.
Paper 14 ("Prelim. Resp.").

A covered business method patent review may not be instituted unless
Petitioner can "demonstrate that it is more likely than not that at least 1 of
the claims challenged in the petition is unpatentable."  35 U.S.C. § 324(a).
Institution of a covered business method patent review is discretionary.  *See*
35 U.S.C. § 324(a); 37 C.F.R. § 42.208(a).  Furthermore, the Office "may
take into account whether, and reject the petition or request because, the
same or substantially the same prior art or arguments previously were
presented to the Office."  *See* 35 U.S.C. § 325(d).  For the reasons set forth
below, we do not institute a covered business method patent review on any
of claims 1–25 of the '849 patent on any ground.

### B.     Related Proceedings

Petitioner and Patent Owner identify the following district court
proceeding concerning the '849 patent:  *IBM v. The Priceline Group Inc.*,
Civil Action No. 1:15-cv-137 (D. Del. Feb. 9, 2015) (the "Litigation")*; IBM
v. Groupon, Inc.*, Civil Action No. 1:16-cv-122 (D. Del. Mar. 2, 2016).
Pet. 4; *see also* Paper 10, 1.  Petitioner and Patent Owner also identify the
following related proceedings before the Patent Trial and Appeal Board

CBM2016-00075
Patent 7,072,849

("Board") involving the same parties:  (1) Case CBM2016-00076 (the '849 patent); and (2) Cases CBM2016-00077 and CBM2016-00078 (related U.S. Patent No. 5,796,967).  Furthermore, Petitioner and Patent Owner identify the following proceedings before the Board involving the same parties:  (1) Cases IPR2016-00604 and IPR2016-00605 (U.S. Patent No. 5,961,601); and (2) Cases IPR2016-00608 and IPR2016-00609 (U.S. Patent No. 7,631,346).

## C.   The '849 Patent

The '849 patent discloses that the claimed invention relates generally to a distributed processing, interactive computer network intended to serve very large numbers of simultaneous users.  Ex. 1001, 1:16–20.  In making the processing power of large computers available to many users, processing bottlenecks arise that cause network slowdowns and compel expansion of computing resources.  Ex. 1001, 1:43–49.

> Particularly, in an interactive service, if advertising were provided in a conventional manner; as for example, by providing the advertising as additional data to be supplied to and presented at the user sites, the effort would compete with the supplying and presentation of service application data, and have the undesirable effect of diminishing service response time.  More specifically, if advertising were supplied conventionally from a host to a user site, the application traffic, which constitutes the substance of the service, would have to compete with advertising for network communication resources.

Ex. 1001, 2:20–30.  To alleviate at least some of this, one possible form is to selectively distribute advertising and application objects in a service network in accordance with a predetermined plan based on a likelihood the applications and advertising will be called by the respective user reception systems.  Ex. 1001, 3:37–41.  According to the '849 patent, because

CBM2016-00075
Patent 7,072,849

selective storage of objects is local, response time is reduced for those applications that a user accesses most frequently.  Ex. 1001, 7:1–3.

### D.  *Illustrative Claim*

Petitioner challenges claims 1–25 of the '849 patent.  Claims 1, 8, 13, 14, and 21 are the only independent claims.  Independent claim 1 is illustrative of the challenged claims and is reproduced below:

1.   A method for presenting advertising obtained from a computer network, the network including a multiplicity of user reception systems at which respective users can request applications, from the network, that include interactive services, the respective reception systems including a monitor at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

a. structuring applications so that they may be presented, through the network, at a first portion of one or more screens of display; and

b. structuring advertising in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion of one or more screens of display concurrently with applications, wherein structuring the advertising includes configuring the advertising as objects that include advertising data and;

c. selectively storing advertising objects at a store established at the reception system.

CBM2016-00075
Patent 7,072,849

### E. Asserted Grounds of Unpatentability

Petitioner challenges claims 1–25:

| Reference(s) | Basis | Claims Challenged |
|---|---|---|
| | § 101 | 1–25 |
| Reference 7[1] and Simon[2] | § 103 | 1–3, 5, 6, 8, 9, 12–16, 18, 19, 21, 22, and 25 |
| Reference 7, Simon, and Alber[3] | § 103 | 4, 7, 17, and 20 |
| Reference 7, Simon, and Wilson[4] | § 103 | 2, 3, 5, 6, 9, 12, 15, 16, 18, 19, 22, and 25 |
| Reference 7, Simon, Wilson, and Alber | § 103 | 4, 7, 17, and 20 |

## II.   ANALYSIS

### A. Obviousness Grounds Based on Reference 7, Simon, Alber, and Wilson

Petitioner asserts that claims 1–25 are unpatentable under 35 U.S.C. § 103 as obvious over various combinations of Reference 7, Simon, Alber, and Wilson.  Pet. 45–86.  Patent Owner disagrees, and asserts further that these grounds should be denied under 35 U.S.C. § 325(d).  Prelim. Resp. 50–82.

---

[1]  "Trintex to Aim On-Line Ads At Demographic Segments," Marketing Today, The American Banker (June 30, 1987) (Ex. 1029, "Reference 7").
[2]  Simon et al., U.S. Patent No. 4,575,579, pub. Mar. 11, 1986 (Ex. 1024, "Simon").
[3]  Alber, Antone F., *Videotex/Teletext Principles & Practices*, 1985 (Ex. 1030, "Alber").
[4]  Wilson, U.S. Patent No. 3,991,495, pub. Nov. 16, 1976 (Ex. 1049, "Wilson").

CBM2016-00075
Patent 7,072,849

*1.    Relevant Prosecution History*

The '849 patent issued on July 4, 2006 from U.S. Patent Application
No. 08/158,025, filed November 26, 1993 ("the '025 application").
Ex. 1001, [45], [60].  The '025 application is a divisional of U.S. Patent
Application No. 07/338,156, filed July 28, 1989 ("the '156 application").
Ex. 1001, [60].  Each of Reference 7, Simon, and Alber are listed in the '849
patent as having been "cited by examiner."  Ex. 1001, [56].  A first Office
Action, was mailed on April 19, 1994, and a Notice of Allowance was
mailed on March 2, 2006.

In an Office Action mailed October 27, 1997, all pending claims were
rejected under 35 U.S.C. § 103 over Simon and various combinations of
other references.  Ex. 1011, 3–14.  In a Decision on Appeal, mailed February
27, 2002, the Board reversed the rejections of all claims under 35 U.S.C.
§ 103 over Simon and various combinations of other references (Ex. 1003,
5–29), and entered new grounds of rejection under 35 U.S.C. § 103 for
certain claims based at least in part on Reference 7, a reference discovered
during a new prior art search conducted by the Board *sua sponte*.  Ex. 1003,
32–47.  In a Decision on Request for Rehearing, mailed February 27, 2002,
the Board acknowledged Alber (Ex. 1036, 2), and addressed the rejection of
certain claims under 35 U.S.C. § 103 based at least in part on Reference 7.
Ex. 1036, 7–44.

In an Office Action mailed June 19, 2003, certain claims were
rejected based at least in part on Alber (Ex. 1015, 2–3, 8–11), and a passing
acknowledgement was made to Reference 7.  Ex. 1015, 11–12.  On
September 16, 2003, an Amendment was filed that mentioned Simon
(Ex. 1015, 9), addressed the rejections based at least in part on Alber

CBM2016-00075
Patent 7,072,849

(Ex. 1015, 10–23, 26–29), and addressed Reference 7. Ex. 1015, 29–31. In
an Office Action mailed December 10, 2003, certain claims were rejected
based at least in part on Alber. Ex. 1016, 2–3, 11–18; *see also* Ex. 1017, 13
(supplemental Office Action, mailed on December 18, 2003, which includes
an additional rejection of claim 32 based at least in part on Alber). On
March 18, 2004, an Amendment was filed that addressed the rejections
based at least in part on Alber. Ex. 1018, 1–3, 6–8, and 17–24. On March
24, 2004, a Supplemental Amendment was filed that addressed the rejections
based at least in part on Alber (Ex. 1018, 9–14), and also indicated that
Alber was discussed in an Examiner Interview conducted on March 23,
2004. Ex. 1018, 9–11. In an Advisory Action, mailed April 21, 2004, the
Examiner indicated that the rejection of certain claims based at least in part
on Alber would be maintained. Ex. 1019, 2–3.

In a Decision on Appeal, mailed December 23, 2005, the Board
addressed the rejections of certain claims based at least in part on Alber
(Ex. 1004, 3–4, 15-22, 30–33), and entered new grounds of rejection under
35 U.S.C. § 103 for certain claims based at least in part on one of Reference
7 (Ex. 1004, 33–59) and Alber. Ex. 1004, 56–59.

### 2. *Analysis Under 35 U.S.C. § 325(d)*

Our discretion as to whether to institute a covered business method
review under 35 U.S.C. § 324(a) is guided, in part, by the further language
of 35 U.S.C. § 325(d), which provides: "In determining whether to institute
or order a proceeding under this chapter, chapter 30, or chapter 31, the
Director may take into account whether, and reject the petition or request
because, the same or substantially the same prior art or arguments previously
were presented to the Office."

CBM2016-00075
Patent 7,072,849

Petitioner acknowledges the extensive prosecution history of the '849 patent.  Pet. 18–21.  Petitioner further acknowledges that "Reference 7, Simon, and Alber were all considered during the prosecution history of the '849 Patent."  Pet. 46.  Petitioner asserts that the Board should, nevertheless, institute a review because of the following:

> The combinations of references discussed below, however, were never expressly considered during the prosecution history. Rather, the BPAI explicitly stated that it was not reviewing a combination of Simon with a conventional videotex system as is presented herein because it was not before it.  Ex. 1003, BPAI1, at 22 ("While, perhaps, it would have been obvious to modify Simon to operate as a conventional interactive videotext system in view of the fact that Simon discusses conventional interactive videotext in the background of the invention, and the fact that the offline system is sometimes connected online to download new pages, this is not the rejection before us.").

Pet. 46.

In opposition, Patent Owner argues the "the Board does not need to revisit eleven years of prosecution that addressed the patentability of the challenged claims over the same previously-considered references and arguments that Petitioner advances here.  The Board should exercise its discretion under 35 U.S.C. § 325(d) and deny institution" on the obviousness grounds proffered by Petitioner.  Prelim. Resp. 50–54.  We agree with Patent Owner.

For the grounds under 35 U.S.C. § 103(a) based solely on Reference 7, Simon, and Alber, we are persuaded that the record could not be clearer that those references were presented to and extensively considered by the Office during prosecution of the '849 patent.  Aside from the fact that each of Reference 7, Simon, and Alber are listed in the '849 patent as having been "cited by Examiner," the prosecution history, collectively, includes at least

CBM2016-00075
Patent 7,072,849

86 pages directed to Reference 7, at least 38 pages directed to Simon, and at least 72 pages directed to Alber.  While we acknowledge that no specific rejection was set forth by the Office over the exact combination of Reference 7, Simon, and Alber advanced by Petitioner, every two-reference permutation of Reference 7, Simon, and Alber is mentioned in at least one of the above-referenced papers, and the Amendment filed September 16, 2003, mentions all three.  Indeed, both the Examiner and the Board were each separately presented with arguments concerning each of Reference 7, Simon, and Alber.

Furthermore, the Board's previous Decisions, all before the same panel, collectively indicated that the Board had no reservations in setting forth new grounds of rejection based on newly discovered references, providing at least some circumstantial evidence that the Board considered Simon, Reference 7, and Alber in combination, especially at the time of the Decision on Appeal, mailed December 23, 2005, when all three references had been mentioned previously by each of the Examiner, the Board, and the Applicants/Appellants.  Accordingly, on these facts, we discern that instituting review solely because the exact combination of Reference 7, Simon, and Alber advanced by Petitioner was not set forth in the prosecution history would exalt form over substance, if Section 325(d) could be avoided entirely by merely adding an already-considered incremental reference to a previously considered prior art combination.  We are unpersuaded that such a position is credible.

Of course, some of the grounds of unpatentability proffered by Petitioner under 35 U.S.C. § 103(a) include Wilson, which neither party asserts was cited during prosecution of the '849 patent.  To that end, Patent

CBM2016-00075
Patent 7,072,849

Owner asserts that "Petitioner applied only Reference 7 and Simon to the independent claims, using Alber and Wilson only to fill in limitations in dependent claims in Grounds 3–5," and further that "Petitioner introduces Wilson in Grounds 4 and 5 to advance the same argument raised by the Examiner in an office action during prosecution: that it would be purportedly obvious to replenish a store of advertising objects when the store of advertising objects falls below a predetermined level." Prelim. Resp. 53–54. We have reviewed the Petition and agree with Patent Owner that Wilson is only cited for the additional subject matter recited in each of dependent claims 2, 9, 15, and 22. Pet. 82–86 ("Wilson renders obvious the 'order point' concept found in claims 2, 9, 15, and 22.")

Additionally, for the grounds that do not include Wilson, Petitioner cites Simon for the additional subject matter recited in each of dependent claims 2, 9, 15, and 22, providing at least circumstantial evidence that the cited portions of Wilson are substantially similar to certain cited disclosures of Simon for that additional subject matter. And as noted above, Wilson is not cited by Petitioner for the subject matter of any other claim, independent or dependent, and the other references cited for the subject matter of those other claims, including Simon, have already been exhaustively presented to and considered by the Office. Accordingly, on these facts, we determine that Petitioner's additional citation of Wilson in certain grounds, for the additional subject matter of certain dependent claims, is insufficient to persuade us that exercising our discretion under 35 U.S.C. § 325(d) is inappropriate.

Indeed, during prosecution, the Examiner was not persuaded that the additional subject matter recited in each of dependent claims 2, 9, 15, and 22

CBM2016-00075
Patent 7,072,849

was separately patentable, even despite the admission by the Examiner, as identified in an Amendment filed September 16, 2003 (Ex. 1015, 22), that "neither reference explicitly discloses that the cache of advertising objects is replenished when the store falls below a predetermined level." Ex. 1017, 7–8 (dependent claims 2, 9, 15 and 22 of the '849 patent correspond respectively to claims 5, 17, 25, and 27 in the prosecution history); *see also* Ex. 1013, 6–7, 10; Ex. 1016, 6–7, 14–15, 18–19; Ex. 1017, 15–16, 19. Given that the Examiner did not need *any* prior art to reject the additional subject matter recited in each of dependent claims 2, 9, 15, and 22, we are persuaded that *any* prior art or arguments now presented for that additional subject matter would be substantially similar to that already presented to and considered by the Examiner.

To be sure, we acknowledge that similarity of prior art alone does not require the Office to exercise its discretion in denying any grounds set forth in a Petition. There could be situations where, for example, the prosecution is not as exhaustive, where there are clear errors in the original prosecution, or where the prior art at issue was only cursorily considered that can weigh against exercising the discretion. Moreover, if the Petitioner had brought forward and explained some specific circumstances that have materially changed or of which the Office was not aware of during the prior consideration of the prior art and arguments at issue—such as, for example, changed claim constructions or new evidence related to priority dates of the prior art or challenged patent—then those could weigh in favor of institution. Petitioner, however, has not articulated such circumstances in this case. Accordingly, for the above reasons, we exercise our discretion under 35 U.S.C. § 325(d) and decline to institute review on Petitioner's

CBM2016-00075
Patent 7,072,849

proffered grounds of obviousness based on Reference 7, Simon, Alber, and Wilson.

### 3.   *Analysis Under 35 U.S.C. § 324(a)*

Institution of a covered business method patent review is discretionary.  *See* 35 U.S.C. § 324(a) ("The Director may not authorize a post-grant review to be instituted unless. . ."); 37 C.F.R. § 42.208(a) ("[T]he Board may authorize the review to proceed.").  Furthermore, this discretionary authority may be exercised as to some or all grounds.  *See* 37 C.F.R. § 42.208(b) ("[T]he Board may deny some or all grounds for unpatentability for some or all of the challenged claims.").  Among the factors we consider in deciding whether to exercise discretion not to institute review on any particular grounds is "the effect on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to complete the proceeding timely in prescribing the rules as required by . . . 35 U.S.C. 326(b)."  77 Fed. Reg. 48,680, 48,702 (Aug 14, 2012).

To that end, the factors set forth above with respect to our analysis under 35 U.S.C. § 325(d) concerning "the same or substantially the same prior art or arguments" also weigh heavily against instituting review under 35 U.S.C. § 324(a) for the prior art grounds proffered by Petitioner.

Additionally, we note that the '025 application underwent more than 12 years of prosecution, including the Examiner's issuance of at least six Office Actions each including a ground of rejection based on prior art, and the Board's issuance of three separate Decisions, each of these Board's Decisions including analysis concerning at least one new ground of rejection based on prior art.  While length of prosecution and the numbers of Office

12

CBM2016-00075
Patent 7,072,849

Actions and Board Decisions do not, by themselves, definitively mandate for or against institution on a particular ground, on these facts, we are persuaded that they do weigh heavily against institution of the prior art grounds proffered by Petitioner.

Again, we acknowledge that the existence of the above factors in a particular case does not require the Office to exercise its discretion in denying any grounds set forth in a Petition. Nevertheless, for the above reasons, we exercise our discretion under 35 U.S.C. § 324(a) and decline to institute review on Petitioner's proffered grounds of obviousness based on Reference 7, Simon, Alber, and Wilson.

### 4. Conclusion

For the above reasons, and on this record, for the grounds based on 35 U.S.C. § 103(a) proffered by Petitioner, we reject the Petition under 35 U.S.C. § 325(d), and also exercise our discretion and decline to institute a covered business method patent review of any of claims 1–25 of the '849 patent on those grounds. *See* 35 U.S.C. § 324(a); 37 C.F.R. § 42.208(a).

### B. Grounds Based on 35 U.S.C. § 101

Petitioner asserts that claims 1–25 are unpatentable under 35 U.S.C. § 101 for failing to recite statutory subject matter. Pet. 26–45. Patent Owner disagrees. Prelim. Resp. 26–49.

### 1. Relevant Law

An invention is patent-eligible if it claims a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. The Supreme Court, however, has long interpreted § 101 to include implicit exceptions: "[l]aws of nature, natural phenomena, and abstract ideas" are

CBM2016-00075
Patent 7,072,849

not patentable.  *E.g.*, *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347,

2354 (2014).

In determining whether a claim falls within the excluded category of

abstract ideas, we are guided in our analysis by the Supreme Court's two-

step framework, described in *Mayo* and *Alice*.  *Id.* at 2355 (citing *Mayo*

*Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296–97

(2012)).  In accordance with that framework, we first determine whether the

claim is "directed to" a patent-ineligible abstract idea.  *See Alice*, 134 S. Ct.

at 2356 ("On their face, the claims before us are drawn to the concept of

intermediated settlement, *i.e.*, the use of a third party to mitigate settlement

risk."); *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) ("Claims 1 and 4 in

petitioners' application explain the basic concept of hedging, or protecting

against risk."); *Diamond v. Diehr*, 450 U.S. 175, 184 (1981) ("Analyzing

respondents' claims according to the above statements from our cases, we

think that a physical and chemical process for molding precision synthetic

rubber products falls within the § 101 categories of possibly patentable

subject matter."); *Parker v. Flook*, 437 U.S. 584, 594–595 (1978)

("Respondent's application simply provides a new and presumably better

method for calculating alarm limit values."); *Gottschalk v. Benson*, 409 U.S.

63, 64 (1972) ("They claimed a method for converting binary-coded decimal

(BCD) numerals into pure binary numerals.").

The patent-ineligible side of the spectrum includes fundamental

economic practices, *Alice*, 134 S. Ct. at 2357; *Bilski*, 130 S. Ct. at 3231;

mathematical formulas, *Flook*, 437 U.S. at 594–95; and basic tools of

scientific and technological work, *Benson*, 409 U.S. at 69.  On the patent-

eligible side of the spectrum are physical and chemical processes, such as

CBM2016-00075
Patent 7,072,849

curing rubber, *Diamond*, 450 U.S. at 184, "tanning, dyeing, making waterproof cloth, vulcanizing India rubber, smelting ores," and a process for manufacturing flour, *Gottschalk*, 409 U.S. at 69.

If the claim is "directed to" a patent-ineligible abstract idea, we then consider the elements of the claim—both individually and as an ordered combination—to assess whether the additional elements transform the nature of the claim into a patent-eligible application of the abstract idea. *Alice*, 134 S.Ct. at 2355. This is a search for an "inventive concept"—an element or combination of elements sufficient to ensure that the claim amounts to "significantly more" than the abstract idea itself. *Id.*

### 2.     Whether the Claims Are Directed to an "Abstract Idea"

Petitioner asserts that independent claim 1 is directed to "generating partitioned screen displays for users (with advertisements and applications displayed concurrently) from information stored at the user's computer," and that independent claim 21 is directed to "presenting a user with targeted advertising that is stored at the user's computer." Petitioner asserts further that both of these concepts are abstract ideas. Pet. 26–35. Patent Owner disagrees, asserting that the challenged claims are directed to improvements in computer functionality, and not an "abstract idea." Prelim. Resp. 26–38. We agree with Patent Owner.

Largely, we agree with Petitioner's characterizations as to what independent claims 1 and 21 are "directed to." Pet. 29–30, 34; *see also* Ex. 1034, 47–48. Where Petitioner's assertions are flawed is as to whether those characterizations are an "abstract idea." Beginning with independent claim 1, the overall weakness in Petitioner's analysis is that it breaks up into several pieces what the characterization of independent claim 1 is "directed

15

CBM2016-00075
Patent 7,072,849

to," and then asserts that each separate piece was well known, with no attempt to tie those pieces together.  We agree with Patent Owner that such an analysis is misplaced, as the proper analytical framework is to treat the characterization as whole, for every characterization can always be broken down into finer constituent pieces, each of which, at some point, can be considered well known.  *See Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015) ("Under step one of *Mayo/Alice*, the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter."); *cf. KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–419 (2007) ("a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. . . . This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known"); *Alice*, 134 S. Ct. at 2355 ("[W]e consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.").  To allow otherwise would effectively render every characterization of what a claim is "directed to" superfluous, in that it would be almost impossible for any characterization to be considered anything other than an amalgamation of "abstract ideas" under the first prong of the *Alice* framework.

To that end, independent claim 1 is directed to "generating partitioned screen displays for users (with advertisements and applications displayed concurrently) from information stored at the user's computer."  In analyzing why the aforementioned characterization is an "abstract idea," Petitioner

CBM2016-00075
Patent 7,072,849

begins with the following analogy: "several analogs for the local storage
concept exist in the brick-and-mortar context: an office worker may create a
copy of certain documents from a larger file stored in a central file room to
keep at her desk to avoid visiting the file room each time she needs to use
the documents." Pet. 30. We discern that the analogy is a stretch.
Moreover, even if were to credit the analogy for being relevant to
"information stored at the user's computer," it is lacking with respect to
many other aspects of the aforementioned characterization, for example,
"partitioned screen displays" and "advertisements." Petitioner's analysis of
the commonplace nature of "caching" (Pet. 31) suffers from the same defect.

    Of course, for "partitioned screen displays," Petitioner cites the real-
world examples of newspapers and magazines. Pet. 30. While we discern
that this attempt at a real-world analogy is also a stretch, even if we were to
credit Petitioner, this example lacks the other aspects of the aforementioned
characterization, for example, "advertisements" and "information stored at
the user's computer." Petitioner's analysis of computerized prior art systems
is more applicable, in that it also accounts for "advertisements" (Pet. 31–32),
but does not account for "information stored at the user's computer."

    Petitioner further asserts that "[s]torage, organization, and/or
transmission of information, even in facilitating a display on a computer
screen, does not render a claim to an abstract idea patent-eligible." Pet. 32–
33. We agree, however, again, we discern that this is even less relevant than
the above examples, because it does account explicitly for any of
"partitioned screen displays," "advertisements," and "information stored at
the user's computer."

CBM2016-00075
Patent 7,072,849

Petitioner also asserts that in contrast to the claims recited in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), independent claim 1 only recites generalized steps, and does not go into further detail as to how the generalized steps are accomplished.  Pet. 33–34.  We agree that the recitation of generalized steps weighs in Petitioner's favor; however, we are unpersuaded that it is sufficient by itself to overcome the aforementioned deficiencies of Petitioner's analysis set forth above with respect to independent claim 1.

Indeed, in that regard, we determine that Petitioner's citation to *Enfish* is instructive, in that if the computer related elements were removed, the characterizations in *Enfish* as to what the claim was "directed to" would be nonsensical.  This is particularly the case when the claimed invention is viewed from the perspective of a person of ordinary skill at the time of invention—at the very least the time of the filing of the application, July 28, 1989.  Here, were we to remove all computer elements from "generating partitioned screen displays for users (with advertisements and applications displayed concurrently) from information stored at the user's computer," we are left, with our best attempt at wordsmithing and gap-filling, with "generating partitions for viewers (with advertisements and other content displayed concurrently) from information available to the viewer."  While minimally comprehensible, we have no trouble in concluding that, to a person of ordinary skill in 1989, the removal of the computer completely changes the character of what the claims are "directed to," weighing against Petitioner's assertion that this characterization is an "abstract idea."  Furthermore, this conclusion is supported by the portions of the '849 patent cited by Patent Owner (Prelim. Resp. 28-30 (citing Ex. 1001, 1:43–52, 2:20–

CBM2016-00075
Patent 7,072,849

30, 2:54–58, 3:38–42, 4:63–67, 5:42–6:5, 6:53–7:3, 7:4–13, 10:58–11:2, 12:38–41, 28:22–32, 32:44–48, 33:63–65, and 35:35–39), and we note generally that we agree with Patent Owner the disclosure of the '849 patent itself is almost exclusively directed to solving a problem arising in computer technology (i.e., bandwidth) with a computerized solution (i.e., local storage).

Petitioner further cites paragraphs 76 and 87 of Declaration of David Eastburn. Pet. 30. Those paragraphs, respectively, assert reasons to combine Reference 7, Simon, and Alber (Ex. 1002 ¶ 76) and Reference 7's disclosure of structured advertising. We are unclear as to the relevance of these paragraphs with respect to this ground.

Independent claim 21 is directed to "presenting a user with targeted advertising that is stored at the user's computer." Petitioner's analysis for independent claim 21 suffers from the same flaws as set forth above for independent claim 1. For example, Petitioner cites the prosecution history, specification, and *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015) for supporting the proposition that "targeted advertising" was well known at the time of the claimed invention. We agree. The aforementioned support, however, does not account for "advertising that is stored at the user's computer."

Petitioner then asserts that "applying well-known local storage techniques does not make the claimed concept less abstract." Pet. 35. For support, however, Petitioner only cites to a portion of the prosecution history, and that cited portion only addresses "advertising that is stored at the user's computer," and not "targeted advertising," as set forth above. Moreover, even if we were to agree that this assertion is entitled to some

CBM2016-00075
Patent 7,072,849

weight in favor of Petitioner, it is insufficient to outweigh all of the factors weighing in favor of Patent Owner set forth above for independent claim 1, with the only difference in the analysis being that the "partitioned screen displays" of independent claim 1 are replaced with the "targeted advertising" of independent claim 21.

As we determine, for the reasons set forth above, that Petitioner has not shown sufficiently that independent claims 1 and 21 are directed to an unpatentable "abstract idea," we see no need to analyze those claims under the "significantly more" prong of the *Alice* framework.

### 3.    Conclusion

For the above reasons, and on this record, we are unpersuaded that Petitioner has met its burden of showing that it is more likely than not that claims 1–25 of the '849 patent do not recite statutory subject matter under 35 U.S.C. § 101.

### C.    Eligibility for Covered Business Method Patent Review

Petitioner asserts that the '849 patent meet all the requirements for being eligible for a covered business method patent review. Pet. 5–13. Patent Owner disagrees, asserting that Petitioner has not met its burden of showing that the claims of the '849 patent are not directed to a technological invention. Prelim. Resp. 8–26. As we determine that even if the '849 patent is eligible for a covered business method patent review, we would decline institution of a review for the reasons set forth above, we see no need to resolve this issue at this time.

CBM2016-00075
Patent 7,072,849

### D.    Conclusion

For the reasons set forth above, and on this record, we do not institute a covered business method patent review on any of claims 1–25 of the '849 patent on any ground.

## III.    ORDER

For the reasons given, it is:

ORDERED that that no trial or covered business method patent review is instituted for any claim of the '849 patent on any ground in this proceeding.

CBM2016-00075
Patent 7,072,849

For PETITIONER:

Richard Zembek
Gilbert A. Greene
Daniel S. Leventhal
Daniel A. Prati
NORTON ROSE FULBRIGHT US LLP

richard.zembek@nortonrosefulbright.com
bert.greene@nortonrosefulbright.com
daniel.leventhal@nortonrosefulbright.com
dan.prati@nortonrosefulbright.com
Priceline-IBM-NRFService@nortonrosefulbright.com

For PATENT OWNER:

Kevin K. McNish
Andrew G. Heinz
DESMARAIS LLP

IBMPricelineIPRService@desmaraisllp.com
kmcnish@desmaraisllp.com
aheinz@desmaraisllp.com