**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 16-122-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC. | ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

OF COUNSEL:

John M. Desmarais
Jon T. Hohenthaner
Karim Oussayef
Laurie N. Stempler
Robert C. Harrits
Michael J. X. Matulewicz-Crowley
Brian D. Matty
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400

Dated: April 17, 2017
5089759 / 43155

David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Stephanie E. O'Byrne (#4446)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Plaintiff International Business Machines Corporation*

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS .................................................................. 1

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.      Disputed Terms For U.S. Patent Nos. 5,796,967 And 7,072,849 ...................................... 2

    A.      "object(s)" ....................................................................................................... 2

    B.      "a first partition for presenting applications" ................................................ 4

        1.      Partitions Need Not Be "Fixed" ........................................................ 4

        2.      Partitions Need Not Be "Dedicated For Displaying Applications" ............ 6

    C.      "a second partition for presenting a plurality of command functions" ................. 8

    D.      "selectively storing advertising objects at a store established at the reception" system" ............................................................................................ 10

    E.      "structuring applications so that they may be presented through the network at a first portion of one or more screens of display / structuring applications so that they may be presented at a first portion of one or more screens of display" ............................................................................................... 13

    F.      "at a second portion of one or more screens of display concurrently with applications" .................................................................................................... 14

II.     Disputed Terms For U.S. Patent No. 5,961,601 ............................................................... 16

    A.      "continuation(s)" ........................................................................................... 16

    B.      "all continuations in an output from said service" ........................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Deere & Co. v. Bush Hog, LLC*,
    703 F.3d 1349 (Fed. Cir. 2012) ......................................................................... 5

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ....................................................................... 11

*Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*,
    No. CV 15-137-LPS, D.I. 199 (D. Del. Oct. 28, 2016) ................................. 3, 12

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
    690 F.3d 1318 (Fed. Cir. 2012) ......................................................... 4, 8, 13, 15

*Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*,
    No. CV 15-137-LPS, 2016 WL 6405824 (D. Del. Oct. 28, 2016) ................... 3, 12, 14, 19

*LSI Indus., Inc. v. ImagePoint, Inc.*,
    279 F. App'x 964, 970 (Fed. Cir. 2008) ............................................................. 6

*NTP, Inc. v. Research In Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) .......................................................................... 6

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .......................................................................... 5

*Rodime PLC v. Seagate Tech., Inc.*,
    174 F.3d 1294 (Fed. Cir. 1999) ................................................................. 11-12, 13

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ......................................................................... 20

*Z4 Techs., Inc. v. Microsoft Corp.*,
    507 F.3d 1340 (Fed. Cir. 2007) .......................................................................... 3

## NATURE AND STAGE OF THE PROCEEDINGS

On March 2, 2016, Plaintiff International Business Machines Corporation ("IBM") filed its Complaint for Patent Infringement ("Complaint") against Defendant Groupon, Inc. ("Groupon") for infringement of United States Patent Nos. 5,796,967 ("the '967 patent"), 7,072,849 ("the '849 patent"), 5,961,601 ("the '601 patent"), and 7,631,346 ("the '346 patent") (collectively, the "Patents-In-Suit"). D.I. 1. On March 24, 2017, the parties filed a Joint Claim Construction Chart for the Patents-In-Suit. D.I. 51. IBM submits this initial brief as part of the parties' simultaneous briefing, pursuant to the Court's Scheduling Order. D.I. 17.

## INTRODUCTION

IBM is a pioneer in online computer systems, and each of the Patents-In-Suit was born out of IBM's extensive investment in research and development. The '967 and '849 patents improve interactive applications by structuring applications as partitions or portions comprised of modular objects that can be selectively stored and retrieved from the network as needed. The '601 patent improves so-called stateless communication protocols by embedding state information into continuations, such as webpage hyperlinks. The '346 patent improves online user authentication via single-sign-on operations by allowing users to sign-on and access protected resources, even when they do not have preexisting user accounts.[1] IBM's proposed constructions for each of the Patents-In-Suit come directly from the specifications and the context of the claims themselves. In contrast, Groupon's proposed constructions are unsupported, derived from preferred embodiments, and attempt to add unclaimed limitations.

---

[1] The claimed inventions are described in detail in IBM's technology tutorial, to be submitted on April 24, 2017.

## ARGUMENT

I.   **Disputed Terms For U.S. Patent Nos. 5,796,967 And 7,072,849**

A.   **"object(s)"**

| IBM's Proposal | Groupon's Proposal |
| --- | --- |
| data structure(s) having a uniform, self-defining format that are known in the reception system | data structure(s) |

IBM's proposed construction comes from the "General System Description" section of the specifications of the '849 and '967 patents, (collectively, the "Filepp patents") which state that "***Objects have a uniform, self-defining format known to RS*** 400 [the reception system], and include data types, such as interpretable programs and presentation data for display at monitor screen 414 of the user's personal computer 405."   D.I. 51, Ex. A-1 at 5:49-55.[2]   The specifications later confirm that objects are "self-describing structures."   *Id.* at 8:3-5.

The prosecution history also supports IBM's construction.   During prosecution, IBM distinguished the current invention over the prior art on the basis of "objects" having a particular data structure.   *See, e.g.*, D.I. 51, Ex. A-3 at 10, 11, 12, 21 ("As is fully disclosed in Applicant[']s specification, the 'objects' recited in Applicant[']s claim 1 . . . are data object[s] having a prescribed data structure."); Ex. A-4 at 4; *see also* Ex. A-5 at 2, 5.

Groupon's proposed construction does not address the specifications' definition.   Further, Groupon's cited evidence from the prosecution history shows that objects are data structures, but does not show that objects are any "data structure" without any regard to their format.   *See, e.g.*, D.I. 51, Ex. A-3 at 7 ("Applicants determined to organize the application code and data as data objects having respective headers and data segments . . . .").

---

[2] IBM cites herein to the '967 patent, but the same language appears in the '849 patent.

In a separate litigation, the Court previously construed "object(s)" as "data structure(s)," stating that IBM's proposed construction[3] was "improper because it attempts to import limitations from the preferred embodiments into the claims . . . ."  *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, No. CV 15-137-LPS, 2016 WL 6405824, at *3 (D. Del. Oct. 28, 2016).  As discussed above, however, IBM's proposed construction comes from the definition of "objects," which is not specific to any particular embodiment.  The Court also reasoned that IBM's proposed construction would render certain claim language superfluous, because "other language in claim 1 dictates that objects have [a prescribed][4] structure and that 'at least some of the objects may be used in more than one application'—implying that a 'uniform' format for objects designed for use with multiple applications is already in the claims."  *Id.*  But, even if the '967 patent implies that objects in the context of claim 1 have characteristics that are similar to the definition in the specification, the Court should explicitly construe the term as it was defined by the patentee to avoid unnecessary ambiguity.  Furthermore, several other claims of the Filepp patents use the term "object(s)" and the term should have a consistent meaning no matter in which claim it appears.  *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007) (holding that a term's "construction applies to all of the asserted claims" because it is "presume[d], unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.")

---

[3] IBM's proposed construction in the *Priceline* litigation was "separate data structures having a uniform, self-defining format that are known to the reception systems, including data types, such as interpretable programs and presentation data for display at the monitor screen of the user's personal computer."  That construction is consistent with IBM's current proposed construction because, as stated by IBM's counsel during the claim construction hearing, the only differences are non-limiting examples.  *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, CV 15-137-LPS, D.I. 199 at 12-13 (D. Del. Oct. 28, 2016).

[4] The Court stated that claim 1 dictates that objects have a "predefined structure" but claim 1 recites a "prescribed structure."

### B. "a first partition for presenting applications"

| IBM's Proposal | Groupon's Proposal |
| --- | --- |
| plain and ordinary meaning or, alternatively:<br><br>a first area for presenting applications | a fixed portion of the screen that is dedicated for displaying applications |

The term "a first partition for presenting applications" should be given its plain and ordinary meaning because it is readily understood by a jury and it was not given a different meaning in the specification or during prosecution. "The plain meaning of claim language ordinarily controls unless the patentee acts as his own lexicographer and provides a special definition for a particular claim term or the patentee disavows the ordinary scope of a claim term either in the specification or during prosecution." *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012). The parties agree that "partition" has its plain and ordinary meaning and agree on the definition of "application(s)." *See* D.I. 51, Ex. A. Therefore the only dispute concerns the remainder of the phrase, "a first" and "for presenting," neither of which are given a special definition in the specification or file history. If the term is construed, the Court should adopt IBM's proposed construction. IBM's construction originates from the Filepp patents' specifications, which state that "pages are divided into separate ***areas called 'partitions'*** by certain objects . . . ." D.I. 51, Ex. A-1 at 15:66-16:9.

### 1. Partitions Need Not Be "Fixed"

Groupon's extraneous limitation that partitions be "fixed" contradicts the specification, the claims, and the prosecution history of the Filepp patents. Groupon's requirement that the partition be "fixed" contradicts the specification, which states that the "the objects are structured in accordance with an architecture ***that permits the displayed data to be relocatable on the screen*** . . . ." *Id.* at 11:5-16. The specifications of the Filepp patents thus contemplate the ability of the data displayed within the partitions to be relocated on the screen.

4

The other claims of the '967 patent provide further evidence that the partition need not be fixed.  "The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (holding that "baffles," used initially in an independent claim, should not be construed to require limitations claimed in dependent claims because "[t]he inclusion of such a specific limitation on the term 'baffles' in claim 2 makes it likely that the patentee did not contemplate that the term 'baffles' already contained that limitation.")  Claim 17 of the '967 patent gives rise to this presumption:

> **17. The method of claim 1** wherein generating the first and second screen partitions includes generating the respective partitions at fixed, predetermined regions of the display screen, the second partition being arranged as a command bar and wherein the data structure of the objects includes a header and one or more data segments, and wherein the objects are stored at the respective reception systems in accordance with a predetermined plan, which includes providing the objects with a storage control parameter at their respective headers.

D.I. 51, Ex. A-1 at 42:1-10.  Claim 17's recitation of a "fixed" partition indicates that a person of ordinary skill in the art would not understand "partitions" to be necessarily "fixed"—otherwise, the use of "fixed" in Claim 17 would be superfluous.

Groupon's requirement that the partitions be "fixed" also contradicts the prosecution history of the Filepp patents.  A term should be construed in accordance with the patent examiner's and patentee's understanding of the term.  *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358-59 (Fed. Cir. 2012).  In the prosecution of the '967 patent, the patent examiner reasoned, and IBM did not dispute based on the definition of "partitions," that "[t]he claimed 'partitions' read on the Windows disclosed by Scheifler."  D.I. 51, Ex. A-10 at 3-4; Ex. A-3. The Windows in the Scheifler Reference were not fixed, but were capable of being "restack[ed],

resiz[ed], and reposition[ed]."   April 17, 2017 Matulewicz-Crowley Decl. Ex. 1 ("Scheifler Reference") at 83, 101.   Likewise, during the prosecution of the '849 patent,[5] the patent examiner claimed, and IBM did not dispute based on the definition of "portions," that portions read on the "viewports" in the Agarwal Reference.  D.I. 51, Ex. B-11 at 3; Ex. B-7.  In Agarwal, "each viewport within the screen can be repositioned with respect to its respective page . . . ." April 17, 2017 Matulewicz-Crowley Decl. Ex. 2 ("Agarwal Reference") at 7:49-54.   Those examples show that both the examiner and IBM understood that partitions need not be fixed and used that understanding in comparing the Filepp Patents to the prior art.

### 2.      Partitions Need Not Be "Dedicated For Displaying Applications"

Groupon's construction requiring that the partition be "dedicated for displaying applications" contradicts the Filepp patents' specifications.   First, Groupon's proposed construction changes the word "presented" to "displayed."   None of the cited evidence supports this rewriting of the claims and the specification distinguishes "presenting" from "displaying."

> As well. the method includes steps for opening and closing windows on the display to enable presentation of additional data relating to the presented applications. Still further. the method includes steps for providing additional partitions for concurrently displaying other applications. which may include advertising.

D.I. 51, Ex. A-1 at 3:1-17.

Second, Groupon's proposed construction requiring that the partition be "*dedicated* to displaying applications" contradicts examples given in the specification.  A claim should not be construed so as to exclude an embodiment.  *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1296-97 (Fed. Cir. 2005) (holding that an "electronic mail system" cannot be limited to a

---

[5] The '849 patent's prosecution history's discussion of "portion" is relevant to the '967 patent because Groupon's proposal effectively construes partition as portion.  *See LSI Indus., Inc. v. ImagePoint, Inc.*, 279 F. App'x 964, 970 (Fed. Cir. 2008) ("[W]hen two patents using the same claim term both stem from the same parent application, the prosecution histories of both are relevant to an understanding of the term in both patents.")

"wireline only system" because "[t]he written description expressly indicates that the 'electronic mail system' in the patent may include wireless connections").  The specifications of the Filepp patents describe an embodiment where a "Window Partition 275" may "pop-up" and overlap other partitions, such as the "Body Partition 260."  D.I. 51, Ex. A-1 at 3:44-48 ("[T]he method features steps for opening windows over the currently displayed application to present further information [to] . . . facilitate the undertaking of interactive operation with respect to the application."), 21:63-22:1.  That embodiment is depicted below:



FIG. 3a

*Id.* at Fig. 3.a (blue and red annotations added); s*ee also id.* at 9:36-45, 9:59-66, 11:66-12:5.

In the above embodiment, the Window Partition (shown above in red) can display any type of display data, *id.* at 9:59-62, including command functions, *id.* at 17:65-67, 3:37-51, and advertising, *id.* at 9:63-66, while the Body Partition (shown above in blue) presents applications. *See, e.g.*, *id.* at Figs. 3.a, 3.b, 36:47-65.  The user can open and close the Window Partition, which causes the Window Partition to cover and uncover a section of the display, such as part of the Body Partition.  *Id.* at 1:30-34, 11:55-60 ("Windows contain display data which overlay the

base page . . . .") Therefore, the "partition for presenting applications," the Body Partition, is not "a portion of the screen *dedicated* for displaying applications" because it can also display other data, such as when the Window Partition (in red) appears in front of the Body Partition (in blue) in a "pop-up." *Id.* at Fig. 3.a, 11:66-12:5.

The Filepp prosecution histories also show that the partition is not a "portion of the screen dedicated for displaying applications" because, as discussed above, in Section I.B.1, partitions were understood not to be fixed and therefore a Window Partition could be moved into any "portion of the screen."

### C.    "a second partition for presenting a plurality of command functions"

| IBM's Proposal | Groupon's Proposal |
|---|---|
| plain and ordinary meaning or, alternatively:  a second area for presenting a plurality of command functions | a fixed portion of the screen that is dedicated to displaying command functions which does not overlap with the fixed portion of the screen that is dedicated for displaying applications |

The term "a second partition for presenting a plurality of command functions" should be given its plain and ordinary meaning because it is readily understood by a jury and it was not given a different meaning in the specification or during prosecution. *See InterDigital Commc'ns, LLC*, 690 F.3d at 1324. The parties agree that "partition" should be given its plain and ordinary meaning and agree on the definition for "command function(s)." *See* D.I. 51, Ex. A. Therefore, the only dispute concerns the remainder of the phrase, "a second" and "for presenting a plurality of," neither of which are given special meanings in the specification or file history. Further, given Groupon's agreement that "partition" has its plain and ordinary meaning, it is nonsensical that a person of ordinary skill in the art would understand "a second partition" to mean "a fixed portion of the screen." That proposed construction would equate the word "second" with "a fixed portion of the screen display," which has nothing to do with the word "second." Likewise,

it is nonsensical that a person of ordinary skill in the art would understand "for presenting a plurality of command functions" to mean "that is dedicated to displaying command functions which does not overlap with the fixed portion of the screen that is dedicated for displaying applications." That proposed construction would rewrite "for presenting" to a cumbersome and overly narrow phrase while eliminating anything equivalent to the word "plurality."

If the term is construed, the Court should adopt IBM's proposed construction for the reasons discussed in Section I.B. Groupon's proposed construction should be rejected because it improperly attempts to read additional limitations into the claims—that the partitions are "fixed," are "dedicated to displaying command functions," and do "not overlap with the fixed portion of the screen that is dedicated for displaying applications." For the reasons discussed in Section I.B.1 and I.B.2, the first two limitations contradict the specifications, the claims, and the prosecution histories. In particular, the disclosure of relocatable Window Partitions, which can contain command functions or applications, and which can overlay any other partition, contradicts Groupon's assertion that the partition must be "dedicated to displaying command functions." D.I. 51, Ex. A-1 at 17:65-67, 3:37-51. Additionally, the specification states that a fixed command bar is a preferred embodiment:

> In preferred form. the method features steps for presenting the command function in a command bar fixed-located on the display screen; e.g.. at the screen bottom. concurrently with the displayed application so that the user can conduct display control functions while viewing an application. Additionally. in preferred form. the command bar features functions for progressing forward and backward in the application. thus reducing the need for user reliance on memory or repeat of the entire application to aid comprehension.

*Id.* at 3:18-22.

Finally, Groupon's construction attempts to read in an additional limitation, unmoored from the claim language itself, which would require that the partition "not overlap with the fixed

portion of the screen that is dedicated for displaying applications."[6]  As discussed above and in

Section I.B.2, this limitation directly contradicts the specification, which explicitly describes

command functions that overlap application partitions.  *Id.* at 17:65-67, 3:37-51.

### D.    "selectively storing advertising objects at a store established at the reception" system"

| IBM's Proposal | Groupon's Proposal |
|---|---|
| storing advertisement objects according to a predetermined storage criterion at a store established at the reception system | pre-fetching advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications |

The Court should adopt IBM's proposed construction for "selectively storing advertising

objects at a store established at the reception system" because it originates from the specification:

> RS **400** includes a means to selectively store objects according to a predetermined storage criterion, thus enabling frequently used objects to be stored locally at the RS. and causing infrequently used objects to forfeit their local storage location. The currency of objects stored locally at the RS **400** is verified before use according to the object's storage control parameters and the storage criterion in use for version checking.

*Id.* at 6:56-63.  Further, the specification indicates that it is this characteristic of selectively

storing that "enabl[es] frequently used objects to be stored locally at the [reception system]."

The storage of objects that meet specific criteria is what allows the reception systems to offload

processing tasks from the host computers and increase the speed of the system as a whole.  *See,*

*e.g., id.* at 7:3-12.

The above definition of "selectively storing" as "according to a predetermined storage

criterion" applies to all objects, including advertising objects.  Advertising objects are a type of

object and are "substantially the same as page element objects."  *Id.* at 14:60-15:2.  The only

---

[6] It is unclear what Groupon contends the difference between "dedicated *for* displaying" and "dedicated *to* displaying" is.  This inconsistency renders Groupon's proposed construction more confusing than the claim language it attempts to construe.

"difference being that, as their name implies, their subject matter is selected to concern advertising." *Id.*; *see also id.* at 8:3-18. When the specification discusses "objects" generally, it is also discussing "advertising objects" in particular because the term "objects" refers to the entire "family of objects," one type of which is "advertising objects." *Id.* at 11:17-24. The discussion of "objects" above, with respect to "selectively storing," thus applies to all objects, including advertising objects.

Groupon's proposed construction should be rejected because it attempts to read a limitation from a non-limiting "pre-fetching" embodiment into the claims. "[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) (internal citations and quotation marks omitted). The specific modules concerning pre-fetching are only "native code modules . . . which **might** be used"— in other words, they are preferred embodiments. D.I, 51, Ex. A-1 at 4:32-36. The specification discusses pre-fetching in the context of advertising objects, as opposed to other types of objects, because pre-fetching is most useful for targeted advertising. But a "pre-fetching" embodiment that applies to advertising objects does not mean that all uses of advertising objects necessarily involve pre-fetching.

Additionally, Groupon's construction improperly morphs a single method step, "storing," into two method steps, "storing" and "pre-fetching." In contrast, claims 9 and 22 of the '849 patent recite both "pre-fetching" and "storing" method steps, which shows that the "storing" and "pre-fetching" steps are distinct and the patentee was capable of explicitly claiming both steps independently when intended. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1304-05

(Fed. Cir. 1999).   The specification also makes clear that "storing" and "pre-fetching" are distinct steps:

> Objects may be nested within one another or referenced by an object identifier (object-id) from within their data structure. References to objects permit the size of objects to be minimized. Further, the time required to display a page is minimized when referenced objects are stored locally at RS 400 (which storage is determined by prior usage meeting certain retention criteria to be described more fully below), or have been pre-fetched, or in fact, are already used for the current page.

D.I. 51, Ex. A-1 at 6:24-32.

In a separate litigation, the Court previously construed "selectively storing advertising objects at a store established at the reception system" as "pre-fetching advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications," stating that selectively storing "advertising objects" has a different meaning than selectively storing objects.[7]   *Int'l Bus. Machines Corp.*, 2016 WL 6405824, at *9-10.   As discussed above, the definition of "selectively storing" objects in the specifications applies to all objects, including advertising objects.   The Court also reasoned that "'selectively' relates to 'characterizations established for the respective reception system users' and involves the retrieval of customized advertising based on these characterizations," because claims 8 and 21 both recite those additional limitations in connection with "***selectively*** supplied to and retrieved at . . . ."   *Id.*   However, the explicit recitation of user "characterizations" in claims 8 and 21 and the conspicuous absence of that limitation in claim 1 demonstrates that "selectively storing" is

---

[7] IBM's proposed construction in that litigation was "storing advertisement objects if they meet certain criteria, such as being non-volatile, non-critical to network integrity, or if they are critical to ensuring reasonable response time, at a store established at the reception system."   This construction is consistent with IBM's current proposed construction because the only differences are non-limiting examples.   *Int'l Bus. Machines Corp.*, CV 15-137-LPS, D.I. 199 at 104-105 .

not necessarily associated with user characterizations or pre-fetching. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1304-05 (Fed. Cir. 1999).

**E.** **"structuring applications so that they may be presented through the network at a first portion of one or more screens of display / structuring applications so that they may be presented at a first portion of one or more screens of display"**

| IBM's Proposal | Groupon's Proposal |
|---|---|
| plain and ordinary meaning or, alternatively: formatting applications so that they may be presented through the network at a first area of one or more screens of display / formatting applications so that they may be presented at a first area of one or more screens of display | Formatting applications so that they are displayed on a fixed portion of the screen that is dedicated to displaying applications |

The terms "structuring applications so that they may be presented through the network at a first portion of one or more screens of display" and "structuring applications so that they may be presented at a first portion of one or more screens of display" should be given their plain and ordinary meaning because they are readily understood by a jury and they were not given a different meaning in the specification or during prosecution. *See InterDigital Commc'ns, LLC*, 690 F.3d at 1324. In particular, since the parties agree that "portion" should be given its plain and ordinary meaning and that "structuring applications" should be construed as "formatting applications" (*see* D.I. 51, Ex. A), the only dispute concerns the remainder of the phrases, which are not given any special meaning by the specification or file history.

If the terms are construed, the Court should adopt IBM's proposed constructions. Groupon's proposed construction should be rejected because it improperly alters, removes, and adds various claim limitations.[8]  First, Groupon's proposed construction includes limitations requiring that the portion be "fixed" and "dedicated to displaying applications," which

---

[8] Groupon's proposal should also be rejected because it provides a single construction for two substantively different terms.

contradicts the specifications, claims, and prosecution history, as discussed in Sections I.B.1 and I.B.2, respectively.[9]

Second, Groupon erroneously construes "so that they *may be* presented" as "so that they *are* displayed."  The claim language makes clear that applications need only be structured so that they *may be* presented and there is no indication in the specification or prosecution history to support Groupon's proposed construction.  Further, this Court noted, while construing the Filepp patents in a separate litigation, that the term "structuring advertising in a manner compatible to that of the applications so that it may be presented" only required that the advertising be formatted for "for *potential* use with a plurality of applications" and not that they "actually be used."  *Int'l Bus. Machines Corp.*, 2016 WL 6405824, at *9-10.

Third, Groupon's proposed construction reads out the requirement (found in the first claim term only) that the applications "may be presented *through the network*."  This unsupported deletion contradicts the plain language of the term.

Fourth, Groupon's proposed construction erroneously construes "so that they may be *presented*" as "so that they are *displayed*."  As discussed in Section I.B.2, Groupon's rewriting of "presented" to "displayed" is unsupported by the intrinsic evidence.

**F.      "at a second portion of one or more screens of display concurrently with applications"**

| IBM's Proposal | Groupon's Proposal |
|---|---|
| plain and ordinary meaning or, alternatively:<br><br>at a second area of one or more screens of display concurrently with applications | on a second fixed portion of the screen that does not overlap the fixed portion of the screen for displaying applications |

---

[9] Groupon's interchangeable use of "portion" and "partition" implies that Groupon assumes that "partition" and "portion" share the same meaning.  The discussion of partition above applies with equal strength to portion.

The term "at a second portion of one or more screens of display concurrently with applications" should be given its plain and ordinary meaning because it is readily understood by a jury and it was not given a different meaning in the specification or during prosecution. *See InterDigital Commc'ns, LLC*, 690 F.3d at 1324.   In particular, since the parties agree that "portion" should be given its plain and ordinary meaning (*see* D.I. 51, Ex. A), the only dispute concerns the remainder of the phrase, "at a second,"[10] "of one or more screens of display," and "concurrently with applications," none of which are given special meaning in the specification or file history.

Groupon's proposed construction includes limitations requiring that the portion be "fixed" and "not overlap the fixed portion of the screen for displaying applications," which contradicts the specifications, claims, and prosecution history of the Filepp patents, as discussed in Sections I.B and I.C, respectively.   In particular, the specifications make clear that Windows, which may overlap the "application" portion, can include advertising data.   D.I. 51, Ex. A-1 at 9:63-66.   Thus, the Window Partition, which is a portion of the screen at which advertising is presented, overlaps with the portion of the screen at which applications are presented, contradicting Groupon's proposed construction.

If the term is construed, the Court should adopt IBM's proposed construction for the reasons discussed in Section I.B.   Groupon's proposed construction should be rejected because it improperly alters, removes, and adds various claim limitations.[11]

---

[10] It is unclear why Groupon's proposed construction for this term includes the word "second," while Groupon's proposed construction for "a second partition for presenting a plurality of command functions," discussed in Section I.C, reads out the word "second."

[11] For example, it is unclear why Groupon's proposed construction for this term is "fixed portion of the screen *for displaying applications*" while its proposed construction for the term discussed in Section I.E, to which the term in this section refers, is construed as "fixed portion of the screen

II.      **Disputed Terms For U.S. Patent No. 5,961,601**

A.      **"continuation(s)"**

| IBM's Proposal | Groupon's Proposal |
|---|---|
| a new request in a conversation which a client may send to a server, such as, for example, a hyperlink | a new request which a client may send to a server, such as, for example a hyperlink |

The parties agree that that the definition of a continuation includes the language "a new request that may be sent from a client to a server, such as, for example, a hyperlink." That agreement aligns with the '601 patent's glossary, which explains that a continuation is "a new request which a client may send to a server" and that "[h]ypertext links (or hyperlinks) are examples of continuations in client-server communications." D.I. 51, Ex. C-1, at 2:47-50. The only dispute between the parties is whether a continuation is *any* new request (Groupon's proposal) or is a new request *in a conversation* (IBM's proposal). The Court should adopt IBM's proposal because (1) the '601 patent repeatedly explains that continuations are requests sent within a conversation and (2) Groupon's proposal improperly encompasses additional examples of "new requests" that the '601 patent explains are not continuations.

The '601 patent consistently describes continuations as being limited to new requests in a conversation. When a client requests something from a server, continuations are options for subsequent requests that are provided by the server to the client. *Id.* at 2:50-52. The difference between continuations sent from the server and other options for subsequent requests that the server may provide to the client is that continuations can be invoked by the client "*to continue the conversation*." *Id.* at 9:55-56. That is why they are called "continuations."

Other "new requests" that are available to the client, by contrast, do not continue the conversation but instead request something else and may even start a new conversation. The

*that is dedicated to displaying applications*." This inconsistency renders Groupon's proposed construction more confusing than the claim language it attempts to construe.

specification makes this clear.  For example, the '601 patent includes an embodiment in which two different servers maintain state information.  In that embodiment, an airline reservation system and a hotel booking system each have their own converter for maintaining state.  *Id.* at 16:47-51.  A client begins a conversation with the airline system, and at some point state information is attached to that conversation.  *Id.* at 16:51-53.  The client then begins a conversation with the hotel system, and the airline system continues to maintain its state while the hotel system can simply ignore the state variables that the airline system maintains.  *Id.* at 16:53-59.  This makes sense for IBM's proposed construction, under which the first request sent to the hotel system is not a continuation because it does not continue a conversation with the hotel system, but instead starts a new conversation different from the client's conversation with the airline system.  Under Groupon's proposal, however, the first request sent to the hotel system is a new request and would be a continuation, and the hotel system would have to maintain the state variables that the '601 patent explains it can simply ignore.  As highlighted by this embodiment, "continuation" does not simply mean *any* "new request," as the first request sent to the hotel system is a new request but is not a continuation.  Rather, a continuation is a new request *in a conversation*.

In addition to describing the differences between continuations and other requests, the '601 patent and its prosecution history highlight the importance of continuations being new requests in a conversation.  For example, the '601 patent describes a need for preserving state information while a client "is browsing HTML files by following hyperlinks *in a conversation*" and provides a solution for that need.  *See id.* at 7:45-48.  The solution provided by the '601 patent addresses problems in prior art approaches, which could not correlate state information with the specific conversations in which they occurred.  *See id.* at 9:15-33.  In contrast to the

prior art approaches, in an embodiment of the claimed invention state information can advantageously be correlated with the specific conversation and preserved during the conversation.  *See*, *e.g.*, *id.* at 13:40-55; 20:22-26.  The added benefit of being able to correlate the state information with each conversation was also highlighted during prosecution of the '601 patent.  D.I. 51, Ex. C-3 at 6.

IBM's proposed construction, which specifies that a continuation is "a new request ***in a conversation***," comports with the intrinsic evidence, while Groupon's proposal encompasses "new requests" that the intrinsic evidence shows are not continuations.  The additional "new requests" encompassed by Groupon's construction are distinguishable from true continuations because they are not ***in the conversation***.  As the '601 patent explains, a conversation is continued by the client always selecting a continuation as its next request, as opposed to sending a different "new request" that would not continue the conversation.  *See* D.I. 51, Ex. C-1 at 2:58-61.  For example, the initial request for a service is a new request, but it is not a continuation because no conversation has started before the request is sent.  *See id.* at 13:65-14:6; 16:53-59.  Additionally, new requests that are explicitly entered by the user, such as URLs typed into a browser, do not continue a conversation and are not continuations.  *Id.* at 7:8-11.  The prosecution history identifies further examples of requests sent from a client that are not continuations, differentiating the backend processing of any "new request" from processing a new request that continues a conversation (*i.e.*, a continuation).  D.I. 51, Ex. C-2 at 18-19.  Whether by explicitly entering a URL, or by following hyperlinks that do not continue a conversation, sending a new request that is not a continuation ***interrupts*** a conversation, rather than ***continuing*** it, as a continuation would do.  D.I. 51, Ex. C-1 at 7:25-31.  Those new requests

that are not in a conversation are properly excluded from IBM's proposed construction but are improperly encompassed by Groupon's proposed construction.

The Court has previously construed "continuation(s)" as "a new request which a client may send to a server, such as, for example a hyperlink." *Int'l Bus. Machines Corp.*, 2016 WL 6405824, at *12. In reaching that construction, the Court acknowledged that IBM's addition of "in a conversation" to the Court's construction "may be in line with many (if not all) embodiments of the specification," but found that the further clarity "is not *required* by the specification." *Id.* (emphasis in original). However, only IBM's construction of continuations is consistent with embodiments of the specification that involve "new requests" that are not continuations. The jury will benefit from the further guidance that IBM's proposal adds to Groupon's proposal and the Court's previous construction, aligning the construction more closely with the specification and clearly defining the line between continuations and other new requests that are not continuations.

### B.     "all continuations in an output from said service"

| IBM's Proposal | Groupon's Proposal |
|---|---|
| [no construction necessary] | all new requests which a client may send to a server, such as, for example a hyperlink in a web page or other output sent to the client |

The phrase "continuations in an output from said service" needs no construction beyond the construction of "continuations," addressed above. "[A]n output from said service" can be readily understood by a jury and does not render any of the claims unclear. Groupon's rewriting of the plain claim language "an output from said service" as "a web page or other output sent to the client" finds no support in the intrinsic or extrinsic evidence and injects unnecessary language that changes the mechanism through which the method step is performed. Groupon's definition should therefore be rejected.

Groupon's proposed construction adds unnecessary confusion to the plan language of the claims.  Under Groupon's construction, the claims would require identifying all continuations in an output "sent to the client" ***before*** (a) recursively embedding state information in all identified continuations and (b) communicating (*i.e.*, sending) the output to the client.  *See, e.g.*, D.I. 51, Ex. C-1 at 23:50-64 (claim 51).  Rewritten as Groupon proposes, the claims would not make sense, and thus Groupon's proposal should be rejected.  *See Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016).

Furthermore, Groupon's proposal runs contrary to the specification.  Groupon's construction excludes embodiments of the invention, such as embodiments claimed in dependent claims.  In addition to the claimed "embedding" step, the '601 patent describes "[a]dditional features" that may process an output from a service before it is actually sent to a client.  D.I. 51, Ex. C-1 at Abstract.  For example, the '601 patent discloses a method of adding and filtering hyperlinks and data in an output before it is sent to a client.  *Id.* at 17:13-17; 17:40-54.  That method appears in claims 9 and 10.  *Id.* at 18:58-63.  The '601 patent also describes an output from a service being further input to and processed by a "convert" module before actually being sent to the client.  *Id.* at 12:30-41; *see also* Fig. 4.  Groupon's construction does not align with those features and instead improperly excludes them.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:   */s/ David E. Moore*
      David E. Moore (#3983)

John M. Desmarais                    Bindu A. Palapura (#5370)
Jon T. Hohenthaner                 Stephanie E. O'Byrne (#4446)
Karim Oussayef                      Hercules Plaza, 6th Floor
Laurie N. Stempler                  1313 N. Market Street
Robert C. Harrits                   Wilmington, DE  19801
Michael J. X. Matulewicz-Crowley   Tel:  (302) 984-6000
Brian D. Matty                      dmoore@potteranderson.com
DESMARAIS LLP                bpalapura@potteranderson.com
230 Park Avenue                sobyrne@potteranderson.com
New York, NY  10169
Tel:  (212) 351-3400          *Attorneys for Plaintiff International Business*
                                  *Machines Corporation*

Dated:  April 17, 2017
5089759 / 43155