# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | **REDACTED PUBLIC VERSION** |
| Plaintiff, | C.A. No. 16-122-LPS-CJB |
| v. | |
| GROUPON, INC. | JURY TRIAL DEMANDED |
| Defendant. | |

## **OPENING CLAIM CONSTRUCTION BRIEF OF DEFENDANT GROUPON, INC.**

*Of Counsel:*

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
Adam M. Lewin
FENWICK & WEST LLP
Silicon Valley Center
801 California Street, 12th Floor
Mountain View, CA  94041
(650) 988-8500

Dated: April 17, 2017

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Defendant Groupon, Inc.*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     THE DISPUTED TERMS OF THE PRODIGY PATENTS ............................................ 2

A.      THE DISPUTED TERMS OF THE '967 PATENT ........................................................ 5

        1.      "a first partition for presenting applications" ........................................ 5

        2.      "a second partition for presenting a plurality of command functions" ................. 7

B.      THE DISPUTED TERMS OF THE '849 PATENT ........................................................ 10

        1.      "a first portion of one or more screens of display" ............................... 10

        2.      "at a second portion of one or more screens of display concurrently with
                applications" ................................................................................ 11

C.      THE COURT'S PRIOR CONSTRUCTIONS OF THE TERMS "OBJECT(S)" AND
        "SELECTIVELY STORING ADVERTISING OBJECTS" ARE CORRECT AND
        SHOULD NOT BE CHANGED. ................................................................................ 14

        1.      "object(s)" ................................................................................... 14

        2.      "selectively storing advertising objects at a store established at the reception
                system" ....................................................................................... 15

III.    THE DISPUTED TERMS OF U.S. PATENT NO. 5,961,601 ...................................... 15

A.      "ALL CONTINUATIONS IN AN OUTPUT FROM SAID SERVICE" ...................... 17

B.      THE COURT'S PRIOR CONSTRUCTION OF "CONTINUATION(S)" IS
        CORRECT AND SHOULD NOT BE CHANGED. ....................................................... 19

IV.     CONCLUSION ................................................................................................... 20

# TABLE OF CONTENTS

**Page**

**CASES**

*Gillespie v. Dywidag Sys. Int'l, USA*,
   501 F.3d 1285 (Fed. Cir. 2007).........................................................................7, 9

*Int'l Bus. Machs. v. Priceline Grp. Inc.*,
   No. 15-137-LPS, 2016 U.S. Dist. LEXIS 150068 (D. Del. Oct. 28, 2016).................... *passim*

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014)........................................................................................14

*Phillips v. AWH Corp.*,
   415 F. 3d 1303 (Fed. Cir. 2005)...........................................................................10

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995)..............................................................................10

*Wi-LAN USA, Inc. v. Apple Inc.*,
   830 F.3d 1374 (Fed. Cir. 2016), *cert. denied*, 85 U.S.L.W. 3409 (2017)................................13

# I.     INTRODUCTION

IBM asserts four patents in this case.[1]  Related U.S. Patent Nos. 5,796,967 and 7,072,849 (respectively, the "'967 patent" and the "'849 patent," and collectively the "Prodigy patents") require separate screen partitions for displaying applications, commands to move between the applications, and advertisements.  During prosecution, IBM told the Patent Office that the partitions are fixed, do not overlap, and do not depend on the content they display.  Now, IBM creates the claimed partitions by literally drawing arbitrary overlapping boxes around web content on the accused Groupon website, identifying identical content as each of an "application partition," a "command partition," and an "advertisement partition."

U.S. Patent No. 5,961,601 (the "'601 patent") requires "embedding state information" in "all continuations," i.e., all hyperlinks in a web page.  IBM told the Patent Office that this requirement distinguished the claims from the prior art.  But now, because Groupon does not embed the alleged "state information" in all returned hyperlinks on its web pages, IBM draws boxes around arbitrary subsets of hyperlinks on Groupon's web pages and calls them "all continuations" while ignoring the rest of the links on those pages.

To make these mappings work, IBM maintains that the disputed terms should be given undefined ordinary meanings or "in the alternative constructions" that are directly contrary to what IBM told the Patent Office the claims require.  IBM also advocates for the very claim constructions the Court already rejected in the related *Priceline* litigation.  The Court should again reject IBM's constructions.

---

[1] The parties do not dispute constructions of the terms from the asserted U.S. Patent No. 7,631,346.

## II.     THE DISPUTED TERMS OF THE PRODIGY PATENTS

The '967 patent is titled "Method for Presenting Applications in an Interactive Service" and the '849 patent is titled "Method for Presenting Advertising in an Interactive Service."  The two patents share a near-identical specification.  The patents relate to a commercial pre-Web system first called Trintex and later renamed as Prodigy.  They purport to improve upon "interactive computer networks" that existed *before* the adoption of the World Wide Web.  (*See, e.g.*, D.I. 52.1, Ex. A-1 at 1:16-22.)  Yet, IBM seeks to stretch the claims of the two patents to target the World Wide Web—a fundamentally different technology.  To accomplish this, IBM proposes constructions that ignore the plain language of the claims, the specification, and the very statements it made to the Patent Office to convince the examiner to allow the claims.

The claims of the Prodigy patents are directed to generating screen displays.  Specifically, the sole independent claim of the '967 patent, claim 1, is directed to concurrently presenting applications and commands on a single screen display and the five independent claims of the '849 patent are directed to concurrently presenting applications and advertisements on a single screen display.  These displays are constructed by a "reception system"—software running on the user's computer.  (*Id.* at 4:62-65, 9:10-14.)  The display layouts include separate partitions in which applications, commands, and advertisements are separately but concurrently displayed.  The layouts do not depend on the content or application displayed and persist across applications.  Figure 3a of both patents illustrates these partitions.

As illustrated, the display layout has multiple partitions: a header partition, a body partition where applications are displayed, a partition for displaying advertising, and a command bar for moving between screens and applications. The parties dispute claim terms directed to three of these partitions: the partition



FIG. 3a

for displaying the applications, the partition for displaying the command bar, and to the partition for displaying advertisements. According to the specification and the prosecution histories, these partitions are fixed portions of the screen dedicated to displaying the specific type of information, i.e., applications, advertisements, or commands.

The specification describes that the command bar is displayed at a "fixed locat[ion] on the display screen." (*Id.* at 3:17-21.) The command bar displays commands, "which are selectable to permit movement between applications." (*Id.*, claim 1.) In other words, the command bar and its commands persist across applications. The specification describes that applications, too, are bound to particular partitions. (*Id.* at 9:32-34 ("Applications . . . are composed of a sequence of one or more pages"), *see id.* Fig. 5a (showing page format objects defining partitions, and page element and program objects defining applications "for a given partition").) Advertisements are also displayed in a separate fixed partition, or portion of the display, separate from the portion that displays the applications. (*See* D.I. 53.1, Ex. B-1 at Abstract ("advertising is structured in a manner comparable to the service applications enabling the applications to be presented at a first portion of a display associated with a reception system and the advertising presented at a second portion").)

The prosecution histories confirm that the three disputed partitions are fixed portions of the screen. During prosecution of the '967 patent, IBM relied on the partition for displaying applications being fixed and persistent across the applications to distinguish the purported invention

from Microsoft Windows prior art, in which a separate window is defined for each application and not reused across applications. (*See* D.I. 52-1, Ex. A-4 at 5 ("In Windows, a new window, i.e., partition is created for each and every application that Windows presents. And further, as each application is extinguished, the associated Window, partition is extinguished and not reused.").) Indeed, IBM described the purported invention as fundamentally different because, according to IBM, in its invention "movement through multiple applications" was done via "a single partition" while in the cited Windows system each partition included its "own, separate and distinct application." (*Id.* at 8.)

IBM also distinguished the purported invention from the cited Microsoft Windows prior art by explaining that displaying commands for moving between applications "in single display partition" was novel and not used in the cited Windows system. (*Id.* at 5-6.) IBM emphasized that in Windows, unlike the alleged invention, screen overlap "is a substantial problem and not to be compared with movement between applications as proposed" by IBM. (*Id.* at 6.)

IBM made the same arguments during prosecution of the '849 patent. It explained to the Patent Office that the display screen was configured "so that applications could be presented at a first part of the screen and advertising presented *separately and concurrently* at a second part of the screen." (D.I. 54-1, Ex. B-10 at 3 (emphasis added).) IBM further relied on Figure 3b, reproduced below, noting that "advertising objects 510 include text and graphics that may be presented at ad partition 280 presented on the monitor screen as shown in FIG. 3b." (D.I. 53-1, Ex. B-7 at 11.)



FIG. 3b

IBM then argued to the Patent Office that the distinct treatment and display of advertising was the defining feature of its purported invention. (D.I. 53-1, Ex. B-8 at 26 ("The rejection is based on equating applications and advertising, thus ignoring distinction underlying the entire invention (which is based is based on the dichotomy of applications and advertising)").) The prosecution history demands that the claimed "partitions" and "portions" of a display be fixed, dedicated regions, distinct from one another.

## A.  The disputed terms of the '967 patent

Ignoring the specification and prosecution history of the '967 patent, IBM discards these requirements in an attempt to sweep in the World Wide Web—a fundamentally different technology than the one described in the Prodigy patents.

### 1.  "a first partition for presenting applications"

| Groupon's Construction | IBM's Construction |
|---|---|
| a fixed portion of the screen that is dedicated for displaying applications | plain and ordinary meaning or, alternatively a first area for presenting applications |

The claims of the '967 patent require "generating at least a first partition for presenting applications." (D.I. 52.1, Ex. A-1, claim 1.) The parties dispute the construction of "a first partition for presenting applications." The correct construction of this term is "a fixed portion of the

screen that is dedicated for displaying applications." It is rooted in the claim language itself, the specification, and the prosecution history. First, the claim language requires "generating a first partition *for presenting applications*." Thus, the partition is independent of any single application and must be capable of displaying multiple applications. The partition cannot be defined by the content displayed within an application; it must exist outside the context of the particular application.

Second, the specification confirms the requirements of the claim, explaining that screen partitions are defined independently of the content displayed by the applications. (*Id.* at 11:26-34, 11:40-44.) Partitions are defined by page format objects, which specify the size and location of each partition independent of the content they display and ensure that the various partitions are tiled without overlap on the screen. (*Id.* at 11:35-39.) Finally, the prosecution history further confirms that partitions must be independent of the content displayed by the application and persist across applications. During prosecution of the '967 patent, IBM specifically told the Patent Office that its purported invention is different than the prior art because it does not create a partition "for each and every application" and the applications are instead displayed in "a single partition" rather than in "its own, separate, and distinct" windows as in the cited prior art. (*See id.*, Ex. A-4 at 5, 8.) Groupon's proposed construction is rooted in this intrinsic evidence and captures the inventors' clear intent that this partition is a fixed portion of a screen dedicated for displaying applications.

In contrast, IBM's "plain meaning" departs from the inventors' clear explanation of what the claimed first partition requires. Indeed, IBM's attempt to cover any "area" within a screen displaying an application would capture the very prior art IBM distinguished during prosecution of the '967 patent. The Microsoft Windows prior art cited during prosecution is a well-known system that presents applications on a screen. Both IBM's "plain meaning" construction and its alternative "area for presenting applications" construction would capture this prior art system that

displays an application on the screen.  IBM cannot argue for one claim interpretation when obtaining a patent and for another when attempting to enforce it.  *Gillespie v. Dywidag Sys. Int'l, USA,* 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent.").



### 2.    "a second partition for presenting a plurality of command functions"

| Groupon's Construction | IBM's Construction |
|---|---|
| a fixed portion of the screen that is dedicated to displaying command functions which does | plain and ordinary meaning or, alternatively |

| not overlap with the fixed portion of the screen that is dedicated for displaying applications | a second area for presenting a plurality of command functions |
| --- | --- |

The claim language as a whole requires that the command function partition is fixed, preexisting, and does not overlap with the application partition. (*See* D.I. 52.1, Ex. A-1, claim 1 ("generating concurrently with the first partition at least a second partition for presenting a plurality of command functions, the command functions including at least a first group which are selectable to permit movement between applications").) The claim language requires both a "first partition" and a "second partition," each for displaying different content, applications and command functions respectively. Thus, according to the claim language itself, the second partition must be separate and distinct from "the first partition." Further, because the claim language specifies that the command functions must "permit movement between applications," the second partition for displaying those commands must exist independently of and persist across different applications. The specification confirms that the claimed partitions do not overlap as they are "tessellat[ed] or til[ed]" (as in a mosaic). (*Id.* at 11:37-39.) And, as described above, during prosecution of the '967 patent, IBM limited the claims to a system in which the command functions are "in [a] single display partition"—a fixed and dedicated portion of the screen. (*Id.*, Ex. A-4 at 5-6.)

As with the application partition, IBM's attempts to equate the "second partition for presenting a plurality of command functions" with any area of a web page that includes links or other navigation features. 

Yet, during prosecution of the '967 patent,

IBM told the Patent Office that screen overlap "is a substantial problem" in the cited Microsoft Windows prior art, and that its purported invention solves that problem by allowing movement between applications via a separate command partition. (D.I. 52-1, Ex. A-4 at 6.) The claimed "second partition" thus must be distinct from the claimed "first partition." *Gillespie*, 501 F.3d at 1291 ("The patentee is held to what he declares during the prosecution of his patent.")

IBM's attempt to depart from the intrinsic evidence and its representations to the Patent Office is further confirmed by its mapping of dependent claim 3 of the '967 patent. Claim 3 requires—within the second partition for displaying commands—"providing a command for causing the user to be presented with at least one procedure for navigating to a new application." (D.I. 52.1, Ex. A-1, claim 3.)



The intrinsic evidence requires that the claimed partitions are specific fixed display regions, in which applications and commands are separately displayed. The claimed partitions cannot exist solely in the eye of the beholder. Nor can they be defined after the fact by drawing boxes around portions

of the displayed content, but that is exactly what IBM is asserting in the guise of its "plain and ordinary meaning." *Phillips v. AWH Corp.*, 415 F. 3d 1303, 1315 (Fed. Cir. 2005). The Court should adopt Groupon's construction, which is rooted in the claim language itself and accurately reflects the teachings of the specification and IBM's statements made during prosecution of the '967 patent. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

**B.    The disputed terms of the '849 patent**

Discarding the key feature of the claimed invention—the separate processing and display of advertisements and applications—IBM maps the same web content as both an "advertisement" and an "application" within concentric "partitions." IBM's "ordinary meaning" constructions designed to support this mapping are again contrary to the claim language, the specification and prosecution history and render the claim limitations meaningless and inconsistent.

**1.    "a first portion of one or more screens of display"[2]**

| Groupon's Construction | IBM's Construction |
| --- | --- |
| formatting applications so that they are displayed on a fixed portion of the screen that is dedicated to displaying applications | plain and ordinary meaning or, alternatively formatting applications so that they may be presented through the network at a first area of one or more screens of display / formatting applications so that they may be presented at a first area of one or more screens of display |

While the claims of the '849 patent recite "portions" rather than "partitions," the claim language itself and the specification make clear that the two terms are referring to the same thing—distinct and preexisting portions of a screen dedicated for displaying different types of content.

_____

[2] This phrase is a shorthand for "structuring applications so that they may be presented through the network at a first portion of one or more screens of display" and "structuring applications so that they may be presented at a first portion of one or more screens of display," the constructions of which the parties dispute.

(*See* D.I. 53.1, Ex. B-1 at 3:10-16 ("In accordance with the method, the advertising is structured in a manner comparable to the manner in which the service applications are structured. This enables the applications to be presented at a first portion of a display associated with the reception system and the advertising to be presented concurrently at a second portion of the display."); *see also id.* at 8:59-62, 11:10-11.) Thus, for the same reasons the Court should accept Groupon's construction for the term "first partition" in the claims of the '967 patent, the Court should adopt Groupon's construction for the term "a first portion" in the '849 patent.

IBM maps the "a first portion" to any portion of the screen in which an "application" is displayed. Adopting IBM's proposal would permit the claims to encompass "presenting applications" on any part of a screen, including the entire screen, and would capture the very prior art system IBM distinguished during prosecution of its patents. For example, as with the '967 patent,



The Court should adopt Groupon's construction.

### 2. "at a second portion of one or more screens of display concurrently with applications"

| Groupon's Construction | IBM's Construction |
|---|---|
| on a second fixed portion of the screen that does not overlap the fixed portion of the screen for displaying applications | plain and ordinary meaning or, alternatively, at a second area of one or more screens of display concurrently with applications |

Independent claims 1, 13 and 14 of the '849 patent require, with minor variations, "structuring advertising in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion of one or more screens of display concurrently with applications." (D.I. 53.1, Ex. B-1, claim 1.)[3]  During prosecution of the patent, IBM told the Patent Office that in its invention the display screen was configured "so that applications could be presented at a first part of the screen and advertising presented *separately and concurrently* at a second part of the screen." (D.I. 54-1, Ex. B-10 at 3 (emphasis added).)  Thus, the claimed "second portion," like the other partitions discussed above, is a fixed portion of a screen for displaying advertisements, and it does not overlap with the other fixed portion of the screen displaying applications. The specification confirms this. (*See* D.I. 53.1, Ex. B-1 at Figures 3a and 3b, 12:37-41.)

IBM ignores the intrinsic record to read this limitation on any display of "advertisements" on the screen, regardless of where or how they are displayed.  To map the claims to Groupon's web pages, IBM resorts to more after the fact arbitrary box drawing. ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

---

[3] Claim 13 recites "structuring the advertising objects . . . so that advertising data from an advertising object may be presented" and claim 14 recites "structuring the advertising in a manner compatible to that of the applications so that advertising may be presented."



But IBM told the Patent Office that advertisements are presented at a portion of the screen separate from the portion displaying the applications. (D.I. 54-1, Ex. B-10 at 3.) IBM cannot change the scope of the claims now by mapping both claimed "portions" to the very same areas of the screen. *See Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1390 (Fed. Cir. 2016), *cert. denied*, 85 U.S.L.W. 3409 (2017) ("A patentee cannot make representations about claim language during prosecution to avoid prior art and then escape these representations when trying to show infringement."). Indeed, while IBM claimed during prosecution that the "distinction underlying the entire invention" is "the dichotomy of applications and advertising" (D.I. 53-1, Ex. B-8 at 26), ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

██████████████████████████████████████████████████████

██████████████████████ For the claims to have any chance of being definite, the claimed screen portions must be identifiable features of the display that are distinct from and do not depend on

the content of a particular application or advertisement. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'"). The Court should adopt Groupon's proposed construction.

### C. The Court's prior constructions of the terms "object(s)" and "selectively storing advertising objects" are correct and should not be changed.

In the *Priceline* litigation, the Court construed the term "object(s)" that appears in every independent claim of the Prodigy patents and the term "selectively storing advertising objects at a store established at the reception system" that appears in the claims of the '849 patent. Here, IBM does not adopt those constructions and instead rehashes constructions that suffer from the very same flaws the Court rejected in the *Priceline* litigation. The Court should reject them again.

#### 1. "object(s)"

| Groupon's Construction | IBM's Construction |
|---|---|
| data structure(s) | data structure(s) having a uniform, self-defining format that are known in the reception system |

In the *Priceline* case, the Court correctly construed the term "object" as "data structure." *Int'l Bus. Machs. v. Priceline Grp. Inc.*, No. 15-137-LPS, 2016 U.S. Dist. LEXIS 150068, at *7-9 (D. Del. Oct. 28, 2016). In doing so, it rejected IBM's construction "separate data structure(s) having a uniform, self-defining format that are known in the reception systems, including data types, such as interpretable programs and presentation data for display at the monitor screen of the user's personal computer." *Id.* As the Court recognized, there was no clearly expressed intent in the intrinsic record to import the additional limitations of IBM's proposed construction into the claims. *Id.* (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)). IBM now proposes a nearly identical construction to the one that the Court already rejected. The sole change is the removal of the exemplary data types. This removal, however, does

not address the flaws the Court previously recognized. Nor is IBM's construction clear. Although the specification uses the phrase "having a uniform self-defining format," it does not explain what it means for a format to be "self-defining." (*See* D.I. 52.1, Ex. A-1, at 5:52-53.) And what does it mean for a format to be uniform? Must all objects have the same format? IBM's construction provides no clarity and should be rejected again.

### 2. "selectively storing advertising objects at a store established at the reception system"

| Groupon's Construction | IBM's Construction |
| --- | --- |
| pre-fetching advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications | storing advertisement objects according to a predetermined storage criterion at a store established at the reception system |

The Court already construed this term in the *Priceline* case. That construction is correct and should not be changed. As the Court recognized, the purported invention of the '849 patent requires "pre-fetched" advertisements to be displayed concurrently with applications. 2016 U.S. Dist. LEXIS 150068, at *28. By pre-fetching the advertisements, the data can be "staged at the reception system in anticipation of being called for presentation." (D.I. 53.1, Ex. B-1 at 3:16-21.) In the slower network environment in which the Prodigy system operated, such pre-fetching "minimizes the potential for communication line interference between application and advertising traffic and makes the advertising available at the reception system so as not to delay presentation of the service applications." (*Id.* at Abstract.) IBM's proposed construction would read out the requirement that the advertising information be available beforehand, merely requiring that it be stored at some point. The Court should affirm its prior construction.

### III. THE DISPUTED TERMS OF U.S. PATENT NO. 5,961,601

The '601 patent is titled "Preserving State Information in a Continuing Conversation Between a Client and Server Networked via Stateless Protocol." It is directed to systems and methods

for including state information in client-server HTTP communications. By default, HTTP communications are stateless, i.e., each request from a client (browser) to a web server is seen by the server as separate and independent from both prior requests and later requests. The stateless nature of HTTP does not allow for user interactions that require the server to retain knowledge of its past interactions with a particular client. For example, as described in the '601 patent, a server handling a business transaction with a client would require that information such as the user ID of the client or a transaction number be maintained across all client requests relating to the transaction. (D.I. 54.2, Ex. C-1 at 7:41-47.) The HTTP protocol on its own does not provide for such state maintenance.

As the specification of the '601 patent acknowledges, at the time of the invention, methods for preserving state information in HTTP client-server communications were already known including the now ubiquitous use of cookies as well as hidden fields in HTML forms. (*Id.* at 7:49-8:19, 8:66-9:10.) The '601 patent purportedly improves on the method of preserving state information in hidden HTML form fields by embedding state information in every hyperlink in a returned web page.

Specifically, the patent describes a conversion program that processes the HTML before it is returned to a user. Figure 8 of the patent illustrates this process. When a user clicks on a hyperlink to select a web page, the server modifies the responsive web page before it is returned to the user by embedding the state information in every link in the returned page. (*See id.* at 13:65-14:18.) By embedding state information into every link that a user may potentially click when a web page is displayed, the system ensures that the desired state information is preserved as it is always included in the next communication with the server no matter which link the user selects.

Indeed, the '601 patent explains that "the present invention advantageously preserves state information by embedding the state in all hyperlinks passed back and forth between the client 450

and server 410." (*Id.* at 16:1-4.) For the '601 patent system to work, it is crucial that state information is embedded in every link in a returned web page. If a server returns a web page with even a single link that does not include the embedded state information and the user follows that link, the state information is lost and cannot be regained. When the server receives an HTTP request from the client that does not include the embedded state information, it has no way to find or regenerate it and accordingly cannot include the state information in future interactions or links in pages returned to the client going forward.

### A. "all continuations in an output from said service"

| Groupon's Construction | IBM's Construction |
|---|---|
| all new requests which a client may send to a server, such as, for example a hyperlink in a web page or other output sent to the client | No construction necessary. |

The gist of the parties' dispute is whether the claimed "output from said service" is the entire web page returned to a user or just a random subset of information in that web page. In other words, the parties disagree whether the claims require that the state information be embedded in every link of a returned webpage or just in a subset of the links in the returned web page. The intrinsic evidence is clear that the claims of the '601 patent require embedding state information in every link in the webpage returned to the user. For example, claim 1 requires "performing said service and identifying all continuations in an output from said service . . . recursively embedding the state information in all identified continuations; and communicating the output to the client." During prosecution of the '601 patent, IBM told the Patent Office that "the present invention advantageously preserves state information by embedding the state in all *in all hyperlinks* passed back and forth between the client, 450 and server 410." (D.I. 54.2, Ex. C-2 at 14:10-11 (emphasis added).) And in response to a petition for *inter partes* review of the '601 patent filed by the *Priceline* defendants, IBM distinguished the cited prior art because the alleged state information was

not appended "onto all tested URL's on a destination web page." (Exhibit 4, IPR2016-00604, IBM's Preliminary Response at 11.) Consistent with that distinction, the specification of the '601 patent explains that the claimed "output" is a webpage and not a subset of a webpage or an arbitrary set of links within that webpage. For example, the specification describes the web page shown in Fig. 1 as "[t]he *corresponding output* that would be displayed on a standard browser accessing [http://www.watson.ibm.com]." (D.I. 54.2, Ex. C-1 at 4:62-67 (emphasis added); *see also id.* at 15:33-35 ("The modified output is then returned to the requesting client. In step 813, the client 450 receives HTML file h [the web page] from the server 410."); *see also id.* Fig. 4 and Fig. 8.)

Now, after obtaining its patent and escaping review by the Patent Trials and Appeal Board, IBM attempts to evade the claimed "all continuations" requirement. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ (*Id.*) According to IBM, "all continuations in an output from said service" does not mean all continuations in the webpage provided to the user, but rather an arbitrary subset of links on the returned page that IBM contends are the only ones produced by the "said service," which is, according to IBM, whatever creates the few specific links to which IBM wants to limit the claim.

IBM's attempt to avoid the "all continuations" requirement is contrary to not only the specification and the prosecution history, but also to the claim requirement that "the state information is preserved and provided to *all* services for the duration of the conversation." As the Summary of the Invention describes it, a user may access various services by clicking on different links in a returned web page. (D.I. 54.2, Ex. C-1 at 9:48-56; *see also id.* at 11:55-58 ("[T]he server processes a request for which the server determines that state variables need to be made available to all services which could be invoked in the current conversation."), 12:15-17.) That is, "all services" means all programs that the user might invoke by clicking on any link in a returned web page. State information must be maintained across "all" of them, as claimed. If a link does not include embedded state information, then the service invoked by the user selecting that link will not be provided with, and cannot preserve, the required state information, as the specification describes and the claims require. IBM's "ordinary meaning" construction is contrary to the explicit claim requirement "wherein the state information is preserved and provided to all services for the duration of the conversation."

**B.    The Court's prior construction of "continuation(s)" is correct and should not be changed.**

| **Groupon's Construction** | **IBM's Construction** |
|---|---|
| a new request which a client may send to a server, such as, for example, a hyperlink | a new request in a conversation which a client may send to a server, such as, for example, a hyperlink |

The Court already construed the term "continuation(s)" in the *Priceline* matter. Groupon's proposed construction is the Court's construction. Indeed, the specification defines the term as the Court construed it: "Hypertext links (or hyperlinks) are examples of continuations in client-server communications. A continuation is a new request which a client may send to a server." (D.I. 54.2, Ex. C-1 at 2:48-50.) IBM, however, is attempting to change it so that it can read the claims on web pages that do not embed state information in every link. Specifically, IBM proposes to add

the phase "in a conversation" to the Court's construction of the term so that it can assert that only a subset of the links on a returned web page are associated with a particular "conversation." As discussed above, that argument is contrary to the claim language, the specification and the prosecution history.

It is also directly contrary to the specification's definition of "conversation," which encompasses the user selecting any of the links in a returned web page and is not limited to a subset of those links. A conversation is defined as the full "sequence of communications between a client and server in which the server responds to each request with a set of continuations and the client always picks the next request from the set of continuations." (*Id.* at 2:58-61.) The client leaves or interrupts the conversation "whenever the client obtains a new page by explicitly requesting a new URL *instead* of following hypertext links." (*Id.* at 7:8-11 (emphasis added).) IBM's construction should be rejected.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court should adopt Groupon's proposed claim constructions.

ASHBY & GEDDES

*/s/ John G. Day*
_____
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Defendant Groupon, Inc.*

*Of Counsel:*

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
Adam M. Lewin
FENWICK & WEST LLP
Silicon Valley Center
801 California Street, 12th Floor
Mountain View, CA 94041
(650) 988-8500

Dated: April 17, 2017