**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-122-LPS-CJB |
| | ) | |
| GROUPON, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**RESPONSIVE CLAIM CONSTRUCTION BRIEF OF DEFENDANT GROUPON, INC.**


*Of Counsel:*

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
Adam M. Lewin
FENWICK & WEST LLP
Silicon Valley Center
801 California Street, 12th Floor
Mountain View, CA 94041
(650) 988-8500

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant Groupon, Inc.*


Dated: May 5, 2017

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. THE DISPUTED TERMS OF THE PRODIGY PATENTS .......... 1

A. THE DISPUTED TERMS OF THE ’967 PATENT .......... 1

1. “a first partition for presenting applications” .......... 1

2. “a second partition for presenting a plurality of command functions” .......... 6

B. THE DISPUTED TERMS OF THE ’849 PATENT .......... 8

1. “structuring applications so that they may be presented through the network at a first portion of one or more screens of display” and “structuring applications so that they may be presented at a first portion of one or more screens of display” .......... 8

2. “at a second portion of one or more screens of display concurrently with applications” .......... 10

C. THE COURT’S PRIOR CONSTRUCTIONS OF THE TERMS “OBJECT(S)” AND “SELECTIVELY STORING ADVERTISING OBJECTS” ARE CORRECT AND SHOULD NOT BE CHANGED. .......... 13

1. “object(s)” .......... 13

2. “selectively storing advertising objects at a store established at the reception system” .......... 14

III. THE DISPUTED TERMS OF U.S. PATENT NO. 5,961,601 .......... 16

A. THE COURT’S PRIOR CONSTRUCTION OF “CONTINUATION(S)” IS CORRECT AND SHOULD NOT BE CHANGED. .......... 16

B. “ALL CONTINUATIONS IN AN OUTPUT FROM SAID SERVICE” .......... 18

IV. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361 (Fed. Cir. 2007)....................3

*Int'l Bus. Machs. Corp. v. Priceline Grp. Inc.*,
No. 15-cv-137-LPS, 2016 WL 6405824 (D. Del. Oct. 28, 2016).................... *passim*

*Intellectual Ventures I LLC v. AT&T Mobility LLC*,
2016 U.S. Dist. LEXIS 107273 (D. Del. Aug. 12, 2016) (Stark, J.)....................3

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....................5

*PSN Ill., LLC v. Ivoclar Vivadent, Inc.*,
525 F.3d 1159 (Fed. Cir. 2008)....................19

*Tip Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F. 3d 1364 (Fed. Cir. 2008)....................19

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007)....................15

**OTHER AUTHORITIES**

37 CFR 1.73....................15

## I. INTRODUCTION

IBM's opening brief confirms that it intends to erase key limitations of the asserted patents in an attempt to sweep modern websites into their reach. The Prodigy patents, U.S. Patent Nos. 5,796,967 and 7,072,849, describe and claim distinct, fixed screen partitions for displaying applications, commands to move between the applications, and advertisements. To read the claims on the arbitrary overlapping boxes IBM drew on Groupon's web pages, IBM misreads the prosecution history and the specification to redefine partitions as overlapping movable windows—the prior art construct it distinguished and disclaimed to get its patents.

Similarly, U.S. Patent No. 5,961,601 requires "embedding state information" in "all continuations," i.e., all hyperlinks in a web page. The specification describes this as essential to the patent, and IBM told the Patent Office that this requirement distinguished the claims from the prior art. IBM now argues for constructions to avoid that key requirement, arbitrarily discarding the links that do not include the required state information by assigning them after the fact to a different "service" or "conversation." IBM's attempt to wiggle out of the key "all continuations" requirement is incorrect and based entirely on a misreading of the specification.

The Court should adopt Groupon's proposed constructions.

## II. THE DISPUTED TERMS OF THE PRODIGY PATENTS

### A. The disputed terms of the '967 patent

#### 1. "a first partition for presenting applications"

| Groupon's Construction | IBM's Construction |
|---|---|
| a fixed portion of the screen that is dedicated for displaying applications | plain and ordinary meaning or, alternatively: a first area for presenting applications |

Each of IBM's arguments is based on a misreading of the claims, the specification, and/or the prosecution history. The ordinary meaning of the verb "to partition" is to divide something

into non-overlapping portions, i.e., the noun "partitions." (Exhibit A, *Partition*, Merriam-Webster's Collegiate Dictionary 847 (10th ed. 1997).) The ordinary meaning is confirmed by the specification and the prosecution history of the '967 patent. The '967 patent states that "pages are divided into separate areas called 'partitions' by certain objects." (D.I. 52-1, Ex. A-1 at 16:4-9.) The screen is partitioned to "ensure a consistent presentation of the page" using "proper tessellation or 'tiling' of the displayed partitions." (*Id.* at 11:35-39.) These partitions are persistent and do not change depending on the content displayed within them. (*Id.*)

In arguing that partitions are not "fixed," IBM misreads the specification, confusing the data that can be displayed within partitions for the partitions themselves. (D.I. 58 at 4.) Specifically, IBM asserts that partitions cannot be "fixed" because the specification describes that "objects are structured in accordance with an architecture *that permits the displayed data to be relocatable on the screen*." (*Id.* (emphasis IBM's).) IBM confuses the objects that specify the "displayed data" with the objects that define the fixed screen partitions. The former can be relocated to different partitions and even different applications; the latter specify fixed addressable locations on the display screen. (D.I. 52-1, Ex. A-1 at 11:5-6 ("The screens presented . . . are each divided into addressable partitions shown in Fig. 3a . . . .").) Displayed data is required to be distinct from the partitions in which it may be displayed because the displayed data and partitions are created from different data sources, namely different object types. Each object described in the specification "perform[s] a specific function." (*Id.* at 11:18-19.) Partitions are defined by page format objects, which are distinct from the page element objects that specify displayed data. (*Id.* at 11:25-30 ("Within this family, page format objects 502 are designed to define the partitioning 250 to 290 of the monitor screen shown in Fig. 3a. The page format objects 502 provide a means for pre-defining screen partitions and for ensuring a uniform look to the page presented on the reception system monitor."); *id.* at 11:40-42 ("Page element objects 504 . . . are structured

to contain the display data; i.e., text and graphic, to be displayed . . . .").) A page element object—and the information content it specifies—can be assigned to and displayed in different partitions across applications. (*Id.* at 11:51-52 ("Page element objects 504 are relocatable and may be reused by many pages.").)

But the partitions themselves are fixed, addressable regions of the screen that are distinct from the data (page element objects) that can be displayed within them. (*Id.* at 37:1-2 ("PFO [Page Format Object] 502 describes the location and size of partitions on the page . . . .").) While the "displayed data" defined by the page element objects may be relocatable (i.e., the same data can be displayed in different partitions and in different applications), the partitions in which the information can be displayed are defined by their fixed location on the screen. (*Id.* at 37:3-6 ("The partition number is used . . . so that an association is established between a called page element object (PEO) 504 and the page partition where it is to be displayed.").)

IBM also incorrectly argues that the doctrine of claim differentiation creates a presumption that partitions need not be fixed. (D.I. 58 at 5.) As a preliminary matter, the doctrine of claim differentiation does not apply here because claim 17 imposes many additional limitations that (unlike the "fixed" limitation) go beyond clarifying aspects of claim 1. For example, it requires that "the data structure of the objects includes a header and one or more data segments," requires that "the objects are stored at the respective reception systems in accordance with a predetermined plan," and requires "providing the objects with a storage control parameter at their respective headers." Claim 1 recites none of these. Correctly construing partitions in claim 1 as fixed therefore does not make claim 17 superfluous. *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) (doctrine inapplicable where "the district court's construction d[id] not make the composite composition claims redundant. Instead, there [we]re numerous other differences varying the scope of the claimed subject matter . . . ."); *Intellectual*

*Ventures I LLC v. AT&T Mobility LLC*, 2016 U.S. Dist. LEXIS 107273, at *12 n.5 (D. Del. Aug. 12, 2016) (Stark, J.) (rejecting claim differentiation argument where disputed limitation was not the only difference between the two claims).

Nor does the prosecution history require that partitions can be movable into "any portion of the screen." (D.I. 58 at 5-8.) Nothing in the file histories indicates that the examiner and the applicant agreed on a construction of "partitions" that includes moveable windows. IBM first argues that during prosecution, the examiner mapped "partitions" to non-fixed windows disclosed in the Scheifler reference. (D.I. 58 at 8.) To the contrary, in rejecting the claims over Scheifler, the examiner explicitly found that Scheifler disclosed fixed predetermined partitions: "As argued above for claim 1, the user could easily construct 'respective partitions at fixed predetermined regions of the display screen, the second partition being arranged as a command bar.'" (D.I. 51, Ex. A-10 at 7.) Nor did IBM ever discuss or acquiesce in the mapping of Scheifler's windows to the claimed partitions. (*See* D.I. 52-1, Ex. A-10 at 3-4; Ex. A-3.) IBM cannot retroactively impute a meaning to the term "partition" based on its own contemporary read of Scheifler that has no support in the prosecution history.

The prosecution history relating to the Agarwal reference similarly fails to support IBM's argument. First, the Patent Office's rejection based on Agarwal was in connection with the '849 patent and was made in 2003—five years after the '967 patent issued. It has no bearing on the proper construction of the term "partition" in the '967 patent. Furthermore, with respect to the '849 patent, IBM did not acknowledge that Agarwal met the claim limitations at issue. Instead, IBM argued that Agarwal did not disclose advertising information and independent delivery of the same. (D.I. 53-1, Ex. B-7 at 23-24.) The mere fact that IBM did not *distinguish* the claimed

screen "portions"[1] from "viewports" as used in the cited Agarwal reference does not mandate a change in construction, even if "viewports" could be repositioned. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes"); *see also id.* ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'") (quoting *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005)).

Regardless, IBM's current argument contradicts its own explicit statements during prosecution distinguishing moveable windows in Microsoft Windows from the claimed partitions and explaining how its invention presents multiple "applications . . . at a single partition" and keeps each partition "separate and distinct." (D.I. 60 at 6; D.I. 52-1, Ex. A-4 at 7-8.) IBM's after-the-fact reading of Scheifler and Agarwal cannot override the clear statements it made to distinguish moveable windows in the prior art from the fixed partitions required by the claims. Groupon's proposed constructions are correct and supported by the prosecution history.

Finally, Groupon's construction of a "first partition" includes the requirement that it be "dedicated for displaying applications." The claim language itself requires, and the parties appear to agree, that the first partition is for displaying applications. IBM itself explains that the "partition for presenting applications" is "the Body Partition." (D.I. 58 at 8.) Still, IBM argues that the first partition is not *dedicated* to displaying applications because the specification describes an embodiment in which an overlay window may pop-up within the first partition. (*Id.* at

---

[1] The parties appear to agree that the claimed "partitions" of the '967 patent and "portions" of a screen in the '849 patent should be interpreted in the same way.

6-7.) IBM again misreads the specification. The overlay window does not change the nature of the content displayed in the underlying partition, and indeed, the underlying display remains, stored as a "bit map," to be shown again when the window disappears. (D.I. 52-1, Ex. A-1 at 11:63-12:3.) The specification explains that a window partition may be opened over an application partition in order to provide additional information relating to *the application*. IBM omits this clarification from its quotation of the specification, which reads in full as follows: "[T]he method features steps for opening windows over the currently displayed application to present further information *concerning the application or* facilitate the undertaking of interactive operation with respect to the application." (*Id.* at 3:44-48 (emphasis added to show omission).)

Dependent claim 14 is specifically drawn to this embodiment and further confirms that the application partition—whether temporarily overlaid in part or not—is dedicated for displaying applications. (*See id.* claim 14 ("generating one or more window partitions that overlays at least a portion of the application partition, the one or more windows for presenting data associated with the application displayed").)

Groupon's proposed construction is correct.

**2. "a second partition for presenting a plurality of command functions"**

| Groupon's Construction | IBM's Construction |
|---|---|
| a fixed portion of the screen that is dedicated to displaying command functions which does not overlap with the fixed portion of the screen that is dedicated for displaying applications | plain and ordinary meaning or, alternatively: a second area for presenting a plurality of command functions |

IBM misreads the specification and the claims when arguing that the "second partition for presenting a plurality of command functions" need not be a fixed or dedicated portion of the screen: The command partition is the command bar 290, not a pop-up window. The claims themselves explicitly distinguish between the command "partition" and a window that can be invoked from the command partition. (*See id.* claim 9 ("wherein providing the navigation proce-

dures to a new application includes presenting a *window* at the display in which the user is presented with multiple, interactive command functions to effect navigation") (emphasis added).) Claim 14 explains that windows exist within, but are distinct from, the application partition ("generating one or more window partitions that overlays at least a portion of the application partition"). In other words, the patentee used "windows" or "window partition" when it meant windows and distinguished windows from partitions throughout the claims.

Contrary to IBM's position, the *command bar*—i.e., the "second partition"—is where command functions must be displayed and activated. According to the patent, the command bar is used for inputting command functions such as the "jump command" for navigating to a new application. Once activated, a window may pop up to enable the user to select or search for an application, but the command function that initiates the procedure is displayed *only* in the command bar, which resides in its own partition. (*Id.* at 3:17-18 ("the method features steps for presenting the command function in a command bar fixed-located on the display screen"); *id.* at 10:31-34 ("As shown in FIG. 3b, interface region 285 includes a command bar 290 having a number of commands 291-298 which the user can execute."); *id.* at Fig. 3b.)

Both the dependent claims and the specification clearly explain this process. For example, claims 3 and 4 recite "providing [a] command for causing the user to be presented for [at least one] procedure for navigating to a new application"; claim 5 (dependent from claim 4) recites "enabling the user to enter a character string at the reception system to randomly search the available applications." The specification further describes how the "user may invoke the procedure by initiating a 'Jump' command at RS 400." (*Id.* at 19:21-29.) This command, "as seen in FIG. 3a, *can be selected by the user from command bar 290*." (*Id.* at 20:45-48 (emphasis added).) Then, the "JUMP command 296 causes window partition 275 to be opened, allowing the user to input a keyword." (*Id.* at 17:65-67.) Claims 6, 7, and 8 (dependent from claim 4) provide

alternate navigation methods to a new application, including accessing an application index (claim 6), accessing a directory (claim 7), or a physical analogy of the applications (claim 8). Claim 9 (dependent from claims 5-8) confirms that the window is invoked from a command displayed in the command partition: "wherein providing the navigation procedures to a new application includes presenting a window at the display in which the user is presented with multiple, interactive command functions to effect navigation."

Nowhere is the window partition described as the command bar or command partition itself; to the contrary, the command partition can display a window partition upon a jump command invoked by the user. Nowhere does the patent describe invoking one pop-up window from another pop-up window as would be required by claim 9 if the second (command) partition in claim 1 was itself a window partition, as IBM asserts. IBM's proposed construction conflates windows and partitions, distinct concepts which the claims and specification consistently distinguish, and it should not be adopted.

### B. The disputed terms of the '849 patent

#### 1. "structuring applications so that they may be presented through the network at a first portion of one or more screens of display" and "structuring applications so that they may be presented at a first portion of one or more screens of display"

| Groupon's Construction | IBM's Construction |
|---|---|
| formatting applications so that they are displayed on a fixed portion of the screen that is dedicated to displaying applications | plain and ordinary meaning or, alternatively: formatting applications so that they may be presented through the network at a first area of one or more screens of display / formatting applications so that they may be presented at a first area of one or more screens of display |

As with the "first partition" in the '967 patent, the critical difference between the parties' proposed constructions is whether, as Groupon proposes, the applications are formatted to be presented at "a fixed portion" of the screen dedicated to displaying applications. Indeed, while

the claims of the '849 patent recite "portions" rather than "partitions," the claim language itself and the specification make clear that the two terms are referring to the same thing—distinct and preexisting portions of a screen dedicated to displaying different types of content. (*See* D.I. 53-1, Ex. B-1 at 3:10-16 ("In accordance with the method, the advertising is structured in a manner comparable to the manner in which the service applications are structured. This enables the applications to be presented at a first portion of a display associated with the reception system and the advertising to be presented concurrently at a second portion of the display."); *see also id.* at 8:59-62, 11:10-11; D.I. 58 at 14 n.9 (noting that "[t]he discussion of partition above applies with equal strength to portion").) Consistent with Section A.1 above, this Court should adopt Groupon's construction for these closely related terms.

None of IBM's gripes with Groupon's construction has anything to do with the actual scope of the claims. First, there is no substantive difference between "formatting applications . . . so that they **are**" displayed and "formatting applications so that they **may be**" displayed. Groupon's construction properly defines what it means to structure an application for *presentation at a first portion* of one or more screens of display, which is formatting an application *to display on a fixed portion* of the screen *dedicated to displaying applications*.

Second, as discussed above, there is nothing wrong with construing "presented" as "displayed." IBM does not actually identify any problem with the difference in words. And in fact, the specification unambiguously describes the "presentation" of applications and advertising as happening at a "display." (*See* D.I. 53-1, Ex. B-1 at 3:10-16 ("applications to be presented at a first portion of a display . . . and the advertising to be presented concurrently at a second portion of the display").) The plain and ordinary meaning of these terms and the intrinsic evidence support Groupon's proposed construction.

Third, IBM argues that Groupon's proposal "provides a single construction for two sub-

stantively different terms" and "reads out the requirement (found in the first claim term only) that the applications 'may be presented through the network.'" (D.I. 58 at 13 n.8, 14.) But IBM does not explain how these terms are substantively different. Again, the terms relate to how the application is structured in order to be presented. It is therefore irrelevant whether the applications are ultimately presented "through a network" or otherwise.[2] Groupon's proposed construction for both of these phrases applies in either instance.

**2. "at a second portion of one or more screens of display concurrently with applications"**

| Groupon's Construction | IBM's Construction |
|---|---|
| on a second fixed portion of the screen that does not overlap the fixed portion of the screen for displaying applications | plain and ordinary meaning or, alternatively: at a second area of one or more screens of display concurrently with applications |

The plain language of independent claims 1, 13, and 14 requires (1) that advertising is structured in a manner compatible to that of the applications; (2) that this structuring allows advertising to be presented at a second portion of one or more screens of display; and (3) that the display of advertising is concurrent with display of applications. (D.I. 53-1, Ex. B-1, claim 1.) The claimed "second portion," like the other partitions discussed above, is a fixed portion of a screen for displaying advertisements, and it does not overlap with the fixed portion of the screen displaying applications. The specification confirms this. (*See id.* at Figures 3a and 3b, 12:37-41.)

IBM raises two issues with Groupon's proposed construction: (1) requiring that the second portion be "fixed" and "not overlap the fixed portion of the screen for displaying applications" allegedly contradicts the specifications, claims, and prosecution history; and (2) it is in-

[2] To the extent that the Court views the "through a network" language necessary to this phrase, Groupon has no objection to including it in its construction.

consistent with Groupon's construction of "structuring applications" for presentation "at a first portion of one or more screens of display" and is therefore confusing. (D.I. 58 at 15-16.) Both objections are unfounded.

The claims' express terms "presented . . . concurrently" imply that these two portions are non-overlapping. Two items are not displayed "concurrently" when one is obscured by another. IBM misreads the specification to argue that "the specifications make clear that Windows, which may overlap the 'application' portion, can include advertising data." (D.I. 58 at 15, citing D.I. 51, Ex. A-1 at 9:63-66.) The cited disclosure (also in the '849 patent (D.I. 53-1, Ex. B-1) at 9:65-10:1) does not stand for that proposition. It merely states: "Continuing with reference to FIG. 3*a*, in accordance with the invention, advertising 280 is provided over network 10, like page elements, also includes information for display on page 255, and may be included in any partition of a page."

Further, the specification clearly distinguishes between windows and partitions. As with the displayed data and partitions, the specification explains that partitions and windows are distinct and created from different object types: "pages are divided into separate areas called 'partitions' by certain objects, while certain other objects describe windows which can be opened on the pages." (D.I. 52-1, Ex. A-1 at 16:4-9; *compare id.* at 11:25-27 ("page format objects 502 are designed to define the partitioning 250 to 290 of the monitor screen shown in FIG. 3a") *with* 11:55-57 ("window objects 506 include the display and control data necessary to support window partitions 275 best seen in Fig. 3a").) Not only are they created from different object types, the specification also consistently distinguishes windows from page partitions. "Page format objects 502 are designed to define the partitioning 250 to 290 of the monitor screen shown in FIG. 3a" (*id.* at 11:26-31), but window partitions exist *within* an application shown in a partition, "opened and closed conditionally on page 255 upon the occurrence of an event specified in the

application being run" (*id.* at 9:41-44).

In particular, the patent never describes displaying advertising data in a window. (*See* D.I. 53-1, Ex. B-1 at Figures 3a and 3b, 12:37-41 ("in accordance with the method of the present invention, advertising objects 510 include the text and graphics that may be presented at ad partition 280 presented on the monitor screen as shown in FIG. 3b").)

Contrary to IBM's assertion, Groupon's position that the second portion be fixed and not overlap with the first portion displaying applications is supported by the prosecution history and the '849 patent's specification. Specifically, IBM told the Patent Office that in its invention, the display screen was configured "so that applications could be presented at a first part of the screen and advertising presented *separately and concurrently* at a second part of the screen." (D.I. 54-1, Ex. B-10 at 3 (emphasis added).) Thus, the claimed "second portion," like the '967 patent's partitions, is a fixed portion of a screen for displaying advertisements, and it does not overlap with the other fixed portion of the screen displaying applications.

Finally, adopting Groupon's proposed construction would not lead to confusion (nor does IBM identify any). The phrases "dedicated to displaying applications" and "for displaying applications" in Groupon's proposed constructions are clear and do not conflict.

As described in Groupon's opening brief, IBM's proposed constructions are aimed at maintaining an infringement case where the alleged advertising data and the alleged application are one and the same: displayed at the same location on the screen and distinguished only by the overlapping boxes that IBM chose to draw. (D.I. 60 at 12-13.) Such an interpretation is contrary to the express claim language, the specification, and IBM's representations to the Patent Office. Groupon's proposed construction should apply.

### C. The Court's prior constructions of the terms "object(s)" and "selectively storing advertising objects" are correct and should not be changed.

#### 1. "object(s)"

| Groupon's Construction | IBM's Construction |
|---|---|
| data structure(s) | data structure(s) that have a uniform, self-defining format known to the reception system[3] |

This Court correctly construed "object(s)" as "data structure(s)" in the *Priceline* case. IBM's newly proposed construction offers nothing that changes that analysis. Indeed, IBM points to the same embodiment limitations previously rejected by the Court. *Compare* D.I. 58 at 2 (citing '967 patent (D.I. 52-1, Ex. A-1) at 5:49-55, 8:3-5), *with Int'l Bus. Machs. Corp. v. Priceline Grp. Inc.*, No. 15-cv-137-LPS, 2016 WL 6405824, at *3 (D. Del. Oct. 28, 2016) (rejecting IBM's reliance on the same specification cites as "import[ing] limitations from preferred embodiments into the claims without any clearly expressed intent in the specification to do so").

Moreover, IBM has not articulated what its proposed construction actually means. The specification describes "objects" as "self-describing structures organized in accordance with a specific data object architecture." (D.I. 52-1, Ex. A-1 at 8:3-5.) Objects, then, have the same object architecture, regardless of type. IBM's construction does not explain or describe what a "self-defining format" is. (*See id.* at 5:52.) Nor does it explain how a format is "uniform," other than vaguely noting that it may be "similar" to having a prescribed structure and may be designed for use in multiple applications. (D.I. 58 at 3.) IBM's construction is ambiguous as to the uniformity of the format—whether the format is the same across object types, as the specification teaches. [redacted]

---

[3] IBM informed counsel for Groupon that it intends to brief this construction in the responsive briefing, as opposed to its prior proposal, "data structure(s) having a uniform, self-defining format that are known in the reception system".

IBM thus turns the specification on its head by changing "uniform . . . format" to multiple formats. It does so despite its acknowledgement that "[d]uring prosecution, IBM distinguished the current invention over the prior art on the basis of 'objects' having a *particular* data structure." (D.I. 58 at 2 (emphasis added).)

In contrast, this Court's construction of the term "object(s)" as "data structure(s)" is both clear and rooted in the specification. *Priceline*, 2016 WL 6405824, at *3 (citing '967 patent at 6:23-25, 5:55-58). The claims and specification confirm that "objects" are "data structures." IBM provides no basis for the Court to revisit its prior construction.

**2. "selectively storing advertising objects at a store established at the reception system"**

| Groupon's Construction | IBM's Construction |
|---|---|
| pre-fetching advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications | storing advertisement objects according to a predetermined storage criterion at a store established at the reception system |

Similarly, IBM points to no intrinsic evidence that requires the Court to re-construe this term. Instead, it continues to rely on portions of the specification that generally discuss objects, rather than those specific to advertising objects. (D.I. 58 at 10 (highlighting '849 patent at 6:56-63).) This Court has already rejected reliance on that language and correctly concluded that "the term should be construed according to how it is used in sections of the specification that specifically relate to ***advertising*** objects." *Priceline*, 2016 WL 6405824, at *9 (emphasis in original). The Court's prior construction is proper—and indeed necessary—since the entire point of the

’849 patent is to treat advertising objects differently than other application objects. *Id.* at *10 (the specification “clearly describes the ‘invention’ as a whole as including ‘pre-fetched’ advertising as an improvement over the prior art, with such advertising being displayed ‘concurrently’ with applications”).

IBM attempts to distract from this by arguing that Groupon’s proposal reads a non-limiting embodiment into the claims because the “specific modules concerning pre-fetching are only” preferred embodiments. (D.I. 58 at 11.) That is not true. Groupon does not rely on the “specific modules” disclosed in the specification for its construction. Nor is pre-fetching advertising an optional feature of a preferred embodiment—it is the key feature of the ’849 patent. Indeed, the summary of the invention section of the specification describes the invention as a whole as including this feature: “in accordance with the method [of the invention], the user reception system at which the advertising is presented includes facility for storing and managing the advertising so that it can be pre-fetched from the network and staged at the reception system.” (D.I. 53-1, Ex. B-1 at 3:16-21); *see Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (“When a patent thus describes the features of the ‘present invention’ as a whole, this description limits the scope of the invention.”); 37 CFR 1.73 (the summary of the invention “should, when set forth, be commensurate with the invention as claimed and any object recited should be that of the invention as claimed”). Notably, although IBM suggests that there are other embodiments in which advertising data is not pre-fetched, it identifies none.

Nor does Groupon’s proposal read an additional method step into the claims, as IBM contends. On its face, the term “*selectively* storing” necessarily encompasses the processes of selecting, or pre-fetching, an item before storing it; one must have the object in order to store it.

Accordingly, the Court should adopt its prior construction of this term.

## III. <u>THE DISPUTED TERMS OF U.S. PATENT NO. 5,961,601</u>

### A. The Court's prior construction of "continuation(s)" is correct and should not be changed.

| Groupon's Construction | IBM's Construction |
|---|---|
| a new request which a client may send to a server, such as, for example, a hyperlink | a new request in a conversation which a client may send to a server, such as, for example, a hyperlink |

Groupon proposes that the Court adopt the construction it adopted for this term in the *Priceline* matter. The specification defines the term as the Court construed it: "Hypertext links (or hyperlinks) are examples of continuations in client-server communications. A continuation is a new request which a client may send to a server." (D.I. 54-2, Ex. C-1 at 2:48-50.) IBM's constructions for both this term and the "all continuations" phrase are aimed at reading the claims on web pages that do not embed state information in every link. (D.I. 60 at 16-18.)

IBM's arguments ignore the clear definitions and descriptions in the specification. The crux of IBM's position is that some "hyperlinks [] do not continue a conversation." (D.I. 58 at 18.) But the explicit definition of a conversation in the specification proves otherwise. The specification specifically describes that the problem to be solved is that state should be maintained in a conversation, which is "formally" defined as a series of web pages viewed by a client where each webpage "was obtained by following a hypertext link" on the prior page. (D.I. 54-2, Ex. C-1 at 7:18-25.) In other words, as long as the user reaches a page "by following a hypertext link," that request is part of the conversation. IBM is arbitrarily excluding links to try to expand the claims to cover web pages in which only some links include the required state information—effectively negating the "all continuations" requirement.

IBM's argument is based on a misreading of an example in column 16 of the specification. (D.I. 58 at 17.) In the example, a user navigates from an airline reservation site to a hotel booking site via a link on a web page returned from the airline site. (D.I. 54-2, Ex. C-1 at 16:48-

52.) IBM argues that the link to the hotel site is not a "continuation" and need not include the required state information because it is purportedly part of a separate "conversation" with the hotel booking site. (D.I. 58 at 17.) The specification says just the opposite. The specification explains that when the user selects the link to the hotel booking site, the state information is maintained by the airline reservation server throughout the user's interactions with the hotel site. "The client then follows a hypertext link to the hotel booking system. Converter A [used by the airline reservation site] continues to maintain state information while the client is using the hotel booking system." (D.I. 54-2, Ex. C-1 at 16:52-56.) The state information is also returned to the hotel booking server throughout the user's interactions on the hotel booking site. "All state variables are propagated to the hotel booking system's CGI programs." (*Id.* at 16:56-58.) Because the user got to the hotel site by following a link in a page from the airline site, the user's interactions with both sites are part of the same conversation, and state information is returned in all links in pages returned to the user from either system. Indeed, the section to which IBM refers is titled "Preserving State on Multiple Communicating Servers," further demonstrating that this section describes a scenario in which state is preserved as long as the user is clicking links, not one in which state need no longer be preserved merely because a link points to a different server. The patent could not be clearer: "A client may communicate with multiple servers during the same conversation." (*Id.* at 16:44; *see also id.* at 7:16-17.)

IBM argues that because the hotel site's system may ignore the state information, it does not receive it in the first place. That is wrong. The system has to have the information in order to either ignore it or use it. That is what the patent says: "*All state variables are propagated to the hotel booking system's CGI programs*. These remote server CGI programs might simply ignore these state variables. On the other hand, if the hotel booking system understands the state variables from the airline reservation systems, these variables could be used by the hotel booking

system (converter H)." (*Id.* at 16:56-62.)

The Court's construction in the *Priceline* case was correct—the specification is clear, and the Court should adopt that construction here.

**B. "all continuations in an output from said service"**

| Groupon's Construction | IBM's Construction |
|---|---|
| all new requests which a client may send to a server, such as, for example a hyperlink in a web page or other output sent to the client | No construction necessary. |

As Groupon explained in its opening brief, the core of the dispute as to this phrase is whether the "output from said service" is the entire web page returned to a user or an arbitrary subset of information and links in that web page. The intrinsic evidence is clear: the claims require embedding state information in every link in the webpage returned to the user. Claim 1 requires "performing said service and identifying all continuations in an output from said service . . . recursively embedding the state information in all identified continuations; and communicating the output to the client." The specification of the '601 patent also explains that the claimed "output" is a webpage, not some arbitrary subset of links on the page. (D.I. 54-2, Ex. C-1 at 4:62-67 (describing the web page shown in Fig. 1 as "[t]he corresponding output" when a user access a link); *see also id.* at 15:33-35 ("The modified output is then returned to the requesting client. In step 813, the client 450 receives HTML file h [the web page] from the server 410."); *id.* Figs. 4 and 8.) Further, IBM told the Patent Office that "the present invention advantageously preserves state information by embedding the state *in all hyperlinks* passed back and forth between the client 450 and server 410." (D.I. 54-2, Ex. C-2 at 14:10-11 (emphasis added).)

IBM finds fault with the phrase "web page or other output sent to the client," arguing that it imposes an impossible temporal limitation on the method by requiring that the output be sent before the other method steps. (D.I. 58 at 19-20.) It doesn't. Describing the continuations as

existing in the "output sent to the client" does not mean that the output is sent before the embedding and other steps; it merely identifies the output to be modified: output is what is sent to the client.

IBM also erroneously argues, without explanation, that Groupon's construction excludes various embodiments in the specification. As a preliminary matter, "read in the context of the specification, the claims of the patent need not encompass all disclosed embodiments." *Tip Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F. 3d 1364, 1373 (Fed. Cir. 2008); *see also PSN Ill., LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1167 (Fed. Cir. 2008) ("[C]ourts must recognize that disclosed embodiments may be within the scope of other allowed but unasserted claims."). In any event, Groupon's construction does not exclude any disclosed embodiments. IBM points to a filtering embodiment in which "[t]he server wishes to filter all HTML text and leave out phrases and hypertext links which have been determined to be objectionable." (D.I. 54-2, Ex. C-1 at 17:13-19.) As long as state information is preserved in all links in the actual "output sent to the client"—the entire point of the invention—then nothing about this embodiment is excluded by Groupon's construction.

IBM points to another embodiment in which the converter program that adds state information might also wish to "add hypertext links each time the name of a company in the database appears in an HTML page." (*Id.* at 17:36-54.) Nothing in Groupon's construction prohibits adding additional links to a returned page as long as those links also include the required state information. As for the example, described in Fig. 8, in which a "convert2" program might process output before it is sent to "convert 1" to embed state information by converting links, Groupon's construction again does not exclude this embodiment. (*Id.* at 12:18-41; Fig. 4.) It merely requires—as do the claim language, specification, and prosecution history—that "all continuations" in the output sent to the client include the claimed state information. Nothing more.

## IV. CONCLUSION

For the foregoing reasons, the Court should adopt Groupon's proposed claim constructions.

ASHBY & GEDDES

/s/ *John G. Day*

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant Groupon, Inc.*

*Of Counsel:*

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
Adam M. Lewin
FENWICK & WEST LLP
Silicon Valley Center
801 California Street, 12th Floor
Mountain View, CA 94041
(650) 988-8500

Dated: May 5, 2017