# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) | C.A. No. 1:16-cv-122-LPS-CJB |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| GROUPON, INC. AND LIVINGSOCIAL, INC., | ) ) ) | |
| Defendants. | ) ) | |

<u>**IBM'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**</u>

Plaintiff International Business Machines Corporation ("IBM"), for its Complaint for

Patent Infringement against Groupon, Inc. ("Groupon") and LivingSocial, Inc. ("LivingSocial")

(collectively "Defendants"), alleges as follows:

<u>**INTRODUCTION**</u>

1.     IBM is a world leader in technology and innovation.  IBM spends billions of

dollars each year on research and development, and those efforts have resulted in the issuance of

more than 60,000 patents worldwide.  Patents enjoy the same fundamental protections as real

property.  IBM, like any property owner, is entitled to insist that others respect its property and to

demand payment from those who take it for their own use.  Groupon and LivingSocial have built

their business model on the use of IBM's patents.  Moreover, despite IBM's repeated attempts to

negotiate, Groupon and LivingSocial refuse to take a license but continue to use IBM's property.

This lawsuit seeks to stop Defendants from continuing to use IBM's intellectual property without

authorization.

## NATURE OF THE CASE

2.      This action arises under 35 U.S.C. § 271 for Groupon's infringement of IBM's United States Patent Nos. 5,796,967 (the "'967 patent"), 7,072,849 (the "'849 patent"), 5,961,601 (the "'601 patent"), and 7,631,346 (the "'346 patent") (collectively the "Patents-In-Suit") and LivingSocial's infringement of the '967 patent, the '849 patent, and the '346 patent.

## THE PARTIES

3.      Plaintiff IBM is a New York corporation, with its principal place of business at 1 New Orchard Road, Armonk, New York 10504.

4.      Defendant Groupon, Inc. is a Delaware corporation with a principle place of business at 600 West Chicago Avenue, Suite 400, Chicago, Illinois 60654.  Groupon may be served through its registered agent for service, The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

5.      Groupon operates online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount through the website www.groupon.com and through Groupon mobile applications.

6.      Defendant LivingSocial, Inc. is a Delaware corporation with a principle place of business at 1445 New York Ave NW, Suite 200, Washington, District of Columbia, 20005. LivingSocial may be served through its registered agent for service, the Corporation Service Company, 2711 Centerville Rd, Suite 400, Wilmington, Delaware, 19808.

7.      LivingSocial operates online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount through the website www.livingsocial.com and through LivingSocial mobile applications.

8.      On October 31, 2016 all of the outstanding shares of LivingSocial were acquired by Groupon, Inc.

## JURISDICTION AND VENUE

9.      This action arises under the patent laws of the United States, including 35 U.S.C.

§ 271 *et seq.*  The jurisdiction of this Court over the subject matter of this action is proper under

28 U.S.C. §§ 1331 and 1338(a).

10.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and

1400(b).

11.      Personal jurisdiction exists over Groupon because Groupon conducts business in

Delaware, by at least offering for sale and selling products and services through its websites and

mobile applications, which are accessible in Delaware, and because infringement has occurred

and continues to occur in Delaware.  Personal jurisdiction also exists over Groupon because

Groupon is a corporation organized under the laws of Delaware.

12.      Personal jurisdiction exists over LivingSocial because LivingSocial conducts

business in Delaware, by at least offering for sale and selling products and services through its

websites and mobile applications, which are accessible in Delaware, and because infringement

has occurred and continues to occur in Delaware.  Personal jurisdiction also exists over

LivingSocial because LivingSocial is a corporation organized under the laws of Delaware.

## FACTUAL BACKGROUND

**A.      IBM Is A Recognized Innovator.**

13.      IBM is recognized throughout the world as a pioneer in many aspects of science

and technology.  On eight occasions, more times than any other company or organization, IBM

has been awarded the U.S. National Medal of Technology, the nation's highest award for

technological innovation.  During IBM's over 100-year history, IBM's employees have included

six Nobel laureates, five National Medal of Science recipients, and at least fourteen inventors in

the National Inventors Hall of Fame.

14.     These and other IBM employees have introduced the world to technology that the global community takes for granted today, including the dynamic random access memory—DRAMs—found in nearly all modern computers; magnetic disk storage—hard disk drives—found in computers and portable music players; and some of the world's most powerful supercomputers, including Deep Blue, the first computer to beat a reigning chess champion and which is on display at the Smithsonian's National Museum of American History in Washington, D.C.  IBM's commitment to developing these types of advanced computing technologies has helped to usher in the information age.

**B.**     **IBM Is Committed To Protecting Its Innovations Through The Patent System.**

15.     IBM's research and development operations differentiate IBM from many other companies.  IBM annually spends billions of dollars for research and development.  In addition to yielding inventions that have literally changed the way in which the world works, IBM's research and development efforts have resulted in more than 60,000 patents worldwide.  For over two decades the United States Patent and Trademark Office ("USPTO") has issued more patents to IBM than to any other company in the world.

16.     Like the research upon which the patents are based, IBM's patents also benefit society.  Indeed, the Supreme Court has recognized that the patent system encourages both the creation and the disclosure of new and useful advances in technology.  Such disclosure, in turn, permits society to innovate further.  And, as the Court has further recognized, as a reward for committing resources to innovation and for disclosing that innovation, the patent system provides patent owners with the exclusive right to prevent others from practicing the claimed invention for a limited period of time.

C.    **IBM Routinely Licenses Its Patents In Many Fields, But Will Enforce Its Rights Against Those Who Take Its Intellectual Property Unlawfully.**

17.    IBM's commitment to creating a large patent portfolio underscores the value that IBM places in the exchange of innovation, and disclosure of that innovation, in return for limited exclusivity.  Indeed, IBM has used its patent portfolio to generate revenue and other significant value for the company by executing patent cross-license agreements.  The revenue generated through patent licensing enables IBM to continue to commit resources to innovation.  Cross licensing, in turn, provides IBM with the freedom to innovate and operate in a manner that respects the technology of others.

18.    Given the investment IBM makes in the development of new technologies and the management of its patent portfolio, IBM and its shareholders expect companies to act responsibly with respect to IBM's patents.  IBM facilitates this by routinely licensing its patents in many fields and by working with companies that wish to use IBM's technology in those fields in which IBM grants licenses.  When a company appropriates IBM's intellectual property but refuses to negotiate a license, IBM has no choice but to seek judicial assistance.

D.    **IBM Invented Methods For Presenting Applications And Advertisements In An Interactive Service While Developing The PRODIGY Online Service.**

19.    The inventors of the '967 and '849 patents developed the patented technology as part of the efforts to launch the PRODIGY online service ("Prodigy"), a forerunner to today's Internet, in the late 1980s.  The inventors believed that to be commercially viable, Prodigy would have to provide interactive applications to millions of users with minimal response times.  The inventors believed that the "dumb" terminal approach that had been commonly used in conventional systems, which heavily relied on host servers' processing and storage resources for performance, would not be suitable.  As a result, the inventors sought to develop more efficient

methods of communication that would improve the speed and functionality of interactive applications and reduce equipment capital and operating costs.

20.     In light of the above considerations, the inventors developed novel methods for presenting applications and advertisements in an interactive service that would take advantage of the computing power of each user's PC and thereby reduce demand on host servers, such as those used by Prodigy.  The inventors recognized that if applications were structured to be comprised of "objects" of data and program code capable of being processed by a user's PC, the Prodigy system would be more efficient than conventional systems.  By harnessing the processing and storage capabilities of the user's PC, applications could then be composed on the fly from objects stored locally on the PC, reducing reliance on Prodigy's server and network resources.

21.     Prodigy embodied inventions from the '967 and '849 patents when it launched in the late 1980s, before the existence of the World Wide Web.  The efficiencies derived from the use of the patented technology permitted the implementation of one the first graphical user interfaces for online services.  The efficiencies also allowed Prodigy to quickly grow its user base.  By 1990, Prodigy had become one of the largest online service providers with hundreds of thousands of users.  The technological innovations embodied in these patents persist to this day and are fundamental to the efficient communication of Internet content.

**E.     IBM Invented Methods Of Preserving State Information In A Continuing Conversation Between A Client And Server Networked Via A Stateless Protocol.**

22.     The inventor of the '601 patent, Arun K. Iyengar, developed the patented technology as part of IBM's efforts to discover a better technique of preserving state information in Internet communications.  State information allows clients and servers to keep track of prior communications during a conversation.  For example, online merchants can use state information

to keep track of a client's product and service selections while the client is shopping and then use

that information when the client decides to make a purchase.  However, typical Internet

communication protocols, such as HTTP, are stateless, in other words, they do not have a built-in

mechanism to keep track of state information.  At the time of the invention, engineers attempted

to solve this problem by passing state information as hidden variables within forms or by using

"Cookies."  Both of those methods had significant drawbacks and limited the types of

interactions that could preserve state information.

23.     The inventor recognized the need for techniques to preserve state information that

supported a wide variety of network interactions.  He thus developed novel methods of

recursively embedding state information into communications between clients and servers.  For

example, the specification of the '601 patent discloses program modules that modify hypertext

links in HTML pages in a way that preserves state information for the duration of a conversation.

By transforming Internet communications in this way, the patented technology of the '601 patent

provides an efficient mechanism to build on previous communications between a server and a

client, such as between an online merchant and a customer.

**F.     IBM Invented Methods For A Runtime User Account Creation Operation Using A Single-Sign-On Process In A Federated Computer Environment.**

24.     The inventors of the '346 patent developed the patented technology as part of

IBM's efforts to improve single-sign-on technology.  To access a protected resource at a service

provider on the Internet, a user typically has to authenticate him or herself with the service

provider.  Single-sign-on technology facilitates a user's connection to resources by requiring

only one authorization operation during a particular user session.  However, conventional

technology at the time of the invention required that the user already have an account with the

service provider to use single-sign-on technology.

25.     The inventors of the '346 patent sought to develop single-sign-on technology that would permit a new user of a service provider to access protected resources.  They developed novel methods for systems interacting within a federated computing environment to trigger a single-sign-on operation on behalf of a user that would obtain access to a protected resource and create an account for the user.  The specification discloses how to structure a federated computing environment and the sequence and content of interactions between different systems that can support the patented methods.  The '346 patent thus extends the benefits of single-sign-on technology.

**G.      Groupon And LivingSocial Have Built Their Businesses By Infringing IBM's Patents.**

26.     Defendants are well-known companies that operate online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount through Defendants' websites, including www.groupon.com and www.livingsocial.com, and through Defendants' mobile applications, including those running on the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.  Groupon has grown rapidly and recently acquired LivingSocial.  Groupon and LivingSocial now generate billions of dollars of revenue per year.

27.     Rather than build its business on its own technologies, Groupon has appropriated the inventions of the Patents-In-Suit.  Websites under Groupon's control, including at least www.groupon.com, use the technology claimed by the Patents-In-Suit to implement online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount.  Groupon's mobile applications, including those running on the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems, use the technology claimed by

the Patents-In-Suit to implement online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount.

28.     On November 1, 2011, IBM sent an email to inform Groupon that Groupon was practicing the inventions of the '967 and '849 patents, among other patents.  Since 2011, IBM has tried to work with Groupon in an effort to negotiate a license agreement.  On August 11, 2014, IBM sent a letter to inform Groupon that Groupon was practicing the inventions of additional patents, including the '346 patent.  IBM has presented detailed examples of Groupon's infringement of the '967, '849, and '346 patents.

29.     On information and belief, Groupon received notice of the '601 patent from the complaint IBM filed on February 9, 2015 in this district, in the action of *International Business Machines Corporation v. Priceline Group Inc. et al*, No. 1:15-cv-137-LPS-CJB ("*Priceline* complaint").  Groupon knew or should have known that it infringed the '601 patent based on the allegations in the *Priceline* complaint.

30.     Groupon has refused to engage in any meaningful discussions about reaching a license agreement to end its infringement of IBM's patents.  Instead, Groupon has continued to willfully infringe IBM's patents so as to obtain the significant benefits of IBM's innovations without paying any compensation to IBM.

31.     Because IBM's over three-year struggle to negotiate a license agreement that remedies Groupon's unlawful conduct has failed, IBM has been forced to seek relief through litigation.  Among other relief sought, IBM seeks royalties on the billions of dollars in revenue that Groupon has received based on its unlawful infringement of IBM's patented technology.

32.     Similarly, LivingSocial has appropriated the inventions of the '967 patent, the '849 patent, and the '346 patent.  Websites under LivingSocial's control, including at least

www.livingsocial.com, use the technology claimed by the '967 patent, the '849 patent, and the '346 patent to implement online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount.  LivingSocial's mobile applications, including those running on the Apple iOS, Microsoft Windows, and Google Android operating systems, use the technology claimed by the '967 patent, the '849 patent, and the '346 patent to implement online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount.

33.     On October 14, 2014, IBM sent an email to inform LivingSocial that it was practicing the inventions of IBM's patents, including the '346 patent.  LivingSocial knew or should have known that it infringed the'346 patent based on IBM's email.

34.     On information and belief, LivingSocial received notice of the '967 patent and the '849 patent, and additional notice of the '346 patent, from the *Priceline* Complaint IBM filed on February 9, 2015 and from the original complaint that IBM filed in this action on March 2, 2016.  LivingSocial knew or should have known that it infringed the '967 patent, '849 patent, and '346 patent based on the allegations in the *Priceline* Complaint and the original complaint filed in this action.

35.     On information and belief, LivingSocial received additional notice of the '967 patent, the '849 patent, and the '346 patent while it was being acquired by Groupon.  Following LivingSocial's acquisition by Groupon, on October 31, 2016, LivingSocial knew or should have known that it infringed the'967 patent, the '849 patent, and the '346 patent based on the allegations against Groupon.

36.     Because IBM has been unable to negotiate a license agreement that remedies LivingSocial's unlawful conduct, IBM has been forced to seek relief through litigation.  Among

other relief sought, IBM seeks royalties on the millions of dollars in revenue that LivingSocial

has received based on its unlawful infringement of IBM's patented technology.

## COUNT ONE

## INFRINGEMENT OF THE '967 PATENT

37.     IBM is the owner of all right, title and interest in the '967 patent.  The '967 patent

was duly and properly issued by the USPTO on August 18, 1998.  The '967 patent was duly

assigned to IBM.  A copy of the '967 patent is attached hereto as Exhibit A.

38.     In violation of 35 U.S.C. § 271, Defendants have infringed, contributed to the

infringement of, and/or induced others to infringe one or more of the claims of the '967 patent by

having made, designed, offered for sale, sold, provided, used, maintained, and/or supported

Defendants' websites, including www.groupon.com and www.livingsocial.com, and Defendants'

mobile applications, including the Groupon and LivingSocial applications running on, for

example, the Apple iOS, Microsoft Windows, and Google Android operating systems.

39.     Groupon infringes at least claim 1 of the '967 patent by, for example:

        a.      presenting interactive applications (such as home, local, goods, etc.) on a

computer network (such as the Internet), the network including a multiplicity of user reception

systems (such as the computers or mobile devices of Groupon's customers) at which respective

users may request a multiplicity of available applications (such as home, local, goods, etc.), the

respective reception systems including a monitor (such as a computer monitor or mobile screen

of a Groupon customer) at which the applications requested can be presented as one or more

screens of display (such as a display region of home, local, goods, etc.).

        b.      generating a screen display at a respective reception system for a

requested application (such as home, local, goods, etc.), the screen display being generated by

the respective reception system from data objects having a prescribed data structure (such as

11

woff and/or jpeg files), at least some of which objects may be stored at the respective reception system (such as the computer or mobile device of a Groupon customer), the screen display including a plurality of partitions (such as the webpage, the menu bar, and/or the content for home, local, goods, etc.), the partitions being constructed from objects, the objects being retrieved from the objects stored at the respective reception system (such as the computer or mobile device of a Groupon customer), or if unavailable from the objects stored at the respective reception system, then from the network (such as the Internet), such that at least some of the objects may be used in more than one application (such as home, local, goods, etc.).

      c.      generating at least a first partition (such as the webpage and/or the content for home, local, goods, etc.) for presenting applications (such as home, local, goods, etc.).

      d.      generating concurrently with the first partition at least a second partition for presenting a plurality of command functions (such as the menu bar), the command functions including at least a first group which are selectable to permit movement between applications (such as home, local, goods, etc.).

      40.      LivingSocial infringes at least claim 1 of the '967 patent by, for example:

      a.      presenting interactive applications (such as escapes, shop, gifts, etc.) on a computer network (such as the Internet), the network including a multiplicity of user reception systems (such as the computers or mobile devices of LivingSocial's customers) at which respective users may request a multiplicity of available applications (such as escapes, shop, gifts, etc.), the respective reception systems including a monitor (such as a computer monitor or mobile screen of a LivingSocial customer) at which the applications requested can be presented as one or more screens of display (such as a display region of escapes, shop, gifts, etc.).

b.      generating a screen display at a respective reception system for a requested application (such as escapes, shop, gifts, etc.), the screen display being generated by the respective reception system from data objects having a prescribed data structure (such as svg or jpeg files), at least some of which objects may be stored at the respective reception system (such as the computer or mobile device of a LivingSocial customer), the screen display including a plurality of partitions (such as the webpage, the menu bar, and/or the content for escapes, shop, gifts, etc.), the partitions being constructed from objects, the objects being retrieved from the objects stored at the respective reception system (such as the computer or mobile device of a LivingSocial customer), or if unavailable from the objects stored at the respective reception system, then from the network (such as the Internet), such that at least some of the objects may be used in more than one application (such as escapes, shop, gifts, etc.).

c.      generating at least a first partition (such as the webpage and/or the content for escapes, shop, gifts, etc.) for presenting applications (such as escapes, shop, gifts, etc.).

d.      generating concurrently with the first partition at least a second partition for presenting a plurality of command functions (such as the menu bar), the command functions including at least a first group which are selectable to permit movement between applications (such as escapes, shop, gifts, etc.).

41.    IBM has been damaged by the infringement of its '967 patent by Defendants. IBM is entitled to recover from Defendants the damages sustained by IBM as a result of Defendants' wrongful acts.

42.    The infringement by Defendants of the '967 patent was deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT TWO

## INFRINGEMENT OF THE '849 PATENT

43.     IBM is the owner of all right, title and interest in the '849 patent. The '849 patent

was duly and properly issued by the USPTO on July 4, 2006. The '849 patent was duly assigned

to IBM. A copy of the '849 patent is attached hereto as Exhibit B.

44.     In violation of 35 U.S.C. § 271, Defendants have infringed, contributed to the

infringement of, and/or induced others to infringe one or more of the claims of the '849 patent by

having made, designed, offered for sale, sold, provided, used, maintained, and/or supported

Defendants' websites, including www.groupon.com and www.livingsocial.com, and Defendants'

mobile applications, including the Groupon and LivingSocial applications running on, for

example, the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating

systems. Defendants' infringement is ongoing.

45.     Groupon infringes at least claim 1 of the '849 patent by, for example:

a.      presenting advertising obtained from a computer network (such as the

Internet), the network including a multiplicity of user reception systems (such as the computers

or mobile devices of Groupon's customers) at which respective users can request applications

(such as home, local, goods, etc.), from the network, that include interactive services (such as

offering goods and services at a discount), the respective reception systems including a monitor

(such as a computer monitor or mobile screen of a Groupon customer) at which at least the visual

portion of the applications can be presented as one or more screens of display, the method

comprising the steps of:

b.      structuring applications (such as home, local, goods, etc.) so that they may

be presented, through the network, at a first portion (such as the webpage and/or the content for

home, local, goods, etc.) of one or more screens of display; and

c.      structuring advertising (such as advertising for coupon codes) in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion (such as a banner) of one or more screens of display concurrently with applications (such as home, local, goods, etc.), wherein structuring the advertising includes configuring the advertising as objects (such as woff or jpeg files) that include advertising data and;

d.      selectively storing (such as by embedding a cache control parameter) advertising objects at a store (such as the browser cache) established at the reception system.

46.      LivingSocial infringes at least claim 1 of the '849 patent by, for example:

a.      presenting advertising obtained from a computer network (such as the Internet), the network including a multiplicity of user reception systems (such as the computers or mobile devices of LivingSocial's customers) at which respective users can request applications (such as escapes, shop, gifts, etc.), from the network, that include interactive services (such as offering goods and services at a discount), the respective reception systems including a monitor (such as a computer monitor or mobile screen of a LivingSocial customer) at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

b.      structuring applications (such as escapes, shop, gifts, etc.) so that they may be presented, through the network, at a first portion (such as the webpage and/or the content for escapes, shop, gifts, etc.) of one or more screens of display; and

c.      structuring advertising (such as advertising for coupon codes) in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion (such as a banner) of one or more screens of display concurrently with

applications (such as escapes, shop, gifts, etc.), wherein structuring the advertising includes configuring the advertising as objects (such as svg or jpeg files) that include advertising data and;

    d.  selectively storing (such as by embedding a cache control parameter) advertising objects at a store (such as the browser cache) established at the reception system.

  47.  IBM has been damaged by the infringement of its '849 patent by Defendants and will continue to be damaged by such infringement.  IBM is entitled to recover from Defendants the damages sustained by IBM as a result of Defendants' wrongful acts.

  48.  The continued infringement by Defendants of the '849 patent is deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

  49.  IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Defendants are enjoined therefrom by this Court.

**<u>COUNT THREE</u>**

**<u>INFRINGEMENT OF THE '601 PATENT</u>**

  50.  IBM is the owner of all right, title and interest in the '601 patent.  The '601 patent was duly and properly issued by the USPTO on October 5, 1999.  The '601 patent was duly assigned to IBM.  A copy of the '601 patent is attached hereto as Exhibit C.

  51.  In violation of 35 U.S.C. § 271, Groupon has infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '601 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported its websites, including www.groupon.com, and its mobile applications, including the Groupon

16

applications for mobile devices running on, for example, the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.  Groupon's infringement is continuing.

52.     Groupon infringes at least claim 51 of the '601 patent by, for example:

a.     preserving state information (such as identification variables about the user and/or the user's request) in a conversation via a stateless protocol (such as http or https) between a client adapted to request services (such as requesting goods and services) from one or more servers (such as Groupon's website servers), the method comprising the steps of:

b.     receiving a service request (such as a request to search for goods and services, including for example "getaways") including state information, via the stateless protocol;

c.     identifying all continuations (such as hyperlinks or other URL references) in an output from said service (such as webpage requests or search results) and recursively embedding the state information (such as inserting identification variables) in all identified continuations, in response to said request; and

d.     communicating a response including the continuations and embedded state information, wherein the continuations enable another service request (such as the process of reserving goods or services, including "getaways" or another HTTP request) and one of the continuations must be invoked to continue the conversation.

53.     IBM has been damaged by the infringement of its '601 patent by Groupon and will continue to be damaged by such infringement.  IBM is entitled to recover from Groupon the damages sustained by IBM as a result of Groupon's wrongful acts.

54.      IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Groupon is enjoined therefrom by this Court.

## COUNT FOUR

## INFRINGEMENT OF THE '346 PATENT

55.      IBM is the owner of all right, title and interest in the '346 patent.  The '346 patent was duly and properly issued by the USPTO on December 8, 2009.  The '346 patent was duly assigned to IBM.  A copy of the '346 patent is attached hereto as Exhibit D.

56.      In violation of 35 U.S.C. § 271, Defendants have infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '346 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported Defendants' websites, including www.groupon.com and www.livingsocial.com, and Defendants' mobile applications, including the Groupon and LivingSocial applications running on, for example, the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.  Defendants' infringement is ongoing.

57.      Groupon infringes at least claim 1 of the '346 patent by, for example:

a.      managing user authentication (such as verifying the identity of a Groupon user) within a distributed data processing system (such as a computer network), wherein a first system (such as Facebook and its network) and a second system (such as Groupon and its network) interact within a federated computing environment (such as a computer network for example the Internet including Facebook and Groupon) and support single-sign-on operations ("Sign In" operations) in order to provide access to protected resources (such as the "BUY!" option on Groupon), at least one of the first system and the second system comprising a processor, the method comprising;

b.      triggering a single-sign-on operation (such as launching an operation to "Sign In" using Facebook) on behalf of the user in order to obtain access to a protected resource that is hosted by the second system, wherein the second system requires a user account for the user to complete the single-sign-on operation (such as requiring the user to have a Groupon account) prior to providing access to the protected resource;

c.      receiving from the first system at the second system an identifier associated with the user (such as an email address, Facebook ID, or access token); and

d.      creating a user account (such as a Groupon account) for the user at the second system based at least in part on the received identifier associated with the user after triggering the single-sign-on operation but before generating at the second system a response for accessing the protected resource (such as the "BUY!" option), wherein the created user account supports single-sign-on operations (such as "Sign In" operations at Groupon using a Facebook account) between the first system and the second system on behalf of the user.

58.     LivingSocial infringes at least claim 1 of the '346 patent by, for example:

a.      managing user authentication (such as verifying the identity of a LivingSocial user) within a distributed data processing system (such as a computer network), wherein a first system (such as Facebook and its network) and a second system (such as LivingSocial and its network) interact within a federated computing environment (such as a computer network for example the Internet including Facebook and LivingSocial) and support single-sign-on operations ("log in" operations) in order to provide access to protected resources (such as the "My stuff" option on LivingSocial), at least one of the first system and the second system comprising a processor, the method comprising;

b.        triggering a single-sign-on operation (such as launching an operation to "log in" using Facebook) on behalf of the user in order to obtain access to a protected resource that is hosted by the second system, wherein the second system requires a user account for the user to complete the single-sign-on operation (such as requiring the user to have a LivingSocial account) prior to providing access to the protected resource;

c.        receiving from the first system at the second system an identifier associated with the user (such as an email address, Facebook ID, or access token); and

d.        creating a user account (such as a LivingSocial account) for the user at the second system based at least in part on the received identifier associated with the user after triggering the single-sign-on operation but before generating at the second system a response for accessing the protected resource (such as the "My stuff" option), wherein the created user account supports single-sign-on operations (such as "log in" operations at LivingSocial using a Facebook account) between the first system and the second system on behalf of the user.

59.     IBM has been damaged by the infringement of its '346 patent by Defendants and will continue to be damaged by such infringement.  IBM is entitled to recover from Defendants the damages sustained by IBM as a result of Defendants' wrongful acts.

60.     The continued infringement by Defendants of the '346 patent is deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

61.     IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Defendants are enjoined therefrom by this Court.

## RELIEF REQUESTED

Wherefore, IBM respectfully requests that this Court enter judgment against the

Defendant as follows:

A.    That the '967 patent has been infringed by Defendants;

B.    That Defendants' infringement of the '967 patent has been willful;

C.    That the '849 patent has been infringed by Defendants;

D.    That Defendants' infringement of the '849 patent has been willful;

E.    An injunction against further infringement of the '849 patent;

F.    That the '601 patent has been infringed by Groupon;

G.    That Groupon's infringement of the '601 patent has been willful;

H.    That the '346 patent has been infringed by Defendants;

I.    That Defendants' infringement of the '346 patent has been willful;

J.    An injunction against further infringement of the '346 patent;

K.    An award of damages adequate to compensate IBM for the patent infringement

that has occurred, together with pre-judgment interest and costs;

L.    An award of all other damages permitted by 35 U.S.C. § 284, including increased

damages up to three times the amount of compensatory damages found;

M.    That this is an exceptional case and an award to IBM of its costs and reasonable

attorneys' fees incurred in this action as provided by 35 U.S.C. § 285; and

N.    Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

IBM hereby demands trial by jury on all claims and issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

John M. Desmarais
Karim Z. Oussayef
Laurie Stempler
Robert C. Harrits
Brian D. Matty
Michael Matulewicz-Crowley
DESMARAIS LLP
230 Park Avenue
New York, NY  10169
Tel:  (212) 351-3400

By:   */s/ David E. Moore*                    
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Stephanie E. O'Byrne (#4446)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    sobyrne@potteranderson.com

*Attorneys for Plaintiff International Business Machines Corporation*

Dated:  May 19, 2017

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) | C.A. No. ——————————1:16-cv-122-LPS-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC. AND LIVINGSOCIAL, INC., | ) ) ) ) | |
| DefendantDefendants. | ) | |

**IBM'S FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff International Business Machines Corporation ("IBM"), for its Complaint for

Patent Infringement against Groupon, Inc. ("Groupon")("Groupon") and LivingSocial, Inc.

("LivingSocial") (collectively "Defendants"), alleges as follows:

**INTRODUCTION**

1.      IBM is a world leader in technology and innovation.  IBM spends billions of

dollars each year on research and development, and those efforts have resulted in the issuance of

more than 60,000 patents worldwide.  Patents enjoy the same fundamental protections as real

property.  IBM, like any property owner, is entitled to insist that others respect its property and to

demand payment from those who take it for their own use.  Groupon hasand LivingSocial have

built itstheir business model on the use of IBM's patents.  Moreover, despite IBM's repeated

attempts to negotiate, Groupon refusesand LivingSocial refuse to take a license, but

continuescontinue to use IBM's property.  This lawsuit seeks to stop GrouponDefendants from

continuing to use IBM's intellectual property without authorization.

**NATURE OF THE CASE**

1.2.    This action arises under 35 U.S.C. § 271 for Groupon's infringement of IBM's United States Patent Nos. 5,796,967 (the "'967 patent"), 7,072,849 (the "'849 patent"), 5,961,601 (the "'601 patent"), and 7,631,346 (the "'346 patent") (collectively the "Patents-In-Suit").") and LivingSocial's infringement of the '967 patent, the '849 patent, and the '346 patent.

**THE PARTIES**

2.3.    Plaintiff IBM is a New York corporation, with its principal place of business at 1 New Orchard Road, Armonk, New York 10504.

3.4.    Defendant Groupon, Inc. is a Delaware corporation with a principle place of business at 600 West Chicago Avenue, Suite 400, Chicago, Illinois 60654.  Groupon may be served through its registered agent for service, The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

4.5.    Groupon operates online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount through the website www.groupon.com and through Groupon mobile applications.

6.    Defendant LivingSocial, Inc. is a Delaware corporation with a principle place of business at 1445 New York Ave NW, Suite 200, Washington, District of Columbia, 20005. LivingSocial may be served through its registered agent for service, the Corporation Service Company, 2711 Centerville Rd, Suite 400, Wilmington, Delaware, 19808.

7.    LivingSocial operates online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount through the website www.livingsocial.com and through LivingSocial mobile applications.

8.    On October 31, 2016 all of the outstanding shares of LivingSocial were acquired by Groupon, Inc.

## JURISDICTION AND VENUE

5.9.    This action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq*.  The jurisdiction of this Court over the subject matter of this action is proper under 28 U.S.C. §§ 1331 and 1338(a).

6.10.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

7.11.    Personal jurisdiction exists over Groupon because Groupon conducts business in Delaware, by at least offering for sale and selling products and services through its websites and mobile applications, which are accessible in Delaware, and because infringement has occurred and continues to occur in Delaware.  Personal jurisdiction also exists over Groupon because Groupon is a corporation organized under the laws of Delaware.

12.    Personal jurisdiction exists over LivingSocial because LivingSocial conducts business in Delaware, by at least offering for sale and selling products and services through its websites and mobile applications, which are accessible in Delaware, and because infringement has occurred and continues to occur in Delaware.  Personal jurisdiction also exists over LivingSocial because LivingSocial is a corporation organized under the laws of Delaware.

## FACTUAL BACKGROUND

**A.    IBM Is A Recognized Innovator.**

8.13.    IBM is recognized throughout the world as a pioneer in many aspects of science and technology.  On eight occasions, more times than any other company or organization, IBM has been awarded the U.S. National Medal of Technology, the nation's highest award for technological innovation.  During IBM's over 100-year history, IBM's employees have included six Nobel laureates, five National Medal of Science recipients, and at least fourteen inventors in the National Inventors Hall of Fame.

9.14.   These and other IBM employees have introduced the world to technology that the global community takes for granted today, including the dynamic random access memory—DRAMs—found in nearly all modern computers; magnetic disk storage—hard disk drives—found in computers and portable music players; and some of the world's most powerful supercomputers, including Deep Blue, the first computer to beat a reigning chess champion and which is on display at the Smithsonian's National Museum of American History in Washington, D.C.  IBM's commitment to developing these types of advanced computing technologies has helped to usher in the information age.

**B.**      **IBM Is Committed To Protecting Its Innovations Through The Patent System.**

10.15.  IBM's research and development operations differentiate IBM from many other companies.  IBM annually spends billions of dollars for research and development.  In addition to yielding inventions that have literally changed the way in which the world works, IBM's research and development efforts have resulted in more than 60,000 patents worldwide.  For over two decades the United States Patent and Trademark Office ("USPTO") has issued more patents to IBM than to any other company in the world.

11.16.  Like the research upon which the patents are based, IBM's patents also benefit society.  Indeed, the Supreme Court has recognized that the patent system encourages both the creation and the disclosure of new and useful advances in technology.  Such disclosure, in turn, permits society to innovate further.  And, as the Court has further recognized, as a reward for committing resources to innovation and for disclosing that innovation, the patent system provides patent owners with the exclusive right to prevent others from practicing the claimed invention for a limited period of time.

C.    **IBM Routinely Licenses Its Patents In Many Fields, But Will Enforce Its Rights Against Those Who Take Its Intellectual Property Unlawfully.**

~~12.~~17.  IBM's commitment to creating a large patent portfolio underscores the value that IBM places in the exchange of innovation, and disclosure of that innovation, in return for limited exclusivity.  Indeed, IBM has used its patent portfolio to generate revenue and other significant value for the company by executing patent cross-license agreements.  The revenue generated through patent licensing enables IBM to continue to commit resources to innovation.  Cross licensing, in turn, provides IBM with the freedom to innovate and operate in a manner that respects the technology of others.

~~13.~~18.  Given the investment IBM makes in the development of new technologies and the management of its patent portfolio, IBM and its shareholders expect companies to act responsibly with respect to IBM's patents.  IBM facilitates this by routinely licensing its patents in many fields and by working with companies that wish to use IBM's technology in those fields in which IBM grants licenses.  When a company appropriates IBM's intellectual property but refuses to negotiate a license, IBM has no choice but to seek judicial assistance.

D.    **IBM Invented Methods For Presenting Applications And Advertisements In An Interactive Service While Developing The PRODIGY Online Service.**

~~14.~~19.  The inventors of the '967 and '849 patents developed the patented technology as part of the efforts to launch the PRODIGY online service ("Prodigy"), a forerunner to today's Internet, in the late 1980s.  The inventors believed that to be commercially viable, Prodigy would have to provide interactive applications to millions of users with minimal response times.  The inventors believed that the "dumb" terminal approach that had been commonly used in conventional systems, which heavily relied on host servers' processing and storage resources for performance, would not be suitable.  As a result, the inventors sought to develop more efficient

methods of communication that would improve the speed and functionality of interactive applications and reduce equipment capital and operating costs.

15.20.  In light of the above considerations, the inventors developed novel methods for presenting applications and advertisements in an interactive service that would take advantage of the computing power of each user's PC and thereby reduce demand on host servers, such as those used by Prodigy.  The inventors recognized that if applications were structured to be comprised of "objects" of data and program code capable of being processed by a user's PC, the Prodigy system would be more efficient than conventional systems.  By harnessing the processing and storage capabilities of the user's PC, applications could then be composed on the fly from objects stored locally on the PC, reducing reliance on Prodigy's server and network resources.

16.21.  Prodigy embodied inventions from the '967 and '849 patents when it launched in the late 1980s, before the existence of the World Wide Web.  The efficiencies derived from the use of the patented technology permitted the implementation of one the first graphical user interfaces for online services.  The efficiencies also allowed Prodigy to quickly grow its user base.  By 1990, Prodigy had become one of the largest online service providers with hundreds of thousands of users.  The technological innovations embodied in these patents persist to this day and are fundamental to the efficient communication of Internet content.

**E.**    **IBM Invented Methods Of Preserving State Information In A Continuing Conservation~~Conversation~~ Between A Client And Server Networked Via A Stateless Protocol.**

17.22.   The inventor of the '601 patent, Arun K. Iyengar, developed the patented technology as part of IBM's efforts to discover a better technique of preserving state information in Internet communications.  State information allows clients and servers to keep track of prior communications during a conversation.  For example, online merchants can use state information

to keep track of a client's product and service selections while the client is shopping and then use that information when the client decides to make a purchase.  However, typical Internet communication protocols, such as HTTP, are stateless, in other words, they do not have a built-in mechanism to keep track of state information.  At the time of the invention, engineers attempted to solve this problem by passing state information as hidden variables within forms or by using "Cookies."  Both of those methods had significant drawbacks and limited the types of interactions that could preserve state information.

18.23.  The inventor recognized the need for techniques to preserve state information that supported a wide variety of network interactions.  He thus developed novel methods of recursively embedding state information into communications between clients and servers.  For example, the specification of the '601 patent discloses program modules that modify hypertext links in HTML pages in a way that preserves state information for the duration of a conversation.  By transforming Internet communications in this way, the patented technology of the '601 patent provides an efficient mechanism to build on previous communications between a server and a client, such as between an online merchant and a customer.

## F.   IBM Invented Methods For A Runtime User Account Creation Operation Using A Single-Sign-On Process In A Federated Computer Environment.

19.24.  The inventors of the '346 patent developed the patented technology as part of IBM's efforts to improve single-sign-on technology.  To access a protected resource at a service provider on the Internet, a user typically has to authenticate him or herself with the service provider.  Single-sign-on technology facilitates a user's connection to resources by requiring only one authorization operation during a particular user session.  However, conventional technology at the time of the invention required that the user already have an account with the service provider to use single-sign-on technology.

20.25.  The inventors of the '346 patent sought to develop single-sign-on technology that would permit a new user of a service provider to access protected resources.  They developed novel methods for systems interacting within a federated computing environment to trigger a single-sign-on operation on behalf of a user that would obtain access to a protected resource and create an account for the user.  The specification discloses how to structure a federated computing environment and the sequence and content of interactions between different systems that can support the patented methods.  The '346 patent thus extends the benefits of single-sign-on technology.

**G.**     **Groupon ~~Has~~And LivingSocial Have Built ~~Its Business~~Their Businesses By Infringing IBM's Patents.**

21.26.  ~~Groupon is a~~Defendants are well-known ~~company~~companies that ~~operates~~operate online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount through ~~its~~Defendants' websites, including www.groupon.com and www.livingsocial.com, and through ~~the Groupon~~Defendants' mobile applications, including those running on the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.  Groupon has grown rapidly and ~~now generates~~recently acquired LivingSocial.  Groupon and LivingSocial now generate billions of dollars of revenue per year.

22.27.  Rather than build its business on its own technologies, Groupon has appropriated the inventions of the Patents-In-Suit.  Websites under Groupon's control, including at least www.groupon.com, use the technology claimed by the Patents-In-Suit to implement online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount.  Groupon's mobile applications, including those running on the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems, use the technology claimed by

the Patents-In-Suit to implement online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount.

23.28.  On November 1, 2011, IBM sent an email to inform Groupon that Groupon was practicing the inventions of the '967 and '849 patents, among other patents.  Since 2011, IBM has tried to work with Groupon in an effort to negotiate a license agreement.  On August 11, 2014, IBM sent a letter to inform Groupon that Groupon was practicing the inventions of additional patents, including the '346 patent.  IBM has presented detailed examples of Groupon's infringement of the '967, '849, and '346 patents.

24.29.  On information and belief, Groupon received notice of the '601 patent from the complaint IBM filed on February 9, 2015 in this district, in the action of *International Business Machines Corporation v. Priceline Group Inc. et al*, No. 1:15-cv-137-LPS-CJB ("*Priceline* complaint").  Groupon knew or should have known that it infringed the '601 patent based on the allegations in the *Priceline* complaint.

25.30.  Groupon has refused to engage in any meaningful discussions about reaching a license agreement to end its infringement of IBM's patents.  Instead, Groupon has continued to willfully infringe IBM's patents so as to obtain the significant benefits of IBM's innovations without paying any compensation to IBM.

26.31.  Because IBM's over three-year struggle to negotiate a license agreement that remedies Groupon's unlawful conduct has failed, IBM has been forced to seek relief through litigation.  Among other relief sought, IBM seeks royalties on the billions of dollars in revenue that Groupon has received based on its unlawful infringement of IBM's patented technology.

32.     Similarly, LivingSocial has appropriated the inventions of the '967 patent, the '849 patent, and the '346 patent.  Websites under LivingSocial's control, including at least

www.livingsocial.com, use the technology claimed by the '967 patent, the '849 patent, and the '346 patent to implement online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount.  LivingSocial's mobile applications, including those running on the Apple iOS, Microsoft Windows, and Google Android operating systems, use the technology claimed by the '967 patent, the '849 patent, and the '346 patent to implement online local commerce marketplaces to connect merchants to consumers by offering goods and services at a discount.

33.     On October 14, 2014, IBM sent an email to inform LivingSocial that it was practicing the inventions of IBM's patents, including the '346 patent.  LivingSocial knew or should have known that it infringed the '346 patent based on IBM's email.

34.     On information and belief, LivingSocial received notice of the '967 patent and the '849 patent, and additional notice of the '346 patent, from the *Priceline* Complaint IBM filed on February 9, 2015 and from the original complaint that IBM filed in this action on March 2, 2016.  LivingSocial knew or should have known that it infringed the '967 patent, '849 patent, and '346 patent based on the allegations in the *Priceline* Complaint and the original complaint filed in this action.

35.     On information and belief, LivingSocial received additional notice of the '967 patent, the '849 patent, and the '346 patent while it was being acquired by Groupon.  Following LivingSocial's acquisition by Groupon, on October 31, 2016, LivingSocial knew or should have known that it infringed the '967 patent, the '849 patent, and the '346 patent based on the allegations against Groupon.

36.     Because IBM has been unable to negotiate a license agreement that remedies LivingSocial's unlawful conduct, IBM has been forced to seek relief through litigation.  Among

other relief sought, IBM seeks royalties on the millions of dollars in revenue that LivingSocial has received based on its unlawful infringement of IBM's patented technology.

## COUNT ONE

## INFRINGEMENT OF THE '967 PATENT

27.37.  IBM is the owner of all right, title and interest in the '967 patent.  The '967 patent was duly and properly issued by the USPTO on August 18, 1998.  The '967 patent was duly assigned to IBM.  A copy of the '967 patent is attached hereto as Exhibit A.

28.38.  In violation of 35 U.S.C. § 271, Groupon hasDefendants have infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '967 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported itsDefendants' websites, including www.groupon.com, and itswww.livingsocial.com, and Defendants' mobile applications, including the Groupon and LivingSocial applications running on, for example, the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.

29.39.  For example,Groupon infringes at least claim 1 of the '967'967 patent by, for example:

        a.      presenting interactive applications (such as home, local, goods, etc.) on a computer network (such as the Internet), the network including a multiplicity of user reception systems (such as the computers or mobile devices of Groupon's customers) at which respective users may request a multiplicity of available applications (such as home, local, goods, etc.), the respective reception systems including a monitor (such as a computer monitor or mobile screen of a Groupon customer) at which the applications requested can be presented as one or more screens of display (such as a display region of home, local, goods, etc.).

   b.  generating a screen display at a respective reception system for a requested application (such as home, local, goods, etc.), the screen display being generated by the respective reception system from data objects having a prescribed data structure (such as woff and/or jpeg files), at least some of which objects may be stored at the respective reception system (such as the computer or mobile device of a Groupon customer), the screen display including a plurality of partitions (such as the webpage, the menu bar, and/or the content for home, local, goods, etc.), the partitions being constructed from objects, the objects being retrieved from the objects stored at the respective reception system (such as the computer or mobile device of a Groupon customer), or if unavailable from the objects stored at the respective reception system, then from the network (such as the Internet), such that at least some of the objects may be used in more than one application (such as home, local, goods, etc.).

   c.  generating at least a first partition (such as the webpage and/or the content for home, local, goods, etc.) for presenting applications (such as home, local, goods, etc.).

   d.  generating concurrently with the first partition at least a second partition for presenting a plurality of command functions (such as the menu bar), the command functions including at least a first group which are selectable to permit movement between applications (such as home, local, goods, etc.).

   40.  LivingSocial infringes at least claim 1 of the '967 patent by, for example:

   a.  presenting interactive applications (such as escapes, shop, gifts, etc.) on a computer network (such as the Internet), the network including a multiplicity of user reception systems (such as the computers or mobile devices of LivingSocial's customers) at which respective users may request a multiplicity of available applications (such as escapes, shop, gifts, etc.), the respective reception systems including a monitor (such as a computer monitor or

mobile screen of a LivingSocial customer) at which the applications requested can be presented as one or more screens of display (such as a display region of escapes, shop, gifts, etc.).

        b.    generating a screen display at a respective reception system for a requested application (such as escapes, shop, gifts, etc.), the screen display being generated by the respective reception system from data objects having a prescribed data structure (such as svg or jpeg files), at least some of which objects may be stored at the respective reception system (such as the computer or mobile device of a LivingSocial customer), the screen display including a plurality of partitions (such as the webpage, the menu bar, and/or the content for escapes, shop, gifts, etc.), the partitions being constructed from objects, the objects being retrieved from the objects stored at the respective reception system (such as the computer or mobile device of a LivingSocial customer), or if unavailable from the objects stored at the respective reception system, then from the network (such as the Internet), such that at least some of the objects may be used in more than one application (such as escapes, shop, gifts, etc.).

        c.    generating at least a first partition (such as the webpage and/or the content for escapes, shop, gifts, etc.) for presenting applications (such as escapes, shop, gifts, etc.).

        d.    generating concurrently with the first partition at least a second partition for presenting a plurality of command functions (such as the menu bar), the command functions including at least a first group which are selectable to permit movement between applications (such as escapes, shop, gifts, etc.).

    30.41.  IBM has been damaged by the infringement of its '967 patent by GrouponDefendants.  IBM is entitled to recover from GrouponDefendants the damages sustained by IBM as a result of Groupon'sDefendants' wrongful acts.

31.42.  The infringement by ~~Groupon~~Defendants of the '967 patent was deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT TWO

## INFRINGEMENT OF THE '849 PATENT

32.43.  IBM is the owner of all right, title and interest in the '849 patent.  The '849 patent was duly and properly issued by the USPTO on July 4, 2006.  The '849 patent was duly assigned to IBM.  A copy of the '849 patent is attached hereto as Exhibit B.

33.44.  In violation of 35 U.S.C. § 271, ~~Groupon has~~Defendants have infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '849 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported ~~its~~Defendants' websites, including www.groupon.com~~,~~ and ~~its~~www.livingsocial.com, and Defendants' mobile applications, including the Groupon and LivingSocial applications running on, for example, the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.  ~~Groupon's~~Defendants' infringement is ongoing.

34.45.  ~~For example,~~ Groupon infringes at least claim 1 of the ~~'849~~'849 patent by, for example:

a.       presenting advertising obtained from a computer network (such as the Internet), the network including a multiplicity of user reception systems (such as the computers or mobile devices of Groupon's customers) at which respective users can request applications (such as home, local, goods, etc.), from the network, that include interactive services (such as offering goods and services at a discount), the respective reception systems including a monitor (such as a computer monitor or mobile screen of a Groupon customer) at which at least the visual

portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

        b.      structuring applications (such as home, local, goods, etc.) so that they may be presented, through the network, at a first portion (such as the webpage and/or the content for home, local, goods, etc.) of one or more screens of display; and

        c.      structuring advertising (such as advertising for coupon codes) in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion (such as a banner) of one or more screens of display concurrently with applications (such as home, local, goods, etc.), wherein structuring the advertising includes configuring the advertising as objects (such as woff or jpeg files) that include advertising data and;

        d.      selectively storing (such as by embedding a cache control parameter) advertising objects at a store (such as the browser cache) established at the reception system.

      46.     LivingSocial infringes at least claim 1 of the '849 patent by, for example:

        a.      presenting advertising obtained from a computer network (such as the Internet), the network including a multiplicity of user reception systems (such as the computers or mobile devices of LivingSocial's customers) at which respective users can request applications (such as escapes, shop, gifts, etc.), from the network, that include interactive services (such as offering goods and services at a discount), the respective reception systems including a monitor (such as a computer monitor or mobile screen of a LivingSocial customer) at which at least the visual portion of the applications can be presented as one or more screens of display, the method comprising the steps of:

       b.     structuring applications (such as escapes, shop, gifts, etc.) so that they may be presented, through the network, at a first portion (such as the webpage and/or the content for escapes, shop, gifts, etc.) of one or more screens of display; and

       c.     structuring advertising (such as advertising for coupon codes) in a manner compatible to that of the applications so that it may be presented, through the network, at a second portion (such as a banner) of one or more screens of display concurrently with applications (such as escapes, shop, gifts, etc.), wherein structuring the advertising includes configuring the advertising as objects (such as svg or jpeg files) that include advertising data and;

       d.     selectively storing (such as by embedding a cache control parameter) advertising objects at a store (such as the browser cache) established at the reception system.

35.47.  IBM has been damaged by the infringement of its '849 patent by ~~Groupon~~Defendants and will continue to be damaged by such infringement.  IBM is entitled to recover from ~~Groupon~~Defendants the damages sustained by IBM as a result of ~~Groupon's~~Defendants' wrongful acts.

36.48.  The continued infringement by ~~Groupon~~Defendants of the '849 patent is deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

37.49.  IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless ~~Groupon is~~Defendants are enjoined therefrom by this Court.

## COUNT THREE

### INFRINGEMENT OF THE '601 PATENT

~~38.~~50.  IBM is the owner of all right, title and interest in the '601 patent.  The '601 patent was duly and properly issued by the USPTO on October 5, 1999.  The '601 patent was duly assigned to IBM.  A copy of the '601 patent is attached hereto as Exhibit C.

~~39.~~51.  In violation of 35 U.S.C. § 271, Groupon has infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '601 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported its websites, including www.groupon.com, and its mobile applications, including the Groupon applications for mobile devices running on, for example, the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.  Groupon's infringement is continuing.

~~40.~~52.  ~~For example,~~ Groupon infringes at least claim 51 of the '601 patent by, for example:

> a.    preserving state information (such as identification variables about the user and/or the user's request) in a conversation via a stateless protocol (such as http or https) between a client adapted to request services (such as requesting goods and services) from one or more servers (such as Groupon's website servers), the method comprising the steps of:

> b.    receiving a service request (such as a request to search for goods and services, including for example "getaways") including state information, via the stateless protocol;

> c.    identifying all continuations (such as hyperlinks or other URL references) in an output from said service (such as webpage requests or search results) and recursively embedding the state information (such as inserting identification variables) in all identified continuations, in response to said request; and

17

d.      communicating a response including the continuations and embedded state information, wherein the continuations enable another service request (such as the process of reserving goods or services, including "getaways" or another HTTP request) and one of the continuations must be invoked to continue the conversation.

41.53.  IBM has been damaged by the infringement of its '601 patent by Groupon and will continue to be damaged by such infringement.  IBM is entitled to recover from Groupon the damages sustained by IBM as a result of Groupon's wrongful acts.

42.54.  IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Groupon is enjoined therefrom by this Court.

**COUNT FOUR**

**INFRINGEMENT OF THE '346 PATENT**

43.55.  IBM is the owner of all right, title and interest in the '346 patent.  The '346 patent was duly and properly issued by the USPTO on December 8, 2009.  The '346 patent was duly assigned to IBM.  A copy of the '346 patent is attached hereto as Exhibit D.

44.56.  In violation of 35 U.S.C. § 271, Groupon hasDefendants have infringed, contributed to the infringement of, and/or induced others to infringe one or more of the claims of the '346 patent by having made, designed, offered for sale, sold, provided, used, maintained, and/or supported itsDefendants' websites, including www.groupon.com, and itswww.livingsocial.com, and Defendants' mobile applications, including the Groupon and LivingSocial applications running on, for example, the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.  Defendants' infringement is ongoing. applications for mobile devices running on, for example, the Apple iOS, Microsoft Windows, BlackBerry, and Google Android operating systems.  Groupon's infringement is continuing.

18

45.57.  For example, Groupon infringes at least claim 1 of the '346 patent by, for example:

      a.     managing user authentication (such as verifying the identity of a Groupon user) within a distributed data processing system (such as a computer network), wherein a first system (such as Facebook and its network) and a second system (such as Groupon and its network) interact within a federated computing environment (such as a computer network for example the Internet including Facebook and Groupon) and support single-sign-on operations ("Sign In" operations) in order to provide access to protected resources (such as the "BUY!" option on Groupon), at least one of the first system and the second system comprising a processor, the method comprising;

      b.     triggering a single-sign-on operation (such as launching an operation to "Sign In" using Facebook) on behalf of the user in order to obtain access to a protected resource that is hosted by the second system, wherein the second system requires a user account for the user to complete the single-sign-on operation (such as requiring the user to have a Groupon account) prior to providing access to the protected resource;

      c.     receiving from the first system at the second system an identifier associated with the user (such as an email address, Facebook ID, or access token); and

      d.     creating a user account (such as a Groupon account) for the user at the second system based at least in part on the received identifier associated with the user after triggering the single-sign-on operation but before generating at the second system a response for accessing the protected resource (such as the "BUY!" option), wherein the created user account supports single-sign-on operations (such as "Sign In" operations at Groupon using a Facebook account) between the first system and the second system on behalf of the user.

58.     LivingSocial infringes at least claim 1 of the '346 patent by, for example:

a.     managing user authentication (such as verifying the identity of a LivingSocial user) within a distributed data processing system (such as a computer network), wherein a first system (such as Facebook and its network) and a second system (such as LivingSocial and its network) interact within a federated computing environment (such as a computer network for example the Internet including Facebook and LivingSocial) and support single-sign-on operations ("log in" operations) in order to provide access to protected resources (such as the "My stuff" option on LivingSocial), at least one of the first system and the second system comprising a processor, the method comprising;

b.     triggering a single-sign-on operation (such as launching an operation to "log in" using Facebook) on behalf of the user in order to obtain access to a protected resource that is hosted by the second system, wherein the second system requires a user account for the user to complete the single-sign-on operation (such as requiring the user to have a LivingSocial account) prior to providing access to the protected resource;

c.     receiving from the first system at the second system an identifier associated with the user (such as an email address, Facebook ID, or access token); and

d.     creating a user account (such as a LivingSocial account) for the user at the second system based at least in part on the received identifier associated with the user after triggering the single-sign-on operation but before generating at the second system a response for accessing the protected resource (such as the "My stuff" option), wherein the created user account supports single-sign-on operations (such as "log in" operations at LivingSocial using a Facebook account) between the first system and the second system on behalf of the user.

46.59.  IBM has been damaged by the infringement of its '346 patent by Groupon~~Defendants and will continue to be damaged by such infringement.  IBM is entitled to recover from Groupon~~Defendants the damages sustained by IBM as a result of Groupon's~~Defendants' wrongful acts.

47.60.  The continued infringement by Groupon~~Defendants of the '346 patent is deliberate and willful, entitling IBM to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

61.    IBM has suffered and continues to suffer irreparable harm, for which there is no adequate remedy at law, and will continue to do so unless Groupon is~~Defendants are enjoined therefrom by this Court.

**RELIEF REQUESTED**

Wherefore, IBM respectfully requests that this Court enter judgment against the Defendant as follows:

A.    That the '967 patent has been infringed by Groupon~~Defendants;

B.    That Groupon's~~Defendants' infringement of the '967 patent has been willful;

C.    That the '849 patent has been infringed by Groupon~~Defendants;

D.    That Groupon's~~Defendants' infringement of the '849 patent has been willful;

E.    An injunction against further infringement of the '849 patent;

F.    That the '601 patent has been infringed by Groupon;

G.    That Groupon's infringement of the '601 patent has been willful;

H.    An injunction against further infringement of the '601 patent;

IH.    That the '346 patent has been infringed by Groupon~~Defendants;

JI.     That ~~Groupon's~~Defendants' infringement of the '346 patent has been willful;

KJ.     An injunction against further infringement of the '346 patent;

LK.     An award of damages adequate to compensate IBM for the patent infringement that has occurred, together with pre-judgment interest and costs;

ML.     An award of all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

NM.     That this is an exceptional case and an award to IBM of its costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285; and

ON.     Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

IBM hereby demands trial by jury on all claims and issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

John M. Desmarais
Karim Z. Oussayef
Laurie Stempler
Robert C. Harrits
Brian D. Matty
Michael Matulewicz-Crowley
DESMARAIS LLP
230 Park Avenue
New York, NY  10169
Tel:  (212) 351-3400

By:   _/s/ David E. Moore_
      David E. Moore (#3983)
      Bindu A. Palapura (#5370)
      Stephanie E. O'Byrne (#4446)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE  19801
      Tel:  (302) 984-6000
      dmoore@potteranderson.com
      bpalapura@potteranderson.com
      sobyrne@potteranderson.com

*Attorneys for Plaintiff International Business Machines Corporation*

Dated:  ~~March 2, 2016~~May 19, 2017
~~1217653 / 43155~~

22

# EXHIBIT 3



October 26, 2016

## Groupon Announces Third Quarter 2016 Results

*Added 1.2 million net new customers and achieved double digit billings growth in North America Local*

- **Gross billings of $1.43 billion**
- **Revenue of $720.5 million**
- **Net Loss of $35.8 million**
- **Adjusted EBITDA of $32.1 million**
- **GAAP loss per share of $0.07; non-GAAP loss per share of $0.01**
- **Operating Cash Flow of $78.9 million for the trailing twelve month period; Free Cash Flow of $14.2 million for the trailing twelve month period**
- **Fiscal year 2016 revenue guidance of $3.075 billion to $3.150 billion and 2016 Adjusted EBITDA guidance of $150.0 million to $165.0 million**
- **Agreed to acquire LivingSocial, expect to close by early November 2016**

CHICAGO--(BUSINESS WIRE)-- Groupon, Inc. (NASDAQ: GRPN) today announced financial results for the quarter ended September 30, 2016.

"Our strategy continues to deliver results with double-digit growth in North America local billings and our highest quarter for customer acquisition in over three years," said Groupon CEO Rich Williams. "We are looking forward to a strong finish to the year and further progress on our mission to make Groupon a daily habit for consumers."

### Third Quarter 2016 Summary

- Gross Billings were $1.43 billion in the third quarter 2016, down 2% from $1.47 billion in the third quarter 2015. Gross billings were impacted by dispositions and country exits in connection with Groupon's restructuring efforts. On a same-country basis, gross billings grew 1% year-over-year excluding the unfavorable impact of year-over-year changes in foreign exchange rates. North America gross billings increased 6%, reflecting the contribution of new active customer cohorts, while EMEA declined by 10% and Rest of World declined by 24%. Excluding the impact of changes in foreign exchange rates, EMEA declined 8% and Rest of World declined 23%. Gross billings reflect the total dollar value of customer purchases of goods and services.

- Revenue was $720.5 million in the third quarter 2016, compared with $713.6 million in the third quarter 2015. Revenue increased 1% globally, or 2% excluding the unfavorable impact from year-over-year changes in foreign exchange rates throughout the quarter. North America revenue increased 4%, EMEA declined 1% and Rest of World declined 19%. Excluding the impact of changes in foreign exchange rates, EMEA was flat year-over-year and Rest of World declined 15%.

- Gross profit was $314.1 million in the third quarter 2016, compared with $328.9 million in the third quarter 2015. Gross profit declined 4% globally. North America gross profit increased 5%, EMEA declined 18% and Rest of World declined 20%.

- Net loss from continuing operations was $35.8 million in the third quarter 2016, compared with $24.6 million in the third quarter 2015.

- Adjusted EBITDA, a non-GAAP performance measure, was $32.1 million in the third quarter 2016, compared with $56.3 million in the third quarter 2015, reflecting our increased investments in customer acquisition.

- Net loss attributable to common stockholders was $38.0 million, or $0.07 per share. Non-GAAP net loss attributable to common stockholders was $8.1 million, or $0.01 per share.

- Global units sold declined 5% year-over-year to 49 million, primarily driven by country exits and our restructuring efforts in international segments. Units in North America increased 4%, EMEA units declined 8%, and Rest of World units declined 31%. Units are defined as vouchers and products sold before cancellations and refunds.

- Operating cash flow for the trailing twelve months ended September 30, 2016 was $78.9 million. Free cash flow, a non-GAAP liquidity measure, was negative $53.7 million in the third quarter 2016, bringing free cash flow for the trailing twelve months ended September 30, 2016 to $14.2 million, which reflects the adverse cash flow impact of restructuring charges, country exits, and the funding of our securities litigation settlement.

- Cash and cash equivalents as of September 30, 2016 were $689.7 million, and we had no outstanding borrowings under our $250.0 million revolving credit facility.

Definitions and reconciliations of all non-GAAP financial measures are included below in the section titled "Non-GAAP Financial Measures" and in the accompanying tables.

**Highlights**

- **North America Local Billings grew 10% year-over-year.** North America Local Billings accelerated to 10% year-over-year growth as we continue to see the contribution of new cohorts.

- **North America accelerated customer growth with nearly 1.2 million incremental active customers.** Customer acquisition marketing yielded an incremental 1.2 million active customers in North America, as compared with the prior quarter, which is the highest acquisition in over three years. North America had 29.1 million active customers as of September 30, 2016. Active customers represent unique customer accounts that have purchased a voucher or product within the last twelve months.

- **SG&A declined $72.0 million, or $34.0 million excluding the impact of a litigation reserve recorded in the third quarter 2015, on solid execution of operational streamlining initiatives.** SG&A in all markets declined year-over-year as we continue to execute on our restructuring plan and scale regional shared service centers, which we expect to not only improve our customer service but also create greater operating leverage over time.

- **Streamlined country footprint.** The Company has identified its go-forward country footprint to consist of 15 countries, down from 27 in the portfolio as of the second quarter 2016. We are pursuing strategic alternatives and other options to exit the remaining countries, which we expect will continue into 2017.

**Acquisition of LivingSocial**

On October 24, 2016, Groupon entered into an agreement to acquire all of the outstanding shares of LivingSocial, Inc. The acquisition is expected to close by early November 2016, subject to satisfaction of customary closing conditions. The acquisition consideration is not material.

**Share Repurchase**

During the third quarter 2016, Groupon repurchased 5,213,778 shares of its Class A common stock for an aggregate purchase price of $24.6 million. Up to $244.7 million of Class A common stock was available for repurchase under Groupon's share repurchase program as of September 30, 2016. The timing and amount of any share repurchases are determined based on market conditions, share price and other factors, and the program may be discontinued or suspended at any time.

**Outlook**

Groupon's outlook for 2016 reflects current foreign exchange rates, as well as expected marketing investments, stabilizing trends in Shopping, the acquisition of LivingSocial, potential disruption related to country exits, and cost benefits associated with our streamlining initiatives.

Groupon is raising its revenue guidance range to between $3.075 and $3.150 billion for the full year, and narrowing its expected 2016 Adjusted EBITDA range to between $150.0 million and $165.0 million.

**Conference Call**

A conference call will be webcast live today at 4:00 p.m. CDT / 5:00 p.m. EDT, and will be available on Groupon's investor relations website at http://investor.groupon.com. This call will contain forward-looking statements and other material information regarding the Company's financial and operating results.

Groupon encourages investors to use its investor relations website as a way of easily finding information about the company. Groupon promptly makes available on this website, free of charge, the reports that the company files or furnishes with the SEC, corporate governance information (including Groupon's Global Code of Conduct), and select press releases and social media postings. Groupon uses its investor relations site (investor.groupon.com) and its blog (https://www.groupon.com/blog) as a means of disclosing material non-public information and for complying with its disclosure obligations under Regulation FD.

**Non-GAAP Financial Measures**

In addition to financial results reported in accordance with U.S. generally accepted accounting principles (U.S. GAAP), we have provided the following non-GAAP financial measures in this release and the accompanying tables: foreign exchange rate neutral operating results, adjusted EBITDA, non-GAAP net income loss attributable to common stockholders, non-GAAP earnings loss per share and free cash flow. These non-GAAP financial measures, which are presented on a continuing operations basis, are intended to aid investors in better understanding Groupon's current financial performance and its prospects for the future as seen through the eyes of management. We believe that these non-GAAP financial measures facilitate comparisons with our historical results and with the results of peer companies who present similar measures (although other companies may define non-GAAP measures differently than we define them, even when similar terms are used to identify such measures). However, non-GAAP financial measures are not intended to be a substitute for those reported in accordance with U.S. GAAP. For reconciliations of these measures to the most applicable financial measures under U.S. GAAP, see "Non-GAAP Reconciliation Schedules" and "Supplemental Financial Information and Business Metrics" included in the tables accompanying this release.

We exclude the following items from one or more of our non-GAAP financial measures:

*Stock-based compensation.* We exclude stock-based compensation because it is primarily non-cash in nature and we believe that non-GAAP financial measures excluding this item provide meaningful supplemental information about our operating performance and liquidity.

*Acquisition-related expense (benefit), net.* Acquisition-related expense (benefit), net is comprised of the change in the fair value of contingent consideration arrangements and external transaction costs related to business combinations, primarily consisting of legal and advisory fees. The composition of our contingent consideration arrangements and the impact of those arrangements on our operating results vary over time based on a number of factors, including the terms of our business combinations and the timing of those transactions. We exclude acquisition-related expense (benefit), net because we believe that non-GAAP financial measures excluding this item provide meaningful supplemental information about our operating performance and facilitate comparisons to our historical operating results.

*Depreciation and amortization.* We exclude depreciation and amortization expenses because they are non-cash in nature and we believe that non-GAAP financial measures excluding these items provide meaningful supplemental information about our operating performance and liquidity.

*Interest and Other Non-Operating Items.* Interest and other non-operating items include: gains and losses related to minority investments, foreign currency gains and losses, interest income and interest expense, including non-cash interest expense from our convertible senior notes. We exclude interest and other non-operating items from certain of our non-GAAP financial measures because we believe that excluding these items provides meaningful supplemental information about our core operating performance and facilitates comparisons to our historical operating results.

*Items That Are Unusual in Nature or Infrequently Occurring.* During the three and nine months ended September 30, 2016 and 2015, items that we believe to be unusual in nature or infrequently occurring were gains from business dispositions and charges related to our restructuring plan. During the three and nine months ended September 30, 2015, items that we believe to be unusual in nature or infrequently occurring also included the write-off of a prepaid asset related to a marketing program that was discontinued because the counterparty ceased operations and the expense related to a significant increase in the contingent liability for our securities litigation matter. We exclude items that are unusual in nature or infrequently occurring because we believe that excluding those items provides meaningful supplemental information about our core operating performance and facilitates comparisons to our historical results.

*Income Tax Effect of Items Excluded from Non-GAAP Financial Measures.* We determine the income tax effect of items excluded from our measures of non-GAAP net income (loss) attributable to common stockholders and non-GAAP earnings (loss) per share by performing a tax provision calculation using pre-tax income (loss) amounts that have been adjusted to exclude those items in the respective jurisdictions to which they relate. The difference between the income tax expense (benefit) determined on that basis and our reported income tax expense (benefit) represents the income tax effect of the excluded items.

Descriptions of the non-GAAP financial measures included in this release and the accompanying tables are as follows:

*Foreign exchange rate neutral operating results* show our current period operating results as if foreign currency exchange rates had remained the same as those in effect in the prior-year period. We present foreign exchange rate neutral information to facilitate comparisons to our historical operating results.

*Adjusted EBITDA* is a non-GAAP performance measure that we define as net income (loss) from continuing operations excluding income taxes, interest and other non-operating items, depreciation and amortization, stock-based compensation, acquisition-related expense (benefit), net, and items that are unusual in nature or infrequently occurring. Our definition of Adjusted EBITDA may differ from similar measures used by other companies, even when similar terms are used to identify such measures. Adjusted EBITDA is a key measure used by our management and Board of Directors to evaluate operating performance, generate future operating plans, and make strategic decisions regarding the allocation of capital. Accordingly, we believe that Adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating performance in the same manner as our management and Board of Directors.

*Non-GAAP net income (loss) attributable to common stockholders* and *non-GAAP earnings (loss) per share* are non-GAAP performance measures that adjust our net income (loss) attributable to common stockholders and earnings (loss) per share to exclude the impact of:

- stock-based compensation,

- amortization of acquired intangible assets,

- acquisition-related expense (benefit), net,

- gains on business dispositions,

- non-cash interest expense on convertible senior notes,

- items that are unusual in nature or infrequently occurring,

- non-operating foreign currency gains and losses related to intercompany balances and reclassifications of cumulative translation adjustments to earnings as a result of business dispositions or country exits,

- non-operating gains and losses from minority investments that we have elected to record at fair value with changes in fair value reported in earnings,

ι   income (loss) from discontinued operations, and

ι   the income tax effect of those items.

We believe that excluding the above items from our measures of non-GAAP net income (loss) attributable to common stockholders and non-GAAP earnings (loss) per share provides useful supplemental information for evaluating our operating performance and facilitates comparisons to our historical results by eliminating items that are non-cash in nature, relate to discrete events, or are otherwise not indicative of the core operating performance of our ongoing business.

*Free cash flow* is a non-GAAP liquidity measure that comprises net cash provided by (used in) operating activities from continuing operations less purchases of property and equipment and capitalized software from continuing operations. We use free cash flow to conduct and evaluate our business because, although it is similar to cash flow from operations, we believe that it typically represents a more useful measure of cash flows because purchases of fixed assets, software developed for internal-use, and website development costs are necessary components of our ongoing operations. Free cash flow is not intended to represent the total increase or decrease in Groupon's cash balance for the applicable period.

**Note on Forward-Looking Statements**

The statements contained in this release that refer to plans and expectations for the next quarter, the full year or the future are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, that involve a number of risks and uncertainties, and actual results could differ materially from those discussed. The words "may," "will," should," "could," "expect," anticipate," "believe," "estimate," "intend," "continue" and other similar expressions are intended to identify forward-looking statements. The risks and uncertainties that could cause our results to differ materially from those included in the forward-looking statements include, but are not limited to, volatility in our revenue and operating results; risks related to our business strategy, including our strategy to grow our local marketplaces, marketing strategy and spend and the productivity of those marketing investments and the impact of our shift away from lower margin products in our Goods category; effectively dealing with challenges arising from our international operations, including fluctuations in currency exchange rates and any potential adverse impact from the United Kingdom's likely exit from the European Union; retaining existing customers and adding new customers, including as we increase our marketing spend and shift away from lower margin products in our Goods category; retaining and adding high quality merchants; cyber security breaches; incurring expenses as we expand our business; competing successfully in our industry; maintaining favorable payment terms with our business partners; providing a strong mobile experience for our customers; delivery and routing of our emails; product liability claims; managing inventory and order fulfillment risks; integrating our technology platforms; litigation; managing refund risks; retaining, attracting and integrating members of our executive team; difficulties, delays or our inability to successfully complete all or part of the announced restructuring actions or to realize the operating efficiencies and other benefits of such restructuring actions; higher than anticipated restructuring charges or changes in the timing of such restructuring charges; completing and realizing the anticipated benefits from acquisitions, dispositions, joint ventures and strategic investments; tax liabilities; tax legislation; compliance with domestic and foreign laws and regulations, including the CARD Act and regulation of the Internet and e-commerce; classification of our independent contractors; maintaining our information technology infrastructure; protecting our intellectual property; maintaining a strong brand; seasonality; customer and merchant fraud; payment-related risks; our ability to raise capital if necessary and our outstanding indebtedness; global economic uncertainty; the impact of our ongoing strategic review and any potential strategic alternatives we may choose to pursue; our senior convertible notes; and our ability to realize the anticipated benefits from the hedge and warrant transactions. For additional information regarding these and other risks and uncertainties, we urge you to refer to the factors included under the headings "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the company's Annual Report on Form 10-K for the year ended December 31, 2015, Quarterly Reports on Form 10-Q for the quarters ended March 31, 2016, June 30, 2016 and September 30, 2016 and our other filings with the Securities and Exchange Commission, copies of which may be obtained by visiting the company's Investor Relations web site at http://investor.groupon.com or the SEC's web site at www.sec.gov. Groupon's actual results could differ materially from those predicted or implied and reported results should not be considered an indication of future performance.

You should not rely upon forward-looking statements as predictions of future events. Although Groupon believes that the expectations reflected in the forward-looking statements are reasonable, it cannot guarantee that the future results, levels of activity, performance or events and circumstances reflected in the forward-looking statements will be achieved or occur. Moreover, neither the company nor any other person assumes responsibility for the accuracy and completeness of the forward-looking statements. The forward-looking statements reflect Groupon's expectations as of October 26, 2016. Groupon undertakes no obligation to update publicly any forward-looking statements for any reason after the date of this release to conform these statements to actual results or to changes in its expectations.

**About Groupon**

Groupon (NASDAQ: GRPN) is building the daily habit in local commerce, offering a vast mobile and online marketplace where people discover and save on amazing things to do, see, eat and buy. By enabling real-time commerce across local businesses, travel destinations, consumer products and live events, shoppers can find the best a city has to offer.

Groupon is redefining how small businesses attract and retain customers by providing them with customizable and scalable marketing tools and services to profitably grow their businesses.

To download Groupon's top-rated mobile apps, visit www.groupon.com/mobile. To search for great deals or subscribe to Groupon emails, visit www.groupon.com. To learn more about the company's merchant solutions and how to work with Groupon, visit www.groupon.com/merchant.

**Groupon, Inc.**
**Summary Consolidated and Segment Results**
**(in thousands, except share and per share amounts)**
**(unaudited)**

The financial results of Ticket Monster are presented as discontinued operations in the accompanying condensed consolidated financial statements and tables for the nine months ended September 30, 2015. All prior period financial information and operational metrics have been retrospectively adjusted to reflect this presentation.

| | Three Months Ended September 30, | | Y/Y % Growth | FX Effect[2] | Y/Y % Growth excluding FX[2] | Nine Months Ended September 30, | | Y/Y % Growth | FX Effect[2] | Y/Y % Growth excluding FX[2] |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | 2015 | | | | 2016 | 2015 | | | |
| Gross Billings (1): | | | | | | | | | | |
| North America | $ 920,962 | $ 869,203 | 6.0% | $ 17 | 6.0% | $ 2,824,290 | $ 2,659,436 | 6.2% | $ (1,085) | 6.2% |
| EMEA | 370,992 | 414,482 | (10.5) | (8,371) | (8.5) | 1,144,528 | 1,307,207 | 12.4) | (20,595) | (10.9) |
| Rest of World | 140,201 | 183,849 | (23.7) | (1,802) | (22.8) | 428,229 | 581,905 | 26.4) | (35,628) | (20.3) |
| Consolidated gross billings | $ 1,432,155 | $ 1,467,534 | (2.4)% | $(10,156) | (1.7)% | $ 4,397,047 | $ 4,548,548 | (3.3)% | $(57,308) | (2.1)% |
| Revenue: | | | | | | | | | | |
| North America | $ 483,281 | $ 463,931 | 4.2% | $ 4 | 4.2% | $ 1,501,016 | $ 1,425,095 | 5.3% | $ (260) | 5.3% |
| EMEA | 196,573 | 199,287 | (1.4) | (2,718) | — | 583,848 | 619,554 | (5.8) | (7,626) | (4.5) |
| Rest of World | 40,614 | 50,377 | (19.4) | (1,976) | (15.5) | 123,605 | 157,697 | (21.6) | (14,576) | (12.4) |
| Consolidated revenue | $ 720,468 | $ 713,595 | 1.0% | $ (4,690) | 1.6% | $ 2,208,469 | $ 2,202,346 | 0.3% | $(22,462) | 1.3% |
| Income (loss) from operations | $ (26,685) | $ (70,423) | 62.1% | $ (562) | 62.9% | $ (117,187) | $ (74,354) | (57.6)% | $ (1,005) | (56.3)% |
| Income (loss) from continuing operations | $ (35,792) | $ (24,613) | | | | $ (133,119) | $ (56,619) | | | |
| Income (loss) from discontinued operations, net of tax | $ — | $ — | | | | $ — | $ 133,463 | | | |
| Net income (loss) attributable to Groupon, Inc. | $ (37,976) | $ (27,615) | | | | $ (141,999) | $ 67,196 | | | |
| **Basic net income (loss) per share:** | | | | | | | | | | |
| Continuing operations | $ (0.07) | $ (0.04) | | | | $ (0.25) | $ (0.10) | | | |
| Discontinued operations | — | — | | | | — | 0.20 | | | |
| **Basic net income (loss) per share** | $ (0.07) | $ (0.04) | | | | $ (0.25) | $ 0.10 | | | |
| **Diluted net income** | | | | | | | | | | |

| (loss) per share: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Continuing operations | $ | (0.07) | $ | (0.04) | | $ | (0.25) $ | (0.10) |
| Discontinued operations | | — | | — | | | — | 0.20 |
| **Diluted net income (loss) per share** | $ | (0.07) | $ | (0.04) | | $ | (0.25) $ | 0.10 |

| Weighted average number of shares outstanding | | | | |
|---|---|---|---|---|
| Basic | 575,216,191 | 644,894,785 | 578,290,291 | 664,302,630 |
| Diluted | 575,216,191 | 644,894,785 | 578,290,291 | 664,302,630 |

(1) Represents the total dollar value of customer purchases of goods and services, excluding applicable taxes and net of estimated refunds.

(2) Represents the change in financial measures that would have resulted had average exchange rates in the reporting period been the same as those in effect during the three and nine months ended September 30, 2015.

**Groupon, Inc.**
**Condensed Consolidated Statements of Cash Flows**
**(in thousands)**
**(unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2016** | **2015** [1] | **2016** | **2015** [1] |
| **Operating activities** | | | | |
| Net income (loss) | $ (35,792) | $ (24,613) | $ (133,119) | $ 76,844 |
| Less: Income (loss) from discontinued operations, net of tax | — | — | — | 133,463 |
| Income (loss) from continuing operations | (35,792) | (24,613) | (133,119) | (56,619) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | | |
| Depreciation and amortization of property, equipment and software | 28,845 | 30,475 | 88,697 | 84,241 |
| Amortization of acquired intangible assets | 4,408 | 5,160 | 13,643 | 14,966 |
| Stock-based compensation | 26,442 | 35,575 | 94,750 | 109,204 |
| Restructuring-related long-lived asset impairments | — | 345 | 45 | 345 |
| Gains on business dispositions | (2,060) | (13,710) | (11,399) | (13,710) |
| Deferred income taxes | (1,288) | (15,202) | (6,436) | (15,252) |
| (Gain) loss, net from changes in fair value of contingent consideration | (162) | 435 | 4,130 | (268) |
| (Gain) loss from changes in fair value of investments | 1,594 | 2,564 | 7,301 | 2,114 |
| Amortization of debt discount on convertible senior notes | 2,458 | — | 4,854 | — |
| Change in assets and liabilities, net of acquisitions: | | | | |
| Restricted cash | 361 | 1,392 | (332) | 4,555 |
| Accounts receivable | (4,798) | 16,635 | (3,593) | 6,353 |
| Prepaid expenses and other current assets | 44,266 | (33,366) | 10,738 | (39,813) |
| Accounts payable | 2,831 | 5,371 | (4,326) | (944) |
| Accrued merchant and supplier payables | (46,354) | (51,319) | (171,816) | (101,852) |
| Accrued expenses and other current liabilities | (51,854) | 51,169 | (47,919) | 57,214 |
| Other, net | (9,719) | (18,551) | (16,775) | (1,242) |
| Net cash provided by (used in) operating activities from continuing operations | (40,822) | (7,640) | (171,557) | 49,292 |
| Net cash provided by (used in) operating activities from discontinued operations | — | (19,205) | — | (36,578) |
| **Net cash provided by (used in) operating activities** | (40,822) | (26,845) | (171,557) | 12,714 |
| Net cash provided by (used in) investing activities from continuing operations | (12,088) | (98,028) | (51,719) | (146,012) |
| Net cash provided by (used in) investing activities from discontinued operations | — | — | — | 244,470 |
| **Net cash provided by (used in) investing activities** | (12,088) | (98,028) | (51,719) | 98,458 |

| | | | | |
|---|---|---|---|---|
| Net cash provided by (used in) financing activities | (38,342) | (14,793) | 52,868 | (192,188) |
| Effect of exchange rate changes on cash and cash equivalents, including cash classified within current assets held for sale | 867 | (6,923) | 6,793 | (27,338) |
| Net increase (decrease) in cash and cash equivalents, including cash classified within current assets held for sale | (90,385) | (146,589) | (163,615) | (108,354) |
| Less: Net increase (decrease) in cash classified within current assets held for sale | — | — | — | (55,279) |
| Net increase (decrease) in cash and cash equivalents | (90,385) | (146,589) | (163,615) | (53,075) |
| Cash and cash equivalents, beginning of period | 780,132 | 1,110,148 | 853,362 | 1,016,634 |
| Cash and cash equivalents, end of period | $ 689,747 | $ 963,559 | $ 689,747 | $ 963,559 |

(1) The Company adopted the guidance in Accounting Standards Update ("ASU") 2016-09, Compensation - Stock Compensation (Topic 718) - Improvements to Employee Share-Based Payment Accounting, on January 1, 2016. ASU 2016-09 requires that all income tax-related cash flows resulting from share-based payments be reported as operating activities in the statement of cash flows. Previously, income tax benefits at settlement of an award were reported as a reduction to operating cash flows and an increase to financing cash flows to the extent that those benefits exceeded the income tax benefits reported in earnings during the award's vesting period. The Company has elected to apply that change in cash flow classification on a retrospective basis, which has resulted in a decrease to net cash provided by (used in) operating activities and net cash used in financing activities of $0.03 million for the three months ended September 30, 2015, and increases to net cash provided by (used in) operating activities and net cash used in financing activities of $6.2 million for the nine months ended September 30, 2015.

**Groupon, Inc.**
**Condensed Consolidated Statements of Operations**
**(in thousands, except share and per share amounts)**
**(unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2016** | **2015** | **2016** | **2015** |
| Revenue: | | | | |
| Third party and other | $ 309,836 | $ 326,306 | $ 962,533 | $ 1,027,273 |
| Direct | 410,632 | 387,289 | 1,245,936 | 1,175,073 |
| Total revenue | 720,468 | 713,595 | 2,208,469 | 2,202,346 |
| Cost of revenue: | | | | |
| Third party and other | 40,419 | 46,050 | 131,000 | 145,292 |
| Direct | 365,932 | 338,633 | 1,090,436 | 1,043,729 |
| Total cost of revenue | 406,351 | 384,683 | 1,221,436 | 1,189,021 |
| Gross profit | 314,117 | 328,912 | 987,033 | 1,013,325 |
| Operating expenses: | | | | |
| Marketing | 87,858 | 61,587 | 269,616 | 171,127 |
| Selling, general and administrative | 253,554 | 326,248 | 811,710 | 904,816 |
| Restructuring charges | 1,459 | 24,146 | 29,988 | 24,146 |
| Gains on business dispositions | (2,060) | (13,710) | (11,399) | (13,710) |
| Acquisition-related expense (benefit), net | (9) | 1,064 | 4,305 | 1,300 |
| Total operating expenses | 340,802 | 399,335 | 1,104,220 | 1,087,679 |
| Income (loss) from operations | (26,685) | (70,423) | (117,187) | (74,354) |
| Other income (expense), net [1] | (7,028) | (8,160) | (14,303) | (25,146) |
| Income (loss) from continuing operations before provision (benefit) for income taxes | (33,713) | (78,583) | (131,490) | (99,500) |
| Provision (benefit) for income taxes | 2,079 | (53,970) | 1,629 | (42,881) |
| Income (loss) from continuing operations | (35,792) | (24,613) | (133,119) | (56,619) |
| Income (loss) from discontinued operations, net of tax | — | — | — | 133,463 |
| Net income (loss) | (35,792) | (24,613) | (133,119) | 76,844 |
| Net income attributable to noncontrolling interests | (2,184) | (3,002) | (8,880) | (9,648) |
| Net income (loss) attributable to Groupon, Inc. | $ (37,976) | $ (27,615) | $ (141,999) | $ 67,196 |
| Basic net income (loss) per share: | | | | |
| Continuing operations | $ (0.07) | $ (0.04) | $ (0.25) | $ (0.10) |
| Discontinued operations | — | — | — | 0.20 |
| Basic net income (loss) per share | $ (0.07) | $ (0.04) | $ (0.25) | $ 0.10 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Diluted net income (loss) per share:** | | | | | | | |
| Continuing operations | $ | (0.07) | $ | (0.04) | $ | (0.25) | $ | (0.10) |
| Discontinued operations | | — | | — | | — | | 0.20 |
| **Diluted net income (loss) per share** | $ | (0.07) | $ | (0.04) | $ | (0.25) | $ | 0.10 |

| | | | | |
|---|---|---|---|---|
| **Weighted average number of shares outstanding** | | | | |
| Basic | 575,216,191 | 644,894,785 | 578,290,291 | 664,302,630 |
| Diluted | 575,216,191 | 644,894,785 | 578,290,291 | 664,302,630 |

(1) Other income (expense), net includes foreign currency gains (losses), net of $0.2 million and $(5.2 million) for the three months ended September 30, 2016 and 2015, respectively, and foreign currency gains (losses), net of $5.4 million and $(22.1 million) for the nine months ended September 30, 2016 and 2015, respectively.

**Groupon, Inc.**
**Condensed Consolidated Balance Sheets**
**(in thousands, except share and per share amounts)**

| | September 30, 2016 | December 31, 2015 |
|---|---|---|
| | (unaudited) | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 689,747 | $ 853,362 |
| Accounts receivable, net | 74,047 | 68,175 |
| Prepaid expenses and other current assets | 145,280 | 153,705 |
| Total current assets | 909,074 | 1,075,242 |
| Property, equipment and software, net | 179,987 | 198,897 |
| Goodwill | 289,856 | 287,332 |
| Intangible assets, net | 25,475 | 36,483 |
| Investments (including $150,532 and $163,675 at September 30, 2016 and December 31, 2015, respectively, at fair value) | 180,617 | 178,236 |
| Deferred income taxes | 4,242 | 3,454 |
| Other non-current assets | 24,290 | 16,620 |
| **Total Assets** | $ 1,613,541 | $ 1,796,264 |
| **Liabilities and Equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 21,833 | $ 24,590 |
| Accrued merchant and supplier payables | 608,939 | 776,211 |
| Accrued expenses and other current liabilities | 353,696 | 402,724 |
| Total current liabilities | 984,468 | 1,203,525 |
| Convertible Senior Notes, Net | 176,473 | |
| Deferred income taxes | 6,840 | 8,612 |
| Other non-current liabilities | 113,604 | 113,540 |
| **Total Liabilities** | 1,281,385 | 1,325,677 |
| Commitments and contingencies | | |
| **Stockholders' Equity** | | |
| Class A common stock, par value $0.0001 per share, 2,000,000,000 shares authorized, 730,849,600 shares issued and 571,551,487 shares outstanding at September 30, 2016 and 717,387,446 shares issued and 588,919,281 shares outstanding at December 31, 2015 | 73 | 72 |
| Class B common stock, par value $0.0001 per share, 10,000,000 shares authorized, 2,399,976 shares issued and outstanding at September 30, 2016 and December 31, 2015 | — | — |
| Common stock, par value $0.0001 per share, 2,010,000,000 shares authorized, no shares issued and outstanding at September 30, 2016 and December 31, 2015 | — | — |
| Additional paid-in capital | 2,094,975 | 1,964,453 |
| Treasury stock, at cost, 159,298,113 shares at September 30, 2016 and 128,468,165 shares at December 31, 2015 | (757,520) | (645,041) |
| Accumulated deficit | (1,046,422) | (901,292) |
| Accumulated other comprehensive income (loss) | 40,132 | 51,206 |
| **Total Groupon, Inc. Stockholders' Equity** | 331,238 | 469,398 |
| Noncontrolling interests | 918 | 1,189 |
| **Total Equity** | 332,156 | 470,587 |
| **Total Liabilities and Equity** | $ 1,613,541 | $ 1,796,264 |

**Groupon, Inc.**

**Segment Information**
**(in thousands)**
**(unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2016** | **2015** | **2016** | **2015** |
| **North America** | | | | |
| Gross billings [1] | $ 920,962 | $ 869,203 | $ 2,824,290 | $ 2,659,436 |
| Revenue | $ 483,281 | $ 463,931 | $ 1,501,016 | $ 1,425,095 |
| Segment cost of revenue and operating expenses [2] [3] [4] | 483,036 | 494,843 | 1,510,731 | 1,404,472 |
| Segment operating income (loss) [2] | $ 245 | $ (30,912) | $ (9,715) | $ 20,623 |
| *Segment operating income (loss) as a percent of segment gross billings* | *-%* | *(3.6)%* | *(0.3)%* | *0.8%* |
| *Segment operating income (loss) as a percent of segment revenue* | *0.1%* | *(6.7)%* | *(0.6)%* | *1.4%* |
| **EMEA** | | | | |
| Gross billings [1] | $ 370,992 | $ 414,482 | $ 1,144,528 | $ 1,307,207 |
| Revenue | $ 196,573 | $ 199,287 | $ 583,848 | $ 619,554 |
| Segment cost of revenue and operating expenses [2][4][5] | 192,692 | 195,397 | 570,294 | 586,343 |
| Segment operating income (loss) [2] | $ 3,881 | $ 3,890 | $ 13,554 | $ 33,211 |
| *Segment operating income (loss) as a percent of segment gross billings* | *1.0%* | *0.9%* | *1.2%* | *2.5%* |
| *Segment operating income (loss) as a percent of segment revenue* | *2.0%* | *2.0%* | *2.3%* | *5.4%* |
| **Rest of World** | | | | |
| Gross billings [1] | $ 140,201 | $ 183,849 | $ 428,229 | $ 581,905 |
| Revenue | $ 40,614 | $ 50,377 | $ 123,605 | $ 157,697 |
| Segment cost of revenue and operating expenses [2] [4] | 45,284 | 57,282 | 146,247 | 175,542 |
| Segment operating income (loss) [2] | $ (4,670) | $ (6,905) | $ (22,642) | $ (17,845) |
| *Segment operating income (loss) as a percent of segment gross billings* | *(3.3)%* | *(3.8)%* | *(5.3)%* | *(3.1)%* |
| *Segment operating income (loss) as a percent of segment revenue* | *(11.5)%* | *(13.7)%* | *(18.3)%* | *(11.3)%* |

(1) Represents the total dollar value of customer purchases of goods and services, excluding applicable taxes and net of estimated refunds.

(2) Segment cost of revenue and operating expenses and segment operating income (loss) exclude stock-based compensation and acquisition-related expense (benefit), net.

(3) Segment cost of revenue and operating expenses for North America for the three and nine months ended September 30, 2015 includes a $37.5 million expense related to an increase in the Company's contingent liability for its securities litigation matter, which was subsequently settled.

(4) Segment cost of revenue and operating expenses for the three months ended September 30, 2016 includes restructuring charges of $1.0 million in North America, $(0.2) million in EMEA and $0.7 million in Rest of World. Segment cost of revenue and operating expenses for the nine months ended September 30, 2016 includes restructuring charges of $6.8 million in North America (which excludes $2.6 million of stock-based compensation), $13.9 million in EMEA (which excludes $2.1 million of stock-based compensation) and $4.6 million in Rest of World (which excludes $0.02 million of stock-based compensation). Segment cost of revenue and operating expenses for the three and nine months ended September 30, 2015 includes restructuring charges of $1.4 million in North America, $19.7 million in EMEA and $3.0 million in Rest of World.

(5) Segment cost of revenue and operating expenses for EMEA for the three and nine months ended September 30, 2015 includes a $6.7 million expense for the write-off of a prepaid asset related to a marketing program that was discontinued because the counterparty ceased operations.

**Groupon, Inc.**
**Non-GAAP Reconciliation Schedules**
**(in thousands, except share and per share amounts)**
**(unaudited)**

Adjusted EBITDA, non-GAAP earnings attributable to common stockholders and non-GAAP earnings per share are non-GAAP performance measures. The Company reconciles Adjusted EBITDA to the most comparable U.S. GAAP performance

measure, "Net income (loss) from continuing operations" for the periods presented and the Company reconciles non-GAAP earnings per share to the most comparable U.S. GAAP performance measure, "Diluted net income (loss) per share," for the periods presented.

The following is a quarterly reconciliation of Adjusted EBITDA to the most comparable U.S. GAAP performance measure, "Income (loss) from continuing operations."

|  | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|
| **Income (loss) from continuing operations** | $ (24,613) | $ (32,552) | $ (45,596) | $ (51,731) | $ (35,792) |
| Adjustments: |  |  |  |  |  |
| Stock-based compensation [1] | 35,432 | 32,691 | 27,976 | 35,244 | 26,176 |
| Depreciation and amortization | 35,635 | 33,763 | 34,797 | 34,290 | 33,253 |
| Acquisition-related expense (benefit), net | 1,064 | 557 | 3,464 | 850 | (9) |
| Gains on business dispositions | (13,710) | — | — | (9,339) | (2,060) |
| Restructuring charges | 24,146 | 5,422 | 12,444 | 16,085 | 1,459 |
| Prepaid marketing write-off | 6,690 | — | — | — | — |
| Securities litigation expense | 37,500 | — | — | — | — |
| Non-operating expense (income), net | 8,160 | 3,393 | (3,486) | 10,761 | 7,028 |
| Provision (benefit) for income taxes | (53,970) | 23,736 | 1,749 | (2,199) | 2,079 |
| Total adjustments | 80,947 | 99,562 | 76,944 | 85,692 | 67,926 |
| **Adjusted EBITDA** | $ 56,334 | $ 67,010 | $ 31,348 | $ 33,961 | $ 32,134 |

(1) Represents stock-based compensation recorded within cost of revenue, marketing expense, and selling, general and administrative expense. Non-operating expense (income), net, includes $0.1 million, $0.2 million, $0.2 million, $0.2 million and $0.3 million of additional stock-based compensation for the three months ended September 30, 2015, December 31, 2015, March 31, 2016, June 30, 2016 and September 30, 2016, respectively. Restructuring charges includes $2.6 million and $2.1 million of additional stock-based compensation for the three months ended March 31, 2016 and June 30, 3016, respectively.

The following is a reconciliation of net income (loss) attributable to common stockholders to non-GAAP net income (loss) attributable to common stockholders and a reconciliation of diluted net income (loss) per share to non-GAAP net income (loss) per share for the three and nine months ended September 30, 2016:

|  | Three Months Ended September 30, 2016 | Nine Months Ended September 30, 2016 |
|---|---|---|
| Net income (loss) attributable to common stockholders | $ (37,976) | $ (141,999) |
| Stock-based compensation [1] | 26,442 | 90,047 |
| Amortization of acquired intangible assets | 4,408 | 13,643 |
| Acquisition-related expense (benefit), net | (9) | 4,305 |
| Restructuring charges | 1,459 | 29,988 |
| Gains on business dispositions | (2,060) | (11,399) |
| Intercompany foreign currency losses (gains) and reclassifications of translation adjustments to earnings [2] | (3,263) | (8,377) |
| Losses (gains), net from changes in fair value of investments | 1,594 | 7,301 |
| Non-cash interest expense on convertible senior notes | 2,458 | 4,854 |
| Income tax effect of above adjustments | (1,154) | (7,849) |
| Non-GAAP net income (loss) attributable to common stockholders | $ (8,101) | $ (19,486) |
|  |  |  |
| Diluted shares | 575,216,191 | 578,290,291 |
| Incremental diluted shares | — | — |
| Adjusted diluted shares | 575,216,191 | 578,290,291 |
|  |  |  |
| Diluted net income (loss) per share | $ (0.07) | $ (0.25) |
| Per share impact of adjustments and related tax effects | 0.06 | 0.22 |
| Non-GAAP net income (loss) per share | $ (0.01) | $ (0.03) |

(1) Excludes $4.7 million of stock-based compensation classified within restructuring charges for the nine months ended September 30, 2016.

(2) Foreign currency gains (losses), net for the nine months ended September 30, 2016 includes $0.3 million of net cumulative translation gains that were reclassified to earnings as a result of the Company's exit from certain countries as part of its restructuring plan.

The following is a reconciliation of the Company's annual outlook for Adjusted EBITDA to the Company's outlook for the most comparable U.S. GAAP performance measure, "Net income (loss)."

| | Year Ending December 31, 2016 |
|---|---|
| **Expected net income (loss) range** | $(155,394) to $(141,894) |
| Expected adjustments: | |
| Stock-based compensation | 120,000 |
| Depreciation and amortization | 136,000 |
| Acquisition-related expense (benefit), net | 4,305 |
| Restructuring charges | 29,988 |
| Gains on business dispositions | (11,399) |
| Non-operating expense (income), net | 20,000 |
| Provision (benefit) for income taxes | 6,500 to 8,000 |
| Total expected adjustments | $305,394 to $306,894 |
| **Expected Adjusted EBITDA range** | $150,000 to $165,000 |

The outlook provided above does not reflect the potential impact of any additional restructuring actions that we may decide to pursue, business acquisitions or dispositions, changes in the fair values of investments or contingent consideration, foreign currency gains or losses or other unusual or non-recurring items that may occur during the fourth quarter of 2016.

Foreign exchange rate neutral operating results are non-GAAP financial measures. The Company reconciles foreign exchange rate neutral operating results to the most comparable U.S. GAAP financial measures, "Gross billings," "Revenue" and "Income (loss) from continuing operations," respectively, for the periods presented. The Company reconciles "foreign exchange rate neutral Gross billings growth" and "foreign exchange rate neutral Revenue growth" to year-over-year growth rates for the most comparable U.S. GAAP financial measures, "Gross billings growth" and "Revenue growth," respectively, for the periods presented.

The effect on the Company's gross billings, revenue and income (loss) from changes in exchange rates versus the U.S. Dollar for the three months ended September 30, 2016 was as follows:

| | Three Months Ended September 30, 2016 | | | Three Months Ended September 30, 2016 | | |
|---|---|---|---|---|---|---|
| | At Avg. Q3 2015 Rates [1] | Exchange Rate Effect [2] | As Reported | At Avg. Q2 2016 Rates [3] | Exchange Rate Effect [2] | As Reported |
| Gross billings | $ 1,442,311 | $ (10,156) | $ 1,432,155 | $ 1,437,017 | $ (4,862) | $ 1,432,155 |
| Revenue | 725,158 | (4,690) | 720,468 | 723,157 | (2,689) | 720,468 |
| Income (loss) from operations | $ (26,123) | $ (562) | $ (26,685) | $ (26,481) | $ (204) | $ (26,685) |

The effect on the Company's gross billings, revenue and income (loss) from operations from changes in exchange rates versus the U.S. Dollar for the nine months ended September 30, 2016 was as follows:

| | Nine Months Ended September 30, 2016 | | | Nine Months Ended September 30, 2016 | | |
|---|---|---|---|---|---|---|
| | At Avg. Q3 2015 YTD Rates [1] | Exchange Rate Effect [2] | As Reported | At Avg. Q4'15-Q2'16 Rates [3] | Exchange Rate Effect [2] | As Reported |
| Gross billings | $ 4,454,355 | $ (57,308) | $ 4,397,047 | $ 4,394,617 | $ 2,430 | $ 4,397,047 |
| Revenue | 2,230,931 | (22,462) | 2,208,469 | 2,208,022 | 447 | 2,208,469 |
| Income (loss) from operations | $ (116,182) | $ (1,005) | $ (117,187) | $ (115,292) | $ (1,895) | $ (117,187) |

(1) Represents the financial statement balances that would have resulted had average exchange rates in the reporting periods been the same as those in effect during the three and nine months ended September 30, 2015.

(2) Represents the increase or decrease in reported amounts resulting from changes in exchange rates from those in effect in the comparable prior periods.

(3) Represents the financial statement balances that would have resulted had average exchange rates in the reporting periods been the same as those in effect during the three and nine months ended June 30, 2016.

The following is a quarterly reconciliation of foreign exchange rate neutral Gross billings growth from the comparable quarterly periods of the prior year to reported Gross billings growth from the comparable quarterly periods of the prior year.

| | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|
| EMEA Gross billings growth, excluding FX | (1)% | (2)% | (12)% | (12)% | (8)% |
| FX Effect | (14) | (11) | (3) | — | (2) |
| EMEA Gross billings growth | (15)% | (13)% | (15)% | (12)% | (10)% |
| | | | | | |
| Rest of World Gross billings growth, excluding FX | —% | (7)% | (17)% | (21)% | (23)% |
| FX Effect | (19) | (14) | (11) | (6) | (1) |

| | | | | | |
|---|---|---|---|---|---|
| Rest of World Gross billings growth | (19)% | (21)% | (28)% | (27)% | (24)% |
| | | | | | |
| Consolidated Gross billings growth, excluding FX | 6% | 4% | (3)% | (2)% | (2)% |
| FX Effect | (8) | (5) | (2) | — | — |
| Consolidated Gross billings growth | (2)% | (1)% | (5)% | (2)% | (2)% |

The following is a quarterly reconciliation of foreign exchange rate neutral Revenue growth from the comparable quarterly periods of the prior year to reported Revenue growth from the comparable quarterly periods of the prior year.

| | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|
| EMEA Revenue growth, excluding FX | 2% | 3% | (10)% | (3)% | —% |
| FX Effect | (15) | (12) | (3) | — | (1) |
| EMEA Revenue growth | (13)% | (9)% | (13)% | (3)% | (1)% |
| | | | | | |
| Rest of World Revenue growth, excluding FX | (5)% | (8)% | (8)% | (14)% | (15)% |
| FX Effect | (18) | (15) | (14) | (9) | (4) |
| Rest of World Revenue growth | (23)% | (23)% | (22)% | (23)% | (19)% |
| | | | | | |
| Consolidated Revenue growth, excluding FX | 7% | 9% | (1)% | 3% | 2% |
| FX Effect | (7) | (5) | (1) | (1) | (1) |
| Consolidated Revenue growth | —% | 4% | (2)% | 2% | 1% |

The effect on North America's gross billings by category from changes in foreign exchange rates versus the U.S. Dollar for the three months ended September 30, 2016 was as follows:

| | At Avg. Q3 2015 Rates (1) | Exchange Rate Effect (2) | September 30, 2016 As Reported | September 30, 2015 As Reported | Y/Y % Growth | Y/Y% Growth excluding FX |
|---|---|---|---|---|---|---|
| Local: | | | | | | |
| Third party and other | $ 530,760 | $ 8 | $ 530,768 | $ 481,608 | 10.2% | 10.2% |
| | | | | | | |
| Travel: | | | | | | |
| Third party | 93,562 | 2 | 93,564 | 101,801 | (8.1)% | (8.1)% |
| Total services | 624,322 | 10 | 624,332 | 583,409 | 7.0% | 7.0% |
| | | | | | | |
| Goods: | | | | | | |
| Third party | 12,768 | 7 | 12,775 | 8,686 | 47.1% | 47.0% |
| Direct | 283,855 | — | 283,855 | 277,108 | 2.4% | 2.4% |
| Total | 296,623 | 7 | 296,630 | 285,794 | 3.8% | 3.8% |
| | | | | | | |
| Total gross billings | $ 920,945 | $ 17 | $ 920,962 | $ 869,203 | 6.0% | 6.0% |

The effect on EMEA's gross billings by category from changes in foreign exchange rates versus the U.S. Dollar for the three months ended September 30, 2016 was as follows:

| | At Avg. Q3 2015 Rates (1) | Exchange Rate Effect (2) | September 30, 2016 As Reported | September 30, 2015 As Reported | Y/Y % Growth | Y/Y% Growth excluding FX |
|---|---|---|---|---|---|---|
| Local: | | | | | | |
| Third party and other | $ 166,081 | $ (7,289) | $ 158,792 | $ 182,540 | (13.0)% | (9.0)% |
| | | | | | | |
| Travel: | | | | | | |
| Third party | 57,510 | 84 | 57,594 | 64,916 | (11.3)% | (11.4)% |
| Total services | 223,591 | (7,205) | 216,386 | 247,456 | (12.6)% | (9.6)% |
| | | | | | | |
| Goods: | | | | | | |
| Third party | 35,564 | (1,295) | 34,269 | 63,918 | (46.4)% | (44.4)% |
| Direct | 120,208 | 129 | 120,337 | 103,108 | 16.7% | 16.6% |
| Total | 155,772 | (1,166) | 154,606 | 167,026 | (7.4)% | (6.7)% |
| | | | | | | |
| Total gross billings | $ 379,363 | $ (8,371) | $ 370,992 | $ 414,482 | (10.5)% | (8.5)% |

The effect on Rest of World's gross billings by category from changes in foreign exchange rates versus the U.S. Dollar for the three months ended September 30, 2016 was as follows:

| | At Avg. Q3 2015 Rates (1) | Exchange Rate Effect (2) | September 30, 2016 As Reported | September 30, 2015 As Reported | Y/Y % Growth | Y/Y% Growth excluding FX |
|---|---|---|---|---|---|---|
| Local: | | | | | | |
| Third party and other | $ 79,716 | $ 602 | $ 80,318 | $ 92,972 | (13.6)% | (14.3)% |
| Travel: | | | | | | |
| Third party | 24,914 | (748) | 24,166 | 30,709 | (21.3)% | (18.9)% |
| Total services | 104,630 | (146) | 104,484 | 123,681 | (15.5)% | (15.4)% |
| Goods: | | | | | | |
| Third party | 29,457 | (180) | 29,277 | 53,095 | (44.9)% | (44.5)% |
| Direct | 7,916 | (1,476) | 6,440 | 7,073 | (8.9)% | 11.9% |
| Total | 37,373 | (1,656) | 35,717 | 60,168 | (40.6)% | (37.9)% |
| Total gross billings | $ 142,003 | $ (1,802) | $ 140,201 | $ 183,849 | (23.7)% | (22.8)% |

The effect on consolidated gross billings by category from changes in foreign exchange rates versus the U.S. Dollar for the three months ended September 30, 2016 was as follows:

| | At Avg. Q3 2015 Rates (1) | Exchange Rate Effect (2) | September 30, 2016 As Reported | September 30, 2015 As Reported | Y/Y % Growth | Y/Y% Growth excluding FX |
|---|---|---|---|---|---|---|
| Local: | | | | | | |
| Third party and other | $ 776,557 | $ (6,679) | $ 769,878 | $ 757,120 | 1.7% | 2.6% |
| Travel: | | | | | | |
| Third party | 175,986 | (662) | 175,324 | 197,426 | (11.2)% | (10.9)% |
| Total services | 952,543 | (7,341) | 945,202 | 954,546 | (1.0)% | (0.2)% |
| Goods: | | | | | | |
| Third party | 77,789 | (1,468) | 76,321 | 125,699 | (39.3)% | (38.1)% |
| Direct | 411,979 | (1,347) | 410,632 | 387,289 | 6.0% | 6.4% |
| Total | 489,768 | (2,815) | 486,953 | 512,988 | (5.1)% | (4.5)% |
| Total gross billings | $ 1,442,311 | $ (10,156) | $ 1,432,155 | $ 1,467,534 | (2.4)% | (1.7)% |

(1) Represents the financial statement balances that would have resulted had average exchange rates in the reporting period been the same as those in effect during the three months ended September 30, 2015.

(2) Represents the increase or decrease in reported amounts resulting from changes in exchange rates from those in effect in the comparable prior year period.

The following is a reconciliation of foreign exchange rate neutral same country gross billings growth for the three months ended September 30, 2016 from the prior year period:

| | September 30, 2016 | September 30, 2015 | Y/Y % Growth |
|---|---|---|---|
| Gross billings as reported | 1,432,155 | 1,467,534 | (2.4)% |
| Less: Gross billings from countries where Groupon no longer operates | (763) | (36,255) | |
| Exchange rate effect (1) | 10,156 | — | |
| Same-country gross billings | $ 1,441,548 | $ 1,431,279 | 0.7% |

(1) Represents the increase or decrease in reported amounts resulting from changes in exchange rates from those in effect in the comparable prior year period.

The following is a reconciliation of foreign exchange rate neutral same-country gross billings growth for our EMEA segment for the three months ended September 30, 2016 from the prior year period:

| | September 30, 2016 | September 30, 2015 | Y/Y % Growth |
|---|---|---|---|
| EMEA gross billings as reported | 370,992 | 414,482 | (10.5)% |

| | | | |
|---|---|---|---|
| Less: EMEA Gross billings from countries where Groupon no longer operates | - | (26,488) | |
| Exchange rate effect [1] | 8,371 | — | |
| Same-country gross billings | $ 379,363 | $ 387,994 | (2.2)% |

[1] Represents the increase or decrease in reported amounts resulting from changes in exchange rates from those in effect in the comparable prior year period.

The following is a reconciliation of foreign exchange rate neutral same country revenue for our EMEA segment for the three months ended September 30, 2016 from the prior year period:

| | September 30, 2016 | September 30, 2015 | Y/Y % Growth |
|---|---|---|---|
| EMEA revenue as reported | 196,573 | 199,287 | (1.4)% |
| Less: EMEA revenue from countries where Groupon no longer operates | - | (11,078) | |
| Exchange rate effect [1] | 2,718 | — | |
| Same-country revenue | $ 199,291 | $ 188,209 | 5.9% |

[1] Represents the increase or decrease in reported amounts resulting from changes in exchange rates from those in effect in the comparable prior year period.

### Groupon, Inc.

### Supplemental Financial Information and Business Metrics [9][11]

### (financial data in thousands; active customers in millions)

### (unaudited)

| | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|
| **Segments** | | | | | |
| **North America Segment:** | | | | | |
| Gross Billings [1]: | | | | | |
| Local [2] Gross Billings | $ 481,608 | $ 531,154 | $ 539,623 | $ 542,439 | $ 530,768 |
| Travel Gross Billings | 101,801 | 89,389 | 103,390 | 105,388 | 93,564 |
| Gross Billings - Services | 583,409 | 620,543 | 643,013 | 647,827 | 624,332 |
| Gross Billings - Goods | 285,794 | 429,818 | 294,061 | 318,427 | 296,630 |
| Total Gross Billings | $ 869,203 | $ 1,050,361 | $ 937,074 | $ 966,254 | $ 920,962 |
| *Year-over-year growth* | *12%* | *11%* | *5%* | *8%* | *6%* |
| *% Third Party and Other* | *68%* | *60%* | *70%* | *68%* | *69%* |
| *% Direct* | *32%* | *40%* | *30%* | *32%* | *31%* |
| Gross Billings Trailing Twelve Months (TTM) | $ 3,608,015 | $ 3,709,797 | $ 3,752,894 | $ 3,822,892 | $ 3,874,651 |
| | | | | | |
| Revenue [3]: | | | | | |
| Local Revenue | $ 163,786 | $ 184,201 | $ 192,153 | $ 184,139 | $ 176,220 |
| Travel Revenue | 21,394 | 18,390 | 20,914 | 21,401 | 21,241 |
| Revenue - Services | 185,180 | 202,591 | 213,067 | 205,540 | 197,461 |
| Revenue - Goods | 278,751 | 420,056 | 287,746 | 311,382 | 285,820 |
| Total Revenue | $ 463,931 | $ 622,647 | $ 500,813 | $ 516,922 | $ 483,281 |
| *Year-over-year growth* | *11%* | *13%* | *4%* | *7%* | *4%* |
| *% Third Party and Other* | *40%* | *33%* | *43%* | *40%* | *41%* |
| *% Direct* | *60%* | *67%* | *57%* | *60%* | *59%* |
| Revenue TTM | $ 1,976,069 | $ 2,047,742 | $ 2,068,673 | $ 2,104,313 | $ 2,123,663 |
| | | | | | |
| Gross Profit [4]: | | | | | |
| Local Gross Profit | $ 138,798 | $ 159,745 | $ 164,018 | $ 158,812 | $ 152,873 |
| *% of North America Local Gross Billings* | *28.8%* | *30.1%* | *30.4%* | *29.3%* | *28.8%* |
| Travel Gross Profit | 17,644 | 15,207 | 15,712 | 16,334 | 17,257 |

| | | | | | |
|---|---|---|---|---|---|
| *% of North America Travel Gross Billings* | *17.3%* | *17.0%* | *15.2%* | *15.5%* | *18.4%* |
| Gross Profit - Services | 156,442 | 174,952 | 179,730 | 175,146 | 170,130 |
| *% of North America Services Gross Billings* | *26.8%* | *28.2%* | *28.0%* | *27.0%* | *27.2%* |
| Gross Profit - Goods | 34,801 | 44,329 | 36,213 | 42,028 | 31,531 |
| *% of North America Goods Gross Billings* | *12.2%* | *10.3%* | *12.3%* | *13.2%* | *10.6%* |
| Total Gross Profit | $ 191,243 | $ 219,281 | $ 215,943 | $ 217,174 | $ 201,661 |
| *Year-over-year growth* | *9%* | *12%* | *11%* | *10%* | *5%* |
| *% Third Party and Other* | *83%* | *81%* | *84%* | *82%* | *85%* |
| *% Direct* | *17%* | *19%* | *16%* | *18%* | *15%* |
| *% of North America Total Gross Billings* | *22.0%* | *20.9%* | *23.0%* | *22.5%* | *21.9%* |

**EMEA Segment:**

Gross Billings:

| | | | | | |
|---|---|---|---|---|---|
| Local Gross Billings | $ 182,540 | $ 197,445 | $ 174,033 | $ 165,290 | $ 158,792 |
| Travel Gross Billings | 64,916 | 59,836 | 57,201 | 52,880 | 57,594 |
| Gross Billings - Services | 247,456 | 257,281 | 231,234 | 218,170 | 216,386 |
| Gross Billings - Goods | 167,026 | 229,866 | 160,993 | 163,139 | 154,606 |
| Total Gross Billings | $ 414,482 | $ 487,147 | $ 392,227 | $ 381,309 | $ 370,992 |
| *Year-over-year growth* | *(15)%* | *(13)%* | *(15)%* | *(12)%* | *(10)%* |
| *Year-over-year growth, excluding FX* [5] | *(1)%* | *(2)%* | *(12)%* | *(12)%* | *(8)%* |
| *% Third Party and Other* | *75%* | *70%* | *73%* | *68%* | *68%* |
| *% Direct* | *25%* | *30%* | *27%* | *32%* | *32%* |
| Gross Billings TTM | $ 1,867,748 | $ 1,794,354 | $ 1,727,392 | $ 1,675,165 | $ 1,631,675 |

Revenue:

| | | | | | |
|---|---|---|---|---|---|
| Local Revenue | $ 70,781 | $ 73,225 | $ 61,886 | $ 60,616 | $ 58,581 |
| Travel Revenue | 13,561 | 11,681 | 11,178 | 10,709 | 12,866 |
| Revenue - Services | 84,342 | 84,906 | 73,064 | 71,325 | 71,447 |
| Revenue - Goods | 114,945 | 163,420 | 115,906 | 126,980 | 125,126 |
| Total Revenue | $ 199,287 | $ 248,326 | $ 188,970 | $ 198,305 | $ 196,573 |
| *Year-over-year growth* | *(13)%* | *(9)%* | *(13)%* | *(3)%* | *(1)%* |
| *Year-over-year growth, excluding FX* | *2%* | *3%* | *(10)%* | *(3)%* | *—%* |
| *% Third Party and Other* | *48%* | *41%* | *44%* | *39%* | *39%* |
| *% Direct* | *52%* | *59%* | *56%* | *61%* | *61%* |
| Revenue TTM | $ 892,029 | $ 867,880 | $ 840,630 | $ 834,888 | $ 832,174 |

Gross Profit:

| | | | | | |
|---|---|---|---|---|---|
| Local Gross Profit | $ 66,288 | $ 68,966 | $ 58,263 | $ 56,849 | $ 54,467 |
| *% of EMEA Local Gross Billings* | *36.3%* | *34.9%* | *33.5%* | *34.4%* | *34.3%* |
| Travel Gross Profit | 12,323 | 10,732 | 10,215 | 9,784 | 11,882 |
| *% of EMEA Travel Gross Billings* | *19.0%* | *17.9%* | *17.9%* | *18.5%* | *20.6%* |
| Gross Profit - Services | 78,611 | 79,698 | 68,478 | 66,633 | 66,349 |
| *% of EMEA Services Gross Billings* | *31.8%* | *31.0%* | *29.6%* | *30.5%* | *30.7%* |
| Gross Profit - Goods | 24,905 | 43,026 | 26,412 | 23,525 | 18,710 |
| *% of EMEA Goods Gross Billings* | *14.9%* | *18.7%* | *16.4%* | *14.4%* | *12.1%* |
| Total Gross Profit | $ 103,516 | $ 122,724 | $ 94,890 | $ 90,158 | $ 85,059 |
| *Year-over-year growth* | *(21)%* | *(14)%* | *(18)%* | *(13)%* | *(18)%* |
| *% Third Party and Other* | *86%* | *77%* | *82%* | *79%* | *83%* |
| *% Direct* | *14%* | *23%* | *18%* | *21%* | *17%* |
| *% of EMEA Total Gross Billings* | *25.0%* | *25.2%* | *24.2%* | *23.6%* | *22.9%* |

**Rest of World Segment:**

Gross Billings:

| | | | | | |
|---|---|---|---|---|---|
| Local Gross Billings | $ 92,972 | $ 83,430 | $ 75,294 | $ 84,581 | $ 80,318 |
| Travel Gross Billings | 30,709 | 25,369 | 23,928 | 22,300 | 24,166 |
| Gross Billings - Services | 123,681 | 108,799 | 99,222 | 106,881 | 104,484 |
| Gross Billings - Goods | 60,168 | 60,685 | 43,487 | 38,438 | 35,717 |
| Total Gross Billings | $ 183,849 | $ 169,484 | $ 142,709 | $ 145,319 | $ 140,201 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Year-over-year growth* | | *(19)%* | | *(21)%* | | *(28)%* | | *(27)%* | *(24)%* |
| *Year-over-year growth, excluding FX* | | *—%* | | *(7)%* | | *(17)%* | | *(21)%* | *(23)%* |
| *% Third Party and Other* | | *96%* | | *95%* | | *95%* | | *95%* | *95%* |
| *% Direct* | | *4%* | | *5%* | | *5%* | | *5%* | *5%* |
| Gross Billings TTM | $ | 797,454 | $ | 751,389 | $ | 695,263 | $ | 641,361 | $ 597,713 |
| | | | | | | | | | |
| **Revenue:** | | | | | | | | | |
| Local Revenue | $ | 26,372 | $ | 22,229 | $ | 22,082 | $ | 22,461 | $ 21,876 |
| Travel Revenue | | 6,135 | | 5,098 | | 5,049 | | 4,321 | 5,075 |
| Revenue - Services | | 32,507 | | 27,327 | | 27,131 | | 26,782 | 26,951 |
| Revenue - Goods | | 17,870 | | 18,870 | | 15,057 | | 14,021 | 13,663 |
| Total Revenue | $ | 50,377 | $ | 46,197 | $ | 42,188 | $ | 40,803 | $ 40,614 |
| *Year-over-year growth* | | *(23)%* | | *(23)%* | | *(22)%* | | *(23)%* | *(19)%* |
| *Year-over-year growth, excluding FX* | | *(5)%* | | *(8)%* | | *(8)%* | | *(14)%* | *(15)%* |
| *% Third Party and Other* | | *86%* | | *82%* | | *85%* | | *82%* | *84%* |
| *% Direct* | | *14%* | | *18%* | | *15%* | | *18%* | *16%* |
| Revenue TTM | $ | 217,476 | $ | 203,894 | $ | 191,828 | $ | 179,565 | $ 169,802 |
| | | | | | | | | | |
| **Gross Profit:** | | | | | | | | | |
| Local Gross Profit | $ | 22,568 | $ | 18,889 | $ | 18,771 | $ | 18,739 | $ 18,645 |
| *% of Rest of World Local Gross Billings* | | *24.3%* | | *22.6%* | | *24.9%* | | *22.2%* | *23.2%* |
| Travel Gross Profit | | 4,859 | | 4,040 | | 3,997 | | 3,240 | 3,962 |
| *% of Rest of World Travel Gross Billings* | | *15.8%* | | *15.9%* | | *16.7%* | | *14.5%* | *16.4%* |
| Gross Profit - Services | | 27,427 | | 22,929 | | 22,768 | | 21,979 | 22,607 |
| *% of Rest of World Services Gross Billings* | | *22.2%* | | *21.1%* | | *22.9%* | | *20.6%* | *21.6%* |
| Gross Profit - Goods | | 6,726 | | 6,806 | | 5,727 | | 4,277 | 4,790 |
| *% of Rest of World Goods Gross Billings* | | *11.2%* | | *11.2%* | | *13.2%* | | *11.1%* | *13.4%* |
| Total Gross Profit | $ | 34,153 | $ | 29,735 | $ | 28,495 | $ | 26,256 | $ 27,397 |
| *Year-over-year growth* | | *(28)%* | | *(23)%* | | *(24)%* | | *(28)%* | *(20)%* |
| *% Third Party and Other* | | *99%* | | *99%* | | *100%* | | *99%* | *100%* |
| *% Direct* | | *1%* | | *1%* | | *—%* | | *1%* | *—%* |
| *% of Rest of World Total Gross Billings* | | *18.6%* | | *17.5%* | | *20.0%* | | *18.1%* | *19.5%* |

**Consolidated Results of Operations:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Gross Billings:** | | | | | | | | | |
| Local Gross Billings | $ | 757,120 | $ | 812,029 | $ | 788,950 | $ | 792,310 | $ 769,878 |
| Travel Gross Billings | | 197,426 | | 174,594 | | 184,519 | | 180,568 | 175,324 |
| Gross Billings - Services | | 954,546 | | 986,623 | | 973,469 | | 972,878 | 945,202 |
| Gross Billings - Goods | | 512,988 | | 720,369 | | 498,541 | | 520,004 | 486,953 |
| Total Gross Billings | $ | 1,467,534 | $ | 1,706,992 | $ | 1,472,010 | $ | 1,492,882 | $ 1,432,155 |
| *Year-over-year growth* | | *(2)%* | | *(1)%* | | *(5)%* | | *(2)%* | *(2)%* |
| *Year-over-year growth, excluding FX* | | *6%* | | *4%* | | *(3)%* | | *(2)%* | *(2)%* |
| *% Third Party and Other* | | *74%* | | *66%* | | *73%* | | *71%* | *71%* |
| *% Direct* | | *26%* | | *34%* | | *27%* | | *29%* | *29%* |
| Gross Billings TTM | $ | 6,273,217 | $ | 6,255,540 | $ | 6,175,549 | $ | 6,139,418 | $ 6,104,039 |
| *Year-over-year growth* | | *3%* | | *—%* | | *(1)%* | | *(2)%* | *(3)%* |
| | | | | | | | | | |
| **Revenue:** | | | | | | | | | |
| Local Revenue | $ | 260,939 | $ | 279,655 | $ | 276,121 | $ | 267,216 | $ 256,677 |
| Travel Revenue | | 41,090 | | 35,169 | | 37,141 | | 36,431 | 39,182 |
| Revenue - Services | | 302,029 | | 314,824 | | 313,262 | | 303,647 | 295,859 |
| Revenue - Goods | | 411,566 | | 602,346 | | 418,709 | | 452,383 | 424,609 |
| Total Revenue | $ | 713,595 | $ | 917,170 | $ | 731,971 | $ | 756,030 | $ 720,468 |
| *Year-over-year growth* | | *—%* | | *4%* | | *(2)%* | | *2%* | *1%* |
| *Year-over-year growth, excluding FX* | | *7%* | | *9%* | | *(1)%* | | *3%* | *2%* |
| *% Third Party and Other* | | *46%* | | *38%* | | *46%* | | *42%* | *43%* |
| *% Direct* | | *54%* | | *62%* | | *54%* | | *58%* | *57%* |

| | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|
| Revenue TTM | $ 3,085,574 | $ 3,119,516 | $ 3,101,131 | $ 3,118,766 | $ 3,125,639 |
| *Year-over-year growth* | *5%* | *3%* | *1%* | *—%* | *1%* |
| **Gross Profit:** | | | | | |
| Local Gross Profit | $ 227,654 | $ 247,600 | $ 241,052 | $ 234,400 | $ 225,985 |
| *% of Consolidated Local Gross Billings* | *30.1%* | *30.5%* | *30.6%* | *29.6%* | *29.4%* |
| Travel Gross Profit | 34,826 | 29,979 | 29,924 | 29,358 | 33,101 |
| *% of Consolidated Travel Gross Billings* | *17.6%* | *17.2%* | *16.2%* | *16.3%* | *18.9%* |
| Gross Profit - Services | 262,480 | 277,579 | 270,976 | 263,758 | 259,086 |
| *% of Consolidated Services Gross Billings* | *27.5%* | *28.1%* | *27.8%* | *27.1%* | *27.4%* |
| Gross Profit - Goods | 66,432 | 94,161 | 68,352 | 69,830 | 55,031 |
| *% of Consolidated Goods Gross Billings* | *13.0%* | *13.1%* | *13.7%* | *13.4%* | *11.3%* |
| Total Gross Profit | $ 328,912 | $ 371,740 | $ 339,328 | $ 333,588 | $ 314,117 |
| *Year-over-year growth* | *(7)%* | *(2)%* | *(2)%* | *(1)%* | *(4)%* |
| *% Third Party and Other* | *85%* | *81%* | *85%* | *82%* | *86%* |
| *% Direct* | *15%* | *19%* | *15%* | *18%* | *14%* |
| *% of Total Consolidated Gross Billings* | *22.4%* | *21.8%* | *23.1%* | *22.3%* | *21.9%* |
| Marketing | $ 61,587 | $ 83,208 | $ 89,765 | $ 91,993 | $ 87,858 |
| Selling, general and administrative | $ 326,248 | $ 287,976 | $ 280,988 | $ 277,168 | $ 253,554 |
| Income (loss) from continuing operations | $ (24,613) | $ (32,552) | $ (45,596) | $ (51,731) | $ (35,792) |
| Adjusted EBITDA | $ 56,334 | $ 67,010 | $ 31,348 | $ 33,961 | $ 32,134 |
| *% of Total Consolidated Gross Billings* | *3.8%* | *3.9%* | *2.1%* | *2.3%* | *2.2%* |
| *% of Total Consolidated Revenue* | *7.9%* | *7.3%* | *4.3%* | *4.5%* | *4.5%* |

Free cash flow is a non-GAAP financial measure. The following is a reconciliation of free cash flow to the most comparable U.S. GAAP financial measure, "Net cash provided by (used in) operating activities from continuing operations."

| | Q3 2015 [10] | Q4 2015 [10] | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities from continuing operations | $ (7,640) | $ 250,455 | $ (76,725) | $ (54,010) | $ (40,822) |
| Purchases of property and equipment and capitalized software from continuing operations | (27,735) | (15,507) | (19,952) | (16,395) | (12,868) |
| Free cash flow | $ (35,375) | $ 234,948 | $ (96,677) | $ (70,405) | $ (53,690) |
| Net cash provided by (used in) operating activities from continuing operations (TTM) | $ 325,971 | $ 299,747 | $ 179,415 | $ 112,080 | $ 78,898 |
| Purchases of property and equipment and capitalized software from continuing operations (TTM) | (88,598) | (83,988) | (85,646) | (79,589) | (64,722) |
| Free cash flow (TTM) | $ 237,373 | $ 215,759 | $ 93,769 | $ 32,491 | $ 14,176 |
| Net cash provided by (used in) investing activities from continuing operations | $ (98,028) | $ (31,238) | $ (20,778) | $ (18,853) | $ (12,088) |
| Net cash provided by (used in) financing activities | $ (14,793) | $ (323,597) | $ (78,015) | $ 169,225 | $ (38,342) |
| Net cash provided by (used in) investing activities from continuing operations (TTM) | $ (181,187) | $ (177,250) | $ (178,585) | $ (168,897) | $ (82,957) |
| Net cash provided by (used in) financing activities (TTM) | $ (216,683) | $ (515,785) | $ (557,962) | $ (247,180) | $ (270,729) |
| **Other Metrics:** | | | | | |
| Active Customers [6] | | | | | |
| North America | 25.2 | 25.9 | 26.9 | 27.9 | 29.1 |
| EMEA | 15.4 | 15.4 | 15.3 | 15.3 | 15.4 |
| Rest of World | 8.0 | 7.6 | 7.2 | 6.8 | 6.3 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total Active Customers | | 48.6 | | 48.9 | | 49.4 | | 50.0 | 50.8 |

TTM Gross Billings / Average Active Customer [7]

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| North America | $ | 148 | $ | 149 | $ | 146 | $ | 145 | $ 142 |
| EMEA | | 123 | | 117 | | 113 | | 109 | 106 |
| Rest of World | | 99 | | 96 | | 90 | | 86 | 84 |
| Consolidated | | 132 | | 130 | | 127 | | 125 | 123 |

Global headcount as of September 30, 2016 and 2015 was as follows:

| | Q3 2015 | Q3 2016 |
|---|---|---|
| Sales [8] | 4,168 | 3,285 |
| % North America | 33% | 34% |
| % EMEA | 42% | 43% |
| % Rest of World | 25% | 23% |
| Other | 6,301 | 5,089 |
| Total Headcount | 10,469 | 8,374 |

(1) Represents the total dollar value of customer purchases of goods and services, excluding applicable taxes and net of estimated refunds.

(2) Local represents deals from local merchants, deals with national merchants, and deals through local events. Other revenue transactions, which include advertising, payment processing and commission revenue, are also included within the Local category.

(3) Includes third party revenue, direct revenue and other revenue. Third party revenue is related to sales for which the Company acts as a marketing agent for the merchant. This revenue is recorded on a net basis. Direct revenue is primarily related to the sale of products for which the Company is the merchant of record. These revenues are accounted for on a gross basis, with the cost of inventory included in cost of revenue. Other revenue primarily consists of commission revenue, payment processing revenue and advertising revenue.

(4) Represents third party revenue, direct revenue and other revenue reduced by cost of revenue.

(5) Represents the change in financial measures that would have resulted had average exchange rates in the reporting periods been the same as those in effect in the prior year periods.

(6) Reflects the total number of unique user accounts who have purchased a voucher or product from us during the trailing twelve months.

(7) Reflects the total gross billings generated in the trailing twelve months per average active customer over that period.

(8) Includes merchant sales representatives, as well as sales support from continuing operations.

(9) Financial information and other metrics exclude Ticket Monster, which has been classified as discontinued operations. The Company sold a controlling stake in Ticket Monster in May 2015.

(10) The Company adopted the guidance in ASU 2016-09 on January 1, 2016. ASU 2016-09 requires that all income tax-related cash flows resulting from share-based payments be reported as operating activities in the statement of cash flows. Previously, income tax benefits at settlement of an award were reported as a reduction to operating cash flows and an increase to financing cash flows to the extent that those benefits exceeded the income tax benefits reported in earnings during the award's vesting period. The Company has elected to apply that change in cash flow classification on a retrospective basis, which has resulted in adjustments to net cash provided by (used in) operating activities, net cash used in financing activities, and free cash flow for the three-month and trailing twelve-month periods ended June 30, 2015, September 30, 2015 and December 31, 2015.

(11) The definition, methodology and appropriateness of each of our supplemental metrics is reviewed periodically. As a result, metrics are subject to removal and/or change.

View source version on businesswire.com: http://www.businesswire.com/news/home/20161026006795/en/

Groupon, Inc.
Investor Relations
Deb Schwartz
312-662-6535
ir@groupon.com
or
Public Relations
Bill Roberts
312-459-5191

Source: Groupon, Inc.

News Provided by Acquire Media

# EXHIBIT 4



**today's offers in your city »**

**our company**

**for media**

**for merchants**

**multimedia**

**careers** ↗

# LivingSocial enters into an agreement to be acquired by Groupon

Posted on **October 26, 2016**

WASHINGTON, OCTOBER 26th 2016 – LivingSocial today announced that the company has entered into an agreement to be acquired by Groupon. The terms of the transaction are not disclosed and the company expects the transaction to close by early November 2016. This brings together the two pioneering companies in the local space to help merchants grow their business and consumers get great value on local services and activities. There will be no change at this point with respect to how consumers and merchants engage with the LivingSocial brand, and the company will remain focused on providing even better experiences to its users as part of the Groupon family in the future.

‹   **LivingSocial completes initial phase of turnaround**

**follow us**







our company    careers ↗    for media    great deals

contact    consumer FAQs   merchant center

© 2016, LivingSocial, Inc. or its affiliated companies. All Rights Reserved.

# EXHIBIT 5

# FILED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No.   16-122-LPS-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC. | ) ) ) | |
| Defendant. | ) | |

## IBM'S AMENDED PRELIMINARY IDENTIFICATION OF ACCUSED PRODUCTS

Plaintiff International Business Machines Corporation ("IBM") provides the following list of accused products pursuant to Paragraph 4(a) of the Delaware Default Standard for Discovery and the Court's October 4, 2016 Order, based on information reasonably available to IBM at this time.  IBM anticipates that discovery and other pretrial preparation will lead to additional relevant information.  IBM reserves the right to clarify, amend, modify, and supplement the information contained in these disclosures to take into account additional relevant information.

### I.    Identity of the Accused Instrumentalities

IBM identifies the following Accused Instrumentalities:

1.    Methods and systems involved in providing access to Groupon, Inc.'s ("Groupon") services, including but not limited to any www.groupon.com webpage, any page or interface for signing in or creating a Groupon account; any Groupon webpage available from selecting content, submitting information, and/or following links from the foregoing; any mobile version of the forgoing; any application for accessing Groupon services from a mobile device, such as the

Groupon App for Google Android, Apple iOS, Blackberry, and Windows; and any other way to access the services available on Groupon's servers or webpages, whether through desktop, mobile devices, or otherwise.

2.      Any prior version of the instrumentalities identified in paragraph 1, above, that existed at any point from March 2010 through the present.

3.      Methods and systems involved in providing access to LivingSocial services, including but not limited to any www.livingsocial.com webpage, any page or interface for signing in or creating a LivingSocial account; any LivingSocial webpage available from selecting content, submitting information, and/or following links from the foregoing; any mobile version of the forgoing; any application for accessing LivingSocial services from a mobile device, such as the LivingSocial App for Google Android, Apple iOS, and Windows; and any other way to access the services available on LivingSocial's servers or webpages, whether through desktop, mobile devices, or otherwise.

4.      Any prior version of the instrumentalities identified in paragraph 3, above, that existed at any point from May 2011 through the present.

## II.      Asserted Patents

IBM contends that the accused instrumentalities infringe United States Patent Nos. 5,796,967, 7,072,849, 5,961,601, and 7,631,346.   The Asserted Patents and associated file histories have been produced herewith.

## III.      Damages Model

IBM identifies its damages model as no less than a reasonable royalty for infringement of the Asserted Patents, which includes the entire revenue derived from the Accused Instrumentalities.   IBM reserves the right to amend the royalty base of its damages model during

discovery, including based on the investigation of the foregoing:

1.  Technical documents concerning the accused instrumentalities;

2.  Financial documents concerning the accused instrumentalities;

3.  Analytics and metrics concerning the accused instrumentalities;

4.  Research of the infringing features of the accused instrumentalities;

5.  Design of the infringing features of the accused instrumentalities;

6.  Testing of the infringing features of the accused instrumentalities;

7.  Unit cost of the infringing features of the accused instrumentalities;

8.  Consumer value of the infringing features of the accused instrumentalities;

9.  Market research regarding the infringing features of the accused instrumentalities; and

10. Licenses regarding technology comparable to the infringing features of the accused instrumentalities.

Dated:   May 19, 2017

By: */s/ Karim Z. Oussayef*

POTTER ANDERSON & CORROON LLP
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel:   (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Counsel for Plaintiff*
*International Business Machines Corporation*

*Of Counsel:*

John M. Desmarais
Karim Z. Oussayef
Laurie Stempler
Robert C. Harrits
Brian D. Matty
Michael Matulewicz-Crowley
DESMARAIS LLP

230 Park Avenue
New York, NY 10169
Tel:   (212) 351-3400

## CERTIFICATE OF SERVICE

I, Michael Matulewicz-Crowley, hereby certify that on May 19, 2017, true and correct copies of the within document were served on the following counsel of record at the addresses and in the manner indicated:

## VIA ELECTRONIC MAIL:

John G. Day
Ashby-Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
jday@ashby-geddes.com

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
FENWICK & WEST LLP
555 California Street, 12thFloor
San Francisco, CA 94104
dhadden@fenwick.com
sshamilov@fenwick.com
phaack@fenwick.com
alewin@fenwick.com
Groupon_IBM_Service@fenwick.com

*/s/ Michael Matulewicz-Crowley*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | C.A. No.   16-122-LPS-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC. | ) ) | |
| | ) ) | |
| Defendant. | ) | |

## IBM'S AMENDED PRELIMINARY IDENTIFICATION OF ACCUSED PRODUCTS

Plaintiff International Business Machines Corporation ("IBM") provides the following list of accused products pursuant to Paragraph 4(a) of the Delaware Default Standard for Discovery and the Court's October 4, 2016 Order, based on information reasonably available to IBM at this time.  IBM anticipates that discovery and other pretrial preparation will lead to additional relevant information.  IBM reserves the right to clarify, amend, modify, and supplement the information contained in these disclosures to take into account additional relevant information.

### I.      Identity of the Accused Instrumentalities

IBM identifies the following Accused Instrumentalities:

1.      Methods and systems involved in providing access to Groupon, Inc.'s ("Groupon") services, including but not limited to any www.groupon.com webpage, any page or interface for signing in or creating a Groupon account; any Groupon webpage available from selecting content, submitting information, and/or following links from the foregoing; any mobile version of the forgoing; any application for accessing Groupon services from a mobile device, such as the

Groupon App for Google Android, Apple iOS, Blackberry, and Windows; and any other way to access the services available on Groupon's servers or webpages, whether through desktop, mobile devices, or otherwise.

2.      Any prior version of the instrumentalities identified in paragraph 1, above, that existed at any point from March 2010 through the present.

3.      Methods and systems involved in providing access to LivingSocial services, including but not limited to any www.livingsocial.com webpage, any page or interface for signing in or creating a LivingSocial account; any LivingSocial webpage available from selecting content, submitting information, and/or following links from the foregoing; any mobile version of the forgoing; any application for accessing LivingSocial services from a mobile device, such as the LivingSocial App for Google Android, Apple iOS, and Windows; and any other way to access the services available on LivingSocial's servers or webpages, whether through desktop, mobile devices, or otherwise.

4.      Any prior version of the instrumentalities identified in paragraph 3, above, that existed at any point from May 2011 through the present.

## II.      Asserted Patents

IBM contends that the accused instrumentalities infringe United States Patent Nos. 5,796,967, 7,072,849, 5,961,601, and 7,631,346.   The Asserted Patents and associated file histories have been produced herewith.

## III.      Damages Model

IBM identifies its damages model as no less than a reasonable royalty for infringement of the Asserted Patents, which includes the entire revenue derived from the Accused Instrumentalities.   IBM reserves the right to amend the royalty base of its damages model during

discovery, including based on the investigation of the foregoing:

1.  Technical documents concerning the accused instrumentalities;

2.  Financial documents concerning the accused instrumentalities;

3.  Analytics and metrics concerning the accused instrumentalities;

4.  Research of the infringing features of the accused instrumentalities;

5.  Design of the infringing features of the accused instrumentalities;

6.  Testing of the infringing features of the accused instrumentalities;

7.  Unit cost of the infringing features of the accused instrumentalities;

8.  Consumer value of the infringing features of the accused instrumentalities;

9.  Market research regarding the infringing features of the accused instrumentalities; and

10. Licenses regarding technology comparable to the infringing features of the accused instrumentalities.

Dated:   May 19, 2017                      By: */s/ Karim Z. Oussayef*

POTTER ANDERSON & CORROON LLP
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel:   (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Counsel for Plaintiff*
*International Business Machines Corporation*

*Of Counsel:*

John M. Desmarais
Karim Z. Oussayef
Laurie Stempler
Robert C. Harrits
Brian D. Matty
Michael Matulewicz-Crowley
DESMARAIS LLP

230 Park Avenue
New York, NY 10169
Tel:   (212) 351-3400

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Matulewicz-Crowley, hereby certify that on May 19, 2017, true and correct copies of the within document were served on the following counsel of record at the addresses and in the manner indicated:

**<u>VIA ELECTRONIC MAIL:</u>**

John G. Day
Ashby-Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
jday@ashby-geddes.com

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
FENWICK & WEST LLP
555 California Street, 12thFloor
San Francisco, CA 94104
dhadden@fenwick.com
sshamilov@fenwick.com
phaack@fenwick.com
alewin@fenwick.com
Groupon_IBM_Service@fenwick.com

*/s/ Michael Matulewicz-Crowley*

# EXHIBIT 7

# FILED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

# FILED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 9

# FILED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY