**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 16-122-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC. | ) ) | |
| Defendant. | ) | |

## IBM'S SECOND NOTICE OF DEPOSITION TO GROUPON, INC.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff International Business Machines Corporation ("IBM"), by its counsel, will take the deposition upon oral examination of Defendant Groupon, Inc. ("Groupon"), regarding the subject matter set forth in the attached Schedule B, which shall be interpreted in accordance with the definitions set forth in the attached Schedule A.

The deposition will begin at 9:30 a.m. on July 12, 2017, at the office of Desmarais LLP, 230 Park Avenue, New York, New York 10169, or at such other time and place as may be agreed upon in writing by counsel for the parties. The examination will be taken before a Notary Public or other person authorized to administer oaths pursuant to Rule 28 of the Federal Rules of Civil Procedure, and will continue day to day until completed. The testimony at the deposition will be recorded by videographic, stenographic, audio, audiovisual, and/or real-time computer means.

In accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, Groupon shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf as to each of the topics set forth in the attached Schedule B. IBM requests that Groupon identify the individual(s) who will testify regarding each topic at least one week in advance of the deposition.

You are invited to attend.

<table>
<tr><td></td><td>POTTER ANDERSON & CORROON LLP</td></tr>
</table>

OF COUNSEL:

| | |
|---|---|
| John M. Desmarais | By:   */s/ Bindu A. Palapura* |
| Jon T. Hohenthaner | David E. Moore (#3983) |
| Karim Oussayef | Bindu A. Palapura (#5370) |
| Laurie N. Stempler | Stephanie E. O'Byrne (#4446) |
| Robert C. Harrits | Hercules Plaza, 6th Floor |
| Michael J. X. Matulewicz-Crowley | 1313 N. Market Street |
| Brian D. Matty | Wilmington, DE 19801 |
| DESMARAIS LLP | Tel: (302) 984-6000 |
| 230 Park Avenue | dmoore@potteranderson.com |
| New York, NY 10169 | bpalapura@potteranderson.com |
| Tel: (212) 351-3400 | sobyrne@potteranderson.com |

Dated: June 20, 2017                          *Attorneys for Plaintiff International Business*

5252481 / 43155                                      *Machines Corporation*

## SCHEDULE A
## DEFINITIONS

1.　　As used herein, "Patents-in-Suit" means United States Patent Nos. 5,796,967 ("the '967 Patent"), 5,961,601 ("the '601 Patent), 7,072,849 ("the '849 Patent"), and 7,631,346 ("the '346 Patent").

2.　　As used herein, "This Action" means the action under the caption *International Business Machines Corporation v. Groupon, Inc.*, Civil Action No. 16-cv-00122-LPS-CJB, in the United States District Court for the District of Delaware.

3.　　As used herein, "Defendant," "You," and "Your" means Groupon, Inc. and includes any predecessors, divisions, departments, subsidiaries, parents, affiliates, present or former officers, directors, employees, agents, counsel, representatives, and others authorized to act on behalf of Groupon, Inc.

4.　　As used herein, "Accused Instrumentality" means any product, application, service, or method accused by IBM of infringing any claim of any of the Patents-in-Suit under any subsection of 35 U.S.C. § 271, including without limitation all products identified in IBM's Preliminary Identification of Accused Products served October 7, 2016 (including any supplements or amendments thereto), IBM's Preliminary Infringement Contentions served January 20, 2017 and March 24, 2017 (including any supplements or amendments thereto), and all products identified by Groupon in response to IBM's First Set of Common Interrogatories to Groupon No. 1, served November 22, 2016.

5.　　As used herein, "Prior Art" has the same meaning as used in 35 U.S.C. § 101 et seq., and includes any patent, printed publication, knowledge, use, sale or offer for sale, or other act or event defined in 35 U.S.C. §§ 102 or 103, taken singly or in combination.

6.　　As used herein, "include" and "including" shall be construed to mean "without limitation," so as to acquire the broadest possible meaning.

7.      As used herein, "communication" means any transmission of information by one or more persons and/or between two or more persons by any means, including telephone conversations, letters, telegrams, teletypes, telexes, telecopies, electronic mail, other computer linkups, written memoranda, and face-to-face conversations.

8.      As used herein, "and" and "or" shall be construed conjunctively and disjunctively, so as to acquire the broadest possibly meaning.

9.      As used herein, "any" and "all" shall each be construed to mean "each and every," so as to acquire the broadest possibly meaning.

10.     The singular and masculine form of a noun or pronoun shall embrace, and shall be read and applied as, the plural or the feminine or neuter, as the particular context makes appropriate and to give the noun or pronoun the broadest possible meaning.

11.     As used herein, "document" has the same broad meaning as in Rule 34 of the Federal Rules of Civil Procedure.   The term "document" also encompasses tangible things.

12.     As used herein, "person" means any natural person or any business, legal, or governmental entity or association.

13.     As used herein, "concerning" or "relating to" means, without limitation, identifying, describing, discussing, concerning, assessing, stating, reflecting, constituting, containing, embodying, tending to support or refute, or referring directly or indirectly to the particular subject matter identified.

14.     As used herein, the terms "Complaint," "Answer," and "Affirmative Defense" shall mean the pleadings as originally filed or as amended or supplemented throughout the progression of the case.

15.     As used herein, the term "Source Code" means any software, markup language files, style sheet language files, template language files, programming language files, configuration files, source code, object code, or other electronic information for directing the operation of a computer,

mobile device, website, web browser, or for processing electronic data, including but not limited to computer instructions and data definitions expressed in a form suitable for input to an assembler, compiler, other translator, or other data processing module. This definition includes, but is not limited to, JavaScript, Java, Java Server Pages (JSP), Active Server Pages (ASP) (including .Net ASP), VBScript, C++, C, C#, Objective-C, Swift, Python, SQL or other query languages, PostScript, Jade, Apache Velocity Templates, HTML, CSS, XML, batch files, and shell scripts.

16.     As used herein, the term "URI" means uniform resource identifier.

17.     As used herein, the term "URL" means uniform resource locator.

18.     As used herein, the term "Source Code Computer" means the laptop You have made available for inspection in This Action in accordance with Paragraph 12 of the Protective Order in this litigation (D.I. 24).

19.     As used herein, "financial data" means any and all information related to Your finances, including but not limited to information concerning revenues, costs, and profits.

20.     As used herein, the term "Transaction Event" means any revenue-generating event, including but not limited to user queries, search hit clicks, use of Groupons, coupons, or offers, reservation bookings, completion of reservations (i.e., reservations that are not cancelled or no-show reservations), ad-related bookings, covers, advertisement impressions, advertisement clicks, or purchases (including but not limited to purchases of Groupons).

21.     As used herein, the term "data source" means database, wiki, file store, intranet site, data repository, network location, document management system, or other data collection used to access and/or maintain documents.

<u>**SCHEDULE B**</u>
<u>**TOPICS**</u>

1.      The way in which each of your Accused Instrumentalities:

        a.      generate URLs, URIs, or hyperlinks;

        b.      allow users to "Sign In"/"Sign Up" and create user accounts, including by using information or data about users from Google or Facebook;

        c.      deliver content, including HTML, web pages, JavaScript, images, graphics, stylesheets, and font files;

        d.      set parameters related to caching; and

        e.      use content delivery networks, including those provided by Akamai Technologies, Inc.

2.      The earliest date that the accused features and functionalities of the Accused Instrumentalities, identified in IBM's January 20, 2017 and March 24, 2017 Preliminary Infringement Contentions, were implemented, and in particular:

        a.      The date(s) on which You first implemented the ability to cache or store content, including but not limited to menus, images, videos, browser-supported source code (such as JavaScript), and advertisements at each of the Accused Instrumentalities;

        b.      The date(s) on which You first implemented the process of embedding information into hyperlinks, internet addresses, URLs, or URIs at each of the Accused Instrumentalities; and

c. The date(s) on which You first made available to users the option to create an account, at each of the Accused Instrumentalities, using Facebook and/or Google login credentials.

3. All changes to the accused features and functionalities of the Accused Instrumentalities identified in IBM's January 20, 2017 and March 24, 2017 Preliminary Infringement Contentions, beginning on the earliest date that such accused features and functionalities were implemented (i.e., the dates identified in response to Topic 2 herein) through the present and any planned future changes to such features and functionalities, including but not limited to any changes made as a result of learning of the Patents-in-Suit.

4. The identity and functionality of the source code that affects how each of the Accused Instrumentalities:

a. generate URLs, URIs, or hyperlinks;

b. allow users to "Sign In"/"Sign Up" and create user accounts, including by using information or data about users from Google or Facebook;

c. deliver content, including HTML, web pages, JavaScript, images, graphics, stylesheets, and font files;

d. set parameters related to caching; and

e. use content delivery networks, including those provided by Akamai Technologies, Inc.

5. The identity, functionality, and configuration of any third-party software, hardware, or service, including by not limited to Akamai, Facebook, Google, Amazon Web Services, Fastly, Apache, Optimizely, Varnish, and Edgecast, that affects how each of your Accused Instrumentalities:

      a.     generate URLs, URIs, or hyperlinks;

      b.     allow users to "Sign In"/"Sign Up" and create user accounts,

including by using information or data about users from Google or

Facebook;

      c.     deliver content, including HTML, web pages, JavaScript, images,

graphics, stylesheets, and font files;

      d.     set parameters related to caching; and

      e.     use content delivery networks, including those provided by Akamai

Technologies, Inc.

6.     Agreements between You and any third party related to how each of your

Accused Instrumentalities:

      a.     generate URLs, URIs, or hyperlinks;

      b.     allow users to "Sign In"/"Sign Up" and create user accounts,

including by using information or data about users from Google or

Facebook;

      c.     deliver content, including HTML, web pages, JavaScript, images,

graphics, stylesheets, and font files;

      d.     set parameters related to caching; and

      e.     use content delivery networks, including those provided by Akamai

Technologies, Inc.

7.     The identity, functionality, topology, and configuration of any servers,

including third-party servers, that deliver content to users.

8.     The number of user accounts at each of the Accused Instrumentalities, created

on a monthly basis, from 2010 and continuing through the present.

9.     On a monthly basis, the total number of Transaction Events made using the Accused Instrumentalities from 2010 to the present.

10.     On a monthly basis, the number of Transaction Events made through the Accused Instrumentalities by users whose accounts were linked to Facebook and/or Google login credentials from 2010 to the present.

11.     On a monthly basis, the number of Transaction Events made through the Accused Instrumentalities by users who were logged in using Facebook and/or Google login credentials from 2010 to the present.

12.     On a monthly basis, the total number of unique and non-unique (i.e., returning) visitors to the Accused Instrumentalities, the number of unique and non-unique visitors who disabled cookies, and the percentage of unique and non-unique visitors who disabled cookies from 2010 to the present.

13.     On a monthly basis, the number of unique and non-unique visitors who disabled caching in their web browser and the percentage of unique and non-unique visitors who disabled caching in their web browser.

14.     The categories of information stored in cookies regarding visitors to the Accused Instrumentalities.

15.     Any analyses of the impact of latency on users of the Accused Instrumentalities, such as measurements or assessments of the impact of latency on click-through rates, Transaction Event conversions, completed Transaction Events, and abandoned Transaction Events.

16.     Control panels, consoles, dashboards, or interfaces for any hosting, caching, or content delivery network service (e.g., Akamai, Fastly, Amazon s3, Amazon, Google, Edgecast), whether in-house or through a third-party for the Accused Instrumentalities.

17.     Any caching-related instructions or configuration settings in each version of the Accused Instrumentalities (such as Cache-Control, Edge-Control, Pragma, ETag, no-store, no-cache, must-revalidate, max-age, or downstream-ttl) that are set or modified by You or a third party.

18.     The identity of, and the location on the Source Code Computer of, any HTML template files that are used to generate content for each version of the Accused Instrumentalities.

19.     The URL(s), URI(s), or other portions of the Accused Instrumentalities generated by each HTML template file found on the Source Code Computer.

20.     The process by which any HTML template files on the Source Code Computer are used to generate content for the Accused Instrumentalities.

21.     The HTTP methods (e.g., GET, POST) used in the Accused Instrumentalities to interact with Your servers.

22.     The data formats (e.g., JSON, xml) used in the Accused Instrumentalities to interact with Your servers.

23.     The parameters and variables (including user IDs, session IDs, and deal IDs) located in hyperlinks in the Accused Instrumentalities.

24.     The communications (e.g., HTTP requests and responses, API calls) between Google or Facebook, Your servers, and the clients or browsers accessing the Accused Instrumentalities, when users "Sign In" to, "Log In" to, "Sign Up" for, or create their user account using Facebook or Google.

25.     Your communications and/or interactions with IBM concerning the Patents-in-Suit prior to March 2, 2016.

26.     Your communications with third parties concerning IBM, the Patents-in-Suit, and/or This Action.

27.     Any attempts you have made to avoid infringement or design around the Patents-in-Suit.

28.     The actual or anticipated cost of avoiding infringement or designing around the Patents-in-Suit.

29.     Any allegedly non-infringing alternatives to the inventions claimed in the Patents-in-Suit and the cost and acceptability of such allegedly non-infringing alternatives in the marketplace.

30.     Your knowledge of the Patents-in-Suit, including but not limited to: (i) how and when such awareness came about, (ii) any analysis performed by You or for You to determine whether You infringe the Patents-in-Suit, whether the Patents-in-Suit are valid or enforceable, or whether You should seek to obtain a license to the Patents-in-Suit, (iii) when any such analysis was performed and the persons involved, and (v) any documents that discuss, refer to, or comprise the same.

31.     Any opinion of counsel (whether oral or written) with respect to the Patents-in-Suit, and the documents that discuss, refer to, or comprise the same.

32.     The factual bases for all of Your defenses (including all affirmative defenses), counterclaims, or requests for relief.