08:45:05  1              IN THE UNITED STATES DISTRICT COURT

        2              IN AND FOR THE DISTRICT OF DELAWARE

        3                          - - -

        4  INTERNATIONAL BUSINESS MACHINES
           CORPORATION,                          :   CIVIL ACTION
                                                 :
        5              Plaintiff,                 :
           v                                      :
        6                                         :
           GROUPON, INC.,                         :
        7                                         :   NO. 16-122-LPS
                       Defendant.
        8                          - - -

        9                      Wilmington, Delaware
                               Monday, June 5, 2017
       10              *Claim Construction and Motion Hearing*

       11                          - - -

       12  BEFORE:    HONORABLE LEONARD P. STARK, Chief Judge

       13  APPEARANCES:                    - - -

       14
                       POTTER ANDERSON & CORROON, LLP
       15              BY:  BINDU A. PALAPURA, ESQ.

       16                  and

       17              DESMARAIS, LLP
                       BY:  JOHN DESMARAIS, ESQ.,
       18                   KARIM OUSSAYEF, ESQ.,
                            LAURIE STEMPLER, ESQ.,
       19                   ROBERT C. HARRITS, ESQ., and
03:00:32                    MICHAEL MATULEWICZ-CROWLEY, ESQ.
       20                   (New York, New York)

       21                      Counsel for Plaintiff

       22
                       ASHBY & GEDDES, P.A.
       23              BY:  JOHN G. DAY, ESQ.

       24                  and

       25                           Brian P. Gaffigan
                                    Registered Merit Reporter

1

**APPEARANCES:   (Continued)**

2

3                    **FENWICK & WEST, LLP**
                    **BY:   J. DAVID HADDEN, ESQ., and**
4                    **PHILLIP HAACK, ESQ.**
                    **(San Francisco, California)**
5
                        **Counsel for Defendants**
6

7

8                        **- oOo -**

9                    **P R O C E E D I N G S**

10                    **(REPORTER'S NOTE:  The following claim**

11    **construction and motion hearing was held in open court,**

08:58:09 12    **beginning at 9:00 a.m.)**

08:58:09 13                    **THE COURT:  Good morning.**

08:58:10 14                    **(The attorneys respond, "Good Morning, Your**

08:58:12 15    **Honor.)**

08:58:12 16                    **THE COURT:  I'll have you put your appearances**

08:58:15 17    **on the record for me, please.  Good morning.**

09:03:27 18                    **MS. PALAPURA:  Good morning, Your Honor.  Bindu**

09:03:29 19    **Palapura from Potter Anderson & Corroon on behalf of IBM.**

09:03:30 20    **With me today from Desmarais, LLP is John Desmarais.**

09:03:34 21                    **MR. DESMARAIS:  Good morning.**

09:03:35 22                    **MS. PALAPURA:  Karim Oussayef.**

09:03:36 23                    **MR. OUSSAYEF:  Good morning, Your Honor.**

09:03:37 24                    **MS. PALAPURA:  Laurie Stempler.**

09:03:38 25                    **MS. STEMPLER:  Good morning.**

09:03:39 1          MS. PALAPURA:  Michael Matulewicz-Crowley.

09:03:43 2          MR. MATULEWICZ-CROWLEY:  Good morning.

09:03:44 3          MS. PALAPURA:  And Roberts Harrits.

09:03:46 4          MR. HARRITS:  Good morning, Your Honor.

09:03:47 5          MR. DAY:  Good morning, Your Honor.

09:03:49 6          THE COURT:  Good morning.

09:03:50 7          MR. DAY:  John Day from Ashby & Geddes, Delaware

09:03:54 8   counsel for Groupon.  With me from Fenwick & West, David

09:03:56 9   Hadden.

09:03:57 10         MR. HADDEN:  Good morning, Your Honor.

09:03:57 11         MR. DAY:  And Phil Haack.

09:03:59 12         MR. HAACK:  Good morning, Your Honor.

09:03:59 13         MR. DAY:  And from Groupon, Lauren Schwartz.

09:04:02 14         MS. SCHWARTZ:  Good morning.

09:04:03 15         THE COURT:  Good morning.  Welcome.  So we're

09:04:05 16  here for argument on a motion as well as the *Markman*

09:04:11 17  hearing.  Have you all conferred on how you would like to

09:04:13 18  use your time this morning?

09:04:15 19         MR. OUSSAYEF:  Yes, Your Honor.  We conferred

09:04:19 20  with the other side.  We decided that we know the order of

09:04:23 21  the terms that we would like to argue for the *Markman*

09:04:25 22  hearing, but we would like to hear whether Your Honor first

09:04:29 23  would hear either the motion for judgment of pleadings or

09:04:31 24  the claim construction issues first.

09:04:32 25         THE COURT:  So you have no view on that.

MR. OUSSAYEF:  If we were to proceed, I think it makes sense to start with the motion for judgment on the pleadings.

THE COURT:  And what is your view?

MR. HADDEN:  That's fine with me, Your Honor.

THE COURT:  Okay.  So let's do the 101 first and then we'll do the claim construction.

MR. OUSSAYEF:  Yes, Your Honor.  It is defendant's motion.  We'll have them go first.

THE COURT:  Right.  We'll hear from defendants first.  Thank you.

MR. HADDEN:  Thank you, Your Honor.

(Elmo settings adjusted.)

MR. HADDEN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. HADDEN:  So as you know, this motion relates to the two Prodigy patents which share, largely share the same specification.

And as the Court found in the prior ruling in the *Priceline* motion, these claims fail under Step One of the *Alice* steps as the Court found the concepts, the patents relate to the general idea of locally storing information in using that to create a partition display.  And,

As Judge Burke found in the prior motion, those concepts are abstract and devoid of concrete and tangent

application. And that people have been storing information locally and using it even before computers, and that this is really not distinguishable from cases like *Content Extraction* or similar concepts have been found to be abstract.

Now, in response, in opposition to the current motion, IBM has argued that the Federal Circuit decision in *Enfish* changed the law. And they've argued that after *Enfish*, any claim that aspires and supports to improve computers or computer networking is somehow immune under 101 or immune to 101 scrutiny. And,

That argument has been rejected repeatedly by courts both in this District and by the Federal Circuit, probably most clearly in Judge Andrews decision in *Visual Memory v Nvidia*. In that case, the plaintiff made exactly the same argument. It said that after *Enfish*, because the claims in the digital memory patent related to a storage system, multi-tier cache, they were aimed at an improvement to computer technology and therefore were immune from 101 scrutiny. And,

Judge Andrews correctly rejected that argument and, as he explained, the real issue in *Enfish* is whether the District Court had been too general and oversimplified in the Step One analysis but not that somehow that case immunizes from 101 scrutiny patents that aspire related to the use. And, again, Judge Andrews reemphasized the real

test, which is not whether it somehow touches on computers but whether the claims provide a specific concrete solution.

And in Your Honor's opinion in *IV v Symantec*, there is a similar argument made. And, again, Your Honor reached the same result. In that case, the claims were to this purportedly improved method for mirroring data to a remote location, and when it was stable against power outages, et cetera, but there was no concrete solution. The claims did not include the required details for the specific solution to avoid 101.

There has to be a concrete specific solution. That is the test. And,

Again, as in this case, IBM is sort of pointing to the specification and arguing that somehow these Prodigy patents overcame problems with dumb terminals or prior networking systems, but that is not in the claims.

The focus on this case has to be the issue, Your Honor noted in *IV v Symantec*, on the claims as written and whether they actually specified a specific solution. And here they don't. And,

Again, just to make clear, there has been a slew of Federal Circuit cases following *Enfish* finding patents that relate somehow or aspire to improve computers invalid under 101 including the *Tranxition* case, *Appistry v Amazon* which are related to distributed computing. *Tranxition* was

about migrating computer settings and the *IV I v Symantec* case of a virus scanning in a computer network. All of those purported to improve computer technology or computer networks. All were found invalid.

IBM's next argument under Step One is that the claims are not invalid under Step One because the PTAB denied a CBM review of one of the patents.

I mean, the first point is the PTAB didn't even look at the '967 patent because IBM disclaimed the advertising claims in that patent to take it out of CBM purview.

But then if we look at the PTAB's analysis on the '849 patent, it is directly contrary to what this Court previously found. So the PTAB agreed that the claims were directed at the abstract idea of generating a partition screen display from information stored at the user's computer. The same idea that Judge Burke and Your Honor found was abstract in the prior *Priceline* decision. And,

Beyond that, the PTAB went on in their decision and agreed with the petitioner that the claims themselves recite only generalized steps. He did not go into further detail as to how those steps were accomplished.

Now, it seems like it should be game over at that point; right? I mean if the claim does not have details about how the ideas are to be accomplished and just describes

09:11:08 1    generalized steps, under *Affinity Labs v Amazon*, that is kind

09:11:14 2    of the hallmark of the claim that is invalid under 101.

09:11:17 3         But, instead, the PTAB applied this test and I

09:11:22 4    frankly have never seen before, which is they said if we

09:11:25 5    take out the words and references to computers in the claim,

09:11:29 6    would that change the meaning to someone in 1989?  And, if

09:11:35 7    so, then somehow the claim is not directed to an abstract idea.

09:11:38 8         That is not a test I have ever seen in a Federal

09:11:42 9    Circuit case or in any District Court case.  And with all

09:11:44 10   due respect to the PTAB, it strikes me as kind of wacky.

09:11:50 11        So I don't think there is any dispute at this

09:11:53 12   point that these claims fail under Step One.

09:11:56 13        Now, if we go to Step Two, what is the inventive

09:12:00 14   concept that provides the specific novel solution?

09:12:05 15        Well, there is none.  IBM hung its hat on "data

09:12:10 16   object" in the *Priceline* motion, but the Court has now

09:12:13 17   construed that "object" as "a data structure."  And the

09:12:17 18   cases are clear that a data structure is a generic concept.

09:12:22 19   There is nothing inventive about using data structures.  In

09:12:25 20   fact, every computer program uses data structures.  Right?

09:12:29 21   Computers understand structured data.  They're data structures.

09:12:36 22        And it is important -- right? -- to distinguish

09:12:39 23   *Enfish*.  *Enfish* survived because it didn't just claim using

09:12:43 24   a data structure, it claimed a very specific type of data

09:12:46 25   structure:  this self-referential cable, and there was a

four step algorithm for how to use it in the claim. So
that claim had a specific solution that saved it that was
inventive. And,

It's clear that is not the case here. Right?
Because IBM is applying the Court's construction of "data
object" as "a data structure" to include anything, right?

So this is from their infringement contentions.

And they say data includes "HTML files,
JavaScript, JSON files, images and other data." So
basically a data object is anything.

IBM next points to the Court's construction that
says "objects being retrieved from the objects stored at the
respective reception system, or, if the current versions of
the objects are not present from the objects stored at the
respective reception system, then from the network."

So all this says we use what is cached locally,
and if it is not there, we go and get it from the network.

But that is the basic idea of caching. And
courts have found that that idea is not inventive. Right?

So in the *Versata v NetBrain* in this District,
the patent was about caching dynamic web pages. It is
essentially what IBM is accusing in this case. And the
Court held that the central concept is receiving information
and a transmitting a response either by recycling the
information you have or collecting the requested information

09:14:32 1  anew, which is no different than what these claims require.

09:14:36 2  Right?  That is what a cache does.  You use what you have.

09:14:39 3  If it is not there, you go get it from the source.  That is

09:14:43 4  now Check ID.

09:14:46 5          IBM also talks a lot in its papers about how,

09:14:55 6  in its tutorial about how somehow this invention splits the

09:14:59 7  functionality between the server and the local reception

09:15:03 8  system computer.

09:15:06 9          But, again, the idea of splitting functionality

09:15:10 10 between a client and a server is not inventive.  That was

09:15:14 11 the very issue in the *Device Enhancement* case in this

09:15:18 12 District.  Again, that is another post-*Enfish* decision.

09:15:22 13         In that case, Judge Robinson said that is not

09:15:24 14 inventive, right?  The server exchanges data with the

09:15:28 15 terminal device -- tasks are split between the client side

09:15:32 16 application and the remote application, albeit without

09:15:37 17 further guidance from the patent.  That was the key point.

09:15:39 18         Such a broad claim, even though it relates to

09:15:42 19 a computer centric idea, is just the idea of using a

09:15:45 20 distributive architecture to increase the capability.

09:15:49 21 Right?  And that is exactly the kind of pitch that IBM is

09:15:52 22 making here.

09:15:53 23         But that is, as Judge Robinson found, abstract.

09:15:59 24 Right?  There is no, there is nothing in these claims that

09:16:01 25 would tell you how actually build a specific solution to

that.  Right?  IBM's patent doesn't tell you how to split an application into pieces, what those pieces should look like, it doesn't tell you how we can find those at the reception system in a way it provides any new functionality.  It is just claiming the idea of using some stuff at a server, using some other stuff that is stored locally.  And that is exactly the idea that Judge Robinson held was abstract and unpatentable.  And,

A similar idea was in the *CyberFone* case.  In *CyberFone*, it was about whether you take some data, you split it up, you send it to different places.  Is that an inventive concept?

Of course, Judge Robinson and the Federal Circuit said no, right?  With taking, obtaining data separating it, sending it to different places, that is not inventive concert.

Nor, of course, is combining data from different sources.  That was the issue in *Electric Power*.

So if IBM's pitch is that the ability to combine data from a local machine with data from the remote server is the invention, that can't be it; right?  The Federal Circuit said that combining information even specific information and displaying it is not inventive.

Finally, IBM on the '849 patent, points to the selective storing.  The prefetching at ad.  And though IBM is going to contest I think later that that is the correct

construction, even though that construction, which I think
is right, just prefetching information to store is not
inventive; right?  That is inherent in the idea of a local
store.  You have to stock the local store.  I recited
something going back to Roman legions; right?  You have to
stock the local store for the soldiers.

And even in the context of advertising, right?
The *Ultramercial* case kind of rejecting that as one of the
steps in those claims.  In those claims, one of the steps
was selecting an ad.  And then you would offer the media in
exchange for watching the ad.  But there was a preselected
ad as part of the step, and the claim was nonetheless abstract.

Of course, there is a slew of cases that confirm
that just fetching and storing information, whether it is a
particular content, like an advertisement or not, is not
inventive.  Going from *Content Extraction* to *CyberFone* to
*Electric Power*.  So that can't be the inventive concept that
saves these claims.

Finally, on the dependent claim, IBM points to
the storage control parameters being the magic inventive
concept, and they say that it is one of the mechanisms
underlying the as-needed retrieval elements of the patented
inventions.

But, of course, it is not a mechanism at all.
It is just a generic parameter that relates to what

09:19:05 1    information is cached.  And, again, in the *Visual Memory*

09:19:09 2    case, this same issue came up.  And if we look at the claim

09:19:14 3    that was at issue in that case, which is this one, it is far

09:19:18 4    more detailed, far more specific, far more concrete and far

09:19:23 5    more technical than any of the claims at issue in these

09:19:27 6    Prodigy patents.  Judge Andrews nonetheless found it was

09:19:31 7    abstract.

09:19:32 8         But one of the components of that claim was

09:19:35 9    these first programmable characteristics which, like the

09:19:38 10   storage control parameter, determined what information was

09:19:42 11   stored in which of the three layers of cache in that system,

09:19:47 12   and whether it was code or data and whether it came from the

09:19:52 13   bus or somewhere else.  And,

09:19:54 14        Judge Andrews, basically the same argument,

09:19:59 15   said that those programmable operational characteristics is

09:20:02 16   simply a generic concept.  It determines a type of data

09:20:05 17   stored by the cache.  And without an explanation the

09:20:09 18   mechanism for how this result is accomplished, it cannot

09:20:11 19   supply an inventive concept.  And,

09:20:15 20        The same is true here.  Just saying there is a

09:20:17 21   parameter that relates to what is stored is not a specific

09:20:20 22   solution or inventive concept.  And,

09:20:25 23        Again we have to focus on the claims, right?

09:20:28 24   IBM, in their tutorial and otherwise, talks a lot about

09:20:32 25   Prodigy and how great it was.  Now, IBM could have claimed

or drafted claims that covered the specific implementation of Prodigy and those claims may well survive 101 but those are not the claims they have. Right?

They tried instead to claim this very basic concept using some information that is stored at the local computer and combining it with some remote information. And that is just too broad. It is just too abstract and covers too much. And it's clear that it covers too much and IBM essentially admits in its opposition brief that it is not only trying to preempt the Web of these patents -- I mean let's be clear. Everybody who has been sued on these patents has been sued just because they use the World Wide Web. There has not been anything common that relates Groupon to *Priceline* to Amazon to Living Social except the use of the Web.

But they want to go beyond that. If you look at their opposition, they say, fine, here are some things we don't preempt. One alternative is to transfer the entire interactive application, the user reception system, at once instead of breaking it up into data objects. So they say you can avoid our patents by not breaking things up. Other than that, we own it. We don't break things up.

The next thing they say is: Another alternative is to required users to retrieve content from the server each time the user interacts with the application, instead

of storing data objects at the user reception system.

So they say, fine, the other way you can avoid our patent, don't store anything locally. But if you break things up or you store them locally, we own it. And these patents preempt it. And that is just, that is too broad. There is nothing in these claims, there is no contribution to the general knowledge in these claims that justify that ridiculous scope of preemption.

Thank you, Your Honor.

THE COURT: Thank you. We'll hear from plaintiff.

MR. OUSSAYEF: Good morning, Your Honor. Karim Oussayef for IBM. May it please the Court.

I won't belabor the law behind *Alice*, Steps One and Two since Your Honor is familiar, but I think there is a couple of points that are important to look at. And,

On slide 5, what we see here are some of the abstract ideas that are not -- some of the abstract ideas that have been found under *Alice* and those type of cases which are really ideas that are found outside of the computer system and brought within the computer realm like mathematical algorithms, fundamental economic and business practices, and claims about an idea itself without anything connected to technology.

What is not an abstract idea, however, is more elucidated in the case of *Enfish* and *McRO* which help specify

09:23:59 1　that *Alice* Step One inquiry with a little bit more rigor.

09:24:04 2　And what it says is that the "directed to" inquiry isn't

09:24:09 3　just whether there is something involved that is a patent

09:24:13 4　ineligible concept but whether the claims are really

09:24:16 5　directed to solving something that exists in the computer

09:24:20 6　realm.

09:24:22 7　　　　　And what it found is that when the focus of the

09:24:27 8　claims is on a specific asserted improvement in computer

09:24:31 9　capabilities, that is when it is not an abstract idea under

09:24:35 10　*Alice* Step One.

09:24:36 11　　　　　Similarly, *McRO* found that claims directed to a

09:24:40 12　patentable, technological improvement over the existing

09:24:44 13　computer techniques, that also passes Step One.  And,

09:24:47 14　　　　　The recent case of *PalTalk Holdings*, which was

09:24:51 15　just in May of this year, that was a Delaware case where

09:24:54 16　"claims addressing a technical challenge ... unique to the

09:24:58 17　world of interactive software applications shared over a

09:25:01 18　computer network," that is something that is not an abstract

09:25:05 19　idea under *Alice* Step One.

09:25:08 20　　　　　So the question here we should be asking

09:25:10 21　ourselves is, are we focused on solving a problem in the

09:25:15 22　computer realm or are we trying to solve a problem outside

09:25:18 23　the computer realm and just trying to capture it by putting

09:25:21 24　it on generic computer software?

09:25:23 25　　　　　So let's look at the answer to that question.

First, let's look at the complaint. The complaint which at this stage of the case must be assumed to be true, and which is backed up with by the evidence as well, indicates that the Filepp patents were conceived in the 1980s, when IBM was developing the Prodigy online system. And,

In that time frame, on slide 7, we see the second bullet point talks about how in the prior art, you had applications but they used a "dumb terminal" approach. And what that means is that all the data was transferred together to the user's computer at once instead of it being broken up into pieces and instead of being organized into partitions or areas of the screen where the user could interact with it.

So what the inventors developed in bullet point three is they developed an innovative method for presenting applications and advertising in a way that would take advantage of the user's computer because at the time, people were starting to buy computers that could use floppy disks that could compute at a local area where the user was. So to take advantage of that, if you break up content, you could have the user's computer put it back together because it's smart enough to do so. And,

Then by doing that, you can reduce the load on the whole system so that the host doesn't have to be

bothered with the request for everything every time.  It can just be asked for individual pieces of that or objects.  And then you can organize those to display it to the user.

So don't just take the complaint's word for it.  Also, if we look specification, that is exactly what is said in the specification.  So it is saying interactive computer networks are not new.  They're something that existed but we want to improve it.

They involved in the past hierarchical architecture of the central host computer.  And in the bottom highlighted part, in such networks, the host has to do all the work.  And that is the problem that causes network slowdown.

Similarly, in the *PalTalk* case, the technical challenge that was addressed was unique to the world of interactive software application shared over a computer network.  So it fits "hand in glove" with the idea of addressing something specific to interactive computers networks and interactive applications.

The specification of the '967, the specification of the '967 leaves no doubt that it is directed to improving computer performance.  It says that objects are structured in an architecture that allows display data to be relocated and reused on the screen to make up other screens, and they can be dynamically created in response to the user's

09:28:20 1　request.  And,

09:28:22 2　　　　　Then at the bottom quote on slide 9:  Because

09:28:25 3　the processing formally done by the host is done by the

09:28:28 4　reception system, that is what allows the performance of the

09:28:32 5　system to be improved.

09:28:33 6　　　　　The '849 patent on slide 10 is specific to

09:28:38 7　advertising.  And it talks about how you can use it for

09:28:42 8　advertising and you can see whether advertising is likely

09:28:47 9　to be used again and, based on whether it is likely to be

09:28:50 10　used again, store it at the user's computer so you can

09:28:53 11　selectively store advertising at the user's computer and

09:28:58 12　therefore response time is reduced.

09:29:01 13　　　　　So what we see here on slide 11 is a

09:29:05 14　demonstration of this.  This is, on the left-hand side, a

09:29:11 15　representation of sending down the entire application, the

09:29:17 16　entire command menu, the entire advertising down to the user

09:29:21 17　in a sequential manner.  So that is the problem that existed

09:29:25 18　in the prior art.  And,

09:29:26 19　　　　　The solution was to break it up into pieces, as

09:29:30 20　we'll see on the next slide.  But the *MAZ Encryption* case

09:29:34 21　explains that when you disparage the prior art and you

09:29:37 22　explain why it was wrong and what the technical problem was,

09:29:42 23　that helps determine something is patent eligible.

09:29:45 24　　　　　On the next slide here, 12, we see how the

09:29:53 25　Filepp patents solve the "dumb terminal" approach.  This is

an adaptation from Figure 3a and it shows how in application it can be broken up into different segments. The blue here is representing what can be stored at the user's computer. The green, what is stored at the host computer. And then it can be combined on the fly when the user wants to do something.

So here on the left-hand side is a little bit busy, but what you see is the next path jump in the window portion up in blue are what are being retrieved from the user's hard drive and the user's system, which is on the bottom, and the other components are being retrieved from the file server or the host system to combine to create the presentation that the user sees. And that is supported by the quotes from the specification on the right-hand side.

A common refrain during opposing counsel's oral arguement, that is just what the specification says. That is not in the claims.

If we look at the claims here on the next slide, we see that it is in the claims. In fact, it talks about on the left-hand side from the '967 patent, claim 1, generating a screen display. And,

That is at a reception system. You create it out of portions. The portions are being constructed of objects. Those objects can be dynamically combined from objects stored at the reception system or unavailable from

the network.  Those objects can be used in more than one

application so they can be reused to reduce demand on the

host.

You can have two different partitions:  one

for presenting applications and one for presenting command

functions.  The command functions allow you to switch

between applications which is the entire idea of having

reuse of objects across applications to decrease demands on

the host.

This is in stark contrast to the prior art

which did not have the idea of modular applications or of

partitions that could be used for specific content.  And,

Then "selectable to permit movement between

applications" is how you are able to harness the ability of

reuse of objects.

On the right-hand side, you see something similar.

The '849 patent is directed specifically to advertising.

And we talk about how you structure advertising so that it

can be used in a combination of applications.  And then you

selectively store it to the user's reception systems so that

you can use the objects that are most likely to be demanded by

the user in the future.

All of this is in the claims.

If we look at -- so we looked at the claims, the

specification, the complaint.  How else do you know that

09:32:44 1   this is really directed to a specific technological problem?

09:32:47 2   The prosecution history tells the same story.  It talks

09:32:50 3   about how the patents were developed as part of the Prodigy

09:32:53 4   service, and how that called for a new approach.

09:32:57 5          In the middle highlighted part on slide 15, it

09:32:59 6   talks about how you need to reduce response time because you

09:33:04 7   needed it to supply things to so many users, and you had to

09:33:08 8   break away from the dumb terminal approach that is in the

09:33:10 9   bottom of slide 15.

09:33:11 10          On slide 16, it explains how this is

09:33:14 11   accomplished:  by breaking data and program code into

09:33:19 12   objects and then harnessing the power of the subscriber's

09:33:24 13   PCs so you can compose things on the fly.

09:33:26 14          So I think one important thing to look at, too,

09:33:37 15   is the Court's prior Report and Recommendation.  In there,

09:33:41 16   the Court already found, on the way to finding that the

09:33:45 17   patent was patent eligible under *Alice* Step Two, found

09:33:50 18   that the claims can be seen as an attempt to improve the

09:33:53 19   functionality of computer networks.

09:33:56 20          I think that is inevitable from all the evidence

09:33:59 21   of the complaint, the specification, the claims, and the

09:34:03 22   prosecution history.  And *Enfish* tells you straight up that

09:34:07 23   claims whose claim focus is on an improvement to computer

09:34:11 24   functionality is patent eligible.

09:34:13 25          *McRO* tells you that claims directed to a

patentable, technological improvement are patent eligible.

So the finding that the Court has already made supports patent eligibility under *Alice* Step One and that is why under *Enfish* and *McRO,* the claims are patent eligible.

The PTAB decision reached a similar result. And I think what they really focused on, the PTAB decision, was not the meat of what the PTAB really found. What the Patent -- what the PTAB rested its argument on or its decision on was that the '849 patent was almost exclusively dedicated to solving a problem arising in computer technology bandwidth with a computerized solution, local storage, and thus found the claims to be patent eligible. And the PTAB didn't rely on a particular construction of the claims. It found that relying on a broadest reasonable interpretation.

So let's look at Groupon's characterization of the claims as "local storage."

If you look at the arguments that opposing counsel made in their oral argument, they said *Enfish* stands for the principle that you should not oversimplify Step One. But in their briefs, they oversimplify the claims as directed just to local storage.

If you look at their *Markman* brief, though, you see the truth of the claims come out where they admit that the claims are directed to something far more specific. They say specifically the sole independent claim of the '967

patent is directed to concurrently presenting applications
and commands on a single screen display.  And the five
independent claims of the '849 patent are directed to
concurrently presenting applications and advertisements on
a single screen display.  The displays are constructed by a
reception system.  Software running on the users' computer.
The display layout includes separate partitions which
applications, commands, and advertisements are selected
separately but concurrently displayed.  And they go on to
explain how the claims are directed to something far more
specific.

Under their own interpretation of *Enfish,* that
should be the inquiry of how to determine what the claims
are directed to.  What are they really doing here?

I think that their analogy which they made in
the oral argument as well, that local storage was known by
the Romans, is really inapt for several reasons.

If you think about it, it just doesn't make
sense because local storage in the local world has nothing
to do with local storage here.  Even if you were just to
look at the idea of local storage, the constraints are
completely different.  Unlike physical objects, the same
data objects can be stored in different locations.  And
multiple objects can be combined on the fly because you can
send things immediately from two locations when you need it

unlike, for example, buildings or patibles or whatever else in the supply chain for the Romans. The solutions are completely different. The Filepp patents say store things at different locations and break them up. The Roman solution is let's get everything to the village and we want it back.

The technological challenges are completely different. It's not where objects are located, which is the problem with the Filepp patents, it is how do you make sure that processing power is used most efficiently which doesn't even make sense to ask in their example.

They don't try to address anything dealing with displays, applications, partitions, objects, selectively storing, command functions, and advertising because all of that doesn't make sense in the real world.

Finally, if we look at their cases that they rely on most heavily, you see a common theme here. You have *Electric Power Grid*. That dealt with taking an off-line idea of using electrical grids and how to analyze them, and just said let's do it on a computer.

If you look at *Content Extraction*, that took the idea of how do we process information from hard copy documents, something that had been done by humans, let's do it on a computer.

If you look at *Ultramercial*, it talked about using advertisements as exchange of currency, something that

1   had been used, for example, on newspapers or TV in the past.

2   Let's just do it on a computer.

3            In contrast, if you look at *McRO*, *Enfish* and the

4   Filepp patents, it talks about something that is already on

5   a computer.  How do we make that better?  How do we improve

6   it?

7            So the idea here is are we targeting a problem

8   that is on a computer?  And the evidence here is uniform

9   that that is exactly what the Filepp patents are doing.

10           Groupon relies heavily on the *Visual Memory*

11  case.  They say, well, this proves that *Enfish* and *McRO*

12  didn't change the law and we can distinguish using the same

13  analysis of visual memory.

14           But *Visual Memory* simply recognized something

15  that had already existed in the past, which was using

16  physical devices or computer devices generically, does not

17  confer patent eligibility.  We knew that before.

18           Really what it is saying is you can't just say,

19  hey, I'm going to do something that existed in the human

20  realm and put a computer there.  But that is not what the

21  patents are doing.  The patents are improving a system that

22  is already on the computer.

23           And the *Visual Memory* case also recognizes

24  that the levels of abstraction at *Alice* Step One must be

25  consistent with the claims themselves.  If you look at the

09:40:15 1    claims on slide 22 of the *Visual Memory* case, I put example

09:40:20 2    there of claim 1.  It is really just saying a main memory, a

09:40:25 3    cache, and programmable, operational characteristics.

09:40:28 4            There is no meat.  There is nothing there.

09:40:32 5            This case is far more analogous to *PalTalk*

09:40:35 6    which I mentioned a couple times before.  *PalTalk*

09:40:38 7    examined the specification and noted that there is no apt

09:40:43 8    brick-and-mortar analysis or analogy that could be used and

09:40:48 9    noticed how the specification was focused on how to improve

09:40:55 10   computer technology.  Specifically, interactive software

09:40:57 11   applications.

09:40:58 12           That is exactly what we have here.

09:41:00 13           *Alice* Step Two --

09:41:02 14           THE COURT:  Before you move on to Step Two.  So

09:41:04 15   is it IBM's view, after all that, that the dispositive

09:41:10 16   question of Step One is are the claims directed to improving

09:41:15 17   computer function and that is all I have to ask?

09:41:22 18           MR. OUSSAYEF:  Yes, but I think the key question

09:41:24 19   is improving computer functionality.  So the cases that we

09:41:28 20   see which talk about, hey, it has computer components in

09:41:31 21   there, the question really has to be are you improving those

09:41:35 22   computer components or not?

09:41:38 23           So, yes, Your Honor, if it really is focused on

09:41:42 24   improving a computer functionality like decreasing bandwidth

09:41:45 25   or increasing the number of users, then it passes *Alice*.

09:41:49 1        THE COURT:  So that would seem to directly

09:41:52 2   contradict Judge Andrews in *Visual Memory*.  I understand

09:41:57 3   you parsed through the holding, but that question, is it

09:42:03 4   dispositive?  He seems to say no, and you would have me say

09:42:06 5   yes.

09:42:08 6        MR. OUSSAYEF:  I think in *Visual Memory*, what

09:42:10 7   you are seeing there is not something that is focused on

09:42:12 8   improving the computer.  I think it is using -- so if we

09:42:16 9   look at *Visual Memory*, we have computer components, main

09:42:20 10  memory, a cache, and programmable operational characteristics.

09:42:27 11  But it does not say how that is improving the computer.

09:42:32 12       So those are components.  They might be used

09:42:34 13  for useful things but it is not addressing a problem that

09:42:36 14  existed.  And it's not anything that is more than just the

09:42:41 15  components themselves.  It's a structural -- it's claiming a

09:42:47 16  structural thing without any kind of solution to a technical

09:42:50 17  problem.

09:42:50 18       THE COURT:  I'm seeing that as slightly

09:42:52 19  different than the question I'm asking.  If we look at slide

09:42:57 20  5 that defendants showed us, I'm sure you are familiar with

09:43:03 21  it, they quote Judge Andrews as specifically saying:

09:43:08 22  Contrary to plaintiff's argument -- the plaintiff there, of

09:43:12 23  course -- the question of whether a given claim improves the

09:43:15 24  way a given computer works is not what by itself determines

09:43:19 25  it.  I understand IBM's position to be directly contrary to

09:43:22 1   that.  I understand you have an argument to distinguish his

09:43:24 2   holding but on that question of law, you disagree.

09:43:29 3           MR. OUSSAYEF:  No, Your Honor.  In fact, right

09:43:30 4   after that quote by Judge Andrews, there is another quote

09:43:33 5   that says, actually, the problem that, or the way you solve

09:43:39 6   the problem or the way you ask the question under *Enfish* is

09:43:42 7   not whether it improves a computer generally but whether

09:43:46 8   there is a specific technical problem that the claims seek

09:43:50 9   to improve.

09:43:51 10          So there are two quotes that come from the

09:43:55 11  *Enfish* decision, and the plaintiff in the case cited the

09:44:00 12  first quote where it discussed the proposition more

09:44:05 13  generally.  Where the *Enfish* Court said, if you look

09:44:09 14  generally to whether there is an improvement, then that

09:44:13 15  indicates that you might pass Step One.  And there is a

09:44:17 16  later quote that says the specific inquiration is whether

09:44:23 17  there is a specific solution that is directed to computer

09:44:27 18  problem.

09:44:28 19          So Judge Andrews was kind of comparing the more

09:44:32 20  loose characterization of *Enfish* versus the more strict and

09:44:38 21  rigorous characterization of *Enfish* later on.  It's right

09:44:42 22  after the quote that the defendants put up on their slide 5

09:44:47 23  in the Andrews's decision.

09:44:48 24          THE COURT:  All right.  So if I want to

09:44:51 25  understand IBM's position, you do agree that I have to do

more work at Step One than simply ask are these claims directed to improving computer technology. Answering that question may get me a long way toward siding with you but I'm not done. Is that fair?

MR. OUSSAYEF: Yes, I think that is fair. I think if you add that there needs to be a specific improvement that you are focused on as opposed to just asserting that there is an improvement without having anything to back you up.

So if you had a patent that just said, hey, here are my components, I improve computers and there is no detail in the specification, there is nothing else that supports it from the state of the art. There is nothing that explains why that is an improvement in computer capabilities. I think in that case, maybe that is a gray area for *Alice* Step One. I think that is not at all what we have here.

THE COURT: All right. Then in terms of the relationship of these claims to the Prodigy embodiment, and this question may spill over to Step Two, and fair enough if you want to answer it as to Step Two, but the argument from defendants is part of the problem here is you didn't focus the claims on Prodigy and it's much, much broader than that. What is IBM's response to that?

MR. OUSSAYEF: I don't think it is much broader

09:46:21  1    than that.  We'll go over both the specific implementation

09:46:24  2    details that are important here, both from the claims

09:46:27  3    themselves and also the Court's construction of those

09:46:30  4    claims, but also we'll go over the preemption issue and

09:46:33  5    we'll see why defendant's characterization that this covers

09:46:37  6    any meaningful way of displaying content on the web is

09:46:41  7    simply incorrect.

09:46:42  8              THE COURT:  Okay.

09:46:47  9              MR. OUSSAYEF:  So what is an inventive concept

09:46:52 10    under *Alice* Step One?

09:46:55 11              This is what *DDR Holdings* says, is that if you

09:47:01 12    are addressing a challenge that specifically arises in the

09:47:05 13    realm of computer networks and where the claimed solution is

09:47:08 14    necessarily rooted in computer technology, that is something

09:47:11 15    that passes *Alice* Step Two.

09:47:13 16              Claims that specify how interaction between

09:47:17 17    computers may be manipulated.

09:47:19 18              *Bascom* also cautions that we need to look at the

09:47:25 19    combination of elements, so taking potshots at just isolated

09:47:29 20    ideas like, hey, storage is new or organizing data is new,

09:47:33 21    but -- sorry, is not new, et cetera, as the defendants do,

09:47:36 22    did in their oral argument is not sufficient.  You must

09:47:39 23    address the claims as a whole and not just certain claim

09:47:43 24    constructions or certain concepts from the patents without

09:47:46 25    addressing it in its entirety.

09:47:49 1    So if we look at *Alice* Step Two, a theme tends

09:47:55 2 to emerge, which is even if you are taking -- even if you do

09:47:58 3 have an abstract idea, bringing it into the computer realm

09:48:02 4 involves specific computer problems and computer solutions.

09:48:05 5 It can still be ineligible under Step Two.  So the question

09:48:08 6 is, do you have to do something innovative on a computer in

09:48:13 7 trying to adapt an abstract idea to a computer?

09:48:18 8    So the Filepp patents solve Internet centric

09:48:23 9 problems.  This is very similar to what we discussed

09:48:26 10 previously.  It kind of melds with some of the same evidence

09:48:29 11 we presented for *Alice* Step One, so I won't belabor the point.

09:48:33 12 But the idea was that the Filepp patents were addressing a

09:48:37 13 problem that is specific to network programming:  bottlenecks,

09:48:42 14 slow down, limitations on a number of users, et cetera.  And

09:48:46 15 the solution was on a way to reduce host processing.

09:48:51 16    And what *DDR Holdings* says is that the claim

09:48:56 17 solution amounts to an inventive concept for resolving this

09:48:59 18 particular Internet centric problem, rendering the claims

09:49:02 19 patent eligible.  That is what we have here.

09:49:04 20    How does the patent do it?

09:49:08 21    Well, the patent does it by splitting up what

09:49:10 22 used to be sent down in its entirety into objects.  Those

09:49:15 23 objects can be organized into logical partitions.  The

09:49:20 24 partitions can be retrieved and selectively stored as needed

09:49:24 25 and that is what we went over previously.  And *DDR Holdings*

says that claims that specify how interactions between

computers are manipulated, that also passes *Alice* Step Two.

So let's look at the Court's previous

constructions and just see how that interplays with the

claim language.

The idea of formatting -- and so what we have

here on this table on the left is the selected claim terms

that were construed by the Court previously.

In the middle, we have the actual constructions

from the *Priceline* case. And in the right, you have the idea

of inventive concepts. So the idea of formatting advertising

for potential use of the plurality of applications, that is

important because at the time, there was no reuse in that

kind of way because everything was used in its entirety as a

monolithic construct that got pushed down. So formatting

advertisements to make sure they could be used for multiple

applications or were compatible allows you to reuse

advertising and minimize network bandwidth. That is on the

right.

Next to each of the inventive concepts we've

supplied is an illustrative quotation from the patents.

"Selectively storing" was construed as

"reception in storing, in anticipation of display."

The idea of anticipating what the user might

want and storing at the users' computer meant that you could

request things at different times.  So it's not you were
asking for everything at once.  You could ask for it once
and then ask for the rest later on.

So that was also an inventive concept.

The "storage control parameter."  Defendant kind
of belittles this concept but the idea of a parameter that
specifies initial or continued storage is an important
concept, too, because if you send a parameter that says
whether or not you should store it, what the patent says is
that that allows you to store things that are more likely to
be used by telling the reception system that it is a good
thing to hold on to for later.

The "objects being retrieved" claim element, the
Court construed it as a kind of "if-then" framework where
you can take some of the objects from the host or from the
reception system depending on whether they're located at the
reception system or not.  That is the idea of dynamically
retrieving objects from both locations and combining it.  And,

The idea of the "applications" being a sequence
of pages opened at the screen, the idea of the sequence of
pages is important because together with the language of
"objects may be used in more than one application," it
allows for the transition between those applications to
reuse objects.  That is another way you decrease the use of
bandwidth.

09:52:21 1      If you look at Groupon's motion, opposing

09:52:24 2 counsel said something that was a little bit off, which was

09:52:27 3 IBM hung its entire hat on the construction of "objects."

09:52:31 4      Well, IBM actually offered many constructions

09:52:34 5 and explained how all of them were innovative in the

09:52:38 6 previous briefing in the *Priceline* case, and it focused on a

09:52:43 7 number of different terms. And the reason why Groupon is

09:52:47 8 focusing on "objects" is because that is one of the few

09:52:50 9 terms where IBM didn't get the full construction it had

09:52:54 10 requested.

09:52:55 11      But Groupon ignores the construction of

09:52:57 12 "application," "permits random movement," "storage control

09:53:02 13 parameter," et cetera, et cetera, and as shown on the

09:53:04 14 previous slide, those all involve inventive concepts.

09:53:07 15      THE COURT: Do you think that the construction

09:53:09 16 of objects helped your defense on 101 and Step Two at all?

09:53:14 17      MR. OUSSAYEF: I think it did. On the next

09:53:15 18 couple of slides, we'll see how the use of the "objects" in

09:53:18 19 the claims and the Court's construction of the terms that

09:53:22 20 contain the term "objects" show that they're inventive even

09:53:27 21 if "objects" is simply construed as "data structure."

09:53:33 22      *Bascom* also invites the idea of just focusing on

09:53:40 23 one idea or one part of the claim in isolation and putting

09:53:45 24 blinders as to the other constructions or the other terms.

09:53:47 25 They need to be evaluated as an ordered combination.

09:53:51  1          So to your point, Your Honor, the construction

09:53:57  2     of "objects," the basis for that construction was that there

09:54:02  3     is other language in the claims.  This is from the Court's

09:54:06  4     claim construction opinion.

09:54:07  5          There is other language in the claims that

09:54:11  6     dictate that objects have a predefined structure and that

09:54:15  7     at least some of the objects may be used in more than one

09:54:18  8     application, which implies that a uniform format for objects

09:54:23  9     designed for use with multiple applications is already in

09:54:27 10     the claims, so including uniform would create redundancies.

09:54:32 11     So it is not so much that the Court rejected the idea that

09:54:36 12     "objects" are specific in some way but rather the Court was

09:54:40 13     worried about putting redundancies into the claims.

09:54:45 14          Furthermore, if we look at slide 31, the Court

09:54:49 15     construed terminology that contains the word "object" in it.

09:54:53 16     So claim 1 of the '967 patent, there is claim language about

09:54:59 17     the objects being retrieved from objects stored at their

09:55:03 18     respective reception system, or if the current version of

09:55:06 19     objects are not present from the reception system, then from

09:55:09 20     the network.

09:55:10 21          And that kind of dynamic recreation of content

09:55:14 22     from objects from both places is something that still shows

09:55:17 23     that the idea of breaking up content into objects and then

09:55:21 24     dynamically putting it back together is an inventive concept.

09:55:26 25          And this is a mechanism that the patent

specifically says was invented. It's described at the '967 patent at lines, column 1, lines 46 through 55.

Likewise, the Court's construction of the '849 patent, "selectively storing" refers to selectively storing objects. And it explains that how prefetching advertising objects, how the term means prefetching advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications.

This is also an inventive concept that the patent specifically calls out.

It says how that minimizes the potential for interference between the supply of interactive service applications and advertising. That is the '849 patent at column 2, 54 through 58.

So it is not just the term "objects" in isolation. It is the Court's reasoning in finding that the term "objects" also encompasses some of those limitations that IBM sought to explicitly incorporate. Those were already implicitly in the claims and it is the use of the word "applications" and the entire phrase involved, not just "objects" by itself.

This isn't one of those patents where it just says "objects" or "data structures." It doesn't tell you anything about how to use them.

Groupon really doesn't analyze the independent claims in any detail as well. So there was a little bit of discussion of some of the independent claims and how the storage control parameter really wasn't helpful.

That really doesn't take into account the combination of the storage control parameter with objects that are designed to be stored at the reception system, reused if needed in applications that could have objects that are used in one application and then another and then requested only if needed.

The "storage control parameter" adds the idea that you can help the reception system know what objects to hang on to by giving it information through a storage control parameter.

The '849 patent also has dependent claims that were not discussed by Groupon. This talks about storing object identifications based on establishing characteristics for the reception system users. So if you know a user is likely to request, say, a special kind of deal on Groupon's website, that characterization is useful because you can have them store that type of data at the reception system and then the next time they visit that website, they're more likely to reuse that object and not have to request it again from the host. That is an inventive concept as well. That is a specific idea that is called out by the '849 patent as

well.

So when we look at their *Alice* Step Two cases, there is really no computer centric problem or computer centric solution that is called out by their cases.

So the cases they primarily rely on is *Apple v Ameranth*, *CyberFone*, and *Affinity Labs*.

*Apple* dealt with the idea of taking a menu for ordering like at a deli and then just adding computer components to do it on the Internet. So it was not solving a computer problem, it was putting a human world problem on the Internet or arguably not even a human problem at all.

*CyberFone* was about exploding information, and the Court said what does exploding information mean? It means sending it somewhere where else. But that's the same. That is an information gathering technique.

So if you look at defendant's cases that say organizing data isn't something that passes *Alice* Step One or Two, they're really missing the point because the idea is not organizing data just for, you know, keeping things in the right place. The idea is let's make computers work better by splitting things into parts and dynamically recreating it. It's not the idea of just organizing things that humans had been doing forever to organize correspondence or e-mails or that kind of thing.

*Affinity Labs* talked about out of region

delivery of regional broadcasting.  So something that, you know, existed with radio signals and did not have a further specification of how that was done.

If you look at the cases we cite, it's really about computer centric problems, solutions, that is *DDR* and *Bascom*, and the Filepp patents fall into this category because they deal with the problems of network bandwidth and the fact that the host had to do all the user data requests.

And the solutions are the similar type of thing where you are doing something that really doesn't make sense in the real world, splitting content up and shipping it to different areas of the world and then reducing processing in that way.  That is not something that happens with Roman armies or with real world situations.

So really one way of thinking about *Alice* Step Two is even if you were convinced that it was the abstract idea of local stores that we're talking about, we don't think it is, but even if you were convinced of that, is bringing the idea of local storage on to a computer, is that something that involves computer specific challenges?

Yes, it does, because local storage to the computer has nothing to do with local storage in the real world.  It is done for different reasons.  It has different technical constraints and it succeeds for different reasons.

So now, the last part is alleged preemption.

So their assumption that we preempt all Web pages is simply an assertion, and there is no evidence to back it up. Even if there were evidence, that is not something that is decided on a judgment on the pleadings procedural standpoint.

It ignores several ways in which Groupon could provide its website over the Web without infringing the Filepp patents. That is on slide 38. Such as:

Presenting all applications on one page.

Storing everything at the host.

Not configuring objects or structuring advertisements for potential use with multiple applications.

Not using parameters that control storage of content.

Not using command functions, et cetera.

The patent is explicit that there are some prior art ways of doing interactive computer applications, but that it is not claiming them. It is improving them. That is at the bottom of slide 38.

This isn't all theoretical either. We pointed out specific examples and Groupon kind of dismisses them out of hand and says, well, that doesn't really count. Those aren't really examples of things that we could do that don't infringe.

But I think they're important to review.

First, Groupon already sends some of its Web pages using PDFs and it sends the entire PDF to the user in kind of the prior art way that we were discussing earlier.

All the content is sent at once. It is not broken up in any way. There is no partitions there. That is an example of how they could display content to a user if they wanted to.

We also didn't accuse Groupon's blog website. The reason why is because the blog doesn't have command functions for moving from one application to the next.

There are many other examples. For example, we don't accuse their mobile applications of infringing the '967 patent.

You know, they're kind of taking a confirmation biased point of view. They say, look at the entities that IBM has asserted against. It's asserted against all five of these companies so it must mean it preempts everything.

Not so. There is a detailed analysis that takes place before asserting against some companies and some companies end up infringing and some companies don't end up infringing.

Just saying that because there has been an assertion against multiple targets that there is a presumption concern simply doesn't make sense.

The Court in the *Priceline* action and the Court

here we believe as well should decide that on the present

record, it is not clear how many of defendant's websites are

at issue, whether the patents cover almost all websites in

existence. In fact, there is evidence that they do not.

Whether there are other methods that exist of

locally storing information and advertising for use in

presenting displays to a user. And there is examples that I

have given on the previous slide of other ways to do it.

So their argument that we attempt to the preempt

all standard uses of the Web which rely on local storage is

simply not true.

And there is examples of presenting content to

the user, using local storage which we have given to the

Court which do not fall under the patent, so that the

patents do not raise preemption concerns.

And if the Court must decide these issues now,

Groupon's motion should be denied under the *MAZ Encryption*

case.

The Groupon's arguments also ignores the

findings in the Groupon action that additional factual

inquiry as to how inventive the patents were would be

helpful as well.

Just like in the *Priceline* case, Groupon can't

circumvent a factual inquiry into the innovative nature of

the claimed inventions.

Groupon even admits that the inventions predate the World Wide Web.  So they're citing cases of things, of patents that came out in 2006 or 2008 that try to capture the Web after the Web existed for ten years and they say those cases are analogous to what we have here.

Not so.  The Filepp patents came before the Web and they really were innovative at the time because what looks obvious to defendants right now or not innovative to defendants right now is not something which was not innovative at the time.  And the complaint, the patent, the prosecution history and the claims all indicate that it was innovative idea and thus it should pass *Alice* Step Two.

Thank you.

THE COURT:  Thank you very much.

Mr. Hadden.

MR. HADDEN:  Thank you, Your Honor.

Let me start with something that counsel for IBM said toward the end.  They sort of admitted that this patent is about moving local storage on to computer systems.  And he says that doing so would create or provide specific challenges, technical challenges.  And that is no doubt true, but what they're claiming is exactly that idea, moving local storage on to computers.  And that is an abstract idea.

Now, if they had claimed their specific solution

to the technical challenges of applying the idea of local
storage to computers, their specific solution would be
patentable.  It would be an inventive concept perhaps.  But
that is not what they are patenting.  And they essentially
admit that is not what they're patenting.

So their argument, going back to Step One which
is, as Your Honor asked -- right? -- is their argument, if
it touches computers, if the patent specification says it
is a gee whiz great improvement, does that get you 101
immunity?  And that is clearly not the law, right?  It is
not the law in this District.  It is clearly not the law in
the Federal Circuit, right?

The *IV v Symantec* case, the Federal Circuit
found that virus scanning on a network was abstract and
invalid.  It's clearly a case that is aimed at improving
computer networks.  That is what that patent is about.

*Appistry v Amazon*, distributed computing across
processors.  That is directed at improving computers.  No
doubt the specification was full of lies about what a great
improvement it was.  Invalid, that is not the test.  Right?

The test after all those cases, *Enfish*, *TLI*,
*Affinity Labs* is whether the claim is to a specific
technical solution.  That's the test.  And they haven't
pointed to it.  Right?  They got up here on Step Two and
said this is inventor concept, this is inventor concept,

1    this is inventor concept.

2            Just going through the claims and saying the

3    specification said this is cool, the specification said this

4    is cool, that is not an inventive concept under Step Two of

5    *Alice*.

6            The inventive concept is the specific technical

7    solution that takes that abstract idea and makes it

8    something concrete you can actually own.  And they haven't

9    pointed to what that is in these claims in their briefs and

10   they didn't point to it, Your Honor, today because it's not

11   there.

12           It clearly is not data objects having a

13   prescribed data structure.  That is a totality.  A data

14   structure has a structure.  It is a structure.  That is

15   meaningless.

16           So at the end of the day, I didn't hear any

17   concrete solution.  And there is none because they choose to

18   claim the idea itself.  And the argument that somehow you

19   can do that if you are in the realm of computers and your

20   specification says you made great advances, that is just not

21   the law.

22           On the preemption issue, I mean their arguments

23   speak for themselves; right?  And they get up here and say,

24   don't worry, we can take down the World Wide Web.  You can

25   still download PDFs.

10:10:23 1          That is what we're left with?  I think it is

10:10:29 2     clear what this patent provides and what the claims disclose

10:10:32 3     cannot possibly justify that range of preemption.  Thank

10:10:37 4     you, Your Honor.

10:10:39 5          THE COURT:  Thank you.  All right.

10:10:53 6          MR. OUSSAYEF:  Just briefly, Your Honor.

10:10:53 7          Your Honor, Karim Oussayef again.

10:10:55 8          The presumption issue is a little bit of a

10:10:57 9     moving target because every time we come up with a

10:11:01 10    noninfringing mechanism, now they're saying, well, are you

10:11:05 11    saying everything except for that noninfringing example?

10:11:10 12    Obviously not.  There are many other examples.  Another way

10:11:14 13    would be not selectively storing advertisements but pushing

10:11:18 14    them down regardless.

10:11:21 15         There are many other examples as well.  But

10:11:24 16    suffice to say, there are examples of noninfringing ways

10:11:27 17    that can be determined from the claims themselves.

10:11:29 18         But I wanted to kind of address the case of

10:11:34 19    *Visual Memory* in a little bit more detail since the parties

10:11:37 20    are going back and forth about it.

10:11:39 21         What we have here, is underlined here is Judge

10:11:50 22    Andrews in the *Visual Memory* case.  And what I was trying to

10:11:54 23    explain earlier and which might have not been entirely clear

10:11:57 24    is that although the Court rejected plaintiff's argument

10:12:03 25    that the question is whether a claim improves the way a

computer works, and said that that by itself is not

determinative. The Court went on to cite later on in *Enfish*

the idea that the question is whether the focus of the

claims is on a specific asserted improvement in computer

capabilities, i.e., the self-referential keyboard or set

of process that qualifies as an abstract idea for which

computers are merely invoked as a tool.

So here what we really have is the question of

are you using computers as a tool to do something that

exists outside the computer realm or do you have a specific

solution? And,

The answer here is we have a specific solution.

The specific solution is not local storage. I went over

in the claims specifically how local storage is not enough.

The idea of breaking things up, storing parts of them at the

user's reception system, parts of them at the host computer,

then having applications which can be navigated, which we

use those objects, and then dynamically combining them when

you need them and selectively storing them at user's device.

Devices based on the likelihood that they be

reused, those are all concepts which were frankly unaddressed

and the sum total of the argument was I didn't hear anything

about inventive concepts, it's just local storage. That is

not true.

So, therefore, the patents are eligible, if not

10:13:39 1    under Step One, under Step Two.

10:13:41 2              THE COURT:  Thank you.  Mr. Hadden, you can have

10:13:43 3    the last word, if you want to add anything.

10:13:45 4              MR. HADDEN:  Unless Your Honor has questions.

10:13:48 5              THE COURT:  No, not at this time.  We will take

10:13:51 6    a short recess.

10:14:14 7                   (Brief recess taken.)

10:14:14 8                   *     *     *

10:31:03 9                   (Proceedings reconvened after recess.)

10:31:03 10             THE COURT:  Have a seat.  I think we're ready to

10:31:06 11   move on to *Markman*.  You may proceed.

10:31:11 12             MR. OUSSAYEF:  Your Honor, my colleague, Laurie

10:31:13 13   Stempler will begin with the *Markman* arguments.

10:31:17 14             THE COURT:  Okay.  That's fine.

10:31:21 15             Good morning.

10:31:23 16             MS. STEMPLER:  Good morning, Your Honor.  Laurie

10:31:25 17   Stempler from Desmarais on behalf of IBM.  May it please the

10:31:28 18   Court.

10:31:28 19             We passed up a binder that's organized that is

10:31:32 20   divided by the disputed terms with a copy of the patents in

10:31:33 21   the back for Your Honor's reference.

10:31:35 22             THE COURT:  Thank you.

10:31:36 23             MS. STEMPLER:  So I would like to begin with Tab

10:31:39 24   A, page 7.

10:31:40 25             This is just -- oh.  Excuse me.

10:31:45 1          (Elmo settings adjusted.)

10:31:47 2          MS. STEMPLER:  I am not going to -- so if we

10:31:47 3  turn to slide 7, I'm not going to go through a detailed

10:31:50 4  overview because my colleague Mr. Oussayef had gone over

10:31:54 5  that in detail during his presentation earlier except to

10:31:58 6  note that something useful to keep in mind during this

10:32:00 7  presentation is that in the prior art for the Filepp

10:32:04 8  patents, the entire application was being sent to the

10:32:09 9  reception or the user terminal.  If the user wanted to

10:32:13 10  assess it again, then the entire application had to be

10:32:16 11  sent again.

10:32:16 12          Contrast that with the invention of the Filepp

10:32:18 13  patents, '967 and the '849, and you have objects being

10:32:23 14  selectively stored and retrieved locally at the reception

10:32:26 15  system which allows for more flexibility and more efficiency.

10:32:33 16  And as Mr. Oussayef mentioned the '967 patent is directed to

10:32:38 17  a command function, an application command function that

10:32:43 18  manages the display and the '849 patent is directed to also

10:32:47 19  having advertising being selectively stored and presented as

10:32:51 20  needed.

10:32:52 21          So I'd like to begin by discussing what we've

10:33:00 22  termed the "partition" disputed terms.  And the reason that

10:33:04 23  we grouped them together, there are five of them, is that

10:33:07 24  there are issues that are common to all of them.

10:33:10 25          The first thing that is the same is that they,

all of them had either the word "partition" or the word
"portion."  The parties have already agreed that those words
mean the same thing.

The "partition" terms of the '967 patent are,

"a first partition for presenting applications,"
and

"a second partition for presenting a plurality
of command functions."

We have highlighted those in exemplary claim 1.

In the '849 patent, the disputed partition terms
are,

"structuring applications so that they may be
presented through the network at a first portion of one or
more screens of display"/"structuring applications so they
may be presented at a first portion of one or more screens
of display."  And,

"at a second portion of one or more screens of
display concurrently with applications."

So something to keep in mind is that the parties
have agreed that the words "partition" and "portion" should
be given their plain and ordinary meaning and those terms
were also given their plain and ordinary meaning in the
previous *Priceline* litigation.

The reason that that is important is if we look
at the first disputed partition term, "a first partition for

10:34:21 1    presenting applications."

10:34:22 2            Well, the term "partition" we've already agreed

10:34:25 3    on, and the term "applications" we have an agreed

10:34:30 4    construction for that as well.

10:34:30 5            That leaves the words "a first" and "for

10:34:34 6    presenting."

10:34:34 7            There is a presumption, as Your Honor knows,

10:34:38 8    that the claim language should be given its customary and

10:34:41 9    ordinary meaning, and that is a very heavy presumption to

10:34:44 10    overcome.  You need to either have the patentee acting as

10:34:47 11    a lexicographer and given a clear definition in the

10:34:52 12    specification or there has to be something unclear.

10:34:54 13            The word "a first" and "for presenting" are not

10:34:57 14    unclear, and that is why IBM has proposed the plain and

10:35:00 15    ordinary meaning for this term, and it said so for the other

10:35:04 16    "partition" terms as well.

10:35:06 17            In the alternative, should the Court decide to

10:35:07 18    construe the term, we propose "a first area for presenting

10:35:10 19    applications."  And the reason for that is that there is a

10:35:14 20    sentence in the specification that we'll look at in a few

10:35:17 21    slide from here showing that partitions are areas.  The

10:35:20 22    patentees actually tell us that.

10:35:22 23            So IBM's constructions are faithful to the claim

10:35:25 24    language.  The only change that would be made, should the

10:35:28 25    Court decide to construe the term, is "partition" to "area."

10:35:32 1          Let's take a look at the defendant's

10:35:34 2     construction.

10:35:34 3          They have no basis in the claim language.  They

10:35:38 4     take "a first" and they changed it to "a fixed," so they're

10:35:42 5     somehow equating "first" with "fixed."

10:35:45 6          There is no definition in the specification that

10:35:48 7     would suggest that change.  And it simply doesn't make sense.

10:35:52 8          Then they take "partition" and they change it to

10:35:55 9     "portion" and then they add "of the screen."

10:35:59 10          So they added in additional language even though

10:36:01 11     the parties have already agreed that "partition" and

10:36:04 12     "portion" are the same thing.

10:36:05 13          Then they take the phrase "for presenting" and

10:36:08 14     they turn it into, "that is dedicated for displaying."

10:36:12 15          They just made that phrase up.  It doesn't

10:36:14 16     appear anywhere in the specification.

10:36:16 17          The same issue exists with this term, "a second

10:36:22 18     partition for presenting a plurality of command functions."

10:36:24 19          Again, the parties have agreed that "partition"

10:36:27 20     gets its plain and ordinary meaning.  And,

10:36:30 21          Then "command function," the parties have agreed

10:36:32 22     on a construction for that as well.  That means "a second,"

10:36:37 23     and "for presenting a plurality of."  These are not words

10:36:40 24     that a jury would have a hard time understanding.

10:36:42 25          Again, IBM's construction is that it should be

given its plain and ordinary meaning or in the alternative to change "a second partition for presenting a plurality of command functions" to "a second area for presenting a plurality of command functions." And that again is based on a sentence in the specification.

If we look at Groupon's construction, they take "a second," and they change it to "a fixed." So now, they have told us that first is fixed and they also said that second is fixed.

We have already talked about the "partition" being changed to "portion" of the screen. They added "of the screen" there.

And the next term, "for presenting," they changed it again to, "that is dedicated to displaying."

And then they take "a plurality of command functions," they remove the phrase "a plurality of" and they add this whole phrase at the end, "which does not overlap with the fixed portion of the screen that is dedicated for displaying applications."

Again, that is a limitation that that sentence is made up. It doesn't exist anywhere in the specification. So they're clearly adding unstated specifications in the claims.

For the '849 patent, we have similar issues. The parties agree that "structuring applications" can be

construed as "formatting applications" but then for the rest

of the claim, the one change that IBM has proposed, should

the Court decide to construe the term and, again, our

position it should be given its plain and ordinary meaning,

but should the Court decide to construe it, would be to

change "the first portion" to "the first area."

The defendants, they take, "may be presented"

and they changed it to "are displayed." So there is a

potential that is implicated in the "may be presented."

They get rid of that and they change it to "are displayed."

Then for the phrase "through the network," they

just delete it entirely. They do the same thing with

"first" and "fixed" again. Now "at a first portion,"

they're changing it to "on a fixed portion."

And then they're adding, they take out "of one

or more" and "of display." So "of one or more screens of

display" just becomes "of the screen." And then they add

on, "that is dedicated to displaying applications." And

again, that phrase doesn't appear anywhere.

And then this is the fifth term, "at a second

portion of one or more screens of display concurrently with

applications."

And the same issues exists here. I'm not going

to belabor the point.

I would like to turn to slide 26 because I think

what is important to keep in mind is when you look at these
disputed partition terms together, they're kind of three
limitations that Groupon is trying to add in that the
partitions have to be fixed, that they have to be dedicated
to displaying applications, and that they have to be
non-overlapping.

None of those words with the exception of
"fixed," and I'll talk about that in a minute, none of
those words appear in the claims or in the specification.

The single instance where "fixed" appears in
conjunction with "the partition" is in a preferred
embodiment of the command functions.

So this is a clear example of trying to add
unstated and unsupported limitations into the claims. And
it doesn't work. Why?

Well, for one example, with respect to whether
partitions are fixed, the partitions from the specification
that they're citing are merely preferred embodiments, and
we'll look that at that in just a moment.

With respect to the partitions being dedicated
to displaying specifications, the specification discloses
that some partitions, like a body partition, may also
contain a window partition. So it's not just dedicated to
displaying applications. It's doing other things.

And then with respect to the non-overlapping

term, the specification discloses overlapping partitions.

These just have no business being in the claim language.

So turning to the first point that the partitions have to be fixed.

Again, the presumption that the claim language should be given its ordinary customary meaning is a heavy one, and the parties have already agreed that the partition has a plain and ordinary meaning, so none of the other words in the claim language require any clarification. And Groupon hasn't pointed to any definition where the patentee said, oh, when we said "partitions" we mean "fixed."

Just to explain where we got the "areas for partitions" or "areas for portion," it's taken directly out of the specification. So should the Court decide to construe the term, IBM's proposed construction is correct because the applicant -- the patentees have told us pages are divided into separate areas called partitions, so they have told us that partitions are areas.

Now, the specification explicitly tells us that partitions are not fixed. And it is helpful here to walk through the description. It tells us that applications presented at the reception system are partitioned into objects. That each application partition typically represents one screen or partial screen of information including fields

filled data. And then it says, in the second excerpt from the '967 patent, the objects are structured in accordance with an architecture that permits the displayed data to be relocatable on the screen.

So if the data that composes a partition can be located within the screen, then the partitions are not fixed.

The claims themselves also give us information about this. If we take a look at claim 17, it says: The method of claim 1 wherein generating the first and second screen partitions include generating the respective partitions at fixed, predetermined regions of the display screen.

So if partitions were already understood and meant to be fixed, then there would be no need to specify that the first and second screen partitions for claim 17 need to be generated at fixed predetermined regions.

Now, contrary to their argument, they say that the application requires that, the specification requires the applications to be bound to particular partitions.

And the language that they rely on is actually a definition of applications that appears in the specification: Application, i.e. information events, are composed of a sequence of one or more pages.

Nothing about that says that the applications have to be bound to particular partitions and, in fact, if

10:43:16  1   we look at the figures in the patent, take a look at Figure

10:43:20  2   3a on the bottom left of slide 34, you can see the body

10:43:23  3   partition is divided into two rectangles on the left-hand

10:43:27  4   side.  And when you look at the depiction in Figure 3b, the

10:43:30  5   body partition is a solid rectangle taking up the middle

10:43:34  6   of the screen.

10:43:35  7             So different pages of the application can be

10:43:37  8   displayed using different partitions.  They're not fixed.

10:43:41  9             This is the language that they're referring to

10:43:44 10   that I mentioned earlier where it describes the partition as

10:43:46 11   being fixed.  It says in preferred form, the method features

10:43:51 12   steps for presenting the command function in a command bar

10:43:54 13   fixed-located on the display screen.

10:43:57 14             So the one time where the patentees do use this

10:43:59 15   word "fixed," it is in a preferred form.  It's an embodiment

10:44:03 16   of the command functions.

10:44:06 17             They also point to page format objects as

10:44:11 18   examples to support their position.

10:44:13 19             But those again are merely embodiments.  And

10:44:16 20   they're, as we can see in the description at Figure 5a which

10:44:20 21   describes the foreign objects, that it's a schematic diagram

10:44:24 22   that illustrates the configuration of the page template

10:44:31 23   object which might be used and may be practiced, it's not

10:44:35 24   required.

10:44:35 25             In addition, the '967 patent discloses that the

display data is relocatable, reusable, and dynamically

created. So if you take a look at the specification, we're

told that display text and graphics and program instructions

and control data are formulated from pre-created objects.

And then it says, the objects are structured in accordance

with an architecture that permits the displayed data to be

relocatable on the screen, and to be reusable to make up

other screens and other sessions, either as pre-created and

stored sessions or interactive sessions, dynamically created

in response to the user's requests.

So these words "relocatable," "reusable,"

"dynamically created," this is how the invention works.

There is absolutely nothing fixed about it.

Can we go to slide 49, please?

Another issue that is common to this dispute for

the "partition" term is their contention that the partitions

have to be dedicated to displaying applications.

And this is a little bit of a backdoor argument

to their argument that the partitions are fixed. So for the

same reasons that I just discussed, these partitions are not

fixed, they're not dedicated for displaying applications.

In addition, this phrase "dedicated to

displaying application," they made it up. It doesn't appear

anywhere in the specification or the prosecution history.

And there is no reason to deviate from the language that the

10:46:07 1    patentee chose to use to describe their invention.

10:46:09 2         In addition, Figure 3a of the '967 patent tells

10:46:16 3    us that the body partition is not dedicated to displaying

10:46:20 4    application, because it can display other types of data like

10:46:23 5    the data that appears in the window partition.

10:46:26 6         The specification states that, "the method

10:46:29 7    features steps for opening windows over the currently

10:46:31 8    displayed application to present further information

10:46:34 9    concerning the application or facilitate the undertaking of

10:46:37 10   interactive operation with respect to the application."

10:46:40 11        So the body partition is displaying within that

10:46:45 12   window partition.  It is not just displaying the application.

10:46:48 13        The last limitation that they're adding, that

10:46:54 14   the partitions have to be non-overlapping.  That is directly

10:46:57 15   contradicted again by the figure that I just showed you.

10:47:00 16   The specification describes an embodiment where the window

10:47:03 17   partition overlaps with the body partition.  We see that in

10:47:08 18   Figure 3a of the '967 patent.  And, by the way, it also

10:47:11 19   appears in the '849 patent.

10:47:13 20        That construction also excludes an embodiment

10:47:19 21   that the inventors have told us about.

10:47:21 22        You can see that it says, "functions supporting

10:47:23 23   the user-partitioned application interface can be performed

10:47:27 24   using the command bar or its equivalent using pull down

10:47:31 25   windows or an overlapping cascade of windows."

10:47:33 1           So just to illustrate this for Your Honor.

10:47:36 2           The first part of the sentence is talking about

10:47:39 3 an application interface can be performed using a command

10:47:42 4 bar as depicted in Figure 3a.  And then the second part of

10:47:46 5 that description, it's equivalent using pull down windows

10:47:50 6 is contemplating a situation where, rather than having a

10:47:52 7 command function here, they are pulled down from underneath

10:47:55 8 the rest of the display.  And,

10:47:57 9           Then there is also an example of an overlapping

10:48:00 10 cascade as we can see in the '967 patent at column 17, lines

10:48:04 11 24 through 27.

10:48:05 12           Now, for the '849 patent, there is claim

10:48:12 13 language that says, this is where this term appears "at a

10:48:17 14 second portion, one or more screens of the display

10:48:20 15 concurrently with the application."  And,

10:48:22 16           The claim language says that, "the advertising

10:48:24 17 data from an advertising object may be presented at a second

10:48:27 18 portion of one or more screens of display concurrently with

10:48:30 19 applications."

10:48:31 20           Well, we know, as we just saw in the previous

10:48:34 21 slide, that the windows can overlap, the window partitions

10:48:37 22 can overlap.  And we also know that the advertisements can

10:48:40 23 be included in the window partition.

10:48:42 24           It says in the bottom left-hand excerpt,

10:48:44 25 advertising is provided over the network and may be included

10:48:47 1    in any partition of a page.

10:48:49 2              That excerpt also appears in the '849 patent at

10:48:53 3    column 9, lines 65 through column 10, line 1.

10:48:57 4              So what the claim is telling us, that the

10:49:00 5    advertising data may be presented at a second portion of one

10:49:03 6    or more screens of display.  There is nothing that requires

10:49:06 7    it to be nonoverlapping.

10:49:09 8              I want to address briefly what they have to say

10:49:13 9    about the tessellated or tiled display.

10:49:17 10             The first thing I want to note, they say, well,

10:49:20 11   the specification tells us page format objects assure

10:49:23 12   tessellation on tiling.

10:49:24 13             Firstly, the page format objects are again a

10:49:26 14   preferred embodiment; and we can see that in the excerpt

10:49:28 15   from the '967 patent at column 11, lines 17 through 24.

10:49:33 16             In addition, they're talking about an analogy.

10:49:37 17   They say, okay, they use the word "tiling" and if you think

10:49:40 18   about tiling, we think of the word "mosaic" and that means

10:49:44 19   not overlapping.

10:49:45 20             First of all, I don't know if that is true.

10:49:47 21             Secondly, we don't know what they meant by

10:49:50 22   tiling.  And there are types of tiles that do overlap.  They

10:49:50 23   could have been referring to, for example, when you think

10:49:53 24   about roof tiles, those overlap.  But if we have to get to

10:49:55 25   the point of debating the meaning of tiling in a preferred

embodiment, then we're very far afield from what the patentees told us using the plain language of the claims.

Can we go to page 67, please.

So in summary, they're making changes to the plain language of the claim terms that are arbitrary, they're not supported. None of their terms are found in the patent or the claims. There are no definitions, and with the exception of that one word "fixed" from the preferred embodiment, and there is no absence of clarity that would require this.

They added requirements that are derived from non-limiting embodiments. We saw that with the preferred embodiment of the command functions in a fixed partition. It's just a preferred embodiment. It doesn't mean that you add it in as a claim limitation.

And then they ignore key language from the claim terms like when they substitute "dedicated" to "displaying applications for presenting."

So these limitations don't have any basis in the claim terms. The patentees told us what the words mean in the claims themselves. And in light of the fact that the parties have already agreed what "partitions" mean, what "portions" mean, what "applications" mean and what "command functions" mean, when you take all of that out and you are left with the remaining words, those are not words that

10:51:20 1  require further construction.

10:51:21 2            Thank you.

10:51:23 3            THE COURT:  Thank you.  We'll hear from defendant.

10:51:32 4            MR. HADDEN:  Thank you, Your Honor.

10:51:43 5            So I'm going to break these up a little bit, the

10:51:46 6  partition by partition, but try not to make it too slow.

10:51:49 7            THE COURT:  All right.  But you do or do not

10:51:51 8  agree that the five terms present the same disputes?

10:51:55 9            MR. HADDEN:  I think they largely present

10:51:58 10  similar disputes.  There is a little difference in the

10:52:02 11  arguments but I think the notion is basically the same.

10:52:05 12            And it starts with the ordinary meaning of

10:52:08 13  "partition;" right?  When you partition something, you

10:52:11 14  divide it into separate regions; right?  Either by walls

10:52:16 15  or by borders or, in this case, by page format objects.

10:52:20 16            And the specification essentially defines

10:52:25 17  partition in this patent, right?  Pages are divided into

10:52:28 18  separate areas called "partitions;" right?

10:52:32 19            It goes on to explain that partitions are

10:52:34 20  different than windows.  It says "while certain other

10:52:37 21  objects describe windows."  So windows in the patent are not

10:52:41 22  partitions.  Partitions are separate regions.

10:52:45 23            And that is what is shown in Figure 3a.  And

10:52:48 24  the important thing in Figure 3a throughout the patent's

10:52:52 25  description of partitions in these page format objects that

define them is that the partitions divide up the screen

display apart from whatever content is being displayed;

right? So this is like the backdrop and it divides up how

this screen is set up. It is not a feature of a particular

application; right?

So you can plop your application into your

body partition but the region that is defined for that

application to be displayed is predefined by these

partitions. And that is what the patent explains. And it

does it, as I said, using these page format objects. And,

The patent is very clear that it does this to

ensure this uniform look and feel so that when you switch

between applications, using that command bar partition at

the bottom, the rest of the page looks the same. And,

The patent explains that these page format

objects define fixed regions; right? They have an origin

and a dimension, and they even specify the background color

of which the information may be presented.

So all of this is defining the structure of the

screen display apart from the application and apart from the

content. Partitions are not features of the application. And,

The patent explains, one of the reasons it does

this is so that the screen display is properly tested. That

is the partitions are not overlapping and the whole screen

is full.

10:54:35  1        If you look at the claim language, I think it

10:54:39  2   is important and it clarifies this; right?  It talks about

10:54:41  3   generating at least a first partition for presenting

10:54:45  4   applications.

10:54:47  5        So you generate the partition.  The partition

10:54:51  6   is there for you then to display applications within.  The

10:54:54  7   partition is separate from the application.  It is not

10:54:58  8   defined by the application.  And,

10:55:02  9        IBM seems to agree that in the patent, the

10:55:05 10   partition for displaying applications is in body partition

10:55:10 11   which is shown as 260.  And in Figure 3b, there is an

10:55:14 12   example of the Apple application being presented within

10:55:18 13   the application partition, body partition 260.

10:55:23 14        Now, IBM disputes or their argument is that

10:55:29 15   because there are two different portions of the display does

10:55:34 16   not mean they have to be "fixed" or "separate."  But the

10:55:40 17   definition of "partition" requires separate regions.  That

10:55:42 18   is what a partition is.  That is how it's defined in the

10:55:46 19   patent.  And,

10:55:47 20        In fact, IBM said they are taking their

10:55:49 21   construction and that definition which says pages are

10:55:53 22   divided into separate areas.  If they're separate areas,

10:55:57 23   partitioned, they're nonoverlapping.

10:56:00 24        Now, their argument that the partitions don't

10:56:04 25   have to be fixed, and we heard that again just now, is all

taking descriptions from the patent of these page element objects and how they can be relocated and dynamically created, et cetera.

That has nothing to do with the partitions; right?  The patent is very clear.  Page element objects specify the content of the application.  They hold the text and the graphics that define the application data that is going to be displayed.  And the way they get shown on the screen is they get mapped to a partition.

So they are relocatable because they can be assigned to different partitions, but the partitions themselves are fixed.  You have the fixed partitions.  You can plop your page element object into whichever partition you want by assigning it that partition's number.  And,

That is what the patent says:  The partition number is used in page element call segments so that an association is established between a called page element object and the page partition where it is to be displayed.

So you can put your page element object in different partitions by assigning them to different partition numbers.

THE COURT:  But you do agree, though, that the page element objects are relocatable.

MR. HADDEN:  Oh, absolutely.  Yes, yes.

THE COURT:  Not fixed.

10:57:34  1     MR. HADDEN:  No, not fixed.  And they can be

10:57:37  2  used in different applications and on different pages but

10:57:40  3  they have nothing to do with the partitions.  The partitions

10:57:42  4  are defined by the page format objects and they are fixed.

10:57:46  5  And the patent explains that.  Page format objects 502

10:57:51  6  describes the location and size of partitions on the page

10:57:54  7  and numbers assigned to each partition.

10:57:56  8     So you have the partition has a number, you

10:57:58  9  associate it with some content by giving that page element

10:58:02 10  object to that partition number.

10:58:05 11     IBM has this argument that somehow partitions

10:58:13 12  are not fixed and can be overlapping because you can open

10:58:18 13  windows.  But,

10:58:20 14     Again, both the claims and the specification

10:58:23 15  explicitly distinguish windows from partitions.  Sometimes

10:58:27 16  they call the windows window partitions.  But if you look

10:58:30 17  at claim 14, which is a dependent claim that goes to this

10:58:35 18  idea about opening a window, it describes the application

10:58:39 19  partition, and then says you can overlay it with window

10:58:43 20  partitions which it also calls windows.

10:58:46 21     And, again, as we saw, the specification

10:58:49 22  distinguishes them.  The description of 3a talks about

10:58:52 23  partitions, 250, 260, 280, and 290, and window 275.  And,

10:59:01 24     Most clearly in that definition that IBM is

10:59:03 25  drawing its construction from of "partitions," the patent

explicitly defines partitions and it separately describes
windows and in fact says the windows are made of different
objects than the partitions.  The partitions -- windows are
not partitions.

So IBM argues that the partitions are not
dedicated.  So the claim says, "partition for displaying
applications" which means that is the partition where
applications are displayed.  If you want to say you can
display anything in that partition because you can put a
window on it, but that doesn't change the underlying
partition.  The partition is still fixed.  It has the same
content.  That you can open a window over it does not change
as the patent explains the base page which is the partition.

In fact, the patent goes on and explains that
when you open up a window over a partition, the underlying
bit map to the partition itself is preserved and is exposed
again once you close the window.  The partition persists but
there is nothing about opening the window that modifies or
changes the partition.  And,

Again, I think even the part that IBM put up,
when you open the window over the application, you are
still getting information about the application or a way to
interact with the application.  So even if you want to treat
the window as somehow modifying the partition, which it
doesn't, everything in that partition is still dedicated to

the application.

This is from IBM's brief. And at this part they say, well, even though the claim says that the partition is for displaying application, it could display other content. So basically application partition can display anything, according to IBM.

But if you get there, right? If a partition is not separate, and it is not fixed, and it can display anything, what is it? Right? How is that a limitation at all?

In fact, you can see from IBM's contentions that it's nothing. It's just a box they make up; right?

So this is what IBM says is the first partition for presenting applications. They just drew a red box around somebody's screen display of the Groupon home page. And the problem -- well, there are a lot of problems with this.

The first is if you see where it is cut off at the bottom, that is just arbitrary. That is just how much of the Groupon home page happened to be displayed on that person's browser which is not something that Groupon even specifies. That is just a function of your browser settings and how long, how large your window it is.

So IBM says, well, the partition is defined by this body tag. So it starts with the top body tag and ends

with the body, bottom body tag, and that is the HTML, the
limiter of the first partition.

But if that were true -- right? -- those tags do
limit the entire Groupon home page.  So what is between
those tags are all of these screens.  So if the user was
going to look at the Groupon home page to limit it by those
body tags, they would have to go scroll through all of those
screens.

THE COURT:  What you have just shown us would
have appeared in succeeding --

MR. HADDEN:  Succeeding screens, right.

THE COURT:  So it's going, which I scroll --

MR. HADDEN:  I scroll down if I have the browser
set up like this, right?  So we get all the way down here.

So the question is how is that collection of
screens a partition of a screen display, right?  Where
is the division on the screen that is somehow fixed or
separate?  It's not.  It is just a Web page that you can
display over multiple screens.

You get down to the bottom and right, that is
the end tag.

So this is just, there is no partition here,
there is a Web page, and they drew a box on what has to be
shown on a one person screen.

We go to the second partition, we have the same

11:03:37 1    kind of problem.  Just to be clear, you have to have a first

11:03:40 2    partition and a second partition, and fortunately the

11:03:41 3    command partition has to persist and be independent of the

11:03:46 4    application because you have to be able to move between

11:03:50 5    applications using the commands in that partition.  And,

11:03:53 6         Again, that is shown in 3b how at this command bar

11:03:56 7    partition.  And it is described in some of the invention.

11:04:01 8    And it says it can be fixed, replicated on the display screen,

11:04:05 9    e.g., at the screen bar.

11:04:07 10        So their argument on this again goes to this popup

11:04:10 11   window.  And they try to say, no, the command partition is not

11:04:14 12   this bar.  It could be this popup window.  But, again, that

11:04:17 13   is not what the patent says, right?  So the patent describes

11:04:22 14   one mechanism for moving between applications where you can

11:04:26 15   select the command like the jump command from the command bar

11:04:30 16   partition, and that will open a window, and then you can put

11:04:33 17   in a keyword or select an index to pick a new application

11:04:37 18   from that window.  But that window is not a partition; right?

11:04:41 19   So this is the dependent claim that describes that very

11:04:44 20   embodiment.

11:04:46 21        We provide the navigation procedure to new

11:04:48 22   applications which include presenting a window.

11:04:52 23        So the window is distinct from the command

11:04:54 24   partition, the patent specification and the claim.  So that

11:04:59 25   window did not change the meaning of "partition."  And,

Again, if we look at what IBM is pointing to, it gets even more absurd.  So here, again, they say the first partition is whatever is shown on your screen.  And,

Then they say for claim 1, the second partition is this box at the top which has some link in a certain box.

Then for dependent claim 3, they say no, the command partition is this box over here or maybe it is both boxes; right?

But all of that is within what they said is the first partition.  So there is no separation here.  You have what they claim is the application partition which is your whole screen and then they're just drawing boxes within it.

So why are they picking these boxes?  Well, presumably because they have a link.  So presumably IBM's argument is if you have a link, that is a command, so we'll drop boxes around where you have links and say that is the command partition.

The problem with that, of course, is that everything on this page is a link; right?  All of these images are links.  I click on the lion, I get details on the zoo trip or whatever it is, right?  Everything is a link.  So are those commands?  How do you know, how do I know whether those are part of my command partition?  And,

If you go down the page, of course, there is hundreds of these.  And when we get down to the bottom,

right?  So maybe IBM will say, well, picture links are
different.  Those aren't commands.  Fine.  I got this.

"View All Deals," is that a command?  Is that
part of the command partition?  How am I possibly going to
know?

All right.  Then you have this whole collection of
browse by city links.  You can click on any city.  Is that
part of a command application or part of the application?  How
would I know?

Same here.  Favorite group coupons, company
information, all of these are just collections of links;
Right?  You can draw a box around anything on this page you
want and tell me it's a command bar partition or an
application.  I have no way to know it.

So then we go to the '849.  A similar issue;
right?  We have to have a partition for advertising and a
partition for applications.  And,

Again, it's clear from the claims that these
things have to be separate.  You have structure applications
so they're on one portion.  You structure advertising on
another portion.  It's got to be separate so you can see it
concurrently with the application.

Again, the patent is very clear about this ad
partition region.  And not only was it clear in the patent,
this is exactly what they told the Patent Office; right?

Application could be presented at a first part of the screen and advertising presented separately and concurrently at a second part of the screen.

They told the Patent Office that this distinction between advertising and applications was key to their invention. That is basic dichotomy of separate treatment. Display of advertising was the key to the '849 patent.

Now we go to the contentions again.

Again, they circled whatever is on the user screen as the first partition. And then they circle some boxes within it and say that those are -- oops, sorry -- those are the ad partitions, or the ad partition. So they circle random boxes within the application and say that is an advertising partition.

I mean this is particularly bizarre for Groupon; right? Groupon's business is to offer local deals. So if their Web page is an application, those deals have to be the application. But now they're saying those deals are also the advertising.

So how do I know where my advertising partition is? How do I know where my application partition is? How do I know the difference between an advertisement and an application? And,

Then I got the whole command problem where

they're just circling links where everything on my page is a link.

Now, IBM says that -- and this is kind of gives up the farm, I think; right? They say even if the invention enables the display application portion and advertising portion, that does not mean it requires it.

Well, if the claim doesn't require an advertising partition or portion and application portion, what does the claim require; right? There is no limitation at that point at all.

You've got structure applications to be displayed at one portion, advertising another. They have to be treated different. And,

IBM goes on and says, trying to back away from what it told the Patent Office, that there is no reason that a dichotomy means that they must be fixed or non-overlapping.

That, Your Honor is just absurd. The definition of a dichotomy is two mutually exclusive or contradictory things. You can't tell me that the Patent Office that the key to my invention is the dichotomy between advertising and applications and then come in here and say they can be the same, which is what IBM is doing.

Finally, with respect to their argument that advertising and applications don't have to be separate, they say that you can display advertising over applications in

windows. They apparently cite something in the patent.

But if you look at what the patent says, it doesn't say that at all. The section they cite says: If further partitions for concurrently displaying, for example, an additional application which may include advertising.

It says you can have an advertising partition.

When it talks about windows, the windows display information related to the application.

So that is not what the patent says. And, of course, that is what the patent actually shows, a separate ad partition.

So at the end of the day, if partitions are not fix, nonoverlapping and dedicated, they are phantoms. They are not limitations and IBM can just draw boxes anywhere it wants. And that can't go to the jury.

Thank you, Your Honor.

THE COURT: Thank you.

Is there any response?

MS. STEMPLER: Yes, Your Honor.

Your Honor, I just want to point out I'm not quite sure why Groupon is arguing about our infringement contentions. They're entirely irrelevant to the claim construction process.

So I don't know why they are going on about it. They might not agree with our infringement read, but that is

11:12:12  1    certainly an issue that kind of should be taken up later.

11:12:15  2            The second issue that I want to point out is

11:12:17  3    that the selection of the partition on their website was,

11:12:22  4    for example, their entire website here.

11:12:24  5            You can't see all of this in the excerpts that

11:12:27  6    is up here, but it was their entire website, and it is based

11:12:30  7    on their own HTML code.  You can see on the right we have

11:12:34  8    excerpted the code.  We had to put an ellipses in because it

11:12:37  9    was a big portion of it, but it is tied directly to the code

11:12:40 10    so it wasn't arbitrary.

11:12:42 11            THE COURT:  So when you drew the red line at the

11:12:44 12    bottom of what we can see, that was not really where you

11:12:46 13    were drawing the line.  You intended for it to be at the

11:12:49 14    very bottom of what you scrolled through.

11:12:52 15            MS. STEMPLER:  Yes.  I suppose we could have

11:12:55 16    zoomed out in a great amount and had everything be very

11:12:56 17    small.  But when we identified, for example, the command

11:12:59 18    partitions, we drew a box around those.  And so in this

11:13:03 19    instance, it's just that it was a lot according to their

11:13:07 20    code so that is why it looks the way it does.

11:13:10 21            THE COURT:  On the dispute about whether there

11:13:12 22    are certain aspects of the screen need to be dedicated or

11:13:15 23    required or intended to do certain things, doesn't your

11:13:21 24    infringement read at least become elucidating, if not

11:13:25 25    relevant?

11:13:27 1          MS. STEMPLER:  Well, I think if we look back at

11:13:29 2    what the patent is telling us, and there is even an excerpt

11:13:32 3    from the patent that talks about what happens when you do

11:13:38 4    have a partition explaining application when a popup window

11:13:41 5    comes up, and that is really what should be controlling here.

11:13:57 6          This is the '849 patent, and in column 11,

11:14:01 7    beginning on line 58.  And as we look, it tells us that window

11:14:09 8    objects include the display and control data necessary to

11:14:12 9    support window partitions.  Windows contain display data which

11:14:17 10   overlay the base page and control data which supersede the

11:14:20 11   base page control data for the underlying screen during the

11:14:24 12   duration of the window.  It says display data within windows

11:14:29 13   overlay the base page until the window is closed.

11:14:32 14          And then when you look to the top of column 12,

11:14:41 15   it says when the window is closed, the saved bit map is

11:14:46 16   swapped onto the screen, the logic functions associated with

11:14:49 17   the window are disabled, and prior logic functions are

11:14:53 18   reactivated.

11:14:54 19          So the patent is telling us that these

11:14:58 20   partitions are not dedicated to displaying applications and

11:15:01 21   we have to go with what the patent is telling us.  We can

11:15:04 22   have the fight later on about whether or not there is

11:15:08 23   infringement there, but that is just not the right thing to

11:15:11 24   be thinking about now.

11:15:12 25          THE COURT:  Do you agree that windows are not

11:15:15 1    partitions in this patent?

11:15:17 2              MS. STEMPLER:  No, Your Honor.  In fact, one of

11:15:19 3    the images that opposing counsel put up from the claim 14,

11:15:24 4    it talks about window partitions.  I mean I don't know how

11:15:29 5    much more clear I can get.  It's referring to windows as

11:15:34 6    window partitions, and again the description of Figure 3a,

11:15:38 7    if we go to slide 52, it is labeled as a window partition.

11:15:46 8              And the other thing that I would point out is a

11:15:48 9    lot of their argument is, basically, they added all of these

11:15:52 10   words into the claims.  They stuffed them all in there and

11:15:55 11   now they're saying, oh, well, you haven't shown us that they

11:15:58 12   shouldn't be there when there is no reason to add them to

11:16:01 13   begin with.

11:16:04 14             Unless Your Honor has any further questions?

11:16:10 15             THE COURT:  No, thank you.

11:16:11 16             Mr. Hadden, is there anything you want to add on

11:16:14 17   this?

11:16:14 18             MR. HADDEN:  The only point, Your Honor, is to

11:16:18 19   go back to this slide where the patent actually defines

11:16:21 20   partitions and then says windows are different.  So despite

11:16:25 21   the labeling of window partitions, the definition of

11:16:28 22   "partition" in the patent does not include windows.  And

11:16:31 23   there is no claim in which the application partition or the

11:16:35 24   first partition or the second partition is described as a

11:16:40 25   window but every time there is a window in the claim it is

called either a window or window partition.  So both the spec and the claims clearly distinguish windows from partitions.

THE COURT:  Okay.  Thank you.

What is next?

MR. OUSSAYEF:  Your Honor, Karim Oussayef again. We'll move on to the dispute concerning the term "objects."

THE COURT:  Okay.

MR. OUSSAYEF:  Your Honor, I'll keep this argument brief since we addressed this during the *Priceline* case.

I think the key thing to recognize here is that both parties agree that "objects" are "data structures." And the question is are they more specific to data structures?

Based on a definition in the '967 patent which also appears in the '849 patent at column 5, lines 49 through 58, objects have a uniform, self-describing format known to their RS 400.  I think that is a key idea that the patent was seizing on because the reception system needs to make sure that objects are uniform.

That doesn't mean that they are all the same exact type of object, but they need to be one of a variety of enumerated type of object, and the reception system must know how to process them.  That is how you are able to offload a processing from the host to the reception system.

IBM relied on the fact that objects were capable

11:18:24  1   of being processed by the PC in the prosecution history.

11:18:27  2   That is how you offset processing from the host to the

11:18:31  3   reception system.

11:18:31  4          That's on slide 73.  And,

11:18:35  5          IBM also defined, distinguished the Filepp

11:18:38  6   inventions based on the fact that there is a prescribed,

11:18:42  7   i.e., uniform, structure.  So there is an enumerated set of

11:18:46  8   objects.  Today they might be JSON objects or JPEG objects

11:18:52  9   or GIF objects but they have a uniform format which is

11:18:56 10   specific to that type of object.

11:18:57 11          Now, I think what is important to go back to is

11:19:02 12   the Court's reasoning for declining to adopt a more lengthy

11:19:08 13   definition of "objects" was based on the fact that claim 1

11:19:12 14   of the '967 patent has some of that language built in and

11:19:17 15   therefore it is implicit in the term.

11:19:20 16          I think applying an explicit definition for

11:19:23 17   "objects" would remove any ambiguity, and it would make sure

11:19:27 18   that the word "object" remains consistent from the '967

11:19:31 19   patent to the '849 patent and the other uses of the term

11:19:35 20   objects elsewhere.  So that would be a benefit to adopting

11:19:40 21   that additional language.

11:19:41 22          Thank you, Your Honor.

11:19:42 23          THE COURT:  Is there anything that has changed?

11:19:46 24   Is there anything different here than what we dealt with

11:19:50 25   previously?

11:19:50 1          MR. OUSSAYEF:  I think the key point that is a

11:19:55 2     little bit different is that some of the reasoning behind

11:19:59 3     the Court's decision was to make sure that there is no

11:20:05 4     duplicative language in the '967 patent.  I think that might

11:20:11 5     be overridden by the principle that the term should mean the

11:20:14 6     same thing no matter where it appears.  And because of that,

11:20:17 7     it makes sense to have "objects" be an explicit definition

11:20:21 8     that applies to the '849 patent as well rather than the

11:20:27 9     concern that it might be duplicative which really doesn't

11:20:31 10    create that much confusion because if it's in there already,

11:20:36 11    it doesn't add anything that is more difficult to interpret.

11:20:39 12         THE COURT:  Well, I think that was only one of

11:20:42 13    the reasons we gave.  I mean wasn't there also an issue

11:20:46 14    about prosecution history and whether you are arguing for

11:20:49 15    disclaimer and whether you are trying to import limitations

11:20:53 16    from the specification?

11:20:56 17         MR. OUSSAYEF:  I believe Your Honor is referring

11:20:59 18    to the prosecution history argument that IBM made in the

11:21:04 19    previous case as well.  But that prosecution history was

11:21:08 20    supporting IBM's definition.  There is nothing that's --

11:21:12 21    that wasn't an argument that was made by defendants in the

11:21:15 22    previous case to try to fight back against the definition

11:21:18 23    of "objects."

11:21:19 24         THE COURT:  Right.  My recollection was you

11:21:22 25    argued those things, and we were not persuaded by them;

11:21:26 1    correct?

11:21:27 2            MR. OUSSAYEF:  Yes.  That is right, Your Honor.

11:21:28 3            THE COURT:  So I'm just a little uncertain about

11:21:31 4    your characterization of the earlier analysis being all we

11:21:34 5    did was say what the plaintiffs want to do would render some

11:21:40 6    claim language superfluous and suggesting I think that was

11:21:43 7    all that was going on with that dispute.  Is that what you

11:21:47 8    are suggesting?

11:21:47 9            MR. OUSSAYEF:  No, Your Honor.  I did not mean

11:21:50 10   to suggest that.  That was one of the bases of the prior

11:21:54 11   opinion.  So based on that understanding which I understand

11:22:01 12   to be one of the influencing factors for the Court's

11:22:05 13   decision, I think if you are taking that into account, it

11:22:08 14   makes sense to incorporate it into the '849 patent.  That

11:22:11 15   is all we said.  I didn't mean to imply that was the only

11:22:14 16   basis for the Court's decision.

11:22:15 17           THE COURT:  Okay.  Thank you.

11:22:17 18           MR. OUSSAYEF:  Thank you.

11:22:17 19           THE COURT:  I'll hear from defendant.

11:22:22 20           MR. HADDEN:  Thank you, Your Honor.

11:22:25 21           We think you got it right last time, Your Honor.

11:22:31 22   That objects "should" be "data structure."

11:22:33 23           Let me make a couple of points there.  There is

11:22:35 24   an interesting fudge going on that I think Your Honor should

11:22:38 25   be aware of which is the patents says objects have an

uniform self-defining format, right?  And IBM is trying to
kind of use that language to add the construction, obviously
to try to buttress its 101 defense.  But they're tweaking
it and they have done it a couple ways in their different
constructions and you heard it here today.

IBM's counsel said, well, we don't actually
mean that objects have a uniform structure.  We mean that
there is some uniformity for different types of objects.  So
Object A may have a structure that is uniform to it, Object
B will have a structure that is uniform to it, but we're not
saying all the objects have the same structure which is what
the patent says, right?

The Prodigy patent, the Prodigy system, they all
have the same structure; right?  They would have different
data but they have a format that is all laid out in there.
They're not claiming that.  What they're trying to claim now
is use that language but let's read data objects as having
whatever structure we need it to have.

So they have changed the "a uniform" to plural,
that are known, but that is just kind of meaningless; right?
Once you say a data structure has a structure that is known,
all that means is you have a data structure.  And,

They even said, they said that basically in their
brief as well; right?  They say "uniform object" means that
the object that has a specific structure according to a type

of object.  They're not uniform across objects.  They just
say it's a type; right?

So this is just kind of just gutting the actual
language from the spec of any meaning and trying to add it
to the claim to just give a little window dressing for their
101.

And that strategy is completely clear when again
you look at their contentions, when they say data objects
can be about anything, HTML, Javascript, JSON files, images
and data, anything; correct?

If it's known by the reception system, all it
means is it works; right?

You have a data structure that your application
can deal with, it's known to the reception system.  But
they're not saying the data is any specific solution.  They
just say carve things up into some structures, and it will
work.  We'll claim that.

THE COURT:  What is the relevance of the
infringement contentions?  Or I suppose another way to ask
it, is it fair for me to consider that?

MR. HADDEN:  Absolutely fair, Your Honor.  So
the question is, claim scope at the end of the day; right?
And we get a little vision as to what the claim scope is and
what they're going to say their expert is going to say.  And
particularly when they're putting forward these ordinary

meaning constructions; right?  Ordinary meaning is a black

box until someone gets up and says, well, that is what

ordinary meaning is.

          To me, for example, the ordinary meaning of

"partition" is "a separate non-overlapping region."  I

thought that is what the ordinary meaning was.  But they're

going to get up and say, no, it is this mosaic of boxes.

Well, we need to know that beforehand, so that we can tailor

the construction to actually clarify what is allowed and

what is not allowable.

          Thank you, Your Honor.

          THE COURT:  Thank you.

          Is there any rebuttal?

          MR. OUSSAYEF:  Just briefly, Your Honor, on the

issue of whether it makes sense to look at infringement

contentions.

          The case of *SRI International v Mitsubishi*

*Electric Corporation of America*.  That is 775 F2d 1107 from

the Federal Circuit, 1985.  It's very clear that first you

analyze, first you construe the claims, and then you apply

it to the accused products to determine infringement.  And

the reason why it is, really, so that there is a focus on

the intrinsic evidence as opposed to the extrinsic evidence

versus where the focus should be.  So I just wanted to

clarify that point.

| | |
|---|---|
| 11:26:47 1 | With that, Your Honor, unless there is anything |
| 11:26:50 2 | further. |
| 11:26:51 3 | THE COURT: Is there anything further? |
| 11:26:52 4 | MR. HADDEN: I would say, Your Honor, there is |
| 11:26:53 5 | a ton of cases that say you can look at infringement to |
| 11:26:56 6 | understand the nature of the dispute. And that is what |
| 11:26:59 7 | we're doing here. Thank you. |
| 11:27:00 8 | THE COURT: You can move on to the next one. |
| 11:27:02 9 | MR. OUSSAYEF: My colleague, Michael |
| 11:27:06 10 | Matulewicz-Crowley will take the next one. |
| 11:27:07 11 | THE COURT: Okay. Good morning. |
| 11:27:19 12 | MR. MATULEWICZ-CROWLEY: Good morning, Your Honor. |
| 11:27:21 13 | (Elmo settings adjusted.) |
| 11:27:25 14 | MR. MATULEWICZ-CROWLEY: May it please the |
| 11:27:26 15 | court, Michael Matulewicz-Crowley on behalf of IBM. |
| 11:27:29 16 | Your Honor, the next disputed term is |
| 11:27:31 17 | "selectively storing advertising objects at a store |
| 11:27:35 18 | established at the reception system." |
| 11:27:37 19 | This term is unique to the '849 patent. |
| 11:27:46 20 | IBM's proposed construction of this term |
| 11:27:49 21 | revisits the meaning of selectively storing and its previous |
| 11:27:54 22 | construction in the *Priceline* litigation. |
| 11:27:56 23 | The specification and the structure of the |
| 11:27:58 24 | claims of the '849 patent show that selectively storing |
| 11:28:03 25 | concerns storing in accordance with a predetermined storage |

criterion and not prefetching and storing in anticipation of display concurrently with the applications.

IBM's proposed construction comes directly from the specification itself. As we can see on the slide 78, the specification defines "selectively storing" as "a means to selective store objects according to a predetermined storage criterion."

This passage, this definition from the specification has been directly imported into IBM's proposed construction.

Additionally, it is this definition of "selectively storing" that is crucial to the patents inventive ability to reduce the systems response time as seen in the passage on the bottom of slide 78.

Groupon's response to this clear definition in the specification is that advertising objects are somehow intrinsically different from the objects referenced in the specification's definition of selectively storing.

But this is not true because as can be seen on slide 79, objects are actually a family of six different types of objects, including advertising objects.

The specification goes on to explain on the bottom of slide 79, that advertising objects are substantially similar to all of the other types of objects, including page element objects which are in charge of

11:29:39 1    displaying non-advertising displays on a screen.

11:29:44 2            Additionally, the specification treats all

11:29:50 3    objects the same, whether they display application data or

11:29:53 4    whether they display advertising data.

11:29:57 5            As an example, you can see on slide 80 that the

11:30:00 6    specification refers to objects when it clearly is referring

11:30:05 7    to objects that display applications and advertising.

11:30:09 8            In this instance, the specification uses the

11:30:11 9    word "object" to mean all objects.

11:30:15 10            And the '849 patent does not support the

11:30:17 11    proposition that objects, when used in the specification,

11:30:21 12    actually means all objects except for advertising objects.

11:30:26 13            The '849 patent also doesn't support the

11:30:32 14    contention that selectively storing involves prefetching.

11:30:37 15            So first we can see from the structure of the

11:30:39 16    claim language that claim 1 does not include a prefetching

11:30:44 17    limitation.  The previous construction of "selectively

11:30:48 18    storing" in the *Priceline* litigation rested in part on the

11:30:52 19    conclusion that the term "selectively" as used in claim 1

11:30:57 20    includes a retrieval limitation.  This conclusion was

11:31:02 21    based on claim 8's recitation of "selectively supplied to

11:31:08 22    and retrieved at."

11:31:09 23            However, the use of "selectively" in claim 1 and

11:31:13 24    claim 8 actually cuts the other way and supports IBM's

11:31:17 25    proposed construction.  This is because as you can see on

slide 81, the fact that claim 8 claims "selectively supplied to and retrieved at" shows that "selectively" does not inherently include a retrieval limitation. Otherwise, claim 8's recitation of "retrieved at" would be superfluous.

Further, the fact that claim 8 explicitly claims a "retrieved at" limitation shows that claim 1, which does not include any retrieval language, does not include a "retrieved at" limitation.

Further, even to the extent that the "retrieval" language in claim 8 is relevant to claim 1, neither claim 1, nor claim 8 include a prefetching limitation. This can be seen most clearly from claim 9 on the bottom of slide 81 which depends from claim 8.

Claim 9 explicitly includes a prefetching limitation as a part of the supplying limitation.

Claim 9 and its explicit claim of prefetching shows that when the patentee intended prefetching to be a claimed limitation, they knew how to do it. Therefore, the fact that claim 1 and claim 8 do not include these explicit language shows that they do not include these limitations.

The specification also supports IBM's proposition because where the specification uses the term "selectively," it does so in accordance with IBM's proposed construction.

For example, on slide 83 on the first excerpt

from the specification, the specification tells us that advertising and application objects are selectively distributed in the service network in accordance with a predetermined plan.

This use of "selectively" is directly analogous to IBM's use in the proposed construction of "selectively storing" meaning storing according to a predetermined storage criterion.

In contrast, the specification never uses the words "selectively" and "prefetching." In fact, they, the word "selectively" and "prefetching" are never used together at all.

"Prefetching" is in fact used in a preferred embodiment as part of a specific module that might be used but may not be and is not a claimed element of the patent.

"Selectively storing" should not be limited to this specific preferred embodiment, especially in light of the clear definition given earlier in the specification.

Groupon's proposed construction also morphs the single step of storing into two steps, storing and prefetching, even though the specification makes clear that storing and prefetching are separate steps.

For example, on slide 85, we see that the specification tells us that there are two ways to minimize the time required to reduce, to display a page. The first

is that objects are stored locally.  And the second is that objects have been prefetched.

These are -- the specification is telling us that these are two different methods.  For these reasons, selectively storing does not include a prefetching limitation.

THE COURT:  All right.  The plaintiff has just over four minutes left, but let me ask you, is it possible for me to agree and adopt your construction without saying I was wrong in the earlier case?

MR. MATULEWICZ-CROWLEY:  We have provided additional reasons.  I think they are applicable.  You know, it is the same specification.  We have provided additional reasoning and evidence in this litigation for you to adopt our proposed construction, but I do think it is the same specification.

THE COURT:  Okay.  Thank you.

We'll hear from defendant.

MR. HADDEN:  Okay.  And I think you were wrong in the prior case, Your Honor.  I think you are right.

"Selectively storing," going back just a step, right?

The key to the '849 patent is this dichotomy the separate treatment of advertising.  So what does that actually mean?

It means that a local system pre-fetches the

11:35:57 1  advertising, stores them locally.  So when there is an empty

11:36:02 2  ad slot to fill, it can pop one up from the local storage

11:36:06 3  and display it.  That is the whole point.  So it's not

11:36:09 4  battling against the application over the network to get

11:36:12 5  content.  It pre-fetches it and stores it locally.  That is

11:36:15 6  selective storing, right?

11:36:17 7          There is no point in selectively storing the ad

11:36:19 8  after you have already shown it to the user.  The point is

11:36:23 9  to selectively store it beforehand, you pre-fetch them, you

11:36:27 10 store them and then you show them when there is a need to

11:36:30 11 show an ad without having to go back to the network.  That

11:36:32 12 is the whole point of the patent.

11:36:34 13         And that is what the abstract describes; right?

11:36:34 14 Storing and managing advertising at the user reception

11:36:43 15 system so that the advertising can be prefetched from the

11:36:46 16 network and staged in anticipation of being called for

11:36:48 17 presentation.

11:36:51 18         You pre-fetch it, that is the same as

11:36:53 19 selectively storing it.  You store it, you need an ad and

11:36:57 20 you show it from the local store.

11:36:59 21         Thank you.

11:36:59 22         THE COURT:  Thank you.

11:37:00 23         Is there any rebuttal on this term?

11:37:05 24         MR. MATULEWICZ-CROWLEY:  Your Honor, I just want

11:37:10 25 to briefly address that.  Two issues.

11:37:14 1          The first is that the portion from the prosecution
11:37:17 2   history that the defendant's counsel just referenced was
11:37:22 3   specifically with regards to a prior art reference that did
11:37:26 4   not include advertising at all.  So the dichotomy, the
11:37:31 5   distinction between advertising and applications that IBM was
11:37:33 6   raising in that instance is merely making the point that the
11:37:38 7   '849 patent concerns advertising, which is not something that
11:37:41 8   IBM is disputing now.
11:37:44 9          Additionally, I just want to point out that
11:37:46 10  although Groupon's counsel references that the '849 patent is
11:37:50 11  all about prefetching advertising, what they have not been
11:37:53 12  able to do in any of the cited portions of the specification
11:37:56 13  is to show how any tie or connection between selectively and
11:38:02 14  prefetching any place where the language of the claim is
11:38:05 15  referenced in the specification.
11:38:07 16         I also, Your Honor, just want to clarify my
11:38:11 17  previous answer.  It was not at clear as possible.  Adopting
11:38:14 18  our construction in this litigation would require you to
11:38:18 19  overturn or change your previous construction of the same
11:38:21 20  term in the *Priceline* litigation.
11:38:22 21              THE COURT:  Okay.  Thank you for that.
11:38:25 22              Is there anything further on this term?
11:38:26 23              MR. HADDEN:  No, Your Honor.
11:38:28 24              MR. MATULEWICZ-CROWLEY:  No, Your Honor.
11:38:28 25              THE COURT:  All right.  IBM.

11:38:31 1    MR. OUSSAYEF:  Your Honor, just a point of

11:38:33 2  clarification.  I understand the parties might update Your

11:38:36 3  Honor about a discovery issue.  Does that count as part of

11:38:39 4  our time, just to make sure?

11:38:40 5    THE COURT:  There will be under two minutes

11:38:41 6  left.  I am going to have to let you update me after the two

11:38:44 7  minutes.

11:38:44 8    MR. OUSSAYEF:  Okay.  Great.

11:38:50 9    Just briefly on "continuations."  I think the

11:38:53 10 key thing is that both -- oh, yes.  Let me ...  (Adjusting

11:39:06 11 Elmo settings.)

11:39:06 12   Yes, I think the key thing with the term

11:39:09 13 "continuations" is that both parties understand that not all

11:39:12 14 requests are continuations.  So construing the term

11:39:18 15 "continuation" as a new request that a client may send to

11:39:21 16 the server is unclear because there are some examples where

11:39:26 17 the client sends a new request to the server which is not a

11:39:32 18 continuation.

11:39:33 19   And Groupon's own brief says that when the

11:39:37 20 client leaves or interrupts the conversation by typing in

11:39:40 21 a URL, that is at the top of slide 103, that that's not a

11:39:44 22 continuation.  So given that there is some situations where

11:39:47 23 a request is not a continuation, the definition needs to be

11:39:53 24 clarified in order to indicate that it is a new request in a

11:39:56 25 continuation.

11:39:57 1          That would incorporation the entire definition

11:39:59 2     from the glossary of terms rather than just the small

11:40:03 3     subsection of continuation as a new request which a client

11:40:07 4     may send to the server.

11:40:08 5          THE COURT:  Okay.  I'll hear from defendant.

11:40:13 6          MR. HADDEN:  Shall I use all the rest of my

11:40:16 7     time?

11:40:18 8          THE COURT:  Yes.  Well, he has 29 seconds left,

11:40:21 9     so ...

11:40:21 10          MR. HADDEN:  Just kidding.  I just want to get

11:40:24 11     up and shoot fish in a barrel with no response.

11:40:28 12          So it's a little more complicated than that,

11:40:30 13     Your Honor.  First, Your Honor, the construction of

11:40:33 14     "continuation" is correct.  We see it comes straight from

11:40:36 15     the glossary of the patent.

11:40:39 16          Now, the issue that IBM's counsel raised is a

11:40:44 17     red herring.  The claim itself requires that the continuation

11:40:48 18     is in an output that is returned to the user.  All such

11:40:54 19     continuations are -- all such links are continuations per this

11:41:00 20     definition; right?

11:41:02 21          So stepping back; right?  IBM's game with respect

11:41:06 22     to these terms is to try to avoid the "all continuations"

11:41:11 23     requirement so that they can point to just a few links on a

11:41:15 24     Web page and say that infringes.  You can ignore all the rest

11:41:19 25     of the links because those are either not continuations, not

1  in a conversation, or not returned by a service.  And those

2  arguments are all clearly wrong.

3         So let me just go forward; right?  Part of

4  what they're trying to do is insert conversation into this

5  construction so that they can define a conversation to be

6  something that is some logically related exchange so they

7  can draw a box.

8         But that is wrong.  The claim, or the patent

9  explicitly describes and defines conversation.  What it says

10 is, on the Web, hypertext links represent continuations and

11 a client engages in a conversation whenever it follows

12 hypertext links.

13        So what that means is any time I'm clicking on a

14 link, I'm in a conversation.  The conversation is continuing.

15 The only way to get out of conversations as the patent

16 explains is if I explicitly request a new URL.  So I type a

17 new URL into my browser instead of clicking on a link on a

18 page.  That's the only way you exit a conversation.  And,

19        If that isn't clear enough, the other definition

20 that the patent actually provides a mathematical definition of

21 conversation; right?  And it says, more importantly, it's a

22 series of HTML pages -- p1 through pn, and if I get from p2 to

23 pn where the client views them all, right?, for i because i is

24 between 1 and n, HPI is obtained by pi - 1.

25        So what does that mean?  That means as long as

I'm looking at Web pages, and I'm getting from page to page by clicking on a link from the prior page, I am in a conversation. Okay? So as long as I'm following links, that is by definition a conversation.

It doesn't then depend on who I'm talking to on the other end. It doesn't depend on whether that link goes to the same server or different server. It doesn't depend on what the Web page is talking about or what that link relates to. It's a very formal definition. As long as I'm clicking on links, I'm in a conversation. And,

That is required because if you could click on a link and not keep this state information, then the whole system in this patent breaks. And,

Just to make clear, they put in this example in their opposition brief arguing that when you start with, I think it would be an airline site and you move to hotel sites and somehow you changed the conversation, the conversation stopped, that is all nonsense; right? That is very clear.

A client may communicate with multiple servers during the same conversation, as long as I keep clicking links in the same conversation. This is the example that they said showed that the conversations break when you go to a different server. It says just the opposite; right? It says I start on the airline site, I click a link to the hotel site, the conversation continues, the state

information keeps getting passed.  The hotel side may be able to use it, it may not, but it always receives it.

Then we get to the all continuations.  This is kind of the similar idea, right?  So in trying to say that all continuations doesn't mean all continuations, because we can define a service to be something that generates just certain links.  And, again, that is just wrong; right?

The output from the service is the Web page; right?  And, again, this is required because as the patent says, for this method to work you have to embed the state information in all hyperlinks passed back and forth between the client and the server.  If you have a link that doesn't have state information, it won't work because the user can click on that link and then the state is lost forever; right?  And,

The abstract describes the same requirement.  And, importantly; right?  The patent talks about communicating the output to the client.  So the output to the client is the Web page that they get back.  And the claim also requires that wherein the state information is preserved, provided to all services for the duration of the conversation.

For that to work, the state information has to be in every link in their Web page because if not, the user could click on that link and, whatever that service is, would not receive that state information during that conversation.  And,

11:46:11 1        Again, the patent is clear that the output that

11:46:14 2   that claim is talking about that goes to the user is the Web

11:46:17 3   page.  They have the IBM example Web page here in the patent

11:46:22 4   and showing that as the output.  So the output is not some

11:46:26 5   subset of links.  It is the page and all the links on them.

11:46:31 6        And the figure shows the same thing.  The output

11:46:33 7   that goes back to the client is the HTML file.

11:46:37 8        So why does this matter?  Well, it matters

11:46:41 9   because again what IBM is trying to do is say, well, we

11:46:45 10  found these two links on your page that have what we call

11:46:48 11  state information, so you infringe.  Because we're going to

11:46:51 12  say that those are the output from some service that we'll

11:46:54 13  identify later.  And,

11:46:58 14       That is nonsense because this page has a whole

11:47:01 15  bunch of links, and all these other links don't have the same

11:47:05 16  information.  So this is not an example of all continuations,

11:47:09 17  including state information as the patent requires; right?

11:47:11 18  This page doesn't work.  I click on any of these, what they're

11:47:14 19  calling state information doesn't get sent back.  It is not

11:47:17 20  embedded into any of these links.  And,

11:47:20 21       These all continuations, they relied on that in

11:47:23 22  the IPR.  It's throughout the prosecution history.  They can't

11:47:27 23  avoid it now and say any two links will do, which is what

11:47:32 24  they're trying to do.

11:47:33 25       Thank you.

11:47:34 1            THE COURT: All right. Do you want to respond

11:47:37 2 briefly?

11:47:37 3            MR. OUSSAYEF: Yes. Very briefly, Your Honor.

11:47:39 4            What I didn't see is a discussion of their

11:47:42 5 actual construction. And the reason why is because once

11:47:46 6 again it rewrites the claim language.

11:47:48 7            "Continuations" is their preferred definition of

11:47:50 8 "continuations." Okay. That is all right.

11:47:52 9            But why "in an output" means "in a Web page or

11:47:56 10 other output?" There is simply no language which is

11:47:59 11 construed from the specification.

11:48:01 12            "From said service" changes to "sent to the

11:48:03 13 client." So "from" turns to "sent," reversing the order,

11:48:08 14 and "service" turns to "client," the opposite entity that

11:48:11 15 should be doing things.

11:48:12 16            If we look at slide 96, we see that their

11:48:17 17 definition would require "in an output from said service" to

11:48:22 18 require something to already be sent to the client before

11:48:24 19 the later step in the claim which requires communicating

11:48:29 20 something to the client.

11:48:30 21            So their definition would require communicating

11:48:33 22 something to the client, doing something in that before

11:48:36 23 you communicate it to the client, which doesn't make sense.

11:48:39 24            THE COURT: All right. Thank you.

11:48:41 25            Do you want to respond?

MR. HADDEN:  Sure.

None of that is right, of course.  The output to the client doesn't have to be communicated.  It's generated before it is sent.  This is in our briefs.  I think this part is pretty clear.

The main point is "all continuations" means "all continuations."  And there is no dispute that continuations are links and a conversation is any time you click a link, so it all fits together.

Thank you, Your Honor.

THE COURT:  All right.  Is there anything else on claim construction from Groupon then?

MR. HADDEN:  No, Your Honor.

THE COURT:  All right.  Then let's talk just briefly about discovery.  I'm curious as to whether there has been progress over the weekend, so let me hear first from IBM on that.

MR. OUSSAYEF:  Your Honor, my colleague Robert Harrits will take this issue.

THE COURT:  Sure.

Good morning.

MR. HARRITS:  Good morning, Your Honor.  Roberts Harrits on behalf of IBM.  May it please the Court.

Following the Court's Order on Friday, the parties met and conferred that evening, and during the meet

11:49:46 1  and confer Groupon agreed to produce and I believe later

11:49:48 2  that evening did produce some revenue cost and profit

11:49:52 3  information associated with the accused products.

11:49:55 4       However, there is other financial and sales

11:49:58 5  information that we have been requesting for some time now

11:50:02 6  that is still not being produced, and Groupon has not

11:50:04 7  provided us a date by which they will be producing these

11:50:07 8  documents:  things like patent licenses, financial future

11:50:12 9  forecasts of the future revenue growth, marketing documents,

11:50:16 10  commercial studies about the accused features, or any

11:50:21 11  potential documents related to the value of the accused

11:50:24 12  features.  And,

11:50:26 13       Given that these discovery responses have been

11:50:28 14  outstanding since December and Groupon has not said they're

11:50:33 15  not going to produce these documents, we think it would be

11:50:36 16  beneficial for the Court to order a reasonable date certain

11:50:39 17  by which Groupon will produce these other requested documents.

11:50:43 18       THE COURT:  And what about the distinction

11:50:45 19  between North American revenue and U.S. revenue?  Did you

11:50:48 20  make progress on that?

11:50:50 21       MR. HARRITS:  Yes, we have.  They have

11:50:51 22  produced a document which they say should be able to help us

11:50:54 23  de-aggregate that data.  We haven't had a chance to fully

11:50:57 24  analyze it with our experts to know whether it will do as

11:51:01 25  they allege it will.

11:51:01 1          THE COURT:  All right.  Is there anything else?

11:51:03 2          MR. HARRITS:  That is it unless Your Honor has

11:51:05 3 other questions.

11:51:05 4          THE COURT:  Not yet.  So let me hear what

11:51:07 5 Groupon's position is.

11:51:12 6          Good morning.

11:51:13 7          MR. HAACK:  Good morning, Your Honor.

11:51:16 8          I think what Mr. Harrits said is generally

11:51:19 9 accurate.  Groupon produced a bunch of data on Friday.  To

11:51:22 10 the extent that the information they moved on, the revenues,

11:51:25 11 cost profits broken down in various ways is not complete, I

11:51:29 12 believe it is, Groupon wanted us to produce that data.

11:51:31 13          On the issue of the U.S./Canada revenues, the

11:51:36 14 issue there is that Groupon does not in the ordinary course

11:51:39 15 of business disaggregate Canada from its North American

11:51:42 16 business.  It reports on a North American basis.

11:51:45 17          The information we provided to IBM at this point

11:51:48 18 is I believe revenue information.  It doesn't disaggregate

11:51:53 19 cost or profits because Groupon doesn't keep that and to do

11:51:57 20 that involves going through every single transaction at

11:52:00 21 Groupon and deciding whether it should allocate cost or

11:52:03 22 profits to that transaction.

11:52:04 23          The information that IBM was given is based on

11:52:06 24 Groupon as separate Canadian entities that report revenue,

11:52:09 25 so we disaggregated that revenue from the U.S. revenue,

11:52:13 1    provided the breakdown of North American into U.S. and

11:52:18 2    Canada.

11:52:19 3                And I should say this for the record.  For the

11:52:22 4    purposes of North American revenue, that means U.S. and

11:52:24 5    Canada, not Mexico for Groupon.

11:52:26 6                As to the patent licenses, the marketing

11:52:30 7    documents, Groupon hasn't refused to produce any of this

11:52:35 8    information.  When I spoke to Mr. Harrits on Friday, I

11:52:38 9    represented we would be happy to give that to them.

11:52:42 10               IBM didn't raise that as a thing they were

11:52:45 11   moving to compel or conversations leading up to the motion

11:52:47 12   to compel.  It asked for revenues, cost profits,

11:52:51 13   disaggregated into the ways Your Honor saw in the briefing.

11:52:54 14               I don't think there is a need for an order to

11:52:57 15   produce those documents, and Groupon hasn't refused to

11:53:00 16   produce anything and particularly on the marking documents,

11:53:03 17   patent licenses.  I'm not aware the parties have conferred

11:53:05 18   on that at all.  Certainly in the conversations I have been

11:53:08 19   involved in in the last month or six weeks, we have not.

11:53:10 20               THE COURT:  Well, what is the date on which

11:53:15 21   you propose to produce the remaining materials that they've

11:53:18 22   mentioned in their letter to me they want?

11:53:22 23               MR. HAACK:  I don't have a date certain for

11:53:23 24   right now, Your Honor.  I'm sure we can get licenses out

11:53:25 25   this week.  I know what the volume of that is.

11:53:27  1          THE COURT:  What, from your perspective, is a

11:53:30  2   reasonable date by which you would agree to produce what

11:53:33  3   all they asked for in the letter?

11:53:34  4          MR. HAACK:  I think by the end of the month, we

11:53:36  5   can do that, Your Honor.  Before that would, I think it

11:53:38  6   might be difficult to get all that out in that time period,

11:53:41  7   particularly the marketing documents that certainly is under

11:53:44  8   the scope of what that would be.

11:53:45  9          THE COURT:  All right.  Mr. Harrits, is the end

11:53:47 10   of the month reasonable?

11:53:48 11          MR. HARRITS:  Yes it is, Your Honor.

11:53:50 12          THE COURT:  All right.  Well, does that take

11:53:51 13   care of what is in dispute on discovery?

11:53:54 14          MR. HARRITS:  I believe for what is currently in

11:53:57 15   dispute.  Yes.

11:53:58 16          THE COURT:  Do you agree with that?

11:53:59 17          MR. HAACK:  Yes.

11:54:00 18          THE COURT:  Okay.  Well, then I do order that

11:54:01 19   defendant will produce what was at issue in the letter and

11:54:05 20   discussed here today by the end of this month.

11:54:08 21          MR. HAACK:  Thank you, Your Honor.

11:54:09 22          THE COURT:  All right.  Is there anything

11:54:10 23   further from IBM?

11:54:12 24          MR. TRAINOR:  No, Your Honor.

11:54:12 25          MR. OUSSAYEF:  No, Your Honor.

11:54:13 1            MR. TRAINOR:  Thank you.

11:54:13 2            THE COURT:  Is there anything further from

11:54:15 3    Groupon?

11:54:15 4            MR. HADDEN:  No.  Thank you, Your Honor.

11:54:16 5            THE COURT:  Thank you for that helpful argument.

11:54:37 6    We will be in recess.

11:54:48 7                (Claim construction and motion hearing ends at

11:54:59 8    11:54 a.m.)

12:00:21 9

12:00:21 10       I hereby certify the foregoing is a true and accurate
         transcript from my stenographic notes in the proceeding.

         11

         12                    /s/ Brian P. Gaffigan
                               Official Court Reporter
         13                    U.S. District Court

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25