## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERNATIONAL BUSINESS   :
MACHINES CORPORATION,    :
               :
   Plaintiff,       :
               :
  v.          :  C.A. No. 16-122-LPS
               :
GROUPON, INC.,       :
               :
   Defendant.      :

---

David E. Moore, Bindu A. Palapura, Stephanie E. O'Byrne, POTTER ANDERSON & CORROON LLP, Wilmington, DE

John M. Desmarais, Jon T. Hohenthaner, Karim Z. Oussayef, Laurie N. Stempler, Robert C. Harrits, Michael James Xavier Matulewicz-Crowley, Brian D. Matty, DESMARAIS LLP, New York, NY

   Attorneys for Plaintiff International Business Machines Corporation.


John G. Day, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE

J. David Hadden, Saina S. Shamilov, Phillip J. Haack, Adam M. Lewin, FENWICK & WEST LLP, Mountain View, CA

   Attorneys for Defendant Groupon, Inc.

---

### MEMORANDUM OPINION


August 3, 2017
Wilmington, Delaware

**STARK, U.S. District Judge:**

Plaintiff International Business Machines Corporation ("IBM") filed suit against

Defendant Groupon, Inc. ("Groupon"), alleging infringement of U.S. Patent Nos. 5,796,967;

7,072,849; 5,961,601; and 7,631,346. The patents describe and claim methods of presenting

applications and advertisements in a computer network, a method and system for preserving state

information in computers communicating over networks using stateless protocols, and a method

for online user authentication via single-sign-on operations.

Presently before the Court is the issue of claim construction. The Court previously

construed terms of the patents-in-suit in related litigation. *See Int'l Bus. Machs. Corp. v.*

*Priceline Grp. Inc.*, 2016 WL 6405824 (D. Del. Oct. 28, 2016). The parties submitted

technology tutorials (*see* D.I. 61, 62) and briefs (*see* D.I. 58, 60, 66, 68). The Court held a claim

construction hearing on June 5, 2017. (*See* D.I. 100 ("Tr."))

## I. LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law. *See*

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview*

*Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the

claims of a patent define the invention to which the patentee is entitled the right to exclude."

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted).

"[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324.

Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the

statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . .

[which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim must also be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven

2

when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d

at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## II.    CONSTRUCTION OF DISPUTED TERMS[1]

### A.    "Partition" Terms

#### "a first partition for presenting applications"[2]

| **Plaintiff**<br>Plain and ordinary meaning<br><br>Alternatively: "a first area for presenting applications" |
| --- |
| **Defendant**<br>"a fixed portion of the screen that is dedicated for displaying applications" |
| **Court**<br>"a first area for presenting applications" |

#### "a second partition for presenting a plurality of command functions"[3]

| **Plaintiff**<br>Plain and ordinary meaning<br><br>Alternatively: "a second area for presenting a plurality of command functions" |
| --- |
| **Defendant**<br>"a fixed portion of the screen that is dedicated to displaying command functions which does not overlap with the fixed portion of the screen that is dedicated for displaying applications" |
| **Court**<br>"a second area for presenting a plurality of command functions" |

---

[1] The parties have agreed to certain constructions, all of which the Court will adopt. (*See generally* D.I. 64 at 11-12, 23, 25-28)

[2] This term appears in claim 1 of the '967 patent.

[3] This term appears in claim 1 of the '967 patent.

**"structuring applications so that they may be presented through the network at a first portion of one or more screens of display" / "structuring applications so that they may be presented at a first portion of one or more screens of display"[4]**

| **Plaintiff** |
| --- |
| Plain and ordinary meaning<br><br>Alternatively: "formatting applications so that they may be presented through the network at a first area of one or more screens of display" / "formatting applications so that they may be presented at a first area of one or more screens of display" |
| **Defendant**<br>"formatting applications so that they are displayed on a fixed portion of the screen that is dedicated to displaying applications" |
| **Court**<br>"formatting applications so that they may be presented through the network at a first area of one or more screens of display" / "formatting applications so that they may be presented at a first area of one or more screens of display" |

**"at a second portion of one or more screens of display concurrently with applications"[5]**

| **Plaintiff** |
| --- |
| Plain and ordinary meaning<br><br>Alternatively: "at a second area of one or more screens of display concurrently with applications" |
| **Defendant**<br>"on a second fixed portion of the screen that does not overlap the fixed portion of the screen for displaying applications" |
| **Court**<br>"at a second area of one or more screens of display concurrently with applications" |

The parties agree that the above-identified terms "present similar disputes" and therefore

---

[4] This term appears in claims 1 and 13 of the '849 patent.

[5] This term appears in claims 1 and 13 of the '849 patent.

should be construed together. (Tr. at 50-51, 65) Each disputed term contains the word "partition" or "portion" – and the parties agree that "partition" and "portion" have the same meaning here. (*See id.*)

Groupon contends that "partitions" must be (1) fixed, (2) non-overlapping, and (3) dedicated to displaying applications (or advertisements). (*Id.* at 56; *see also* D.I. 60 at 6-7) IBM counters that requiring the partitions to be "fixed" and "non-overlapping" contradicts the specification and runs afoul of the doctrine of claim differentiation, as the '967 patent contains dependent claims expressly reciting a partition that is fixed. (*See* D.I. 58 at 4-5, 7; '967 Patent at claims 14 and 17) Additionally, IBM points to Figures 3(a) and 3(b) of the '849 and '967 patents, which show two different pages of the application – one in which the screen is divided into two rectangles representing two body partitions (Fig. 3(a)), and one in which the screen is a solid rectangle taking up the middle of the screen representing only one partition (Fig. 3(b)). From these figures it follows, in IBM's view, that construing partitions as fixed would exclude an embodiment depicted in the figures. (*See* Tr. at 59) Figure 3(a) also depicts a partition capable of displaying other types of data, such as window partitions, supporting IBM's position that partition should not be construed as solely dedicated to displaying applications. (*See id.* at 61) That Figure 3(a) shows a window partition that overlays the body partition also demonstrates, according to IBM, that the partitions are able to overlap. (*See id.*)

The Court agrees with IBM. Contrary to Groupon's contention, the specification and prosecution history do not support construing partition as a fixed, non-overlapping portion of the screen display. To the contrary, the Court agrees with IBM that the specification shows that the "partition for presenting applications" does not exclude that area of the screen from also

presenting other data outside of applications, such as when window partitions "pop-up" in front of the body partition.[6] (D.I. 58 at 7-8)

As for the parties' dispute with respect to the terms "structuring applications so that they may be presented through the network at a first portion of one or more screens of display" / "structuring applications so that they may be presented at a first portion of one or more screens of display," the Court is not persuaded by Groupon that "may be" should be construed as "are." As with a similar dispute in the *Priceline* litigation – where the Court held that the '849 patent's term "structuring advertising in a manner compatible to that of the applications so that it may be presented" required the advertising be formatted "for ***potential*** use with a plurality of applications," not that they "***actually*** be used," *Int'l Bus. Machines Corp.*, 2016 WL 6405824, at *9-10 – the Court is not persuaded by Groupon's proposed narrowing of the claim.

Accordingly, the Court adopts IBM's constructions, which are in line with the plain and ordinary meaning of the identified terms.

**B.    "object(s)"[7]**

| Plaintiff |
|---|
| "data structure(s) that have a uniform, self-defining format known to the reception system" |
| **Defendant** |
| "data structure(s)" |

---

[6] While Groupon argues that windows and partitions are separate elements (*see* Tr. at 73-74), the patent states that "[a] window page partition 275 seen in Fig. 3*a* represents the same informational and transactional capability as a body partition, except greater flexibility is provided for its location and size." ('967 Patent at 9:59-62)

[7] This term appears in claims 1, 2-4, 12, and 17 of the '967 patent and in claims 1-3 and 13-16 of the '849 patent.

| Court |
|---|
| "data structure(s)" |

The Court previously construed the term "object(s)" to mean "data structure(s)." *See*

*Int'l Bus. Machs. Corp.*, 2016 WL 6405824, at \*3. The Court agrees with Groupon that it should

adopt this construction here as well. IBM has not presented any new argument.

### C. "selectively storing advertising objects at a store established at the reception system"[8]

| Plaintiff |
|---|
| "storing advertisement objects according to a predetermined storage criterion at a store established at the reception system" |

| Defendant |
|---|
| "pre-fetching advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications" |

| Court |
|---|
| "pre-fetching advertising objects and storing at a store established at the reception system in anticipation of display concurrently with the applications" |

Groupon proposes that the Court adopt the same construction it previously adopted in the

*Priceline* litigation. *See Int'l Bus. Machs. Corp.*, 2016 WL 6405824, at \*9-10. IBM has not

pointed to any intrinsic evidence not considered by the Court in the first action, nor does it

present any persuasive arguments for its proposal. Accordingly, the Court will adopt Groupon's

proposed construction.

---

[8] This term appears in claims 1, 13, and 14 of the '849 patent.

## D.    "continuation(s)"[9]

| Plaintiff |
|---|
| "a new request in a conversation which a client may send to a server, such as, for example, a hyperlink" |
| **Defendant** |
| "a new request which a client may send to a server, such as, for example, a hyperlink" |
| **Court** |
| "a new request which a client may send to a server, such as, for example, a hyperlink" |

Again, Groupon proposes that the Court adopt the same construction it adopted in the earlier case, and again IBM fails to offer any evidence or argument that persuades the Court it should do something different. *See Int'l Bus. Machs. Corp.*, 2016 WL 6405824, at *12. IBM's position that the phrase "in a conversation" should be added to the construction is inconsistent with the specification, which describes a "continuation" as "a new request which a client may send to a server." Nothing in the specification ***requires*** all continuations to be in a conversation. The Court will adopt Groupon's construction.

## E.    "all continuations in an output from said service"[10]

| Plaintiff |
|---|
| No construction necessary |
| **Defendant** |
| "all new requests which a client may send to a server, such as, for example a hyperlink in a web page or other output sent to the client" |
| **Court** |
| "all new requests which a client may send to a server, such as, for example, a hyperlink, in an output from said service" |

---

[9] This term appears in claims 1, 3, 6, 8, 11-12, 51, 53, and 56-57 of the '601 patent.

[10] This term appears in claims 1 and 51 of the '601 patent.

IBM asserts that this term does not need any construction beyond the construction of "continuations" above. (D.I. 58 at 19) Groupon responds that the "output from said service" must be construed as the entire web page, rather than just a subset of information on the web page. (D.I. 60 at 17)

Groupon's construction improperly equates "output" to the entire web page, contrary to the specification. While the specification describes embodiments that construe the output as a web page, other embodiments describe outputs that are further processed or filtered before the web page is generated.

Accordingly, the Court will adopt the plain and ordinary meaning of the term consistent with its construction of "continuations." Although the Court agrees with the substance of IBM's position, a construction of the term will be helpful to the jury.

## III. CONCLUSION

The Court will construe the disputed terms as explained above. An appropriate Order follows.