# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 16-122-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC. | ) ) | |
| Defendant. | ) | |

## IBM'S FIRST NOTICE OF DEPOSITION TO GROUPON, INC.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff International Business Machines Corporation ("IBM"), by its counsel, will take the deposition upon oral examination of Defendant Groupon, Inc. ("Groupon"), regarding the subject matter set forth in the attached Schedule B, which shall be interpreted in accordance with the definitions set forth in the attached Schedule A.

The deposition will begin at 9:00 a.m. on June 7, 2017, at the office of Desmarais LLP, 230 Park Avenue, New York, New York 10169, or at such other time and place as may be agreed upon in writing by counsel for the parties. The examination will be taken before a Notary Public or other person authorized to administer oaths pursuant to Rule 28 of the Federal Rules of Civil Procedure, and will continue day to day until completed. The testimony at the deposition will be recorded by videographic, stenographic, audio, audiovisual, and/or real-time computer means.

In accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, Groupon shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf as to each of the topics set forth in the attached Schedule B. IBM requests

that Groupon identify the individual(s) who will testify regarding each topic at least one week in advance of the deposition.

You are invited to attend.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

John M. Desmarais
Jon T. Hohenthaner
Karim Oussayef
Laurie N. Stempler
Robert C. Harrits
Michael J. X. Matulewicz-Crowley
Brian D. Matty
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400

Dated: May 11, 2017
5159939 / 43155

By: _/s/ David E. Moore_____
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Plaintiff International Business Machines Corporation*

## SCHEDULE A
## DEFINITIONS

1.     As used herein, "Patents-In-Suit" means United States Patent Nos. 5,796,967 ("the '967 Patent"), 5,961,601 ("the '601 Patent), 7,072,849 ("the '849 Patent"), and 7,631,346 ("the '346 Patent").

2.     As used herein, "This Action" means the action under the caption International Business Machines Corporation v. Groupon, Inc., Civil Action No. 16-cv-122-LPS-CJB, in the United States District Court for the District of Delaware.

3.     As used herein, "Defendant" "You," and "Your" means Groupon, Inc. and includes any predecessors, divisions, departments, subsidiaries, parents, affiliates, present or former officers, directors, employees, agents, counsel, representatives, and others authorized to act on behalf of Groupon, Inc.

4.     As used herein, "Accused Instrumentality" means any product, application, service, or method accused by IBM of infringing any claim of any of the Patents-In-Suit under any subsection of 35 U.S.C. § 271, including without limitation all products identified in IBM's Preliminary Identification of Accused Products served October 7, 2016 (including any supplements or amendments thereto), IBM's Preliminary Infringement Contentions served January 20, 2017 and March 24, 2017 (including any supplements or amendments thereto), and all products identified by Groupon in response to IBM's First Set of Interrogatories to Groupon No. 1 served November 22, 2016.

5.     As used herein, "Prior Art" has the same meaning as used in 35 U.S.C. § 101 et seq., and includes any patent, printed publication, knowledge, use, sale or offer for sale, or other act or event defined in 35 U.S.C. §§ 102 or 103, taken singly or in combination.

6.     As used herein, "include" and "including" shall be construed to mean "without limitation," so as to acquire the broadest possible meaning.

7.       As used herein, "communication" means any transmission of information by one or more persons and/or between two or more persons by any means, including telephone conversations, letters, telegrams, teletypes, telexes, telecopies, electronic mail, other computer linkups, written memoranda, and face-to-face conversations.

8.       As used herein, "and" and "or" shall be construed conjunctively and disjunctively, so as to acquire the broadest possible meaning.

9.       As used herein, "any" and "all" shall each be construed to mean "each and every," so as to acquire the broadest possible meaning.

10.      The singular and masculine form of a noun or pronoun shall embrace, and shall be read and applied as, the plural or the feminine or neuter, as the particular context makes appropriate and to give the noun or pronoun the broadest possible meaning.

11.      As used herein, "document" has the same broad meaning as in Rule 34 of the Federal Rules of Civil Procedure. The term "document" also encompasses tangible things.

12.      As used herein, "person" means any natural person or any business, legal, or governmental entity or association.

13.      As used herein, "concerning" or "relating to" means, without limitation, identifying, describing, discussing, concerning, assessing, stating, reflecting, constituting, containing, embodying, tending to support or refute, or referring directly or indirectly to the particular subject matter identified.

14.      As used herein, the terms "Complaint," "Answer," and "Affirmative Defense," shall mean the pleadings as originally filed or as amended or supplemented throughout the progression of the case.

15.      As used herein, the term "Source Code" means any software, markup language files, style sheet language files, template language files, programming language files,

configuration files, source code, object code, or other electronic information for directing the operation of a computer, mobile device, website, web browser, or for processing electronic data, including but not limited to computer instructions and data definitions expressed in a form suitable for input to an assembler, compiler, other translator, or other data processing module. This definition includes, but is not limited to, JavaScript, Java, Java Server Pages (JSP), Active Server Pages (ASP) (including .Net ASP), VBScript, C++, C, C#, Objective-C, Swift, Python, Mustache, CoffeeScript, Ruby, SQL or other query languages, PostScript, Jade, Apache Velocity Templates, HTML, CSS, XML, batch files, and shell scripts.

16.     As used herein, the term "URI" means uniform resource identifier.

17.     As used herein, the term "URL" means uniform resource locator.

18.     As used herein, the term "Source Code Computer" means the laptop You have made available for inspection in This Action in accordance with paragraph 12 of the Protective Order in this litigation (D.I. 24).

19.     As used herein "financial data" means any and all information related to Your finances, including but not limited to information concerning revenues, costs, and profits.

20.     As used herein, the term "Transaction Event" means any revenue-generating event, including but not limited to user queries, search hit clicks, use of coupons or offers, reservation bookings, completion of reservations (i.e., reservations that are not cancelled or no-show reservations), ad-related bookings, covers, advertisement impressions, advertisement clicks, or purchases.

# SCHEDULE B
# TOPICS

1.     The location, type, and organization of documents in Your possession, custody, and control that show, describe, or illustrate how the Accused Instrumentalities have, from 2010 to the present:

    a.   generated URLs, URIs, or hyperlinks;

    b.   allowed users to Sign In and create user accounts, including by using information or data about users from Google or Facebook;

    c.   delivered content, including HTML, web pages, JavaScript, images, graphics, stylesheets, and font files;

    d.   set parameters related to caching; and

    e.   used content delivery networks, including those provided by Akamai Technologies, Inc.

2.     The location, identity, and type of control panels, consoles, dashboards, and interfaces related to (a) configuring any parameters related to caching and (b) configuring content delivery networks, such as those provided by Akamai Technologies, Inc.

3.     The location, type, and organization of documents in Your possession, custody, and control that show, describe, or illustrate the topology of the networks that support the Accused Instrumentalities or deliver content relevant to the Accused Instrumentalities.

4.     The location, identity, and type of financial data, including financial data concerning the Accused Instrumentalities and Transaction Events, in Your possession, custody, or control, and the manner in which such financial data is recorded, organized, stored, analyzed, reported, and distributed.

5.     The location and identity of license agreements in Your possession, custody, or control, and the manner in which such license agreements are organized and stored.

6.      The location, identity, and type of documents reflecting Your licensing policies and practices in Your possession, custody, or control, and the manner in which such documents are organized, stored, and distributed.

7.      The location, identity, and type of documents reflecting consumer feedback and/or survey results concerning the Accused Instrumentalities in Your possession, custody, or control, and the manner in which such documents are organized, stored, and distributed.

8.      The location, identity, and type of documents reflecting Your marketing strategies and practices concerning the Accused Instrumentalities in Your possession, custody, or control, and the manner in which such documents are prepared, organized, stored, and distributed.

9.      The location, identity, and type of information in Your possession, custody, or control concerning Transaction Events, and the manner in which such information is recorded, organized, analyzed, reported, and distributed.

10.      The source(s) of the documents You have produced to date.

11.      The identity and type of the documents accessible on each of the non-custodial data sources identified in Your ESI Disclosures or that were the source of the documents You have produced to date.

12.      Your document retention policies and practices from 2010 to the present.

13.      The identity, title, and responsibilities of the three people most knowledgeable about the financial data in Your possession, custody, or control.

14.      The identity, title, and responsibilities of the three people most knowledgeable about how the Accused Instrumentalities have, from 2010 to the present:

     a.   generated URLs, URIs, or hyperlinks;

     b.   allowed users to Sign In and create user accounts, including by using information or data about users from Google or Facebook;

2

    c.   delivered content, including HTML, web pages, java script, images, graphics, stylesheets, and font files;

    d.   set parameters related to caching; and

    e.   used content delivery networks, such as the one operated by Akamai Technologies, Inc.

# EXHIBIT 2

## Michael Matulewicz-Crowley

| | |
|---|---|
| **From:** | Robert Harrits |
| **Sent:** | Friday, June 2, 2017 1:31 PM |
| **To:** | Jessica Benzler; IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Karim Oussayef |
| **Cc:** | Phillip Haack; David Hadden; Adam Lewin; jday@ashby-geddes.com; Groupon_IBM_Service@Fenwick.com; Saina Shamilov; Sapna Mehta |
| **Subject:** | RE: Groupon-IBM (Del.) - 30(b)(6) Witness |

Counsel,

Can you please let us know the name of the individual Groupon will be putting up for IBM's noticed 30(b)(6) deposition next week Wednesday at our offices.

In addition, please let us know whether the Google Drive/Google Vault that was searched using searched terms contains non-technical documents so that we can propose appropriate additional search terms if necessary.

Thank you,
Robert

---

**From:** Robert Harrits
**Sent:** Wednesday, May 31, 2017 2:38 PM
**To:** 'Jessica Benzler'; IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Karim Oussayef
**Cc:** Phillip Haack; David Hadden; Adam Lewin; jday@ashby-geddes.com; Groupon_IBM_Service@Fenwick.com; Saina Shamilov
**Subject:** Groupon-IBM (Del.) - 30(b)(6) Witness

Counsel,

IBM's First Notice of Deposition to Groupon, Inc., served on May 11, 2017, requested Groupon identify which individual or individuals would be testifying regarding topics 1-14 a week before the deposition. IBM noticed the deposition for June 7, 2017 at 9 am in the Offices of Desmarais LLP.  As today is one week before the notice date, please inform IBM of who will be testifying so that we can adequately prepare for the deposition.

Regards,
Robert

Robert C. Harrits | Desmarais LLP
230 Park Avenue | New York, NY 10169
Tel: (212) 808-2946 | Fax: (212) 351-3401
Email: rharrits@desmaraisllp.com

# EXHIBIT 3

**Alexandra Kochian**

| | |
|---|---|
| **From:** | Sapna Mehta <smehta@fenwick.com> |
| **Sent:** | Friday, June 23, 2017 6:10 PM |
| **To:** | Robert Harrits; Phillip Haack; Laurie Stempler; Groupon_IBM_Service@Fenwick.com |
| **Cc:** | IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com); OByrne, Stephanie E. (sobyrne@potteranderson.com) |
| **Subject:** | RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.) |

Robert,

The witness is Sarah Baldwin and the deposition will take place at Fenwick's office in San Francisco.  The address is: 555 California Street 12th Floor, San Francisco, CA 94104.

Sapna

**From:** Robert Harrits [mailto:RHarrits@desmaraisllp.com]
**Sent:** Friday, June 23, 2017 1:37 PM
**To:** Sapna Mehta <smehta@fenwick.com>; Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com) <jday@ashby-geddes.com>; OByrne, Stephanie E. (sobyrne@potteranderson.com) <sobyrne@potteranderson.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)


Sapna,

Next Thursday, June 29, 2017 in San Francisco works for IBM.  Please let us know the name of the witness and the location of the deposition so we can adequately prepare and arrange for a court reporter.

Thank you,
Robert

**From:** Sapna Mehta [mailto:smehta@fenwick.com]
**Sent:** Friday, June 23, 2017 4:26 PM
**To:** Phillip Haack; Robert Harrits; Laurie Stempler; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com); OByrne, Stephanie E. (sobyrne@potteranderson.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)

Robert,

Groupon's 30(b)(6) designee for IBM's First Notice of Deposition is available next Thursday, June 29 in San Francisco.  Please let us know as soon as possible if that date will not work.

Regards,
Sapna

**From:** Phillip Haack
**Sent:** Wednesday, June 21, 2017 6:15 PM
**To:** 'Robert Harrits' <RHarrits@desmaraisllp.com>; Laurie Stempler <LStempler@desmaraisllp.com>;
Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; dmoore@potteranderson.com;
bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com) <jday@ashby-geddes.com>; OByrne,
Stephanie E. (sobyrne@potteranderson.com) <sobyrne@potteranderson.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)


Robert,

Groupon expects to offer dates for its 30(b)(6) designee on IBM's first notice by the end of the week.  With respect to
the Groupon source code, the export is still in progress.  Groupon anticipates that the export should complete
tomorrow, at which point Groupon will have to remove certain irrelevant sensitive information (such as the credit card
processing environment) and then transfer the code to Fenwick to make available for inspection.  If you would like to
discuss the details, please let me know.  Groupon is currently collecting documents based on the search terms provided
by IBM last week and hopes to produce the responsive non-privileged documents resulting from that search by the end
of next week.  With respect to the financial documents, Groupon is not using search terms to collect additional financial
and marketing documents, but is collecting based on the search terms relating to financial and marketing documents
identified in your email of last week.


Regards,
Phil

**From:** Robert Harrits [mailto:RHarrits@desmaraisllp.com]
**Sent:** Tuesday, June 20, 2017 6:46 AM
**To:** Laurie Stempler <LStempler@desmaraisllp.com>; Phillip Haack <phaack@fenwick.com>;
Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; dmoore@potteranderson.com;
bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com) <jday@ashby-geddes.com>; OByrne,
Stephanie E. (sobyrne@potteranderson.com) <sobyrne@potteranderson.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)



Phil,

To clarify, I meant Wednesday June 21, 2017 not Wednesday June 19.

Robert

**From:** Robert Harrits
**Sent:** Monday, June 19, 2017 11:11 PM
**To:** Laurie Stempler; Phillip Haack; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-
geddes.com); OByrne, Stephanie E. (sobyrne@potteranderson.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)

Phil,

I write to follow up on a number of outstanding items.  First, please provide the date, the location, and the name of Groupon's 30(b)(6) witness who will testify to the topics in IBM's First Notice of Deposition to Groupon.  IBM served its notice well over a month ago on May 11, 2017 (D.I. 73), noticed the deposition for June 7, 2017 (*id.*), and, after conferring with Groupon, further confirmed its intent to go forward with the deposition. *See* June 7, 2017 Email from R. Harrits to P. Haack.  Please provide a date and location, as well as the name of the witness, by Wednesday, June 19, 2017 so that IBM can make arrangements and properly prepare for the deposition.

Second, during our meet and confer you indicated that Groupon expected to have all of the additional source code loaded on the Source Code Computer by early this week.  Please let us know the code's status, so IBM can make arrangements for its expert to inspect the new code.  We would appreciate an update by Wednesday, June 19, so we can make the necessary travel arrangements.

Third, please let us know whether Groupon has run the search terms IBM proposed pursuant to paragraph 5(b) of the ESI order in my June 14, 2017 email and when IBM can expect the production of those documents from Google Drive/Vault and JIRA.

Finally, following up on Laurie's email below, please let us know by Wednesday of this week if Groupon intends to search for financial and marketing documents using search terms.  As you know, IBM has the option to propose additional search terms pursuant to paragraph 5(b) and expects that any documents that hit on IBM's proposed terms will be included in the production Groupon told the Court it would produce by the end of this month.

Regards,
Robert

---

**From:** Laurie Stempler
**Sent:** Friday, June 16, 2017 10:35 AM
**To:** Phillip Haack; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)

Phil,

Thanks for your email.  Given that the Court ordered Groupon to produce such documents by the end of the month and that IBM has the opportunity to review and add terms to your list under Paragraph 5(b), please disclose any such terms by early next week.

Laurie

---

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Thursday, June 15, 2017 9:10 PM
**To:** Laurie Stempler; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)

Laurie,

If Groupon uses search terms to locate additional financial and marketing documents for production, it will disclose those terms to IBM pursuant to Court's standard for discovery.

Best,
Phil

---

**From:** Laurie Stempler [mailto:LStempler@desmaraisllp.com]
**Sent:** Wednesday, June 14, 2017 6:08 PM
**To:** Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com) <jday@ashby-geddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)


Counsel,

I am following up on my email from last week.  Will you be using search terms to locate the documents that the Court ordered Groupon to produce?  If so, please identify them.

Regards,
Laurie

---

**From:** Laurie Stempler
**Sent:** Friday, June 9, 2017 12:29 PM
**To:** Groupon_IBM_Service@Fenwick.com (Groupon_IBM_Service@fenwick.com)
**Cc:** IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com)
**Subject:** IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)

Counsel,

I write regarding the Court's order at the June 5, 2017 hearing that Groupon produce the financial and marketing documents that IBM has requested by the end of this month.  Please identify any search terms that Groupon intends to use to locate such documents pursuant to Paragraph 5(b) of the Court's "Default Standard for Discovery, Including Discovery of Electronically Stored Information."

Regards,
Laurie

Laurie Stempler
Desmarais LLP
230 Park Avenue
New York, NY 10169
(212) 351-3423
lstempler@desmaraisllp.com


This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

-------------------------------------------
NOTICE:
This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom

the email is addressed.  However, mistakes sometimes happen in addressing emails.  If you believe that you are not an intended recipient, please stop reading immediately.  Do not copy, forward, or rely on the contents in any way.  Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments.  Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION,    ) | |
| ) | |
| Plaintiff,    ) | C.A. No. 16-122-LPS |
| ) | |
| v.    ) | **JURY TRIAL DEMANDED** |
| ) | |
| GROUPON, INC.    ) | |
| ) | |
| Defendant.    ) | |

## IBM'S SECOND NOTICE OF DEPOSITION TO GROUPON, INC.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff International Business Machines Corporation ("IBM"), by its counsel, will take the deposition upon oral examination of Defendant Groupon, Inc. ("Groupon"), regarding the subject matter set forth in the attached Schedule B, which shall be interpreted in accordance with the definitions set forth in the attached Schedule A.

The deposition will begin at 9:30 a.m. on July 12, 2017, at the office of Desmarais LLP, 230 Park Avenue, New York, New York 10169, or at such other time and place as may be agreed upon in writing by counsel for the parties. The examination will be taken before a Notary Public or other person authorized to administer oaths pursuant to Rule 28 of the Federal Rules of Civil Procedure, and will continue day to day until completed. The testimony at the deposition will be recorded by videographic, stenographic, audio, audiovisual, and/or real-time computer means.

In accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, Groupon shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf as to each of the topics set forth in the attached Schedule B. IBM requests that Groupon identify the individual(s) who will testify regarding each topic at least one week in advance of the deposition.

You are invited to attend.

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

John M. Desmarais
Jon T. Hohenthaner
Karim Oussayef
Laurie N. Stempler
Robert C. Harrits
Michael J. X. Matulewicz-Crowley
Brian D. Matty
DESMARAIS LLP
230 Park Avenue
New York, NY   10169
Tel:   (212) 351-3400

By:     /s/ Bindu A. Palapura
      David E. Moore (#3983)
      Bindu A. Palapura (#5370)
      Stephanie E. O'Byrne (#4446)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE   19801
      Tel:   (302) 984-6000
      dmoore@potteranderson.com
      bpalapura@potteranderson.com
      sobyrne@potteranderson.com

Dated:   June 20, 2017
5252481 / 43155

*Attorneys for Plaintiff International Business Machines Corporation*

2

## SCHEDULE A
## DEFINITIONS

1.      As used herein, "Patents-in-Suit" means United States Patent Nos. 5,796,967

("the '967 Patent"), 5,961,601 ("the '601 Patent), 7,072,849 ("the '849 Patent"), and 7,631,346

("the '346 Patent").

2.      As used herein, "This Action" means the action under the caption *International*

*Business Machines Corporation v. Groupon, Inc.*, Civil Action No. 16-cv-00122-LPS-CJB, in the

United States District Court for the District of Delaware.

3.      As used herein, "Defendant," "You," and "Your" means Groupon, Inc. and includes

any predecessors, divisions, departments, subsidiaries, parents, affiliates, present or former officers,

directors, employees, agents, counsel, representatives, and others authorized to act on behalf of

Groupon, Inc.

4.      As used herein, "Accused Instrumentality" means any product, application, service, or

method accused by IBM of infringing any claim of any of the Patents-in-Suit under any subsection of

35 U.S.C. § 271, including without limitation all products identified in IBM's Preliminary

Identification of Accused Products served October 7, 2016 (including any supplements or amendments

thereto), IBM's Preliminary Infringement Contentions served January 20, 2017 and March 24, 2017

(including any supplements or amendments thereto), and all products identified by Groupon in

response to IBM's First Set of Common Interrogatories to Groupon No. 1, served November 22, 2016.

5.      As used herein, "Prior Art" has the same meaning as used in 35 U.S.C. § 101 et seq.,

and includes any patent, printed publication, knowledge, use, sale or offer for sale, or other act or event

defined in 35 U.S.C. §§ 102 or 103, taken singly or in combination.

6.      As used herein, "include" and "including" shall be construed to mean "without

limitation," so as to acquire the broadest possible meaning.

7.    As used herein, "communication" means any transmission of information by one or more persons and/or between two or more persons by any means, including telephone conversations, letters, telegrams, teletypes, telexes, telecopies, electronic mail, other computer linkups, written memoranda, and face-to-face conversations.

8.    As used herein, "and" and "or" shall be construed conjunctively and disjunctively, so as to acquire the broadest possibly meaning.

9.    As used herein, "any" and "all" shall each be construed to mean "each and every," so as to acquire the broadest possibly meaning.

10.    The singular and masculine form of a noun or pronoun shall embrace, and shall be read and applied as, the plural or the feminine or neuter, as the particular context makes appropriate and to give the noun or pronoun the broadest possible meaning.

11.    As used herein, "document" has the same broad meaning as in Rule 34 of the Federal Rules of Civil Procedure.   The term "document" also encompasses tangible things.

12.    As used herein, "person" means any natural person or any business, legal, or governmental entity or association.

13.    As used herein, "concerning" or "relating to" means, without limitation, identifying, describing, discussing, concerning, assessing, stating, reflecting, constituting, containing, embodying, tending to support or refute, or referring directly or indirectly to the particular subject matter identified.

14.    As used herein, the terms "Complaint," "Answer," and "Affirmative Defense" shall mean the pleadings as originally filed or as amended or supplemented throughout the progression of the case.

15.    As used herein, the term "Source Code" means any software, markup language files, style sheet language files, template language files, programming language files, configuration files, source code, object code, or other electronic information for directing the operation of a computer,

mobile device, website, web browser, or for processing electronic data, including but not limited to computer instructions and data definitions expressed in a form suitable for input to an assembler, compiler, other translator, or other data processing module. This definition includes, but is not limited to, JavaScript, Java, Java Server Pages (JSP), Active Server Pages (ASP) (including .Net ASP), VBScript, C++, C, C#, Objective-C, Swift, Python, SQL or other query languages, PostScript, Jade, Apache Velocity Templates, HTML, CSS, XML, batch files, and shell scripts.

16.     As used herein, the term "URI" means uniform resource identifier.

17.     As used herein, the term "URL" means uniform resource locator.

18.     As used herein, the term "Source Code Computer" means the laptop You have made available for inspection in This Action in accordance with Paragraph 12 of the Protective Order in this litigation (D.I. 24).

19.     As used herein, "financial data" means any and all information related to Your finances, including but not limited to information concerning revenues, costs, and profits.

20.     As used herein, the term "Transaction Event" means any revenue-generating event, including but not limited to user queries, search hit clicks, use of Groupons, coupons, or offers, reservation bookings, completion of reservations (i.e., reservations that are not cancelled or no-show reservations), ad-related bookings, covers, advertisement impressions, advertisement clicks, or purchases (including but not limited to purchases of Groupons).

21.     As used herein, the term "data source" means database, wiki, file store, intranet site, data repository, network location, document management system, or other data collection used to access and/or maintain documents.

**SCHEDULE B**
**TOPICS**

1.      The way in which each of your Accused Instrumentalities:

      a.      generate URLs, URIs, or hyperlinks;

      b.      allow users to "Sign In"/"Sign Up" and create user accounts, including by using information or data about users from Google or Facebook;

      c.      deliver content, including HTML, web pages, JavaScript, images, graphics, stylesheets, and font files;

      d.      set parameters related to caching; and

      e.      use content delivery networks, including those provided by Akamai Technologies, Inc.

2.      The earliest date that the accused features and functionalities of the Accused Instrumentalities, identified in IBM's January 20, 2017 and March 24, 2017 Preliminary Infringement Contentions, were implemented, and in particular:

      a.      The date(s) on which You first implemented the ability to cache or store content, including but not limited to menus, images, videos, browser-supported source code (such as JavaScript), and advertisements at each of the Accused Instrumentalities;

      b.      The date(s) on which You first implemented the process of embedding information into hyperlinks, internet addresses, URLs, or URIs at each of the Accused Instrumentalities; and

   c.  The date(s) on which You first made available to users the option to
create an account, at each of the Accused Instrumentalities, using Facebook
and/or Google login credentials.

  3.  All changes to the accused features and functionalities of the Accused
Instrumentalities identified in IBM's January 20, 2017 and March 24, 2017 Preliminary
Infringement Contentions, beginning on the earliest date that such accused features and
functionalities were implemented (i.e., the dates identified in response to Topic 2 herein)
through the present and any planned future changes to such features and functionalities,
including but not limited to any changes made as a result of learning of the Patents-in-Suit.

  4.  The identity and functionality of the source code that affects how each of the
Accused Instrumentalities:

   a.  generate URLs, URIs, or hyperlinks;

   b.  allow users to "Sign In"/"Sign Up" and create user accounts,
including by using information or data about users from Google or
Facebook;

   c.  deliver content, including HTML, web pages, JavaScript, images,
graphics, stylesheets, and font files;

   d.  set parameters related to caching; and

   e.  use content delivery networks, including those provided by Akamai
Technologies, Inc.

  5.  The identity, functionality, and configuration of any third-party software,
hardware, or service, including by not limited to Akamai, Facebook, Google, Amazon Web
Services, Fastly, Apache, Optimizely, Varnish, and Edgecast, that affects how each of your
Accused Instrumentalities:

   a.  generate URLs, URIs, or hyperlinks;

   b.  allow users to "Sign In"/"Sign Up" and create user accounts,

including by using information or data about users from Google or

Facebook;

   c.  deliver content, including HTML, web pages, JavaScript, images,

graphics, stylesheets, and font files;

   d.  set parameters related to caching; and

   e.  use content delivery networks, including those provided by Akamai

Technologies, Inc.

  6.  Agreements between You and any third party related to how each of your

Accused Instrumentalities:

   a.  generate URLs, URIs, or hyperlinks;

   b.  allow users to "Sign In"/"Sign Up" and create user accounts,

including by using information or data about users from Google or

Facebook;

   c.  deliver content, including HTML, web pages, JavaScript, images,

graphics, stylesheets, and font files;

   d.  set parameters related to caching; and

   e.  use content delivery networks, including those provided by Akamai

Technologies, Inc.

  7.  The identity, functionality, topology, and configuration of any servers,

including third-party servers, that deliver content to users.

  8.  The number of user accounts at each of the Accused Instrumentalities, created

on a monthly basis, from 2010 and continuing through the present.

9.      On a monthly basis, the total number of Transaction Events made using the Accused Instrumentalities from 2010 to the present.

10.      On a monthly basis, the number of Transaction Events made through the Accused Instrumentalities by users whose accounts were linked to Facebook and/or Google login credentials from 2010 to the present.

11.      On a monthly basis, the number of Transaction Events made through the Accused Instrumentalities by users who were logged in using Facebook and/or Google login credentials from 2010 to the present.

12.      On a monthly basis, the total number of unique and non-unique (i.e., returning) visitors to the Accused Instrumentalities, the number of unique and non-unique visitors who disabled cookies, and the percentage of unique and non-unique visitors who disabled cookies from 2010 to the present.

13.      On a monthly basis, the number of unique and non-unique visitors who disabled caching in their web browser and the percentage of unique and non-unique visitors who disabled caching in their web browser.

14.      The categories of information stored in cookies regarding visitors to the Accused Instrumentalities.

15.      Any analyses of the impact of latency on users of the Accused Instrumentalities, such as measurements or assessments of the impact of latency on click-through rates, Transaction Event conversions, completed Transaction Events, and abandoned Transaction Events.

16.      Control panels, consoles, dashboards, or interfaces for any hosting, caching, or content delivery network service (e.g., Akamai, Fastly, Amazon s3, Amazon, Google, Edgecast), whether in-house or through a third-party for the Accused Instrumentalities.

17.     Any caching-related instructions or configuration settings in each version of the Accused Instrumentalities (such as Cache-Control, Edge-Control, Pragma, ETag, no-store, no-cache, must-revalidate, max-age, or downstream-ttl) that are set or modified by You or a third party.

18.     The identity of, and the location on the Source Code Computer of, any HTML template files that are used to generate content for each version of the Accused Instrumentalities.

19.     The URL(s), URI(s), or other portions of the Accused Instrumentalities generated by each HTML template file found on the Source Code Computer.

20.     The process by which any HTML template files on the Source Code Computer are used to generate content for the Accused Instrumentalities.

21.     The HTTP methods (e.g., GET, POST) used in the Accused Instrumentalities to interact with Your servers.

22.     The data formats (e.g., JSON, xml) used in the Accused Instrumentalities to interact with Your servers.

23.     The parameters and variables (including user IDs, session IDs, and deal IDs) located in hyperlinks in the Accused Instrumentalities.

24.     The communications (e.g., HTTP requests and responses, API calls) between Google or Facebook, Your servers, and the clients or browsers accessing the Accused Instrumentalities, when users "Sign In" to, "Log In" to, "Sign Up" for, or create their user account using Facebook or Google.

25.     Your communications and/or interactions with IBM concerning the Patents-in-Suit prior to March 2, 2016.

26.     Your communications with third parties concerning IBM, the Patents-in-Suit, and/or This Action.

27.     Any attempts you have made to avoid infringement or design around the Patents-in-Suit.

28.     The actual or anticipated cost of avoiding infringement or designing around the Patents-in-Suit.

29.     Any allegedly non-infringing alternatives to the inventions claimed in the Patents-in-Suit and the cost and acceptability of such allegedly non-infringing alternatives in the marketplace.

30.     Your knowledge of the Patents-in-Suit, including but not limited to: (i) how and when such awareness came about, (ii) any analysis performed by You or for You to determine whether You infringe the Patents-in-Suit, whether the Patents-in-Suit are valid or enforceable, or whether You should seek to obtain a license to the Patents-in-Suit, (iii) when any such analysis was performed and the persons involved, and (v) any documents that discuss, refer to, or comprise the same.

31.     Any opinion of counsel (whether oral or written) with respect to the Patents-in-Suit, and the documents that discuss, refer to, or comprise the same.

32.     The factual bases for all of Your defenses (including all affirmative defenses), counterclaims, or requests for relief.

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERNATIONAL BUSINESS MACHINES  )
CORPORATION,  )
  )
              Plaintiff,  )  C.A. No. 16-122-LPS
  )
      v.  )  **JURY TRIAL DEMANDED**
  )
GROUPON, INC.  )
  )
              Defendant.  )

## IBM'S THIRD NOTICE OF DEPOSITION TO GROUPON, INC.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and the Local Rules of this Court, Plaintiff International Business Machines Corporation ("IBM"), by its counsel, will take the deposition upon oral examination of Defendant Groupon, Inc. ("Groupon"), regarding the subject matter set forth in the attached Schedule B, which shall be interpreted in accordance with the definitions set forth in the attached Schedule A.

The deposition will begin at 9:30 a.m. on July 19, 2017, at the office of Desmarais LLP, 230 Park Avenue, New York, New York 10169, or at such other time and place as may be agreed upon in writing by counsel for the parties. The examination will be taken before a Notary Public or other person authorized to administer oaths pursuant to Rule 28 of the Federal Rules of Civil Procedure, and will continue day to day until completed. The testimony at the deposition will be recorded by videographic, stenographic, audio, audiovisual, and/or real-time computer means.

In accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, Groupon shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf as to each of the topics set forth in the attached Schedule B.  IBM requests

that Groupon identify the individual(s) who will testify regarding each topic at least one week in
advance of the deposition.

You are invited to attend.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

John M. Desmarais
Jon T. Hohenthaner
Karim Oussayef
Laurie N. Stempler
Robert C. Harrits
Michael J. X. Matulewicz-Crowley
Brian D. Matty
DESMARAIS LLP
230 Park Avenue
New York, NY  10169
Tel:  (212) 351-3400

By:  /s/ Bindu A. Palapura
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

Dated:  June 20, 2017
5252482 / 43155

*Attorneys for Plaintiff International Business
Machines Corporation*

2

## SCHEDULE A
## DEFINITIONS

1.      As used herein, "Patents-In-Suit" means United States Patent Nos. 5,796,967

("the '967 Patent"), 5,961,601 ("the '601 Patent), 7,072,849 ("the '849 Patent"), and 7,631,346

("the '346 Patent").

2.      As used herein, "This Action" means the action under the caption *International*

*Business Machines Corporation v. Groupon, Inc.*, Civil Action No. 16-cv-00122-LPS-CJB, in the

United States District Court for the District of Delaware.

3.      As used herein, "Defendant," "You," and "Your" means Groupon, Inc. and includes

any predecessors, divisions, departments, subsidiaries, parents, affiliates, present or former officers,

directors, employees, agents, counsel, representatives, and others authorized to act on behalf of

Groupon, Inc.

4.      As used herein, "Accused Instrumentality" means any product, application, service,

or method accused by IBM of infringing any claim of any of the Patents-In-Suit under any subsection

of 35 U.S.C. § 271, including without limitation all products identified in IBM's Preliminary

Identification of Accused Products served October 7, 2016 (including any supplements or

amendments thereto), IBM's Preliminary Infringement Contentions served January 20, 2017 and

March 24, 2017 (including any supplements or amendments thereto), and all products identified by

Groupon in response to IBM's First Set of Common Interrogatories to Groupon No. 1, served

November 22, 2016.

5.      As used herein, "Prior Art" has the same meaning as used in 35 U.S.C. § 101 et seq.,

and includes any patent, printed publication, knowledge, use, sale or offer for sale, or other act or

event defined in 35 U.S.C. §§ 102 or 103, taken singly or in combination.

6.      As used herein, "include" and "including" shall be construed to mean "without

limitation," so as to acquire the broadest possible meaning.

7.      As used herein, "communication" means any transmission of information by one or more persons and/or between two or more persons by any means, including telephone conversations, letters, telegrams, teletypes, telexes, telecopies, electronic mail, other computer linkups, written memoranda, and face-to-face conversations.

8.      As used herein, "and" and "or" shall be construed conjunctively and disjunctively, so as to acquire the broadest possibly meaning.

9.      As used herein, "any" and "all" shall each be construed to mean "each and every," so as to acquire the broadest possibly meaning.

10.      The singular and masculine form of a noun or pronoun shall embrace, and shall be read and applied as, the plural or the feminine or neuter, as the particular context makes appropriate and to give the noun or pronoun the broadest possible meaning.

11.      As used herein, "document" has the same broad meaning as in Rule 34 of the Federal Rules of Civil Procedure.   The term "document" also encompasses tangible things.

12.      As used herein, "person" means any natural person or any business, legal, or governmental entity or association.

13.      As used herein, "concerning" or "relating to" means, without limitation, identifying, describing, discussing, concerning, assessing, stating, reflecting, constituting, containing, embodying, tending to support or refute, or referring directly or indirectly to the particular subject matter identified.

14.      As used herein, the terms "Complaint," "Answer," and "Affirmative Defense" shall mean the pleadings as originally filed or as amended or supplemented throughout the progression of the case.

15.      As used herein, the term "Source Code" means any software, markup language files, style sheet language files, template language files, programming language files, configuration files,

4

source code, object code, or other electronic information for directing the operation of a computer, mobile device, website, web browser, or for processing electronic data, including but not limited to computer instructions and data definitions expressed in a form suitable for input to an assembler, compiler, other translator, or other data processing module. This definition includes, but is not limited to, JavaScript, Java, Java Server Pages (JSP), Active Server Pages (ASP) (including .Net ASP), VBScript, C++, C, C#, Objective-C, Swift, Python, SQL or other query languages, PostScript, Jade, Apache Velocity Templates, HTML, CSS, XML, batch files, and shell scripts.

16. As used herein, the term "URI" means uniform resource identifier.

17. As used herein, the term "URL" means uniform resource locator.

18. As used herein, the term "Source Code Computer" means the laptop You have made available for inspection in This Action in accordance with Paragraph 12 of the Protective Order in this litigation (D.I. 24).

19. As used herein, "financial data" means any and all information related to Your finances, including but not limited to information concerning revenues, costs, and profits.

20. As used herein, the term "Transaction Event" means any revenue-generating event, including but not limited to user queries, search hit clicks, use of Groupons, coupons, or offers, reservation bookings, completion of reservations (i.e., reservations that are not cancelled or no-show reservations), ad-related bookings, covers, advertisement impressions, advertisement clicks, or purchases (including but not limited to purchases of Groupons).

21. As used herein, the term "data source" means database, wiki, file store, intranet site, data repository, network location, document management system, or other data collection used to access and/or maintain documents.

## SCHEDULE B
## TOPICS

1.      All revenues (including but not limited to advertising revenue), costs, and

sources (including geographic sources) thereof derived by You from, for, or concerning the

Accused Instrumentalities, from March 2010 to the present.

2.      The identity, content, and interpretation of the annual profit and loss

statements for Your business unit(s) responsible for each of the Accused Instrumentalities.

3.      Your pricing policies, strategies, and practices concerning the Accused

Instrumentalities.

4.      Business plans, marketing strategies, go-to-market plans, market projections,

and competitive analyses concerning the Accused Instrumentalities.

5.      Any evaluation, study, analysis, or investigation about how users interact with

the Accused Instrumentalities, including:

> a.      the extent to which users interact with the Accused Instrumentalities,
>
> including total visitors, unique visitors, non-unique (i.e., returning) visitors,
>
> pages per session, session duration, and conversions;
>
> b.      how users interact with the Accused Instrumentalities to search for
>
> services and/or navigate through options to make a purchase and/or
>
> reservation;
>
> c.      how users interact with the Accused Instrumentalities to create, "Sign
>
> In," "Sign Up," or "Log In" to user accounts using Facebook, Google, or any
>
> other third-party platform; and
>
> d.      how users interact with the Accused Instrumentalities to store, cache,
>
> or interact with any advertisements or menus on the Accused
>
> Instrumentalities.

6.    The bases for customer demand or preference for each Accused Instrumentality, including users' preferences for interacting with the Accused Instrumentalities to:

      a.    search for services and/or navigate through options to make a purchase and/or reservation where user identification, transaction identification, or other state information is maintained;

      b.    create, "Sign In," "Sign Up," or "Log In" to user accounts using Facebook, Google, or any other third-party platform; and

      c.    store, cache, or interact with any advertisements, images, or menus on the Accused Instrumentalities.

7.    Usage data or metrics for the Accused Instrumentalities, such as the extent to which users interact with the Accused Instrumentalities to:

      a.    search for services and/or navigate through options to make a purchase and/or reservation where user identification, transaction identification, deal identification, session identification, or other state information is maintained;

      b.    create, "Sign In," "Sign Up," or "Log In" to user accounts using Facebook, Google, or any other third-party platform; and

      c.    store, cache, or interact with any advertisements, images, or menus on the Accused Instrumentalities.

8.    Any policy, procedure, practice, or program related to licensing (in-bound or out-bound) or use of intellectual property by Groupon, including both written and unwritten policies, procedures, practices, or programs, further including but not limited to patent licensing efforts and Groupon's criteria for taking or offering a license to a patent.

9.     The identity, content, interpretation, negotiation, and decision to enter into: (a) any patent license that you have identified or produced in This Action (b) any patent license that pertains to any aspect of any of the Accused Instrumentalities, or (c) any patent license pools that you have entered or in which you have invested.

10.     From 2010 to the present, on a monthly basis, for each of the Accused Instrumentalities:

     a.     The number of queries for deals and/or "Groupons" performed by users in the United States;

     b.     The number and nature (i.e., description) of Transaction Events that generated the revenue produced in This Action and the amount of revenue generated by such Transaction Events; and

     c.     The number and nature (i.e., description) of advertising-related Transaction Events, such as, for example, purchase of deals and/or Groupons as a result of clicking on advertisements (including but not limited to third-party advertisements) on the Accused Instrumentalities and the revenues resulting from such advertisements.

# EXHIBIT 7

**Alexandra Kochian**

| | |
|---|---|
| **From:** | Karim Oussayef |
| **Sent:** | Monday, July 10, 2017 9:22 AM |
| **To:** | Sapna Mehta; Phillip Haack; Groupon_IBM_Service@Fenwick.com |
| **Cc:** | IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com); OByrne, Stephanie E. (sobyrne@potteranderson.com) |
| **Subject:** | RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.) |

Counsel,

Please let us know when you are available for a meet and confer today or tomorrow to discuss these issues.

Best,
Karim

---

**From:** Karim Oussayef
**Sent:** Thursday, July 6, 2017 4:09 PM
**To:** Sapna Mehta; Phillip Haack; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com); OByrne, Stephanie E. (sobyrne@potteranderson.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)

Counsel,

First, we are still waiting for a response to Robert's June 29, 2017 letter.  Please address the issues from that letter by the end of the day tomorrow.

Second, please confirm deposition dates and provide witness names for IBM's Second and Third Deposition Notices to Groupon.  Those depositions are noticed for the next two weeks and we need to confirm travel plans.

Third, please produce native copies of Groupon's Weekly Business Reviews (e.g. GROUP028444, GROUP093569) and "NA Email and CRM" documents (e.g. GROUP028545, GROUP028548).  The versions of those documents that you have produced contain illegible text (e.g. middle of GROUPON093569) and/or text hidden in collapsible elements (e.g. bottom of GROUPON028550).

Thanks,
Karim

---

**From:** Robert Harrits
**Sent:** Thursday, June 29, 2017 11:20 AM
**To:** Sapna Mehta; Phillip Haack; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; dmoore@potteranderson.com; bpalapura@potteranderson.com; Day, John G. (jday@ashby-geddes.com); OByrne, Stephanie E. (sobyrne@potteranderson.com)
**Subject:** IBM v. Groupon, C.A. No. 16-cv-00122-LPS-CJB (D. Del.)

Counsel,

Please see attached correspondence.

Regards,
Robert

Robert C. Harrits | Desmarais LLP
230 Park Avenue | New York, NY 10169
Tel: (212) 808-2946 | Fax: (212) 351-3401
Email: rharrits@desmaraisllp.com

# EXHIBIT 8

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 10

## Michael Matulewicz-Crowley

| | |
|---|---|
| **From:** | Laurie Stempler |
| **Sent:** | Wednesday, July 26, 2017 11:48 AM |
| **To:** | smehta@fenwick.com; phaack@fenwick.com; Groupon_IBM_Service@Fenwick.com (Groupon_IBM_Service@fenwick.com) |
| **Cc:** | IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) |
| **Subject:** | IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.) |
| **Attachments:** | GROUP0002777-2792.pdf |

Counsel,

I write regarding several outstanding discovery-related disputes.

First, we have not yet received Groupon's supplemental interrogatory responses, despite your previous commitment to serve them last Friday, nor have we received a response to my reminder email from this past Monday.  Please either provide the supplemental responses or provide your availability to meet and confer tomorrow after 3 PM ET.

We have also not received confirmation that Groupon will produce the native versions of the Weekly Business Reviews and NA Email and CRM documents.  Although our respective support teams have worked together to try to sort out the technical issues, we are still unable to view the documents as produced.  As I mentioned on Monday (after failed attempts to sort out the technical issue), the most efficient way forward would be for Groupon to produce the native files with a DAT overlay.  Please confirm that you will do so or confirm your availability to meet and confer.

Thank you for serving your amended initial disclosures.  Please confirm that you have completed your collection and production of documents from the Groupon employees that you identified in those disclosures.

Please provide an update on your efforts to identify 30(b)(6) witnesses and their availability for deposition, along with the availability of the 30(b)(1) witnesses that we noticed.

Documents in Groupon's production reference additional relevant documentation that appears to not have been produced.  For example, the attached Operational Readiness Review document states that the users-service is documented at a github repository.  (See the highlighted link at the top of p.3 of the attached document.)  Please confirm that you will produce this documentation – and all other relevant github documentation, including that requested by Robert Harrits in his July 21st email – by the end of next week.

Finally, please provide an update on when we can expect production of all relevant documents from Splunk, Grapher, and Basecamp, as requested in Robert's email.

We are available to meet and confer on the above issues tomorrow any time after 3 PM ET.  Please confirm your availability and we will circulate a dial-in number.

Laurie


Laurie Stempler
Desmarais LLP
230 Park Avenue

1

New York, NY  10169
(212) 351-3423
lstempler@desmaraisllp.com

# EXHIBIT 11

## Michael Matulewicz-Crowley

| | |
|---|---|
| **From:** | Karim Oussayef |
| **Sent:** | Thursday, July 27, 2017 1:59 PM |
| **To:** | Laurie Stempler; smehta@fenwick.com; phaack@fenwick.com; Groupon_IBM_Service@Fenwick.com (Groupon_IBM_Service@fenwick.com) |
| **Cc:** | IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) |
| **Subject:** | RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.) |

Counsel,

We have not gotten a response to our last three emails.  Could you please let us know when you are available to meet and confer today?  There are several outstanding discovery issues and we need to understand whether Groupon has made any progress in resolving them.

Best,
Karim

**Karim Z. Oussayef**

**DESMARAIS LLP**
230 Park Avenue
New York, NY  10169
T: (212) 351-3427 | F: (212) 351-3401

**From:** Laurie Stempler
**Sent:** Wednesday, July 26, 2017 11:48 AM
**To:** smehta@fenwick.com; phaack@fenwick.com; Groupon_IBM_Service@Fenwick.com (Groupon_IBM_Service@fenwick.com)
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Counsel,

I write regarding several outstanding discovery-related disputes.

First, we have not yet received Groupon's supplemental interrogatory responses, despite your previous commitment to serve them last Friday, nor have we received a response to my reminder email from this past Monday.  Please either provide the supplemental responses or provide your availability to meet and confer tomorrow after 3 PM ET.

We have also not received confirmation that Groupon will produce the native versions of the Weekly Business Reviews and NA Email and CRM documents.  Although our respective support teams have worked together to try to sort out the technical issues, we are still unable to view the documents as produced.  As I mentioned on Monday (after failed attempts to sort out the technical issue), the most efficient way forward would be for Groupon to produce the native files with a DAT overlay.  Please confirm that you will do so or confirm your availability to meet and confer.

Thank you for serving your amended initial disclosures.  Please confirm that you have completed your collection and production of documents from the Groupon employees that you identified in those disclosures.

Please provide an update on your efforts to identify 30(b)(6) witnesses and their availability for deposition, along with the availability of the 30(b)(1) witnesses that we noticed.

Documents in Groupon's production reference additional relevant documentation that appears to not have been produced.  For example, the attached Operational Readiness Review document states that the users-service is documented at a github repository.  (See the highlighted link at the top of p.3 of the attached document.)  Please confirm that you will produce this documentation – and all other relevant github documentation, including that requested by Robert Harrits in his July 21st email – by the end of next week.

Finally, please provide an update on when we can expect production of all relevant documents from Splunk, Grapher, and Basecamp, as requested in Robert's email.

We are available to meet and confer on the above issues tomorrow any time after 3 PM ET.  Please confirm your availability and we will circulate a dial-in number.

Laurie

Laurie Stempler
Desmarais LLP
230 Park Avenue
New York, NY  10169
(212) 351-3423
lstempler@desmaraisllp.com

# EXHIBIT 12

**Michael Matulewicz-Crowley**

| | |
|---|---|
| **From:** | Phillip Haack <phaack@fenwick.com> |
| **Sent:** | Thursday, July 27, 2017 4:40 PM |
| **To:** | Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com |
| **Cc:** | IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) |
| **Subject:** | RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.) |

Karim,

Groupon made a production of the requested native files yesterday.

We will provide dates for Groupon's 30(b)(6) witnesses shortly, and can confirm that we will be putting up at least Phil Dunham and Damien Schmitz the week of August 7 in Chicago.   With respect to the other 30(b)(1) notices, we are tracking down witness availability.  I will note that Kyle Oppenheim has left Groupon.

We will investigate the documents mentioned in Laurie's email.  Based on the URL in the document she forwarded, we expect that the referenced document will be in the forthcoming production of GitHub wiki documents collected along with the source code.

With respect to Splunk, Grapher, and Basecamp, we are not yet aware of any non-redundant documents in those repositories.

We are available to confer after 2pm Pacific/5pm Eastern today, or tomorrow before 1:30 Eastern or after 3:30 pm Eastern.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, July 27, 2017 10:59 AM
**To:** Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Phillip Haack <phaack@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Counsel,

We have not gotten a response to our last three emails.  Could you please let us know when you are available to meet and confer today?  There are several outstanding discovery issues and we need to understand whether Groupon has made any progress in resolving them.

Best,

Karim

**Karim Z. Oussayef**

**DESMARAIS LLP**
230 Park Avenue
New York, NY  10169
T: (212) 351-3427 | F: (212) 351-3401

---

**From:** Laurie Stempler
**Sent:** Wednesday, July 26, 2017 11:48 AM
**To:** smehta@fenwick.com; phaack@fenwick.com; Groupon_IBM_Service@Fenwick.com
(Groupon_IBM_Service@fenwick.com)
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Counsel,

I write regarding several outstanding discovery-related disputes.

First, we have not yet received Groupon's supplemental interrogatory responses, despite your previous commitment to serve them last Friday, nor have we received a response to my reminder email from this past Monday.  Please either provide the supplemental responses or provide your availability to meet and confer tomorrow after 3 PM ET.

We have also not received confirmation that Groupon will produce the native versions of the Weekly Business Reviews and NA Email and CRM documents.  Although our respective support teams have worked together to try to sort out the technical issues, we are still unable to view the documents as produced.  As I mentioned on Monday (after failed attempts to sort out the technical issue), the most efficient way forward would be for Groupon to produce the native files with a DAT overlay.  Please confirm that you will do so or confirm your availability to meet and confer.

Thank you for serving your amended initial disclosures.  Please confirm that you have completed your collection and production of documents from the Groupon employees that you identified in those disclosures.

Please provide an update on your efforts to identify 30(b)(6) witnesses and their availability for deposition, along with the availability of the 30(b)(1) witnesses that we noticed.

Documents in Groupon's production reference additional relevant documentation that appears to not have been produced.  For example, the attached Operational Readiness Review document states that the users-service is documented at a github repository.  (See the highlighted link at the top of p.3 of the attached document.)  Please confirm that you will produce this documentation – and all other relevant github documentation, including that requested by Robert Harrits in his July 21st email – by the end of next week.

Finally, please provide an update on when we can expect production of all relevant documents from Splunk, Grapher, and Basecamp, as requested in Robert's email.

We are available to meet and confer on the above issues tomorrow any time after 3 PM ET.  Please confirm your availability and we will circulate a dial-in number.

Laurie

2

Laurie Stempler
Desmarais LLP
230 Park Avenue
New York, NY  10169
(212) 351-3423
lstempler@desmaraisllp.com

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

-------------------------------------------
NOTICE:
This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed.  However, mistakes sometimes happen in addressing emails.  If you believe that you are not an intended recipient, please stop reading immediately.  Do not copy, forward, or rely on the contents in any way.  Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments.  Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.

"

# GZJ KDKV'35''

## Michael Matulewicz-Crowley

| | |
|---|---|
| **From:** | Jessica Benzler <jbenzler@fenwick.com> |
| **Sent:** | Wednesday, August 2, 2017 8:13 PM |
| **To:** | Karim Oussayef; Laurie Stempler; IBM Groupon Service |
| **Cc:** | bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Phillip Haack; Sapna Mehta; Groupon_IBM_Service@Fenwick.com |
| **Subject:** | RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.) |
| **Attachments:** | 2017 08 02 Responses and Objections to IBM's Second Notice of Deposition of Groupon.pdf; 2017 08 02 Responses and Objections to IBM's Third Notice of Deposition of Groupon.pdf |

Your attachments have been security checked by Mimecast Attachment Protection. Files where no threat or malware was detected are attached.

---

Counsel,

Attached please find Groupon's Responses and Objections to IBM's Second and Third Notices of Deposition.  Pursuant to Rule 30(b)(6), Groupon designates the following witnesses on the topics listed:

Damien Schmitz (Deposition on August 9, 2017):
- Second Notice Topics: 25, 26, 30, 31
- Third Notice Topics: 1, 2, 8, 9,

Phillip Dunham (Deposition on August 10, 2017):
- Second Notice Topics: 1-7, 14-24, 27-29

Both of these depositions will take place at Marshall, Gerstein & Borun LLP:

       233 South Wacker Drive
       6300 Willis Tower
       Chicago, IL 60606-6357

Regards,
Jessica



**JESSICA BENZLER**
Fenwick & West LLP
Associate, Litigation Group
☎ (650) 335-7279
🖨 (415) 281-1350
✉ jbenzler@fenwick.com

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Wednesday, August 02, 2017 10:52 AM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com

**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Phil,

We accept those dates.  Could you please confirm the topics for which each witness is designated?

Thanks,
Karim

---

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Wednesday, August 2, 2017 12:49 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

Damien Schmitz for is available on the 9th and Phil Dunham on the 10th.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Wednesday, August 02, 2017 6:38 AM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Phil,

We have not heard back from you.  Once again, we request that you confirm the availability of Groupon's witnesses so that our team can prepare and make travel plans.  Please let us know today.

Regards,
Karim

---

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Monday, July 31, 2017 8:35 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com

**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

Groupon agrees to produce relevant responsive documents in the witnesses' possession to the extent they have not yet been produced.   I can confirm we are putting up Phil Dunham and Damien Schmitz next week in Chicago and expect to have final confirmation of dates tomorrow.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Monday, July 31, 2017 7:02 AM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Phil,

Could you please confirm the availability of Groupon's witnesses to sit for deposition next week so that our team can prepare and make travel plans?

Also, could you please answer my question below?  We want to understand whether we have a disagreement about Groupon's obligations to search for and produce documents from relevant witnesses.

Thanks,
Karim

---

**From:** Karim Oussayef
**Sent:** Thursday, July 27, 2017 9:45 PM
**To:** Phillip Haack; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

You state: "I represented that we had or would check with witnesses about the location of relevant responsive non-duplicative documents and, to the extent those documents had not been collected, collect and produce them.  I explicitly rejected IBM's suggested that Groupon is obligated to collect personal or non-central documents for every witness that IBM has noticed a deposition for unless those documents would reveal unique information material to the case."  Could you please clarify what you are agreeing to do and what you are not agreeing to do?  Are you agreeing to produce documents that your witnesses identify but not if they are "personal" or "non-central"?

We are in agreement about the deadlines for final contentions.  We will draft a proposed stipulation.

I will check with my team about the native documents and get back to you.

Best,
Karim

---

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Thursday, July 27, 2017 9:20 PM
**To:** Karim Oussayef <KOussayef@desmaraisllp.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

I wanted to clarify our position on additional documents from the people IBM has noticed.  I represented that we had or would check with witnesses about the location of relevant responsive non-duplicative documents and, to the extent those documents had not been collected, collect and produce them.  I explicitly rejected IBM's suggested that Groupon is obligated to collect personal or non-central documents for every witness that IBM has noticed a deposition for unless those documents would reveal unique information material to the case.  Groupon maintains that such a collection is not proportional to the needs of the case.

With respect to IBM's request to move out the date for its final infringement contentions, Groupon will agree if it has an equal extension of time for its invalidity contentions.  Your current proposal would move IBM's deadline out four weeks and Groupon's three.

Finally, the additional documents you mentioned in your email were produced in redacted form due to privilege issues, so we cannot produce the native files.  The original TIFF production documents appear to us to be fully legible.  If your team is having trouble viewing them, we are willing to explore other formats, such as the color TIFF or PDF documents proposed previously.  Please let me know if you'd like to discuss.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, July 27, 2017 4:05 PM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

Thanks for conferring with us about outstanding discovery issues.  We agreed on the following:

1. Groupon will offer witnesses to testify about IBM's technical and financial 30(b)(6) topics during the week of August 7th.

2. Groupon will offer a witness to testify about IBM's marketing 30(b)(6) topics during the week of August 14th.

3. We tentatively scheduled Damien Shmitz to testify on financial topics on August 10 and Phil Dunham to testify on technical topics on August 11, both in Chicago.  Groupon expects to offer the marketing witness in Seattle.

4. Groupon will diligently search for and produce documents from each witness before the date of their deposition, to the extent it has not already.

5. Groupon will diligently search for and produce relevant non-duplicative documents from Splunk, Grapher, and Basecamp, before the week of August 7.

6. Groupon is diligently working to produce wiki documents from GitHub and will endeavor to produce them before the week of August 7.

7. Groupon will serve a supplemental response to Interrogatory No. 7 today and expects to serve a supplemental response to Interrogatory No. 10 tomorrow.

8. The parties will confer about the necessity of taking the depositions of certain witness, including Soo, Sighn, and Oppenheim.

9. In light of the depositions scheduled in August, you will check with your client about agreeing to extend the deadline for IBM's Final Infringement Contention until August 25.  We are amendable to extending the deadline for Groupon's Final Invalidity Contentions until September 18 as part of that agreement.

Finally, the following documents did not make it into Groupon's production of native documents.  Please produce them in native form:

GROUP028695
GROUP028702
GROUP029648

Please let me know if you disagree with any aspects of my summary.

Thanks,
Karim

**Karim Z. Oussayef**

**DESMARAIS LLP**
230 Park Avenue
New York, NY  10169
T: (212) 351-3427 | F: (212) 351-3401

**From:** Karim Oussayef
**Sent:** Thursday, July 27, 2017 4:52 PM
**To:** Phillip Haack; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

Thanks for your response.  Let's confer at 5:30 ET.

Conference number: (866) 835-1224
Conference code: 511 566 5982

Best,
Karim

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Thursday, July 27, 2017 4:40 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

Groupon made a production of the requested native files yesterday.

We will provide dates for Groupon's 30(b)(6) witnesses shortly, and can confirm that we will be putting up at least Phil
Dunham and Damien Schmitz the week of August 7 in Chicago.   With respect to the other 30(b)(1) notices, we are
tracking down witness availability.  I will note that Kyle Oppenheim has left Groupon.

We will investigate the documents mentioned in Laurie's email.  Based on the URL in the document she forwarded, we
expect that the referenced document will be in the forthcoming production of GitHub wiki documents collected along
with the source code.

With respect to Splunk, Grapher, and Basecamp, we are not yet aware of any non-redundant documents in those
repositories.

We are available to confer after 2pm Pacific/5pm Eastern today, or tomorrow before 1:30 Eastern or after 3:30 pm
Eastern.

Best,
Phil

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, July 27, 2017 10:59 AM
**To:** Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Phillip Haack
<phaack@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com;

6

dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
<JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Counsel,

We have not gotten a response to our last three emails.  Could you please let us know when you are available to meet and confer today?  There are several outstanding discovery issues and we need to understand whether Groupon has made any progress in resolving them.

Best,
Karim


**Karim Z. Oussayef**

**Desmarais LLP**
230 Park Avenue
New York, NY  10169
T: (212) 351-3427 | F: (212) 351-3401

---

**From:** Laurie Stempler
**Sent:** Wednesday, July 26, 2017 11:48 AM
**To:** smehta@fenwick.com; phaack@fenwick.com; Groupon_IBM_Service@Fenwick.com
(Groupon_IBM_Service@fenwick.com)
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Counsel,

I write regarding several outstanding discovery-related disputes.

First, we have not yet received Groupon's supplemental interrogatory responses, despite your previous commitment to serve them last Friday, nor have we received a response to my reminder email from this past Monday.  Please either provide the supplemental responses or provide your availability to meet and confer tomorrow after 3 PM ET.

We have also not received confirmation that Groupon will produce the native versions of the Weekly Business Reviews and NA Email and CRM documents.  Although our respective support teams have worked together to try to sort out the technical issues, we are still unable to view the documents as produced.  As I mentioned on Monday (after failed attempts to sort out the technical issue), the most efficient way forward would be for Groupon to produce the native files with a DAT overlay.  Please confirm that you will do so or confirm your availability to meet and confer.

Thank you for serving your amended initial disclosures.  Please confirm that you have completed your collection and production of documents from the Groupon employees that you identified in those disclosures.

Please provide an update on your efforts to identify 30(b)(6) witnesses and their availability for deposition, along with the availability of the 30(b)(1) witnesses that we noticed.

Documents in Groupon's production reference additional relevant documentation that appears to not have been produced.  For example, the attached Operational Readiness Review document states that the users-service is

documented at a github repository.  (See the highlighted link at the top of p.3 of the attached document.)  Please confirm that you will produce this documentation – and all other relevant github documentation, including that requested by Robert Harrits in his July 21st email – by the end of next week.

Finally, please provide an update on when we can expect production of all relevant documents from Splunk, Grapher, and Basecamp, as requested in Robert's email.

We are available to meet and confer on the above issues tomorrow any time after 3 PM ET.  Please confirm your availability and we will circulate a dial-in number.

Laurie


Laurie Stempler
Desmarais LLP
230 Park Avenue
New York, NY  10169
(212) 351-3423
lstempler@desmaraisllp.com


This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

-----------------------------------------
NOTICE:
This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed.  However, mistakes sometimes happen in addressing emails.  If you believe that you are not an intended recipient, please stop reading immediately.  Do not copy, forward, or rely on the contents in any way.  Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments.  Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.


This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

This email may contain confidential and privileged material for the use of the intended recipient. Any review,

use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

# EXHIBIT 14

## Michael Matulewicz-Crowley

**From:** Robert Harrits
**Sent:** Saturday, August 5, 2017 1:32 PM
**To:** Phillip Haack; Karim Oussayef; Jessica Benzler; Laurie Stempler; IBM Groupon Service
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

I write to summarize yesterday's meet and confer.  Please let me know if you disagree with anything below:

Regarding IBM's Second 30(b)(6) Notice
- Topic 6 – Groupon agreed to provide a witness to testify on all agreements except those that you allege to be privileged, and on the existence of any agreements that you allege to be privileged.
- Topic 7 – Groupon agreed to provide a witness to testify on the functionality and configuration of servers that deliver content to Groupon's users.
- Topic 9 – Groupon agreed to provide a witness to testify on the total number of revenue-generating transaction events made using the Accused Instrumentalities.
- Topic 10 – Groupon agreed to provide a witness  to testify on the total number of revenue-generating transaction events made by users whose accounts were linked to Facebook and/or Google login credentials.
- Topic 11 – Groupon agreed to provide a witness to testify generally as to what transaction events Groupon tracks and the number of transaction events for a particular year.  Groupon refused to provide a witness to testify about the specific raw data on a month-by-month basis.
- Topic 30 – Groupon agreed to provide a witness to testify about all non-privileged information related to this topic.
- Topic 32 – Groupon refused to provide a witness on Topic 32 at this time.

Regarding IBM's Third 30(b)(6) Notice

- Topic 3 – Groupon agreed that its "marketing" witness would be prepared to testify on this topic.
- Topic 7 - Groupon agreed to provide a witness to testify generally on what usage data Groupon tracks and the number of transaction events for a particular year.  Groupon refused to provide a witness to testify about the specific raw data on a month by month basis.
- Topic 9 – Groupon agreed to provide a witness to testify on "any patent license that Groupon has identified or produced in this matter, any patent license which relates to technology claimed by the patents-in-suit, or any patent license which relates to the allegedly infringing aspects of the accused Groupon instrumentalities."  Groupon refused to provide a witness to testify on all patent licenses that cover Groupon's website.
- Topic 10 – Groupon agreed to provide a witness to testify on revenue-generating transaction events, Groupon's mobile applications, and its website.

Please let us know as soon as possible when Groupon will make a witness available on the topics that have not yet been designated.

Regards,
Robert

**From:** Robert Harrits
**Sent:** Friday, August 4, 2017 1:40 PM
**To:** Phillip Haack; Karim Oussayef; Jessica Benzler; Laurie Stempler; IBM Groupon Service
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

We can meet at 2 pm pacific/ 5 pm eastern.  We can use the following dial in:
Dial-in: 866.835.1224
Conference Code 4682626058

Thanks,
Robert

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Friday, August 4, 2017 12:59 PM
**To:** Karim Oussayef; Jessica Benzler; Laurie Stempler; IBM Groupon Service
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

We are available at 12:15pm Pacific/3:15pm Eastern today, or after 2pm Pacific.  Groupon will be designating Mr. Schmitz on topics 4, 5, 6 and 9 and Mr. Dunham on topic 2 from IBM's first notice.  The remaining topic, 6, regarding customer feedback, will be handled by Groupon's marketing witness.

Best,
Phil

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, August 03, 2017 4:45 PM
**To:** Jessica Benzler <jbenzler@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; IBM Groupon Service <IBMGrouponService@desmaraisllp.com>
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>; Phillip Haack <phaack@fenwick.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Counsel,

We accept your invitation to meet and confer.  Please let us know when you are available tomorrow to discuss Groupon's responses to at least topics 6, 7, 9, 10, 11, 30, and 32 from IBM's Second Notice and topics 3, 7, 9, and 10 from IBM's Third Notice.

Please let us know what topics Damien Schmitz and Phillip Dunham will address from IBM's First Deposition Notice to Groupon.  You previously agreed that your "substantive" witnesses would testify about the topics Ms. Baldwin was unable to address at her deposition (nos. 2, 4, 5, 6, 7, and 9).

Thanks,
Karim

---

**From:** Jessica Benzler [mailto:jbenzler@fenwick.com]
**Sent:** Wednesday, August 2, 2017 8:13 PM
**To:** Karim Oussayef; Laurie Stempler; IBM Groupon Service
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Phillip Haack; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Mimecast Attachment Protection has created safe copies of your attachments.

---

Counsel,

Attached please find Groupon's Responses and Objections to IBM's Second and Third Notices of Deposition.  Pursuant to Rule 30(b)(6), Groupon designates the following witnesses on the topics listed:

Damien Schmitz (Deposition on August 9, 2017):
- Second Notice Topics: 25, 26, 30, 31
- Third Notice Topics: 1, 2, 8, 9,

Phillip Dunham (Deposition on August 10, 2017):
- Second Notice Topics: 1-7, 14-24, 27-29

Both of these depositions will take place at Marshall, Gerstein & Borun LLP:

    233 South Wacker Drive
    6300 Willis Tower
    Chicago, IL 60606-6357

Regards,
Jessica



**JESSICA BENZLER**
Fenwick & West LLP
Associate, Litigation Group
☎ (650) 335-7279
🖷 (415) 281-1350
✉ jbenzler@fenwick.com

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Wednesday, August 02, 2017 10:52 AM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com;

dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
<JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

We accept those dates.  Could you please confirm the topics for which each witness is designated?

Thanks,
Karim

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Wednesday, August 2, 2017 12:49 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

Damien Schmitz for is available on the 9th and Phil Dunham on the 10th.

Best,
Phil

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Wednesday, August 02, 2017 6:38 AM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta
<smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com;
dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
<JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

We have not heard back from you.  Once again, we request that you confirm the availability of Groupon's
witnesses so that our team can prepare and make travel plans.  Please let us know today.

Regards,
Karim

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Monday, July 31, 2017 8:35 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;

4

sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

Groupon agrees to produce relevant responsive documents in the witnesses' possession to the extent they have not yet been produced.   I can confirm we are putting up Phil Dunham and Damien Schmitz next week in Chicago and expect to have final confirmation of dates tomorrow.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Monday, July 31, 2017 7:02 AM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

Could you please confirm the availability of Groupon's witnesses to sit for deposition next week so that our team can prepare and make travel plans?

Also, could you please answer my question below?  We want to understand whether we have a disagreement about Groupon's obligations to search for and produce documents from relevant witnesses.

Thanks,
Karim

---

**From:** Karim Oussayef
**Sent:** Thursday, July 27, 2017 9:45 PM
**To:** Phillip Haack; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

You state: "I represented that we had or would check with witnesses about the location of relevant responsive non-duplicative documents and, to the extent those documents had not been collected, collect and produce them.  I explicitly rejected IBM's suggested that Groupon is obligated to collect personal or non-central documents for every witness that IBM has noticed a deposition for unless those documents would reveal unique information material to the case."  Could you please clarify what you are agreeing to do and what you are not agreeing to do?  Are you agreeing to produce documents that your witnesses identify but not if they are "personal" or "non-central"?

We are in agreement about the deadlines for final contentions.  We will draft a proposed stipulation.

I will check with my team about the native documents and get back to you.

Best,
Karim

---

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Thursday, July 27, 2017 9:20 PM
**To:** Karim Oussayef <KOussayef@desmaraisllp.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

I wanted to clarify our position on additional documents from the people IBM has noticed.  I represented that we had or would check with witnesses about the location of relevant responsive non-duplicative documents and, to the extent those documents had not been collected, collect and produce them.  I explicitly rejected IBM's suggested that Groupon is obligated to collect personal or non-central documents for every witness that IBM has noticed a deposition for unless those documents would reveal unique information material to the case.  Groupon maintains that such a collection is not proportional to the needs of the case.

With respect to IBM's request to move out the date for its final infringement contentions, Groupon will agree if it has an equal extension of time for its invalidity contentions.  Your current proposal would move IBM's deadline out four weeks and Groupon's three.

Finally, the additional documents you mentioned in your email were produced in redacted form due to privilege issues, so we cannot produce the native files.  The original TIFF production documents appear to us to be fully legible.  If your team is having trouble viewing them, we are willing to explore other formats, such as the color TIFF or PDF documents proposed previously.  Please let me know if you'd like to discuss.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, July 27, 2017 4:05 PM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

Thanks for conferring with us about outstanding discovery issues.  We agreed on the following:

1. Groupon will offer witnesses to testify about IBM's technical and financial 30(b)(6) topics during the week of August 7th.

2. Groupon will offer a witness to testify about IBM's marketing 30(b)(6) topics during the week of August 14th.

3. We tentatively scheduled Damien Shmitz to testify on financial topics on August 10 and Phil Dunham to testify on technical topics on August 11, both in Chicago.  Groupon expects to offer the marketing witness in Seattle.

4. Groupon will diligently search for and produce documents from each witness before the date of their deposition, to the extent it has not already.

5. Groupon will diligently search for and produce relevant non-duplicative documents from Splunk, Grapher, and Basecamp, before the week of August 7.

6. Groupon is diligently working to produce wiki documents from GitHub and will endeavor to produce them before the week of August 7.

7. Groupon will serve a supplemental response to Interrogatory No. 7 today and expects to serve a supplemental response to Interrogatory No. 10 tomorrow.

8. The parties will confer about the necessity of taking the depositions of certain witness, including Soo, Sighn, and Oppenheim.

9. In light of the depositions scheduled in August, you will check with your client about agreeing to extend the deadline for IBM's Final Infringement Contention until August 25.  We are amendable to extending the deadline for Groupon's Final Invalidity Contentions until September 18 as part of that agreement.

Finally, the following documents did not make it into Groupon's production of native documents.  Please produce them in native form:

GROUP028695
GROUP028702
GROUP029648

Please let me know if you disagree with any aspects of my summary.

Thanks,
Karim

**Karim Z. Oussayef**

DESMARAIS LLP
230 Park Avenue
New York, NY  10169
T: (212) 351-3427 | F: (212) 351-3401

**From:** Karim Oussayef
**Sent:** Thursday, July 27, 2017 4:52 PM
**To:** Phillip Haack; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

Thanks for your response.  Let's confer at 5:30 ET.

Conference number: (866) 835-1224
Conference code: 511 566 5982

Best,
Karim

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Thursday, July 27, 2017 4:40 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

Groupon made a production of the requested native files yesterday.

We will provide dates for Groupon's 30(b)(6) witnesses shortly, and can confirm that we will be putting up at least Phil
Dunham and Damien Schmitz the week of August 7 in Chicago.   With respect to the other 30(b)(1) notices, we are
tracking down witness availability.  I will note that Kyle Oppenheim has left Groupon.

We will investigate the documents mentioned in Laurie's email.  Based on the URL in the document she forwarded, we
expect that the referenced document will be in the forthcoming production of GitHub wiki documents collected along
with the source code.

With respect to Splunk, Grapher, and Basecamp, we are not yet aware of any non-redundant documents in those
repositories.

We are available to confer after 2pm Pacific/5pm Eastern today, or tomorrow before 1:30 Eastern or after 3:30 pm
Eastern.

Best,
Phil

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, July 27, 2017 10:59 AM
**To:** Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Phillip Haack
<phaack@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com;

dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
<JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Counsel,

We have not gotten a response to our last three emails.  Could you please let us know when you are available to meet and confer today?  There are several outstanding discovery issues and we need to understand whether Groupon has made any progress in resolving them.

Best,
Karim

**Karim Z. Oussayef**

**DESMARAIS LLP**
230 Park Avenue
New York, NY  10169
T: (212) 351-3427 | F: (212) 351-3401

---

**From:** Laurie Stempler
**Sent:** Wednesday, July 26, 2017 11:48 AM
**To:** smehta@fenwick.com; phaack@fenwick.com; Groupon_IBM_Service@Fenwick.com
(Groupon_IBM_Service@fenwick.com)
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Counsel,

I write regarding several outstanding discovery-related disputes.

First, we have not yet received Groupon's supplemental interrogatory responses, despite your previous commitment to serve them last Friday, nor have we received a response to my reminder email from this past Monday.  Please either provide the supplemental responses or provide your availability to meet and confer tomorrow after 3 PM ET.

We have also not received confirmation that Groupon will produce the native versions of the Weekly Business Reviews and NA Email and CRM documents.  Although our respective support teams have worked together to try to sort out the technical issues, we are still unable to view the documents as produced.  As I mentioned on Monday (after failed attempts to sort out the technical issue), the most efficient way forward would be for Groupon to produce the native files with a DAT overlay.  Please confirm that you will do so or confirm your availability to meet and confer.

Thank you for serving your amended initial disclosures.  Please confirm that you have completed your collection and production of documents from the Groupon employees that you identified in those disclosures.

Please provide an update on your efforts to identify 30(b)(6) witnesses and their availability for deposition, along with the availability of the 30(b)(1) witnesses that we noticed.

Documents in Groupon's production reference additional relevant documentation that appears to not have been produced.  For example, the attached Operational Readiness Review document states that the users-service is

documented at a github repository.  (See the highlighted link at the top of p.3 of the attached document.)  Please confirm that you will produce this documentation – and all other relevant github documentation, including that requested by Robert Harrits in his July 21st email – by the end of next week.

Finally, please provide an update on when we can expect production of all relevant documents from Splunk, Grapher, and Basecamp, as requested in Robert's email.

We are available to meet and confer on the above issues tomorrow any time after 3 PM ET.  Please confirm your availability and we will circulate a dial-in number.

Laurie


Laurie Stempler
Desmarais LLP
230 Park Avenue
New York, NY  10169
(212) 351-3423
lstempler@desmaraisllp.com

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

--------------------------------------------
NOTICE:
This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed.  However, mistakes sometimes happen in addressing emails.  If you believe that you are not an intended recipient, please stop reading immediately.  Do not copy, forward, or rely on the contents in any way.  Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments.  Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.


This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.


This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.


This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.


This email may contain confidential and privileged material for the use of the intended recipient. Any review,

use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.


This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

# EXHIBIT 15

## Michael Matulewicz-Crowley

| | |
|---|---|
| **From:** | Robert Harrits |
| **Sent:** | Monday, August 7, 2017 5:19 PM |
| **To:** | Phillip Haack; Karim Oussayef; Jessica Benzler; Laurie Stempler; IBM Groupon Service |
| **Cc:** | bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Sapna Mehta; Groupon_IBM_Service@Fenwick.com |
| **Subject:** | RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.) |

Phil,

I write to follow up on the status of Groupon's production of the GitHub wiki documents. During a meet and confer on July 27, 2017, you stated that Groupon would endeavor to produce the GitHub documents before the week of August 7.  Can you please let us know when Groupon expects to produce the GitHub documents, especially considering Groupon's 30(b)(6) witness on technical issues is expected to testify on August 10, 2017.

Also, please let us know who will be testifying to topics 8-13 from IBM's Second 30(b)(6) Notice and topics 3-7 and 10 from IBM's Third 30(b)(6) Notice and the date and location of the deposition so we can make travel arrangements.  In addition, please let us know the dates and the location of the 30(b)(1) witnesses that IBM noticed.

Thank you,
Robert

---

**From:** Robert Harrits
**Sent:** Saturday, August 5, 2017 1:32 PM
**To:** Phillip Haack; Karim Oussayef; Jessica Benzler; Laurie Stempler; IBM Groupon Service
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

I write to summarize yesterday's meet and confer.  Please let me know if you disagree with anything below:

Regarding IBM's Second 30(b)(6) Notice
- Topic 6 – Groupon agreed to provide a witness to testify on all agreements except those that you allege to be privileged, and on the existence of any agreements that you allege to be privileged.
- Topic 7 – Groupon agreed to provide a witness to testify on the functionality and configuration of servers that deliver content to Groupon's users.
- Topic 9 – Groupon agreed to provide a witness to testify on the total number of revenue-generating transaction events made using the Accused Instrumentalities.
- Topic 10 – Groupon agreed to provide a witness  to testify on the total number of revenue-generating transaction events made by users whose accounts were linked to Facebook and/or Google login credentials.
- Topic 11 – Groupon agreed to provide a witness to testify generally as to what transaction events Groupon tracks and the number of transaction events for a particular year.  Groupon refused to provide a witness to testify about the specific raw data on a month-by-month basis.

1

- Topic 30 – Groupon agreed to provide a witness to testify about all non-privileged information related to this topic.
- Topic 32 – Groupon refused to provide a witness on Topic 32 at this time.

Regarding IBM's Third 30(b)(6) Notice

- Topic 3 – Groupon agreed that its "marketing" witness would be prepared to testify on this topic.
- Topic 7 - Groupon agreed to provide a witness to testify generally on what usage data Groupon tracks and the number of transaction events for a particular year.  Groupon refused to provide a witness to testify about the specific raw data on a month by month basis.
- Topic 9 – Groupon agreed to provide a witness to testify on "any patent license that Groupon has identified or produced in this matter, any patent license which relates to technology claimed by the patents-in-suit, or any patent license which relates to the allegedly infringing aspects of the accused Groupon instrumentalities."  Groupon refused to provide a witness to testify on all patent licenses that cover Groupon's website.
- Topic 10 – Groupon agreed to provide a witness to testify on revenue-generating transaction events, Groupon's mobile applications, and its website.

Please let us know as soon as possible when Groupon will make a witness available on the topics that have not yet been designated.

Regards,
Robert

**From:** Robert Harrits
**Sent:** Friday, August 4, 2017 1:40 PM
**To:** Phillip Haack; Karim Oussayef; Jessica Benzler; Laurie Stempler; IBM Groupon Service
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

We can meet at 2 pm pacific/ 5 pm eastern.  We can use the following dial in:
Dial-in: 866.835.1224
Conference Code 4682626058

Thanks,
Robert

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Friday, August 4, 2017 12:59 PM
**To:** Karim Oussayef; Jessica Benzler; Laurie Stempler; IBM Groupon Service
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

We are available at 12:15pm Pacific/3:15pm Eastern today, or after 2pm Pacific.  Groupon will be designating Mr. Schmitz on topics 4, 5, 6 and 9 and Mr. Dunham on topic 2 from IBM's first notice.  The remaining topic, 6, regarding customer feedback, will be handled by Groupon's marketing witness.

Best,

Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, August 03, 2017 4:45 PM
**To:** Jessica Benzler <jbenzler@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; IBM Groupon Service <IBMGrouponService@desmaraisllp.com>
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>; Phillip Haack <phaack@fenwick.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Counsel,

We accept your invitation to meet and confer.  Please let us know when you are available tomorrow to discuss Groupon's responses to at least topics 6, 7, 9, 10, 11, 30, and 32 from IBM's Second Notice and topics 3, 7, 9, and 10 from IBM's Third Notice.

Please let us know what topics Damien Schmitz and Phillip Dunham will address from IBM's First Deposition Notice to Groupon.  You previously agreed that your "substantive" witnesses would testify about the topics Ms. Baldwin was unable to address at her deposition (nos. 2, 4, 5, 6, 7, and 9).

Thanks,
Karim

---

**From:** Jessica Benzler [mailto:jbenzler@fenwick.com]
**Sent:** Wednesday, August 2, 2017 8:13 PM
**To:** Karim Oussayef; Laurie Stempler; IBM Groupon Service
**Cc:** bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com); Phillip Haack; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Mimecast Attachment Protection has created safe copies of your attachments.

---

Counsel,

Attached please find Groupon's Responses and Objections to IBM's Second and Third Notices of Deposition.  Pursuant to Rule 30(b)(6), Groupon designates the following witnesses on the topics listed:

Damien Schmitz (Deposition on August 9, 2017):
-    Second Notice Topics: 25, 26, 30, 31
-    Third Notice Topics: 1, 2, 8, 9,

Phillip Dunham (Deposition on August 10, 2017):
-    Second Notice Topics: 1-7, 14-24, 27-29

Both of these depositions will take place at Marshall, Gerstein & Borun LLP:
        233 South Wacker Drive

6300 Willis Tower
Chicago, IL 60606-6357

Regards,
Jessica



**JESSICA BENZLER**
Fenwick & West LLP
Associate, Litigation Group
☎ (650) 335-7279
🖶 (415) 281-1350
✉ jbenzler@fenwick.com

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Wednesday, August 02, 2017 10:52 AM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta
<smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com;
dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
<JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Phil,

We accept those dates.  Could you please confirm the topics for which each witness is designated?

Thanks,
Karim

---

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Wednesday, August 2, 2017 12:49 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;
sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Karim,

Damien Schmitz for is available on the 9th and Phil Dunham on the 10th.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Wednesday, August 02, 2017 6:38 AM

**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Phil,

We have not heard back from you.  Once again, we request that you confirm the availability of Groupon's witnesses so that our team can prepare and make travel plans.  Please let us know today.

Regards,
Karim

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Monday, July 31, 2017 8:35 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

Groupon agrees to produce relevant responsive documents in the witnesses' possession to the extent they have not yet been produced.  I can confirm we are putting up Phil Dunham and Damien Schmitz next week in Chicago and expect to have final confirmation of dates tomorrow.

Best,
Phil

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Monday, July 31, 2017 7:02 AM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)


Phil,

Could you please confirm the availability of Groupon's witnesses to sit for deposition next week so that our team can prepare and make travel plans?

Also, could you please answer my question below?  We want to understand whether we have a disagreement about Groupon's obligations to search for and produce documents from relevant witnesses.

Thanks,
Karim

---

**From:** Karim Oussayef
**Sent:** Thursday, July 27, 2017 9:45 PM
**To:** Phillip Haack; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

You state: "I represented that we had or would check with witnesses about the location of relevant responsive non-duplicative documents and, to the extent those documents had not been collected, collect and produce them.  I explicitly rejected IBM's suggested that Groupon is obligated to collect personal or non-central documents for every witness that IBM has noticed a deposition for unless those documents would reveal unique information material to the case."  Could you please clarify what you are agreeing to do and what you are not agreeing to do?  Are you agreeing to produce documents that your witnesses identify but not if they are "personal" or "non-central"?

We are in agreement about the deadlines for final contentions.  We will draft a proposed stipulation.

I will check with my team about the native documents and get back to you.

Best,
Karim

---

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Thursday, July 27, 2017 9:20 PM
**To:** Karim Oussayef <KOussayef@desmaraisllp.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

I wanted to clarify our position on additional documents from the people IBM has noticed.  I represented that we had or would check with witnesses about the location of relevant responsive non-duplicative documents and, to the extent those documents had not been collected, collect and produce them.  I explicitly rejected IBM's suggested that Groupon is obligated to collect personal or non-central documents for every witness that IBM has noticed a deposition for unless those documents would reveal unique information material to the case.  Groupon maintains that such a collection is not proportional to the needs of the case.

With respect to IBM's request to move out the date for its final infringement contentions, Groupon will agree if it has an equal extension of time for its invalidity contentions.  Your current proposal would move IBM's deadline out four weeks and Groupon's three.

Finally, the additional documents you mentioned in your email were produced in redacted form due to privilege issues, so we cannot produce the native files.  The original TIFF production documents appear to us to be fully legible.  If your team is having trouble viewing them, we are willing to explore other formats, such as the color TIFF or PDF documents proposed previously.  Please let me know if you'd like to discuss.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, July 27, 2017 4:05 PM
**To:** Phillip Haack <phaack@fenwick.com>; Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

Thanks for conferring with us about outstanding discovery issues.  We agreed on the following:

1.  Groupon will offer witnesses to testify about IBM's technical and financial 30(b)(6) topics during the week of August 7th.

2.  Groupon will offer a witness to testify about IBM's marketing 30(b)(6) topics during the week of August 14th.

3.  We tentatively scheduled Damien Shmitz to testify on financial topics on August 10 and Phil Dunham to testify on technical topics on August 11, both in Chicago.  Groupon expects to offer the marketing witness in Seattle.

4.  Groupon will diligently search for and produce documents from each witness before the date of their deposition, to the extent it has not already.

5.  Groupon will diligently search for and produce relevant non-duplicative documents from Splunk, Grapher, and Basecamp, before the week of August 7.

6.  Groupon is diligently working to produce wiki documents from GitHub and will endeavor to produce them before the week of August 7.

7.  Groupon will serve a supplemental response to Interrogatory No. 7 today and expects to serve a supplemental response to Interrogatory No. 10 tomorrow.

8.  The parties will confer about the necessity of taking the depositions of certain witness, including Soo, Sighn, and Oppenheim.

9.   In light of the depositions scheduled in August, you will check with your client about agreeing to extend the deadline for IBM's Final Infringement Contention until August 25.  We are amendable to extending the deadline for Groupon's Final Invalidity Contentions until September 18 as part of that agreement.

Finally, the following documents did not make it into Groupon's production of native documents.  Please produce them in native form:

GROUP028695
GROUP028702
GROUP029648

Please let me know if you disagree with any aspects of my summary.

Thanks,
Karim

**Karim Z. Oussayef**

**DESMARAIS LLP**
230 Park Avenue
New York, NY  10169
T: (212) 351-3427 | F: (212) 351-3401

---

**From:** Karim Oussayef
**Sent:** Thursday, July 27, 2017 4:52 PM
**To:** Phillip Haack; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Phil,

Thanks for your response.  Let's confer at 5:30 ET.

Conference number: (866) 835-1224
Conference code: 511 566 5982

Best,
Karim

---

**From:** Phillip Haack [mailto:phaack@fenwick.com]
**Sent:** Thursday, July 27, 2017 4:40 PM
**To:** Karim Oussayef; Laurie Stempler; Sapna Mehta; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Karim,

Groupon made a production of the requested native files yesterday.

We will provide dates for Groupon's 30(b)(6) witnesses shortly, and can confirm that we will be putting up at least Phil Dunham and Damien Schmitz the week of August 7 in Chicago.   With respect to the other 30(b)(1) notices, we are tracking down witness availability.  I will note that Kyle Oppenheim has left Groupon.

We will investigate the documents mentioned in Laurie's email.  Based on the URL in the document she forwarded, we expect that the referenced document will be in the forthcoming production of GitHub wiki documents collected along with the source code.

With respect to Splunk, Grapher, and Basecamp, we are not yet aware of any non-redundant documents in those repositories.

We are available to confer after 2pm Pacific/5pm Eastern today, or tomorrow before 1:30 Eastern or after 3:30 pm Eastern.

Best,
Phil

---

**From:** Karim Oussayef [mailto:KOussayef@desmaraisllp.com]
**Sent:** Thursday, July 27, 2017 10:59 AM
**To:** Laurie Stempler <LStempler@desmaraisllp.com>; Sapna Mehta <smehta@fenwick.com>; Phillip Haack <phaack@fenwick.com>; Groupon_IBM_Service@Fenwick.com
**Cc:** IBM Groupon Service <IBMGrouponService@desmaraisllp.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com; sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com) <JDay@ashbygeddes.com>
**Subject:** RE: IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Counsel,

We have not gotten a response to our last three emails.  Could you please let us know when you are available to meet and confer today?  There are several outstanding discovery issues and we need to understand whether Groupon has made any progress in resolving them.

Best,
Karim

**Karim Z. Oussayef**

**DESMARAIS LLP**
230 Park Avenue
New York, NY  10169
T: (212) 351-3427 | F: (212) 351-3401

---

**From:** Laurie Stempler
**Sent:** Wednesday, July 26, 2017 11:48 AM
**To:** smehta@fenwick.com; phaack@fenwick.com; Groupon_IBM_Service@Fenwick.com (Groupon_IBM_Service@fenwick.com)
**Cc:** IBM Groupon Service; bpalapura@potteranderson.com; dmoore@potteranderson.com;

sobyrne@potteranderson.com; 'Day, John G.' (JDay@ashbygeddes.com)
**Subject:** IBM v. Groupon, C.A. No. 16-cv-122 (D. Del.)

Counsel,

I write regarding several outstanding discovery-related disputes.

First, we have not yet received Groupon's supplemental interrogatory responses, despite your previous commitment to serve them last Friday, nor have we received a response to my reminder email from this past Monday.  Please either provide the supplemental responses or provide your availability to meet and confer tomorrow after 3 PM ET.

We have also not received confirmation that Groupon will produce the native versions of the Weekly Business Reviews and NA Email and CRM documents.  Although our respective support teams have worked together to try to sort out the technical issues, we are still unable to view the documents as produced.  As I mentioned on Monday (after failed attempts to sort out the technical issue), the most efficient way forward would be for Groupon to produce the native files with a DAT overlay.  Please confirm that you will do so or confirm your availability to meet and confer.

Thank you for serving your amended initial disclosures.  Please confirm that you have completed your collection and production of documents from the Groupon employees that you identified in those disclosures.

Please provide an update on your efforts to identify 30(b)(6) witnesses and their availability for deposition, along with the availability of the 30(b)(1) witnesses that we noticed.

Documents in Groupon's production reference additional relevant documentation that appears to not have been produced.  For example, the attached Operational Readiness Review document states that the users-service is documented at a github repository.  (See the highlighted link at the top of p.3 of the attached document.)  Please confirm that you will produce this documentation – and all other relevant github documentation, including that requested by Robert Harrits in his July 21st email – by the end of next week.

Finally, please provide an update on when we can expect production of all relevant documents from Splunk, Grapher, and Basecamp, as requested in Robert's email.

We are available to meet and confer on the above issues tomorrow any time after 3 PM ET.  Please confirm your availability and we will circulate a dial-in number.

Laurie


Laurie Stempler
Desmarais LLP
230 Park Avenue
New York, NY  10169
(212) 351-3423
lstempler@desmaraisllp.com


This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

-------------------------------------------
NOTICE:
This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed.  However, mistakes sometimes happen in addressing emails.  If you believe that you are not an intended recipient, please stop reading immediately.  Do not copy, forward, or rely on the contents in any way.  Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments.  Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

This email may contain confidential and privileged material for the use of the intended recipient. Any review, use, or distribution by anyone other than the addressee is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and delete all copies of this message.

# EXHIBIT 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 16-122-LPS-CJB |
| GROUPON, INC., | ) ) | |
| Defendant. | ) | |

**INITIAL DISCLOSURES PURSUANT TO
SECTION 3 OF THE COURT'S DEFAULT STANDARD FOR DISCOVERY**

Defendant Groupon, Inc. ("Groupon"), by and through undersigned counsel, and pursuant to this District's Default Standard for Discovery, hereby provides the following disclosures pursuant to paragraph 3 of the Default Standard for Discovery.  Groupon served its disclosures pursuant to Rule 26(a)(1) on October 12, 2016 and those disclosures are incorporated by reference herein.

These disclosures are based on information reasonably available to Groupon at this time. In addition, these disclosures are made with the understanding that Groupon cannot anticipate all of the positions that it or IBM may take in this case. Groupon's investigation is ongoing, and it reserves the right to supplement or amend these disclosures as discovery and investigation proceed.

Groupon makes these disclosures without waiving in any manner: (1) the right to object on any basis permitted by law to the use of any information contained herein for any purpose in any subsequent proceeding in this or any other action; and (2) the right to object on any basis permitted by law to any discovery request or proceeding involving or related to the subject matter of these disclosures.

1

# I.      3(A) —GROUPON CUSTODIANS LIKELY TO HAVE DISCOVERABLE IN-FORMATION

Pursuant to Section 3.a of the Default Standard for Discovery, Including Discovery of Electronically Stored Information, Groupon identifies the individuals listed below as the custodians most likely to have discoverable information in their possession, custody, or control. Given the status of discovery, Groupon is unable to rank the relative importance of these custodians. Groupon reserves the right to supplement this list at a later date.

Groupon does not represent that these custodians have relevant documents in their possession, custody, or control and does not waive its right to object to the production of any document or tangible thing in the possession of any custodian on the basis of any applicable privilege, the work product doctrine, relevance, or any other valid objection.

| Name and Contact Information, if Known | Connection with the Case | Brief Statement of Substance of Information Known |
|---|---|---|
| Jim Breen<br>c/o Fenwick & West LLP<br>Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041 | Senior Software Developer, Groupon, Inc. | Design, development and operation of technology in the accused Groupon instrumentalities, including their history and development; and other matters within his personal knowledge. |
| Phillip Dunham<br>c/o Fenwick & West LLP<br>Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041 | Senior Manager, Groupon, Inc. | Design, development and operation of technology in the accused Groupon instrumentalities, including their history and development; and other matters within his personal knowledge. |

| Name and Contact Information, if Known | Connection with the Case | Brief Statement of Substance of Information Known |
|---|---|---|
| Michael Mulvihill<br><br>c/o Fenwick & West LLP<br>Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041 | Senior Software Developer, Groupon, Inc. | Design, development and operation of technology in the accused Groupon instrumentalities, including their history and development; and other matters within his personal knowledge. |
| Damien Schmitz<br><br>c/o Fenwick & West LLP<br>Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041 | Director, Global FP&A, Groupon, Inc. | Sales and financial information relating to the accused Groupon instrumentalities. |
| Vikram Singh<br><br>c/o Fenwick & West LLP<br>Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041 | Senior Director, Consumer Product, Groupon, Inc. | Design, development and operation of technology in the accused Groupon instrumentalities, including their history and development; and other matters within his personal knowledge. |
| Joanne Soo<br><br>c/o Fenwick & West LLP<br>Silicon Valley Center<br>801 California Street<br>Mountain View, CA 94041 | Product Manager, Global Consumer Products, Groupon, Inc. | Design, development and operation of technology in the accused Groupon instrumentalities, including their history and development; and other matters within her personal knowledge. |

Additional custodians who may have discoverable information may be identified through the course of discovery. Groupon expressly reserves the right to supplement and/or amend this disclosure based on further investigation, analysis, and discovery.

## II.  3(B)—NON-CUSTODIAL DATA SOURCES

Pursuant to Section 3.b of the Default Standard for Discovery, Including Discovery of Electronically Stored Information, Groupon identifies its source code repositories, Google Drive,

internal development wikis at wiki.groupdev.com and GitHub Enterprise, its databases storing sales information, JIRA, and Pivotal Tracker as the noncustodial data sources that are most likely to contain non-duplicative discoverable information. Groupon has attempted to rank these non-custodial sources from mostly likely to possess discoverable information to least likely, but given the status of discovery, Groupon is unable to rank the relative importance of these non-custodial sources precisely.

Groupon does not represent that these data sources necessarily contain relevant information, and does not waive its right to object to the production of any document or data residing in such data sources on the basis of any privilege, the work product doctrine, relevance, confidentiality or any other valid objection.

Additional data sources may be identified through the course of discovery. Groupon expressly reserves the right to supplement and/or amend this disclosure based on further investigation, analysis, and discovery.

## III.    3(C)(I)—ISSUES RELATED TO ESI

Pursuant to Section 3.c.(i) of the Default Standard for Discovery, Including Discovery of Electronically Stored Information, Groupon identifies the following categories of ESI as not reasonably accessible under Fed. R. Civ. P 26(b)(2)(C)(i): information listed in Schedule A of the Default Standard for Discovery, Including Discovery of Electronically Stored Information; and electronic information retained primarily for back-up or disaster recovery purposes.

## IV.    3(C)(II)—ISSUES RELATED TO THIRD-PARTY DISCOVERY UNDER FED. R. CIV. P. 45 AND OTHERWISE, INCLUDING THE TIMING AND SEQUENCING OF SUCH DISCOVERY

Pursuant to Section 3.c.(ii) of the Default Standard for Discovery, Including Discovery of Electronically Stored Information, Groupon presently anticipates that third party discovery may

be necessary from the following parties: IBM's licensees; the inventors of the patents-in-suit; the firms, attorneys, and other individuals involved in the prosecution of the patents-in-suit; persons with knowledge regarding invalidating prior art references, devices or systems; IBM's former employees with relevant knowledge and persons with knowledge regarding IBM or its predecessors' previous efforts to license, market, or sell the alleged inventions.

Given that discovery in this case is just beginning, IBM has not yet provided its infringement contentions, and the ongoing nature of Groupon's investigation, Groupon is not currently aware of any issues that need to be addressed concerning the timing and sequencing of third-party discovery. Groupon will work with IBM to coordinate the timing and sequencing of such discovery, if required.

Additional third parties may be identified through the course of discovery. Groupon expressly reserves the right to supplement and/or amend this disclosure based on further investigation, analysis, and discovery.

## V.      3(C)(III)—ISSUES RELATED TO PRODUCTION SUBJECT TO FOREIGN LAWS AND/OR PRIVACY PROTECTIONS

Pursuant to Section 3.c.(iii) of the Default Standard for Discovery, Including Discovery of Electronically Stored Information, Groupon is currently unaware of any specific information that may need to be produced from outside of the United States and subject to foreign laws. Groupon notes, however, that it is a global company with offices around the world.

Groupon is currently unaware of any discoverable information subject to privacy protections. Groupon notes, however, that some information in Groupon's possession, custody or control may be subject to confidentiality agreements between Groupon and third parties. Groupon does not intend to produce any personal information about its customers. Additional issues with respect to privacy protections or the application of foreign laws may be identified through the

course of discovery.  Groupon expressly reserves the right to supplement and/or amend this dis-

closure based on further investigation, analysis, and discovery.


                                                  ASHBY & GEDDES


*Of Counsel:*                                     */s/ Andrew C. Mayo*
                                                  _____
J. David Hadden                                   John G. Day (#2403)
Saina S. Shamilov                                 Andrew C. Mayo (#5207)
Phillip J. Haack                                  500 Delaware Avenue, 8th Floor
Adam M. Lewin                                     P.O. Box 1150
FENWICK & WEST LLP                                Wilmington, DE  19899
Silicon Valley Center                             (302) 654-1888
801 California Street                             jday@ashby-geddes.com
Mountain View, CA  94041                          amayo@ashby-geddes.com
(650) 988-8500

Dated: November 2, 2016                           *Attorneys for Defendant Groupon, Inc.*


                                6

# EXHIBIT 17

**Michael Matulewicz-Crowley**

| | |
|---|---|
| **From:** | Sandra Pomeroy <spomeroy@fenwick.com> |
| **Sent:** | Monday, August 7, 2017 7:41 PM |
| **To:** | Karim Oussayef; Jon Hohenthaner; Palapura, Bindu A. (bpalapura@potteranderson.com) |
| **Cc:** | IBM Groupon Service; Phillip Haack; Sapna Mehta; Sandra Pomeroy |
| **Subject:** | FW: IBM v Groupon (D. Del), Case No. 16-cv-122 |

Counsel,

Please find below instructions to access Groupon's production of documents - volumes GRP-DEL006 and GRP-DEL007.  The password for the zip files will follow in a separate email.

Sincerely,



**S A N D R A   P O M E R O Y**
Fenwick & West LLP
Senior Paralegal, Litigation Group

☎ (650) 335-7861
📠 (650) 938-5200
✉ spomeroy@fenwick.com


FTP Information:
Host: securefile.fenwick.com
Port: 22
Server Type: SFTP
Log on type: normal
Username: groupon_ibm_oppcounsel
Password: 7hYfr/TA+U(ac{:/

FTP Instructions:

You will need to download and install Filezilla, or use another client that fully supports secure FTP (SFTP). Most web browsers like Internet Explorer or Firefox will not support SFTP natively. We recommend Filezilla because it's small and works well.

You can download Filezilla here: https://filezilla-project.org/download.php?show_all=1

Once you have it downloaded, install then run the program.

Then launch the program, and just fill in the information in the top bar (copy and paste works well to avoid mistakes), make sure the port is 22, then hit Quickconnect.



Once you are connected, to upload files, drag files from the desktop to the right hand pane. To download files, drag the files from the right hand pane down to the desktop.

**If uploading** - We highly recommend that when you upload files, you combine everything you want to upload into a single archive with a simple name (such as upload.zip) to prevent issues with uploading, especially since our FTP server is restricted to Windows naming conventions, thank you.

-----------------------------------------------

NOTICE:
This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed.  However, mistakes sometimes happen in addressing emails.  If you believe that you are not an intended recipient, please stop reading immediately.  Do not copy, forward, or rely on the contents in any way.  Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments.  Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.

# EXHIBIT 18

# Michael Matulewicz-Crowley

**From:** Sandra Pomeroy <spomeroy@fenwick.com>
**Sent:** Tuesday, August 8, 2017 6:27 PM
**To:** Karim Oussayef; Jon Hohenthaner; Palapura, Bindu A. (bpalapura@potteranderson.com)
**Cc:** IBM Groupon Service; Phillip Haack; Sapna Mehta; Sandra Pomeroy
**Subject:** IBM v Groupon (D. Del), Case No. 16-cv-122

Counsel,

Please find below instructions to access Groupon's production of documents - volume GRP-DEL008. The password for the zip files will follow in a separate email.

Sincerely,



**S A N D R A   P O M E R O Y**
Fenwick & West LLP
Senior Paralegal, Litigation Group
☎ (650) 335-7861
📠 (650) 938-5200
✉ spomeroy@fenwick.com

FTP Information:
Host: securefile.fenwick.com
Port: 22
Server Type: SFTP
Log on type: normal
Username: groupon_ibm_oppcounsel
Password: 7hYfr/TA+U(ac{:/

FTP Instructions:

You will need to download and install Filezilla, or use another client that fully supports secure FTP (SFTP). Most web browsers like Internet Explorer or Firefox will not support SFTP natively. We recommend Filezilla because it's small and works well.

You can download Filezilla here: https://filezilla-project.org/download.php?show_all=1

Once you have it downloaded, install then run the program.

Then launch the program, and just fill in the information in the top bar (copy and paste works well to avoid mistakes), make sure the port is 22, then hit Quickconnect.



Once you are connected, to upload files, drag files from the desktop to the right hand pane. To download files, drag the files from the right hand pane down to the desktop.

**If uploading** - We highly recommend that when you upload files, you combine everything you want to upload into a single archive with a simple name (such as upload.zip) to prevent issues with uploading, especially since our FTP server is restricted to Windows naming conventions, thank you.

---------------------------------------------

NOTICE:
This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed.  However, mistakes sometimes happen in addressing emails.  If you believe that you are not an intended recipient, please stop reading immediately.  Do not copy, forward, or rely on the contents in any way.  Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments.  Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.

# EXHIBIT 19

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 20

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 21

1

08:45:05  1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -
     INTERNATIONAL BUSINESS MACHINES
4    CORPORATION,                         :  CIVIL ACTION
                                          :
5              Plaintiff,                 :
     v                                    :
6                                         :
     GROUPON, INC.,                       :
7                                         :  NO. 16-122-LPS
               Defendant.                 
8                                              - - -

9                          Wilmington, Delaware
                           Monday, June 5, 2017
10                   *Claim Construction and Motion Hearing*

11                             - - -

12   BEFORE:    HONORABLE LEONARD P. STARK, Chief Judge

13   APPEARANCES:                  - - -

14
                   POTTER ANDERSON & CORROON, LLP
15                 BY:  BINDU A. PALAPURA, ESQ.

16                     and

17                 DESMARAIS, LLP
                   BY:  JOHN DESMARAIS, ESQ.,
18                      KARIM OUSSAYEF, ESQ.,
                        LAURIE STEMPLER, ESQ.,
19                      ROBERT C. HARRITS, ESQ., and
03:00:32                MICHAEL MATULEWICZ-CROWLEY, ESQ.
20                      (New York, New York)

21                     Counsel for Plaintiff

22
                   ASHBY & GEDDES, P.A.
23                 BY:  JOHN G. DAY, ESQ.

24                     and

25                               Brian P. Gaffigan
                                 Registered Merit Reporter

1

APPEARANCES: (Continued)

2

3     FENWICK & WEST, LLP
      BY: J. DAVID HADDEN, ESQ., and
4         PHILLIP HAACK, ESQ.
          (San Francisco, California)
5
          Counsel for Defendants
6

7
8                 - oOo -
9       P R O C E E D I N G S
10      (REPORTER'S NOTE:  The following claim
11  construction and motion hearing was held in open court,
12  beginning at 9:00 a.m.)
13      THE COURT:  Good morning.
14      (The attorneys respond, "Good Morning, Your
15  Honor.)
16      THE COURT:  I'll have you put your appearances
17  on the record for me, please.  Good morning.
18      MS. PALAPURA:  Good morning, Your Honor.  Bindu
19  Palapura from Potter Anderson & Corroon on behalf of IBM.
20  With me today from Desmarais, LLP is John Desmarais.
21      MR. DESMARAIS:  Good morning.
22      MS. PALAPURA:  Karim Oussayef.
23      MR. OUSSAYEF:  Good morning, Your Honor.
24      MS. PALAPURA:  Laurie Stempler.
25      MS. STEMPLER:  Good morning.

3

1       MS. PALAPURA:  Michael Matulewicz-Crowley.
2       MR. MATULEWICZ-CROWLEY:  Good morning.
3       MS. PALAPURA:  And Roberts Harrits.
4       MR. HARRITS:  Good morning, Your Honor.
5       MR. DAY:  Good morning, Your Honor.
6       THE COURT:  Good morning.
7       MR. DAY:  John Day from Ashby & Geddes, Delaware
8   counsel for Groupon.  With me from Fenwick & West, David
9   Hadden.
10      MR. HADDEN:  Good morning, Your Honor.
11      MR. DAY:  And Phil Haack.
12      MR. HAACK:  Good morning, Your Honor.
13      MR. DAY:  And from Groupon, Lauren Schwartz.
14      MS. SCHWARTZ:  Good morning.
15      THE COURT:  Good morning.  Welcome.  So we're
16  here for argument on a motion as well as the *Markman*
17  hearing.  Have you all conferred on how you would like to
18  use your time this morning?
19      MR. OUSSAYEF:  Yes, Your Honor.  We conferred
20  with the other side.  We decided that we know the order of
21  the terms that we would like to argue for the *Markman*
22  hearing, but we would like to hear whether Your Honor first
23  would hear either the motion for judgment of pleadings or
24  the claim construction issues first.
25      THE COURT:  So you have no view on that.

5

1       MR. OUSSAYEF:  If we were to proceed, I think
2   it makes sense to start with the motion for judgment on the
3   pleadings.
4       THE COURT:  And what is your view?
5       MR. HADDEN:  That's fine with me, Your Honor.
6       THE COURT:  Okay.  So let's do the 101 first and
7   then we'll do the claim construction.
8       MR. OUSSAYEF:  Yes, Your Honor.  It is
9   defendant's motion.  We'll have them go first.
10      THE COURT:  Right.  We'll hear from defendants
11  first.  Thank you.
12      MR. HADDEN:  Thank you, Your Honor.
13      (Elmo settings adjusted.)
14      MR. HADDEN:  Good morning, Your Honor.
15      THE COURT:  Good morning.
16      MR. HADDEN:  So as you know, this motion relates
17  to the two Prodigy patents which share, largely share the
18  same specification.
19      And as the Court found in the prior ruling in
20  the *Priceline* motion, these claims fail under Step One of
21  the *Alice* steps as the Court found the concepts, the patents
22  relate to the general idea of locally storing information
23  in using that to create a partition display.  And,
24      As Judge Burke found in the prior motion, those
25  concepts are abstract and devoid of concrete and tangent

1   application.  And that people have been storing information
2   locally and using it even before computers, and that this is
3   really not distinguishable from cases like *Content Extraction*
4   or similar concepts have been found to be abstract.
5       Now, in response, in opposition to the current
6   motion, IBM has argued that the Federal Circuit decision in
7   *Enfish* changed the law.  And they've argued that after
8   *Enfish*, any claim that aspires and supports to improve
9   computers or computer networking is somehow immune under
10  101 or immune to 101 scrutiny.  And,
11      That argument has been rejected repeatedly by
12  courts both in this District and by the Federal Circuit,
13  probably most clearly in Judge Andrews decision in *Visual
14  Memory v Nvidia*.  In that case, the plaintiff made exactly
15  the same argument.  It said that after *Enfish*, because the
16  claims in the digital memory patent related to a storage
17  system, multi-tier cache, they were aimed at an improvement
18  to computer technology and therefore were immune from 101
19  scrutiny.  And,
20      Judge Andrews correctly rejected that argument
21  and, as he explained, the real issue in *Enfish* is whether
22  the District Court had been too general and oversimplified
23  in the Step One analysis but not that somehow that case
24  immunizes from 101 scrutiny patents that aspire related to
25  the use.  And, again, Judge Andrews reemphasized the real

1 test, which is not whether it somehow touches on computers
2 but whether the claims provide a specific concrete solution.
3          And in Your Honor's opinion in *IV v Symantec*,
4 there is a similar argument made. And, again, Your Honor
5 reached the same result. In that case, the claims were to
6 this purportedly improved method for mirroring data to a
7 remote location, and when it was stable against power
8 outages, et cetera, but there was no concrete solution. The
9 claims did not include the required details for the specific
10 solution to avoid 101.
11          There has to be a concrete specific solution.
12 That is the test. And,
13          Again, as in this case, IBM is sort of pointing
14 to the specification and arguing that somehow these Prodigy
15 patents overcame problems with dumb terminals or prior
16 networking systems, but that is not in the claims.
17          The focus on this case has to be the issue, Your
18 Honor noted in *IV v Symantec*, on the claims as written and
19 whether they actually specified a specific solution. And
20 here they don't. And,
21          Again, just to make clear, there has been a slew
22 of Federal Circuit cases following *Enfish* finding patents
23 that relate somehow or aspire to improve computers invalid
24 under 101 including the *Tranxition* case, *Appistry v Amazon*
25 which are related to distributed computing. *Tranxition* was

7

1 about migrating computer settings and the *IV I v Symantec*
2 case of a virus scanning in a computer network. All of
3 those purported to improve computer technology or computer
4 networks. All were found invalid.
5          IBM's next argument under Step One is that the
6 claims are not invalid under Step One because the PTAB
7 denied a CBM review of one of the patents.
8          I mean, the first point is the PTAB didn't
9 even look at the '967 patent because IBM disclaimed the
10 advertising claims in that patent to take it out of CBM
11 purview.
12          But then if we look at the PTAB's analysis on
13 the '849 patent, it is directly contrary to what this Court
14 previously found. So the PTAB agreed that the claims were
15 directed at the abstract idea of generating a partition
16 screen display from information stored at the user's
17 computer. The same idea that Judge Burke and Your Honor
18 found was abstract in the prior *Priceline* decision. And,
19          Beyond that, the PTAB went on in their decision
20 and agreed with the petitioner that the claims themselves
21 recite only generalized steps. He did not go into further
22 detail as to how those steps were accomplished.
23          Now, it seems like it should be game over at that
24 point; right? I mean if the claim does not have details
25 about how the ideas are to be accomplished and just describes

1 generalized steps, under *Affinity Labs v Amazon*, that is kind
2 of the hallmark of the claim that is invalid under 101.
3          But, instead, the PTAB applied this test and I
4 frankly have never seen before, which is they said if we
5 take out the words and references to computers in the claim,
6 would that change the meaning to someone in 1989? And, if
7 so, then somehow the claim is not directed to an abstract idea.
8          That is not a test I have ever seen in a Federal
9 Circuit case or in any District Court case. And with all
10 due respect to the PTAB, it strikes me as kind of wacky.
11          So I don't think there is any dispute at this
12 point that these claims fail under Step One.
13          Now, if we go to Step Two, what is the inventive
14 concept that provides the specific novel solution?
15          Well, there is none. IBM hung its hat on "data
16 object" in the *Priceline* motion, but the Court has now
17 construed that "object" as "a data structure." And the
18 cases are clear that a data structure is a generic concept.
19 There is nothing inventive about using data structures. In
20 fact, every computer program uses data structures. Right?
21 Computers understand structured data. They're data structures.
22          And it is important -- right? -- to distinguish
23 *Enfish*. *Enfish* survived because it didn't just claim using
24 a data structure, it claimed a very specific type of data
25 structure: this self-referential cable, and there was a

9

1 four step algorithm for how to use it in the claim. So
2 that claim had a specific solution that saved it that was
3 inventive. And,
4          It's clear that is not the case here. Right?
5 Because IBM is applying the Court's construction of "data
6 object" as "a data structure" to include anything, right?
7          So this is from their infringement contentions.
8          And they say data includes "HTML files,
9 JavaScript, JSON files, images and other data." So
10 basically a data object is anything.
11          IBM next points to the Court's construction that
12 says "objects being retrieved from the objects stored at the
13 respective reception system, or, if the current versions of
14 the objects are not present from the objects stored at the
15 respective reception system, then from the network."
16          So all this says we use what is cached locally,
17 and if it is not there, we go and get it from the network.
18          But that is the basic idea of caching. And
19 courts have found that that idea is not inventive. Right?
20          So in the *Versata v NetBrain* in this District,
21 the patent was about caching dynamic web pages. It is
22 essentially what IBM is accusing in this case. And the
23 Court held that the central concept is receiving information
24 and a transmitting a response either by recycling the
25 information you have or collecting the requested information

10

1 anew, which is no different than what these claims require.
2 Right? That is what a cache does. You use what you have.
3 If it is not there, you go get it from the source. That is
4 now Check ID.
5         IBM also talks a lot in its papers about how,
6 in its tutorial about how somehow this invention splits the
7 functionality between the server and the local reception
8 system computer.
9         But, again, the idea of splitting functionality
10 between a client and a server is not inventive. That was
11 the very issue in the *Device Enhancement* case in this
12 District. Again, that is another post-*Enfish* decision.
13         In that case, Judge Robinson said that is not
14 inventive, right? The server exchanges data with the
15 terminal device -- tasks are split between the client side
16 application and the remote application, albeit without
17 further guidance from the patent. That was the key point.
18         Such a broad claim, even though it relates to
19 a computer centric idea, is just the idea of using a
20 distributive architecture to increase the capability.
21 Right? And that is exactly the kind of pitch that IBM is
22 making here.
23         But that is, as Judge Robinson found, abstract.
24 Right? There is no, there is nothing in these claims that
25 would tell you how actually build a specific solution to

11

1 that. Right? IBM's patent doesn't tell you how to split an
2 application into pieces, what those pieces should look like,
3 it doesn't tell you how we can find those at the reception
4 system in a way it provides any new functionality. It is
5 just claiming the idea of using some stuff at a server,
6 using some other stuff that is stored locally. And that is
7 exactly the idea that Judge Robinson held was abstract and
8 unpatentable. And,
9         A similar idea was in the *CyberFone* case. In
10 *CyberFone*, it was about whether you take some data, you
11 split it up, you send it to different places. Is that an
12 inventive concept?
13         Of course, Judge Robinson and the Federal Circuit
14 said no, right? With taking, obtaining data separating it,
15 sending it to different places, that is not inventive concert.
16         Nor, of course, is combining data from different
17 sources. That was the issue in *Electric Power*.
18         So if IBM's pitch is that the ability to combine
19 data from a local machine with data from the remote server
20 is the invention, that can't be it; right? The Federal
21 Circuit said that combining information even specific
22 information and displaying it is not inventive.
23         Finally, IBM on the '849 patent, points to the
24 selective storing. The prefetching at ad. And though IBM
25 is going to contest I think later that that is the correct

12

1 construction, even though that construction, which I think
2 is right, just prefetching information to store is not
3 inventive; right? That is inherent in the idea of a local
4 store. You have to stock the local store. I recited
5 something going back to Roman legions; right? You have to
6 stock the local store for the soldiers.
7         And even in the context of advertising, right?
8 The *Ultramercial* case kind of rejecting that as one of the
9 steps in those claims. In those claims, one of the steps
10 was selecting an ad. And then you would offer the media in
11 exchange for watching the ad. But there was a preselected
12 ad as part of the step, and the claim was nonetheless abstract.
13         Of course, there is a slew of cases that confirm
14 that just fetching and storing information, whether it is a
15 particular content, like an advertisement or not, is not
16 inventive. Going from *Content Extraction* to *CyberFone* to
17 *Electric Power*. So that can't be the inventive concept that
18 saves these claims.
19         Finally, on the dependent claim, IBM points to
20 the storage control parameters being the magic inventive
21 concept, and they say that it is one of the mechanisms
22 underlying the as-needed retrieval elements of the patented
23 inventions.
24         But, of course, it is not a mechanism at all.
25 It is just a generic parameter that relates to what

13

1 information is cached. And, again, in the *Visual Memory*
2 case, this same issue came up. And if we look at the claim
3 that was at issue in that case, which is this one, it is far
4 more detailed, far more specific, far more concrete and far
5 more technical than any of the claims at issue in these
6 Prodigy patents. Judge Andrews nonetheless found it was
7 abstract.
8         But one of the components of that claim was
9 these first programmable characteristics which, like the
10 storage control parameter, determined what information was
11 stored in which of the three layers of cache in that system,
12 and whether it was code or data and whether it came from the
13 bus or somewhere else. And,
14         Judge Andrews, basically the same argument,
15 said that those programmable operational characteristics is
16 simply a generic concept. It determines a type of data
17 stored by the cache. And without an explanation the
18 mechanism for how this result is accomplished, it cannot
19 supply an inventive concept. And,
20         The same is true here. Just saying there is a
21 parameter that relates to what is stored is not a specific
22 solution or inventive concept. And,
23         Again we have to focus on the claims, right?
24 IBM, in their tutorial and otherwise, talks a lot about
25 Prodigy and how great it was. Now, IBM could have claimed

1 or drafted claims that covered the specific implementation
2 of Prodigy and those claims may well survive 101 but those
3 are not the claims they have.  Right?
4         They tried instead to claim this very basic
5 concept using some information that is stored at the local
6 computer and combining it with some remote information.  And
7 that is just too broad.  It is just too abstract and covers
8 too much.  And it's clear that it covers too much and IBM
9 essentially admits in its opposition brief that it is not
10 only trying to preempt the Web of these patents -- I mean
11 let's be clear.  Everybody who has been sued on these
12 patents has been sued just because they use the World Wide
13 Web.  There has not been anything common that relates
14 Groupon to Priceline to Amazon to Living Social except the
15 use of the Web.
16         But they want to go beyond that.  If you look at
17 their opposition, they say, fine, here are some things we
18 don't preempt.  One alternative is to transfer the entire
19 interactive application, the user reception system, at once
20 instead of breaking it up into data objects.  So they say
21 you can avoid our patents by not breaking things up.  Other
22 than that, we own it.  We don't break things up.
23         The next thing they say is:  Another alternative
24 is to required users to retrieve content from the server
25 each time the user interacts with the application, instead

15

1 of storing data objects at the user reception system.
2         So they say, fine, the other way you can avoid
3 our patent, don't start thinking locally.  But if you break
4 things up or you store them locally, we own it.  And these
5 patents preempt it.  And that is just, that is too broad.
6 There is nothing in these claims, there is no contribution
7 to the general knowledge in these claims that justify that
8 ridiculous scope of preemption.
9         Thank you, Your Honor.
10         THE COURT:  Thank you.  We'll hear from plaintiff.
11         MR. OUSSAYEF:  Good morning, Your Honor.  Karim
12 Oussayef for IBM.  May it please the Court.
13         I won't belabor the law behind Alice, Steps One
14 and Two since Your Honor is familiar, but I think there is a
15 couple of points that are important to look at.  And,
16         On slide 5, what we see here are some of the
17 abstract ideas that are not -- some of the abstract ideas
18 that have been found under Alice and those type of cases
19 which are really ideas that are found outside of the
20 computer system and brought within the computer realm like
21 mathematical algorithms, fundamental economic and business
22 practices, and claims about an idea itself without anything
23 connected to technology.
24         What is not an abstract idea, however, is more
25 elucidated in the case of Enfish and McRO which help specify

1 that Alice Step One inquiry with a little bit more rigor.
2 And what it says is that the "directed to" inquiry isn't
3 just whether there is something involved that is a patent
4 ineligible concept but whether the claims are really
5 directed to solving something that exists in the computer
6 realm.
7         And what it found is that when the focus of the
8 claims is on a specific asserted improvement in computer
9 capabilities, that is when it is not an abstract idea under
10 Alice Step One.
11         Similarly, McRO found that claims directed to a
12 patentable, technological improvement over the existing
13 computer techniques, that also passes Step One.  And,
14         The recent case of PalTalk Holdings, which was
15 just in May of this year, that was a Delaware case where
16 "claims addressing a technical challenge ... unique to the
17 world of interactive software applications shared over a
18 computer network," that is something that is not an abstract
19 idea under Alice Step One.
20         So the question here we should be asking
21 ourselves is, are we focused on solving a problem in the
22 computer realm or are we trying to solve a problem outside
23 the computer realm and just trying to capture it by putting
24 it on generic computer software?
25         So let's look at the answer to that question.

17

1         First, let's look at the complaint.  The
2 complaint which at this stage of the case must be assumed
3 to be true, and which is backed up with by the evidence as
4 well, indicates that the Filepp patents were conceived in
5 the 1980s, when IBM was developing the Prodigy online
6 system.  And,
7         In that time frame, on slide 7, we see the
8 second bullet point talks about how in the prior art, you
9 had applications but they used a "dumb terminal" approach.
10 And what that means is that all the data was transferred
11 together to the user's computer at once instead of it being
12 broken up into pieces and instead of being organized into
13 partitions or areas of the screen where the user could
14 interact with it.
15         So what the inventors developed in bullet point
16 three is they developed an innovative method for presenting
17 applications and advertising in a way that would take
18 advantage of the user's computer because at the time, people
19 were starting to buy computers that could use floppy disks
20 that could compute at a local area where the user was.  So
21 to take advantage of that, if you break up content, you
22 could have the user's computer put it back together because
23 it's smart enough to do so.  And,
24         Then by doing that, you can reduce the load
25 on the whole system so that the host doesn't have to be

18

1  bothered with the request for everything every time.  It can
2  just be asked for individual pieces of that or objects.  And
3  then you can organize those to display it to the user.
4          So don't just take the complaint's word for it.
5  Also, if we look specification, that is exactly what is said
6  in the specification.  So it is saying interactive computer
7  networks are not new.  They're something that existed but we
8  want to improve it.
9          They involved in the past hierarchical
10  architecture of the central host computer.  And in the
11  bottom highlighted part, in such networks, the host has
12  to do all the work.  And that is the problem that causes
13  network slowdown.
14          Similarly, in the *PalTalk* case, the technical
15  challenge that was addressed was unique to the world of
16  interactive software application shared over a computer
17  network.  So it fits "hand in glove" with the idea of
18  addressing something specific to interactive computers
19  networks and interactive applications.
20          The specification of the '967, the specification
21  of the '967 leaves no doubt that it is directed to improving
22  computer performance.  It says that objects are structured
23  in an architecture that allows display data to be relocated
24  and reused on the screen to make up other screens, and
25  they can be dynamically created in response to the user's

19

1  request.  And,
2          Then at the bottom quote on slide 9:  Because
3  the processing formally done by the host is done by the
4  reception system, that is what allows the performance of the
5  system to be improved.
6          The '849 patent on slide 10 is specific to
7  advertising.  And it talks about how you can use it for
8  advertising and you can see whether advertising is likely
9  to be used again and, based on whether it is likely to be
10  used again, store it at the user's computer so you can
11  selectively store advertising at the user's computer and
12  therefore response time is reduced.
13          So what we see here on slide 11 is a
14  demonstration of this.  This is, on the left-hand side, a
15  representation of sending down the entire application, the
16  entire command menu, the entire advertising down to the user
17  in a sequential manner.  So that is the problem that existed
18  in the prior art.  And,
19          The solution was to break it up into pieces, as
20  we'll see on the next slide.  But the *MAZ Encryption* case
21  explains that when you disparage the prior art and you
22  explain why it was wrong and what the technical problem was,
23  that helps determine something is patent eligible.
24          On the next slide here, 12, we see how the
25  Filepp patents solve the "dumb terminal" approach.  This is

20

1  an adaptation from Figure 3a and it shows how in application
2  it can be broken up into different segments.  The blue here
3  is representing what can be stored at the user's computer.
4  The green, what is stored at the host computer.  And then
5  it can be combined on the fly when the user wants to do
6  something.
7          So here on the left-hand side is a little bit
8  busy, but what you see is the next path jump in the window
9  portion up in blue are what are being retrieved from the
10  user's hard drive and the user's system, which is on the
11  bottom, and the other components are being retrieved from
12  the file server or the host system to combine to create the
13  presentation that the user sees.  And that is supported by
14  the quotes from the specification on the right-hand side.
15          A common refrain during opposing counsel's oral
16  argument, that is just what the specification says.  That
17  is not in the claims.
18          If we look at the claims here on the next slide,
19  we see that it is in the claims.  In fact, it talks about on
20  the left-hand side from the '967 patent, claim 1, generating
21  a screen display.
22          That is at a reception system.  You create it
23  out of portions.  The portions are being constructed of
24  objects.  Those objects can be dynamically combined from
25  objects stored at the reception system or unavailable from

21

1  the network.  Those objects can be used in more than one
2  application so they can be reused to reduce demand on the
3  host.
4          You can have two different partitions:  one
5  for presenting applications and one for presenting command
6  functions.  The command functions allow you to switch
7  between applications which is the entire idea of having
8  reuse of objects across applications to decrease demands on
9  the host.
10          This is in stark contrast to the prior art
11  which did not have the idea of modular applications or of
12  partitions that could be used for specific content.  And,
13          Then "selectable to permit movement between
14  applications" is how you are able to harness the ability of
15  reuse of objects.
16          On the right-hand side, you see something similar.
17  The '849 patent is directed specifically to advertising.
18  And we talk about how you structure advertising so that it
19  can be used in a combination of applications.  And then you
20  selectively store it to the user's reception systems so that
21  you can use the objects that are most likely to be demanded by
22  the user in the future.
23          All of this is in the claims.
24          If we look at -- so we looked at the claims, the
25  specification, the complaint.  How else do you know that

22

1 this is really directed to a specific technological problem?
2 The prosecution history tells the same story. It talks
3 about how the patents were developed as part of the Prodigy
4 service, and how that called for a new approach.
5       In the middle highlighted part on slide 15, it
6 talks about how you need to reduce response time because you
7 needed it to supply things to so many users, and you had to
8 break away from the dumb terminal approach that is in the
9 bottom of slide 15.
10      On slide 16, it explains how this is
11 accomplished: by breaking data and program code into
12 objects and then harnessing the power of the subscriber's
13 PCs so you can compose things on the fly.
14      So I think one important thing to look at, too,
15 is the Court's prior Report and Recommendation. In there,
16 the Court already found, on the way to finding that the
17 patent was patent eligible under *Alice* Step Two, found
18 that the claims can be seen as an attempt to improve the
19 functionality of computer networks.
20      I think that is inevitable from all the evidence
21 of the complaint, the specification, the claims, and the
22 prosecution history. And *Enfish* tells you straight up that
23 claims whose claim focus is on an improvement to computer
24 functionality is patent eligible.
25      *McRO* tells you that claims directed to a

23

1 patentable, technological improvement are patent eligible.
2       So the finding that the Court has already made
3 supports patent eligibility under *Alice* Step One and that is
4 why under *Enfish* and *McRO,* the claims are patent eligible.
5       The PTAB decision reached a similar result. And
6 I think what they really focused on, the PTAB decision, was
7 not the meat of what the PTAB really found. What the Patent
8 -- what the PTAB rested its argument on or its decision on
9 was that the '849 patent was almost exclusively dedicated to
10 solving a problem arising in computer technology bandwidth
11 with a computerized solution, local storage, and thus found
12 the claims to be patent eligible. And the PTAB didn't rely
13 on a particular construction of the claims. It found that
14 relying on a broadest reasonable interpretation.
15      So let's look at Groupon's characterization of
16 the claims as "local storage."
17      If you look at the arguments that opposing
18 counsel made in their oral argument, they said *Enfish* stands
19 for the principle that you should not oversimplify Step One.
20 But in their briefs, they oversimplify the claims as
21 directed just to local storage.
22      If you look at their *Markman* brief, though, you
23 see the truth of the claims come out where they admit that
24 the claims are directed to something far more specific.
25 They say specifically the sole independent claim of the '967

24

1 patent is directed to concurrently presenting applications
2 and commands on a single screen display. And the five
3 independent claims of the '849 patent are directed to
4 concurrently presenting applications and advertisements on
5 a single screen display. The displays are constructed by a
6 reception system. Software running on the users' computer.
7 The display layout includes separate partitions which
8 applications, commands, and advertisements are selected
9 separately but concurrently displayed. And they go on to
10 explain how the claims are directed to something far more
11 specific.
12      Under their own interpretation of *Enfish,* that
13 should be the inquiry of how to determine what the claims
14 are directed to. What are they really doing here?
15      I think that their analogy which they made in
16 the oral argument as well, that local storage was known by
17 the Romans, is really inapt for several reasons.
18      If you think about it, it just doesn't make
19 sense because local storage in the local world has nothing
20 to do with local storage here. Even if you were just to
21 look at the idea of local storage, the constraints are
22 completely different. Unlike physical objects, the same
23 data objects can be stored in different locations. And
24 multiple objects can be combined on the fly because you can
25 send things immediately from two locations when you need it

25

1 unlike, for example, buildings or patibles or whatever else
2 in the supply chain for the Romans. The solutions are
3 completely different. The Filepp patents say store things
4 at different locations and break them up. The Roman solution
5 is let's get everything to the village and we want it back.
6       The technological challenges are completely
7 different. It's not where objects are located, which is the
8 problem with the Filepp patents, it is how do you make sure
9 that processing power is used most efficiently which doesn't
10 even make sense to ask in their example.
11      They don't try to address anything dealing with
12 displays, applications, partitions, objects, selectively
13 storing, command functions, and advertising because all of
14 that doesn't make sense in the real world.
15      Finally, if we look at their cases that they
16 rely on most heavily, you see a common theme here. You have
17 *Electric Power Grid.* That dealt with taking an off-line
18 idea of using electrical grids and how to analyze them, and
19 just said let's do it on a computer.
20      If you look at *Content Extraction,* that took
21 the idea of how do we process information from hard copy
22 documents, something that had been done by humans, let's do
23 it on a computer.
24      If you look at *Ultramercial,* it talked about
25 using advertisements as exchange of currency, something that

26

1  had been used, for example, on newspapers or TV in the past.
2  Let's just do it on a computer.
3        In contrast, if you look at *McRO*, *Enfish* and the
4  Filepp patents, it talks about something that is already on
5  a computer.  How do we make that better?  How do we improve
6  it?
7        So the idea here is are we targeting a problem
8  that is on a computer?  And the evidence here is uniform
9  that that is exactly what the Filepp patents are doing.
10       Groupon relies heavily on the *Visual Memory*
11  case.  They say, well, this proves that *Enfish* and *McRO*
12  didn't change the law and we can distinguish using the same
13  analysis of visual memory.
14       But *Visual Memory* simply recognized something
15  that had already existed in the past, which was using
16  physical devices or computer devices generically, does not
17  confer patent eligibility.  We knew that before.
18       Really what it is saying is you can't just say,
19  hey, I'm going to do something that existed in the human
20  realm and put a computer there.  But that is not what the
21  patents are doing.  The patents are improving a system that
22  is already on the computer.
23       And the *Visual Memory* case also recognizes
24  that the levels of abstraction at *Alice* Step One must be
25  consistent with the claims themselves.  If you look at the

27

1  claims on slide 22 of the *Visual Memory* case, I put example
2  there of claim 1.  It is really just saying a main memory, a
3  cache, and programmable, operational characteristics.
4        There is no meat.  There is nothing there.
5        This case is far more analogous to *PalTalk*
6  which I mentioned a couple times before.  *PalTalk*
7  examined the specification and noted that there is no apt
8  brick-and-mortar analysis or analogy that could be used and
9  noticed how the specification was focused on how to improve
10  computer technology.  Specifically, interactive software
11  applications.
12       That is exactly what we have here.
13       *Alice* Step Two --
14       THE COURT:  Before you move on to Step Two.  So
15  is it IBM's view, after all that, that the dispositive
16  question of Step One is are the claims directed to improving
17  computer function and that is all I have to ask?
18       MR. OUSSAYEF:  Yes, but I think the key question
19  is improving computer functionality.  So the cases that we
20  see which talk about, hey, it has computer components in
21  there, the question really has to be are you improving those
22  computer components or not?
23       So, yes, Your Honor, if it really is focused on
24  improving a computer functionality like decreasing bandwidth
25  or increasing the number of users, then it passes *Alice*.

28

1        THE COURT:  So that would seem to directly
2  contradict Judge Andrews in *Visual Memory*.  I understand
3  you parsed through the holding, but that question, is it
4  dispositive?  He seems to say no, and you would have me say
5  yes.
6        MR. OUSSAYEF:  I think in *Visual Memory*, what
7  you are seeing there is not something that is focused on
8  improving the computer.  I think it is using -- so if we
9  look at *Visual Memory*, we have computer components, main
10  memory, a cache, and programmable operational characteristics.
11  But it does not say how that is improving the computer.
12       So those are components.  They might be used
13  for useful things but it is not addressing a problem that
14  existed.  And it's not anything that is more than just the
15  components themselves.  It's a structural -- it's claiming a
16  structural thing without any kind of solution to a technical
17  problem.
18       THE COURT:  I'm seeing that as slightly
19  different than the question I'm asking.  If we look at slide
20  5 that defendants showed us, I'm sure you are familiar with
21  it, they quote Judge Andrews as specifically saying:
22  Contrary to plaintiff's argument -- the plaintiff there, of
23  course -- the question of whether a given claim improves the
24  way a given computer works is not what by itself determines
25  it.  I understand IBM's position to be directly contrary to

29

1  that.  I understand you have an argument to distinguish his
2  holding but on that question of law, you disagree.
3        MR. OUSSAYEF:  No, Your Honor.  In fact, right
4  after that quote by Judge Andrews, there is another quote
5  that says, actually, the problem that, or the way you solve
6  the problem or the way you ask the question under *Enfish* is
7  not whether it improves a computer generally but whether
8  there is a specific technical problem that the claims seek
9  to improve.
10       So there are two quotes that come from the
11  *Enfish* decision, and the plaintiff in the case cited the
12  first quote where it discussed the proposition more
13  generally.  Where the *Enfish* Court said, if you look
14  generally to whether there is an improvement, then that
15  indicates that you might pass Step One.  And there is a
16  later quote that says the specific inquiration is whether
17  there is a specific solution that is directed to computer
18  problem.
19       So Judge Andrews was kind of comparing the more
20  loose characterization of *Enfish* versus the more strict and
21  rigorous characterization of *Enfish* later on.  It's right
22  after the quote that the defendants put up on their slide 5
23  in the Andrews's decision.
24       THE COURT:  All right.  So if I want to
25  understand IBM's position, you do agree that I have to do

30

1  more work at Step One than simply ask are these claims
2  directed to improving computer technology. Answering that
3  question may get me a long way toward siding with you but
4  I'm not done. Is that fair?
5      MR. OUSSAYEF: Yes, I think that is fair. I
6  think if you add that there needs to be a specific
7  improvement that you are focused on as opposed to just
8  asserting that there is an improvement without having
9  anything to back you up.
10     So if you had a patent that just said, hey,
11 here are my components, I improve computers and there is
12 no detail in the specification, there is nothing else that
13 supports it from the state of the art. There is nothing
14 that explains why that is an improvement in computer
15 capabilities. I think in that case, maybe that is a gray
16 area for *Alice* Step One. I think that is not at all what
17 we have here.
18     THE COURT: All right. Then in terms of the
19 relationship of these claims to the Prodigy embodiment, and
20 this question may spill over to Step Two, and fair enough if
21 you want to answer it as to Step Two, but the argument from
22 defendants is part of the problem here is you didn't focus
23 the claims on Prodigy and it's much, much broader than that.
24 What is IBM's response to that?
25     MR. OUSSAYEF: I don't think it is much broader

31

1  than that. We'll go over both the specific implementation
2  details that are important here, both from the claims
3  themselves and also the Court's construction of those
4  claims, but also we'll go over the preemption issue and
5  we'll see why defendant's characterization that this covers
6  any meaningful way of displaying content on the web is
7  simply incorrect.
8      THE COURT: Okay.
9      MR. OUSSAYEF: So what is an inventive concept
10 under *Alice* Step One?
11     This is what *DDR Holdings* says, is that if you
12 are addressing a challenge that specifically arises in the
13 realm of computer networks and where the claimed solution is
14 necessarily rooted in computer technology, that is something
15 that passes *Alice* Step Two.
16     Claims that specify how interaction between
17 computers may be manipulated.
18     *Bascom* also cautions that we need to look at the
19 combination of elements, so taking potshots at just isolated
20 ideas like, hey, storage is new or organizing data is new,
21 but -- sorry, is not new, et cetera, as the defendants do,
22 did in their oral argument is not sufficient. You must
23 address the claims as a whole and not just certain claim
24 constructions or certain concepts from the patents without
25 addressing it in its entirety.

32

1      So if we look at *Alice* Step Two, a theme tends
2  to emerge, which is even if you are taking -- even if you do
3  have an abstract idea, bringing it into the computer realm
4  involves specific computer problems and computer solutions.
5  It can still be ineligible under Step Two. So the question
6  is, do you have to do something innovative on a computer in
7  trying to adapt an abstract idea to a computer?
8      So the Filepp patents solve Internet centric
9  problems. This is very similar to what we discussed
10 previously. It kind of melds with some of the same evidence
11 we presented for *Alice* Step One, so I won't belabor the point.
12 But the idea was that the Filepp patents were addressing a
13 problem that is specific to network programming: bottlenecks,
14 slow down, limitations on a number of users, et cetera. And
15 the solution was on a way to reduce host processing.
16     And what *DDR Holdings* says is that the claim
17 solution amounts to an inventive concept for resolving this
18 particular Internet centric problem, rendering the claims
19 patent eligible. That is what we have here.
20     How does the patent do it?
21     Well, the patent does it by splitting up what
22 used to be sent down in its entirety into objects. Those
23 objects can be organized into logical partitions. The
24 partitions can be retrieved and selectively stored as needed
25 and that is what we went over previously. And *DDR Holdings*

33

1  says that claims that specify how interactions between
2  computers are manipulated, that also passes *Alice* Step Two.
3      So let's look at the Court's previous
4  constructions and just see how that interplays with the
5  claim language.
6      The idea of formatting -- and so what we have
7  here on this table on the left is the selected claim terms
8  that were construed by the Court previously.
9      In the middle, we have the actual constructions
10 from the *Priceline* case. And in the right, you have the idea
11 of inventive concepts. So the idea of formatting advertising
12 for potential use of the plurality of applications, that is
13 important because at the time, there was no reuse in that
14 kind of way because everything was used in its entirety as a
15 monolithic construct that got pushed down. So formatting
16 advertisements to make sure they could be used for multiple
17 applications or were compatible allows you to reuse
18 advertising and minimize network bandwidth. That is on the
19 right.
20     Next to each of the inventive concepts we've
21 supplied is an illustrative quotation from the patents.
22     "Selectively storing" was construed as
23 "reception in storing, in anticipation of display."
24     The idea of anticipating what the user might
25 want and storing at the users' computer meant that you could

34

1    request things at different times.  So it's not you were
2    asking for everything at once.  You could ask for it once
3    and then ask for the rest later on.
4          So that was also an inventive concept.
5          The "storage control parameter."  Defendant kind
6    of belittles this concept but the idea of a parameter that
7    specifies initial or continued storage is an important
8    concept, too, because if you send a parameter that says
9    whether or not you should store it, what the patent says is
10   that that allows you to store things that are more likely to
11   be used by telling the reception system that it is a good
12   thing to hold on to for later.
13        The "objects being retrieved" claim element, the
14   Court construed it as a kind of "if-then" framework where
15   you can take some of the objects from the host or from the
16   reception system depending on whether they're located at the
17   reception system or not.  That is the idea of dynamically
18   retrieving objects from both locations and combining it.  And,
19        The idea of the "applications" being a sequence
20   of pages opened at the screen, the idea of the sequence of
21   pages is important because together with the language of
22   "objects may be used in more than one application," it
23   allows for the transition between those applications to
24   reuse objects.  That is another way you decrease the use of
25   bandwidth.

36

1          So to your point, Your Honor, the construction
2    of "objects," the basis for that construction was that there
3    is other language in the claims.  This is from the Court's
4    claim construction opinion.
5          There is other language in the claims that
6    dictate that objects have a predefined structure and that
7    at least some of the objects may be used in more than one
8    application, which implies that a uniform format for objects
9    designed for use with multiple applications is already in
10   the claims, so including uniform would create redundancies.
11   So it is not so much that the Court rejected the idea that
12   "objects" are specific in some way but rather the Court was
13   worried about putting redundancies into the claims.
14        Furthermore, if we look at slide 31, the Court
15   construed terminology that contains the word "object" in it.
16   So claim 1 of the '967 patent, there is claim language about
17   the objects being retrieved from objects stored at their
18   respective reception system, or if the current version of
19   objects are not present from the reception system, then from
20   the network.
21        And that kind of dynamic recreation of content
22   from objects from both places is something that still shows
23   that the idea of breaking up content into objects and then
24   dynamically putting it back together is an inventive concept.
25        And this is a mechanism that the patent

35

1        If you look at Groupon's motion, opposing
2    counsel said something that was a little bit off, which was
3    IBM hung its entire hat on the construction of "objects."
4          Well, IBM actually offered many constructions
5    and explained how all of them were innovative in the
6    previous briefing in the *Priceline* case, and it focused on a
7    number of different terms.  And the reason why Groupon is
8    focusing on "objects" is because that is one of the few
9    terms where IBM didn't get the full construction it had
10   requested.
11        But Groupon ignores the construction of
12   "application," "permits random movement," "storage control
13   parameter," et cetera, et cetera, and as shown on the
14   previous slide, those all involve inventive concepts.
15        THE COURT:  Do you think that the construction
16   of objects helped your defense on 101 and Step Two at all?
17        MR. OUSSAYEF:  I think it did.  On the next
18   couple of slides, we'll see how the use of the "objects" in
19   the claims and the Court's construction of the terms that
20   contain the term "objects" show that they're inventive even
21   if "objects" is simply construed as "data structure."
22        *Bascom* also invites the idea of just focusing on
23   one idea or one part of the claim in isolation and putting
24   blinders as to the other constructions or the other terms.
25   They need to be evaluated as an ordered combination.

37

1    specifically says was invented.  It's described at the '967
2    patent at lines, column 1, lines 46 through 55.
3          Likewise, the Court's construction of the '849
4    patent, "selectively storing" refers to selectively storing
5    objects.  And it explains that how prefetching advertising
6    objects, how the term means prefetching advertising objects
7    and storing at a store established at the reception system
8    in anticipation of display concurrently with the
9    applications.
10        This is also an inventive concept that the
11   patent specifically calls out.
12        It says how that minimizes the potential for
13   interference between the supply of interactive service
14   applications and advertising.  That is the '849 patent at
15   column 2, 54 through 58.
16        So it is not just the term "objects" in
17   isolation.  It is the Court's reasoning in finding that the
18   term "objects" also encompasses some of those limitations
19   that IBM sought to explicitly incorporate.  Those were
20   already implicitly in the claims and it is the use of the
21   word "applications" and the entire phrase involved, not just
22   "objects" by itself.
23        This isn't one of those patents where it just
24   says "objects" or "data structures."  It doesn't tell you
25   anything about how to use them.

38

1 　　　Groupon really doesn't analyze the independent
2 claims in any detail as well.  So there was a little bit of
3 discussion of some of the independent claims and how the
4 storage control parameter really wasn't helpful.
5 　　　That really doesn't take into account the
6 combination of the storage control parameter with objects
7 that are designed to be stored at the reception system,
8 reused if needed in applications that could have objects
9 that are used in one application and then another and then
10 requested only if needed.
11 　　　The "storage control parameter" adds the idea
12 that you can help the reception system know what objects to
13 hang on to by giving it information through a storage
14 control parameter.
15 　　　The '849 patent also has dependent claims that
16 were not discussed by Groupon.  This talks about storing
17 object identifications based on establishing characteristics
18 for the reception system users.  So if you know a user is
19 likely to request, say, a special kind of deal on Groupon's
20 website, that characterization is useful because you can
21 have them store that type of data at the reception system
22 and then the next time they visit that website, they're more
23 likely to reuse that object and not have to request it again
24 from the host.  That is an inventive concept as well.  That
25 is a specific idea that is called out by the '849 patent as

40

1 delivery of regional broadcasting.  So something that, you
2 know, existed with radio signals and did not have a further
3 specification of how that was done.
4 　　　If you look at the cases we cite, it's really
5 about computer centric problems, solutions, that is *DDR* and
6 *Bascom*, and the Filepp patents fall into this category
7 because they deal with the problems of network bandwidth and
8 the fact that the host had to do all the user data requests.
9 　　　And the solutions are the similar type of thing
10 where you are doing something that really doesn't make sense
11 in the real world, splitting content up and shipping it to
12 different areas of the world and then reducing processing in
13 that way.  That is not something that happens with Roman
14 armies or with real world situations.
15 　　　So really one way of thinking about *Alice* Step
16 Two is even if you were convinced that it was the abstract
17 idea of local stores that we're talking about, we don't
18 think it is, but even if you were convinced of that, is
19 bringing the idea of local storage on to a computer, is that
20 something that involves computer specific challenges?
21 　　　Yes, it does, because local storage to the
22 computer has nothing to do with local storage in the real
23 world.  It is done for different reasons.  It has different
24 technical constraints and it succeeds for different reasons.
25 　　　So now, the last part is alleged preemption.

39

1 well.
2 　　　So when we look at their *Alice* Step Two cases,
3 there is really no computer centric problem or computer
4 centric solution that is called out by their cases.
5 　　　So the cases they primarily rely on is *Apple v
6 Ameranth, CyberFone,* and *Affinity Labs.*
7 　　　*Apple* dealt with the idea of taking a menu for
8 ordering like at a deli and then just adding computer
9 components to do it on the Internet.  So it was not solving
10 a computer problem, it was putting a human world problem on
11 the Internet or arguably not even a human problem at all.
12 　　　*CyberFone* was about exploding information, and
13 the Court said what does exploding information mean?  It
14 means sending it somewhere else.  But that's the same.
15 That is an information gathering technique.
16 　　　So if you look at defendant's cases that say
17 organizing data isn't something that passes *Alice* Step One or
18 Two, they're really missing the point because the idea is not
19 organizing data just for, you know, keeping things in the
20 right place.  The idea is let's make computers work better by
21 splitting things into parts and dynamically recreating it.
22 It's not the idea of just organizing things that humans had
23 been doing forever to organize correspondence or e-mails or
24 that kind of thing.
25 　　　*Affinity Labs* talked about out of region

41

1 　　　So their assumption that we preempt all Web
2 pages is simply an assertion, and there is no evidence to
3 back it up.  Even if there were evidence, that is not
4 something that is decided on a judgment on the pleadings
5 procedural standpoint.
6 　　　It ignores several ways in which Groupon could
7 provide its website over the Web without infringing the
8 Filepp patents.  That is on slide 38.  Such as:
9 　　　Presenting all applications on one page.
10 　　　Storing everything at the host.
11 　　　Not configuring objects or structuring
12 advertisements for potential use with multiple applications.
13 　　　Not using parameters that control storage of
14 content.
15 　　　Not using command functions, et cetera.
16 　　　The patent is explicit that there are some prior
17 art ways of doing interactive computer applications, but
18 that it is not claiming them.  It is improving them.  That
19 is at the bottom of slide 38.
20 　　　This isn't all theoretical either.  We pointed
21 out specific examples and Groupon kind of dismisses them out
22 of hand and says, well, that doesn't really count.  Those
23 aren't really examples of things that we could do that don't
24 infringe.
25 　　　But I think they're important to review.

42

1    First, Groupon already sends some of its Web
2    pages using PDFs and it sends the entire PDF to the user in
3    kind of the prior art way that we were discussing earlier.
4    All the content is sent at once. It is not
5    broken up in any way. There is no partitions there. That
6    is an example of how they could display content to a user
7    if they wanted to.
8    We also didn't accuse Groupon's blog website.
9    The reason why is because the blog doesn't have command
10   functions for moving from one application to the next.
11   There are many other examples. For example, we
12   don't accuse their mobile applications of infringing the
13   '967 patent.
14   You know, they're kind of taking a confirmation
15   biased point of view. They say, look at the entities that
16   IBM has asserted against. It's asserted against all five of
17   these companies so it must mean it preempts everything.
18   Not so. There is a detailed analysis that
19   takes place before asserting against some companies and some
20   companies end up infringing and some companies don't end up
21   infringing.
22   Just saying that because there has been an
23   assertion against multiple targets that there is a presumption
24   concern simply doesn't make sense.
25   The Court in the *Priceline* action and the Court

43

1    here we believe as well should decide that on the present
2    record, it is not clear how many of defendant's websites are
3    at issue, whether the patents cover almost all websites in
4    existence. In fact, there is evidence that they do not.
5    Whether there are other methods that exist of
6    locally storing information and advertising for use in
7    presenting displays to a user. And there is examples that I
8    have given on the previous slide of other ways to do it.
9    So their argument that we attempt to the preempt
10   all standard uses of the Web which rely on local storage is
11   simply not true.
12   And there is examples of presenting content to
13   the user, using local storage which we have given to the
14   Court which do not fall under the patent, so that the
15   patents do not raise preemption concerns.
16   And if the Court must decide these issues now,
17   Groupon's motion should be denied under the *MAZ Encryption*
18   case.
19   The Groupon's arguments also ignores the
20   findings in the Groupon action that additional factual
21   inquiry as to how inventive the patents were would be
22   helpful as well.
23   Just like in the *Priceline* case, Groupon can't
24   circumvent a factual inquiry into the innovative nature of
25   the claimed inventions.

44

1    Groupon even admits that the inventions predate
2    the World Wide Web. So they're citing cases of things, of
3    patents that came out in 2006 or 2008 that try to capture
4    the Web after the Web existed for ten years and they say
5    those cases are analogous to what we have here.
6    Not so. The Filepp patents came before the Web
7    and they really were innovative at the time because what
8    looks obvious to defendants right now or not innovative
9    to defendants right now is not something that was not
10   innovative at the time. And the complaint, the patent, the
11   prosecution history and the claims all indicate that it was
12   innovative idea and thus it should pass *Alice* Step Two.
13   Thank you.
14   THE COURT: Thank you very much.
15   Mr. Hadden.
16   MR. HADDEN: Thank you, Your Honor.
17   Let me start with something that counsel for
18   IBM said toward the end. They sort of admitted that this
19   patent is about moving local storage on to computer systems.
20   And he says that doing so would create or provide specific
21   challenges, technical challenges. And that is no doubt
22   true, but what they're claiming is exactly that idea, moving
23   local storage on to computers. And that is an abstract
24   idea.
25   Now, if they had claimed their specific solution

45

1    to the technical challenges of applying the idea of local
2    storage to computers, their specific solution would be
3    patentable. It would be an inventive concept perhaps. But
4    that is not what they are patenting. And they essentially
5    admit that is not what they're patenting.
6    So their argument, going back to Step One which
7    is, as Your Honor asked -- right? -- is their argument, if
8    it touches computers, if the patent specification says it
9    is a gee whiz great improvement, does that get you 101
10   immunity? And that is clearly not the law, right? It is
11   not the law in this District. It is clearly not the law in
12   the Federal Circuit, right?
13   The *IV v Symantec* case, the Federal Circuit
14   found that virus scanning on a network was abstract and
15   invalid. It's clearly a case that is aimed at improving
16   computer networks. That is what that patent is about.
17   *Appistry v Amazon*, distributed computing across
18   processors. That is directed at improving computers. No
19   doubt the specification was full of lies about what a great
20   improvement it was. Invalid, that is not the test. Right?
21   The test after all those cases, *Enfish, TLI,*
22   *Affinity Labs* is whether the claim is to a specific
23   technical solution. That's the test. And they haven't
24   pointed to it. Right? They got up here on Step Two and
25   said this is inventor concept, this is inventor concept,

46

1   this is inventor concept.
2           Just going through the claims and saying the
3   specification said this is cool, the specification said this
4   is cool, that is not an inventive concept under Step Two of
5   *Alice*.
6           The inventive concept is the specific technical
7   solution that takes that abstract idea and makes it
8   something concrete you can actually own.  And they haven't
9   pointed to what that is in these claims in their briefs and
10  they didn't point to it, Your Honor, today because it's not
11  there.
12          It clearly is not data objects having a
13  prescribed data structure.  That is a totality.  A data
14  structure has a structure.  It is a structure.  That is
15  meaningless.
16          So at the end of the day, I didn't hear any
17  concrete solution.  And there is none because they choose to
18  claim the idea itself.  And the argument that somehow you
19  can do that if you are in the realm of computers and your
20  specification says you made great advances, that is just not
21  the law.
22          On the preemption issue, I mean their arguments
23  speak for themselves; right?  And they get up here and say,
24  don't worry, we can take down the World Wide Web.  You can
25  still download PDFs.

47

1           That is what we're left with?  I think it is
2   clear what this patent provides and what the claims disclose
3   cannot possibly justify that range of preemption.  Thank
4   you, Your Honor.
5           THE COURT:  Thank you.  All right.
6           MR. OUSSAYEF:  Just briefly, Your Honor.
7           Your Honor, Karim Oussayef again.
8           The presumption issue is a little bit of a
9   moving target because every time we come up with a
10  noninfringing mechanism, now they're saying, well, are you
11  saying everything except for that noninfringing example?
12  Obviously not.  There are many other examples.  Another way
13  would be not selectively storing advertisements but pushing
14  them down regardless.
15          There are many other examples as well.  But
16  suffice to say, there are examples of noninfringing ways
17  that can be determined from the claims themselves.
18          But I wanted to kind of address the case of
19  *Visual Memory* in a little bit more detail since the parties
20  are going back and forth about it.
21          What we have here, is underlined here is Judge
22  Andrews in the *Visual Memory* case.  And what I was trying to
23  explain earlier and which might have not been entirely clear
24  is that although the Court rejected plaintiff's argument
25  that the question is whether a claim improves the way a

48

1   computer works, and said that that by itself is not
2   determinative.  The Court went on to cite later on in *Enfish*
3   the idea that the question is whether the focus of the
4   claims is on a specific asserted improvement in computer
5   capabilities, i.e., the self-referential keyboard or set
6   of process that qualifies as an abstract idea for which
7   computers are merely invoked as a tool.
8           So here what we really have is the question of
9   are you using computers as a tool to do something that
10  exists outside the computer realm or do you have a specific
11  solution?  And,
12          The answer here is we have a specific solution.
13  The specific solution is not local storage.  I went over
14  in the claims specifically how local storage is not enough.
15  The idea of breaking things up, storing parts of them at the
16  user's reception system, parts of them at the host computer,
17  then having applications which can be navigated, which we
18  use those objects, and then dynamically combining them when
19  you need them and selectively storing them at user's device.
20          Devices based on the likelihood that they be
21  reused, those are all concepts which were frankly unaddressed
22  and the sum total of the argument was I didn't hear anything
23  about inventive concepts, it's just local storage.  That is
24  not true.
25          So, therefore, the patents are eligible, if not

49

1   under Step One, under Step Two.
2           THE COURT:  Thank you.  Mr. Hadden, you can have
3   the last word, if you want to add anything.
4           MR. HADDEN:  Unless Your Honor has questions.
5           THE COURT:  No, not at this time.  We will take
6   a short recess.
7           (Brief recess taken.)
8           *   *   *
9           (Proceedings reconvened after recess.)
10          THE COURT:  Have a seat.  I think we're ready to
11  move on to *Markman*.  You may proceed.
12          MR. OUSSAYEF:  Your Honor, my colleague, Laurie
13  Stempler will begin with the *Markman* arguments.
14          THE COURT:  Okay.  That's fine.
15          Good morning.
16          MS. STEMPLER:  Good morning, Your Honor.  Laurie
17  Stempler from Desmarais on behalf of IBM.  May it please the
18  Court.
19          We passed up a binder that's organized that is
20  divided by the disputed terms with a copy of the patents in
21  the back for Your Honor's reference.
22          THE COURT:  Thank you.
23          MS. STEMPLER:  So I would like to begin with Tab
24  A, page 7.
25          This is just -- oh.  Excuse me.

50

1          (Elmo settings adjusted.)

2          MS. STEMPLER:  I am not going to -- so if we
3   turn to slide 7, I'm not going to go through a detailed
4   overview because my colleague Mr. Oussayef had gone over
5   that in detail during his presentation earlier except to
6   note that something useful to keep in mind during this
7   presentation is that in the prior art for the Filepp
8   patents, the entire application was being sent to the
9   reception or the user terminal.  If the user wanted to
10  assess it again, then the entire application had to be
11  sent again.

12          Contrast that with the invention of the Filepp
13  patents, '967 and the '849, and you have objects being
14  selectively stored and retrieved locally at the reception
15  system which allows for more flexibility and more efficiency.
16  And as Mr. Oussayef mentioned the '967 patent is directed to
17  a command function, an application command function that
18  manages the display and the '849 patent is directed to also
19  having advertising being selectively stored and presented as
20  needed.

21          So I'd like to begin by discussing what we've
22  termed the "partition" disputed terms.  And the reason that
23  we grouped them together, there are five of them, is that
24  there are issues that are common to all of them.

25          The first thing that is the same is that they,

51

1   all of them had either the word "partition" or the word
2   "portion."  The parties have already agreed that those words
3   mean the same thing.

4          The "partition" terms of the '967 patent are,

5          "a first partition for presenting applications,"
6   and

7          "a second partition for presenting a plurality
8   of command functions."

9          We have highlighted those in exemplary claim 1.

10         In the '849 patent, the disputed partition terms
11  are,

12         "structuring applications so that they may be
13  presented through the network at a first portion of one or
14  more screens of display"/"structuring applications so they
15  may be presented at a first portion of one or more screens
16  of display."  And,

17         "at a second portion of one or more screens of
18  display concurrently with applications."

19         So something to keep in mind is that the parties
20  have agreed that the words "partition" and "portion" should
21  be given their plain and ordinary meaning and those terms
22  were also given their plain and ordinary meaning in the
23  previous *Priceline* litigation.

24         The reason that that is important is if we look
25  at the first disputed partition term, "a first partition for

52

1   presenting applications."

2          Well, the term "partition" we've already agreed
3   on, and the term "applications" we have an agreed
4   construction for that as well.

5          That leaves the words "a first" and "for
6   presenting."

7          There is a presumption, as Your Honor knows,
8   that the claim language should be given its customary and
9   ordinary meaning, and that is a very heavy presumption to
10  overcome.  You need to either have the patentee acting as
11  a lexicographer and given a clear definition in the
12  specification or there has to be something unclear.

13         The word "a first" and "for presenting" are not
14  unclear, and that is why IBM has proposed the plain and
15  ordinary meaning for this term, and it said so for the other
16  "partition" terms as well.

17         In the alternative, should the Court decide to
18  construe the term, we propose "a first area for presenting
19  applications."  And the reason for that is that there is a
20  sentence in the specification that we'll look at in a few
21  slide from here showing that partitions are areas.  The
22  patentees actually tell us that.

23         So IBM's constructions are faithful to the claim
24  language.  The only change that would be made, should the
25  Court decide to construe the term, is "partition" to "area."

53

1          Let's take a look at the defendant's
2   construction.

3          They have no basis in the claim language.  They
4   take "a first" and they changed it to "a fixed," so they're
5   somehow equating "first" with "fixed."

6          There is no definition in the specification that
7   would suggest that change.  And it simply doesn't make sense.

8          Then they take "partition" and they change it to
9   "portion" and then they add "of the screen."

10         So they added in additional language even though
11  the parties have already agreed that "partition" and
12  "portion" are the same thing.

13         Then they take the phrase "for presenting" and
14  they turn it into, "that is dedicated for displaying."

15         They just made that phrase up.  It doesn't
16  appear anywhere in the specification.

17         The same issue exists with this term, "a second
18  partition for presenting a plurality of command functions."

19         Again, the parties have agreed that "partition"
20  gets its plain and ordinary meaning.  And,

21         Then "command function," the parties have agreed
22  on a construction for that as well.  That means "a second,"
23  and "for presenting a plurality of."  These are not words
24  that a jury would have a hard time understanding.

25         Again, IBM's construction is that it should be

54

1  given its plain and ordinary meaning or in the alternative
2  to change "a second partition for presenting a plurality of
3  command functions" to "a second area for presenting a
4  plurality of command functions."  And that again is based on
5  a sentence in the specification.
6          If we look at Groupon's construction, they take
7  "a second," and they change it to "a fixed."  So now, they
8  have told us that first is fixed and they also said that
9  second is fixed.
10          We have already talked about the "partition"
11 being changed to "portion" of the screen.  They added "of
12 the screen" there.
13          And the next term, "for presenting," they
14 changed it again to, "that is dedicated to displaying."
15          And then they take "a plurality of command
16 functions," they remove the phrase "a plurality of" and they
17 add this whole phrase at the end, "which does not overlap
18 with the fixed portion of the screen that is dedicated for
19 displaying applications."
20          Again, that is a limitation that that sentence
21 is made up.  It doesn't exist anywhere in the specification.
22 So they're clearly adding unstated specifications in the
23 claims.
24          For the '849 patent, we have similar issues.
25 The parties agree that "structuring applications" can be

56

1  what is important to keep in mind is when you look at these
2  disputed partition terms together, they're kind of three
3  limitations that Groupon is trying to add in that the
4  partitions have to be fixed, that they have to be dedicated
5  to displaying applications, and that they have to be
6  non-overlapping.
7          None of those words with the exception of
8  "fixed," and I'll talk about that in a minute, none of
9  those words appear in the claims or in the specification.
10          The single instance where "fixed" appears in
11 conjunction with "the partition" is in a preferred
12 embodiment of the command functions.
13          So this is a clear example of trying to add
14 unstated and unsupported limitations into the claims.  And
15 it doesn't work.  Why?
16          Well, for one example, with respect to whether
17 partitions are fixed, the partitions from the specification
18 that they're citing are merely preferred embodiments, and
19 we'll look at that at that in just a moment.
20          With respect to the partitions being dedicated
21 to displaying specifications, the specification discloses
22 that some partitions, like a body partition, may also
23 contain a window partition.  So it's not just dedicated to
24 displaying applications.  It's doing other things.
25          And then with respect to the non-overlapping

55

1  construed as "formatting applications" but then for the rest
2  of the claim, the one change that IBM has proposed, should
3  the Court decide to construe the term and, again, our
4  position it should be given its plain and ordinary meaning,
5  but should the Court decide to construe it, would be to
6  change "the first portion" to "the first area."
7          The defendants, they take, "may be presented"
8  and they changed it to "are displayed."  So there is a
9  potential that is implicated in the "may be presented."
10 They get rid of that and they change it to "are displayed."
11          Then for the phrase "through the network," they
12 just delete it entirely.  They do the same thing with
13 "first" and "fixed" again.  Now "at a first portion,"
14 they're changing it to "on a fixed portion."
15          And then they're adding, they take out "of one
16 or more" and "of display."  So "of one or more screens of
17 display" just becomes "of the screen."  And then they add
18 on, "that is dedicated to displaying applications."  And
19 again, that phrase doesn't appear anywhere.
20          And then this is the fifth term, "at a second
21 portion of one or more screens of display concurrently with
22 applications."
23          And the same issues exists here.  I'm not going
24 to belabor the point.
25          I would like to turn to slide 26 because I think

57

1  term, the specification discloses overlapping partitions.
2          These just have no business being in the claim
3  language.
4          So turning to the first point that the
5  partitions have to be fixed.
6          Again, the presumption that the claim language
7  should be given its ordinary customary meaning is a heavy
8  one, and the parties have already agreed that the partition
9  has a plain and ordinary meaning, so none of the other words
10 in the claim language require any clarification.  And
11 Groupon hasn't pointed to any definition where the patentee
12 said, oh, when we said "partitions" we mean "fixed."
13          Just to explain where we got the "areas for
14 partitions" or "areas for portion," it's taken directly out
15 of the specification.  So should the Court decide to
16 construe the term, IBM's proposed construction is correct
17 because the applicant -- the patentees have told us pages
18 are divided into separate areas called partitions, so they
19 have told us that partitions are areas.
20          Now, the specification explicitly tells us that
21 partitions are not fixed.  And it is helpful here to walk
22 through the description.  It tells us that applications
23 presented at the reception system are partitioned into
24 objects.  That each application partition typically represents
25 one screen or partial screen of information including fields

58

1    filled data.  And then it says, in the second excerpt from the
2    '967 patent, the objects are structured in accordance with an
3    architecture that permits the displayed data to be relocatable
4    on the screen.
5            So if the data that composes a partition can be
6    located within the screen, then the partitions are not fixed.
7            The claims themselves also give us information
8    about this.  If we take a look at claim 17, it says:  The
9    method of claim 1 wherein generating the first and second
10   screen partitions include generating the respective
11   partitions at fixed, predetermined regions of the display
12   screen.
13           So if partitions were already understood and
14   meant to be fixed, then there would be no need to specify
15   that the first and second screen partitions for claim 17
16   need to be generated at fixed predetermined regions.
17           Now, contrary to their argument, they say that
18   the application requires that, the specification requires
19   the applications to be bound to particular partitions.
20           And the language that they rely on is actually a
21   definition of applications that appears in the specification:
22   Application, i.e. information events, are composed of a
23   sequence of one or more pages.
24           Nothing about that says that the applications
25   have to be bound to particular partitions and, in fact, if

60

1    display data is relocatable, reusable, and dynamically
2    created.  So if you take a look at the specification, we're
3    told that display text and graphics and program instructions
4    and control data are formulated from pre-created objects.
5    And then it says, the objects are structured in accordance
6    with an architecture that permits the displayed data to be
7    relocatable on the screen, and to be reusable to make up
8    other screens and other sessions, either as pre-created and
9    stored sessions or interactive sessions, dynamically created
10   in response to the user's requests.
11           So these words "relocatable," "reusable,"
12   "dynamically created," this is how the invention works.
13   There is absolutely nothing fixed about it.
14           Can we go to slide 49, please?
15           Another issue that is common to this dispute for
16   the "partition" term is their contention that the partitions
17   have to be dedicated to displaying applications.
18           And this is a little bit of a backdoor argument
19   to their argument that the partitions are fixed.  So for the
20   same reasons that I just discussed, these partitions are not
21   fixed, they're not dedicated for displaying applications.
22           In addition, this phrase "dedicated to
23   displaying application," they made it up.  It doesn't appear
24   anywhere in the specification or the prosecution history.
25   And there is no reason to deviate from the language that the

59

1    we look at the figures in the patent, take a look at Figure
2    3a on the bottom left of slide 34, you can see the body
3    partition is divided into two rectangles on the left-hand
4    side.  And when you look at the depiction in Figure 3b, the
5    body partition is a solid rectangle taking up the middle
6    of the screen.
7            So different pages of the application can be
8    displayed using different partitions.  They're not fixed.
9            This is the language that they're referring to
10   that I mentioned earlier where it describes the partition as
11   being fixed.  It says in preferred form, the method features
12   steps for presenting the command function in a command bar
13   fixed-located on the display screen.
14           So the one time where the patentees do use this
15   word "fixed," it is in a preferred form.  It's an embodiment
16   of the command functions.
17           They also point to page format objects as
18   examples to support their position.
19           But those again are merely embodiments.  And
20   they're, as we can see in the description at Figure 5a which
21   describes the foreign objects, that it's a schematic diagram
22   that illustrates the configuration of the page template
23   object which might be used and may be practiced, it's not
24   required.
25           In addition, the '967 patent discloses that the

61

1    patentee chose to use to describe their invention.
2            In addition, Figure 3a of the '967 patent tells
3    us that the body partition is not dedicated to displaying
4    application, because it can display other types of data like
5    the data that appears in the window partition.
6            The specification states that, "the method
7    features steps for opening windows over the currently
8    displayed application to present further information
9    concerning the application or facilitate the undertaking of
10   interactive operation with respect to the application."
11           So the body partition is displaying within that
12   window partition.  It is not just displaying the application.
13           The last limitation that they're adding, that
14   the partitions have to be non-overlapping.  That is directly
15   contradicted again by the figure that I just showed you.
16   The specification describes an embodiment where the window
17   partition overlaps with the body partition.  We see that in
18   Figure 3a of the '967 patent.  And, by the way, it also
19   appears in the '849 patent.
20           That construction also excludes an embodiment
21   that the inventors have told us about.
22           You can see that it says, "functions supporting
23   the user-partitioned application interface can be performed
24   using the command bar or its equivalent using pull down
25   windows or an overlapping cascade of windows."

62

1     So just to illustrate this for Your Honor.

2     The first part of the sentence is talking about

3 an application interface can be performed using a command

4 bar as depicted in Figure 3a.  And then the second part of

5 that description, it's equivalent using pull down windows

6 is contemplating a situation where, rather than having a

7 command function here, they are pulled down from underneath

8 the rest of the display.  And,

9     Then there is also an example of an overlapping

10 cascade as we can see in the '967 patent at column 17, lines

11 24 through 27.

12     Now, for the '849 patent, there is claim

13 language that says, this is where this term appears "at a

14 second portion, one or more screens of the display

15 concurrently with the application."  And,

16     The claim language says that, "the advertising

17 data from an advertising object may be presented at a second

18 portion of one or more screens of display concurrently with

19 applications."

20     Well, we know, as we just saw in the previous

21 slide, that the windows can overlap, the window partitions

22 can overlap.  And we also know that the advertisements can

23 be included in the window partition.

24     It says in the bottom left-hand excerpt,

25 advertising is provided over the network and may be included

64

1 embodiment, then we're very far afield from what the

2 patentees told us using the plain language of the claims.

3     Can we go to page 67, please.

4     So in summary, they're making changes to the

5 plain language of the claim terms that are arbitrary,

6 they're not supported.  None of their terms are found in

7 the patent or the claims.  There are no definitions, and

8 with the exception of that one word "fixed" from the

9 preferred embodiment, and there is no absence of clarity

10 that would require this.

11     They added requirements that are derived from

12 non-limiting embodiments.  We saw that with the preferred

13 embodiment of the command functions in a fixed portion.

14 It's just a preferred embodiment.  It doesn't mean that you

15 add it in as a claim limitation.

16     And then they ignore key language from the claim

17 terms like when they substitute "dedicated" to "displaying

18 applications for presenting."

19     So these limitations don't have any basis in the

20 claim terms.  The patentees told us what the words mean in

21 the claims themselves.  And in light of the fact that the

22 parties have already agreed what "partitions" mean, what

23 "portions" mean, what "applications" mean and what "command

24 functions" mean, when you take all of that out and you are

25 left with the remaining words, those are not words that

63

1 in any partition of a page.

2     That excerpt also appears in the '849 patent at

3 column 9, lines 65 through column 10, line 1.

4     So what the claim is telling us, that the

5 advertising data may be presented at a second portion of one

6 or more screens of display.  There is nothing that requires

7 it to be nonoverlapping.

8     I want to address briefly what they have to say

9 about the tessellated or tiled display.

10     The first thing I want to note, they say, well,

11 the specification tells us page format objects assure

12 tessellation on tiling.

13     Firstly, the page format objects are again a

14 preferred embodiment; and we can see that in the excerpt

15 from the '967 patent at column 11, lines 17 through 24.

16     In addition, they're talking about an analogy.

17 They say, okay, they use the word "tiling" and if you think

18 about tiling, we think of the word "mosaic" and that means

19 not overlapping.

20     First of all, I don't know if that is true.

21     Secondly, we don't know what they meant by

22 tiling.  And there are types of tiles that do overlap.  They

23 could have been referring to, for example, when you think

24 about roof tiles, those overlap.  But if we have to get to

25 the point of debating the meaning of tiling in a preferred

65

1 require further construction.

2     Thank you.

3     THE COURT:  Thank you.  We'll hear from defendant.

4     MR. HADDEN:  Thank you, Your Honor.

5     So I'm going to break these up a little bit, the

6 partition by partition, but try not to make it too slow.

7     THE COURT:  All right.  But you do or do not

8 agree that the five terms present the same disputes?

9     MR. HADDEN:  I think they largely present

10 similar disputes.  There is a little difference in the

11 arguments but I think the notion is basically the same.

12     And it starts with the ordinary meaning of

13 "partition;" right?  When you partition something, you

14 divide it into separate regions; right?  Either by walls

15 or by borders or, in this case, by page format objects.

16     And the specification essentially defines

17 partition in this patent, right?  Pages are divided into

18 separate areas called "partitions;" right?

19     It goes on to explain that partitions are

20 different than windows.  It says "while certain other

21 objects describe windows."  So windows in the patent are not

22 partitions.  Partitions are separate regions.

23     And that is what is shown in Figure 3a.  And

24 the important thing in Figure 3a throughout the patent's

25 description of partitions in these page format objects that

66

1  define them is that the partitions divide up the screen
2  display apart from whatever content is being displayed;
3  right?  So this is like the backdrop and it divides up how
4  this screen is set up.  It is not a feature of a particular
5  application; right?
6         So you can plop your application into your
7  body partition but the region that is defined for that
8  application to be displayed is predefined by these
9  partitions.  And that is what the patent explains.  And it
10  does it, as I said, using these page format objects.  And,
11        The patent is very clear that it does this to
12  ensure this uniform look and feel so that when you switch
13  between applications, using that command bar partition at
14  the bottom, the rest of the page looks the same.  And,
15        The patent explains that these page format
16  objects define fixed regions; right?  They have an origin
17  and a dimension, and they even specify the background color
18  of which the information may be presented.
19        So all of this is defining the structure of the
20  screen display apart from the application and apart from the
21  content.  Partitions are not features of the application.  And,
22        The patent explains, one of the reasons it does
23  this is so that the screen display is properly tested.  That
24  is the partitions are not overlapping and the whole screen
25  is full.

67

1         If you look at the claim language, I think it
2  is important and it clarifies this; right?  It talks about
3  generating at least a first partition for presenting
4  applications.
5         So you generate the partition.  The partition
6  is there for you then to display applications within.  The
7  partition is separate from the application.  It is not
8  defined by the application.  And,
9         IBM seems to agree that in the patent, the
10  partition for displaying applications is in body partition
11  which is shown as 260.  And in Figure 3b, there is an
12  example of the Apple application being presented within
13  the application partition, body partition 260.
14        Now, IBM disputes or their argument is that
15  because there are two different portions of the display does
16  not mean they have to be "fixed" or "separate."  But the
17  definition of "partition" requires separate regions.  That
18  is what a partition is.  That is how it's defined in the
19  patent.  And,
20        In fact, IBM said they are taking their
21  construction and that definition which says pages are
22  divided into separate areas.  If they're separate areas,
23  partitioned, they're nonoverlapping.
24        Now, their argument that the partitions don't
25  have to be fixed, and we heard that again just now, is all

68

1  taking descriptions from the patent of these page element
2  objects and how they can be relocated and dynamically
3  created, et cetera.
4         That has nothing to do with the partitions;
5  right?  The patent is very clear.  Page element objects
6  specify the content of the application.  They hold the text
7  and the graphics that define the application data that is
8  going to be displayed.  And the way they get shown on the
9  screen is they get mapped to a partition.
10        So they are relocatable because they can be
11  assigned to different partitions, but the partitions
12  themselves are fixed.  You have the fixed partitions.  You
13  can plop your page element object into whichever partition
14  you want by assigning it that partition's number.  And,
15        That is what the patent says:  The partition
16  number is used in page element call segments so that an
17  association is established between a called page element
18  object and the page partition where it is to be displayed.
19        So you can put your page element object in
20  different partitions by assigning them to different
21  partition numbers.
22        THE COURT:  But you do agree, though, that the
23  page element objects are relocatable.
24        MR. HADDEN:  Oh, absolutely.  Yes, yes.
25        THE COURT:  Not fixed.

69

1         MR. HADDEN:  No, not fixed.  And they can be
2  used in different applications and on different pages but
3  they have nothing to do with the partitions.  The partitions
4  are defined by the page format objects and they are fixed.
5  And the patent explains that.  Page format objects 502
6  describes the location and size of partitions on the page
7  and numbers assigned to each partition.
8         So you have the partition has a number, you
9  associate it with some content by giving that page element
10  object to that partition number.
11        IBM has this argument that somehow partitions
12  are not fixed and can be overlapping because you can open
13  windows.  But,
14        Again, both the claims and the specification
15  explicitly distinguish windows from partitions.  Sometimes
16  they call the windows window partitions.  But if you look
17  at claim 14, which is a dependent claim that goes to this
18  idea about opening a window, it describes the application
19  partition, and then says you can overlay it with window
20  partitions which it also calls windows.
21        And, again, as we saw, the specification
22  distinguishes them.  The description of 3a talks about
23  partitions, 250, 260, 280, and 290, and window 275.  And,
24        Most clearly in that definition that IBM is
25  drawing its construction from of "partitions," the patent

1 explicitly defines partitions and it separately describes
2 windows and in fact says the windows are made of different
3 objects than the partitions. The partitions -- windows are
4 not partitions.
5        So IBM argues that the partitions are not
6 dedicated. So the claim says, "partition for displaying
7 applications" which means that is the partition where
8 applications are displayed. If you want to say you can
9 display anything in that partition because you can put a
10 window on it, but that doesn't change the underlying
11 partition. The partition is still fixed. It has the same
12 content. That you can open a window over it does not change
13 as the patent explains the base page which is the partition.
14        In fact, the patent goes on and explains that
15 when you open up a window over a partition, the underlying
16 bit map to the partition itself is preserved and is exposed
17 again once you close the window. The partition persists but
18 there is nothing about opening the window that modifies or
19 changes the partition. And,
20        Again, I think even the part that IBM put up,
21 when you open the window over the application, you are
22 still getting information about the application or a way to
23 interact with the application. So even if you want to treat
24 the window as somehow modifying the partition, which it
25 doesn't, everything in that partition is still dedicated to

71

1 the application.
2        This is from IBM's brief. And at this part they
3 say, well, even though the claim says that the partition is
4 for displaying application, it could display other content.
5 So basically application partition can display anything,
6 according to IBM.
7        But if you get there, right? If a partition is
8 not separate, and it is not fixed, and it can display
9 anything, what is it? Right? How is that a limitation at
10 all?
11        In fact, you can see from IBM's contentions that
12 it's nothing. It's just a box they make up; right?
13        So this is what IBM says is the first partition
14 for presenting applications. They just drew a red box
15 around somebody's screen display of the Groupon home page.
16 And the problem -- well, there are a lot of problems with
17 this.
18        The first is if you see where it is cut off at
19 the bottom, that is just arbitrary. That is just how much
20 of the Groupon home page happened to be displayed on that
21 person's browser which is not something that Groupon even
22 specifies. That is just a function of your browser settings
23 and how long, how large your window it is.
24        So IBM says, well, the partition is defined by
25 this body tag. So it starts with the top body tag and ends

1 with the body, bottom body tag, and that is the HTML, the
2 limiter of the first partition.
3        But if that were true -- right? -- those tags do
4 limit the entire Groupon home page. So what is between
5 those tags are all of these screens. So if the user was
6 going to look at the Groupon home page to limit it by those
7 body tags, they would have to go scroll through all of those
8 screens.
9        THE COURT: What you have just shown us would
10 have appeared in succeeding --
11        MR. HADDEN: Succeeding screens, right.
12        THE COURT: So it's going, which I scroll --
13        MR. HADDEN: I scroll down if I have the browser
14 set up like this, right? So we get all the way down here.
15        So the question is how is that collection of
16 screens a partition of a screen display, right? Where
17 is the division on the screen that is somehow fixed or
18 separate? It's not. It is just a Web page that you can
19 display over multiple screens.
20        You get down to the bottom and right, that is
21 the end tag.
22        So this is just, there is no partition here,
23 there is a Web page, and they drew a box on what has to be
24 shown on a one person screen.
25        We go to the second partition, we have the same

73

1 kind of problem. Just to be clear, you have to have a first
2 partition and a second partition, and fortunately the
3 command partition has to persist and be independent of the
4 application because you have to be able to move between
5 applications using the commands in that partition. And,
6        Again, that is shown in 3b how at this command bar
7 partition. And it is described in some of the invention.
8 And it says it can be fixed, replicated on the display screen,
9 e.g., at the screen bar.
10        So their argument on this again goes to this popup
11 window. And they try to say, no, the command partition is not
12 this bar. It could be this popup window. But, again, that
13 is not what the patent says, right? So the patent describes
14 one mechanism for moving between applications where you can
15 select the command like the jump command from the command bar
16 partition, and that will open a window, and then you can put
17 in a keyword or select an index to pick a new application
18 from that window. But that window is not a partition; right?
19 So this is the dependent claim that describes that very
20 embodiment.
21        We provide the navigation procedure to new
22 applications which include presenting a window.
23        So the window is distinct from the command
24 partition, the patent specification and the claim. So that
25 window did not change the meaning of "partition." And,

1 Again, if we look at what IBM is pointing to, it
2 gets even more absurd. So here, again, they say the first
3 partition is whatever is shown on your screen. And,
4 Then they say for claim 1, the second partition
5 is this box at the top which has some link in a certain box.
6 Then for dependent claim 3, they say no, the
7 command partition is this box over here or maybe it is both
8 boxes; right?
9 But all of that is within what they said is the
10 first partition. So there is no separation here. You have
11 what they claim is the application partition which is your
12 whole screen and then they're just drawing boxes within it.
13 So why are they picking these boxes? Well,
14 presumably because they have a link. So presumably IBM's
15 argument is if you have a link, that is a command, so we'll
16 drop boxes around where you have links and say that is the
17 command partition.
18 The problem with that, of course, is that
19 everything on this page is a link; right? All of these
20 images are links. I click on the lion, I get details on the
21 zoo trip or whatever it is, right? Everything is a link.
22 So are those commands? How do you know, how do I know
23 whether those are part of my command partition? And,
24 If you go down the page, of course, there is
25 hundreds of these. And when we get down to the bottom,

75

1 right? So maybe IBM will say, well, picture links are
2 different. Those aren't commands. Fine. I got this.
3 "View All Deals," is that a command? Is that
4 part of the command partition? How am I possibly going to
5 know?
6 All right. Then you have this whole collection of
7 browse by city links. You can click on any city. Is that
8 part of a command application or part of the application? How
9 would I know?
10 Same here. Favorite group coupons, company
11 information, all of these are just collections of links;
12 Right? You can draw a box around anything on this page you
13 want and tell me it's a command bar partition or an
14 application. I have no way to know it.
15 So then we go to the '849. A similar issue;
16 right? We have to have a partition for advertising and a
17 partition for applications. And,
18 Again, it's clear from the claims that these
19 things have to be separate. You have structure applications
20 so they're on one portion. You structure advertising on
21 another portion. It's got to be separate so you can see it
22 concurrently with the application.
23 Again, the patent is very clear about this ad
24 partition region. And not only was it clear in the patent,
25 this is exactly what they told the Patent Office; right?

1 Application could be presented at a first part of the screen
2 and advertising presented separately and concurrently at a
3 second part of the screen.
4 They told the Patent Office that this
5 distinction between advertising and applications was key to
6 their invention. That is basic dichotomy of separate
7 treatment. Display of advertising was the key to the '849
8 patent.
9 Now we go to the contentions again.
10 Again, they circled whatever is on the user
11 screen as the first partition. And then they circle some
12 boxes within it and say that those are -- oops, sorry --
13 those are the ad partitions, or the ad partition. So they
14 circle random boxes within the application and say that is
15 an advertising partition.
16 I mean this is particularly bizarre for Groupon;
17 right? Groupon's business is to offer local deals. So if
18 their Web page is an application, those deals have to be the
19 application. But now they're saying those deals are also
20 the advertising.
21 So how do I know where my advertising partition
22 is? How do I know where my application partition is? How
23 do I know the difference between an advertisement and an
24 application? And,
25 Then I got the whole command problem where

77

1 they're just circling links where everything on my page is a
2 link.
3 Now, IBM says that -- and this is kind of gives
4 up the farm, I think; right? They say even if the invention
5 enables the display application portion and advertising
6 portion, that does not mean it requires it.
7 Well, if the claim doesn't require an
8 advertising partition or portion and application portion,
9 what does the claim require; right? There is no limitation
10 at that point at all.
11 You've got structure applications to be
12 displayed at one portion, advertising another. They have to
13 be treated different. And,
14 IBM goes on and says, trying to back away from
15 what it told the Patent Office, that there is no reason that
16 a dichotomy means that they must be fixed or non-overlapping.
17 That, Your Honor is just absurd. The definition
18 of a dichotomy is two mutually exclusive or contradictory
19 things. You can't tell me that the Patent Office that the
20 key to my invention is the dichotomy between advertising and
21 applications and then come in here and say they can be the
22 same, which is what IBM is doing.
23 Finally, with respect to their argument that
24 advertising and applications don't have to be separate, they
25 say that you can display advertising over applications in

78

1  windows.  They apparently cite something in the patent.

2          But if you look at what the patent says, it

3  doesn't say that at all.  The section they cite says:  If

4  further partitions for concurrently displaying, for example,

5  an additional application which may include advertising.

6          It says you can have an advertising partition.

7          When it talks about windows, the windows display

8  information related to the application.

9          So that is not what the patent says.  And, of

10  course, that is what the patent actually shows, a separate

11  ad partition.

12          So at the end of the day, if partitions are not

13  fix, nonoverlapping and dedicated, they are phantoms.  They

14  are not limitations and IBM can just draw boxes anywhere it

15  wants.  And that can't go to the jury.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          Is there any response?

19          MS. STEMPLER:  Yes, Your Honor.

20          Your Honor, I just want to point out I'm not

21  quite sure why Groupon is arguing about our infringement

22  contentions.  They're entirely irrelevant to the claim

23  construction process.

24          So I don't know why they are going on about it.

25  They might not agree with our infringement read, but that is

79

1  certainly an issue that kind of should be taken up later.

2          The second issue that I want to point out is

3  that the selection of the partition on their website was,

4  for example, their entire website here.

5          You can't see all of this in the excerpts that

6  is up here, but it was their entire website, and it is based

7  on their own HTML code.  You can see on the right we have

8  excerpted the code.  We had to put an ellipses in because it

9  was a big portion of it, but it is tied directly to the code

10  so it wasn't arbitrary.

11          THE COURT:  So when you drew the red line at the

12  bottom of what we can see, that was not really where you

13  were drawing the line.  You intended for it to be at the

14  very bottom of what you scrolled through.

15          MS. STEMPLER:  Yes.  I suppose we could have

16  zoomed out in a great amount and had everything be very

17  small.  But when we identified, for example, the command

18  partitions, we drew a box around those.  And so in this

19  instance, it's just that it was a lot according to their

20  code so that is why it looks the way it does.

21          THE COURT:  On the dispute about whether there

22  are certain aspects of the screen need to be dedicated or

23  required or intended to do certain things, doesn't your

24  infringement read at least become elucidating, if not

25  relevant?

80

1          MS. STEMPLER:  Well, I think if we look back at

2  what the patent is telling us, and there is even an excerpt

3  from the patent that talks about what happens when you do

4  have a partition explaining application when a popup window

5  comes up, and that is really what should be controlling here.

6          This is the '849 patent, and in column 11,

7  beginning on line 58.  And as we look, it tells us that window

8  objects include the display and control data necessary to

9  support window partitions.  Windows contain display data which

10  overlay the base page and control data which supersede the

11  base page control data for the underlying screen during the

12  duration of the window.  It says display data within windows

13  overlay the base page until the window is closed.

14          And then when you look to the top of column 12,

15  it says when the window is closed, the saved bit map is

16  swapped onto the screen, the logic functions associated with

17  the window are disabled, and prior logic functions are

18  reactivated.

19          So the patent is telling us that these

20  partitions are not dedicated to displaying applications and

21  we have to go with what the patent is telling us.  We can

22  have the fight later on about whether or not there is

23  infringement there, but that is just not the right thing to

24  be thinking about now.

25          THE COURT:  Do you agree that windows are not

81

1  partitions in this patent?

2          MS. STEMPLER:  No, Your Honor.  In fact, one of

3  the images that opposing counsel put up from the claim 14,

4  it talks about window partitions.  I mean I don't know how

5  much more clear I can get.  It's referring to windows as

6  window partitions, and again the description of Figure 3a,

7  if we go to slide 52, it is labeled as a window partition.

8          And the other thing that I would point out is a

9  lot of their argument is, basically, they added all of these

10  words into the claims.  They stuffed them all in there and

11  now they're saying, oh, well, you haven't shown us that they

12  shouldn't be there when there is no reason to add them to

13  begin with.

14          Unless Your Honor has any further questions?

15          THE COURT:  No, thank you.

16          Mr. Hadden, is there anything you want to add on

17  this?

18          MR. HADDEN:  The only point, Your Honor, is to

19  go back to this slide where the patent actually defines

20  partitions and then says windows are different.  So despite

21  the labeling of window partitions, the definition of

22  "partition" in the patent does not include windows.  And

23  there is no claim in which the application partition or the

24  first partition or the second partition is described as a

25  window but every time there is a window in the claim it is

82

1 called either a window or window partition. So both the spec
2 and the claims clearly distinguish windows from partitions.
3         THE COURT: Okay. Thank you.
4     What is next?
5         MR. OUSSAYEF: Your Honor, Karim Oussayef again.
6 We'll move on to the dispute concerning the term "objects."
7         THE COURT: Okay.
8         MR. OUSSAYEF: Your Honor, I'll keep this
9 argument brief since we addressed this during the *Priceline*
10 case.
11         I think the key thing to recognize here is that
12 both parties agree that "objects" are "data structures."
13 And the question is are they more specific to data structures?
14         Based on a definition in the '967 patent which
15 also appears in the '849 patent at column 5, lines 49
16 through 58, objects have a uniform, self-describing format
17 known to their RS 400. I think that is a key idea that the
18 patent was seizing on because the reception system needs to
19 make sure that objects are uniform.
20         That doesn't mean that they are all the same
21 exact type of object, but they need to be one of a variety
22 of enumerated type of object, and the reception system must
23 know how to process them. That is how you are able to
24 offload a processing from the host to the reception system.
25         IBM relied on the fact that objects were capable

83

1 of being processed by the PC in the prosecution history.
2 That is how you offset processing from the host to the
3 reception system.
4         That's on slide 73. And,
5         IBM also defined, distinguished the Filepp
6 inventions based on the fact that there is a prescribed,
7 i.e., uniform, structure. So there is an enumerated set of
8 objects. Today they might be JSON objects or JPEG objects
9 or GIF objects but they have a uniform format which is
10 specific to that type of object.
11         Now, I think what is important to go back to is
12 the Court's reasoning for declining to adopt a more lengthy
13 definition of "objects" was based on the fact that claim 1
14 of the '967 patent has some of that language built in and
15 therefore it is implicit in the term.
16         I think applying an explicit definition for
17 "objects" would remove any ambiguity, and it would make sure
18 that the word "object" remains consistent from the '967
19 patent to the '849 patent and the other uses of the term
20 objects elsewhere. So that would be a benefit to adopting
21 that additional language.
22         Thank you, Your Honor.
23         THE COURT: Is there anything that has changed?
24 Is there anything different here than what we dealt with
25 previously?

84

1         MR. OUSSAYEF: I think the key point that is a
2 little bit different is that some of the reasoning behind
3 the Court's decision was to make sure that there is no
4 duplicative language in the '967 patent. I think that might
5 be overridden by the principle that the term should mean the
6 same thing no matter where it appears. And because of that,
7 it makes sense to have "objects" be an explicit definition
8 that applies to the '849 patent as well rather than the
9 concern that it might be duplicative which really doesn't
10 create that much confusion because if it's in there already,
11 it doesn't add anything that is more difficult to interpret.
12         THE COURT: Well, I think that was only one of
13 the reasons we gave. I mean wasn't there also an issue
14 about prosecution history and whether you are arguing for
15 disclaimer and whether you are trying to import limitations
16 from the specification?
17         MR. OUSSAYEF: I believe Your Honor is referring
18 to the prosecution history argument that IBM made in the
19 previous case as well. But that prosecution history was
20 supporting IBM's definition. There is nothing that's --
21 that wasn't an argument that was made by defendants in the
22 previous case to try to fight back against the definition
23 of "objects."
24         THE COURT: Right. My recollection was you
25 argued those things, and we were not persuaded by them;

85

1 correct?
2         MR. OUSSAYEF: Yes. That is right, Your Honor.
3         THE COURT: So I'm just a little uncertain about
4 your characterization of the earlier analysis being all we
5 did was say what the plaintiffs want to do would render some
6 claim language superfluous and suggesting I think that was
7 all that was going on with that dispute. Is that what you
8 are suggesting?
9         MR. OUSSAYEF: No, Your Honor. I did not mean
10 to suggest that. That was one of the bases of the prior
11 opinion. So based on that understanding which I understand
12 to be one of the influencing factors for the Court's
13 decision, I think if you are taking that into account, it
14 makes sense to incorporate it into the '849 patent. That
15 is all we said. I didn't mean to imply that was the only
16 basis for the Court's decision.
17         THE COURT: Okay. Thank you.
18         MR. OUSSAYEF: Thank you.
19         THE COURT: I'll hear from defendant.
20         MR. HADDEN: Thank you, Your Honor.
21         We think you got it right last time, Your Honor.
22 That objects "should" be "data structure."
23         Let me make a couple of points there. There is
24 an interesting fudge going on that I think Your Honor should
25 be aware of which is the patents says objects have an

86

1 uniform self-defining format, right?  And IBM is trying to
2 kind of use that language to add the construction, obviously
3 to try to buttress its 101 defense.  But they're tweaking
4 it and they have done it a couple ways in their different
5 constructions and you heard it here today.
6        IBM's counsel said, well, we don't actually
7 mean that objects have a uniform structure.  We mean that
8 there is some uniformity for different types of objects.  So
9 Object A may have a structure that is uniform to it, Object
10 B will have a structure that is uniform to it, but we're not
11 saying all the objects have the same structure which is what
12 the patent says, right?
13        The Prodigy patent, the Prodigy system, they all
14 have the same structure; right?  They would have different
15 data but they have a format that is all laid out in there.
16 They're not claiming that.  What they're trying to claim now
17 is use that language but let's read data objects as having
18 whatever structure we need it to have.
19        So they have changed the "a uniform" to plural,
20 that are known, but that is just kind of meaningless; right?
21 Once you say a data structure has a structure that is known,
22 all that means is you have a data structure.  And,
23        They even said, they said that basically in their
24 brief as well; right?  They say "uniform object" means that
25 the object that has a specific structure according to a type

87

1 of object.  They're not uniform across objects.  They just
2 say it's a type; right?
3        So this is just kind of just gutting the actual
4 language from the spec of any meaning and trying to add it
5 to the claim to just give a little window dressing for their
6 101.
7        And that strategy is completely clear when again
8 you look at their contentions, when they say data objects
9 can be about anything, HTML, Javascript, JSON files, images
10 and data, anything; correct?
11        If it's known by the reception system, all it
12 means is it works; right?
13        You have a data structure that your application
14 can deal with, it's known to the reception system.  But
15 they're not saying the data is any specific solution.  They
16 just say carve things up into some structures, and it will
17 work.  We'll claim that.
18        THE COURT:  What is the relevance of the
19 infringement contentions?  Or I suppose another way to ask
20 it, is it fair for me to consider that?
21        MR. HADDEN:  Absolutely fair, Your Honor.  So
22 the question is, claim scope at the end of the day; right?
23 And we get a little vision as to what the claim scope is and
24 what they're going to say their expert is going to say.  And
25 particularly when they're putting forward these ordinary

88

1 meaning constructions; right?  Ordinary meaning is a black
2 box until someone gets up and says, well, that is what
3 ordinary meaning is.
4        To me, for example, the ordinary meaning of
5 "partition" is "a separate non-overlapping region."  I
6 thought that is what the ordinary meaning was.  But they're
7 going to get up and say, no, it is this mosaic of boxes.
8 Well, we need to know that beforehand, so that we can tailor
9 the construction to actually clarify what is allowed and
10 what is not allowable.
11        Thank you, Your Honor.
12        THE COURT:  Thank you.
13        Is there any rebuttal?
14        MR. OUSSAYEF:  Just briefly, Your Honor, on the
15 issue of whether it makes sense to look at infringement
16 contentions.
17        The case of *SRI International v Mitsubishi
18 Electric Corporation of America.*  That is 775 F2d 1107 from
19 the Federal Circuit, 1985.  It's very clear that first you
20 analyze, first you construe the claims, and then you apply
21 it to the accused products to determine infringement.  And
22 the reason why it is, really, so that there is a focus on
23 the intrinsic evidence as opposed to the extrinsic evidence
24 versus where the focus should be.  So I just wanted to
25 clarify that point.

89

1        With that, Your Honor, unless there is anything
2 further.
3        THE COURT:  Is there anything further?
4        MR. HADDEN:  I would say, Your Honor, there is
5 a ton of cases that say you can look at infringement to
6 understand the nature of the dispute.  And that is what
7 we're doing here.  Thank you.
8        THE COURT:  You can move on to the next one.
9        MR. OUSSAYEF:  My colleague, Michael
10 Matulewicz-Crowley will take the next one.
11        THE COURT:  Okay.  Good morning.
12        MR. MATULEWICZ-CROWLEY:  Good morning, Your Honor.
13        (Elmo settings adjusted.)
14        MR. MATULEWICZ-CROWLEY:  May it please the
15 court, Michael Matulewicz-Crowley on behalf of IBM.
16        Your Honor, the next disputed term is
17 "selectively storing advertising objects at a store
18 established at the reception system."
19        This term is unique to the '849 patent.
20        IBM's proposed construction of this term
21 revisits the meaning of selectively storing and its previous
22 construction in the *Priceline* litigation.
23        The specification and the structure of the
24 claims of the '849 patent show that selectively storing
25 concerns storing in accordance with a predetermined storage

90

1  criterion and not prefetching and storing in anticipation of
2  display concurrently with the applications.
3          IBM's proposed construction comes directly from
4  the specification itself.  As we can see on the slide 78,
5  the specification defines "selectively storing" as "a means
6  to selective store objects according to a predetermined
7  storage criterion."
8          This passage, this definition from the
9  specification has been directly imported into IBM's proposed
10  construction.
11          Additionally, it is this definition of
12  "selectively storing" that is crucial to the patents
13  inventive ability to reduce the systems response time as
14  seen in the passage on the bottom of slide 78.
15          Groupon's response to this clear definition in
16  the specification is that advertising objects are somehow
17  intrinsically different from the objects referenced in the
18  specification's definition of selectively storing.
19          But this is not true because as can be seen on
20  slide 79, objects are actually a family of six different
21  types of objects, including advertising objects.
22          The specification goes on to explain on the
23  bottom of slide 79, that advertising objects are
24  substantially similar to all of the other types of objects,
25  including page element objects which are in charge of

91

1  displaying non-advertising displays on a screen.
2          Additionally, the specification treats all
3  objects the same, whether they display application data or
4  whether they display advertising data.
5          As an example, you can see on slide 80 that the
6  specification refers to objects when it clearly is referring
7  to objects that display applications and advertising.
8          In this instance, the specification uses the
9  word "object" to mean all objects.
10          And the '849 patent does not support the
11  proposition that objects, when used in the specification,
12  actually means all objects except for advertising objects.
13          The '849 patent also doesn't support the
14  contention that selectively storing involves prefetching.
15          So first we can see from the structure of the
16  claim language that claim 1 does not include a prefetching
17  limitation.  The previous construction of "selectively
18  storing" in the *Priceline* litigation rested in part on the
19  conclusion that the term "selectively" as used in claim 1
20  includes a retrieval limitation.  This conclusion was
21  based on claim 8's recitation of "selectively supplied to
22  and retrieved at."
23          However, the use of "selectively" in claim 1 and
24  claim 8 actually cuts the other way and supports IBM's
25  proposed construction.  This is because as you can see on

92

1  slide 81, the fact that claim 8 claims "selectively supplied
2  to and retrieved at" shows that "selectively" does not
3  inherently include a retrieval limitation.  Otherwise, claim
4  8's recitation of "retrieved at" would be superfluous.
5          Further, the fact that claim 8 explicitly claims
6  a "retrieved at" limitation shows that claim 1, which does
7  not include any retrieval language, does not include a
8  "retrieved at" limitation.
9          Further, even to the extent that the "retrieval"
10  language in claim 8 is relevant to claim 1, neither claim 1,
11  nor claim 8 include a prefetching limitation.  This can be
12  seen most clearly from claim 9 on the bottom of slide 81
13  which depends from claim 8.
14          Claim 9 explicitly includes a prefetching
15  limitation as a part of the supplying limitation.
16          Claim 9 and its explicit claim of prefetching
17  shows that when the patentee intended prefetching to be a
18  claimed limitation, they knew how to do it.  Therefore, the
19  fact that claim 1 and claim 8 do not include these explicit
20  language shows that they do not include these limitations.
21          The specification also supports IBM's
22  proposition because where the specification uses the term
23  "selectively," it does so in accordance with IBM's proposed
24  construction.
25          For example, on slide 83 on the first excerpt

93

1  from the specification, the specification tells us that
2  advertising and application objects are selectively
3  distributed in the service network in accordance with a
4  predetermined plan.
5          This use of "selectively" is directly analogous
6  to IBM's use in the proposed construction of "selectively
7  storing" meaning storing according to a predetermined
8  storage criterion.
9          In contrast, the specification never uses the
10  words "selectively" and "prefetching."  In fact, they, the
11  word "selectively" and "prefetching" are never used together
12  at all.
13          "Prefetching" is in fact used in a preferred
14  embodiment as part of a specific module that might be used
15  but may not be and is not a claimed element of the patent.
16          "Selectively storing" should not be limited to
17  this specific preferred embodiment, especially in light of
18  the clear definition given earlier in the specification.
19          Groupon's proposed construction also morphs the
20  single step of storing into two steps, storing and prefetching,
21  even though the specification makes clear that storing and
22  prefetching are separate steps.
23          For example, on slide 85, we see that the
24  specification tells us that there are two ways to minimize
25  the time required to reduce, to display a page.  The first

94

1  is that objects are stored locally.  And the second is that
2  objects have been prefetched.
3         These are -- the specification is telling us
4  that these are two different methods.  For these reasons,
5  selectively storing does not include a prefetching limitation.
6         THE COURT:  All right.  The plaintiff has just
7  over four minutes left, but let me ask you, is it possible
8  for me to agree and adopt your construction without saying I
9  was wrong in the earlier case?
10        MR. MATULEWICZ-CROWLEY:  We have provided
11  additional reasons.  I think they are applicable.  You know,
12  it is the same specification.  We have provided additional
13  reasoning and evidence in this litigation for you to adopt
14  our proposed construction, but I do think it is the same
15  specification.
16        THE COURT:  Okay.  Thank you.
17        We'll hear from defendant.
18        MR. HADDEN:  Okay.  And I think you were wrong
19  in the prior case, Your Honor.  I think you are right.
20        "Selectively storing," going back just a step,
21  right?
22        The key to the '849 patent is this dichotomy
23  the separate treatment of advertising.  So what does that
24  actually mean?
25        It means that a local system pre-fetches the

96

1         The first is that the portion from the prosecution
2  history that the defendant's counsel just referenced was
3  specifically with regards to a prior art reference that did
4  not include advertising at all.  So the dichotomy, the
5  distinction between advertising and applications that IBM was
6  raising in that instance is merely making the point that the
7  '849 patent concerns advertising, which is not something that
8  IBM is disputing now.
9         Additionally, I just want to point out that
10  although Groupon's counsel references that the '849 patent is
11  all about prefetching advertising, what they have not been
12  able to do in any of the cited portions of the specification
13  is to show how any tie or connection between selectively and
14  prefetching any place where the language of the claim is
15  referenced in the specification.
16        I also, Your Honor, just want to clarify my
17  previous answer.  It was not as clear as possible.  Adopting
18  our construction in this litigation would require you to
19  overturn or change your previous construction of the same
20  term in the *Priceline* litigation.
21        THE COURT:  Okay.  Thank you for that.
22        Is there anything further on this term?
23        MR. HADDEN:  No, Your Honor.
24        MR. MATULEWICZ-CROWLEY:  No, Your Honor.
25        THE COURT:  All right.  IBM.

95

1  advertising, stores them locally.  So when there is an empty
2  ad slot to fill, it can pop one up from the local storage
3  and display it.  That is the whole point.  So it's not
4  battling against the application over the network to get
5  content.  It pre-fetches it and stores it locally.  That is
6  selective storing, right?
7         There is no point in selectively storing the ad
8  after you have already shown it to the user.  The point is
9  to selectively store it beforehand, you pre-fetch them, you
10  store them and then you show them when there is a need to
11  show an ad without having to go back to the network.  That
12  is the whole point of the patent.
13        And that is what the abstract describes; right?
14  Storing and managing advertising at the user reception
15  system so that the advertising can be prefetched from the
16  network and staged in anticipation of being called for
17  presentation.
18        You pre-fetch it, that is the same as
19  selectively storing it.  You store it, you need an ad and
20  you show it from the local store.
21        Thank you.
22        THE COURT:  Thank you.
23        Is there any rebuttal on this term?
24        MR. MATULEWICZ-CROWLEY:  Your Honor, I just want
25  to briefly address that.  Two issues.

97

1         MR. OUSSAYEF:  Your Honor, just a point of
2  clarification.  I understand the parties might update Your
3  Honor about a discovery issue.  Does that count as part of
4  our time, just to make sure?
5         THE COURT:  There will be under two minutes
6  left.  I am going to have to let you update me after the two
7  minutes.
8         MR. OUSSAYEF:  Okay.  Great.
9         Just briefly on "continuations."  I think the
10  key thing is that both -- oh, yes.  Let me ...  (Adjusting
11  Elmo settings.)
12        Yes, I think the key thing with the term
13  "continuations" is that both parties understand that not all
14  requests are continuations.  So construing the term
15  "continuation" as a new request that a client may send to
16  the server is unclear because there are some examples where
17  the client sends a new request to the server which is not a
18  continuation.
19        And Groupon's own brief says that when the
20  client leaves or interrupts the conversation by typing in
21  a URL, that is at the top of slide 103, that that's not a
22  continuation.  So given that there is some situations where
23  a request is not a continuation, the definition needs to be
24  clarified in order to indicate that it is a new request in a
25  continuation.

98

1          That would incorporation the entire definition
2    from the glossary of terms rather than just the small
3    subsection of continuation as a new request which a client
4    may send to the server.
5          THE COURT:  Okay.  I'll hear from defendant.
6          MR. HADDEN:  Shall I use all the rest of my
7    time?
8          THE COURT:  Yes.  Well, he has 29 seconds left,
9    so ...
10         MR. HADDEN:  Just kidding.  I just want to get
11   up and shoot fish in a barrel with no response.
12         So it's a little more complicated than that,
13   Your Honor.  First, Your Honor, the construction of
14   "continuation" is correct.  We see it comes straight from
15   the glossary of the patent.
16         Now, the issue that IBM's counsel raised is a
17   red herring.  The claim itself requires that the continuation
18   is in an output that is returned to the user.  All such
19   continuations are -- all such links are continuations per this
20   definition; right?
21         So stepping back; right?  IBM's game with respect
22   to these terms is to try to avoid the "all continuations"
23   requirement so that they can point to just a few links on a
24   Web page and say that infringes.  You can ignore all the rest
25   of the links because those are either not continuations, not

99

1    in a conversation, or not returned by a service.  And those
2    arguments are all clearly wrong.
3          So let me just go forward; right?  Part of
4    what they're trying to do is insert conversation into this
5    construction so that they can define a conversation to be
6    something that is some logically related exchange so they
7    can draw a box.
8          But that is wrong.  The claim, or the patent
9    explicitly describes and defines conversation.  What it says
10   is, on the Web, hypertext links represent continuations and
11   a client engages in a conversation whenever it follows
12   hypertext links.
13         So what that means is any time I'm clicking on a
14   link, I'm in a conversation.  The conversation is continuing.
15   The only way to get out of conversations as the patent
16   explains is if I explicitly request a new URL.  So I type a
17   new URL into my browser instead of clicking on a link on a
18   page.  That's the only way you exit a conversation.  And,
19         If that isn't clear enough, the other definition
20   that the patent actually provides a mathematical definition of
21   conversation; right?  And it says, more importantly, it's a
22   series of HTML pages -- p1 through pn, and if I get from p2 to
23   pn where the client views them all, right?, for i because i is
24   between 1 and n, HPI is obtained by pi - 1.
25         So what does that mean?  That means so long as

100

1    I'm looking at Web pages, and I'm getting from page to
2    page by clicking on a link from the prior page, I am in a
3    conversation.  Okay?  So as long as I'm following links,
4    that is by definition a conversation.
5          It doesn't then depend on who I'm talking to on
6    the other end.  It doesn't depend on whether that link goes
7    to the same server or different server.  It doesn't depend
8    on what the Web page is talking about or what that link
9    relates to.  It's a very formal definition.  As long as I'm
10   clicking on links, I'm in a conversation.  And,
11         That is required because if you could click on a
12   link and not keep this state information, then the whole
13   system in this patent breaks.  And,
14         Just to make clear, they put in this example in
15   their opposition brief arguing that when you start with, I
16   think it would be an airline site and you move to hotel sites
17   and somehow you changed the conversation, the conversation
18   stopped, that is all nonsense; right?  That is very clear.
19         A client may communicate with multiple servers
20   during the same conversation, as long as I keep clicking
21   links in the same conversation.  This is the example that
22   they said showed that the conversations break when you go
23   to a different server.  It says just the opposite; right?
24   It says I start on the airline site, I click a link to
25   the hotel site, the conversation continues, the state

101

1    information keeps getting passed.  The hotel side may be
2    able to use it, it may not, but it always receives it.
3          Then we get to the all continuations.  This is
4    kind of the similar idea, right?  So in trying to say that
5    all continuations doesn't mean all continuations, because
6    we can define a service to be something that generates just
7    certain links.  And, again, that is just wrong; right?
8          The output from the service is the Web page;
9    right?  And, again, this is required because as the patent
10   says, for this method to work you have to embed the state
11   information in all hyperlinks passed back and forth between
12   the client and the server.  If you have a link that doesn't
13   have state information, it won't work because the user
14   can click on that link and then the state is lost forever;
15   right?  And,
16         The abstract describes the same requirement.  And,
17   importantly; right?  The patent talks about communicating the
18   output to the client.  So the output to the client is the Web
19   page that they get back.  And the claim also requires that
20   wherein the state information is preserved, provided to all
21   services for the duration of the conversation.
22         For that to work, the state information has to be
23   in every link in their Web page because if not, the user could
24   click on that link and, whatever that service is, would not
25   receive that state information during that conversation.  And,

102

1    Again, the patent is clear that the output that
2    that claim is talking about that goes to the user is the Web
3    page. They have the IBM example Web page here in the patent
4    and showing that as the output. So the output is not some
5    subset of links. It is the page and all the links on them.
6        And the figure shows the same thing. The output
7    that goes back to the client is the HTML file.
8        So why does this matter? Well, it matters
9    because again what IBM is trying to do is say, well, we
10   found these two links on your page that have what we call
11   state information, so you infringe. Because we're going to
12   say that those are the output from some service that we'll
13   identify later. And,
14       That is nonsense because this page has a whole
15   bunch of links, and all these other links don't have the same
16   information. So this is not an example of all continuations,
17   including state information as the patent requires; right?
18   This page doesn't work. I click on any of these, what they're
19   calling state information doesn't get sent back. It is not
20   embedded into any of these links. And,
21       These all continuations, they relied on that in
22   the IPR. It's throughout the prosecution history. They can't
23   avoid it now and say any two links will do, which is what
24   they're trying to do.
25       Thank you.

103

1        THE COURT: All right. Do you want to respond
2    briefly?
3        MR. OUSSAYEF: Yes. Very briefly, Your Honor.
4        What I didn't see is a discussion of their
5    actual construction. And the reason why is because once
6    again it rewrites the claim language.
7        "Continuations" is their preferred definition of
8    "continuations." Okay. That is all right.
9        But why "in an output" means "in a Web page or
10   other output?" There is simply no language which is
11   construed from the specification.
12       "From said service" changes to "sent to the
13   client." So "from" turns to "sent," reversing the order,
14   and "service" turns to "client," the opposite entity that
15   should be doing things.
16       If you look at slide 96, we see that their
17   definition would require "in an output from said service" to
18   require something to already be sent to the client before
19   the later step in the claim which requires communicating
20   something to the client.
21       So their definition would require communicating
22   something to the client, doing something in that before
23   you communicate it to the client, which doesn't make sense.
24       THE COURT: All right. Thank you.
25       Do you want to respond?

104

1        MR. HADDEN: Sure.
2        None of that is right, of course. The output to
3    the client doesn't have to be communicated. It's generated
4    before it is sent. This is in our briefs. I think this
5    part is pretty clear.
6        The main point is "all continuations" means "all
7    continuations." And there is no dispute that continuations
8    are links and a conversation is any time you click a link,
9    so it all fits together.
10       Thank you, Your Honor.
11       THE COURT: All right. Is there anything else
12   on claim construction from Groupon then?
13       MR. HADDEN: No, Your Honor.
14       THE COURT: All right. Then let's talk just
15   briefly about discovery. I'm curious as to whether there
16   has been progress over the weekend, so let me hear first
17   from IBM on that.
18       MR. OUSSAYEF: Your Honor, my colleague Robert
19   Harrits will take this issue.
20       THE COURT: Sure.
21       Good morning.
22       MR. HARRITS: Good morning, Your Honor. Roberts
23   Harrits on behalf of IBM. May it please the Court.
24       Following the Court's Order on Friday, the
25   parties met and conferred that evening, and during the meet

105

1    and confer Groupon agreed to produce and I believe later
2    that evening did produce some revenue cost and profit
3    information associated with the accused products.
4        However, there is other financial and sales
5    information that we have been requesting for some time now
6    that is still not being produced, and Groupon has not
7    provided us a date by which they will be producing these
8    documents: things like patent licenses, financial future
9    forecasts of the future revenue growth, marketing documents,
10   commercial studies about the accused features, or any
11   potential documents related to the value of the accused
12   features. And,
13       Given that these discovery responses have been
14   outstanding since December and Groupon has not said they're
15   not going to produce these documents, we think it would be
16   beneficial for the Court to order a reasonable date certain
17   by which Groupon will produce these other requested documents.
18       THE COURT: And what about the distinction
19   between North American revenue and U.S. revenue? Did you
20   make progress on that?
21       MR. HARRITS: Yes, we have. They have
22   produced a document which they say should be able to help us
23   de-aggregate that data. We haven't had a chance to fully
24   analyze it with our experts to know whether it will do as
25   they allege it will.

106

1    THE COURT:  All right.  Is there anything else?

2    MR. HARRITS:  That is it unless Your Honor has

3  other questions.

4    THE COURT:  Not yet.  So let me hear what

5  Groupon's position is.

6    Good morning.

7    MR. HAACK:  Good morning, Your Honor.

8    I think what Mr. Harrits said is generally

9  accurate.  Groupon produced a bunch of data on Friday.  To

10  the extent that the information they moved on, the revenues,

11  cost profits broken down in various ways is not complete, I

12  believe it is, Groupon wanted us to produce that data.

13    On the issue of the U.S./Canada revenues, the

14  issue there is that Groupon does not in the ordinary course

15  of business disaggregate Canada from its North American

16  business.  It reports on a North American basis.

17    The information we provided to IBM at this point

18  is I believe revenue information.  It doesn't disaggregate

19  cost or profits because Groupon doesn't keep that and to do

20  that involves going through every single transaction at

21  Groupon and deciding whether it should allocate cost or

22  profits to that transaction.

23    The information that IBM was given is based on

24  Groupon as separate Canadian entities that report revenue,

25  so we disaggregated that revenue from the U.S. revenue,

107

1  provided the breakdown of North American into U.S. and

2  Canada.

3    And I should say this for the record.  For the

4  purposes of North American revenue, that means U.S. and

5  Canada, not Mexico for Groupon.

6    As to the patent licenses, the marketing

7  documents, Groupon hasn't refused to produce any of this

8  information.  When I spoke to Mr. Harrits on Friday, I

9  represented we would be happy to give that to them.

10    IBM didn't raise that as a thing they were

11  moving to compel or conversations leading up to the motion

12  to compel.  It asked for revenues, cost profits,

13  disaggregated into the ways Your Honor saw in the briefing.

14    I don't think there is a need for an order to

15  produce those documents, and Groupon hasn't refused to

16  produce anything and particularly on the marking documents,

17  patent licenses.  I'm not aware the parties have conferred

18  on that at all.  Certainly in the conversations I have been

19  involved in in the last month or six weeks, we have not.

20    THE COURT:  Well, what is the date on which

21  you propose to produce the remaining materials that they've

22  mentioned in their letter to me they want?

23    MR. HAACK:  I don't have a date certain for

24  right now, Your Honor.  I'm sure we can get licenses out

25  this week.  I know what the volume of that is.

108

1    THE COURT:  What, from your perspective, is a

2  reasonable date by which you would agree to produce what

3  all they asked for in the letter?

4    MR. HAACK:  I think by the end of the month, we

5  can do that, Your Honor.  Before that would, I think it

6  might be difficult to get all that out in that time period,

7  particularly the marketing documents that certainly is under

8  the scope of what that would be.

9    THE COURT:  All right.  Mr. Harrits, is the end

10  of the month reasonable?

11    MR. HARRITS:  Yes it is, Your Honor.

12    THE COURT:  All right.  Well, does that take

13  care of what is in dispute on discovery?

14    MR. HARRITS:  I believe for what is currently in

15  dispute.  Yes.

16    THE COURT:  Do you agree with that?

17    MR. HAACK:  Yes.

18    THE COURT:  Okay.  Well, then I do order that

19  defendant will produce what was at issue in the letter and

20  discussed here today by the end of this month.

21    MR. HAACK:  Thank you, Your Honor.

22    THE COURT:  All right.  Is there anything

23  further from IBM?

24    MR. TRAINOR:  No, Your Honor.

25    MR. OUSSAYEF:  No, Your Honor.

109

1    MR. TRAINOR:  Thank you.

2    THE COURT:  Is there anything further from

3  Groupon?

4    MR. HADDEN:  No.  Thank you, Your Honor.

5    THE COURT:  Thank you for that helpful argument.

6  We will be in recess.

7    (Claim construction and motion hearing ends at

8  11:54 a.m.)

9

10    I hereby certify the foregoing is a true and accurate

    transcript from my stenographic notes in the proceeding.

11

12    /s/ Brian P. Gaffigan
    Official Court Reporter

13    U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25

**'**

**'849** [31] - 7:13, 11:23, 19:6, 21:17, 23:9, 24:3, 37:3, 37:14, 38:15, 38:25, 50:13, 50:18, 51:10, 54:24, 61:19, 62:12, 63:2, 75:15, 76:7, 80:6, 82:15, 83:19, 84:8, 85:14, 89:19, 89:24, 91:10, 91:13, 94:22, 96:7, 96:10
**'967** [21] - 7:9, 18:20, 18:21, 20:20, 23:25, 36:16, 37:1, 42:13, 50:13, 50:16, 51:4, 58:2, 59:25, 61:2, 61:18, 62:10, 63:15, 82:14, 83:14, 83:18, 84:4

**/**

**/s** [1] - 109:12

**1**

**1** [18] - 20:20, 27:2, 36:16, 37:2, 51:9, 58:9, 63:3, 74:4, 83:13, 91:16, 91:19, 91:23, 92:6, 92:10, 92:19, 99:24
**10** [2] - 19:6, 63:3
**101** [13] - 4:6, 5:10, 5:18, 5:24, 6:10, 6:24, 8:2, 14:2, 35:16, 45:9, 86:3, 87:6
**103** [1] - 97:21
**11** [3] - 19:13, 63:15, 80:6
**1107** [1] - 88:18
**11:54** [1] - 109:8
**12** [2] - 19:24, 80:14
**14** [2] - 69:17, 81:3
**15** [2] - 22:5, 22:9
**16** [1] - 22:10
**16-122-LPS** [1] - 1:7
**17** [4] - 58:8, 58:15, 62:10, 63:15
**1980s** [1] - 17:5
**1985** [1] - 88:19
**1989** [1] - 8:6

**2**

**2** [1] - 37:15

**2006** [1] - 44:3
**2008** [1] - 44:3
**2017** [1] - 1:9
**22** [1] - 27:1
**24** [2] - 62:11, 63:15
**250** [1] - 69:23
**26** [1] - 55:25
**260** [3] - 67:11, 67:13, 69:23
**27** [1] - 62:11
**275** [1] - 69:23
**280** [1] - 69:23
**29** [1] - 98:8
**290** [1] - 69:23

**3**

**3** [1] - 74:6
**31** [1] - 36:14
**34** [1] - 59:2
**38** [2] - 41:8, 41:19
**3a** [9] - 20:1, 59:2, 61:2, 61:18, 62:4, 65:23, 65:24, 69:22, 81:6
**3b** [3] - 59:4, 67:11, 73:6

**4**

**400** [1] - 82:17
**46** [1] - 37:2
**49** [2] - 60:14, 82:15

**5**

**5** [5] - 1:9, 15:16, 28:20, 29:22, 82:15
**502** [1] - 69:5
**52** [1] - 81:7
**54** [1] - 37:15
**55** [1] - 37:2
**58** [3] - 37:15, 80:7, 82:16
**5a** [1] - 59:20

**6**

**65** [1] - 63:3
**67** [1] - 64:3

**7**

**7** [3] - 17:7, 49:24, 50:3
**73** [1] - 83:4
**775** [1] - 88:18
**78** [2] - 90:4, 90:14

**79** [2] - 90:20, 90:23

**8**

**8** [7] - 91:24, 92:1, 92:5, 92:10, 92:11, 92:13, 92:19
**8's** [2] - 91:21, 92:4
**80** [1] - 91:5
**81** [2] - 92:1, 92:12
**83** [1] - 92:25
**85** [1] - 93:23

**9**

**9** [5] - 19:2, 63:3, 92:12, 92:14, 92:16
**96** [1] - 103:16
**9:00** [1] - 2:12

**A**

**a.m** [2] - 2:12, 109:8
**ability** [3] - 11:18, 21:14, 90:13
**able** [6] - 21:14, 73:4, 82:23, 96:12, 101:2, 105:22
**absence** [1] - 64:9
**absolutely** [3] - 60:13, 68:24, 87:21
**abstract** [24] - 4:25, 5:4, 7:15, 7:18, 8:7, 10:23, 11:7, 12:12, 13:7, 14:7, 15:17, 15:24, 16:9, 16:18, 32:3, 32:7, 40:16, 44:23, 45:14, 46:7, 48:6, 95:13, 101:16
**abstraction** [1] - 26:24
**absurd** [2] - 74:2, 77:17
**accomplished** [4] - 7:22, 7:25, 13:18, 22:11
**accordance** [5] - 58:2, 60:5, 89:25, 92:23, 93:3
**according** [5] - 71:6, 79:19, 86:25, 90:6, 93:7
**account** [2] - 38:5, 85:13
**accurate** [2] - 106:9, 109:10
**accuse** [2] - 42:8, 42:12
**accused** [4] - 88:21, 105:3, 105:10,

105:11
**accusing** [1] - 9:22
**acting** [1] - 52:10
**ACTION** [1] - 1:4
**action** [2] - 42:25, 43:20
**actual** [3] - 33:9, 87:3, 103:5
**ad** [12] - 11:24, 12:10, 12:11, 12:12, 75:23, 76:13, 78:11, 95:2, 95:7, 95:11, 95:19
**adapt** [1] - 32:7
**adaptation** [1] - 20:1
**add** [13] - 30:6, 49:3, 53:9, 54:17, 55:17, 56:3, 56:13, 64:15, 81:12, 81:16, 84:11, 86:2, 87:4
**added** [2] - 53:10, 54:11, 64:11, 81:9
**adding** [4] - 39:8, 54:22, 55:15, 61:13
**addition** [4] - 59:25, 60:22, 61:2, 63:16
**additional** [6] - 43:20, 53:10, 78:5, 83:21, 94:11, 94:12
**additionally** [3] - 90:11, 91:2, 96:9
**address** [5] - 25:11, 31:23, 47:18, 63:8, 95:25
**addressed** [2] - 18:15, 82:9
**addressing** [6] - 16:16, 18:18, 28:13, 31:12, 31:25, 32:12
**adds** [1] - 38:11
**adjusted** [3] - 4:13, 50:1, 89:13
**Adjusting** [1] - 97:10
**admit** [2] - 23:23, 45:5
**admits** [2] - 14:9, 44:1
**admitted** [1] - 44:18
**adopt** [3] - 83:12, 94:8, 94:13
**adopting** [2] - 83:20, 96:17
**advances** [1] - 46:20
**advantage** [2] - 17:18, 17:21
**advertisement** [2] - 12:15, 76:23
**advertisements** [7] - 24:4, 24:8, 25:25, 33:16, 41:12, 47:13, 62:22
**advertising** [55] - 7:10, 12:7, 17:17, 19:7, 19:8, 19:11,

19:16, 21:17, 21:18, 25:13, 33:11, 33:18, 37:5, 37:6, 37:14, 43:6, 50:19, 62:16, 62:17, 62:25, 63:5, 75:16, 75:20, 76:2, 76:5, 76:7, 76:15, 76:20, 76:21, 77:5, 77:8, 77:12, 77:20, 77:24, 77:25, 78:5, 78:6, 89:17, 90:16, 90:21, 90:23, 91:1, 91:4, 91:7, 91:12, 93:2, 94:23, 95:1, 95:14, 95:15, 96:4, 96:5, 96:7, 96:11
**affinity** [1] - 39:25
**Affinity** [3] - 8:1, 39:6, 45:22
**afield** [1] - 64:1
**aggregate** [1] - 105:23
**agree** [11] - 29:25, 54:25, 65:8, 67:9, 68:22, 78:25, 80:25, 82:12, 94:8, 108:2, 108:16
**agreed** [12] - 7:14, 7:20, 51:2, 51:20, 52:2, 52:3, 53:11, 53:19, 53:21, 57:8, 64:22, 105:1
**aimed** [2] - 5:17, 45:15
**airline** [1] - 100:16, 100:24
**albeit** [1] - 10:16
**algorithm** [1] - 9:1
**algorithms** [1] - 15:21
**Alice** [22] - 4:21, 15:13, 15:18, 16:1, 16:10, 16:19, 22:17, 23:3, 26:24, 27:13, 27:25, 30:16, 31:10, 31:15, 32:1, 32:11, 33:2, 39:2, 39:17, 40:15, 44:12, 46:5
**allege** [1] - 105:25
**alleged** [1] - 40:25
**allocate** [1] - 106:21
**allow** [1] - 21:6
**allowable** [1] - 88:10
**allowed** [1] - 88:9
**allows** [6] - 18:23, 19:4, 33:17, 34:10, 34:23, 50:15
**almost** [2] - 23:9, 43:3
**alternative** [4] - 14:18, 14:23, 52:17, 54:1
**Amazon** [4] - 6:24, 8:1, 14:14, 45:17
**ambiguity** [1] - 83:17
**Ameranth** [1] - 39:6

**America** [1] - 88:18
**American** [5] - 105:19, 106:15, 106:16, 107:1, 107:4
**amount** [1] - 79:16
**amounts** [1] - 32:17
**analogous** [3] - 27:5, 44:5, 93:5
**analogy** [3] - 24:15, 27:8, 63:16
**analysis** [6] - 5:23, 7:12, 26:13, 27:8, 42:18, 85:4
**analyze** [4] - 25:18, 38:1, 88:20, 105:24
**AND** [1] - 1:2
**Anderson** [1] - 2:19
**ANDERSON** [1] - 1:14
**Andrews** [10] - 5:13, 5:20, 5:25, 13:6, 13:14, 28:2, 28:21, 29:4, 29:19, 47:22
**Andrews's** [1] - 29:23
**anew** [1] - 10:1
**answer** [4] - 16:25, 30:21, 48:12, 96:17
**answering** [1] - 30:2
**anticipating** [1] - 33:24
**anticipation** [4] - 33:23, 37:8, 90:1, 95:16
**apart** [2] - 66:2, 66:20
**appear** [4] - 53:16, 55:19, 56:9, 60:23
**appearances** [2] - 2:1, 2:16
**APPEARANCES** [1] - 1:13
**appeared** [1] - 72:10
**Appistry** [2] - 6:24, 45:17
**Apple** [2] - 39:5, 67:12
**apple** [1] - 39:7
**applicable** [1] - 94:11
**applicant** [1] - 57:17
**application** [72] - 5:1, 10:16, 11:2, 14:19, 14:25, 18:16, 19:15, 20:1, 21:2, 34:22, 35:12, 36:8, 38:9, 42:10, 50:8, 50:10, 50:17, 57:24, 58:18, 58:22, 59:7, 60:23, 61:4, 61:8, 61:9, 61:10, 61:12, 61:23, 62:3, 62:15, 66:5, 66:6, 66:8, 66:20, 66:21, 67:7, 67:8, 67:12, 67:13, 68:6, 68:7, 69:18, 70:21,

70:22, 70:23, 71:1, 71:4, 71:5, 73:4, 73:17, 74:11, 75:8, 75:14, 75:22, 76:1, 76:14, 76:18, 76:19, 76:22, 76:24, 77:5, 77:8, 78:5, 78:8, 80:4, 81:23, 87:13, 91:3, 93:2, 95:4
**applications** [74] - 16:17, 17:9, 17:17, 18:19, 21:5, 21:7, 21:8, 21:11, 21:14, 21:19, 24:1, 24:4, 24:8, 25:12, 27:11, 33:12, 33:17, 34:19, 34:23, 36:9, 37:9, 37:14, 37:21, 38:8, 41:9, 41:12, 41:17, 42:12, 48:17, 51:5, 51:12, 51:14, 51:18, 52:1, 52:3, 52:19, 54:19, 54:25, 55:1, 55:18, 55:22, 56:5, 56:24, 57:22, 58:19, 58:21, 58:24, 60:17, 60:21, 62:19, 64:18, 64:23, 66:13, 67:4, 67:6, 67:10, 69:2, 70:7, 70:8, 71:14, 73:5, 73:14, 73:22, 75:17, 75:19, 76:5, 77:11, 77:21, 77:24, 77:25, 80:20, 90:2, 91:7, 96:5
**applied** [1] - 8:3
**applies** [1] - 84:8
**apply** [1] - 88:20
**applying** [3] - 9:5, 45:1, 83:16
**approach** [4] - 17:9, 19:25, 22:4, 22:8
**apt** [1] - 27:7
**arbitrary** [3] - 64:5, 71:19, 79:10
**architecture** [5] - 10:20, 18:10, 18:23, 58:3, 60:6
**area** [6] - 17:20, 30:16, 52:18, 52:25, 54:3, 55:6
**areas** [10] - 17:13, 40:12, 52:21, 57:13, 57:14, 57:18, 57:19, 65:18, 67:22
**arguably** [1] - 39:11
**argue** [1] - 3:21
**argued** [3] - 5:6, 5:7, 84:25
**arguement** [1] - 20:16
**argues** [1] - 70:5
**arguing** [4] - 6:14,

78:21, 84:14, 100:15
**argument** [34] - 3:16, 5:11, 5:15, 5:20, 6:4, 7:5, 13:14, 23:8, 23:18, 24:16, 28:22, 29:1, 30:21, 31:22, 43:9, 45:6, 45:7, 46:18, 47:24, 48:22, 58:17, 60:18, 60:19, 67:14, 67:24, 69:11, 73:10, 74:15, 77:23, 81:9, 82:9, 84:18, 84:21, 109:5
**arguments** [6] - 23:17, 43:19, 46:22, 49:13, 65:11, 99:2
**arises** [1] - 31:12
**arising** [1] - 23:10
**armies** [1] - 40:14
**art** [9] - 17:8, 19:18, 19:21, 21:10, 30:13, 41:17, 42:3, 50:7, 96:3
**as-needed** [1] - 12:22
**Ashby** [1] - 3:7
**ASHBY** [1] - 1:22
**aspects** [1] - 79:22
**aspire** [2] - 5:24, 6:23
**aspires** [1] - 5:8
**asserted** [4] - 16:8, 42:16, 48:4
**asserting** [2] - 30:8, 42:19
**assertion** [2] - 41:2, 42:23
**assess** [1] - 50:10
**assigned** [2] - 68:11, 69:7
**assigning** [2] - 68:14, 68:20
**associate** [1] - 69:9
**associated** [2] - 80:16, 105:3
**association** [1] - 68:17
**assumed** [1] - 17:2
**assumption** [1] - 41:1
**assure** [1] - 63:11
**attempt** [2] - 22:18, 43:9
**attorneys** [1] - 2:14
**avoid** [5] - 6:10, 14:21, 15:2, 98:22, 102:23
**aware** [2] - 85:25, 107:17

## B

**backdoor** [1] - 60:18
**backdrop** [1] - 66:3
**backed** [1] - 17:3

**background** [1] - 66:17
**bandwidth** [5] - 23:10, 27:24, 33:18, 34:25, 40:7
**bar** [9] - 59:12, 61:24, 62:4, 66:13, 73:6, 73:9, 73:12, 73:15, 75:13
**barrel** [1] - 98:11
**Bascom** [3] - 31:18, 35:22, 40:6
**base** [4] - 70:13, 80:10, 80:11, 80:13
**based** [11] - 19:9, 38:17, 48:20, 54:4, 79:6, 82:14, 83:6, 83:13, 85:11, 91:21, 106:23
**bases** [1] - 85:10
**basic** [3] - 9:18, 14:4, 76:6
**basis** [5] - 36:2, 53:3, 64:19, 85:16, 106:16
**battling** [1] - 95:4
**become** [1] - 79:24
**becomes** [1] - 55:17
**BEFORE** [1] - 1:12
**beforehand** [2] - 88:8, 95:9
**begin** [4] - 49:13, 49:23, 50:21, 81:13
**beginning** [2] - 2:12, 80:7
**behalf** [4] - 2:19, 49:17, 89:15, 104:23
**behind** [2] - 15:13, 84:2
**belabor** [3] - 15:13, 32:11, 55:24
**belittles** [1] - 34:6
**beneficial** [1] - 105:16
**benefit** [1] - 83:20
**better** [2] - 26:5, 39:20
**between** [22] - 10:7, 10:10, 10:15, 21:7, 21:13, 31:16, 33:1, 34:23, 37:13, 66:13, 68:17, 72:4, 73:4, 73:14, 76:5, 76:23, 77:20, 96:5, 96:13, 99:24, 101:11, 105:19
**beyond** [2] - 7:19, 14:16
**biased** [1] - 42:15
**big** [1] - 79:9
**binder** [1] - 49:19
**Bindu** [1] - 2:18
**BINDU** [1] - 1:15
**bit** [11] - 16:1, 20:7,

35:2, 38:2, 47:8, 47:19, 60:18, 65:5, 70:16, 80:15, 84:2
**bizarre** [1] - 76:16
**black** [1] - 88:1
**blinders** [1] - 35:24
**blog** [2] - 42:8, 42:9
**blue** [2] - 20:2, 20:9
**body** [14] - 56:22, 59:2, 59:5, 61:3, 61:11, 61:17, 66:7, 67:10, 67:13, 71:25, 72:1, 72:7
**borders** [1] - 65:15
**bothered** [1] - 18:1
**bottlenecks** [1] - 32:13
**bottom** [17] - 18:11, 19:2, 20:11, 22:9, 41:19, 59:2, 62:24, 66:14, 71:19, 72:1, 72:20, 74:25, 79:12, 79:14, 90:14, 90:23, 92:12
**bound** [2] - 58:19, 58:25
**box** [10] - 71:12, 71:14, 72:23, 74:5, 74:7, 75:12, 79:18, 88:2, 99:7
**boxes** [8] - 74:8, 74:12, 74:13, 74:16, 76:12, 76:14, 78:14, 88:7
**break** [8] - 14:22, 15:3, 17:21, 19:19, 22:8, 25:4, 65:5, 100:22
**breakdown** [1] - 107:1
**breaking** [5] - 14:20, 14:21, 22:11, 36:23, 48:15
**breaks** [1] - 100:13
**Brian** [2] - 1:25, 109:12
**brick** [1] - 27:8
**brick-and-mortar** [1] - 27:8
**Brief** [1] - 49:7
**brief** [7] - 14:9, 23:22, 71:2, 82:9, 86:24, 97:19, 100:15
**briefing** [2] - 35:6, 107:13
**briefly** [8] - 47:6, 63:8, 88:14, 95:25, 97:9, 103:2, 103:3, 104:15
**briefs** [3] - 23:20, 46:9, 104:4
**bringing** [2] - 32:3, 40:19

**broad** [3] - 10:18, 14:7, 15:5
**broadcasting** [1] - 40:1
**broader** [2] - 30:23, 30:25
**broadest** [1] - 23:14
**broken** [4] - 17:12, 20:2, 42:5, 106:11
**brought** [1] - 15:20
**browse** [1] - 75:7
**browser** [4] - 71:21, 71:22, 72:13, 99:17
**build** [1] - 10:25
**buildings** [1] - 25:1
**built** [1] - 83:14
**bullet** [2] - 17:8, 17:15
**bunch** [2] - 102:15, 106:9
**Burke** [2] - 4:24, 7:17
**bus** [1] - 13:13
**BUSINESS** [1] - 1:3
**business** [5] - 15:21, 57:2, 76:17, 106:15, 106:16
**busy** [1] - 20:8
**buttress** [1] - 86:3
**buy** [1] - 17:19
**BY** [4] - 1:15, 1:17, 1:23, 2:3

**C**

**cable** [1] - 8:25
**cache** [6] - 5:17, 10:2, 13:11, 13:17, 27:3, 28:10
**cached** [2] - 9:16, 13:1
**caching** [2] - 9:18, 9:21
**California** [1] - 2:4
**Canada** [3] - 106:15, 107:2, 107:5
**Canadian** [1] - 106:24
**cannot** [2] - 13:18, 47:3
**capabilities** [3] - 16:9, 30:15, 48:5
**capability** [1] - 10:20
**capable** [1] - 82:25
**capture** [2] - 16:23, 44:3
**care** [1] - 108:13
**carve** [1] - 87:16
**cascade** [2] - 61:25, 62:10
**case** [44] - 5:14, 5:23, 6:5, 6:13, 6:17, 6:24, 7:2, 8:9, 9:4, 9:22, 10:11, 10:13, 11:9,

12:8, 13:2, 13:3, 15:25, 16:14, 16:15, 17:2, 18:14, 19:20, 26:11, 26:23, 27:1, 27:5, 29:11, 30:15, 33:10, 35:6, 43:18, 43:23, 45:13, 45:15, 47:18, 47:22, 65:15, 82:10, 84:19, 84:22, 88:17, 94:9, 94:19
**cases** [16] - 5:3, 6:22, 8:18, 12:13, 15:18, 25:15, 27:19, 39:2, 39:4, 39:5, 39:16, 40:4, 44:2, 44:5, 45:21, 89:5
**category** [1] - 40:6
**causes** [1] - 18:12
**cautions** [1] - 31:18
**CBM** [2] - 7:7, 7:10
**central** [2] - 9:23, 18:10
**centric** [6] - 10:19, 32:8, 32:18, 39:3, 39:4, 40:5
**certain** [9] - 31:23, 31:24, 65:20, 74:5, 79:22, 79:23, 101:7, 105:16, 107:23
**certainly** [3] - 79:1, 107:18, 108:7
**certify** [1] - 109:10
**cetera** [7] - 6:8, 31:21, 32:14, 35:13, 41:15, 68:3
**chain** [1] - 25:2
**challenge** [3] - 16:16, 18:15, 31:12
**challenges** [5] - 25:6, 40:20, 44:21, 45:17
**chance** [1] - 105:23
**change** [14] - 8:6, 26:12, 52:24, 53:7, 53:8, 54:2, 54:7, 55:2, 55:6, 55:10, 70:10, 70:12, 73:25, 96:19
**changed** [8] - 5:7, 53:4, 54:11, 54:14, 55:8, 83:23, 86:19, 100:17
**changes** [3] - 64:4, 70:19, 103:12
**changing** [1] - 55:14
**characteristics** [5] - 13:9, 13:15, 27:3, 28:10, 38:17
**characterization** [6] - 23:15, 29:20, 29:21, 31:5, 38:20, 85:4
**charge** [1] - 90:25

**Check** [1] - 10:4
**Chief** [1] - 1:12
**choose** [1] - 46:17
**chose** [1] - 61:1
**circle** [2] - 76:11, 76:14
**circled** [1] - 76:10
**circling** [1] - 77:1
**Circuit** [9] - 5:6, 5:12, 6:22, 8:9, 11:13, 11:21, 45:12, 45:13, 88:19
**circumvent** [1] - 43:24
**cite** [4] - 40:4, 48:2, 78:1, 78:3
**cited** [2] - 29:11, 96:12
**citing** [2] - 44:2, 56:18
**city** [2] - 75:7
**CIVIL** [1] - 1:4
**claim** [105] - 2:10, 3:24, 4:7, 5:8, 7:24, 8:2, 8:5, 8:7, 8:23, 9:1, 9:2, 10:18, 12:12, 12:19, 13:2, 13:8, 14:4, 20:20, 22:23, 23:25, 27:2, 28:23, 31:23, 32:16, 33:5, 33:7, 34:13, 35:23, 36:4, 36:16, 45:22, 46:18, 47:25, 51:9, 52:8, 52:23, 53:3, 55:2, 57:2, 57:6, 57:10, 58:8, 58:9, 58:15, 62:12, 62:16, 63:4, 64:5, 64:15, 64:16, 64:20, 67:1, 69:17, 70:6, 71:3, 73:19, 73:24, 74:4, 74:6, 74:11, 77:7, 77:9, 78:22, 81:3, 81:23, 81:25, 83:13, 85:6, 86:16, 87:5, 87:17, 87:22, 87:23, 91:16, 91:19, 91:21, 91:23, 91:24, 92:1, 92:3, 92:5, 92:6, 92:10, 92:11, 92:12, 92:13, 92:14, 92:16, 92:19, 96:14, 98:17, 99:8, 101:19, 102:2, 103:6, 103:19, 104:12, 109:7
**Claim** [1] - 1:10
**claimed** [7] - 8:24, 13:25, 31:13, 43:25, 44:25, 92:18, 93:15
**claiming** [5] - 11:5, 28:15, 41:18, 44:22, 86:16
**claims** [92] - 4:20, 5:16, 6:2, 6:5, 6:9,

6:16, 6:18, 7:6, 7:10, 7:14, 7:20, 8:12, 10:1, 10:24, 12:9, 12:18, 13:5, 13:23, 14:1, 14:2, 14:3, 15:6, 15:7, 15:22, 16:4, 16:8, 16:11, 16:16, 20:17, 20:18, 20:19, 21:23, 21:24, 22:18, 22:21, 22:23, 22:25, 23:4, 23:12, 23:13, 23:16, 23:20, 23:23, 23:24, 24:3, 24:10, 24:13, 26:25, 27:1, 27:16, 29:8, 30:1, 30:19, 30:23, 31:2, 31:4, 31:16, 31:23, 32:18, 33:1, 35:19, 36:3, 36:5, 36:10, 36:13, 37:20, 38:2, 38:3, 38:15, 44:11, 46:2, 46:9, 47:2, 47:17, 48:4, 48:14, 54:23, 56:9, 56:14, 58:7, 64:2, 64:7, 64:21, 69:14, 75:18, 81:10, 82:2, 88:20, 89:24, 92:1, 92:5
**clarification** [2] - 57:10, 97:2
**clarified** [1] - 97:24
**clarifies** [1] - 67:2
**clarify** [3] - 88:9, 88:25, 96:16
**clarity** [1] - 64:9
**clear** [28] - 6:21, 8:18, 9:4, 14:8, 14:11, 43:2, 47:2, 47:23, 52:11, 56:13, 66:11, 68:5, 73:1, 75:18, 75:23, 75:24, 81:5, 87:7, 88:19, 90:15, 93:18, 93:21, 96:17, 99:19, 100:14, 100:18, 102:1, 104:5
**clearly** [11] - 5:13, 45:10, 45:11, 45:15, 46:12, 54:22, 69:24, 82:2, 91:6, 92:12, 99:2
**click** [8] - 74:20, 75:7, 100:11, 100:24, 101:14, 101:24, 102:18, 104:8
**clicking** [5] - 99:13, 99:17, 100:2, 100:10, 100:20
**client** [20] - 10:10, 10:15, 97:15, 97:17, 97:20, 98:3, 99:11, 99:23, 100:19,

101:12, 101:18, 102:7, 103:13, 103:14, 103:18, 103:20, 103:22, 103:23, 104:3
**close** [1] - 70:17
**closed** [2] - 80:13, 80:15
**code** [6] - 13:12, 22:11, 79:7, 79:8, 79:9, 79:20
**colleague** [4] - 49:12, 50:4, 89:9, 104:18
**collecting** [1] - 9:25
**collection** [2] - 72:15, 75:6
**collections** [1] - 75:11
**color** [1] - 66:17
**column** [9] - 37:2, 37:15, 62:10, 63:3, 63:15, 80:6, 80:14, 82:15
**combination** [4] - 21:19, 31:19, 35:25, 38:6
**combine** [2] - 11:18, 20:12
**combined** [3] - 20:5, 20:24, 24:24
**combining** [5] - 11:16, 11:21, 14:6, 34:18, 48:18
**command** [41] - 19:16, 21:5, 21:6, 25:13, 41:15, 42:9, 50:17, 51:8, 53:18, 53:21, 54:3, 54:4, 54:15, 56:12, 59:12, 59:16, 61:24, 62:3, 62:7, 64:13, 64:23, 66:13, 73:3, 73:6, 73:11, 73:15, 73:23, 74:7, 74:15, 74:17, 74:23, 75:3, 75:4, 75:8, 75:13, 76:25, 79:17
**commands** [5] - 24:2, 24:8, 73:5, 74:22, 75:2
**commercial** [1] - 105:10
**common** [5] - 14:13, 20:15, 25:16, 50:24, 60:15
**communicate** [2] - 100:19, 103:23
**communicated** [1] - 104:3
**communicating** [3] - 101:17, 103:19, 103:21
**companies** [4] -

42:17, 42:19, 42:20
**company** [1] - 75:10
**comparing** [1] - 29:19
**compatible** [1] - 33:17
**compel** [2] - 107:11,
107:12
**complaint** [5] - 17:1,
17:2, 21:25, 22:21,
44:10
**complaint's** [1] - 18:4
**complete** [1] - 106:11
**completely** [4] -
24:22, 25:3, 25:6,
87:7
**complicated** [1] -
98:12
**components** [9] -
13:8, 20:11, 27:20,
27:22, 28:9, 28:12,
28:15, 30:11, 39:9
**compose** [1] - 22:13
**composed** [1] - 58:22
**composes** [1] - 58:5
**compute** [1] - 17:20
**computer** [80] - 5:9,
5:18, 7:1, 7:2, 7:3,
7:17, 8:20, 10:8,
10:19, 14:6, 15:20,
16:5, 16:8, 16:13,
16:18, 16:22, 16:23,
16:24, 17:11, 17:18,
17:22, 18:6, 18:10,
18:16, 18:22, 19:10,
19:11, 20:3, 20:4,
22:19, 22:23, 23:10,
24:6, 25:19, 25:23,
26:2, 26:5, 26:8,
26:16, 26:20, 26:22,
27:10, 27:17, 27:19,
27:20, 27:22, 27:24,
28:8, 28:9, 28:11,
28:24, 29:7, 29:17,
30:2, 30:14, 31:13,
31:14, 32:3, 32:4,
32:6, 32:7, 33:25,
39:3, 39:8, 39:10,
40:5, 40:19, 40:20,
40:22, 41:17, 44:19,
45:16, 48:1, 48:4,
48:10, 48:16
**computerized** [1] -
23:11
**computers** [19] - 5:2,
5:9, 6:1, 6:23, 8:5,
8:21, 17:19, 18:18,
30:11, 31:17, 33:2,
39:20, 44:23, 45:2,
45:8, 45:18, 46:19,
48:7, 48:9
**computing** [2] - 6:25,
45:17
**conceived** [1] - 17:4

**concept** [25] - 8:14,
8:18, 9:23, 11:12,
12:17, 12:21, 13:16,
13:19, 13:22, 14:5,
16:4, 31:9, 32:17,
34:4, 34:6, 34:8,
36:24, 37:10, 38:24,
45:3, 45:25, 46:1,
46:4, 46:6
**concepts** [9] - 4:21,
4:25, 5:4, 31:24,
33:11, 33:20, 35:14,
48:21, 48:23
**concern** [2] - 42:24,
84:9
**concerning** [2] - 61:9,
82:6
**concerns** [3] - 43:15,
89:25, 96:7
**concert** [1] - 11:15
**conclusion** [2] -
91:19, 91:20
**concrete** [7] - 4:25,
6:2, 6:8, 6:11, 13:4,
46:8, 46:17
**concurrently** [12] -
24:1, 24:4, 24:9,
37:8, 51:18, 55:21,
62:15, 62:18, 75:22,
76:2, 78:4, 90:2
**confer** [2] - 26:17,
105:1
**conferred** [4] - 3:17,
3:19, 104:25, 107:17
**configuration** [1] -
59:22
**configuring** [1] -
41:11
**confirm** [1] - 12:13
**confirmation** [1] -
42:14
**confusion** [1] - 84:10
**conjunction** [1] -
56:11
**connected** [1] - 15:23
**connection** [1] - 96:13
**consider** [1] - 87:20
**consistent** [2] - 26:25,
83:18
**constraints** [2] -
24:21, 40:24
**construct** [1] - 33:15
**constructed** [2] -
20:23, 24:5
**construction** [49] -
2:11, 3:24, 4:7, 9:5,
9:11, 12:1, 23:13,
31:3, 35:3, 35:9,
35:11, 35:15, 35:19,
36:1, 36:2, 36:4,
37:3, 52:4, 53:2,

53:22, 53:25, 54:6,
57:16, 61:20, 65:1,
67:21, 69:25, 78:23,
86:2, 88:9, 89:20,
89:22, 90:3, 90:10,
91:17, 91:25, 92:24,
93:6, 93:19, 94:8,
94:14, 96:18, 96:19,
98:13, 99:5, 103:5,
104:12, 109:7
**Construction** [1] -
1:10
**constructions** [8] -
31:24, 33:4, 33:9,
35:4, 35:24, 52:23,
86:5, 88:1
**construe** [6] - 52:18,
52:25, 55:3, 55:5,
57:16, 88:20
**construed** [8] - 8:17,
33:8, 33:22, 34:14,
35:21, 36:15, 55:1,
103:11
**construing** [1] - 97:14
**contain** [3] - 35:20,
56:23, 80:9
**contains** [1] - 36:15
**contemplating** [1] -
62:6
**Content** [3] - 5:3,
12:16, 25:20
**content** [19] - 12:15,
14:24, 17:21, 21:12,
31:6, 36:21, 36:23,
40:11, 41:14, 42:4,
42:6, 43:12, 66:2,
66:21, 68:6, 69:9,
70:12, 71:4, 95:5
**contention** [2] - 60:16,
91:14
**contentions** [7] - 9:7,
71:11, 76:9, 78:22,
87:8, 87:19, 88:16
**contest** [1] - 11:25
**context** [1] - 12:7
**continuation** [8] -
97:15, 97:18, 97:22,
97:23, 97:25, 98:3,
98:14, 98:17
**continuations** [18] -
97:9, 97:13, 97:14,
98:19, 98:22, 98:25,
99:10, 101:3, 101:5,
102:16, 102:21,
103:7, 103:8, 104:6,
104:7
**continued** [1] - 34:7
**Continued** [1] - 2:1
**continues** [1] - 100:25
**continuing** [1] - 99:14
**contradict** [1] - 28:2

**contradicted** [1] -
61:15
**contradictory** [1] -
77:18
**contrary** [4] - 7:13,
28:22, 28:25, 58:17
**contrast** [4] - 21:10,
26:3, 50:12, 93:9
**contribution** [1] - 15:6
**control** [13] - 12:20,
13:10, 34:5, 35:12,
38:4, 38:6, 38:11,
38:14, 41:13, 60:4,
80:8, 80:10, 80:11
**controlling** [1] - 80:5
**conversation** [21] -
97:20, 99:1, 99:4,
99:5, 99:9, 99:11,
99:14, 99:18, 99:21,
100:3, 100:4,
100:10, 100:17,
100:20, 100:21,
100:25, 101:21,
101:25, 104:8
**conversations** [4] -
99:15, 100:22,
107:11, 107:18
**convinced** [2] - 40:16,
40:18
**cool** [2] - 46:3, 46:4
**copy** [2] - 25:21, 49:20
**Corporation** [1] -
88:18
**CORPORATION** [1] -
1:4
**correct** [5] - 11:25,
57:16, 85:1, 87:10,
98:14
**correctly** [1] - 5:20
**correspondence** [1] -
39:23
**Corroon** [1] - 2:19
**CORROON** [1] - 1:14
**cost** [5] - 105:2,
106:11, 106:19,
106:21, 107:12
**Counsel** [2] - 1:21, 2:5
**counsel** [9] - 3:8,
23:18, 35:2, 44:17,
81:3, 86:6, 96:2,
96:10, 98:16
**counsel's** [1] - 20:15
**count** [2] - 41:22, 97:3
**couple** [5] - 15:15,
27:6, 35:18, 85:23,
86:4
**coupons** [1] - 75:10
**course** [10] - 11:13,
11:16, 12:13, 12:24,
28:23, 74:18, 74:24,
78:10, 104:2, 106:14

**Court** [33] - 4:19, 4:21,
5:22, 7:13, 8:9, 8:16,
9:23, 15:12, 22:16,
23:2, 29:13, 33:8,
34:14, 36:11, 36:12,
36:14, 39:13, 42:25,
43:14, 43:16, 47:24,
48:2, 49:18, 52:17,
52:25, 55:3, 55:5,
57:15, 104:23,
105:16, 109:12,
109:13
**court** [2] - 2:11, 89:15
**COURT** [74] - 1:1,
2:13, 2:16, 3:6, 3:15,
3:25, 4:4, 4:6, 4:10,
4:15, 15:10, 27:14,
28:1, 28:18, 29:24,
30:18, 31:8, 35:15,
44:14, 47:5, 49:2,
49:5, 49:10, 49:14,
49:22, 65:3, 65:7,
68:22, 68:25, 72:9,
72:12, 78:17, 79:11,
79:21, 80:25, 81:15,
82:3, 82:7, 83:23,
84:12, 84:24, 85:3,
85:17, 85:19, 87:18,
88:12, 89:3, 89:8,
89:11, 94:6, 94:16,
95:22, 96:21, 96:25,
97:5, 98:5, 98:8,
103:1, 103:24,
104:11, 104:14,
104:20, 105:18,
106:1, 106:4,
107:20, 108:1,
108:9, 108:12,
108:16, 108:18,
108:22, 109:2, 109:5
**Court's** [14] - 9:5,
9:11, 22:15, 31:3,
33:3, 35:19, 36:3,
37:3, 37:17, 83:12,
84:3, 85:12, 85:16,
104:24
**courts** [2] - 5:12, 9:19
**cover** [1] - 43:3
**covered** [1] - 14:1
**covers** [3] - 14:7, 14:8,
31:5
**create** [6] - 4:23,
20:12, 20:22, 36:10,
44:20, 84:10
**created** [7] - 18:25,
60:2, 60:4, 60:8,
60:9, 60:12, 68:3
**criterion** [3] - 90:1,
90:7, 93:8
**Crowley** [3] - 3:1,
89:10, 89:15
**CROWLEY** [7] - 1:19,

3:2, 89:12, 89:14, 94:10, 95:24, 96:24
**crucial** [1] - 90:12
**curious** [1] - 104:15
**currency** [3] - 25:25
**current** [3] - 5:5, 9:13, 36:18
**customary** [2] - 52:8, 57:7
**cut** [1] - 71:18
**cuts** [1] - 91:24
**CyberFone** [5] - 11:9, 11:10, 12:16, 39:6, 39:12

## D

**data** [71] - 6:6, 8:15, 8:17, 8:18, 8:19, 8:20, 8:21, 8:24, 9:5, 9:6, 9:8, 9:9, 9:10, 10:14, 11:10, 11:14, 11:16, 11:19, 13:12, 13:16, 14:20, 15:1, 17:10, 18:23, 22:11, 24:23, 31:20, 35:21, 37:24, 38:21, 39:17, 39:19, 40:8, 46:12, 46:13, 58:1, 58:3, 58:5, 60:1, 60:4, 60:6, 61:4, 61:5, 62:17, 63:5, 68:7, 80:8, 80:9, 80:10, 80:11, 80:12, 82:12, 82:13, 85:22, 86:15, 86:17, 86:21, 86:22, 87:8, 87:10, 87:13, 87:15, 91:3, 91:4, 105:23, 106:9, 106:12
**date** [5] - 105:7, 105:16, 107:20, 107:23, 108:2
**David** [1] - 3:8
**DAVID** [1] - 2:3
**DAY** [5] - 1:23, 3:5, 3:7, 3:11, 3:13
**DDR** [4] - 31:11, 32:16, 32:25, 40:5
**de** [1] - 105:23
**de-aggregate** [1] - 105:23
**deal** [3] - 38:19, 40:7, 87:14
**dealing** [1] - 25:11
**Deals** [1] - 75:3
**deals** [3] - 76:17, 76:18, 76:19
**dealt** [3] - 25:17, 39:7, 83:24
**debating** [1] - 63:25

**December** [1] - 105:14
**decide** [7] - 43:1, 43:16, 52:17, 52:25, 55:3, 55:5, 57:15
**decided** [2] - 3:20, 41:4
**deciding** [1] - 106:21
**decision** [13] - 5:6, 5:13, 7:18, 7:19, 10:12, 23:5, 23:6, 23:8, 29:11, 29:23, 84:3, 85:13, 85:16
**declining** [1] - 83:12
**decrease** [2] - 21:8, 34:24
**decreasing** [1] - 27:24
**dedicated** [18] - 23:9, 53:14, 54:14, 54:18, 55:18, 56:4, 56:20, 56:23, 60:17, 60:21, 60:22, 61:3, 64:17, 70:6, 70:25, 78:13, 79:22, 80:20
**Defendant** [1] - 1:7
**defendant** [6] - 34:5, 65:3, 85:19, 94:17, 98:5, 108:19
**defendant's** [4] - 4:9, 31:5, 39:16, 43:2, 53:1, 96:2
**Defendants** [1] - 2:5
**defendants** [9] - 4:10, 28:20, 29:22, 30:22, 31:21, 44:8, 44:9, 55:7, 84:21
**defense** [2] - 35:16, 86:3
**define** [5] - 66:1, 66:16, 68:7, 99:5, 101:6
**defined** [6] - 66:7, 67:8, 67:18, 69:4, 71:24, 83:5
**defines** [5] - 65:16, 70:1, 81:19, 90:5, 99:9
**defining** [2] - 66:19, 86:1
**definition** [30] - 52:11, 53:6, 57:11, 58:21, 67:17, 67:21, 69:24, 77:17, 81:21, 82:14, 83:13, 83:16, 84:7, 84:20, 84:22, 90:8, 90:11, 90:15, 90:18, 93:18, 97:23, 98:1, 98:20, 99:19, 99:20, 100:4, 100:9, 103:7, 103:17, 103:21
**definitions** [1] - 64:7
**DELAWARE** [1] - 1:2

**Delaware** [3] - 1:9, 3:7, 16:15
**delete** [1] - 55:12
**deli** [1] - 39:8
**delivery** [1] - 40:1
**demand** [1] - 21:2
**demanded** [1] - 21:21
**demands** [1] - 21:8
**demonstration** [1] - 19:14
**denied** [2] - 7:7, 43:17
**dependent** [5] - 12:19, 38:15, 69:17, 73:19, 74:6
**depicted** [1] - 62:4
**depiction** [1] - 59:4
**derived** [1] - 64:11
**describe** [2] - 61:1, 65:21
**described** [3] - 37:1, 73:7, 81:24
**describes** [12] - 7:25, 59:10, 59:21, 61:16, 69:6, 69:18, 70:1, 73:13, 73:19, 95:13, 99:9, 101:16
**describing** [1] - 82:16
**description** [6] - 57:22, 59:20, 62:5, 65:25, 69:22, 81:6
**descriptions** [1] - 68:1
**designed** [2] - 36:9, 38:7
**DESMARAIS** [3] - 1:17, 1:17, 2:21
**Desmarais** [2] - 2:20, 49:17
**despite** [1] - 81:20
**detail** [5] - 7:22, 30:12, 38:2, 47:19, 50:5
**detailed** [3] - 13:4, 42:18, 50:3
**details** [4] - 6:9, 7:24, 31:2, 74:20
**determinative** [1] - 48:2
**determine** [3] - 19:23, 24:13, 88:21
**determined** [2] - 13:10, 47:17
**determines** [2] - 13:16, 28:24
**developed** [3] - 17:15, 17:16, 22:3
**developing** [1] - 17:5
**deviate** [1] - 60:25
**Device** [1] - 10:11
**device** [2] - 10:15, 48:19
**devices** [3] - 26:16, 48:20

**devoid** [1] - 4:25
**diagram** [1] - 59:21
**dichotomy** [6] - 76:6, 77:16, 77:18, 77:20, 94:22, 96:4
**dictate** [1] - 36:6
**difference** [2] - 65:10, 76:23
**different** [41] - 10:1, 11:11, 11:15, 11:16, 20:2, 21:4, 24:22, 24:23, 25:3, 25:4, 25:7, 28:19, 34:1, 35:7, 40:12, 40:23, 40:24, 59:7, 59:8, 65:20, 67:15, 68:11, 68:20, 69:2, 70:2, 75:2, 77:13, 81:20, 83:24, 84:2, 86:4, 86:8, 86:14, 90:17, 90:20, 94:4, 100:7, 100:23
**difficult** [2] - 84:11, 108:6
**digital** [1] - 5:16
**dimension** [1] - 66:17
**directed** [21] - 7:15, 8:7, 16:2, 16:5, 16:11, 18:21, 21:17, 22:1, 22:25, 23:21, 23:24, 24:1, 24:3, 24:10, 24:14, 27:16, 29:17, 30:2, 45:18, 50:16, 50:18
**directly** [9] - 7:13, 28:1, 28:25, 57:14, 61:14, 79:9, 90:3, 90:9, 93:5
**disabled** [1] - 80:17
**disaggregate** [2] - 106:15, 106:18
**disaggregated** [2] - 106:25, 107:13
**disagree** [1] - 29:2
**disclaimed** [1] - 7:9
**disclaimer** [1] - 84:15
**disclose** [1] - 47:2
**discloses** [3] - 56:21, 57:1, 59:25
**discovery** [4] - 97:3, 104:15, 105:13, 108:13
**discussed** [5] - 29:12, 32:9, 38:16, 60:20, 108:20
**discussing** [2] - 42:3, 50:21
**discussion** [2] - 38:3, 103:4
**disks** [1] - 17:19
**dismisses** [1] - 41:21

**disparage** [1] - 19:21
**display** [53] - 4:23, 7:16, 18:3, 18:23, 20:21, 24:2, 24:5, 24:7, 33:23, 37:8, 42:6, 50:18, 51:16, 51:18, 55:16, 55:17, 55:21, 58:11, 59:13, 60:1, 60:3, 61:4, 62:8, 62:14, 62:18, 63:6, 63:9, 66:2, 66:20, 66:23, 67:6, 67:15, 70:9, 71:4, 71:5, 71:8, 71:15, 72:16, 72:19, 73:8, 76:7, 77:5, 77:25, 78:7, 80:8, 80:9, 80:12, 90:2, 91:3, 91:4, 91:7, 93:25, 95:3
**display"/" structuring** [1] - 51:14
**displayed** [14] - 24:9, 55:8, 55:10, 58:3, 59:8, 60:6, 61:8, 66:2, 66:8, 68:8, 68:18, 70:8, 71:20, 77:12
**displaying** [22] - 11:22, 31:6, 53:14, 54:14, 54:19, 55:18, 56:5, 56:21, 56:24, 60:17, 60:21, 60:23, 61:3, 61:11, 61:12, 64:17, 67:10, 70:6, 71:4, 78:4, 80:20, 91:1
**displays** [3] - 24:5, 25:12, 43:7, 91:1
**dispositive** [2] - 27:15, 28:4
**dispute** [9] - 8:11, 60:15, 79:21, 82:6, 85:7, 89:6, 104:7, 108:13, 108:15
**disputed** [6] - 49:20, 50:22, 51:10, 51:25, 56:2, 89:16
**disputes** [3] - 65:8, 65:10, 67:14
**disputing** [1] - 96:8
**distinct** [1] - 73:23
**distinction** [3] - 76:5, 96:5, 105:18
**distinguish** [5] - 8:22, 26:12, 29:1, 69:15, 82:2
**distinguishable** [1] - 5:3
**distinguished** [1] - 83:5

distinguishes [1] - 69:22
distributed [3] - 6:25, 45:17, 93:3
distributive [1] - 10:20
DISTRICT [2] - 1:1, 1:2
District [7] - 5:12, 5:22, 8:9, 9:20, 10:12, 45:11, 109:13
divide [2] - 65:14, 66:1
divided [5] - 49:20, 57:18, 59:3, 65:17, 67:22
divides [1] - 66:3
division [1] - 72:17
document [1] - 105:22
documents [10] - 25:22, 105:8, 105:9, 105:11, 105:15, 105:17, 107:7, 107:15, 107:16, 108:7
done [7] - 19:3, 25:22, 30:4, 40:3, 40:23, 86:4
doubt [3] - 18:21, 44:21, 45:19
down [16] - 19:15, 19:16, 32:14, 32:22, 33:15, 46:24, 47:14, 61:24, 62:5, 62:7, 72:13, 72:14, 72:20, 74:24, 74:25, 106:11
download [1] - 46:25
drafted [1] - 14:1
draw [3] - 75:12, 78:14, 99:7
drawing [3] - 69:25, 74:12, 79:13
dressing [1] - 87:5
drew [4] - 71:14, 72:23, 79:11, 79:18
drive [1] - 20:10
drop [1] - 74:16
due [1] - 8:10
dumb [4] - 6:15, 17:9, 19:25, 22:8
duplicative [2] - 84:4, 84:9
duration [2] - 80:12, 101:21
during [8] - 20:15, 50:5, 50:6, 80:11, 82:9, 100:20, 101:25, 104:25
dynamic [2] - 9:21, 36:21
dynamically [10] - 18:25, 20:24, 34:17, 36:24, 39:21, 48:18, 60:1, 60:9, 60:12,

68:2

## E

e-mails [1] - 39:23
e.g [1] - 73:9
economic [1] - 15:21
efficiency [1] - 50:15
efficiently [1] - 25:9
either [9] - 3:23, 9:24, 41:20, 51:1, 52:10, 60:8, 65:14, 82:1, 98:25
Electric [4] - 11:17, 12:17, 25:17, 88:18
electrical [1] - 25:18
element [11] - 34:13, 68:1, 68:5, 68:13, 68:16, 68:17, 68:19, 68:23, 69:9, 90:25, 93:15
elements [2] - 12:22, 31:19
eligibility [2] - 23:3, 26:17
eligible [8] - 19:23, 22:17, 22:24, 23:1, 23:4, 23:12, 32:19, 48:25
ellipses [1] - 79:8
Elmo [4] - 4:13, 50:1, 89:13, 97:11
elsewhere [1] - 83:20
elucidated [1] - 15:25
elucidating [1] - 79:24
embed [1] - 101:10
embedded [1] - 102:20
embodiment [13] - 30:19, 56:12, 59:15, 61:16, 61:20, 63:14, 64:1, 64:9, 64:13, 64:14, 73:20, 93:14, 93:17
embodiments [3] - 56:18, 59:19, 64:12
emerge [1] - 32:2
empty [1] - 95:1
enables [1] - 77:5
encompasses [1] - 37:18
Encryption [2] - 19:20, 43:17
end [12] - 42:20, 44:18, 46:16, 54:17, 72:21, 78:12, 87:22, 100:6, 108:4, 108:9, 108:20
ends [2] - 71:25, 109:7
Enfish [22] - 5:7, 5:8, 5:15, 5:21, 6:22,

8:23, 10:12, 15:25, 22:22, 23:4, 23:18, 24:12, 26:3, 26:11, 29:6, 29:11, 29:13, 29:20, 29:21, 45:21, 48:2
engages [1] - 99:11
Enhancement [1] - 10:11
ensure [1] - 66:12
entire [14] - 14:18, 19:15, 19:16, 21:7, 35:3, 37:21, 42:2, 50:8, 50:10, 72:4, 79:4, 79:6, 98:1
entirely [3] - 47:23, 55:12, 78:22
entirety [1] - 31:25, 32:22, 33:14
entities [2] - 42:15, 106:24
entity [1] - 103:14
enumerated [2] - 82:22, 83:7
equating [1] - 53:5
equivalent [2] - 61:24, 62:5
especially [1] - 93:17
ESQ [9] - 1:15, 1:17, 1:18, 1:18, 1:19, 1:19, 1:23, 2:3, 2:4
essentially [4] - 9:22, 14:9, 45:4, 65:16
established [3] - 37:7, 68:17, 89:18
establishing [1] - 38:17
et [7] - 6:8, 31:21, 32:14, 35:13, 41:15, 68:3
evaluated [1] - 35:25
evening [2] - 104:25, 105:2
events [1] - 58:22
evidence [10] - 17:3, 22:20, 26:8, 32:10, 41:2, 41:3, 43:4, 88:23, 94:13
exact [1] - 82:21
exactly [8] - 5:14, 10:21, 11:7, 18:5, 26:9, 27:12, 44:22, 75:25
examined [1] - 27:7
example [23] - 25:1, 25:10, 26:1, 27:1, 42:6, 42:11, 47:11, 56:13, 56:16, 62:9, 63:23, 67:12, 78:4, 79:4, 79:17, 88:4, 91:5, 92:25, 93:23,

100:14, 100:21, 102:3, 102:16
examples [10] - 41:21, 41:23, 42:11, 43:7, 43:12, 47:12, 47:15, 47:16, 59:18, 97:16
except [4] - 14:14, 47:11, 50:5, 91:12
exception [2] - 56:7, 64:8
excerpt [6] - 58:1, 62:24, 63:2, 63:14, 80:2, 92:25
excerpted [1] - 79:8
excerpts [1] - 79:5
exchange [3] - 12:11, 25:25, 99:6
exchanges [1] - 10:14
excludes [1] - 61:20
exclusive [1] - 77:18
exclusively [1] - 23:9
excuse [1] - 49:25
exemplary [1] - 51:9
exist [2] - 43:5, 54:21
existed [7] - 18:7, 19:17, 26:15, 26:19, 28:14, 40:2, 44:4
existence [1] - 43:4
existing [1] - 16:12
exists [4] - 16:5, 48:10, 53:17, 55:23
exit [1] - 99:18
expert [1] - 87:24
experts [1] - 105:24
explain [6] - 19:22, 24:10, 47:23, 57:13, 65:19, 90:22
explained [2] - 5:21, 35:5
explaining [1] - 80:4
explains [11] - 19:21, 22:10, 30:14, 37:5, 66:9, 66:15, 66:22, 69:5, 70:13, 70:14, 99:16
explanation [1] - 13:17
explicit [5] - 41:16, 83:16, 84:7, 92:16, 92:19
explicitly [8] - 37:19, 57:20, 69:15, 70:1, 92:5, 92:14, 99:9, 99:16
exploding [2] - 39:12, 39:13
exposed [1] - 70:16
extent [2] - 92:9, 106:10
Extraction [3] - 5:3, 12:16, 25:20

extrinsic [1] - 88:23

## F

F2d [1] - 88:18
facilitate [1] - 61:9
fact [20] - 8:20, 20:19, 29:3, 40:8, 43:4, 58:25, 64:21, 67:20, 70:2, 70:14, 71:11, 81:2, 82:25, 83:6, 83:13, 92:1, 92:5, 92:19, 93:10, 93:13
factors [1] - 85:12
factual [2] - 43:20, 43:24
fail [2] - 4:20, 8:12
fair [5] - 30:4, 30:5, 30:20, 87:20, 87:21
faithful [1] - 52:23
fall [2] - 40:6, 43:14
familiar [2] - 15:14, 28:20
family [1] - 90:20
far [5] - 13:3, 13:4, 23:24, 24:10, 27:5, 64:1
farm [1] - 77:4
favorite [1] - 75:10
feature [1] - 66:4
features [2] - 59:11, 61:7, 66:21, 105:10, 105:12
Federal [9] - 5:6, 5:12, 6:22, 8:8, 11:13, 11:20, 45:12, 45:13, 88:19
FENWICK [1] - 2:3
Fenwick [1] - 3:8
fetch [2] - 95:9, 95:18
fetches [1] - 94:25, 95:5
fetching [1] - 12:14
few [3] - 35:8, 52:20, 98:23
fields [1] - 57:25
fifth [1] - 55:20
fight [2] - 80:22, 84:22
Figure [11] - 20:1, 59:1, 59:4, 59:20, 61:2, 61:18, 62:4, 65:23, 65:24, 67:11, 81:6
figure [2] - 61:15, 102:6
figures [1] - 59:1
file [2] - 20:12, 102:7
Filepp [14] - 17:4, 19:25, 25:3, 25:8, 26:4, 26:9, 32:8,

32:12, 40:6, 41:8,
44:6, 50:7, 50:12,
83:5
**files** [3] - 9:8, 9:9, 87:9
**fill** [1] - 95:2
**filled** [1] - 58:1
**finally** [4] - 11:23,
12:19, 25:15, 77:23
**financial** [2] - 105:4,
105:8
**findings** [1] - 43:20
**fine** [5] - 4:5, 14:17,
15:2, 49:14, 75:2
**first** [50] - 3:22, 3:24,
4:6, 4:9, 4:11, 7:8,
13:9, 17:1, 29:12,
42:1, 50:25, 51:5,
51:13, 51:15, 51:25,
52:5, 52:13, 52:18,
53:4, 53:5, 54:8,
55:6, 55:13, 57:4,
58:9, 58:15, 62:2,
63:10, 63:20, 67:3,
71:13, 71:18, 72:2,
73:1, 74:2, 74:10,
76:1, 76:11, 81:24,
88:19, 88:20, 91:15,
92:25, 93:25, 96:1,
98:13, 104:16
**firstly** [1] - 63:13
**fish** [1] - 98:11
**fits** [2] - 18:17, 104:9
**five** [4] - 24:2, 42:16,
50:23, 65:8
**fix** [1] - 78:13
**fixed** [42] - 53:4, 53:5,
54:7, 54:8, 54:9,
54:18, 55:13, 55:14,
56:4, 56:8, 56:10,
56:17, 57:5, 57:12,
57:21, 58:6, 58:11,
58:14, 58:16, 59:8,
59:11, 59:13, 59:15,
60:13, 60:19, 60:21,
64:8, 64:13, 66:16,
67:16, 67:25, 68:12,
68:25, 69:1, 69:4,
69:12, 70:11, 71:8,
72:17, 73:8, 77:16
**fixed-located** [1] -
59:13
**flexibility** [1] - 50:15
**floppy** [1] - 17:19
**fly** [3] - 20:5, 22:13,
24:24
**focus** [8] - 6:17,
13:23, 16:7, 22:23,
30:22, 48:3, 88:22,
88:24
**focused** [7] - 16:21,
23:6, 27:9, 27:23,

28:7, 30:7, 35:6
**focusing** [2] - 35:8,
35:22
**following** [4] - 2:10,
6:22, 100:3, 104:24
**follows** [1] - 99:11
**FOR** [1] - 1:2
**forecasts** [1] - 105:9
**foregoing** [1] - 109:10
**foreign** [1] - 59:21
**forever** [2] - 39:23,
101:14
**form** [2] - 59:11, 59:15
**formal** [1] - 100:9
**formally** [1] - 19:3
**format** [14] - 36:8,
59:17, 63:11, 63:13,
65:15, 65:25, 66:10,
66:15, 69:4, 69:5,
82:16, 83:9, 86:1,
86:15
**formatting** [4] - 33:6,
33:11, 33:15, 55:1
**formulated** [1] - 60:4
**forth** [2] - 47:20,
101:11
**fortunately** [1] - 73:2
**forward** [2] - 87:25,
99:3
**four** [2] - 9:1, 94:7
**frame** [1] - 17:7
**framework** [1] - 34:14
**Francisco** [1] - 2:4
**frankly** [2] - 8:4, 48:21
**Friday** [3] - 104:24,
106:9, 107:8
**fudge** [1] - 85:24
**full** [3] - 35:9, 45:19,
66:25
**fully** [1] - 105:23
**function** [7] - 27:17,
50:17, 53:21, 59:12,
62:7, 71:22
**functionality** [7] -
10:7, 10:9, 11:4,
22:19, 22:24, 27:19,
27:24
**functions** [17] - 21:6,
25:13, 41:15, 42:10,
51:8, 53:18, 54:3,
54:4, 54:16, 56:12,
59:16, 61:22, 64:13,
64:24, 80:16, 80:17
**fundamental** [1] -
15:21
**furthermore** [1] -
36:14
**future** [3] - 21:22,
105:8, 105:9

**G**

**Gaffigan** [2] - 1:25,
109:12
**game** [2] - 7:23, 98:21
**gathering** [1] - 39:15
**GEDDES** [1] - 1:22
**Geddes** [1] - 3:7
**gee** [1] - 45:9
**general** [3] - 4:22,
5:22, 15:7
**generalized** [2] - 7:21,
8:1
**generally** [4] - 29:7,
29:13, 29:14, 106:8
**generate** [1] - 67:5
**generated** [2] - 58:16,
104:3
**generates** [1] - 101:6
**generating** [5] - 7:15,
20:20, 58:9, 58:10,
67:3
**generic** [4] - 8:18,
12:25, 13:16, 16:24
**generically** [1] - 26:16
**GIF** [1] - 83:9
**given** [15] - 28:23,
28:24, 43:8, 43:13,
51:21, 51:22, 52:8,
52:11, 54:1, 55:4,
57:7, 93:18, 97:22,
105:13, 106:23
**glossary** [2] - 98:2,
98:15
**glove** [1] - 18:17
**graphics** [2] - 60:3,
68:7
**gray** [1] - 30:15
**great** [6] - 13:25, 45:9,
45:19, 46:20, 79:16,
97:8
**green** [1] - 20:4
**Grid** [1] - 25:17
**grids** [1] - 25:18
**group** [1] - 75:10
**grouped** [1] - 50:23
**Groupon** [38] - 3:8,
3:13, 14:14, 26:10,
35:7, 35:11, 38:1,
38:16, 41:6, 41:21,
42:1, 43:20, 43:23,
44:1, 56:3, 57:11,
71:15, 71:20, 71:21,
72:4, 72:6, 76:16,
78:21, 104:12,
105:1, 105:6,
105:14, 105:17,
106:9, 106:12,
106:14, 106:19,
106:21, 106:24,

107:5, 107:7,
107:15, 109:3
**GROUPON** [1] - 1:6
**Groupon's** [13] -
23:15, 35:1, 38:19,
42:8, 43:17, 43:19,
54:6, 76:17, 90:15,
93:19, 96:10, 97:19,
106:5
**growth** [1] - 105:9
**guidance** [1] - 10:17
**gutting** [1] - 87:3

**H**

**HAACK** [7] - 2:4, 3:12,
106:7, 107:23,
108:4, 108:17,
108:21
**Haack** [1] - 3:11
**HADDEN** [25] - 2:3,
3:10, 4:5, 4:12, 4:14,
4:16, 44:16, 49:4,
65:4, 65:9, 68:24,
69:1, 72:11, 72:13,
81:18, 85:20, 87:21,
89:4, 94:18, 96:23,
98:6, 98:10, 104:1,
104:13, 109:4
**Hadden** [4] - 3:9,
44:15, 49:2, 81:16
**hallmark** [1] - 8:2
**hand** [9] - 18:17,
19:14, 20:7, 20:14,
20:20, 21:16, 41:22,
59:3, 62:24
**hang** [1] - 38:13
**happy** [1] - 107:9
**hard** [3] - 20:10,
25:21, 53:24
**harness** [1] - 21:14
**harnessing** [1] - 22:12
**HARRITS** [7] - 1:19,
3:4, 104:22, 105:21,
106:2, 108:11,
108:14
**Harrits** [6] - 3:3,
104:19, 104:23,
106:8, 107:8, 108:9
**hat** [1] - 8:15, 35:3
**hear** [12] - 3:22, 3:23,
4:10, 15:10, 46:16,
48:22, 65:3, 85:19,
94:17, 98:5, 104:16,
106:4
**heard** [2] - 67:25, 86:5
**Hearing** [1] - 1:10
**hearing** [4] - 2:11,
3:17, 3:22, 109:7
**heavily** [2] - 25:16,
26:10

**heavy** [2] - 52:9, 57:7
**held** [3] - 2:11, 9:23,
11:7
**help** [3] - 15:25, 38:12,
105:22
**helped** [1] - 35:16
**helpful** [4] - 38:4,
43:22, 57:21, 109:5
**helps** [1] - 19:23
**hereby** [1] - 109:10
**herring** [1] - 98:17
**hierarchical** [1] - 18:9
**highlighted** [3] -
18:11, 22:5, 51:9
**history** [10] - 22:2,
22:22, 44:11, 60:24,
83:1, 84:14, 84:18,
84:19, 96:2, 102:22
**hold** [2] - 34:12, 68:6
**holding** [2] - 28:3,
29:2
**Holdings** [4] - 16:14,
31:11, 32:16, 32:25
**home** [4] - 71:15,
71:20, 72:4, 72:6
**Honor** [81] - 2:15,
2:18, 2:23, 3:4, 3:5,
3:10, 3:12, 3:19,
3:22, 4:5, 4:8, 4:12,
4:14, 6:4, 6:18, 7:17,
15:9, 15:11, 15:14,
27:23, 29:3, 36:1,
44:16, 45:7, 46:10,
47:4, 47:6, 47:7,
49:4, 49:12, 49:16,
52:7, 62:1, 65:4,
77:17, 78:16, 78:19,
78:20, 81:2, 81:14,
81:18, 82:5, 82:8,
83:22, 84:17, 85:2,
85:9, 85:20, 85:21,
85:24, 87:21, 88:11,
88:14, 89:1, 89:4,
89:12, 89:16, 94:19,
95:24, 96:16, 96:23,
96:24, 97:1, 97:3,
98:13, 103:3,
104:10, 104:13,
104:18, 104:22,
106:2, 106:7,
107:13, 107:24,
108:5, 108:11,
108:21, 108:24,
108:25, 109:4
**Honor's** [2] - 6:3,
49:21
**HONORABLE** [1] -
1:12
**host** [16] - 17:25,
18:10, 18:11, 19:3,
20:4, 20:12, 21:3,
21:9, 32:15, 34:15,

38:24, 40:8, 41:10, 48:16, 82:24, 83:2

**hotel** [3] - 100:16, 100:25, 101:1

**HPI** [1] - 99:24

**HTML** [6] - 9:8, 72:1, 79:7, 87:9, 99:22, 102:7

**human** [3] - 26:19, 39:10, 39:11

**humans** [2] - 25:22, 39:22

**hundreds** [1] - 74:25

**hung** [2] - 8:15, 35:3

**hyperlinks** [1] - 101:11

**hypertext** [2] - 99:10, 99:12

**I**

**i.e** [3] - 48:5, 58:22, 83:7

**IBM** [59] - 2:19, 5:6, 6:13, 7:9, 8:15, 9:5, 9:11, 9:22, 10:5, 10:21, 11:23, 11:24, 12:19, 13:24, 13:25, 14:8, 15:12, 17:5, 35:3, 35:4, 35:9, 37:19, 42:16, 44:18, 49:17, 52:14, 55:2, 67:9, 67:14, 67:20, 69:11, 69:24, 70:5, 70:20, 71:6, 71:13, 71:24, 74:1, 75:1, 77:3, 77:14, 77:22, 78:14, 82:25, 83:5, 84:18, 86:1, 89:15, 96:5, 96:8, 96:25, 102:3, 102:9, 104:17, 104:23, 106:17, 106:23, 107:10, 108:23

**IBM's** [24] - 7:5, 11:1, 11:18, 27:15, 28:25, 29:25, 30:24, 52:23, 53:25, 57:16, 71:2, 71:11, 74:14, 84:20, 86:6, 89:20, 90:3, 90:9, 91:24, 92:21, 92:23, 93:6, 98:16, 98:21

**ID** [1] - 10:4

**idea** [59] - 4:22, 7:15, 7:17, 8:7, 9:18, 9:19, 10:9, 10:19, 11:5, 11:7, 11:9, 12:3, 15:22, 15:24, 16:9, 16:19, 18:17, 21:7, 21:11, 24:21, 25:18,

25:21, 26:7, 32:3, 32:7, 32:12, 33:6, 33:10, 33:11, 33:24, 34:6, 34:17, 34:19, 34:20, 35:22, 35:23, 36:11, 36:23, 38:11, 38:25, 39:7, 39:18, 39:20, 39:22, 40:17, 40:19, 44:12, 44:22, 44:24, 45:1, 46:7, 46:18, 48:3, 48:6, 48:15, 69:18, 82:17, 101:4

**ideas** [5] - 7:25, 15:17, 15:19, 31:20

**identifications** [1] - 38:17

**identified** [1] - 79:17

**identify** [1] - 102:13

**if-then** [1] - 34:14

**ignore** [2] - 64:16, 98:24

**ignores** [3] - 35:11, 41:6, 43:19

**illustrate** [1] - 62:1

**illustrates** [1] - 59:22

**illustrative** [1] - 33:21

**images** [4] - 9:9, 74:20, 81:3, 87:9

**immediately** [1] - 24:25

**immune** [3] - 5:9, 5:10, 5:18

**immunity** [1] - 45:10

**immunizes** [1] - 5:24

**implementation** [2] - 14:1, 31:1

**implicated** [1] - 55:9

**implicit** [1] - 83:15

**implicitly** [1] - 37:20

**implies** [1] - 36:8

**imply** [1] - 85:15

**import** [1] - 84:15

**important** [13] - 8:22, 15:15, 22:14, 31:2, 33:13, 34:7, 34:21, 41:25, 51:24, 56:1, 65:24, 67:2, 83:11

**importantly** [2] - 99:21, 101:17

**imported** [1] - 90:9

**improve** [9] - 5:8, 6:23, 7:3, 18:8, 22:18, 26:5, 27:9, 29:9, 30:11

**improved** [2] - 6:6, 19:5

**improvement** [12] - 5:17, 16:8, 16:12, 22:23, 23:1, 29:14, 30:7, 30:8, 30:14,

45:9, 45:20, 48:4

**improves** [3] - 28:23, 29:7, 47:25

**improving** [12] - 18:21, 26:21, 27:16, 27:19, 27:21, 27:24, 28:8, 28:11, 30:2, 41:18, 45:15, 45:18

**IN** [2] - 1:1, 1:2

**inapt** [1] - 24:17

**INC** [1] - 1:6

**include** [6] - 6:9, 9:6, 58:10, 73:22, 78:5, 80:8, 81:22, 91:16, 92:3, 92:7, 92:11, 92:19, 92:20, 94:5, 96:4

**included** [2] - 62:23, 62:25

**includes** [4] - 9:8, 24:7, 91:20, 92:1

**including** [6] - 6:24, 36:10, 57:25, 90:21, 90:25, 102:17

**incorporate** [2] - 37:19, 85:14

**incorporation** [1] - 98:1

**incorrect** [1] - 31:7

**increase** [1] - 10:20

**increasing** [1] - 27:25

**independent** [5] - 23:25, 24:3, 38:1, 38:4, 73:3

**index** [1] - 73:17

**indicate** [1] - 44:11, 97:24

**indicates** [2] - 17:4, 29:15

**individual** [1] - 18:2

**ineligible** [2] - 16:4, 32:5

**inevitable** [1] - 22:20

**influencing** [1] - 85:12

**information** [46] - 4:22, 5:1, 7:16, 9:23, 9:25, 11:21, 11:22, 12:2, 12:14, 13:1, 13:10, 14:5, 14:6, 25:21, 38:13, 39:12, 39:13, 39:15, 43:6, 57:25, 58:7, 58:22, 61:8, 66:18, 70:22, 75:11, 78:8, 100:12, 101:1, 101:11, 101:13, 101:20, 101:22, 101:25, 102:11, 102:16, 102:17, 102:19, 105:3, 105:5, 106:10, 106:17,

106:18, 106:23, 107:8

**infringe** [2] - 41:24, 102:11

**infringement** [9] - 9:7, 78:21, 78:25, 79:24, 80:23, 87:19, 88:15, 88:21, 89:5

**infringes** [1] - 98:24

**infringing** [4] - 41:7, 42:12, 42:20, 42:21

**inherent** [1] - 12:3

**inherently** [1] - 92:3

**initial** [1] - 34:7

**innovative** [8] - 17:16, 32:6, 35:5, 43:24, 44:7, 44:8, 44:10, 44:12

**inquiration** [1] - 29:16

**inquiry** [5] - 16:1, 16:2, 24:13, 43:21, 43:24

**insert** [1] - 99:4

**instance** [4] - 56:10, 79:19, 91:8, 96:6

**instead** [7] - 8:3, 14:4, 14:20, 14:25, 17:11, 17:12, 99:17

**instructions** [1] - 60:3

**intended** [3] - 79:13, 79:23, 92:17

**interact** [2] - 17:14, 70:23

**interaction** [1] - 31:16

**interactions** [1] - 33:1

**interactive** [11] - 14:19, 16:17, 18:6, 18:16, 18:18, 18:19, 27:10, 37:13, 41:17, 60:9, 61:10

**interacts** [1] - 14:25

**interesting** [1] - 85:24

**interface** [2] - 61:23, 62:3

**interference** [1] - 37:13

**INTERNATIONAL** [1] - 1:3

**International** [1] - 88:17

**Internet** [4] - 32:8, 32:18, 39:9, 39:11

**interplays** [1] - 33:4

**interpret** [1] - 84:11

**interpretation** [2] - 23:14, 24:12

**interrupts** [1] - 97:20

**intrinsic** [1] - 88:23

**intrinsically** [1] - 90:17

**invalid** [6] - 6:23, 7:4,

7:6, 8:2, 45:15, 45:20

**invented** [1] - 37:1

**invention** [9] - 10:6, 11:20, 50:12, 60:12, 61:1, 73:7, 76:6, 77:4, 77:20

**inventions** [4] - 12:23, 43:25, 44:1, 83:6

**inventive** [31] - 8:13, 8:19, 9:3, 9:19, 10:10, 10:14, 11:12, 11:15, 11:22, 12:3, 12:16, 12:17, 12:20, 13:19, 13:22, 31:9, 32:17, 33:11, 33:20, 34:4, 35:14, 35:20, 36:24, 37:10, 38:24, 43:21, 45:3, 46:4, 46:6, 48:23, 90:13

**inventor** [3] - 45:25, 46:1

**inventors** [2] - 17:15, 61:21

**invites** [1] - 35:22

**invoked** [1] - 48:7

**involve** [1] - 35:14

**involved** [4] - 16:3, 18:9, 37:21, 107:19

**involves** [4] - 32:4, 40:20, 91:14, 106:20

**IPR** [1] - 102:22

**irrelevant** [1] - 78:22

**isolated** [1] - 31:19

**isolation** [2] - 35:23, 37:17

**issue** [24] - 5:21, 6:17, 10:11, 11:17, 13:2, 13:3, 13:5, 31:4, 43:3, 46:22, 47:8, 53:17, 60:15, 75:15, 79:1, 79:2, 84:13, 88:15, 97:3, 98:16, 104:19, 106:13, 106:14, 108:19

**issues** [6] - 3:24, 43:16, 50:24, 54:24, 55:23, 95:25

**itself** [8] - 15:22, 28:24, 37:22, 46:18, 48:1, 70:16, 90:4, 98:17

**IV** [4] - 6:3, 6:18, 7:1, 45:13

**J**

**Javascript** [2] - 9:9, 87:9

**JOHN** [2] - 1:17, 1:23

**John** [2] - 2:20, 3:7

**JPEG** [1] - 83:8
**JSON** [3] - 9:9, 83:8, 87:9
**Judge** [17] - 1:12, 4:24, 5:13, 5:20, 5:25, 7:17, 10:13, 10:23, 11:7, 11:13, 13:6, 13:14, 28:2, 28:21, 29:4, 29:19, 47:21
**judgment** [3] - 3:23, 4:2, 41:4
**jump** [2] - 20:8, 73:15
**June** [1] - 1:9
**jury** [2] - 53:24, 78:15
**justify** [2] - 15:7, 47:3

**K**

**Karim** [4] - 2:22, 15:11, 47:7, 82:5
**KARIM** [1] - 1:18
**keep** [7] - 50:6, 51:19, 56:1, 82:8, 100:12, 100:20, 106:19
**keeping** [1] - 39:19
**keeps** [1] - 101:1
**key** [2] - 10:17, 27:18, 64:16, 76:5, 76:7, 77:20, 82:11, 82:17, 84:1, 94:22, 97:10, 97:12
**keyboard** [1] - 48:5
**keyword** [1] - 73:17
**kidding** [1] - 98:10
**kind** [25] - 8:1, 8:10, 10:21, 12:8, 28:16, 29:19, 32:10, 33:14, 34:5, 34:14, 36:21, 38:19, 39:24, 41:21, 42:3, 42:14, 47:18, 56:2, 73:1, 77:3, 79:1, 86:2, 86:20, 87:3, 101:4
**knowledge** [1] - 15:7
**known** [6] - 24:16, 82:17, 86:20, 86:21, 87:11, 87:14
**knows** [1] - 52:7

**L**

**labeled** [1] - 81:7
**labeling** [1] - 81:21
**Labs** [4] - 8:1, 39:6, 39:25, 45:22
**laid** [1] - 86:15
**language** [35] - 33:5, 34:21, 36:3, 36:5, 36:16, 52:8, 52:24,

53:3, 53:10, 57:3, 57:6, 57:10, 58:20, 59:9, 60:25, 62:13, 62:16, 64:2, 64:5, 64:16, 67:1, 83:14, 83:21, 84:4, 85:6, 86:2, 86:17, 87:4, 91:16, 92:7, 92:10, 92:20, 96:14, 103:6, 103:10
**large** [1] - 71:23
**largely** [2] - 4:17, 65:9
**last** [5] - 40:25, 49:3, 61:13, 85:21, 107:19
**Lauren** [1] - 3:13
**LAURIE** [1] - 1:18
**Laurie** [3] - 2:24, 49:12, 49:16
**law** [8] - 5:7, 15:13, 26:12, 29:2, 45:10, 45:11, 46:21
**layers** [1] - 13:11
**layout** [1] - 24:7
**leading** [1] - 107:11
**least** [3] - 36:7, 67:3, 79:24
**leaves** [3] - 18:21, 52:5, 97:20
**left** [12] - 19:14, 20:7, 20:20, 33:7, 47:1, 59:2, 59:3, 62:24, 64:25, 94:7, 97:6, 98:8
**left-hand** [5] - 19:14, 20:7, 20:20, 59:3, 62:24
**legions** [1] - 12:5
**lengthy** [1] - 83:12
**LEONARD** [1] - 1:12
**letter** [3] - 107:22, 108:3, 108:19
**levels** [1] - 26:24
**lexicographer** [1] - 52:11
**licenses** [4] - 105:8, 107:6, 107:17, 107:24
**lies** [1] - 45:19
**light** [2] - 64:21, 93:17
**likelihood** [1] - 48:20
**likely** [6] - 19:8, 19:9, 21:21, 34:10, 38:19, 38:23
**likewise** [1] - 37:3
**limit** [2] - 72:4, 72:6
**limitation** [15] - 54:20, 61:13, 64:15, 71:9, 77:9, 91:17, 91:20, 92:3, 92:6, 92:8, 92:11, 92:15, 92:18, 94:5

**limitations** [8] - 32:14, 37:18, 56:3, 56:14, 64:19, 78:14, 84:15, 92:20
**limited** [1] - 93:16
**limiter** [1] - 72:2
**limiting** [1] - 64:12
**line** [5] - 25:17, 63:3, 79:11, 79:13, 80:7
**lines** [6] - 37:2, 62:10, 63:3, 63:15, 82:15
**link** [18] - 74:5, 74:14, 74:15, 74:19, 74:21, 77:2, 99:14, 99:17, 100:2, 100:6, 100:8, 100:12, 100:24, 101:12, 101:14, 101:23, 101:24, 104:8
**links** [23] - 74:16, 74:20, 75:1, 75:7, 75:11, 77:1, 98:19, 98:23, 98:25, 99:10, 99:12, 100:3, 100:10, 100:21, 101:7, 102:5, 102:10, 102:15, 102:20, 102:23, 104:8
**lion** [1] - 74:20
**litigation** [6] - 51:23, 89:22, 91:18, 94:13, 96:18, 96:20
**Living** [1] - 14:14
**LLP** [4] - 1:14, 1:17, 2:3, 2:20
**load** [1] - 17:24
**local** [31] - 10:7, 11:19, 12:3, 12:4, 12:6, 14:5, 17:20, 23:11, 23:16, 23:21, 24:16, 24:19, 24:20, 24:21, 40:17, 40:19, 40:21, 40:22, 43:10, 43:13, 44:19, 44:23, 45:1, 48:13, 48:14, 48:23, 76:17, 94:25, 95:2, 95:20
**locally** [11] - 4:22, 5:2, 9:16, 11:6, 15:3, 15:4, 43:6, 50:14, 94:1, 95:1, 95:5
**located** [4] - 25:7, 34:16, 58:6, 59:13
**location** [2] - 6:7, 69:6
**locations** [4] - 24:23, 24:25, 25:4, 34:18
**logic** [2] - 80:16, 80:17
**logical** [1] - 32:23
**logically** [1] - 99:6
**look** [57] - 7:9, 7:12,

11:2, 13:2, 14:16, 15:15, 16:25, 17:1, 18:5, 20:18, 21:24, 22:14, 23:15, 23:17, 23:22, 24:21, 25:15, 25:20, 25:24, 26:3, 26:25, 28:9, 28:19, 29:13, 31:18, 32:1, 33:3, 35:1, 36:14, 39:2, 39:16, 40:4, 42:15, 51:24, 52:20, 53:1, 54:6, 56:1, 56:19, 58:8, 59:1, 59:4, 60:2, 66:12, 67:1, 69:16, 72:6, 74:1, 78:2, 80:1, 80:7, 80:14, 87:8, 88:15, 89:5, 103:16
**looked** [1] - 21:24
**looking** [1] - 100:1
**looks** [3] - 44:8, 66:14, 79:20
**loose** [1] - 29:20
**lost** [1] - 101:14

**M**

**machine** [1] - 11:19
**MACHINES** [1] - 1:3
**magic** [1] - 12:20
**mails** [1] - 39:23
**main** [3] - 27:2, 28:9, 104:6
**manages** [1] - 50:18
**managing** [1] - 95:14
**manipulated** [2] - 31:17, 33:2
**manner** [1] - 19:17
**map** [2] - 70:16, 80:15
**mapped** [1] - 68:9
**marketing** [3] - 105:9, 107:6, 108:7
**marking** [1] - 107:16
**Markman** [5] - 3:16, 3:21, 23:22, 49:11, 49:13
**materials** [1] - 107:21
**mathematical** [2] - 15:21, 99:20
**matter** [2] - 84:6, 102:8
**matters** [1] - 102:8
**Matulewicz** [3] - 3:1, 89:10, 89:15
**MATULEWICZ** [7] - 1:19, 3:2, 89:12, 89:14, 94:10, 95:24, 96:24
**Matulewicz-Crowley** [3] - 3:1, 89:10, 89:15
**MATULEWICZ-**

**CROWLEY** [7] - 1:19, 3:2, 89:12, 89:14, 94:10, 95:24, 96:24
**MAZ** [2] - 19:20, 43:17
**McRO** [6] - 15:25, 16:11, 22:25, 23:4, 26:3, 26:11
**mean** [29] - 7:8, 7:24, 14:10, 39:13, 42:17, 46:22, 51:3, 57:12, 64:14, 64:20, 64:22, 64:23, 64:24, 67:16, 76:16, 77:6, 81:4, 82:20, 84:5, 84:13, 85:9, 85:15, 86:7, 91:9, 94:24, 99:25, 101:5
**meaning** [21] - 8:6, 51:21, 51:22, 52:9, 52:15, 53:20, 54:1, 55:4, 57:7, 57:9, 63:25, 65:12, 73:25, 87:4, 88:1, 88:3, 88:4, 88:6, 89:21, 93:7
**meaningful** [1] - 31:6
**meaningless** [2] - 46:15, 86:20
**means** [18] - 17:10, 37:6, 39:14, 53:22, 63:18, 70:7, 77:16, 86:22, 86:24, 87:12, 90:5, 91:12, 94:25, 99:13, 99:25, 103:9, 104:6, 107:4
**meant** [3] - 33:25, 58:14, 63:21
**meat** [2] - 23:7, 27:4
**mechanism** [5] - 12:24, 13:18, 36:25, 47:10, 73:14
**mechanisms** [1] - 12:21
**media** [1] - 12:10
**meet** [1] - 104:25
**melds** [1] - 32:10
**Memory** [5] - 5:14, 13:1, 26:10, 26:14, 26:23, 27:1, 28:2, 28:6, 28:9, 47:19, 47:22
**memory** [4] - 5:16, 26:13, 27:2, 28:10
**mentioned** [4] - 27:6, 50:16, 59:10, 107:22
**menu** [2] - 19:16, 39:7
**merely** [4] - 48:7, 56:18, 59:19, 96:6
**Merit** [1] - 1:25
**met** [1] - 104:25

**method** [6] - 6:6, 17:16, 58:9, 59:11, 61:6, 101:10
**methods** [2] - 43:5, 94:4
**Mexico** [1] - 107:5
**Michael** [3] - 3:1, 89:9, 89:15
**MICHAEL** [1] - 1:19
**middle** [3] - 22:5, 33:9, 59:5
**might** [12] - 28:12, 29:15, 33:24, 47:23, 59:23, 78:25, 83:8, 84:4, 84:9, 93:14, 97:2, 108:6
**migrating** [1] - 7:1
**mind** [3] - 50:6, 51:19, 56:1
**minimize** [2] - 33:18, 93:24
**minimizes** [1] - 37:12
**minute** [1] - 56:8
**minutes** [3] - 94:7, 97:5, 97:7
**mirroring** [1] - 6:6
**missing** [1] - 39:18
**Mitsubishi** [1] - 88:17
**mobile** [1] - 42:12
**modifies** [1] - 70:18
**modifying** [1] - 70:24
**modular** [1] - 21:11
**module** [1] - 93:14
**moment** [1] - 56:19
**Monday** [1] - 1:9
**monolithic** [1] - 33:15
**month** [4] - 107:19, 108:4, 108:10, 108:20
**morning** [26] - 2:13, 2:17, 2:18, 2:21, 2:23, 2:25, 3:2, 3:4, 3:5, 3:6, 3:10, 3:12, 3:14, 3:15, 3:18, 4:14, 4:15, 15:11, 49:15, 49:16, 89:11, 89:12, 104:21, 104:22, 106:6, 106:7
**Morning** [1] - 2:14
**morphs** [1] - 93:19
**mortar** [1] - 27:8
**mosaic** [2] - 63:18, 88:7
**most** [6] - 5:13, 21:21, 25:9, 25:16, 69:24, 92:12
**Motion** [1] - 1:10
**motion** [14] - 2:11, 3:16, 3:23, 4:2, 4:9, 4:16, 4:20, 4:24, 5:6, 8:16, 35:1, 43:17,

107:11, 109:7
**move** [6] - 27:14, 49:11, 73:4, 82:6, 89:8, 100:16
**moved** [1] - 106:10
**movement** [2] - 21:13, 35:12
**moving** [6] - 42:10, 44:19, 44:22, 47:9, 73:14, 107:11
**MR** [77] - 2:21, 2:23, 3:2, 3:4, 3:5, 3:7, 3:10, 3:11, 3:12, 3:13, 3:19, 4:1, 4:5, 4:8, 4:12, 4:14, 4:16, 15:11, 27:18, 28:6, 29:3, 30:5, 30:25, 31:9, 35:17, 44:16, 47:6, 49:4, 49:12, 65:4, 65:9, 68:24, 69:1, 72:11, 72:13, 81:18, 82:5, 82:8, 84:1, 84:17, 85:2, 85:9, 85:18, 85:20, 87:21, 88:14, 89:4, 89:9, 89:12, 89:14, 94:10, 94:18, 95:24, 96:23, 96:24, 97:1, 97:8, 98:6, 98:10, 103:3, 104:1, 104:13, 104:18, 104:22, 105:21, 106:2, 106:7, 107:23, 108:4, 108:11, 108:14, 108:17, 108:21, 108:24, 108:25, 109:1, 109:4
**MS** [14] - 2:18, 2:22, 2:24, 2:25, 3:1, 3:3, 3:14, 49:16, 49:23, 50:2, 78:19, 79:15, 80:1, 81:2
**multi** [1] - 5:17
**multi-tier** [1] - 5:17
**multiple** [7] - 24:24, 33:16, 36:9, 41:12, 42:23, 72:19, 100:19
**must** [7] - 17:2, 26:24, 31:22, 42:17, 43:16, 77:16, 82:22
**mutually** [1] - 77:18

## N

**nature** [2] - 43:24, 89:6
**navigated** [1] - 48:17
**navigation** [1] - 73:21
**necessarily** [1] - 31:14
**necessary** [1] - 80:8

**need** [15] - 22:6, 24:25, 31:18, 35:25, 48:19, 52:10, 58:14, 58:16, 79:22, 82:21, 86:18, 88:8, 95:10, 95:19, 107:14
**needed** [6] - 12:22, 22:7, 32:24, 38:8, 38:10, 50:20
**needs** [3] - 30:6, 82:18, 97:23
**NetBrain** [1] - 9:20
**network** [19] - 7:2, 9:15, 9:17, 16:18, 18:13, 18:17, 21:1, 32:13, 33:18, 36:20, 40:7, 45:14, 51:13, 55:11, 62:25, 93:3, 95:4, 95:11, 95:16
**networking** [2] - 5:9, 6:16
**networks** [7] - 7:4, 18:7, 18:11, 18:19, 22:19, 31:13, 45:16
**never** [3] - 8:4, 93:9, 93:11
**new** [15] - 1:20, 11:4, 18:7, 22:4, 31:20, 31:21, 73:17, 73:21, 97:15, 97:17, 97:24, 98:3, 99:16, 99:17
**New** [1] - 1:20
**newspapers** [1] - 26:1
**next** [16] - 7:5, 9:11, 14:23, 19:20, 19:24, 20:8, 20:18, 33:20, 35:17, 38:22, 42:10, 54:13, 82:4, 89:8, 89:10, 89:16
**NO** [1] - 1:7
**non** [7] - 56:6, 56:25, 61:14, 64:12, 77:16, 88:5, 91:1
**non-advertising** [1] - 91:1
**non-limiting** [1] - 64:12
**non-overlapping** [5] - 56:6, 56:25, 61:14, 77:16, 88:5
**none** [7] - 8:15, 46:17, 56:7, 56:8, 57:9, 64:6, 104:2
**nonetheless** [2] - 12:12, 13:6
**noninfringing** [3] - 47:10, 47:11, 47:16
**nonoverlapping** [2] - 63:7, 67:23, 78:13
**nonsense** [2] - 100:18, 102:14

**North** [5] - 105:19, 106:15, 106:16, 107:1, 107:4
**NOTE** [1] - 2:10
**note** [2] - 50:6, 63:10
**noted** [2] - 6:18, 27:7
**notes** [1] - 109:10
**nothing** [16] - 8:19, 10:24, 15:6, 24:19, 27:4, 30:12, 30:13, 40:22, 58:24, 60:13, 63:6, 68:4, 69:3, 70:18, 71:12, 84:20
**noticed** [1] - 27:9
**notion** [1] - 65:11
**novel** [1] - 8:14
**number** [7] - 27:25, 32:14, 35:7, 68:14, 68:16, 69:8, 69:10
**numbers** [2] - 68:21, 69:7
**Nvidia** [1] - 5:14

## O

**object** [21] - 8:16, 8:17, 9:6, 9:10, 36:15, 38:17, 38:23, 59:23, 62:17, 68:13, 68:18, 68:19, 69:10, 82:21, 82:22, 83:10, 83:18, 86:24, 86:25, 87:1, 91:9
**Object** [2] - 86:9
**objects** [120] - 9:12, 9:14, 14:20, 15:1, 18:2, 18:22, 20:24, 20:25, 21:1, 21:8, 21:15, 21:21, 22:12, 24:22, 24:23, 24:24, 25:7, 25:12, 32:22, 32:23, 34:13, 34:15, 34:18, 34:22, 34:24, 35:3, 35:8, 35:16, 35:18, 35:20, 35:21, 36:2, 36:6, 36:7, 36:8, 36:12, 36:17, 36:19, 36:22, 36:23, 37:5, 37:6, 37:16, 37:18, 37:22, 37:24, 38:6, 38:8, 38:12, 41:11, 46:12, 48:18, 50:13, 57:24, 58:2, 59:17, 59:21, 60:4, 60:5, 63:11, 63:13, 65:15, 65:21, 65:25, 66:10, 66:16, 68:2, 68:5, 68:23, 69:4, 69:5, 70:3, 80:8, 82:6, 82:12, 82:16, 82:19, 82:25, 83:8,

83:9, 83:13, 83:17, 83:20, 84:7, 84:23, 85:22, 85:25, 86:7, 86:8, 86:11, 86:17, 87:1, 87:8, 89:17, 90:6, 90:16, 90:17, 90:20, 90:21, 90:23, 90:24, 90:25, 91:3, 91:6, 91:7, 91:9, 91:11, 91:12, 93:2, 94:1, 94:2
**obtained** [1] - 99:24
**obtaining** [1] - 11:14
**obvious** [1] - 44:8
**obviously** [2] - 47:12, 86:2
**OF** [1] - 1:2
**off-line** [1] - 25:17
**offer** [2] - 12:10, 76:17
**offered** [1] - 35:4
**Office** [4] - 75:25, 76:4, 77:15, 77:19
**Official** [1] - 109:12
**offload** [1] - 82:24
**offset** [1] - 83:2
**once** [8] - 14:19, 17:11, 34:2, 42:4, 70:17, 86:21, 103:5
**One** [22] - 4:20, 5:23, 7:5, 7:6, 8:12, 15:13, 16:1, 16:10, 16:13, 16:19, 23:3, 23:19, 26:24, 27:16, 29:15, 30:1, 30:16, 31:10, 32:11, 39:17, 45:6, 49:1
**one** [50] - 7:7, 12:8, 12:9, 12:21, 13:3, 13:8, 14:18, 21:1, 21:4, 21:5, 22:14, 34:22, 35:8, 35:23, 36:7, 37:23, 38:9, 40:15, 41:9, 42:10, 51:13, 51:15, 51:17, 55:2, 55:15, 55:16, 55:21, 56:16, 57:8, 57:25, 58:23, 59:14, 62:14, 62:18, 63:5, 64:8, 66:22, 72:24, 73:14, 75:20, 77:12, 81:2, 82:21, 84:12, 85:10, 85:12, 89:8, 89:10, 95:2
**online** [1] - 17:5
**oOo** [1] - 2:8
**oops** [1] - 76:12
**open** [6] - 2:11, 69:12, 70:12, 70:15, 70:21, 73:16
**opened** [1] - 34:20
**opening** [3] - 61:7,

69:18, 70:18
**operation** [1] - 61:10
**operational** [3] - 13:15, 27:3, 28:10
**opinion** [3] - 6:3, 36:4, 85:11
**opposed** [2] - 30:7, 88:23
**opposing** [4] - 20:15, 23:17, 35:1, 81:3
**opposite** [2] - 100:23, 103:14
**opposition** [4] - 5:5, 14:9, 14:17, 100:15
**oral** [4] - 20:15, 23:18, 24:16, 31:22
**Order** [1] - 104:24
**order** [6] - 3:20, 97:24, 103:13, 105:16, 107:14, 108:18
**ordered** [1] - 35:25
**ordering** [1] - 39:8
**ordinary** [16] - 51:21, 51:22, 52:9, 52:15, 53:20, 54:1, 55:4, 57:7, 57:9, 65:12, 87:25, 88:1, 88:3, 88:4, 88:6, 106:14
**organize** [2] - 18:3, 39:23
**organized** [3] - 17:12, 32:23, 49:19
**organizing** [4] - 31:20, 39:17, 39:19, 39:22
**origin** [1] - 66:16
**otherwise** [3] - 13:24, 92:3
**ourselves** [1] - 16:21
**Oussayef** [6] - 2:22, 15:12, 47:7, 50:4, 50:16, 82:5
**OUSSAYEF** [29] - 1:18, 2:23, 3:19, 4:1, 4:8, 15:11, 27:18, 28:6, 29:3, 30:5, 30:25, 31:9, 35:17, 47:6, 49:12, 82:5, 82:8, 84:1, 84:17, 85:2, 85:9, 85:18, 88:14, 89:9, 97:1, 97:8, 103:3, 104:18, 108:25
**outages** [1] - 6:8
**output** [13] - 98:18, 101:8, 101:18, 102:1, 102:4, 102:6, 102:12, 103:9, 103:10, 103:17, 104:2
**outside** [3] - 15:19, 16:22, 48:10

**outstanding** [1] - 105:14
**overcame** [1] - 6:15
**overcome** [1] - 52:10
**overlap** [5] - 54:17, 62:21, 62:22, 63:22, 63:24
**overlapping** [11] - 56:6, 56:25, 57:1, 61:14, 61:25, 62:9, 63:19, 66:24, 69:12, 77:16, 88:5
**overlaps** [1] - 61:17
**overlay** [3] - 69:19, 80:10, 80:13
**overridden** [1] - 84:5
**oversimplified** [1] - 5:22
**oversimplify** [2] - 23:19, 23:20
**overturn** [1] - 96:19
**overview** [1] - 50:4
**own** [6] - 14:22, 15:4, 24:12, 46:8, 79:7, 97:19

# P

**P.A** [1] - 1:22
**p1** [1] - 99:22
**p2** [1] - 99:22
**page** [58] - 41:9, 49:24, 59:17, 59:22, 63:1, 63:11, 63:13, 64:3, 65:15, 65:25, 66:10, 66:14, 66:15, 68:1, 68:5, 68:13, 68:16, 68:17, 68:18, 68:19, 68:23, 69:4, 69:5, 69:6, 69:9, 70:13, 71:15, 71:20, 72:4, 72:6, 72:18, 72:23, 74:19, 74:24, 75:12, 76:18, 77:1, 80:10, 80:11, 80:13, 90:25, 93:25, 98:24, 99:18, 100:1, 100:2, 100:8, 101:8, 101:19, 101:23, 102:3, 102:5, 102:10, 102:14, 102:18, 103:9
**pages** [13] - 9:21, 34:20, 34:21, 41:2, 42:2, 57:17, 58:23, 59:7, 65:17, 67:21, 69:2, 99:22, 100:1
**PALAPURA** [6] - 1:15, 2:18, 2:22, 2:24, 3:1, 3:3
**Palapura** [1] - 2:19

**PalTalk** [4] - 16:14, 18:14, 27:5, 27:6
**papers** [1] - 10:5
**parameter** [11] - 12:25, 13:10, 13:21, 34:5, 34:6, 34:8, 35:13, 38:4, 38:6, 38:11, 38:14
**parameters** [2] - 12:20, 41:13
**parsed** [1] - 28:3
**part** [23] - 12:12, 18:11, 22:3, 22:5, 30:22, 35:23, 40:25, 62:2, 62:4, 70:20, 71:2, 74:23, 75:4, 75:8, 76:1, 76:3, 91:18, 92:15, 93:14, 97:3, 99:3, 104:5
**partial** [1] - 57:25
**particular** [6] - 12:15, 23:13, 32:18, 58:19, 58:25, 66:4
**particularly** [4] - 76:16, 87:25, 107:16, 108:7
**parties** [14] - 47:19, 51:2, 51:19, 53:11, 53:19, 53:21, 54:25, 57:8, 64:22, 82:12, 97:2, 97:13, 104:25, 107:17
**partition** [126] - 4:23, 7:15, 50:22, 51:1, 51:4, 51:5, 51:7, 51:10, 51:20, 51:25, 52:2, 52:16, 52:25, 53:8, 53:11, 53:18, 53:19, 54:2, 54:10, 56:2, 56:11, 56:22, 56:23, 57:8, 57:24, 58:5, 59:3, 59:5, 59:10, 60:16, 61:3, 61:5, 61:11, 61:12, 61:17, 62:23, 63:1, 64:13, 65:6, 65:13, 65:17, 66:7, 66:13, 67:3, 67:5, 67:7, 67:10, 67:13, 67:17, 67:18, 68:9, 68:13, 68:15, 68:18, 68:21, 69:7, 69:8, 69:10, 69:19, 70:6, 70:7, 70:9, 70:11, 70:13, 70:15, 70:16, 70:17, 70:19, 70:24, 70:25, 71:3, 71:5, 71:7, 72:11, 71:24, 72:2, 72:16, 72:22, 72:25, 73:2, 73:3, 73:5, 73:7, 73:11, 73:16, 73:18, 73:24, 73:25,

74:3, 74:4, 74:7, 74:10, 74:11, 74:17, 74:23, 75:4, 75:13, 75:16, 75:17, 75:24, 76:11, 76:13, 76:15, 76:21, 76:22, 77:8, 78:6, 78:11, 79:3, 80:4, 81:7, 81:22, 81:23, 81:24, 82:1, 88:5
**partition's** [1] - 68:14
**partitioned** [3] - 57:23, 61:23, 67:23
**partitions** [76] - 17:13, 21:4, 21:12, 24:7, 25:12, 32:23, 32:24, 42:5, 52:21, 56:4, 56:17, 56:20, 56:22, 57:1, 57:5, 57:12, 57:14, 57:18, 57:19, 57:21, 58:6, 58:10, 58:11, 58:13, 58:15, 58:19, 58:25, 59:8, 60:16, 60:19, 60:20, 61:14, 62:21, 64:22, 65:18, 65:19, 65:22, 65:25, 66:1, 66:9, 66:21, 66:24, 67:24, 68:4, 68:11, 68:12, 68:20, 69:3, 69:6, 69:11, 69:15, 69:16, 69:20, 69:23, 69:25, 70:1, 70:3, 70:4, 70:5, 76:13, 78:4, 78:12, 79:18, 80:9, 80:20, 81:1, 81:4, 81:6, 81:20, 81:21, 82:2
**parts** [3] - 39:21, 48:15, 48:16
**pass** [2] - 29:15, 44:12
**passage** [2] - 90:8, 90:14
**passed** [3] - 49:19, 101:1, 101:11
**passes** [5] - 16:13, 27:25, 31:15, 33:2, 39:17
**past** [3] - 18:9, 26:1, 26:15
**Patent** [5] - 23:7, 75:25, 76:4, 77:15, 77:19
**patent** [128] - 5:16, 7:9, 7:10, 7:13, 9:21, 10:17, 11:1, 11:23, 15:3, 16:3, 19:6, 19:23, 20:20, 21:17, 22:17, 22:24, 23:1, 23:3, 23:4, 23:9, 23:12, 24:1, 24:3, 26:17, 30:10, 32:19,

32:20, 32:21, 34:9, 36:16, 36:25, 37:2, 37:4, 37:11, 37:14, 38:15, 38:25, 41:16, 42:13, 43:14, 44:10, 44:19, 45:8, 45:16, 47:2, 50:16, 50:18, 51:4, 51:10, 54:24, 58:2, 59:1, 59:25, 61:2, 61:18, 61:19, 62:10, 62:12, 63:2, 63:15, 64:7, 65:17, 65:21, 66:9, 66:11, 66:15, 66:22, 67:9, 67:19, 68:1, 68:5, 68:15, 69:5, 69:25, 70:13, 70:14, 73:13, 73:24, 75:23, 75:24, 76:8, 78:1, 78:2, 78:9, 78:10, 80:2, 80:3, 80:6, 80:19, 80:21, 81:1, 81:19, 81:22, 82:14, 82:15, 82:18, 83:14, 83:19, 84:4, 84:8, 85:14, 86:12, 86:13, 89:19, 89:24, 91:10, 91:13, 93:15, 94:22, 95:12, 96:7, 96:10, 98:15, 99:8, 99:15, 99:20, 100:13, 101:9, 101:17, 102:1, 102:3, 102:17, 105:8, 107:6, 107:17
**patent's** [1] - 65:24
**patentable** [3] - 16:12, 23:1, 45:3
**patented** [1] - 12:22
**patentee** [4] - 52:10, 57:11, 61:1, 92:17
**patentees** [5] - 52:22, 57:17, 59:14, 64:2, 64:20
**patenting** [2] - 45:4, 45:5
**patents** [38] - 4:17, 4:21, 5:24, 6:15, 6:22, 7:7, 13:6, 14:10, 14:12, 14:21, 15:5, 17:4, 19:25, 22:3, 25:3, 25:8, 26:4, 26:9, 26:21, 31:24, 32:8, 32:12, 33:21, 37:23, 40:6, 41:8, 43:3, 43:15, 43:21, 44:3, 44:6, 48:25, 49:20, 50:8, 50:13, 85:25, 90:12
**path** [1] - 20:8
**patibles** [1] - 25:1
**PC** [1] - 83:1
**PCs** [1] - 22:13

**PDF** [1] - 42:2
**PDFs** [2] - 42:2, 46:25
**people** [2] - 5:1, 17:18
**per** [1] - 98:19
**performance** [2] - 18:22, 19:4
**performed** [2] - 61:23, 62:3
**perhaps** [1] - 45:3
**period** [1] - 108:6
**permit** [1] - 21:13
**permits** [3] - 35:12, 58:3, 60:6
**persist** [1] - 73:3
**persists** [1] - 70:17
**person** [1] - 72:24
**person's** [1] - 71:21
**perspective** [1] - 108:1
**persuaded** [1] - 84:25
**petitioner** [1] - 7:20
**phantoms** [1] - 78:13
**Phil** [1] - 3:11
**PHILLIP** [1] - 2:4
**phrase** [8] - 37:21, 53:13, 53:15, 54:16, 54:17, 55:11, 55:19, 60:22
**physical** [2] - 24:22, 26:16
**pi** [1] - 99:24
**pick** [1] - 73:17
**picking** [1] - 74:13
**picture** [1] - 75:1
**pieces** [5] - 11:2, 17:12, 18:2, 19:19
**pitch** [2] - 10:21, 11:18
**place** [3] - 39:20, 42:19, 96:14
**places** [3] - 11:11, 11:15, 36:22
**plain** [9] - 51:21, 51:22, 52:14, 53:20, 54:1, 55:4, 57:9, 64:2, 64:5
**plaintiff** [5] - 5:14, 15:10, 28:22, 29:11, 94:6
**Plaintiff** [2] - 1:5, 1:21
**plaintiff's** [2] - 28:22, 47:24
**plaintiffs** [1] - 85:5
**plan** [1] - 93:4
**pleadings** [3] - 3:23, 4:3, 41:4
**plop** [2] - 66:6, 68:13
**plural** [1] - 86:19
**plurality** [8] - 33:12, 51:7, 53:18, 53:23, 54:2, 54:4, 54:15,

54:16
**pn** [2] - 99:22, 99:23
**point** [32] - 7:8, 7:24, 8:12, 10:17, 17:8, 17:15, 32:11, 36:1, 39:18, 42:15, 46:10, 55:24, 57:4, 59:17, 63:25, 77:10, 78:20, 79:2, 81:8, 81:18, 84:1, 88:25, 95:3, 95:7, 95:8, 95:12, 96:6, 96:9, 97:1, 98:23, 104:6, 106:17
**pointed** [4] - 41:20, 45:24, 46:9, 57:11
**pointing** [2] - 6:13, 74:1
**points** [5] - 9:11, 11:23, 12:19, 15:15, 85:23
**pop** [1] - 95:2
**popup** [3] - 73:10, 73:12, 80:4
**portion** [27] - 20:9, 51:2, 51:13, 51:15, 51:17, 51:20, 53:9, 53:12, 54:11, 54:18, 55:6, 55:13, 55:14, 55:21, 57:14, 62:14, 62:18, 63:5, 75:20, 75:21, 77:5, 77:6, 77:8, 77:12, 79:9, 96:1
**portions** [5] - 20:23, 64:23, 67:15, 96:12
**position** [5] - 28:25, 29:25, 55:4, 59:18, 106:5
**possible** [2] - 94:7, 96:17
**possibly** [2] - 47:3, 75:4
**post** [1] - 10:12
**post-Enfish** [1] - 10:12
**potential** [5] - 33:12, 37:12, 41:12, 55:9, 105:11
**potshots** [1] - 31:19
**POTTER** [1] - 1:14
**Potter** [1] - 2:19
**power** [3] - 6:7, 22:12, 25:9
**Power** [3] - 11:17, 12:17, 25:17
**practiced** [1] - 59:23
**practices** [1] - 15:22
**pre** [6] - 60:4, 60:8, 94:25, 95:5, 95:9, 95:18
**pre-created** [2] - 60:4,

60:8
**pre-fetch** [2] - 95:9, 95:18
**pre-fetches** [2] - 94:25, 95:5
**predate** [1] - 44:1
**predefined** [2] - 36:6, 66:8
**predetermined** [6] - 58:11, 58:16, 89:25, 90:6, 93:4, 93:7
**preempt** [5] - 14:10, 14:18, 15:5, 41:1, 43:9
**preemption** [6] - 15:8, 31:4, 40:25, 43:15, 46:22, 47:3
**preempts** [1] - 42:17
**preferred** [12] - 56:11, 56:18, 59:11, 59:15, 63:14, 63:25, 64:9, 64:12, 64:14, 93:13, 93:17, 103:7
**prefetched** [2] - 94:2, 95:15
**prefetching** [19] - 11:24, 12:2, 37:5, 37:6, 90:1, 91:14, 91:16, 92:11, 92:14, 92:16, 92:17, 93:10, 93:11, 93:13, 93:20, 93:22, 94:5, 96:11, 96:14
**prescribed** [2] - 46:13, 83:6
**preselected** [1] - 12:11
**present** [6] - 9:14, 36:19, 43:1, 61:8, 65:8, 65:9
**presentation** [4] - 20:13, 50:5, 50:7, 95:17
**presented** [13] - 32:11, 50:19, 51:13, 51:15, 55:7, 55:9, 57:23, 62:17, 63:5, 66:18, 67:12, 76:1, 76:2
**presenting** [25] - 17:16, 21:5, 24:1, 24:4, 41:9, 43:7, 43:12, 51:5, 51:7, 52:1, 52:6, 52:13, 52:18, 53:13, 53:18, 53:23, 54:2, 54:3, 54:13, 59:12, 64:18, 67:3, 71:14, 73:22
**preserved** [2] - 70:16, 101:20
**presumably** [2] - 74:14

**presumption** [5] - 42:23, 47:8, 52:7, 52:9, 57:6
**pretty** [1] - 104:5
**previous** [12] - 33:3, 35:6, 35:14, 43:8, 51:23, 62:20, 84:19, 84:22, 89:21, 91:17, 96:17, 96:19
**previously** [5] - 7:14, 32:10, 32:25, 33:8, 83:25
**Priceline** [13] - 4:20, 7:18, 8:16, 14:14, 33:10, 35:6, 42:25, 43:23, 51:23, 82:9, 89:22, 91:18, 96:20
**primarily** [1] - 39:5
**principle** [2] - 23:19, 84:5
**problem** [26] - 16:21, 16:22, 18:12, 19:17, 19:22, 22:1, 23:10, 25:8, 26:7, 28:13, 28:17, 29:5, 29:6, 29:8, 29:18, 30:22, 32:13, 32:18, 39:3, 39:10, 39:11, 71:16, 73:1, 74:18, 76:25
**problems** [6] - 6:15, 32:4, 32:9, 40:5, 40:7, 71:16
**procedural** [1] - 41:5
**procedure** [1] - 73:21
**proceed** [2] - 4:1, 49:11
**proceeding** [1] - 109:10
**Proceedings** [1] - 49:9
**process** [4] - 25:21, 48:6, 78:23, 82:23
**processed** [1] - 83:1
**processing** [6] - 19:3, 25:9, 32:15, 40:12, 82:24, 83:2
**processors** [1] - 45:18
**Prodigy** [11] - 4:17, 6:14, 13:6, 13:25, 14:2, 17:5, 22:3, 30:19, 30:23, 86:13
**produce** [11] - 105:1, 105:2, 105:15, 105:17, 106:12, 107:7, 107:15, 107:16, 107:21, 108:2, 108:19
**produced** [3] - 105:6, 105:22, 106:9
**producing** [1] - 105:7
**products** [2] - 88:21,

105:3
**profit** [1] - 105:2
**profits** [4] - 106:11, 106:19, 106:22, 107:12
**program** [3] - 8:20, 22:11, 60:3
**programmable** [4] - 13:9, 13:15, 27:3, 28:10
**programming** [1] - 32:13
**progress** [2] - 104:16, 105:20
**properly** [1] - 66:23
**propose** [2] - 52:18, 107:21
**proposed** [11] - 52:14, 55:2, 57:16, 89:20, 90:3, 90:9, 91:25, 92:23, 93:6, 93:19, 94:14
**proposition** [3] - 29:12, 91:11, 92:22
**prosecution** [10] - 22:2, 22:22, 44:11, 60:24, 83:1, 84:14, 84:18, 84:19, 96:1, 102:22
**proves** [1] - 26:11
**provide** [4] - 6:2, 41:7, 44:20, 73:21
**provided** [7] - 62:25, 94:10, 94:12, 101:20, 105:7, 106:17, 107:1
**provides** [4] - 8:14, 11:4, 47:2, 99:20
**PTAB** [11] - 7:6, 7:8, 7:14, 7:19, 8:3, 8:10, 23:5, 23:6, 23:7, 23:8, 23:12
**PTAB's** [1] - 7:12
**pull** [2] - 61:24, 62:5
**pulled** [1] - 62:7
**purported** [1] - 7:3
**purportedly** [1] - 6:6
**purposes** [1] - 107:4
**purview** [1] - 7:11
**pushed** [1] - 33:15
**pushing** [1] - 47:13
**put** [12] - 2:16, 17:22, 26:20, 27:1, 29:22, 68:19, 70:9, 70:20, 73:16, 79:8, 81:3, 100:14
**putting** [6] - 16:23, 35:23, 36:13, 36:24, 39:10, 87:25

## Q

**qualifies** [1] - 48:6
**questions** [3] - 49:4, 81:14, 106:3
**quite** [1] - 78:21
**quotation** [1] - 33:21
**quote** [7] - 19:2, 28:21, 29:4, 29:12, 29:16, 29:22
**quotes** [2] - 20:14, 29:10

## R

**radio** [1] - 40:2
**raise** [2] - 43:15, 107:10
**raised** [1] - 98:16
**raising** [1] - 96:6
**random** [2] - 35:12, 76:14
**range** [1] - 47:3
**rather** [4] - 36:12, 62:6, 84:8, 98:2
**reached** [2] - 6:5, 23:5
**reactivated** [1] - 80:18
**read** [3] - 78:25, 79:24, 86:17
**ready** [1] - 49:10
**real** [6] - 5:21, 5:25, 25:14, 40:11, 40:14, 40:22
**really** [28] - 5:3, 15:19, 16:4, 22:1, 23:6, 23:7, 24:14, 24:17, 26:18, 27:2, 27:21, 27:23, 38:1, 38:4, 38:5, 39:3, 39:18, 40:4, 40:10, 40:15, 41:22, 41:23, 44:7, 48:8, 79:12, 80:5, 84:9, 88:22
**realm** [9] - 15:20, 16:6, 16:22, 16:23, 26:20, 31:13, 32:3, 46:19, 48:10
**reason** [10] - 35:7, 42:9, 50:22, 51:24, 52:19, 60:25, 77:15, 81:12, 88:22, 103:5
**reasonable** [4] - 23:14, 105:16, 108:2, 108:10
**reasoning** [4] - 37:17, 83:12, 84:2, 94:13
**reasons** [8] - 24:17, 40:23, 40:24, 60:20, 66:22, 84:13, 94:4, 94:11

**rebuttal** [2] - 88:13, 95:23
**receive** [1] - 101:25
**receives** [1] - 101:2
**receiving** [1] - 9:23
**recent** [1] - 16:14
**reception** [34] - 9:13, 9:15, 10:7, 11:3, 14:19, 15:1, 19:4, 20:22, 20:25, 21:20, 24:6, 33:23, 34:11, 34:16, 34:17, 36:18, 36:19, 37:7, 38:7, 38:12, 38:18, 38:21, 48:16, 50:9, 50:14, 57:23, 82:18, 82:22, 82:24, 83:3, 87:11, 87:14, 89:18, 95:14
**recess** [4] - 49:6, 49:7, 49:9, 109:6
**recitation** [1] - 91:21, 92:4
**recite** [1] - 7:21
**recited** [1] - 12:4
**recognize** [1] - 82:11
**recognized** [1] - 26:14
**recognizes** [1] - 26:23
**recollection** [1] - 84:24
**Recommendation** [1] - 22:15
**reconvened** [1] - 49:9
**record** [3] - 2:17, 43:2, 107:3
**recreating** [1] - 39:21
**recreation** [1] - 36:21
**rectangle** [1] - 59:5
**rectangles** [1] - 59:3
**recycling** [1] - 9:24
**red** [3] - 71:14, 79:11, 98:17
**reduce** [6] - 17:24, 21:2, 22:6, 32:15, 90:13, 93:25
**reduced** [1] - 19:12
**reducing** [1] - 40:12
**redundancies** [2] - 36:10, 36:13
**reemphasized** [1] - 5:25
**reference** [2] - 49:21, 96:3
**referenced** [3] - 90:17, 96:2, 96:15
**references** [2] - 8:5, 96:10
**referential** [2] - 8:25, 48:5
**referring** [5] - 59:9, 63:23, 81:5, 84:17, 91:6

**refers** [2] - 37:4, 91:6
**refrain** [1] - 20:15
**refused** [2] - 107:7, 107:15
**regardless** [1] - 47:14
**regards** [1] - 96:3
**region** [4] - 39:25, 66:7, 75:24, 88:5
**regional** [1] - 40:1
**regions** [6] - 58:11, 58:16, 65:14, 65:22, 66:16, 67:17
**Registered** [1] - 1:25
**rejected** [4] - 5:11, 5:20, 36:11, 47:24
**rejecting** [1] - 12:8
**relate** [2] - 4:22, 6:23
**related** [6] - 5:16, 5:24, 6:25, 78:8, 99:6, 105:11
**relates** [4] - 4:16, 10:18, 12:25, 13:21, 14:13, 100:9
**relationship** [1] - 30:19
**relevance** [1] - 87:18
**relevant** [2] - 79:25, 92:10
**relied** [2] - 82:25, 102:21
**relies** [1] - 26:10
**relocatable** [6] - 58:3, 60:1, 60:7, 60:11, 68:10, 68:23
**relocated** [2] - 18:23, 68:2
**rely** [5] - 23:12, 25:16, 39:5, 43:10, 58:20
**relying** [1] - 23:14
**remaining** [2] - 64:25, 107:21
**remains** [1] - 83:18
**remote** [4] - 6:7, 10:16, 11:19, 14:6
**remove** [2] - 54:16, 83:17
**render** [1] - 85:5
**rendering** [1] - 32:18
**repeatedly** [1] - 5:11
**replicated** [1] - 73:8
**report** [1] - 106:24
**Report** [1] - 22:15
**Reporter** [2] - 1:25, 109:12
**REPORTER'S** [1] - 2:10
**reports** [1] - 106:16
**represent** [1] - 99:10
**representation** [1] - 19:15
**represented** [1] -

107:9
**representing** [1] - 20:3
**represents** [1] - 57:24
**request** [11] - 18:1, 19:1, 34:1, 38:19, 38:23, 97:15, 97:17, 97:23, 97:24, 98:3, 99:16
**requested** [4] - 9:25, 35:10, 38:10, 105:17
**requesting** [1] - 105:5
**requests** [2] - 40:8, 60:10, 97:14
**require** [10] - 10:1, 57:10, 64:10, 65:1, 77:7, 77:9, 96:18, 103:17, 103:18, 103:21
**required** [7] - 6:9, 14:24, 59:24, 79:23, 93:25, 100:11, 101:9
**requirement** [2] - 98:23, 101:16
**requirements** [1] - 64:11
**requires** [9] - 58:18, 63:6, 67:17, 77:6, 98:17, 101:19, 102:17, 103:19
**resolving** [1] - 32:17
**respect** [7] - 8:10, 56:16, 56:20, 56:25, 61:10, 77:23, 98:21
**respective** [4] - 9:13, 9:15, 36:18, 58:10
**respond** [3] - 2:14, 103:1, 103:25
**response** [11] - 5:5, 9:24, 18:25, 19:12, 22:6, 30:24, 60:10, 78:18, 90:13, 90:15, 98:11
**responses** [1] - 105:13
**rest** [6] - 34:3, 55:1, 62:8, 66:14, 98:6, 98:24
**rested** [2] - 23:8, 91:18
**result** [3] - 6:5, 13:18, 23:5
**retrieval** [5] - 12:22, 91:20, 92:3, 92:7, 92:9
**retrieve** [1] - 14:24
**retrieved** [12] - 9:12, 20:9, 20:11, 32:24, 34:13, 36:17, 50:14, 91:22, 92:2, 92:4, 92:6, 92:8

**retrieving** [1] - 34:18
**returned** [2] - 98:18, 99:1
**reusable** [3] - 60:1, 60:7, 60:11
**reuse** [6] - 21:8, 21:15, 33:13, 33:17, 34:24, 38:23
**reused** [4] - 18:24, 21:2, 38:8, 48:21
**revenue** [5] - 105:2, 105:9, 105:19, 106:18, 106:24, 106:25, 107:4
**revenues** [3] - 106:10, 106:13, 107:12
**reversing** [1] - 103:13
**review** [2] - 7:7, 41:25
**revisits** [1] - 89:21
**rewrites** [1] - 103:6
**rid** [1] - 55:10
**ridiculous** [1] - 15:8
**right-hand** [2] - 20:14, 21:16
**rigor** [1] - 16:1
**rigorous** [1] - 29:21
**Robert** [1] - 104:18
**ROBERT** [1] - 1:19
**Roberts** [2] - 3:3, 104:22
**Robinson** [4] - 10:13, 10:23, 11:7, 11:13
**Roman** [2] - 12:5, 25:4, 40:13
**Romans** [2] - 24:17, 25:2
**roof** [1] - 63:24
**rooted** [1] - 31:14
**RS** [1] - 82:17
**ruling** [1] - 4:19
**running** [1] - 24:6

## S

**sales** [1] - 105:4
**San** [1] - 2:4
**saved** [2] - 9:2, 80:15
**saves** [1] - 12:18
**saw** [4] - 62:20, 64:12, 69:21, 107:13
**scanning** [2] - 7:2, 45:14
**schematic** [1] - 59:21
**Schwartz** [1] - 3:13
**SCHWARTZ** [1] - 3:14
**scope** [4] - 15:8, 87:22, 87:23, 108:8
**screen** [43] - 7:16, 17:13, 18:24, 20:21, 24:2, 24:5, 34:20,

53:9, 54:11, 54:12, 54:18, 55:17, 57:25, 58:4, 58:6, 58:10, 58:12, 58:15, 59:6, 59:13, 60:7, 66:1, 66:4, 66:20, 66:23, 66:24, 68:9, 71:15, 72:16, 72:17, 72:24, 73:8, 73:9, 74:3, 74:12, 76:1, 76:3, 76:11, 79:22, 80:11, 80:16, 91:1

**screens** [15] - 18:24, 51:14, 51:15, 51:17, 55:16, 55:21, 60:8, 62:14, 62:18, 63:6, 72:5, 72:8, 72:11, 72:16, 72:19

**scroll** [3] - 72:7, 72:12, 72:13

**scrolled** [1] - 79:14

**scrutiny** [3] - 5:10, 5:19, 5:24

**seat** [1] - 49:10

**second** [24] - 17:8, 51:7, 51:17, 53:17, 53:22, 54:2, 54:3, 54:7, 54:9, 55:20, 58:1, 58:9, 58:15, 62:4, 62:14, 62:17, 63:5, 72:25, 73:2, 74:4, 76:3, 79:2, 81:24, 94:1

**secondly** [1] - 63:21

**seconds** [1] - 98:8

**section** [1] - 78:3

**see** [35] - 15:16, 17:7, 19:8, 19:13, 19:20, 19:24, 20:8, 20:19, 21:16, 23:23, 25:16, 27:20, 31:5, 33:4, 35:18, 59:2, 59:20, 61:17, 61:22, 62:10, 63:14, 71:11, 71:18, 75:21, 79:5, 79:7, 79:12, 90:4, 91:5, 91:15, 91:25, 93:23, 98:14, 103:4, 103:16

**seeing** [2] - 28:7, 28:18

**seek** [1] - 29:8

**seem** [1] - 28:1

**sees** [1] - 20:13

**segments** [2] - 20:2, 68:16

**seizing** [1] - 82:18

**select** [2] - 73:15, 73:17

**selectable** [1] - 21:13

**selected** [2] - 24:8, 33:7

**selecting** [1] - 12:10

**selection** [1] - 79:3

**selective** [3] - 11:24, 90:6, 95:6

**selectively** [37] - 19:11, 21:20, 25:12, 32:24, 33:22, 37:4, 47:13, 48:19, 50:14, 50:19, 89:17, 89:21, 89:24, 90:5, 90:12, 90:18, 91:14, 91:17, 91:19, 91:21, 91:23, 92:1, 92:2, 92:23, 93:2, 93:5, 93:6, 93:10, 93:11, 93:16, 94:5, 94:20, 95:7, 95:9, 95:19, 96:13

**self** [4] - 8:25, 48:5, 82:16, 86:1

**self-defining** [1] - 86:1

**self-describing** [1] - 82:16

**self-referential** [2] - 8:25, 48:5

**send** [5] - 11:11, 24:25, 34:8, 97:15, 98:4

**sending** [3] - 11:15, 19:15, 39:14

**sends** [3] - 42:1, 42:2, 97:17

**sense** [11] - 4:2, 24:19, 25:10, 25:14, 40:10, 42:24, 53:7, 84:7, 85:14, 88:15, 103:23

**sent** [9] - 32:22, 42:4, 50:8, 50:11, 102:19, 103:12, 103:13, 103:18, 104:4

**sentence** [4] - 52:20, 54:5, 54:20, 62:2

**separate** [21] - 24:7, 57:18, 65:14, 65:18, 65:22, 67:7, 67:16, 67:17, 67:22, 71:8, 72:18, 75:19, 75:21, 76:6, 77:24, 78:10, 88:5, 93:22, 94:23, 106:24

**separately** [3] - 24:9, 70:1, 76:2

**separating** [1] - 11:14

**separation** [1] - 74:10

**sequence** [3] - 34:19, 34:20, 58:23

**sequential** [1] - 19:17

**series** [1] - 99:22

**server** [14] - 10:7, 10:10, 10:14, 11:5, 11:19, 14:24, 20:12,

97:16, 97:17, 98:4, 100:7, 100:23, 101:12

**servers** [1] - 100:19

**service** [11] - 22:4, 37:13, 93:3, 99:1, 101:6, 101:8, 101:24, 102:12, 103:12, 103:14, 103:17

**services** [1] - 101:21

**sessions** [3] - 60:8, 60:9

**set** [4] - 48:5, 66:4, 72:14, 83:7

**settings** [6] - 4:13, 7:1, 50:1, 71:22, 89:13, 97:11

**several** [2] - 24:17, 41:6

**shall** [1] - 98:6

**share** [1] - 4:17

**shared** [2] - 16:17, 18:16

**shipping** [1] - 40:11

**shoot** [1] - 98:11

**short** [1] - 49:6

**show** [6] - 35:20, 89:24, 95:10, 95:11, 95:20, 96:13

**showed** [3] - 28:20, 61:15, 100:22

**showing** [2] - 52:21, 102:4

**shown** [10] - 35:13, 65:23, 67:11, 68:8, 72:9, 72:24, 73:6, 74:3, 81:11, 95:8

**shows** [8] - 20:1, 36:22, 78:10, 92:2, 92:6, 92:17, 92:20, 102:6

**side** [9] - 3:20, 10:15, 19:14, 20:7, 20:14, 20:20, 21:16, 59:4, 101:1

**siding** [1] - 30:3

**signals** [1] - 40:2

**similar** [12] - 5:4, 6:4, 11:9, 21:16, 23:5, 32:9, 40:9, 54:24, 65:10, 75:15, 90:24, 101:4

**similarly** [1] - 16:11

**Similarly** [1] - 18:14

**simply** [10] - 13:16, 26:14, 30:1, 31:7, 35:21, 41:2, 42:24, 43:11, 53:7, 103:10

**single** [5] - 24:2, 24:5, 56:10, 93:20, 106:20

**site** [3] - 100:16, 100:24, 100:25

**sites** [1] - 100:16

**situation** [1] - 62:6

**situations** [2] - 40:14, 97:22

**six** [2] - 90:20, 107:19

**size** [1] - 69:6

**slew** [2] - 6:21, 12:13

**slide** [39] - 15:16, 17:7, 19:2, 19:6, 19:13, 19:20, 19:24, 20:18, 22:5, 22:9, 22:10, 27:1, 28:19, 29:22, 35:14, 36:14, 41:8, 41:19, 43:8, 50:3, 52:21, 55:25, 59:2, 60:14, 62:21, 81:7, 81:19, 83:4, 90:4, 90:14, 90:20, 90:23, 91:5, 92:1, 92:12, 92:25, 93:23, 97:21, 103:16

**slides** [1] - 35:18

**slightly** [1] - 28:18

**slot** [1] - 95:2

**slow** [2] - 32:14, 65:6

**slowdown** [1] - 18:13

**small** [2] - 79:17, 98:2

**smart** [1] - 17:23

**Social** [1] - 14:14

**software** [5] - 16:17, 16:24, 18:16, 24:6, 27:10

**soldiers** [1] - 12:6

**sole** [1] - 23:25

**solid** [1] - 59:5

**solution** [27] - 6:2, 6:8, 6:10, 6:11, 6:19, 8:14, 9:2, 10:25, 13:22, 19:19, 23:11, 25:4, 28:16, 29:17, 31:13, 32:15, 32:17, 39:4, 44:25, 45:2, 45:23, 46:7, 46:17, 48:11, 48:12, 48:13, 87:15

**solutions** [4] - 25:2, 32:4, 40:5, 40:9

**solve** [4] - 16:22, 19:25, 29:5, 32:8

**solving** [4] - 16:5, 16:21, 23:10, 39:9

**someone** [2] - 8:6, 88:2

**sometimes** [1] - 69:15

**somewhere** [2] - 13:13, 39:14

**sorry** [2] - 31:21, 76:12

**sort** [2] - 6:13, 44:18

**sought** [1] - 37:19

**source** [1] - 10:3

**sources** [1] - 11:17

**spec** [2] - 82:1, 87:4

**special** [1] - 38:19

**specific** [45] - 6:2, 6:9, 6:11, 6:19, 8:14, 8:24, 9:2, 10:25, 11:21, 13:4, 13:21, 14:1, 16:8, 18:18, 19:6, 21:12, 22:1, 23:24, 24:11, 29:8, 29:16, 29:17, 30:6, 31:1, 32:4, 32:13, 36:12, 38:25, 40:20, 41:21, 44:20, 44:25, 45:2, 45:22, 46:6, 48:4, 48:10, 48:12, 48:13, 82:13, 83:10, 86:25, 87:15, 93:14, 93:17

**specifically** [9] - 21:17, 23:25, 27:10, 28:21, 31:12, 37:1, 37:11, 48:14, 96:3

**specification** [67] - 4:18, 6:14, 18:5, 18:6, 18:20, 20:14, 20:16, 21:25, 22:21, 27:7, 27:9, 30:12, 40:3, 45:8, 45:19, 46:3, 46:20, 52:12, 52:20, 53:6, 53:16, 54:5, 54:21, 56:9, 56:17, 56:21, 57:1, 57:15, 57:20, 58:18, 58:21, 60:2, 60:24, 61:6, 61:16, 63:11, 65:16, 69:14, 69:21, 73:24, 84:16, 89:23, 90:4, 90:5, 90:9, 90:16, 90:22, 91:2, 91:6, 91:8, 91:11, 92:21, 92:22, 93:1, 93:9, 93:18, 93:21, 93:24, 94:3, 94:12, 94:15, 96:12, 96:15, 103:11

**specification's** [1] - 90:18

**specifications** [2] - 54:22, 56:21

**specified** [1] - 6:19

**specifies** [2] - 34:7, 71:22

**specify** [6] - 15:25, 31:16, 33:1, 58:14, 66:17, 68:6

**spill** [1] - 30:20

**split** [3] - 10:15, 11:1, 11:11

**splits** [1] - 10:6

**splitting** [4] - 10:9, 32:21, 39:21, 40:11
**SRI** [1] - 88:17
**stable** [1] - 6:7
**stage** [1] - 17:2
**staged** [1] - 95:16
**standard** [1] - 43:10
**standpoint** [1] - 41:5
**stands** [1] - 23:18
**stark** [1] - 21:10
**STARK** [1] - 1:12
**start** [4] - 4:2, 44:17, 100:15, 100:24
**starting** [1] - 17:19
**starts** [2] - 65:12, 71:25
**state** [12] - 30:13, 100:12, 100:25, 101:10, 101:13, 101:14, 101:20, 101:22, 101:25, 102:11, 102:17, 102:19
**states** [1] - 61:6
**STATES** [1] - 1:1
**Stempler** [3] - 2:24, 49:13, 49:17
**STEMPLER** [9] - 1:18, 2:25, 49:16, 49:23, 50:2, 78:19, 79:15, 80:1, 81:2
**stenographic** [1] - 109:10
**Step** [38] - 4:20, 5:23, 7:5, 7:6, 8:12, 8:13, 16:1, 16:10, 16:13, 16:19, 22:17, 23:3, 23:19, 26:24, 27:13, 27:14, 27:16, 29:15, 30:1, 30:16, 30:20, 30:21, 31:10, 31:15, 32:1, 32:5, 32:11, 33:2, 35:16, 39:2, 39:17, 40:15, 44:12, 45:6, 45:24, 46:4, 49:1
**step** [5] - 9:1, 12:12, 93:20, 94:20, 103:19
**stepping** [1] - 98:21
**Steps** [1] - 15:13
**steps** [10] - 4:21, 7:21, 7:22, 8:1, 12:9, 59:12, 61:7, 93:20, 93:22
**still** [7] - 32:5, 36:22, 46:25, 70:11, 70:22, 70:25, 105:6
**stock** [2] - 12:4, 12:6
**stopped** [1] - 100:18
**storage** [34] - 5:16, 12:20, 13:10, 23:11,

23:16, 23:21, 24:16, 24:19, 24:20, 24:21, 31:20, 34:5, 34:7, 35:12, 38:4, 38:6, 38:11, 38:13, 40:19, 40:21, 40:22, 41:13, 43:10, 43:13, 44:19, 44:23, 45:2, 48:13, 48:14, 48:23, 89:25, 90:7, 93:8, 95:2
**store** [20] - 12:2, 12:4, 12:6, 15:3, 15:4, 19:10, 19:11, 21:20, 25:3, 34:9, 34:10, 37:7, 38:21, 89:17, 90:6, 95:9, 95:10, 95:19, 95:20
**stored** [19] - 7:16, 9:12, 9:14, 11:6, 13:11, 13:17, 13:21, 14:5, 20:3, 20:4, 20:25, 24:23, 32:24, 36:17, 38:7, 50:14, 50:19, 60:9, 94:1
**stores** [3] - 40:17, 95:1, 95:5
**storing** [40] - 4:22, 5:1, 11:24, 12:14, 15:1, 25:13, 33:22, 33:23, 33:25, 37:4, 37:7, 38:16, 41:10, 43:6, 47:13, 48:15, 48:19, 89:17, 89:21, 89:24, 89:25, 90:1, 90:5, 90:12, 90:18, 91:14, 91:18, 93:7, 93:16, 93:20, 93:21, 94:5, 94:20, 95:6, 95:7, 95:14, 95:19
**story** [1] - 22:2
**straight** [2] - 22:22, 98:14
**strategy** [1] - 87:7
**strict** [1] - 29:20
**strikes** [1] - 8:10
**structural** [2] - 28:15, 28:16
**structure** [31] - 8:17, 8:18, 8:24, 8:25, 9:6, 21:18, 35:21, 36:6, 46:13, 46:14, 66:19, 75:19, 75:20, 77:11, 83:7, 85:22, 86:7, 86:9, 86:10, 86:11, 86:14, 86:18, 86:21, 86:22, 86:25, 87:13, 89:23, 91:15
**structured** [4] - 8:21, 18:22, 58:2, 60:5
**structures** [7] - 8:19, 8:20, 8:21, 37:24, 82:12, 82:13, 87:16

**structuring** [3] - 41:11, 51:12, 54:25
**studies** [1] - 105:10
**stuff** [2] - 11:5, 11:6
**stuffed** [1] - 81:10
**subscriber's** [1] - 22:12
**subsection** [1] - 98:3
**subset** [1] - 102:5
**substantially** [1] - 90:24
**substitute** [1] - 64:17
**succeeding** [2] - 72:10, 72:11
**succeeds** [1] - 40:24
**sued** [2] - 14:11, 14:12
**suffice** [1] - 47:16
**sufficient** [1] - 31:22
**suggest** [2] - 53:7, 85:10
**suggesting** [2] - 85:6, 85:8
**sum** [1] - 48:22
**summary** [1] - 44:4
**superfluous** [2] - 85:6, 92:4
**supersede** [1] - 80:10
**supplied** [3] - 33:21, 91:21, 92:1
**supply** [4] - 13:19, 22:7, 25:2, 37:13
**supplying** [1] - 92:15
**support** [4] - 59:18, 80:9, 91:10, 91:13
**supported** [2] - 20:13, 64:6
**supporting** [2] - 61:22, 84:20
**supports** [5] - 5:8, 23:3, 30:13, 91:24, 92:21
**suppose** [2] - 79:15, 87:19
**survive** [1] - 14:2
**survived** [1] - 8:23
**swapped** [1] - 80:16
**switch** [2] - 21:6, 66:12
**Symantec** [4] - 6:3, 6:18, 7:1, 45:13
**system** [43] - 5:17, 9:13, 9:15, 10:8, 11:4, 13:11, 14:19, 15:1, 15:20, 17:6, 17:25, 19:4, 19:5, 20:10, 20:12, 20:22, 20:25, 24:6, 26:21, 34:11, 34:16, 34:17, 36:18, 36:19, 37:7, 38:7, 38:12, 38:18, 38:21, 48:16, 50:15,

57:23, 82:18, 82:22, 82:24, 83:3, 86:13, 87:11, 87:14, 89:18, 94:25, 95:15, 100:13
**systems** [4] - 6:16, 21:20, 44:19, 90:13

---

## T

**Tab** [1] - 49:23
**table** [1] - 33:7
**tag** [4] - 71:25, 72:1, 72:21
**tags** [3] - 72:3, 72:5, 72:7
**tailor** [1] - 88:8
**talks** [15] - 10:5, 13:24, 17:8, 19:7, 20:19, 22:2, 22:6, 26:4, 38:16, 67:2, 69:22, 78:7, 80:3, 81:4, 101:17
**tangent** [1] - 4:25
**target** [1] - 47:9
**targeting** [1] - 26:7
**targets** [1] - 42:23
**tasks** [1] - 10:15
**technical** [11] - 13:5, 16:16, 18:14, 19:22, 28:16, 29:8, 40:24, 44:21, 45:1, 45:23, 46:6
**technique** [1] - 39:15
**techniques** [1] - 16:13
**technological** [4] - 16:12, 22:1, 23:1, 25:6
**technology** [7] - 5:18, 7:3, 15:23, 23:10, 27:10, 30:2, 31:14
**template** [1] - 59:22
**ten** [1] - 44:4
**tends** [1] - 32:1
**term** [32] - 35:20, 37:6, 37:16, 37:18, 51:25, 52:2, 52:3, 52:15, 52:18, 52:25, 53:17, 54:13, 55:3, 55:20, 57:1, 57:16, 60:16, 62:13, 82:6, 83:15, 83:19, 84:5, 89:16, 89:19, 89:20, 91:19, 92:22, 95:23, 96:20, 96:22, 97:12, 97:14
**termed** [1] - 50:22
**terminal** [5] - 10:15, 17:9, 19:25, 22:8, 50:9
**terminals** [1] - 6:15
**terminology** [1] - 36:15

**terms** [21] - 3:21, 30:18, 33:7, 35:7, 35:9, 35:19, 35:24, 49:20, 50:22, 51:4, 51:10, 51:21, 52:16, 56:2, 64:5, 64:6, 64:17, 64:20, 65:8, 98:2, 98:22
**tessellated** [1] - 63:9
**tessellation** [1] - 63:12
**test** [7] - 6:1, 6:12, 8:3, 8:8, 45:20, 45:21, 45:23
**tested** [1] - 66:23
**text** [2] - 60:3, 68:6
**THE** [75] - 1:1, 1:2, 2:13, 2:16, 3:6, 3:15, 3:25, 4:4, 4:6, 4:10, 4:15, 15:10, 27:14, 28:1, 28:18, 29:24, 30:18, 31:8, 35:15, 44:14, 47:5, 49:2, 49:5, 49:10, 49:14, 49:22, 65:3, 65:7, 68:22, 68:25, 72:9, 72:12, 78:17, 79:11, 79:21, 80:25, 81:15, 82:3, 82:7, 83:23, 84:12, 84:24, 85:3, 85:17, 85:19, 87:18, 88:12, 89:3, 89:8, 89:11, 94:6, 94:16, 95:22, 96:21, 96:25, 97:5, 98:5, 98:8, 103:1, 103:24, 104:11, 104:14, 104:20, 105:18, 106:1, 106:4, 107:20, 108:1, 108:9, 108:12, 108:16, 108:18, 108:22, 109:2, 109:5
**theme** [2] - 25:16, 32:1
**themselves** [9] - 7:20, 26:25, 28:15, 31:3, 46:23, 47:17, 58:7, 64:21, 68:12
**theoretical** [1] - 41:20
**therefore** [5] - 5:18, 19:12, 48:25, 83:15, 92:18
**they've** [2] - 5:7, 107:21
**thinking** [2] - 40:15, 80:24
**three** [3] - 13:11, 17:16, 56:2
**throughout** [2] - 65:24, 102:22
**tie** [1] - 96:13

**tied** [1] - 79:9
**tier** [1] - 5:17
**tiled** [1] - 63:9
**tiles** [2] - 63:22, 63:24
**tiling** [12] - 63:12, 63:17, 63:18, 63:22, 63:25
**TLI** [1] - 45:21
**today** [5] - 2:20, 46:10, 83:8, 86:5, 108:20
**together** [8] - 17:11, 17:22, 34:21, 36:24, 50:23, 56:2, 93:11, 104:9
**ton** [1] - 89:5
**took** [1] - 25:20
**tool** [2] - 48:7, 48:9
**top** [4] - 71:25, 74:5, 80:14, 97:21
**total** [1] - 48:22
**totality** [1] - 46:13
**touches** [2] - 6:1, 45:8
**toward** [2] - 30:3, 44:18
**TRAINOR** [2] - 108:24, 109:1
**transaction** [2] - 106:20, 106:22
**transcript** [1] - 109:10
**transfer** [1] - 14:18
**transferred** [1] - 17:10
**transition** [1] - 34:23
**transmitting** [1] - 9:24
**Tranxition** [2] - 6:24, 6:25
**treat** [1] - 70:23
**treated** [1] - 77:13
**treatment** [2] - 76:7, 94:23
**treats** [1] - 91:2
**tried** [1] - 14:4
**trip** [1] - 74:21
**true** [9] - 13:20, 17:3, 43:11, 44:22, 48:24, 63:20, 72:3, 90:19, 109:10
**truth** [1] - 23:23
**try** [7] - 25:11, 44:3, 65:6, 73:11, 84:22, 86:3, 98:22
**trying** [16] - 14:10, 16:22, 16:23, 32:7, 47:22, 56:3, 56:13, 77:14, 84:15, 86:1, 86:16, 87:4, 99:4, 101:4, 102:9, 102:24
**turn** [3] - 50:3, 53:14, 55:25
**turning** [1] - 57:4
**turns** [2] - 103:13, 103:14

**tutorial** [2] - 10:6, 13:24
**TV** [1] - 26:1
**tweaking** [1] - 86:3
**Two** [19] - 8:13, 15:14, 22:17, 27:13, 27:14, 30:20, 30:21, 31:15, 32:1, 32:5, 33:2, 35:16, 39:2, 39:18, 40:16, 44:12, 45:24, 46:4, 49:1
**two** [15] - 4:17, 21:4, 24:25, 29:10, 59:3, 67:15, 77:18, 93:20, 93:24, 94:4, 95:25, 97:5, 97:6, 102:10, 102:23
**type** [11] - 8:24, 13:16, 15:18, 38:21, 40:9, 82:21, 82:22, 83:10, 86:25, 87:2, 99:16
**types** [5] - 61:4, 63:22, 86:8, 90:21, 90:24
**typically** [1] - 57:24
**typing** [1] - 97:20

## U

**U.S** [5] - 105:19, 106:25, 107:1, 107:4, 109:13
**U.S./Canada** [1] - 106:13
**Ultramercial** [2] - 12:8, 25:24
**unaddressed** [1] - 48:21
**unavailable** [1] - 20:25
**uncertain** [1] - 85:3
**unclear** [3] - 52:12, 52:14, 97:16
**under** [25] - 4:20, 5:9, 6:24, 7:5, 7:6, 8:1, 8:2, 8:12, 15:18, 16:9, 16:19, 22:17, 23:3, 23:4, 24:12, 29:6, 31:10, 32:5, 43:14, 43:17, 46:4, 49:1, 97:5, 108:7
**underlined** [1] - 47:21
**underlying** [4] - 12:22, 70:10, 70:15, 80:11
**underneath** [1] - 62:7
**understood** [1] - 58:13
**undertaking** [1] - 61:9
**uniform** [15] - 26:8, 36:8, 36:10, 66:12, 82:16, 82:19, 83:7, 83:9, 86:1, 86:7,

86:9, 86:10, 86:19, 86:24, 87:1
**uniformity** [1] - 86:8
**unique** [3] - 16:16, 18:15, 89:19
**UNITED** [1] - 1:1
**unless** [4] - 49:4, 81:14, 89:1, 106:2
**unlike** [2] - 24:22, 25:1
**unpatentable** [1] - 11:8
**unstated** [2] - 54:22, 56:14
**unsupported** [1] - 56:14
**up** [53] - 11:11, 13:2, 14:20, 14:21, 14:22, 15:4, 17:3, 17:12, 17:21, 18:24, 19:19, 20:2, 20:9, 22:22, 25:4, 29:22, 30:9, 32:21, 36:23, 40:11, 41:3, 42:5, 42:20, 45:24, 46:23, 47:9, 48:15, 49:19, 53:15, 54:21, 59:5, 60:7, 60:23, 65:5, 66:1, 66:3, 66:4, 70:15, 70:20, 71:12, 72:14, 77:4, 79:1, 79:6, 80:5, 81:3, 87:16, 88:2, 88:7, 95:2, 98:11, 107:11
**update** [2] - 97:2, 97:6
**URL** [3] - 97:21, 99:16, 99:17
**useful** [3] - 28:13, 38:20, 50:6
**user** [28] - 14:19, 14:25, 15:1, 17:13, 17:20, 18:3, 19:16, 20:5, 20:13, 21:22, 33:24, 38:18, 40:8, 42:2, 42:6, 43:7, 43:13, 50:9, 61:23, 72:5, 76:10, 95:8, 95:14, 98:18, 101:13, 101:23, 102:2
**user's** [14] - 7:16, 17:11, 17:18, 17:22, 18:25, 19:10, 19:11, 20:3, 20:10, 21:20, 48:16, 48:19, 60:10
**user-partitioned** [1] - 61:23
**users** [5] - 14:24, 22:7, 27:25, 32:14, 38:18
**users'** [2] - 24:6, 33:25
**uses** [5] - 8:20, 43:10, 83:19, 91:8, 92:22,

86:9, 86:10, 86:19, 86:24, 87:1
**uniformity** [1] - 86:8
**unique** [3] - 16:16, 18:15, 89:19
**UNITED** [1] - 1:1
**unless** [4] - 49:4, 81:14, 89:1, 106:2
**unlike** [2] - 24:22, 25:1
**unpatentable** [1] - 11:8
**unstated** [2] - 54:22, 56:14
**unsupported** [1] - 56:14

93:9

## V

**value** [1] - 105:11
**variety** [1] - 82:21
**various** [1] - 106:11
**Versata** [1] - 9:20
**version** [1] - 36:18
**versions** [1] - 9:13
**versus** [2] - 29:20, 88:24
**view** [5] - 3:25, 4:4, 27:15, 42:15, 75:3
**views** [1] - 99:23
**village** [1] - 25:5
**virus** [2] - 7:2, 45:14
**vision** [1] - 87:23
**visit** [1] - 38:22
**visual** [1] - 26:13
**Visual** [11] - 5:13, 13:1, 26:10, 26:14, 26:23, 27:1, 28:2, 28:6, 28:9, 47:19, 47:22
**volume** [1] - 107:25

## W

**wacky** [1] - 8:10
**walk** [1] - 57:21
**walls** [1] - 65:14
**wants** [2] - 20:5, 78:15
**watching** [1] - 12:11
**ways** [8] - 41:6, 41:17, 43:8, 47:16, 86:4, 93:24, 106:11, 107:13
**web** [2] - 9:21, 31:6
**Web** [25] - 14:10, 14:13, 14:15, 41:1, 41:7, 42:1, 43:10, 44:2, 44:4, 44:6, 46:24, 72:18, 72:23, 76:18, 98:24, 99:10, 100:1, 100:8, 101:8, 101:18, 101:23, 102:2, 102:3, 103:9
**website** [7] - 38:20, 38:22, 41:7, 42:8, 79:3, 79:4, 79:6
**websites** [2] - 43:2, 43:3
**week** [1] - 107:25
**weekend** [1] - 104:16
**weeks** [1] - 107:19
**welcome** [1] - 3:15
**WEST** [1] - 2:3
**West** [1] - 3:8
**wherein** [2] - 58:9,

101:20
**whichever** [1] - 68:13
**whiz** [1] - 45:9
**whole** [11] - 17:25, 31:23, 54:17, 66:24, 74:12, 75:6, 76:25, 95:3, 95:12, 100:12, 102:14
**Wide** [3] - 14:12, 44:2, 46:24
**Wilmington** [1] - 1:9
**window** [43] - 20:8, 56:23, 61:5, 61:12, 61:16, 62:21, 62:23, 69:16, 69:18, 69:19, 69:23, 70:10, 70:12, 70:15, 70:17, 70:18, 70:21, 70:24, 71:23, 73:11, 73:12, 73:16, 73:18, 73:22, 73:23, 73:25, 80:4, 80:7, 80:9, 80:12, 80:13, 80:15, 80:17, 81:4, 81:6, 81:7, 81:21, 81:25, 82:1, 87:5
**windows** [25] - 61:7, 61:25, 62:5, 62:21, 65:20, 65:21, 69:13, 69:15, 69:16, 69:20, 70:2, 70:3, 78:1, 78:7, 80:9, 80:12, 80:25, 81:5, 81:20, 81:22, 82:2
**word** [14] - 18:4, 36:15, 37:21, 49:3, 51:1, 52:13, 59:15, 63:17, 63:18, 64:8, 83:18, 91:9, 93:11
**words** [14] - 8:5, 51:2, 51:20, 52:5, 53:23, 56:7, 56:9, 57:9, 60:11, 64:20, 64:25, 81:10, 93:10
**works** [4] - 28:24, 48:1, 60:12, 87:12
**World** [3] - 14:12, 44:2, 46:24
**world** [9] - 16:17, 18:15, 24:19, 25:14, 39:10, 40:11, 40:12, 40:14, 40:23
**worried** [1] - 36:13
**worry** [1] - 46:24
**written** [1] - 6:18

## Y

**year** [1] - 16:15
**years** [1] - 44:4
**York** [2] - 1:20

## Z

**zoo** [1] - 74:21
**zoomed** [1] - 79:16

# EXHIBIT 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

          Plaintiff,

          v.

GROUPON, INC.

          Defendant.

C.A. No. 16-122-LPS-CJB

JURY TRIAL DEMANDED

**GROUPON, INC.'S OBJECTIONS TO PLAINTIFF'S SECOND NOTICE
OF DEPOSITION TO GROUPON, INC.**

Pursuant to Federal Rules of Civil Procedure 26 and 30(b)(6), Defendant Groupon, Inc.

("Groupon") hereby responds and objects to Plaintiff International Business Machines

Corporation's ("IBM") Second Notice of Deposition to Groupon, Inc. as follows:

**<u>GENERAL OBJECTIONS</u>**

Groupon makes the following General Objections to each and every Definition and Topic

in Schedules A and B of IBM's Notice of Deposition.  Each of these objections is incorporated

into Groupon's response to each and every Topic, whether or not separately set forth therein.  By

failing to specifically refer to or specify any particular General Objection in response to a

particular Topic, Groupon does not waive any of these General Objections, nor admit or concede

the appropriateness of any purported Topic or any assumptions contained therein.

1.      Nothing in these responses should be construed as waiving rights or objections

that might otherwise be available to Groupon, nor should Groupon's responses to any of these

1

Topics be deemed an admission of relevancy, materiality, or admissibility in evidence of the Topic or the response thereto.

2.      Groupon objects to each Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.   Groupon will not provide such privileged or protected information, and any inadvertent disclosure of any privileged or protected information shall not be deemed a waiver of any privilege.

3.      Groupon objects to each Topic, and to each Definition that each Topic incorporates, to the extent they impose obligations upon Groupon that are broader than, or inconsistent with, the obligations imposed by the Federal Rules of Civil Procedure, the Local Rules of the District of Delaware, or any applicable Order of the Court, regulation or case law.

4.      Groupon further objects to each Topic, and to each Definition that each Topic incorporates, to the extent that it is overbroad, vague and ambiguous, unduly burdensome, oppressive, and not proportional to the needs of this case.   Groupon will not provide testimony regarding Topics that are not relevant to a claim or defense in this matter or are not proportional to the needs of the case.   Groupon will not inquire of witnesses other than those that could reasonably be expected to have responsive information.   Unless otherwise indicated, Groupon shall give the terms of the Topics their ordinary and plain meanings.   Groupon shall not be held responsible where its reasonable interpretation of the Topics does not comport with IBM's intentions.   Groupon objects to all definitions and Topics that fail to describe the information sought with reasonable particularity or are so unintelligible that Groupon cannot determine what, if any, information is responsive or cannot prepare a witness to testify as to the information.

5.      Groupon objects to each Topic to the extent the information sought is already in IBM's possession or equally available to IBM from publicly available sources.  Groupon further objects to each Topic to the extent the burden of preparing a witness to testify as to that topic outweighs its likely benefit.

6.      Groupon objects to all definitions, instructions, and Topics to the extent that they purport to require Groupon to disclose private or personally-identifiable information of its customers, business partners, or employees.  Groupon does not intend to provide such confidential information without the consent of the relevant persons or a court order.

7.      Groupon objects to each Topic to the extent it requires Groupon to disclose information that is subject to a protective order, contractual obligation, or other confidentiality obligation owed to any third party.  Groupon will disclose such information only in compliance with its obligations to third parties and subject to an appropriate protective order.

8.      Groupon objects to each Topic to the extent it requires a legal conclusion of Groupon.

9.      Groupon objects to the definition of "Defendant," "You," and "Your" because it seeks to broaden the scope of allowable discovery and seeks information that is not within the possession, custody, or control of Groupon, but is in the possession of third parties and non-parties to this lawsuit.  Groupon further objects to the definition of these terms as they include Groupon's attorneys and patent agents and seeks privileged and attorney-work product information.  Groupon will interpret these terms as referring to Groupon, Inc.

10.     Groupon objects to the definition of "Accused Instrumentality" (or "Accused Instrumentalities," to the extent used in the Topics) as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it includes

3

instrumentalities not identified by IBM in its infringement contentions.  Groupon further objects that the definition is overbroad and unduly burdensome to the extent it is not limited to any particular accused feature.

11.     Groupon objects to the definition of "document" as overbroad, unduly burdensome and oppressive as it seeks to encompass tangible things.  Groupon will construe this term to mean any items described in Federal Rule of Civil Procedure 34(a)(1)(A).

12.     Groupon objects to the definition of "financial data" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case.

13.     Groupon objects to the definition of "Transaction Event" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case.

14.     No incidental or implied admissions are intended by any response by Groupon to any Topic. That Groupon agreed to provide a witness to testify to a Topic is not an admission that Groupon accepts or admits the existence of any alleged facts set forth in or assumed by such Topic, or that the response constitutes admissible evidence.

15.     Groupon's responses are made solely for the purpose of this case.

16.     All objections as to competency, relevance, materiality, propriety, and admissibility, are expressly reserved and may be interposed at any other proceeding in this case or any other action.

17.     Groupon objects to the later deposition of any witness produced in response to this Notice with respect to any Topic covered by the notice or resulting deposition, whether or not the later deposition is in the deponent's individual capacity or capacity as a corporate representative.

Without waiver of and subject to the foregoing General Objections, Groupon responds to the Topics as follows.

**SPECIFIC OBJECTIONS AND RESPONSES**

**DEPOSITION TOPIC NO. 1:**

The way in which each of your Accused Instrumentalities:

a.      generate URLs, URIs, or hyperlinks;

b.      allow users to "Sign In"/"Sign Up" and create user accounts, including by using information or data about users from Google or Facebook;

c.      deliver content, including HTML, web pages, JavaScript, images, graphics, stylesheets, and font files;

d.      set parameters related to caching; and

e.      use content delivery networks, including those provided by Akamai Technologies, Inc.

**RESPONSE TO DEPOSITION TOPIC NO. 1:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Your" and "Accused Instrumentalities."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this

Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the operation of the aspects of the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period, including generally how Groupon's website generates URLs, URIs, or hyperlinks, how user accounts are created via Google or Facebook, generally how Groupon's accused instrumentalities deliver content to end-users, and generally how the accused instrumentalities set parameters related to caching and use content delivery networks.

**DEPOSITION TOPIC NO. 2:**

The earliest date that the accused features and functionalities of the Accused Instrumentalities, identified in IBM's January 20, 2017 and March 24, 2017 Preliminary Infringement Contentions, were implemented, and in particular:

a.    The date(s) on which You first implemented the ability to cache or store content, including but not limited to menus, images, videos, browser-supported source code (such as JavaScript), and advertisements at each of the Accused Instrumentalities;

b.    The date(s) on which You first implemented the process of embedding information into hyperlinks, internet addresses, URLs, or URIs at each of the Accused Instrumentalities; and

c.    The date(s) on which You first made available to users the option to create an account, at each of the Accused Instrumentalities, using Facebook and/or Google login credentials.

6

**RESPONSE TO DEPOSITION TOPIC NO. 2:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definition of "You" and "Accused Instrumentalities." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the earliest date that the accused features and functionalities of the specific Groupon instrumentalities accused of infringement in IBM's January 20, 2017 and March 24, 2017 Preliminary Infringement Contentions were implemented.

**DEPOSITION TOPIC NO. 3:**

All changes to the accused features and functionalities of the Accused Instrumentalities identified in IBM's January 20, 2017 and March 24, 2017 Preliminary Infringement Contentions, beginning on the earliest date that such accused features and functionalities were implemented (i.e., the dates identified in response to Topic 2 herein) through the present and any planned

future changes to such features and functionalities, including but not limited to any changes made as a result of learning of the Patents-in-Suit.

**RESPONSE TO DEPOSITION TOPIC NO. 3:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities." Groupon further objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting "all changes . . . beginning on the earliest date that such accused features and functionalities were implemented . . . through the present". No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will make reasonable efforts to prepare a witness or witnesses to testify regarding substantial changes to the accused features and functionalities of the specific Groupon instrumentalities accused of infringement in IBM's January 20, 2017 and March 24, 2017 Preliminary Infringement Contentions from the date those

features or functionalities were implemented to the present, and any currently planned changes to such features and functionalities that have yet to be implemented.

**DEPOSITION TOPIC NO. 4:**

The identity and functionality of the source code that affects how each of the Accused Instrumentalities:

a.  generate URLs, URIs, or hyperlinks;

b.  allow users to "Sign In"/"Sign Up" and create user accounts, including by using information or data about users from Google or Facebook;

c.  deliver content, including HTML, web pages, JavaScript, images, graphics, stylesheets, and font files;

d.  set parameters related to caching; and

e.  use content delivery networks, including those provided by Akamai Technologies, Inc.

**RESPONSE TO DEPOSITION TOPIC NO. 4:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities." Groupon further objects to this Topic because it is not limited to a relevant time period. Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the terms "identity" and "affects." Groupon further objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by asking for a witness to identify and explain the operation of a large quantity of source code. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking

information that can be obtained more efficiently through written discovery or document production or inspection and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular source code, Groupon objects as the source code available for inspection would speak for itself.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will reasonably prepare a witness or witnesses to testify regarding the functionality of Groupon's source code that controls the features and operation of the aspects of the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**<u>DEPOSITION TOPIC NO. 5:</u>**

The identity, functionality, and configuration of any third-party software, hardware, or service, including by not limited to Akamai, Facebook, Google, Amazon Web Services, Fastly, Apache, Optimizely, Varnish, and Edgecast, that affects how each of your Accused Instrumentalities:

f.      generate URLs, URIs, or hyperlinks;

g.      allow users to "Sign In"/"Sign Up" and create user accounts, including by using

information or data about users from Google or Facebook;

h.      deliver content, including HTML, web pages, JavaScript, images, graphics, stylesheets, and font files;

i.      set parameters related to caching; and

j.      use content delivery networks, including those provided by Akamai Technologies, Inc.

## RESPONSE TO DEPOSITION TOPIC NO. 5:

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Your" and "Accused Instrumentalities." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting testimony regarding *any* third-party software, hardware, or service, particularly given that it is not limited a relevant time period. Groupon further objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the term "identity" and "affects." No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party. Furthermore, Groupon objects to the extent this Topic seeks

information concerning how any third party system affects Groupon; no Groupon-designated witness would be capable of testifying to such third-party information.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding third-party software, hardware, or services that directly impacts how the features and operation of the aspects of the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period, and how such third-party software, hardware, or services are configured to the extent that knowledge is within Groupon's knowledge.

## DEPOSITION TOPIC NO. 6:

Agreements between You and any third party related to how each of your Accused Instrumentalities:

k.      generate URLs, URIs, or hyperlinks;

l.      allow users to "Sign In"/"Sign Up" and create user accounts, including by using information or data about users from Google or Facebook;

m.      deliver content, including HTML, web pages, JavaScript, images, graphics, stylesheets, and font files;

n.      set parameters related to caching; and

o.      use content delivery networks, including those provided by Akamai Technologies, Inc.

## RESPONSE TO DEPOSITION TOPIC NO. 6:

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "You" and "Accused Instrumentalities." Groupon objects to this Topic to the extent that it seeks information which is

neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information regarding agreements with any third party not limited to a relevant time period.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular agreements, Groupon objects as any written agreement would speak for itself.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's non-privileged agreements with third parties that relate to the features and operation of the aspects of the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 7:**

The identity, functionality, topology, and configuration of any servers, including third-party servers, that deliver content to users.

**RESPONSE TO DEPOSITION TOPIC NO. 7:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon objects to this Topic to the extent that it seeks information which is neither relevant to

the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information regarding *any* servers, including third party servers, that deliver content to users.  Groupon further objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the terms "identity" and "topology."  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.  Furthermore, Groupon objects to the extent this Topic seeks information concerning internal servers of third parties; no Groupon-designated witness would be capable of testifying to such third-party information.

Subject to the foregoing objections, Groupon will reasonably prepare a witness or witnesses to testify regarding the general identity and location of servers or services that deliver content to Groupon's end users from Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 8:**

The number of user accounts at each of the Accused Instrumentalities, created on a monthly basis, from 2010 and continuing through the present.

**RESPONSE TO DEPOSITION TOPIC NO. 8:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information on a monthly basis. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the number of Groupon user accounts created during the relevant time period.

**DEPOSITION TOPIC NO. 9:**

On a monthly basis, the total number of Transaction Events made using the Accused Instrumentalities from 2010 to the present.

**RESPONSE TO DEPOSITION TOPIC NO. 9:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Accused Instrumentalities" and "Transaction Events." Groupon objects to this Topic to the extent that it seeks information

which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information on a monthly basis.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the total number of sales generated for each of the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period, to the extent such information is in Groupon's possession, custody or control and reasonably available.

## DEPOSITION TOPIC NO. 10:

On a monthly basis, the number of Transaction Events made through the Accused Instrumentalities by users whose accounts were linked to Facebook and/or Google login credentials from 2010 to the present.

**RESPONSE TO DEPOSITION TOPIC NO. 10:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Accused Instrumentalities" and "Transaction Events."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information on a monthly basis.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the total number of sales generated via the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions by users whose accounts were created via Facebook and/or Google during the relevant time period, to the extent such information is in Groupon's possession, custody or control and reasonably available.

17

**DEPOSITION TOPIC NO. 11:**

On a monthly basis, the number of Transaction Events made through the Accused Instrumentalities by users who were logged in using Facebook and/or Google login credentials from 2010 to the present.

**RESPONSE TO DEPOSITION TOPIC NO. 11:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Accused Instrumentalities" and "Transaction Events."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information on a monthly basis.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon is willing to meet and confer with counsel for IBM to narrow the information requested by this Topic to information that is relevant to an issue in this case.

**DEPOSITION TOPIC NO. 12:**

On a monthly basis, the total number of unique and non-unique (i.e., returning) visitors to the Accused Instrumentalities, the number of unique and non-unique visitors who disabled cookies, and the percentage of unique and non-unique visitors who disabled cookies from 2010 to the present.

**RESPONSE TO DEPOSITION TOPIC NO. 12:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Accused Instrumentalities." Groupon also objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "unique and non-unique visitors." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information on a monthly basis. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by

19

confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the total number of unique and non-unique visitors, the number of unique and non-unique visitors who disabled cookies, and the percentage of unique and non-unique visitors who disabled cookies on Groupon's desktop and mobile websites during the relevant time period to extent such information is ascertainable and tracked by Groupon in the ordinary course of business.

**DEPOSITION TOPIC NO. 13:**

On a monthly basis, the number of unique and non-unique visitors who disabled caching in their web browser and the percentage of unique and non-unique visitors who disabled caching in their web browser.

**RESPONSE TO DEPOSITION TOPIC NO. 13:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "unique and non-unique visitors." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information on a monthly basis and that not tied to the Groupon instrumentalities accused of infringement by IBM or limited by time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that is not within its possession, custody, or control. Groupon objects to this Topic to the extent that it

seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the total number of unique and non-unique visitors who disabled caching in their web browser and the percentage of unique and non-unique visitors who disabled caching in their web browser during the relevant time period to extent such information is ascertainable and tracked by Groupon in the ordinary course of business.

**DEPOSITION TOPIC NO. 14:**

The categories of information stored in cookies regarding visitors to the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 14:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities."  Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "categories of information . . . regarding visitors."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-

product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the categories of information that is stored in cookies by Groupon regarding visitors to the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 15:**

Any analyses of the impact of latency on users of the Accused Instrumentalities, such as measurements or assessments of the impact of latency on click-through rates, Transaction Event conversions, completed Transaction Events, and abandoned Transaction Events.

**RESPONSE TO DEPOSITION TOPIC NO. 15:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Accused Instrumentalities" and "Transaction Event(s)."   Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "analyses of the impact of latency on users." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited to the relevant time period.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.  Groupon further objects to this Topic as seeking information that is not within its possession, custody, or control. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine

or restriction on discovery.   Groupon further objects to the extent that this Topic seeks

information protected by confidentiality obligations to any third party; Groupon will not provide

such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify

regarding Groupon's analyses of the impact of latency on users of the Groupon instrumentalities

specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017

infringement contentions during the relevant time period, if any.

**DEPOSITION TOPIC NO. 16:**

Control panels, consoles, dashboards, or interfaces for any hosting, caching, or content

delivery network service (e.g., Akamai, Fastly, Amazon s3, Amazon, Google, Edgecast),

whether in-house or through a third-party for the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 16:**

Groupon incorporates by reference its General Objections as if fully set forth herein.

Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities."  Groupon

objects to this Topic to the extent that it seeks information which is neither relevant to the claims

and defenses in this matter nor proportional to the needs of this case, for example by requesting

information relating to "control panels, consoles, dashboards, or interfaces for any hosting,

caching, or content delivery network service" and that is not limited to the relevant time period.

No witness, or reasonably-sized group of witnesses, would be capable of testifying to the

subjects therein.   Groupon further objects to this Topic as seeking information that can be

obtained more efficiently through written discovery or document production and as cumulative

and redundant of discovery requests already served by IBM.  Groupon objects to this Topic as

seeking information that is not within its possession, custody, or control.  Groupon objects to this

Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the control panels, consoles, dashboards, or interfaces for the hosting, caching, or content delivery network service(s) Groupon utilizes in connection with the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 17:**

Any caching-related instructions or configuration settings in each version of the Accused Instrumentalities (such as Cache-Control, Edge-Control, Pragma, ETag, no-store, no-cache, must-revalidate, max-age, or downstream-ttl) that are set or modified by You or a third party.

**RESPONSE TO DEPOSITION TOPIC NO. 17:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "You" and "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "caching-related instructions or configuration settings." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information relating to "*Any* caching-related instructions or configuration settings in

*each* version" and is not limited to the relevant time period.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.  Groupon objects to this Topic as seeking information that is not within its possession, custody, or control.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding instructions or configuration settings for caching Groupon has set in connection with the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 18:**

The identity of, and the location on the Source Code Computer of, any HTML template files that are used to generate content for each version of the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 18:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities."  Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the term "identity."  Groupon objects to this Topic to the extent that it seeks information which is

neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information relating to source code for "each version" of the Groupon instrumentalities accused of infringement by IBM and that is not limited to the relevant time period.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular source code, Groupon objects as any source code would speak for itself.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will reasonably prepare a witness or witnesses to testify regarding the general location of HTML template files that are used to generate content for the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 19:**

The URL(s), URI(s), or other portions of the Accused Instrumentalities generated by each HTML template file found on the Source Code Computer.

**RESPONSE TO DEPOSITION TOPIC NO. 19:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities."  Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the

phrase "other portions of the Accused Instrumentalities generated . . . ."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information relating to "URL(s), URI(s), or other portions . . . generated by *each* HTML template file" and that is not limited to the relevant time period.   No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular source code, Groupon objects as any source code would speak for itself.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will make reasonable efforts to prepare a witness or witnesses to testify regarding generally how Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period generate from HTML template files.

**DEPOSITION TOPIC NO. 20:**

The process by which any HTML template files on the Source Code Computer are used to generate content for the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 20:**

Groupon incorporates by reference its General Objections as if fully set forth herein.

Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities."  Groupon

27

objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information relating to "*any* HTML template files" and that is not limited to the relevant time period.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the general process by which HTML template files within Groupon's source code are used to generate content for the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 21:**

The HTTP methods (e.g., GET, POST) used in the Accused Instrumentalities to interact with Your servers.

**RESPONSE TO DEPOSITION TOPIC NO. 21:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Your" and "Accused Instrumentalities."  Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "to interact with."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not

limited to the relevant time period.  No witness, or reasonably-sized group of witnesses, would

be capable of testifying to the subjects therein.  Groupon further objects to this Topic as seeking

information that can be obtained more efficiently through written discovery or document

production and as cumulative and redundant of discovery requests already served by IBM.

Groupon objects to this Topic to the extent that it seeks the disclosure of information protected

by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common

interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine

or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify

regarding the HTTP methods generally used in the Groupon instrumentalities specifically

accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement

contentions during the relevant time period.

## DEPOSITION TOPIC NO. 22:

The data formats (e.g., JSON, xml) used in the Accused Instrumentalities to interact with

Your servers.

## RESPONSE TO DEPOSITION TOPIC NO. 22:

Groupon incorporates by reference its General Objections as if fully set forth herein.

Groupon incorporates its objections to IBM's definitions of "Your" and "Accused

Instrumentalities."  Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly

burdensome in its use of the phrase "to interact with."  Groupon objects to this Topic to the

extent that it seeks information which is neither relevant to the claims and defenses in this matter

nor proportional to the needs of this case, for example by requesting information that is not

limited to the relevant time period.  No witness, or reasonably-sized group of witnesses, would

be capable of testifying to the subjects therein.  Groupon further objects to this Topic as seeking

information that can be obtained more efficiently through written discovery or document

production and as cumulative and redundant of discovery requests already served by IBM.

Groupon objects to this Topic to the extent that it seeks the disclosure of information protected

by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common

interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine

or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify

regarding the data formats generally used to send data related to Groupon instrumentalities

specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017

infringement contentions during the relevant time period between Groupon's servers and end-

users.

**DEPOSITION TOPIC NO. 23:**

The parameters and variables (including user IDs, session IDs, and deal IDs) located in

hyperlinks in the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 23:**

Groupon incorporates by reference its General Objections as if fully set forth herein.

Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities."  Groupon

objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the

phrase "parameters and variables located in hyperlinks."  Groupon objects to this Topic to the

extent that it seeks information which is neither relevant to the claims and defenses in this matter

nor proportional to the needs of this case, for example by requesting information that is not

limited to the relevant time period.  No witness, or reasonably-sized group of witnesses, would

be capable of testifying to the subjects therein.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify generally regarding the kinds of components found in hyperlinks in the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 24:**

The communications (e.g., HTTP requests and responses, API calls) between Google or Facebook, Your servers, and the clients or browsers accessing the Accused Instrumentalities, when users "Sign In" to, "Log In" to, "Sign Up" for, or create their user account using Facebook or Google.

**RESPONSE TO DEPOSITION TOPIC NO. 24:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Your" and "Accused Instrumentalities."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this

case, for example by requesting information that is not limited to the relevant time period.   No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.   Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.   To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic as seeking information that is not within its possession, custody, or control.   Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.   Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the communications between Google or Facebook, Groupon's servers, and the clients or browsers accessing Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period, when users "Sign In" to, "Log In" to, "Sign Up" for, or create their user account using Facebook or Google.

**DEPOSITION TOPIC NO. 25:**

Your communications and/or interactions with IBM concerning the Patents-in-Suit prior to March 2, 2016.

**RESPONSE TO DEPOSITION TOPIC NO. 25:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Your." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "communications and/or interactions." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic as seeking information that is not within its possession, custody, or control. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the non-privileged aspects of Groupon's communications and interactions with IBM concerning the Patents-in-Suit prior to March 2, 2016.

**DEPOSITION TOPIC NO. 26:**

Your communications with third parties concerning IBM, the Patents-in-Suit, and/or This Action.

**RESPONSE TO DEPOSITION TOPIC NO. 26:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Your." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited by subject matter or time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic as seeking information that is not within its possession, custody, or control. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding non-privileged communications with third parties, excluding consultants, vendors, contractors, and the like, concerning IBM, the Patents-in-Suit, and/or This Action.

**DEPOSITION TOPIC NO. 27:**

Any attempts you have made to avoid infringement or design around the Patents-in-Suit.

**RESPONSE TO DEPOSITION TOPIC NO. 27:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "You." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "attempts." Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's non-privileged efforts, if any, to design around the Patents-in-Suit.

**DEPOSITION TOPIC NO. 28:**

The actual or anticipated cost of avoiding infringement or designing around the Patents-in-Suit.

**RESPONSE TO DEPOSITION TOPIC NO. 28:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case. Groupon objects to this Topic as premature as it calls for information that will be the subject of expert opinion. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. Groupon objects to this Topic to the extent that it

seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's estimated actual or anticipated cost of designing around the Patents-in-Suit.

**DEPOSITION TOPIC NO. 29:**

Any allegedly non-infringing alternatives to the inventions claimed in the Patents-in-Suit and the cost and acceptability of such allegedly non-infringing alternatives in the marketplace.

**RESPONSE TO DEPOSITION TOPIC NO. 29:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information relating to "*any* allegedly non-infringing alternatives". No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon objects to this Topic as premature as it calls for information that will be the subject of expert opinion. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. Groupon objects to this Topic as seeking information that is not within its possession, custody, or control. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by

confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding non-infringing alternatives to the inventions claimed in the Patents-in-Suit and the cost and acceptability of such non-infringing alternatives in the marketplace.

## DEPOSITION TOPIC NO. 30:

Your knowledge of the Patents-in-Suit, including but not limited to: (i) how and when such awareness came about, (ii) any analysis performed by You or for You to determine whether You infringe the Patents-in-Suit, whether the Patents-in-Suit are valid or enforceable, or whether You should seek to obtain a license to the Patents-in-Suit, (iii) when any such analysis was performed and the persons involved, and (v) any documents that discuss, refer to, or comprise the same.

## RESPONSE TO DEPOSITION TOPIC NO. 30:

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Your."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other

applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's knowledge of the Patents-in-Suit to the extent there is any discoverable information not protected by the attorney-client privilege.

**DEPOSITION TOPIC NO. 31:**

Any opinion of counsel (whether oral or written) with respect to the Patents-in-Suit, and the documents that discuss, refer to, or comprise the same.

**RESPONSE TO DEPOSITION TOPIC NO. 31:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself.  Groupon objects to this Topic as seeking information that is not within its possession, custody, or control.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks

38

information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding any non-privileged opinion of counsel regarding to the Patents-in-Suit upon which Groupon intends to rely, if any, and the documents that discuss, refer to, or comprise the same, if any.

**DEPOSITION TOPIC NO. 32:**

The factual bases for all of Your defenses (including all affirmative defenses), counterclaims, or requests for relief.

**RESPONSE TO DEPOSITION TOPIC NO. 32:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Your." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its request for the "factual basis for *all* of Your defenses," as this Topic does not "describe with reasonable particularity the matters for examination" as required by Fed. R. Civ. P. 30(b)(6). No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further

objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

ASHBY & GEDDES

*Of counsel:*

/s/ *Phillip J. Haack*

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
Adam M. Lewin
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
(650) 988-8500

Phillip J. Haack (*pro hac vice*)
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashby-geddes.com
amayo@ashby-geddes.com

Dated:  August 2, 2017

*Attorneys for Defendant Groupon, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August, 2017, a true and correct copy of the

foregoing document was served on each party through their counsel of record via email.

John M. Desmarais
Karim Oussayef
Robert C. Harrits
Laurie N. Stempler
Jon T. Hohenthaner
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400
jdesmarais@desmaraisllp.com
koussayef@desmaraisllp.com
rharrits@desmaraisllp.com
lstempler@desmaraisllp.com
jhohenthaner@desmaraislp.com

*Of Counsel for Plaintiff International Business Machines Corporation*

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Counsel for Plaintiff International Business Machines Corporation.*

/s/ Jessica Benzler
Jessica Benzler
jbenzler@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, California  94041
Telephone:     (650) 988-8500
Facsimile:     (650) 938-5200

*Attorneys for Defendant*
GROUPON, INC.

# EXHIBIT 23

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Plaintiff,

                v.

GROUPON, INC.

                Defendant.

C.A. No. 16-122-LPS-CJB

JURY TRIAL DEMANDED

**GROUPON, INC.'S OBJECTIONS TO PLAINTIFF'S THIRD NOTICE
OF DEPOSITION TO GROUPON, INC.**

        Pursuant to Federal Rules of Civil Procedure 26 and 30(b)(6), Defendant Groupon, Inc.

("Groupon") hereby responds and objects to Plaintiff International Business Machines

Corporation's ("IBM") Third Notice of Deposition to Groupon, Inc. as follows:

## <u>GENERAL OBJECTIONS</u>

        Groupon makes the following General Objections to each and every Definition and Topic

in Schedules A and B of IBM's Notice of Deposition.  Each of these objections is incorporated

into Groupon's response to each and every Topic, whether or not separately set forth therein.  By

failing to specifically refer to or specify any particular General Objection in response to a

particular Topic, Groupon does not waive any of these General Objections, nor admit or concede

the appropriateness of any purported Topic or any assumptions contained therein.

        1.      Nothing in these responses should be construed as waiving rights or objections

that might otherwise be available to Groupon, nor should Groupon's responses to any of these

Topics be deemed an admission of relevancy, materiality, or admissibility in evidence of the Topic or the response thereto.

2.      Groupon objects to each Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.   Groupon will not provide such privileged or protected information, and any inadvertent disclosure of any privileged or protected information shall not be deemed a waiver of any privilege.

3.      Groupon objects to each Topic, and to each Definition that each Topic incorporates, to the extent they impose obligations upon Groupon that are broader than, or inconsistent with, the obligations imposed by the Federal Rules of Civil Procedure, the Local Rules of the District of Delaware, or any applicable Order of the Court, regulation or case law.

4.      Groupon further objects to each Topic, and to each Definition that each Topic incorporates, to the extent that it is overbroad, vague and ambiguous, unduly burdensome, oppressive, and not proportional to the needs of this case.  Groupon will not provide testimony regarding Topics that are not relevant to a claim or defense in this matter or are not proportional to the needs of the case.  Groupon will not inquire of witnesses other than those that could reasonably be expected to have responsive information.  Unless otherwise indicated, Groupon shall give the terms of the Topics their ordinary and plain meanings.  Groupon shall not be held responsible where its reasonable interpretation of the Topics does not comport with IBM's intentions.  Groupon objects to all definitions and Topics that fail to describe the information sought with reasonable particularity or are so unintelligible that Groupon cannot determine what, if any, information is responsive or cannot prepare a witness to testify as to the information.

5.      Groupon objects to each Topic to the extent the information sought is already in IBM's possession or equally available to IBM from publicly available sources.  Groupon further objects to each Topic to the extent the burden of preparing a witness to testify as to that topic outweighs its likely benefit.

6.      Groupon objects to all definitions, instructions, and Topics to the extent that they purport to require Groupon to disclose private or personally-identifiable information of its customers, business partners, or employees.   Groupon does not intend to provide such confidential information without the consent of the relevant persons or a court order.

7.      Groupon objects to each Topic to the extent it requires Groupon to disclose information that is subject to a protective order, contractual obligation, or other confidentiality obligation owed to any third party.  Groupon will disclose such information only in compliance with its obligations to third parties and subject to an appropriate protective order.

8.      Groupon objects to each Topic to the extent it requires a legal conclusion of Groupon.

9.      Groupon objects to the definition of "Defendant," "You," and "Your" because it seeks to broaden the scope of allowable discovery and seeks information that is not within the possession, custody, or control of Groupon, but is in the possession of third parties and non-parties to this lawsuit.  Groupon further objects to the definition of these terms as they include Groupon's attorneys and patent agents and seeks privileged and attorney-work product information.  Groupon will interpret these terms as referring to Groupon, Inc.

10.     Groupon objects to the definition of "Accused Instrumentality" (or "Accused Instrumentalities," to the extent used in the Topics) as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case to the extent that it includes

instrumentalities not identified by IBM in its infringement contentions.  Groupon further objects that the definition is overbroad and unduly burdensome to the extent it is not limited to any particular accused feature.

11.     Groupon objects to the definition of "document" as overbroad, unduly burdensome and oppressive as it seeks to encompass tangible things.  Groupon will construe this term to mean any items described in Federal Rule of Civil Procedure 34(a)(1)(A).

12.     Groupon objects to the definition of "financial data" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case.

13.     Groupon objects to the definition of "Transaction Event" as vague and ambiguous, overbroad, unduly burdensome, and not proportional to the needs of the case.

14.     No incidental or implied admissions are intended by any response by Groupon to any Topic. That Groupon agreed to provide a witness to testify to a Topic is not an admission that Groupon accepts or admits the existence of any alleged facts set forth in or assumed by such Topic, or that the response constitutes admissible evidence.

15.     Groupon's responses are made solely for the purpose of this case.

16.     All objections as to competency, relevance, materiality, propriety, and admissibility, are expressly reserved and may be interposed at any other proceeding in this case or any other action.

17.     Groupon objects to the later deposition of any witness produced in response to this Notice with respect to any Topic covered by the notice or resulting deposition, whether or not the later deposition is in the deponent's individual capacity or capacity as a corporate representative.

Without waiver of and subject to the foregoing General Objections, Groupon responds to the Topics as follows.

**SPECIFIC OBJECTIONS AND RESPONSES**

**DEPOSITION TOPIC NO. 1:**

All revenues (including but not limited to advertising revenue), costs, and sources (including geographic sources) thereof derived by You from, for, or concerning the Accused Instrumentalities, from March 2010 to the present.

**RESPONSE TO DEPOSITION TOPIC NO. 1:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "You" and "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "concerning the Accused Instrumentalities." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding revenues, costs, and sources thereof derived from the Groupon instrumentalities accused of infringement by IBM during the relevant time period.

**DEPOSITION TOPIC NO. 2:**

The identity, content, and interpretation of the annual profit and loss statements for Your business unit(s) responsible for each of the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 2:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Your" and "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the terms "identity" and "interpretation." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited to the relevant time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's annual profit and loss statements.

**DEPOSITION TOPIC NO. 3:**

Your pricing policies, strategies, and practices concerning the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 3:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Your" and "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "concerning the Accused Instrumentalities." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited to the relevant time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon objects to this topic as vague and ambiguous in that Groupon does not sell or have prices for the Accused Instrumentalities.

**DEPOSITION TOPIC NO. 4:**

Business plans, marketing strategies, go-to-market plans, market projections, and competitive analyses concerning the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 4:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Your" and "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "concerning the Accused Instrumentalities." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited to the relevant time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic as seeking information that is not within its possession, custody, or control. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's general marketing strategies and plans, and any competitive analyses, if any, for the aspects of the Groupon instrumentalities specifically accused of infringement in

IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 5:**

Any evaluation, study, analysis, or investigation about how users interact with the Accused Instrumentalities, including:

a.      the extent to which users interact with the Accused Instrumentalities, including total visitors, unique visitors, non-unique (i.e., returning) visitors, pages per session, session duration, and conversions;

b.      how users interact with the Accused Instrumentalities to search for services and/or navigate through options to make a purchase and/or reservation;

c.      how users interact with the Accused Instrumentalities to create, "Sign In," "Sign Up," or "Log In" to user accounts using Facebook, Google, or any other third-party platform; and

d.      how users interact with the Accused Instrumentalities to store, cache, or interact with any advertisements or menus on the Accused Instrumentalities.

**RESPONSE TO DEPOSITION TOPIC NO. 5:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "how users interact." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited to the relevant time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be

obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself.  Groupon objects to this Topic as seeking information that is not within its possession, custody, or control.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's plans or studies regarding how users utilize the aspects of the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period, if any.

**DEPOSITION TOPIC NO. 6:**

The bases for customer demand or preference for each Accused Instrumentality, including users' preferences for interacting with the Accused Instrumentalities to:

a.  search for services and/or navigate through options to make a purchase and/or reservation where user identification, transaction identification, or other state information is maintained;

b.  create, "Sign In," "Sign Up," or "Log In" to user accounts using Facebook, Google, or any other third-party platform; and

c.  store, cache, or interact with any advertisements, images, or menus on the Accused Instrumentalities.

10

**RESPONSE TO DEPOSITION TOPIC NO. 6:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "bases for customer demand or preference." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited to the relevant time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon objects to this Topic as seeking information that is not within its possession, custody, or control. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's understanding of the bases of its customer's demand or preference for the aspects of the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 7:**

Usage data or metrics for the Accused Instrumentalities, such as the extent to which users interact with the Accused Instrumentalities to:

a.  search for services and/or navigate through options to make a purchase and/or reservation where user identification, transaction identification, or other state information is maintained;

b.  create, "Sign In," "Sign Up," or "Log In" to user accounts using Facebook, Google, or any other third-party platform; and

c.  store, cache, or interact with any advertisements, images, or menus on the Accused Instrumentalities.

## RESPONSE TO DEPOSITION TOPIC NO. 7:

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities." Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "usage data or metrics." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited to the relevant time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic as seeking information that is not within its possession, custody, or control. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery. Groupon further objects to the extent

12

that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the types of usage data or metrics collected for the Groupon instrumentalities specifically accused of infringement in IBM's January 20, 2017 and March 24, 2017 infringement contentions during the relevant time period.

**DEPOSITION TOPIC NO. 8:**

Any policy, procedure, practice, or program related to licensing (in-bound or out-bound) or use of intellectual property by Groupon, including both written and unwritten policies, procedures, practices, or programs, further including but not limited to patent licensing efforts and Groupon's criteria for taking or offering a license to a patent.

**RESPONSE TO DEPOSITION TOPIC NO. 8:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the phrase "policy, procedure, practice, or program related to licensing." Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information that is not limited to the relevant time period. No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein. Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM. To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic to the extent that

it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding Groupon's established licensing policies or practices during the relevant time period, if any.

**DEPOSITION TOPIC NO. 9**:

The identity, content, interpretation, negotiation, and decision to enter into: (a) any patent license that you have identified or produced in This Action (b) any patent license that pertains to any aspect of any of the Accused Instrumentalities, or (c) any patent license pools that you have entered or in which you have invested.

**RESPONSE TO DEPOSITION TOPIC NO. 9:**

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objection to IBM's definition of "Accused Instrumentalities."  Groupon objects to this Topic as vague, ambiguous, overbroad, and unduly burdensome in its use of the terms "identity" and "interpretation."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting the content and interpretation of any patent licenses and information that is not limited to the relevant time period.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.

Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.   To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself. Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.   Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the identity of and non-privileged information relating to the negotiation regarding and decision to enter into any patent license that Groupon has identified or produced in this matter, any patent license which relates to technology claimed by the patents-in-suit, or any patent license which relates to the allegedly infringing aspects of the accused Groupon instrumentalities.

## DEPOSITION TOPIC NO. 10:

From 2010 to the present, on a monthly basis, for each of the Accused Instrumentalities:

a.     The number of queries for deals and/or "Groupons" performed by users in the United States;

b.     The number and nature (i.e., description) of Transaction Events that generated the revenue produced in This Action and the amount of revenue generated by such Transaction Events; and

     c.     The number and nature (i.e., description) of advertising-related Transaction Events, such as, for example, purchase of deals and/or Groupons as a result of clicking on advertisements (including but not limited to third-party advertisements) on the Accused Instrumentalities and the revenues resulting from such advertisements.

## RESPONSE TO DEPOSITION TOPIC NO. 10:

Groupon incorporates by reference its General Objections as if fully set forth herein. Groupon incorporates its objections to IBM's definitions of "Transaction Events" and "Accused Instrumentalities."  Groupon objects to this Topic to the extent that it seeks information which is neither relevant to the claims and defenses in this matter nor proportional to the needs of this case, for example by requesting information on a monthly basis.  No witness, or reasonably-sized group of witnesses, would be capable of testifying to the subjects therein.  Groupon further objects to this Topic as seeking information that can be obtained more efficiently through written discovery or document production and as cumulative and redundant of discovery requests already served by IBM.  To the extent this Topic seeks information concerning particular documents, Groupon objects as any document would speak for itself.  Groupon objects to this Topic as seeking information that is not within its possession, custody, or control.  Groupon objects to this Topic to the extent that it seeks the disclosure of information protected by the attorney-client privilege, attorney work-product doctrine, joint defense privilege, common interest exception, duty of confidentiality, or any other applicable privilege, immunity, doctrine or restriction on discovery.  Groupon further objects to the extent that this Topic seeks information protected by confidentiality obligations to any third party; Groupon will not provide such information without appropriate notice to the third party.

Subject to the foregoing objections, Groupon will prepare a witness or witnesses to testify regarding the number and value to Groupon of sales generated by the Groupon website during the relevant time period, and the nature of revenue-generating activities engaged in by Groupon.

<table>
<tr><td><em>Of counsel:</em></td><td>ASHBY & GEDDES</td></tr>
</table>

|  |  |
|---|---|
| *Of counsel:* | ASHBY & GEDDES |
|  | */s/ Phillip J. Haack* |
| J. David Hadden | Phillip J. Haack (*pro hac vice*) |
| Saina S. Shamilov | John G. Day (#2403) |
| Phillip J. Haack | Andrew C. Mayo (#5207) |
| Adam M. Lewin | 500 Delaware Avenue, 8th Floor |
| FENWICK & WEST LLP | P.O. Box 1150 |
| 801 California Street | Wilmington, DE 19899 |
| Mountain View, CA 94041 | (302) 654-1888 |
| (650) 988-8500 | jday@ashby-geddes.com |
|  | amayo@ashby-geddes.com |
|  |  |
| Dated:  August 2, 2017 | *Attorneys for Defendant Groupon, Inc.* |

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August, 2017, a true and correct copy of the foregoing document was served on each party through their counsel of record via email.

John M. Desmarais
Karim Oussayef
Robert C. Harrits
Laurie N. Stempler
Jon T. Hohenthaner
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400
jdesmarais@desmaraisllp.com
koussayef@desmaraisllp.com
rharrits@desmaraisllp.com
lstempler@desmaraisllp.com
jhohenthaner@desmaraislp.com

*Of Counsel for Plaintiff International Business Machines Corporation*

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Counsel for Plaintiff International Business Machines Corporation.*

/s/ Jessica Benzler
Jessica Benzler
jbenzler@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, California 94041
Telephone:    (650) 988-8500
Facsimile:    (650) 938-5200

*Attorneys for Defendant*
GROUPON, INC.