**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) | |
| Plaintiff, | ) | C.A. No. 16-122-LPS |
| v. | ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC. | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

**IBM'S ANSWERING BRIEF IN OPPOSITION TO MOTION OF GROUPON, INC. TO EXCLUDE EXPERT TESTIMONY OF DR. JERRY A. HAUSMAN**

OF COUNSEL:

John M. Desmarais
Karim Z. Oussayef
Laurie Stempler
Robert C. Harrits
Brian D. Matty
Michael Matulewicz-Crowley
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*

Dated: March 19, 2018
Public Version Dated: March 26, 2018
5694847 / 43155

# TABLE OF CONTENTS

**Pages**


I. NATURE AND STAGE OF PROCEEDINGS .......... 1

II. SUMMARY OF THE ARGUMENT .......... 1

III. RESPONSE TO GROUPON'S STATEMENT OF FACTS .......... 1

IV. LEGAL STANDARDS .......... 3

V. ARGUMENT .......... 4

A. Dr. Hausman Used Proper Revenue Data And Groupon's Preferred Profit Measure. .......... 4

B. Dr. Hausman Properly Relied On Dr. Schmidt's Extent Of Use To Apportion For The Value Of The Patents-In-Suit. .......... 8

VI. CONCLUSION .......... 11

# TABLE OF AUTHORITIES

**Pages**

## Cases

*Biomedical Enters., Inc. v. Solana Surgical, LLC*,
No. A-14-CV-0095, 2016 WL 4198304 (W.D. Tex. Apr. 26, 2016) .................. 4, 9, 11

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
807 F.3d 1283 (Fed. Cir. 2015).................................................. 1, 3, 7, 9

*Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*,
218 F. Supp. 3d 375 (E.D. Pa. 2016). ................................................ *passim*

*Delaware Display Grp. Ltd. v. Lenovo Grp. Ltd.*,
C.A. No. 13-2108-RGA, 2017 WL 214079 (D. Del. Jan. 18, 2017) .................. 3, 4

*Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*,
235 U.S. 641 (1915)........................................................................ 3, 9

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018)........................................................ 10

*Finjan, Inc. v. Blue Coast Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)...................................................... 10, 11

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970)..................................................... 9

*International Business Machines Corp. v. The Priceline Group, Inc.*,
C.A. No. 15-137 (D. Del. Sept. 18, 2017) ........................................... 3, 4, 8

*ResQNet v. Lansa*,
594 F.3d 860 (Fed. Cir. 2010)............................................................ 9

*Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*,
C.A. No. 12-1013-RGA, 2015 WL 410342 (D. Del. Jan. 29, 2015) ................. 9, 10

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
802 F.3d 1283 (Fed. Cir. 2015)..................................................... *passim*

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)............................................................ 8

*Walker v. Gordon*,
46 F. App'x 691 (3d Cir. 2002) ......................................................... 1, 8

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
791 F.3d 1340 (Fed. Cir. 2015)........................................................................................ 5

## I. NATURE AND STAGE OF PROCEEDINGS

On March 5, 2018, Defendant Groupon, Inc. ("Groupon") moved to exclude the expert testimony of Dr. Hausman. D.I. 217, 218. IBM files this brief in opposition.

## II. SUMMARY OF THE ARGUMENT

1. Multiple approaches exist for determining a reasonable royalty in patent cases, and estimating a reasonable royalty is not an exact science. *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

2. Dr. Hausman calculated a reasonable royalty using Groupon-produced revenue data and a measure of profit that Groupon has endorsed. Groupon's disagreement with Dr. Hausman's decision to use that data is grounds for cross-examination, not exclusion. *Summit 6*, 802 F.3d at 1296, 1299; *Walker v. Gordon*, 46 F. App'x 691, 695-96 (3d Cir. 2002).

3. Dr. Hausman properly incorporated Dr. Schmidt's analysis of the accused instrumentalities' use of the patented features in his determination of a reasonable royalty. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303-04 (Fed. Cir. 2015); *Summit 6*, 802 F.3d at 1298.

## III. RESPONSE TO GROUPON'S STATEMENT OF FACTS

IBM incorporates Section IV from its Opening Brief in Support of Its Motion to Exclude the Testimony of James Malackowski and Jon Weissman. D.I. 223.

Dr. Hausman served an opening and reply report in this matter, opining that Groupon would compensate IBM for its infringement in the form of a reasonable royalty. Ex. 1 ¶ 11. To arrive at his reasonable royalty, Dr. Hausman first calculated accused revenues for each of the

patents-in-suit, using data Groupon produced.[1] He apportioned those accused revenues for the accused instrumentalities' use of the patented technologies, using Dr. Schmidt's extent of use analysis. *Id.* ¶¶ 163-166, 187-190, 211-214, 234-235. For the '967 patent, Dr. Hausman apportioned for the percent of cacheable objects and the percentage of non-unique views of the accused instrumentalities. *Id.* ¶¶ 164-165. For the '849 patent, Dr. Hausman apportioned for the percentage of advertisements that were badges or urgency messages and the percentage of non-unique views. *Id.* ¶¶ 188-189. For the '601 patent, Dr. Hausman apportioned for the number of steps in which the '601 patented technology is used as a fraction of the total steps required to complete a transaction. *Id.* ¶¶ 212-213.[2] And for the '346 patent, Dr. Hausman apportioned for the percentage of total accounts that were social account registrations. *Id.* ¶ 234.[3] Dr. Hausman then applied Groupon's adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization) margin to arrive at apportioned profits. *Id.* ¶¶ 167, 191, 215, 236. Lastly, he analyzed several factors impacting the parties' bargaining positions to determine how they would

---

[1] Groupon contends Dr. Hausman used total revenues. D.I. 218 at 1, 3. That is incorrect. Dr. Hausman used accused revenues. Ex. 1 Exhibits 4-7, 10. All exhibits are to the Declaration of Laurie Stempler filed concurrently with this brief.

[2] Groupon argues that the apportionment that Dr. Hausman applies for the '601 patent is arbitrary (D.I. 218 at 5), but Dr. Hausman's basis for using that percentage was Dr. Schmidt's analysis (which Groupon does not challenge) and Dr. Hausman's understanding of the benefits associated with using the patented technology. Ex. 1 ¶¶ 211-214; Ex. 2 at 186:21-188:3.

[3] Groupon claims, without any support, that Dr. Hausman admitted that ███ "grossly overstates" incremental revenue to Groupon. D.I. 218 at 5. But Dr. Hausman never said that. He explained that he used the best data available to him and adjusted his profit split accordingly. Ex. 2 at 194:14-198:17, 200:4-201:10. Groupon's criticism of the extent of use for the '346 patent is particularly egregious given the number of times Groupon confirmed that the data it produced was the best available data. Ex. 3 at 167:23-168:8; Ex. 4 at 22-24.

share the apportioned profits. *Id.* ¶¶ 168-182, 192-206, 216-229, 237-250.[4] The Court found this methodology reliable in a previous case.[5]

Groupon grossly misrepresents Dr. Hausman's opinions in this case. As discussed in Section V.A, Dr. Hausman used the proper revenue data and profit measure to determine a reasonable royalty. Moreover, contrary to Groupon's assertions (D.I. 218 at 10), Dr. Hausman did not refer to his results as "incremental revenue." Instead, he used Dr. Schmidt's extent of use analysis, which provided the best estimates of the use of the patented features, to help him value the patented technologies. *E.g.*, Ex. 2 at 105:15-24, 131:11-16, 189:14-190:10. He also considered and cited ample evidence that revenue from the accused instrumentalities is tied to the patented features. *Id.* at 106:2-107:17, 121:15-122:22, 132:2-134:20, 135:5-15, 136:21-137:21; Ex. 1 ¶¶ 83-90, 99, 101-102.

## IV. LEGAL STANDARDS

IBM incorporates Section V of its Opening Brief in Support of Its Motion to Exclude the Testimony of James Malackowski and Jon Weissman. D.I. 223.

"[E]stimating a reasonable royalty is not an exact science. . . . [T]here may be more than one reliable method for estimating a reasonable royalty." *Summit 6*, 802 F.3d at 1296; *see also Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 647 (1915); *Carnegie Mellon*, 807 F.3d at 1304; *Delaware Display Grp. Ltd. v. Lenovo Grp. Ltd.*, C.A. No. 13-2108-RGA, 2017 WL 214079, at *2 (D. Del. Jan. 18, 2017); *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, 218 F. Supp. 3d 375, 390 (E.D. Pa. 2016). Moreover, "[a]ll approaches have

---

[4] Groupon completely ignores Dr. Hausman's analysis of the parties' positions to arrive at the bargaining share, contending, incorrectly, that Dr. Hausman did not quantify how he determined the profit split percentages. D.I. 218 at 6.

[5] Mem. Op. at 36, *International Business Machines Corp. v. The Priceline Group, Inc.*, C.A. No. 15-137 (D. Del. Sept. 18, 2017), D.I. 525.

certain strengths and weaknesses . . . . [T]he relative strengths and weaknesses of each approach may be exposed at trial or attacked during cross-examination." *Summit 6*, 802 F.3d at 1296.

## V. ARGUMENT

Groupon bases its motion on two arguments. First, Groupon disagrees with Dr. Hausman's use of accused revenues and adjusted EBITDA. Second, Groupon takes issue with Dr. Hausman's use of Dr. Schmidt's estimate of the extent to which the accused instrumentalities use the patented technologies.

Dr. Hausman employed a methodology that has already survived a *Daubert* challenge in this Court.[6] He relied on Groupon-produced data, testimony from Groupon's witnesses, and documents Groupon provides to the SEC and its investors. Groupon's disagreements with how Dr. Hausman determined a reasonable royalty are grounds for cross-examination, not exclusion. *Summit 6*, 802 F.3d at 1296, 1299; *Delaware Display*, 2017 WL 214079, at *2-3; *Comcast Cable*, 218 F. Supp. 3d at 381; *see also Biomedical Enters., Inc. v. Solana Surgical, LLC*, No. A-14-CV-0095, 2016 WL 4198304, at *3 (W.D. Tex. Apr. 26, 2016).

### A. Dr. Hausman Used Proper Revenue Data And Groupon's Preferred Profit Measure.

Groupon contends that Dr. Hausman improperly used Groupon's revenues to determine a reasonable royalty. D.I. 218 at 7. As an initial matter, Dr. Hausman's reasonable royalty is based on Groupon's profits, not revenues, from the accused instrumentalities.[7] Groupon earns revenue from transactions selling deals for products or experiences on the accused instrumentalities. Ex. 8 at GROUP0024554 ("Groupon operates online local commerce

[6] Mem. Op. at 36, *International Business Machines Corp. v. The Priceline Group, Inc.*, C.A. No. 15-137 (D. Del. Sept. 18, 2017), D.I. 525 ("The Court . . . finds Dr. Hausman's analysis of the *Georgia Pacific* factors a reliable methodology.").

[7] Dr. Hausman calculated Groupon's profits using data that Groupon produced in response to IBM's request for the relevant financial data associated with each of the accused instrumentalities. Ex. 4 at 10-12; Ex. 5 at 120:12-123:14, 179:21-181:22; Ex. 1 Exhibit 10.

marketplaces throughout the world that connect merchants to consumers by offering goods and services, generally at a discount."); D.I. 227 at 2 ("Users can view the available offers by visiting Groupon's website or using Groupon's mobile applications on their iPhones or Android devices."). Importantly, however, for transactions on the accused instrumentalities to be possible, the accused instrumentalities have to function. *See, e.g.*, Ex. 6 ¶¶ 90, 97, 102, 103. Groupon regularly tests the accused instrumentalities to ensure they function properly and strives to improve the accused instrumentalities' performance. Ex. 3 at 157:9-12; Ex. 7 at 181:16-19, 181:25-182:17; Ex. 15 [REDACTED] Groupon's reliance on *WesternGeco L.L.C. v. ION Geophysical Corp.* is misplaced because, unlike Dr. Hausman, the expert in *WesternGeco* used revenue from the defendant's ***customers'*** use of the infringing product rather than the defendant's revenues from selling the infringing product to its customers. 791 F.3d 1340, 1353 n.9 (Fed. Cir. 2015), *vacated on other grounds*, 136 S. Ct. 2486 (2016).

Groupon does not generate profits from manufacturing goods or providing services. *See* Ex. 8 at GROUP0024554. Instead, Groupon's revenues are received after Groupon provides merchants their share of the proceeds from deals purchased on the accused instrumentalities. Ex. 8 at GROUP0024564; Schmitz Tr. at 55:24-56:19, 58:9-16. Dr. Hausman began his analysis using the revenue numbers Groupon provided and then used Groupon's profits from hosting deals to calculate his ultimate reasonable royalty. Dr. Hausman's use of profits thus excludes merchants' proceeds from selling goods and services and instead reflects the value Groupon generates from connecting merchants and customers on the accused instrumentalities.

Groupon also takes issue with Dr. Hausman's use of adjusted EBITDA in his determination of a reasonable royalty. Groupon argues that adjusted EBITDA is an "irrelevant

metric[]" and a Non-GAAP metric used to "create" profits. D.I. 218 at 7.[8] But Groupon prefers to report profits in the form of adjusted EBITDA.

For example, Groupon tells the SEC and its investors that adjusted EBITDA is the right way to measure Groupon's profits. In its 10-K annual report, Groupon touts adjusted EBITDA:

> *Adjusted EBITDA*. Adjusted EBITDA is a non-GAAP performance measure that we define as net income (loss) from continuing operations excluding income taxes, interest and other non-operating items, depreciation and amortization, stock-based compensation, acquisition-related expense (benefit), net and other special charges and credits, including items that are unusual in nature or infrequently occurring. Our definition of Adjusted EBITDA may differ from similar measures used by other companies, even when similar terms are used to identify such measures. Adjusted EBITDA is a key measure used by our management and Board of Directors to evaluate operating performance, generate future operating plans and make strategic decisions for the allocation of capital. Accordingly, we believe that Adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and Board of Directors.
>
> We exclude stock-based compensation expense and depreciation and amortization because they are primarily non-cash in nature and we believe that non-GAAP financial measures excluding these items provide meaningful supplemental information about our operating performance and liquidity. Acquisition-related expense (benefit),

Ex. 8 at GROUP0024624 (annotations added). Damien Schmitz, Groupon's Senior Director of Financial Planning and Analysis and corporate witness, confirmed the 10-K statements. Ex. 5 at 219:6-220:6. Mr. Schmitz described adjusted EBITDA as a "key profitability metric[]"and "a better measure of cash profitability." *Id.* at 105:15-107:9. [REDACTED] *Id.* at 109:13-19. [REDACTED] *Id.* at 109:13-19, 110:25-111:13. [REDACTED] *Id.* at 106:21-107:7. Its quarterly earnings reports demonstrate its reliance on adjusted EBITDA to report its financial performance:

[8] Groupon cites no authority that non-GAAP measurements are unreliable. And, as discussed above, Dr. Hausman explained why his use of adjusted EBITDA was appropriate and consistent with Groupon's practices. Groupon also repeatedly clips Dr. Hausman's testimony to obtain convenient quotes for its motion. For example, rather than take the position that Groupon has been consistently profitable (D.I. 218 at 6), Dr. Hausman acknowledged that Groupon's operating income has been negative some years (Ex. 1 ¶ 71) and stated that Groupon has been "consistently profitable ***on a CSOI and Adjusted EBITDA basis*** since 2011." Ex. 1 ¶ 77. Groupon's corporate witness agrees. Ex. 5 at 114:8-25.



ENHANCING OUR FINANCIAL PROFILE

Gross Profit
Focus on driving long-term gross profit dollar growth
- Continued focus on core North America Local business; emerging products such as Groupon+, Bookability, and Marketplace
- Unlock International potential by executing on North America playbook

Marketing
Plan to maintain 12-18 month payback of incremental spend
- Integrated offline campaigns; Super Bowl, product, and merchant focused
- Continued ramp in International markets in line with improving returns

SG&A
Maintain leverageable cost structure
- Significant cost restructuring completed in 2017
- Expect 2018 SG&A to grow slightly above inflation with investment in business being somewhat offset by continued efficiencies

Adjusted EBITDA
Target multi-year Adjusted EBITDA growth
- Facilitate flow through from gross profit
- Expect gross profit dollar growth to exceed marketing and SG&A dollar growth

Free Cash Flow
Target multi-year Free Cash Flow growth
- Expect to generate significant positive Free Cash Flow in 2018
- Expect operating cash flow to trend above the rate of Adjusted EBITDA growth
- Capex targeted at $60-70 million for 2018

Balance Sheet
Strong balance sheet provides strategic flexibility[1]
- $880 million cash balance
- $250 million undrawn revolver[2]
- Over $1.1 billion available liquidity

GROUPON 5

Ex. 9 at 5-6 (annotations added); *see also id.* at 14; EX. 10 at GROUP206634; Ex. 2 at 23:25-24:18. Dr. Hausman therefore used a profit measure that Groupon itself advocates as a reliable, accurate measure of its profitability and that the parties would consider at the hypothetical negotiation. *See Carnegie Mellon*, 807 F.3d at 1303-04.

Moreover, Dr. Hausman explained the economic basis for using adjusted EBITDA rather than another profit measure. Groupon contends that use of adjusted EBITDA does not account for certain expenses. D.I. 218 at 5. But Dr. Hausman explained that the expenses that are excluded—depreciation and employee stock options—are not actual expenses of running the company but are rather accounting conventions. *See, e.g.*, Ex. 2 at 10:16-23, 11:8-16, 24:19-24, 64:12-65:6; 73:2-11, 74:6-19; *see also* Ex. 11 ¶ 75.

To bolster its argument, Groupon cites Dr. Hausman's opinions from two previous litigations, *Parallel Networks v. IBM* and *IBM v. Priceline*. D.I. 218 at 2-3. But those reports are from different cases, concern different products, and involve different parties who used different measurements to report profits. For example, unlike Groupon, Priceline does not advocate using adjusted EBITDA as an alternative measure of profits. Ex. 2 at 11:17-21, 12:13-20, 85:16-86:14. Groupon's citation to Dr. Hausman's reports from other cases is a distraction and does not support excluding his opinion.

Groupon incorrectly contends that Dr. Hausman opines that Groupon should pay royalty on profits "it never earned" and that such testimony is prejudicial, citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011). D.I. 218 at 8. But Groupon undoubtedly earned the profits Dr. Hausman used in his analysis—it reported that data to the SEC and investors. Moreover, Groupon's reliance on *Uniloc* is misplaced. Unlike the expert there, Dr. Hausman has not employed the entire market value rule, nor does Groupon argue that he has. Uniloc's expert referenced Microsoft's total revenues of $19 billion as a "check" on his reasonable royalty. 632 F.3d at 1318. The "check" was improper because it would skew the jury's damages award. *Id.* at 1320. Dr. Hausman does not rely on Groupon's total revenues at all, let alone use them to confirm the reasonableness of his proposed royalty. Rather, he apportions Groupon's profits to calculate his proposed reasonable royalty, a permissible approach. Mem. Op. at 36, *International Business Machines Corp. v. The Priceline Group, Inc.*, C.A. No. 15-137 (D. Del. Sept. 18, 2017), D.I. 525.

Groupon's arguments amount to disagreements with Dr. Hausman's decision to use adjusted EBITDA rather than some other profit measure. But such disagreements are fuel for cross-examination, not exclusion. *Summit 6*, 802 F.3d at 1296, 1299 ("To the extent [the expert's] credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not its admissibility."); *Walker*, 46 F. App'x at 695-96 (noting that disagreement with evidence on which the expert relied should be dealt with on cross examination).

### B. Dr. Hausman Properly Relied On Dr. Schmidt's Extent Of Use To Apportion For The Value Of The Patents-In-Suit.

Groupon accuses Dr. Hausman of failing to establish the value of the patents-in-suit. D.I. 218 at 8. But nothing could be further from the truth. A reasonable royalty must be tied to the

invention's footprint in the market place. *ResQNet v. Lansa*, 594 F.3d 860, 869 (Fed. Cir. 2010). Dr. Hausman achieved that through his multi-step apportionment process.

To apportion for the value of the patents-in-suit, Dr. Hausman applied Dr. Schmidt's estimates of the extent to which the accused instrumentalities use the patented technologies. Ex. 1 ¶¶ 163-166, 187-190, 211-214, 234-235. He was entitled to get that information from Dr. Schmidt. *Carnegie Mellon*, 807 F.3d at 1303; *Comcast Cable*, 218 F. Supp. 3d, at 390; *Biomedical Enters.*, 2016 WL 4198304, at *6. Moreover, Dr. Schmidt's measure of the extent to which the accused instrumentalities make use of the patented features is directly relevant to Dr. Hausman's damages analysis. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also, e.g.*, *Summit 6*, 802 F.3d at 1298; *Dowagiac*, 235 U.S. at 648 ("[I]t was permissible to show the value by providing what would have been a reasonable royalty, considering the nature of the invention, its utility and advantages, and the extent of the use involved."); *Comcast*, 218 F. Supp. 3d at 389-90.

Groupon claims Dr. Hausman should have used data from a Groupon document related to incremental revenue to determine a reasonable royalty for the '849 patent. D.I. 218 at 10. But that document reports that "[REDACTED] Ex. 12 at GROUP086932. It does not provide any confirmation that [REDACTED] is the total incremental revenue associated with [REDACTED] to all of the accused instrumentalities for the entire damages period in this case. *Id.*; *see also* Ex. 2 at 164:23-165:4, 165:20-167:8.

Groupon's cited case law is inapposite. In *Sprint Commc'ns Co. L.P. v. Comcast IP Holdings, LLC*, the Court excluded the technical expert's estimate of the infringing portion of the

accused product because he provided no basis for how he identified the features related to the asserted patent. C.A. No. 12-1013-RGA, 2015 WL 410342, at *2 (D. Del. Jan. 29, 2015). Because the damages expert based her analysis on the technical expert's excluded data points, the Court excluded her opinion too. *Id.* Here, Groupon does not challenge Dr. Schmidt's extent of use analysis, and even if it had, Dr. Schmidt provided a thorough analysis of the extent to which the accused instrumentalities make use of each of the patents-in-suit based on his own testing and Groupon's data. Ex. 6 Section XI. And, aside from using Dr. Schmidt's analysis for extent of use, Dr. Hausman also cited Groupon documents and testimony demonstrating that the patented features were linked to increased revenue. Ex. 1 ¶¶ 83-90, 99, 101-102. *Comcast Cable*, 218 F. Supp. 3d at 390 (rejecting reliance on *Sprint Commc'ns*).

In *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, the Federal Circuit held that the District Court erred by not excluding a damages expert who discussed the advantages of the patented features and then "plucked the 5% royalty rate out of nowhere," even after acknowledging that other elements of the accused product contributed to sales. 879 F.3d 1332, 1350-51 (Fed. Cir. 2018). The Court found that the expert made no attempt to tie her 5% royalty rate to any facts. *Id.* at 1351. In contrast, Dr. Hausman's reasonable royalty is directly tied to several facts, including but not limited to the sales and usage data that Groupon produced, Groupon's documents and witness testimony, and Dr. Schmidt's extent of use analysis.

In *Finjan, Inc. v. Blue Coast Sys., Inc.*, the damages expert multiplied the number of users by the percentage of web traffic that passed through the "DRTR" component of the accused product to tie the royalty base to the value of the infringed patents. 879 F.3d 1299, 1310 (Fed. Cir. 2018). But the DRTR component performed both infringing and non-infringing functions. *Id.* Because further apportionment was required, the Federal Circuit vacated the damages award

for that patent.[9] *Id.* at 1311. Contrary to Groupon's argument that Dr. Hausman employs percentages "akin to the traffic percentages in *Finjan*" (D.I. 218 at 12), Dr. Hausman does not use the accused instrumentalities' traffic percentages for his apportionment; he performs further steps to apportion for the specific uses of the patented technologies. Ex. 1 ¶¶ 163-166, 187-190, 211-214, 234-235.

Notably, even though Groupon contends that Dr. Hausman did not properly value the benefits of the patents-in-suit, it does not offer any alternative apportionment methods through its own experts. Neither Mr. Malackowski nor Dr. Weissman attempted to apportion for the value of the patents-in-suit. Ex. 13 at 234:16-235:17; Ex. 14 at 302:11-17. Instead, Groupon's experts gave up, believing such a task to be impossible. *See, e.g.*, Ex. 13 at 286:18-287:7, 287:22-288:9, 290:3-11. Moreover, in response to IBM's request that Groupon identify the portion of profit that should be attributed to non-patented elements, Groupon stated that [REDACTED] Ex. 4 at 28-30 (emphasis added). Groupon's argument rests on its disagreement with Dr. Hausman's method of apportionment. It does not support excluding his testimony. *See, e.g.*, *Biomedical Enters.*, 2016 WL 4198304, at *5.

## VI. CONCLUSION

For the foregoing reasons, IBM respectfully requests that the Court deny the Motion of Groupon, Inc. to Exclude Expert Testimony of Dr. Jerry A. Hausman.

[9] The Federal Circuit affirmed the damages award for two other patents, where the damages expert relied on the technical expert's analysis of infringing components. 879 F.3d at 1313.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ Bindu A. Palapura*
David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Plaintiff International Business Machines Corporation*

John M. Desmarais
Karim Z. Oussayef
Laurie Stempler
Robert C. Harrits
Brian D. Matty
Michael Matulewicz-Crowley
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400

Dated: March 19, 2018
Public Version Dated: March 26, 2018
5694847 / 43155