# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) |
| Plaintiff, | ) **C.A. No. 16-122-LPS** |
| v. | ) **JURY TRIAL DEMANDED** |
| GROUPON, INC. | ) **PUBLIC VERSION** |
| Defendant. | ) |

## IBM'S BRIEF IN OPPOSITION TO DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

OF COUNSEL:

John M. Desmarais
Karim Z. Oussayef
Laurie Stempler
Robert C. Harrits
Brian D. Matty
Michael Matulewicz-Crowley
DESMARAIS LLP
230 Park Avenue
New York, NY  10169
Tel:  (212) 351-3400

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*

Dated: March 19, 2018
Public Version Dated: March 26, 2018
5694879 / 43155

## TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF PROCEEDINGS ........................................................................... 1

SUMMARY OF THE ARGUMENT ..................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.   THERE ARE GENUINE QUESTIONS OF MATERIAL FACT AS TO
     WHETHER GROUPON INFRINGES THE FILEPP PATENTS ..................................... 2

     A.   Groupon Infringes The Asserted Claims Of The Filepp Patents. ......................... 2

     B.   Groupon's Motion For Summary Judgement Relies On Claim Construction
          Positions That The Court Rejected. ........................................................... 3

     C.   There Are Genuine Questions Of Material Fact As To Whether Groupon's
          Website Infringes The '967 Patent. ........................................................... 4

          1.   Groupon's Website Generates A First Partition For Displaying
               Applications. ..................................................................................... 4

               a.   Claim 1 Of The '967 Patent Does Not Require That The
                    "First Area For Presenting Applications" Be Separate And
                    Distinct From The Applications Themselves. ............................... 4

               b.   Groupon's Website Infringes Even Under Groupon's
                    Interpretation Of The Claims. .................................................. 5

          2.   Groupon's Website Generates Concurrently With The First Partition
               A Second Partition For Presenting A Plurality Of Command
               Functions. ........................................................................................ 7

     D.   There Are Genuine Questions Of Material Fact As To Whether Groupon's
          Website And Mobile Applications Infringe The '849 Patent. ............................. 9

          1.   The Court's Summary Judgment Decision From The *Priceline* Case
               Does Not Apply To Groupon's Infringement Of The '849 Patent. ............ 9

               a.   Groupon Controls The Storing Step For Its Website When
                    Caching Is Enabled, Even For The Subset Of Users Who
                    Have The Ability To Disable Caching. ........................................ 9

               b.   Groupon Controls The Storing Step For Its Website In
                    Situations When ███████████████ ........................ 10

c.     Groupon Controls The Storing Step For Its Website For Users Who Cannot Disable Caching, Such As Users Of Mobile Devices. ........................................................................ 11

d.     Groupon—Not The Mobile Operating System—Controls The Storing Step For The Accused Mobile Applications ███ ██████████████████ That Was Not At Issue In the Priceline Case. ...................................................................... 11

e.     In The Alternative, Groupon Infringes Under A Theory Of Joint Infringement. ................................................................ 13

       i.     Groupon Infringes By Conditioning Receipt Of A Benefit Upon Performance Of The Storing Step And Establishing The Manner And Timing Of That Performance. .................................................... 13

       ii.     Groupon Infringes By Profiting From Direct Infringement With The Right To Stop Or Limit Infringement. .......................................................... 13

2.     Groupon's Website And Mobile Applications Format Applications So That They May Be Presented At A First Area And Advertising For Potential Use With A Plurality Of Applications In A Second Area Concurrently With Applications. ...................................................... 14

3.     Groupon's Website And Mobile Applications Selectively Store Advertising Objects As Required By The Claims. ................................. 17

4.     The Claims Of The '967 Patent And The '849 Patent Are Not Indefinite. ................................................................................ 21

II.     THERE ARE GENUINE QUESTIONS OF MATERIAL FACT AS TO WHETHER GROUPON INFRINGES THE '601 PATENT. .......................................... 22

    A.     There Is Substantial Evidence That Groupon Infringes The '601 Patent. ............ 22

       1.     Groupon's Use Of Cookies Is Irrelevant Because Groupon Infringes By Tracking State Information Embedded In Continuations. .................. 23

       2.     Groupon's ██████████████████ Is Compatible With The "Services" Of The '601 Patent. ................................................................. 24

    B.     Groupon's Website And Mobile Applications Detect When Requests Require Preservation Of State Information. ........................................................ 24

C.     Groupon's Website And Mobile Applications Identify All Continuations In An Output And Embed State Information Into All Identified Continuations. .................................................................................................... 25

     1.     Groupon Identifies Continuations. ......................................... 25

          a.     Groupon's ███████████ Are Outputs From A Requested Service. ............................................... 25

          b.     Groupon Identifies Continuations ████████ ......... 26

     2.     Groupon Embeds State Information In Continuations .............. 27

          a.     Groupon's Website Embeds State Information ███ ████████████████ ......... 27

          b.     Groupon's Mobile Applications Embed State Information. ......... 28

D.     Dr. Schmidt's Opinions Regarding Groupon's "Services" Are Consistent. ......... 29

E.     There Is Significant Evidence Of Groupon's Infringement Under The Doctrine Of Equivalents In Addition To Literal Infringement. ............................ 33

III.     THERE ARE GENUINE QUESTIONS OF MATERIAL FACT AS TO WHETHER GROUPON INFRINGES THE '346 PATENT. ............................................. 34

A.     IBM Can Assert Claims 1, 3, 12, And 13 Against Groupon. ................. 34

B.     There Is Substantial Evidence That Groupon Infringes Claim 2 Of The '346 Patent. ....................................................................... 34

C.     There Is Substantial Evidence That Groupon Infringes Claim 5 Of The '346 Patent. ....................................................................... 35

IV.     THERE ARE GENUINE QUESTIONS OF MATERIAL FACT AS TO AN EARLIER ACTUAL REDUCTION TO PRACTICE OF THE '601 PATENT. ............. 37

A.     IBM Produced Evidence Of Actual Reduction To Practice Before The '601 Patent Was Filed. .......................................................... 37

B.     IBM Produced Significant Evidence That The Reduction To Practice Met All Limitations Of The Claim and Worked For Its Intended Purpose. ................. 39

CONCLUSION ........................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.,*
    797 F.3d 1020 (Fed. Cir. 2015) .................................................................. 13, 14

*Apotex USA, Inc. v. Merck & Co.,*
    254 F.3d 1031 (Fed. Cir. 2001) .......................................................................... 37

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.,*
    55 F.3d 615 (Fed. Cir. 1995) ............................................................................. 10

*Biosig Instruments, Inc. v. Nautilus, Inc.,*
    783 F.3d 1374 (Fed. Cir. 2015) .......................................................................... 22

*Dow Chem. Co. v. Sumitomo Chem. Co.,*
    257 F.3d 1364 (Fed. Cir. 2001) ................................................................. 8, 23, 27

*Enercon GmbH v. Int'l Trade Comm'n,*
    151 F.3d 1376 (Fed. Cir. 1998) .......................................................................... 18

*Ethicon EndoSurgery, Inc., v. U.S. Surgical Corp.,*
    93 F.3d 1572 (Fed. Cir. 1996) ............................................................................. 4

*Fresenius USA, Inc. v. Baxter Int'l, Inc.,*
    721 F.3d 1330 (Fed. Cir. 2013) .......................................................................... 34

*Girafa.com, Inc. v. IAC Search & Media, Inc.,*
    C.A. No. 07-787-SLR, 2009 WL 2949509 (D. Del. Sept. 15, 2009) .............. 13

*i4i Ltd. P'ship v. Microsoft Corp.,*
    598 F.3d 831 (Fed. Cir. 2010), *aff'd,* 564 U.S. 91 (2011) ................................ 10

*Intellectual Ventures I LLC v. Toshiba Corp.,*
    221 F. Supp. 3d 534 (D. Del. 2016) ................................................................... 34

*Int'l Bus. Machines Corp. v. Priceline Grp. Inc.,*
    271 F. Supp. 3d 667 (D. Del. 2017), *reconsideration denied,* C.A. No. 15-137-LPS,
    2018 WL 746521 (D. Del. Feb. 1, 2018) ........................................................... 22

*Int'l Bus. Machines Corp. v. Priceline Grp. Inc.,*
    C.A. No. 15-137-LPS, 2016 WL 6405824 (D. Del. Oct. 28, 2016) .......... *passim*

*KCJ Corp. v. Kinetic Concepts, Inc.,*
    223 F.3d 1351 (Fed. Cir. 2000) .......................................................................... 15

*Kenexa Brassring, Inc. v. Taleo Corp.,*
    751 F. Supp. 2d 735 (D. Del. 2015).............................................................. 38, 39

*Netscape Comm'cns Corp. v. ValueClick, Inc.,*
    707 F. Supp. 2d 640 (E.D. Va. 2010) .............................................................. 38

*SiRF Tech., Inc. v. Int'l Trade Comm'n,*
    601 F.3d 1319 (Fed. Cir. 2010)........................................................................ 10

*Summit 6, LLC v. Samsung Elecs. Co.,*
    802 F.3d 1283 (Fed. Cir. 2015)........................................................................ 10

*Travel Sentry, Inc. v. Tropp,*
    877 F.3d 1370 (Fed. Cir. 2017)........................................................................ 14

*Versa Corp. v. Ag-Bag Int'l Ltd.,*
    392 F.3d 1325 (Fed. Cir. 2004).......................................................................... 5

*Z4 Techs., Inc. v. Microsoft Corp.,*
    507 F.3d 1340 (Fed. Cir. 2007)........................................................................ 10

*Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.,*
    522 F.3d 1348 (Fed. Cir. 2008)........................................................................ 17

## **Statutes**

35 U.S.C. § 318(b).......................................................................................................... 34

## **Regulations**

37 C.F.R. § 42.80............................................................................................................ 34

Fed. R. Civ. P. 56(a) ........................................................................................................ 1

Fed. R. Civ. P. 56(c)(1).................................................................................................... 9

## NATURE AND STAGE OF PROCEEDINGS

IBM submits this opposition to Groupon's summary judgment motion.  (D.I. 226-227.)

## SUMMARY OF THE ARGUMENT

Groupon treats summary judgment as an opportunity to relitigate the positions it lost at claim construction.  Under the Court's actual claim constructions, there are genuine questions of material fact about whether Groupon infringes[1] that preclude summary judgment.  *See* Fed. R. Civ. P. 56(a).

1.      With respect to the Filepp Patents, Groupon bases its arguments on limitations that do not exist in the claims or the Court's constructions, such as "separate," "distinct," "concurrently displayed," "multiple applications," and "prefetched to."  Even under Groupon's rewriting of the claims, there are factual disputes about whether Groupon infringes.  Furthermore, Groupon cannot apply the Court's findings from the *Priceline* litigation to the facts here because Groupon's actions and the accused products are different.

2.      With respect to the '601 patent, Groupon mistakenly assumes that it cannot infringe if it performs additional steps beyond those claimed.  Groupon also bases its arguments on the incorrect assumption that the claims require embedding state information in all continuations on a webpage.  The Court rejected that argument but Groupon tries again by pointing to disputes about the terms "service" and "output."  Those factual disputes preclude summary judgment.

3.      With respect to the '346 patent, Groupon contests the functionality of its source code and the testimony of its witnesses.  Once again, those factual disputes preclude summary judgment.

4.      With respect to the priority date of the '601 patent, Groupon focuses on conception and

---

[1] IBM's expert, Dr. Schmidt, explains in detail why Groupon's accused products have infringed the asserted claims of the '967, '849, and '601 patents since at least 2010, and the '346 patent since mid-2011.  (Ex. 2 ¶ 12; Ex. 3 ¶ 12; Ex. 4 ¶ 11; Ex. 5 ¶¶ 8-10; Ex. 6 ¶¶ 8-10; Ex. 7 ¶¶ 9-11; Ex. 8 ¶¶ 9-11.)  For brevity, IBM refers to infringement in the present tense in this brief.

diligence, but cannot adequately answer IBM's evidence of reduction to practice.

## ARGUMENT

**I.    THERE ARE GENUINE QUESTIONS OF MATERIAL FACT AS TO WHETHER GROUPON INFRINGES THE FILEPP PATENTS.**

**A.    Groupon Infringes The Asserted Claims Of The Filepp Patents.**

██████████████████████████████████████████████████████

████████████████████████ (Ex. 2 ¶¶ 19-21, 74-91; Ex. 3 ¶¶ 20-31; Ex. 9 at 58:5-60:25.)███████████████████████████████████

████████████████████████ (Ex. 10 at 99:21-23, 100:22-103:4;

Ex. 9 at 38:7-41:8; Ex. 1 ¶¶ 60-62, 89-95; Ex. 2 ¶¶ 145-184; Ex. 3 ¶¶ 86-151.) ████████████

██████████████████████████████████████████████████████

████████████████████████████ (*Id.*; Ex. 10 at 100:22-

24; Ex. 9 at 146:2-148:2.) ████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████



(Ex. 11 ¶ 51 (annotation added).)          (D.I. 1, Ex. A at Fig. 3a (annotation added).)

Groupon generates the "area for presenting applications" using ████████████████ which

corresponds to the "body partition" in the specification (all shown in red).  (Ex. 12 at 1, 3; Ex. 11 ¶¶ 51-62.)  Groupon generates the "area for presenting a plurality of command functions" using ████████████████ which corresponds to the "command bar" in the specification (all shown in blue).  (Ex. 12 at 1, 4; Ex. 11 ¶¶ 51-56.)  And Groupon generates the areas for presenting advertising using ████████████████████████████████████████ which correspond to the "ad partition" or "window partition" in the specification (all shown in orange). (Ex. 12 at 1, 5; Ex. 11 ¶¶ 57-62.)  Not only does Groupon's website meet the claim language, it closely tracks the preferred embodiment, albeit with the claimed areas appearing in different places on the screen display.[2]

## B.   Groupon's Motion For Summary Judgement Relies On Claim Construction Positions That The Court Rejected.

Groupon's arguments about the claimed partitions and portions have already been rejected. During claim construction, Groupon argued that the claimed partitions and portions must be "fixed," "dedicated," and "non-overlapping" and that applications must be "bound to particular partitions."  (D.I. 60.)  Groupon also argued that the "second partition for presenting a plurality of command functions" must "persist across applications" and that "advertising portions" must be "separate" from application portions.  *Id.*  The Court rejected those arguments and defined the claim terms "portion" and "partition" as "area."  (D.I. 120 at 7-8.)  Now, Groupon reiterates its unsuccessful arguments that the claimed areas must be (1) separate from the content presented within the areas and (2) dedicated to presenting only one of applications, command functions, or advertising.  (D.I. 227 at 4-9, 11-12.)

Likewise, Groupon's arguments about "structuring advertising" were rejected in the related

---

[2] Groupon's brief focuses on Groupon's website and rarely references Groupon's mobile applications.  This brief therefore focuses primarily on the functionality of Groupon's website ████████████████████████████████████████████████████████████████

*Priceline* litigation.   The Court ruled that "the intrinsic record does not support including a requirement that advertising ***actually be used***[3] in two or more applications." *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, No. CV 15-137-LPS, 2016 WL 6405824, at *11 (D. Del. Oct. 28, 2016) (emphasis in original); (*see also* D.I. 120 at 8.)   Yet Groupon nevertheless argues that advertising must ***actually be used*** with multiple applications.  (D.I. 227 at 12-13.)

### C.      There Are Genuine Questions Of Material Fact As To Whether Groupon's Website Infringes The '967 Patent.

#### 1.      Groupon's Website Generates A First Partition For Displaying Applications.

##### a.      Claim 1 Of The '967 Patent Does Not Require That The "First Area For Presenting Applications" Be Separate And Distinct From The Applications Themselves.

Groupon advances recycled claim construction arguments regarding the claimed "area" that are no more persuasive this time around.  First, Groupon argues that "area" and "application" cannot mean the same thing because "different claim terms are presumed to have different meanings."  (D.I. 227 at 5 (citing *Ethicon EndoSurgery, Inc., v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996)).)  Of course, "area" and "applications" have different meanings—the area is ***where*** the content appears, and the application is ***what*** is presented.  That does not indicate they must be separate and distinct.  Second, Groupon argues that the specification requires "areas" and "applications" to be separate because the specification states that "page partitions" should not be confused with "application partitions."  (D.I. 227 at 5.)  But the fact that "page partitions" and "application partitions" are different does not mean that "areas" must be distinct from applications. It merely clarifies that the specification uses the word "partition" in two different ways.  (D.I. 1, Ex. A at 9:26-40.)  Finally, Groupon compares the claims to chapters in a book.  (D.I. 227 at 6.) That analogy only demonstrates the flaws in Groupon's argument: the area where a chapter appears

---

[3] All emphasis herein is added unless noted otherwise.

is not "distinct" or "separate" from the chapter itself.  In sum, the '967 patent does not require that the first area be separate and distinct from applications.

Groupon also asserts, without support, that the first area must present *multiple* applications.[4]  (D.I. 227 at 5-7.)  The phrase "for presenting applications" only describes the type of information that can be displayed—applications—and does not require the ability to display more than one application. *See Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (construing "for creating air channels" and finding that "in context, the plural can describe a universe ranging from one to some higher number, rather than requiring more than one item").  Therefore, the '967 patent does not require that the first area present multiple applications.

### b.    Groupon's Website Infringes Even Under Groupon's Interpretation Of The Claims.

Groupon generates a "first area for presenting applications" that is "separate and distinct" from the application itself.   Specifically, Groupon generates the "first area for presenting applications" ███████████████████████████████ shown in red in the image in Section I.A).  The ███████████████ distinct and separate from the application itself because ███████████████████████████████████████████████ ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ just as the patent describes using "page template objects" and "page format objects" to generate the various claimed areas. (*See* D.I. 1, Ex. A at fig. 7, 11:26-39, 12:38-54.)  Therefore, the "first area"

---

[4] Alternatively, Groupon implies that every portion or page of an application must be presented within the same area. (D.I. 227 at 7.)  That argument finds no support in the claim language.  It would also preclude an embodiment of the '967 patent because the specification contemplates each page of an application having its own partitions. (D.I. 1, Ex. A at 9:37-39 ("*[E]ach page* 255 is formatted with a service interface *having page partitions* . . . .").)

[5] To use Groupon's "cake" analogy, the div is the sheet pan and the content of the application inside of that div is the cake itself. (*Compare* D.I. 227 at 6.)

is separate and distinct from the application.

To support its argument, Groupon repeatedly mischaracterizes Dr. Schmidt's testimony about whether the "area" and "applications" are distinct.  First, Groupon alleges that Dr. Schmidt "testified that ███████████████████████████████████████████████ ████████████████████████ (D.I. 227 at 5.)  Dr. Schmidt actually testified that ████████████ ███████████████████████████████████ (Ex. 9 at 31:13-19.)  In other words, ███████████████████████████████████████████ as is required by the claims.  *Id.*  Second, Groupon alleges that Dr. Schmidt ████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████ (D.I. 227 at 5.)  To the contrary, Dr. Schmidt explained that ████████████████████████████████████████████ ██████████████████████████████████████████████ *see also id.* at 196:5-197:15.)  Groupon's citation to a vague question that referred to undefined "assumptions of [] prior questions" and Dr. Schmidt's response that he would like to review his expert report does not show otherwise.  (D.I. 227 (*citing* Ex. 9 at 87:10-87:20).)  Finally, Groupon contends that Dr. Schmidt should have been able to define the exact "size" of the claimed area.  (D.I. 227 at 6.)  That is not relevant to the claims.  In any case, Dr. Schmidt ███████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████ Ex. 9 at 41:20-42:16.)

Even if the '967 patent required that the claimed "first area" be capable of presenting multiple applications, Groupon meets that limitation.  For example, ████████████████████████ █████████████████████████████████████████████ (*See, e.g.,* Ex. 2 ¶ 153; Ex. 12 at 3, 6.)  Groupon ignores that evidence and alleges that Dr. Schmidt did not

opine on 

(D.I. 227 at 7.)  Dr. Schmidt actually testified that

(Ex. 9 at 72:9-23.)  Groupon also alleges that Dr. Schmidt admitted that

(D.I. 227 at 7.)  Dr. Schmidt actually testified that

(Ex. 9 at 68:1-69:12.)  Groupon thus infringes even

under Groupon's flawed interpretation of the claims.

### 2. Groupon's Website Generates Concurrently With The First Partition A Second Partition For Presenting A Plurality Of Command Functions.

Groupon's website generates concurrently with the first area a second area for presenting

a plurality of command functions                    (Ex. 11 ¶¶ 51-62.)  Groupon does

not contest that fact.  Instead, Groupon relies on limitations that the claims do not require.  Groupon

begins by arguing that the second area of its website was "not concurrently *displayed*" with the

first partition at all times because a user could scroll down the webpage so that the second area

was no longer visible.[6]  (D.I. 227 at 8.)  However, the claim language requires that the second area

be *generated concurrently*, not *displayed concurrently* with the first area.  Groupon does not

dispute that it generates the second area concurrently with the first area, as the claims require.

Groupon then argues that the "second partition" cannot be "within the first partition." (D.I.

227 at 8-9.)  That argument reiterates Groupon's failed claim construction position that the second

---

[6] Further, Groupon does not dispute that when the user first accesses the page, before scrolling down, Groupon displays the areas concurrently.  Groupon apparently concedes that it meets the limitation at least some of the time.

partition must be "dedicated to displaying command functions" and that the first partition must be "dedicated for displaying applications." (D.I. 60; D.I. 120 at 7.)  In recognition of the Court's holding, Groupon now argues that the '967 patent prohibits partitions "within" other partitions. That new spin on the same old argument directly contradicts the Court's reasoning: "the Court agrees with IBM that the specification shows that the 'partition for presenting applications' *does not exclude that area of the screen from also presenting other data outside of applications* . . . ." (D.I. 120 at 7-8.)  Further, Groupon's proposed limitation would exclude an embodiment of the invention where the window partition containing command functions appears within the first partition.  (D.I. 1, Ex. A at Fig. 3a, 17:65-67, 3:37-51.)

Groupon also argues that Dr. Schmidt's infringement analysis is "arbitrary." (D.I. 227 at 8-9.)  To the contrary, Dr. Schmidt relies on ████████████████████████ ████████████████████   *See* Section I.A.  To support its position, Groupon mischaracterizes Dr. Schmidt's testimony.  First, Groupon makes an argument about ████████████   (D.I. 227 at 8 (*citing* Ex. 9 at 48:9-19).)  Groupon's citation has nothing to do with ███████ Second, Groupon alleges that ████████████████████████████ ████████  (D.I. 227 at 8-9.)  The claims do not prohibit ████████████████ ██████ and additional functionality does not preclude infringement.  *See Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1380–81 (Fed. Cir. 2001); (D.I. 120 at 7-8.)  Groupon also cites no evidence that ████████████████████████████ ████████████ as is required by the second area.  Thus, there is no evidence that the functionality of the two areas overlaps.  Third, Groupon alleges that Dr. Schmidt ████████ ████████████████████████(D.I. 227 at 9.)  Not true.  Dr. Schmidt testified ████████████████████████████████

████████████████████████████████████████ (Ex. 9 at 129:24-131:4.)  In

effect, Groupon criticizes Dr. Schmidt for only showing infringement in one way when there may

be additional ways that Groupon infringes.

### D. There Are Genuine Questions Of Material Fact As To Whether Groupon's Website And Mobile Applications Infringe The '849 Patent.

#### 1. The Court's Summary Judgment Decision From The *Priceline* Case Does Not Apply To Groupon's Infringement Of The '849 Patent.

Without addressing the specific functionality of the accused products, Groupon contends

that the Court's summary judgment decision in the *Priceline* case applies here.  Such cursory

analysis does not satisfy Groupon's burden to demonstrate the absence of a genuine issue of

material fact for summary judgment.  *See* Fed. R. Civ. P. 56(c)(1).  This is not the *Priceline* case.

The facts here are different and preclude summary judgment for several reasons—even under the

Court's prior analysis.

##### a. Groupon Controls The Storing Step For Its Website When Caching Is Enabled, Even For The Subset Of Users Who Have The Ability To Disable Caching.

████████████████████████████████████████████████████

(Ex. 10 at 144:3-8.)  ██████████████████ provide explicit directives to the user's device to

cache the associated content.  (Ex. 19 at 77.)  In other words, ████████████████████

██████████████████████ (Ex. 10 at 135:12-17.)  None of Groupon's users can disable

or change ██████████████████████████  A subset of users—those

who access Groupon's website using a conventional computer—can disable caching entirely on

their browsers.  In that configuration, content will not be stored at the user's device.  However,

browsers have caching enabled by default, and most users do not even know that they can disable

caching.  (Ex. 1 ¶¶ 68, 279-282; Ex. 13 at 1; Ex. 14 at 1; Ex. 10 at 139:11-140:12, 143:16-144:2;

Ex. 15 ¶ 109, Ex. H.)  Thus, almost all browsers obey ███████████████ without any action

or decision by the user, and Groupon has control over the "storing" step by ███████ ████████ (Ex. 10 at 145:13-146:6.) For browsers in that default configuration, Groupon dictates the performance of the storing step and infringes the '849 patent. *See SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1330-31 (Fed. Cir. 2010).

The fact that a browser ***could*** be configured to disable caching does not preclude infringement when that browser is ***actually*** configured to enable caching. *See Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007) ("[I]nfringement is not avoided merely because a non-infringing mode of operation is possible."); *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622–23 (Fed. Cir. 1995) (reversing summary judgment of noninfringement even though the accused product "allows for" noninfringing methods because "an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes"). Countless cases involve situations where infringement depends on how the product is used. In those cases, courts apportion damages to account for non-infringing uses. *See, e.g., Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283 (Fed. Cir. 2015); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011). User behavior that affects whether the defendant meets all of the claimed elements is relevant to the extent of infringement, not the existence of infringement.

**b.    Groupon Controls The Storing Step For Its Website In Situations When** ██████████████████



██████████████████████ (Ex. 1 ¶¶ 196-212; Ex. 17 at 181:16-19, 183:9-15, 184:24-185:4.) █████████████████████

████████████████████████████ (Ex. 10 at 146:7-147:9.)

██████████████████████████

██████████████   Dr. Weissman does not offer any opinions to rebut evidence of infringement

██████████████   (Ex. 16 ¶¶ 145-152.)   ██████   was not considered in the *Priceline*

case.

### c. Groupon Controls The Storing Step For Its Website For Users Who Cannot Disable Caching, Such As Users Of Mobile Devices.

Many of Groupon's users cannot disable caching.  Users accessing Groupon's website

using an iPad or mobile phone cannot disable caching.  (Ex. 9 at 135:21-136:10; Ex. 17 at 187:17-

21; Ex. 1 ¶ 77; Ex. 11 ¶ 90.)  Likewise, users accessing Groupon's services through Groupon's

iOS or Android applications cannot disable caching.  (Ex. 10 at 136:20-137:10; Ex. 17 at 186:13-

17, 187:13-16; Ex. 1 ¶ 78; Ex. 11 ¶ 90.)  Because those users cannot disable caching, the user

reception system always obeys the ██████████████████████  Groupon is in

complete control of the "storing" step, no matter the configuration of the user's device.  (Ex. 10 at

145:13-146:6.)

Groupon quotes the Court's order from the *Priceline* case finding that Priceline's "users

are not required to enable the caching to use the websites, nor are the browsers or mobile

applications contractually required to ensure caching is enabled; users are not penalized for not

caching." (D.I. 227 at 10-11.)  That finding about Priceline's products is not relevant.  Here, the

uncontroverted evidence demonstrates that it is ***impossible*** to disable caching for iPads, mobile

phones, or mobile applications.  Users do not choose whether to enable caching; they do not have

a choice because ***caching cannot be disabled for those products.***  Thus, those products will always

obey cache-control instructions from Groupon to store content.

### d. Groupon—Not The Mobile Operating System—Controls The Storing Step For The Accused Mobile Applications By ████████ ██████████████ That Was Not At Issue In the Priceline Case.

████████████████████████████████████████████



(Ex. 17 at 98:4-98:20

Ex. 4

¶¶ 198-231.)

(Ex. 18 at 13, lines 468, 491; *see also* Ex. 17 at 179:14-181:19

(Ex. 4 ¶¶ 246-255, 258; Ex. 10 at 121:11-18.)  Dr. Weissman does not even attempt to address this clear proof that Groupon performs the storing step.  (Ex. 10 at 192:5-10

Dr. Weissman also admits that performing prefetching necessarily includes storing.  (Ex. 10 at 121:11-18.)

Groupon claims that

(D.I. 227 at 11 (*citing* D.I. 228, Ex. 8 ¶¶ 193, 246 n.72).)  Those citations do not support Groupon's argument.

(Ex. 4 ¶ 246.)  In fact, Dr. Weissman does not opine that the operating system performs the storing step.[7]

---

[7] Even if Dr. Weissman had offered an opinion that the operating system was ***involved*** in

e.   **In The Alternative, Groupon Infringes Under A Theory Of Joint Infringement.**

i.   **Groupon Infringes By Conditioning Receipt Of A Benefit Upon Performance Of The Storing Step And Establishing The Manner And Timing Of That Performance.**

"Liability under § 271(a) can . . . be found when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022-23 (Fed. Cir. 2015). Groupon's users benefit from caching because they can retrieve content from their local device more quickly than from Groupon's network. (Ex. 1 ¶¶ 64-65; Ex. 19 at 74.) However, the benefit of faster access is conditioned on the user having caching enabled. When caching is enabled, Groupon establishes the manner and timing of the storing step by ███████████████████████ (Ex. 3 ¶¶ 219-230; Ex. 4 ¶ 244-266; Ex. 19 at 108 ("The Cache-Control general-header is used to specify directives that MUST be obeyed by all caching mechanisms along the request/response chain.").) Groupon infringes under a theory of joint infringement because Groupon conditions the benefits of storing content at the user reception system on having caching enabled, and establishes the manner in which the storing step occurs.

ii.   **Groupon Infringes By Profiting From Direct Infringement With The Right To Stop Or Limit Infringement.**

*Akamai* recognized that "other factual scenarios may arise which warrant attributing others' performance of method steps to a single actor. Going forward, principles of attribution are to be considered in the context of the particular facts presented." *Akamai Techs., Inc. v. Limelight*

---

prefetching, it is ███████████████████████ (Ex. 32 at 215:22-25; Ex. 17 at 179:14-181:15.) Thus, Groupon infringes. *See Girafa.com, Inc. v. IAC Search & Media, Inc.*, C.A. No. 07-787-SLR, 2009 WL 2949509, *10-11 (D. Del. Sept. 15, 2009).

*Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015). For example, "an actor infringes vicariously by profiting from direct infringement if that actor has the right and ability to stop or limit the infringement." *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1385 (Fed. Cir. 2017). Here Groupon benefits from caching at its users' devices because caching decreases network traffic. (Ex. 1 ¶¶ 64-65; Ex. 19 at 74.) And, as Dr. Weissman admits, ███████████████████████████████████████████████████████████ (Ex. 10 at 279:17-280:9.) Therefore, Groupon infringes under a theory of joint infringement because Groupon profits from caching while having the ability to stop caching from occurring.

> **2.    Groupon's Website And Mobile Applications Format Applications So That They May Be Presented At A First Area And Advertising For Potential Use With A Plurality Of Applications In A Second Area Concurrently With Applications.**

Groupon's website and mobile applications format applications so that they may be presented at a first area of one or more screens of display and format advertising for potential use with a plurality of applications in a second area of one or more screens of display concurrently with applications. (Ex. 3 ¶¶ 93-151; Ex. 4 ¶¶ 95-141; Ex. 9 at 35:9-37:23.) Unlike the '967 patent, the '849 patent does not require ***presenting*** the applications and advertising, but rather ***formatting*** the applications and advertising so that they ***may be presented***. Groupon ignores this distinction and offers no arguments specific to the "formatting" step.

Although Groupon does not contest that it formats applications and advertising for presentation for its website, it argues that: (1) the identified "second area" is not a single area, (2) the '849 patent requires that "applications and advertising must be distinct," and (3) the '849 patent requires that advertising be ***actually presented*** with multiple applications.[8]

---

[8] Groupon's arguments rely on language such as "first area," "second area," and "concurrently with the applications" that does not appear in or apply to claims 8, 9, 12, 21, 22, and 25.

First, Groupon refers to a figure from Dr. Schmidt's expert report that █████████████
█████████████████████████████████████████████████████████████ D.I. 227 at

12.)  The claims do not require the second partition/area to be contiguous.  Nor do they require

that the second partition/area contain only one image.  What is important is whether Groupon

formats advertising so that it may be presented at a second area.  Dr. Schmidt explains that

Groupon indeed formats advertising so that multiple images may be presented within a second

area ████████████████████████ (Ex. 3 ¶¶ 132-151; Ex. 11 ¶¶ 57-59.)

Even if there are multiple areas instead of just "an area," Dr. Schmidt opines that ████████
████████████████████████████████████████████████████████████████████
████████████████████ (*See, e.g.*, Ex. 3 ¶ 136 ███████████████████████
█ ; Ex. 11 ¶¶ 57-59 █████████████████████████████████████████
████████  Groupon cannot escape infringement by claiming that multiple areas qualify as a

"second partition," instead of just one.[9]  *See KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351,

1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an'

in patent parlance carries the meaning of 'one or more' in open-ended claims containing the

transitional phrase 'comprising.'").

Second, Groupon repeats its argument that applications and advertising are distinct.  (D.I.

227 at 12.)  The Court rejected this claim construction, stating: "the Court agrees with IBM that

the specification shows that the 'partition for presenting applications' does not exclude that area

of the screen from also presenting other data outside of applications . . . ."  (D.I. 120 at 7-8.)

Further, even under Groupon's flawed interpretation of the claims, the identified advertising is

---

[9] To use Groupon's "states" analogy, (D.I. 227 at 12), whether California, Texas, and New York
comprise an area of this country or multiple areas, there is at least "an area" of the country.

distinct from the identified applications.  Groupon does not dispute that it displays advertising.
Nor does it dispute that it meets the Court's definition of applications.  Nor does it dispute that the
requirements for those terms are different.  Given those concessions, Groupon does not avoid
infringement merely because it chooses to ███████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████████████  Groupon's website and mobile applications therefore
infringe the claims of the '849 patent even if they require advertising and applications to be
"distinct."

      Third, Groupon argues that the '849 patent requires that advertising must ***actually be used***
with multiple applications.  (D.I. 227 at 12-13.)  The Court rejected this argument in the *Priceline*
litigation, stating that "the intrinsic record does not support including a requirement in this term
that advertising ***actually be used*** in two or more applications."  *Int'l Bus. Machines Corp.*, 2016
WL 6405824, at *11 (emphasis in original); (*see also* D.I. 120 at 8.)  Therefore, Groupon's
assertion that it "does not present advertising with multiple applications" is irrelevant.  (D.I. 227
at 13.)  Groupon cites testimony from Dr. Schmidt and argues that it is unfair to base infringement
on the fact that ████████████████████████████████████████████████D.I. 227 at 13.)
That is not Dr. Schmidt's opinion, and Groupon's citation do not support that assertion.  Rather,
Dr. Schmidt opines that ███████████████████████████████████████████████████
████████████████████████  (Ex. 3 ¶¶ 132-139; Ex. 4 ¶¶ 127-134; Ex. 9 at 146:2-148:2, 152:10-
153:8.)  In any case, Dr. Weissman admits that ████████████████████████████████████
██████████████████(Ex. 10 at 163:11-24.)

      Finally, Groupon does not address the mobile applications in Section I.C.2 of its opening

brief, besides including the words "mobile applications" in the section header. ████████

████████████████████████████████████████████████████████

████████████ (Ex. 4 ¶¶ 19-36, 77, 88-141.)  Thus, Groupon has not satisfied its burden of

identifying an absence of evidence of infringement for the accused mobile applications. *See Zenith*

*Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008).

### 3.   Groupon's Website And Mobile Applications Selectively Store Advertising Objects As Required By The Claims.

Groupon prefetchs advertising objects in four different ways.[10]  First, Groupon's website

and mobile applications prefetch advertising objects when ████████████████████████

████████████████████████████████████████████████████████

████. (Ex. 1 ¶¶ 73-74, 110-120; Ex. 3 ¶¶ 202-204; Ex. 4 ¶¶ 195-197; Ex. 9 at 215:19-216:22.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ (*Id.*)  Groupon thus prefetches advertising objects.

Groupon alleges that the ████ theory does not show infringement because "the objects

must be pre-fetched to the store at the reception system." (D.I. 227 at 14.)  But the Court's

construction does not require prefetching *to* the reception system.  The Court construed the

"selectively storing" element as (1) prefetching advertising objects and (2) storing at a store

established at the reception system in anticipation of display concurrently with the applications.

To reach that conclusion, the Court partly relied on the portion of the specification that states,

"advertising . . . can be pre-fetched from the network and staged at the reception system in

---

[10] Groupon's arguments rely on the claim language "selectively storing" that does not appear in, and does not apply to, independent claims 8 and 21, or their dependents.

anticipation of being called for presentation." *Int'l Bus. Machines Corp.*, 2016 WL 6405824, at *10. That language does not limit where objects are "pre-fetched to." Nor do any of Groupon's citations to the specification. (*See* D.I. 14.) Even if there were an example in the specification that disclosed a specific method of prefetching, it is improper to import an embodiment into the claims. *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1384–85 (Fed. Cir. 1998).

Second, Groupon's website and mobile applications prefetch advertising objects whenever advertising objects are sent to the user's browser to be stored at the user's computer in anticipation of future display at the user's reception system. (Ex. 3 ¶¶ 205-207; Ex. 4 ¶¶ 232-234.) Groupon is incorrect that fetching content for immediate display is incompatible with prefetching content in anticipation of future display. As Dr. Schmidt explains, when Groupon fetches advertising objects for a page that a user is visiting, Groupon also prefetches those objects in anticipation of future display by storing them at the reception system. (Ex. 3 ¶¶ 205-207; Ex. 4 ¶¶ 232-234.) The advertising objects are thus prefetched. Groupon claims, "Dr. Schmidt admitted in his deposition that ██████████████████████████████████████████ (D.I. 227 at 14-15.) Not so; he testified that ████████████████████ ████████████████████████████████████████ (Ex. 9 at 223:20-224:6.) In other words, Dr. Schmidt testified that ████████████████████████ ████████████████████████████████████████████████████ ████████ (*Id.*)

Third, Groupon's website and mobile applications prefetch advertising objects whenever Groupon sends advertising objects to the user's browser before those objects are displayed to the user. (Ex. 3 ¶¶ 208-218; Ex. 4 ¶¶ 235-243.) For example, the webpage www.groupon.com/coupons includes a "carousel" of six images, shown in the middle of Exhibit

20, currently advertising "ABCmouse.com." (Ex. 3 ¶¶ 212-214; Ex. 20.) The experts refer to it as a "carousel" because the user can click on the arrows to the right and left to rotate through the advertisements until they return to the first image. For example, if the user clicks on the left arrow on Exhibit 20, the user will see an advertisement for Hilton and if the user clicks on the right arrow, the user will see an advertisement for Nutrisystem (shown to the left and right of ABCmouse.com in the black bar at the bottom of the carousel). (Ex. 3 ¶¶ 212-214; Ex. 10 at 186:3-8; Ex. 20.) When a user first visits the webpage, Groupon only displays the first image in the carousel. None of the remaining five images are displayed unless and until the user selects them. (Ex. 3 ¶¶ 212-214; Ex. 10 at 186:21-188:5.) Nevertheless, Groupon prefetches all six images to the user's reception system when the user first accesses the page, in anticipation of possible future display. As another example of prefetching, when a user accesses a Groupon page, some advertisements are not displayed until the user scrolls down on the webpage, but Groupon sends those advertising images to the user when the user first accesses the page, in anticipation of future display. (Ex. 3 ¶ 213.)

Groupon argues that this method of infringement "improperly equates objects downloaded in response to a user request for immediate display on a given page with 'pre-fetching' objects 'in anticipation of display.'" (D.I. 227 at 15.) That is attorney argument without support. The objects are not "downloaded in response to a user request for *immediate* display." Rather, Groupon fetches them in anticipation of a user request for *future* display. Groupon also argues that the '849 patent's reference to a "Get" command and a "Fetch" command means that the prefetched object cannot be displayed on a requested page. (D.I. 227 at 15.) The cited passage (1) has nothing to do with pages, (2) describes a non-limiting embodiment, and (3) describes fetching for future display, which is precisely what Groupon does. (D.I. 1, Ex. B at 27:8-13.)

Fourth, Groupon's mobile applications prefetch advertising objects by ██████████ ████████████████████████████████████ (Ex. 4 ¶¶ 198-231.)  For example,



Groupon's expert did not even attempt to address this theory.  Dr. Weissman admits that his expert report did not provide any ████████████████████████████ ████████████████████████████████████ (Ex. 10 at 192:5-10, 198:10-13, 201:7-24.)  Groupon's attorneys argue that there is "no evidence that ████████ ████████████████████████████ (DI. 227 at 15-16.)  However, Groupon's corporate representative on the topic and its vice president of engineering both testified that ██████████████████████████████████████████████████████████████████ ██████████████████████████████████ Groupon's internal technical documents also show that Groupon implemented ████████████ ████████ (Ex. 20; Ex. 22 at GROUP290986, GROUP291023; Ex. 21; Ex. 23 at GROUP188925-29.) ████████████████████████

████████████████████████████████████████████████

████████████████████████████████ (Ex. 17 at 116:2-7, 117:8-15, 118:6-17, 151:3-8.)

Groupon also argues that it does not prefetch advertising objects because deal images are not "advertising objects." Groupon first argues that the deal images are not advertising objects because they are application data. (D.I. 227 at 17.) This is merely a rehashing of Groupon's flawed claim construction argument that nothing shown with applications can be advertisements because they must be separate. Groupon does not dispute that what Dr. Schmidt identified is advertising and, indeed, it attempts to persuade users to buy products with language like "Trending," "45% Off," and "25,000+ bought." (Ex. 3 ¶¶ 160-162.) Therefore, the deal images are still advertising objects, even if they appear with application data.

Groupon next contends that the deal images are not advertising objects because the identified advertising objects "include[] images **and** related text description ████████████ ████████████ D.I. 227 at 16.) Here, Groupon conflates "advertising objects" with "advertising." The advertising is the combination of the image and the text descriptions. (Ex. 3 ¶¶ 154-179; Ex. 4 ¶¶ 144-174.) The '849 patent requires that the advertising is "configure[ed] . . . as objects . . . ." Groupon configures the advertising as objects, which include deal images. (*See, e.g.*, Ex. 3 ¶ 200

████████████████████████████████████████████████

████████████████████████████████████ the deal images are the identified advertising objects.

### 4.   The Claims Of The '967 Patent And The '849 Patent Are Not Indefinite.

As a last ditch effort, Groupon asserts that if it cannot win on noninfringement then the claims of '967 and '849 patents are too difficult to understand and must be indefinite. (D.I. 227 at

9.)  That argument is not based on the law.  Patents are presumed to be valid and the accused

infringer bears the burden of establishing invalidity by "clear and convincing evidence."  *Biosig*

*Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015).  Groupon has not

explained the basis for its assertion and thus has not met that burden.  Nor did Groupon address

the Court's decision in the *Priceline* litigation, which found that the claims were not indefinite.

*Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, 271 F. Supp. 3d 667, 677-78 (D. Del. 2017),

reconsideration denied, C.A. No. 15-137-LPS, 2018 WL 746521 (D. Del. Feb. 1, 2018).

## II.   THERE ARE GENUINE QUESTIONS OF MATERIAL FACT AS TO WHETHER GROUPON INFRINGES THE '601 PATENT.

### A.   There Is Substantial Evidence That Groupon Infringes The '601 Patent.

Groupon tracks state information about the deals that users select and purchase, thereby

infringing the '601 patent.  Groupon ███████████████████████████████████████████

████████████████████████████████████████████████████████ (Ex. 25 at

GROUP258391-92; Ex. 26 at GROUP0020892; Ex. 27 at 117:7-119:10; Ex. 28 at 1-2; Ex. 5 ¶¶

20, 38, 45, 124-126.) ████████████████████████████████████████████████████

████████ (Ex. 25 at GROUP258382; Ex. 27 at 50:18-51:20; Ex. 5 ¶¶ 35-36, 121.)  When user

requests relate to a particular deal, ████████████████████████████████████████

███████████████████████████████████

For example, if a user selects a particular deal to view deal details, that selection ████

██████████████ (Ex. 28 at 3; Ex. 5 ¶¶ 35-36.) ████████████████████████████

███████████████ (Ex. 25 at GROUP258396; Ex. 28 at 1; Ex. 5 ¶¶ 37, 136.) ████

████████████████████████████████████████████████████████████████████

---

[11] Groupon ████████████████████████████████████████████████████████

███ (Ex. 6 ¶¶ 20, 35-36, 83.) ████████████████████████████████████████████



████████████████████████████████████     (Ex. 29 at GROUP0001212-13;

Ex. 27 at 89:4-90:6, 91:7-22, 94:6-95:4; Ex. 30 at 25:9-26:7; Ex. 28 at 4; Ex. 5 ¶¶ 128-131, 136-

147.) ███████████████████████████████████████

███████████████████████████     (Ex. 31 at line 8; Ex. 27 at 91:23-93:10; Ex. 28

at 5-6; Ex. 5 ¶¶ 149, 187.) ███████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████     (Ex. 32 at

161:25-162:23; Ex. 30 at 18:14-23, 19:25-20:7, 56:23-58:3, 80:20-81:7; Ex. 27 at 92:8-93:10,

96:23-98:2, 185:4-15; Ex. 28 at 7; Ex. 5 ¶¶ 148-154, 172-182, 187-188.)

### 1.   Groupon's Use Of Cookies Is Irrelevant Because Groupon Infringes By Tracking State Information Embedded In Continuations.

Cookies are compatible with the technology claimed by the '601 patent. ████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████     It is black letter law that adding unclaimed features does not avoid infringement.

*Dow Chem.*, 257 F.3d at 1380–81.  Groupon uses both techniques, as explained in Section II.A.

(*See* Ex. 11 ¶ 293.)

Groupon admits that it ████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████     (D.I. 227 at 19.)  The Court has construed "state

information" as "information about a conversation between a client and a server."  (D.I. 64 at 26;

D.I. 120 at 5 n.1.)  Dr. Schmidt explains how Groupon tracks information about a conversation

that meets that construction—████████████████████████████████████████

████████████—through continuations.  (Ex. 5 ¶¶ 172-182.)  Dr. Schmidt supports his opinions

with testimony from Groupon's witnesses and records of the requests to and responses from Groupon servers.  (Ex. 30 at 18:14-23; 19:25-20:7; 56:23-58:3; 80:20-81:7; Ex. 27 at 185:4-15; 96:23-98:2; Ex. 32 at 161:25-162:23; 178:25-179:8; Ex. 28 at 8.)  Groupon does not address any of that evidence and does not cite any evidence of its own that could lead to a contrary conclusion. Moreover, Dr. Weissman characterizes the same types of data as state information in his invalidity analysis. (Ex. 33 at 205 ████████████████████████████ ████████████████████.)[13]

### 2.   Groupon's ███████████████ Is Compatible With The "Services" Of The '601 Patent.

Groupon ██████████████████████████████████████ ████████████████████ (D.I. 227 at 19-20.)  Groupon does not cite any evidence or expert opinion to support the notion that ████████████████████████████████ █████ In fact, █████████████████████████████████████ ███████████████████████████████████████████████ ████████ (Ex. 5 ¶¶ 20-22; Ex. 27 at 117:7-118:20.)  On Groupon's website, ███████ ███████████████████████████████████████████████ ████████████████████████████████ (Ex. 25 at GROUP258392; Ex. 28 at 1; Ex. 5 ¶¶ 20, 35-38, 45, 121, 124-126; Ex. 27 at 157:16-158:7.)

### B.   Groupon's Website And Mobile Applications Detect When Requests Require Preservation Of State Information.

Groupon detects the need to preserve state information when ███████████████████

---

[13] Groupon also quibbles with whether ████████████████████████████ ██████████████████████████████████████████████ ██████ (D.I. 227 at 20-21.)  But there is no dispute that ████████████████████████████████████████████████ ████████████████████████████████████████ The embedding step is discussed in detail in Section II.C.2.



██████████████████████████████████████████████. (Ex. 5 ¶¶ 104-112; Ex. 9

at 342:7-347:16.) Groupon argues that there is no evidence of infringement because Dr. Schmidt

███████████████████████████████████ [4] (D.I. 227 at 21-22.) But Groupon does not

address or rebut any of the evidence that Dr. Schmidt cited to support his opinion. For example,

Dr. Schmidt described in detail his experiments navigating through Groupon's website. Those

experiments showed █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ (Ex. 5 ¶¶ 105-112; Ex. 9 at 343:6-346:20.) Dr. Schmidt's evidence

includes records of the HTTP traffic sent to and from Groupon's server and exemplary pages from

Groupon's website and mobile applications. (Ex. 5 ¶¶ 105-112.) Groupon ignores that evidence.

(D.I. 227 at 21.) Tellingly, Groupon only cites parts of Dr. Schmidt's testimony about █████████

(*id.*), while omitting his explanations of the other evidence of the detecting step. (*See* Ex. 9 at

343:6-347:16.) The evidence and explanations that Groupon does not address show that Groupon

performs the "detecting" step and at least creates a question of fact that cannot be resolved at

summary judgment.

### C.    Groupon's Website And Mobile Applications Identify All Continuations In An Output And Embed State Information Into All Identified Continuations.

#### 1.    Groupon Identifies Continuations.

##### a.    Groupon's ████████████████ Are Outputs From A Requested Service.[15]

Dr. Schmidt's report and testimony explain that ████████████████████████████

████████████ and Groupon's documents and witnesses support that conclusion. A selection from a

---

[14] Groupon's argument applies to claim 1 and its dependents.  Claim 51 has no "detecting" step.
[15] Groupon's argument applies only to Groupon's website.  ████████████████████████████
████████████████████████████████ (Ex. 30 at 110:3-12.)



user on Groupon's website, ██████████████████████████████████████

██████████████████████████████ (Ex. 5 ¶¶ 121-127.) Dr. Schmidt

identified the ████████████████████████████████████████████

███████████████ (Ex. 5 ¶¶ 131, 136-140; Ex. 11 ¶¶ 305-307.) Groupon's documentation

corroborates Dr. Schmidt's testimony about ██████████████████████████ (Ex.

25 at GROUP258389 (describing ███████████████████████████████████

*see also id.* at 7; Ex. 29 at GROUP0001212-13; Ex. 27 at 89:4-90:6; 117:7-119:10; 157:16-158:7.)

Groupon dismisses ████████████████████ (D.I. 227 at 22.) But whether a ████████

██████████████████████████████ The claims of the '601 patent place

no size requirement on the services that create the output.  Groupon also contends that Dr. Schmidt

admitted ████████████████████████████████ *id.*, but Dr. Schmidt made no such

statement in any of the testimony Groupon cites.  (Ex. 9 at 358:13-359:15, 363:5-11, 368:6-

370:13.)

### b.   Groupon Identifies Continuations ██████████████████████

Dr. Schmidt explains that Groupon identifies continuations ██████████████████████

██████████████████████████████ (Ex. 5 ¶¶ 148-154; Ex. 11 ¶¶ 308-310.) For

example, Dr. Schmidt points to ████████████████████████████████████████

████████████████ (Ex. 5 ¶ 149; *see also* Ex. 31.) ████████████████████████

██████████████████████████████ (Ex. 5 ¶ 150; Ex. 27 at 91:23-92:12.)  The text

"url" stands for Universal Resource Locator and is a unique address for a resource on the Internet,

such as the address for a particular webpage.  (D.I. 1, Ex. C at 1:60-2:8.)   Therefore,

██████████████ is a continuation under the Court's construction.  (D.I. 121 at 2.)  Dr. Weissman

agrees.  (Ex. 10 at 106:21-107:3 ("Q.  When you see "HREF [] in an HTML file, what does that

indicate?  A.  Well, that will show the user or give the user an opportunity to select that reference

26

to follow that **link** to obtain a resource."); *see also id.* at 233:23-235:4, 461:12-25.) ███

███████████████████████████████████████████████████████████

██████████████████████████████████ (*Id.* at 232:16-232:23 ("█████████████

███████████████████████████████████████████████.");

*see also* Ex. 27 at 92:8-12 ██████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████  ████████████████████████████████

██████████████████████ (Ex. 5 ¶¶ 148-154; Ex. 10 at 233:14-234:10.)

Groupon argues that ████████████████████ is not identifying a continuation.

(D.I. 227 at 22-23.)[16]   But Dr. Weissman admits that a ██████████████████

██████████████████████████ provided the other limitations of the claims

are met.  (Ex. 10 at 271:14-272:24.)  Indeed, Dr. Weissman relies on that very process in his

invalidity analysis.  (Ex. 33 at 264-266 (opining that ████████████████████

███████ is "identifying"), 291-293 (opining that ████████████████████

████████████████████ is "identifying"); Ex. 10 at 408:11-24.)  Groupon

also asserts that ████████████████████████████ (D.I. 227 at

23.)  But Groupon cannot avoid infringement by █████████████████████████

████████████████.  *Dow Chem.*, 257 F.3d at 1380–81.

### 2.    Groupon Embeds State Information In Continuations.

#### a.    Groupon's Website Embeds State Information ████████████████

After identifying continuations █████████████ Groupon's website ████████████

---

[16] Groupon argues that ████ has no significance.  (D.I. 227 at 23.)  To the contrary, Groupon programmed the hyperlink on its webpage ██████████████████████████████████████

███████████████████████████████████████████████████████



thereby performing the "embedding" step. (Ex. 27 at 92:8-93:10; Ex. 5 ¶¶ 187-188; Ex. 11 ¶¶ 317-325.)  The result is

(Ex. 5 ¶¶ 172-183.)  In that process, Groupon modifies continuations                    to include state information.  For example,

(Ex. 5 ¶¶ 149, 187, 201-203 (emphasis indicates state information); *see also* Ex. 31 at line 8.)

**b.    Groupon's Mobile Applications Embed State Information.**

Groupon argues its mobile applications do not embed state information because (1) embedding cannot happen at a client, (2) continuations are not modified, and (3) there is no communication in response to embedding.  (D.I. 227 at 23-24.)  At the outset, Groupon's arguments rely on an incorrect reading of the claims that excludes any situation in which embedding occurs at the client.  (D.I. 227 at 23.)  The claims are not so limited; both the specification and the dependent claims include embodiments in which code for embedding is downloaded to the client to perform the embedding step.  (*E.g.*, D.I. 1, Ex. C at Abstract, 16:30-42, claim 4.)  The Court acknowledged that disclosure in the *Priceline* case, finding that "the specification discloses that [communicating the output to the client] may be implemented on either a client or a server."  *Int'l Bus. Machines Corp.*, 2016 WL 6405824, at *14.

Groupon's mobile applications embed state information when

(Ex. 6 ¶¶ 149-150; Ex. 11 ¶¶ 326-329.)  Dr. Schmidt explained that process and the way in which it modifies an identified continuation to include state information.  (Ex. 9 at 465:18-

28

470:15; 482:18-485:5.)  Groupon argues that this process is not a "modification" to include state information, alleging that URLs are unchanged in that process.  (D.I. 227 at 23.)  The evidence cited by Dr. Schmidt, however, shows otherwise.   In the example below, Groupon's mobile application modifies the following continuation from the Groupon server:



(Ex. 6 ¶ 115 (JSON data received from Groupon server).)

After modification, the continuation includes state information:



(Ex. 6 ¶ 151 (request with state information sent to server after user selection).)  Groupon's mobile applications then communicate the claimed "output" or "response," with embedded state information, to the client.

Groupon argues that Dr. Schmidt improperly mapped the "communicating" steps to communication within the client itself.  (D.I. 227 at 24.)  Groupon's argument runs contrary to the Court's prior findings.  *Int'l Bus. Machines Corp.*, 2016 WL 6405824, at *14.  In line with the Court's opinion, Dr. Schmidt explained that Groupon's mobile applications ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (Ex. 6 ¶¶ 182-184; Ex. 9 at 493:3-25; 494:8-495:3; 497:18-498:13.)  Groupon ignores that explanation and contradicts the Court's prior findings, thus failing to show that summary judgment is appropriate.

**D.     Dr. Schmidt's Opinions Regarding Groupon's "Services" Are Consistent.**

Groupon argues Dr. Schmidt's analysis is inconsistent in the identification of the "service" requested by a client[17] and the "service" performed by the Groupon server.  (D.I. 227 at 24-26.) That argument rests on the false assumption that the client can only request the service "that returns the Local Deal webpage." (D.I. 227 at 25.) Dr. Schmidt explained that Groupon ███████████ ████████████████████████████████████████████████████████████.  (*E.g.*, Ex. 5 ¶¶ 121-124.)  Dr. Schmidt also explained that ████████████████████████ ██████████ (Ex. 5 ¶¶ 131, 136-140; Ex. 11 ¶¶ 305-307.)   Dr. Schmidt reiterated that explanation at his deposition.  (Ex. 9 at 358:13-359:15; 363:5-11; 368:6-370:13.)  Groupon does not address that testimony, focusing instead on different questioning, during which Groupon's counsel interrupted Dr. Schmidt to cut off his testimony and did not allow him to give full explanations.  (Ex. 9 at 359:16-362:16.)  Dr. Schmidt's actual testimony and expert report, considered in full, shows that his analysis is consistent.

Groupon also argues that there is a timing problem with Dr. Schmidt's infringement read. According to Groupon, the claimed service cannot be "invoked" after the need to preserve state information is "detected."[18]  (D.I. 227 at 25.)  That argument has no link to the claim language, and Groupon offers none.  Dr. Schmidt explained that ██████████████████████████ ████████████████████████████████████████ (Ex. 9 at 369:21-370:3.) That process matches claim 1: ████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████

---

[17] This argument applies only to Claim 1 and its dependents.  Claim 51 does not require that the request be from a client because it does not depend on language associated with the client.

[18] This argument applies only to claim 1 and its dependent claims.  Claim 51 does not recite "detecting."

Groupon puts forth three additional reasons why ███████████ supposedly cannot be the "service" of the claims, (D.I. 227 at 26), but each falls short.  First, Groupon argues again that Dr. Schmidt admitted ████████████████████████████████████████ Dr. Schmidt made no such admission, and the characterization of a service as a ███████ does not avoid infringement of the claims, as explained in Section II.A.2.  Second, Groupon argues that ████████████████████████████████████  But there is no dispute that ██ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ (Ex. 5 ¶¶ 137-148, 201-203; *see also* Ex. 25 at GROUP258396.)  Third, Groupon argues that ██████████████ ████████████████ do not contain any continuations at all.  But ██████████████████ are continuations, as explained in Section II.C.1.b.

Groupon also asserts that Groupon cannot infringe because "every continuation presented to the user" and "all continuations in each webpage" must include state information, while Groupon's website includes some links that do not have state information.  (D.I. 227 at 26-27.) The Court considered and rejected that argument, finding that Groupon's position "improperly equates 'output' to the entire webpage."  (D.I. 120 at 11.)  Groupon re-packages that argument to focus on the "wherein" clauses of Claim 1 and 51, but it fairs no better the second time around.

Groupon's argument focuses on the claim language "all services for the duration of the conversation," from claim 1, and "one of the continuations must be invoked to continue the conversation," from claim 51.  (D.I. 227 at 26.)  Dr. Schmidt pointed to multiple examples of conversations where state information is preserved for the duration of the conversation, and where continuations are invoked to continue the conversation.  (Ex. 5 ¶¶ 23-24, 65-72, 215-229.) Regarding claim 1, Groupon's corporate witness agreed that Groupon ██████████████████

31

██████████████████████████████████████████████████████████

(Ex. 27 at 166:20-167:10; *see also* Ex. 30 at 19:13-20:7.)  In other words, ████████████

█████████████ for the ***duration*** of the user's interaction with Groupon's servers (*i.e.*, the

conversation with those servers).  Groupon's alleged use████████████████████████████████

during a conversation, (D.I. 227 at 27), does not preclude infringement for the other ways in which

Groupon also tracks state information, as explained in Section II.A.1.  Furthermore, even under

Groupon's characterization of the claims in which a user's selection of one "stateless continuation"

avoids infringement, (D.I. 227 at 26), state is preserved and provided to all services for the duration

of the conversation at least in the situation where the user proceeds through the transaction.

Regarding claim 51, Groupon misreads the wherein clause as requiring that "every

continuation presented to the user must include state information."  (D.I. 227 at 26; Ex. 16 ¶ 233.)

Claim 51 recites "identifying all ***continuations in an output from said service***" and "wherein the

continuations enable another service request and one of ***the continuations*** must be invoked to

continue the ***conversation***."  Therefore, the wherein clause only requires that continuations within

the conversation that are identified in the output be able to "enable another service request" and

be embedded with state information.  The Court construed "conversation" as "a sequence of

communications between a client and a server in which the ***server responds to each request with***

***a set of continuations*** and the client always picks the next request from the set of continuations."

Thus, Groupon is incorrect that "every continuation presented to the user must include state

information."  (D.I. 227 at 26.)  The continuations that must include state information are those

that are in the output from the performed service and are in the conversation, *i.e.*, the "set of

continuations" in response from Groupon's servers ████████████████████████████ Dr.

Schmidt explained that every continuation ██████████████████████████████████████

32

███████████████████████████████████████████████████████████ (*See, e.g.,*

Ex. 5 ¶¶ 171, 187-188, 391-392.)  Groupon's contention about "most links on any given Groupon

webpage" rests on a misreading of the claim language.

### E.      There Is Significant Evidence Of Groupon's Infringement Under The Doctrine Of Equivalents In Addition To Literal Infringement.

Dr. Schmidt's limitation-by-limitation analysis shows how all continuations ████████

████████████████████████████████████ are identified and embedded with state information.

Notwithstanding that evidence of literal infringement, Dr. Schmidt also explained how identifying

and embedding all continuations *in a transaction* would be equivalent to the claim language, even

if some continuations outside of that transaction were not identified or not embedded.  (Ex. 5 ¶¶

164-167, 194-197; Ex. 11 ¶¶ 313-314, 330.)

Groupon's position is that █████████████████████ can never be substantially the same

as identifying all continuations.  (D.I. 227 at 27-28.)  But when the continuations are viewed in

terms of a conversation that facilitates a transaction, which is the purpose of Groupon's website,

Groupon provides no availing reason why embedding state information in only continuations that

further the transaction could never be an equivalent.   Dr. Schmidt explained how Groupon

███████████████████████████████████████████████████████████

(*E.g.*, Ex. 5 ¶¶ 23-24.)  That opinion squares with Groupon's own characterization of its website

in other parts of its summary judgment argument, which states that Groupon ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ (D.I. 227 at 27.)  The

links Dr. Weissman points to as allegedly missing state information ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ (Ex. 16 ¶ 238.) The disagreement between the experts at least gives

rise to a triable issue of fact regarding equivalents that cannot be resolved on summary judgment.

## III. THERE ARE GENUINE QUESTIONS OF MATERIAL FACT AS TO WHETHER GROUPON INFRINGES THE '346 PATENT.

### A. IBM Can Assert Claims 1, 3, 12, And 13 Against Groupon.

Groupon implies that IBM cannot assert claim 1, 3, 12 and 13 against Groupon because

the Patent Trial and Appeal Board ("PTAB") issued a final written decision finding those claims

to be unpatentable.  Yet claims 1, 3, 12, and 13 will only be cancelled if the PTAB issues a trial

certificate cancelling them, which can only occur after IBM has exhausted its rights to seek review

of the PTAB's final written decisions.  35 U.S.C. § 318(b); 37 C.F.R. § 42.80.  As Groupon

recognizes, those claims are currently up on appeal.  (D.I. 227 at 28 n. 9.)  Unless and until the

PTAB issues trial certificate cancelling those claims, IBM has a viable cause of action.  *Id.;*

*Intellectual Ventures I LLC v. Toshiba Corp.*, 221 F. Supp. 3d 534, 553-554, n.18 (D. Del. 2016);

*see also Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1344 (Fed. Cir. 2013).  Groupon

has not attempted to address infringement of claims 1, 3, 12, and 13.  Therefore, summary

judgment should be denied as to those claims.

### B. There Is Substantial Evidence That Groupon Infringes Claim 2 Of The '346 Patent.



Groupon focuses on ████████████████████████████████████ to

argue that Groupon does not infringe Claim 2 of the '346 patent, but, ████████████████

████████████████ Groupon performs the step of "creating an alias identifier."  As part of

Groupon's sign-in process, █████████████████████████████████████

████████████████████████ Groupon focuses on this behavior.  (D.I. 227 at 30-31.)

However, Dr. Schmidt cites to █████████████████████████████████████

████████ (Ex. 11 ¶¶ 417-421.)  Specifically, as Dr. Schmidt explains, ████████████

██████████████████████████████████████████████ (Ex. 11 ¶

418.)  Therefore, Groupon creates an alias identifier.

The alias identifier that Groupon creates is "for the user at the first system."  As Dr.

Schmidt explains, ████████████████████████████████████████████

██████████████████████████████████████████████████

(Ex. 11 ¶ 420.)  In other words, the alias identifier that Groupon creates is for the user at the identity

provider, the claimed "first system."[19]  Groupon thus meets the claim language of "creating an

alias identifier for the user at the first system."

Groupon advances two arguments to discredit Dr. Schmidt's argument, but both fail.  First,

Groupon argues that it ████████████████████████████ That argument is

not consistent with Groupon's █████████████████████████████████

██████████████████████████ (Ex. 11 ¶ 419 (citing GROUP-SC-001926).)  As Dr.

Schmidt explains, ████████████████████████████████████████████

Second, Groupon argues that the creation "must take place" at the first system.  To the contrary,

the claim language explains that the user is "at the first system," but does not impose a location

requirement on the "creating" step.  The claim language does not recite "*creating at a first system*

an alias identifier for the user."  Rather it recites "creating an alias identifier for the *user at the*

*first system*."  Thus, Claim 2 is not amenable to summary judgment.

### C.   There Is Substantial Evidence That Groupon Infringes Claim 5 Of The '346 Patent.

Groupon's ██████████████████████████████████████████████

---

[19] Dr. Schmidt's infringement read is also consistent with one of the embodiment of the '346 patent.  First, the identify provider (*e.g.* Facebook or Google) generates an alias for the user.  D.I. 1, Ex. D at 31:35-36.  Then, "in some embodiments," the service provider (*e.g.* Groupon) may "create a linked user account using only the alias identifier . . . ."  *Id.* at 32:58-61.



(D.I. 227 at 32.)  Groupon's lawyers contend that Groupon does not request user attribute information based on a determination that ███████████████████████ ███████  *Id.*  But Groupon's corporate representative disagrees:

(Ex. 27 at 22:8-24:3.)  Mr. Dunham emphasizes the determination by ████████████ ████████████████████████████████████████████████████  Mr. Dunham later provides more detail about how Groupon ████████████████████ ██████████████████  (*Id.* at 149:24-150:5, 150:16-151:10.)  Dr. Schmidt cites Mr. Dunham's testimony and explains how ██████████████ sends a request message "in response to a determination at the second system that the second system does not have sufficient user attribute information." (Ex. 7 ¶¶ 212-215; Ex. 8 ¶¶ 201-205.)

Dr. Schmidt also gives several examples of how █████████████████████ ████████████████████████████████████  For example, Dr. Schmidt cites ████ ████████████████████████████████████████████████████████ ███████████████████  (Ex. 8 ¶¶ 207-209; Ex. 11 ¶¶ 426-428.)  At his deposition, when asked ████████████████████████████████████████████████ █████████████████████████████████████████████████████

██████████   (Ex. 9 at 279:4-280:25; *see also id.* at 289:21-290:5.)  Dr. Schmidt also cites ████

████████████████████████████████████████████████████████████████████████████

████████   (Ex. 11 ¶ 428.)

Groupon does not address the admissions of its corporate representative.  Rather, Groupon contends that Dr. Schmidt cannot identify ██████████████████████ and relies on two citations from Dr. Schmidt's deposition.  (D.I. 227 (*citing* Ex. 9 at 319:2-320:1, 324:16-325:22).)  Groupon's first citation concerns whether Groupon *does* have sufficient information, which is not the claimed "determination . . . that the second system *does not* have sufficient user attribute information."  (Ex. 9 at 319:2-320:1.)  Groupon's second citation does not refer to any determination and Groupon does not explain its alleged relevance.  (*Id.* at 324:16-325:22 (answering a question about █████████████████████████ )  In short, Groupon may disagree with the testimony of its own corporate representatives and Dr. Schmidt's testimony about ██████████████ but that is not grounds for summary judgment.

## IV.   THERE ARE GENUINE QUESTIONS OF MATERIAL FACT AS TO AN EARLIER ACTUAL REDUCTION TO PRACTICE OF THE '601 PATENT.

### A.   IBM Produced Evidence Of Actual Reduction To Practice Before The '601 Patent Was Filed.

To swear behind prior art, IBM must show either (1) conception and reasonable diligence in reduction or (2) actual reduction to practice.  *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1037-38 (Fed. Cir. 2001).  IBM produced evidence that the inventor of the '601 patent built a working embodiment of his invention before filing his patent.  Dr. Schmidt performed a limitation-by-limitation analysis showing that the inventor's work evidences an actual reduction to practice of the claimed invention.  (Ex. 34 ¶¶ 1348-1412.)  Groupon advances numerous arguments about

---

[20] Groupon also has no support for its assumption that the word "determination" means that Groupon must perform a "determining" step.

conception and diligence in reducing to practice, (D.I 227 at 35-37), but those arguments are irrelevant in view of IBM's evidence of actual reduction to practice.[21]

IBM's evidence of actual reduction includes ████████████████████████

████████████████████████████████████████████████████████████

█████████████ (Ex. 34 ¶¶ 1351-1358.) Every one of those dates is months before the filing date of the '601 patent. *Id.* Groupon argues that the dates are unreliable, offering no more than general assertions that timestamps might be tampered with, but whether or not the stamped dates are reliable is at minimum a triable question of fact.[22]  Groupon's only cited authority, *Kenexa Brassring, Inc. v. Taleo Corp.*, 751 F. Supp. 2d 735 (D. Del. 2015), is inapposite.  That case precluded evidence of a prior art system, but importantly did not involve expert testimony explaining the reduction to practice, and the court differentiated the case from others where an expert offered such testimony. *Id.* at 760.  In one such case, the combination of timestamped source code files, such as those IBM produced, and a detailed expert report explaining reduction to practice, such as Dr. Schmidt's analysis, was sufficient evidence to preclude summary judgment. *Netscape Comm'cns Corp. v. ValueClick, Inc.*, 707 F. Supp. 2d 640, 652-53 (E.D. Va. 2010) (finding that timestamped source code and expert's "limitation-by-limitation comparison" to the claims defeat summary judgment despite movant's argument that the timestamps were not corroborated).  And notwithstanding the availability of expert testimony here, even the *Kenexa*

---

[21] Should the Court find in Groupon's favor based on the current record, IBM should be granted leave to submit additional evidence of conception, diligence, and reduction to practice because of Groupon's late disclosure of the relevant prior art after the close of fact discovery.  (D.I. 173.)
[22] Groupon also notes that █████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████ (D.I. 227 at 36.)  Every one of those dates, however, is prior to the filing of the '601 date and creates a triable issue of fact whether it was reduced to practice before the patent filing date. (Ex. 34 at ¶ 1351.)

court found "source code . . . that bears an automatic time stamp" to create a genuine issue of material fact in its analysis regarding reduction to practice of a different prior art system than the one on which Groupon bases its analysis of the case. *Kenexa*, 751 F. Supp. 2d at 759-60.

### B.  IBM Produced Significant Evidence That The Reduction To Practice Met All Limitations Of The Claim and Worked For Its Intended Purpose.

Groupon also claims that the ▮▮▮▮▮▮▮▮▮▮ was not a working program and did not perform all steps of the claims. (D.I. 227 at 37-38.) As purported support for that proposition, Groupon cites its expert's claim that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ (D.I. 227 at 37; Ex. 16 ¶¶ 192-194.) Groupon's focus on the ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, as Dr. Schmidt showed they do. (*See* Ex. 34 ¶¶ 1360-1412.) Groupon does not address Dr. Schmidt's analysis ▮▮▮▮▮▮▮▮ every limitation of the '601 patent claims and does not give any reason why that mapping is incorrect. Indeed, Groupon does not point to a single limitation in the claims that is not met by the inventor's prior reduction to practice or ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ that would not work for its intended purpose. (*Cf.* D.I. 227 at 34-38.) Instead, Groupon twists the inventor's words when he stated that it would be ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ (Ex. 35 at 50:19-51:19.) At most, this is a triable issue of fact that is properly left for the jury.

### CONCLUSION

For the foregoing reasons, IBM respectfully requests that the Court deny Defendants' Motion For Summary Judgment.

                                              POTTER ANDERSON & CORROON LLP

OF COUNSEL:                                   By:   /s/ Bindu A. Palapura
                                                    David E. Moore (#3983)
John M. Desmarais                                   Bindu A. Palapura (#5370)
Karim Z. Oussayef                                   Stephanie E. O'Byrne (#4446)
Laurie Stempler                                     Hercules Plaza, 6th Floor
Robert C. Harrits                                   1313 N. Market Street
Brian D. Matty                                      Wilmington, DE 19801
Michael Matulewicz-Crowley                          Tel: (302) 984-6000
DESMARAIS LLP                                       dmoore@potteranderson.com
230 Park Avenue                                     bpalapura@potteranderson.com
New York, NY 10169                                  sobyrne@potteranderson.com
Tel: (212) 351-3400

                                              *Attorneys for Plaintiff*
Dated: March 19, 2018                         *International Business Machines Corporation*
5694847 / 43155

                                              40