```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE

INTERNATIONAL BUSINESS   )
MACHINES CORPORATION,     )
                          )
            Plaintiff,    )
                          ) C.A. No. 16-122-LPS
v.                        )
                          )
GROUPON, INC.,            )
                          )
            Defendant.    )


                 Monday, June 18, 2018
                 1:05 p.m.
                 Courtroom 6B

                 844 King Street
                 Wilmington, Delaware


BEFORE:  THE HONORABLE LEONARD P. STARK
         United States District Court Judge



APPEARANCES:


         POTTER ANDERSON & CORROON, LLP
         BY:  DAVID MOORE, ESQ.

              -and-

         DESMARAIS, LLP
         BY:  JOHN M. DESMARAIS, ESQ.
         BY:  KARIM Z. OUSSAYEF, ESQ.
         BY:  LAURIE N. STEMPLER, ESQ.
         BY:  BRIAN D. MATTY, ESQ.
         BY:  ROBERT C. HARRIS, ESQ.
         BY:  MICHAEL MATULEWICZ-CROWLEY, ESQ.


               Counsel for the Plaintiff
```

APPEARANCES CONTINUED:


        ASHBY & GEDDES
        BY:  JOHN G. DAY, ESQ.

                -and-

        FENWICK & WEST, LLP
        BY:  J. DAVID HADDEN, ESQ.
        BY:  SAINA S. SHAMILOV, ESQ.
        BY:  PHILLIP J. HAACK, ESQ.
        BY:  JESSICA BENZLER, ESQ.
        BY:  ATHUL ACHARYA, ESQ.

                Counsel for the Defendant

1              THE COURT:  Good afternoon.  I'll

2    have you put your appearances on the record

3    first, please.

4              MR. MOORE:  Good afternoon, Your

5    Honor.  David Moore from Potter, Anderson on

6    behalf of IBM.  With me today from the Desmarais

7    Firm are John Desmarais.

8              MR. DESMARAIS:  Good afternoon,

9    Your Honor.

10              MR. MOORE:  Karim Oussayef, Laurie

11    Stempler.  And in the row behind that are

12    Michael Matulewitz-Crowley, Robert Harris and

13    Brian Matty.  We also have summer associates

14    viewing the hearing today, Your Honor.

15              THE COURT:  That's fine.  Thank

16    you.  Welcome everyone.

17              MR. DAY:  Good afternoon, Your

18    Honor.  John Day from Ashby & Geddes for

19    Groupon.  With me from Fenwick & West, David

20    Hadden.  Saina Shamilov.  Phillip Haack.  In the

21    back row, Athul Acharya and Jessica Benzler.

22              THE COURT:  Good afternoon.

23              Welcome again to everyone.  So

24    we're here for the pretrial conference for the

1    trial that is set to begin July 16th.  As I'm

2    sure you have seen, last week we docketed the

3    opinion on the Daubert motions and the motions

4    in limine as well as some other issues in the

5    pretrial order.  Earlier today we docketed the

6    opinion on summary judgment.

7                So my agenda for today there is

8    the motion to strike related to the supplemental

9    damages report.  We'll start with argument on

10   that.  There is a few open issues that I

11   identified in the motion in limine opinion and

12   maybe a few others that I have noticed, so I'll

13   bring those up with you.  And I'll certainly

14   give you all an opportunity to present any other

15   issues that you might like.

16               We'll run through at least briefly

17   some of the mechanics of what the trial will

18   look like.  Are there any questions before we

19   begin all that?  From IBM?

20               MR. DESMARAIS:  None from the

21   plaintiff, Your Honor.

22               THE COURT:  How about from

23   Groupon.

24               MR. HADDEN:  No, Your Honor.

```
 1              THE COURT:  Let's start again with

 2    argument, limited argument, but some argument if

 3    you wish on Groupon's motion to strike.

 4              MS. SHAMILOV:  Good afternoon.  I

 5    think IBM laid out the issues.  I will address

 6    some of the issues that opposing counsel may

 7    bring up in opposition, but basically the report

 8    was served too late, there was no new data that

 9    the report relies on.  We did not consent to

10    service of that report.  The submission of the

11    report could have been presented in the opening

12    report and included there, they were not, just

13    right now it's just too late to serve them.  And

14    that's why it should be stricken, Your Honor.

15              THE COURT:  All right.  I do have

16    questions about all of that.  You say it's just

17    too late, but it's hard for me to understand

18    that.  You know, a significant trial team even

19    just here in the courtroom, it's a three-page

20    update of calculations.  We have what, a month

21    until trial.  How much work would it really be

22    or why should I view it as too much to ask you

23    if you wished to file your own supplement?

24              MS. SHAMILOV:  Yes, I think the
```

1    question is if we have a schedule and the

2    requirement and the order from the Court to say

3    when to disclose opinions and that deadline

4    passed six months ago, and there is no data that

5    was produced or provided or nothing new

6    happened, and the information and the opinions

7    that should have been disclosed six months ago

8    are now disclosed now, which significantly

9    changes the damages figure in the case and we're

10   preparing -- the trial starts in four weeks, we

11   will need to, you know, prepare a rebuttal.  If

12   Your Honor is somehow inclined to allow that in,

13   I think the other side needs to pay for the fees

14   and the legal fees and our expert fees to

15   prepare a response because we would have

16   responded to this in our rebuttal to their

17   opening damages report and there was absolutely

18   no reason why they shouldn't have or couldn't

19   have included the opinion that they serve now

20   six months ago when it was actually due.

21              THE COURT:  So I guess we'll need

22   to bring this down a little bit.  They served

23   interrogatories.  They served request for

24   production of documents.  It asked for various

1      financial information and I think it said

2      through the present.

3                  MS. SHAMILOV:  Correct.

4                  THE COURT:  And you have an

5      obligation to supplement, they have an

6      obligation to supplement their expert report.

7      And there are practices that I have some

8      knowledge of.  Why didn't Mr. Housman reasonably

9      assume that sometime before trial he was going

10     to get, given all of that, some additional

11     financial information from Groupon?

12                 MS. SHAMILOV:  I think you could

13     assume it, but I don't think that has anything

14     to do with whether he could or couldn't have

15     estimated the calculations that he's presenting

16     now six months ago.

17                 Also, I think generally when you

18     -- when the plaintiff request information

19     through trial and expects to supplement the

20     report, the interrogatories and RFPs call for

21     information either through -- give me a

22     financial information from date X or give me

23     financial information from date X through trial.

24     They didn't do that.  Instead they served

```
 1    discovery that said give me financial
 2    information from the date X through the present.
 3    That is not what generally plaintiffs ask in
 4    these situations.
 5              THE COURT:  Wasn't it at least a
 6    reasonable mistake, if that's what it was, when
 7    they said through present that they thought you
 8    would know that meant he better update you
 9    through the present day as we get closer to
10    trial?
11              MS. SHAMILOV:  If it was an
12    interrogatory response that may be a mistake,
13    but there were multiple discovery requests that
14    were phrased that way.  And so -- and then plus
15    there is -- we are so close to trial, they
16    themselves cite to cases in their briefing that
17    says to the extent there is no damages for a
18    particular period before trial, if the jury
19    returns damages verdict Your Honor can take into
20    consideration that verdict, and if there was a
21    missing damages period presented to the jury and
22    adjust it if necessary at that time, so that is
23    certainly what Your Honor can do if the jury
24    returns with a damages verdict.
```

```
1                    THE COURT:  But I would have

2      thought that probably cuts against you.  I mean,

3      why not, we're going to have a jury here, you're

4      going to present your damages theories, why

5      should I invite potential further litigation

6      after trial when we could just resolve it at

7      trial?

8                    MR. HADDEN:  This would be a

9      nonissue if we win.

10                    THE COURT:  Well, that's true.

11                    All right.  Anything else you want

12     to add?

13                    MS. SHAMILOV:  Not at this moment,

14     Your Honor.

15                    THE COURT:  Let me hear from IBM.

16                    MS. STEMPLER:  Good afternoon.

17     Laurie Simpler on behalf of IBM.

18                    With respect to the discovery

19     request of the interrogatories that we issued,

20     we also included an instruction that said that

21     we were expecting Groupon to supplement their

22     responses in accordance with Rule 26.  And with

23     respect to one of the requests at least, request

24     number 33, that was not bounded by the present,
```

1    but we did expect that using that phrase they

2    would understand that we expected them to

3    supplement.  Section 284 entitles IBM to a

4    reasonable royalty to compensate it for

5    Groupon's use of the patented technology.  And

6    that use continues after the date that they

7    decided to stop producing data.  We're talking

8    about a three-page supplement.  It's just math.

9    And it's not even clear what their expert would

10   have to change in his rebuttal opinion because

11   his criticisms of Dr. Housman focused on

12   methodology and not the number.

13              In terms of we could have

14   estimated, we asked for updated data from them.

15   When we didn't get it -- this was back in May.

16   When we didn't receive it, then Dr. Housman

17   decided well, I'll use the next best thing and

18   I'll do my best to estimate.

19              THE COURT:  There is reference I

20   think in your letter to other supplements of

21   other reports over the course of this

22   litigation.  And I have this provision in the

23   scheduling order here that said you can't serve

24   additional expert reports without consent or

1      order from the Court.  Were any of those

2      supplements ones that the parties expressly

3      asked each other for consent on?

4                    MS. STEMPLER:  I believe one of

5      the corrected reports, Groupon did notify us

6      that they were going to serve a corrected

7      reports to deal with the additional Priceline

8      agreement the parties had also agreed because

9      that was new information, and it's the same

10     thing here under Rule 26 that in addition to

11     them being required to supplement, Dr. Housman

12     is required to supplement to account for

13     additional information which are the sales from

14     July 2017 through the present.

15                    THE COURT:  Anything else?

16                    MS. STEMPLER:  No, Your Honor.

17                    THE COURT:  Okay.  Any reply?

18                    MS. SHAMILOV:  Very quickly, Your

19     Honor, if I may.

20                    THE COURT:  Sure.

21                    MS. SHAMILOV:  Just very quickly,

22     Your Honor.  Since the report was served, the

23     report, opening reports were served in

24     September.  Their reply reports, supplemental

1    reports, depositions took place at the beginning

2    of 2018.  At no point throughout this entire

3    period until May 2nd did IBM ask for

4    supplemental information or that we expect you

5    to supplement data regarding your sales through

6    July 17 or we're going to serve supplemental

7    reports from Dr. Housman.  And the very first

8    time this was raised, we were actually

9    negotiating the pretrial order on May 2nd.

10                 I think if rules mean anything,

11   this is just too late, Your Honor.  And they had

12   many opportunities to raise it.  That's all I'm

13   saying.  Thank you.

14                 THE COURT:  Thank you.

15                 I don't agree with the defense's

16   position.  I am denying the motion to strike.

17   In my view, IBM is meeting its obligation to

18   supplement its expert report by supplementing

19   the damages figure of the damages it's seeking

20   through trial.

21                 In part having looked at what was

22   served in discovery and understanding something

23   about the course of this litigation, I don't

24   think that what has happened here was any

1    surprise to Groupon.  I don't think that Groupon

2    is prejudiced in any material way by it.  I

3    think that they can fairly easily prepare a

4    rebuttal response if they wish to do so.

5    Alternatively, they can, although I'm not

6    ordering it, they can provide at this point if

7    they wish the updated data and the parties can

8    then all appropriately respond to it.

9            I also don't think that that would

10   be unfair or unduly prejudicial to either side.

11   You are all experienced trial lawyers.  There

12   are a lot of you here.  That's not a lot to do

13   in the next four weeks.

14           If there was any failing by IBM, I

15   would find that it's substantially justified and

16   largely harmless.  I don't think Pennypack

17   factors apply, but if they do, they certainly

18   don't favor exclusion for reasons including

19   those that I have ready said.

20           And one other thing, at least in

21   my experience, damages experts frequently seem

22   to sit through the entirety of the trial.  And

23   it seems to me that one reason they do that is

24   they like to have the opportunity to perhaps

1    respond a little bit to things that they see

2    happen in real time during trial.

3              Whether that's going to happen in

4    this case, whether I will permit it, whether

5    there will be objections, those are all

6    questions we will have to see, but I think it

7    puts it in context that what's happened here, if

8    it was any failing at all on IBM's part it's a

9    very minimal one and not really prejudicial to

10   the defendants.  And it's something defendants

11   can deal with I think quite easily.  So the

12   motion is denied.

13              Any questions about that?

14              MS. SHAMILOV:  No, Your Honor.

15              THE COURT:  Any questions?

16              MS. STEMPLER:  No, Your Honor.

17              THE COURT:  Let's move on to some

18   other issues.  There might be a dispute about

19   whether joint infringement is being alleged and

20   if so, which patents.  And so let's first find

21   out if IBM thinks it's asserting that, and if so

22   whether there is a dispute about it.

23              MR. OUSSAYEF:  Your Honor, Karim

24   Oussayef for IBM.

1               Yes, IBM is alleging joint or also

2    called attributed infringement.  And that theory

3    was disclosed both in its infringement

4    contentions and also in its expert report.  And

5    both of those specifically related to the '967

6    and the '849 patents.  Both of those were

7    specifically called out in both the infringement

8    contentions and its expert report.

9               THE COURT:  These are the Philip

10   patents; correct?

11              MR. OUSSAYEF:  Yes, that's correct

12   Your Honor.

13              THE COURT:  Do you understand

14   there to be a dispute on this?

15              MR. OUSSAYEF:  I understand the

16   defendant's position is that we did not

17   adequately disclose joint infringement, although

18   I can't speak for defendants, that's my

19   understanding of their position.

20              THE COURT:  Thank you.  Let me

21   hear from defendants, is there an issue on this?

22              MS. SHAMILOV:  Your Honor, yes,

23   there is an issue, to the extent during summary

24   judgment briefing the joint infringement

1    arguments made by IBM was not something in their

2    expert reports, so to the extent that is the

3    theory that will be advanced at trial, which we

4    don't know yet, which joint infringement would,

5    there is no supporting expert reports for that.

6    That's the nature of the dispute right now.

7            THE COURT:  So as you probably

8    know, normally I would deal with objections that

9    certain expert testimony is beyond the scope of

10   what was fairly disclosed at trial.  Is

11   defendant asking me to depart from that practice

12   on this dispute or is this something we can deal

13   with at trial?

14           MS. SHAMILOV:  I guess it would be

15   good for us to know IBM isn't expecting or

16   intending to advance the joint liability issue

17   as articulated in their summary judgment motion

18   now.

19           THE COURT:  So you agree that they

20   preserved the right to proceed on joint

21   infringement, but the articulation of the theory

22   that you saw in the briefing on summary judgment

23   you say was not disclosed?

24           MS. SHAMILOV:  Correct.

```
1                    THE COURT:  All right.

2     Mr. Oussayef, I don't know if that helps, or do

3     you have anything to say in response?

4                    MR. OUSSAYEF:  Yes, Your Honor.  I

5     believe this is an issue that could have

6     properly been raised at summary judgment.  This

7     was a position that Groupon took with respect to

8     the '601 patent.  They allege that our theory

9     had somehow changed.  We disagreed with them.  I

10    think the proper procedure is if they believed

11    that the theory has changed, they could have

12    brought it up at summary judgment.  To put it in

13    a new issue in the pretrial order doesn't seem

14    to make sense particularly in light of the fact

15    that there is specific citation in footnote

16    three to the pretrial order that specifically

17    outlines exactly where those theories were

18    produced and disclosed.

19                    THE COURT:  Thank you.

20                    Ms. Shamilov, anything you want to

21    say in response?

22                    MS. SHAMILOV:  I think the parties

23    are bound by what their experts disclose.  There

24    is no such thing as a waiver, that is not
```

1    pointing something out in the summary judgment

2    which I think we did, but I don't think that

3    means that their expert can talk about stuff

4    that's not in their expert report.

5                THE COURT:  All right.  Thank you.

6    So I am going to the extent there is a conflict

7    here defer resolving it until it comes up if it

8    does at trial.  I think the parties are in

9    agreement, and certainly this is my finding,

10   that IBM has disclosed some theory of joint

11   infringement of the '967 and '849 patents.  IBM

12   has an obligation, as both parties do, to have

13   fairly disclosed any expert support for that

14   theory, including in any expert reports,

15   declarations and depositions.  There is a

16   process discussed I think in the pretrial order,

17   if you have questions about it, you'll let me

18   know, whereby you will disclose on a witness by

19   witness basis whatever exhibits you intend to

20   introduce through that witness as well as any

21   demonstratives you intend to use.  Typically

22   that gives you a pretty good clue as to what

23   testimony is going to be proffered, and to the

24   extent that doesn't, then as you hear it, you

1    have the right to stand up and object.  And if

2    there are objections that something was not

3    fairly disclosed previously, we'll deal with

4    those at trial.

5              Any questions about that?

6              MR. OUSSAYEF:  No, Your Honor.

7              THE COURT:  Questions?

8              MS. SHAMILOV:  No, Your Honor.

9              THE COURT:  Okay.  How about

10   doctrine of equivalents.  For what patents, if

11   any, is IBM asserting doctrine of equivalents

12   infringement?  I want to make sure similarly we

13   don't have a dispute as to what's going to be at

14   issue here.

15             MR. OUSSAYEF:  Yes, Your Honor.

16   IBM is alleging doctrine of equivalents theory

17   for the '849 patent.  I think there was -- I did

18   read Your Honor's opinion from earlier today

19   where there was a footnote that expressed that

20   perhaps there was some confusion over the

21   doctrine of equivalents theory.  I think the

22   reason why the issue did not come up during

23   summary judgment is our doctrine of equivalents

24   theory is not specific to what Groupon was

```
 1    alleging in its summary judgment brief.  So, for
 2    example, Groupon was arguing that, you know,
 3    areas had to be fixed and separate, and our
 4    doctrine of equivalents argument is not about
 5    whether things are fixed or separate, so that's
 6    why it did not come up during summary judgment
 7    briefing.
 8              THE COURT:  But you're only
 9    proceeding on a doctrine of equivalents on the
10    '849?
11              MR. OUSSAYEF:  Excuse me, also the
12    '601 patent.  I apologize, Your Honor.  So the
13    '601 patent is a theory that Your Honor
14    discussed in the opinion from earlier today.
15    That is also doctrine of equivalents.
16              THE COURT:  Thank you.  Do
17    defendants understand that and/or have any
18    objection to that?
19              MR. HADDEN:  No.  We understand
20    that, Your Honor.  I think we'll deal with it as
21    Your Honor suggest at trial to the extent it
22    goes beyond their expert report or goes to
23    what's covered by the prior art.
24              THE COURT:  Thank you.  Let's talk
```

```
1    about where we are on objections based on

2    authentication.  I'll let plaintiffs address

3    this first.

4              MR. OUSSAYEF:  Your Honor, with

5    respect to authentication, I believe there had

6    been a proposal by defendants about the

7    stipulations that might be able to be stipulated

8    to regarding authenticity.  I understand that

9    Your Honor rejected that proposal, but also told

10   the parties to be prepared to discuss

11   authenticity with specificity here today.  So

12   with that in mind, the parties have discussed

13   earlier this morning about what procedures to

14   proceed by in order to make sure that all

15   parties understand how authentication challenges

16   will proceed.  And we do have a proposal for

17   Your Honor.  And I believe we're on the same

18   page as Groupon.  I would like to read that into

19   the record and make sure that we're all on the

20   same page.

21             THE COURT:  Okay.

22             MR. OUSSAYEF:  So our proposal is

23   that Groupon will disclose all exhibits relevant

24   to invalidity that it will use at trial on June
```

1    29th.  And that's the date that Your Honor

2    ordered with respect to narrowing contentions.

3              And on that date, then IBM will

4    later identify its authenticity objections with

5    respect to those exhibits on July 3rd, 2018.  So

6    that's a few days afterwards.  And the parties

7    will meet and confer regarding those

8    authenticity objections with specificity on July

9    7th, 2018.

10             And in that way, the universe of

11   potential exhibits with authentication

12   challenges will be narrowed before the parties

13   discuss authenticity with specificity and try to

14   narrow the issues in dispute.

15             THE COURT:  In the course of that,

16   there was some back and forth about witnesses

17   and who might come to lay a foundation if need

18   be.  What does your proposal say about that?

19             MR. OUSSAYEF:  There is no

20   specific proposal with regard to that.  Your

21   Honor, IBM's position would be that on the

22   witness list there is no person identified with

23   specificity regarding custodians that could

24   testify about authenticity.  So it's IBM's

1      position that Groupon has not disclosed any

2      witness, it has simply said that it reserves the

3      right to bring a custodian, presumably to be

4      named later that we have no idea who that is.

5      To the extent Groupon wanted to preserve a

6      witness to testify about authenticity, it had

7      the opportunity to do so and has not done so.

8      So IBM would ask the Court to strike the

9      reference to unnamed custodians because there is

10     no information that IBM can use to prepare its

11     case with regard to who those custodians would

12     be.  And even if Groupon was of the perspective

13     that there should be no authenticity objection,

14     then it should have doubly made sure to put

15     witnesses on its witness list to address any

16     authentication challenges.

17              THE COURT:  Thank you.  Let me

18     hear from Groupon.

19              MS. SHAMILOV:  Your Honor, I think

20     generally the agreement was correctly read, but

21     there is a wrinkle to that.  So this will

22     resolve the authenticity objections to

23     invalidity type of exhibits, but IBM is

24     objecting to other documents on our exhibit list

1     on this ground.  And we're not sure yet what the

2     nature of that objection is because they're

3     actually authenticity objections to documents

4     that are on IBM own list and to documents that

5     IBM itself produced in this case, and so when we

6     discussed before coming into the courtroom, we

7     also, at least Karim can correct me if I'm

8     wrong, agreed that on June 29th when we will

9     identify which particular invalidity references

10    they may bring up in trial, IBM will identify

11    their own non-prior art exhibits on our list, it

12    will continue to maintain an authentication

13    objection and then we can cure whatever that

14    objection is in the parties' discussions as

15    outlined by Karim and in agreements July 3rd and

16    July 7th.

17            As to the witness on our list, we

18    have no -- because we don't have an idea, right

19    now every single invalidity reference on our

20    list is objected as not authenticated.  We have

21    no idea what the specific objections will be at

22    issue here.  And so once those are identified,

23    we'll be able to cure any issues to the extent

24    IBM raises any specifically in this proposal, so

1    we don't agree that we cannot raise the issue.

2    I think also the authentication objections are

3    something Your Honor will probably decide, and

4    so we can sort of resolve those disputes outside

5    of the jury hopefully and that won't need to be

6    an issue in front of the jury.

7                 THE COURT:  Okay.  Thank you.

8                 Mr. Oussayef.

9                 MR. OUSSAYEF:  Yes, I do have a

10   point of clarification, Your Honor.

11                THE COURT:  Okay.

12                MR. OUSSAYEF:  So we went back and

13   looked at the exhibits that we objected to on

14   authentication grounds, and we don't understand

15   what exhibits there are that are not related to

16   prior art that Groupon intends to rely that we

17   objected to on authentication.  So we would

18   propose that to the extent there is an exhibit

19   that's there that is for something other than

20   prior art that Groupon would identify that they

21   intend to use that exhibit, too, because from

22   our perspective, we see, for example, the screen

23   shot of a website that's kind of bare but that

24   we don't know what it is, and that's our

1    authentication objection.  And we're not sure,

2    perhaps Groupon intends to use it for something

3    other than prior art, but from our perspective,

4    it looks like the exhibits where we objected to

5    authentication are ones that they're intending

6    to use it on prior art.  To the extent that

7    they're using it for something different, we

8    would ask that they identify that so that we

9    understand the context of where those exhibits

10   are being used.

11              THE COURT:  Is it not correct that

12   you've agreed before coming in today that by

13   June 29th, you will let them know of any other

14   documents that you object to based on

15   authentication issues?

16              MR. OUSSAYEF:  So the procedure,

17   Your Honor, we outlined is by June 29th, they

18   will identify the exhibits that they intend to

19   use for prior art purposes, and then we'll

20   identify our authenticity objections with

21   specificity with respect to those objections.

22   We think that all of the things that we have

23   objected to on authentication grounds are things

24   that are relevant to prior art, but to the

1    extent there is not, we want to know what they

2    are going to be used for.

3                    THE COURT:  All right.

4                    MS. SHAMILOV:  I think I can

5    clearly resolve this if IBM represents that

6    they're not objecting on authenticity basis to

7    anything that's not going to be used, solely for

8    documents that we may use for prior art.  For

9    example, there are screen shots from Groupon's

10   website that are being objected to on

11   authenticity basis.  That is not a prior art

12   issue.

13                   So long as IBM's position is that

14   their authentication objection is only to prior

15   art references, I think our proposal that we

16   discussed will work and that means all the other

17   authentication objections that are currently on

18   our list are dropped.  Other than that, I just

19   don't see how else we will know what an

20   authentication objection is to prior art.

21                   THE COURT:  What's IBM's response?

22                   MR. OUSSAYEF:  I think there is a

23   way, Your Honor, that this can all be avoided

24   which is that Groupon can just identify which

1    exhibits it intends to use that have

2    authenticity challenges, you know, pending on

3    them, and then we will identify our

4    authentication challenges with specificity,

5    regardless of whether they pertain to prior art

6    or not.  There is a small handful, a couple of

7    dozens of objections on authenticity.  It's

8    pretty manageable.  It should be much more

9    manageable once we get to a situation where we

10   know what the universe of prior art is.  To the

11   extent there is a handful of exhibits that

12   Groupon intends to use at trial that doesn't

13   relate to prior art, we'll understand what those

14   exhibits are, too, and we'll be able to figure

15   out exactly what's at issue.

16            THE COURT:  Is that agreeable?

17            MS. SHAMILOV:  I cannot agree to

18   that, Your Honor, because they're asking for a

19   preview of exhibits that we're going to use at

20   trial that are not prior art related.  We seek

21   when trial commences, outside of the strategy of

22   trial, to identify exhibits.  So I think -- I

23   mean, I think it's what -- they have objected to

24   the authentication stipulation which was

1    reasonable.  I think it's for IBM to identify

2    with specificity what it is that they believe is

3    not authentic outside of the prior art realm on

4    the date when we will identify the prior art.

5    And then we can resolve the issues hopefully

6    before the trial commences.

7            THE COURT:  Here what is we're

8    going to do.  I'm directing that you all meet

9    and confer and get me a revised proposal by the

10    end of the day tomorrow.  You have the outlines

11    of a proposal, but I don't think it's fair to

12    ask the defendant to disclose exhibits they're

13    going to use at trial for which the plaintiff

14    has an unspecified authentication objection.

15    It's for the plaintiff to identify which, if

16    any, authentication objections it wants to press

17    based on what it knows at this point.

18            Now, I'm not saying that it's a

19    bad idea for the defendant to disclose what

20    prior art documents it's going to use.  I think

21    that's a good idea, but in parallel with that,

22    somehow the plaintiff has to identify for the

23    defendant what else it might want to press an

24    authentication exhibit on, so there is going to

```
 1        have to be a series of steps.  I'm fine with you
 2        all concluding that process with a meet and
 3        confer on July 7th.
 4                        I'm going to add to it that by
 5        let's say July 8th, you get a joint status
 6        report to me so I know whether there are any
 7        remaining objections to authentication that are
 8        ripe and if so, how you propose to deal with it.
 9        I'm hoping the day doesn't come, but if it does,
10        I can tell you I think I would probably let the
11        defendant produce a witness or witnesses if
12        that's the only way to authenticate these
13        exhibits.  I don't think that they're unfairly
14        prejudicing the plaintiff in not being able to
15        identify with specificity the individuals when
16        the plaintiffs have not yet specified exactly
17        why they're objecting based on authentication
18        grounds.  But exactly what we'll do after July
19        8th to resolve any remaining objections, I'll
20        look for your proposals first.
21                        But get me some kind of proposal
22        tomorrow for how we're going to get there.  Any
23        questions about that?
24                        MR. OUSSAYEF:  No, Your Honor.
```

1    Thank you.

2                    THE COURT:  Any questions?

3                    MS. SHAMILOV:  No, Your Honor.

4                    THE COURT:  Let's talk about the

5    issue of closing the courtroom.  You saw my

6    inclination not to close the courtroom.  Does

7    IBM want to talk about that?

8                    MS. STEMPLER:  Yes, Your Honor.

9    Thank you.  On the issue of clearing the

10   courtroom, IBM has an active licensing practice

11   and there are confidential sensitive financial

12   terms in its license agreements.  To the extent

13   that those terms get disclosed, that can injure

14   IBM because it would give competitors or

15   potential future licensees the ability to

16   undercut IBM in future negotiations.  It also

17   would reveal information about IBM's licensing

18   strategy.  Not only does it harm IBM, disclosure

19   would harm the non-licensee parties to those

20   agreements because they also have accepted the

21   terms and the confidential financial terms of

22   those agreements.

23                    On balance the injury to the IBM

24   nonparty outweighs any interest the public could

```
1    have in having access to the detailed terms of
2    IBM's confidential agreements.  This isn't a
3    case where everything is centered on a core
4    dispute involving license terms.  And the
5    sealing would really pertain to a handful of
6    witnesses and to select portions of their
7    testimony.
8                In contrast, if it's an open
9    courtroom, IBM will have to notify the licensees
10   of the potential for disclosure and give the
11   licensees an opportunity to intervene and seek
12   further protection from the Court.
13               THE COURT:  Should I understand
14   that the licensees are not aware of this
15   potentiality?
16               MS. STEMPLER:  So when we had to
17   produce the license agreement we had to notify
18   them of production under the protective order
19   and their licenses would be designated outside
20   counsel eyes only and that was the disclosure
21   that they agreed to at the time.  Obviously when
22   the licenses are disclosed in open court, that's
23   a different level of disclosure, so we would
24   have to reach out again to notify them of the --
```

1          THE COURT:  I guess the question

2    occurs to me, how do I know that any of these

3    third parties even care or that they would view

4    themselves as being injured?

5          MS. STEMPLER:  The licensees said

6    they were okay with disclosure under the

7    protective order on the outside counsel eyes

8    only basis, suggesting that if it was anything

9    more than that, that they would want to be

10   notified.  These are confidential terms that

11   they have agreed to and having that become

12   public it could harm them in the future because

13   other parties would know what they've agreed to.

14          I would add that if the Court is

15   not inclined to seal the courtroom completely,

16   then IBM would respectfully request that another

17   way to deal with this could be to the extent

18   license agreements are admitted into evidence,

19   admit those under seal, and while the witness is

20   testifying about them to not publish the

21   contents of the license agreements on the court

22   monitors.

23          THE COURT:  And how is IBM injured

24   and how do I weigh that against IBM wants to use

1    these licenses and use the Court's time and the

2    resources including citizens sitting on a jury

3    to ask for quite a lot of money?

4              MS. STEMPLER:  So the license

5    agreements in terms of IBM's use of the license

6    agreements, they would be used to -- really it

7    would be a discussion of IBM's licensing

8    practices and to show that these patents have

9    been successfully licensed in the past.  The

10   issue really lies with the Groupon's damages

11   expert who has an analysis where he's going to

12   be talking about the amounts that these nonparty

13   licensees paid for a license to the patent, and

14   that's really where there is the sensitive

15   financial information that would be harmful to

16   both IBM and the nonparty licensees because then

17   other parties would know and the public would

18   know about the amount that they're willing to

19   accept or to pay.

20             THE COURT:  I see that they would

21   know, but you brought this lawsuit.  These are

22   relevant documents.  You want to use them at

23   least in part affirmatively it sounds like

24   because you want to talk about your successful

1    licensing of them, of the patents.  In doing the

2    balancing that you suggest I need to do, I'm

3    just having a hard time seeing why that balance

4    at all favors IBM on this point.

5                MS. STEMPLER:  I think it's just

6    that the injury in terms of the harm to IBM

7    would be that in the future other companies

8    would know the confidential financial terms that

9    were acceptable to IBM and would be able to

10   undercut IBM in negotiations perhaps, and just

11   that IBM's licensing strategy, detailed

12   licensing strategy and detailed financial terms

13   would be disclosed.  And that's really the heart

14   of the injury.  And the financial information of

15   the nonparty licensees as well.

16               THE COURT:  Okay.  Thank you.

17   We'll hear from Groupon both on this and if

18   you're still asking that we close the courtroom

19   for other information.

20               MR. HADDEN:  No, we are fine with

21   Your Honor's proposal to leave the courtroom

22   open.

23               On the licensing, you know, as

24   Your Honor notes, IBM is asking for a lot of

1    money in this case.  And it is using these

2    licenses both as an argument to show that the

3    patents are valid and being used.  And those

4    licenses are going to be a key aspect of this

5    case, both on damages and to rebut that argument

6    by showing what people actually paid for these

7    licenses.  To come in here and claim $250

8    million and then try to hide the ball as to what

9    the actual licensees who took licenses paid is

10   not fair, Your Honor.

11              In addition, the licenses provide

12   a defense to us on the '346 patent, so we're

13   going to need to discuss the specific terms of

14   those licenses as well as the amounts which is

15   clearly relevant to damages.

16              So if there is an issue with

17   notifying the third parties, IBM could have

18   notified the third parties.  And knew it was

19   going to trial.  It's been chugging along there

20   for months.  There is no prejudice.

21              THE COURT:  I assume if I made

22   this an order that the courtroom is going to be

23   opened that they will notify third parties if

24   they presumably have obligation to do so.  I

1    don't know.  They suggest at least in the papers

2    that there could be some sort of administrative

3    nightmare coming for all of us once they notify

4    all of those third parties.  Are you concerned

5    about that?

6              MR. HADDEN:  I'm not concerned

7    about it.  I think they should notify them

8    already if they haven't, and I would be

9    surprised if they haven't.

10              THE COURT:  Okay.  Thank you.

11              MR. HADDEN:  Thank you.

12              THE COURT:  Anything else?

13              MS. STEMPLER:  Just to clarify,

14    Your Honor, with respect to your question about

15    the public, there is no harm in the public not

16    knowing about the details of confidential terms

17    of IBM's license agreements.  The jury will have

18    access to that.  The public will still be able

19    to understand the disputes that are at issue in

20    this case without having access to the content

21    and the detailed information within those

22    agreements.  I just wanted to further address

23    the question that you asked at the end.

24              THE COURT:  Okay.  Thank you.  I'm

1    going to adhere to my inclination and make it an

2    order at this point, and I'll try to explain it.

3    So at this point I don't anticipate closing the

4    courtroom at all during the trial.  Groupon is

5    no longer asking that I close it with respect to

6    discussions of source code, so that's a

7    nonissue.

8              I recognize IBM's concerns, but I

9    think, you know, the courtroom is presumptively

10   open.  The public has a First Amendment right

11   for reasons that are well settled and that we

12   probably all understand.  So I have to think

13   about what harm or prejudice has been asserted

14   that might begin to rise to that level or that I

15   should weigh against the public's interest and

16   here I just don't find it persuasive.  IBM I

17   think should have known when they filed this

18   case that it's quite likely that their licensing

19   strategy and the specific terms of license

20   agreements would become public should they be

21   seeking damages, which they have been from the

22   beginning, and it's not a surprise they're still

23   seeking damages should the validity of their

24   patents be challenged, and it's not a surprise

```
1     that the validity of the patents had been

2     challenged, should there be a licensing defense,

3     which there is a licensing defense, there has

4     been in this case for quite some time, so I

5     think in order to understand this case, it's

6     important that the public have access to the

7     information on which the jury is going to make

8     their decision.  And I don't think any injury to

9     IBM comes close to being significant enough to

10    lead to me closing the courtroom.

11                 With that said, there is reference

12    to third parties.  I have nothing in front of me

13    that indicates that any third party is in any

14    way injured or sufficiently injured to ask me to

15    do anything about that injury.  There is what,

16    four weeks until trial.  You know, if I hear

17    from third parties and they ask me to evaluate

18    this further, I'm sure that I will, you know,

19    have to pay attention to whatever they say.  But

20    you know, both sides will have a chance to be

21    heard on that.  And if I have to reevaluate,

22    I'll reevaluate.

23                 The only further thing I would say

24    is I do want the parties to confer with one
```

```
1     another as we get close to this case where these
2     exhibits would be used, there might be some
3     redactions that I would approve of.  If they're
4     sensitive stuff that is truly irrelevant to the
5     issues being tried, then perhaps the parties
6     will agree that can be redacted and if they
7     don't agree, perhaps I'll be persuaded to redact
8     it, but until any further order of the Court,
9     this trial will be fully opened to the public.
10                  Any questions about that?
11                  MS. STEMPLER:  No, Your Honor.
12                  THE COURT:  Any questions?
13                  MR. HADDEN:  No, Your Honor.
14                  THE COURT:  Okay.  In terms of
15    when you call experts and I do the voir dire
16    basically and then at a certain point offer the
17    expert for a certain purpose, I want you to make
18    sure that you have conferred with the other side
19    about what language you're going to use when you
20    say we hereby offer this expert for whatever,
21    patent damages or whatever the case may be.  I
22    don't want to have to deal with objections to
23    that language that you use.  So disclose that
24    proposed language sufficiently in advance that
```

1    if the other side has a concern with it and you

2    can't work it out, you can raise it with me

3    before that witness is called to the stand.

4                    Any questions about that?

5                    MR. DESMARAIS:  No, Your Honor.

6    That makes sense.

7                    MR. HADDEN:  No, Your Honor.

8                    THE COURT:  In terms of voir dire

9    and the preliminary instructions, so I have made

10   a number of rulings already since you submitted

11   those last week including you now know I have

12   approved of the juror questionnaire.  You will

13   have those responses at least some time before

14   jury selection.

15                   You should also know, here is the

16   way I'll do jury selection.  Some of you have

17   already seen it.  But the jury pool will be

18   brought into the courtroom.  They'll be in those

19   benches behind all of you.  I will read

20   something about the nature of the case, and I

21   will read all of the questions to them.  They'll

22   all be in yes, no format and there won't be any

23   follow-up built into the questions that I ask

24   because I will ask each of the members of the

1    jury pool just to think to themselves without

2    standing up, without raising their hand, without

3    talking in court whether they have a yes to any

4    question.  And then we'll move into my jury room

5    and my staff will bring in jurors one by one who

6    tell my staff that they answered yes to

7    something and then when they come in, I'll make

8    a record with them by asking them do you know

9    what you answered yes to.  I may ask a little

10   bit of follow-up, and then I will give each side

11   a chance for a very brief, if necessary,

12   follow-up questioning.

13            All that is a long way of saying I

14   want you all to put together a new version of

15   the voir dire as well as the preliminary

16   instructions.  I'm talking about the voir dire

17   now that is consistent with that approach as

18   well as the rulings that I have given you, and

19   any rulings that might be forthcoming because I

20   don't need to see that again until July 11th.

21   So work together and get me something.

22            And so among other things I'm

23   hopeful you'll all agree on a very brief

24   statement that I could read to the jury about

1    what this case is about.  I don't think they

2    need a lot of detail at the very beginning and I

3    think you should be able to work that out.

4              Also on July 11th, get me an

5    updated version of the preliminary instructions.

6    You had a lot of disputes in the version you

7    submitted the other day.  I would be hopeful

8    that maybe you'll work some of those out, but

9    whether you do or not, get me a new verdict on

10   July 11th.

11             Before I ask you if you have

12   questions about that, another question I want to

13   hear your views on is am I going to be asked to

14   tell the jury pool that they are not to use

15   Groupon during the course of this trial?  This

16   is an issue that comes up when very popular

17   internet programs are on trial, so if plaintiffs

18   can speak to that and if you have any questions

19   about what I see about voir dire and preliminary

20   instructions.

21             MR. DESMARAIS:  John Desmarais for

22   IBM.  No questions about the voir dire or

23   preliminary instructions.  I do think that we

24   would want you to tell the jury not to use the

1    internet, not to use Google searches, not to

2    research the case.  And I think in this

3    particular case that would have applicability

4    here because they're going to hear our theory of

5    infringement and if they're on the Groupon

6    website, they can do their practical test of

7    whether they agree with us or not.  It seems

8    very dangerous to us.

9              THE COURT:  Okay.  Groupon?

10             MR. HADDEN:  Your Honor, I think

11   your standard instructions to tell the jury not

12   to go do their own research, I don't see any

13   reason to instruct them not to use Groupon

14   during the course of the trial.

15             THE COURT:  The problem is we all

16   know, I think, that just using Groupon would in

17   effect be doing research.  I mean, they could

18   see some of the functionality that they're going

19   to hear about during the course of the trial.

20             MR. HADDEN:  I think that's

21   different than going on and Googling to find out

22   about some technical feature.  I think if

23   they're Groupon users, they're used to using

24   Groupon.  Whether they do it during the trial or

1    not is not going to affect what goes on in the

2    jury room.

3                THE COURT:  Mr. Desmarais,

4    anything further that?

5                MR. DESMARAIS:  I would just be

6    repeating myself, Your Honor.  I think you

7    understand our position.

8                THE COURT:  I see that I raised

9    the problem for myself, but it was going to come

10   up eventually I suspect.  I don't have an answer

11   to the question.  I have had trials with

12   Facebook, I have had trials with Google, and

13   that's why I thought I should bring it up,

14   because the issue, if I don't deal with it

15   upfront, someone will ask me over the course of

16   a couple of weeks, you know, is it okay for me

17   to use Facebook or something to that effect.

18                I'm going to ask you all to think

19   about it further.  If you form a joint position,

20   let me know that right away and I'll stop

21   worrying about it.  If you don't, then I will

22   make a decision by the time we select the jury

23   whether I'm going to tell them anything about if

24   they can use Groupon or not.

1              In terms of final jury

2    instructions and the proposed verdict sheet, I

3    will need you to revise those as well.  For that

4    I'm going to give you until July 18th, which I

5    think is the first Wednesday of trial.  So I

6    hope that you will continue to meet and confer,

7    and as you refine your cases, I think some of

8    those disputes at least will go away.

9              To the extent there are remaining

10   disputes and the verdict is on the 18th, we will

11   find a time during the time of the trial for you

12   to argue those and that's one of the few things

13   that I don't charge time for during trial.

14             So let's talk about time at this

15   point.  You probably understand that other than

16   the whole jury selection process and me reading

17   the preliminary instructions and me reading

18   final instructions, and any argument we have

19   about the verdict sheet and the jury

20   instructions, other than that, I think it's safe

21   to say that if I'm on the bench, somebody is

22   being charged time.  The easy ones are your

23   direct examination of a witness, your

24   cross-examinations of a witness, your redirect

1    examinations of a witness, your opening and your

2    closing arguments are all charged to you.  When

3    we meet in the mornings, because we will meet

4    before the jury comes in each morning, if there

5    are objections to admission of exhibits, for

6    example, I'm going to charge all of the time to

7    the objecting party, so whoever raises the

8    objection will be charged for their time as well

9    as the other side's response as well as whatever

10   time it takes me to articulate my decision.

11                Obviously with that, and with

12   everything, if I think somebody is abusing

13   things, then I reserve the right to shift time

14   or deduct time or whatever need be.

15                Expert objections or those

16   objections to expert testimony being beyond the

17   scope is one exception to the rule that I just

18   explained, so on those we do our best to

19   determine who won and who lost that objection.

20   And whoever prevails on the objection is not

21   charged any time for that objection.  The party

22   that did not prevail is charged all the time, so

23   they're charged for their own argument, for the

24   other side's argument, and for whatever time I

```
 1      took to resolve the dispute.  We let you know

 2      day by day where you are on time.  And if you

 3      have any questions, you are to let us know and

 4      we'll do our best to resolve them as quickly as

 5      possible.

 6                  All that said, you saw that I

 7      think you can do this in 18 hours, but I will

 8      hear argument for up to 20 hours.  Now would be

 9      the time to argue for more time or to ask more

10      questions about how we're going to keep track of

11      time.

12                  First from the plaintiff.

13                  MR. DESMARAIS:  We are comfortable

14      with 18 hours.

15                  THE COURT:  How about defendant?

16                  MR. HADDEN:  Your Honor, given

17      that all four patents are going to stand in the

18      case, we think 20 would be helpful, Your Honor.

19                  THE COURT:  Okay.  And any

20      questions about the time, Mr. Hadden?

21                  MR. HADDEN:  No questions, Your

22      Honor.

23                  THE COURT:  Mr. Desmarais?

24                  MR. DESMARAIS:  No questions, Your
```

```
 1    Honor.
 2               THE COURT:  All right.  I don't
 3    think you need 20, but I will give you the 20.
 4               MR. HADDEN:  Thank you, Your
 5    Honor.
 6               THE COURT:  So we'll enter an
 7    order to make sure that each side has 20 hours
 8    now.
 9               Let me ask you this.  We have had
10    occasion, including very recently, where a party
11    does not save any material amount of time for
12    their closing argument and that becomes
13    difficult for the jury.  Other judges, including
14    judges in this court, I think either separately
15    count time for closing.  I'm not going to do
16    that.  You have 20 hours, that's set.  But what
17    I'm contemplating doing is keeping a certain
18    amount of that in a bank and not letting you
19    touch it until we get to closings.  I haven't
20    tried that before, but I'm thinking about it.
21    Any thoughts on whether I should do that and if
22    I were to do that, how much should I put in the
23    bank and not let you touch.  Mr. Desmarais?
24               MR. DESMARAIS:  I think an
```

1    hour-and-a-half would be a good amount of time

2    for closing.  If you wanted to do that, that

3    would be a fair amount for us.

4              THE COURT:  You have no objection

5    to me telling you there is 90 minutes you can't

6    touch until we get to closing?

7              MR. DESMARAIS:  No objection, Your

8    Honor.

9              THE COURT:  What do defendants

10   think?

11             MR. HADDEN:  That's fine, Your

12   Honor.  Since he gets to go twice at closing,

13   maybe save an hour for me.

14             THE COURT:  Well, we'll try this.

15   I'll save an hour for both of you.  So you have

16   20 hours, but unless you make a persuasive pitch

17   sometime when you get close to 19 hours that you

18   want to dip into your retirement savings, I'm

19   going to hold on to that last hour and give it

20   to you only when we get to closing arguments.

21             Okay.  That was pretty much my

22   list of things I wanted to make sure to raise

23   with you, other than mechanics of how we'll run

24   the courtroom, which I'll get to, but are there

```
 1    issues that IBM wanted to raise that I didn't

 2    get to?

 3                    MR. OUSSAYEF:  Yes, Your Honor.

 4                    THE COURT:  Okay.

 5                    MR. OUSSAYEF:  The parties have

 6    reached a couple of agreements that I thought I

 7    would just read into the record to make sure

 8    we're all on the same page.  The first is the

 9    parties have agreed that they will identify each

10    witness that they intend to call at trial by

11    6:00 p.m. two days before the party intends to

12    call that witness.

13                    THE COURT:  Is that agreeable?

14                    MS. SHAMILOV:  That's agreeable,

15    in light of the Court's instructions that once

16    we proposed exhibits, they're going to --

17                    MR. OUSSAYEF:  I think that's

18    already in the order in terms of a specific

19    procedure for when and how to disclose exhibits

20    as opposed to the witnesses themselves.

21                    THE COURT:  And you're in

22    agreement on that and you haven't changed from

23    what you proposed in the order; correct?

24                    MS. SHAMILOV:  Correct.
```

```
 1                    THE COURT:  That's fine.  Go on.
 2                    MR. OUSSAYEF:  The second issue is
 3      regarding the Court's motion in limine regarding
 4      pre-suit communications.  The Court's reasoning
 5      was based in part on the fact that Groupon had
 6      stipulated to particular dates of notice.  Those
 7      dates of notice are no longer in the pretrial
 8      order and I believe that was the -- the parties
 9      have agreed to put that information back in the
10      pretrial order.
11                    And specifically what that
12      information is is that Groupon first became
13      aware of U.S. Patent Number 5,796,967, and U.S.
14      Patent Number 7,072,849 on November 1st, 2011.
15                    Groupon first became aware of U.S.
16      Patent Number 5,961,601 on April 13th, 2012.
17      And Groupon first became aware of U.S. Patent
18      Number 7,631,346 on August 11th, 2014.
19                    THE COURT:  That's all agreed?
20                    MS. SHAMILOV:  Those are not
21      precisely the dates we agreed on.
22                    THE COURT:  Why don't you two
23      confer and make sure we get it right.
24                    MR. OUSSAYEF:  Your Honor, I
```

```
1    believe there is some minor question about the
2    exact wording that was in the original pretrial
3    order so the parties I think will confer about
4    exactly what that language was and I believe the
5    best way to do it is to amend the pretrial order
6    and I believe the parties will be able to reach
7    agreement.
8                    THE COURT:  Just submit, unless
9    you disagree, a proposed stipulation with the
10   language and the dates and do that sometime
11   before trial, obviously.
12                   MR. OUSSAYEF:  Yes, Your Honor.
13   Thank you.
14                   THE COURT:  Is that it for those
15   agreements?
16                   MR. OUSSAYEF:  Yes, that's
17   correct.
18                   THE COURT:  How about other things
19   that IBM wants to raise?
20                   MR. OUSSAYEF:  Nothing further
21   from IBM.
22                   THE COURT:  How about Groupon?
23                   MS. SHAMILOV:  One issue, Your
24   Honor.
```

1          THE COURT:  Yes.

2          MS. SHAMILOV:  It's an issue about

3     witness lists, Your Honor.  I don't know if Your

4     Honor wants to decide it today, but I want to

5     raise an issue.  There is one expert witness

6     that is identified as may call on IBM's list.

7     That witness was not disclosed as an expert

8     witness in our case.  At some point during

9     discovery IBM produced an expert report from the

10    Priceline case that that particular expert

11    issued there, along with a whole bunch of other

12    documents from the Priceline case during

13    discovery.  At no point was that witness

14    identified on Rule 26(t) report that was

15    produced as part of the production of the

16    Priceline documents had the, you know, the

17    caption of the Priceline case, the documents

18    reviewed related to sort of the Priceline

19    complaint, and so we were never on notice that

20    that particular witness is going to be an expert

21    witness.

22          So we have asked IBM to remove

23    that witness from the may call list, but as of

24    now, IBM has not agreed to do that.  So this is

```
1      an outstanding issue.

2                  THE COURT:  Which witness is this?

3                  MS. SHAMILOV:  I don't know if

4      it's Dr. Stewart or Mr. Steward, but last name

5      is Stewart.

6                  THE COURT:  Okay.  All right.  Let

7      me hear from IBM if you wish to have the right

8      to keep Stewart on the may call list.

9                  MR. OUSSAYEF:  Yes, Your Honor.

10     IBM's position is that IBM's damages expert and

11     IBM's technical expert witness both rely on this

12     Stewart report that was produced in this case

13     and also in the Priceline case.  And IBM has

14     Dr. Stewart on its witness list in case Groupon

15     intends to challenge the basis for the damages

16     or for the technical experts reliance on that.

17                 We don't believe that Groupon will

18     do so because there is no specific challenging

19     of the Stewart report or the basis for those

20     surveys in -- the reports are disclosed during

21     expert discovery, but in the case that Groupon

22     does choose to make an issue out of it, that is

23     why Dr. Stewart is on the exhibit list.

24                 THE COURT:  Dr. Stewart did a
```

1    survey that the other two experts relied on?

2              MR. OUSSAYEF:  Yes, Your Honor.

3    Everything was disclosed in discovery in terms

4    of what is required under the disclosure rules

5    for expert witnesses.

6              THE COURT:  All right.

7              MS. SHAMILOV:  On the last point,

8    that's not actually accurate, Rule 26, for

9    example, requires disclosure of all previous

10   engagements of an expert.  The only engagement

11   that were produced in the case, that was

12   disclosed in the Priceline case and that was

13   only through 2016 that was attached to the

14   report.  If the experts relied on the report and

15   want to talk about it in trial consistent with

16   opinions disclosed in the report, they can do

17   that.  I don't think that means that IBM gets to

18   call another expert witness who was never

19   disclosed as an expert in our case and it's

20   simply a report from another case that was

21   produced as part of fact discovery along with

22   other actual expert reports from that Priceline

23   case.  Dr. Stewart should not be an expert

24   witness called here live at trial.

```
 1                  THE COURT:  Are you reserving the
 2     right to question the other two experts who rely
 3     on Stewart about Stewart because Mr. Oussayef
 4     suggest maybe this is a nonissue?
 5                  MS. SHAMILOV:  Well, I think we
 6     might question him about the opinions that they
 7     have reached based on, you know, whatever
 8     documents they may -- unless we know exactly
 9     what they're going to say, as of now we're
10     intending to challenge their opinion.  But I do
11     say that regardless of how we're going to
12     cross-examine their witnesses, I don't think
13     that let's them under federal rules to bring a
14     new expert witness that they never disclosed as
15     an expert witness in our case, Your Honor.
16                  THE COURT:  Okay.  Thank you.
17     Anything else?
18                  MR. OUSSAYEF:  Just briefly, Your
19     Honor.  Your Honor, I believe this is analogous
20     to what Your Honor decided on the authenticity
21     issue.  We don't have specificity over how
22     Groupon intends to challenge or even if they do
23     intend to put this at issue in terms of what the
24     connection is between the damages and technical
```

1    experts reliance on the survey expert and what

2    might become an issue.  If they intend to

3    disclose what they're going to do in terms of

4    questioning, you know, the witnesses on the

5    reliance on the survey expert, then that --

6    those issues will become relevant and that's

7    when we would call Dr. Stewart.  In the

8    eventuality that we chose not to do so there

9    would be no need to do so.

10             I believe it's analogous to the

11   authentication issue where we should be -- we

12   should be able to rely on Dr. Stewart if Groupon

13   puts that issue to their own choice.

14             THE COURT:  It sounds like maybe

15   he's a rebuttal type witness.  Is this the kind

16   of thing that, you know, we don't necessarily

17   need to decide now and see how things play out

18   and if after you see the cross of your other two

19   experts, you think you need Dr. Stewart we can

20   decide at that point whether you can bring him

21   for your rebuttal?

22             MR. OUSSAYEF:  Yes, Your Honor,

23   that's exactly the case.

24             THE COURT:  Would that work for

```
 1        defendants?

 2                    MS. SHAMILOV:  That would only

 3        work, Your Honor, if we get an opportunity to

 4        depose Dr. Stewart before he takes the stand.

 5        We didn't know he would be an expert testifying

 6        in this trial.  He can't just take the stand

 7        without being able to depose him first.

 8                    THE COURT:  Would you object to a

 9        short deposition in that circumstance?

10                    MR. OUSSAYEF:  No, Your Honor.

11                    THE COURT:  Does that resolve it

12        for now.

13                    MS. SHAMILOV:  For now it does.

14        We still reserve our objection to them calling

15        Dr. Stewart.

16                    THE COURT:  I don't think you need

17        more from me on that.  If it were to play out

18        that way that there was an objection, plaintiff

19        will let defendant know that they wish to call

20        Dr. Stewart as part of their rebuttal, we will

21        have the entirety of defendant's case at that

22        point in which to find time for a short

23        deposition.  If they don't put him up for a

24        deposition, I won't let them call him on
```

1      rebuttal.  Even if they do, if you want to renew

2      your argument that I shouldn't allow him anyway,

3      you can raise it then.

4                    Any other arguments for Groupon?

5                    MR. HADDEN:  No, Your Honor.

6                    THE COURT:  Let me quickly run

7      through some of the mechanics of the pretrial

8      order and mechanics of the trial and/or if you

9      do have other questions.  With respect to the

10     pretrial order, if the parties did not identify

11     a dispute on a certain topic and we haven't

12     talked about it today and I didn't say anything

13     about it in my order last week, then it is

14     acceptable and it is hereby adopted.

15                    In terms of uncontested facts, as

16     I think you put in the order these facts may be

17     read to the jury by either side provided that

18     you give notice to the other side that you're

19     going to do it.  And whoever stands up to read

20     them will be charged time for doing that.

21                    In terms of the factual issues to

22     be tried, I asked you already my questions about

23     where I thought there might be some uncertainty

24     about what issues are going to be tried, does

1    IBM believe there is any dispute as to what is

2    going to be in dispute as the factual issues in

3    this trial?

4              MR. DESMARAIS:  No, Your Honor.

5              THE COURT:  Does Groupon have any

6    concerns about that.

7              MR. HADDEN:  No, Your Honor.

8              THE COURT:  In terms of the legal

9    issues, we really handled those mostly in the

10   context of the jury instruction.  I already

11   talked about how you will submit another version

12   and you'll have a chance to argue any remaining

13   disputes during trial.  So I don't propose to

14   provide anything further in terms of legal

15   guidance now.

16             Exhibits, exhibits on the exhibit

17   list in the pretrial order that are not objected

18   to on the exhibit list are received into

19   evidence by operation of the pretrial order once

20   the exhibit is shown to a witness and offered

21   into evidence and the Court says it's admitted.

22   So that means if there is no objections, you

23   don't need to lay a foundation, but you do have

24   to say at some point when the witness is on the

1    stand, A, you have to show it to some witness,

2    and B, you have to offer it into evidence at

3    some point either at the beginning, during or at

4    the end of the examination of the witness.  And

5    I will ask as a formal manner whether the other

6    side objects to the admission of that exhibit.

7    We know you'll say no, but we still go through

8    that whole process.

9              We do that same thing with respect

10   to exhibits for which there are objections on

11   the exhibit list.  Those you usually narrow them

12   down once you see the actual exhibits that are

13   going to be used on direct, you meet and confer.

14   If there are still outstanding objections the

15   morning that you expect that witness to be

16   called, you'll bring those to my attention in

17   the morning.  I will do my best to rule on them.

18             Let's suppose that I have ruled on

19   all of them, so let's just suppose I have

20   overruled the objections to amend the document,

21   we'll still go through that process of once you

22   show the exhibit to the witness at some point

23   you'll say we offer this exhibit into evidence,

24   I will ask the other side is there any

```
 1    objection, you will say no, but we all know that

 2    you did object, your objection is clear in the

 3    record, you're not waiving it, but as far as the

 4    jury is concerned, there is no objection to any

 5    exhibit coming in.  Any question about how we

 6    deal with objections and exhibits?

 7                    MR. DESMARAIS:  No Your Honor.

 8                    MR. HADDEN:  Just one question,

 9    Your Honor.

10                    THE COURT:  Yes.

11                    MR. HADDEN:  Can an unobjected to

12    exhibit be shown to the jury before it is

13    offered in?

14                    THE COURT:  You mean like in

15    opening statement?

16                    MR. HADDEN:  Or also with the

17    witness who is going to --

18                    THE COURT:  If you know in good

19    faith that it's coming into evidence in that

20    circumstance, you would know, then you can use

21    it before it comes into evidence.

22                    MR. HADDEN:  Thank you, Your

23    Honor.

24                    THE COURT:  All right.  In terms
```

1     of witnesses who are testifying by deposition,

2     if you're playing the video, if you want to run

3     the transcript underneath the video, you need to

4     make sure the other side knows that so when you

5     disclose to the other side here is exactly what

6     we're going to play, either show them that it's

7     going to have a transcript or at least tell

8     them.  We have had disputes coming up during

9     trial that the parties aren't sure that the

10    other side wants to put the transcript on.  It's

11    hard to deal with during the trial.  If there

12    are going to be objections, I need to know about

13    that before you call that witness.

14              In terms of objections to expert

15    testimony, as we talked about, I will rule on

16    those objections during trial.  As I said, the

17    time will be charged to the party that does not

18    prevail on that objection.  As hopefully you

19    understand, I will not have read or memorized

20    all of the expert disclosures that are made

21    prior to trial, so you need to come prepared

22    with copies of your expert reports, declaration,

23    deposition testimony, so that if there is an

24    objection to certain testimony as being beyond

1    the scope, you will be able to hand me

2    everything the expert has said previously.

3    You'll be expected to be able to point to me

4    where it is that the expert fairly disclosed the

5    opinion that's now being challenged and I'll do

6    my best to as quickly as possible review that so

7    that I can make a decision as to who prevails on

8    that objection.

9              Examination of all witnesses is

10   limited to direct and cross and redirect.  We

11   don't have recross-examination.  You need to ask

12   for leave to approach a witness once for a

13   witness.  If you have asked once for a witness,

14   you can assume that leave has been freely

15   granted and you can move back and forth as you

16   wish in examining that witness.

17             We do encourage transition

18   statements.  Jurors usually really appreciate

19   that, just a brief non-argumentative statement

20   just telling the jurors who the witness is and,

21   you know, whatever they're here to talk about,

22   infringement, they're here to talk about

23   damages, whatever the case may be.

24             Any questions about any of that?

1           MR. DESMARAIS:  No, Your Honor.

2           MR. HADDEN:  No, Your Honor.

3           THE COURT:  We talked about jury

4    selection.  The only other thing I'll add, we

5    end up with a jury of eight, none of whom are

6    treated as alternatives, so whether we have six,

7    seven or eight left when it's time for

8    deliberations, all of those who are still with

9    us will deliberate.

10          Any question about that?

11          MR. DESMARAIS:  No, Your Honor.

12          THE COURT:  Any questions?

13          MR. HADDEN:  No, Your Honor.

14          THE COURT:  All right.  And then

15   my list of what I call petty stuff, which

16   happily I don't think has grown lately.  In

17   general, no chewing gum.  No sucking candy.  No

18   eating in the courtroom.  That applies to you,

19   your witnesses, your clients, anyone within your

20   control.  Please let them know that.  If there

21   were some medical or other reason that you

22   needed to do any of those things, I will let you

23   do it, but please just approach my staff and let

24   us know, otherwise we'll assume that you're not

```
 1        complying with our rules.  You can drink water

 2        in the courtroom, but only water.  The

 3        electronic devices that are in the courtroom are

 4        for aid in the trial presentation, for

 5        preparation of the trail presentation, they're

 6        not for searching Groupon or doing deals or -- I

 7        have to say that at least once during this

 8        trial, you can have the devices but they're for

 9        the purposes of the trial presentation.  Please

10        turn your cell phones and your other devices

11        off.  Please don't wear hats in the courtroom.

12        Please don't wear sunglasses in the courtroom.

13        And please don't read large newspapers in the

14        courtroom.

15                    And this list is all derived from

16        experience from seeing all of these things

17        multiple times.  Any questions about any of

18        that?

19                    MR. DESMARAIS:  No, Your Honor.

20                    MR. HADDEN:  No, Your Honor.

21                    THE COURT:  If you were to make

22        any submissions after the normal trial day or on

23        weekends or on holidays, please make sure to

24        send a courtesy copy by e-mail.  We have a
```

1   chambers e-mail address.  I will read it to you

2   now in case you don't have it.  It is

3   Judge_Stark_chambers@ded, for Delaware

4   District,.uscourts, with an S, .gov.  So it's

5   Judge_Stark_chambers@ded.gov, so if you are

6   filing anything at those unusual times, please

7   make sure to send a courtesy copy to that e-mail

8   address.

9               That was all I have.  Have I

10  raised any other questions in anybody's mind,

11  first from IBM?

12              MR. DESMARAIS:  I did have one

13  question about your practice on impeachment.  Do

14  you allow video clips or is it just the

15  transcript?

16              THE COURT:  Right.  Impeachment of

17  prior inconsistent testimony, you can use video

18  clips.  I think that you all indicated you

19  wanted to have the opportunity to make

20  objections for incompleteness or for lack of

21  inconsistency, so if that's how you want to do

22  it, that's fine.  But that means you have to

23  pause at least a brief amount of time before you

24  show a video clip so that the other side has a

```
1      chance to say we have an objection.  It's not an

2      objection that it's a video, it's an objection

3      that it's incomplete or it's not actually

4      impeaching.  To do all that, you have to call

5      out with clarity what it is, where you're going,

6      what day, what line, what page, et cetera.  Any

7      further questions about that or anything else?

8                   MR. DESMARAIS:  No, that's good,

9      Your Honor.  Thank you.

10                  THE COURT:  Any questions about

11     that or anything else?

12                  MR. HADDEN:  No, Your Honor.

13                  THE COURT:  Thank you all very

14     much.  We'll look for your submissions and we'll

15     see you in July.

16                  (Concluded at 2:15 p.m.)

17

18

19

20

21

22

23

24
```

```
 1    State of Delaware )
                       )
 2    New Castle County )

 3

 4

 5                  CERTIFICATE OF REPORTER

 6

 7         I, Dale C. Hawkins, Registered Merit

 8    Reporter, Certified Shorthand Reporter, and Notary

 9    Public, do hereby certify that the foregoing record,

10    is a true and accurate transcript of my stenographic

11    notes taken on June 18, 2018, in the above-captioned

12    matter.

13

14         IN WITNESS WHEREOF, I have hereunto set my

15    hand and seal this 22nd day of June 2018, at

16    Wilmington.

17

18

19              /s/ Dale C. Hawkins

20              Dale C. Hawkins, RMR

21

22

23

24
```