IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTERNATIONAL BUSINESS   )
MACHINES CORPORATION,     )
                          )
          Plaintiff,      )
                          ) C.A. No. 16-122-LPS
v.                        )
                          )
GROUPON, INC.,            )
                          )
          Defendant.      )


            Friday, July 13, 2018
            8:40 a.m.
            Courtroom 6B

            844 King Street
            Wilmington, Delaware




BEFORE:  THE HONORABLE LEONARD P. STARK
         United States District Court Judge




APPEARANCES:


         POTTER ANDERSON & CORROON, LLP
         BY:  BINDU PALAPURA, ESQ.

              -and-

         DESMARAIS, LLP
         BY:  KARIM Z. OUSSAYEF, ESQ.


              Counsel for the Plaintiff

```
 1     APPEARANCES CONTINUED:

 2

 3            ASHBY & GEDDES
              BY:  JOHN G. DAY, ESQ.
 4
                       -and-
 5
              FENWICK & WEST, LLP
 6            BY:  J. DAVID HADDEN, ESQ.
              BY:  SAINA S. SHAMILOV, ESQ.
 7            BY:  PHILLIP J. HAACK, ESQ.
              BY:  SAPNA MEHTA, ESQ.
 8            BY:  JESSICA KAEMPF, ESQ.

 9                     -and-

10            LEE SULLIVAN SHEA & SMITH, LLP
              BY:  SEAN M. SULLIVAN, ESQ.
11
                      Counsel for the Defendant
12

13            COZEN O'CONNOR
              BY:  GREGORY FISCHER, ESQ.
14
                      Counsel for Hulu and
15                    GoDaddy Operating Company

16

17            PHILLIPS GOLDMAN McLAUGHLIN & HALL
              BY:  DAVID A. BILSON, ESQ.
18
                       -and-
19
              ROPERS MAJESKI KOHN BENTLEY PC
              BY:  ANDREW L. MARGULIS, ESQ.
20
                      Counsel for Kabam, Wipro,
21                    Maxim and Infosys

22

23            MORRIS NICHOLS ARSHT & TUNNELL
              BY:  JEREMY A. TIGAN, ESQ.
24
                      Counsel for Activision, Cognizant,
                      Facebook, LinkedIn and Twitter
```

1          THE COURT:  Good morning,

2     everyone.  Start by having whoever wishes to put

3     their appearances on the record.

4          MS. PALAPURA:  Good morning, Your

5     Honor.  Bindu Palapura from Potter Anderson on

6     behalf of IBM.  And with me today is Karim

7     Oussayef from Demarais, LLP.

8          MR. OUSSAYEF:  Good morning, Your

9     Honor.

10          MR. DAY:  Good morning, Your

11     Honor.  John Day from Ashby & Geddes from

12     Groupon.  With me at counsel table is Dave

13     Hadden and Saina Shamilov from Fenwick & West.

14     Behind them is Phil Haack, Sapna Mehta, and

15     Jessica Kaempf, also from Fenwick & West.  And

16     we have one new name and face for Your Honor

17     this morning, Sean Sullivan from Lee Sullivan

18     Shea & Smith.

19          We have some conflict issues with

20     respect to some of the interveners and

21     Mr. Sullivan may address the specific questions.

22          THE COURT:  Welcome.  Thank you.

23          And I suspect we have some

24     interveners in the room, so if you wish to make

1    your appearances, please.

2                    MR. FISCHER:  Good morning, Your

3    Honor.  Greg Fischer from Cozen & O'Connor on

4    behalf of GoDaddy Operating Company and Hulu,

5    two of the interveners in the matter.

6                    THE COURT:  Thank you.

7                    MR. BILSON:  Good morning, Your

8    Honor.  David Bilson, Phillips, Goldman,

9    McLaughlin & Hall for interveners Kabam, Inc.,

10   Wipro Limited and Maxim Integrated Products and

11   Infosys Limited.  With me in the courtroom on

12   behalf of Wipro, Maxim and Infosys is Andrew

13   Margulis from Ropers, Majeski, Kohn, Bentley.

14                   MR. MARGULIS:  Good morning, Your

15   Honor.

16                   THE COURT:  Good morning.

17                   MR. TIGAN:  Good morning, Your

18   Honor.  Jeremy Tigan from Morris Nichols on

19   behalf of third parties Activision, Cognizant,

20   Facebook, LinkedIn and Twitter.

21                   THE COURT:  Thank you.  All right.

22   So we're here first to deal with the issue of

23   whether the courtroom should be closed at all

24   during this trial.  I do want to give a chance

1    for everyone who wishes to be heard to be heard

2    on that.  Of course I have received many

3    letters.  I'm sure you all have seen them.  I

4    have reviewed them and may have some questions.

5              After we deal with that, provided

6    there is still time because I do have other

7    things going on this morning, I'll meet with the

8    parties to talk about some of the other issues

9    that have arisen between the parties.

10             So let's start with the

11   third-party intervening issue.  I want to start

12   with IBM.  We haven't heard anything formally

13   from you.  I can guess what your position is,

14   but if there is anything you wanted to say on

15   this issue, why don't you start us off.

16             MR. OUSSAYEF:  Good morning, Your

17   Honor.  Karim Oussayef from IBM.  Yes, that is

18   correct, we haven't submitted anything formal

19   since the discussions in the pretrial order.

20   IBM's position remains the same, but we didn't

21   feel like it was necessary to reiterate the

22   previous points.

23             The only thing that we would

24   propose is one solution that might balance First

1    Amendment concerns with the concerns of the

2    confidentiality might be if someone at the

3    podium is going to delve into the details of a

4    license that in that case we could seal the

5    courtroom, ask everyone to leave that isn't

6    under the protective order and have them come in

7    once the parties are through those issues.

8    That's the only additional proposal that IBM has

9    to offer to the Court.

10            THE COURT:  One thing that's

11   unclear to me is the timing of which you gave

12   notice to the various third parties.  Is there

13   an easy answer to that?  I know there is a lot

14   of third parties at this point.

15            MR. OUSSAYEF:  Yes, Your Honor,

16   it's an easy answer.  When the licenses were

17   first produced in this litigation, we gave

18   notice to all of the third-party licensees.  So

19   that was back a year or two ago.  And told them

20   that they were being produced in the case

21   according to the protective order and attached a

22   copy of the protective order.

23            Then when the Court ruled on IBM's

24   request to seal the courtroom when the licenses

1    were discussed and the Court denied that motion,

2    at that point IBM gave additional notice to all

3    the licensees informed them of the Court's

4    decision.

5              THE COURT:  So there is at least

6    one third party that may have misread that

7    suggest that they heard from IBM around July 3rd

8    which would have been at least a week after the

9    pretrial conference.  And didn't expressly

10   indicate that they had heard from you at the

11   time of the production, didn't deny it, but

12   didn't expressly say that.  That would be an

13   incorrect impression if I took that impression.

14             MR. OUSSAYEF:  Yes, Your Honor, we

15   gave notice to all the licensees at the time the

16   licenses were produced.

17             THE COURT:  And is it an easy

18   answer what your sense is as to putting aside

19   what the defendant is going to do with these

20   agreements at trial, what you would intend to

21   do, how many of them you intend to use, and how

22   detailed your use of them would be?

23             MR. OUSSAYEF:  IBM's presentation

24   of the licenses is anticipated to be less

1    detailed than Groupon's presentation.  That

2    being said, certainly IBM intends to mention the

3    licenses that are relevant to many issues in the

4    case.  In terms of going through the specific

5    terms and saying, you know, exactly what the

6    language is, I think that would be fairly

7    limited, Your Honor, but there is some

8    references to a license defense, for example in

9    this case, and, you know, that would require

10   some discussion of the detail terms.

11            THE COURT:  And if I were

12   considering something along the lines of where

13   the agreements came in the courtroom was open

14   but we didn't specifically identify who the

15   licensees are, so there is maybe six or ten or

16   whatever, there is a bundle of them, and we

17   don't tell the jury even, you know, license

18   agreement one was with Hulu, for instance, would

19   that prejudice the plaintiff's case?

20            MR. OUSSAYEF:  Yes, Your Honor, we

21   do believe that would prejudice the case.  One

22   of the important issues in here is, for example,

23   secondary considerations and who these companies

24   are in terms of how important the technology is

1    to a particular sector.

2                    Furthermore, the comparison

3    between Groupon's position in this case and

4    other web technology companies is very

5    important.  If these companies are in the same

6    kind of business, it is important to signal that

7    to the jury so that they understand that these

8    licenses are the same kind of business and the

9    same type of people who, you know, took a

10   license willingly where Groupon has not.

11                    THE COURT:  Okay.  Thank you.

12   Anything else you wanted to add at this point?

13                    MR. OUSSAYEF:  No, Your Honor,

14   that's all we had.

15                    THE COURT:  All right.  Because as

16   I see at least the third parties are for the

17   most part aligned with the position that IBM

18   articulated, I'll hear from them and then we'll

19   turn it over to Groupon.  So if any of the third

20   parties want to be heard on this issue, you can

21   come forward at this point.

22                    Good morning.

23                    MR. FISCHER:  Thank you again.

24   Greg Fischer from Cozen & O'Connor on behalf of

1   GoDaddy and Hulu.

2              It's the position of my clients,

3   and it's somewhat duplicative so I'll address it

4   at once and if you have specific questions to

5   the individual clients, please let me know.  But

6   it's their position that the mere existence of

7   these license agreements and these documents are

8   confidential per the terms of the agreements.

9              When it was disclosed to us that

10  they were going to be turned over subject to a

11  protective order, that was one analysis, one

12  consideration.  But then I guess two weeks ago

13  when we learned, roughly two weeks ago when we

14  learned that these documents would be provided

15  in open court, it was a different consideration.

16             There are certainly sensitive

17  terms as our papers laid out.  We have analyzed

18  the law on the issue and we think it balances in

19  our favor, specifically the Pansy factors from

20  the Third Circuit.  With more specificity

21  because I realize that was one of Groupon's

22  arguments in their rebuttal letter, the

23  competitive harm issue, these documents contain

24  very sensitive pricing issues, pricing terms,

1    payment, identification terms and language.

2    They also contain specifically negotiated terms

3    consisting of usage of the licenses, even down

4    to subsidiaries, affiliates, and potential

5    manufacturing arrangements.

6              Without getting into anymore of

7    those details, because we do consider those to

8    be confidential per the terms, I believe that

9    that specificity satisfies the good cause

10   requirement as it was addressed by the District

11   of New Jersey in the Castaleage case.

12             Our position remains that as

13   uninterested and innocent third parties in the

14   matter, when the Pansy factors are applied, the

15   balance goes in favor of sealing the courtroom.

16             We've reached out to counsel for

17   Groupon to try to figure out what the usage of

18   these documents might be.  I'm not sure at this

19   point whether I understand the concept enough of

20   how they will be presenting these licenses to

21   tell you whether we can redact certain parts or

22   fully seal the courtroom, so in the interest of

23   conservativeness, I would say we need to fully

24   seal the courtroom regarding any discussion of

1    even the existence of these agreements as it was

2    laid out in the papers.

3              If Your Honor has any further

4    questions than that, I'm more than happy to

5    field them.

6              THE COURT:  There is an argument

7    from Groupon, and I will admit I didn't

8    carefully map whether it applies to GoDaddy or

9    Hulu, or neither or both, so if you have nothing

10   responsive, I'll understand, that suggest that

11   at least the existence of some of these

12   agreements is already a public fact, and that,

13   you know, not everything that you're asking me

14   to keep confidential really is even confidential

15   at this moment.  Does that apply in any way to

16   your two clients?

17             MR. FISCHER:  I don't believe that

18   applies to my two clients.  It's my clients'

19   position both collectively that that is not the

20   case, that these are confidential agreements by

21   their terms, and that any disclosure could be

22   problematic.  So I saw the pleading, I think it

23   was last night from Groupon, regarding some of

24   the other interveners, I'll let them speak to

1     that effect, but I don't believe it affects my

2     clients.

3               THE COURT:  What about the general

4     idea that you're in a business relationship with

5     an entity that licenses patents and asserts

6     patents.  You have known for some time that

7     they're litigating at least some of the patents

8     that evidently your clients have a license to.

9     While certainly the parties want for their own

10    reasons to preserve confidentiality and

11    contracted for that, it's all of course as you

12    know subject to court order and a First

13    Amendment right of the public and others.  And

14    this is just one of the risks of doing business

15    with an entity that is doing other things with

16    its patents.  And while that may be unfortunate

17    for your clients, that's just the way things

18    happen sometimes.  Why shouldn't I see it that

19    way?

20              MR. FISCHER:  While I can

21    appreciate Your Honor's perspective, GoDaddy and

22    Hulu are both private companies.  These

23    agreements were specifically crafted between the

24    legal counsel for the parties to the agreements,

1    and specifically did include the confidentiality

2    language.  So from a business perspective, these

3    are private parties that did not avail

4    themselves to this.  They specifically

5    negotiated a clause in the agreements that would

6    control perhaps the disclosure of the

7    information therein.  It was not the position of

8    either of my clients to avail themselves of this

9    forum and on the basis of the carefully

10   negotiated language of the agreements we believe

11   that the confidentiality should stand.

12              THE COURT:  Okay.  Anything else?

13              MR. FISCHER:  Not at the moment.

14   Thank you.

15              THE COURT:  Thank you.  Any other

16   interveners want to be heard?

17              Good morning.

18              MR. MARGULIS:  Good morning, Your

19   Honor.  Andrew Margulis for Wipro, Maxim and

20   Infosys.  And just to clarify, it was in one of

21   my letters on behalf of Wipro that I mentioned

22   that Wipro did not have knowledge of the earlier

23   disclosure when it was first made, and I didn't

24   mean to say that they didn't get it, it's just

1  that they couldn't find it, so they had no

2  knowledge if they actually got it so they

3  couldn't say whether they did or they didn't,

4  but the people they checked with on both the

5  legal and the business side didn't know anything

6  about it.

7         THE COURT:  You're not here to say

8  that what IBM represents is incorrect?

9         MR. MOORE:  Not at all.  I will

10  echo what GoDaddy argued, and again, my clients

11  are in different sectors of the technology

12  industry, but they did negotiate these license

13  agreements and the cross license agreements with

14  various patents that they own with IBM.  And it

15  is very commercially sensitive information.

16  They don't want competitors and other people in

17  the industry knowing about the specific patents

18  they're licensing or how they work with their

19  specific technology that they're cross

20  licensing.  And there are obviously pricing

21  terms that are very competitive that could have

22  serious consequences.

23         As far as we know, we understand

24  Your Honor's concern that we entered into

1     license agreements with IBM who is a big company

2     and that just happens sometimes.  We did

3     negotiate confidentiality terms and certainly

4     there was no belief or knowledge at the time

5     that IBM would end up in a patent litigation

6     years later and this would become an issue.  So

7     everyone negotiating these license agreements

8     knows that in these industries these are very

9     commercially sensitive terms and technologies

10    and they had no indication that they would ever

11    become public and they have done everything they

12    can not to make it public.

13              THE COURT:  I'll accept that

14    representation, you're in the industry and I'm

15    not, but why shouldn't I view that as IBM's

16    problem at this point?  If you didn't know,

17    maybe you did or didn't have a right to know,

18    but you know, isn't your recourse, whatever it

19    may be, against the party that you're in a

20    license agreement with?

21              MR. MARGULIS:  Not necessarily.

22    If the agreement -- if the agreement was

23    produced, my understanding is that if the

24    agreement was produced a year or two ago in

1    discovery with attorneys eyes only designation

2    which does provide some level of protection

3    without knowing it would become public, my

4    understanding in discussions with IBM was that

5    they were not going to introduce these specific

6    terms into evidence which means we have an

7    agreement with IBM that IBM can't use it and has

8    to keep it confidential, but now it's been

9    produced as it was required to Groupon, we have

10   no contractual relationship with Groupon, so if

11   Groupon intends to come into court and read

12   that, we have no recourse against Groupon, and

13   that becomes the issue.

14              THE COURT:  Anything else?

15              MR. MARGULIS:  No, Your Honor.

16              THE COURT:  Thank you.

17              Good morning.

18              MR. TIGAN:  Good morning again,

19   Your Honor.  Just one point for Mr. Margulis I

20   want to pick up on and then just a brief

21   response to the letter Groupon filed last night.

22   One point many of my clients find is important

23   and maybe didn't come out at the pretrial

24   conference is that the licenses are not all just

1     from IBM to licensees, and wouldn't affect just

2     IBM's licensing program.  Many of my clients

3     have cross licenses with IBM in which we have

4     licensed our own patents and trademarks to IBM,

5     negotiated financial terms and other provisions,

6     again, with an expectation of confidentiality.

7     And we think we're in a position that way in

8     addition to being nonparties to this case.

9                THE COURT:  I know you're new to

10    the case, but do you have any understanding from

11    the parties as to whether the cross license

12    terms, that is related to your client's patents

13    going to IBM I guess, whether anyone intended to

14    make any use of that in this case.

15               MR. TIGAN:  It's unclear.  We

16    learned more in Groupon's letters to be candid

17    last night and Twitter in particular received

18    some comfort that one of the paragraphs and one

19    of the exhibits that we are concerned about

20    Groupon doesn't intend to elicit testimony

21    about.  We have done some review of what's on

22    the docket, but to be honest, you know, we don't

23    have a good idea.

24               Just a couple of comments about

1    Groupon's letters, because they have some

2    concerns we don't think are valid, but they may

3    be concerns we think the Court has.  Groupon

4    said my clients didn't articulate any specific

5    competitive harm and we disagree, that's why we

6    took the declaration that's we did and submitted

7    them to the Court.  We wanted the Court to know

8    that this isn't just our say so, but our clients

9    have looked at this and have signed on

10   declarations specifying specific harm.

11            And in one case we identified a

12   specific paragraph and exhibit that's sensitive

13   to us.  In others we're concerned about our own

14   licensing program and, you know, the public and

15   competitors having access to information about

16   that and encumbering us.  Across the board my

17   clients are also concerned about the financial

18   aspects of this also becoming public, giving

19   others a window into their licensing practices,

20   how they value intellectual property and maybe

21   even encouraging others to file suit against

22   them.

23            To the extent Groupon suggest that

24   we're trying to protect the fact of the

1    agreements from becoming public, at least for my

2    clients, I can't speak for any others, we're

3    not.  I think it's apparent from the docket now

4    that there is agreements in place.  We're not

5    trying to protect things like the date of the

6    agreements or some of the particulars, but we do

7    have concerns about the financial aspects and,

8    of course, some client specific concerns that we

9    articulated in the declaration.  And if we knew

10   more about what the party's plans were, perhaps

11   we would have fewer concerns or we could propose

12   some limited redactions or excerpts that might

13   make this less burdensome for the Court.

14           On the prior notice, some of my

15   clients definitely did receive notice during

16   discovery, others just can't recall.  But we

17   think it's different to receive notice that your

18   agreement may be produced to outside counsel and

19   experts under a protective order as opposed to

20   the whole agreement becoming public at trial and

21   being available through the clerk's office.

22           THE COURT:  Isn't it reasonable

23   foreseeable, though, that the latter may have

24   happened sometime down the road if the case goes

1      to trial?

2                  MR. TIGAN:  I think that's a fair

3      point, Your Honor, and granted few cases go to

4      trial these days, but some of my clients have

5      had the experience in this district and others

6      that licensing terms are protected at trial,

7      courtroom is closed for just a limited amount of

8      time when there is specific testimony about the

9      particulars of a license and every so often the

10     opportunity to at least weigh in on redactions

11     as to anything in the post-trial record.  So I

12     think those expectations have been changed a

13     little bit by experience in other cases, if

14     that's fair to say.

15                 Just one other point about

16     Groupon's position.  We understand their

17     position and why they're taking that position

18     for trial.  And certainly the case law they

19     cited is case law others have cited and Your

20     Honor should take it into account, but you know,

21     looking on the public docket, there is a

22     protective order.  Groupon has taken advantage

23     of it at least a dozen times and filed their own

24     things under seal, and redacted versions

1    thereafter.  Now, often items that may have been

2    because IBM's information was in there, but as

3    far as I can tell from some of the redactions it

4    was also Groupon's information, so to the extent

5    Groupon argues that third parties should be

6    deprived of any protection, we don't think that

7    should be given much weight.

8              And the last thing is, things

9    happen, right, during trial despite agreements

10   to not say this or not say that or to be careful

11   about certain things, sometimes a witness blurts

12   something out, sometimes counsel puts the wrong

13   thing up on the monitor, and my clients would

14   respectfully ask if counsel for the parties

15   could do it they concentrate the testimony into

16   a specific range or a couple of ranges, seal the

17   courtroom and that would provide everyone more

18   protection.

19             THE COURT:  Is there any potential

20   merit to this idea I threw out earlier I think

21   with Mr. Oussayef about, since I do have roughly

22   a dozen of these agreements redacting the name

23   of the licensee or the other party besides IBM

24   and just letting the public know there is about

1     a dozen of these, but you don't get to know who

2     they are?

3                    MR. TIGAN:  I have discussed that

4     with at least one client and I think at least

5     one would be comfortable with it.  I think it

6     would depend on what other provisions in some

7     instances were going to be talked about, whether

8     the names or financial terms were disclosed.

9     But I will tell you across the board for my five

10    clients there is a high sensitivity about the

11    financial terms, so to the extent those were

12    disclosed even without names, I suspect we would

13    still have concerns.

14                   THE COURT:  Thank you very much.

15                   MR. TIGAN:  Thank you.

16                   THE COURT:  Any other third

17    parties want to be heard?

18                   MR. BILSON:  Good morning, Your

19    Honor.  Thank you for the opportunity to be

20    heard.  I really have nothing of substance to

21    add.  I just wanted to join in and incorporate

22    the arguments of the other interveners on behalf

23    of my clients.

24                   THE COURT:  Thank you.

1          MR. BILSON:  Thank you.

2          THE COURT:  Then we'll hear from

3     Groupon.

4          MS. SHAMILOV:  Good morning, Your

5     Honor.

6          THE COURT:  Good morning.

7          MS. SHAMILOV:  With respect to the

8     existence of the agreement that someone just

9     already said, it's now on the public docket that

10    these entities have agreements with IBM.  I

11    think it would probably be helpful for the Court

12    what it is that we intend to potentially use.

13    There are over forty agreements that were

14    produced, so the problem with sealing the

15    courtroom as some of the parties are now asking

16    we're going to be sealing and opening, sealing

17    and opening potentially every few minutes.

18    We're going to be talking about a lot of

19    agreements at least in our case and in the

20    crosses of some of the fact witnesses and expert

21    witnesses of IBM, so in terms of what is it that

22    we need, unfortunately the names of the

23    licensees will be hard I think with both

24    parties' cases and there is no way to go around

1       it without prejudicing the parties.  The

2       financial terms are very important, what other

3       parties paid for these patents will be important

4       because the patents in the case are specifically

5       part of these cross licenses.

6                   The notion -- the cross license

7       portion, we need to know -- we would like to use

8       the fact that there was a cross license and sort

9       of the volume of the license, of the cross

10      license, meaning how many patents, but we don't

11      care about the actual individual patent numbers

12      or applications or whatnot, so to the extent --

13      not all agreements have those kind of exhibits,

14      so to the extent there is an exhibit with lists

15      of just patents with the licenses and cross

16      licenses to IBM, we do not intend to use that

17      exhibit, we just want to know how many patents

18      and we want the jury to know how many patents

19      were cross licensed as part of the arrangement.

20                  I think this is generally what we

21      -- obviously there is a licensing defense, too,

22      so for at least two of the licenses there will

23      be sort of an extensive discussion of the terms.

24                  With respect to I think your point

1    about these third parties sort of taking a risk

2    by entering into a business relationship with

3    IBM is a valid one, and then IBM -- we could

4    have been in the private arbitration, for

5    example, if this was an issue.  It was IBM's

6    business decision to enter a public courtroom

7    rather than do a private arbitration.

8              In terms of the harm, my read of

9    the letters was generally that the harm is a

10   leverage in future negotiations potentially that

11   may take place, undefined kind of hypothetical.

12   These are not trade secrets.  These are not sort

13   of specific technological pieces that directly

14   relate to the businesses or technologies of

15   these clients.  There are cases out there, not

16   from this circuit, but from the Seventh Circuit,

17   that the leverage in business negotiations, that

18   that is not a trade secret or a harm that

19   justifies sealing the courtroom.  If it was,

20   then every single business agreement that has

21   some financial terms in it that was not made

22   public can never be talked about publicly in

23   courtroom because that would generally apply to

24   every business agreement out there.

1          I hope that sort of clarifies for

2     the Court what it is that we intend to put in

3     front of the jury at trial.  If you have any

4     other questions.

5          THE COURT:  A couple.  So if I'm

6     not going to close the courtroom, it does sound

7     as if Groupon would be agreeable to some

8     significant redactions to these license

9     agreements.  I take it they contain a whole

10     bunch of stuff that you don't contend is

11     relevant to this case.

12          MS. SHAMILOV:  Miscellaneous

13     provisions, all that, yeah.

14          THE COURT:  Something related to

15     manufacturing was mentioned.

16          MS. SHAMILOV:  I don't honestly

17     know what it is.  I didn't see anything like

18     that in the agreement.  I don't think any expert

19     talked about manufacturing provisions.  I

20     honestly don't know what that provision was.  It

21     wasn't mentioned in the filing.

22          THE COURT:  If I were to as part

23     of my ruling were to direct you to spend some

24     time between now and Monday working with these

1    third parties coming up with redactions and I

2    would rule on disputes, that's not prejudicial

3    to Groupon?

4                    MS. SHAMILOV:  We can do that, but

5    I can tell you we will not agree to redact

6    financial terms.  We cannot do that or the

7    names, or the fact that it was a cross license,

8    and what patents it is that they licensed from

9    IBM and just the volume of the cross licenses

10   because that just goes to the core.  For two of

11   the licenses, Google is not an issue here, but

12   Facebook is part of the license defense that has

13   to have a detailed discussion of this license

14   agreement.

15                   THE COURT:  If you would run

16   through the Pansy factors for me and tell me how

17   they favor Groupon's position.

18                   MS. SHAMILOV:  I think the biggest

19   one would be sort of for me is the First

20   Amendment right and the public knowledge.  I

21   mean, if you take -- we are in public court,

22   we're going to have jurors and citizens of this

23   state here deciding it.  These license

24   agreements will be, both parties now agree,

1    relevant to several issues and really are going

2    to be discussed in both IBM's case and our case

3    extensively by multiple witnesses.  If you take

4    that and weigh it against the harm, there is no

5    specific injury that's been identified by any

6    party.  We're not talking about trade secrets.

7    Literally this is leverage and business

8    negotiations that applicable across the board to

9    any business.  I think in balance the public

10   interest in deciding -- in knowing how this case

11   will be decided at the end of trial by the jury

12   and what it is that they considered and what

13   they heard I think outweighs any harm that's

14   been articulated.

15              THE COURT:  All right.

16              MS. SHAMILOV:  Thank you, Your

17   Honor.

18              THE COURT:  Anything further from

19   Groupon?

20              MR. HADDEN:  I just wanted to add,

21   Your Honor, picking up on your suggestion of

22   redactions, we do think that we could agree to

23   redact if there is information about

24   manufacturing or specific technology or anything

1    else that the third parties point to.  As

2    Ms. Shamilov says, the key factors are how much

3    did they pay, and did they provide a cross

4    license.  We don't care what the patents were

5    they cross licensed, we don't care what

6    technology space they're in, that's really all

7    Groupon needs to put these licenses in

8    perspective.

9              THE COURT:  If IBM took the

10   position that they do want at least the

11   technology space to be known to the jury, you

12   don't object to that?

13             MR. HADDEN:  I don't care.  I'm

14   just saying as between us and the third parties,

15   that's fine.

16             THE COURT:  Yes, Mr. Oussayef.

17             MR. OUSSAYEF:  Your Honor, just

18   briefly, this may be the only point in the next

19   few days I'll say this, but I do agree with

20   Groupon on a number of points.  Specifically we

21   do agree that the identity of the licensees is

22   very important for a couple of reasons.  First

23   of all, if we think about the factors at issue,

24   we already know a lot of the licensees, some of

1    them were just mentioned when Groupon were at

2    the podium, some of them are clear from who was

3    intervening in this case.  That was kind of

4    already -- the ship has already left the dock on

5    that issue.

6              Second of all, if we think about

7    the licensing defense that may become an issue,

8    it's unavoidable who those folks will be.  And

9    then I think the last issue is there is a big

10   difference between saying company A licensed its

11   licensed IBM's technology and gave a cross

12   license, and you know, an unnamed company and a

13   company in a specific technology space.  So I'm

14   not giving you the name of actual licensees in

15   the interest of confidentiality, but there is a

16   difference between saying, for example, Wal-Mart

17   got a license to the patents and eBay or Yahoo

18   did, because it's just a different technology

19   space and it reflects what the value of the

20   technology is in this case and what the

21   relevance is of the technology in the case.

22             So if we were to eliminate the

23   identity of the licenses, it really would not be

24   a fair portrayal of the facts in this case.

1          THE COURT:  Thank you.  Any of the

2     third parties want to add anything?  Okay.  Give

3     me a moment.

4          All right.  Well, I thank all of

5     you for the argument and I particularly thank

6     the third parties for intervening and providing

7     the letters and the supporting materials of

8     being here to answer my questions.

9          I have had occasion to give this

10    issue a lot of thought before the pretrial

11    conference and in the weeks since.  And my

12    conclusion basically remains what it was at the

13    time of the pretrial conference.  In the context

14    at least of this particular case, I do not find

15    that either IBM or now with the support of the

16    third parties have met their burden to rebut the

17    presumption of access to this public trial, to

18    this public courtroom, to a public official

19    presiding over a proceeding that may take up two

20    weeks of eight of our citizen's time.  The

21    public has an access, has a right under the

22    First Amendment to see that process, to evaluate

23    that process should they wish to do so.  The

24    Court is being asked to preside over a

1    proceeding that may shift something on the order

2    of a quarter of a billion dollars from one

3    private party to another private party, and

4    given the relevance in many ways of the various

5    license agreements to that dispute and given the

6    background of law, again, I find that IBM with

7    the support of the third parties has not met

8    their burden to rebut the presumption that the

9    public has access to that proceeding.

10              The burden is on those who want to

11   close the courtroom doors.  They must show good

12   cause.  Relevant to that are the so-called Pansy

13   factors which I have carefully considered.  At a

14   broad level here, these various license

15   agreements are relevant to issues including most

16   especially damages and the license defense.

17   It's very clear from both parties to the case

18   that this case cannot be tried without frequent

19   and likely extensive reference by numerous

20   witnesses to the license agreements, which means

21   as a practical matter were I to open and close

22   the doors each time we were to talk about those

23   license agreements, we would be opening and

24   closing the doors a great deal, and that would

1      interfere with my ability, I think, to have this

2      trial move smoothly and efficiently, not unduly

3      burden the jurors who will be here and not

4      unduly interfere with the parties ability to

5      fairly present their case.

6              Weighed against that are I will

7      acknowledge legitimate concerns of IBM, but even

8      more so the third parties.  I recognize that

9      there may be some arguable competitive harm to

10     them.  They clearly have a preference that these

11     terms of their agreement not be made public, not

12     be made known to their competitors or future

13     licensees or counterparties in license

14     agreements.  They bargained among themselves to

15     the extent the law allowed for that protection.

16     I recognize their preference that that not be --

17     that work not be undone, but that all is not, of

18     course, decisive and it's all against the

19     background law which is patents are public

20     property, they are publicly issued rights.  They

21     are frequently litigated.

22             It's reasonably foreseeable that a

23     party like IBM may continue its licensing

24     program and that may reasonably lead to a

1   situation in which they reasonably foreseeably

2   lead to a public trial.  The third parties had

3   notice of this ongoing proceeding, and so in

4   this particular case they could see that there

5   was at least some chance that we would end up

6   where we are.  And so while I don't mean to

7   minimize that there may be some adverse

8   consequence to this ruling to these third

9   parties, it does not outweigh the interest in

10   having the courtroom open and the other

11   interests that I have mentioned.

12           I will also say it's not quite in

13   my view the type of harm, specific and

14   particularized harm that the cases generally say

15   is required to get the kind of weight to lead to

16   a public proceeding being not public.  I do

17   think it's fairly characterized as some loss or

18   diminishment of leverage in future negotiations

19   with other third parties.  And again while I

20   don't say no weight is afforded to that, it's

21   not like it is in any instance that I have seen

22   the so-called secret sauce of your whole

23   business is at stake, or you know, the situation

24   we see sometimes in this court in our ANDA

1     litigation where the generic drug company's

2     specific formulation as to how they supposedly

3     do not infringe a patent would be particularly

4     harmful to other generic drug company

5     competitors solve that specific formulation that

6     they may not have done themselves, it's not that

7     type of information.

8               All that said, I do direct that

9     the parties meet and confer, and by parties I

10    now mean my interveners as well have a seat at

11    this table, and work on redactions.  It's my

12    sense, and I don't think there is disagreement

13    on this, that there is a whole lot in these

14    agreements that is not relevant.

15              What is clearly relevant is the

16    financial terms, the existence of the

17    agreements, the names of the parties, and

18    whether there are cross licenses.  That I am

19    persuaded is relevant.  And so unless you work

20    out an agreement which I don't expect to redact

21    any of that, I don't think you'll persuade me to

22    redact any of those types of details.

23              Beyond that, I think you'll

24    probably agree on a lot that is not relevant to

```
 1         this case and can be redacted.  If you don't

 2         work out an agreement, I will be willing to hear

 3         from IBM and/or the third parties at some time

 4         you all have crystalized the dispute and present

 5         it to me during the course of the trial and I

 6         will rule on specific objections to proposed

 7         redactions.

 8                   I also direct that the parties

 9         confer on what should be in the record post

10         trial.  I haven't focused as much on that.  I

11         have really been focused on what's going to

12         happen in realtime in the courtroom.  But it may

13         be the considerations, it may even be that

14         Groupon's position is different with respect to

15         what the public transcript and the public set of

16         exhibits needs to look like in a post trial

17         context.  Again, I really haven't focused on

18         that and we're not going to be at the post trial

19         time until some point down the road, so I would

20         ask that you meet and confer and get me your

21         views on that at some appropriate time as well.

22                   Any questions about any of that

23         from IBM?

24                   MR. OUSSAYEF:  Not from IBM.
```

```
 1                    THE COURT:  And from Groupon.

 2                    MR. HADDEN:  No, Your Honor.

 3                    THE COURT:  How about any of the

 4       third parties, any questions or anything else

 5       you want to add at this time?

 6                    MR. FISCHER:  No, Your Honor.

 7                    MR. MARGULIS:  No, Your Honor.

 8                    MR. TIGAN:  No, Your Honor.

 9                    THE COURT:  I think that takes

10       care of the issues the third parties are

11       concerned with.  If that's true, you're excused.

12       You're welcome to stay, also.  I'm now going to

13       turn my remaining time to IBM and Groupon and

14       some of the issues that relate to the trial.

15                    First, I just want to make sure

16       everyone understands the schedule.  On Monday,

17       the jury pool will be available to us at 9:30.

18       I am not available on Monday until at least

19       9:15, so you don't have to be here until 9:15 on

20       Monday.  I'm hopeful I'll be here at 9:15 and

21       I'll get a chance to see you before we bring the

22       jury pool in.  If I'm not able to get here in

23       time for that, then trust me, all we're going to

24       do initially is jury selection and we'll have
```

1    time to talk about any issues that you want to

2    talk about before we even get into opening

3    statements.  It just may not be that we get to

4    do it before we select the jury.

5              Further, I issued an order that

6    told you I'm going to have to have basically

7    some half days along the way.  We're just trying

8    to balance a whole lot of cases at the moment.

9    I do think with that, if you do use all of your

10   time, it's more likely you will still be in

11   trial as late as Friday the 27th as opposed to

12   Wednesday the 25th.  So the references you had

13   in the preliminary instructions, and maybe in

14   the voir dire to Wednesday the 25th are going to

15   be changed to Friday the 27th.  I much rather

16   tell the jury they're going to be here much

17   longer than they are.

18             All right.  In terms of this open

19   question about access to Groupon by potential

20   jurors during the trial, I have given that more

21   thought as well.  I saw the dispute remains, at

22   least as of the time you submitted the

23   preliminary instructions.  I have decided that I

24   am going to bar access to use of Groupon on

1    either computer or mobile device among members

2    of the jury.  My understanding of the technology

3    and the allegations here is such that while I

4    don't mean that a juror would be consciously

5    doing research relative to the issues in

6    dispute, they would in effect knowingly or

7    unknowingly be looking at precisely the accused

8    technology in a way that concerns me by those

9    who are going to be finding facts and resolving

10   this dispute.

11            So what I'm going to do is I will

12   have a question in the voir dire, or I will

13   somehow -- I know you guys have some information

14   on the party's use of Groupon based on the

15   questionnaire.  I will also probably have one

16   question that ask about the general use of

17   Groupon and if they answer yes, come back to the

18   jury room and talk to us about that.  Part of

19   what I will be thinking about is is this someone

20   who will be able to follow my instruction and

21   stay off of Groupon for the next two weeks and

22   if I'm afraid that they're not going to be able

23   to follow that instruction, that may well be

24   cause to strike them.  So you will see that.

1          In terms of the rest of the voir

2     dire and the preliminary instructions, I'll

3     obviously have to get that done by Monday

4     morning and docket it so you'll see it.  I think

5     the only question I have for you all is on the

6     proposed voir dire questions 10, 11 and 12 are

7     awfully broad.  They're basically do you

8     regularly use a computer, use applications and

9     shop online.  And I'm not sure that anyone today

10    would answer no to that, so it may be that you

11    want to talk to everyone, but is that what

12    you're intending or might there be a way we

13    could narrow those questions?  I'm just trying

14    to figure out what you're trying to get at with

15    those questions.  Any thoughts from IBM?

16          MR. OUSSAYEF:  Yes, Your Honor.

17    That's a fair point.  And we do think that

18    question could be narrowed.  Perhaps those

19    questions could be condensed down to something

20    like are you a frequent, you know, online

21    shopper or some way of making it a little bit

22    more narrowly tailored so that not everyone

23    answers yes.

24          THE COURT:  If I tailor it to

1    Groupon, would that be too narrow from IBM's

2    perspective?

3                    MR. OUSSAYEF:  I think, Your

4    Honor, that might be a little bit too narrow

5    because there are other questions that target

6    Groupon specifically.  We might as well use this

7    question as a way of distinguishing this

8    question from questions that are specific to

9    Groupon.  I struggle to come up with something

10   off the top of my head, but I'm thinking about

11   do you regularly purchase products and services

12   online on a weekly basis or something of that

13   nature.

14                   THE COURT:  Okay.  Thank you.

15   Does Groupon have any thoughts?

16                   MR. HADDEN:  We generally are in

17   agreement, Your Honor.  I think we can narrow it

18   to some frequency thing to get it to kind of how

19   savvy they are versus not, and not focus just on

20   Groupon.  I think we can come up with some

21   agreeable language, Your Honor.

22                   THE COURT:  Okay.  Well, let's put

23   it this way, we're going to be working on this

24   this morning.  If you come up with something

1     that you agree on this morning, please let us

2     know, otherwise we'll put our heads together and

3     we'll come up with something.

4                    MR. HADDEN:  Thank you, Your

5     Honor.

6                    THE COURT:  In terms of

7     preliminary instructions of voir dire, anything

8     else that IBM wanted to talk about?  Again, I

9     have asked you my question.

10                   MR. OUSSAYEF:  No, Your Honor,

11    nothing else comes to mind in particular.

12                   THE COURT:  How about from

13    Groupon?  And is it about the license point?

14                   MS. SHAMILOV:  Yes.

15                   THE COURT:  I'm with you on the

16    license point, so I am going to tell the jury

17    about your license defense.

18                   MS. SHAMILOV:  Thank you.  Then

19    that resolves -- we don't have any other issues.

20                   THE COURT:  Thank you.  I thought

21    it was appropriate, it is one of the issues in

22    this case and I didn't think it was inconsistent

23    with how we're handling the other issues and

24    just a sentence or two, it's not going to

 1    overwhelm the jury.

 2              On your notebooks, we have had

 3    some success with photos of the witnesses,

 4    jurors tend to like that.  If there is no

 5    objection, then I would suggest that you add

 6    those as well.  Is there any objection to that?

 7              MR. OUSSAYEF:  No objection from

 8    IBM, Your Honor.

 9              MR. HADDEN:  No objection, Your

10    Honor.

11              THE COURT:  All right.  Then we

12    have these authenticity or other objections in

13    your status report.  I guess let me hear from

14    IBM first because I read it, I think there are

15    two broad issues that IBM was raising, so why

16    don't you come up and address those.

17              MR. OUSSAYEF:  Yes, Your Honor,

18    there are two issues that we're addressing.  The

19    first concerns newly produced documents, newly

20    identified witnesses, new depo designations and

21    a variety of other material that was disclosed

22    this week.  And the second involves the

23    identification of prior art by Groupon.

24              I'll start with the first issue

1    which in my mind is the much more serious issue

2    here.  What has happened recently is we have had

3    the identification of a lot of materials that

4    were produced very recently and have a

5    significant potential impact on this trial.

6              If Your Honor can imagine

7    identification of five new witnesses that were

8    not on the original trial witness list on the

9    eve of trial creates a lot of prejudice here.

10             THE COURT:  Let me ask you, do all

11   those witnesses to the extent you understand

12   them, do they go to any issue other than

13   authentication?

14             MR. OUSSAYEF:  Yes, Your Honor,

15   they go well beyond authentication.  There are

16   witnesses who talk about how the prior art

17   functioned, when it was available, when

18   references were published, et cetera.

19             THE COURT:  Well, I would assume

20   all those are authentication.  How is that --

21             MR. OUSSAYEF:  Let me give you a

22   specific example, Your Honor.  There is a

23   reference called the Solomon reference.  That

24   reference is a thesis.  That thesis was during

1    the Priceline case we had a summary judgment

2    argument about whether that was publicly

3    available because it was in a library somewhere

4    and there was a question about whether it was

5    able to be searched by the public, whether that

6    library was accessible by the public, et cetera.

7    And as a thesis, it's different than a normal

8    periodical.  That issue was all debated during

9    the Priceline case.  There was a deposition

10   taken in that case.  It was produced in this

11   case.  And our expert opined in detail about how

12   it wasn't publicly available.  That's a

13   different issue than authenticity.

14            Now in this case the week before

15   trial on the witness list is the purported

16   author of this, the librarian where this

17   reference was kept, and declarations from those

18   individuals.  And that is not an issue of

19   authenticity.  This isn't a question of whether

20   that is the actual thesis, it's a question of

21   whether the thesis was publicly available.

22            There is absolutely no reason why

23   that evidence should be brought up now.  And the

24   fact that we objected to authenticity has no

1    bearing on public availability.  Furthermore,

2    IBM has offered to drop authenticity objections

3    to all prior art except for the Amazon system

4    where there are the most serious concerns.  That

5    would include the Solomon reference, if Groupon

6    would simply say we're not going to rely on the

7    stuff we produced this week.  That's a very fair

8    compromise.

9              We don't think we necessarily need

10   to make it because we don't think the simple act

11   of making objections to trial exhibits should

12   reopen fact discovery, otherwise in every single

13   case we would reopen fact discovery because

14   everyone objects to everyone else's exhibits.

15             Here we have a compromise where we

16   say we will drop the authenticity objections

17   just so we can focus on trial and get by this.

18   All we're asking is let's not bring up any of

19   this new material, these new witnesses, this

20   declaration, these deposition designations,

21   these documents the week before trial.

22             THE COURT:  So if they don't

23   accept that and I don't order that as the result

24   here, one of things they do say is that they

1    understand they have an obligation to show good

2    cause if they're going to rely on any of these

3    new things at trial, why shouldn't I just say

4    that's fine and we'll deal with it next week or

5    the week after as need be?

6              MR. OUSSAYEF:  Because, Your

7    Honor, if we think about the newly identified

8    witnesses, we do not know who is coming to

9    trial.  We don't know what they're going to say.

10   We had no opportunity to depose those witnesses.

11   So what that would mean is that the day before

12   someone is going to testify, according to the

13   pretrial order, they would disclose the witness

14   to us.  So they would say, oh, by the way, the

15   author of this prior art system is coming to

16   trial tomorrow, and then we would have no idea

17   what they're going to say.  They could testify

18   about hey, in my understanding --

19             THE COURT:  So what if I make them

20   change them from may call to will call, they're

21   going to in the next day or two and give you a

22   chance to depose them.

23             MR. OUSSAYEF:  The problem, Your

24   Honor, is that the next day or two would be

1    Sunday before trial.  So we're talking about

2    taking away members of our team to go take

3    depositions of witnesses that were never

4    explored during discovery because they were

5    never disclosed.  It's completely disruptive of

6    the trial.  And furthermore, it was entirely

7    foreseeable.  This whole thing, this is not an

8    issue where there was something that came up

9    unexpectedly.  This is something they knew about

10   all along.

11            Let me give you another example,

12   Your Honor, which shows what's going on here.

13   The Amazon source code, which is one of their

14   prior art systems, that source code was produced

15   after the close of fact discovery.  We had a big

16   dispute about it.  Eventually Your Honor

17   permitted Groupon to rely on it, but Your Honor

18   did grant costs for our expert to fly across the

19   country and go and investigate that source code.

20   We had to extend expert discovery out.  We had

21   to investigate the source code and respond to

22   their expert's additional opinions on the source

23   code.  We deposed a witness on this all after

24   the close of fact discovery.

```
 1                    Now they're submitting a

 2       declaration and saying a witness might come to

 3       trial and tell us that the source code was on

 4       Fenwick & West servers since 2009.  They had it

 5       the entire time.  And that's going to be their

 6       rebuttal to the authenticity challenges to the

 7       public availability challenges.  We know as a

 8       firm that we have had it since 2009 even though

 9       we produced it after the close of fact

10       discovery.  It's almost comical what's going on

11       here.  And it's really frustrating because we

12       don't have a chance to defend ourselves from

13       these unknown surprise witnesses.

14                    THE COURT:  Let's save the prior

15       art question so I can deal with this one first.

16                    MS. SHAMILOV:  Your Honor, I guess

17       I'll address the Amazon issue first.  So

18       yesterday we did get an offer from IBM to drop

19       sixty-eight of their authentication objections

20       and maintain them only to Amazon source code if

21       we agree not to rely on anything else.  So we

22       responded and said that's fine, we can work with

23       that.  Would you please stipulate to this

24       addition to the joint stipulated facts, for
```

1    example, that certain U.S. patents have this

2    date.  And they refused.  They said -- they're

3    basically saying now that they never raised this

4    issue, but a whole bunch of prior art including

5    U.S. patents that they dispute that they were

6    publicly available, U.S. issued patents.  So

7    these were never issues that were raised.

8              THE COURT:  So you're saying if I

9    looked at whatever back and forth you have had,

10   that they made an offer and you're accepting it,

11   but now they don't want to take it?

12             MS. SHAMILOV:  We accepted it by

13   saying -- the problem is the authentication

14   objections as they were phrased and given to us

15   were broaden than just authentication objection

16   and now they seem to be authentication

17   objections together with public availability

18   objections, and to a whole bunch of prior art

19   that was never an issue during this case that

20   IBM has never raised even in the expert reports

21   about public availability.

22             So we said fine, I think this will

23   resolve the issue if you drop all these

24   authentication objections, but just so we know

1    your position would you agree to this joint

2    addenda of the uncontested fact that basically

3    just list the name of the prior art and the

4    date.  And they said we will not agree to any of

5    this.  And the list, and I don't understand

6    honestly why because the list includes U.S.

7    patents and they're now saying we dispute that.

8                 With respect to what it is that we

9    have produced, we produced information to deal

10   with authentication objections.  For example,

11   the Solomon declaration, the reason why it said

12   there this is my thesis and I gave it to the

13   library is to make sure that they don't come

14   back and say, well she says this is her thesis,

15   but there is nothing else in the declaration to

16   tell us that she actually has knowledge that

17   this is her thesis.  The stuff that we produced

18   is to deal with authentication, not public

19   availability.  It's just phrased that way to be

20   complete, to show authentication.

21                 On the Amazon issue, Paul Davis

22   will be the fact witness on the Amazon code and

23   is the author of it during his deposition said

24   many times, this is the code I wrote, I operated

1        the website, this is the code that ran the

2        website.  We never thought there would be an

3        authentication objection to the Amazon code in

4        light of that deposition.

5                    Now that they're maintaining that,

6        the declaration from our paralegal said in 2009

7        I was on the case, here is two trial exhibits

8        that were in our vault since then that Amazon

9        directed -- allowed production in response to

10       the subpoena, these are the same things that are

11       exhibits in this case.  It's just authenticating

12       the CDs.  It is nothing about public

13       availability.

14                    And honestly the only reason we

15       had to do it is because they maintain an

16       authentication objection, but there shouldn't

17       really be an authentication objection.  To the

18       extent they're arguing that there is an issue,

19       we dispute that it was publicly available, that

20       is a substantive issue, Paul Davis will be here,

21       they can cross-examine him on that.  That is not

22       an authentication objection but they lumped

23       those two issues together and we had to deal

24       with it and that's how we addressed it.

 1                    THE COURT:  The letter also had as

 2       a Groupon issue concerns about whether IBM had

 3       still articulated all of its authenticity

 4       objections.  I think we are at least implicating

 5       that now.  Is that still a concern?

 6                    MS. SHAMILOV:  It's still a

 7       concern.  The problem is that all we have --

 8       authentication issues, if there is no suspicion

 9       that something is not authentic and this is not

10       what it is, I think an authentication objection

11       in a vacuum is not an genuine objection, and so

12       far everything we have from them said you did

13       not put forth any evidence showing this is

14       authentic, you did not meet your burden on

15       authentication.  They're objection to the

16       authentication of books.  I don't know how to

17       deal with that, Your Honor, honestly.

18                    THE COURT:  Well, in terms of how

19       to deal with it is my understanding was that

20       everything that you might rely on to deal with

21       it has now been identified to IBM and that's

22       part of what they want me to say won't come in.

23       But if you say to me I don't know how to deal

24       with it, and I say to you, well, if you can show

1     good cause that this is just for authenticity

2     purposes, I'll let you present the evidence.

3     That evidence, the full universe of it is these

4     five new witnesses plus the new documents, et

5     cetera; correct?

6                MS. SHAMILOV:  Correct.  Correct.

7     I do think at this point what you've suggested I

8     think is the right approach and the procedure

9     here.  We're obviously going second.  Maybe some

10    of this stuff won't be coming in, so to the

11    extent it will come in, we can definitely

12    resolve that then and sort of bring it up to

13    your attention.  Some of the stuff may not be an

14    issue.

15                At the moment we think that

16    authentication objections were not articulated,

17    just sort of everything is the same high level

18    you didn't meet your burden.  And we have tried

19    our best, we really put a lot of effort and

20    tried our best to resolve it by giving

21    information that really shows, these are not

22    doctored documents, they're authentic books and

23    articles, and that's kind of where we are right

24    now.

1            THE COURT:  Thank you.  I'll have

2    you come on back.  We're now dealing with their

3    concern about your objections as well as the

4    issues.

5            MR. OUSSAYEF:  Right.  Your Honor,

6    I think there is a very simple solution to this

7    which is we will drop our authenticity

8    challenges to all prior art except for the

9    Amazon source code if they don't bring their new

10   people that they identified this week.  There is

11   no reason why that deal can't work.  And I don't

12   understand why this won't work.  We're not going

13   to agree to public availability, that's a

14   different issue.

15           THE COURT:  Is that a deal or is

16   there something missing?

17           MS. SHAMILOV:  That's generally

18   fine, but I do need the paralegal declaration on

19   Amazon code if they're going to say it's not an

20   authentic --

21           THE COURT:  My understanding the

22   offer -- well, are you asking them to drop the

23   new witnesses and new documents that relate to

24   Amazon code, or just everything that doesn't

1      relate to Amazon code?

2                  MR. OUSSAYEF:  I'm a little

3      confused because my understanding is Paul Davis

4      was going to be the fact witness on Amazon, the

5      person who was already deposed on this issue.

6                  MS. SHAMILOV:  That is correct,

7      but even in light of his deposition testimony

8      they're now complaining that the CD, the

9      exhibits about with source code are not

10     authentic.  I'm fine dropping everything but the

11     Amazon related declaration.

12                 THE COURT:  There is two buckets,

13     there is Amazon code and non Amazon code.  All

14     of our objections and all of the new evidence

15     that goes to non Amazon code bucket is out, but

16     Amazon code objections and therefore Amazon code

17     new evidence is still on the table.  Maybe I

18     should make a ruling, but at least it's still on

19     the table.

20                 MR. OUSSAYEF:  Yes, Your Honor, I

21     think that's fair.  Just to clarify, we wouldn't

22     waive our objection to bringing a new witness on

23     Amazon code at this late stage, but we could

24     have an agreement that would resolve the vast

1    majority of the disagreements between the

2    parties by us simply dropping all our

3    authenticity challenges to all the other prior

4    art besides Amazon in exchange for not relying

5    on anything new and we would take up the dispute

6    about the paralegal.

7                    THE COURT:  Not relying on

8    anything new for the non Amazon code; correct?

9                    MR. OUSSAYEF:  Right.  That's

10   correct, Your Honor.

11                   THE COURT:  So I think that's a

12   deal; is that right?

13                   MS. SHAMILOV:  As long as the

14   Amazon stuff stays, what I want is the Amazon to

15   stay in, I think that's fine.

16                   THE COURT:  So to be precise, the

17   so-called non-Amazon code authenticity

18   objections are now withdrawn and, therefore, all

19   of the, we'll call it in quotes, new evidence

20   that Groupon wanted to rely on with respect to

21   the non-Amazon code materials relating to

22   authenticity, those are now no longer being

23   offered into evidence.  Which still leaves in

24   dispute IBM wants to continue to press its

1    objections for the moment at least to the

2    authenticity of the Groupon code and, therefore,

3    Groupon reserves the right to present or try to

4    show good cause to present the new evidence

5    related to authenticity of the Groupon code.

6    Understood?

7              MR. OUSSAYEF:  Yes, Your Honor,

8    that is all correct by IBM.

9              MR. HADDEN:  One correction.  You

10   said Groupon code.  I think you meant Amazon

11   code.

12             THE COURT:  I meant Amazon code,

13   yes.

14             So you all tell me, I feel like we

15   just did a little bit of work, do you want more

16   time to talk about how to deal with the Amazon

17   code objections and evidence or are you asking

18   for a ruling at this point?

19             MR. OUSSAYEF:  I think on the

20   Amazon code issues, I don't think the parties

21   are likely to reach agreement right now.  I

22   guess, you know, setting aside the previous

23   agreement, which I think it was great, it

24   resolved a lot of issues in dispute, focusing on

1    the Amazon issue, I guess IBM is at a loss, if

2    Paul Davis is sufficient to authenticate the

3    Amazon code, why do we need a surprise witness

4    on the eve of trial?

5              So we already deposed someone who

6    supposedly is going to come in and I think

7    opposing counsel even stated in the presentation

8    earlier today Paul Davis is our fact witness on

9    authentication.  So why do we need another fact

10   witness?  And I would ask the Court to preclude

11   that because once again, we don't have a

12   deposition of this witness, we don't know

13   exactly what they're going to say.  And the

14   witness -- let's be clear, the witness is going

15   to say something like, you know, our legal

16   offices had this code the entire time which just

17   demonstrates a total lack of diligence in terms

18   of disclosing this evidence if it really was

19   something that was relevant back during fact

20   discovery or even after fact discovery when this

21   became a big dispute last year.

22              THE COURT:  Do you want to

23   respond?

24              MS. SHAMILOV:  Yes, Your Honor.  I

1    think the issue is as I understand their

2    objection, they're going to come up and say Paul

3    Davis is not a current employee at Amazon.

4    Amazon produced these two CDs in response to the

5    subpoena in this case.  We have no clue where

6    these two CDs came from.  I think that's the

7    gist of their objection.  And Paul Davis cannot

8    talk about it.

9              If they will agree for Your Honor

10   to consider that declaration in resolving their

11   objection to the CDs, we don't need the witness

12   to be here.  I don't think this is a jury

13   question, I think it's a question to resolve

14   whether we have enough here legally from a legal

15   perspective that these CDs are just authentic

16   copies of these CDs.  We have a declaration, we

17   don't need Ms. Palmroy here on the stand in

18   front of the jury if Your Honor will consider

19   the declaration and just resolve the issue, but

20   that's the reason we need Ms. Palmroy to say

21   these are the same CDs that are sitting in the

22   vault.

23             THE COURT:  At this point do you

24   still request further specification of their

1     objection, or are you pretty confident you

2     understand their objection?

3                    MS. SHAMILOV:  I think I

4     understand their objection and I think at this

5     point, once --

6                    THE COURT:  And you would be

7     content for me to rule on the objection after

8     reviewing whatever this declaration or other

9     evidence is?

10                   MS. SHAMILOV:  Yes, Your Honor.

11                   THE COURT:  Mr. Oussayef, how do

12    you feel about me ruling on the authenticity

13    objection after I review whatever it is that you

14    want to present to me about it?

15                   MR. OUSSAYEF:  Your Honor, right

16    now there are no facts entered into the case, so

17    I think it would be premature to rule on

18    something that is not entered into evidence.  So

19    I think it would be premature.  We don't have

20    any discovery on this witness and what they're

21    going to say, so simply --

22                   THE COURT:  So if I'm not prepared

23    to say they can't use the declaration or new

24    witness, what else would you propose that I do?

1          MR. OUSSAYEF:  Then the witness

2     should come to trial and testify about the

3     authenticity about the Amazon source code if

4     they can.

5          THE COURT:  Is there something

6     more you want to propose?

7          MR. HADDEN:  Just to put this in

8     perspective, the witness is a paralegal at my

9     law firm.  She will testify that we have these

10    CD's.  Why do we have these CD's?  Because they

11    were evidence in this Court in 2007 in a case in

12    front of Judge Thynge where exactly the same

13    code was at issue, it was admitted into

14    evidence.  We kept a copy of the exhibit.  All

15    she's going to say is yes, that is the same

16    exhibit that was in court in Delaware however

17    many years ago and it's been in our vault ever

18    since.  I'm not sure why she needs to come and

19    testify about that.  It seems like her

20    declaration explaining that simple fact should

21    be enough to put this to rest.

22         THE COURT:  Just briefly, I'm near

23    the end of time.

24         MR. OUSSAYEF:  Your Honor, I think

1    what's been lost here, and this is not just a

2    procedural pro forma objection here, we have

3    Paul Davis, the witness on the Amazon code say I

4    don't know, this wasn't organized the way I

5    organized it.  It's in different folders.  I

6    can't verify that all the files existed from the

7    past.  I don't know how it got from Amazon to

8    here.

9              So this is not let's make

10   Groupon's life difficult.  I think that that's

11   reflected by the fact that we dropped all the

12   authenticity challenges.  It's something serious

13   and important in this case which is was this

14   actually the code running on Amazon's website in

15   1995.

16              THE COURT:  All right.  Well,

17   then, if IBM is going to continue to press this

18   objection, which I hear they are, I'm going to

19   allow Groupon to reserve the right to present

20   this again new evidence including the witness to

21   answer the authenticity objection if it

22   continues to be pressed, but I don't think IBM

23   should have to hear the witness's testimony for

24   the first time from the stand, so she, I think

```
 1    it is, will have to be made available for a

 2    deposition, likely a very short deposition, at

 3    some reasonable time before the witness is

 4    called to the stand at trial.  So you all are

 5    going to have to work that out.  But I'm not

 6    going to deprive IBM of its objection, but I'm

 7    not going to deprive Groupon of its chance to

 8    have a full and fair opportunity to respond to

 9    that objection.

10              I don't think what Groupon is

11    proposing to do is unfair or unduly prejudicial

12    to IBM given how these objections have played

13    out in terms of timing and specificity, et

14    cetera.  I'll leave it to you all to work out

15    the details.

16              In my remaining just a couple of

17    minutes left, I think there was that one last

18    issue about the number of prior art references

19    and if I understand it correctly, it basically

20    comes down to there is a bunch of them that

21    relate to maybe one system and how should we

22    count that.

23              MR. OUSSAYEF:  Yes, Your Honor.

24    So that's the very issue is there is no
```

1    allegation that there is any Liberty system.

2    That is, you know, undisputed between the

3    parties.  So the question is does multiple

4    publications which are different versions of

5    parts of a specification, do they all count as

6    one prior art piece?  And if we look at the

7    language that the parties agreed to, it's

8    explicit that a publication is a piece of prior

9    art, and that Groupon is limited to five pieces

10   of prior art or references per patent.

11          So it comes down to something very

12   simple because they have listed seven different

13   parts of the Liberty specification that concern

14   different issues, so one is like the protocol

15   specification, the other is the communication

16   spec.  I'm not using the exact words, but

17   they're different pieces of the specification in

18   different version.  So one is Version 1 Errata

19   2, one is Version 2, one is Version 1 but Errata

20   Version 1, and really it should be -- I think it

21   should be pretty easy for Groupon to simply go

22   down to the five references they want to use.

23   They have listed three other references for the

24   '346 patent, so they can pick the two Liberty

1     alliance publications that they want to rely on

2     and go into conformance.

3                    THE COURT:  What about the

4     argument that your expert treated all of these

5     Liberty documents as a single prior art

6     reference?

7                    MR. OUSSAYEF:  I think my expert

8     addressed individual disclosures in the

9     different references.  I mean, I think to a

10    certain extent if we have their expert saying

11    it's one big combination, it's natural that

12    we're going to try to address their theory that

13    they can be all combined together.  But that

14    doesn't excuse the fact that they are different

15    versions of the specification.  And if we think

16    about a system, if they're saying there is a

17    system that existed at some point in time, I can

18    attack that system and say that system didn't do

19    what you said, this is evidence that this system

20    didn't do what you said.

21                    But if you say that there is all

22    these publications and together I think they

23    used the word akin to a system, then we can't

24    attack one of those publications because they

1    could say well, forget about that one, we're

2    going to talk about this other publication.

3              So it's a very different

4    situation, it's a moving target compared to a

5    system where you have one specific thing that we

6    know of in advance of trial.

7              THE COURT:  Thank you.  I'll hear

8    from Groupon.

9              MS. SHAMILOV:  Your Honor, Liberty

10   Alliance is an industry standard.  It's

11   mentioned as such in the patent itself.  The

12   inventor admitted that it was a standard that

13   everybody knew about, described it in various

14   levels of details in several documentation, but

15   it's one single thing, Liberty Alliance

16   standard.  Our expert's theory on invalidity

17   relies on the standard, not any individual

18   reference.  So by them asking us to drop

19   references, that means that my expert will not

20   be able to take the stand and talk about this

21   theory at all.  And honestly --

22             THE COURT:  I don't understand

23   that, why can't you use --

24             MS. SHAMILOV:  Because think of it

1    as this, so it is akin to a system because it's

2    a standard, think of it as a system that has

3    multiple source code files.  You rely on source

4    code files to say this is how the system works.

5    Here we have a standard that's described in

6    multiple documents and our expert said this is

7    the standard, here are the documents that

8    describe it, this is how the standard work.

9    It's undisputed that this was one single thing.

10   It's not multiple publications, it said so in

11   the patent and then the inventor admitted it.

12          If I'm going to be forced to

13   remove certain documents, my expert did not talk

14   about the standard because the standard is akin

15   to a system and basically he cannot rely -- he

16   doesn't have a description, the full description

17   of that one standard.

18          And the parties agreed to the

19   limitations that are how much prior art and

20   claims we would identify.  We would never have

21   agreed to this number.  We have no dispute of

22   what prior art or how much of it to identify.

23          THE COURT:  What you agreed to

24   doesn't refer to how to count a standard, it

1    refers to systems, patents, publications;

2    correct?

3                MS. SHAMILOV:  Your Honor, I

4    agree.  If we were to be a little more detailed

5    and precise, we could have called that a

6    standard, but in our mind how it's treated in

7    the patent by the inventor itself, it is akin to

8    a system.  There is no Liberty Alliance

9    publication one, Liberty Alliance publication

10   five.  There is a Liberty Alliance standard and

11   its description just happens to be in separate

12   documents.

13                And their expert had absolutely no

14   problem addressing it.  There is one section in

15   the report that talks about the Liberty Alliance

16   standard, so I'm not sure this notion that they

17   do not know how to respond to the invalidity

18   theory, he responded to it, he had absolutely no

19   problem with it and treated it as one single

20   thing.  That's how the industry treats it,

21   that's how the patent treats it, that's how the

22   inventor herself admitted it in her deposition

23   and will testify so at trial.

24                THE COURT:  Thank you.

1             Is it your understanding that

2      there would be no testimony from their expert

3      allowed about this being a system if I grant

4      your position?

5                   MR. OUSSAYEF:  No testimony

6      allowed --

7                   THE COURT:  What I understood is

8      if I agree with IBM, they could only use up to

9      five of these publications, and fewer than that

10     if they want to use other publications for this

11     particular claim, I guess, but I'm not sure that

12     there is anything that would preclude them from

13     having an expert say Liberty Alliance is a

14     system and I understand it to be a system and

15     maybe make some argument based on that, but does

16     your position preclude the latter?

17                  MR. OUSSAYEF:  Our position does

18     not preclude the expert from talking about the

19     Liberty standard, vis-a-vis a certain number of

20     publications that's acceptable under the

21     limitation of prior art, so if they choose to

22     choose three publications and that meets the

23     limitations, then their expert can say here is

24     what the standard was and talk about those three

1    publications.

2              What we're worried about is if the

3    expert starts saying well, here is the one

4    Version 1.0 of this part of the standard, here

5    is Version 2 of this other part of the standard,

6    and there is no testimony on the record about a

7    particular system that existed at any particular

8    point in time, then we don't know what their

9    theory really is and they're going above the

10   limitations that are here.

11             There are many standards in the

12   world.  There is the GTPIP standard, but in a

13   patent case we figure out what references are

14   you going to use to describe that standard

15   because you can implement that standard in

16   different ways.  That standard can be used one

17   way or another, and there is many different ways

18   to describe it.  But to assert an obviousness

19   combination you have to tell us what are the

20   things that you contend express that standard.

21   And that's all we're asking.

22             And their expert will be perfectly

23   free to talk about the Liberty Alliance

24   standard, they just can't rely on eight

```
1        different documents to describe it, they just

2        rely on the three that they think best describes

3        it and discloses what's going on.

4                    THE COURT:  Come on back just

5        briefly.

6                    MS. SHAMILOV:  I know you're out

7        of time, Your Honor, I'm sorry.

8                    THE COURT:  I'm already late.

9                    MS. SHAMILOV:  But my expert

10       cannot get up here and say there was a Liberty

11       Alliance standard that the patent talks about

12       and the inventor admitted to, but I'm not

13       allowed to actually use the documents to tell

14       you what the standard was.  This is what they're

15       trying to do.  So it is a standard.  It's

16       described in seven documents.

17                   THE COURT:  I don't understand.

18       Of course we're not going to let the expert

19       complain about the court to the jury, but the

20       expert as I understand it, there is no objection

21       to him or her saying Liberty Alliance is a

22       standard, here is what the standard is, and I'm

23       going to show you some documents now, but it's

24       only up to five documents.
```

1          MS. SHAMILOV:  But he can't do

2    that.  He won't be able to describe the standard

3    and all the relevant functionality with the

4    reduced amount of the documents because that's

5    an incomplete description of the standard.

6          THE COURT:  But then why did you

7    agree to what you agreed to?

8          MS. SHAMILOV:  Because from our

9    perspective we actually were surprised for them

10   to raise this issue because every single -- the

11   inventor, their expert, our expert and the

12   patent itself treats it as one thing.  It's a

13   single prior art.  It's an industry standard.

14   It's not seven different prior art publications,

15   it's a single prior art.  We're talking about

16   akin to an argument that you can talk about

17   Amazon's system, but only if you can use five

18   source code files to describe it instead of ten

19   source code files to describe it.

20         THE COURT:  But you foresaw that

21   situation and you dealt with it with the source

22   code.

23         MS. SHAMILOV:  But they're picking

24   things that something is akin to a system and

1    not saying system/standard that every party at

2    issue in this case was operating under and

3    forcing us to limit the Liberty Alliance

4    publications, it's highly prejudicial because it

5    will really wipe out our invalidity defense and

6    the theory.

7              THE COURT:  Bear with me a minute.

8              All right.  Well, I'm going to go

9    with Groupon on this.  I'm troubled that you all

10   didn't deal with this more clearly and sooner.

11   I'm going to view akin to a system as akin to a

12   system.  It doesn't sound to me like this is

13   terribly prejudicial to IBM.  If the universe, I

14   should say I don't understand the great dispute

15   on this, is capped at the seven publications,

16   but my ruling doesn't mean go out and find 25

17   more because I have now said this is akin to a

18   system, but I think the patentee as well as the

19   plaintiff's expert has understood that this

20   Liberty Alliance is a standard, it's close

21   enough therefore to a system.

22             I'm concerned by the defendant's

23   argument that this would totally eviscerate

24   their invalidity arguments if I ruled for IBM on

1   this.  Again, I think that the parties should

2   have foreseen this and I'm troubled a little bit

3   that the literal language that you all proposed

4   is such that it favors IBM, but weighing

5   everything I'm going to let Groupon do this.

6              Hopefully there is nothing urgent

7   because I'm already pretty late, but anything

8   else?

9              MR. OUSSAYEF:  Nothing further,

10  Your Honor.

11             THE COURT:  Anything else from

12  Groupon?

13             MS. SHAMILOV:  No.  I do have

14  proposed voir dire questions.  I don't know the

15  best way to handle it.  I can put it on the

16  record.

17             THE COURT:  I assume you haven't

18  had a chance to chat yet?

19             MS. SHAMILOV:  No.

20             THE COURT:  Chat about that and

21  then call or email Mr. Looby if you can.

22             MS. SHAMILOV:  I do have just one

23  very quick question.  We have this potential

24  supplementation issue.  We have asked IBM to

1      supplement their licenses post discovery to the

2      extent they have entered into additional license

3      agreements, sort of similar to supplementing our

4      financials, and they have refused to do that.

5      We probably will need your help with that.  I

6      know you're out of time.

7                    THE COURT:  I'm not able to help

8      you now other than to say Mr. Oussayef, is there

9      potentially a dispute here?

10                   MR. OUSSAYEF:  No, there is not,

11     Your Honor.  We represented to them that we have

12     produced all relevant licenses several times in

13     emails.  I don't understand this dispute.  Every

14     time we say we have produced all relevant

15     licenses they come back and ask us to do it

16     again, but that's --

17                   MS. SHAMILOV:  We can talk about

18     this in light of this representation off of the

19     Court's time.

20                   THE COURT:  You'll be seeing

21     plenty of me starting Monday and if this remains

22     a dispute, you'll let me know.  See you Monday.

23     Have a nice weekend.

24                   (Court recessed at 10:00 a.m.)

1  State of Delaware )
                    )
2  New Castle County )

3

4

5                 CERTIFICATE OF REPORTER

6

7         I, Dale C. Hawkins, Registered Merit

8  Reporter, Certified Shorthand Reporter, and Notary

9  Public, do hereby certify that the foregoing record,

10 is a true and accurate transcript of my stenographic

11 notes taken on July 13, 2018, in the above-captioned

12 matter.

13

14         IN WITNESS WHEREOF, I have hereunto set my

15 hand and seal this 13th day of July 2018, at

16 Wilmington.

17

18

19              /s/ Dale C. Hawkins

20              Dale C. Hawkins, RMR

21

22

23

24