# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | **HIGHLY CONFIDENTIAL-** **ATTORNEYS' EYES ONLY:** **FILED UNDER SEAL** |
| Plaintiff, | ) ) | |
| | ) | C.A No. 16-122-LPS |
| v. | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| GROUPON, INC. | ) ) | |
| Defendant. | ) | |

## PROPOSED FINAL PRETRIAL ORDER

David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

OF COUNSEL:

John M. Desmarais
Karim Z. Oussayef
Laurie Stempler
Kevin K. McNish
Robert C. Harrits
Brian Matty
Michael Matulewicz-Crowley
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400

*Attorneys for Plaintiff*
*International Business Machines Corporation*

Dated: June 2, 2018

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashby-geddes.com
amayo@ashby-geddes.com

*Of counsel:*

J. David Hadden
Saina S. Shamilov
Phillip J. Haack
Sapna Mehta
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
(650) 988-8500

*Attorneys for Defendant*
GROUPON, INC.

On June 8, 2018, the Court will hold a pretrial conference pursuant to Fed. R. Civ. P. 16

in C.A. No. 16-122-LPS.  Trial will begin July 16, 2018.  The parties submit for the Court's

approval this proposed Pretrial Order governing the trial pursuant to District of Delaware Local

Rule 16.3 and the Court's Scheduling Orders.  (D.I. 17, 201).

This matter comes before the Court at a final pretrial conference held pursuant to Rule 16

of the Federal Rules of Civil Procedure.

**Plaintiff Counsel:**  Plaintiff International Business Machines ("IBM") is represented by:

John M. Desmarais (pro hac vice)
Karim Z. Oussayef (pro hac vice)
Laurie Stempler (pro hac vice)
Kevin K. McNish (pro hac vice)
Robert C. Harrits (pro hac vice)
Brian Matty (pro hac vice)
Michael Matulewicz-Crowley (pro hac vice)
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Tel: (212) 351-3400

David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

**Groupon's Counsel:**  Defendant Groupon, Inc. ("Groupon") is represented by:

J. David Hadden (pro hac vice)
Saina S. Shamilov (pro hac vice)
Phillip J. Haack (pro hac vice)
Sapna Mehta (pro hac vice)
Jessica M. Kaempf (pro hac vice app to be filed)
Athul Acharya (pro hac vice app to be filed)
Jessica Benzler (pro hac vice app to be filed)
FENWICK & WEST LLP

Silicon Valley Center
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500

John G. Day (#2403)
Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
Tel: (302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

## I.     NATURE OF THE CASE

This is a patent case.  The plaintiff in this case is International Business Machines Corporation ("IBM").  The defendant is Groupon, Inc. ("Groupon").

IBM alleges that Groupon infringes four patents:  U.S. Patent Nos. 5,796,967 (that may be referred to as the "'967 patent"), 7,072,849 (or the "'849 patent"), 5,961,601 (or the "'601 patent"), and 7,631,346 (or the "'346 patent") (collectively, the "patents-in-suit").  Two of the patents are related:  the '967 patent is titled "Method for Presenting Applications in an Interactive Service" and the '849 patent is titled "Method for Presenting Advertising in an Interactive Service."  The '601 patent is titled "Preserving State Information in a Continuing Conversation between a Client and Server Networked Via a Stateless Protocol."  The fourth patent, the '346 patent, is titled "Method and System for a Runtime User Account Creation Operation within a Single-Sign-On Process in a Federated Computing Environment."  IBM accuses Groupon's website of infringing the '967 patent, and it accuses Groupon's website and mobile applications of infringing the other asserted patents.

IBM further alleges that Groupon infringes the patents-in-suit directly and indirectly and that Groupon's infringement is willful.  IBM alleges that Groupon infringes the four patents-in-suit literally.  IBM further alleges that, in the alternative, Groupon's website infringes the '849 patent under the doctrine of equivalents and [Groupon's website and mobile applications infringe the '601 patent under the doctrine of equivalents.][1]  IBM seeks both pre-verdict and post-verdict damages up to the time of judgment to compensate IBM for Groupon's alleged acts of infringement, but in no event less than a reasonable royalty, [as well as injunctive relief against future acts of infringement by Groupon under 35 U.S.C. § 283.  In the alternative, IBM contends that any denial of a permanent injunction should be conditioned on payment of a reasonable royalty for infringement.  IBM also seeks prejudgment and post judgment interest and costs, pursuant to 35 U.S.C. § 284 and Fed. R. Civ. P. 54, attorneys' fees pursuant to 35 U.S.C. § 285, and enhanced damages against Groupon.][2]

Groupon denies that it infringes any of the four asserted patents either directly or indirectly, literally or under the doctrine of equivalents, jointly or otherwise.  Groupon further maintains that none of its conduct can support a finding of willful infringement.  Groupon contends that each of the four patents is invalid because none is directed to an invention that was new or non-obvious at the time they were made.  Groupon maintains that IBM cannot now reverse statements made about the purported inventions during the process of obtaining the patents to argue that Groupon infringes under the doctrine of equivalents or to overcome prior art

---

[1] In the event the Court grants Groupon's motion *in limine* number 3, Groupon objects to IBM's allegation (bracketed above) that Groupon infringes the '601 patent under the doctrine of equivalents being read to prospective jurors.

[2] Because the Court's model order indicates that this statement may be used by the Court to explain the case to prospective jurors, Groupon opposes IBM's inclusion of allegations (bracketed above) that will not be before the jury as unduly prejudicial.

that invalidates the patents.  Groupon also contends that the two related patents (the '967 and '849 patents) are invalid because they are directed to unpatentable abstract-ideas and fail to adequately describe any invention in their specifications.  Finally, Groupon contends that IBM's claims for the '346 patent are barred in light of IBM's licenses to Google and Facebook because IBM authorized the conduct it now alleges is infringing through those licenses.  For all of these reasons, Groupon maintains that IBM is not entitled to any of the monetary damages or other relief it requests.  [Specifically, Groupon contends that IBM is not entitled to injunctive relief or a payment of a reasonably royalty as an alternative.  Groupon also contends that IBM is not entitled to prejudgment and post judgment interest and costs, attorneys' fees, or enhanced damages.  Groupon seeks it attorneys' fees pursuant to 35 U.S.C. § 285 and costs.][3]

## II.     JURISDICTION

The jurisdiction of the Court is invoked under 28 U.S.C. §§ 1331 and 1338(a). Jurisdiction is not disputed.

## III.    FACTS

### A.     Uncontested Facts

1.      IBM is a New York corporation, with its principal place of business at 1 New Orchard Road, Armonk, New York 10504.

2.      Groupon is a Delaware corporation with a principle place of business at 600 West Chicago Avenue, Suite 400, Chicago, Illinois 60654.

3.      IBM and Groupon are not competitors.

4.      United States Patent Number 5,769,967 ("the '967 patent"), entitled "Method for Presenting Applications in an Interactive Service," was issued August 18, 1998, to named

---

[3] To the extent the Court omits the bracketed text from IBM's statement concerning issues that will not be before the jury, the bracketed text preceding this footnote should be omitted as well.

inventors Robert Filepp, Kenneth H. Appleman, Allan M. Wolf, James A. Galambos, and Sam Meo.

5.    The effective filing date of the '967 patent is July 15, 1988.

6.    The expiration date of the '967 patent was August 18, 2015.

7.    IBM is the owner of all substantial rights, title, and interest in and to the '967 patent.

8.    United States Patent Number 7,072,849 ("the '849 patent"), entitled "Method for Presenting Advertising In An Interactive Service," was issued July 4, 2006, to named inventors Robert Filepp, Alexander W. Bidwell, Francis C. Young, Allan M. Wolf, Duane Tiemann, Mel Bellar, Robert D. Cohen, James A. Galambos, Kenneth H. Appleman, and Sam Meo.

9.    IBM is the owner of all substantial rights, title, and interest in and to the '849 patent.

10.    The effective filing date of the '849 patent is July 15, 1988.

11.    United States Patent Number 5,961,601 ("the '601 patent), entitled "Preserving State Information in a Continuing Conversation Between a Client and Server Networked via a Stateless Protocol," was issued October 5, 1999, to named inventor Arun K. Iyengar.

12.    IBM is the owner of all substantial rights, title, and interest in and to the '601 patent.

13.    The effective filing date of the '601 patent is June 7, 1996

14.    The expiration date of the '601 patent was June 7, 2016.

15.    United States Patent Number 7,631,346 ("the '346 patent), entitled "Method and System for a Runtime User Account Creation Operation within a Single-Sign-On Process in a

Federated Computing Environment," was issued December 8, 2009, to named inventors Heather

Maria Hinton, Ivan Matthew Millman, Venkat Raghavan, and Shane Bradley Weeden.

16.     IBM is the owner of all substantial rights, title, and interest in and to the '346

patent.

17.     The effective filing date of the '346 patent is April 1, 2005.

18.     Claims 1, 3, 12-15, and 18 of the '346 patent were found unpatentable by the

Patent Trial and Appeal Board on August 7, 2017, and IBM has appealed those decisions.

19.     IBM does not practice the patents-in-suit.

20.     Prior to IBM filing this lawsuit, the parties were involved in patent licensing

negotiations.  Groupon was represented by in-house counsel and outside counsel during those

discussions.

21.     On July 9, 2012, the parties entered into a Confidential Disclosure

Agreement.  The Agreement stated that IBM "has not demanded, nor does it expect" that

Groupon "will cease or terminate any" use and provision of its products and services.

22.     On February 26, 2013, the parties entered into a Confidential Disclosure

Agreement Supplement.  The Agreement stated that IBM "has not demanded, nor does it expect"

that Groupon "will cease or terminate any" use and provision of its products and services.

23.     On May 4, 2015, the parties entered into a Confidential Disclosure Agreement.

The Agreement stated that IBM "and its Related Companies have not demanded, nor do they

expect" that Groupon "will cease or terminate any" use and provision of its products and

services.  The Agreement also requires that "[i]n the event of litigation," IBM "shall not seek to

enhance [] damages by asserting willful patent infringement, if any, that arise during the Period,"

defined as August 12, 2014 through June 30, 2015.

24.     IBM filed this lawsuit, alleging that Groupon infringes the patents-in-suit, on March 2, 2016.

25.     IBM has accused Groupon of infringing the patents-in-suit through making, using, offering for sale, selling, and/or importing Groupon's website and Android and iOS mobile applications (collectively, the "Accused Products").  IBM does not accuse Groupon's Android and iOS mobile applications of infringing any asserted claim of the '967 patent.

26.     Groupon develops and maintains its website, which is available at www.groupon.com.

27.     Groupon's website is rendered and displayed on a computer by a web browser, such as Google Chrome, Apple Safari, Mozilla Firefox, or Microsoft Internet Explorer.

28.     Groupon develops and maintains its mobile applications, which are available for download to Android and iOS phones.

29.     Groupon sells deals through its website and Android and iOS mobile applications.

30.     Groupon does not have any policies for licensing patents, but evaluates requests to license patents on a case-by-case basis.

31.     Groupon's website uses HTML, which stands for Hypertext Markup Language.

32.     Groupon's website communicates with web browsers using HTTP, which stands for the Hypertext Transfer Protocol.

33.     Groupon's Android and iOS mobile applications communicate with Groupon's web servers using HTTP, which stands for the Hypertext Transfer Protocol.

34.     Groupon's users can choose to log in to Groupon's website or Android and iOS mobile applications using Google credentials.  Groupon relies on Google's sign-on application programming interface (API) and software development kit (SDK) to offer this option.

35.     IBM granted a license to Google on September 29, 2006 to all of IBM's issued patents with an effective filing date prior to September 29, 2006, which covers the '346 patent, under which Google agreed to pay IBM $35 million for a license through the life of the patents. IBM's September 29, 2006 license to Google authorizes Google to make, use, and distribute "Information Handling Systems" defined as "any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes," which authorizes Google's distribution of Google's sign-on SDK and distribution of access to its API.  The license also provides a covenant not to sue Google's "Affiliates," which is defined to include "direct and indirect customers and end-users of" and "any third party that uses" Google's Information Handling Systems, for acts that Google would be liable for as a contributory infringer in the absence of the license agreement.

36.     Groupon's users can choose to log in to Groupon's website and Android and iOS mobile applications using Facebook credentials.  Groupon relies on Facebook's sign-on application programming interface (API) and software development kit (SDK) to offer this option.

37.     IBM granted a license to Facebook on December 29, 2011 to all of IBM's issued patents with an effective filing date prior to December 29, 2011, which covers the '346 patent, under which Facebook agreed to pay IBM $10 million for a five-year license.  On March 9, 2017, IBM and Facebook renewed this license, extending the term by seven years and to all patents filed before March 9, 2017.  Facebook agreed to pay IBM $10 million for the seven-year license.  IBM's license to Facebook authorizes Facebook to make, use, and distribute

"Information Handling Systems" defined as "any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes," which authorizes Facebook's distribution of Facebook's sign-on SDK and distribution of access to its API.  The license states that a Facebook Licensed Product includes or consists of access to the Facebook API and "shall not cease to be a FACEBOOK Licensed Product merely because it is utilized by a third party or otherwise accessed by a third party."

38.     On May 7, 2007, IBM and Amazon.com, Inc. entered into a patent cross-license agreement under which Amazon agreed to pay IBM $49.8 million for a portfolio license through the life of the patents.

39.     On July 24, 2009, IBM and Comcast Corporation entered into a patent cross-license agreement under which Comcast agreed to pay IBM $10.5 million for a portfolio license through the life of the patents.

40.     On January 4, 2010, IBM and Wipro Limited entered into a patent cross-license agreement under which Wipro agreed to pay IBM $7.5 million for a five-year portfolio license. On December 30, 2014, IBM and Wipro entered into a second cross-license agreement under which Wipro agreed to pay IBM $10 million for a ten-year portfolio license.

41.     On June 21, 2010, IBM and Infosys Technologies Limited entered into a patent cross-license agreement under which Infosys agreed to pay IBM $7.5 million for a five-year portfolio license.  On September 20, 2015, IBM and Infosys entered into a second cross-license agreement under which Infosys agreed to pay IBM $6.5 million for a five-year portfolio license.

42.     On May 9, 2011, IBM and Cognizant Technology Solutions Corporation entered into a patent cross-license agreement under which Cognizant agreed to pay $10 million for a ten-year portfolio license.

43.     On June 21, 2011, IBM and Maxim Integrated Products Incorporated entered into a patent cross-license agreement covering seven of IBM's patents and five of Maxim's patents, under which Maxim agreed to pay IBM $2 million for a license through the life of the patents.

44.     On September 29, 2011, IBM and Convergys Corporation entered into a patent cross-license agreement under which Convergys agreed to pay IBM $1.7 million for a five-year portfolio license.

45.     On December 28, 2012, IBM and Tech Mahindra Limited entered into a patent cross-license agreement under which Tech Mahindra agreed to pay IBM $3 million for a four-year portfolio license.

46.     On June 20, 2013, IBM and HCL Technologies Ltd. entered into a patent cross-license agreement under which HCL agreed to pay IBM $4 million for a five-year portfolio license.

47.     On December 31, 2014, IBM and Go Daddy Operating Company, LLC entered into a patent cross-license agreement under which GoDaddy agreed to pay IBM $3 million for a five-year portfolio license.

48.     On June 26, 2015, IBM and WebMD entered into a patent cross-license agreement, under which WebMD agreed to pay IBM $5 million for a portfolio license through the life of the patents.

49.     On December 22, 2017, IBM and The Priceline Group Inc. entered into a patent cross-license agreement under which Priceline agreed to pay IBM $34 million for a portfolio license (excluding IBM's '849 patent) through the life of the patents.

50.     Groupon uses servers operated by Akamai Technologies, Inc., a content delivery network provider, to proxy requests sent to Groupon's website and to deliver static content to the web browsers and mobile devices of Groupon's users.

51.     Groupon first became aware of U.S. Patent Nos. 5,796,967 and 7,072,849 on November 1, 2011.

52.     Groupon first became aware of U.S. Patent No. 5,961,601 on April 13, 2012.

53.     Groupon first became aware of U.S. Patent No. 7,631,346 on August 11, 2014.

54.     "Apple Macintosh HyperCard User's Guide" by Apple Computer Inc. was published at least as early as 1987.

55.     "The Complete HyperCard Handbook" by Danny Goodman was published at least as early as August 3, 1987.

56.     "The Complete HyperCard Handbook," 2nd Edition, by Danny Goodman was published at least as early as October 1988.

57.     "Danny Goodman's HyperCard Developer's Guide" by Danny Goodman was published at least as early as July 1988.

58.     "HyperCard Made Easy," by William B. Sanders was published at least as early as July 8, 1988.

59.     "Andrew: A Distributed Personal Computing Environment" by James H. Morris et al. was published at least as early as March 1986.

60.     "Designing the Star User Interface" by David Canfield Smith et al. was published

in Byte Magazine, Volume 7, Issue 4, at least as early as April 1982.

61.    "The star user interface: an overview" by David Canfield Smith et al. was published in the Proceedings of the National Computer Conference at least as early as 1982.

62.    "Caching Hints in Distributed Systems" by Douglas B. Terry was published in the Journal IEEE Transactions on Software Engineering, Vol. 13 at least as early as January 1987.

63.    "IBM, Sears shooting for '88 entry; New life for videotex" by Cleveland Horton was published by Advertising Age at least as early as April 6, 1987.

64.    "Trintex Signs up 42 Advertising Clients; Is Hoping for Launch in Early '88, VP Says," by Jerrold Ballinger was published by DM News at least as early as June 1, 1987.

65.    "Big advertisers link to videotext venture," by Cleveland Horton was published by Advertising Age at least as early as June 15, 1987

66.    "Trintex interactive videotext service will feature magazine-type format," by Arthur Markowitz was published by Discount Store News at least as early as June 22, 1987.

67.    "Trintex to Aim On-Line Ads at Demographic Segments," was published by The American Banker at least as early as June 30, 1987.

68.    "Trintex: Exclusive Status Report," by Gary Arlen was published by Videotex Teletext News, No. 94 at least as early as November 1986.

69.    U.S. Patent No. 4,575,579, "Editing Arrangement for Videotex System with Public Terminals," issued to Gerhard J. Simon and Gerhard Schneider from a patent application filed on November 29, 1983.

70.    "Design and Implementation of An Electronic Special Interest Magazine," by Gitta B. Salomon was published by MIT at least as early as September 1986.

71.    "VIDEOTEX/TELETEXT Principles and Practices," by Antoine F. Alber was

published by McGraw-Hill at least as early as 1985.

72.      "HTML & CGI UNLEASHED" by John December and Mark Ginsburg was published by Sams.net at least as early as 1995.

73.      "Spinning the Web: a guide to serving information on the World Wide Web," by Yuval Fisher was published by Springer-Verlag New York, Inc. at least as early as February 23, 1996.

74.      Amazon launched its website www.amazon.com in July 1995.

75.      U.S. Patent No. 6,016,484, "System, Method and Article of Manufacture for Network Electronic Payment Instrument and Certification of Payment and Credit Collection Utilizing a Payment," issued to Humphrey Williams et al. from a patent application filed on April 26, 1996.

76.      Japanese Laid Open Patent Application Publication No. Tokkai 2004-302907, "Network Apparatus and Authentication Server," to Akira Sunada was published on October 28, 2004 and filed on March 31, 2003.

77.      U.S. Patent No. 7,680,819, "Managing Digital Identity Information," issued to Joseph Andrew Mellmer et al. from a patent application filed on September 27, 2000.

78.      "Liberty ID-FF Architecture Overview," Version 1.2, was published by the Liberty Alliance Project on November 12, 2003 and was publicly available as of December 4, 2003.

79.      "Liberty ID-FF Protocols and Schema Specification," Version 1.2, was published by the Liberty Alliance Project on November 12, 2003 and was publicly available as of December 4, 2003.

80.      "Liberty ID-FF Bindings and Profiles Specification," Version 1.2-errata-v2.0, was

published by the Liberty Alliance Project on November 12, 2003 and was publicly available as of December 4, 2003.

81.     "Privacy and Security Best Practices," by Christine Varney, Version 2.0, was published by the Liberty Alliance Project on November 12, 2003 and was publicly available as of December 3, 2003.

82.     U.S. Patent No. 7,137,006, "Method and System for Single Sign-on User Access to Multiple Web Servers," issued to Michael L. Grandolas from a patent application filed on September 22, 2000.

83.     "A Fast File System for UNIX," by Marshall Kirk McKusick et al. was published as revised on February 18, 1984.

84.     On July 6, 1998, during prosecution of the '601 patent, the applicant submitted an amendment in response to an office action dated April 3, 1998.  Responding to a rejection, the applicant stated that "the present invention advantageously preserves state information by embedding the state in all hyperlinks passed back and forth between the client [] and server []." Responding to a rejection over the prior art, the applicant stated that "the present invention allows a client to browse information, i.e., access different HTML files while preserving the state information regardless of whether the HTML files constituting the information reside on different servers."

85.     On July 6, 1998, during prosecution of the '601 patent, the applicant submitted an amendment in response to an office action dated September 28, 1998.  The applicant included remarks, responding to a rejection over prior art, in which the applicant described that the prior art reference "does not necessarily preserve and provide the state information to all services for the duration of the conversation."  The applicant also described that the prior art reference "does

not teach or suggest any means to identify all continuations and recursively embed the state information in all identified continuations."

### B.   Contested Facts

IBM's Statement of Contested Facts is attached as **Exhibit A.**

Groupon's Statement of Contested Facts is attached as **Exhibit B.**

Should the Court find that any of the issues of law listed in Exhibits C or D of the Joint Pretrial Order should be considered as issues of fact, they shall be incorporated as issues in Exhibit A or B, respectively.

## IV.   <u>ISSUES OF LAW</u>

IBM's Statement of Issues of Law is attached as **Exhibit C.**

Groupon's Statement of Issues of Law is attached as **Exhibit D.**

Should the Court find that any issues identified in Exhibits A or B should be considered as an issue of law, they shall be incorporated as issues in Exhibit C or D, respectively.

## V.   <u>WITNESSES</u>

Any witness not listed will be precluded from testifying, absent good cause shown.  In the absence of an alternative agreement between the parties, fact witnesses will be sequestered. Also, unless the parties reach an alternative agreement, the order of the presentation of evidence will follow the burden of proof.  The order of proof is:

Phase I:        Plaintiff case-in-chief on infringement and damages.

Phase II:       Defendant response on infringement and damages, and case-in-chief on invalidity and other affirmative defenses.

Phase III:      Plaintiff response on invalidity.

Phase IV:      Defendant rebuttal on invalidity.

### A.     List of Witnesses the Plaintiff Expects to Call

Plaintiff's witness list is attached as **Exhibit E.**

### B.     List of Witnesses the Defendant Expects to Call

Groupon's witness list is attached as **Exhibit F.**

### C.     List of Witnesses Third Parties Expect to Call

There are no third parties to this action.

### D.     Testimony By Deposition

IBM's deposition designations are attached as **Exhibit G.**

Groupon's deposition designations are attached as **Exhibit H.**

This pretrial order contains the maximum universe of deposition designations, counter-designations, and objections to admission of deposition testimony; none of the foregoing shall be supplemented without approval of all parties or leave of the Court, on good cause shown.

If there are objections that remain to be resolved, the party calling the witness by deposition shall, no later than two (2) calendar days before the witness is to be called at trial, submit, on behalf of all parties: (i) a copy of the entire deposition testimony of the witness at issue, clearly highlighting the designations, counter-designations, and pending objections; and (ii) a cover letter clearly identifying the pending objections as well as a brief indication (i.e., no more than one sentence per objection) of the basis for the objection and the offering party's response to it.  Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of the deposition testimony or waiver of objection to the use of the deposition testimony.

All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the deposition is read or viewed at trial.

When the witness is called to testify by deposition at trial, the party calling the witness shall provide the Court with two copies of the transcript of the designations and counter-designations that will be read or played.  The parties agree to use deposition videos to the extent such videos exist.  The parties will be charged for all time that elapses from the time the witness is called until the next witness is called, according to the proportions to be provided by the parties with the exception of motions that may be argued outside the presence of the jury for which the parties will not be charged time.

If a party decides to play less than all of the designated testimony for a witness at trial, or to include less than all of its counter-designations or counter-counter-designations, the opposing parties may use such dropped testimony as counter-designations or counter-counter designations to the extent the usage of such testimony in such manner is otherwise consistent with Fed. R. Evid. 106, Fed. R. Civ. P. 32, and any other applicable Federal Rule of Evidence or Federal Rule of Civil Procedure.

To the extent a party requests to present a witness for live testimony only one time at trial due to limited availability, the scope of cross-examination shall not be limited by the scope of the witness's direct testimony, and the witness can be examined on any issue relevant to the issues being tried to the jury, regardless of the order of the presentation of evidence.  However, if a party agrees to make a witness available for live testimony as needed by the opposing party, then cross-examination should be limited to the scope of the direct testimony.

E.      **Impeachment with Prior Inconsistent Testimony**

Pursuant to Fed. R. Evid. 613, deposition and other testimony or statements not specifically identified on a party's deposition designation list or exhibit list may be used at trial only for the purpose of impeachment, if otherwise competent for such purpose.  The Court will rule at trial on any objections based on lack of completeness and/or lack of inconsistency.

F.      **Objections to Expert Testimony**

The parties have submitted *Daubert* motions and motions *in limine* that may affect the

scope of expert testimony.  The Court will rule on any objections to expert testimony as beyond

the scope of expert disclosures at trial, taking time from the parties' trial presentation to argue

and decide such objections.

VI.   **EXHIBITS**

A.      **Exhibits**

IBM's exhibit list is attached as **Exhibit I.**

Groupon's exhibit list is attached **Exhibit J**.

This pretrial order contains the maximum universe of exhibits to be used in any party's

case-in-chief, as well as all objections to the admission of such exhibits, neither of which shall be

supplemented without approval of all parties or leave of the Court, on good cause shown.

Exhibits not listed will not be admitted unless good cause is shown.

No exhibit will be admitted unless offered into evidence through a witness, who must at

least be shown the exhibit.  At some point before the completion of the witness's testimony, any

party that has used an exhibit with the witness and wishes that exhibit to be admitted into

evidence must formally move the exhibit into evidence by exhibit number.  Exhibits may not be

published, displayed, or otherwise shown to the jury until after they have been admitted into

evidence.  Once admitted, counsel may publish exhibits to the jury without requesting to do so.

A party will provide exhibits to be used in connection with direct examination by 6:00

p.m. the day before their intended use, and objections will be provided no later than 8:00 p.m. the

night before their intended use.  If good faith efforts to resolve the objections fail, the party

objecting to the exhibits shall bring its objections to the Court's attention prior to the witness

being called to the witness stand.  Failure to comply with these procedures, absent an agreement

by the parties and approval by the Court, will result in waiver of the use of an exhibit or waiver of objection to the exhibit.

Exhibits not objected to will be received into evidence by the operation of the Final Pretrial Order without the need for additional foundation testimony, provided they are shown to a witness.

On or before the first day of trial, counsel will deliver to the Courtroom Deputy a completed AO Form 187 exhibit list for each party.

**B.    Demonstrative Exhibits**

The parties will exchange demonstratives to be used in opening statements by 8:00 p.m. two nights before opening statements.  The parties will provide any objections to such demonstratives by 12:00 p.m. (noon) on the day before opening statements.

A party will provide demonstrative exhibits to be used in connection with direct examination by 6:00 p.m. the night before their intended use, and objections will be provided no later than 8:00 p.m. the night before their intended use.  If any of the demonstratives change after the deadline, the party intending to use the demonstrative will promptly notify the opposing party of the change(s).

The party seeking to use a demonstrative will provide a color representation of the demonstrative to the other side in PDF form.  For irregularly sized physical exhibits, the party seeking to use the demonstrative will provide a color representation as a PDF of 8.5 x 11 copies of the exhibits.  For physical demonstratives for which a color representation as a PDF is not feasible, the party must identify it in writing with specificity by the 6:00 p.m. deadline and, upon request, make it available for inspection no later than the 8:00 p.m. deadline for objections.

This provision does not apply to demonstratives created during testimony or demonstratives to be used for cross-examination, neither of which need to be provided to the

other side in advance of their use.  In addition, blow-ups or highlights of exhibits or parts of

exhibits or testimony are not required to be provided to the other side in advance of their use.

If good faith efforts to resolve objections to demonstrative exhibits fail, the objecting

party shall bring its objections to the Court's attention prior to the opening statements or prior to

the applicable witness being called to the witness stand.  Failure to comply with these

procedures, absent an agreement by the parties and approval by the Court, will result in waiver of

the use of an exhibit or waiver of objection to the exhibit.

## VII.   <u>DAMAGES</u>

<u>IBM's Position</u>

At trial, IBM will seek damages in the form of a reasonable royalty pursuant to 35 U.S.C.

§ 284 as compensation for Groupon's infringement of each of the patents-in-suit.  IBM contends

that damages are available from the earliest date of known infringement through expiration of the

patents-in-suit and will ask the jury to award reasonable royalties in the amount of $175,884,055.

In particular, IBM contends that damages are available as follows[4]:

For sales during the period of March 2010 through August 2015, IBM will ask the jury to

award reasonable royalties of $23,546,921 for compensation for Groupon's infringement of the

'967 patent.

For sales during the period of March 2010 through July 2017, IBM will ask the jury to

award reasonable royalties of $63,276,535 for compensation for Groupon's infringement of the

'849 patent.

---

 [4] IBM will ask the jury to award reasonable royalties for Groupon's infringement of the '849
and '346 patents through trial, but Groupon has only produced financial data through July 2017.
IBM will update the above figures for the '849 and '346 patents upon Groupon's production of
updated financial data for the accused instrumentalities.  Fact discovery and expert disclosures
are closed and Groupon thus maintains that IBM's request for additional data to supplement its
damages theories is untimely.

For sales during the period of March 2010 through June 2016, IBM will ask the jury to award reasonable royalties of $40,691,044 for compensation for Groupon's infringement of the '601 patent.

For sales during the period of July 2011 through July 2017, IBM will ask the jury to award reasonable royalties of $48,369,555 for compensation for Groupon's infringement of the '346 patent.

IBM also seeks post-verdict damages up to the time of judgment.  IBM further seeks an award of prejudgment interest, an award of attorneys' fees pursuant to 35 U.S.C. § 285, and interest, costs, and disbursements as justified under 35 U.S.C. § 284 and/or Fed. R. Civ. P. 54. IBM also seeks treble damages based on Groupon's willful infringement of the patents-in-suit. IBM also seeks injunctive relief against future acts of infringement by Groupon under 35 U.S.C. § 283.  In the alternative, IBM contends that any denial of a permanent injunction should be conditioned on payment of a reasonable royalty for infringement.

Groupon's Position

Groupon disputes that IBM is entitled to any damages in this action.  Groupon further disputes that IBM is entitled to any injunctive relief because IBM cannot show irreparable harm; there are adequate remedies available to IBM, though it cannot show entitlement to any such relief; granting an injunction would contravene public interest; and consideration of the balance of hardships to IBM and Groupon disfavors an injunction.  Finally, IBM's request for a payment of a reasonable royalty as an alternative to a permanent injunction is improper as IBM did not did not request in its Complaint an accounting or other monetary relief for alleged future infringement.  (D.I. 1 at 16.)  Instead, IBM's request for an award of damages is limited to "damages adequate to compensate IBM for the patent infringement *that has occurred*."  (*Id.*)

Groupon does not have a pending claim for damages.  It does, however, maintain that this is an exceptional case for which it is entitled to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.  Groupon also seeks its costs.

## VIII.   BIFURCATED TRIAL

IBM does not request a bifurcated trial.

Groupon requests that the Court bifurcate and stay IBM's claims with respect to the '346 patent.  IBM asserts claims 1-3, 5, 8, 10, 12, and 13 of the '346 patent in this case.  On August 7, 2017, the Patent Trial and Appeal Board found four of those eight asserted claims (claims 1, 3, 12, 13) and three additional claims (claims 14, 15, 18) unpatentable and thus invalid in two separate post grant review proceedings.  The remaining claims at issue in this case (claims 2, 5, 8, and 10) all depend on the claims found invalid by the PTAB.  On October 17, 2017, IBM appealed the PTAB's findings to the Federal Circuit.  Those appeals will not be resolved before trial in this matter, but the Federal Circuit is likely to issue its orders in the next six months.  If the '346 patent is not bifurcated and stayed pending final resolution of the PTAB's decisions, the parties will need to present to the jury the claims and defenses for the patent claims that are currently invalid.  If the PTAB's decisions are affirmed, all of that time and those resources would have been spent for nothing.  Further, if the PTAB's decisions are affirmed, and if IBM prevails at trial, the parties will still need to have another trial, because IBM has not disclosed a damages theory limited to the remaining dependent claims.  Thus, any damages awarded by the jury for the '346 patent would cover all of the asserted claims and thus be rendered moot by any final invalidity decision of claims 1, 3, 12, and 13.  Bifurcation and stay pending a final resolution of the PTAB's proceedings will promote judicial efficiency by simplifying the issues at trial this summer and eliminating the risk of duplicative trials on the same claims.  IBM will suffer no prejudice from a brief stay.  Although it maintains that it seeks injunctive relief, the

parties are not competitors and IBM cannot prove any irreparable harm as its damages expert
opined as to purportedly proper dollar amounts to compensate IBM for any alleged infringement.
And any minimal inconvenience IBM may face is outweighed by conserving the Court and
parties' resources, and the jurors' time, by not considering claims that may be, and are likely to
be, affirmed as unpatentable and thus invalid.

## IX.    MOTIONS *IN LIMINE*

Motions *in limine* have been fully briefed.  IBM's motions *in limine*, Groupon's
oppositions, and IBM's replies are attached as Exhibit K.  Groupon's motions *in limine*, IBM's
oppositions, and Groupon's replies are attached as Exhibit L.  No separate briefing shall be
submitted on *in limine* requests, unless otherwise permitted by the Court.

## X.    DISCOVERY

Each party has completed discovery.

## XI.    NUMBER OF JURORS

There shall be eight jurors.  The Court will conduct jury selection through the "struck
juror" method, beginning with the Court reading voir dire to the jury panel in the courtroom,
continuing by meeting with jurors individually in chambers or at sidebar and there addressing
any challenges for cause, and concluding with peremptory strikes.

## XII.    NON-JURY TRIAL

[To discuss during the meet and confer process.]

## XIII.    LENGTH OF TRIAL

The trial will be timed.  Unless otherwise ordered, time will be charged to a party for its
opening statement, direct and redirect examinations of witnesses it calls, cross-examination of
witnesses called by any other party, closing argument, its argument on any motions for judgment

as a matter of law, and all sides' argument on objections a party raises (outside the presence of the jury) to another party's exhibits and demonstrative exhibits.

The Courtroom Deputy will keep a running total of trial time used by counsel. If any party uses all of its allotted trial time, the Court will terminate that party's trial presentation.

Considering the Court's procedures for counting time, and considering the nature and extent of the parties' disputes, the parties request a total of 52 hours for their trial presentation, allocated as 26 hours per side.

## XIV.  MOTIONS FOR JUDGMENT AS A MATTER OF LAW

The parties propose that motions for judgment as a matter of law be made and argued during breaks when the jury is out of the courtroom or at the end of the day after the jury has been dismissed.  The parties agree that such motions will be raised with the Court at the first break after the appropriate point during trial so that the Court may inform the parties when such motions will be heard and whether the Court wishes to receive briefing.

## XV.  AMENDMENTS OF THE PLEADINGS

The parties are not seeking any amendments to the pleadings at this time.

## XVI.  ADDITIONAL MATTERS

[To discuss during the meet and confer process.]

Request Regarding Confidentiality and Introducing Evidence Under Seal

Recognizing that "[a]s a general matter, sealing judicial records, including the transcript of a trial or portions of the trial transcript, is contrary to the principle that judicial proceedings in this country are to be conducted in public," Groupon contends that the vast majority of the trial proceedings in this case should be in open court. *Bianco v. Globus Med., Inc*., No. 2:12–CV–00147–WCB, 2014 WL 3422000, at *1 (E.D. Tex. July 14, 2014) (Bryson, J.).  Specifically, other than highly confidential technical information, disclosure of which would provide the

parties' competitors with an unfair advantage in competitive product design and development, no

other information, including financial and patent licensing information, should be sealed from

public access.  "The public has a common law right of access to judicial proceedings and

records" and "[t]he exercise of this right to access, among other benefits, promotes public

confidence in the judicial system by enhancing the quality of justice dispensed by the court and

diminishes possibilities for injustice, incompetence, perjury and fraud while providing the public

with a more complete understanding of the judicial system and a better perception of its

fairness."  *Mosaid Techs. Inc. v. LSI Corp.*, 878 F. Supp. 2d 503, 507 (D. Del. 2012) (internal

quotations and citation omitted).  Accordingly, it is well settled that at trial, a party seeking to

prevent disclosure "must demonstrate compelling reasons for keeping such information out of

public view," such as a "clearly defined and serious injury."  *AmerGen Energy Co. v. United

States*, 115 Fed. Cl. 132, 137-38 (2014) (citation omitted); *Mosaid*, 878 F. Supp. 2d at 508.  The

fact that material was produced under a blanket protective order during discovery is not a

compelling reason and cannot rebut the presumption in favor of public access.  *AmerGen*, 115

Fed. Cl. at 138; *Mosaid*, 878 F. Supp. 2d at 508-09.  A party seeking to seal material introduced

at trial accordingly bears a heavy burden to show that a sealing order would protect important

countervailing values.  *Id.*

Here, other than with respect to the highly confidential technical information, no party

can meet this heavy burden.  For example, IBM has produced in this litigation a number of

license agreements relating to the asserted patents.  The parties dispute which ones are relevant

for purposes of computing damages, but *some* of IBM's licenses will likely be admitted at trial.

*See generally Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1368-73 (Fed. Cir.

2017), *cert. denied*, 138 S. Ct. 429 (2017). Those licenses and testimony about them should be

accessible to the public.  The grant of a patent is a matter "between the public, who are the

grantors, and the patentee." *Oil States Energy Servs., LLC v. Greene's Energy Grp.*, LLC, 138

S. Ct. 1365, 1373 (2018) (quotation marks and alteration omitted).  "By issuing patents, the PTO

takes from the public rights of immense value, and bestows them upon the patentee." *Id*.  The

public accordingly has a right to know the measure of value it has granted—especially when that

value is litigated in a public forum.  *See Mosaid*, 878 F. Supp. 2d at 512 ("There are other

forums—such as arbitration—available if parties wish to protect all of this type of information

from public view.").  The patents and parties involved, and the amounts paid, will be critical to

"giv[ing] the public an opportunity to truly understand the issues in [the damages portion of] this

case." *LifeNet Health v. LifeCell Corp.*, No. 2:13cv486, 2015 WL 12516758, at *2 (E.D. Va.

Jan. 9, 2015).  The Court should accordingly ensure that the public retains the right and the

ability to access that information.

　　Resolving and identifying types of information to be sealed from the public during trial

now would promote a more efficient trial proceedings and reduce, if not eliminate, disruptions to

be caused by requests to seal the Courtroom once the trial has commenced.

　　Request Regarding Reduction of Asserted Claims

　　Groupon requests that IBM reduce the number of its asserted claims prior to trial.  IBM is

currently asserting fifty-three (53) claims across four patents.  Given the finite number of hours

that the parties will have for trial presentation, asserting fifty-three (53) claims is not practical.

Further, without requiring IBM to reduce its asserted claims to a manageable number sufficiently

in advance before the trial commences in this matter will prejudice Groupon, as it will be forced

to prepare to defend against claims that IBM ultimately intends to drop or may not cover in its

trial presentation without any advance notice to Groupon (indeed, it is Groupon's burden to

prove invalidity of each asserted claim).  Courts in this district have repeatedly required parties

to reduce the number of asserted claims to a manageable number prior to trial.  *See, e.g.*, *Nox*

*Med. ehf v. Natus Neurology Inc.*, C.A. No. 1-15-cv-00709, D.I. 241 (D. Del. Apr. 12, 2018)

(requiring plaintiff to commit to reducing number of asserted claims by pretrial conference);

*Reckitt Benckiser Pharm. Inc. v. Watson Labs.*, C.A. No. 13-1674-RGA, D.I. 320 at 1 (D. Del.

Sep. 9, 2015) (requiring plaintiffs to reduce the number of asserted claims to fifteen (15) claims

from three (3) patents prior to trial); *GreatBatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS, D.I.

368 at 1-2 (D. Del. July 28, 2015) (reducing number of asserted claims to no more than fifteen

(15) from five (5) asserted patents, noting that narrowing "is proper in light of the complexity of

the subject matter at issue in the asserted patents, the number of patents that remain asserted in

this case, and the parties' competing proposals"); *Galderma Labs. LP v. Actavis Labs. UT Inc.*,

C.A. No. 1-15-cv-00232, D.I. 215 (D. Del. Dec. 14, 2016) (J. Stark) ("the Court expects that the

parties will narrow the case (including in terms of asserted claims as well as invalidity

references) in an expeditious manner following the completion of expert discovery").

## XVII.  <u>SETTLEMENT</u>

The parties have engaged in a good faith effort to explore resolution of the controversy

by settlement, including mediation sessions before a private mediator on July 20, 2016 and

Magistrate Judge Christopher J. Burke on April 3, 2018.

* * *

**IT IS HEREBY ORDERED** that this Final Pretrial Order shall control the subsequent

course of the action, unless modified by the Court to prevent manifest injustice.


DATED:  June 2, 2018

_____
United States District Judge

APPROVED AS TO FORM AND
SUBSTANCE:


POTTER ANDERSON & CORROON LLP


OF COUNSEL:                    By: _____
                                   Richard L. Horwitz (#2246)
John M. Desmarais                  David E. Moore (#3983)
Karim Z. Oussayef                  Bindu A. Palapura (#5370)
Laurie Stempler                    Hercules Plaza, 6th Floor
Kevin K. McNish                    1313 N. Market Street
Robert C. Harrits                  Wilmington, DE  19801
Michael Matulewicz-Crowley         Tel:  (302) 984-6000
Brian Matty                        rhorwitz@potteranderson.com
DESMARAIS LLP                      dmoore@potteranderson.com
230 Park Avenue                    bpalapura@potteranderson.com
New York, NY  10169
Tel:  (212) 351-3400           *Attorneys for Plaintiff*
                               *International Business Machines Corporation*

                               ASHBY & GEDDES


                               By: _____
                                   John G. Day (#2403)
Of counsel:                        Andrew C. Mayo (#5207)
J. David Hadden                    500 Delaware Avenue, 8th Floor
Saina S. Shamilov                  P.O. Box 1150
Phillip J. Haack                   Wilmington, DE  19899
Sapna Mehta                        (302) 654-1888
FENWICK & WEST LLP                 jday@ashby-geddes.com
Silicon Valley Center              amayo@ashby-geddes.com
801 California Street
Mountain View, CA  94041
(650) 988-8500
                                   Attorneys for Defendant
                                   GROUPON, INC.