1                     IN THE UNITED STATES DISTRICT COURT

2                     IN AND FOR THE DISTRICT OF DELAWARE

3                                  - - -

    INTERNATIONAL BUSINESS MACHINES
4   CORPORATION,                          :   CIVIL ACTION
                                          :
5            Plaintiff,                    :
    v                                     :
6                                         :
    GROUPON, INC.,                        :
7                                         :   NO. 16-122-LPS
             Defendant.                    :
8                                  - - -

9                          Wilmington, Delaware
                           Monday, July 16, 2018
10                         *Jury Trial - Volume A*

11                                 - - -

12  BEFORE:  HONORABLE LEONARD P. STARK, Chief Judge, and a jury

13  APPEARANCES:                       - - -

14              POTTER ANDERSON & CORROON, LLP
                BY:  DAVID E. MOORE, ESQ.,
15                   BINDU A. PALAPURA, ESQ., and
                     STEPHANIE E. O'BYRNE, ESQ.
16
                     and
17
                DESMARAIS, LLP
18              BY:  JOHN DESMARAIS, ESQ.,
                     KARIM Z. OUSSAYEF, ESQ.,
19                   LAURIE STEMPLER, ESQ.,
                     KEVIN K. McNISH, ESQ.,
20                   MICHAEL MATULEWICZ-CROWLEY, ESQ.
                     ROBERT C. HARRITS, ESQ.,
21                   BRIAN D. MATTY, ESQ., and
                     EDWARD GEIST, ESQ.
22                   (New York, New York)

23                       Counsel for Plaintiff

24

25  Dale Hawkins                      Brian P. Gaffigan
    Registered Merit Reporter         Registered Merit Reporter

1    APPEARANCES:   (Continued)

2
                        ASHBY & GEDDES, P.A.
3                       BY:   JOHN G. DAY, ESQ., and
                              ANDREW C. MAYO, ESQ.
4
                              and
5
                        FENWICK & WEST, LLP
6                       BY:   J. DAVID HADDEN, ESQ.,
                              SAINA M. SHAMILOV, ESQ.
7                             PHILLIP J. HAACK, ESQ.
                              SAPNA MEHTA, ESQ.
8                             JESSICA M. KAEMPF, ESQ.,
                              ATHUL ACHARYA, ESQ., and
9                             JESSICA BENZLER, ESQ.
                              (Mountainview, California)
10
                              Counsel for Defendants
11

12

13

14                              - oOo -

15

16                      P R O C E E D I N G S

17             (REPORTER'S NOTE:   The following jury trial was

18    held in open court, beginning at 9:47 a.m.)

19             THE COURT:   Good morning.

20             (The attorneys respond, "Good morning, Your

21    Honor.")

22             THE COURT:   A special welcome to the members of

23    our jury pool.  My name is Leonard Stark.  I'm the Chief

24    Judge of the United States District Court for the District

25    of Delaware.  I'm the judicial officer who will be presiding

1   over the trial for which we are to select a jury.  As

2   you likely already know, serving on a jury is one of the

3   responsibilities and privileges that we all share as

4   citizens of the United States.  We're all very grateful to

5   you for taking time out of your schedules and your lives to

6   allow us to consider placing you on this jury.  I will have

7   some more instructions for you in just a moment about this

8   selection process.  It is likely to take a good part of the

9   day but we will be moving along just as quickly as we

10   possibly can.

11            The first order of business is for me to

12   introduce my deputy Mr. Neil lobby.  He is going to

13   administer an oath.  Mr. Looby.

14            (Prospective jurors placed under oath.)

15            THE COURT:  Thank you.

16            So we're now going to begin what is called the

17   voir dire process.  The voir dire is going to involve my

18   reading you a very brief description of what this trial is

19   about and who the parties are and then reading out loud to

20   you 16 requests.  All of the questions are in a yes/no

21   format.  As I read them, please listen carefully to the

22   questions and try to think to yourself as I go along whether

23   you have a "yes" answer to my of my 16 questions.  There is

24   no need for the members of the jury pool to stand up or to

25   raise their hands or to say anything out loud in response to

1    my questions at this time.  Just please listen and think to

2    yourself do you have a "yes" answer to any of them.

3              After I have read all of the questions, I will

4    move to my jury room which is right behind where I'm

5    sitting.  Some of the lawyers will join me and a court

6    reporter and then members of my staff will bring in those of

7    you who tell us you had a "yes" answer.  You will come in

8    one by one and we'll discuss your concerns.  All right?  So

9    that is where we are headed.

10              Let me now begin reading to you the voir dire.

11              This is a patent case.  The plaintiff in this

12   case is International Business Machines Corporation, also

13   known as "IBM."  The defendant is Groupon Inc.  IBM contends

14   that Groupon infringes four patents and seeks money damages

15   to compensate it for that infringement.  Groupon denies

16   that it infringes any valid patent and denies that IBM is

17   entitled to any damages.

18              In light of this brief summary, I will ask you

19   certain questions, the purpose of which is to:  (1) enable

20   the Court to determine whether or not any prospective juror

21   should be excused for cause; and (2), enable counsel for the

22   parties to exercise their individual judgment with respect

23   peremptory challenges, that is, challenges for which no

24   reason need be given by counsel.

25              I will now read those questions to you.

```
 1                    Question 1 is:  Are you familiar with this case
 2      or have you heard or read anything about it?
 3                    Question 2.  Counsel will now introduce
 4      themselves.  After they do so, I will ask you whether you or
 5      any members of your immediate family or anyone close to you
 6      know of or have any current or former relationship with any
 7      of the attorneys or their law firms.
 8                    All right.  First for IBM.
 9                    MR. DESMARAIS:  Thank you, Your Honor.
10                    THE COURT:  Good morning.
11                    MR. DESMARAIS:  John Desmarais from Desmarais
12      LLP.  Karim Oussayef from Desmarais LLP, Laurie Stempler
13      from Desmarais LLP.
14                    Mr. Moore.
15                    MR. MOORE:  David Moore from Potter Anderson.
16                    MS. PALAPURA:  Bindu Palapura from Potter
17      Anderson.
18                    THE COURT:  Okay.  Thank you.  Now for Groupon.
19                    MR. HADDEN:  Thank you.  Good morning.  David
20      Hadden from Fenwick & West.  This is Saina Shamilov, also
21      from Fenwick & West.  Phillip Haack Fenwick & West.
22                    Also with us are members of our team:  Dave
23      Weinberg and Phil Dunham.
24                    And John Day from Ashby & Geddes.
25                    THE COURT:  Thank you.  So ladies and gentlemen
```

1   of the jury pool.  Question 2 is:  Are you related to or

2   personally acquainted with any of those attorneys or their

3   firms?

4            Question 3.  The parties in this case are

5   International Business Machines Corporation (IBM) and

6   Groupon Inc.  Do you know any of the parties or any of the

7   following:

8            A.  Prodigy Services Company.

9            B.  Trintex.

10           Question 4.  Have you or a family member ever

11  worked for, had or have business dealings with, or owned

12  stock in any of these companies or organizations?

13           Question 5.  I will now read a list of

14  individuals who might appear as witnesses in this cares,

15  and then ask if you know any of these individuals:

16           Douglas Schmidt, Jerry Hausman, Jon Weissman,

17  James Malackowski, Thomas McBride, Robert Filepp, Heather

18  Hinton, Arun Iyengar, Michele Baumgartner-Bonanno, Brian

19  Turner, Phil Dunham, Jim Breen, Jason Carlisle, Paul Davis,

20  Jan Krems, Aileen Sandridge, Damien Schmitz, Varun Sood.

21           So Question 5 is:  Do you know any of these

22  individuals that might appear as witnesses in this case?

23           Question 6.  Have you, a relative or close

24  friend had any experience with patents, patent law, patented

25  technology, trade secrets or the United States Patent and

Trademark Office?

Question 7.  Have you ever been involved in the development of a new product or process?

Question 8.  Do you have any strong feelings about awarding damages or choosing not to award damages in a case like this?

Question 9.  Do you have an opinion about whether software or online processes should be patented?

Question 10.  Do you frequently use a computer or mobile device for purchasing goods or services?

Question 11.  Do you regularly use Groupon either on a computer or mobile device?

Question 12.  Look around the other potential jury members.  Do you know any of the others or have you had any relationship with any of the other jurors before today?

Question 13.  If you are selected to sit on this case, is there any reason you could not render a verdict solely on the evidence presented at the trial and in the context of the law as given to you in my instructions in reaching your verdict and disregard any other ideas, notions or beliefs about the law that you may have?

Question 14.  Do you have any special disability or problem that would make it difficult or impossible for you to serve as a member of the jury?

Question 15.  On most days, jurors will be

1    expected to sit from 9:00 in the morning until 4:30 in the

2    afternoon.  There will be a lunch break and at least a

3    fifteen minute break in the morning and afternoon.  The

4    trial is expected to last ten days, so we expect to be done

5    by Friday, July 27th.

6              Does this schedule present any special hardship

7    for you?

8              And finally, question 16.  Do you know of any

9    other matter which you believe should be called to the

10   Court's attention or which you think may prevent you from

11   rendering a fair and impartial verdict based solely upon the

12   evidence and my instructions as to the law?

13             So that completes the sixteen voir dire

14   questions.  As I indicated, I and some of the lawyers will

15   now move to my jury room and please wait here and when

16   called to do so, if you have a yes answer, you'll come back

17   and meet with us in the jury room.

18             Thank you.

19             (A brief recess was taken.)

20             THE COURT:  So before we bring the jurors in,

21   first off, we'll have time to talk before we get the

22   openings, so if there are issues, they're all preserved,

23   don't worry about that.

24             Thank you for identifying last week, I think it

25   was late in the week I think it was thirteen potential

```
 1    jurors that you all agreed should be stricken, we let you

 2    know and we let them know that they are stricken.  Mr. Looby

 3    will put their numbers on the record in a moment and there

 4    is also I believe nine additional folks who have not shown

 5    up.

 6                 MR. HADDEN:  There is one we saw on the

 7    questionnaire this morning that we would agree to strike,

 8    number 48, who loss a father recently.

 9                 THE COURT:  Do you agree with 48 being stricken

10    as well?

11                 MR. DESMARAIS:  I do, Your Honor.

12                 THE COURT:  We will add 48 to your list.  I just

13    also wanted to note if you haven't figured out already,

14    there are a lot of interns in the building.  One is seated

15    to my left.  As I understand it, a number of them want to

16    see jury selection, so they'll be rotating in through our

17    time here in the jury room.  All right?  Any questions

18    before we get started?

19                 MR. DESMARAIS:  No, Your Honor.

20                 MR. HADDEN:  No, Your Honor.

21                 THE COURT:  Can you tell us who is not here,

22    Mr. Looby.

23                 THE CLERK:  This includes the 13 from Friday.

24    No. 2, No. 14, No. 15, No. 16, 17, 18, 22, 25, 26, 27, 28,

25    30, 31, 33, 38, 41, 47, 48, 50, 53, 56, 57, and 59.
```

```
 1                      THE COURT:  Okay.  Bring the first person in,

 2      please.

 3                      (Juror entered the jury room.)

 4                      Good morning.

 5                      A JUROR:  Good morning.

 6                      THE COURT:  Please join us.  Have a seat.  There

 7      is a lot of us here.  Could you tell us if you recall your

 8      juror number?

 9                      A JUROR:  12.

10                      THE COURT:  The number given to you this

11      morning.  12.  Thank you.  Are you Ashley Dougall.

12                      A JUROR:  Dougall.

13                      THE COURT:  Do you remember anything that you

14      answered yes to?

15                      A JUROR:  Yes, to buying electronics, buying

16      online, as well as yes to possibly schedule issues.

17                      THE COURT:  All right.  Let's talk about the

18      potential hardship first with the schedule.

19                      A JUROR:  Okay.

20                      THE COURT:  Give us an idea what the issue is.

21                      A JUROR:  I do have two jobs.  I work at

22      Discover and CVS as a pharmacy technician.  Like in the

23      morning I'm usually 8:00 to 2:00, and at CVS 5:00 to 9:00.

24      That would be the only thing.

25                      THE COURT:  As you heard, if your on the jury,
```

1       you will be expected to be here 9:00 to 4:30 most days this

2       week and next week.  That would seem to interfere at least

3       with the Discover job.

4                       A JUROR:  Yeah.  And then I take the bus.  That

5       would be the only thing.  If I didn't, I would be fine.

6                       THE COURT:  So just give me an idea of the

7       hardship, we said you're not going to be able to do the

8       Discover job the next few weeks.  You would be able to get

9       to your CVS job.

10                      A JUROR:  As long as the buses were able to get

11      me there just because I have to be there by 5:00.  I rely on

12      public transportation, that would be the only thing.

13                      THE COURT:  How far is the CVS location from

14      here?

15                      A JUROR:  It's in Newark.  The buses take about

16      thirty minutes depending, just depends on traffic.

17                      THE COURT:  If I said we were going to finish at

18      say 4 o'clock, are you pretty comfortable that an hour would

19      give you enough time to get there?

20                      A JUROR:  Yeah.

21                      THE COURT:  Tell us when your buying online, is

22      that a pretty regular practice?

23                      A JUROR:  Yes, on Amazon sometimes every couple

24      of months kind of thing.

25                      THE COURT:  Not something you do every week,

1    though?

2              A JUROR:  No, too many bills.

3              THE COURT:  Any other issues or anything you

4    said yes to?

5              A JUROR:  No.  I mean, I have had used Groupon

6    once or twice, for like Dunkin Donuts, but that was about

7    it.

8              THE COURT:  Was that recently?

9              A JUROR:  No, years ago.

10             THE COURT:  Let me see if anyone else has any

11   questions.

12             Any questions?

13             MR. DESMARAIS:  No, Your Honor.

14             MR. HADDEN:  Just a couple.  I understand you

15   used Groupon.  Did you have any problems?

16             A JUROR:  Only once, it was just like it had

17   said I redeemed like a Dunkin Donuts gift card, but it was

18   like five bucks.  It was okay.

19             MR. HADDEN:  They thought you redeemed it and

20   you didn't redeem it?

21             A JUROR:  Yes.  It was all right.  It worked the

22   other time.

23             MR. HADDEN:  And I think Judge Stark is going to

24   instruct the jury not to use Groupon during the trial.

25   Would that be a problem?

```
 1              A JUROR:  No.

 2              MR. HADDEN:  Thank you.

 3              THE COURT:  You can go back in the courtroom.

 4   Thank you very much.

 5              A JUROR:  Thank you.

 6              THE COURT:  Any motion?

 7              MR. DESMARAIS:  No, Your Honor.

 8              THE COURT:  Any motion?

 9              MR. HADDEN:  No.

10              THE CLERK:  Next.

11              (Juror entered the jury room.)

12              THE COURT:  Good morning.  You can have a seat

13   here and tell us your juror number.

14              A JUROR:  I'm number 46.

15              THE COURT:  I can check that for you.  So you

16   should be Martha Sosangelis?

17              A JUROR:  Yes.

18              THE COURT:  Do you recall anything you answered

19   yes to?

20              A JUROR:  Yes.  My issue is a hardship.  My

21   husband is in stage renal failure.  He goes to dialysis

22   three times a week and I'm basically his sole caretaker.  So

23   it's just when I heard the length of ten days, it's going to

24   be an issue.

25              THE COURT:  Right, that would be he would miss
```

1    some of his appointments?

2              A JUROR:  Yes.  I'm the one who is taking him --

3    I don't have to take him to dialysis, but I have to drive

4    him other places and that sort of thing.

5              THE COURT:  And it would be difficult to arrange

6    for someone else to do that?

7              A JUROR:  Yeah.

8              THE COURT:  Were there other things you answered

9    yes to?

10             A JUROR:  No.

11             THE COURT:  No.

12             Any questions?

13             MR. DESMARAIS:  No, Your Honor.

14             THE COURT:  Any questions?

15             MR. HADDEN:  No, Your Honor.

16             THE COURT:  You can go back in the courtroom.

17             A JUROR:  Thank you.

18             (Juror left jury room.)

19             THE COURT:  Any objection to striking her for

20   the hardship?

21             MR. DESMARAIS:  No, Your Honor.

22             MR. HADDEN:  No, Your Honor.

23             THE COURT:  Okay.  I'll strike Juror No. 46.

24             (Juror comes into jury room.)

25             A JUROR:  Good morning.

1              THE COURT:  Can you tell us your juror number

2    please.

3              A JUROR:  7.

4              THE COURT:  Are you Stacie Cataldi?

5              A JUROR:  I am.

6              THE COURT:  Do you recall what you answered yes

7    to?

8              A JUROR:  That I used my cellular device to buy

9    in purchasing.  I have used Groupon to purchase a few

10    different things, so that should be it.

11              THE COURT:  Let's talk just a little bit about

12    those.

13              A JUROR:  Sure.

14              THE COURT:  How often do you buy things online

15    with either a mobile device or a desktop?

16              A JUROR:  I can't believe it is that often.  I

17    will say I used it just this past weekend.  We were in

18    Tennessee.

19              THE COURT:  No one told you not to.

20              A JUROR:  Yes, there was a Titanic museum type

21    deal to get in a little cheaper.

22              THE COURT:  So that was with Groupon?

23              A JUROR:  That was with Groupon.

24              THE COURT:  So how often would you say you use

25    Groupon?

1          A JUROR:  I probably only used it about three

2    times truly, and it has been for like deals to do things

3    with the family.

4               THE COURT:  Right.

5          A JUROR:  Bowling, things like that.

6               THE COURT:  Do you have any strong feelings

7    positive or negative about Groupon?

8          A JUROR:  No, I haven't had any issues.  But I,

9    you know ...

10               THE COURT:  If you are on the jury and I tell

11    you that you can't use Groupon for the length of trial,

12    would that be a hardship for you?

13          A JUROR:  No.

14               THE COURT:  Okay.

15          A JUROR:  It's not like I use it daily or weekly

16    either.  I can't even say I use it monthly, just once in a

17    while when I run across something that I know we're going to

18    do that it works out.

19               THE COURT:  Okay.  Anything else that you

20    remember saying "yes" to?

21          A JUROR:  No.  My only other thing, I am

22    downstate.  I live downstate.  I do have two younger kids

23    that are involved in camp.  We have appointments, you

24    things, not that I can't try to rearrange things.

25               I do have a dental class that I was supposed to

1    take on the 26th that my boss has already paid for and

2    registered me for in Rehoboth.

3              THE COURT:  That would be right near the end of

4    what we expect to have the trial for.

5              A JUROR:  Right.  I know you said until the

6    27th, so I'd said "hmm."

7              THE COURT:  Is that during the daytime at class?

8              A JUROR:  Yes.

9              THE COURT:  Is there going to be any problem for

10   you at work if you are with us and you don't make it to that

11   class?

12             A JUROR:  No, I don't think so.  I know he will

13   be disappointed because the whole office is supposed to go.

14             THE COURT:  Okay.  And in terms of the

15   downstate, I don't know if you would find this helpful or

16   not.  But you could -- we could put you up in a hotel.

17             A JUROR:  She did say that when we were in the

18   jury room, yes.  So that possibly would help if I was

19   chosen.

20             THE COURT:  Right.  Okay.  Is there anything

21   else?

22             A JUROR:  No, nothing else.

23             THE COURT:  Any questions?

24             MR. DESMARAIS:  I do have one question.

25             THE COURT:  Go ahead.

1            MR. DESMARAIS:  You said your boss might about

2  disappointed if you didn't go to the class.  Would you be

3  disappointed if you didn't go?

4            A JUROR:  It's OSHA.  I mean, I mean it's one of

5  those like we haven't gone to a class and we were going to

6  have kind of a work group thing because it was down at the

7  beach afterwards, so the class was in the morning.  We were

8  going to stay until about noon and then be able to kind of

9  do something as an office together.

10           We are a small office.  There are only ten of

11 us including the doctor so it has been hard.  He did write

12 a letter trying to get me out of this because it does put

13 patients behind.  There are certain things that as dental

14 assistant I do and there are things that the other girls

15 don't tend to do.  We've only got three dental assistants

16 including myself, so, that's -- yeah, but it was nice.  So

17 that's okay.  They know.  They understand.

18           MR. DESMARAIS:  Thank you.

19           THE WITNESS:  Okay.

20           THE COURT:  Any questions?

21           MR. HADDEN:  No.

22           THE COURT:  Okay.  You can go back.

23           A JUROR:  Thank you very much.

24           THE COURT:  Thank you.

25           (Juror left jury room.)

```
 1                   THE COURT:  Any motion?

 2                   MR. DESMARAIS:  No, Your Honor.

 3                   THE COURT:  Any motion?

 4                   MR. HADDEN:  No, Your Honor.

 5                   (Juror comes into jury room.)

 6                   THE COURT:  Good morning.  You can have a seat,

 7     please.

 8                   Do you know your juror number?

 9                   A JUROR:  32.

10                   THE COURT:  Thank you.  Are you Carol Overdorf?

11                   A JUROR:  I am.

12                   THE COURT:  Do you recall anything you answered

13     yes to?

14                   A JUROR:  Yes.  It was the 14th, 15th question.

15     The hardship.

16                   THE COURT:  The hardship.

17                   A JUROR:  Yes.

18                   THE COURT:  Tell me.

19                   A JUROR:  My crew is dedicated to getting me

20     back to work.  I'm only three days ahead.  No. 2, I have a

21     job interview on Friday for another job.  And, 3, my 89 year

22     old mother moved in with me.  I can't leave her alone.

23                   THE COURT:  So in terms of your work, you are at

24     a tree company, is that right?

25                   A JUROR:  Yes.
```

```
1                    THE COURT:  And you are the one?

2                    A JUROR:  Yes, I do the work.  I do the

3       proposals and all that.

4                    THE COURT:  If you don't do that, then the whole

5       process falls apart.

6                    A JUROR:  (Nodding yes.)

7                    THE COURT:  Just for his benefit, that is a

8       "yes?"

9                    A JUROR:  Yes.  Okay.

10                   THE COURT:  He is trying to take down what you

11      are saying?

12                   A JUROR:  Okay.

13                   THE COURT:  And then you are looking for another

14      job?

15                   A JUROR:  Yes, I am.

16                   THE COURT:  In addition of that one.

17                   A JUROR:  Instead of this one.  This one is

18      driving me crazy.

19                   THE COURT:  I see.  And you don't want to have

20      to reschedule an interview for a job.

21                   A JUROR:  It's actually my second interview.

22                   THE COURT:  And it was your mother you said?

23                   A JUROR:  Uh-huh.

24                   THE COURT:  You're normally taking care of her.

25                   A JUROR:  I check in on her several times a day.
```

```
 1      I am worried because I called and she didn't answer the
 2      phone.
 3                  THE COURT:  I'm sorry about that.  You are in
 4      Ellendale?
 5                  A JUROR:  Yes, 80 miles from here.
 6                  THE COURT:  So if you were here, I think you
 7      would be pretty distracted and worried about those other
 8      issues?
 9                  A JUROR:  (Nodding yes.)
10                  THE COURT:  That is a yes?
11                  A JUROR:  Yes.  Yes.  I'm sorry.
12                  THE COURT:  Thanks.  I'm going to have you go
13      back into the courtroom.
14                  A JUROR:  Thank you.
15                  THE COURT:  Thank you.
16                  (Juror left jury room.)
17                  THE COURT:  We'll strike 32 for cause.
18                  Any objection?
19                  MR. DESMARAIS:  No.
20                  MR. HADDEN:  No.
21                  THE COURT:  We'll strike 32 for cause.
22                  (Juror entered jury room.)
23                  THE COURT:  Have a seat.
24                  Do you know what your juror number is?
25                  A JUROR:  24.
```

1          THE COURT:  Thank you.  Are you Ms. Korzeniwsky?

2          A JUROR:  Korzeniwsky, yes.

3          THE COURT:  Korzeniwsky.  My apologies.  Do your

4    do you recall what you answered "yes" to?

5          A JUROR:  Yes.  The fact that today I have a

6    good friend who passed away and --

7          THE COURT:  I'm sorry.

8          A JUROR:  -- the funeral is today.  And service

9    starts at 12:00.  So I didn't ...

10         THE COURT:  Okay.

11         A JUROR:  I was hoping to do that, but ...

12         THE COURT:  Right.  That is here in Wilmington

13   or ...

14         A JUROR:  No, it's off Kirkwood Highway or not

15   Kirkwood Highway.  It's Betty Munson.

16         THE COURT:  Okay.

17         A JUROR:  I'm trying to think of ...

18         THE COURT:  I'm very sorry to hear that.  And I

19   don't want this to sound insensitive, but if you go to the

20   funeral today, do you have a hardship over the next nine

21   days or is it just a today issue?

22         A JUROR:  Well, it's just really a today issue.

23   And I'm not comfortable with settings like this but ... I'm

24   nervous right now.

25         THE COURT:  I'm sorry about that.

```
 1                    A JUROR:  Yes.

 2                    THE COURT:  Were there other issues that you

 3      wanted to share with us?

 4                    A JUROR:  No.

 5                    THE COURT:  No.  All right.  Any questions?

 6                    MR. DESMARAIS:  No, Your Honor.

 7                    THE COURT:  Any questions?

 8                    MR. HADDEN:  No, Your Honor.

 9                    THE COURT:  Okay.  You can go back into the

10      courtroom.

11                    A JUROR:  Okay.  Thank you.

12                    (Juror left jury room.)

13                    THE COURT:  What do you think we should do with

14      Juror No. 24?

15                    MR. DESMARAIS:  I would let her go to the

16      funeral, Your Honor.

17                    THE COURT:  Excuse her so she can go to the

18      funeral?

19                    MR. DESMARAIS:  I would.

20                    THE COURT:  Any objection to that?

21                    MR. HADDEN:  No.

22                    THE COURT:  Okay.  So I am going to strike 24.

23      We don't normally let people go, but under these

24      circumstances, if you could work with Liz and see if there

25      is some subtle way to let her know she can leave.  I don't
```

1   want others to leave.

2               MR. HADDEN:  They're headed for the doors.

3               THE COURT:  Right.

4               THE LAW CLERK:  I can talk to Liz.

5               THE COURT:  Right.  I want to keep this going.

6               MR. DESMARAIS:  We're going to get down to 14

7   pretty quickly.

8               (Juror comes into the jury room.)

9               THE COURT:  Good morning.

10              A JUROR:  Good morning.

11              THE COURT:  Could you tell us your juror number,

12  please?

13              A JUROR:  19.

14              THE COURT:  19.  So you are Frank Hartsell?

15              A JUROR:  That's correct.

16              THE COURT:  Do you recall what you answered

17  "yes" to?

18              A JUROR:  I did.  My concern is the length of

19  time of the trial simply because I work for a small company

20  and it would be a financial burden to both myself and family

21  and the company and a disservice to my customers simply

22  because I wouldn't be able to respond to their calls at

23  the present time.  This is our busiest time of the year.

24  Wintertime would be a much more preferable time for us.  I

25  can maneuver that.  This would be tough.

```
 1              THE COURT:  You do pest control?

 2              A JUROR:  Yes, I do.  Yes.

 3              THE COURT:  So things are better pest-wise in

 4   the cold?

 5              A JUROR:  Very, very busy now, and the majority

 6   of our customers are female.  And when they call and you

 7   tell them you can't get there for just a couple days, there

 8   is a real panic on the other end of the phone.  It's a

 9   psychological problem with a lot of people.  To me it's an

10   insect, but to them it's the end of the world.  So that's my

11   concern.

12              I would like to say that I take responsibility,

13   my civic responsibility very seriously and I'm planning on

14   retiring in a couple years and at that time I could stay a

15   month if you needed me.

16              THE COURT:  Right.  So would it be a financial

17   hardship to you?  Would you get paid or not paid?

18              A JUROR:  No, I do not get paid.  I get paid for

19   what I do, and there would be no income there for myself or

20   the company.

21              THE COURT:  And in terms of servicing the

22   customers, how many others like you does the company have?

23              A JUROR:  The owner and myself.  I have been

24   with them for 47 years.

25              THE COURT:  And he can't do the all of work
```

1   himself?

2              A JUROR:  He is 81 years old, and at the present

3   time I do the majority of the work.

4              THE COURT:  All right.  Is there anything else?

5              A JUROR:  No.  Everything else I could -- I

6   could go with everything else except for this was my

7   concern.  If it was a day trial ...

8              THE COURT:  Right.

9              A JUROR:  If you said 9:00 o'clock tonight, I

10  would still be here.

11             THE COURT:  Okay.  Any questions?

12             MR. DESMARAIS:  No, Your Honor.

13             THE COURT:  Any questions?

14             MR. HADDEN:  Just one question.

15             A JUROR:  Yes, sir.

16             MR. HADDEN:  On your questionnaire you mentioned

17  your wife was a witness in a medical malpractice.

18             A JUROR:  Yes.  My wife retired recently as an

19  RN, and it was a malpractice case she was involved in.  I

20  can't even tell you how many years ago it was.  I don't

21  remember that.

22             MR. HADDEN:  And she was, she was just a

23  witness?

24             A JUROR:  Just a witness, I believe.  I can't

25  remember if it was for the defense or the prosecution.  I

1    can't remember that.

2              MR. HADDEN:  Thank you.  That was all the

3    questions.

4              A JUROR:  Thank you.

5              THE COURT:  You can go back into the courtroom.

6              A JUROR:  Thank you.

7              THE COURT:  Thank you very much.

8              (Juror left jury room.)

9              THE COURT:  I think I probably need to strike 19

10   due to the hardship, but any objection to that from IBM?

11             MR. DESMARAIS:  I guess not, Your Honor.

12             THE COURT:  Any objection?

13             MR. HADDEN:  No, Your Honor.

14             MR. DESMARAIS:  It's a close call.

15             THE COURT:  It's a close call but with no

16   objection I'm going to strike No. 19.

17             (Juror comes into jury room.)

18             THE COURT:  Good morning.  You can have a seat

19   there, please.

20             A JUROR:  Good morning.

21             THE COURT:  Do you know your juror number?

22             A JUROR:  43.

23             THE COURT:  43.  Are you Wilhemina Silva?

24             A JUROR:  Yes, I am.

25             THE COURT:  Okay.  Do you recall what you

1   answered "yes" to?

2           A JUROR:  Basically, are you able -- the very

3   last question.

4           THE COURT:  Okay.  You have some concern about

5   being on this jury?

6           A JUROR:  Right.  Not about the jury itself but

7   my disability.

8           THE COURT:  Oh.

9           A JUROR:  I have issues sitting, standing.  I'm

10  a disabled veteran.  And my husband has to bring me up here

11  because I don't drive.  I had to talk off from work to do

12  that.  I'm a little concerned about that.  I have sciatica.

13          THE COURT:  Sorry to hear that.

14          So there are a couple of things there.

15          First, in terms of your husband having to take

16  time off from work and drive you back and forth, if it

17  were helpful, we could put you in a hotel up there.

18          A JUROR:  That would be an accommodation.

19          THE COURT:  That would help?

20          A JUROR:  Uh-huh.

21          THE COURT:  That part at least.

22          A JUROR:  Uh-huh.

23          THE COURT:  In terms of the sitting, there is a

24  lot of sitting involved.  I announced we do take a break

25  regularly every hour and-a-half, two hours.  We can take

1  breaks more frequently and sometimes we have to do that.

2         A JUROR:  That is going to hold you all up.

3         THE COURT:  What is that?

4         A JUROR:  That is going to hold you up.

5         THE COURT:  No, we have the time to do that.

6         A JUROR:  Okay.

7         THE COURT:  But I do need to have a sense as to

8  how long you think you could sit comfortably without having

9  to get up and move around.  Is an hour too much to do that?

10        A JUROR:  No, I can sit for an hour.

11        THE COURT:  Sit for an hour.

12        A JUROR:  I have to get up and move around and I

13 can sit again.  It just tingles.

14        THE COURT:  Now, if we took a break every hour

15 but it was bothering you and you needed more breaks, we're

16 fine doing that as long as you raise your hand or let us

17 know you need a break.  Are you comfortable?  Would you be

18 able to get our attention and let us know if you need a

19 break?

20        A JUROR:  I can do that.  I hate making waves.

21        THE COURT:  Right.  We don't want you to sit

22 there suffering.

23        A JUROR:  Right.

24        THE COURT:  All right.  Well, if we're able to

25 do that at what I have just said, how concerned are you with

1     whether you could serve on this jury?

2                    A JUROR:  I don't have any problems serving on

3     the jury.  I think the concentration, I'm more concerned

4     about my husband having to take me and my disability.  I

5     don't know how much I can, what percentage of it I can

6     really give to what you want me to do.  Because if I'm

7     hurting, then it takes away from what I can do for you.

8                    THE COURT:  Right.

9                    A JUROR:  Basically.  But I can other than that.

10                   THE COURT:  Well, if we got started with you,

11    would you feel comfortable is letting us know if the pain is

12    too much and lot not able to concentrate?

13                   A JUROR:  I could do that.  But the

14    transportation ...

15                   THE COURT:  Right, but that we could address

16    with a hotel.

17                   A JUROR:  Right.

18                   THE COURT:  Okay.  Any questions for you?

19                   MR. DESMARAIS:  No, Your Honor.

20                   THE COURT:  Any questions?

21                   MR. HADDEN:  No, Your Honor.

22                   THE COURT:  All right.  You can go back into the

23    courtroom.

24                   A JUROR:  Thank you.

25                       (Juror left jury room.)

```
 1                    THE COURT:  Any motion?

 2                    MR. DESMARAIS:  No, Your Honor.

 3                    THE COURT:  Any motion?

 4                    MR. HADDEN:  No, Your Honor.

 5                    THE COURT:  Okay.

 6                    (Juror entered courtroom.)

 7                    THE COURT:  Good morning.

 8                    A JUROR:  Good morning.

 9                    THE COURT:  Have a seat.

10                    Tell us your juror number, please.

11                    A JUROR:  I'm Juror No. 21.

12                    THE COURT:  Are you Lisa Holland?

13                    A JUROR:  I am sir.

14                    THE COURT:  Do you recall what you answered

15   "yes" to?

16                    A JUROR:  I do.  You asked if we use our

17   cellphone to purchase, and I use Amazon.

18                    THE COURT:  About how often would you say you

19   buy things on Amazon?

20                    A JUROR:  Maybe every two weeks.

21                    THE COURT:  Have you ever used Groupon?

22                    A JUROR:  No.

23                    THE COURT:  Do you have any feelings positively

24   or negatively about Groupon?

25                    A JUROR:  None.
```

```
 1                    THE COURT:  Okay.  About how long ago would you

 2      say was your last purchase on Amazon?

 3                    A JUROR:  I purchased a car part over the weekend.

 4                    THE COURT:  All right.  Were there any other

 5      questions that you answered "yes" to?

 6                    A JUROR:  No.

 7                    THE COURT:  No.  Okay.  Any questions?

 8                    MR. DESMARAIS:  No, Your Honor.

 9                    THE COURT:  Any questions?

10                    MR. HADDEN:  No, Your Honor.

11                    THE COURT:  Okay.  You can go back in.

12                    A JUROR:  Thank you, sir.

13                    (Juror left jury room.)

14                    THE COURT:  Any motion?

15                    MR. DESMARAIS:  No, Your Honor.

16                    THE COURT:  Any motion?

17                    MR. HADDEN:  No.

18                    (Juror comes into jury room.)

19                    THE COURT:  Good morning.  Have a seat.  Tell us

20      your juror number.

21                    A JUROR:  44.

22                    THE COURT:  Thank you.  Are you John Simmons?

23                    A JUROR:  I am indeed.

24                    THE COURT:  Do you recall anything you answered

25      yes to?
```

```
 1              A JUROR:  Yes.  About five of the questions.

 2              THE COURT:  In whatever order.

 3              A JUROR:  One is I worked with DuPont for

 4   thirty-four years as a research chemist and I have over

 5   twenty-five U.S. and European patents, so I have been

 6   heavily involved in patent work, so I definitely have strong

 7   opinions about that because it's property.

 8              Obviously I have owned stock in IBM.  I don't

 9   know if I still do.  I have to check my portfolio and talk

10   to my financial people, but I'm not sure about that.  I know

11   of two employees at IBM, one I dated in college who has done

12   relatively well at IBM, a woman named Emily McCabe, and the

13   other is my wife's daughter's -- my wife's daughter, just

14   got married, her husband's mother worked for IBM.

15              I'm trying to think of some of the other

16   questions.  As I said, I have strong opinions about patents.

17              THE COURT:  Why don't we talk about some of the

18   things you mentioned and if you think of the other ones, you

19   can let us know.  So you have about twenty-five patents?

20              A JUROR:  Yes.

21              THE COURT:  Very broadly, what type of area are

22   they in?

23              A JUROR:  All over the chemical industry, gas

24   separation, high temperature polymers for engineering parts

25   mostly.
```

1           THE COURT:  Have any of those patents to your

2    knowledge been litigated?

3           A JUROR:  I don't think so, no.

4           THE COURT:  Do you know whether DuPont practices

5    any of those patents?

6           A JUROR:  I know Air Lockheed because I was on

7    loan to them, practices one.  One is practiced by DuPont,

8    yes.

9           THE COURT:  Now, you suggest you have strong

10    opinions about the patent system.  Why don't you give us a

11    brief sense of what they are.

12           A JUROR:  Well, I do believe the patent system

13    is there to protect corporations and they need to be strong,

14    strong defense of big corporations to protect the

15    intellectual interest because we have seen many times,

16    especially DuPont is one of the examples, Benlate, not

17    Benlate, one of the crop protection things we had arguments

18    with a South Korean company over who owned all of these

19    things, so that got litigated for years and it cost the

20    company a lot of money.  So I believe there are certain

21    feelings that make me believe that you need to protect your

22    intellectual property.

23           THE COURT:  So if you were on this jury and

24    learned that this case involved one side alleging that the

25    other side infringes its patents, do you think the

1    patentholder would start out a little bit ahead in your

2    mind?

3              A JUROR:  Probably, because of the way I have

4    dealt with patents and how they were used.  I mean, I would

5    have to look at the patent, but normally, in the chemical

6    industry it's pretty cut and dry, you can look and see what

7    the claims are, you get a good idea of what's valid and what

8    isn't.  I don't know enough about these patents to know

9    whether I can look into it and make a quick decision, but

10   normally it's pretty cut and dried.

11             THE COURT:  If you were on the jury and one of

12   the issues you heard was are these patents valid and you

13   were going to be asked to determine the validity of the

14   patents, do you think you could follow the law that I tell

15   you and base your decision on the testimony and evidence you

16   have heard in this trial?

17             A JUROR:  Probably, yes.

18             THE COURT:  All right.  Now, you may as we sit

19   here own IBM stock, you don't know; is that right?

20             A JUROR:  I would have to check.  I know I have

21   owned it in the past.  I don't know if we still own it.

22             THE COURT:  Is that check something that's a

23   quick phone call?

24             A JUROR:  I can call my stock broker to check

25   that.

1    THE COURT:  You're pretty sure you don't own a

2    lot of it?

3    A JUROR:  No, no, we have a diversified

4    portfolio.  It's family money and things like that through a

5    different trust.

6    THE COURT:  Do you have strong feelings about

7    IBM?

8    A JUROR:  Negatively or positively, no.

9    THE COURT:  Did you choose to buy IBM stock or

10   you leave the decision in the hands of somebody else?

11   A JUROR:  These were not my decisions, they were

12   done by financial people.

13   THE COURT:  And you mentioned people at IBM that

14   you have relationships with or had relationships with?

15   A JUROR:  Yes.

16   THE COURT:  Does any of that give you a feeling

17   that you're going to treat IBM as starting ahead or behind

18   perhaps in this case?

19   A JUROR:  It wouldn't make me start behind, but

20   I don't know about ahead.  It's hard to know.  I don't have

21   negative feelings about anything.

22   THE COURT:  Have you ever heard of Groupon?

23   A JUROR:  Yes, I have.

24   THE COURT:  Have you ever used Groupon?

25   A JUROR:  I have not used it, but I spend a lot

1    of time on the internet and I obviously used all these

2    things.

3              THE COURT:  Do you have any feelings about

4    Groupon?

5              A JUROR:  No.

6              THE COURT:  Do you have any feelings about

7    patenting certain software or computer science or internet

8    programs?

9              A JUROR:  Some of it, yes, obviously I believe

10   software should be patentable.

11             THE COURT:  You do believe it should be?

12             A JUROR:  And protected, highly.  I play a lot

13   of computer games, I understand the pirating and things that

14   go along with that.  Yes, you need to protect intellectual

15   property.

16             THE COURT:  Anything else you answered yes to

17   that you wanted to share with us?

18             A JUROR:  I think that was it.  Those are the

19   main ones.

20             THE COURT:  Let me see if anyone else here has

21   questions for you.

22             MR. DESMARAIS:  Just one general question.  It

23   sounds like, you know, based on your answers that you

24   believe even though you have these things that you talked

25   about that you could be fair and impartial and judge this

1    case based on the facts and the evidence and the law as the

2    Judge gives it to you.  Is that a fair conclusion?

3              A JUROR:  Yeah.

4              MR. DESMARAIS:  That's what I thought you said.

5    I just want to make sure that was clear.

6              Nothing else.

7              THE COURT:  Any questions?

8              MR. HADDEN:  Sure.  As Groupon is the accused

9    infringer in this case, do you think they should be

10   concerned given your strong views about patent and

11   viewpoints about patents?

12             A JUROR:  I don't know.  I would have to read or

13   hear the patents and what was involved.

14             MR. HADDEN:  Without knowing the specifics of

15   the patents, just knowing that Groupon is being accused of

16   infringement by IBM, is that -- should Groupon be concerned?

17             A JUROR:  I don't know.  I mean, I can't make

18   that decision based on -- I'm a trained scientist, so

19   empirically I would say no, I wouldn't be concerned, but I

20   would have to look into what was going on and what

21   happened --

22             MR. HADDEN:  Okay.

23             A JUROR:  -- from a scientific standpoint.

24             MR. DAY:  Your Honor, in the interest of full

25   disclosure, Mr. Simmons and I were in a fantasy baseball

1  league together for a long time.  It's been a while, but...

2          THE COURT:  Do you recognize Mr. Day?

3          A JUROR:  Now I do, yes.  He had hair back then.

4  That was over twenty years ago.

5          THE COURT:  Well, knowing that Mr. Day is

6  sitting right in the middle of the table so you may not know

7  which side he's on, but you would find out if you were on

8  the jury, do you think his side would end up getting your

9  sympathy or maybe not?

10         A JUROR:  I don't know.  I have no negative

11 feelings toward him if that's what you mean.  I don't know,

12 to be honest.

13         THE COURT:  If you're on the jury, you'll be

14 instructed you have to be fair and impartial and decide this

15 case based on the evidence and the law.  Do you think you

16 could follow that instruction?

17         A JUROR:  Yes.

18         THE COURT:  Okay.  Thank you.  Anything else?

19 You can go back in the jury room.

20         A JUROR:  Thank you.

21         THE COURT:  Any motion from IBM?

22         MR. DESMARAIS:  No, Your Honor.

23         THE COURT:  Any motion from Groupon?

24         MR. HADDEN:  Yes, dismiss for cause, IBM

25 connections, his obviously strong view that we're behind, he

said something along the lines of we would be behind at the

start or something.

        THE COURT:  I don't remember him saying that.

        MR. DESMARAIS:  In fact he said just the

opposite at the end.  He doesn't even know if he has IBM

stock.  I don't see how that's going to corrupt his

independence.

        MS. SHAMILOV:  His first answer was that they

probably would be behind and he backtracked a little bit,

but the very first thing he said I believe that was

probably, he would view infringement as behind, probably,

and then he backtracked a little bit later.

        THE COURT:  Anything else?

        MR. HADDEN:  That and what he said in his

questionnaire which is --

        THE COURT:  I don't have that in front of me so

put on the record what he said.

        MR. HADDEN:  He said that patents are important,

they protect intellectual property, vital to tech and

science companies.

        THE COURT:  Does that constitute cause in your

view?

        MR. HADDEN:  No, but I think that combined with

his past response and what he said about infringers being

behind from the start, and his connections to IBM, I think

1    it's enough --

2              THE COURT:  You would oppose?

3              MR. DESMARAIS:  I would totally oppose that.  I

4    would think everyone on the jury thinks patents are a good

5    thing.  It's in our constitution.  The question isn't

6    whether patents are good things, it's whether patents are

7    infringed and he was asked two or three times could you

8    judge that question fairly and impartially and he said yes.

9              THE COURT:  I'm going to deny the motion and

10   overrule the objection.  My strong feeling from him was he

11   doesn't know whether these patents are valid, he doesn't

12   know whether these patents should have been issued, he

13   doesn't know whether the defendant infringes because he

14   hasn't seen any of the evidence and yes, he has experience

15   with patents, he has opinions about patents.  He seemed very

16   familiar with the idea that patents can be invalid which is

17   not something that every juror walking will know.  So what I

18   took from all that is he's going to follow my instructions

19   and decide things based on the evidence and the law, so the

20   motion is denied.

21             Bring in the next one.

22             (Juror entered the jury room.)

23             THE COURT:  Good morning.  You can have a seat,

24   please.  Tell us your juror number.

25             A JUROR:  40.

```
 1                    THE COURT:  40.  You are Alsi Sayadin?

 2                    A JUROR:  Yes.

 3                    THE COURT:  Do you recall anything you answered

 4    yes to?

 5                    A JUROR:  Yes, shopping online and on purchase

 6    Groupon.

 7                    THE COURT:  Okay.  About how often would you say

 8    you shop online.

 9                    A JUROR:  Most -- a lot, actually.

10                    THE COURT:  Most days, actually?

11                    A JUROR:  No, once every week.

12                    THE COURT:  About how regularly would you say

13    you have used Groupon?

14                    A JUROR:  Just once in a while.

15                    THE COURT:  Once in a while.

16                    A JUROR:  Just one time actually.

17                    THE COURT:  Just one time.

18                    A JUROR:  Just one.

19                    THE COURT:  Do you remember about when that was?

20                    A JUROR:  I can't say, maybe two years ago.

21                    THE COURT:  Did you feel like you had a positive

22    or a negative experience or anything?

23                    A JUROR:  Nothing.

24                    THE COURT:  No strong feelings?

25                    A JUROR:  No.
```

1                     THE COURT:  If I were to tell you if you're on

2      the jury you can't use Groupon for the next couple of weeks

3      while you're here with us, would that be a problem?

4                     A JUROR:  Not at all.

5                     THE COURT:  Anything else you answered yes to?

6                     A JUROR:  No.

7                     THE COURT:  Any questions?

8                     MR. DESMARAIS:  No, Your Honor.

9                     THE COURT:  Any questions?

10                    MR. HADDEN:  No.

11                    THE COURT:  Okay.  Thank you.

12                    Any motions?

13                    MR. DESMARAIS:  No.

14                    THE COURT:  Any motion?

15                    MR. HADDEN:  No.

16                    (Juror entered the jury room.)

17                    THE COURT:  Good morning.

18                    A JUROR:  Good morning.

19                    THE COURT:  Have a seat and tell us your juror

20     number, please.

21                    A JUROR:  60.

22                    THE COURT:  60.  So you are Kristin Wright?

23                    A JUROR:  Yes.

24                    THE COURT:  And do you recall what you answered

25     yes to?

| | |
|---|---|
| 1 | A JUROR:  I work at Pepper Hamilton, so although |
| 2 | I'm not familiar with any of the attorneys here from Potter |
| 3 | or Ashby, I am familiar with people at your firm.  I have |
| 4 | also -- I work in the commercial litigation department and I |
| 5 | have worked on many patent infringement cases.  And I do |
| 6 | online shopping. |
| 7 | THE COURT:  And you do online shopping? |
| 8 | A JUROR:  Yes. |
| 9 | THE COURT:  Let's talk about these things a |
| 10 | little bit.  You are a legal assistant; is that right? |
| 11 | A JUROR:  Yes. |
| 12 | THE COURT:  And is part of your work trial |
| 13 | related? |
| 14 | A JUROR:  It can be, yes. |
| 15 | THE COURT:  Have you spent time in this |
| 16 | courthouse? |
| 17 | A JUROR:  No.  Uh-uh.  Trial prep. |
| 18 | THE COURT:  Trial prep? |
| 19 | A JUROR:  Yes. |
| 20 | THE COURT:  Not in the courthouse, for better or |
| 21 | for worse? |
| 22 | A JUROR:  No. |
| 23 | THE COURT:  You've heard of, of course, and are |
| 24 | familiar with the two Delaware firms involved? |
| 25 | A JUROR:  Yes. |

1          THE COURT:  Potter Anderson and Ashby & Geddes.

2    Do you have strong feelings about either of them or are you

3    going to hold anything for or against either of those two

4    firms?

5          A JUROR:  No.

6          THE COURT:  Some of your work involves patent

7    litigation?

8          A JUROR:  It has, yes.  I worked with an

9    attorney that did mostly patent infringement litigation.  He

10   has since retired and we might get a couple of cases here

11   and there.

12         THE COURT:  Do you have any strong feelings

13   about patents or patent litigation or patent lawyers?

14         A JUROR:  No, I don't.

15         THE COURT:  Okay.  And in terms of your online

16   shopping, just roughly, how frequently?

17         A JUROR:  It's mostly what I do my shopping on,

18   online shopping.  Although I don't use Groupon.  I may have

19   once used Groupon.  It's just for convenience, online

20   shopping.  I have a small child, so it's easier for me.

21         THE COURT:  Sure.  The Groupon, do you have

22   strong feelings about Groupon?

23         A JUROR:  No, the one time I used it, it was

24   easy, and I had no issues with it.  But, yeah.

25         THE COURT:  All right.  And again, if I said you

1    can't use Groupon for the next couple of weeks while you're

2    with us, that would be okay?

3              A JUROR:  Yeah that would be fine.

4              THE COURT:  Anything else?

5              A JUROR:  No.

6              THE COURT:  We'll see if the lawyers have

7    questions for you.  The lawyers never have questions.  Any

8    questions?

9              MR. DESMARAIS:  Yes, just one or two.  Did any

10   of your patent cases that you worked on actually go to

11   trial?

12             A JUROR:  Yes.

13             MR. DESMARAIS:  And did that experience, do you

14   think that will affect you one way or the other on giving

15   the parties in this case an open mind?

16             A JUROR:  No.

17             MR. DESMARAIS:  Just had one patent trial?

18             A JUROR:  No, there were several.

19             MR. DESMARAIS:  Where were they, what courts in

20   Delaware?

21             A JUROR:  Here in Delaware.

22             MR. DESMARAIS:  With Judge Stark?

23             A JUROR:  No, Judge Andrews.

24             THE COURT:  Anything else?

25             MR. DESMARAIS:  No.

```
 1                    THE COURT:  Any questions?

 2                    MR. HADDEN:   The patent cases, the one that went

 3       to trial, was your firm representing the plaintiff or the

 4       defendant?

 5                    A JUROR:  The plaintiff.

 6                    THE COURT:  Anything else?

 7                    MR. HADDEN:  No.

 8                    THE COURT:  You can go back in the courtroom.

 9       Thank you.

10                    A JUROR:  Thank you.

11                    THE COURT:  Any motions?

12                    MR. DESMARAIS:  No.

13                    THE COURT:  Any motions?

14                    MR. HADDEN:  No.

15                    (Juror entered the jury room.)

16                    THE COURT:  Good morning.  Please have a seat.

17       And tell us your juror number.

18                    A JUROR:  54.

19                    THE COURT:  Are you Linda Tumulty?

20                    A JUROR:  I am.

21                    THE COURT:  Do you recall anything you answered

22       yes to?

23                    A JUROR:  Selfishly the first thing is I'm

24       supposed to go on vacation starting Friday for a week.  So

25       that was my main one concern, personally.  I do have a
```

1   business relationship with IBM, but it's more, I work for

2   the insurance company that is their carrier for their

3   property and casualty and marine.  I don't know if that

4   would affect anything.  If they were the defendant it might

5   be different.

6              And then the third thing was the online shopping

7   question.  I'm quite well aware, it's prime day today at

8   three o'clock, so I do quite a bit of online shopping.

9              THE COURT:  Let's talk about each of those a

10  little bit.  So the vacation that's supposed to start

11  Friday, where is that and have you already paid money for it

12  that you can't get back?

13             A JUROR:  It's in Rehoboth Beach and yes, it's

14  not just that, it's the fact that I have family that also

15  took off for that week, so it would be kind of an

16  inconvenience for more than just myself.

17             THE COURT:  And the business you do with IBM,

18  you're at Chubb; is that right?

19             A JUROR:  Yes.

20             THE COURT:  As long as there is a plaintiff

21  here, which I can tell you there is a plaintiff, you don't

22  think there could be any adverse impact on the job or your

23  job or anything?

24             A JUROR:  I wouldn't foresee that.

25             THE COURT:  Do you have any strong feelings

1   about IBM?

2              A JUROR:  I mean, I have feelings just because

3   they're one of our bigger clients, you know.

4              THE COURT:  Do you personally deal with IBM?

5              A JUROR:  Yes, mostly they're a captive company,

6   WTC insurance company.

7              THE COURT:  That's an HTO of IBM?

8              A JUROR:  Right.

9              THE COURT:  And then happy prime day, I guess.

10  How regularly would you say on the internet shopping?

11             A JUROR:  Quite a lot.  Five days a week, maybe.

12             THE COURT:  And do you use Groupon?

13             A JUROR:  I have received Groupon.  I haven't

14  personally ever obtained a Groupon deal.  But like I have

15  gotten the gifts that were with the Groupon.

16             THE COURT:  Do you have any feelings about

17  Groupon?

18             A JUROR:  Not really.

19             THE COURT:  All right.  Any questions?

20             MR. DESMARAIS:  No, Your Honor.

21             THE COURT:  Any questions?

22             MR. HADDEN:  No, Your Honor.

23             THE COURT:  You can go back in the courtroom.

24             A JUROR:  Thank you.

25             THE COURT:  I certainly would prefer not to take

1    her vacation away that she's prepaid for.  Normally that

2    gets you out of jury duty.  I think we're going to have

3    enough numbers, but any concerns with me striking 54?

4               MR. DESMARAIS:  No, Your Honor.

5               MR. HADDEN:  No, Your Honor.

6               THE COURT:  So we'll strike 54.

7               (Juror entered the jury room.)

8               THE COURT:  Good morning.

9               A JUROR:  Good morning.

10              THE COURT:  You can have a seat and tell us your

11   juror number, please.

12              A JUROR:  55.

13              THE COURT:  Are you Robert Urian?

14              A JUROR:  Yes.

15              THE COURT:  And do you recall anything you

16   answered yes to?

17              A JUROR:  Well, one thing about I don't get

18   reimbursed for being off for court, so that would be about

19   1,500 for two weeks.

20              THE COURT:  You would lose or not earn $1,500?

21              A JUROR:  Yes.

22              THE COURT:  Give us a sense of what you do.

23              A JUROR:  I'm an occupational safety and health

24   supervisor, consulting for Wor-Wic Community College.

25              THE COURT:  They're not going to pay you if

1    you're not there?

2              A JUROR:  No.  I have the policy if you want to

3    see the policy.

4              THE COURT:  No, I trust you, of course.  Is

5    there any way you could make that up at some other time?

6              A JUROR:  No.  I work Monday Wednesday -- I'm

7    sorry, Monday, Tuesday, Wednesday, and that's what they

8    hired me to do.  The rest is just, it probably conflicts

9    with my other job.  I have three jobs.

10             THE COURT:  Okay.  With the one that you would

11   miss and not make the $1,500 is the one at the community

12   college?

13             A JUROR:  Yes.

14             THE COURT:  And what hours would you normally

15   work on Monday, Tuesday, Wednesday?

16             A JUROR:  8:00 to 4:30.

17             THE COURT:  And this is downstate; correct?

18             A JUROR:  Yes.  It's actually in Salisbury.

19             THE COURT:  Okay.  All right.  So certainly that

20   would be a financial hardship to you if you didn't get to

21   earn that income.  Were there other things that you wanted

22   to share with us?

23             A JUROR:  Nope.

24             THE COURT:  All right.  Any questions?

25             MR. DESMARAIS:  No, Your Honor.

```
 1              THE COURT:  Any questions?

 2              MR. HADDEN:  No, Your Honor.

 3              THE COURT:  You can go back in the courtroom.

 4              (Juror left jury room.)

 5              THE COURT:  I think someone working three jobs,

 6   $1,500 is a real financial hardship.

 7              Any objection to striking him?

 8              MR. DESMARAIS:  No, Your Honor.

 9              MR. HADDEN:  No, Your Honor.

10              THE COURT:  All right.  We'll strike 55.

11              (Juror comes into jury room.)

12              THE COURT:  Good morning.

13              A JUROR:  Good morning.

14              THE COURT:  Have a seat.  Tell us your juror

15   number, please.

16              A JUROR:  48, I believe.  Yes, 48.

17              THE COURT:  48.  Did you say 48?

18              A JUROR:  48, yes.

19              THE COURT:  What is your name?

20              A JUROR:  Starr.

21              THE COURT:  Oh, Allan Starr.  Okay.

22              And what do you recall you answered "yes" to?

23              A JUROR:  It's also online buying.  We use

24   Groupon.  I see a lot of people coming through with that.

25              Another thing is my brother recently passed
```

```
1    away.  I think it would be a hardship because I still have a
2    lot of to deal with.  It was just over a week ago.
3                 MR. HADDEN:  We agreed to strike.
4                 MR. DESMARAIS:  Yes, we did.
5                 THE COURT:  All right.  You are not going to be
6    serving on the jury but I do need you to sit in the
7    courtroom for the rest of this process.
8                 A JUROR:  Okay.  I appreciate you guys ...
9                 THE COURT:  Sorry for your loss.
10                A JUROR:  Thank you.
11                THE COURT:  Thank you for coming back here.
12                A JUROR:  Thank you.
13                (Juror left jury room.)
14                THE COURT:  So we didn't communicate --
15                MR. DESMARAIS:  We didn't tell him.
16                THE COURT:  -- that he could go.  So 48 is
17    stricken.
18                (Juror left jury room.)
19                THE COURT:  Good morning.
20                A JUROR:  Good morning.
21                THE COURT:  Good morning.
22                A JUROR:  A room full of attorneys.
23                THE COURT:  Just a few.  Yes.
24                Do you know what your juror number is?
25                A JUROR:  39.  My age.
```

1                    THE COURT:  Beverley Sappington.

2                    A JUROR:  Yes.

3                    THE COURT:  You will love it when you get to 40.

4                    A JUROR:  So I hear.  It will be awhile.

5                    THE COURT:  All right.  Do you recall what you

6      answered "yes" to?

7                    A JUROR:  There were a couple of things.

8      Everybody bought something online so that one for sure.

9                    The other thing is that I worked for 20 years at

10     AstraZeneca in the Legal Department.  And of course patents

11     were, although I wasn't in a specific patent area, some of

12     my attorneys did have input on patent work.

13                   And I'm currently the only admin at AAA

14     headquarters supporting the chief legal officer and four

15     assistant counsels, so being out for ten days would be a

16     little uncomfortable.  You know, everybody has got jobs but

17     it would cause a little bit of a hardship.

18                   So those are my answers.

19                   THE COURT:  All right.  Thank you.  Let's talk

20     about some of those as well.

21                   A JUROR:  Okay.

22                   THE COURT:  Your online shopping, would you say

23     it is a daily thing, a weekly thing?

24                   A JUROR:  Every other week or so.  Amazon

25     usually, Wal-Mart.

```
 1                    THE COURT:  Do you ever use Groupon?

 2                    A JUROR:  I have not used Groupon.  I have

 3      looked at it, but I haven't ...

 4                    THE COURT:  Do you have any feelings, positive

 5      or negative, about Groupon from what you have seen?

 6                    A JUROR:  No.

 7                    THE COURT:  No.  Okay.  If I told you not to use

 8      Groupon for the next couple of weeks if you are on the jury,

 9      that would not be a hardship?

10                    A JUROR:  No.

11                    THE COURT:  At AstraZeneca, how long ago did you

12      leave?

13                    A JUROR:  2016.  March of 2016.

14                    THE COURT:  And you were not personally involved

15      in patents; is that right?

16                    A JUROR:  Not personally, no.

17                    THE COURT:  Okay.  But some of the lawyers and,

18      of course, the company.

19                    A JUROR:  The work I would do for them.

20                    THE COURT:  Might relate to patents?

21                    A JUROR:  Uh-huh.  Some, slightly.

22                    THE COURT:  Some.  Were you there when any

23      patents that AstraZeneca owns were being litigated?

24                    A JUROR:  Uh-huh.

25                    THE COURT:  That's a "yes?"  That's for the
```

1    court reporter's benefit.

2            A JUROR:  Yes.  I'm sorry.

3            THE COURT:  Whatever you saw from your vantage

4    point, did that leave you with a positive or negative

5    feeling about patents and how they're litigated?

6            A JUROR:  I just know the importance, you know,

7    of patents to the business, you know, has them.  And, you

8    know, just that it's important protect them.

9            THE COURT:  Okay.  If you are on this jury, you

10   would hear a lot of legal instructions you are probably

11   familiar with, jury instructions, you will hear a lot of

12   instructions about the law that governs patents and how

13   they're issued and when they might be invalid.  Do you think

14   you could follow and comply with the instructions I would

15   give you?

16           A JUROR:  Yes.

17           THE COURT:  Do you think you could be fair and

18   open minded to both sides in a patent case?

19           A JUROR:  Yes.

20           THE COURT:  Okay.  Now let's talk about your

21   hardships.  First off, would you personally be getting paid

22   if you are with us the next couple weeks?

23           A JUROR:  As far as I know, I would be getting

24   paid.

25           THE COURT:  So it's more a concern about the

1  work, right?

2                A JUROR:  The work, and the person that backs me

3  up is on vacation.  So the person he will use in my place

4  will, you know, do their best but it would leave a big gap.

5                THE COURT:  And if you were with us this week

6  and next week, are you going to be so concerned about what

7  is going on back at the office that you won't be able to

8  give our case the attention that it needs?

9                A JUROR:  I would hope not.  I mean if I'm

10  selected, I would do my job here.

11                THE COURT:  And if that happened and you get

12  back to the office two weeks from today, is it, is all that

13  work going to be waiting on the table for you?

14                A JUROR:  Probably.

15                THE COURT:  But you could get through it

16  eventually?

17                A JUROR:  I would get through it eventually and

18  try to do something at night.  Although I -- my main

19  attorney, the Chief Legal Officer is, I shouldn't state,

20  kind of stuck in the 70s.  That secretaries can't work from

21  home, there is really nothing they can do from home, which

22  just so you know we can.  My job is online, but anyway

23  that's his opinion.

24                MR. DESMARAIS:  We're familiar.

25                A JUROR:  He handwrites everything.

```
 1                    MR. DESMARAIS:  Tell him to give us a call.

 2                    A JUROR:  Okay.

 3                    THE COURT:  Okay.  Any others concerns you want

 4      to share with us?

 5                    A JUROR:  I don't think so.  I think those are

 6      the main ones.

 7                    THE COURT:  Let's see if the lawyers have any

 8      questions?

 9                    MR. DESMARAIS:  No, Your Honor.

10                    THE COURT:  Any questions?

11                    MR. HADDEN:  No, Your Honor.

12                    THE COURT:  All right.  You can go into the

13      courtroom.

14                    A JUROR:  Thank you.

15                    THE COURT:  Thank you.

16                    (Juror left jury room.)

17                    THE COURT:  Any motion?

18                    MR. DESMARAIS:  No.

19                    THE COURT:  Any motion?

20                    MR. HADDEN:  No.

21                    (Juror comes into jury room.)

22                    THE COURT:  Good morning.  You can have a seat

23      and tell us your juror number, please.

24                    A JUROR:  No. 35.

25                    THE COURT:  35.  Are you John Phanthayoum?
```

```
1                    A JUROR:  Yes.

2                    THE COURT:  And I apologize if I got that wrong.

3                    A JUROR:  That's all right.

4                    THE COURT:  Do you recall what you answered

5       "yes" to?

6                    A JUROR:  Yes.  I bought products from Groupon.

7                    THE COURT:  You used Groupon?

8                    A JUROR:  Yes, sir.

9                    THE COURT:  Do you regularly use Groupon?

10                   A JUROR:  Not so often.

11                   THE COURT:  About how often did you last use it?

12                   A JUROR:  The last time I used it was early or

13      late March.

14                   THE COURT:  Okay.  And about how many times do

15      you think in your life you have used it?  Just a couple?

16                   A JUROR:  Just like three or four times.

17                   THE COURT:  Any positive or negative feelings

18      about Groupon?

19                   A JUROR:  No, nothing bad.

20                   THE COURT:  If you are on this jury and you were

21      told you couldn't use Groupon during the time that you're on

22      the jury, would that be a problem?

23                   A JUROR:  No.

24                   THE COURT:  No.  Okay.  Were there other things

25      that you wanted to share with us?
```

1          A JUROR:  No.

2          THE COURT:  That was it?

3          A JUROR:  Uh-huh.

4          THE COURT:  Any questions?

5          MR. DESMARAIS:  No, Your Honor.

6          THE COURT:  Any questions?

7          MR. HADDEN:  Just a couple.

8          In your questionnaire, you mentioned you or your

9    family member own a property preservation business, is that

10   right?

11         A JUROR:  I owned a property preservation

12   business before, yes.

13         MR. HADDEN:  Can you tell me what you did?

14         A JUROR:  We managed foreclosed homes by the

15   bank.  We had an LLC.

16         MR. HADDEN:  And have you been in any, involved

17   in any lawsuits with respect to that business?

18         A JUROR:  No, sir.

19         MR. HADDEN:  That's all.

20         THE COURT:  Thank you.  You can go back.

21         A JUROR:  Thank you.

22         (Juror comes into jury room.)

23         THE COURT:  Any motion?

24         MR. DESMARAIS:  No.

25         THE COURT:  Any motion?

```
 1                    MR. HADDEN:  No.

 2                    (Juror comes into jury room.)

 3                    THE COURT:  Good morning.  You can have a seat

 4    here with us.

 5                    A JUROR:  Good morning.

 6                    THE COURT:  Do you know your juror number?

 7                    A JUROR:  Which number?

 8                    THE COURT:  It would be the two digit number.

 9                    A JUROR:  No 3.

10                    THE COURT:  Are you Chandra Bell?

11                    A JUROR:  Yes, I am.

12                    THE COURT:  Do you recall what you answered

13    "yes" to?

14                    A JUROR:  I think you asked if anyone used

15    products for online purchasing.

16                    THE COURT:  Right.  Do you do online purchasing?

17                    A JUROR:  Yes.

18                    THE COURT:  About how often would you say you do

19    that?

20                    A JUROR:  About two or three times a month.

21                    THE COURT:  Okay.  And have you ever used

22    Groupon?

23                    A JUROR:  Oh, yes.

24                    THE COURT:  Yes.

25                    A JUROR:  Uh-huh.  I think everybody has.
```

1          THE COURT:  How often would you say you use

2    Groupon?  Is it that same amount of time?

3          A JUROR:  Not as often.  Not as often.

4          THE COURT:  Maybe once a month.

5          A JUROR:  Maybe once a month I use Groupon.

6          THE COURT:  Do you have any feelings, positive

7    or negative, about Groupon?

8          A JUROR:  No.  I love them.

9          THE COURT:  You do love them?

10          A JUROR:  Yes.

11          THE COURT:  So if you were on this jury and

12    you heard that Groupon was the defendant and was accused of

13    violating somebody else's patent, do you think that you

14    could be fair and open minded and assess whether Groupon did

15    something maybe they shouldn't have or do you think because

16    you love Groupon, you might not believe that they did

17    something wrong?

18          A JUROR:  No.  I can, I would be able to be fair

19    about it.  I don't think that would be a problem, would have

20    bearing on anything.

21          THE COURT:  Okay.  And if I told you, if you are

22    on the jury, that I don't want jurors to use Groupon during

23    the trial, would that be a problem for you?

24          A JUROR:  No.

25          THE COURT:  All right.  Did you answer yes or

1      anything else that you remember?

2             A JUROR:  I remember the length of time.  Right

3   now, I do work for a temporary agency, and so it's -- I

4   wouldn't probably get paid if I had to be on a jury for ten

5   days.  I can't really say what I would do because it is a

6   banker lockbox, and I signed a NDA, so they don't want us to

7   disclose what I do at the bank, but that is only thing.

8   Other than that, it shouldn't be a problem.

9             THE COURT:  Do you know -- so the trial may last

10   all of this week and all of next week.  Would you have been

11   planning to work for the temp agency over that time?

12             A JUROR:  Yeah.  I actually work a weekend

13   shift.  I work Friday through Monday from 7:00 a.m. to 5:30

14   p.m.  My off days are on Tuesday, Wednesday, and Thursday.

15             THE COURT:  So are you missing work today?

16             A JUROR:  Yeah.

17             THE COURT:  Okay.

18             A JUROR:  Uh-huh.

19             THE COURT:  And you would miss Friday and

20   probably Monday and possibly the following Friday, so

21   possibly the next three days, right?

22             A JUROR:  Uh-huh.

23             THE COURT:  If you are not earning the income

24   you would have earned on those days, is that real hardship

25   for you?

```
 1                    A JUROR:  Yes, because it's a temp agency, so
 2     like you don't get paid if you are not there.  I work for
 3     that agency.
 4                    THE COURT:  Is there anything else is you
 5     answered "yes" to?
 6                    A JUROR:  That would be it right now.
 7                    THE COURT:  All right.  Any questions?
 8                    MR. DESMARAIS:  No, Your Honor.
 9                    THE COURT:  Any questions?
10                    MR. HADDEN:  No, Your Honor.
11                    THE COURT:  All right.  You can go back.
12                    A JUROR:  Thank you.
13                    (Juror left jury room.)
14                    THE COURT:  What do you think?
15                    MR. DESMARAIS:  I think we should let her go.
16                    THE COURT:  Any objection?
17                    MR. HADDEN:  No, no objection.
18                    THE COURT:  We will let No. 3 go due to the
19     hardship.
20                    (Juror comes into jury room.)
21                    THE COURT:  Good morning.  You can have a seat,
22     please.
23                    If you could tell us your juror number?
24                    A JUROR:  4.
25                    THE COURT:  Is your name Don Bleasdale.
```

1              A JUROR:  Bleasdell.

2              THE COURT:  My apologies.  Do you recall what

3    you answered "yes" to?

4              A JUROR:  I was a Patent Examiner, and I do shop

5    on Groupon.  I can't remember the third one.

6              THE COURT:  Okay.  If it comes to you, let me

7    know.  But we'll talk about those couple.

8              So you were a Patent Examiner?

9              A JUROR:  Yes.

10             THE COURT:  What type of patents?

11             A JUROR:  Mechanical.

12             THE COURT:  Mechanical.

13             A JUROR:  Yes.

14             THE COURT:  About what time frame was that.

15             A JUROR:  That was 2001 to 2003.

16             THE COURT:  Okay.  Did that experience give you

17   a strong feeling, positive or negative, about patents?

18             A JUROR:  One of the most difficult jobs I ever

19   did in my life.  Gosh, lawyers are determined.

20             THE COURT:  So if you are on this jury, as you

21   may have heard from my little summary, you might be asked

22   whether the patent here not only is infringed but whether

23   it's invalid.  You may hear certain evidence about the

24   prosecution of the patent.  Do you think that you could

25   follow the law that you give you and decide those issues

1    based on the evidence?

2              A JUROR:  Yes.

3              THE COURT:  You do think so?

4              MR. HADDEN:  Uh-huh.

5              THE COURT:  Is that a "yes?"

6              MR. HADDEN:  Yes.  Sorry.

7              THE COURT:  For the court reporter's benefit.

8    No problem.  So since 2003, have you had any involvement

9    with patents?

10             A JUROR:  I wrote a few for some folks, but

11   other than that, no.

12             THE COURT:  And did those turn into issued

13   patents?

14             A JUROR:  No, those didn't.

15             THE COURT:  Do you know if any patents you

16   examined ever ended up being litigated?  I don't know if

17   that is something you would keep track of.

18             A JUROR:  No, I wouldn't.  When I left, I left.

19             THE COURT:  All right.  Fair enough.  In terms

20   of Groupon, about how often would you say you used it?

21             A JUROR:  Last night.

22             THE COURT:  Okay.  Is it a pretty regular

23   website for you?

24             A JUROR:  Yes, on my phone.

25             THE COURT:  Okay.

1              A JUROR:  I actually just got a message from

2     Groupon, so ...

3              THE COURT:  Is that like a regular e-mail

4     telling about deals?

5              A JUROR:  No, it is telling my package is on its

6     way.

7              THE COURT:  I see.  If you are on this jury and

8     we tell you not to use Groupon just during the time you are

9     on the trial, so say the next two weeks, would that be a

10    hardship for you?

11             A JUROR:  No, that should be doable.

12             THE COURT:  Do you have strong feelings about

13    Groupon as a company?

14             A JUROR:  Good deals.  Other than that, not

15    really, no.

16             THE COURT:  So do you think that Groupon might

17    start out a little bit ahead in this trial in your mind?

18             A JUROR:  No, I don't think so.  I think I'll

19    just see what IBM is saying is the patent infringement and

20    just wait from there.

21             THE COURT:  Okay.  Did you think of anything

22    else you answered "yes" to or you wanted to respond to?

23             A JUROR:  Can you ask the questions again.

24             THE COURT:  Sure, if you'd like.

25             Have you heard anything about this case?

1              A JUROR:  No.

2              THE COURT:  Do you know the lawyers?

3              A JUROR:  No.

4              THE COURT:  Do you know any of the witnesses?

5              A JUROR:  No.

6              THE COURT:  Did you ever hear of Prodigy or

7    Trintex?

8              A JUROR:  No.

9              THE COURT:  No, okay.

10             A JUROR:  It was something to do with

11   employment.  Did I know about IBM?  Did my employer ...

12             THE COURT:  Have you had any business dealings

13   with any of those companies?

14             A JUROR:  Me personally, no.  But the company I

15   work for, they actually have business with IBM.

16             THE COURT:  Okay.  That's your current employer?

17             A JUROR:  Yes.

18             THE COURT:  And what is it, if you know.

19             A JUROR:  CD Richard Ellis.  So it's IFM, an IFM

20   program.  It basically manage IBM's production sites.  But

21   other than that, that's it.

22             THE COURT:  Like manage the physical plant

23   facility?

24             A JUROR:  Yes.

25             THE COURT:  Do you personally work at IBM

1  facilities?

2        A JUROR:  At Datacom probably two years ago.  As

3  of two years ago, no.

4        THE COURT:  So not the last two years?

5        A JUROR:  No.

6        THE COURT:  Did that experience or your

7  company's relationship with IBM, does it impact how you view

8  IBM?

9        A JUROR:  No.

10        THE COURT:  No.

11        A JUROR:  No.

12        THE COURT:  Do you think they would start out

13  ahead in the case in your mind?

14        A JUROR:  The same as Groupon.

15        THE COURT:  Okay.

16        A JUROR:  Yes.

17        THE COURT:  You could be a fair and impartial

18  juror?

19        A JUROR:  Yes.

20        THE COURT:  Is that it?

21        A JUROR:  That was it.

22        THE COURT:  Any questions?

23        MR. DESMARAIS:  I do, yes.

24        So if you get selected and you are in a room

25  like this with the other jurors and you were deliberating,

1    don't you think it would be very difficult for you not to

2    share with the other jurors details about how the Patent

3    Office works and how the -- you have sort of specialized

4    knowledge about that process; right?  And if the jurors are

5    debating whether these patents are valid or infringed,

6    don't you think you will want to share you views about your

7    experience in the Patent Office?

8              A JUROR:  So, by my nature, I probably would

9    just sit back and listen.  And then if I see it's going,

10   well, this is how the Patent Office goes, and they ask how

11   do I know?  Because I'm a Patent Examiner.  And I'll

12   basically tell them this is what -- when somebody says you

13   are infringing on their patent, this is what they're saying

14   is infringing on, which is the claims.

15             MR. DESMARAIS:  Right.

16             A JUROR:  Other than that, no.

17             MR. DESMARAIS:  It would be hard not to do; is

18   that right?  It's human nature.

19             A JUROR:  Yeah.

20             MR. DESMARAIS:  Okay.  Nothing.

21             THE COURT:  Nothing else?

22             MR. DESMARAIS:  No.

23             THE COURT:  Any questions?

24             MR. HADDEN:  No.

25             THE COURT:  Okay.  You can go back into the

1    courtroom.  Thank you very much.

2              A JUROR:  Thank you.

3              (Juror left jury room.)

4              THE COURT:  Any motion?

5              MR. DESMARAIS:  I think he needs to be excused.

6    He has too much specific knowledge about how the Patent

7    Office works, and Groupon is charging these patents are

8    invalid and the Patent Office missed stuff, so I think it is

9    too dangerous.

10             THE COURT:  What do you think?

11             MR. HADDEN:  I disagree.  I think what he said

12   was he would make it clear he would look at the claims,

13   which is right out of the patent video.  He said he would be

14   fair and impartial.

15             MR. DESMARAIS:  He also said he is --

16             THE COURT:  Hold on.

17             MR. DESMARAIS:  I'm sorry.  I didn't mean to

18   speak over you.

19             THE COURT:  If, in fact, he were to, during the

20   deliberations, reveal his experience in the Patent Office

21   and talk about his understanding how that process works,

22   would that be something -- obviously, we'll never know, but

23   would that be problematic from your view?

24             MR. HADDEN:  Well, I don't see any occasion

25   where he would do that.  So I think if he says he is

1    going to follow your instructions and what he gave was a

2    clarifying you have to look at the claims, I don't see the

3    issue.

4              THE COURT:  I guess the question I have is if he

5    was going to say something that did not have an evidentiary

6    basis, it could be an example of what he did or just general

7    experience he had in the office, is that something I should

8    be concerned with?  I don't know if we all have to guess

9    whether he would do it.

10              MR. HADDEN:  Right.

11              THE COURT:  But if I tell you I know he is going

12   to do it, is it a problem or not a problem?

13              MR. HADDEN:  I don't think it's a problem.  And

14   we have other people that talked to you who have patents

15   who certainly are going to talk about the process, or are

16   equally likely to.  That this gentleman is going to talk

17   about the evidence.

18              MR. DESMARAIS:  If I might be heard, Your Honor.

19              THE COURT:  Yes.

20              MR. DESMARAIS:  I directly asked him when you

21   are in the deliberations, are you going to share your

22   specialized knowledge about how this happens in the Patent

23   Office?  And he directly said yes.  And that won't be in

24   evidence.

25              THE COURT:  Hold on.  So I'm willing to assume

1    that he would, since it is human nature that that could

2    happen.

3              MR. DESMARAIS:  Right.

4              THE COURT:  I'm less sure on why it is a problem.

5              MR. DESMARAIS:  It is a problem because the jury

6    in their deliberations isn't supposed to be relying on

7    anything other than what is in evidence in the trial and if

8    he starts sharing things about the Patent Office like Patent

9    Examiners make mistakes, it's very common.  We don't look at

10   all the art.  It is common patents are invalidated.  Things

11   that won't be in the record.

12             THE COURT:  Some of those will be, but not all.

13             MR. DESMARAIS:  He has unique expertise to share

14   with the jury that is extra record, and it could be highly

15   prejudicial.  So I don't know if it will be prejudicial to

16   him or Groupon because I don't know what he will say but he

17   said he is going to say it.  We know he is going to say it.

18   And once he interjects into that deliberation room facts and

19   opinions that are not evidence that the lawyers didn't

20   elicit in direct or cross, that corrupts the process.

21             THE COURT:  Is there anything else you want to

22   say?

23             MR. HADDEN:  Well, it's the same issue we had

24   with Juror 44 who had the 25 patents.  He said the patent is

25   the bedrock of our economy.  He is going to put in his ideas

1    with his experience with those 25 patents and how important

2    they were to DuPont.

3              So I don't see any difference.  All this

4    gentleman said is he will point the jurors to the claims,

5    which is what they should be doing anyway.

6              MR. DESMARAIS:  I will point out one major

7    difference, which is coming from the Patent Office, he will

8    speak with authority which is a different thing than

9    somebody who got his own patent.

10             THE COURT:  All right.  I want to think about

11   this one a little bit more.  So we'll put 4 off to the side

12   for the moment.  I have under advisement IBM's motion to

13   strike.

14             (Juror comes into jury room.)

15             THE COURT:  Good morning.  Have a seat and tell

16   us your juror number, please.

17             A JUROR:  52.

18             (Juror entered the jury room.)

19             THE COURT:  Good morning.  Have a seat.  Tell us

20   your juror number, please.

21             A JUROR:  52.

22             THE COURT:  Are you Ms. Nicole Tingle?

23             A JUROR:  I am.

24             THE COURT:  Do you recall what you answered yes

25   to?

1          A JUROR:  I do.

2          THE COURT:  Okay.  Let us know, please.

3          A JUROR:  Sure.  So I shop online probably every

4    day.  And I have purchased on Groupon within the last year,

5    several times.  I'm the business manager of a facility at

6    the beach and we are short staffed at this moment, so ten

7    days being away from this facility with twenty year olds

8    would cause a major hardship for the business, along with,

9    you know, the financial obligation as well.

10         THE COURT:  Were there other things?

11         A JUROR:  No, that's it.  Those are the things.

12         THE COURT:  Let's talk about those things, then.

13         A JUROR:  Sure.

14         THE COURT:  We'll go in reverse order.  So you

15   are at the Factory Sports Complex; is that right?

16         A JUROR:  Yes.

17         THE COURT:  That's somewhere near the beach; is

18   that correct?

19         A JUROR:  Yes, it's at the beach.  It's an

20   indoor sports facility for the adults and children.

21         THE COURT:  So I see you're the business

22   manager.

23         A JUROR:  I am.

24         THE COURT:  Part of your job is overseeing the

25   other folks working there?

1          A JUROR:  The employees and the day-to-day

2    operations of the business.

3          THE COURT:  And I'm sure this is the busiest

4    time of the year?

5          A JUROR:  It is.  We have summer camp going on

6    right now with thirty plus kids within the building.

7          THE COURT:  Within the building?

8          A JUROR:  Yes.

9          THE COURT:  What would be -- what are you afraid

10   of is going to happen this week and next if you're not

11   there?

12         A JUROR:  I don't know.  You know, the second

13   graders might take over the twenty year olds in the

14   building.  No, just the day-to-day operations that happen

15   could be a hardship.  There is no one at this time to --

16   that's able to fulfill those responsibilities.  The owners

17   are not in at the moment.

18         THE COURT:  Can do you any of that remotely

19   during a break, or as you're driving up or back?

20         A JUROR:  Probably not.  I mean, it's physically

21   just laying eyes on what's going on with the staff.  There

22   is five staff members in the building all under the age of

23   twenty-five, you know, with thirty kids.

24         THE COURT:  If you are here, are you going to be

25   able to give the trial the attention it needs or are you --

1    is your mind going to be with the kids?

2              A JUROR:  I'm going to be worried about what's

3    going on at the factory.

4              THE COURT:  About how often would you say you

5    use Groupon?

6              A JUROR:  I bought probably fifty percent of my

7    Christmas gifts for my family last year off of Groupon.

8    Usually during Christmas time is when we use Groupon.

9              THE COURT:  If you are on our jury and I tell

10   you don't use Groupon while you're on the jury, so say for

11   the next two weeks, would that be a hardship for you?

12             A JUROR:  No.

13             THE COURT:  Your online shopping, that's a

14   pretty regular occurrence?

15             A JUROR:  Yes, personal and through the

16   business.

17             THE COURT:  Let me see if anyone else has

18   questions.  Any questions?

19             MR. DESMARAIS:  No, Your Honor.

20             THE COURT:  Any questions?

21             MR. HADDEN:  One question.

22             In your questionnaire, you mentioned you had at

23   least one bad experience with Groupon where you think

24   somebody was misleading.  Did you say that?

25             A JUROR:  Yes.

1          MR. HADDEN:  When was that?

2          A JUROR:  Probably over a year ago.  I didn't

3   read the fine print.  You know, the fine print.

4          MR. HADDEN:  Have you used Groupon after that?

5          A JUROR:  Yes, after reading the fine print.

6          MR. HADDEN:  Thank you.  And does your

7   experience with Groupon put it in a bad light your mind?

8          A JUROR:  Uh-uh.  No.

9          MR. HADDEN:  Thank you.

10          A JUROR:  You're welcome.

11          THE COURT:  You can go back in the courtroom.

12   Thank you.

13          A JUROR:  Thank you.

14          THE COURT:  Any motion for IBM?

15          MR. DESMARAIS:  Yeah.  I mean, I think she's got

16   a long commute and she said already that she would be

17   distracted, so it seems to me that we don't need somebody

18   that's got a long commute that's going to be distracted.

19          THE COURT:  Any objection?

20          MR. HADDEN:  No objection.

21          THE COURT:  We'll strike 52.

22          (Juror entered the jury room.)

23          THE COURT:  Good morning.  Have a seat and tell

24   us your juror number, please.

25          A JUROR:  Nine.

1            THE COURT:  Jaquetta Collins?

2            A JUROR:  Yes.

3            THE COURT:  Do you recall what you answered yes

4    to?

5            A JUROR:  Shopping online.

6            THE COURT:  About how often would you say you

7    shop online?

8            A JUROR:  Pretty often.

9            THE COURT:  Every week at least?

10           A JUROR:  Not every week, no.  I can't afford

11   that.

12           THE COURT:  Maybe once a month?

13           A JUROR:  Maybe once a month or once every few

14   months, yeah.

15           THE COURT:  Is Groupon one of the sites you have

16   ever shopped on?

17           A JUROR:  No.

18           THE COURT:  Have you heard of Groupon?

19           A JUROR:  I have heard of it, but I have never

20   used it.

21           THE COURT:  You don't have any positive or

22   negative feelings about them, do you?

23           A JUROR:  No.

24           THE COURT:  Were there other things that you

25   answered yes to?

```
1                    A JUROR:  Uh-uh.

2                    THE COURT:  That's it?

3                    A JUROR:  That's it.

4                    THE COURT:  Any questions?

5                    MR. DESMARAIS:  No, Your Honor.

6                    THE COURT:  Any questions?

7                    MR. HADDEN:  No, Your Honor.

8                    THE COURT:  Okay.  Thank you very much.

9            Any motions?

10                   MR. DESMARAIS:  No.

11                   THE COURT:  Any motions?

12                   MR. HADDEN:  No.

13                   (Juror entered the jury room.)

14                   THE COURT:  Good morning.  Have a seat.  Tell us

15   your juror number, please.

16                   A JUROR:  42, I think.

17                   THE COURT:  42 is Nicole Shuba?

18                   A JUROR:  Yes.

19                   THE COURT:  Can you tell me if you recall what

20   you answered yes to.

21                   A JUROR:  There was a question about someone

22   working for IBM.

23                   THE COURT:  Okay.

24                   A JUROR:  My grandfather worked for them.

25                   THE COURT:  Did work for them?
```

1          A JUROR:  Uh-huh.

2          THE COURT:  Do you know what he did?

3          A JUROR:  What he did?

4          THE COURT:  Yes.

5          A JUROR:  No.

6          THE COURT:  Do you have strong positive or

7    negative feelings about IBM as a result of your

8    grandfather's relationship with them?

9          A JUROR:  I mean, I know he liked them a lot.

10          THE COURT:  Do you think in this trial that IBM

11   might start out a little bit ahead in your mind given that?

12          A JUROR:  I don't know.

13          THE COURT:  Do you think that you could be fair

14   and impartial to both sides in a case where IBM is one of

15   the parties?

16          A JUROR:  Yeah, I guess.

17          THE COURT:  Were there other things you answered

18   yes to?

19          A JUROR:  The one if you've bought stuff online.

20          THE COURT:  You do shop online occasionally at

21   least?

22          A JUROR:  Yes, a lot.

23          THE COURT:  A lot.  About how often would you

24   say you're doing online shopping?

25          A JUROR:  Probably like four times a week,

1    probably.

2              THE COURT:  And is Groupon one of the sites that

3    you use?

4              A JUROR:  Yes.

5              THE COURT:  About how often would you say you

6    were using Groupon.

7              A JUROR:  I don't necessarily always buy on

8    there, but I'm on there once a week looking because I have

9    the app.

10             THE COURT:  So you can look at the deals that

11   are on there?

12             A JUROR:  Yes.

13             THE COURT:  You have bought, though, at some

14   point something on Groupon?

15             A JUROR:  Uh-huh.  Yes.

16             THE COURT:  Do you have positive or negative

17   feelings about Groupon?

18             A JUROR:  They've always -- I have gotten good

19   deals, so that's positive.

20             THE COURT:  Do you think they may start out a

21   little bit ahead in a lawsuit with IBM?

22             A JUROR:  I don't know.

23             THE COURT:  You don't know.  Okay.  If I were to

24   tell you that if you're on this jury you can't use Groupon

25   for the next two weeks, would that be a problem?

1              A JUROR:  No.

2              THE COURT:  Okay.  Other things that you

3   answered yes to?

4              A JUROR:  No.

5              THE COURT:  Okay.  Let me see if the lawyers

6   have questions for you.  Any questions?

7              MR. DESMARAIS:  Just one.  So you seem a little

8   hesitant on whether you think you could be fair and

9   impartial.  What do you think is really going on with

10  respect to the case of IBM versus Groupon, do you feel like

11  you favor one side versus the other before we even start?

12             A JUROR:  I don't know.  I have always heard

13  about IBM, so it's like already in my mind, but like I don't

14  know about it.  I just know that my grandfather worked for

15  them, that's why my dad and my uncle are in that field.  So

16  I have positive things about them.

17             MR. DESMARAIS:  But your experience with Groupon

18  is favorable, too?

19             A JUROR:  Uh-huh.

20             MR. DESMARAIS:  How do you feel about Groupon

21  going in without hearing anything about the case?

22             A JUROR:  I just have positive things for both.

23             MR. DESMARAIS:  Okay.

24             THE COURT:  Anything else?

25             Any questions?

1              MR. HADDEN:  Just a couple of questions.  You

2    mentioned your dad and uncle were in the field.  You said

3    your grandfather worked at IBM?

4              A JUROR:  My dad and my uncle just work like in

5    computers and things like that.

6              MR. HADDEN:  Okay.  No further questions.

7              THE COURT:  Nothing else.  You can go back in

8    the courtroom.  Thank you.

9              Any motions?

10             MR. DESMARAIS:  No.

11             THE COURT:  Any motions?

12             MR. HADDEN:  No.  I don't think we have a

13    questionnaire from her.

14             MR. DESMARAIS:  No, we don't.

15             THE COURT:  All right.

16             (Juror entered the jury room.)

17             THE COURT:  Good morning.

18             A JUROR:  Good morning.

19             THE COURT:  You can have a seat.

20             A JUROR:  Hello everyone.

21             THE COURT:  Do you know your juror number?

22             A JUROR:  Yeah, 23.

23             THE COURT:  23.  So are you Donna Jones?

24             A JUROR:  Yes, I am.

25             THE COURT:  Do you recall what you answered yes

1    to?

2              A JUROR:  Yeah, the Groupon, who hasn't used

3    Groupon.  I'm not a regular user, though, sorry guys, I only

4    used it a couple of times.

5              THE COURT:  A couple times.  About how recently

6    would you say?

7              A JUROR:  A couple of years ago.

8              THE COURT:  Any strong positive or negative

9    feelings?

10             A JUROR:  No.

11             THE COURT:  If I said don't use Groupon over the

12   next couple of weeks, would that be okay with you?

13             A JUROR:  That would be fine.

14             I used to work for attorneys.  I don't know

15   these guys.  It was thirty years ago.

16             THE COURT:  Thirty years ago here in Wilmington?

17             A JUROR:  Yes, Phillip and Synder, Spencer and

18   Goldman, they kind of split up and they have done different

19   things.

20             THE COURT:  What did you do there?

21             A JUROR:  I was in admin, but I worked in the

22   trademark area.  I only did that for a year-and-a-half and

23   went with the Bank of America, MBNA.

24             THE COURT:  Have you ever done anything with

25   patents?

```
 1                    A JUROR:  No, just trademarks.

 2                    THE COURT:  So you have heard of some of the

 3      firms that I have mentioned; is that right?

 4                    A JUROR:  Only Potter Anderson.

 5                    THE COURT:  Only Potter Anderson.

 6                    A JUROR:  Yeah, because they have been around a

 7      lot of years, thirty years ago I remember.

 8                    THE COURT:  Do you think the side that Potter is

 9      on would start out ahead in your mind?

10                    A JUROR:  No.  Oh, gosh no.

11                    THE COURT:  Would they start out behind?

12                    A JUROR:  No, even.  Even, I'm pretty, yeah.

13                    THE COURT:  You think you could be fair and

14      impartial?

15                    A JUROR:  Absolutely.

16                    THE COURT:  Other things you answered yes or no?

17                    A JUROR:  No, that's it.

18                    THE COURT:  Any questions?

19                    MR. DESMARAIS:  No, Your Honor.

20                    THE COURT:  Any questions?

21                    MR. HADDEN:  No, Your Honor.

22                    THE COURT:  You can go back in the courtroom.

23                    Any motions?

24                    MR. DESMARAIS:  No.

25                    MR. HADDEN:  No.
```

1          (Juror entered the jury room.)

2          THE COURT:  Good morning.  You can have a seat

3  and tell us your -- a lot of us.  If you could tell us your

4  juror number, please.

5          A JUROR:  Ten.

6          THE COURT:  Just so we know who you are.  Are

7  you Gail Cooke?

8          A JUROR:  Yes.

9          THE COURT:  Do you recall what you answered yes

10  to?

11          A JUROR:  Well, a couple of them.  One of them

12  was the products one, have I been involved in the

13  development of products where I work, and before in the

14  process with it, and also I worked at purchasing for a long

15  time and I dealt a lot with IBM and ordering all the

16  machines and computers and typewriters and the consumables

17  that went along with those where I worked.  And also, my

18  brother-in-law has his own patent.

19          THE COURT:  We're going to talk about all these

20  things.  Were there others that you remember answering yes

21  to?

22          A JUROR:  No, I think those were the three that

23  stood out.

24          THE COURT:  Let's talk about those and if you

25  think of any others, let me know.  The product development

1   that you have been involved in, is that with your current

2   employer?

3                   A JUROR:  Well, it's been with like all of them

4   along, DuPont and with Seamen's now.

5                   THE COURT:  Is it easy to describe to us

6   generally the type of products you have been part of

7   developing?

8                   A JUROR:  It's health care.

9                   THE COURT:  Health care.

10                  A JUROR:  Uh-huh.

11                  THE COURT:  And just generally what is your role

12  in the product development process?

13                  A JUROR:  Okay.  Well, at the present time I

14  work in QA, so we are involved with actually the process of

15  how it flows from -- to the customer and through the

16  development of the testing and the manufacturing of the

17  product, and the correct paperwork and all of the things

18  that like the foreign ministry in Japan and the other

19  countries need as well as if they have the patents then

20  occasionally the other, with the regulatory, QA regulatory

21  department, they come back with us with list of things that

22  we have to make sure are on the products when they get sent

23  out.  And you know, as far as copyright, things like that.

24                  THE COURT:  What does QA mean?

25                  A JUROR:  Quality assurance.

1          THE COURT:  You mentioned patents.  Do you

2   personally have any involvement with patents in the

3   development process?

4          A JUROR:  Not directly, but indirectly, they're

5   in the other building, they're like in the process for the

6   consumables that we do.  Not right away, but for the down

7   the line.

8          THE COURT:  Do you have any feelings about

9   patents or the patent system?

10         A JUROR:  No.

11         THE COURT:  Do you know if any of the patents

12  related to any of the products that you worked with have

13  been litigated, any lawsuits?

14         A JUROR:  I don't think so, but just when I

15  worked with DuPont there was those ones for back then, but I

16  don't think they involved me directly.

17         THE COURT:  You haven't had to provide evidence

18  or documents or testimony for any of those?

19         A JUROR:  No.

20         THE COURT:  All right.  In terms of being

21  responsible for making purchases from IBM, that was in a

22  prior job; is that right?

23         A JUROR:  That's when I worked for DuPont, and

24  then Dade.

25         THE COURT:  And about how long ago did that role

1    end, you helping purchase from IBM?

2              A JUROR:  Maybe twenty-five years.

3              THE COURT:  And it was like computers and

4    typewriters?

5              A JUROR:  Yeah, I did all the ordering for the

6    site because I was purchasing coordinator then and handled

7    all of that.

8              THE COURT:  No business interaction with IBM for

9    the last twenty plus years, would you say?

10             A JUROR:  Well, just getting computers at home,

11   and you know, calculators and things like that online.

12             THE COURT:  Do you have any general feeling

13   about IBM?

14             A JUROR:  Other than I thought they were really

15   great.  I guess no.

16             THE COURT:  Do you think that in a case in which

17   they are a party they might start out a little bit ahead in

18   your mind?

19             A JUROR:  Probably.

20             THE COURT:  Probably, because of those positive

21   experiences?

22             A JUROR:  Yeah.  Yeah.  I never had any bad

23   experiences with them in dealing with any of their services

24   or anything like that.

25             THE COURT:  Is it possible that after hearing

1    the evidence and the law in this case you might think even

2    though they're a great company and I never had a bad

3    experience, maybe they're not right in this case?

4                  A JUROR:  I don't know how to answer that

5    because, you know, not seeing everything and know what's

6    really involved.

7                  THE COURT:  Let's talk about something else.

8    Your brother-in-law has a patent.  Do you know what kind of

9    patent it is, what it relates to?

10                 A JUROR:  That's when he worked for DuPont and

11   then he got one of his own for something totally different,

12   it's like something with the -- he's a golfer.

13                 THE COURT:  Something related to golf?

14                 A JUROR:  Yeah, something like that.

15                 THE COURT:  Does he actually have the patent

16   now?

17                 A JUROR:  I think he still does, yeah.

18                 THE COURT:  And did he share with you any

19   feelings about the patent system or did you --

20                 A JUROR:  No.

21                 THE COURT:  And do you have any feelings about

22   it based on his experience?

23                 A JUROR:  No, other than I know it was a lengthy

24   process.

25                 THE COURT:  Do you know if he's ever sold any

1   products or made any money related to this patent?

2   A JUROR:  I think he does.  I think he sells

3   them himself.  He didn't go out to like another company to

4   do it.  He does it individually, but since he's passed away

5   now.  So I don't know what my sister has done with it.  I

6   have never questioned her about it.

7   THE COURT:  All right.  From the little bit I

8   have told you about the case, do you think you could be a

9   fair and impartial juror on it?

10   A JUROR:  Well, it's hard to say.

11   THE COURT:  Have you ever been on a jury before?

12   A JUROR:  Yes, I have.

13   THE COURT:  About how long ago was that?

14   A JUROR:  Maybe eight, ten years.

15   THE COURT:  Do you remember what kind of case it

16   was?

17   A JUROR:  It was civil.  And then I was chosen

18   for I think -- no, I was like on, like I am not for federal

19   and then I was not chosen.

20   THE COURT:  So you know at least for one trial

21   what this is like?

22   A JUROR:  Uh-huh.

23   THE COURT:  You seem a little hesitant.

24   A JUROR:  This is a bigger one than the other

25   ones I was on.  So, you know --

```
 1                    THE COURT:  But I assume you were able to be

 2     fair and impartial in that smaller case; is that right?

 3                    A JUROR:  Yeah, in the smaller case.  A couple

 4     of them were settled before we ever went.  Yeah, I guess I

 5     can, yeah, not lean one way or the other.

 6                    THE COURT:  Did you think of anything else you

 7     wanted to tell us?

 8                    A JUROR:  No.  Those are the only things that

 9     stood out.

10                    THE COURT:  Let me see if anyone else here has

11     any questions for you.  Any questions?

12                    MR. DESMARAIS:  No, Your Honor.

13                    MR. HADDEN:  No questions.

14                    THE COURT:  You can go back into the courtroom.

15     Thanks so much.

16                    (Juror left jury room.)

17                    THE COURT:  Any motion?

18                    MR. DESMARAIS:  No, Your Honor.

19                    THE COURT:  Any motion?

20                    MR. HADDEN:  For cause.  She said IBM stood out

21     in front.  She couldn't decide against IBM.  She hesitated

22     forever before she could say she was fair.

23                    MR. DESMARAIS:  I think at the very last

24     question you asked her, had she done this before, was she

25     fair, and could she be fair and impartial in this case?  And
```

```
 1    she said yes.

 2              THE COURT:  She said "I guess."  But she was

 3    very reluctant repeatedly.  I'm concerned enough that I'm

 4    going grant the motion to strike No. 10.

 5              (Juror comes into jury room.)

 6              THE COURT:  Good morning.

 7              A JUROR:  Good morning.

 8              THE COURT:  Have a seat.  Tell us your number,

 9    please.

10              A JUROR:  My phone number is --

11              THE COURT:  No, not your phone number.  Your

12    juror number.

13              A JUROR:  Juror No. 34.

14              THE COURT:  Are you of a Patricia Park?

15              A JUROR:  Yes.

16              THE COURT:  Do you recall what you answered

17    "yes" to?

18              A JUROR:  I do know one of the other jurors.

19              THE COURT:  You do?

20              A JUROR:  I do.

21              THE COURT:  Okay.  You don't know his or her

22    juror number?

23              A JUROR:  I do not know his number.

24              THE COURT:  So how well do you know him or her?

25              A JUROR:  We bowl together September through May
```

1    once a week on the same team -- on the same league.  Not the

2    same team but the same league.

3              THE COURT:  Have you seen him or her since May

4    when the season ended.

5              A JUROR:  No.

6              THE COURT:  Okay.  Is he or she an arch-rival?

7    No?

8              A JUROR:  Only when we're bowling.

9              THE COURT:  Did you talk to him or her today?

10             A JUROR:  Yes.

11             THE COURT:  Just because you saw him?

12             A JUROR:  Yes.

13             THE COURT:  All right.  That was it?

14             A JUROR:  That was it.

15             THE COURT:  Any questions?

16             MR. DESMARAIS:  No.

17             THE COURT:  Any questions?

18             MR. HADDEN:  No.

19             THE COURT:  Okay.  You can go back into the

20   courtroom.

21             A JUROR:  Okay.

22             (Juror left jury room.)

23             THE COURT:  Any motion?

24             MR. DESMARAIS:  No.

25             MR. HADDEN:  No.

1                    (Juror comes into jury room.)

2                    THE COURT:  Good morning.  Have a seat, please.

3                    A JUROR:  Good morning.

4                    THE COURT:  Can you tell us your juror number.

5                    A JUROR:  No. 5.

6                    THE COURT:  Are you Christina Bonilla?

7                    A JUROR:  Yes.

8                    THE COURT:  And what did you answer "yes" to,

9      please?

10                    A JUROR:  Actually two questions.

11                    THE COURT:  Sure.

12                    A JUROR:  Whether I knew one of the other jurors

13     on my team.  And I do, No. 36.  His name is Allen Samuels.

14     We worked together at Girls Inc. a few years back.

15                    And then the other one was something about

16     shopping online on a mobile app.  I do that all the time.

17                    THE COURT:  All the time.

18                    A JUROR:  Yes.  Yes.

19                    THE COURT:  So let's talk about both of those a

20     little bit.

21                    Would you say you shop online everyday?

22                    A JUROR:  A few times a week.

23                    THE COURT:  A few times a week.

24                    A JUROR:  Uh-huh.

25                    THE COURT:  But with a mobile app and also like

1    on a desktop?

2              A JUROR:  Yes, a desktop and through my phone,

3    mobile phone.

4              THE COURT:  Is Groupon one of the sites you

5    would visit?

6              A JUROR:  No.  It's typically more retail

7    companies like Macy's, Old Navy, places like that.

8              THE COURT:  Have you ever looked at Groupon?

9              A JUROR:  You've looked at it but I've never

10   used any of there services before.

11             THE COURT:  Do you have any strong feelings

12   about Groupon from either what you saw or just know?

13             A JUROR:  Not strong feelings, just I know

14   they're -- I have an idea it did sounds like they're some

15   kind of a discount company where they promote offers.  I

16   know my daughter used Groupon one time to get a membership

17   for my youngest son for karate membership in Hockessin.  But

18   that's about it.

19             THE COURT:  Okay.  And in terms of this other

20   juror, you know Juror No. 36.

21             A JUROR:  Uh-huh.

22             THE COURT:  About how long ago did you work

23   together?

24             A JUROR:  Probably over ten years ago.

25             THE COURT:  Have you seen him since you stopped

1    working together?

2              A JUROR:  No.

3              THE COURT:  Did you talk today?

4              A JUROR:  Yes.  I actually went up to him and

5    said don't I know you?  And it went from there.  And I

6    figured we work together, so ...

7              THE COURT:  Is there anything else you want to

8    share with us?

9              A JUROR:  No, that's it.

10             THE COURT:  Any questions?

11             MR. DESMARAIS:  No.

12             A JUROR:  Any questions?

13             MR. HADDEN:  No.

14             THE COURT:  Okay.  You can go back.  Thank you.

15             A JUROR:  Uh-huh.

16             (Juror left jury room.)

17             THE COURT:  Any motion?

18             MR. DESMARAIS:  No.

19             THE COURT:  Okay.

20             MR. HADDEN:  No.  But I think to correct the

21   record, I think Samuels is actually 37, not 36.  I think she

22   might have gotten the number wrong.

23             THE COURT:  I do see No. 37 is a Mr. Samuels.

24   She did say 36 but she also said Samuels.  Thank you.

25             Okay.

```
 1                      (Juror comes into jury room.)

 2                THE COURT:  Good morning.

 3                A JUROR:  Good morning.

 4                THE COURT:  If you could have a seat.

 5                A JUROR:  Wow.  Good morning, everybody.

 6                THE COURT:  There are a lot of us.  Can you tell

 7   us your juror number, please?

 8                Just the one or two digit number from this

 9   morning.

10                A JUROR:  Oh.  Is this what is on the inside of

11   the envelope?

12                THE COURT:  Yes, you are No 1.

13                A JUROR:  Wow.

14                THE COURT:  You must be Richard Allen.

15                A JUROR:  That's it.

16                THE COURT:  Tell us what you know.

17                A JUROR:  I have purchased things on the

18   Internet.

19                THE COURT:  Okay.

20                A JUROR:  I do know a Robert Phillips.  I don't

21   know if you said Phillip or --

22                THE COURT:  I meant to say Filepp with an F.  Is

23   yours with an F?

24                A JUROR:  No, with a P.

25                THE COURT:  I know it was not clear from my
```

1    pronunciation.

2              A JUROR:  The most important thing is I have

3    reservations next week for vacation.

4              THE COURT:  Okay.

5              THE JURORS:  Not paid for, but I mean I do have

6    reservations.  I'm on vacation starting this Saturday.

7              THE COURT:  Right.

8              A JUROR:  So that would be my concern.  And I

9    had let the Court know about this several weeks ago.  I

10   never got a response though.  If it was for the week, that

11   would be great, but ...

12             THE COURT:  So you wouldn't lose any money.  You

13   would lose your vacation.

14             A JUROR:  Right.  And I'd have to reschedule my

15   vacation.

16             THE COURT:  Okay.

17             A JUROR:  I would not lose money, honestly.

18             THE COURT:  How much of hardship would it be if

19   you had to move your vacation back?

20             A JUROR:  I don't know.  I'd have to say it's

21   still, I would be able to take one.  But before the summer

22   is over, I'm not sure about that.

23             THE COURT:  Okay.  And you're online shopping,

24   just give us a sense of how often you do that.

25             A JUROR:  Not even once a month.

1      THE COURT:  Okay.

2      A JUROR:  Less than that.

3      THE COURT:  Is Groupon one of the sites?

4      A JUROR:  No.

5      THE COURT:  Have you heard of Groupon?

6      A JUROR:  Yes.

7      THE COURT:  Do you have any feelings about that?

8      A JUROR:  No.  I don't know anything about them.

9      THE COURT:  Had you heard of IBM?

10     A JUROR:  Oh, absolutely.  I've got computers.

11     THE COURT:  Any feeling?

12     A JUROR:  No.

13     THE COURT:  All right.  Is there anything

14  else --

15     A JUROR:  No.

16     THE COURT:  -- you want to share?

17     A JUROR:  No.

18     THE COURT:  Any questions?

19     MR. DESMARAIS:  No, Your Honor.

20     THE COURT:  Any questions?

21     MR. HADDEN:  No, Your Honor.

22     THE COURT:  All right.  You can go back.

23     A JUROR:  Thank you, sir.

24     Thank you.

25     (Juror left jury room.)

| | |
|---|---|
| 1 | THE COURT:  Any motion? |
| 2 | MR. DESMARAIS:  No. |
| 3 | THE COURT:  Any motion? |
| 4 | MR. HADDEN:  No. |
| 5 | THE COURT:  Okay. |
| 6 | MR. DESMARAIS:  It's unfortunate, though. |
| 7 | (Juror comes into jury room.) |
| 8 | THE COURT:  You can have a seat, please. |
| 9 | Do you know your juror number they gave you |
| 10 | today? |
| 11 | A JUROR:  I believe it's 36.  I can check. |
| 12 | THE COURT:  I can check for you. |
| 13 | A JUROR:  Yes, 36. |
| 14 | THE COURT:  Joshua Robbins. |
| 15 | A JUROR:  Yes. |
| 16 | THE COURT:  Tell us, if you could, what you |
| 17 | answered "yes" to. |
| 18 | A JUROR:  There was a few, and I don't remember |
| 19 | all of them. |
| 20 | THE COURT:  Whatever you remember. |
| 21 | A JUROR:  The main thing is I was trying to be |
| 22 | excused.  I am a sole proprietor and my business, my |
| 23 | business, I deliver snacks to Ocean City. |
| 24 | THE COURT:  Okay. |
| 25 | A JUROR:  If I'm not there, I'm in breach of |

1          contract.

2                    THE COURT:   Okay.   Ocean City, Maryland?

3                    A JUROR:   Maryland.

4                    THE COURT:   This is a pretty busy time at Ocean

5          City, Maryland.

6                    A JUROR:   Yes, it is.   And if I'm not there for

7          a week, I could easily not have a business anymore.   That's

8          my only source of income.

9                    And then it was kind of like hardship-type

10         questions I know you also asked.

11                   THE COURT:   Right.

12                   A JUROR:   I do shop online a lot.

13                   There was a question that was have you ever

14         worked for a company that produces new products.   Was that

15         it?

16                   THE COURT:   Yes, certain product development.

17                   A JUROR:   Yes.   I interned in a product

18         development department for a company that produced textbooks

19         for schools.

20                   I feel there was another.

21                   THE COURT:   That's okay.   I take it the snack

22         delivery business in Ocean City is not big in the winter; is

23         that right?

24                   A JUROR:   It's not.

25                   THE COURT:   That would be a better time for you

1    to do this.

2                    A JUROR:  That would be much better.

3                    THE COURT:  Any questions?

4                    MR. DESMARAIS:  No, Your Honor.

5                    THE COURT:  Any questions?

6                    MR. HADDEN:  No, Your Honor.

7                    THE COURT:  You can go back into the courtroom.

8                    A JUROR:  Thank you.

9                    (Juror left jury room.)

10                    THE COURT:  Any objection to striking 36 for the

11   hardship?

12                    MR. DESMARAIS:  No Your Honor.

13                    MR. HADDEN:  No, Your Honor.

14                    THE COURT:  We'll strike 36.

15                    (Juror comes into jury room.)

16                    THE COURT:  Good morning.

17                    A JUROR:  Good morning.

18                    THE COURT:  You can have a seat right there.

19                    What is your juror number, please?

20                    A JUROR:  51.

21                    THE COURT:  Thank you.  Are you John Sweetman?

22                    A JUROR:  That is correct.

23                    THE COURT:  And do you recall what you answered

24   "yes" to?

25                    A JUROR:  Yes.  The design and development of

the product.  I work for Siemens Healthcare.  I work in the

support role, technical support person that helps out

engineers get done changes to machinery and also development

of machinery.

THE COURT:  That's part of your ongoing job

responsibilities?

A JUROR:  Correct.  I've been doing that for

about 11 years.

THE COURT:  Do you know if patents are part of

that development process?

A JUROR:  It is part of that.  I don't deal

directly with that, but I do deal with documentation that

patenting would do.  And I would help that get processed

into an SPA program.

THE COURT:  Do you, through that experience or

otherwise, have any strong feelings about patents?

A JUROR:  No.

THE COURT:  Have any of the patents you have

been indirectly involved with, have they ever ended up

lawsuits, do you know?

A JUROR:  No, I'm relatively -- In R&D, it takes

five to ten years to develop something and I'm in my

eleventh year.  So so far, in my time, I have seen no

lawsuits.

THE COURT:  Other things you answered "yes" to?

1                    A JUROR:  Not anything pressing.  I do have a

2        field trip with my son next week I'd like to go on that is

3        kind of special.

4                    What really popped out is the whole thing with

5        dealing with the developmental product.

6                    THE COURT:  Right.  Which day next week is the

7        field trip?

8                    A JUROR:  It's Tuesday.

9                    THE COURT:  And would you lose any money if you

10       are not able to do that?

11                   A JUROR:  No.  I was going to take the day off

12       work.

13                   THE COURT:  Okay.  Is there anything else?

14                   A JUROR:  No.

15                   THE COURT:  Any questions?

16                   MR. DESMARAIS:  No.

17                   THE COURT:  Any questions?

18                   MR. HADDEN:  Just one.

19                   A JUROR:  Sure.

20                   MR. HADDEN:  With the work you do in developing

21       products and dealing with patents, would IBM, being the

22       patent holder, be ahead of Groupon in your view in this

23       case?

24                   A JUROR:  No.

25                   MR. HADDEN:  Thank you.

1          THE COURT:  Okay.  You can go back into the

2    courtroom.  Thank you.

3          A JUROR:  Thank you very much.

4          (Juror left jury room.)

5          THE COURT:  Any motion?

6          MR. DESMARAIS:  No.

7          THE COURT:  Any motion?

8          MR. HADDEN:  No.

9          (Juror comes into jury room.)

10          THE COURT:  Good morning.

11          A JUROR:  Good morning.

12          THE COURT:  You can have a seat.  Tell us your

13    juror number.

14          A JUROR:  37.

15          THE COURT:  37.  Allen Samuels, right?

16          A JUROR:  Yes.

17          THE COURT:  Do you recall what you answered

18    "yes" to?

19          A JUROR:  I know someone on the jury.

20          THE COURT:  Who do you know on the jury?

21          A JUROR:  No. 5, Christine Bonilla.

22          THE COURT:  How do you know her?

23          A JUROR:  She used to work with me at Girls Inc.

24          THE COURT:  About how long ago was that?

25          A JUROR:  Over ten years ago.

```
 1              THE COURT:  Have you seen her since?

 2              A JUROR:  No, I haven't.

 3              THE COURT:  You talked to her today?

 4              MR. HADDEN:  Yes.

 5              THE COURT:  Is there anything else you answered

 6    "yes" to?

 7              MR. HADDEN:  That was it.

 8              THE COURT:  Any questions?

 9              MR. DESMARAIS:  No.

10              THE COURT:  Any questions?

11              MR. HADDEN:  I just have one question.

12              In your questionnaire, you said your family

13    member owned a non-profit business?

14              A JUROR:  Yes.

15              MR. HADDEN:  Is that you?

16              A JUROR:  That's me.

17              MR. HADDEN:  What kind of business?

18              A JUROR:  Inner city youth.  It deals with inner

19    city youth, mentoring and prevention programs.

20              THE COURT:  Is there anything else?

21              MR. HADDEN:  No.

22              THE COURT:  Thank you.  You can go back into the

23    courtroom.

24              (Juror left jury room.)

25              THE COURT:  Any motion?
```

```
 1                    MR. DESMARAIS:  No.

 2                    MR. HADDEN:  No.

 3                    (Juror comes into jury room.)

 4                    THE COURT:  Good morning.

 5                    A JUROR:  Hi.

 6                    THE COURT:  Would you mind have having a seat

 7      there?  And tell us your juror number.

 8                    A JUROR:  45.

 9                    THE COURT:  Thank you.  You are Pamela Simon?

10                    A JUROR:  Yep.

11                    THE COURT:  Do you recall what you answered

12      "yes" to?

13                    A JUROR:  My brother is a lawyer and my

14      husband's best friend is a patent attorney.  And my husband

15      bought from Groupon in the past, though I haven't seen any

16      transactions in the past couple of years.  And I buy online.

17                    THE COURT:  Okay.  Thank you.  Let's talk about

18      each of those just a little bit.

19                    So it is your brother I think is a lawyer?

20                    A JUROR:  Yes.  Yes.

21                    THE COURT:  Do you know what kind of law he

22      does?

23                    A JUROR:  He work for Richards, Layton & Finger.

24                    THE COURT:  Here in Delaware?

25                    A JUROR:  Yes.  Cottrell.
```

1    THE COURT:  Fred Cottrell.

2    A JUROR:  And he doesn't talk anything about

3    that, and I don't ask him any questions.

4    THE COURT:  Do you know if he involved with

5    patent litigation?

6    A JUROR:  I don't know.

7    THE COURT:  You don't know.  Okay.

8    A JUROR:  I think he just does doctors, or -- I

9    don't know.

10    THE COURT:  Okay.  That's fine.  But your

11    husband's best friend is a patent attorney; is that right?

12    A JUROR:  Yes, in Salt Lake City.

13    THE COURT:  In Salt Lake City.  Okay.  Do you

14    have any feelings about patent litigation?

15    A JUROR:  No.

16    THE COURT:  Any feelings about patents?

17    A JUROR:  No.

18    THE COURT:  Okay.  Now, your husband uses

19    Groupon, not you, though, I guess?

20    A JUROR:  No.

21    THE COURT:  Okay.  Do you'd have any feelings

22    about Groupon?

23    A JUROR:  No.

24    THE COURT:  Has your husband shared with you his

25    views on Groupon?

```
1                    A JUROR:  No.

2                    THE COURT:  No.

3                    A JUROR:  No.

4                    THE COURT:  You do do some shopping on Priceline

5        though, correct?

6                    A JUROR:  Uh-huh.

7                    THE COURT:  Just for the court reporter, that

8        was a "yes," right?

9                    A JUROR:  Yes.  Sorry.

10                    THE COURT:  That's all right.  About how often

11       would you say you are buying things online?

12                    A JUROR:  For myself personally, like about

13       every couple of months.

14                    THE COURT:  Okay.

15                    A JUROR:  And my husband buys me.

16                    THE COURT:  All right.  Fair enough.  Let me see

17       if anyone has any further questions.  Any questions?

18                    MR. DESMARAIS:  No, Your Honor.

19                    THE COURT:  Any questions?

20                    MR. HADDEN:  Just one question, ma'am.

21                    A JUROR:  Yep.

22                    MR. HADDEN:  You wrote in your questionnaire

23       there are medical issues that would make it difficult for

24       you to pay attention in the trial?

25                    A JUROR:  If it were lasting beyond like a month
```

1    potentially.  I had a stroke.  I could get like tired in the

2    long run from waking up early, but I think like it's about a

3    month.

4                    MR. HADDEN:  Okay.  Well, we will not make a

5    month.

6                    THE COURT:  Okay.  Anything else?

7                    MR. HADDEN:  No.

8                    THE COURT:  All right.  You can go back into the

9    courtroom.

10                   A JUROR:  Thank you.

11                   THE COURT:  Thank you very much.

12                   (Juror left jury room.)

13                   THE COURT:  Any motion?

14                   MR. DESMARAIS:  No, Your Honor.

15                   THE COURT:  Any motion?

16                   MR. HADDEN:  No, Your Honor.

17                   (Juror comes into jury room.)

18                   THE COURT:  Good morning.

19                   A JUROR:  Hello.

20                   THE COURT:  Have a seat right there.  This one

21   here, near us.  Thank you.

22                   And do you know your juror number?  Just the one

23   or two digit number.

24                   A JUROR:  It's either 6 or 9.

25                   THE COURT:  That's a good question.  Are you

1    Reginald Butler?

2               A JUROR:  Yes, it is.  Which is it.

3               THE COURT:  We should do something about that.

4    It's 6.  I'm glad you pointed that out.  We're going to do

5    something about that.

6               A JUROR:  It's either 6 or 9.

7               THE COURT:  Do you know what you answered "yes"

8    to?

9               A JUROR:  Yes, I just know a juror.  That's all.

10              THE COURT:  Do you know his or her name or juror

11   number?

12              A JUROR:  No.  She is on my bowling league.  We

13   bowl the winter league and she happened to hear my voice.  I

14   turned around and knew her, and that's all it is.

15              THE COURT:  Do you see her other than in

16   bowling?

17              A JUROR:  No, just bowling.

18              THE COURT:  When is the bowling league?

19              A JUROR:  When does it happen?

20              THE COURT:  Yes.  Is it ongoing?

21              A JUROR:  No, it's not ongoing.  We just

22   finished up.  It's a winter league.

23              THE COURT:  All right.  Anything else you

24   answered "yes" to?

25              A JUROR:  That's it.

1              THE COURT:  That's it.

2              Any questions.

3              MR. DESMARAIS:  No.

4              THE COURT:  Any questions?

5              MR. HADDEN:  No.

6              THE COURT:  Okay.  Thank you.

7              A JUROR:  All right.

8              (Juror left jury room.)

9              THE COURT:  Any motion from IBM?

10             MR. DESMARAIS:  No.

11             THE COURT:  From Groupon?

12             MR. HADDEN:  No.

13             (Juror comes into jury room.)

14             THE COURT:  Good morning.  You can have a seat

15     over there.

16             Do you know your juror number?

17             A JUROR:  11.

18             THE COURT:  Are you Tamera Davis?

19             A JUROR:  Uh-huh.

20             THE COURT:  That is a "yes" for the court

21     reporter's benefit?

22             A JUROR:  Yes.

23             THE COURT:  He doesn't know how to spell the

24     other word.  Do you know what you answered "yes" to?

25             A JUROR:  The shopping online.

1                    THE COURT:  Okay.

2                    A JUROR:  And Groupon.

3                    THE COURT:  Okay.

4                    A JUROR:  I have the app.

5                    THE COURT:  On your phone?

6                    A JUROR:  Yes, I use it.

7                    THE COURT:  About how often would you say you

8     use Groupon?

9                    A JUROR:  Not that often.

10                   THE COURT:  Every month maybe?

11                   A JUROR:  Most likely, yes.

12                   THE COURT:  Okay.  If you are on the jury and I

13    tell you don't use Groupon for the next two weeks, would

14    that be a problem?

15                   A JUROR:  No.

16                   THE COURT:  No.  Okay.  How often would you say

17    you shop online?

18                   A JUROR:  A lot.

19                   THE COURT:  A couple times a week at least?

20                   A JUROR:  Yes.

21                   THE COURT:  All right.  Other things you

22    answered "yes" to?

23                   A JUROR:  No.

24                   THE COURT:  No, that's it.

25                   Any questions?

```
1              MR. DESMARAIS:  No.

2              THE COURT:  Any questions?

3              MR. HADDEN:  No.

4              THE COURT:  Thank you.  You can go back into the

5    courtroom.

6              (Juror left jury room.)

7              THE COURT:  Any motion?

8              MR. DESMARAIS:  No.

9              THE COURT:  Any motion?

10             MR. HADDEN:  No.

11             THE COURT:  Okay.

12             (Juror comes into jury room.)

13             THE COURT:  Good morning.

14             A JUROR:  Good morning.

15             THE COURT:  You can have a seat over here,

16   please, and join us at the table.

17             Do you know what your juror number is?

18             A JUROR:  20.

19             THE COURT:  20.  Are you Kenneth Hilton?

20             A JUROR:  Yes.

21             THE COURT:  Do you recall what you answered

22   "yes" to?

23             A JUROR:  I recall answering "yes" on

24   technology.

25             THE COURT:  Okay.
```

1           A JUROR:  And "yes" on answer to why I shouldn't

2   be, because of my knee, sitting for a long period of time.

3           THE COURT:  So it would be a hardship for you to

4   have to sit through the trial for two weeks.

5           A JUROR:  Yes.

6           THE COURT:  We may be able to arrange to take a

7   break so you wouldn't sit more than an hour at a time.

8           A JUROR:  That would be good.

9           THE COURT:  That would be good if we took a

10  break every hour for a few minutes, though you would be here

11  from 9:00 to 430 probably for ten days.

12          A JUROR:  Just as long as I don't have to sit in

13  one place for four hours.

14          THE COURT:  No, no.  It wouldn't be for four

15  hour.  It could be one to two hours, but if you needed it to

16  be one hour?

17          A JUROR:  I could deal with that.

18          THE COURT:  One hour you could do.  Okay.  And

19  what about the technological experience or background did

20  you want to share with us?

21          A JUROR:  Well, I work with CJ Reynolds and

22  Morgan Stanley on computers and they, as a company, they

23  deal with IBM computers.

24          THE COURT:  You used IBM computers at those

25  companies?

1           A JUROR:  Right.

2           THE COURT:  What was your general responsibility

3    with those?

4           A JUROR:  It was whether it was stolen software,

5    building a computer up, upgrading it.

6           THE COURT:  And what was in sort of time frame

7    what was the most recent experience?  How many years ago did

8    you stop doing that kind of work?

9           A JUROR:  That's two months before the World

10   Trade incident.

11          THE COURT:  Okay.  So 2001?

12          A JUROR:  Yeah.

13          THE COURT:  Okay.  And do you do much with

14   computers now?

15          A JUROR:  Oh, yes.  Still work on computers.

16          THE COURT:  For your own?

17          A JUROR:  At home.

18          THE COURT:  At home.

19          A JUROR:  Right.

20          THE COURT:  Do you have any feelings about IBM?

21          A JUROR:  No.

22          THE COURT:  No.  All right.  Other things you

23   wanted to tell us?

24          A JUROR:  No that's it.

25          THE COURT:  That's it.  Let me see if anyone

1   else has any questions?

2           MR. DESMARAIS:  No, Your Honor.

3           THE COURT:  Any questions?

4           MR. HADDEN:  No, Your Honor.

5           THE COURT:  All right.  You can go back.

6           A JUROR:  All right.

7           THE COURT:  Thank you very much.

8           (Juror left jury room.)

9           THE COURT:  Any motion for Juror 20?

10           MR. DESMARAIS:  No.

11           MR. HADDEN:  No.

12           THE COURT:  We're going to check on how many

13   more we may need.

14           THE CLERK:  Three.

15           THE COURT:  Three left.

16           Let's take a very short break and we'll bring

17   the last three in.  There are two restrooms here.  Feel free

18   to use them if you want.  I'll come back in about five

19   minutes.

20           (A brief recess was taken.)

21           THE COURT:  All right.  We have only three left.

22   We'll bring one in.

23           (Juror entered the jury room.)

24           THE COURT:  Have a seat there and tell us your

25   juror number, please.

```
 1                    A JUROR:  49.

 2                    THE COURT:  Thank you.

 3                    A JUROR:  Sure.

 4                    THE COURT:  I can check that for you.  Karen

 5     Stratton?

 6                    A JUROR:  Uh-huh.

 7                    THE COURT:  That's a yes for the court

 8     reporter's benefit?

 9                    A JUROR:  I'm sorry, yes.

10                    THE COURT:  Do you recall what you answered yes

11     to?

12                    A JUROR:  I'm a sole proprietor.  I work off of

13     AR for a surgeon.  I have a medical billing business, ten

14     days would jeopardize the accounts receivable, it's just me,

15     so I have a tax I.D., I have my own business.

16                    THE COURT:  So it's a hardship to be here for

17     the next ten days?

18                    A JUROR:  Yeah, it would take his whole numbers

19     down.  He would probably want to get rid of me or something.

20                    THE COURT:  And if you're here 9:00 to 4:30?

21                    A JUROR:  I can't be there for patients and

22     billing calls and the office, so on and so forth, and

23     insurance companies.  Plus I'm a Grouponer.  I don't know

24     how much that has to do with it.

25                    THE COURT:  About how often would you say you
```

1    use Groupon?

2              A JUROR:  They contact me daily.

3              MR. HADDEN:  Sorry about that.

4              THE COURT:  And do you look at the website on a

5    pretty regular basis?

6              A JUROR:  Uh-huh.

7              THE COURT:  Yes?

8              A JUROR:  Yeah.

9              THE COURT:  Anything else you answered yes to?

10             A JUROR:  I can't think, it might have been

11   another Groupon question, but I think it's all hand in hand.

12   I'm an avid internet shopper.

13             THE COURT:  Right.

14             A JUROR:  Much to my husband's dismay.

15             THE COURT:  All right.  Any questions?

16             MR. DESMARAIS:  No.

17             THE COURT:  Any questions?

18             MR. HADDEN:  No, Your Honor.

19             THE COURT:  You can go back in the courtroom.

20             A JUROR:  Thanks.

21             THE COURT:  I propose to strike 49 for the

22   hardship.  Any objection?

23             MR. DESMARAIS:  No.

24             MR. HADDEN:  No.

25             THE COURT:  49 is stricken.

```
 1                    (Juror entered the jury room.)

 2                    THE COURT:  I think it's now afternoon, so good

 3       afternoon.  Thank you, sir, for your patience.  What is your

 4       juror number, please?

 5                    A JUROR:  58, I believe.

 6                    THE COURT:  58.  I can check for you.  Are you

 7       David Wakefield.

 8                    A JUROR:  Bingo.  Yes.

 9                    THE COURT:  You are 58.  And what did you answer

10       yes to?

11                    A JUROR:  Well, I have owned IBM stock in the

12       past.

13                    THE COURT:  Not currently?

14                    A JUROR:  I don't know.  I have a mutual fund,

15       maybe.  I don't know.

16                    My wife and I use Groupon a fair amount.  My

17       brother-in-law is going through the patenting process, so

18       slightly familiar with that, not detailed.  And I have a big

19       dentist appointment scheduled for next week, which is a

20       long, five, six hour appointment.

21                    THE COURT:  Okay.  Are you asking me to get you

22       out of that appointment?

23                    A JUROR:  Good question.  I would like to eat

24       corn on the cob sometime this summer.

25                    THE COURT:  Understood.  Were there other things
```

```
 1    that you answered yes to?

 2              A JUROR:  I think that's largely it.

 3              THE COURT:  All right.

 4              A JUROR:  I mean, I have some friends that are

 5    lawyers in town, you know, so...

 6              THE COURT:  Let's talk about each of these

 7    things and if you think of something else, you let me know.

 8              You have owned IBM stock in the past.  Did you

 9    make the decision to buy it?

10              A JUROR:  I have in the past, yes, and I made

11    the decision to sell it.  But I have mutual funds.

12              THE COURT:  You don't know whether the funds own

13    it currently?

14              A JUROR:  That's correct.

15              THE COURT:  Did you have or do you have strong

16    feelings about IBM that perhaps contributed to your decision

17    to purchase or sell the stock?

18              A JUROR:  Just performance.

19              THE COURT:  Do you think that IBM as a litigant

20    would start out a little bit ahead or behind in this lawsuit

21    in your mind?

22              A JUROR:  I don't think so.

23              THE COURT:  You have, you and your wife use

24    Groupon?

25              A JUROR:  Yes.
```

| | |
|---|---|
| 1 | THE COURT:  About how often would you say that |
| 2 | you're on the Groupon site? |
| 3 | A JUROR:  I actually don't do it.  I make the |
| 4 | decisions with my wife and she does it.  I'm not a real |
| 5 | technology guy. |
| 6 | THE COURT:  Okay.  You're part of the decision |
| 7 | making process whether to purchase? |
| 8 | A JUROR:  Yes. |
| 9 | THE COURT:  All right.  If I were to say that I |
| 10 | don't want the jurors on this case to have any involvement |
| 11 | with Groupon over the next two weeks, would that be a |
| 12 | hardship for you or your wife? |
| 13 | A JUROR:  No. |
| 14 | THE COURT:  Your brother-in-law is seeking a |
| 15 | patent? |
| 16 | A JUROR:  No, he got one. |
| 17 | THE COURT:  He got one? |
| 18 | A JUROR:  Yeah. |
| 19 | THE COURT:  Do you know anything about what it's |
| 20 | on? |
| 21 | A JUROR:  Yeah.  It's a crazy little thing. |
| 22 | He's a big wave surfer out in Hawaii and he invented this |
| 23 | little contraption that's good for practicing.  There is a |
| 24 | small surfboard with an inflatable bottom and there is a |
| 25 | little ball that it's inflatable, like a dodgeball.  He can |

```
1    inflate or deflate it for difficulty.  You can use it for

2    dry land practice.

3              THE COURT:  Sounds quite fun.

4              A JUROR:  You can break your neck.

5              THE COURT:  He's selling this product?

6              A JUROR:  Yes.

7              THE COURT:  Did he express to you any feelings

8    about patents or the patent system?

9              A JUROR:  Not particularly.

10             THE COURT:  Do you yourself have any strong

11   feelings about patents?

12             A JUROR:  I do, I have strong feelings on the

13   protection of them, because I think that's really important

14   to keep R & D money going into things, knowing you can

15   recoup your costs.

16             THE COURT:  Your dentist appointment, which day

17   is it?

18             A JUROR:  Wednesday.

19             THE COURT:  Wednesday.  Do you know what time?

20             A JUROR:  Yes.

21             THE COURT:  What time?

22             A JUROR:  10:00 to 3:00.

23             THE COURT:  And if you were in trial between

24   10:00 and 3:00 Wednesday and had to reschedule, how much of

25   a hardship would that be?
```

1          A JUROR:  I can't answer that right now.  I

2     would have to talk to my dentist.

3          THE COURT:  You don't know how long it would

4     take to reschedule?

5          A JUROR:  Yeah, I don't know.  I don't know when

6     the time is available.

7          THE COURT:  Let's say it was available even a

8     week later, are you okay with that?  Would that be a real

9     problem?

10         A JUROR:  No.  No.  It's really up to his

11    schedule.

12         THE COURT:  You have friends who are lawyers.

13    Are any of them lawyers here in Delaware?

14         A JUROR:  Yeah, quite a few.  I have club

15    affiliations and there is a lot of members.

16         THE COURT:  Do you know if any of them are at

17    Potter Anderson or Ashby & Geddes?

18         A JUROR:  Potter Anderson, but not Ashby.

19         THE COURT:  If Potter Anderson was on one side

20    of this case --

21         A JUROR:  I was aware of that.

22         THE COURT:  -- do you think you could fair and

23    impartial to both sides?

24         A JUROR:  Yes.

25         THE COURT:  Do you know if any of your lawyer

1    friends do patent related law?

2              A JUROR:  I can't speak to that directly.  No.

3              THE COURT:  Anything else that you thought of?

4              A JUROR:  No, that's it.

5              THE COURT:  Any questions?

6              MR. DESMARAIS:  No, Your Honor.

7              THE COURT:  Any questions.

8              MR. HADDEN:  Just one, sir.  You expressed a

9    strong feeling about the importance of patents, promote R &

10   D.  Given that IBM is the patentholder here and Groupon is

11   the accused infringer, would that -- how would you view that

12   from the get go, would Groupon be at a disadvantage?

13             A JUROR:  I would like to say no, but it might

14   be, you know.  But it would be entirely fact based, I would

15   base my decision on.

16             MR. HADDEN:  Before you heard the facts, you

17   would think IBM was in the right because they have the

18   patent?

19             A JUROR:  That's a good question.  I guess maybe

20   a little bit.

21             MR. HADDEN:  Thank you.

22             THE COURT:  So if you're on the jury you might

23   learn that besides determining if the patents here are

24   infringed, you might be asked whether they're valid patents.

25             A JUROR:  Right.

 1                    THE COURT:  Can you envision being fair and

 2      impartial and deciding whether a U.S. issued patent might

 3      actually be invalid?

 4                    A JUROR:  Repeat that, please.

 5                    THE COURT:  Sure.

 6                    You say patents are important.

 7                    A JUROR:  Yes.

 8                    THE COURT:  Do you think that means that if

 9      you're asking whether a particular patent is valid or

10      invalid, that you would be likely to say it's valid because

11      you believe that patents are important?  I don't know if

12      that was any better way of asking it.

13                    A JUROR:  Are you saying because of my belief of

14      patents?

15                    THE COURT:  Yes.  One of the issues this jury

16      might have to decide is hey, is this particular patent, is

17      it valid or maybe it should have never been a patent.

18                    A JUROR:  I see what you mean.

19                    THE COURT:  But you think patents are important,

20      so might you be more inclined to say this is a valid patent,

21      this patent should remain.

22                    A JUROR:  I don't think I would be more inclined

23      one way or the other.  I would have to listen to the facts.

24                    THE COURT:  Okay.  Do you have any concerns

25      about being a fair and impartial juror in this case?

```
 1                    A JUROR:  No.

 2                    THE COURT:  All right.  Anything else you want

 3       to share with us?

 4                    A JUROR:  I think that's it.

 5                    THE COURT:  Okay.  Thank you.  You can go back

 6       in the courtroom.  Thanks for your time.

 7                    Any motions?

 8                    MR. DESMARAIS:  No.

 9                    THE COURT:  Any motion?

10                    MR. HADDEN:  I move for cause, at least given he

11       also had the dental issue, we have enough jurors.

12                    THE COURT:  Do you object?

13                    MR. DESMARAIS:  Yes, I object.  He said he could

14       be fair and impartial and he said the dental could be

15       rescheduled.  We can't strike people just because they find

16       patents important.  People should find patents important.

17                    MR. HADDEN:  Beyond that, he said IBM would

18       start off with an advantage.

19                    THE COURT:  I'm going to deny the motion.  I was

20       persuaded in the end that he would be fair and impartial.  I

21       think he obviously doesn't know the facts, he doesn't know

22       the law, and just because he thinks patents are important I

23       don't think precludes him from being fair and impartial.  I

24       gave him every chance to have me let him out with the

25       dentist or reschedule being a problem and he seemed okay
```

```
 1     either way.  So the motion is denied.

 2                    (Juror entered the jury room.)

 3                    THE COURT:  Good afternoon.

 4                    A JUROR:  Good morning.

 5                    THE COURT:  You can have a seat.  Come to the

 6     one near us.  Thank you.  And your junior number, please?

 7                    A JUROR:  Eight.

 8                    THE COURT:  Are you Norman Clemo?

 9                    A JUROR:  Yes, sir.

10                    THE COURT:  And do you recall what you answered

11     yes to?

12                    A JUROR:  I believe was do you regularly use a

13     computer or other device to make online purchases.

14                    THE COURT:  You do?

15                    A JUROR:  I do.

16                    THE COURT:  About how often would you say you're

17     making online purchases?

18                    A JUROR:  Probably at least once a week.

19                    THE COURT:  Is Groupon one of the sites that you

20     use?

21                    A JUROR:  No.

22                    THE COURT:  Have you ever been on Groupon?

23                    A JUROR:  No.  I don't even know what it is.

24                    THE COURT:  Have you heard of it before?

25                    A JUROR:  I have heard of it.
```

1              THE COURT:  You don't have any real feelings

2    about them?  For the record that was a no; right?

3              A JUROR:  No.

4              THE COURT:  Okay.  Other things that you

5    answered yes to?

6              A JUROR:  That was it.

7              THE COURT:  That was it.

8              Any questions?

9              MR. DESMARAIS:  No, Your Honor.

10             THE COURT:  Any questions?

11             MR. HADDEN:  No, Your Honor.

12             THE COURT:  You can go back to the courtroom.

13   Thank you.

14             Any motions?

15             MR. DESMARAIS:  No.

16             MR. HADDEN:  No.

17             THE COURT:  I think that's it; right.

18             THE CLERK:  Yes, I believe so.

19             THE COURT:  So I had reserved on juror number 4,

20   the one who was the former patent examiner.  IBM has moved

21   to strike and Groupon opposes.  I'm going to grant the

22   motion to strike.  I actually think it's a difficult very

23   close call.  But I do think that he will in the course of

24   the deliberations be motivated to share the fact that he is

25   a patent examiner and share some evidence and perhaps

1    opinion of things that are not in the record and I'm not

2    sure how big a problem that is, but all that suggest to me I

3    should be cautious and strike juror number 4.  So with that,

4    Mr. Looby, why don't you tell us who is still in the pool.

5              THE CLERK:  Okay.  Juror number 1.  Juror

6    numbers 5 through 9, 11, 12, 13, 20, 21, 23, 29, 34 and 35,

7    37, 39 and 40, 42, 43, 44 and 45, 51, 58 and 60.

8              THE COURT:  Thank you.  Any questions or

9    disputes about who is in the pool?

10             MR. DESMARAIS:  No, Your Honor.

11             MR. HADDEN:  No, Your Honor.

12             THE COURT:  Let's just talk about where we are.

13   So it's 12:10.  When we go back in, we will finish the jury

14   selection process, then I'll let them go for lunch.  Do we

15   have issues or objections that relate to either side's

16   opening statement that will need to be dealt with before we

17   get to openings?

18             MR. OUSSAYEF:  Yes, Your Honor.

19             THE COURT:  On both sides?

20             MS. SHAMILOV:  Correct.

21             THE COURT:  And nonbinding estimates as to how

22   long the openings are going to be once we get there?

23             MR. DESMARAIS:  I would say, you know,

24   forty-five minutes to an hour would be roughly what I'm

25   thinking.

THE COURT:  And what about Groupon?

MR. HADDEN:  Ours will be less, thirty to forty minutes.

THE COURT:  All right.  Well, be prepared to discuss the objections as soon as the jury leaves and then we'll hope to give you a little bit of a break, and me, to eat something and then we'll figure out where we are.  So you'll get yourselves assembled in the courtroom.

(Following a brief recess:)

THE COURT:  Thank you again to everyone for your patience.  I will need to ask for your patience just a little bit longer, but we are gearing up for the last stages of the jury selection process.

What's going to happen next is that Mr. Looby is going to randomly call 14 juror numbers.  If you are one of these 14, please follow the instructions of Mr. Looby about where to take a seat in the jury box which is up here to my right.

After 14 of you are seated, each side gets three of what are called preemptory strikes, that is they can strike up to three jurors per side for no reason at all. And the way that we do the strikes is by silently passing a clipboard back and forth from one side to the other, so I'll ask that you be patient and quiet if you can so that we can move through that process as quickly as possible.

1                      Once the lawyers have completed the striking

2      process, Mr. Looby will announce which six have been

3      stricken and, therefore, which eight remain to be our jury.

4      At that point we'll be able to excuse all of you except the

5      eight who will be our jury.  Please bear with us and we'll

6      move as efficiently as we can.

7                      Mr. Looby.

8                      THE CLERK:  Juror number 13, please come

9      forward.  First seat in the first row.

10                     Juror number 34, second seat in the first row.

11                     Juror number 60, third seat.

12                     Juror number 35.

13                     Juror number 42.

14                     Juror number 51.

15                     Juror number 37.

16                     Juror number 5, first seat in the second row.

17                     Juror number 21.

18                     Juror number 6.

19                     Juror number 58.

20                     Juror number 45.

21                     Juror number 44.

22                     Juror number 7.

23                     THE COURT:  We will begin the striking process.

24                     (Silent striking process takes place.)

25                     THE COURT:  Are there any objections to the

1    striking process?

2              MR. DESMARAIS:  Not from the plaintiff, Your

3    Honor.

4              MR. HADDEN:  No, Your Honor.

5              THE COURT:  Okay.  Mr. Looby.

6              THE DEPUTY CLERK:  Will the following jurors

7    return to the back of the courtroom.

8              Juror No. 13.

9              Juror No. 35.

10             Juror No. 37.

11             Juror No. 58.

12             Juror No. 44.  And, Juror No. 7.

13             THE COURT:  Okay.  Those of you in the jury box,

14   please sit tight, and I'll have some more instructions for

15   you in a moment.

16             Those of you not in the jury box, you are not

17   part of the jury for this trial.  I want to thank you again

18   for your willingness to serve, but you are all free to go.

19   Thank you very much.

20             (Unselected jurors leave courtroom.)

21             THE COURT:  Ladies and gentlemen of the jury,

22   Mr. Looby will pass around to you now copies of the Bible.

23   And we're going to begin your jury duty with administering

24   another oath.

25             Mr. Looby.

1                            **(Selected jurors placed under oath.)**

2                    **THE COURT:  Thank you, Mr. Looby.**

3                    **So, ladies and gentlemen of the jury, hopefully**

4   **you will be pleased that almost the first thing we're going**

5   **to do is give you a break to go find some lunch.  But a few**

6   **words before we do that.**

7                    **On your way out of here, Mr. Looby will take you**

8   **through this door just to your immediate left and that leads**

9   **directly to the jury room.  I saw many, if not all of you,**

10   **in the jury room over the course of the jury selection**

11   **process.  That will be a little bit of your second home in**

12   **the time that you are with us for the trial.  Mr. Looby will**

13   **show you how to get in and out of the jury room and where**

14   **you can leave your things, if you wish to do so.**

15                    **You all have juror stickers.  At some point, we**

16   **will probably give you lanyard necklace versions of those**

17   **that say "juror" on them.  As you will hear me say repeatedly,**

18   **it is important that we know that you are our jurors because**

19   **we are not to have any interaction with you.  Nobody**

20   **involved in the case should be talking to you, and in order**

21   **for us to know that you are our jurors, it helps if you have**

22   **a sticker on a necklace on so we can identify you.**

23                   **There is no talking about the case with anybody**

24   **else or with each other until all the evidence is in and I**

25   **tell you it is time to start talking about the case, so I'll**

1    give you more instructions on that as well but just

2    understand that now even though you know very little about

3    the case, don't talk about the case with one another.

4              I'm going to give you until 1:30 to find lunch

5    and find your way back to our jury room.  When we get

6    started at around 1:30, the first order of business will be

7    for me to give you some preliminary instructions.  So I'll

8    be reading instructions to you.  We also have some of the

9    instructions in a video form, so we'll show you a video.

10   And after that, we'll hear opening statements from the

11   parties.  And we will be done by 4:30 today.

12             All right.  With that, Mr. Looby, let me have

13   you take the jury out.

14             (Jury left courtroom.)

15             THE COURT:  Okay.  You can all have a seat.

16             I understand that there are objections relating

17   to opening statements, so I do want to begin with that.

18   We'll start with the plaintiff and any objections you want

19   to raise to the defendant's openings.

20             MR. OUSSAYEF:  Good morning, Your Honor.  Karim

21   Oussayef for IBM.

22             THE COURT:  Good afternoon now.

23             MR. OUSSAYEF:  Good afternoon.

24             THE COURT:  Where did the morning go ...

25             MR. OUSSAYEF:  I'm calling up the document

1    camera.

2              Your Honor, the first issue with Groupon's

3    opening statement regards Your Honor's claim construction

4    about the term "partition."  During claim construction,

5    Groupon argued that a partition needs to be fixed and not

6    moving.  And that is something that Your Honor's claim

7    construction decided that that was not a requirement of

8    the term.

9              And now when we look at the opening demonstratives

10   that Groupon has presented to us, there is a movie, it's not

11   clear exactly how they intend to use the movie, but the movie

12   shows resizing a window over and over again, zooming in and

13   out.  And based on that disclosure, it is our understanding

14   that Groupon intends to argue contrary to the Court's

15   construction that because a window on a browser can be resized

16   from one size to another that partitions or areas are not

17   fixed and therefore they don't infringe.  And we believe

18   that to be contrary to the Court's claim construction.  And,

19              furthermore, even if there were some marginal

20   relevance to some issue which we don't know what issue that

21   would be, then it would be highly prejudicial because the jury

22   would be thinking about an argument that would be contrary to

23   the Court's construction.  And,

24              Specifically, just to spell it out in a little bit

25   more detail, what the Court has already decided is:  Contrary

1    to Groupon's contention, the specification and prosecution

2    history do not support construing "partition" as a fixed,

3    nonoverlapping portion of the screen display.  To the

4    contrary, the Court agrees with IBM that the specification

5    shows that the "partition for presenting applications" does

6    not exclude that area of the screen from also presenting other

7    data outside of applications such as window partitions pop up

8    in front of the body partition.

9              So now, I would ask, Mr. Kelly, if you could

10   please play the video that was disclosed to us yesterday --

11   or the day before yesterday.

12             (Elmo settings adjusted.)

13             MR. OUSSAYEF:  Excuse me just a second, Your

14   Honor.

15             THE COURT:  Sure.  Not a problem.

16             (Elmo settings further adjusted.)

17             MR. OUSSAYEF:  Your Honor, in the absence of the

18   actual video, I can just describe it to you.

19             THE COURT:  Sure.

20             MR. OUSSAYEF:  Basically what we see is a

21   browser window, and the browser window is initially the

22   entire screen, and then there is a slow video which resizes

23   to make it smaller and then to make it bigger again.  Then

24   there is a zooming in on the area of the browser window and

25   a zooming back out.  So there is a demonstration of a window

1      that is not fixed.

2                      So that is our objection, Your Honor.

3                      THE COURT:  How many objections do you think you

4      have?

5                      MR. OUSSAYEF:  I have two more objections, Your

6      Honor.

7                      THE COURT:  Okay.  We'll go through them all.

8                      MR. OUSSAYEF:  Okay.  The second objection is

9      based off of a part of the opening slides that presents a

10     description of a preferred embodiment of the '601 patent.

11                     On this slide here, we see something that

12     Groupon intends to present showing a statement about a

13     preferred embodiments whereby all hyperlinks passed back and

14     forth between the client and the server are embedded with

15     state information.

16                     However, that is a preferred embodiment in the

17     claim language that actually talks about embedding hyperlinks

18     in an output from a service, not in all hyperlinks passed back

19     and forth between the client and the server.

20                     This, too, is an issue that the Court has

21     previously constructed.  And here, what happened was that

22     Groupon argued at claim construction that the construction

23     for "all hyperlinks in an output" should be construed as

24     "all hyperlinks in a web page."

25                     The Court found that was a preferred embodiment

1    and found there were instances where not all hyperlinks were

2    embedded in the web page but rather just all hyperlinks

3    within the output.  So there, too, it is contrary to the

4    Court's claim co-construction.

5            So here, Groupon's construction improperly

6    equates "output" to the entire web page, contrary to the

7    specification.  And then the Court goes on to explain the

8    logic about the Court's construction.

9            So here, by having a preferred embodiment that

10   all hyperlinks need to be embedded in every communication

11   back and forth, that, too, is prejudicial.

12           THE COURT:  Do you have any reason to think that

13   Groupon is going to argue to the jury that this is something

14   other than a preferred embodiment?

15           MR. OUSSAYEF:  Yes, Your Honor.  In fact, if

16   we look at their later slides, we actually have an example

17   where they show a web page with several hyperlinks on the

18   page.  And they showed a demonstration that they believe

19   that -- with several hyperlinks and Xs through them showing

20   presumably that they're not embedded with state information.

21   So they show a picture of a web page with several Xs over

22   hyperlinks which we understand them to be arguing that they

23   don't embed with state information there.

24           THE COURT:  So that would be an example of

25   something that is not this preferred embodiment, but your

1    argument would be it is still within the scope of the

2    claims; is that correct?

3                 MR. OUSSAYEF:   I would argue that it is an

4    example of the preferred embodiment.   What I'll argue in

5    argument is the web page is the entire output where the

6    Court has already construed the term to not mean the

7    entire web page.   So by showing the web page with certain

8    hyperlinks Xed out, that is contrary to the Court's previous

9    construction.

10                THE COURT:   Okay.

11                MR. OUSSAYEF:   The third argument concerns a

12   part of the slide deck that defendants have disclosed to us.

13   Here, what we see is a disclosure of the Patent Office

14   proceedings whereby there is an issue up on appeal where a

15   certain of the patents were found to -- found certain claims

16   to be canceled, but that issue is now on appeal.   That

17   concerns some of the asserted claims in this case but not

18   all of the asserted claims.

19                So the issue here is that this will be unduly

20   prejudicial because we're talking about an outside proceeding,

21   namely, the Patent Office, with a different standard of review

22   and a different standard of how to construe the claims and a

23   different standard of how to prove invalidity.

24                THE COURT:   So I just want to understand.   Some

25   of the claims that are asserted before this jury now stand

1    canceled at the PTO.

2              MR. OUSSAYEF:  Yes, that's true.  One of the

3    asserted claims of one of the patents is canceled.  So my

4    understanding is that Groupon intends to introduce this to

5    call into question the validity in this case of not only

6    the canceled claims but also the -- not only the one

7    canceled claim that is still asserted in this case but

8    also the non-canceled claims, and introducing that kind of

9    information about a separate proceeding with different

10   standards will be confusing to the jury and will cause a

11   trial within a trial about the Patent Office proceedings,

12   and it will also be prejudicial not only to the claim that

13   is still up on appeal but also to the claim that is not

14   even canceled at all.

15             THE COURT:  So what kind of proceeding was this

16   in front of the PTO?

17             MR. OUSSAYEF:  This is a PTAB IPR proceeding

18   that is currently pending before the Federal Circuit.

19             THE COURT:  On the patentee's appeal, correct?

20             MR. OUSSAYEF:  That's correct, Your Honor.

21             THE COURT:  What is the status of that appeal?

22             MR. OUSSAYEF:  So that briefing is ongoing right

23   now.  IBM has submitted its appeal brief, and we're still

24   waiting on the response from the Patent Office.

25             THE COURT:  So your objection obviously is to

1    this slide at this point, but are you objecting to anything

2    relating to the IPR proceedings coming in at any point

3    during the trial?

4         MR. OUSSAYEF:  Yes, Your Honor.  Current with

5    the Court's recent decisions in things such as *Integra Life*

6    *Sciences v HyperBranch Medical Technology,* a case in which

7    Your Honor decided just a couple of months ago, the IPR

8    should be excluded under Federal Rule 403, both under the

9    prejudice prong of 403 and also under the undue confusion

10   prong of 403 as well.

11        THE COURT:  Okay.  Is that all three objections

12   for now?

13        MR. OUSSAYEF:  Yes, Your Honor.  Those are the

14   three objections to the opening slides.

15        THE COURT:  All right.  Let me hear from Groupon

16   on just IBM's objections for the moment.

17        Good afternoon.

18        MS. SHAMILOV:  Good afternoon.  The first three

19   objections, the same category, we represented to IBM, I'll

20   represent here in open court, Groupon does not intend to

21   argue anything or will present anything to the jury that is

22   contrary to the Court's constructions.  We'll abide by the

23   Court constructions and use them, and so will our witnesses.

24        The video that was mentioned is a Groupon

25   website in a browser, and the video shows how you can

1   minimize the browser, zoom in/zoom out.

2           The claims talk about areas having areas of the

3   screen.  There are two issues of whether Groupon controls

4   what area its web pages display in, and obviously the issue

5   will be whether Groupon's websites even have areas.  It has

6   nothing to do with areas being fixed or non-fixed.  This is

7   going to be the issue what the jury has to decide.

8           THE COURT:  So in opening and then through

9   testimony and closing argument, you're never going to

10   suggest or of course expressly argue that you don't infringe

11   because you don't have a fixed partition.

12           MS. SHAMILOV:  We are never going to say that

13   the claims require to have fixed areas and we don't do fixed

14   areas, we will absolutely apply the Court's construction.

15   That slide is not going to be used at all in the way that

16   they're suggesting it's going to be used in opening or all

17   through trial.

18           THE COURT:  Okay.

19           MS. SHAMILOV:  With respect to the second slide

20   with the quote from the patent, again, we will abide by the

21   Court's constructions and use them.  We obviously think that

22   we're entitled to tell the Court, the jury what the patent

23   describes, so we're putting the quote from the patent that,

24   you know, adheres to the patent.

25           With respect to what's coming later, the slides

1    that they have alluded to that there is a hyperlink on the

2    page with crosses, that has nothing to do with what the

3    patent is talking about, that slide show is Groupon's page

4    and specific page that IBM was saying, you know, is approved

5    of infringement in this case if you will, and it's just

6    showing which links on Groupon's page -- in fact, on that

7    page not a single link includes any information.  There is

8    no conflicting out, any conflict or whatever, at all, about

9    what the patent is about or we're not arguing the scope of

10   the claims outside the Court's construction.  We really only

11   have one slide that has a quote from the patent and one

12   slide that shows Groupon's page specifically that will be at

13   issue here.

14           THE COURT:  Is the suggestion at least going to

15   be in opening that Groupon is not this preferred embodiment?

16           MS. SHAMILOV:  No, Your Honor.

17           THE COURT:  No.  Okay.

18           MS. SHAMILOV:  With respect to the last slide

19   that two IPR decisions, claim 1 in those discussions was

20   found to be unpatentable, IBM, over exactly the same prior

21   art at issue here.  If IBM is going to get up and claim --

22   and the other two claims are dependent on that claim, so the

23   elements of claim 1 will have to be considered as part of

24   the other two claims, if IBM is going to get up and argue

25   that its patents are valid, and the patent office already

determined that one claim that the jury, will be in the

front of the jury is unpatentable over the prior art,

they'll have to consider the same claim amounts as part of

the other two dependents claims that they were asserting

here.  We don't see why we shouldn't be able to tell the

jury that the same argument already found, to show that

claim 1 has been disclosed.

THE COURT:  The patent is legally valid and

enforceable in this courtroom today, isn't it?

MS. SHAMILOV:  That's correct.  But I think it's

a decision from the patent office and in a way it's almost

part of the file wrapper if you will now of what the patent

office decided, the independent claim of those patents, it's

not patentable over the two pieces of prior art that will be

in front of the jury.

THE COURT:  The PTAB would be applying a

different standard than this jury is going to be asked to

apply, isn't that true?

MS. SHAMILOV:  I think whether the claim is

valid or not valid, that's the same standard.

THE COURT:  Sorry, did the PTAB have to find

clear and convincing evidence of invalidity.

MS. SHAMILOV:  I'm not sure if THE clear and

convincing evidence actually applied, Your Honor, in front

of the patent office.  All I know is that if a claim itself

1    is found to be unpatentable as a PTAB, you don't get to come

2    to court later and say because the standards were different

3    now the claim is valid.  Once the patent, the claim is

4    invalid, it's invalid whether we are in court or not in

5    court.

6              THE COURT:  So I'm not sure where you're getting

7    that from.  What can I point to to say you don't get to come

8    to court and do what the patentee is doing?

9              MS. SHAMILOV:  I'm saying if the patent office

10   has determined a patent is invalid, a claim has been invalid

11   and it's canceled, you don't get to come and relitigate it

12   in court and say because a different standard was applied in

13   the patent office somehow the claim is now uncanceled.

14             THE COURT:  That's where you're losing me.  My

15   understanding, but I'm happy to be corrected if you can

16   point me to something, that's exactly what you do get to do

17   under current law until the Federal Circuit says we're

18   affirming the PTAB finding, the patentee has a legally valid

19   claim that they can enforce in this courtroom.

20             MS. SHAMILOV:  All I'm saying, Your Honor, is

21   the claim construction, maybe the standards are different,

22   for now that's sort of different than what's applied at the

23   PTAB and what's applied here, I don't think there is any

24   specific claim construction differences here, I'm saying if

25   they're going to come up and say all these claims are valid

1    and the prior art we're putting forth is not invalidating

2    these claims, I think we get to rebut that and put something

3    that shows that the patent office already thought otherwise

4    at least with one claim, the elements of which are part of

5    the other two claims that they're asserting here.

6              THE COURT:  What about the concerns of jury

7    confusion and unfair prejudice to the patentee here?

8              MS. SHAMILOV:  I'm not sure they'll be confusion

9    here because we -- they will know that it's done by the

10   patent office and the patent office considered it.  They

11   will be provided instructions on how they have to determine

12   validity here by Your Honor.  Every single juror I believe

13   said that they will be able to follow the instructions.  I

14   think the instructions are very clear what they'll have to

15   do.

16             THE COURT:  Anything else on their objections?

17             MS. SHAMILOV:  Not on their objections, Your

18   Honor.  Thank you.

19             THE COURT:  Anything by way of response?

20             MR. OUSSAYEF:  Just briefly, Your Honor.

21   Groupon's counsel's comments about claim construction still

22   give me pause, so I think it's important to have a marker

23   here for future proceedings in the case to ensure that we

24   don't hear any claim constructions contrary to what the

25   Court has already ordered.  And so on that issue, given

1        their representations, you know, I think we still have grave

2        concerns about what they're presenting to the jury.

3                On the second issue regarding the PTAB

4        proceedings, it's different claim construction, there is

5        different claim constructions there, there is different

6        standards of proof, it's simply inconceivable that a jury

7        wouldn't be prejudiced by the fact that there has already

8        been a decision, all be it a nonfinal decision about the

9        validity of the patents and having to go into the

10       differences and the standards the differences in the claim

11       constructions, how that impacted a different office's

12       procedures and how they consider the prior art will be

13       unduly prejudicial and very confusing for the jury.

14               THE COURT:  That may be, but isn't it akin to

15       additional prosecution history at this point?  I assume the

16       jury is going to hear some of the initial examination

17       prosecution history, so aren't we giving them an incomplete

18       story by not telling them where the PTO is now on this

19       claim?

20               MR. OUSSAYEF:  Not at all, Your Honor, it's

21       quite the opposite.  We're giving them an incomplete picture

22       if Groupon can present evidence about the PTAB proceedings

23       because we don't talk about the appeal and what's going on

24       there.  You know, that process going into the full details

25       of that process and the fact that the claims are not

1    actually, you know, are still enforceable, would be, you

2    know, something that would have to be introduced as well to

3    explain why the patents are still at issue here and that

4    there needs to be a clear line and the clear line should be

5    let's talk about what's in this courtroom and the proper

6    standards here as opposed to another proceeding and trying

7    to compare the two and figuring out, you know, why the jury

8    here should decide in a different way than the patent

9    office, that the PTAB is deciding at the same time.

10              THE COURT:  Thank you.  So there is three

11   objections by IBM.  With respect to one and two, I'm going

12   to overrule them.  With respect to number three, I am going

13   to sustain it.  One and two presents similar issues,

14   essentially arguments that these slides and perhaps the

15   statements being made in connection with those slides will

16   be inconsistent with or will conflict with the Court's claim

17   construction.  I have the defendant's representation that

18   that is not how they are using the slides.  The slides on

19   their face that have been shown to me do not contradict the

20   Court's claim construction.  I certainly remind everybody,

21   it would be a huge mistake and wrong and something that

22   would cause negative consequences if you argue in a way that

23   conflicts with the Court's claim construction, if you elicit

24   testimony from a witness that does that or if you, you know,

25   make any suggestion to that effect.

That said, you know, determining exactly where
the line is between applying the claim construction and
actually contradicting it is something that sometimes
requires sort of in the moment careful assessment, and I can
only assess what's been presented to me and I don't see it
as a conflict.  And I also have the representation from the
defendant that they'll be held to that they won't contradict
the Court's claim construction.

In terms of the third objection, that one is
sustained.  The slides describing the PTAB proceedings and
any discussion of PTAB proceedings is not going to be
permitted at this trial.  I make that decision principally
on 403 grounds.  It is unclear to me that there is any
relevance at all to that proceeding.  But even assuming that
there is some, I think it is very substantially outweighed
by the risk of confusion of the jury, risk of unfair
prejudice to the patentee, even risk of wasting some of the
limited time that I have given you all.

Under current law as I understand it, the PTAB
follows a different claim construction process than we do.
I don't believe they apply the clear and convincing evidence
standard.  They have a different record in front of them
than we will have here.  And to tell the jury that the
patent is legally valid, it was issued by the PTO, but now
there is another PTO or an arm of the PTO that has looked at

1    it under different rules looking at different evidence, some

2    of the same evidence, but some clearly not, and now says,

3    well, we think we shouldn't have issued this patent, but oh,

4    by the way, that's all subject to a further level of review

5    which is ongoing and none of us know how it will come out I

6    don't think is something I should burden the jury with and

7    so I won't.  So that's my ruling on IBM's objections.

8            Any objections that Groupon has to what you

9    anticipate in the opening statement of IBM?

10           MS. SHAMILOV:  Your Honor, I have -- it's one

11   objection that affects several slides.

12           THE COURT:  Okay.

13           MS. SHAMILOV:  Let's see if I can do this.  So

14   basically, it concerns -- it concerns this particular cloud

15   icon.

16           THE COURT:  The cloud icon?

17           MS. SHAMILOV:  The cloud icon, which generally

18   represents internet and actually used in our slide to

19   represent internet.  The issue is that this particular cloud

20   is being shown as part of being what IBM patent describes.

21   For example, this is the down terminal approach which is

22   prior art that's described in the Prodigy patent, so what's,

23   in the '80's.  They're using the internet cloud here.

24           They're using the internet cloud in describing

25   the Prodigy patents themselves.  And then they're using the

1    internet cloud in describing how Groupon is used in maps to

2    the patent.  It is confusing and misleading because internet

3    is not what the prior patents describes as the network, and

4    they're equating the network from the '80's to basically the

5    worldwide web and the internet.

6              So all we ask, we asked them to use different

7    icons to represent the network because otherwise it's a

8    visual and misleading element and that's basically the

9    nature of the dispute, Your Honor.

10             THE COURT:  Did you have a suggestion for them

11   as to what they could depict?

12             MS. SHAMILOV:  Yes.  They had, the earlier

13   version of the slide had a different icon, we raised an

14   objection, and they decided instead of just adding this icon

15   and using it for one and the other, they replaced that icon

16   completely with this one.  They have one icon that they have

17   used in the previous slide.  All I'm saying is use one of

18   them, you can use that other icon for when you're talking

19   about the Prodigy patents and the state of the art prior to

20   that, and they can use the internet patent when they talk

21   about Groupon and the worldwide web, but using one icon

22   across the board is misleading.

23             THE COURT:  Thank you.  I'll hear from IBM.

24             MS. SHAMILOV:  Before I sit down, I'm sorry,

25   there were two other witnesses disclosed to potentially be

1       called today.  I have issues to raise with that, but I can

2       do that after.

3                   THE COURT:  I'm not sure we're going to get to

4       the witnesses today, but remind me if we get to that point.

5                   MS. SHAMILOV:  I will definitely do that.

6                   THE COURT:  Thank you.

7                   MR. DESMARAIS:  Good afternoon, Your Honor, John

8       Desmarais for IBM.  They objected to the slides in their

9       previous version.  So in an attempt to accommodate them, we

10      changed the prior icon to just a generic cloud which is

11      standard representation of a network.  The patents are a

12      network.  It says network all over the patents.  That's what

13      our allegation is.  If they have a different view of what

14      our patents -- what the network is that our patents relate

15      to or what the network is that their products relate to,

16      they can argue that.  Our slides don't have to adopt their

17      view of what the network is, our slides are adopting our

18      view of what the network is.

19                  THE COURT:  Are you going to suggest or argue to

20      the jury that that cloud represents the same network in each

21      of the different slides you plan to show?

22                  MR. DESMARAIS:  It depends what slide you're

23      talking about, but it's clear that our allegations in this

24      case is that when Groupon users use Groupon over the

25      internet, the patents in this case apply to the internet.

1    In fact, the defendants have never moved for summary

2    judgment to say the opposite.  It is true that when Prodigy,

3    when the patents were being developed in Prodigy, they were

4    being developed not necessarily over the internet, but the

5    patents are generic enough about the network that is being

6    used in the patent that it certainly applies to the

7    internet.

8              THE COURT:  I guess the question is, there is

9    something on the order of four of these slides using exactly

10   the same cloud.

11             MR. DESMARAIS:  Yes.

12             THE COURT:  Is it IBM's view that the cloud

13   represents the same identical thing in each of those four

14   slides?

15             MR. DESMARAIS:  It was attempting to represent a

16   network, it's not necessary that it be the internet, it's

17   not necessary that it be a different type of network.  The

18   point of the slides isn't the cloud, the point of the slides

19   is what's happening in the network, whatever the network is.

20             THE COURT:  So what would be prejudicial or

21   would you object to just having a different cloud image at

22   least on some of the slides so that the jury isn't confused

23   into thinking whatever that cloud is representing never

24   changed across the time periods depicted in any of these

25   slides?

1              MR. DESMARAIS:  I think the lawyers can make

2    that argument if they want to make that argument.  I think

3    it doesn't make any sense -- that would be prejudicial to

4    IBM because our arguments is the patents apply to the

5    internet and they're arguing that it isn't, but that's their

6    argument.  I don't think there is any merit to that --

7              THE COURT:  Hold on.  When I'm talking you

8    should stop.  So my concern is I think we all agree as a

9    factual matter that that cloud is not representing the same

10   thing in each of the four or so slides; correct?

11             MR. DESMARAIS:  I don't think we all agree to

12   that.

13             THE COURT:  Well, then, tell me what does the

14   cloud image, what's it depicting?

15             MR. DESMARAIS:  A generic network.  It doesn't

16   matter whether it's the internet or some other network, it's

17   depicting a generic network.

18             THE COURT:  Is the generic network depicted in

19   the Prodigy slide, can it be the same generic network

20   depicted in the internet slide?

21             MR. DESMARAIS:  Yes, it can.  That's IBM's

22   position.  That's what this trial is about.

23             THE COURT:  Are you going to argue or prove that

24   the internet in today's time frame is the same as it was in

25   the time frame that Prodigy patents were being developed?

MR. DESMARAIS:  No.  In fact, I will make that

clear, well I intend to make that clear in my opening that

Prodigy actually was shortly before the WWW invention, I'm

going to explain all that.  There is going to be nothing

confusing about the slides.  I'm going to tell the jury

exactly what the timeline is.  There is a timeline that

shows when Prodigy came out and when WWW started and then

what happened next.  I'm laying that all out and I'm going

to explain that.  The cloud isn't anything other than a

network, that's why we made it generic, that's the whole

point of it.

THE COURT:  Anything else you want to say?

MR. DESMARAIS:  No, Your Honor.

THE COURT:  We'll hear from Groupon.

MR. HADDEN:  Your Honor, this isn't the same

network.  The Prodigy patents describe a specific network

which is not either the internet or the worldwide web.  It's

an IBM network where you dial up your phone, connect to a

IBM modem base and talk to an IBM mainframe.

They're going to try to say this is exactly like

shopping now in the worldwide web by putting up the same

cloudy icon falsely suggesting that that was the way Prodigy

worked and they're going to talk about the history of

Prodigy and show the cloud and they're going to try to make

that very clear distinction.

1            The cloud has a meaning.  Everybody knows the

2    cloud means the internet.  These patents were not developed

3    on the internet.  Prodigy did not work on the internet.  And

4    the suggestion that we can put the same cloud here,

5    terminals here, terminals there, and therefore Prodigy was

6    shopping online now on the internet and the worldwide web is

7    just clearly misleading.

8            THE COURT:  I'm told the suggestion and the

9    evidence is going to be that cloud represents a network, and

10   you'll be free to prove or argue or suggest that the network

11   depicted in slide one is not nearly the network depicted in

12   say slide four.  Why is that not an appropriate thing to

13   allow to happen here?

14           MR. HADDEN:  Because they're going to stand up

15   and say IBM did this in Prodigy in 1988.  They're going put

16   up a cloud.  They are not going to talk about what that

17   network is, they're just going to put up a cloud.  We are

18   going to get to 2018, here is how you shop online over the

19   internet and worldwide web, wow, it's the same cloud.  We

20   have a user and computer, we have the same cloud in between

21   and we have some server.  The clear depiction there is that

22   Prodigy invented shopping on the internet in 1988 and that's

23   nonsense.

24           All they need to do is put a box.  If they want

25   to have a cloud, whatever icon they want, when they put up

1    the Prodigy sign, they should say IBM network.  When they

2    put up the internet, they can say network, worldwide web,

3    whatever they want, otherwise it's really confusing.

4              THE COURT:  Okay.  Did you have something you

5    wanted to add as well?

6              MS. SHAMILOV:  Just one comment that I felt you

7    might find helpful is this cloud appeared in their slide

8    after it was disclosed in our slide we showed the cloud and

9    how worldwide web from Groupon works, basically in response

10   to our objection took the slide from our slide and

11   promulgated it in the Prodigy slide which I think is a

12   problem.

13             THE COURT:  All right.  I'm going to overrule

14   the objection.  You all can use the clouds that you

15   evidently each have.  I certainly hear the concern but I

16   think it is within the fair range of when an opening

17   statement is to depict "a network with a cloud icon" and to

18   not change that cloud icon if you wish not to do so.

19             Mr. Desmarais has described what he intends to

20   be depicting there.  And I'm quite confident that whoever

21   is doing the opening for defendant can point out that the

22   evidence will, in your view, show that that cloud does not

23   represent the same thing in each of those time frames or

24   slides or embodiments.  So I'm overruling the objections.

25             Does that take care of everything that I have to

1    decide before we do openings, as far as plaintiff knows?

2              MR. DESMARAIS:  Yes, Your Honor.

3              THE COURT:  And as far as defendant knows?

4              MR. HADDEN:  Yes, Your Honor.

5              THE COURT:  So we'll take a break until 1:30,

6    and then we'll do all the instructions.  And then based on

7    your representations about the timing, I think I'm going to

8    try to get through the plaintiff's opening before break, and

9    then take a break, and then do the defendant's opening.  And

10   then we'll see if there is any time left, and if there is,

11   is there any witness that could testify before me ruling on

12   objections or does it deal with the first witness?

13             MS. SHAMILOV:  There is an objection, Your

14   Honor.

15             THE COURT:  On the first witness.  Okay.  So

16   then we'll talk further at with whenever the first break is

17   and figure out if we need to deal with that today.  We will

18   be in recess.

19                  (Lunch recess taken.)

20                  *     *     *

21                  1:37 p.m. - Afternoon Session.

22             THE COURT:  The jurors are all back from lunch.

23   Any issues before we bring them in?

24             MR. DESMARAIS:  Not from plaintiff.

25             MR. HADDEN:  No, Your Honor.

1              THE COURT:  All right.  Let's bring them in.

2              (Jury returned.)

3              THE COURT:  Welcome back, ladies and gentlemen

4    of the jury.  I hope you found some lunch.

5              So the first thing that is going to happen is my

6    deputy, Ms Ghione, who I think you have now met, is going to

7    hand you a document, what is called the preliminary jury

8    instructions.  You will each have your own copies for you to

9    have and refer to if you wish during the trial.

10             I'm going to read this document to you.  Feel

11   free to look at your own copy if you wish as I'm reading to

12   you.

13             You will see, as I sort of alluded to this

14   morning, there is a patent video that is part of these

15   instructions.  It actually comes up at page 2.  So after I

16   read for just a moment or two, we'll pause for the video and

17   then I will read the rest of this.

18             I'm beginning on page 1.

19             Introduction.

20             Members of the jury:  Now that you have been

21   sworn in, I have the following preliminary instructions for

22   guidance on your role as jurors in this case.

23             These instructions are intended to introduce you

24   to the case and the law that you will apply to the evidence

25   that you will hear.  I will give you more detailed

1    instructions on the law at the end of the trial.  Also,

2    because this is a patent trial which will deal with subject

3    matter that is not within the everyday experience of most of

4    us, I will additionally give you some preliminary

5    instructions regarding patents to assist you in discharging

6    your duties as jurors.

7                I expect that your commitment as jurors will

8    last approximately ten business days, through July 27.  This

9    case involves multiple issues, and so we will break the

10   trial into multiple phases.

11               You will hear the evidence, decide what the

12   facts are, and then apply those facts to the law that I will

13   give to you.

14               You, and only you, will the judges of the facts.

15   I play no part in judging the facts.  You should not take

16   anything I may say or do during the trial as indicating what

17   I think of the evidence or what your verdict should be.  My

18   role is to be the judge of the law.  I will make whatever

19   legal decisions have to be made during the course of the

20   trial, and I will explain to you the legal principles that

21   must guide you in your decisions.  You must follow that law

22   whether you agree with it or not.

23               Patent Video.

24               This case involves a dispute related to United

25   States patents.  Before summarizing the positions of the

1    parties and the issues involved in the dispute, I am going

2    to show a 17-minute video as an introduction to the patent

3    system.   It contains background information to help you

4    understand what patents are, why we have them, the role of

5    the Patent Office, and why disputes over patents arise.

6    This was prepared by the government, not by the parties.

7    The video references a sample patent that you will find in

8    your notebooks.  Also, many of the terms that are used in

9    the video are contained in a glossary of patent terms in

10   your notebooks.  Please feel free to refer to this glossary

11   throughout the trial.

12             Do we have the juror notebooks?

13             MR. DESMARAIS:  Yes, Your Honor.

14             THE COURT:  Okay.  We will pass those out to you

15   at this point.

16             You can hand them to Ms. Ghione, please.

17             MR. DESMARAIS:  Yes, Your Honor.

18             (Juror notebooks passed out.)

19             THE COURT:  Ladies and gentlemen, I'll talk more

20   about the notebooks a little bit later but it does have some

21   of the materials in it that will be referenced in this video.

22             Does everybody have one?  One more?

23             (One last juror notebook passed out.)

24             THE COURT:  Thank you.  All right.  Ms. Ghione,

25   I'll ask you to dim the lights.  And once she has done that,

1    we'll then play the video, please.

2              Thank you.

3              (Patent video played as follows.)

4              JUDGE FOGEL:  Hello.  I'm Jeremy Fogel.  I've

5    been a United States District Judge since 1998, and I'm now

6    the Director of the Federal Judicial Center.

7              As you probably know by now, this is a patent

8    case, so you may be wondering, how can I sit in judgment on

9    a case like this when I'm not entirely sure what a patent

10   is?  We hope to answer that concern with this brief video,

11   which will give you some of the background needed to do your

12   job.

13             This case will involve some special issues that

14   the Judge and lawyers will explain to you, but all patent

15   cases involve some basics that you will learn about.

16             This video will discuss what patents are, why we

17   have them, how people get them, and why there are disputes

18   that require us to call in a jury like you.  We'll also show

19   you what patents look like.

20             The United States Constitution gives Congress

21   the power to pass laws relating to patents.  Article 1,

22   Section 8, Clause 8 allows Congress to promote the progress

23   of science and useful arts by securing for limited times to

24   authors and inventors the exclusive right to their

25   respective writings and discoveries.

A patent, then, is an official grant by the United States Government that gives its owners certain rights to an invention.  Those include the right to stop others from making, using, selling, or offering for sale the invention that is claimed in the patent.

A patent lasts for a specific period of time, usually 20 years from the date that the application is filed by the inventor.  But because it takes an average of three years for the Patent and Trademark Office to act on the application, the effective life of a patent is closer to 17 years.

A patent represents a bargain made between the government and the inventor.  In return for the right to prevent others from using the invention, the inventor must enhance the public knowledge, or what we sometimes call the state of the art, by adding something new and useful to it.

A famous example is Thomas Edison's invention of a light bulb.  Harnessing electrical power for illumination transformed society and led to many other important break-throughs.  During the lifetime of the patent, its disclosure may inspire new inventions, and after it expires, the invention is free for anyone to use.  It is this combination of something new and valuable to the public that justifies granting time-limited patent protection to the inventor.

1            A patent is in many ways like a deed to a piece

2    of property.  It grants the owner the right to keep people

3    off the property or to charge them a fee, like rent, for

4    using it.  And just as a deed indicates boundaries defining

5    the landowner's property, a patent claim defines the

6    patentee's domain.

7            The patent system works because the inventor is

8    required to describe the invention in clear and specific

9    terms so that the public knows what the boundaries of the

10   invention are.  Once a patent is issued by the government,

11   it becomes available for public inspection.  And that way,

12   anyone who learns of a patent can read it and understand

13   exactly what the inventor invented and the limits of the

14   patent set forth in the claims.

15           Now that we understand what a patent is, let's

16   take a closer look at term "invention."  An invention is a

17   new way of solving a problem for a useful new machine,

18   manufacture, or composition of matter.

19           The patent process begins in the mind of the

20   inventor and, in particular, when the invention is

21   formulated in the mind of the inventor.  Patent lawyers call

22   this "conception."  This is when the idea occurs to the

23   inventor clearly enough that he or she can write it down and

24   explain it to someone.

25           To qualify for a patent, the invention needs to

be new and useful.  Also, it must not be obvious to one of

ordinary skill in the field.  If the inventor believes these

requirements are met, he or she will prepare an application

for filing with the Patent and Trademark Office, whose

headquarters are in Alexandria, Virginia, just outside of

Washington, D.C.

The Patent and Trademark Office, often called

the PTO, is the agency of the federal government whose

job it is to examine patent applications to make sure they

were in proper form and comply with the requirements of the

law.

The inventor can prepare an application for

filing with the PTO, but usually it is drafted by a patent

attorney or a patent agent who specializes in what is called

prosecuting patent applications.  That is, the process by

which they are evaluated.

The attorney or agent works with the inventor

to be sure the invention is described and claimed in a way

that complies with the law and the regulations of the PTO.

98 percent of patent applications are made online using the

PTO's electronic filing system, although a few paper

applications are still made.

When the PTO receives the inventor's

application, it is first checked to see if it is complete

and complies with all the PTO's application requirements.

1    It then assigns the submission to a Patent Examiner, a

2    staff person with a background in the field or art the

3    invention falls within to evaluate the application and

4    decide whether a patent can be granted.

5              You've been given a sample patent to refer to as

6    you watch this video, so you already have a sense of what a

7    patent looks like, but now let's take a closer look at the

8    three main parts of a patent.

9              To begin with, there are some basic identifying

10   information on the first page.  This material is highlighted

11   in your handout.  On the upper right side of the page is the

12   number assigned to the patent by the PTO and on the left

13   side is a title that describes the invention and the names

14   of the inventors and sometimes the company to whom they've

15   assigned the patent.  Also on the left is the date when the

16   patent application was filed, and back on the right, the

17   date when the patent was issued.

18             There also is more detailed information on the

19   first page, including a list of numbers following the

20   caption "Field of Search."  These numbers identify

21   previously issued patents the Examiner looked at or searched

22   to make sure the applicant's claimed invention really is

23   something new, not obvious, and thus patentable.

24             Also listed on the first page is what we call

25   references.  That is, previous patents or articles that

describe the technology or prior art known at the time the

application was filed.  It may seem strange to you that we

call this pre-existing technology prior art even though it

has nothing to do with artists.

We use the word "art" in its historical sense

to include inventions and other subject matter reasonably

related to the claimed invention.  We also refer to the

latest technology as state of the art, and we say of someone

who can understand and apply the technology that he or she

is skilled in the art.

The second major part of the patent is what we

call the specification or written description.  As is the

case in your sample, it is usually the longest part of the

patent.  It includes an abstract, which is a brief summary

of the invention.  A background section describes the nature

of the problem the invention is supposed to solve.  One or

more drawings, called figures, that illustrate various

aspects of the application, and a detailed description of

one or more embodiments of the invention.

An embodiment is a specific device or method

that uses the invention, such as a particular form of light

bulb.

The third and most important part of the patent

is the claims.  These are the numbered paragraphs that

appear at the end.  The claims are what give the public

1    notice of the boundaries of the invention.  They're similar

2    to the description of property you may have seen in a deed,

3    referring to precise measurements taken on the ground.

4              The Judge will instruct you further on how any

5    technical or ambiguous terms in the patent claims should be

6    understood.

7              Now that we've discussed the main parts of a

8    patent, let's look at how the PTO processes patent

9    applications, what we referred to earlier as patent

10   prosecution of an application.  This process begins when the

11   inventor's application arrives at the PTO.  There, it

12   receives a filing date.  Under the American Invents Act of

13   2011, filing dates will determine who is awarded the patent

14   if there are competing valid applications.

15             In 2012, the PTO received nearly 600,000 patent

16   applications and issued more than 270,000 patents.

17             After determining that the application is

18   complete, the receiving branch also decides what field of

19   technology an application relates to and assigns it to the

20   appropriate examining group.  In order to make that

21   decision, the Patent Examiner usually looks at patents that

22   have been issued previously in the same or closely related

23   fields of art.  The Examiner has computer databases that

24   contain information used to accomplish this task.

25             Another part of the job is to decide if the

inventor's description of the invention is complete and
clear enough to meet the requirements for a patent,
including the requirement that the description enables
someone of ordinary skill in the field to actually make and
use it.

However, because the job of examining so many
applications is challenging, the law requires the applicant
to tell the Examiner whatever he or she knows about the
prior art that might be important to the Examiner's decision
on whether to allow the patent.  We call this the
applicant's duty of candor.

One way the applicant can satisfy this duty is
by bringing pertinent prior art to the attention of the
Examiner, either in the original application, or in other
submissions called Information Disclosure Statements.  In
this way, the decisions of the Examiner are based on both
the information provided by the applicant and on the
information the Examiner finds during his or her prior art
search.

Sometimes the Examiner concludes that the
application meets all the requirements we've discussed and
allows the patent to issue at this first stage, but more
frequently the Examiner will reject the application as
deficient in some respect.  This decision will be
communicated by the Examiner in what is called an Office

Action, which is a preliminary notice to the applicant of what the Examiner finds insufficient or unpatentable.  For example, the Examiner may reject certain claims as being unpatentable because a journal article written and published by another person prior to the effective filing date of the patent application disclosed what the applicant was currently claiming.  At that point, the applicant prepares a written response, either agreeing or disagreeing with the Examiner.

An applicant who agrees with the Examiner can suggest amendments to the application, designed on overcome the Examiner's rejection.  Alternatively, an applicant who disagrees with the Examiner's Office Action can explain the reasons for the disagreement.

This exchange of Office Actions and responses goes on until the Examiner issues a Final Office Action, which may reject or allow some or all of the applicant's claims.  The overall process is referred to as the prosecution history of the application.

The written incoming and outgoing correspondence between the PTO Examiner and the applicant is also called the file wrapper.  In the past, these file wrappers were all in paper form as were the submitted applications.  Now they are most often electronic and may occasionally be paper as well.

1           Most patent applications filed on or after

2    November 29th, 2000 are published by the PTO 18 months after

3    the inventor has filed his or her application so that the

4    public may inspect it.

5           Once a final PTO Office Action has occurred

6    and one or more claims have been allowed, the applicant is

7    required to pay an issuance fee and the patent is printed.

8    Then, on the date shown on the upper right-hand corner, the

9    first page of the patent, it is issued by the PTO and the

10    inventor receives all the rights of the patent.  That date

11    is highlighted on your sample.

12           Once a patent has issued, the inventor or the

13    person or company the inventor has assigned a patent to can

14    enforce the patent against anyone who uses the invention

15    without permission.  We call such unlawful use infringement,

16    but the PTO and its Examiners have no jurisdiction over

17    questions relating to infringement of patents.  If there is

18    a dispute about infringement, it is brought to the Court to

19    decide.

20           Sometimes in a court case you are also asked to

21    decide about validity.  That is whether the patent should

22    have been allowed at all by the PTO.  A party accused of

23    infringement is entitled to challenge whether the asserted

24    patent claims are sufficiently new or nonobvious in light of

25    the prior art or whether other requirements of patentability

have been met.  In other words, a defense to an infringement

lawsuit is that the patent in question is invalid.

You may wonder why it is that you would be asked

to consider such things when the patent has already been

reviewed by a Government Examiner.  There are several

reasons for this.

First, there may be facts or arguments that the

Examiner did not consider, such as prior art that was not

located by the PTO or provided by the applicant.  In

addition, there is of course the possibility that mistakes

were made or important information overlooked.  Examiners

have a lot of work to do and no process is perfect.

Also, unlike a court proceeding, prosecution of

a patent application takes place without input from people

who might later be accused of infringement, so it is

important that we provide a chance for someone who is

accused of infringement to challenge the patent in court.

In deciding issues of infringement and validity,

it is your job to decide the facts of the case.  The

Judge will instruct you about the law, which may include

the meaning of certain words or phrases contained in the

patent.

So it is your primary duty as jurors to resolve

any factual disputes and in some cases, such as infringement

and validity, to apply the law to those facts.  To prove

infringement, the patentholder must persuade you by what is called a preponderance of the evidence relating to the facts of the case that the patent has been infringed.

To prove invalidity, the alleged infringer must persuade you by what is called clear and convincing evidence that the patent is invalid.

The judge in your case will explain these and other terms and provide additional specific instructions at the appropriate time.

Good luck with your task, and thank you for your service.

(End of video.)

THE COURT:  We'll bring the lights back up.

Ladies and gentlemen, I'm going to pick up where I left off in reading the preliminary instructions. I'm on page 2 in a section called The Parties and Their Contentions.

The plaintiff in this case is International Business Machines corporation, or "IBM."  The defendant in this case is Groupon Inc.  IBM contends that Groupon infringes four U.S. patents, and that Groupon's infringement is willful.  Those patents are:  No. 5,796,967; No. 7,072,849, No. 5,961,601 and No. 7,631,346.  Copies of each of the patents have been given to you along with these preliminary instructions.  Patents are usually referred to

by these three digits.  Patent No. 5,796,967 can be referred

to as "the '967 patent."  Patent No. 7,072,849 can be

referred to as "the '849 patent" and so forth.  IBM contends

that it is entitled to damages to compensate IBM for

Groupon's infringement.

Groupon denies that it infringes the

patents-in-suit and denies that IBM is entitled to any

damages in this action.  Groupon also contends that the

patents-in-suit are invalid, and that IBM is barred from

asserting the '346 patent because IBM granted patent

licenses to third parties.

Overview of the Applicable Law.

In deciding the issues I just described, you

will be asked to consider specific legal standards.  I will

give you an overview of those standards now and will review

them in more detail before the case is submitted to you for

your verdict.

You will be asked to decide whether Groupon has

infringed the asserted claims of the patents-in-suit.

Infringement is asserted on a claim-by-claim basis.

Therefore, there may be infringement as to one claim, but

not infringement as to another.  There are a few different

ways that a patent may be infringed.  I will explain the

requirements for each of these types of infringement to you

in detail at the conclusion of the case.  In general,

however, Groupon may infringe the patents-in-suit by making,

using, selling or offering for sale in the United States or

by importing into the United States a product or by using a

method meeting all the requirements or steps of a claim of

the patents-in-suit.

        If you have determined that one or more of the

asserted patents are infringed by Groupon, then you will

need to determine if that infringement was willful.  I will

provide you more direct instructions on how to determine

that at the end of the trial.

        You will be asked to decide whether IBM's

infringement claims for the '346 patent are barred because

IBM has granted licenses to its patents to third parties.

        You will be asked to decide whether the

patents-in-suit are invalid.  A patent may be invalid for a

number of reasons, including because the claimed subject

matter that is not new or is obvious.  Like infringement,

invalidity is assessed on a claim-by-claim basis.

Therefore, there may be invalidity as to one claim but not

as to another.  A claim is invalid if all of its

requirements are present in a single previous device or

method or sufficiently described in a single previous

printed publication or patent.  In this situation a claim is

said to be anticipated by prior art.  The claim is also

invalid if it would have been obvious to a person of

ordinary skill in the field of technology of the patent at

the relevant time.  You will need to consider a number of

questions in deciding whether the invention or inventions

claimed in the patents-in-suit are obvious.  I will provide

you detailed instructions on these questions at the

conclusion of the case.

If you decide that any claim of the

patents-in-suit has been infringed, is not invalid, and IBM

is not barred from asserting it against Groupon, then you

will need to decide any money damages to be awarded to IBM

to compensate it for the infringement.  A damages award

should put IBM in approximately the same financial position

that it would have been in had the infringement not

occurred.  In this case, IBM seeks a reasonable royalty.  A

reasonable royalty is the amount of royalty payment that a

patent holder and the alleged infringer would have agreed to

in a hypothetical negotiation taking place at a time prior

to when the infringement first began.  Any damages you may

award are not meant to punish Groupon.  I will give you more

detailed instructions on the calculation of damages at the

conclusion of the case.

General Guidance Regarding Patents.

Although you have heard much of this in the

video, I will now give you a general overview of what a

patent is and how one is obtained.

**A.   Constitutional Basis for Patents Granted.**

**The United States Constitution, Article I, Section 8 grants the Congress of the United States the power to enact laws "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."**

**B. Exclusionary Right and Term of a Patent.**

**The United States Patent and Trademark Office is responsible for reviewing patent applications and granting patents.  Once the Patent Office or USPTO has issued a patent, the patent owner has a right to exclude others from making, using, selling, or offering for sale the invention throughout the United States, or from importing the invention into the United States for the length of the patent term.  A person who, without the patent owner's authority makes, uses, sells, offers to sell or imports a product that is covered by one or more claims of a valid patent infringes the patent.**

**C.   The Parts of a Patent.**

**I will next briefly describe the parts of the patent and some of the procedures followed by those attempting to obtain patents.  Many of the terms I will use in this description are contained in the glossary of patent terms I have given you along with a copy of these**

preliminary instructions.  Feel free to refer to the glossary throughout the trial.  There is a copy of the glossary in the last couple of pages of these instructions.

For an invention to be patentable, it must be new, useful and, at the time the invention was made must not have been obvious to a person having ordinary skill in the art to which the subject matter pertains.

Under the patent laws, the Patent Office examines patent applications and issues patents.  A person applying for a patent must include a number of items in his or her application, including:  (1) a detailed description of the inventions in terms sufficiently full, clear, concise, and exact to enable any person skilled in the art to which the invention pertains to make and use the invention; and (2) one or more claims.

The application includes a written description of the invention called a specification that may include drawings that illustrate the invention.  The specification concludes with one or more claims that particularly and distinctly define the subject matter that the inventor regards as his or her invention.

When a patent application is received at the Patent Office, it is assigned to an examiner who examines the application, including the claims, to determine whether the application complies with the requirements of the U.S.

1    patent law.  The examiner reviews the prior work of others

2    in the form of files of patents and publications.  This type

3    of material is called "prior art."  Prior art is generally

4    technical information and knowledge that was known to the

5    public either before the invention by the applicant or more

6    than one year before the filing date of the application.

7    Documents found in the search of prior art are called

8    references.  In conducting a search of prior art, the

9    examiner notes in writing on the file the classes or

10   subclasses of art searched.

11          The compilation of the papers concerning the

12   proceedings before the patent office is called the

13   prosecution history, file wrapper or file history.

14          The examiner may reject the patent application

15   claims if he or she believes that they are not patentable in

16   light of the prior art or because the patent specification

17   does not adequately describe the claimed invention.  The

18   applicant may then amend the claims to respond to the

19   examiner's rejection.  If, after reviewing the prior art

20   maintained at the Patent Office or provided by the

21   application to the Patent Office during prosecution of the

22   application, the examiner concludes that the claims

23   presented by the applicant define the applicant's claimed

24   invention over the most relevant prior art in a manner that

25   is patentable and that the patent meets the other

1    requirements for patentability, then the application is

2    granted as a U.S. patent.

3                 D.   Infringement Disputes and Invalidity.

4                 The Patent Office and its Examiners do not

5    decide infringement issues.  If there is a dispute about

6    infringement, it is brought to the Court to decide.  Here,

7    you are also asked to decide about validity -- that is,

8    whether the patent should have been allowed by the patent

9    office.  A party accused of infringement is entitled to

10   challenge whether the asserted patent claims are

11   sufficiently new or nonobvious in light of the prior art or

12   whether the other requirements of patentability have been

13   met.  In other words, a defense to an infringement lawsuit

14   is that the patent in question is invalid.

15                 Duties of the Jury.

16                 Let me now turn to the general rules that will

17   govern the discharge of your duties as jurors in this case.

18   It will be your duty to find what the facts are from the

19   evidence as presented at the trial.  You and you alone will

20   be the judges of the facts.  You will have to apply those

21   facts to the law as I will instruct you at the close of the

22   evidence.  You must follow that law whether you agree with

23   it or not.

24                 In addition to instructing you about the law, at

25   the close of the evidence, I will provide you with

instructions as to what the claims of the patents mean.
Again, of course, you are bound by your oath as jurors to
follow these and all the instructions that I give you even
if you personally disagree with them.  All the instructions
are important, and you should consider them together as a
whole.

You are the judges of the facts.  I will decide
which rules of law apply to this case.

Perform these duties fairly.  Do not let any
bias, sympathy, or prejudice that you may feel toward one
side or the other influence your decision in any way.  Also,
do not let anything I say or do during the trial influence
you.  Nothing I say or do is intended to indicate, or should
be taken by you as indicating, what your verdict should be.

Evidence.

The evidence from which you will find the facts
will consist of the testimony of witnesses and the documents
and other things admitted into evidence.  The evidence may
also include certain facts agreed to by the parties or that
I may instruct you to find.

Certain things are not evidence.  I will list
them for you now.

1.  Statements, arguments, and questions by
lawyers are not evidence.

2.  Objections to questions are not evidence.

Lawyers have an obligation to their clients to make an

objection when they believe testimony or exhibits being

offered are not admissible under the rules of evidence.   You

should not be influenced by a lawyer's objection or by my

ruling on the objection.   If I sustain or uphold the

objection and find the matter is not admissible, you should

ignore the question or document.   If I overrule an objection

and allow the matter into evidence, you should treat the

testimony or document like any evidence.   If I instruct you

during the trial that some item of evidence is admitted for

a limited purpose, you must follow that instruction and

consider that evidence for that purpose only.   If this

occurs during the trial, I will try to clarify this for you

at that time.

            3.   Testimony that the Court has excluded or

told you to disregard is not evidence and must not be

considered.

            4.   During trial you will be shown charts and

animations to help illustrate the testimony of the

witnesses.   These illustrative exhibits called

"demonstrative exhibits" are not admitted into evidence and

should not be considered as evidence.

            5.   Anything you see or hear outside the

courtroom is not evidence and must be disregarded.   You are

to decide this case solely on the evidence presented here in

1    the courtroom.

2              Top of page nine, Direct and Circumstantial

3    Evidence.

4              There are two kinds of evidence, direct and

5    circumstantial.  Direct evidence is direct proof of a fact

6    such as the testimony of an eye witness.  If a witness

7    testified that he saw it raining outside and you believed

8    him, that would be direct evidence that it was raining.

9              Circumstantial evidence is proof of facts from

10   which you may infer or conclude that other facts exist.  If

11   someone walked into a courtroom wearing a raincoat covered

12   in drops of water, and carrying a wet umbrella, that would

13   be circumstantial evidence from which you could conclude

14   that it was raining outside.

15             As a general rule, the law makes no distinction

16   between these two types of evidence, but simply requires

17   that you find facts from all the evidence in the case,

18   whether direct or circumstantial or a combination of the

19   two.  In judging the facts, it will be up to you to decide

20   which witnesses to believe, which witnesses not to believe,

21   and how much of any witness's testimony to accept or reject.

22             Credibility of Witnesses Weighing Conflicting

23   Testimony.

24             You are the sole judges of each witness's

25   credibility.  You should consider each witnesses' means of

knowledge; strength of memory; opportunity to observe; how

reasonable or unreasonable the testimony is; whether it is

consistent or inconsistent; whether it has been

contradicted; the witness's bias, prejudices or interests;

the witness's manner or demeanor on the witness stand; and

all circumstances that, according to the evidence could

affect the credibility of the testimony.

If you find the testimony to be contradictory,

you must try to reconcile it, if reasonable possible, so as

to make one harmonious story of it all.  But if you can't do

this, then it is your duty and privilege to believe the

testimony that, in your judgment, is most believable and

disregard any testimony that, in your judgment, is not

believable.  This instruction applies to the testimony of

all witnesses, including expert witnesses.

Expert Testimony.

Expert testimony is testimony from a person who

has a special skill or knowledge in some science, profession

and business.  This skill or knowledge is not common to the

average person but has been acquired by the expert through

special study or experience.  In weighing expert testimony,

you may consider the expert's qualifications, the reasons

for the expert's opinions, and the reliability of the

information supporting the expert's opinions as well as the

factors that I have previously mentioned for weighing

testimony of any other witness.  Expert testimony should

receive whatever weight and credit you think appropriate,

given all the other evidence in the case.  You are free to

accept or reject the testimony of experts, just as with any

other witness.

Burden of Proof.

In any legal action, facts must be proven by a

required standard of evidence known as the "burden of

proof."  In a patent case such as this, there are two

different burdens of proof that are used.  The first is

called "preponderance of the evidence."  The second is

called "clear and convincing evidence."

A party asserting patent infringement has the

burden of proving infringement by a preponderance of the

evidence.  That means the party asserting infringement has

to produce evidence that, when considered in light of all of

the facts, leads you to believe that what that party claims

is more likely true than not.  To put it differently, if you

were to put the party's evidence on opposite sides of the

scale, the evidence supporting the claims of the party

asserting infringement must make the scales tip somewhat on

its side.  If it does not and the scale remains equal or

tips the other way, then that party failed to prove its

infringement claims.  A party asserting willful infringement

also has the burden of proving that any infringement was

willful by a preponderance of the evidence.  And it has the

burden to establish the amount of damages it seeks by a

preponderance of the evidence.

A party challenging the validity of a patent has

the burden of proving by clear and convincing evidence that

the patent is invalid.  Clear and convincing evidence is

evidence that produces an abiding conviction that the truth

of a factual contention is highly probably.  Proof by clear

and convincing evidence is, thus, a higher burden than proof

by a preponderance of the evidence.

Some of you may have heard the phrase "proof

beyond a reasonable doubt."  That burden of proof applies

only in criminal cases and has nothing to do with a civil

case like this one.  You should therefore not consider it in

this case.

Summary of the Patent Issues.

In this case, you must decide several things

according to the instructions I will give you at the end of

the trial.  Those instructions will repeat this summary and

will provide more detail.  You must decide:

1.  Whether IBM has proven by a preponderance

of the evidence that Groupon infringes one or more of the

asserted claims of the patents in suit and, if so, whether

it does so willfully;

2.  Whether Groupon has proven by clear and

convincing evidence that one or more of the asserted claims

of the patents in suit are invalid;

      3.  Whether Groupon has proven by a

preponderance of the evidence that it had an implied license

to practice the '346 patent and/or that IBM's rights to

enforce the '346 patent against Groupon were exhausted.  And,

      4.  If you find Groupon has infringed a valid

patent, and it had no implied license to practice that

patent and IBM's right to assert that patent has not been

exhausted, the amount of damages that IBM has proven, by a

preponderance of the evidence, that should be awarded to IBM

as compensation for that infringement.

      Conduct of the Jury.

      Now a few words about your conduct as jurors.

      First, I instruct you that during the trial you

are not to discuss the case with anyone or permit anyone

to discuss it with you.  Until you retire to the jury room

at the end of the case to deliberate on your verdict, you

simply are not to talk about this case.  If any lawyer,

party, or witness does not speak to you when you pass in the

hall, ride the elevator, or the like, remember it is because

they are not supposed to talk with you, nor you with them.

In this way, any unwarranted and unnecessary suspicion about

your fairness can be avoided.  If anyone should try to talk

to you about the case, bring it to the Court's attention

1    promptly.

2              Second, do not read or listen to anything

3    touching on this case in any way.  By that I mean that if

4    there is a newspaper or Internet article or television or

5    radio report relating to this case, do not read the article

6    or watch or listen to the report.

7              Third, do not try to do any research or

8    investigate the case on your own.  Let me elaborate.  During

9    the course of the trial, you must not conduct any

10   independent research about the case, the matters in the

11   case, and the individuals or entities involved in the case.

12   In other words, you should not consult dictionaries or

13   reference materials, search the Internet, websites, blogs,

14   or any other print, electronic or any other means.  In

15   particular, you may not access or use Groupon, whether

16   through Groupon's website or through Groupon's mobile apps.

17   Also, again, should there happen to be a newspaper article

18   or television or radio report relating to this case, do not

19   read the article or watch or listen to the report.  It is

20   important that you decide this case based solely another

21   evidence present in the courtroom.  Place do not try to find

22   out Freedom of Information from any or sources.

23              I know that many of you use cellphones, tablets,

24   iPhones, the Internet, and other tools of technology.  You

25   also must not talk to anyone about this case or use these

tools to communicate electronically with anyone about the

case.  This includes your family and friends.  You may not

communicate with anyone about the case on your cellphone,

through e-mail, your tablet or iPhone, text messages, on

Twitter, through any blog or website, including any Internet

chat room, or by way of any other social networking

websites, including Facebook, Twitter, LinkedIn, and

YouTube.

During the trial, you may, but are not required

to, take notes regarding testimony; for example, exhibit

numbers, impressions of witnesses, or other things related

to the proceedings.  A word of caution is in order.  There

is generally I think a tendency to attach undue importance

to matters which one has written down.  Some testimony which

is considered unimportant at the time presented, and thus

not written down, takes on greater importance later in the

trial in light of all the evidence presented.  Therefore,

you are instructed that your notes are only a tool to aid in

your own individual memory and you should not compare your

notes with other jurors in determining the content of any

testimony or in evaluating the importance of any evidence.

Your notes are not evidence and are by no means a complete

outline of the proceedings or a list of the highlights of

the trial.  Also, keep in mind that you will not have a

transcript of the testimony to review.  So, above all, your

memory will be your greatest asset when it comes time to deliberate and render a decision in this case.

If you do take notes, you must leave them in the jury deliberation room which is secured at the end of each day.  And remember that they are for your own personal use.

Finally, do not form any opinion until all the evidence is in.  Keep an open mind until you start your deliberations at the end of the case -- I will give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and de.

Juror Notebook, as I mentioned.

To assist in your deliberations, you have been provided with a notebook that contains the following:

Glossary of patent terms.

Sample patent.

The Court's claim constructions, copies of the patents in suit.

Pictures of witnesses.

These materials have been jointly submitted by the parties.  Please refer to these materials to assist you during the trial.

Sidebars.

During the trial it may be necessary for me to talk with the lawyers out of your hearing by having a bench conference, which is also called a sidebar.  If that

1    happens, please be patient.

2              We are not trying to keep important information

3    from you.  These conferences are necessary for me to fulfill

4    my responsibility to be sure that evidence is presented to

5    you correctly under the law.

6              We will, of course, do what we can to keep the

7    number and length of these conferences to a minimum.  If you

8    would like to stand or stretch or walk around the jury box

9    while we are at sidebar, you should feel free to do so.

10             I may not always grant an attorney's request for

11   a sidebar.  Do not consider my granting or denying a request

12   for a conference as an indication of my opinion of the case

13   or what of what your verdict should be.

14             Course of the Trial.

15             The case will now begin.

16             First, IBM may make an opening statement

17   outlining its case.  Then Groupon may make an opening

18   statement outlining its case.  Opening statements are not

19   evidence; their only purpose is to help you understand what

20   the evidence will be.

21             Next, the parties will present their evidence.

22   IBM will first introduce its evidence that it believes

23   supports its claim that Groupon infringes the patents-in-suit

24   and the damages that it is entitled to.  When IBM is finished,

25   group will introduce evidence to defend against IBM's

infringement and damages claims and will introduce evidence

that it believes supports its claims that the patents-in-suit

are invalid and that it was licensed to practice one of the

patents and IBM has exhausted its rights to assert that

patent against Groupon.  IBM will then have the opportunity to

introduce evidence to defend Groupon's claims of invalidity,

and Groupon's claims that it was licensed to practice one of

the patents and that IBM has exhausted its rights to assert

that patent against Groupon.

            After all of the evidence is in, the lawyers

will present closing arguments.  The closing arguments are

not evidence.  Their purpose is to summarize and interpret

the evidence for you, and to tie the evidence into their

story.  I will give you instructions on the law and describe

for you the matters you must resolve.  You will then retire

to the jury room to deliberate on your verdict.

            Trial Schedule.

            Though you may have heard me say this during the

jury selection process, I want to again outline the schedule

I expect to maintain during the course of this trial.

            As I mentioned previously, once trial begins,

this case is expected to take up to eight business days to

try, between now and Friday, July 27th.  We actually should

assume its up to ten business days.  So that would be

between now and next Friday.

1              We will normally begin the day at 9:00 a.m.   We

2    will go until around 12:30 p.m. and, after about a half hour

3    break for lunch, continue until 4:30 p.m.   There will be a

4    15 minute break in the morning and another 15 minute break

5    in the afternoon.

6              What I have just outlined is the general

7    schedule.   It is possible there will be some interruptions

8    as I have to attend to other matters.   I already know of

9    some other commitments I have and so I can tell you now that

10   some of our days will be shorter than I just described.

11   I'll list these specifics for you now.

12              Today, Monday, July 2016, we're here until 4:30.

13              Tomorrow, Tuesday, July 17th, we'll be here from

14   9:00 a.m. to 4:30.

15              Wednesday, July 18th, we'll be here from 9:00

16   a.m. only until 1:00 p.m.

17              On Thursday, we'll be here from 9:00 a.m. to

18   4:30 p.m.

19              On Friday, July 20, we'll be here from 9:00 a.m.

20   only to 1:00 p.m.

21              Next Monday, July 23rd and Tuesday, July 24th,

22   we'll be here from 9:00 a.m. to 4:30 p.m.

23              Next Wednesday, July 25th, we'll be here from

24   9:00 a.m. to 1:00 p.m.

25              Next Thursday, July 26th, we'll be here from

1    9:00 a.m. to 3:30 p.m.  And,

2              Next Friday, July 27th, 9:00 a.m. to 3:30 p.m.

3              The only significant exception to this schedule

4    may occur when the case is submitted to you for your

5    deliberations.  At that point, you will be are permitted to

6    deliberate as late as you wish.

7              Please keep in mind that this is a timed trial.

8    That means I have allocated each party a maximum number of

9    hours in which to present all portions of its case.  This

10   allows me to assure you that we expect to be completed with

11   this case by next Friday, July 27th.  Of course, you can

12   help me keep us on schedule by being here promptly each

13   morning and being ready to proceed at the end of each break.

14              So that takes me through the instructions.

15   Pages 17 and 18 are where the glossary of patent terms are.

16   I'm not going to read it to you but feel free to refer to it

17   as you wish.

18              Just a couple other quick instructions.  I

19   indicated to you we try to take in general one break in the

20   morning and one in the afternoon plus a lunch break of about

21   a half hour.  We will be able to give you lunch on all

22   future days of this trial, so we'll talk about that.

23   Tomorrow morning, we'll have menus for you to think about to

24   buy your lunch.

25              If it turns out you need additional breaks,

1    maybe you need the restroom, maybe you are getting a little

2    tired, maybe it's getting too hot in here, just raise your

3    hand or do something to get our attention and we can take a

4    break just as soon as possible.  Okay?

5              Additionally, the temperature in here feels to

6    me like it has gotten hotter today.  I apologize.  We do not

7    actually control the temperature.  We beg certain other

8    people to get it as good as they can.  Sometimes in the

9    course of a day it's too hot and at other times in that same

10   day it's too cold.  We're usually able to sense it and try

11   and get it fixed.  If you want to let us know if you are

12   getting uncomfortable, please do.  The best strategy is to

13   have layers with you and to feel free to take things off and

14   put them on over the course of the day.

15             So that completes the instructions.  We'll now

16   call on IBM to do their opening statements.

17             MR. DESMARAIS:  Thank you, Your Honor.

18             May it please the Court, ladies and gentlemen of

19   the jury.

20             This is a case about a company, Groupon, that

21   refuses to take responsibility for technology it is using.

22   And that technology is owned by IBM.  It is patented by IBM

23   and it is owned by IBM.

24             Groupon, as you will learn at the trial, was

25   relatively late to the e-commerce revolution.  They didn't

launch their website until 2008 and they didn't launch their

mobile app until 2010.  By then, the likes of Amazon and

Google and Facebook were already big.

Groupon came up with a different approach.

Their website was offering discount deals to consumers who

want discounted merchandise and services.  That's where the

name comes from is sort of a group coupon.  And it was a

cleaver idea, and we don't deny that.

But in order for Groupon to launch that service,

and to launch it on the Internet and to make it successful,

they had to build on what came before.  There are several

things they had to do:

They had to figure out how to present their

software or their applications in a fast and efficient way.

Another thing they had to do?  They had to

figure out how to present advertising.  Advertising takes a

lot of data and they had to figure out how to send that over

the Internet in a fast and efficient way.

They had to figure out how to get users signed

up easily, efficiently so the users would come on the

website, and then to deal with the transactions that they

were going to do with those users in a fast and efficient

way.

Groupon was not early to e-commerce, and they

did not invent any of these things I just told you about.

1    And these things are important and they're required.

2              So what did Groupon do?  They implemented them

3    anyway.  They implemented them anyway without asking for

4    permission and without taking a license.

5              Now, before Groupon existed, in fact, before

6    Amazon existed, before Facebook existed, before Google

7    existed, engineers at IBM were working on how to make

8    e-commerce fast and efficient.  And they figured it out, and

9    they patented it.  And four of those patents are what this

10   case is about.

11             IBM spends literally billions of dollars every

12   year on research and development to make our lives better,

13   to invent the things we all use and to make our lives

14   easier.

15             Now, they patent these inventions but they don't

16   patent them to exclude people.  They make them available to

17   anybody who wants to take a reasonable license.  And we're

18   here because Groupon did not take a license.

19             Now, you will learn at this trial -- Your Honor

20   may I put up a pad?

21             THE COURT:  You may.

22             If anybody for defense counsel wants to move

23   around to see, you are free to do that.

24             MR. DESMARAIS:  You are going to learn at this

25   trial that Amazon took a license from IBM, Google took a

1    license from IBM, Facebook took a license from IBM,

2    Priceline took a license from IBM.  So did LinkedIn,

3    Twitter, and many others.

4              Groupon has not.  The new kid on the block

5    refuses to take responsibility for the technology it is

6    using but it continues to infringe literally every day,

7    millions of times.  That is what this case is about.  All

8    IBM wants is a reasonable royalty for the technology that it

9    invented.

10             My name is John Desmarais, and I represent IBM.

11   Working on this trial with me are some of my colleagues,

12   Kareem Oussayef, Laurie Stempler, and Robert Harrits; and

13   there are some others not sitting up here.

14             Also sitting with us throughout the trial will

15   be Dr. Hinton.  She is sitting here at the table here,

16   Dr. Hinton.  She is one of the inventors on one of the IBM

17   patents in this case and she will be testifying later, and

18   she is going to tell you her invention story.

19             Now, before I get into the details of the case,

20   let me tell you a little bit about who IBM is.

21             THE COURT:  You may be using the pad again?

22             MR. DESMARAIS:  I am going to use it again, but

23   I can move it aside.  And maybe over here, if that is all

24   right.

25             THE COURT:  Sure.  Just let us know when you are

1    ready to use it again.

2             MR. DESMARAIS:   Thank you, Your Honor.

3             This is sort of a snapshot of IBM over time.   So

4    IBM started, as you heard, as International Business

5    Machines years ago.   They made manual typewriters.   Some of

6    you may remember that.   But IBM's invention history is

7    storied, like very few other companies in the history of the

8    world.

9             Back in 1944, they made the first computer with

10   Harvard University.

11            In 1956, they invented the disk drives.

12            In 1964, they made the mainframe computer.

13            In 1966, they invented DRAM memory which powers

14   most computers.

15            And also in that year, NASA used IBM computers

16   in is space flights.

17            In 1962, they invented the SABRE system which is

18   airline reservations.   And don't worry, I talked to them

19   about that.   That system is still not working, but they're

20   working on it.

21            1981, personal computer debuts.   Also that year,

22   IBM in their labs invented the notion that you could use

23   lasers on people for surgery.

24            In 1988, Prodigy was launched.   This case is

25   about Prodigy and this shows you in the timeline of IBM

where that fits.  And I'll tell you about Prodigy in a short minute.

IBM then launched a laptop computer.  In 1997, the Deep Blue Super Computer beat the reigning chess champ of the world.  It was mind boggling.  The artificial intelligence of that machine was mind boggling.  It was widely publicized across the world that a computer beat a chess champion.

In 2007 IBM invented quantum computers.  In 2011, an IBM super computer played jeopardy against humans and beat humans.  The artificial intelligence was mind boggling.

In 2017, just last year, IBM made computers available to businesses that store information on the quantum state of individual atoms.  It's mind boggling what the scientists at IBM can do and what they come up with.

So that's a little bit about who IBM is.  A lot of that research gets done at the Watson Research Center which is in New York.  And there is a picture of it there from Yorktown, New York and Hoffman, New York and this is a figure from one of the patents in the case, a lot of the IBM, some of this stuff I just talked to you about the quantum computing is there and other stuff is there, too.

IBM is recognized worldwide for these inventions.  NASA gave IBM an certificate of recognition for

1    outstanding contributions to lunar space and science.

2    They're the ten time winner of the U.S. National Medal on

3    Technology and Innovation.  The six time winner of the

4    Touring Award on Computer Machinery.  There are six Nobel

5    Laureates working in the IBM labs.  20 inductees into the

6    National Inventors Hall of Fame.  19 inductees into the

7    National Academy of Science.  And they're a five time winner

8    of the National Medal of Science.

9              As a result of all this effort, IBM spends about

10   $5.6 billion annually on research and development.  As a

11   result of that, every year for the past twenty-five years,

12   they have been granted more patents from the United States

13   Patent Office than any other company in the world.

14             This case is about four of those patents and

15   you'll see them here.  You heard about patents in the video.

16   You'll see the patents.  You'll have them.  They'll be

17   entered into the evidence.  They have the seal of the United

18   States Patent Office on them, there is four.  Dr. Hinton is

19   the inventor on one of them with others, and Bob Filepp, who

20   will testify as our first witness, is the inventor on two of

21   them.

22             Now, what are those patents about?  So I think

23   we have a board on this.  It might be easier for me to use

24   the board.  So what those patents are about is when a user

25   is working at a terminal, and communicating over a network

to servers, there is a couple of things that have to happen.

Number one is the applications that the user wants to work

on have to come down from the servers through the network to

get on to the computer.

The first patent, what one of Mr. Filepp's

patents, the '967, taught us how to present those

applications over a network in a fast and efficient way.

And that's complicated.  The network Mr. Filepp built at one

point got up to two million users at the same time.

The second patent in the case, the '849, also

one of Mr. Filepp's patents, he's going to be one of our

first witnesses is about presenting advertising.  The trick

with advertising is it takes a lot of data, and to get that

data to get over a network and get on to the users when you

have, for instance, millions of users, takes up a lot of the

space on the network, takes up a lot of work on the server,

and how do you do that, how do you get it across fast and

efficiently.

One of the other patents, the '601 is preserving

state information.  What that relates to is when the user is

talking to the server, you can imagine a server is talking

to a lot of people at the same time.  If it's a network,

there is going to be a lot of them.  And what the server and

the user have to do is they have to figure out how are we

going to have a conversation separate from the server's

1   conversation with the next user and the server's

2   conversation with the other user.  So this patent tells us

3   how to preserve the state information between a user and a

4   server so when they're talking, the conversation continues

5   in an intelligent fashion.

6          And the last patent, the '346 on new account

7   creation, this is Dr. Hinton's invention, what that's about

8   and for those of you who do online shopping, I think you'll

9   appreciate this, this one is down to earth for regular

10  people, when you go to a new site, a new service provider

11  and you want to do a transaction, you get confronted with

12  that create an account, you got to put your name and address

13  in there, you got to put your credit card in there.  It can

14  be a real pain because you also have to do a user name and

15  password.  If you start joining a lot of these different

16  places, you have a lot of user names and lot of passwords,

17  it will drive you crazy.  I don't know about you all, but I

18  have a long list of user names and passwords and it's

19  killing me.  But Hinton's invention is how to do that for

20  you automatically.  So when you go to a new service

21  provider, now what you see, and you probably see this, it

22  might say rather than fill out an application, would you

23  like to join through Facebook, your Facebook account or

24  would you like to join through your Google account or Amazon

25  account.

This patent talked about how to get those

companies into a federated environment, have them

communicate with each other to take the burden off us and

have these new account applications created automatically

for you, and that was Dr. Hinton's invention.

Now, the first two patents, the '967 and the

'849, are as I said, Mr. Filepp's patents and he's going to

tell you about those.  And the work on that started at IBM

in 1984.  And the notion there was IBM looked ahead and

thought this E-Commerce thing is the real deal.  This is

going to be the next big thing.  And boy, were they right.

This is in 1984 when they're talking about this.

And IBM wasn't in the business of selling goods

and services, that's not what their business was.  And

they're not in the business of creating advertising and

making money from advertising.  What they were studying was

how to architect this thing, how to make the foundation that

would make it customers work and the advertising work.

Rather than try to be the jack of all trades, they made a

partnership with Sears and IBM and CBS.  And they called it

Trintex.  They got in partnership with Sears because Sears

provided the retail experience.  Sears was a retail shop

that sells goods and services.  They got involved with CBS

so CBS could create the content and the advertising and that

sort of thing which is not in the IBM sweet spot.  And IBM's

business was, you know, provide the know how, figure out how

to do it over a network with computers and how to make it

work.

And the first two patents come out of that.  The

'967 is a method for presenting applications in an

interactive service, and that's an interactive service

between a user and a server, how you're going to present

those applications.  I won't go into the details.

Mr. Filepp is going to explain it to you in his testimony.

The second of Mr. Filepp's patents, the '849, is

a method for presenting advertising in an interactive

service.  Again, the interactive service is a user talking

to a server over a network, and Mr. Filepp will explain to

you how complicated it is to present advertising and how he

solved that problem.  He is going to tell you what was the

problem they were confronted and how they solved it.

I'll give you a short overview now just to

introduce the topic.

It used to be the case prior to Mr. Filepp's

inventions that when a computer wanted to talk to a server

over a network back in the '80's, the terminals are what we

called, not so nicely, dumb terminals because they didn't

have a lot of intelligence on them, they didn't have a lot

of storage on them.  So when a user sitting at a terminal

wanted to talk over a network to a server, the server had to

send everything down to the terminal that the user needed.
And when the user wanted to do something, everything had to
get sent back and then when the transaction moved to the
next phase, the server had to send everything back down.
You can imagine if you wanted to make a system like that
with a lot of users, you're going to get into a big problem
because if every one of those users has to get the entirety
of the application sent down to each of them every single
time over a network, you're going to clog up the network and
you're going to clog up the server and everything is going
to break down and backlog.

That's where Mr. Filepp came up with his
invention, what he thought of is really creative.  If you
take that terminal and you add some intelligence to the
terminal, and you put a memory store or an object store at
the terminal, you can solve this problem.

And here is how it works.  If you take the
screen of the terminal and break it into partitions or
areas, and then within those areas even smaller pieces
called objects or data structures, and you put intelligence
at the terminal and you put a memory at the terminal called
either a store or an object store or a cache, then when this
person wants to do something, they can store locally pieces
of the displays, objects of display, they store the objects
locally, and then when they need something, the computer

checks first in the store, creates the screen and only goes

to the network to get the pieces that are missing, the

things that have changed, the things that have been updated.

That was the key of the invention, we need to break the

screen into areas and we need to create the screen from

objects and we need to store objects locally and only go

across the network to the server when we need something.

You guys see this on your computers today, if you watch your

computer screen when you load a web page.  Sometimes it

populates right away, sometimes it populates into a little

piece that isn't there yet, your screen is made of objects.

That was Mr. Filepp's invention.

Now, the patent also, the second patent deals

with advertising, this is the figure from the '849 patent.

Even back in the '80's when they drafted the patent they

were realizing thinking ahead, you know, this network is

going to be able to even not just do goods and services,

you'll be able to buy your groceries on this network.  One

of the examples is ABC Apples, apples are good for you,

apples cost blank each, how many apples do you want to

order.  Think about how future looking this was.

I don't know if you guys follow Amazon, but

Amazon in the recent past acquired Whole Foods and now you

can get your apples on Amazon.  And IBM thought of that long

before Amazon acquired Whole Foods.

1    So it solved the problem of the bottleneck and

2 the storage and the efficiency because now if you have all

3 these terminals and you communicate over a network to a

4 server, if each of those terminals is only loading up parts

5 of the screen that they need to get because the information

6 is old and they get all the rest of it locally, you can put

7 a lot more terminals on the network without making the

8 system crash.  And this project was a success.

9    Trintex, which was a combination of Sears, IBM

10 and CBS, changed their name to Prodigy and 1988 they

11 launched a commercial service.  It was called Prodigy.

12 That's actually what the screen looked like.  It has a space

13 for your ID and your password.

14    Now I'm going to show you one of the

15 advertisements for Prodigy.  Keep in mind, this service was

16 launched in 1988.  So this was huge, but listen to what they

17 say because it's all come true.

18    (Video played:  It makes investing in banking

19 more convenient.

20    Prodigy makes learning more fun.

21    It makes everything more fun.

22    Yeah, lots more fun.

23    It let's me save money on travel.  It's like

24 going to the biggest shopping mall in the world.  Prodigy

25 gives you the news at the touch of the key.  You got to get

1    this thing.  This is Prodigy, the online service that you'll

2    access on your home computer over a regular phone line using

3    a modem.  You can shop for great values, pay bills without

4    writing checks, learn from an online encyclopedia that's

5    updated quarterly, communicate with people all across the

6    country and more, lots more.  For instance, Prodigy service

7    is great for travels.  It let's you plan it all right from

8    your home computer.  Book your own seats on over 300

9    airlines with Easy Statement.  Here is the best part, you

10   can book your seat at the lowest available airfare so you

11   know for sure you're saving money.  And Prodigy service

12   makes booking hotel reservations just as easy.  You can save

13   50 percent at over 1,500 hotels in the U.S., Canada and

14   Europe and check the weather before you go.  On the Prodigy

15   service you can get forecasts for 335 cities worldwide

16   updated continually.  For places to eat, things to see,

17   check out the mobile travel guide.  If you like to travel,

18   you got to get this.

19          Need another reason why you got to get this

20   thing, shopping.  Listen if you like to shop, you'll love

21   shopping on the Prodigy service.  Especially the hundreds of

22   exclusive discounts and special offers available only to

23   Prodigy service members.  Buy that special guy a designed

24   tailored dress shirt, then send your mom some flowers.  In

25   some areas you can even do your grocery shopping and have

1  groceries delivered right to your door.  Taking advantage of

2  weekly sales on CD's, tapes videos and more, buy China,

3  silverware, even house gifts from over 60 manufacturers from

4  guaranteed lowest prices.  And if you need help for the

5  purchase decision, check Consumer Reports before you start

6  to shop.  Prodigy, so many great values on so many items

7  right at your fingertips.

8              (End of video.)

9              MR. DESMARAIS:  1988, think about that.  This is

10  what we do today every day.  In jury selection some of you

11  say you shop online every single day.  IBM built this and

12  created this system in 1988.

13              And they launched the system and at one point it

14  was a big success.  At one point they had two million users.

15  Let me put the date in perspective for you just so you can

16  really appreciate the brilliance of the team that Mr. Filepp

17  worked with.

18              Back in 1969, the predecessors to the internet

19  was created.  It was called ARPA Net.  This was actually a

20  military operation with universities and they were trying to

21  protect the country in case our communications network got

22  knocked out so they made a data network the Army could use

23  to talk in case a nuclear bomb blew out our main

24  communication network.

25              After ARPA was created, some companies tried to

1    make it commercial, AT&T and CBS tried Venture One, Minitec

2    tried to launch a service in France.  And right here in

3    1984, Trintex was formed with IBM at the lead in partnership

4    with Sears and CBS.  The Prodigy service was launched in

5    1988.  Before the worldwide web was even invented, before

6    AOL.  Tim Berners-Lee invented today what we call the

7    worldwide web in 1989.  AOL 1.0 didn't ship until 1991.

8    Amazon didn't launch until years later, Google until years

9    later and Facebook and Groupon after that.  That's how

10   advance that was.  It was successful.

11            Prodigy as I said had a service launch at 1.2

12   million users and they proved out they could do this.  And

13   then because IBM is not in the retail business as I

14   mentioned and they're not content providers, once they

15   proved they could do it and they built the technology, they

16   sold Prodigy off, but they retained the patents.  And the

17   patents as I told you are widely licensed to all the

18   companies that came later and all the companies that are

19   using these ideas.

20            Most big companies have taken licenses to this

21   portfolio, Amazon did, Google did, Facebook did, et cetera.

22   The list is very long.  Groupon hasn't.  The new kid on the

23   block refuses to take responsibility for using these

24   inventions.

25            The next patent you're going to hear about at

this trial is the '601 patent.  The '601 is the one about

preserving state information.  So this is -- and I have a

board on this one, too.  So the title of the patent is

Preserving State Information in a continuing conversation

between a client and a server networked via a stateless

protocol.  What does that mean?  Here is a figure from the

patent.  We have added the color, the figure is black and

white.  But a client is a user at a terminal, when you're

doing your online shopping, communicating over the internet

with the stateless protocol to a server, it could be

Groupon, could be Facebook, could be Google, can be anybody,

when this client is talking to the server over the internet,

they have to find a way to keep their conversation between

them, because that server is talking to a lot of different

people and the protocol on the internet it's stateless which

means the server has a hard time trying to figure out how to

keep the conversation going between the user and the client,

what are they ordering, what do they want, how many shirts

do they want, what inventor came up with we can change the

protocol by inventing in the communications between the

individuals and the servers we can embed in that what are

called state variables, the state of the conversation, how

many shirts did you order, what was the color, why do you

want them delivered.  That stuff can be embedded into the

communication and preserved in state and it's one of the

1    things that is widely used today in order to make all these

2    E-Commerce transactions work.

3           The next patent is Dr. Hinton that I told you

4    about.  This is the automatic account creation.  And you

5    guys I'm sure are all familiar with the problem.  For every

6    place you go, you got to put in a user name and a password

7    and it will drive you crazy if you're going to a lot of

8    different places on a regular basis.

9           So the invention was let's make this simple for

10   users.  And the way it works is if you go to use your

11   account at a service provider and -- not use your account,

12   if you go to a service provider where you don't have an

13   account and you get presented with fill out this account

14   application, how can we streamline that.

15          And the way the patent suggests streaming like

16   that is to have the companies make an agreement between

17   themselves for those that you have an account at and those

18   you don't, and they call that a federated environment.  So

19   the companies have to federate and they have to agree to

20   participate.  And if they do, then when you go to a new

21   service provider, what happens is what you see today.  You

22   can join that new service provider just by saying go look at

23   my Google account, go look at my Facebook account, and go

24   look at my Amazon account.

25          And the way it works in practice, the way the

patent works, if you click that button that says go to, use

my Facebook ID and my Google ID, all that happens is behind

the scenes, the website you are trying to go to calls over

to Google or Facebook or whatever you clicked and says give

me their name, give me their e-mail, and I will do the

account creation automatically behind the scenes.

So the place you are trying to go to will get

information about you from Facebook or Google or whatever

you clicked, they'll take that information in and, through

their own software, they will create an application for you,

create an account for you, and then let you come in and use

the service.  And it's all over the place.  It's called

social sign on or single sign on, and everybody is doing it

now.

So those are the four patents in the case.

Who is Groupon?  Groupon came on the scene in

2007 and 2008 but Groupon is not a small company.  I don't

know how many of you use Groupon, but it is a big company.

They have over 6,000 employees throughout the world.  And

they have approximately 50 million active customers

worldwide.  50 million.  This is a big company.

These are the products that accused in this

case.  Groupon has a website which looks like that, and you

can also use that website on your mobile phone.  But then

they also have mobile apps.  They have an app for Android

and they haven an app for Apple.  So you will see us talk about the website products and the mobile app products.

And it's not news to Groupon that these patents exist.  Groupon will admit to you in this trial that they knew about the two Filepp patents, the ones that came out of the Prodigy product.  They have known about them since November of 2011.

They will admit to you that they have known about preserving state information, the '601, since April 2012.  And,

They will admit to you that they knew about the single sign on application creation patent since August 2014.

That's just a timeline that fits those dates and perspective.

But Groupon did not take a license from IBM, and they used the technology anyway.  And that's what this case is about.

So in March of 2016, we had to file a complaint in this court to try to get a license for IBM.

Now, what is Groupon going to tell you about this case?  They're going to tell you they don't infringe.  All infringers say that.  They're going to say, no, we don't infringe.  The lawyers are going to tell you, well, the patent has these words in it and if you interpret this word

1    in this way, then we don't infringe.  It's the first thing

2    that every infringer says.

3            But we're going to bring to this trial Douglas

4    Schmidt.  Douglas Schmidt has a Ph.D. in computer science.

5    He got his degree at University of California at Irvine.  He

6    is a professor right now at the University of Vanderbilt.

7    And he is going to explain to you, no, Groupon infringes.

8    He is going to take you through how their product works, he

9    is going to take you through their computer code, and he is

10   going to go patent by patent, and he is going to explain.

11   It's not just me talking.  Professor Schmidt is going to

12   tell you the details of the infringement.

13           And he is going to tell you that Groupon users,

14   when they go over the Internet to the Groupon servers, use

15   Groupon software using the '967 to present applications and

16   Groupon's software is using the '849 to present advertising,

17   and Groupon software is preserving state information the way

18   it tells you to do it in the '601 patent.  And they are

19   setting up their accounts using the automatic account

20   creation of the '346 patent.

21           And if you use Groupon, you know that because

22   you go on and you can see:  Do you want to sign in by

23   Facebook?  Do you want to sign in by Google?

24           Then after professor Schmidt tells you or

25   Dr. Schmidt tells you how Groupon infringes, we're going to

1  bring Professor Hausman to talk fo you.  Professor Hausman

2  is an economist.  He was educated at Brown University and

3  then got a Marshall scholarship to be trained at the

4  University of Oxford in economics, and he has been teaching

5  at the Massachusetts Institute of Technology since 1972.

6  And he is going to help us come in and value the patents.

7  What should the license be that Groupon owes IBM?

8  Professor Hausman will start by explaining how

9  IBM makes Groupon makes money.  They make money by pairing

10 discount merchants with consumers who want discounts.  And

11 if they're lucky to conclude a deal, Groupon takes a little

12 piece of the deal.  That is how they make their money.  They

13 bring the two together, and if the deal closes, they take a

14 piece.

15 And Professor Hausman will talk about how much

16 Groupon is using it.  It's called the extended use.  He is

17 going to tell you there are a lot of deals.  People are

18 looking at Groupon all the time.  It's a big deal.  People

19 look at it in the morning.  They might look at it again

20 later.  So there is a lot of repeat use.

21 And to give you a sense of exactly how many

22 people are viewing Groupon, let me show you this board.  It

23 is a snapshot from just one week.  It's the week of June 4,

24 2017.  So last year.

25 If we look at just the website products, unique

deal views, that is people looking just once.  In one week,

almost 12 and-a-half million people looked at Groupon using

the website product.

If you talk about greater deal usage, those are

including the repeats where you look in the morning and

maybe go again in the afternoon, it gets up to 15 million.

If you add in the touch products, which are the

website operating on your phone, it's another 11.6 unique

deal views.  And if you do you understand the repeats, 15

million.

And then if you add the mobile apps, it's

another 36 million unique deal views or 45 million repeats.

So if you add that up in one week's time, 75

million, more than 75 million -- I'm rounding it down --

more than 75 million folks are looking at Groupon deals in a

week.

So if you break that up to one day, divide that

by seven, you are talking over 10 million deal views a day.

All right?  So when you are thinking about how much is

Groupon using in these inventions, what is the extent of

their infringement, it's a big number.  They have over 50

million customers worldwide and they're getting 10 million

views a day.

So Professor Hausman is going to tell us that.

How do you put a number on that?  And the Court will give up

instructions how you do it.  But it's called a hypothetical

negotiation.

There was no deal, so there was no negotiation,

there was no license concluded, so it's hypothetical.

And you have IBM sit down and you have Groupon

sit down, and we have to play it out.  How would they

negotiate a deal?

And the one thing the Court will tell us in the

instructions is you have to presume the patents are valid

and you have to presume they're infringed so Groupon and IBM

are sitting at a table and they're going to negotiate and

Groupon has to agree it infringes and they have to agree the

patents are valid.  And they're going to determine what is

the economic benefit Groupon is getting from using these

patents?  How much money?  What is their product related to

those patents?

Once you determine the profit they make,

Professor Hausman is going to tell you he is going to go

through the factors and how would you split that profit, how

do you allocate some to IBM so it's a fair deal?  And he

explain all that to you.  I'm not going to go into the

details right now, but it's a big number.

You see the 10 million views a day?  Keep in

mind this is a number for the past.  They have known about

the patents, the two Filepp patents since 2011.  They have

known about the '601 patents since 2012.  And they have

known about the account creation automation patent since

2014.  So the number is for all of the past up until today.

And it's a big number.

Professor Hausman breaks it down by patent and

then he adds it up and the number is $166 million.  That is

what this case is about.

Now, I already told you, so let's talk a little

bit about what Groupon is going to say.  I already told you

that they're going to say they don't infringe.  Lawyers love

the word games.  They say if this word in the patent means

this, I don't infringe.  My client doesn't owe you any

money.  Everybody does that.  It's the first line of

defense.

When Groupon fails to prove to you that they

don't infringe, they're going to come here and tell you that

our patents are invalid.  They're going to say somebody else

did it first.  I think one of the things they're going to

say is a company in Japan did it first.  Everybody does

that.  Everybody argues, no, I don't want to pay.  The

patents are invalid.

They've got a license defense.  The license

defense literally makes no sense.  What they're going to say

is because we licensed Google and because we licensed

Facebook, and because Groupon says you can log on with

1  Google and you can log on with Facebook that somehow that is

2  a license for Groupon to do it, too.

3         Well, you are going to see the licenses in this

4  case.  And the licenses to Google and Facebook are going to

5  be in evidence.  And they say right in them that Facebook

6  and Google, by that license, do not license combinations

7  with other people.  It's excluded from the very license

8  agreement that they're relying on in the black-and-white

9  letters.

10        Moreover, the software that does Dr. Hinton's

11 patent is on the Google servers -- excuse me -- Groupon

12 servers.  Groupon is creating accounts automatically with

13 their own software.  The only thing they get from Google and

14 Facebook is the user's e-mail and name.  And they take it

15 and they do the whole account creation themselves.

16        So the idea that they would be licensed by

17 licenses that say these licenses do not transfer to third

18 parties and that they would be licensed when it's their

19 license on their machine is nonsense.  It is a defense smoke

20 screen, and you will see from the evidence in this case that

21 that argument makes no sense.

22        They're also going to argue these patents are

23 old.  And that's true.  I showed you the Prodigy timeline.

24 Two of them are old.  Two of them are from 1988 when Prodigy

25 was invented.  But old doesn't make them bad.  Right?  What

do we know about technology?  When you invent something that is breakthrough, everybody comes next has to build on it. So old doesn't make it bad, old makes it foundational.  We did it first.  We did it before everybody else.

Two of the patents in this case are expired. They're going to say, oh, those patents are expired.  You can't -- that's not -- we're not going to give up any money for those.

That doesn't make any sense.  That is not the law.  Expired means Groupon can now use the two now for free.  It doesn't mean they can use them in the past for free before they were expired.

If you look at the timeline I showed you -- there we go.

They've known about the Filepp patent since 2011.  One of those Filepp patents expired in 2015.

They owe IBM for that little stub of 2011, 2012, 2013, 2014, and for the stub of 2015 before the patent expired.

The patent being expired does not excuse infringement.  They're going to say it, and they're going to say it, and they're going to say it.  It's a smoke screen. It has no merit.

The '601 patent they have known about since 2012.  They owe us from 2012, 2013, 2014, 2015, and the

1    portion of 2016 before it expired, the '601 expired, and the

2    lawsuit was filed in 2016.

3            The other two patents, the '849 and the '346

4    continue to run for years.  So those two are not expired.

5            But the fact that two of the patents are expired

6    is not a defense to infringement.  It doesn't make the

7    patents invalid.  It does not excuse damages.  It does not

8    excuse the royalty.  It is nonsense.  It is a defense smoke

9    screen.

10           The other thing they're going to tell you is

11   that you are just asking for too much money.  $160 million

12   is too much money.  They're going to say nobody paid

13   $160 million.

14           So let's look at what other people pay.  I'll

15   leave the others blank, but just to give you a sense:

16           Amazon paid $49.8 million for a license.

17           Google paid $35 million for a license.

18           Facebook paid $20 million.

19           Priceline paid $34 million plus a contingent $6

20   million which we will explain.

21           LinkedIn paid $30 million.  And,

22           Twitter paid $36 million.

23           But that is not all they paid.  So don't be

24   misled by this smoke screen.  What you are going to find out

25   at this trial, when Professor Hausman takes you through it

1    and when our licensing executive Tom McBride takes you

2    through it, for each one of those deals, in fact, for most

3    of the IBM deals, IBM, in addition to money, gets from those

4    companies a license to all their patents.

5         So take Amazon, for instance.  Amazon is huge in

6    cloud computing.  Amazon is huge in artificial intelligence.

7    Amazon is huge in servers.  As a result of the deal IBM did

8    with Amazon, IBM can now use all of Amazon cloud computing

9    patents, all of their artificial intelligence patents, all

10   of their server patents.

11        Google.  Google has a huge portfolio.  Quantum

12   computing, right in IBM's sweet spot.  Servers, right in

13   their IBM's sweet spot.  Artificial intelligence, data

14   analytics, right in their IBM's sweet spot.

15        So each of these deals, in addition to money,

16   IBM got a pile of patents.  So that has to be added on to

17   the value.

18        And Professor Hausman is going to tell you how

19   to add that on on the value.  Our licensing executive Tom

20   McBride is going to tell you how important it is to IBM and

21   how valuable is to IBM.

22        And that is not all.  Every one of these deals

23   were voluntary deals.  And IBM, you will learn when Mr.

24   McBride testifies, when somebody is willing to do a

25   voluntary deal with IBM, IBM gives them a huge litigation

discount.

Why do they do that?  If you look at that
timeline, this complaint was filed in March of 2016.  It's
now 2018.  It has taken us two and-a-half years to get us to
this trial.  In that time, we spent millions of dollars in
this case.

Dr. Hinton is not in the lab.  She is here.  She
is going to spend two weeks with us.  Mr. Filepp is not in
the lab.  He is going to spend time with us here.  All the
IBM executives and witnesses had to deposed.  Documents had
to be disrupted at the company.

It is hugely expensive and disruptive to have
these cases.  So if you can get a company to sign up for a
voluntary, IBM makes it a policy of give them a big
avoidance litigation discount.  Let's do this as
businessmen.  Let's not fight in court.  So every one of
these deals has, in addition to patents, a litigation
discount.

Now, two of these companies did have litigation.
Amazon had to be sued by IBM, but then they settled quickly
into the lawsuit.  So we didn't have the expense, we didn't
have the time delay.  We didn't have the diversion of
resources and inventor time.

Facebook went a little further.  Facebook, there
was a lawsuit with Facebook that went a little further but

1  didn't require a trial like this one.

2            And so the litigation discount for Priceline

3  wasn't as great as the others' and the litigation discount

4  for Amazon, not as great as others; but everybody on this

5  list got a litigation discount.

6            So when you add the value of what they paid plus

7  the value of the patents that they gave back to IBM as part

8  of the deal, plus the litigation discount, you are right at

9  about $160 million.

10            Now, lastly, I think Groupon is going to make

11  the following argument.  Listen, even if that is right, even

12  if $160 million might sound reasonable when you do the math,

13  we shouldn't pay Groupon.  We shouldn't pay $160 million

14  because we have a very easy and cheap way to do this without

15  using your patents.  It's called a design around.  And

16  they're going to say they could have designed around.  They

17  could designed around for maybe $3 million and we wouldn't

18  be in this mess and we wouldn't own you $160 million.  So

19  why on earth would we pay you $160 million?

20            Well, all you have to do, ladies and gentlemen,

21  is take a look at that timeline.  They have been infringing

22  these patents since 2011.  They knew about the patents since

23  2011.

24            If it was cheap and it was easy to design around

25  these patents and all of this could have been avoided, if

1    the executives at Groupon said to themselves, you know what?

2    It's cheap and it's easy, but we're not going to do it, damn

3    the torpedoes, let's charge ahead.  Well, that is willful

4    infringement.  So it's either willful infringement or it

5    ain't cheap and easy to design around these patents.

6    Because if it was cheap and easy to design around the

7    patents, they would have done it in 2011 or 2012.  We

8    wouldn't be here in 2018 with them still doing it exactly

9    the same way they were doing it back then.

10            Use your common sense.  Actions speak louder

11   than words.  Look at Groupon's actions of not designing

12   around and that will help you view their words, because if

13   it was clean and easy they would have.

14            Before I sit down, I want to leave you with a

15   thought, and I want to leave you with a commitment.  I'm

16   going to promise to you right now that I'm going to prove to

17   you three things.  And I call them the bedrock facts.  And I

18   call them the bedrock facts because they're so fundamental

19   to this case, they should form the foundation of your

20   deliberations.

21            Bedrock Fact No. 1.  IBM invented these ideas,

22   came up with these ideas, thee inventions, these patents

23   before anybody else.  These patents are valid.

24            Bedrock Fact No. 2.  If it was so cheap and it

25   was so easy, Groupon would have designed around.  They

```
 1    didn't.  They infringe.

 2                Bedrock Fact No. 3.  These patents are very

 3    valuable.  Their reasonable royalty in this case should be a

 4    lot more than the voluntary licenses.  They should be a lot

 5    more than the voluntary licenses because these companies

 6    gave IBM a deal without making us go through a trial.  They

 7    gave IBM a deal where they gave back to IBM all of their

 8    patents.  The idea that Groupon would get a deal at that

 9    level makes absolutely no sense.  It is not fair.  The

10    proper value of this case is $160 million.

11                Now at the end of the trial I'm going to get to

12    speak to you again in the closing argument.  I'm going to

13    remind you of these three bedrock facts.  IBM did it first

14    in each of these four patents.  If Groupon could have

15    designed around, they would have and they didn't.  They

16    infringe.  And the reasonable royalty in this case to IBM

17    should be very substantial.  It should be $160 million.

18                Thank you.

19                THE COURT:  Thank you.  Ladies and gentlemen,

20    we're going to give you a break before we hear from the

21    defendant.  During the break, no talking about the case and

22    we will come look for you in about 15 minutes.

23                (Jury left courtroom.)

24                THE COURT:  All right.  So we may get to the

25    first witness.  Every one else can sit or leave but let's
```

1  hear the objection, if there are any, to the first witness.

2  Ms. Shamilov.

3          MR. DESMARAIS:  Should I move the patent?

4          THE COURT:  I think so, yes.

5          MS. SHAMILOV:  Your Honor, I believe the first

6  witness will be Mr. Filepp, the inventor of the Prodigy

7  patent.  This is the slide in a demonstrative to be used

8  with him.  So this appears to be providing the Prodigy

9  service in context, the title says in context, so it appears

10  that they are going to be talking about the state of the art

11  before the patents, what was around at the time and before

12  the patents.  And then everything all the way down to 2008,

13  so what is happening now.

14          In initial disclosures throughout this case

15  Mr. Filepp has consistently told us he only knows about the

16  subject matter of his patent, file history, conception and

17  reduction to practice and products incorporating these two

18  patents.  That is it.  Here is basically going to be

19  providing expert testimony about what was the state of the

20  art and what is happening in the modern world, that is not

21  what he's been told his knowledge is in this case.  And he

22  certainly was not disclosed as an expert witness as an

23  employee expert witness, there has been no identification of

24  that or disclosure of that.  This is the basis of the

25  objection of the slide and basically the objection to the

1    subject matter of the testimony that is relating to the

2    demonstrative.

3              THE COURT:  Thank you.  I'll hear from IBM.

4              MR. DESMARAIS:  Your Honor, my colleague,

5    Mr. Harrits, will address that if that's okay.

6              THE COURT:  Sure.

7              MR. HARRITS:  Your Honor, Robert Harrits on

8    behalf of IBM.  Mr. Filepp is coming in to testify as a fact

9    witness and will be providing testimony about facts that he

10   is aware of.  He will only be testifying about facts related

11   to the Prodigy system.

12             THE COURT:  Is he going to talk about the prior

13   art that we just saw on the screen.

14             MR. HARRITS:  The things that come before

15   Prodigy, he will be mentioning that that was stuff that was

16   around while he was developing his technology.

17             THE COURT:  Is that fact testimony or is that

18   expert testimony.

19             MR. HARRITS:  It is fact testimony about things

20   that he encountered that led him up to coming up with the

21   inventions in his patent.

22             THE COURT:  And what about this stuff that

23   postdates his invention, is he going to testify about that.

24             MR. HARRITS:  He will not be testifying about

25   that.  He will be testifying about what is just up to his

1    invention.

2              THE COURT:  Are you agreeable to modify the

3    slide to take everything off that comes off?

4              MR. HARRITS:  Yes, we are.

5              THE COURT:  So everything to the right of

6    Prodigy will come off of the slide?

7              MR. HARRITS:  We will.

8              THE COURT:  And in terms of the prior art that

9    you want him to testify about, what about the contention

10   that he's not previously indicated that he actually has any

11   knowledge about that, that seems to be the argument that he

12   was not disclosed as someone who knew anything about the

13   prior art.

14             MR. HARRITS:  I believe he was put up on a

15   30(b)(6) topic regarding the prior art, so he was testifying

16   on behalf of IBM what was known of the prior art.

17             THE COURT:  Thank you.

18             MS. SHAMILOV:  The initial disclosures don't

19   mention anything about the prior art or state of the art and

20   certainly we have stuff on this slide that goes back to 1969

21   and I don't think Mr. Filepp has any testimony that he can

22   say that in 1969 he was trying to invent Prodigy.

23             THE COURT:  If he's disclosed as an inventor and

24   undisputedly he is an inventor named on the patent, doesn't

25   it follow that he would know something about what existed at

1     the time of the invention?

2              MS. SHAMILOV:  That's no where on the initial

3     disclosure of his knowledge.  We want to see that data slide

4     because we were not provided the data slide.  We were not

5     actually provided any boards for that matter.

6              THE COURT:  If you have an objection to that.

7              MS. SHAMILOV:  I didn't want to interrupt the

8     opening.  But I would love to see the updated slides before

9     we can agree that this can go in.  And if they remove

10    everything after the Prodigy service, then it's probably --

11    I'll just listen to what he's going to say and may raise an

12    objection.

13             THE COURT:  Well, we do the slide consistent

14    with the representation, but the witness won't be offering

15    testimony as I understand it for the time frame post

16    Prodigy.  And consistent with that we're going to remove

17    post Prodigy from the timeline.  And I think the objection

18    has been withdrawn with respect to let's say the left side

19    of the slide, but to the extent it hasn't, I'm overruling

20    the objection.  It will be fact testimony.  If you think

21    he's straying to the expert side, then object on a

22    question-by-question basis.  We'll deal with it.

23             Now, with respect to the boards, it certainly is

24    a concern to me if you didn't know about it.  And I know it

25    created some awkwardness for where you could stand.  But do

1   you have a request for some relief?  Are you objecting?

2           MS. SHAMILOV:  No, going forward I want to have

3   notice if there will be boards in the court.

4           THE COURT:  We certainly won't have this again

5   in the closing.  We're going to work this out.

6           MR. DESMARAIS:  Everything was disclosed.  All

7   of this was disclosed.

8           THE COURT:  I'm told it wasn't.

9           MR. DESMARAIS:  No, no, let me just be clear,

10  because I certainly know the rules, Your Honor, the

11  entire -- every slide that I used was disclosed.

12          THE COURT:  Did you disclose that you were going

13  to blow it up as a board and display it separate from the

14  screen?

15          MR. DESMARAIS:  No, but the pretrial order

16  doesn't require that.  The pretrial order says disclose your

17  demonstratives.  There is nothing in the pretrial order that

18  says disclose the manner in which you're going to use them.

19          THE COURT:  I hereby order you will disclose the

20  manner in which you're going to do that for closing.  Don't

21  feel any obligation for your opening to do any more than

22  what was extended to you by plaintiff.

23          MS. SHAMILOV:  Thank you, Your Honor.

24          THE COURT:  All right.  We'll be in recess.

25          (A brief recess was taken.)

1          THE COURT:  All right.  Bring the jury in.

2              (Jury entering the courtroom at 3:45 p.m.)

3          THE COURT:  Welcome back, ladies and gentlemen.

4    I want to just apologize again, I know the courtroom is a

5    lot less comfortable than out in the hallway there.  We have

6    made the calls that we can make.  I don't know if it will

7    get better today, but I certainly expect it will tomorrow.

8              With that, it's time for Groupon to make their

9    opening statement.

10         MR. HADDEN:  May it please the Court, ladies and

11   gentlemen of the jury, why are we here?  As you will hear

12   from IBM's own witnesses, we're not here because IBM and

13   Groupon are competitors.  They are not.  And we are not here

14   because these four patents protect IBM's products or

15   technology.  They do not.  IBM's own witnesses will testify

16   that IBM did not even use these patents.  As you heard, two

17   of them were filed thirty years ago.  Two have expired.

18             We are here because IBM has another business, a

19   business that IBM doesn't talk about in its TV commercial.

20   In that business, IBM does not make any products or

21   services.  In that business, IBM uses its huge stock of

22   patents as a club to get money from other companies.  As

23   part of that business, IBM is demanding that every company

24   that does business on the worldwide web has to pay IBM.

25             You will hear from Mr. McBride, IBM's licensing

1  executive, that IBM has gone after every significant company

2  on the web.

3        This is just a sampling.  IBM has gone after

4  travel companies, AirBNB, Travelocity, Orbitz, Expedia, IBM

5  has gone after as you heard, they sued Amazon, they have

6  gone after LivingSocial, they have gone after shopping sites

7  on the web.  IBM has gone after all of the social media

8  sites, Facebook, Yelp, LinkedIn.  IBM has even gone after

9  all the cable TV, internet TV and satellite TV companies

10  from Direct TV to Hulu.  IBM has also gone after the search

11  engines like Google.

12        The only thing these companies have in common is

13  that they use the worldwide web.  And you'll hear from

14  Mr. McBride, that's the only reason IBM went after Groupon.

15  Groupon was operating on the worldwide web and it was

16  growing.

17        Now, IBM is not just going after companies that

18  operate websites.  In this case, IBM is accusing Groupon

19  customers and end users, people who just visit the website

20  of infringing IBM's patents.

21        Now, it's unlikely that IBM is going to sue

22  everyone who visits Groupon's website or all of the other

23  websites that IBM is going after.  But IBM is claiming in

24  this suit that it could.  So a key question for you to

25  decide in this lawsuit is whether these patents from IBM

cover the worldwide web.  And whether they cover the

standard web technology that is used not just by Groupon,

but by millions of websites in the world.

And the evidence will show that those patents do

not.  And the reason they do not is that IBM didn't invent

the worldwide web.

The worldwide web was invented by Tim

Berners-Lee in a laboratory in Switzerland.  And Tim

Berners-Lee invented the idea of a worldwide web of

information on computers all over the world that could be

accessed by users by just clicking on links.  But he didn't

just invent that idea, he invented the technology that made

it a reality.

That technology includes HTTP which you probably

seen in your browser windows, that's the Hypertext Transfer

Protocol, that's what's used to communicate data on the web

and connect the web.  He also invented Hypertext Markup

Language, or HTML, which is the language that's used to

create web pages.  It is that technology that makes the web

the web, and it is used by literally millions of websites

today.

Importantly, Tim Berners-Lee made a decision.

He decided that he wasn't going to patent his invention.

Instead, he decided that to make his vision of the worldwide

web a reality, he was going to give his ideas to the public.

1    He gave his invention to everyone, you and me, everyone.

2    And he did that so that everybody could use it freely, and

3    so that the web would grow.

4            And you're going to meet in this case one of

5    those early web developers who benefited from Tim

6    Berners-Lee's decision to give the web to the public, and

7    his name is Paul Davis.  He was, in fact, the second

8    employee hired by Jeff Bezos when he founded Amazon back in

9    1994.  And Paul Davis actually developed the original Amazon

10   website that launched in 1995.  And Mr. Davis will testify

11   that for the early web, and the reason that it grew to what

12   it is today is due most to the technology that Tim

13   Berners-Lee invented, HTTP and HTML, but actually more

14   importantly that Tim Berners-Lee gave that technology to the

15   public so that everybody can use it.  And that's really why

16   we have the worldwide web we have today.  It is a source of

17   information, commerce and entertainment from hundreds of

18   millions of people every day.  And it is that because Tim

19   Berners-Lee invented the technology and gave it to the

20   public to use.

21           You're also going to meet in this case Jason

22   Carlisle who is a vice-president at Groupon.  He will

23   explain how Groupon uses that technology, the worldwide web,

24   to help local merchants find new customers and thrive and to

25   help consumers save money and discover new things to do and

1   new merchants in their community.

2          So let's look at these patents because we didn't

3   see much of them in IBM's presentation.  Let's start with

4   the Prodigy patents, the '967 and the '849.  These are the

5   two patents that IBM is claiming give them rights to the

6   web.

7          And as you see, they were filed thirty years

8   ago, and two have already expired.  So what are they really

9   about?  Well, as you heard, Prodigy was an online service.

10  It was created by Sears and IBM.  CBS was involved early,

11  but then dropped out, so it was primarily Sears and IBM.

12         And in Prodigy, information was presented to the

13  user as a series of screens, like a slide show.  You could

14  click on buttons to move forward or backward through these

15  screens of information.  Prodigy looked nothing like the web

16  and Prodigy worked nothing like the web.

17         In fact, Prodigy was based on earlier technology

18  called Videotex.  Videotex was also a similar screen base,

19  it provided screens of information.  And in Videotex those

20  screens would get sent down to your computer as one full

21  screen at a time.  You'll hear some of this from IBM's

22  inventor, Mr. Filepp.  You would click and get screens and

23  move on to the next screen.

24         Now, the big invention that Mr. Filepp came up

25  with in Prodigy was to divide the users screen into these

partitions.  And the benefit for that was that now you could

fill this screen in by sending down the different pieces of

information that would fit into each of those areas piece by

piece.  And then you could have the software on the user's

computer put those pieces in these predefined screen areas

to fill the user screen.  That was the innovation that

Mr. Filepp and Prodigy provided over Videotex.

Now, if you think about it, to make this work,

and the only reason it worked was because Prodigy was a

closed system.  Everything you could see on Prodigy, any

screen on Prodigy, any piece of text, any graphic, this

graph like this, it all came from a single database on a

single IBM mainframe computer.  So Prodigy had complete

control how every piece of information looked and equally

importantly how big it was.

So the way it worked was if you had an area on

the screen you need to fill, Prodigy would know what the

size of the area of the screen was because they predefine it

and they could send down a piece of information that would

precisely fit in that area so you could fill the screen in

this way.  In the end of that process you had essentially a

Videotex screen.  That is, in fact, not the way the

worldwide web works.  In the worldwide web, the whole point

of the worldwide web is you have a web, you have a web of

millions of computers all over the world and you can get

1    information from any of those millions of computers by

2    clicking a link in your web browsers.

3           If you think about this picture, it's clear,

4    there is no single entity that controls the worldwide web.

5    There is no one to dictate what information you provide to

6    the screen and how big it is to determine if it will fit in

7    a predefined area of your screen.  That's just not the way

8    the web worked.  It only worked in Prodigy because all the

9    information is controlled by Prodigy and comes out of one

10   database.

11          If we go back just for a second, IBM's slides

12   showed throughout a cloud representing the network, and just

13   to be clear, the network that connected this computer to

14   that server at IBM in Prodigy was not the internet, it was

15   not the worldwide web, it was a proprietary dedicated

16   network built by IBM that essentially went from your

17   computer through a telephone line to a modem bank at IBM to

18   that single computer.  Everything came from the mother ship.

19   That's not the way the worldwide web works.  That's not the

20   way the internet works.

21          So if we go back and look at Prodigy and

22   Mr. Filepp's invention, so one of these areas of the screen

23   that your screen would be divided into was reserved for the

24   information that you were requesting.  It could be stock

25   quotes, it could be news, it could be weather information.

1    Those were called applications in Prodigy.  So there is one

2    area of the screen that that information would be displayed

3    in.  Everything that would go in that area would be

4    predefined to fit in that predefined area.  There was

5    another area of the screen that had command functions.  That

6    is how you would move between these screens of information

7    with this next and back button, you can see up there, or you

8    can select another application so you could go from Prodigy

9    weather to Prodigy news by selecting one of those buttons.

10              Now, that is in fact what the '967 patent is

11   about.  It's about predefining areas of the screen for these

12   Prodigy applications and for command functions that allow

13   you to move between those applications and presenting those

14   together on a single screen.  As you'll see and as the

15   evidence will show, that's not the way the worldwide web

16   works.

17              In addition, Prodigy wanted to make money by

18   selling advertising.  So there was another area that was

19   reserved on the screen for advertising.  So the idea was

20   that because the advertising would be in its own area of the

21   screen, it wouldn't interfere with the user needing the

22   information it wanted which would be displayed in the

23   application area of the screen.

24              So the '849 patent is about having another area

25   of the user screen for presenting advertising.  And because

the advertising was separate from what was displayed in the

application area, Prodigy could send those advertisements

down to the user's computer.  They could preload them.  And

then whenever the user -- a new screen was needed to be

displayed, Prodigy could go -- the Prodigy software on your

computer could pull up one of those advertisements and plop

into that area of the screen.  And, again, like everything

else in Prodigy, those advertisements came out of that one

database in that one IBM computer.  So they could all be

designed to exactly fit into that advertising area on the

screen.

　　　　　This displaying of these prestored

advertisements on an advertising area of the screen is what

the '849 patent is about.  And, again, that is not the way

the World Wide Web works, as the evidence will show.

　　　　　Now, Prodigy failed.  It was shut down 20 years

ago.  In fact, you will hear from Mr. Filepp, the Prodigy

inventor he was laid off in 1997.

　　　　　Now, if you think about it, 1997, when Prodigy

is failing, that is when the World Wide Web is exploding.

And as Dr. Jon Weissman, the Groupon's technical expert, who

is sitting right over there, will explain, that is not a

paradox.  The web was exploding because Prodigy was not the

web.  Prodigy was not even a precursor to the web.  The web

was new technology and different technology and it worked

1  nothing like Prodigy.  And that is why, in 1997, based on

2  Tim Berners-Lee invention, the World Wide Web took off,

3  Prodigy was shut off.  Mr. Filepp was laid off.

4          Just one second.

5          Now, you heard some suggestions from IBM's

6  lawyer that the idea of storing information on the user's

7  computer or using a non-dumb terminal, it is a computer that

8  could actually do things, was somehow a new invention in

9  Prodigy.

10          That is not the case, as you will hear from

11  Dr. Weissman.  Dr. Weissman's specialty is what is called

12  distributive computing, when means you have computers doing

13  different things that talk to each other.  And he will

14  explain that the idea of storing some information on a

15  user's local computer and having that computer do actual

16  real work did not come from Prodigy.  It is a basic

17  fundamental idea in computer science that came decades

18  before these patents.

19          And they it didn't get to the web through

20  Prodigy.  As Dr. Weissman will explain, there is no lineage,

21  quite frankly, if you will, from Prodigy to the World Wide

22  Web.  There was Prodigy which was based on videotex.  It

23  died.  Basically Prodigy was the last gasp of what is now

24  extinct technology, videotex.  The World Wide Web was born,

25  it was new, it was different.  It works different.

How can we see it works different?  Well, a web page is a document but it is a document that is written in that HTML language that Tim Berners-Lee invented.  And because it's a document, Groupon and other websites don't control your computer screen.  And they don't divide your computer screen into areas.  They send you a document and you can look at that document using your web browser anywhere you want on your screen.  And you can look at any part of that document anywhere you want on your screen by scrolling up and down.

So if you get a web page, you can scroll down, you can see as much of the information on that page and you can see it anywhere you want.  And you can also put your browser window anywhere on the screen.  And you can make it as big or as small as you want.  And within your browser window, you can change your view so you can zoom in and see make it as big and as small as you want anywhere on your screen.

Now, you can do that because Groupon and the World Wide Web in general don't divide your screen into areas.  They don't generate areas on your screen.  They send you one of these HTML documents, and you look at it in a browser, and you can look at any part of it anywhere you want any size.

For that reason, the evidence will show that

Groupon does not use the Prodigy patents.  And that IBM will be unable to meet its burden to prove that it does.

Now, IBM's counsel said something in its opening that Groupon will have to prove it doesn't infringe.  That is not the law.  The burden of proving infringement is on IBM.  IBM has to prove that Groupon infringes, and IBM won't be able to do that in this case.

Now, there are two other patents that IBM has asserted.  The next one is the '601 patent which was filed 22 years ago and has also expired.

Now, what is this patent about?  It is essentially about a specific method for working around a feature of the World Wide Web.  So as I said, the World Wide Web is based on this HTTP protocol.  And a feature of that protocol is what is called stateless.

So what does that mean?  That means when you send a request to a web server from your web browser; right?  You type in a URL, you want to go to, your web browser sends a request over at the real Internet this time.  That is why we have the Internet cloud lingo.  The web server will respond with a web page.  You will get the web page.

Now, at that point, the web server forgets all about that request.  So each request to a web server is handled separately by the web server and it doesn't have any memory of what it did before.

1             Now, Tim Berners-Lee made the web this way

2    because it is very efficient, if you think about it.  If you

3    have a web server that is receiving a lot of requests from a

4    lot of different users, the easiest way is to respond,

5    forget, wait for the next request.  That is the way the web

6    works.

7             Now, that can be a problem if you are trying to

8    track what a specific user is doing on a website.  So if you

9    have a shopping site like Amazon and you want to track what

10   items people are putting in their shopping carts, you need

11   to know that those requests for different items are coming

12   from the same user, or at least the same browser, so you

13   know what shopping cart to put them in.

14            Now, there is actually a standard way to solve

15   this problem now.  And the standard way is when you first go

16   to a website, the web server will assign you an identifier.

17   And it is often called a session ID.  And it will store that

18   session ID in what is called a cookie which is just a small

19   file of information that gets sent back with the web

20   response, with the web page from the web server, and it gets

21   stored on your computer.

22            Your browser will know that the next time you go

23   back to that same website, to send with the request, I'll

24   click on the buy line here, my request will automatically go

25   along with the cookie, and the cookie automatically gets

1    sent for free along with the request to the web server.

2            And when that happens, the web server can then

3    read the session ID and the cookie and figure out who it is

4    talking to and it can do things like now I know that this is

5    the session ID that corresponds to Customer No. 4, and I can

6    put this item in Customer No. 4 shopping cart and everything

7    will work fine.

8            So that is the way this stateless problem is

9    generally solved today on the web.

10           And Phillip Dunham, who is sitting over here,

11   who is a senior engineering manager, will be here and

12   explain how Groupon uses cookies to solve the statelessness

13   problem on the Groupon website.

14           Mr. Dunham will explain that, in fact, Groupon

15   is so reliant on this cookie technology, the users on a

16   Groupon site cannot make purchases if they disable cookies

17   on their browsers.  So cookies are the only way to put

18   things in your shopping cart or buy on Groupon.

19           Now, importantly, IBM did not invent cookies.  A

20   company called Netscape invented cookies, as the '601 patent

21   explains.  This was from this IBM '601 patent.  Cookies were

22   prior art.  They were a known solution at the time of the

23   '601 patent.  And the patent explains that.

24           So what does the '601 patent talk about?  Well,

25   the '601 patent is about basically an alternative method for

1    passing this session ID or other state information back and

2    forth between the server and the browser, if you don't want

3    to have cookies.

4              And the way it does it is instead of putting it

5    in a cookie, it puts that information in the links on what

6    gets returned to the browser and that is what is described

7    here.

8              So what does that mean?  Well, you know when you

9    click on a hyperlink, there is some information that gets

10   sent to the web server that basically identifies the web

11   page you are asking for.

12             So what the '601 patent does is it adds to those

13   links additional information, the state information like

14   session ID, so that when a user, before the page gets sent

15   to the user, the web server will add to those links, the

16   session ID of that particular user.  So it will modify the

17   links in the web page that is being sent back to the user to

18   include the session ID or other state information.

19             And then the page gets to the user.  If they

20   want to click on any of those links, the links will already

21   have the session idea or state information in them.

22             So when the user clicks on one of those, along

23   with the normal URL that identifies the web page they want,

24   the URL will include the session ID which will tell the web

25   server who it is talking to essentially.

1            So this is an alternative to cookies.

2            Now, the problem with this approach is -- well,

3    there is a couple of problems:

4            One, it's slow because you have to, the web

5    server has to modify every page for every user to add their

6    specific session ID to the links.

7            And the other problem is if it misses a link.

8    So if it leaves a session ID out of some of the links and

9    the user then clicks on one of those links, they're lost

10   because basically the server doesn't know now who it is

11   talking to, and it can't figure out where it is in the

12   session.

13           For that reason, even IBM never used this

14   patent.  And you will hear that from their own inventor.

15   IBM also used cookies instead.  So IBM, like Groupon, like

16   almost every site on the Internet, uses cookies instead of

17   this patent.  It never used it.

18           Now, Groupon doesn't use it either, as Phil

19   Dunham will explain.  When you are in the process of making

20   a purchase on Groupon, after you pick an item, put it in

21   your shopping cart, you get a page like this.  And this page

22   has a butch of links on it.  You can click on all these

23   links.  And then you click on the last link if you want to

24   proceed and complete your purchase.

25           But as Phil Dunham will explain, none of these

links have a session ID or any other state information in them.  And that is because Groupon doesn't use this technique.  It uses cookies.  So the cookie will tell Groupon's server who this user is and what item to put in what shopping cart.

Now, interestingly, cookies were not always accepted.  So early in the World Wide Web, in the early 90s, 1993 and '94, many web developers were suspicious of cookies.  You may hear things today about you get people's cookie policy when you click on a website or they're private cookies.  That was an even bigger concern in the early days of the web.  So a lot of developers thought it was a bad idea for a server to write information on the user's computer basically without them knowing it, which is what cookies do.

One of those developers was Mr. Davis again, the second employee at Amazon who built Amazon original website and before coming to Amazon, you will hear from Mr. Davis, that he was at the University of Washington's computer science department, and he didn't think cookies were a good idea.  So he came up with the idea of putting state information, like session ID in links instead.  Exactly the same idea that is in the IBM patent.  But Mr. Davis came up with it two years earlier.  And, in fact, he used it when he built Amazon's original website in 1995.

1           This is an image from the home page of Amazon

2      when it originally launched out of Mr. Bezo's garage in

3      1995.  And Paul Davis will be here as a witness and will

4      explain how he built this website and how he used this

5      alternative to cookies as a way to keep track of what items

6      people were purchasing at Amazon.

7           Now, unfortunately, the Patent Office didn't

8      know about Paul Davis and their work.  So you will be the

9      first people who will be hearing his story and understand

10     how it relates to this patent.  And the evidence will show

11     that it invalidates this patent.  The Patent Office didn't

12     know that he had his idea first and he used the idea in a

13     big way actually on Amazon's website.

14          So that leaves one patent, the '346 patent which

15     we heard about, which is Dr. Hinton's patent.  And we heard

16     some about single sign on.  And you can single sign on at

17     Groupon.  You click on the sign in button and you get a

18     screen like this.  And if you have an account on Groupon

19     already, you can fill in your e-mail and password and click

20     sign in, or if you have an account on Facebook or Google,

21     you can sign in using Facebook or Google, your credentials

22     there, and not have to type in your e-mail password.

23          Now, there is no dispute this is a convenient

24     feature.  But there is also no dispute that this is not what

25     Dr. Hinton invented.  Single sign on was known before this

1    patent.  Dr. Hinton will testify to that.

2            What this patent is about is not single sign on.

3    This patent is about a specific way to create a new user

4    account in the middle of a single sign on operation.  And

5    as you will hear, part of the requirement for Dr. Hinton's

6    patent is that the website that you are trying to access has

7    to initiate or trigger the single sign on operation before

8    all this account creation takes place.

9            And that's not the way Groupon works.  So what

10   happens on Groupon is if you don't have an account, you get

11   a page like this which allows to you create a new account.

12   It's called signing up at Groupon as opposed to signing in.

13   When you get this page, you can either put in your name,

14   email address and password and create a new account directly

15   on Groupon, or you can click on one of these sign up with

16   Facebook or sign up with Google button.  If you click the

17   sign up with Facebook button, software in your browser, that

18   your browser down loads from Facebook will send a request

19   directly to Facebook, it doesn't go to Groupon, it goes

20   directly to Facebook.

21           In response, Facebook sends back this web page

22   from Facebook, which allows you, the user to log in and then

23   start the process of creating a new account.  This is all

24   between user and Facebook.  This is not going through

25   Groupon.  Groupon did not trigger this process, Groupon does

1   not provide this screen.  Groupon does not even provide the

2   software that calls Facebook, that's all Facebook

3   technology.

4              Similarly for Google, if you click on the Google

5   sign on button, your browser sends a request not to Groupon,

6   but to Google and Google will send back this web page that

7   allows you to sign in and start the process of creating a

8   new account.  All of that is between your browser and

9   Google, not Groupon.

10             Now, the fact that this happens in this way

11  between the user's browser and software downloads from

12  Facebook and Google in those servers is important for two

13  reasons.  First it means that Groupon does not trigger a

14  single sign on operation so we don't use this patent.

15  Second, it means if even if we did use this patent, these

16  companies are already licensed.  Facebook and Google.  And

17  as we'll see, they're licensed to provide services and what

18  are called API, Application Programing Interfaces, which is

19  what other services talk to to provide this very service.

20  And that's important because IBM can't charge Groupon for

21  using a service it is already licensed Facebook and Google

22  to provide.  It's like you can't sell your house to one

23  person, collect their money and then sell the same house to

24  someone else.  That's not what you can do.

25             There is one more problem with this patent.

1    First, everything in the patent talks about single sign on,

2    and single sign on technology was already known.  And, in

3    fact, Dr. Hinton will testify, it was described in standard

4    industry technical specifications, many of them are from

5    this organization called Liberty Alliance which you'll hear

6    more about.  But Dr. Hinton and her colleagues at IBM

7    studied those specifications and used them to implement the

8    single sign on functionality at IBM.  The only thing that's

9    not described in these specifications was the idea of

10   creating a new account in the middle of that process.  But

11   in fact that simple idea was also known before IBM.

12          And it was just known by two different

13   companies.  The first is Xerox.  And Xerox filed its

14   application, we heard Mr. Desmarais said it was in Japan it

15   was filed first in Japan.  Nothing wrong with that.  And it

16   describes exactly this process.  This is a flow chart from

17   the patent.  It shows that you're starting at single sign

18   on, SSO stands for single sign on.  It's just shorthand.

19   You start that process, you get a single point here and you

20   check, does user account exist?  So these diamonds in these

21   flow charts means that's a decision point, you have gone

22   through a process, you make a decision.  You check there.

23   Does the user have an account, and if he doesn't, you get

24   information from the SSO server which is the identity server

25   that IBM's counsel talked about, you get all the information

you need and then you have create a user account.  This is

exactly what is described in IBM's '346 patent.  And it was

done and described first by Xerox.

The other company that had the idea first was

Novell which is a networking company in Silicone Valley, and

they had a similar idea.  So you would be in one of these

single sign on processes, you would do this check, user has

an account on this site, again a diamond, decide yes or no,

if not, you proceed get this to this side, site generates

new user account.  Exactly the same idea that's in

Dr. Hinton's patent.  It was done before and in fact

patented by Novell.

Again, unfortunately neither the Liberty

Alliance specifications nor these two patents to Novell and

Xerox were provided to the patent office.  So the patent

office didn't have this information when it allowed the '346

patent to issue.

So at the end of this case, you're going to be

asked to make some determinations, determinations about

infringement and determinations about invalidity.  And

because Groupon does not use any of these four patents, the

evidence will show that IBM will be unable to meet its

burden of proof of proving infringement.

In addition, because two of these patents were

already described, well, you heard prior art, they're

1    already known, they're already done either by Mr. Davis at

2    Amazon or in those patents to Xerox and Novell.  In all

3    cases that information was not before the patent office and

4    the patent Examiners did not consider it in allowing those

5    patents.  Because of that, the evidence will show, and in

6    fact two of these patents are invalid over the prior art.

7            Now, the way the trial works is you heard from

8    Judge Stark, he said IBM gets to go first.  So you will not

9    be hearing from Groupon's witnesses for several days.  I ask

10   you to please be patient and keep an open mind until you get

11   that opportunity, and I thank you very much for your time

12   and service.

13           THE COURT:  Thank you very much.  So ladies and

14   gentlemen, it's pretty close to 4:30.  So I'm going to let

15   you go a few minutes early today.  Just a few words about

16   tomorrow.  We'll be with you from 9:00 until 4:30.  As I

17   have said, we're able to order lunch for you in order to do

18   that efficiently skilled that you get here a few minutes

19   before nine o'clock so that we'll probably have a menu in

20   the jury room waiting for you and you'll be able to figure

21   out what you want and let us know all before you get started

22   at 9 o'clock.  We'll be here until 4:30 tomorrow.

23           While you're aware from us, it's very important,

24   please no talking about the case with each other or anyone

25   else.  Don't do any research or look for other information

1    related to the case.  As I have indicated to you in my

2    instructions, please don't use Groupon during the time that

3    you're on this jury.  And I think that is it.  We'll hope

4    that the temperature is better in here tomorrow and we'll

5    see you tomorrow morning.  Have a good night.

6                    (Jury left courtroom.)

7                    THE COURT:  You can have a seat.

8                    Just a couple of comments in terms of issues.

9    In terms of openings and what happened here, I want to make

10   very clear for any future witnesses and certainly for

11   closing argument, you all are obligated to disclose to one

12   another not just, let's say, the substance of what you are

13   using in your slides but also what let's call it medium you

14   are going to use.  if it's going to be on the screen, it's

15   going to be in a cardboard cutout, if it's going to be a pad

16   that you are going to use, I want each side to know how you

17   are going to present it.

18                   Among other things, I think that is just fair to

19   both sides, but where we put things in the courtroom can be

20   very tricky.  And I think it was unfortunate that defense

21   counsel in the very beginning of the trial had to figure out

22   whether she could see what was going on, where to stand, and

23   it was very hard to work out in real-time with no notice to

24   any of us while the jury was sitting there.  So I don't want

25   anything like that to happen again.

```
 1              Further, I do have a rule.  I think it probably

 2    didn't come up in the pretrial order, the pretrial

 3    conference.  I can take the blame for that.  But I prefer

 4    counsel to say within arm's length of the podium.  So when

 5    you are doing your examinations or when you are doing your

 6    closings, you should basically be able to touch the podium.

 7    So let's comply with that going forward.

 8              I will be available at 8:30 tomorrow if there

 9    are any issues but any questions about any of that or any

10    other issues from IBM?

11              MR. DESMARAIS:  No, Your Honor.

12              THE COURT:  Okay.  And from Groupon?

13              MR. HADDEN:  No, Your Honor.

14              THE COURT:  Okay.  We'll see you tomorrow

15    morning.

16              (Proceedings end at 4:30 p.m.)

17

18         I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.
19

20                        /s/ Brian P. Gaffigan
                           Official Court Reporter
21                          U.S. District Court

22

23

24

25
```