1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

   INTERNATIONAL BUSINESS MACHINES
4  CORPORATION,                            :  CIVIL ACTION
                                           :
5              Plaintiff,                   :
   v                                        :
6                                          :
   GROUPON, INC.,                          :
7                                          :  NO. 16-122-LPS
              Defendant.
8                              - - -

9                         Wilmington, Delaware
                      Wednesday, July 18, 2018
10                     *Jury Trial - Volume C*

11                             - - -

12  BEFORE:  HONORABLE LEONARD P. STARK, Chief Judge, and a jury

13  APPEARANCES:                   - - -

14             POTTER ANDERSON & CORROON, LLP
               BY:  DAVID E. MOORE, ESQ.,
15                  BINDU A. PALAPURA, ESQ., and
                    STEPHANIE E. O'BYRNE, ESQ.
16
17                  and

               DESMARAIS, LLP
18             BY:  JOHN DESMARAIS, ESQ.,
                    KARIM Z. OUSSAYEF, ESQ.,
19                  LAURIE STEMPLER, ESQ.,
                    KEVIN K. McNISH, ESQ.,
20                  MICHAEL MATULEWICZ-CROWLEY, ESQ.
                    ROBERT C. HARRITS, ESQ.,
21                  BRIAN D. MATTY, ESQ., and
                    EDWARD GEIST, ESQ.
22                  (New York, New York)

23                         Counsel for Plaintiff

24

25  Dale Hawkins                      Brian P. Gaffigan
    Registered Merit Reporter         Registered Merit Reporter

```
 1    APPEARANCES:  (Continued)

 2
                   ASHBY & GEDDES, P.A.
 3                 BY:  JOHN G. DAY, ESQ., and
                        ANDREW C. MAYO, ESQ.
 4
                        and
 5
                   FENWICK & WEST, LLP
 6                 BY:  J. DAVID HADDEN, ESQ.,
                        SAINA M. SHAMILOV, ESQ.
 7                      PHILLIP J. HAACK, ESQ.
                        SAPNA MEHTA, ESQ.
 8                      JESSICA M. KAEMPF, ESQ.,
                        ATHUL ACHARYA, ESQ., and
 9                      JESSICA BENZLER, ESQ.
                        (Mountainview, California)
10
                             Counsel for Defendants
11

12

13

14

15

16

17                           - oOo -

18                   P R O C E E D I N G S

19              (REPORTER'S NOTE:  The following jury trial was

20    held in open court, beginning at 8:33 a.m.)

21              THE COURT:  Good morning.

22              (The attorneys respond, "Good morning, Your

23    Honor.")

24              THE COURT:  Any issues from IBM this morning?

25              MR. OUSSAYEF:  No issues from IBM.
```

1              THE COURT:  And from Groupon?

2              MS. SHAMILOV:  One issue Your Honor, Your Honor.

3    My colleague, Ms. Mehta.

4              THE COURT:  Good morning.

5              MS. MEHTA:  Good morning, your Honor.  Sapna

6    Mehta on behalf of Groupon.

7              There is one issue with respect to a deposition

8    clip that IBM has included for the video for today.  We

9    believe Your Honor already excluded it during yesterday's

10   hearing.  It's the deposition of Jan Krems at 244 when he

11   was asked:  What changes were made to Groupon's website,

12   mobile application after reading patents in suit?

13             And it was Groupon's understanding that the

14   Court excluded that testimony, but IBM insisted it be

15   included in the video for today.

16             THE COURT:  So Krem's, page 244.

17             MS. MEHTA:  Correct.

18             THE COURT:  Do you have in front of you whatever

19   I said yesterday?

20             MS. MEHTA:  I do.  The trial transcript on page

21   537.  In sustaining IBM's objection to Groupon's counter the

22   Court said, noted that Groupon actually agreed it wouldn't

23   play the counter testimony on page 242 since the Court was

24   not going to allow IBM to do some of what was disputed.

25             THE COURT:  All right.  I'm probably going to go

1      back and refresh my recollection.  But you want to come back

2      and attempt to help me understand?

3                   MR. OUSSAYEF:  Good morning, Your Honor.  Kareem

4      Oussayef for IBM.

5                   Here is the testimony at issue Your Honor.

6                   The question is:  Were any changes made to

7      Groupon's website, touch, or mobile applications after

8      reading the patents in suit?

9                   And the witness said:  As far as I know.

10                  So that testimony was not objected to by Groupon

11     even whether before, during the pretrial phrase or at the

12     trial phrase.

13                  And, furthermore, even if Groupon were to make a

14     new objection now, based on Your Honor's ruling, this does

15     not fall under the Court's former ruling because it wasn't

16     objected to.

17                  And, furthermore, it's not about whether the

18     witness read the patents in suit or not and what kind of

19     implications to draw from that.  It's just a question

20     whether they changed their products after reading the

21     patents or not, which goes to design-arounds.

22                  THE COURT:  So in looking again at the letter,

23     is Krems only dealt with on page 3 of the letter?

24                  MR. OUSSAYEF:  Yes, Your Honor.  That's my

25     understanding of what Krems dealt with.

1                THE COURT:  And you are saying I won't see

2    anywhere here an objection even from Groupon to page 244 of

3    Krems?

4                MR. OUSSAYEF:  Yes, that's correct, Your Honor.

5                THE COURT:  Okay.  Thank you.

6                Ms. Mehta?  There you are.

7                Is that correct?  I'm trying to find where your

8    objection is.

9                MS. MEHTA:  Sure.  On page 3 where it says

10   Groupon's position and response to IBM's objection, we noted

11   that the counter testimony was countered because of the

12   testimony that IBM had designated which we deemed

13   objectionable.  So it says in the middle of the page that,

14   excuse me, objectionable testimony is permitted.  Groupon is

15   allowed to counter with testimony that explains the context

16   of that witness's answer.  And now that the context of the

17   witness's answer has been excluded, we understood the

18   Court's ruling to mean that IBM's initial designations were

19   excluded as well.

20                And I'll note with respect to this particular

21   question that it was a 30(b)(6) witness but he was not

22   designated on the topic of Groupon's awareness.  So it is

23   highly prejudicial to include that quote without the

24   context, without him saying right beforehand he read the

25   patents and thought Groupon didn't infringe and only include

1    portion where it said:  And then I didn't take any action.

2              THE COURT:  Page 244 doesn't appear to be called

3    out anywhere as objected to at page 3 of the letter.  Do you

4    agree with that?

5              MS. MEHTA:  In our response to IBM's objection

6    to our counter, we believe we were noting that we were

7    countering conditionally.  It was a conditional objection

8    that if our counter was played, we would allow IBM's

9    designation.

10             THE COURT:  I understood that conceptually but

11   there is no reference to page 244 here that I see.

12   Moreover, when I look at Attachment C again, refresh my

13   recollection, there is no red text on the side indicating an

14   objection.  Is that correct?

15             MS. MEHTA:  That is correct.  Again, because

16   Groupon believed that if your counter testimony was played,

17   we would be amenable IBM's designations being played as

18   well.

19             THE COURT:  Well, if I view this as that there

20   was not a proper designation in light of all of the

21   confusion which only seems to be multiplying at this point,

22   would you want the opportunity to go back and revisit what

23   you want to play for Krems?

24             MS. MEHTA:  Yes, we would ask the Court

25   reconsider and allow the context of his answer that was

1    struck yesterday.  So the testimony starting at page 241

2    going through 242 that was counter.

3              THE COURT:  That would be the blue text at

4    Exhibit C?

5              MS. MEHTA:  Correct.

6              THE COURT:  All right.  What is IBM's position

7    on that?

8              MR. OUSSAYEF:  Your Honor, the additional

9    deposition testimony that Groupon would now want to add back

10   in is not relevant to the issue of design-around.  They want

11   to add in testimony about consulting with lawyers or about,

12   you know, opinions about the patents, that kind of thing.

13   It's not relevant or responsive to this.

14             And, furthermore, we've gone -- we are at a

15   point where we would like to play this deposition testimony

16   at a specific stage in the case and not have to go back and

17   reedit the deposition one more time.

18             THE COURT:  All you have to do is add pages 241

19   and 242.  That is all we're talking about.  And I don't see

20   any references to consulting with lawyers at 241 and 242, do

21   you?

22             MR. OUSSAYEF:  No, that's correct, Your Honor.

23             THE COURT:  All right.  Well, I'm going to allow

24   IBM to do 244, which is not objected to.  And I'm going to

25   allow Groupon to add back 241 and 242 to give proper

1     context.

2              And, again, I'm sorry that we're going in

3     circles but it was extremely confusing, what you put in

4     front of me.  I tried my best to be clear yesterday but

5     that's my ruling on that.

6              MR. OUSSAYEF:  Thank you, Your Honor.

7              THE COURT:  Understood?  All right.  Is there

8     anything else this morning?

9              MS. MEHTA:  No.

10             THE COURT:  Yes?

11             MR. DAY:  One proposal from the parties that I

12    hope will be a welcome one, Your Honor, because it's going

13    to result in less paper for you than more.

14             The parties have discussed Rule 50 motions.

15    And our proposal is that rather than file anything on the

16    docket, that we would each just present orally to the Court

17    in brief fashion with just enough detail to identify what,

18    on what ground we were moving our Rule 50 motions.  We

19    wanted to make sure that was okay with Your Honor.

20             THE COURT:  As long as that is agreeable to both

21    sides, it's agreeable to me.

22             MR. DESMARAIS:  Your Honor, as long as the

23    grounds are stated orally on the record, we see no need to

24    have a written filing.

25             THE COURT:  Further, my feeling is if the time

1   for which those motions are appropriate doesn't coincide

2   with the break for the jury, you can simply say, for my

3   purposes at least, you know, we have a motion to make and

4   we'll take it up with Your Honor at a convenient time, and

5   then we can argue it such as you want during the break.

6               MR. DAY:  Okay.

7               THE COURT:  Do you have any concerns about that?

8               MR. DAY:  Not at all.

9               THE COURT:  Do you have any concerns about that

10  approach?

11              MR. DESMARAIS:  No, Your Honor.  But probably

12  both sides should state on the record they will not argue

13  that that procedure is a waiver of any appellate issues, and

14  IBM would consent that is not a waiver if Groupon would.

15              MR. DAY:  No objection.

16              THE COURT:  And from my perspective, you have

17  preserved the record at that point, but all the better that

18  no one is going to argue there was a waiver.

19              Is there anything else?

20              MR. DAY:  No, that's all.

21              THE COURT:  All right.  We'll come back once the

22  jury is ready.

23              (Brief recess taken.)

24              *     *     *

25              (Proceedings reconvened after recess.)

1          THE COURT:  The jurors are all here, so we'll

2     bring them in.  We'll bring Dr. Schmidt back up.

3          MR. OUSSAYEF:  Your Honor, one thing.  Today is

4     the deadline the Court had for jury instructions.  We would

5     ask if we could have until Monday at noon to work out

6     additional instructions.

7          THE COURT:  Monday at noon is fine.

8          MR. OUSSAYEF:  Thank you, Your Honor.

9          THE COURT:  I understand that is a joint

10    request.

11         MS. SHAMILOV:  Yes.

12         THE COURT:  That's fine.

13         (Jury returned.)

14         THE COURT:  Good morning, members of the jury.

15    Welcome back.  It's nice to see you all again.

16         And good morning, Dr. Schmidt.

17         THE WITNESS:  Good morning.

18         THE COURT:  I remind you, of course, you remain

19    under oath.

20         THE WITNESS:  Yes, sir.

21         ... DR. DOUGLAS CRAIG SCHMIDT, previously sworn

22    under oath, was examined and testified further as follows ...

23         THE COURT:  Mr. Oussayef, good morning.

24         And Mr. Hadden, good morning as well.

25         Mr. Oussayef, you may begin when you are ready.

Schmidt - direct

1          MR. OUSSAYEF:  Thank you, Your Honor.

2                      DIRECT EXAMINATION

3     BY MR. OUSSAYEF:

4     Q.     Dr. Schmidt, I'd like to orient us where we were in

5     your analysis of the claims.  So we were talking about claim

6     1 of the '967 patent, is that right?

7     A.     That's correct.

8     Q.     And we were talking about the last element, Element

9     1(c), is that correct?

10    A.     Yes.

11    Q.     So I see that is what we have here on slide 137 here.

12    So I'd like to ask you to tell us what part of the claim

13    element you are addressing here.

14    A.     So this is looking at the first part of element 1(c)

15    which is highlighted in yellow, and that has been construed

16    by the Court to mean "generating concurrently with the first

17    partition at least a second partition for presenting a

18    plurality of command functions."

19    Q.     So I see here on slide 137 you have a new color here

20    in purple.  Could you explain what you are showing here?

21    A.     So these are command functions which include, among

22    other things, local goods, getaways, coupons, and so on.

23    Q.     And are they presented at the same time as the second

24    area and the first area?

25    A.     Yes, and they're presented as part of the second

Schmidt - direct

1   area.

2   Q.      Now, if we move on to the next slide here, can you

3   tell us what we're seeing here with the human language on

4   the left and the computer language on the right?

5   A.      Yes.   This is kind of zooming back in showing

6   portions of that Hypertext market language or HTML computer

7   language code.   If you take a look, you can see that we are

8   culling out the div class header-V2 portion of that code,

9   that HTML code.   And within that we're also pointing out

10  outlined in purple some of the list elements that are used

11  to generate the various command functions that we see on the

12  left-hand side within the purple portion inside the blue box

13  the left.

14  Q.      And Dr. Schmidt, because it's a little faint on

15  exhibit PX 964, can you give us a couple of examples of

16  what's in the purple box there?

17  A.      Sure.   You can see, if you squint really hard, local,

18  goods, getaways, coupons, you have the same thing we have

19  been talking about before.

20  Q.      Does that correspond with anything on PX-965 on the

21  right?

22  A.      If you take a look, it's a little hard to see, if you

23  take a look at the second list item that starts out less

24  than RI, it says nav local, on the right it says nav goods,

25  and then it says nav getaways, and then nav coupons and

Schmidt - direct

1    those are basically defining the elements that show up on

2    the left-hand side as the command functions.

3    Q.    So now I'm looking to slide 139 here.  I see you have

4    blown this up a little bit, but first let me ask you, what

5    part of the claim element are you addressing here?

6    A.    So here I'm dealing with the second part of claim

7    element 1C which is the part that says the command functions

8    including at least a first group which are selectable to

9    permit movement between applications.

10   Q.    And which part of the header here did you analyze in

11   slide 139?

12   A.    So for all the command functions that are listed in

13   that second area of command bar portion, I'm underlining the

14   command functions which are selectable to permit movement

15   between applications.

16   Q.    So let's see slide 140 here.  Can you remind us of

17   the Court's definition of applications?

18   A.    So if you recall, an application is information event

19   or information events composed of a sequence of one or more

20   pages opened at a screen.

21   Q.    I believe we have a short animation here.  Can you

22   tell us what's going on when I play the animation, please?

23   A.    Sure.  We're up on the home screen, Groupon, now

24   we're navigating to the locals application, so we're moving

25   from the home screen to locals application.

Schmidt - direct

1    Q.      How does the user tell Groupon and allow Groupon to

2    bring the user to the new application?

3    A.      They click on that command function where the little

4    cursor is shown, it says local.

5    Q.      Now, let's see what happens in this animation.  Can

6    you tell us what's happening?

7    A.      Down here we're selecting a local deal which brings

8    up a more detailed view of that deal.

9    Q.      And now if we play the next slide, what's going on

10   here?

11   A.      Now, we're navigating from within a page in the local

12   deals application to a new application, we're moving between

13   applications, we're moving local over to goods, now we're in

14   the goods application.

15   Q.      Now that you have shown us navigating from, you know,

16   one page in the application to the next and going from

17   application to application, how does that factor into your

18   analysis?

19   A.      So this is essentially demonstrating that these

20   command functions are selectable, you can click on them, for

21   example, to permit movement between applications.

22   Q.      So looking at slide 147, it's your opinion that

23   Groupon performs the generating concurrently element of

24   claim 1 of the '967 patent?

25   A.      Yes, that is correct.

Schmidt - direct

1    Q.      Can you remind us of your opinion regarding claim 2

2    of the '967 patent?

3    A.      It's my opinion that Groupon infringes claim 2 of the

4    '967 patent.

5    Q.      Now, looking at claim 2, can you tell us what you're

6    showing here in slide 149 with claim 1 on the left and claim

7    2 on the right?

8    A.      Sure.  So we just talked about claim 1, and I showed

9    how Groupon performs all the steps and therefore infringes

10   claim 1.  Claim 2 starts out with a highlighted phrase that

11   says the method of claim 1 and that's basically showing that

12   claim 2 depends upon claim 1.  So in order for claim 2 to be

13   infringed, claim 1 also has to be infringed, which I've

14   already shown.

15   Q.      So here on slide 150, I see you have a checkmark

16   already in the method of claim 1.  Why is that the case?

17   A.      As we just saw through the previous testimony, I

18   showed that Groupon performed all those steps for claim 1 so

19   they infringed that claim.

20   Q.      Let's move on to the first part of claim 2 here after

21   the part that says the method of claim 1.  And it's wherein

22   the data structure of the object includes a header and one

23   or more data segments.  So looking at the next slide here,

24   has the Court construed any terms in this claim element?

25   A.      Yes.  The term object is construed.  We have seen

1    this term construed before and it means the same as we

2    talked about earlier, a data structure or data structures.

3    Q.      Looking at slide 153, what are you showing here?

4    A.      So this is that element about wherein the data

5    structure of the object includes a header and one or more

6    data segments.  And what I'm showing here is that an HTTP

7    response data structure, the thing that comes back from

8    Groupon servers back to the client, the reception system,

9    includes headers and data sections such as the image data.

10   What we see here if you take a look at exhibit PX-965 we see

11   a view of the server's response that's coming back to

12   Groupon's servers and you can see it's clearly marked, there

13   is a bunch of letters up there, including things we talked

14   about before including the cache control header and so on.

15   It also includes the data segment which would be the image

16   data, for example, for the font of the shopping cart here.

17   Q.      Is it your opinion that Groupon performs this element

18   that says wherein the data structure of the object includes

19   a header and one or more data segments?

20   A.      Yes, that's correct.

21   Q.      Let's move on to the last element of claim 2.  Did

22   the Court construe any claim terms in the last element of

23   claim 2?

24   A.      Yes, several of these terms you have seen before,

25   applications, partitions, we just talked about command

1    functions.  And this particular claim element includes a new

2    claim term which is permit random movement.

3    Q.      We will go into that as we go through the next set of

4    slides?

5    A.      Yes, absolutely.  I'll explain what that means.

6    Q.      Looking at slide 157, can you tell us how the Court

7    has construed permit random movement?

8    A.      So permit random movement has been construed as

9    meaning allow navigation to other applications at the user's

10   behest or at the will of the user.

11   Q.      And looking at slide 157, what are you showing here

12   with the home page of Groupon on the left and then a

13   particular page of Groupon on the right?

14   A.      So what we're showing here is how Groupon implements

15   the random movement or the ability to navigate from one

16   application to another.  So here we are -- we're on the home

17   page at the moment and we're going to navigate to another

18   application.  In this case it's the local application of the

19   local deals application.  And you recall I showed you some

20   of that HTML code on the right-hand side a few slides

21   earlier.  That HTML code is actually what's used to

22   implement clicking on that local link.  When you click on

23   the local link, you take a real careful look there, you see

24   that it has an H ref, it is a description of the hyperlink

25   and that hyperlink says browse Nashville context local, what

Schmidt - direct

1    that does is that combines it with Groupon's home page URL

2    and it ends up navigating the browser to what you see on the

3    right-hand side so that complete URL or the hyperlink that's

4    been opened allowing the user to navigate to the local

5    application.

6    Q.    Looking at slide 158, is it your opinion that Groupon

7    performs the last element of claim 2?

8    A.    That's correct.

9    Q.    So we have been focusing a little bit more on

10   Groupon's desktop website.  I would like to talk a little

11   bit about Groupon's mobile website.  What's your opinion

12   about Groupon's mobile website?

13   A.    It's my opinion that Groupon's mobile website

14   infringes claim 1 and 2 of the '967 patent.

15   Q.    Looking at slide 160, what are you referencing here

16   with the title of the slide?

17   A.    So this slide, the title basically explains the fact

18   that the differences between the mobile website and the

19   desktop or laptop website that we talked about before

20   doesn't affect the infringement, Groupon's infringement of

21   claim 1 of the '967 patent.

22   Q.    And so looking at PX-967 on the left and PX-968 on

23   the right, does the mobile website have a first area and a

24   second area?

25   A.    You can see on the left-hand side you can see the

1    form factor of the mobile application, this happens to be

2    Android, but it could be iPhone for that matter, what we're

3    seeing here that is we have two areas, the first area is in

4    red, and the second area is in blue, it's a little hard to

5    see it, but it's basically where the green command bar is

6    with the various command functions.

7              I show in PX-968 how Groupon generates HTML

8    codes.  It generates that red portion to the left-hand side,

9    the first area on the left-hand side and they also generate

10   codes in their server which contains the divs and the other

11   HTML elements that are on the second area in PX-968 and that

12   will be used to generate that portion as the command bar

13   portion of the command function.

14   Q.    And looking at slide 161, do the differences between

15   the mobile website and the desktop website affect

16   infringement for claim 2?

17   A.    No, the differences doesn't affect the infringement

18   for claim 2.  As before, you can see that we have got

19   command functions, goods, getaways, for example, and as

20   before the user can permit random movement, they can select

21   these particular command functions in order to move back and

22   forth between the various applications on the mobile device

23   just like they can do for the desktop and laptop version.

24   Q.    So is it your opinion that Groupon's mobile website

25   infringes claim 1 of the '967 patent?

Schmidt - direct

1    A.      Yes, that's correct.

2    Q.      And then looking at claim 2, is it your opinion that

3    Groupon's mobile website infringes claim 2 of the '967

4    patent?

5    A.      Yes, that's correct.

6    Q.      So now I would like to talk a little bit about how

7    Groupon's website and mobile apps infringed in the past, so

8    I would like to ask you what evidence did you review about

9    how Groupon's website and mobile apps functioned in the

10   past.

11   A.      So, I reviewed a number of pieces of evidence, but I

12   want to iterate, reiterate first that it's my opinion that

13   Groupon's website infringed claims 1 and 8 of the '849 and

14   claims 1 and 2 of the '967 patent since November of 2008,

15   and they also, the mobile app version, the IOS mobile app

16   version for the iPhone has infringed claims 1 and 8 of the

17   '849 patent since March 2010, and the Android mobile apps

18   has infringed claims 1 and 8 of the '849 patent since July

19   of 2010.

20   Q.      Then looking at the left here on the bottom, did you

21   review past versions of Groupon's website and mobile

22   applications?

23   A.      Yes, I reviewed a number of exhibits that showed

24   screen shots and other views of Groupon's mobile apps and

25   website.  You see a picture here from Groupon's website from

Schmidt - direct

1    2009, PX-727, there is a view of Groupon's mobile

2    applications 2010, Exhibit 1054, for example.

3    Q.      Did you review Groupon's past source code?

4    A.      Yes.  As I mentioned earlier, I reviewed -- I had

5    access to Groupon's code going back in time, and so I

6    reviewed various logs that showed the changes that they

7    made.  I reviewed the source code itself to see what the

8    source code looked like.  The logs I reviewed were exhibit

9    PX-1501 and the source code computer code I reviewed was

10   PX-1112.

11              MR. OUSSAYEF:  Your Honor, I offer PX-727,

12   PX-1054, PX-1501 and PX-1112.

13              MR. HADDEN:  No objection.

14              THE COURT:  Those are all admitted.

15              (The above exhibits were admitted.)

16   BY MR. OUSSAYEF:

17   Q.      Did you review any testimony of Groupon's engineers

18   and employees?

19   A.      Yes, I reviewed the testimony of Ms. Sandridge,

20   Mr. Dunham and Mr. Krems.

21   Q.      And how about past technical documents from Groupon?

22   A.      Yes, I also reviewed various Groupon technical

23   documents such as PX-625.

24   Q.      Did you review anything of else in your analysis the

25   past services of Groupon?

Schmidt - direct

1    A.      Yes.   Groupon made a description of past versions,

2    what things changed over time.   I reviewed those and found

3    the changes identified had no material impact on my

4    infringement analysis.   And that was PX-497.

5              MR. OUSSAYEF:  Your Honor, I offer PX-625 and

6    PX-497.

7              MR. HADDEN:  No objection.

8              THE COURT:  It's admitted.

9              (The above exhibits were admitted.)

10   BY MR. OUSSAYEF:

11   Q.    I would like to talk a little bit more about the

12   materials you reviewed.   Can you tell us, did you also

13   review as shown the bottom of slide 165, PX-463, 464, 465,

14   723, 724, 725, 726, 728, 729, 1055, 1056, 1057, 1058, 1059,

15   1064, 1079, and 1096?

16   A.      Yes, I did.

17             MR. OUSSAYEF:  Your Honor, I offer those exhibit

18   as well.

19             MR. HADDEN:  No objection.

20             THE COURT:  They're all admitted.

21             (The above exhibits were admitted.)

22   BY MR. OUSSAYEF:

23   Q.    So now we have gone through the elements of the

24   patents.   I would like to talk a little bit about your

25   analysis of how Groupon uses those patents.   What are you

1    showing here on slide 166?

2    A.    So I used two different methods for being able to

3    analyze Groupon's extended use of the patent technology in

4    the '849 and '967 patents, and what we'll talk about them in

5    detail, but at a high level for the '849 patent I looked at

6    the percentage of advertisements with badges or urgency

7    messages which are used to draw attention to the ads.  And

8    the '967 patent I looked at the percent of Groupon's

9    cacheable objects, these are objects that Groupon gave cache

10   value that were greater than zero.  For both the '849 and

11   '967 patents I also did a second method where I looked at

12   the percentage of repeated page views to see the benefits of

13   the cache values.

14   Q.    So looking on slide 167, can you tell us a little bit

15   more about Step 1 for the '967 patent?

16   A.    So if you recall, Groupon sets headers and sets the

17   cache max age header for various objects that they download

18   from their web servers.  And so I used my Chrome Dev tools

19   facility using the HTTP archive mechanism I mentioned before

20   being able to look at all the traffic that goes back and

21   forth between the client and the server.  And in this

22   particular case, I was focusing on the desktop or laptop

23   version.  And I took a look at all the cache, at all the

24   objects that are downloaded that have cache control headers

25   that are greater than zero.  So they're intended to be

1    cached.  So this is essentially the percentage of Groupon's

2    cacheable objects.

3            What I found is at the very least there is at

4    least 59.2 percent of the objects that come down are cached.

5    Sometimes there will be more than that, but that is at least

6    the amount they found to my knowledge.

7    Q.    So now sticking with your analysis of the extended

8    use for the '967 patent, what are you showing on slide 168?

9    A.    So to think about caching, what is the benefit of

10   caching?  The idea is if you download something to the

11   user's computer and at some point let's say in the morning

12   on January 1st, and then the user does a bunch of other

13   things on their computer and comes back later in the day and

14   revisits that page or a page that has that downloaded

15   content, an image or an application object and so on, that

16   will demonstrate repeated views that are nonunique that can

17   reuse or benefit from having cached that information.  The

18   basic point is you don't have to go back out to the network

19   and download it all over again.

20   Q.    And then looking on slide 169.  Just at a high level,

21   how did you use that data?

22   A.    So essentially I had access to the total number of

23   deals views, that Groupon keeps track of the total number of

24   deal views done each week, for example.  So I took the total

25   number of deal views that they had and then I subtracted the

Schmidt - direct

1    number of unique deal views.  These are views that only seen

2    one time.  And subtracting the total views from the unique

3    views gives the benefits of caching.  These are the

4    non-unique views.  These are the ones being used over and

5    over again because people come back and look at them.  And I

6    took that number, that difference, and I divide it by the

7    total number of deal views and that gives a percentage of

8    repeat page views, essentially illustrating Groupon's

9    extended use of caching for reusable objects.

10   Q.     And just for the record, I'd like to go back to slide

11   167 and ask you what exhibit did you refer to for extended

12   views?

13   A.     This is PX-525, Schedule A.

14          MR. OUSSAYEF:  Your Honor, I offer that exhibit.

15          MR. HADDEN:  No objection.

16          THE COURT:  It's admitted.

17          (PX-525 was admitted into evidence.)

18          MR. OUSSAYEF:  So now I'd like to bring you to

19   the slide 170 and ask you, and switch gears a little bit to

20   just talk about the '849 patent.  Can you tell us about your

21   analysis for extended views there?

22   A.     Sure.  So as you recall, the '849 patent is talking

23   about presenting advertising.  The '947 was talking about

24   presenting applications.

25          So here what is the question is what is the

Schmidt - direct

1    percentage of advertisements that Groupon downloads in their

2    servers that contain badges or some other type of urgency

3    messages that draws the user's attention to the advertiser.

4    I just showed an example up here of a couple of

5    advertisements that have trending badges highlighted.  You

6    will notice some have trending badges highlighted, some

7    don't have trending badges.

8              So in Exhibit PX-973 and 526, Schedule B, I was

9    able to once again take a look at the traffic that goes back

10   and forth between the client and the server, Groupon's

11   server, and see which of those things that are downloaded

12   will contain these badges.  And so I could actually see the

13   badges being downloaded.  I could look at the screen.  So I

14   essentially counted up the number and then I divided by the

15   total number of advertisements that were on a page.  And

16   there were at least 52.7 percent.  There was some, some

17   variance, say, the mobile version perhaps had more but this

18   was at least 52.7.

19   Q.    And, Dr. Schmidt, why did you look at urgency

20   messaging?

21   A.    Urgency messages are another way that Groupon draws

22   attention to their -- to a particular advertisement.  It

23   will say something like sale ends the end of the week or

24   something like that.

25              MR. OUSSAYEF:  Your Honor, I offer PX-973 and

1    526.

2                    MR. HADDEN:  No objection.

3                    THE COURT:  They're both admitted.

4                    (PX-973 and PX-526 were admitted into evidence.)

5    BY MR. OUSSAYEF:

6    Q.    Okay.  Now looking at slide 171.  This looks

7    familiar, this slide, but I think you are talking about the

8    '849 patent.  Can you remind us of your analysis here?

9    A.    That's correct.  For the '849 patent, same basic

10   idea.  In this case, I was looking at the percentage of

11   repeated page views for advertisements.  So in this case, we

12   would be looking at the pizza ad, for instance, and if a

13   person looked on a local deals page early in the morning,

14   did a bunch of other things on their computer and came back

15   later that day, say, in the evening and went back to that

16   page, they would benefit from the object being cached.

17   Q.    So looking at slide 172.  Can you just summarize your

18   analysis for the '849 patent and the '967 patent?

19   A.    So for the first method, they talked about where I

20   was looking at percentages, either pages of advertisements

21   with badges, urgency messages, or percentages of cacheable

22   objects, I found that for the '849 patent it was about

23   52.7 percent at least were marked with those badge urgency

24   messages.  And for the '967 patent, around at least

25   59.2 percent objects that Groupon downloads are cache or

1    cacheable.

2    Q.    And then can you remind us, just looking at slide

3    173, what your analysis was for both patents?

4    A.    So essentially what I'm showing for the second deal

5    or the second method is the formula where the number of deal

6    views minus the number of unique deal views divided by the

7    deal views gives the percentage of repeated page views.

8    Q.    Thank you, Dr. Schmidt.  I'd like to now move to a

9    different subject, the '601 601 patent.  So looking at slide

10   173, can you remind us of your opinion with respect to the

11   '601 patent?

12   A.    So it's my opinion that Groupon infringes claims 51

13   and 54 of the '601 patent.

14   Q.    Then here on slide 175, I see you have an excerpt of

15   claim 51 of the '601 patent?

16   A.    Yes.  These are the elements that make up claim 51.

17   Q.    Then once again on slide 176, you have them color

18   coded?

19   A.    That's correct?

20   Q.    So let's start with the preamble on claim 51.

21   Looking at slide 178, has the Court construed any terms in

22   the preamble of claim 51?

23   A.    Yes.  There are four terms here:  "state

24   information," "conversations," "stateless protocol," and

25   "client."  And these have interesting Court constructions

1    that we'll talk about at length as we go through the slides.

2    Q.    So now looking at slide 179, let's talk about the

3    Court's construction of "conversations."  What is that

4    construction?

5    A.    So as you can see, the claim language itself says "a

6    computerized method for preserving state information in a

7    conversation" -- which I will expand on in a second -- "by a

8    stateless protocol between a client adapted to request

9    services from one or more servers."

10         So the underlying term is "conversation."  And

11   that has been given a specific meaning by the Court.  And

12   the meaning of "conversation" is "a sequence of

13   communications between a client and a server in which the

14   server responds to each request with a set of continuations

15   and the client always picks the next request from the set of

16   continuations."

17         And what makes this particular claim element a

18   little bit subtle is the word "continuations" is also

19   construed, and I will give you that formal definition

20   shortly.  But in a nutshell, "continuation" means "a new

21   request which a client may send to a server such as, for

22   example, a hyperlink."

23   Q.    And looking at slide 179, what are you showing here

24   with the client on the left and the Groupon servers on the

25   right?

Schmidt - direct

1  A.      So because this is a long claim and it's somewhat

2  subtle, I'm going to kind of walk through step by step

3  showing you what happens with the conversation.

4          So just to set up the stage, there is a client

5  on the left-hand side which is software running on a

6  computer, say, for a web browser, being a web browser, for

7  example, and on the right-hand side I show Groupon's

8  servers.

9  Q.      So let's go on to the next part of the slide and tell

10  us what you are showing here.

11  A.      So what I'm showing here is a user may decide to

12  navigate to the goods application.  And that would cause a

13  request to be sent from the client shown as the gray area --

14  gray arrow at the top, and that request goes over to the

15  servers, Groupon's servers, and the servers do some

16  processing, and they send back HTML and other data.  And

17  that data comes back and then is used to generate the screen

18  display that I show on the left-hand side.  And that screen

19  display is the goods application.

20          And included in the goods application HTML will

21  be a set of continuations or hyperlinks.  N each of those

22  hyperlinks, there will be a hyperlink for every one of the

23  goods deal that displays there that you can click on, and

24  each of the hyperlinks will contain state information to

25  uniquely identify each of those deals.

Schmidt - direct

Q.      So now looking at the next part of slide 179, what
are you showing here?

A.      So now let's assume that the client would like to
look at more details about a deal.  So let's say that they
click on a particular link for a deal.  Now, let's say for
sake of argument that deal is the My Three Treasures
pendant.

        And so what will happen is a request will be
sent from the client over to the server, and that request
will include some state information that indicates which
deal we want to be finding more information about in this
case the My Three Treasures pendant.  And that will go over
to the servers, and the servers will do some processing, and
they will send back HTML and other data that will be used in
order to generate the display we see on the left-hand side.
And contained as part of the HTML that comes back and is
displayed will be another continuation, which is a hyperlink
in this case that will be used to show what Groupon calls
the purchase cluster, which is the part of the right-hand
side of the screen that has the green buy button, -- it's a
little hard to see but there is a green button that says
"buy" along with options or option that the user can select.

        So in that case, what will be encoded in that
continuation or that hyperlink will be state Information for
the particular deal or good the user is interested, which in

1    this case is the My Three Treasures pendant as well as some

2    other state information that indicates the particular option

3    or options that are available.

4    Q.    And, Dr. Schmidt, will we get into more details about

5    exactly how all of those steps happen later on in these

6    slides?

7    A.    Absolutely.  Right now, I'm just explaining what a

8    conversation is.

9    Q.    So now what is shown on this next part the slide 179?

10   A.    So let's say the user is actually interested in

11   purchasing that particular good.  So they could click on

12   the buy button, and that would take that hyperlink, that

13   continuation that has been downloaded from the server, and

14   it will send a request back over to the client, including

15   the state information for the deal, and the particular

16   option that the user wants to select.

17         That will go to Groupon servers.  They'll

18   process that request.  They'll send back HTML and other data

19   that will be used to generate the screen that we see on the

20   left-hand side which allows the user to enter in their

21   credit card information.

22         And there is also the purchase cluster, which is

23   hard to see, but it says place order in the green "buy"

24   button.  And so if the user decides that after they entered

25   their credit card information, they would like to buy the

1    item, they press the place order button, and that sends

2    yet another request back to the server with the state

3    information embedded in it in order to be able to purchase

4    that particular good.

5    Q.     And what exhibits are you referring to here on slide

6    179?

7    A.     So these are Exhibits 963 and 964 illustrating this

8    conversation back and forth to carry out the e-commerce

9    transaction.

10   Q.     So now let's look at slide 180 here.  What portion of

11   the claim element are you addressing here?

12   A.     So now I'm zooming in on the state element or, sorry,

13   state information portion of the beginning part of the

14   preamble for claim 51.

15   Q.     And what, how has the Court construed "state

16   information?"

17   A.     "State information" is defined as "information about

18   a conversation between a client and a server."

19   Q.     And did you review any Groupon testimony relevant to

20   state information?

21   A.     I did.  Mr. Krems, who is a principal engineer at

22   Groupon, was asked:  Does Groupon track information about

23   the deal that the user is purchasing during the sequence of

24   pages?

25            And he answered:  Yes.

1          And then he was asked:  Do you know any

2    variables associated with the deal or the final purchase

3    that Groupon tracks?

4          And he said the deal ID.

5          And we just seen an example of a deal ID which

6    is a particular good that the user was interested in; My

7    Three Treasures pendant, for example.

8    Q.    So now let's look at slide 181 here.  What portion of

9    the claim element are you addressing here?

10   A.    Here, we're addressing the "via a stateless protocol"

11   of the preamble.

12   Q.    How has the Court construed "stateless protocol?"

13   A.    So "stateless protocol" is defined as "the protocol

14   where every request from a client to a server is treated

15   independently of previous connections."

16   Q.    And what are you showing here at the bottom of slide

17   181 with the back-and-forth communications again?

18   A.    So without going back into detail of all the

19   conversation, all this is showing is that conversation we

20   saw earlier is being send or requests and the responses are

21   being sent back and forth using the HTTP protocol or the

22   Hypertext Transfer Protocol.

23   Q.    In looking at slide 182 here, is HTTP a stateless

24   protocol?

25   A.    Yes.  This is a quote from the patent that says:

1    HTTP is example of a stateless protocol, which means that

2    every request from a client to server is treated

3    independently.

4    Q.    Now, in your own expert opinion, is HTTP also a

5    stateless protocol in your opinion?

6    A.    HTTP certainly is a stateless protocol in my opinion.

7    Q.    Now, looking at slide 183 here.  Is it your opinion

8    that Groupon performs the preamble of claim 51?

9    A.    Yes, that's correct.

10   Q.    Let's move on to the receiving step.  Did the Court

11   construe, looking at slide 185, any portion of that claim

12   element?

13   A.    Yes, the Court construed the term "stateless

14   protocol" which we talked about and also the term "state

15   information" which we also talked about.

16   Q.    So let take a look on slide 186.  What are you

17   showing here with reference to PX-964 on the top?

18   A.    So PX-964 is just the typical client we have been

19   showing which is demonstrating the desktop or laptop browser

20   that is being used to send requests.

21   Q.    What are you showing with respect to PX-919?

22   A.    So PX-176 are some elements from a Groupon document

23   called the shared layout service.  And what this is showing

24   is that the client is accessed by a user to send requests to

25   Groupon.  You can see a request is being send out from the

1   client computer.  And it's also then showing on the kind of

2   middle to the right-hand portion, it is showing Groupon's

3   service oriented architecture which is the way in which they

4   take user requests and then handle those requests in a bunch

5   of different services.  So you can see there is a routing

6   service.  You can see there is a backend service.  There are

7   several backend services.  There is a service called the

8   Layout Service that we'll talk more about.

9            So Groupon with this picture is showing with

10  Groupon's document that they take user requests and they

11  service them in service oriented architectures, the various

12  services to carry out those requests.

13  Q.      Looking on slide 167.  Did you review any deposition

14  testimony about services and service requests?

15  A.      Yes.  So this is Mr. Dunham, the Groupon corporate

16  witness.

17           And he is asked a question:  What does it mean

18  to be a server oriented architecture?

19           And he said:  A service oriented architecture,

20  certain pieces of business logic are isolated within one

21  specific running application that's dedicated to that

22  business logic.  So in order for the frontend client to do

23  multiple things, they may call several different services,

24  and they require different pieces of business logic.

25  Q.      So looking at slide 188.  What portion of the claim

Schmidt - direct

1   element are you dealing with here?

2   A.     So here, we're kind of zooming in on the "state

3   information" portion, which is construed.

4   Q.     And how has the Court construed that?

5   A.     It's construed as "information about a conversation

6   between a client and a server."

7   Q.     Okay.  So now let's look at, in a little bit more

8   detail, slide 188.  What are you showing here with the

9   client on the left and the Groupon servers on the right?

10  A.     So what I'm showing here, we have a client.  This is

11  the point where the client is on the goods page, goods

12  application, and the client has decided they're interested

13  in the My Three Treasures pendant good.  So they're going

14  to click on that hyperlink.  And that link will generate a

15  request and that request will go over to Groupon's servers.

16         And if you look at Exhibit PX-965, it is a

17  little hard to see, but what I'm highlighting there is state

18  information.  And what that state information says, that's

19  the yellow part that is highlighted and underlined in red:

20  It says GG -- which is their code for Groupon goods -- -AJS

21  -collection-custom-my-three-treasures.

22         And as you will see, that is a unique identifier

23  that identifies this deal.  They call it a deal code, but

24  it's a unique code for that unique good.

25  Q.     And then looking at the bottom of PX-176, I see you

Schmidt - direct

1   are referring back to this same diagram there?

2   A.     That's correct.  That is just illustrating Groupon's

3   service oriented architecture with the multiple services,

4   the multiple backend services, including the Layout Service

5   and so on.  And that is what will be receiving this service

6   request which includes the state information.

7   Q.     So now looking at slide 189 here.  Do you view any

8   deposition testimony that is relevant to your opinion about

9   service requests, including state information?

10  A.     Yes.  Mr. Sood, who is the Director of Engineering at

11  Groupon, defines a couple of terms we have been talking about.

12          So he is asked:  What is a deal permalink?

13          And he said:  It's a unique identifier for a

14  deal.

15          Like the My Three Treasures pendant that we

16  looked at.

17          And then up above, he is asked:  When Groupon's

18  receive that URL, how do the servers know what deal I'm

19  buying?

20          And so then he mentioned something called a

21  pledge ID.

22          And then he is asked:  So the pledge ID is

23  included in the request that's sent to Groupon's servers, at

24  least.

25          And he agrees:  Yes.

Schmidt - direct

1        And we'll talk more about pledge ID shortly.

2    Q.    So looking at slide 189, is it your opinion that

3    Groupon performs the receiving the service request element

4    of claim 51?

5    A.    Yes, that's correct.

6    Q.    So let's move on to the identifying all continuations

7    element.  Did the Court construe any claim terms in the

8    identifying all continuations element?

9    A.    Yes, the term continuation is formally defined here.

10   We talked about it before.

11   Q.    So looking on slide 193, what portion of the claim

12   element are you addressing here?

13   A.    So this is the portion of the claim element

14   highlighted in yellow that says an output from said service.

15   Q.    And what are you showing in PX-176 there with the

16   highlighting?

17   A.    So PX-176 is this Groupon shared layout service

18   document, and it contains this diagram is a descriptions of

19   what this diagram means.  What this diagram is showing is

20   it's showing one of the services in the services

21   architecture, this is called the layout service.  If you

22   read the little portion, the first bullet in red that's

23   underneath the call out that says layout service, it says

24   the layout service is a service that serves for outputs

25   Mustache templates.

1    Q.      That's a strange name.  Why is it called Mustache

2    templates?  I'll show you something here on 193.

3    A.      So if you take a look at the box that's highlighted

4    in the yellow and it's arranged with a red boarder, you can

5    see it has this open curly brace, open curly brace Mustache,

6    close curly base, close curly base.

7            If you were to turn your head to one side or the

8    other and squint really hard, the reason it's called a

9    Mustache template is the curly braces look like the

10   handlebar mustache that I'm showing here on the left-hand

11   side.  That's where the word mustache comes from.

12   Q.      Thank you, Dr. Schmidt.  Looking at slide 194 here,

13   did you review any deposition testimony that was relevant to

14   your analysis of this portion of the claim element?

15   A.      Yes, Mr. Dunham, Groupon's corporate witness

16   explained in answer to the question:

17           "Question:  What is a Mustache template?

18           "Answer:  It's a file that specifies basically

19   the skeleton of an HTML document or a portion of an HTML

20   document with sections that can be filled in with data."

21   Q.      And will we look at the portion of the HTML document

22   in question later on in these slides?

23   A.      Absolutely.

24   Q.      So let's take a look at slide 195 here.  What portion

25   of the claim element are we addressing here?

Schmidt - direct

1   A.      So this is the part highlighted first in yellow that

2   says identifying all continuations.

3   Q.      And what is the Court's definition of a continuation?

4   A.      So here is the formal definition.  A continuation or

5   continuations is a new request which a client may send to a

6   server, such as, for example, a hyperlink.

7   Q.      So looking on slide 155 here, what are you showing

8   with the human language on the left in PX-964 and the

9   computer language on the right in exhibit PX-1224?

10  A.      So we're showing a bunch of interesting things here.

11  Let's start with PX-1224.  First and foremost this is an

12  example of a Mustache template.  You heard Mr. Dunham

13  describe it as a being a portion of the HTML file because

14  the name of the file ends in dot Mustache, that's the file

15  extension, Mustache template.  You also notice that it says

16  dot HTML is part of the file.

17          If you take a little hard squint in there, it's

18  extremely hard to see, but halfway down on line 16 you'll

19  see div class equals, et cetera, et cetera.  This is an

20  example of HTML.  This is a template for HTML or a portion

21  of HTML.

22          If you also squint really hard you'll see there

23  is lots of open curly braces and closed curly braces.

24  That's a Mustache template.  I'll explain what I show in

25  yellow in just a second, but first I want to explain what it

1    means to be a continual option Mustache template.

2            If you take a look on the left-hand side you'll

3    see a red box around the purchase cluster which is

4    containing the buy button that the user can click to

5    continue the conversation with the business.  We'll talk

6    about that in a second.

7            What I want you to notice is that there is one

8    green little circle in there and that's the option that a

9    user can select to buy that particular good.  It says one

10   custom My Three Treasures necklace.  This is a single option

11   Mustache template and it will generate a purchase cluster

12   with a single option.  On the left-hand side, that's what

13   I'm showing.  We'll talk about that later.

14   Q.    Does the Mustache template in PX-1224 correspond to

15   the entire page on PX-964?

16   A.    No, it's simply the part that's shown in that red

17   box, the purchase cluster, and that's essentially the output

18   from the layout service which we talked about on the

19   previous page, that's the part that gets output and that's

20   the part that gets displayed in that portion of that screen.

21   Q.    So now let's go back to PX-1224.  Can you tell us

22   what you're showing in the highlighted?

23   A.    In the highlighting, this is line seven and eight.

24   I'm focusing particularly on line eight.  This is part of

25   the Mustache template and it says HREF which is pronounced

1   HREF.  It says HREF equals, and you see a string and inside

2   that string starts with double quotes and ends with double

3   quotes.  Inside the string we see open curly brace, open

4   curly brace, those are the mustaches, then you see the

5   string URL, and we see close curly brace, close curly brace.

6   And what that is in a mustache template is it's defining an

7   HREF or a hyperlink as an example of a so-called

8   continuation.

9   Q.      What is the URL with the two curly braces mean?

10  A.      So this is a placeholder that will be filled in with

11  embedded state information -- I'll show you that in a second

12  -- to actually provide a way to access this particular deal

13  by the client when they click the buy button that shows up

14  in the screen on the left-hand side.

15  Q.      So looking at slide 196, did you review any

16  deposition testimony, any testimony from the witnesses here

17  that was relevant to your analysis of identifying all

18  continuations?

19  A.      Yes.  So if you recall, we identified lines seven and

20  eight in that Mustache template on the previous slide.

21  Mr. Dunham was asked, how do you identify that line seven

22  and eight correspond to a hyperlink.  And he answers, the

23  HREF, or HREF letters specifying that URL, we had an URL

24  there, which is based on the curly braces data, those are

25  those Mustache curly braces we looked at, that's a

Schmidt - direct

1   placeholder for data that would be filled in.

2   Q.      And how about Groupon's technical expert witness,

3   what does he say about Mustache templates?

4   A.      So's he asked the question, Mustache templates work

5   by applying a find and replace to insert values for

6   placeholders; right?  And he agrees, that's my

7   understanding.

8   Q.      So looking at slide 197, is it your opinion that

9   Groupon performs the identifying all continuations element

10  of claim 51?

11  A.      Yes, that's correct.

12  Q.      Let's go on to the recursively embedding step.  Did

13  the Court construe looking at slide 199, did the Court

14  construe any terms for this element?

15  A.      Yes, the term recursively embedding the state

16  information in all identified continuations.

17  Q.      Let's take a look at that on slide 200.  So can you

18  tell us how the Court's definition applies to the claim

19  language here?

20  A.      Sure.  So the Court has defined or construed that

21  element as meaning applying a process one or more times to

22  each identified continuation to modify all identified

23  continuations to include state information.  So that's the

24  construction.

25  Q.      So looking at the human language on the left and the

Schmidt - direct

1   computer language on the right, is this the same two files

2   that we were looking at previously?

3   A.      Yes.  So on the left-hand side we're showing the

4   purchase cluster which has the output for the layout

5   service, this is PX-964 and the red box, and on the

6   right-hand side we have that same Mustache template that we

7   talked about before and you can see once again that it's got

8   that HREF equals and the funny Mustache surrounding the URL

9   strings.

10          But what I'm showing here is actually what's

11  described in the Court's construction.  So what Groupon's

12  server code does is it essentially has a process that is

13  applied one or more times, in other words, for each

14  identified continuation it would be applied, so for that

15  identified continuation, that one that says HREF equals left

16  curly brace, left curly brace, URL, close curly brace, close

17  curly brace, it will go ahead and modify that continuation

18  to include state information.

19          And what you see on the yellow box underneath is

20  the modified continuation which as you can tell, I'll

21  explain is a URL that will get you back to Groupon and it

22  includes the state information, it includes the collection,

23  custom My Three Treasures deal permalink that identifies the

24  deal, and it includes this pledge ID which is an indication

25  of the particular option that the user would have a chance

Schmidt - direct

1    to select in the red box on the left-hand side in Exhibit

2    964.

3    Q.      And you're referring here to PX-1224 and PX-1344 for

4    the computer language code that you're relying on?

5    A.      That's correct.

6    Q.      Looking at the Mustache template here, there is only

7    one continuation in this Mustache template; is that right?

8    A.      That's correct.  And that's because it's a single

9    option deal, so My Three Treasures necklace or pendant as

10   you can see in the box on the left-hand side in Exhibit 964,

11   that only has one option so that is only one continuation.

12   Q.      Did you also look at multi-option deals as well?

13   A.      I did, and we'll talk about those shortly.

14   Q.      Now, looking at slide 201 here, did you review any

15   deposition testimony to inform your opinion about this claim

16   element?

17   A.      Yes.  I looked at Mr. Dunham and Dr. Weissman's

18   testimony, and these are the same testimonies as before

19   explaining how hyperlinks are identified and so on.  I'm

20   just emphasizing the portion of the construction modify all

21   identified continuations to include state information, so

22   you can see Mr. Dunham says that that data is a placeholder

23   for data, the curly brace HREF stuff is a placeholder for

24   data that will be filled in, that's the modifying part,

25   that's the filling in part and Dr. Weissman is saying

Schmidt - direct

1    replace to insert values, so that's the part -- I'm sorry,

2    he's agreeing, he's not saying he's agreeing, but that his

3    understanding that it replace to insert values, that's the

4    modifying portion of the claim.

5    Q.      Slide 202, let's talk a little bit more about state

6    information.  What testimony did you review about state

7    information?

8    A.      This is additional testimony from Mr. Dunham and

9    Mr. Sood and in these cases they're talking about pledge ID.

10   We talked about deal permalinks, we talked about deal ID and

11   now they're explaining what pledge IDs are.  A pledge ID,

12   Mr. Dunham said my understanding is a pledge ID specifies a

13   specific option for a deal.  Then he says pledge ID

14   specifies which option for that deal the user is interested

15   in purchasing such as the My Three Treasures pendant.

16   Q.      What do you see on the right-hand side, Dr. Schmidt?

17   A.      Mr. Sood is saying that Groupon tracks the deal name

18   on the checkout page by using a pledge ID associated with a

19   URL.

20   Q.      Is pledge ID an example of state information?

21   A.      Pledge ID is another example of state information

22   that is included in the continuation we have been looking

23   at.

24   Q.      Looking at slide 203.  Is it your opinion that

25   Groupon performs the recursively embedding step of claim 1?

Schmidt - direct

1   A.      Yes, that's correct.

2   Q.      Let's go to the communicating step.  Looking at slide

3   205, what part of this claim element are you analyzing here?

4   A.      So this is the final element and I'm looking at the

5   first portion highlighted in yellow which is communicating a

6   response including the continuations and embedded state

7   information.

8   Q.      What are you showing here at the bottom of the slide

9   or I guess on slide 205?

10  A.      So if you take a look at exhibit PX-176, this is that

11  Groupon shared layout service document, this is showing some

12  visualizations of elements in their service architecture.

13  We talked about the layout service earlier, that's a service

14  that will return Mustache templates that include these

15  continuations, and we saw how other parts of Groupon's code

16  will then recursively embed state information into those

17  identified continuations.  What we see here in this picture

18  from their documentation, this HTML and other data is sent

19  back to the client's browser, to the client, and that

20  information in the HTML file is then communicated to the

21  client, it's coming back from the server architecture on the

22  right back to the client on the left.

23  Q.      Can you tell us what exhibit shows kind of what the

24  person would see on their computer when it comes back?

25  A.      Yes.  So what's happening there, we look at exhibit

Schmidt - direct

1    PX-964 which has the page that lays out the purchase cluster

2    and you can see that there is the buy button there with the

3    option that the person can select, the user can select, and

4    if we were to peek behind the buy button or if we were to

5    look at the flow of the traffic back and forth using the

6    Chrome Def tools or the HTTP archive stuff I talked about,

7    we would be able to see that the continuation and embedded

8    state information has been communicated in the response, so

9    this is what came back from the server, back to the client

10   and that state information about collection, custom, My

11   Three Treasures, which is the deal permalink, and the pledge

12   ID, all that's been communicated back to the client.

13   Q.     Now, looking at slide 206, what portion of the claim

14   element are you addressing here?

15   A.     So this is the final part of the final claim of claim

16   51, and this is wherein the continuations enable another

17   service request and one of the continuations must be invoked

18   to continue the conversation.

19   Q.     So now looking at slide 206 here, this diagram looks

20   familiar.  What are you showing here?

21   A.     This is what we start out talking about a while back

22   about a conversation.  And so just to kind of orient you

23   where we are, at this particular point in the conversation,

24   what I have been showing you on the back end identifying and

25   recursively embedded portion from the Groupon servers, what

Schmidt - direct

1    will come back will be that screen in the middle which

2    contains the purchase cluster that has the buy button.  And

3    that includes a continuation, that's the continuation, and

4    if the user selects that continuation, or invokes that

5    continuation, then the conversation will continue, and

6    another service request will be sent from the client back to

7    Groupon's servers this time in order to be able to attempt

8    to purchase that particular good.

9    Q.      Now, looking at slide 207, is it your opinion that

10   Groupon performs the communicating a response element of

11   claim 51?

12   A.      Yes, that's correct.

13   Q.      Now, I would like to stay on this slide for just a

14   second and ask you, does claim 51 require identifying all

15   links in a web page?

16   A.      No, it does not.

17   Q.      What does it require?

18   A.      As you can see here, it requires identifying all

19   continuations in an output from a service or from said

20   service.

21   Q.      Is that what you analyzed?

22   A.      That is what I analyzed, that's correct.

23   Q.      Let's go on to slide 208 here.  So what are you

24   showing here with claim 54?

25   A.      So this shows that claim 54 depends on claim 51,

1   that's the highlighted portion, the method claim 51 which

2   again means that in order for claim 54 to be infringed,

3   claim 51 must be infringed.

4   Q.   Let's look at claim 54 on slide 209 and then let's

5   look at the evidence on slide 210.  So what are you showing

6   here with the client on the left and the Groupon servers on

7   the right?

8   A.   So what I'm showing here is that the step, I'm

9   showing the step of dynamically downloading computer program

10  code for the client to perform said embedding step, the

11  embedding step we talked about before in response to said

12  step of communicating output to the client.

13          Remember earlier when we looked at My Three

14  Treasures pendant, that was a single option deal.  Now we're

15  looking at a multi-option deal and this particular deal

16  happens to be shown on the client.  It's a deal for getting

17  45 percent off on pizza, or some percentage off on pizza at

18  Jet's Pizza.  And that's -- and that particular screen can

19  be used to generate a request and you can see that the

20  request is shown in PX-965.  If you squint really hard it

21  includes the information that says Jet's Pizza, Nashville.

22  Q.   Let's talk about dynamically downloading part.  What

23  are you showing below in PX-963 and then PX-1411?

24  A.   So 963 and 1411 are showing the HTML and other data

25  that will be downloaded from Groupon's servers as a result

1   of the processing that they do in order to provide a

2   purchase cluster with three options, not one, so this is

3   what's called a multi-option deal.

4   Q.     What are you showing in PX-1229?

5   A.     So because it's a multi-option deal, the Groupon

6   servers also send down some program code, in this code it's

7   Java script program code, and this Java script program code

8   will be used to perform the embedding step.

9   Q.     Let's look at slide 211 here.  So there is a couple

10  of steps in this slide, so could you just set up what we're

11  looking at here on slide 211 with reference to PX-963?

12  A.     Because this is a little hard to see that purchase

13  cluster in the screen in the previous slide, I have kind of

14  zoomed in on it, you can see the purchase cluster which is

15  the part with the buy button and the various options and I'm

16  going to use this to demonstrate how the downloaded computer

17  programing code is used by the client to perform the

18  embedding step.

19  Q.     What do we see here on slide 212?

20  A.     On slide 212, the user, the client has selected one

21  of the options, this is to get a pizza deal at a Nashville

22  location.  And what will happen there is that the downloaded

23  program computer code that the client now has will be used

24  to perform the embedding system and in particular what it's

25  going to do is it's going to put a pledge ID that ends in

Schmidt - direct

1    507 into the continuation that's associated with that buy

2    button if that's the option that's selected.

3    Q.      So then what happens in slide 213 here?

4    A.      So this is showing the user selecting a different

5    option.  This time they're selecting the Green Hills

6    location for Jet's Pizza.  And, once again, computer code

7    that has been dynamically download will be used by the

8    client to perform the embedding step.  In this case, it will

9    put a different pledge ID into that continuation, this one

10   ending in 509.

11           And I kind of showed the other earlier pledge

12   off to the side just so you could see it ended in 507 which

13   is different from 509.  So it's a different embedding of

14   state information for that option.

15   Q.      And looking at slide 214.  What do we see here with

16   the third option?

17   A.      So this is the third and final way of doing things.

18   It's more or less the same as before except this time the

19   user is selecting the Antioch Jets Pizza location.  And when

20   they do that, the downloaded computer code will be used by

21   the client to perform the embedding step in this case

22   putting a different pledge ID that ends in 511, rather than

23   509 or 507, as was the case before.

24   Q.      So now looking at slide 215.  Is it your opinion that

25   Groupon performs claim 54 of the '601 patent?

Schmidt - direct

1   A.      That's correct.

2   Q.      So now I would like to talk a little bit about

3   Groupon's mobile apps.  Can you remind us of your opinions

4   with respect to Groupon mobile apps?

5   A.      Yes.  My opinion is that Groupon's mobile apps

6   infringe claims 51 and 54 of the '601 patent.

7   Q.      So let's start again with the preamble of claim 51.

8   And looking at slide 218, what are you showing here?

9   A.      So this is essentially showing that the mobile apps

10  version -- see we have a mobile device on the left-hand side

11  this time -- preserves state information in a conversation

12  in essentially the same way as Groupon's website version we

13  just looked at.

14          There are just a couple differences for this

15  example:

16          No. 1, it's a mobile device, not a desktop

17  browser.

18          No. 2, the example we're using is actually a,

19  it's a getaway at a culinary resort in North Carolina as

20  opposed to picking the My Three Treasures pendant.

21          And you can also see it's a multi-option deal.

22  So we have multiple options for different packages to go to

23  that getaway.

24  Q.      So in your opinion, does Groupon's mobile app perform

25  the preamble of claim 51?

Schmidt - direct

1    A.      Yes, that's correct.

2    Q.      So let's move on to the receiving step.  So then

3    looking at slide 221.  What are you showing here for the

4    receiving step?

5    A.      So this is essentially demonstrating how the mobile

6    client will send a request.  That request includes state

7    information.  In this particular case, it's a little hard to

8    see.  But if you look carefully, you will see the underlying

9    portion on the right-hand side says deal ID equals GA --

10   which stand for getaway -- -the-farm-kitchen-2.  So that is

11   the particular identifier that is unique for that particular

12   deal.  That is the request that is being sent over to

13   Groupon's servers, including that deal state information.

14   Q.      And what exhibit are you referring to here?

15   A.      So this is Exhibit 970.

16   Q.      So looking at slide 222.  Is it your opinion that

17   Groupon's mobile apps perform the receiving step of claim

18   51?

19   A.      Yes, that's correct.

20   Q.      Let's move on to the identifying step.  So looking at

21   slide 224, can you remind us of the Court's construction of

22   "continuations?"

23   A.      Sure.  So the element we're dealing with here is

24   "identifying all continuations in an output from said

25   service."

1           And "continuations" has been construed as, "a

2   new request which a client may send to a server, such as,

3   for example, a hyperlink."

4   Q.      And what are you showing here on slide 224 with that

5   construction in mind?

6   A.      So this is showing how for the mobile apps version,

7   Groupon's servers send down Javascript Object Notation or

8   JSON data which contains information about the deal and the

9   options for a deal.  And that is the information that goes

10  from the servers to the client.  Remember, before, we were

11  looking at HTML?  That is what it does for the desktop

12  version.  For the mobile version, however, JSON is the

13  information that is sent out.

14  Q.      And what are the continuations here on slide 224?

15  A.      So these continuations correspond to the various

16  options that a user could select.  So we would have option 1

17  which would be for one type of getaway.  Option 2 for a

18  different type of getaway at that culinary resort.  Option 3

19  is a different option at that getaway resort.

20  Q.      So we're now looking a slide 225.  What are you

21  showing here with the kind of human visualization on the

22  left and the computer language on the right?

23  A.      So what is happening on the right-hand side is the

24  code that is supplied by Groupon as part of their mobile

25  app is looking at that output that is coming down from the

1    shared Layout Service and for Groupon's servers, and it is

2    identifying the continuations in that output.

3              And, in particular, you can see it's looking at

4    those options that we just saw.  There were three options.

5    The code is able to identify these are the options that

6    correspond to this particular output from that service.

7    Q.    So looking at slide 226.  Is it your opinion that

8    Groupon's mobile apps perform the identifying step of claim

9    51 of the '601 patent?

10   A.    That is correct.

11   Q.    Now, let's look at the "recursively embedding" step.

12   So can you tell us what we're seeing here on slide 228?  But

13   maybe first I'll ask you, can you remind us of the claim

14   term we're dealing with in the Court's construction of

15   "recursively embedding?"

16   A.    Sure.  So this claim has been defined or construed

17   as, "applying a process one or more times to each identified

18   continuation to modify all identified continuations to

19   include state information."

20   Q.    So let's break this down a little bit.  So looking at

21   slide 228, what are you showing with the various options

22   there?

23   A.    Sure.  So from Exhibits 969 and 970, on the

24   right-hand side, I'm showing the various options that have

25   been sent down to the mobile app, the client, from the

Schmidt - direct

1    Groupon servers.  And these correspond to the identified

2    continuations.

3    Q.      And --

4    A.      And so -- sorry.

5    Q.      Please go ahead.

6    A.      And so the user on the client, on the phone, will be

7    given the opportunity to select which option or options that

8    they would like to choose.  Let's say they choose the second

9    option.  And so what happens when they do that is the

10   Groupon mobile app code will apply a process to that

11   identified continuation to modify it in order to yield what

12   we see in the upper left-hand portion, which is going to be

13   the modified continuation that will be used momentarily to

14   send a response.  It will be used to send a response back

15   because of the conversation.

16   Q.      So what do we see as the continuation with embedded

17   state information?

18   A.      So the continuation, which is again the left-hand

19   part up in the upper box, has embedded state information

20   in it.  You can see, for example, that it has a piece of

21   state information that says deal option ID.  That's the part

22   that is highlighted in yellow.  And underlined in red in

23   the middle, deal option ID.  And that includes a number,

24   54247467.  And you can see that that number is state

25   information that is shown in the option on the right-hand

1    side.   On the right-hand side is referred to as pledge ID.

2    On the left-hand side, after it has been modified, it's

3    now called a deal option ID.

4    Q.      So looking at slide 229, is it your opinion that

5    Groupon's mobile apps perform the "recursively embedding"

6    step?

7    A.      Yes, that's correct.

8    Q.      So now let's look at the communicating step.   Looking

9    at slide 231, what are you shown here with reference to

10   PX-969?

11   A.      So this slide, which I will explain in a second, is

12   showing how Groupon performs the element "communicating a

13   response including the continuations and embedded state

14   information, wherein the continuations enable another

15   service request and one of the continuations must be invoked

16   to continue the conversation."

17            So if you recall in the previous slide, I showed

18   you how the embedding part was done by Groupon's mobile app

19   code, but that is done inside the application.   In order for

20   that to actually be displayed to the user so they can do

21   something about it, that code that is written in there has

22   to be sent from Groupon's app running on the mobile device

23   to another portion of the mobile device which will be the

24   display server, display manager.   And to do that, Groupon

25   communicates this information through the local device

1    operating system such as iOS or Android.  And that

2    communication is then used to display the user interface

3    that we see on the right-hand side.  And that user interface

4    we see on the right-hand side will allow the user to invoke

5    one of the continuations, in other words, one of those

6    options in order to continue the conversation.

7    Q.    So looking at slide 232.  Is it your opinion that

8    Groupon's mobile apps perform the last element of claim 51

9    of the '601 patent?

10   A.    Yes, that's correct.

11   Q.    So now let's talk about claim 54 again.  And if we

12   look at slide 234.  Can you show us what your -- can you

13   tell us what you are shown here on slide 234 with the

14   "dynamically downloading?"

15   A.    So this is the part dealing with further comprising

16   the step of dynamically downloading computer code to the

17   client to perform said embedding step.

18            What this shows is the Javascript Object

19   Notation computer program code which is what is downloaded

20   from the server to the mobile app client is then used by

21   that client in order to perform the embedding step, what we

22   just looked at.

23   Q.    And what exhibit did you look at to confirm that

24   opinion?

25   A.    This is PX-970.

Schmidt - direct

1   Q.      So is it your opinion that Groupon's mobile

2   applications perform claim 54 of the '601 patent?

3   A.      That's correct.

4   Q.      So now looking at slide 236.  Can you tell us what

5   your opinions are regarding past versions of Groupon's

6   website and mobile apps?

7   A.      Yes.  So it is my opinion Groupon's website has

8   infringed claims 51 and 54 of the '601 patent since November

9   2008.

10          Groupon's iOS mobile app has infringed claims 51

11  and 54 of the '601 patent since March 2010.

12          And, likewise, Groupon's Android mobile app has

13  infringed claims 51 and 54 of the '601 patent since July

14  2010.

15  Q.      And looking at the left-hand side of the materials

16  reviewed, can you tell us what you reviewed, first?

17  A.      Yes.  So I reviewed past versions of Groupon's

18  website and mobile apps as shown in a number of exhibits.

19  Q.      And those are PX-1022, PX-1034, PX-1025, PX-1036, and

20  PX-1037?

21  A.      That's correct.

22          MR. OUSSAYEF:  Your Honor, I offer those

23  exhibits.

24          MR. HADDEN:  No objection.

25          THE COURT:  Those are admitted.

Schmidt - direct

1              (Above-referenced exhibits admitted in evidence.)

2      BY MR. OUSSAYEF:

3      Q.      And then next I see you reviewed Groupon's past

4      source code.  Can you tell us a little bit about that?

5      A.      Yes.  So as I mentioned earlier for the other

6      patents, I was able to look back at Groupon's source code

7      repository, roll back, look at different versions, see how

8      those versions corresponded to the other analysis of website

9      and app photos and images and so on.  And this was done

10     through Groupon's own source code computer.

11     Q.      And that includes PX-1495, 1496, 1497, 1502, 1503,

12     1519, 1529, 1530, 1531, 1537, 1542 and 1543?

13     A.      That's correct.

14              MR. OUSSAYEF:  Your Honor, I offer those

15     exhibits.

16              MR. HADDEN:  No objection.

17              THE COURT:  They are admitted.

18     A.      I believe also PX-1112.

19              MR. OUSSAYEF:  Yes, and I offer that exhibit as

20     well.

21              THE COURT:  Any objection?

22              MR. HADDEN:  No objection.

23              THE COURT:  That one is admitted, too.

24              (Above-referenced exhibits admitted in evidence.)

25     BY MR. OUSSAYEF:

Schmidt - direct

1   Q.      Now, did you review any testimony from Groupon,

2   personally?

3   A.      Yes.  I reviewed testimony from Mr. Sood, Mr. Dunham,

4   and Mr. Krems.

5   Q.      Did you review any Groupon technical documents to

6   support your opinions about past infringement?

7   A.      Yes, I reviewed a number of Groupon technical

8   documents, including PX-625, PX-1027, and PX-1038.

9           MR. OUSSAYEF:  Your Honor I offer those exhibits

10  as well.

11          MR. HADDEN:  No objection.

12          THE COURT:  They're admitted.

13          (Above-referenced exhibits admitted in evidence.)

14  BY MR. OUSSAYEF:

15  Q.      So now -- oh, I'm sorry.  There is one more thing,

16  too.  Did you review Groupon's statements about past

17  versions of its mobile application and website as well?

18  A.      Yes, I did.  That was exhibit PX-4967, and I reviewed

19  that as well.

20          MR. OUSSAYEF:  And that has been previously

21  offered.

22  BY MR. OUSSAYEF:

23  Q.      So I'll move on to slide 237.  So can you tell us a

24  little bit about how you analyzed extent of use for the '601

25  patent?

1   A.      Sure.  So when we walked through that conversation

2   slide awhile back, it showed the various steps involved IN

3   selecting, choosing a particular application, selecting a

4   particular deal, finding information about a deal, selecting

5   deal options, deciding to buy, clicking the buy button,

6   being given a chance to purchase the deal and so on and so

7   forth.

8           So there is roughly eight steps or so in a

9   typical successful transaction from start to finish.  And to

10  be conservative, I assumed that at least one of those steps

11  involve state information that is embedded into a hyperlink

12  or continuation as we described.  And so my conservative

13  analysis was 1/8, which is about 12.5 percent.

14  Q.      What step from going from the launch pad until the

15  order did we just go through in your analysis?

16  A.      So we went through a couple of steps, but what we

17  were doing there was looking at selecting a particular deal

18  to find information about, that was one of the things, and

19  being able to get detailed information about that deal.

20          We also used purchasing or clicking the "buy"

21  button on the deal.  That was another step that I showed.

22          And then being able to get back the purchase

23  order information for completing the purchase.

24  Q.      Thank you, Dr. Schmidt.  So now let's move on to the

25  subject of the '346 patent.  Before we go into your

Schmidt - direct

1   analysis, can you remind us of your opinion with respect to

2   the '346 patent?

3   A.      Yes.  It's my opinion that Groupon infringes claims 1

4   and 5 of the '346 patent.

5   Q.      So looking at slide 239.  I see you are going to take

6   us through the claim elements again?

7   A.      Yes, that's correct.

8   Q.      And then on slide 240, we see claim elements color

9   coded?

10  A.      Yes.

11  Q.      So let's deal with the first element, the preamble of

12  the '346 patent.

13          So, first of all, looking on slide 242, did the

14  Court construe any terms in the preamble of the '346 patent?

15  A.      Yes.  There are a number of terms construed here:

16  user authentication, single-sign-on operations, and so

17  forth.  And I will describe them as we go through the

18  material.

19  Q.      So looking at slide 243.  What portion of the

20  preamble are you addressing on this slide?

21  A.      So this is the very first part of the preamble which

22  states:  a method for managing user authentication.

23  Q.      And what are you showing here with the image of

24  Groupon's website on the right and then the testimony of Mr.

25  Dunham on the left?

Schmidt - direct

1    A.      So Mr. Dunham is asked a question:  Is it fair to say

2    that Facebook login, Google login are ways of authenticating

3    a user?

4              And he agrees with that.

5              Then to the right-hand side in Exhibit 964, I'm

6    showing an example of a screen that Groupon shows to users,

7    in this particular case, it's for the desktop website, that

8    allows the users to log in or sign up using Google or

9    Facebook credentials, to log in to Groupon using the

10   credentials that are provided by Google or Facebook to

11   authenticate the user.

12   Q.      So now looking at slide 244.  What portion of the

13   claim element are you addressing here?  Or what portion, I

14   should say.

15   A.      So this is the part highlighted in yellow:  "a first

16   system and second system interact within a federated

17   computer environment and at least one of the first system

18   and second system comprising a processor."

19   Q.      And what is the Court's construction of "federated

20   computing environment" which appears in what you are

21   analyzing?

22   A.      So this is a long construction, so I'll try to break

23   it down and read it to you carefully.

24              It's a "federated computer environment" is

25   defined as "a set of distinct entities, such as enterprises,

Schmidt - direct

1    organizations, institutions, et cetera, that cooperate to

2    provide a single-sign-on, ease-of-use experience to a user,

3    wherein the enterprises need not have a direct,

4    pre-established, relationship defining how and what

5    information to transfer about a user."

6    Q.    So tell us what we're seeing with the map of the

7    United States and the federated computing environment there.

8    A.    So this is demonstrating how we have servers provided

9    by Groupon which might be in one location.  That is what

10   we're calling the second system, and that would about color

11   coded in green -- green for Groupon.  And then we also show

12   first system computers which could be provided by Google or

13   Facebook or somewhere else.

14         So this is illustrating how these different

15   systems, the first system and the second system, interacting

16   within this federated computer environment.  And, of course,

17   this is also showing that these are computers, so naturally

18   they comprise a processor, at least one, probably more.

19   Q.    So now looking at slide 245.  In case there is any

20   doubt, are Facebook and Facebook different entities than

21   Groupon?

22   A.    So Mr.  Breen, who is Groupon's Senior Engineering

23   Manager, agrees that Google and Facebook are different

24   entities than Groupon.

25   Q.    And do those entities cooperate in order to provide a

1  single-sign-on operation?

2  A.      Through the technology we're about to look at, yes.

3  Q.      So now let's look at slide 246 here.  What portion of

4  the claim element are you addressing here?

5  A.      So now we're talking about supporting single-sign-on

6  operations in order to provide access to protected

7  resources.

8  Q.      So what is the Court's construction for "protected

9  resources?"

10  A.      So this is another long instruction.  I'll walk

11  through it carefully.

12          "A protected resource is defined as, an

13  application, an object, a document, a page, a file,

14  executable code, or other computational resource,

15  communication-type resource, et cetera, identified by a

16  Uniform Resource Locator (URL) or, more generally, a Uniform

17  Resource Identifier (URI) that can only be accessed by an

18  authenticated and/or authorized user."

19  Q.      So look at the bottom of slide 246, can you tell us

20  what you have shown here to kind of explain that in a way

21  that is easier to understand?

22  A.      Sure.  So we're looking at exhibit PX-964.  On the

23  right-hand side, we see some examples of protected resources

24  that Groupon offers through their service.  So this would

25  include things like purchases.  We'll see in a moment you

1    need to be logged in or signed in to purchase deal.

2              Other things that are protected, not just

3    anybody can access unless they're authenticated, would be

4    the profile information about the user, particular Groupons

5    that a user might have in their possession.  And so I have a

6    little wall, a little brick wall there showing if a user

7    attempts to check out of their cart and they haven't signed

8    in yet, they won't be able to get access to those protected

9    resources.

10   Q.    So now looking at slide 247, what does Mr. Dunham say

11   about protected resources?

12   A.    He's saying a couple of things.  First he's agreeing

13   that on Groupon's website, users need to be registered to

14   purchase Groupon deals.  And then he's giving some examples

15   of portions of Groupon's website that are only available to

16   logged in users and these include the My Profile page I just

17   mentioned, My Groupons page and so on.

18   Q.    Looking on slide 248, is it your opinion that Groupon

19   performs the preamble of claim 1 of the '346 patent?

20   A.    Yes, that's correct.

21   Q.    Now, let's talk about the triggering element.  Did

22   the Court construe any language in the triggering element of

23   the '346 patent?

24   A.    Yes.  The term we just discussed protected resources

25   is construed as well as a term single-sign-on operations.

1    Q.      Looking at slide 251, what portion of the claim

2    element are you dealing with here?

3    A.      Here we're dealing with the first portion of this

4    claim element which says triggering a single-sign-on

5    operation on behalf of the user in order to obtain access to

6    a protected resource that is hosted by the second system.

7    Q.      How has the Court construed single-sign-on

8    operations?

9    A.      This is construed as an authentication process

10   whereby the user is subsequently not required to perform

11   another authentication operation during a particular user

12   session.

13   Q.      What are you showing here with the arrows jumping

14   over the brick wall here?

15   A.      This is showing that the user is going to be required

16   to log in using the screen and other code that Groupon

17   provides in order to do that login in order to trigger that

18   login, and once that happens, once they're successfully

19   signed in, then they'll be able to access the protected

20   resources without having to perform other authentication

21   operations up to the point where they log out.

22   Q.      Now, looking at slide 252, what does Mr. Dunham say

23   about the triggering step?

24   A.      He's agreeing that if a user tries to purchase a deal

25   but they're not logged in, that will trigger a login

Schmidt - direct

1    process.

2    Q.      And then looking at slide 243, is it Groupon who

3    designed this website to have that triggering step?

4    A.      Yes, Mr. Dunham is agreeing that Groupon designed its

5    website because users have to be logged in to purchase

6    deals.

7    Q.      Now, looking at the slide 254 here, what are you

8    showing here with the human language on the left and then

9    the computer language on the right?

10   A.      So let's start with the human language on the left.

11   This is showing a screen that Groupon will provide in this

12   case to a desktop browsers or a laptop browser and one of

13   the things you see here is highlighted in red says log in

14   with Google.  This is I believe the single-sign-off or sign

15   in button.  And if the user were to select that button, then

16   the code that's shown on the right-hand side which is code

17   that Groupon provides, it's downloaded into the browser from

18   Groupon, this code then triggers the single-sign-on.  If you

19   take a look, you can see that this is coming out as source

20   code that is provided by Groupon, and there is a click hand,

21   you see dot click, that means that's the code that will be

22   run to trigger the login.

23   Q.      And you're referring to PX-964 on the left and

24   PX-1192 on the right?

25   A.      That's correct, yes.

Schmidt - direct

1    Q.      So we're referring to logging in using Google

2    credentials, let's talk about logging in using Facebook

3    credentials.  What do we see here on slide 255?

4    A.      So in the left-hand side is Exhibit 964, we see once

5    again there is a chance to login with Facebook, and if the

6    user selects that particular way to do the single-sign-on,

7    then you take a look in the right-hand side this is source

8    code provided by Groupon, and that source code when run will

9    trigger the single-sign-on operation and so you can see go

10   ahead and start the social client login using Facebook as

11   the way to provide the credentials.

12   Q.      So looking at slide 256, is it your opinion that

13   Groupon performs the trigger steps of claim 1 of the '346

14   patent?

15   A.      That's correct, it's performing that, it's triggering

16   that single-sign-on operation on behalf of the user, the

17   code that we saw is triggering that on behalf of the user.

18   Q.      Let's go to the receiving step.  So we have a couple

19   of slides here on slide 258 with a couple of builds which

20   will build on each slide.  I would like to start with the

21   setup here.  Can you tell us what we're seeing here?

22   A.      So the claim element is receiving from the first

23   system at the second system an identifier associated with

24   the user.  So I'm just kind of showing, just to remind

25   everyone what the first system or first systems are, that

Schmidt - direct

1    would be things like Google or Facebook, those are the

2    so-called identity providers and I'm showing the second

3    system which is Groupon servers which are the so-called

4    service providers.

5    Q.      Let's look at the first step here.  What are you

6    showing here on in this first step on slide 259?

7    A.      So assume a client tries to access a protected

8    resource, they're trying to purchase a deal, they're trying

9    to access their profile.  What I'm showing here is that

10   Groupon will go ahead and send them back that login screen

11   that we just looked at, that sign in screen that has various

12   ways to sign in, and what you can see there is two of the

13   ways is login with Google, login with Facebook.

14   Q.      What happens in this next step we see here in slide

15   260?

16   A.      So, assuming the user selects one of the social sign

17   in buttons, at that point the code that Groupon provides

18   will trigger that login process, single-sign-on process, and

19   that will involve ultimately a password and a user name to

20   be sent over to the first system.

21   Q.      What happens in this next step on slide 261?

22   A.      So the first system will then send back something

23   called a token which travels back through the user's client

24   computer software and then is redirected to go back to the

25   Groupon second system, the Groupon servers.

1    Q.      Is that token something we saw when Dr. Hinton was on

2    the stand?

3    A.      Yes, exactly.

4    Q.      And then let's look at this next step here on 262.

5    A.      So at this point, Groupon code running on the second

6    server would use that token in order to send a request back

7    to the first system, back to Google, back to Facebook, back

8    to whoever the identity provider is that's involved here.

9    Q.      What happens in slide 263?

10   A.      So, in response to that request that comes from

11   Groupon with that token that a then indicates the user, then

12   whoever the identity provider is, be it Facebook or Google,

13   will send back additional information about the user, such

14   as their email address, their name and so on, and that comes

15   back from Groupon from the second server.

16   Q.      Looking at slide 264, what portion of the claim

17   element are you addressing here?

18   A.      The part about an identifier associated with a user.

19   Q.      What does Mr. Dunham say about that identifier?

20   A.      He says that it's his understanding that uniquely

21   identifying the user in Groupon's database is the user's

22   email address that performs the purpose of uniquely

23   identifying the user.

24   Q.      Looking at slide 265, is it your opinion that Groupon

25   performs the receiving element of claim 1 of the '346

Schmidt - direct

1   patent?

2   A.      Yes, that's correct.

3   Q.      Let's look at the next element, the creating element.

4   So on slide 267, what portion of the claim element are you

5   addressing here?

6   A.      So this is the part dealing with creating a user

7   account for the user at the second system.

8   Q.      And you're referring to PX-1005.  What are you

9   showing in that document?

10  A.      This is a document where Groupon explains how an

11  account is created on a Groupon server for the use if the

12  user is not present yet on the Groupon server.  Let me read

13  it, it says a request is fired checking to see if the Google

14  user is present on the Groupon server.  And if they're not,

15  an additional request is executed creating an account on the

16  Groupon server.

17  Q.      And then looking at slide 268, what portion of the

18  claim element are you addressing here?

19  A.      This is the part that deals with based at least in

20  part on the received identifier associated with the user.

21  Q.      What are you showing here in PX-466?

22  A.      This is a quote from another one of Groupon's

23  documents about the user service, and it basically says that

24  the user's email address is the primary identifier for the

25  user account.  The specific quote is the user's service is

Schmidt - direct

1      the system of record for the email address associated with

2      an account since possession of that email account is the

3      primary way Groupon verifies identity.

4      Q.      Looking at slide 269, what portion of the claim

5      element are you addressing here?

6      A.      This is the final part highlighted in yellow, and in

7      order to make sense of it, you have to first put in the

8      phrase creating a user account, put that in the back of your

9      head.  Then it says after triggering the single-sign-on

10     operation, but before generating at the second system, a

11     response for accessing the protected resource, wherein the

12     created user account supports single-sign-on operations

13     between the first system and the second system on behalf of

14     the user.

15     Q.      So there is a triggering step and a creating step.

16     What do we see about those two steps on slide 269 here?

17     A.      So in exhibit PX-964, we can see what's happening

18     here is that the user account is created at step two which

19     is after the triggering step, so step two is after the

20     triggering step, and as we'll see in the next build it's

21     before.

22     Q.      Let's look at the next build.  What do we see here?

23     A.      After the user -- I'm sorry, after the user account

24     is created, the user of the second system, then after that

25     is created, at that point then a response is generated at

Schmidt - direct

1    the second system at Groupon to allow the client to access

2    the protected resource, that's generating, this allows the

3    client to access whatever resource they were trying to

4    obtain earlier.

5    Q.     So it's creating it after triggering but before

6    generating?

7    A.     Creating is after triggering but before generating,

8    yes.

9    Q.     Looking at slide 271, is it your opinion that Groupon

10   performs the last element of claim 1 of the 364 patent?

11   A.     Yes, that's correct.

12          THE COURT:  Mr. Oussayef, I think I'm going to

13   stop you there just briefly.  We'll give the jury a little

14   bit of a break.  No talking about the case during the break.

15   We'll bring you back in a bit.

16          (Jury exited the courtroom at 10:37 a.m.)

17          THE COURT:  We'll be in recess.

18          (A brief recess was taken)

19          THE COURT:  Bring the jury back in.

20          (Jury entering the courtroom at 11:00 a.m.)

21          THE COURT:  We are ready to continue.

22          Mr. Oussayef.

23          MR. OUSSAYEF:  Thank you, Your Honor.

24   BY MR. OUSSAYEF:

25   Q.     So, Dr. Schmidt, we were on slide 271.  Is it your

 1    opinion that Groupon performs each element of claim 1 of the

 2    '346 patent?

 3    A.      Yes, that's correct.

 4    Q.      Now, did you hear counsel for Groupon say during his

 5    opening statement that Google and Facebook were responsible

 6    for these elements of the claims?

 7    A.      Yes, I did.

 8    Q.      Now, does that make any sense to you?

 9    A.      No, it doesn't.  As I showed in the code snippets,

10    the code that is provided by Groupon is what triggers the

11    single-sign-on operation.

12    Q.      Let's take a look at the creating element here.

13    Would it make any sense for Google or Facebook to create a

14    Groupon user account?

15    A.      No, it would not.

16    Q.      Let's move on to claim 5 here.  What is your opinion

17    about claim 5 of the '346 patent?

18    A.      It's my opinion that Groupon infringes claim 5 of the

19    '346 patent.

20    Q.      So looking at slide 273, what do we see here with

21    claim 5 and claim 1 side-by-side?

22    A.      So, we're showing here is that claim 5 depends on

23    claim 1 as we talked about before.

24    Q.      So looking on slide 274, let's deal with each claim

25    element in turn.  So let's start with the first half of

1   claim 5 of the '346 patent.  And now looking on slide 276,

2   what are you showing here about the first part of claim 5?

3   A.      So what I'm showing here is the first part of claim 5

4   is dealing with this sending of the token from the second

5   system over to the first system, or Groupon over to Facebook

6   or Google.

7   Q.      And tell us what the first part of claim 5 is?

8   A.      The first part of claim 5 is in response to a

9   determination at the second system that the second system

10  does not have sufficient user attribute information to

11  complete creation of a user account for the user of the

12  second system.

13  Q.      And if we look on slide 277, what does Mr. -- I

14  guess, let me start with this.  What part of the claim

15  element are you addressing here?

16  A.      So I'm addressing the part that's in yellow which is

17  the part about in response to the determination at the

18  second system that the second system does not have

19  sufficient user attribute information to complete creation

20  of a user act for the user of the second system.

21  Q.      Can you simplify that a little bit?  What is that

22  referring to, what situation?

23  A.      So as Mr. Dunham was testifying here, if the token

24  that Groupon receives from Google, once it's decrypted does

25  not have the user information that we need, then in that

1   case the Groupon user service needs to make an API call to

2   Google.

3   Q.      If we look on slide 278, what portion of the claim

4   element are you addressing here?

5   A.      We're talking about the second portion which is

6   sending a request message from the second system to the

7   first system to retrieve user attribute information.

8   Q.      And I see you have the same quote from Mr. Dunham.

9   What are you focusing in on here?

10  A.      I'm focusing on the second half of his quote, the

11  first quote said if the token Groupon receives from Google

12  does not have the user information that we need, then in

13  that case the Groupon user service needs to make an API call

14  to Google.

15  Q.      In looking at slide 279, did you review any source

16  code from Groupon that supports your opinion?

17  A.      Yes, this is source code from exhibit PX-1188 and

18  what this code is showing is that Groupon is sending a

19  request to Google to retrieve user attribute information.

20  If you look down at the part at the bottom it says Google

21  colon colon API client dot get account data by access

22  tokens, it says tokens results, access token, that's taking

23  the access token that was received from Google in this case

24  and using it in order to be able to get account data or get

25  the user's email address or account data, that's code that

Schmidt - direct

1    we're seeing that Groupon writes.

2    Q.      Now, looking at slide 280, we were referring to

3    Groupon's login using Google credentials.  Let's talk about

4    Groupon's login using Facebook credentials.  What part of

5    the element are we going back to here?

6    A.      This is in response to a determination at the second

7    system that the second system does not have sufficient user

8    attribute information to complete creation of a user account

9    for the user of the second system.

10   Q.      What does Mr. Dunham say about that part?

11   A.      So he's asked if the token that Groupon received from

12   Facebook does not have enough information to uniquely

13   identify the user, is that fair, and he says it cannot be

14   used to identify that user.

15   Q.      And then looking at slide 281, what part of the claim

16   element are you addressing here?

17   A.      Here we're talking about the sending a request

18   message from the second system to the first system to

19   retrieve user attribute information.

20   Q.      What part of Mr. Dunham's testimony are you referring

21   to here?

22   A.      This is the part where he says, it, which is the

23   token, is used to provide access to query Facebook for

24   information about that user.  And then he's asked and the

25   way in which Groupon queries Facebook for information about

1    the user is call Facebook graph API about the token, he

2    agrees with that, and says that's correct.

3    Q.      Looking at slide 282, did you review any source code

4    that supported your opinion?

5    A.      Yes.  This is source code that comes from exhibit

6    PX-1211.  And as you can see, this is Groupon code, this is

7    code that Groupon wrote, and it's using the Facebook API

8    client to send a request to Facebook to retrieve user

9    attribute information.

10   Q.      Looking at slide 283, is it your opinion that Groupon

11   performs the preamble or the first part of claim 5 of the

12   '346 patent?

13   A.      Yes, that's correct.

14   Q.      Let's look at the second part of claim 5 of the '346

15   patent.  Now, looking at slide 285, what are you showing

16   here?

17   A.      So this is the final part of that claim element.

18   It's receiving at the second system from the first system a

19   response message that contains user attribute information

20   that is employed by the second system to complete creation

21   of a user account for the user at the second system.

22   Q.      Now, looking at slide 286, what does Mr. Breen say

23   about this claim element?

24   A.      Mr. Breen is agreeing that or answering that Google

25   returns information from the Google account, and contained

1    in that information is the Google user ID, their email

2    address, and the name of the user.

3    Q.    So now let's look at slide 287.  What does Mr. Breen

4    say about Facebook credentials?

5    A.    Mr. Breen is agreeing that Facebook returns the

6    Facebook user ID, email and name.

7    Q.    In your opinion does Groupon perform the second part

8    of claim 5 of the '346 patent?

9    A.    Yes, that's correct.

10   Q.    So now let's talk about Groupon's mobile apps.  Can

11   you tell us what your opinion is there?

12   A.    Yes.  It's my opinion that Groupon's mobile apps

13   infringe claims 1 and 5 of the '346 patent.

14   Q.    So now let's look at slide 290.  This looks similar

15   to an image we saw before, but can you explain what you're

16   showing here?

17   A.    Sure.  This is just showing the same process when the

18   client happens to be something that's running on a mobile

19   app, so either iPhone or Android, and the point of this

20   slide is the differences between the mobile app

21   implementations and the website version don't affect the

22   infringement of the '346 patent.  The only real difference

23   there is that it's a mobile device and the screen therefore

24   looks a slight bit different when the user is prompted from

25   Groupon in order to be able to do social sign up or sign in

Schmidt - direct

1    using Facebook or Google.

2    Q.     You're referring to PX-969?

3    A.     That's correct.

4    Q.     Now let's look at analysis of the past website, past

5    mobile apps.  Can you tell us what your opinion is regarding

6    those versions of Groupon's services?

7    A.     Yes.  So it's my opinion that Groupon's website and

8    mobile apps have infringed claims 1 and 5 of the '346 patent

9    through Facebook login since the middle of 2011.  And

10   Groupon's website and mobile apps have infringed claims 1

11   and 5 of the '346 patent through the Google login since

12   2016.

13   Q.     And did you review any materials to support your

14   opinion about Groupon's past infringement?

15   A.     Yes, I looked at the past version of Groupon's

16   website and mobile apps.

17   Q.     And that would be PX-993?

18   A.     That's correct.

19          MR. OUSSAYEF:  Your Honor, I offer PX-993.

20          MR. HADDEN:  No objection.

21          THE COURT:  It's admitted.

22   BY MR. OUSSAYEF:

23   Q.     Did you review any past source code?

24   A.     Yes.  I reviewed Groupon's past source code that was

25   available on their source code computer.

Schmidt - direct

1    Q.      That would be PX-1492, PX-1504, 1505, 1506, 1509, and

2    1514, is that right?

3    A.      As well as 1112.

4    Q.      As well as 1112.

5            MR. OUSSAYEF:  Your Honor, I offer those

6    exhibits as well.

7            MR. HADDEN:  No objection.

8            THE COURT:  They're all admitted.

9            (Above-referenced exhibits admitted into evidence.)

10   BY MR. OUSSAYEF:

11   Q.      Did you review any testimony of Groupon's engineers

12   and employees?

13   A.      Yes, testimony from Mr. Dunham and Mr. Breen.

14   Q.      And how about Groupon's past technical documents?

15   A.      I reviewed Groupon's past technical documents,

16   including Exhibit PX-625.

17           MR. OUSSAYEF:  Your Honor, I offer that exhibit.

18           MR. HADDEN:  No objection.

19           THE COURT:  It's admitted.

20           (Above-referenced exhibits admitted into evidence.)

21   BY MR. OUSSAYEF:

22   Q.      And did you review Groupon's statements about past

23   versions of its services as well?

24   A.      Yes, I looked at Exhibit PX-497.

25           MR. HADDEN:  No objection.

Schmidt - direct

1          THE COURT:  It's admitted.

2              (Above-referenced exhibits admitted into evidence.)

3      BY MR. OUSSAYEF:

4      Q.      Now looking at slide 292.  Can you tell us how you

5      analyzed Groupon's extended use of the '346 patent?

6      A.      Sure.  So Groupon gave us a spreadsheet that went

7      back many years back starting in 2007 going through I

8      believe May or beginning of May 2016, and it had a

9      compilation of the total accounts created per month.  That's

10     what is shown on the left-hand side in Exhibit PX-46.

11              And then they also gave us a spreadsheet that

12     included the total registrations by month for the same time

13     frame.  And that is PX-46 at the different sub-columns and

14     rows.

15              And so what I did is I took the total number of

16     accounts, whichever is what is shown on the left, and I took

17     the total social registrations, these were the number of

18     registrations that involve social sign-ins, we found through

19     analysis to involve social sign-ins versus creating a Google

20     account.  And I divided the total social registrations by

21     the total accounts and came up with 14 percent.

22     Q.      And what exhibits did you look at there?

23     A.      That was PX-46.

24              MR. OUSSAYEF:  Your Honor, I offer PX-46.

25              MR. HADDEN:  No objection.

1          THE COURT:  It's admitted.

2               (PX-46 was admitted into evidence.)

3          MR. OUSSAYEF:  And, Your Honor, to the extent

4    any of the previous exhibits were admitted conditionally

5    upon providing additional context, we offer those exhibits

6    as well, Your Honor.

7          THE COURT:  Okay.

8          MR. HADDEN:  I'm not sure what those are but I

9    don't object.

10         THE COURT:  Okay.  They're all admitted then.

11              (Above-referenced exhibits admitted into evidence.)

12         MR. OUSSAYEF:  Thank you, Your Honor.  And with

13   that, I have no further questions.  Thank you, Dr. Schmidt.

14         THE COURT:  Okay.  Thank you.  We'll have

15   cross-examination.

16         MR. HADDEN:  May I approach, Your Honor?

17         THE COURT:  You may did.

18              (Binders passed forward.)

19                  CROSS-EXAMINATION

20   BY MR. HADDEN:

21   Q.     I'm going to start, Dr. Schmidt, by discussing the

22   '601 patent.

23   A.     Okay.

24   Q.     So this is one of the slides that you discussed with

25   IBM's counsel; correct?

Schmidt - cross

1    A.      That's correct.

2    Q.      Right.  And this relates to the first step of claim

3    51, receiving a service request including state information.

4    Is that right?

5    A.      That's correct.

6    Q.      And the service request with the state information

7    that you are talking about is the request from the user's

8    browser to the Groupon server; is that correct?

9    A.      That's correct.

10   Q.      And that is shown in the middle.  That's this guy

11   right here, right?

12   A.      Yes.

13   Q.      Okay.  And at the bottom of this diagram, we have

14   this kind of cartoonish picture from the Groupon

15   documentation; right?

16   A.      That's correct.

17   Q.      Okay.  And what is shown here is the request coming

18   from the user's browser, right?  And that would be this

19   request up here; right?

20   A.      That's correct.

21   Q.      Okay.  And that ultimately goes to this Grout thing

22   which is basically kind of a routing load balancing; right?

23   A.      That's my understanding.

24   Q.      And then it would get to a program on Groupon which

25   they call an I Tier Application, right?

Schmidt - cross

1   A.      That is correct.

2   Q.      And this diagram says Homepage ITA, but for this

3   particular request, it would be the Dealpage ITA; right?

4   A.      It could be implemented various ways.  That is

5   possibly one way it would be implemented.

6   Q.      I'm not asking how it could be done, I'm asking how

7   it is done.  So at Groupon, if a user sent this request, it

8   would end up at a Dealpage ITA at Groupon; right?

9   A.      I don't recall exactly what it was showing.  But that

10  was something that was showing up as part of the service

11  oriented architecture that Groupon provides.

12  Q.      Right.  So let's step back.  The service oriented

13  architecture, right, means that there are programs at

14  Groupon like these I Tier Applications that process requests

15  for web pages, and they call on other programs to provide

16  them data and other information they need; right?

17  A.      That's, as Mr. Dunham testified in deposition, there

18  are various services that are used to carry out users

19  requests.

20  Q.      Right.  And that is what you are pointing to here as

21  these backend services, right?

22  A.      There are many services shown there.  We can see

23  there is a Routing Service, there is Backend Service, a

24  Layout Service, there is the Homepage ITA.  That is a

25  service, too, in a service architecture.

Schmidt - cross

1    Q.      Right.  So we have this Dealpage ITA that receives

2    the user's request and creates the page that is going to be

3    sent back to the user; right?

4    A.      I'm sorry.  Ask the question again.

5    Q.      Sure.  This box in the middle on the diagram that you

6    put up in front of the jurors shows a Homepage ITA, but as

7    we discussed, in your example, it would actually be a

8    Dealpage ITA.  That is a computer program running on a

9    server at Groupon; right?

10   A.      There are many services running on servers at

11   Groupon.  Yes, I agree.

12   Q.      Sir, I'm asking about this specific one on the

13   diagram you put in front of the jury.  Now, do you

14   understand or not that that is a program running on a

15   computer at Groupon?

16   A.      The Homepage ITA is certainly a program that is

17   running on a computer at Groupon, yes.

18   Q.      And the Dealpage ITA would also be a program that is

19   running on a server at Groupon; right?

20   A.      That's not what that diagram is showing, but there is

21   undoubtedly a Dealpage ITA running in there somewhere.

22   Q.      Okay.  So it is your understanding that the Homepage

23   ITA is what is processing this request?

24   A.      Well, I believe it was my testimony that there are a

25   number of services that are processing this.  As you can see

1    there, there is a Routing service, there is a Homepage ITA

2    service.  The request can show up and be processed perhaps

3    initially.  The process would be several places but it is

4    being processed at the Homepage ITA, among other things.

5    Q.      So it's your testimony that this request that you

6    pointed out in your demonstrative is being processed by a

7    Homepage ITA.  That is your understanding of Groupon's

8    backend infrastructure?

9    A.      So the Homepage ITA is part of the service oriented

10   architecture that is processing that request.

11   Q.      That wasn't my question, so let's be very clear.

12   This specific request that you are pointing to that you say

13   fulfills this element of the claim, it's your testimony that

14   that is being processed by the Homepage I Tier Application

15   at Groupon; is that your understanding?

16   A.      The Homepage ITA --

17   Q.      It's a yes or no question.  Can you answer it,

18   please?

19   A.      Yes, it's being processed by the Homepage ITA.

20   Q.      Okay.

21   A.      Along with other services that are part of the

22   service oriented architecture.

23   Q.      And if you are wrong and that request is not

24   processed by the Homepage ITA, you don't have any evidence

25   that this element is met, do you?

Schmidt - cross

1    A.      Again, as I testified, there is many services that

2    are being used here.  And the Homepage ITA is a part of that

3    service oriented architecture that will process that

4    request.  There are other things that will also process that

5    request, services that process that request as well.

6    Q.      Let's go back.  This isn't that complicated, right?

7    You get a request from the user.  It comes to some program

8    at Groupon that is responsible for making the web page that

9    gets sent back; right?

10   A.      There is various parts --

11   Q.      Is that a yes or no?  Can you answer that question?

12   A.      There are various -- yes, there are various parts of

13   Groupon's service oriented architecture that will process

14   the request to produce a web page.

15   Q.      Is it an I Tier Application that will create the web

16   page that gets sent back to the user?  That's a yes or no

17   question.

18   A.      The I Tier Application -- yes, the I Tier Application

19   produces various things.  HTTP is part of it for the web

20   page.  There are other data from other parts of the service

21   as well, just to be clear.

22   Q.      That's the question.  The question is very simple.

23   We have an arrow coming in with the request from the web

24   page.  Ultimately, a web page is going to come back.  Is

25   that web page created by this Homepage I Tier Application?

1    Yes or no?

2    A.      Portions of it are created by that, portions are

3    created by other parts.  So it is created by the I Tier

4    Application along with other parts of other services that

5    creates parts of that page.

6    Q.      Right, but ultimately the page that comes back is

7    what the Homepage ITA returns to the user?  Yes or no.

8    A.      No, not necessarily.  No.

9    Q.      Okay.  So it's your testimony that there is stuff in

10   the web pages that comes back to the user that is not the

11   output of the Homepage ITA or the other like Dealpage ITA.

12   Is that your testimony?

13   A.      When a web page comes back to a client, there is

14   multiple requests from the client that provide multiple

15   parts of that web page.  Some parts of that will be coming

16   back from the Homepage ITA, but there is also other things

17   that are coming back such as images which are also part of

18   what is returned as part of the web page.  We talked about

19   that when I talked about the '849 and '967 patents.  Those

20   things come from other places.

21   Q.      Okay.

22   A.      That's what multiple service architecture means.

23   Q.      Well, let's look at what this service oriented

24   architecture means here.

25           So the Homepage ITA receives the request from

1    the user's browser, right?

2    A.    It receives the request, yes.

3    Q.    Okay.  And then it sends out its own request, right?

4    Which are the async.parallel nodeJS.  That is the request

5    sent from the Homepage ITA to these other backend services;

6    right?  That is what the arrows represent, right?

7    A.    It is representing that among other things, yes.

8    Q.    Right.  And you say one of these other backend

9    services is the Layout Service, right?

10   A.    One of the other services is the Layout Service, yes.

11   Q.    And your theory of infringement for this claim is

12   that the Layout Service receives this service request from

13   the user and specifically it includes this state information

14   which identifies this necklace, right?

15   A.    I don't think that quite states my testimony

16   correctly.

17   Q.    Well, you did say, and I thought it heard it, that

18   the service request, including the state information, is

19   received by the Layout Service.  Okay?  Is that your

20   testimony?

21   A.    No.  No.

22   Q.    So does the Layout Service receive the service

23   request with the state information?

24   A.    So the service request or the request that is sent

25   across there is going to be received by the Homepage ITA,

1    and then as part of checking that out, other services in the

2    service oriented architecture will do their thing.

3    Q.      That's not the question.  The question is does the

4    Layout Service receive the service request that includes the

5    state information?

6    A.      So --

7    Q.      Yes or no.

8    A.      That's not part of my testimony.

9    Q.      Okay.  So do you have an opinion?  Does it or doesn't

10   it?

11   A.      So as I stated in my testimony, and I will restate

12   here if you would like me to, the Homepage ITA receives the

13   service request, and then it uses the services in the

14   service oriented architecture in order to carry out the

15   request that is being asked for by the client.

16   Q.      So does the Layout Service receive a request that

17   includes this state information?  Yes or no.

18   A.      I don't really think it matters as it is not part of

19   my read here.

20   Q.      So does it or doesn't it?  Does the Layout Service

21   receive a request that includes the state information?

22   A.      I don't know off the top of my head, but I believe

23   that is not relevant for my read.

24   Q.      Do you know?  You don't know.

25   A.      I'd have to go back and look into my report.

1   Q.      Now, you haven't actually identified any Groupon

2   source code in the Homepage ITA that sends a request to the

3   Layout Service, have you?

4   A.      I don't recall.

5   Q.      Okay.  And you looked at all of Groupon's source

6   code; right?  You had access, as you testified, to all of

7   Groupon's source code; right?

8   A.      I had access to all of Groupon's source code.  That's

9   correct.

10  Q.      And you have never identified any Groupon source

11  code at the Layout Service that receives a request from the

12  Homepage ITA, have you?

13  A.      I don't recall.

14  Q.      Okay.  And you haven't ever identified any request

15  from the Homepage ITA to the Layout Service that includes

16  any of this state information, have you?

17  A.      I don't recall.

18  Q.      Okay.  But sitting here today, you can't point to

19  any, you can you?

20  A.      I have to look at my report.

21  Q.      Okay.  So once we get this request -- could I skip

22  forward, Brian, to 193?

23          So this is the next element of the claim.  And

24  if I understand what you pointed to here, we still have this

25  guy here with the browser.  You are now saying that the

1   Homepage ITA receives a mustache template from the Layout

2   Service; right?

3   A.      That's what that diagram from Groupon shows, yes.

4   Q.      And the particular output that you point to in your

5   -- can I go to the next slide, please?  Let's go to 205. One

6   more.  Okay.  Go back.

7               Okay.  The particular mustache template you

8   point to as being the output is the purchase cluster

9   template; right?

10  A.      I believe I pointed to the single option HTML

11  mustache template.

12  Q.      Right, the single option mustache template.  And you

13  haven't identified source code at Groupon from the Layout

14  Service that actually outputs that particular mustache

15  template, have you?

16  A.      There is a lot of source code.  I'm not sure.  I

17  don't know off the top of my head.

18  Q.      Well, you didn't identify it in front of the jury

19  today, did you?

20  A.      The source code that I showed was the single option

21  mustache template.

22  Q.      You showed the template, but you didn't show any

23  source code in the Layout Service that actually shows that

24  the Layout Service provides that template, did you?

25  A.      No, I referred to this diagram here that explains

Schmidt - cross

1    what the purpose of the Layout Service is from this

2    document.

3    Q.      Let's look at this document, though.  It says service

4    that serves mustache templates.  Now, this doesn't say that

5    the Layout Service serves the mustache template with the

6    "buy" button, does it?

7    A.      It simply says that the Layout Service serves the

8    mustache template.  That's correct.

9    Q.      And there are lots of mustache templates you use on

10   Groupon's website.  Right?  Some of them are for the

11   headers, some are for the footers, and there is this one

12   that pointed to for the "buy" button; right?

13   A.      There is that one, yes.

14   Q.      And you have no evidence that the Layout Service

15   actually provides the mustache template with the "buy"

16   button, do you?

17   A.      I wouldn't characterize my testimony like that at

18   all.  In fact, I have lots of evidence that that is what is

19   happening.

20   Q.      You don't have any source code from the Layout

21   Service that shows that it outputs that particular mustache

22   template that you are relying on, do you?

23   A.      The slides I showed today don't show that source

24   code -- that source code is in the source code that I

25   reviewed.

1  Q.      Well, you haven't identified any of that source code

2  to the jury, have you?

3  A.      As I mentioned, my testimony shows that the material

4  from the Groupon shared Layout Service documents.

5  Q.      Well, you never identified any source code in the

6  Homepage ITA that requests or receives that particular

7  mustache template from the Layout Service either, have you?

8  A.      I don't recall.

9  Q.      You certainly didn't provide the jury with it today,

10  did you?

11  A.      Today I showed the documents here that we're looking

12  at.

13  Q.      If, in fact, the layout service doesn't provide that

14  Mustache template with the buy button, you have not shown

15  that Groupon meets this element of the claim, have you?

16  A.      Well, yes, I have, because we've looked at the other

17  portions that demonstrated the information that was coming

18  back.

19  Q.      Where have you shown that the Mustache template with

20  the buy button comes from the layout service?  You just put

21  out this slide, you haven't shown any software that shows

22  that.  You haven't shown any Groupon testimony that shows

23  that.  You haven't put up a single Groupon document that

24  shows that.  You have had this one generic document.  So if

25  this generic document is not referring to this specific

Schmidt - cross

1    Mustache template that has the buy button, you haven't

2    proven anything, have you?

3    A.     I wouldn't characterize it that way.

4    Q.     So if you're wrong and, in fact, the layout service

5    does not provide the Mustache template with the buy button,

6    Groupon doesn't infringe this claim; right?

7    A.     I don't believe I'm wrong.

8    Q.     If you're wrong, Groupon doesn't infringe this claim

9    and IBM can't meet its burden to prove infringement; isn't

10   that true?

11   A.     I wouldn't agree with that, no.

12   Q.     Just going back to the state information, you have

13   not provided any information that the layout service

14   receives any state information from the home page ITA or any

15   other ITA; isn't that right?

16   A.     That's not required by the claim element, that's

17   correct.

18   Q.     So this is where you're talking about claim 54 which

19   depends on 51; right?

20   A.     That's correct.

21   Q.     So if you're going to infringe 54, you also have to

22   infringe 51?

23   A.     That is correct.

24   Q.     So if I'm right and you're wrong that the layout

25   service does not provide the Mustache template that includes

1    that buy button, Groupon can't infringe 54 either; right?

2    A.      Are you asking me the definition of depends?

3    Q.      It's a yes or no question, sir.  Please answer.  If

4    I'm right and you're wrong, and the layout service does not

5    provide that Mustache template with the buy button, Groupon

6    does not infringe claim 54, either; right?

7    A.      I don't agree with your premise, but --

8    Q.      The premise is pretty clear, if I'm right and the

9    layout service doesn't provide that Mustache template with

10   the buy button, Groupon does not infringe claim 54; isn't

11   that true, sir?

12   A.      I understand your question, but I don't agree with

13   your premise.

14   Q.      But it has a premise.  If my premise is right,

15   Groupon doesn't infringe claim 54; right?

16   A.      If claim 51 is not infringed, claim 54 will not be

17   infringed.

18   Q.      In addition, though, claim 54, you point to the state

19   information that is embedded at the various pledge ID's;

20   right?

21   A.      So, yes, that slide is showing that the dynamically

22   downloaded computer program code the client would use to

23   perform that embedding step, that's correct, by embedding

24   the pledge ID in the continuation.

25   Q.      You're saying the state information is these various

1    pledge IDs, which these three are different?

2    A.      There is more state information than just the pledge

3    IDs, but the pledge ID it is part of the state information.

4    Q.      The only state information that you identified for

5    the jury today is these pledge IDs; right?

6    A.      No, I don't believe so.  You take a look at Jet's

7    Pizza, Nashville, I believe that I also identified that as

8    being a deal ID or a deal permalink, that was another piece

9    of state information identified.

10   Q.      When you got to claim 54, the embedding step, you

11   relied on these pledge IDs?

12   A.      For claim 54 what I'm showing is the pledge ID being

13   embedded.

14   Q.      Claim 54 refers to said embedding step; correct?

15   A.      That's correct.

16   Q.      And said embedding step refers back to the embedding

17   step in claim 51; right?

18   A.      That's correct.

19   Q.      And in claim 51, the embedding step says embedding

20   said state information; right?

21   A.      That's correct.

22   Q.      And said state information refers back to the state

23   information that was received in the service request; right?

24   A.      Partly.  The state information could be various

25   things.

1    Q.      Let's be clear --

2            MR. OUSSAYEF:  Your Honor, he should be able to

3    finish his answer.

4            THE COURT:  Okay.  I think counsel has been

5    pretty patient, but go ahead.

6    BY MR. HADDEN:

7    Q.      We all know what said means in patent claims, right,

8    said means it's referring back to the prior instance of that

9    item, right, you understand that?

10   A.      I do.

11   Q.      So when it says said state information, that doesn't

12   mean any state information, that means the state information

13   that was described earlier in the claim; right?

14   A.      That's correct.

15   Q.      Okay.  And the state information that was described

16   earlier in the claim was the state information that was

17   received with the service request; right?

18   A.      That's also correct.

19   Q.      And that's not these pledge IDs, these were not in

20   your service request?

21   A.      I don't believe that's really true, because when the

22   information comes down there is a default, there is a

23   default option.  If you were to go back a couple of slides,

24   you see there is a default option there, and the default

25   option will have a pledge ID filled in.

Schmidt - cross

1   Q.      What you identified was the state information in the

2   service request step was the permalink for that necklace;

3   right?

4   A.      Right.  And also we saw that that has a default state

5   information that's put into that which is a pledge ID.

6   Q.      No, you identified the permalink as the state

7   information that was received in the request, that wasn't a

8   pledge ID; right?

9           If we have to go back to the slide, we can.

10  Let's go back to 188.  This is where what you said was the

11  state information.  That's not those three pledge IDs?

12  A.      So if you don't mind me stepping through all the

13  other claims as well.

14  Q.      No, I'll ask the questions.  This is what you

15  identified as the state information.  Later claim refers

16  back to said state information.  That means you got to point

17  back to the same information you had here, and you didn't do

18  it, right, you changed the state information?

19  A.      So we're talking about claim 54, and that has said

20  inventing step.

21  Q.      It does.  Now it refers back to the embedding step in

22  claim 51, we agreed on that already, so we're back to claim

23  51 and that requires the state information that was in the

24  service request; right, and that's this, but that's not what

25  you pointed to in claim 54, is it?

1    A.      That's certainly part of what was there but --

2    Q.      It was nowhere on that slide, we have to go back, we

3    have to go back to the slide that has claim 54.   214.

4             THE COURT:  Is this the one you want?

5             MR. HADDEN:  Yes.

6             THE COURT:  214.

7    BY MR. HADDEN:

8    Q.      So 214 we have different state information for those

9    pledge IDs, we don't have permalink that describes the

10   network, so you switched the state information.

11   A.      Well, to be fair, the example is different, the state

12   information couldn't be the same.  The other example was the

13   My Three Treasures pendant and this is for Jet's Pizza.

14   Q.      You never walked through an example that shows claim

15   54, you switched examples and you changed the state

16   information?

17   A.      This example would be consistent for the analysis for

18   claim 51 and claim 54.

19   Q.      But you didn't provide that evidence to the jury?

20   You never showed this pledge ID is received in a service

21   request anywhere?

22   A.      This was a different example.

23   Q.      Right.  But to meet claim 54, you have to show that

24   this pledge ID was received in a service request in claim

25   51, and you didn't do it, did you?

Schmidt - cross

1    A.        The examples were different to illustrate different

2    types of options.

3    Q.        Just to be clear, you got to match every element of

4    the claim to infringe, you understand that; right?

5    A.        Sure.

6    Q.        You didn't provide any mapping of claim 54 where

7    Groupon performed every element, did you?

8    A.        It's the same behavior.

9    Q.        It's not the same behavior.  You have three different

10   pledge IDs here and you pointed to one permalink before.

11   Nowhere did you connect the dots to show that these were

12   received in a service request, have you?  Right?  So you

13   have not met your burden of proving infringement of this

14   claim or claim 51, have you, Dr. Schmidt?

15   A.        I wouldn't agree with that.

16   Q.        Let's talk about the same patent, the same claim with

17   respect to the mobile apps.  If we could go to -- let's to

18   go slide 228.  So this is a little complicated.  First off

19   in the mobile apps you're saying that the recursively

20   embedding step is performed by the claim, the mobile

21   applications; right?

22   A.        The analysis shown in that slide is showing that the

23   client is recursively embedding the state information.

24   Q.        So that's a yes?

25   A.        That's a yes.

1    Q.      Thank you.

2            And again, what you show over here is the state

3    information, nowhere did you show that as being what is

4    received in the service request, did you, Dr. Schmidt?

5    A.      I'm sorry, can you show me what you're referring to?

6    Q.      Sure.

7            You're saying this is the state information;

8    right?  These different pledge IDs in these different

9    operations have options.  But again, this requires

10   recursively embedding the state information in all

11   identified continuations, but this is not the state

12   information that was received in the service request, is it?

13   A.      Again, there is state information that is shown there

14   that is, in fact, included, such as the GA to Farm Kitchen.

15   Q.      That's not what you identified as the state

16   information in the continuation?

17   A.      Sure.  If you look at the other part of the

18   continuation, it's a little hard to see, but you'll see the

19   GA to Farm Kitchen two also appears in that as well, too?

20   Q.      These continuations with the state information are

21   what are received on the mobile client from the server;

22   right?

23   A.      That's correct.

24   Q.      So that's before the recursively embedding step;

25   right?

1    A.      That's correct.

2    Q.      So that continuations already have the state

3    information when they're received from the client and

4    they're not modified to include that state information?

5    A.      I don't agree with that.  If you take a look at the

6    continuation that's shown on the left-hand side, the

7    information you see on the right-hand side is not the same.

8    The left-hand it says pledge ID equals 542, whatever, the

9    right-hand side it says deal option ID equals 542, whatever,

10   those are not the same.

11   Q.      This is not a continuation.  What you're pointing to

12   here is what gets sent from the mobile app after the user

13   has already selected an option; right?

14   A.      That's --

15   Q.      That's what you're showing there, right, this is the

16   information that gets that from the client to the server

17   after a continuation has already been selected by the user?

18   A.      There is an identified continuation and --

19   Q.      Just answer the question yes or no.  What you're

20   showing here is what gets sent from the client back to the

21   server after the user has selected one of these options;

22   right?

23   A.      What I'm showing there is what will be installed as

24   the HREF in the quick handler on the client portion.

25   Q.      This says request headers, right?  This is something

 1    that got sent from the client to the server; right?

 2    A.    Sure, but it didn't get sent out of thin air it got

 3    sent --

 4    Q.    Just answer the question, sir.  This is what is being

 5    sent over the network from the client back to the server

 6    after an option has already been selected; right?

 7          Yes or no?

 8    A.    Yes, it will be sent.

 9    Q.    Okay.  Thank you.

10    A.    And it will be created by the quick handler which is

11    the continuation.

12          THE COURT:  Dr. Schmidt, if he ask a yes or no

13    question, do your best to answer yes or no.  If he wants

14    some more explanation, he'll ask you.

15          THE WITNESS:  Okay.

16    BY MR. HADDEN:

17    Q.    But the continuations are what the user can select

18    from, so the continuations are like for the hyperlinks, the

19    other things the user can choose to click on to extend the

20    conversation; right?

21    A.    Hyperlinks is one example, yes.

22    Q.    But that's not what you're showing here.  What you're

23    showing here is a message that gets sent after the user has

24    already picked one continuation, so this isn't embedded in

25    all the identified continuations, this is what gets sent

1    after the user has already picked his next option; right?

2    A.    Yes.

3    Q.    Right?

4    A.    Modified continuation.

5    Q.    So what this requires is recursively embedded state

6    information and all identified continuations, that means

7    putting it in all of these options before user picks one;

8    right?

9    A.    I don't believe --

10   Q.    You didn't show it?

11   A.    I don't know if that's what the claim element is

12   construed to mean.

13   Q.    It says applying a process one or more times to each

14   identified continuation, so the identified continuations are

15   these three options, right, so you got to go through each of

16   these three and modify it to include the state information;

17   right?  That's what the claim says, right?  You didn't show

18   that, all you showed was here is an unmodified continuation,

19   here is an unmodified continuation, here is an unmodified

20   continuation that already has state information.  Then you

21   showed after user clicks on one, a different message gets

22   sent to the server, it has nothing to do with what the claim

23   requires.

24   A.    I disagree.

25   Q.    So where does the code modify all identified

1    continuations to include state information and what is the

2    state information that gets included?

3    A.      So what would happen is any one of those, any time a

4    user selects one of those options, I showed one for option

5    two, if the user had selected option one, then that would

6    have caused the modifying of that identified continuation in

7    order to be able to create a different or a modified

8    continuation that would correspond to option one.  The same

9    would be the case for option three.

10   Q.      Now, you recall that you were deposed in this case,

11   don't you, Dr. Schmidt, for two days?

12   A.      I do.

13   Q.      And you were under oath in your deposition, weren't

14   you?

15   A.      I was.

16   Q.      And you were supposed to express in your deposition

17   all of your opinions regarding infringement in this matter,

18   weren't you?

19   A.      That's correct.

20   Q.      Let's look at your deposition.  It's in front of you.

21   This will be the second tab, it's page 485, lines 6 through

22   14.

23   A.      Which page, please.

24   Q.      It is page 485, lines 6 through 14.  This is SB 74.

25              THE COURT:  Hold on.  Is there any objection?

1    No objection.  Okay.  You can go ahead and play it.

2                "Question:  Okay.  But where does the code

3    modify all identified continuations to include state

4    information, and what is the state information that gets

5    included?

6                "Answer:  So the state information is shown, for

7    example, in -- the state information that's modify is the --

8    sorry, the state information is the information that's

9    encoded in the original unmodified continuation."

10   BY MR. HADDEN:

11   Q.       Was that you?

12   A.       That was.

13   Q.       And you testified that the state information is what

14   was in the unmodified continuation, so you haven't shown

15   anywhere with this code that actually modifies all

16   identified continuations to include state information as the

17   claim requires, have you, Dr. Schmidt?

18   A.       I disagree with that.

19   Q.       And if what you said in your deposition is correct,

20   you haven't shown that Groupon performs this element of the

21   claim in mobile applications, have you?

22   A.       I disagree with that interpretation of what I said.

23   Q.       Now, you don't even know what it means to modify an

24   existing continuation, do you, Dr. Schmidt?

25   A.       Yes, I do know what it means to modify an exist -- I

1    do know what it means, yes.

2    Q.    Let's go back to your deposition.  This is page 390,

3    lines 20 to 391, line 2.  Again, you were under oath in your

4    deposition, you were supposed to express your opinions, all

5    of your opinions; right?

6    A.    That's correct.

7    Q.    That is SB 68.

8            "Question:  Okay.  So you don't know what it

9    means to modify an existing continuation?

10           "Answer:  So it looks here as though a

11   continuation is a new request.  So if a continuation is a

12   new request, I'm not sure what it means to modify something

13   that is new."

14           That was you; right?

15   A.    That was, yes.

16   Q.    Let's talk know about the Prodigy patents,

17   Dr. Schmidt.  We turned to the Court's construction.  Do you

18   recognize this from the claim construction in the juror

19   notebooks?

20   A.    Yes, I recognize that.

21   Q.    And in the Prodigy patents, both the '967 and the

22   '849 require an area for presenting applications; right?

23   A.    That is correct.  That is what the construction says.

24   Q.    And for the '967 patent, you need another, a second

25   area of the screen for presenting a plurality of command

1    functions; right?

2    A.    Yes.

3    Q.    And for the '849, you need another area of the screen

4    for presenting applications; right?   I mean for

5    presenting -- let me restate the question.   Let me restart.

6         You need, for the '849, both the area of the

7    screen for presenting applications like in the '967, but you

8    also need an area of the screen for presenting advertising;

9    correct?

10   A.    That's not quite my understanding of those

11   constructions.   I don't know that you need a separate

12   area -- or, I'm sorry, I didn't quite understand what you

13   said.

14   Q.    Well, let's look at the construction:   "at a second

15   area of one or more screens of display concurrently with

16   applications."

17        That is describing where the advertisements are

18   displayed; right?

19   A.    It is saying the advertising is structured so it can

20   be presented at a second area.   I agree with you on that.

21   Q.    Right.   So we have now essentially three areas of the

22   screen; right?   We have an area for applications, we have an

23   area for advertisements, and we have an area for command

24   functions; right?

25   A.    As long as we're consistent in talking about there

1  are two different patents involved here.  These are not same

2  patent, is that correct?

3  Q.    Yes, but you are accusing the same web pages at

4  Groupon of infringing both patents.  So to do that, we've

5  got to have all three areas; right?

6  A.    Again, these are constructions that are explaining

7  what these terms mean.

8  Q.    Right.  So just to put things in context, right?  So

9  we have three areas of the screen, right?  We heard Mr.

10  Filepp talk about the real estate on the user screen.  So we

11  have three pieces of real estate on the user screen:  one of

12  them is for applications, one of them is for advertisements,

13  and one of them is for command functions.  Right,

14  Dr. Schmidt?

15  A.    I believe I was here when Mr. Filepp talked, and he

16  was talking about Prodigy as one embodiment of his patent.

17  Q.    He was talking about his invention which is capturing

18  these two patents, wasn't he?

19  A.    He was talking about Prodigy which is not the same

20  thing as his invention.

21  Q.    Okay.  And in addition to the areas for presenting

22  these three things -- right? -- applications, advertisements

23  and command functions, you have to have those three things,

24  too, right?  You have to have an application or applications,

25  you have to have an advertisement, you have to have command

1    functions; right?

2    A.      I agree.

3    Q.      So essentially we have like the monster game that Mr.

4    Filepp talked about, right?  We have three areas of the

5    screen and we have three things to put in there, right?  But

6    instead of having an area for head, an area for body, and an

7    area for feet, we have an area for applications, an area for

8    advertisements, and an area for command functions; right?

9    A.      Yes and no.  It's not from the claim constructions

10   you are showing here how these claim constructions fit into

11   the claim elements that we're talking about.

12   Q.      Well, these are Court constructions; right?

13   A.      These are the Court's constructions, I agree.  And

14   these are what I used, to my knowledge.

15   Q.      So we've got to figure out, if we're going to map

16   these claims on to Groupon, what are applications are, what

17   our advertisements are, what our command functions are, and

18   what are those three areas on the screen that they put in;

19   right?

20   A.      That's correct.

21   Q.      Okay.  So let's start with the applications.  Now,

22   you say -- and this is from your slide of your counsel --

23   that the application is a web page or is made up of a

24   collection of web pages; right?

25   A.      Well, I use the Court's construction to define what

1    is an application.

2    Q.    Well, I'm not asking about the definition.  I'm

3    asking about your attempt to read this patent on Groupon's

4    website.  And when you did that, you identified as

5    applications, collections of pages on Groupon's website,

6    like the goods application you say which is a collection of

7    pages that describe goods and how users can purchase goods

8    on Groupon's website, right?  That is what you said were the

9    applications.

10   A.    Goods was an example of that, yes.

11   Q.    And another example you had was local.  So local

12   would be the collection of pages on Groupon's website that a

13   user would browse and could use to purchase a local deal on

14   Groupon's website; right?

15   A.    That's correct.

16   Q.    Okay.  And you said that those applications are

17   made up of web pages; right?  This is what you said in your

18   expert report:  Groupon structured the applications that

19   made up the application.  And you list all the components of

20   a web page; right?

21   A.    That's correct.

22   Q.    Right.  So you say that the application is the entire

23   web page.  It includes the images.  It includes the HTML.

24   It includes JavaScript.  Everything that is on this web page

25   is what you are saying is the web page; right?

Schmidt - cross

1    A.      As you showed before, the red area was the

2    application.   The visual portion is the application.

3    Q.      Right, but the application is the images, the

4    JavaScript, the HTML, everything that is this web page;

5    right?

6    A.      That's a slightly different question.

7    Q.      Well, that what you said right here, isn't it, in

8    your expert report?

9    A.      I'm talking about the web pages that make up the

10   applications.

11   Q.      Correct.  That's what I'm talking about, web pages.

12   This is a web page; right?

13   A.      To display a web page, yes.

14   Q.      So if the web page is the application, we've got to

15   have an area to put that application in; right?  We have to

16   have some screen real estate that is the area for presenting

17   the application; right?  And that has to be something other

18   than the application itself; right?  Otherwise, it doesn't

19   make any sense.  You don't present yourself; right?

20   A.      Well, was that a question?

21   Q.      So where do you identify here what the area is for

22   presenting this web page?  What is the area of the real

23   estate on the user screen that is used to present this

24   application, this web page?

25   A.      So based on my testimony, that would be the portion

1    that is the visual portion that is created from the HTML

2    code that comes back with the divs, that has the global

3    container div, which is used to instruct how to format the

4    application so it can be displayed in one or more screens of

5    display.

6    Q.    But you --

7    A.    What we see here is one screen of display.

8    Q.    But you just told me that the HTML, including the

9    global container div, was the application.  So I'm trying to

10   figure out what is the area for presenting the application.

11   So I get it that you are saying that the -- you can go

12   back -- that you are saying the web page is the application,

13   but you got to have an area of real estate on the user

14   screen where you are going to put that application.  You

15   can't tell me that it's the application.  You've got to tell

16   me what the area is.  So what is the area where Groupon puts

17   this application on the user screen.

18   A.    So it's the part that is going to, it's the screen

19   in this case you are showing a browser that has exploded

20   the whole window.  And the HTML code or the div that comes

21   down there is going to be used to format and present that

22   application in the visual portion of the screen of display.

23   That is a screen of display there and the visual portion

24   of the application showing up there on that application

25   display.

Schmidt - cross

1   Q.      But you just told me the HTML was the application and

2   the div is part of the HTML.  So are you telling me that the

3   application is presenting itself in its own area?  Is that

4   what you are saying?

5   A.      No.

6   Q.      Okay.  So what is the area that is not the web page

7   itself in which this web page is presented?

8   A.      Well, I think it is showing on the screen right now.

9   It is showing a screen of display where the application

10  that is formatted using the divs and the HTML we just talked

11  about is being displayed on the screen of display.

12  Q.      Well, so if I zoom my browser in and out, okay?  So

13  what is the -- let me go back.

14          Now, is the area of the screen presenting that

15  web page the same now as it is here?  (Indicating).

16  A.      I'm not sure what that has to do with the claim.

17  Q.      Well, that's a yes or no question.  Can you answer

18  the question?  So is the area presenting the web page the

19  same when I zoom my browser out like this as when I zoom my

20  browser -- oops -- like this?  So is that the same area of

21  the screen that is being used to present that web page?

22  A.      I'm not sure where area of the screen plays in here,

23  but you zoom the application in and out.

24  Q.      Just, can you just answer the question; right?  So we

25  have to have a first area of the screen that is going to be

1    used to present this web page.  And my question is when I'm

2    looking at my browser like this, okay?  Is it the same area

3    of the screen as when I look at it in my browser like that?

4    A.    All you are simply doing there is showing different

5    visual, different portions of the visual portion of the

6    application.  Just zooming them in and out.

7    Q.    Could you just answer the question yes or no?  This

8    is being presented in the same area of my screen, this web

9    page when it's like this (indicating) or when it's like this

10   (indicating).  So it's the same.  Are you telling the jury

11   those are the same first area of the screen?

12   A.    It's displaying different parts of the application.

13   Q.    That wasn't the question.  Are those two depictions

14   of that web page on this screen presented in the same area?

15   We have to have a first area for presenting applications.

16   Were those shown in the same first area?

17   A.    It is showing the same application, zooming in and

18   out.

19   Q.    That's not the question.  It's a yes or no question.

20   I'm not asking the same application, I'm asking about the

21   same first area.  So are those shown in the first same area

22   on the user screen?  Yes or no.

23   A.    I'm not sure I understand your question.

24   Q.    So you can't answer that?

25   A.    I'm not sure I understand what you are asking.

1    Q.      Now, the claim requires a first area for presenting

2    applications, plural, right?  And you have identified, as we

3    talked about, multiple what you claim are applications on

4    Groupon's website, including the goods application, you say,

5    and the local deals application.  But you don't have an

6    opinion whether the goods application is presented in the

7    same first area for presenting applications as the local

8    deal application, do you, Dr. Schmidt?

9    A.      Well, I'm not sure -- I don't understand the

10   question.  But if you show an application, the goods

11   application will show up in a first area.  If you switch

12   applications, there will also be a first area.  I'm not sure

13   I would consider that to be the same first area because it

14   is different applications, but they're both showing up in

15   the first area.

16   Q.      Let's look back at your deposition again.  So this

17   would be page 75, that would be the first tab, lines 5

18   through 1.  And that is SP 57, Brian.

19           "Question:  But you don't have an opinion

20   whether the goods application is presented in the same first

21   area for presenting applications as the local deals

22   application?

23           "Answer:  Without knowing some definition or

24   construction of 'same,' it's hard to give an opinion that's

25   not speculation."

Schmidt - cross

1    Q.     Okay.  Is that you?

2    A.     That is, in fact, me.

3    Q.     Okay.  So what would you define as the size of the

4    first area, your mapping of the Groupon website?

5    A.     I'm not sure I really looked much at the issue of

6    size, although I could be happy to tell you different ways I

7    would look at size.  Size was not something that showed up

8    in the claims or the construction of the claims.  So I

9    didn't analyze it from that point of view, although I do

10   have an opinion about what size could mean.

11   Q.     Let's go back to your deposition.  This is page 44,

12   lines 4 through 10.  SB 55.

13          Again, you were under oath and you were supposed

14   to provide all of your opinions regarding infringement in

15   this case in your deposition.  You understood that; right?

16   A.     That's correct.

17   Q.     Okay.

18          MR. OUSSAYEF:  Your Honor, may we approach?

19          THE COURT:  Yes.  You may approach.

20          (Sidebar conference held.)

21          MR. OUSSAYEF:  Your Honor.

22          THE COURT:  Yes.

23          MR. OUSSAYEF:  The question asked of the witness

24   is:  Did you take into account the size of the area?

25          And the deposition testimony opposing counsel

1   seeks to play says you didn't take into account the size.

2   So it's not inconsistent.  It is in fact consistent with

3   what he testified.

4           MR. HADDEN:  Then he went on and said I have an

5   opinion, and he said in his deposition he didn't have an

6   opinion.

7           THE COURT:  He went on today to say he has an

8   opinion.

9           MR. HADDEN:  Yes.

10          THE COURT:  But previously?

11          MR. HADDEN:  He said I didn't have an opinion.

12          MR. OUSSAYEF:  The question that is pending as I

13   understand is did you take into account the size of the

14   area.

15          MR. HADDEN:  That's not the question.  I read

16   the question and his answer.  We'll see it is blah blah

17   blah, I don't have an opinion.

18          THE COURT:  Do you agree he said he does not

19   have an opinion.

20          MR. OUSSAYEF:  Yes, but the question pending

21   right now is do you have an opinion about the size?  And he

22   said no, I don't have an opinion.  I asked him.

23          It is consistent with what he said.

24          THE COURT:  Well, let's ask the question.

25          (Mr. Desmarais softly speaks.)

1            THE COURT REPORTER:  I can't hear you.

2            THE COURT:  Hold on.  Let's deal with this

3     first.

4            MR. HADDEN:  I asked him exactly the question

5     for the deposition read in, so I can do it again.

6            THE COURT:  Let's do it again.  And we don't

7     have to have a sidebar every time we do this.  We had been

8     pausing, but I have been getting the impression you don't

9     have any objection, so we have just been letting it happen.

10           Sorry.  Do you have another issue?

11           MR. DESMARAIS:  Yes.  This entire line is

12    contrary to the Court's *Markman*.

13           THE COURT:  You have to speak up.

14           MR. DESMARAIS:  This entire line is contrary to

15    the Court's *Markman*.  Groupon pursued a claim construction

16    that the size of the area has to be fixed and that the

17    different areas can't be overlapping.  Your Honor

18    specifically addressed that and said contrary to Groupon's

19    contention, the specification and prosecution history do not

20    support construing partition as a fixed nonoverlapping

21    portion of the screen display.

22           This entire cross, it has to be separate

23    different areas.  They have to be.

24           MR. HADDEN:  I didn't say fixed.  He has to say

25    what the area is.  That's all.

1          THE COURT:  Yes.  All he is trying to do, I can

2    see, is establish your expert opinion on what the areas are.

3    You haven't said they have to be fixed.  Is there anything

4    else?

5          MR. DESMARAIS:  No.

6          THE COURT:  Okay.

7          (Sidebar conference ends.)

8          THE COURT:  When you are ready, let's ask the

9    question again.

10         MR. HADDEN:  Sure.  Let me ask the question

11   again.

12   BY MR. HADDEN:

13   Q.     So what would you define as the size of the first

14   area in your mapping of the Groupon website, Dr. Schmidt?

15   A.     So that was not part of the claim or claim

16   construction.  And so I'm not sure I really analyzed that

17   because it wasn't part of what I thought the claims were in

18   the case.

19   Q.     So does Groupon specify the size of the first area?

20   A.     That is another very interesting question.  It does

21   in various ways through the content that it sends down, for

22   example.

23   Q.     Okay.  Let's look at your deposition again.  This

24   would be page 41, lines 14 through 19.  And this is SP 54,

25   Brian.

 1              "Question:  So does Groupon specify the size of

 2    the first area?

 3              "Answer:  It's not clear to me that there's any

 4    need for Groupon to specify the size of the first area."

 5    BY MR. HADDEN:

 6    Q.      Okay.  Now, you have talked a lot within IBM's

 7    counsel in front of the jury about these div tags.  And you

 8    say that, you talked a lot about the global container div

 9    tags; right?

10    A.      That's correct.

11    Q.      Now, div tags are part of the HTML of the web page;

12    correct?

13    A.      That's correct.

14    Q.      Okay.  Where does the div specify the size of the

15    first area?

16    A.      So that the div plus the attribute like IPO class is

17    used by style sheets in order to figure out how to lay out

18    the -- in order to instruct the browser in order to have a

19    layout of the page.

20    Q.      Okay.  Let's see your deposition again, Dr. Schmidt.

21    This is page 41, lines 9 through 13.  It's SB 53?

22              MR. OUSSAYEF:  Objection.  That is not

23    inconsistent, Your Honor.

24              THE COURT:  Okay.  Mr. Hadden, did you want to

25    respond?

1           MR. HADDEN:  It is inconsistent.  I can read it.

2           THE COURT:  I'm going to overrule the objection.

3    The jury will decide.

4           "Question:  Well, where does the div specify the

5    size of the first area?

6           "Answer:  So I don't think there's any need for

7    the div to specify the size of the first area."

8    Q.    That was you again, right?

9    A.    That's correct.

10   Q.    Can we go back.

11         Now as you saw, as you agree the div tag is part

12   of the HTML and they're defined in the HTML specification;

13   is that right?

14   A.    That's correct.

15   Q.    And as explained here in this document from the

16   Mozilla Developer Network, the div is what they call a pure

17   container, div almost is not inherently represent anything,

18   do you see that?

19   A.    I do.

20   Q.    You agree with that, don't you?

21   A.    I agree with that plus the following sentence that

22   says that it's used to group consent so it can be easily

23   styled using the class or ID attributes as I mentioned many

24   times in my testimony.

25   Q.    And that's described here, right, the HTML content

 1    division element div is the generic container for flow

 2    content.  It has no effect on the content or layout until

 3    styled using CSS.  Do you see that?

 4    A.      That's correct.

 5    Q.      So what that's saying that just having a div tag in a

 6    web page does not do anything unless there is a style sheet,

 7    that's what a CSS is, right, cascading style sheet.

 8    A.      That's what CSS stands for.

 9    Q.      A style sheet or some Java script that refers to that

10    particular div tag and tells the browser to do something

11    with it; right?

12    A.      That's correct.

13    Q.      And so just a pair of div tags by themselves, they

14    don't change the layout or format or size of a web page;

15    right?

16    A.      You're correct.  And I showed IDs and class

17    attributes after them as this document mentions, which are

18    part of CSS.

19    Q.      Have you identified any style sheets that refer to

20    the global container div tag?

21    A.      Yes.

22    Q.      What is that?  Where was that in your presentation?

23    A.      Every time I showed the snippets of the ID equals

24    global container.

25    Q.      That's just an identifier for div tag.  Now, if the

1     browser is going to do anything with this particular div

2     tag, there has to be some reference to this global container

3     div tag and a style sheet or a Java script; right?

4     A.      That's correct.

5     Q.      And you haven't shown any style sheet or Java script

6     that refers to or does anything with this global container

7     div tag?

8     A.      Well, actually the layout on the human language on

9     the left is, in fact, the output of the web browser

10    processing the global container style guide to show what it

11    lays out there.

12    Q.      Well, that's not true at all and you know that.  So

13    this doesn't do anything unless there is a style sheet or

14    Java script that tells the browser that this global

15    container div tag should be used in some formatting or

16    layout; right?  And you haven't identified any style sheet

17    or Java script that refers to this global container div tag

18    to tell the browser to do anything with it.

19    A.      ID --

20    Q.      Correct?

21    A.      No, ID attribute is identifying the global container.

22    Q.      That's just a name.  This is just identifying that

23    particular pair of div tags; right?  That doesn't do

24    anything.  You have to have Java script or a style sheet

25    that says for global container to do something; right?  And

1    you haven't shown anything that does anything with that

2    global container; right?

3    A.     I don't agree with that at all.

4    Q.     Where is the style sheet that you identified here

5    that refers to global container div and tells the browser to

6    do something with it?

7    A.     As I explained before, that's what's shown being

8    represented on --

9    Q.     No, you pointed to the web page.  Listen carefully to

10   the question.  The web page is what the browser outputs.

11   What I'm asking you is, what is in the HTML or in the Java

12   script that refers to this particular global container div

13   tag that would cause the browser to do something with it

14   that would change the way this web page would look, where

15   did you identify that?  Is it here?

16   A.     That's not a complete HTML file.

17   Q.     But you didn't identify anything in any HTML file

18   that refers to this global container div tag, did you?

19   A.     I'm not sure if the snippets are shown elsewhere, but

20   that tag is what is used to generate that display.

21   Q.     But you haven't shown that; right?  If you're going

22   to show that this tag had any effect on this display, you

23   have to first show that there is some Java script or style

24   sheet that refers to this global container div tag and tells

25   the browser to do something with it; right?

Schmidt - cross

1    A.     I don't agree with that, no, I'm sorry.

2    Q.     Well, we just agreed that just having this tag in the

3    HTML with no reference to it in a style sheet or Java script

4    is going to do nothing; right?

5    A.     I don't agree it does nothing.  It does what we see

6    on the left-hand side.

7    Q.     Let's be clear.  Now you're playing games.  We agree

8    that unless there is a style sheet or Java script that

9    refers to a specific div tag, that div tag even if you give

10    it a name, you can call it Fred instead of global container,

11    it would still do nothing in changing how this web page is

12    rendered?

13    A.     I'm sorry, I disagree with that.

14    Q.     You think if I wrote div equals Fred instead of

15    global container that this web page would change?

16    A.     No.  What I'm saying is that the HTML code that

17    Groupon is downloading is generating a display that we're

18    seeing on the left-hand side.

19    Q.     That's not the question.  You got to listen to the

20    question.  I'm not talking about whether there is a web

21    page.  I get that.  The question is what does this global

22    container div tag do?  And you have hung your hat on it as

23    saying this is what defines an area on a screen.  And if you

24    tell the jury that, you got to tell them how it does it.

25    Right?  We all agree that this is just an identifier of a

1   div tag which would do nothing unless something else tells

2   the browser to do something with it.

3           So you picked up on this one because it says

4   global container, but we agree I could call this Fred and it

5   would make no difference; right?  That name is just

6   arbitrary unless it's referenced by a style sheet or a Java

7   script.  You haven't shown any style sheet or Java script

8   that does anything with global container that --

9           MR. OUSSAYEF:  Objection.  There is no question.

10          THE COURT:  Mr. Hadden, let's not do oral

11  argument.

12          MR. HADDEN:  Sorry, Your Honor.

13          THE COURT:  Go ahead and ask your question.

14  BY MR. HADDEN:

15  Q.      Let's be clear, if there is no style sheet or Java

16  script that refers to this global container, div tag, I can

17  delete this global container div tag from the web page and

18  it would look exactly the same; right?

19  A.      I'm not sure I agree with that.

20  Q.      Have you tried it?

21  A.      No, I didn't try that.

22  Q.      Did you do anything to investigate whether or not

23  having this global container div tag on the page or not

24  would have any effect on how this page looked?

25  A.      I didn't change the Groupon code, no.

Schmidt - cross

1   Q.      But, I mean, that's easy to do, right, you have your

2   Chrome browser, you go to view source, you can delete this

3   and see if the page remains the same?

4   A.      I could do that.

5   Q.      But you didn't do that?

6   A.      I didn't do that.

7   Q.      You didn't identify anywhere in any expert report any

8   Java script or style sheet that refers to that global

9   container div tag?

10  A.      I'm not sure.

11  Q.      So if I'm right and I can delete that global

12  container div tag from the web page and the web page

13  remained exactly the same in my browser, you haven't shown

14  that that global container div tag defines an area of the

15  screen, have you?

16  A.      I don't know that I agree with that.

17  Q.      If I can take it out and the page looks exactly the

18  same, how can you say that that global container div tag is

19  what it is, generating a first area of the user screen?

20  A.      I need to try it out and see.

21  Q.      But if I'm right, let's assume I'm right, assume I'm

22  right that I can delete that global container div tag from

23  the HTML and the page looks exactly the same in the browser,

24  you would agree with me then that you have failed to prove

25  that that global container div tag generates a first area on

1    the user screen; right?

2    A.    Again, I don't subscribe to your assumption.

3    Q.    But if I'm right, I'm right, and you haven't shown

4    that Groupon generates a first area; right?

5    A.    I don't know if I agree with that or not.

6    Q.    And if Groupon doesn't generate a first area using

7    this global container div tag, then Groupon doesn't infringe

8    the '967 patent and doesn't infringe the '849 patent?

9    A.    I don't agree with that.

10   Q.    Well, both of them require generating a first area,

11   and the only thing you pointed to on the website is this

12   global container div tag; right?  You told the jury about it

13   umpteen times today, didn't you?

14   A.    It was yesterday.

15   Q.    Thank you.

16         So if I'm right, that element is gone, at least

17   that element; right?  And therefore, Groupon won't infringe.

18   The same for the '967 patent.

19         Now, we also need a second area for displaying

20   advertisements; right?

21   A.    Yes.  For the '849?

22   Q.    Yes.

23         Let me go back before we get to the '849.  We

24   also for the '967 need a second area for displaying command

25   functions?

Schmidt - cross

1    A.     Yes.

2    Q.     When I scroll down the page like this, where is the

3    second area for displaying command functions?

4    A.     It's not currently being shown on the screen display.

5    Q.     But we're talking about an area of the screen, so is

6    there an area of the screen now for displaying command

7    functions?

8    A.     Yes.

9    Q.     Right there, where is it on the screen?

10   A.     Not showing a visual portion for the moment.

11   Q.     Are you saying the screen has nonvisual portions?

12   A.     The application contains a first area and a second

13   area, and that code hasn't disappeared.

14   Q.     That's a good point you just made.  You said the

15   application has a first area and a second area.  I don't

16   dispute that.  The web page has different areas, but that's

17   not what the claim requires, the claim requires that there

18   is an area of the screen displayed for displaying command

19   functions and an area of the screen display for visual

20   application, the screen real estate that Mr. Filepp talked

21   about.  Where is the area of the screen display that is

22   displaying command functions now?

23   A.     Again, the command functions are part of the HTML.

24   And if you scroll up, you'll find them.

25   Q.     So you're agreeing that the command functions are not

1   in an area of the screen display, they're just part of the

2   web page which you're saying is also the application; right?

3   A.      Well, as we saw before, the HTML is nested.

4   Q.      So let's talk about ads for a second.  Now, you have

5   said that this is the first area, and this is the

6   application; right?

7   A.      We're referring to '849 at this point?

8   Q.      Yes.

9   A.      It's a first area for displaying the application.

10  Q.      And the web page is the application, we went through

11  that; right?  The web page, we saw that right, the web page

12  with all the images, the HTML, the Java script, that's the

13  application; right?

14  A.      The HTML defines the area that can be generated, yes.

15  Q.      Well, let's go back.  I'm not talking about areas

16  now, I'm talking about applications.  We're done with areas.

17  We're moving on.  So we have an application which you said

18  is the web page; right?  And it's got HTML, it's got Java

19  script, it's got images; right?

20  A.      So application has a specific meaning and it's a

21  sequence of pages, so this is a page.

22  Q.      I'm not asking about what the Court's construction

23  is, I'm asking about your attempt to mount these patents on

24  to Groupon I thought we talked about this already, you

25  identified the web pages that relate to local deals or goods

1   or whatever as being the application; right?

2   A.      Local goods are examples of applications.

3   Q.      And what you're saying is the application is the

4   collection of web pages the user goes through to buy goods

5   or local deals, those are the two local applications you

6   talked about?

7   A.      Local and deals are two of them.

8   Q.      And now, so you were -- you show this as being this

9   web page, and then when you get to the advertising, the

10  second area for displaying advertisements, you just drew a

11  box around part of what you previously said was the

12  application; right?  That can't work because the application

13  is this and it's a first area --

14             MR. OUSSAYEF:  Objection.

15             THE COURT:  The objection is sustained.  You

16  asked the question and then you went on with a speech.  Ask

17  the question.

18             MR. HADDEN:  Sorry, Your Honor.

19             THE COURT:  Go ahead and ask the question.

20             MR. HADDEN:  Sure.

21  BY MR. HADDEN:

22  Q.      So this is the application in the first area;

23  correct?

24  A.      That's correct.

25  Q.      And now you're saying that this is the application in

Schmidt - cross

1   the first area, the red box, it goes down, and you're

2   saying, you're drawing a box within that be and you're

3   saying that this is advertising in the second area, is that

4   what you're saying?

5   A.     So just to be very clear, the application is being

6   displayed, format and displayed in the first area, the part

7   in red, and then there is the advertising data that's being

8   displayed in the second area, which is the part that's

9   surrounded by the blue overlay just to draw attention to

10  that part, that's the second area.

11  Q.     But you previously said that these images are --

12  these are images for local deals, you said those are part of

13  the application; right?

14  A.     So there is a very deep set of issues, but the

15  application images are downloaded separately, they

16  eventually show up in the browser.  And as to whether

17  they're part of the application, HTML, it's a subtle issue,

18  but the key point there is there is a first area for

19  displaying the application, which includes all the stuff

20  that we see up there on the left hand and there is a second

21  area that we see in the blue part which is where the

22  advertisers are displayed.

23  Q.     I'm not trying to be tricky, but this picture of the

24  pizza in the local deals, is that part of the application?

25  A.     So that particular snapshot shows things appearing

1    within that which is not inconsistent with the claims.

2    Q.      So this is within the application, and in the first

3    area, and over here you're trying to say it's also an

4    advertisement within a second area, that's what you're

5    saying?

6    A.      So what I'm showing there is that the advertising is

7    being displayed in a second area and we see a first area

8    which is the enclosing application.

9    Q.      But you're saying that the picture of pizza is both

10   in the application in the first area, and also in

11   advertisement in the second area, that's what you're saying?

12   A.      Sure, nothing inconsistent about that.

13   Q.      I just want to be clear what you're saying.  In your

14   expert report you agree some other boxes, this is from your

15   slide yesterday with the jury, and you have the second area

16   being this blue box and then before you had in your expert

17   report, you had these three red boxes and also this red box

18   at the top.  So how are you drawing these boxes?

19   A.      Those boxes are highlighting what are advertising.

20   Q.      And you're deciding it's advertising because it talks

21   about a deal, is that how you're deciding it's advertising?

22   A.      So in the case of an application, I think that's the

23   local deals application, then the images and the other

24   surrounding text would be the advertisements that are being

25   presented by Groupon as part of the local deals application.

1    Q.      So the purpose of a local deals application is to

2    give people information about local deals; right?

3    A.      There is other things that it does, but that's

4    certainly a portion of what it does, probably a key portion.

5    Q.      And the key portion of that is to provide people with

6    local deals; right?

7    A.      That's certainly one of the things that that

8    application is doing, yes.

9    Q.      So you're not saying that if I took out the local

10   deals, I would still have an application, a local deals

11   application; right?

12   A.      I'm not saying if you took out the local deals would

13   you still have a local deals application.  I'm not sure I

14   understand the question.

15   Q.      Well, if I took out what you were calling

16   advertisements now, I would be left with this, right?  And

17   my question is, is that an application, is that a local

18   deals application in the first area still?

19   A.      If you don't mind scrolling up just a tad.

20   Q.      Sure.  If I can get it to work.

21   A.      Can we stop?  You keep going past the part.

22           There is other stuff that we're showing in that

23   application which unfortunately has been and animated past,

24   but there were other things in there that looked like they

25   had to do with local deals, so just removing the advertising

Schmidt - cross

1   data portion which is not how Groupon data works, if you

2   remove that, there are still things on the left-hand side

3   that zoom by very quickly that looked like they were part of

4   the application.

5   Q.      So you were saying this would be the local DEALS

6   application and the rest is just advertising?

7   A.      Well, so this, I'm not sure what you mean by this,

8   but if we were able to scroll back up the part that whizzed

9   by a second ago.  This is the footer.  But if we went back

10  to the part that has now scrolled past, we would see other

11  things up there.  And that would be part of the local deals

12  application.  In fact, that is not in the second area where

13  the advertisements are appearing.

14  Q.      Let me see if I have it here.  Now, when you were

15  talking about the '346 patent, you put up and discussed this

16  screen as the way that the triggering step occurred.  This

17  is your slide from today; correct?

18  A.      That tis correct.

19  Q.      Now, this is the login screen.  It says here:  I have

20  an account.  Do you see that?

21  A.      Yes.

22  Q.      Okay.  But this is the screen that a user goes to if

23  they already have an account; right?  That is why it says:

24  I have an account.

25  A.      Let's see.  Well ...

1   Q.      Is that what it says?

2   A.      Sure.  That's what it says.  It is not necessarily

3   what they want to log in with.

4   Q.      Okay.  But the whole purpose of the '346 patent in

5   claim 1 is to create an account where the user doesn't have

6   one already; right?

7   A.      That would be the case, yes.

8   Q.      Right.  But you're starting from a page where the

9   user already has an account; right?  So if I don't have an

10  account, I'm not going to be using this page; right?

11  A.      If you don't have an account, a page that looks like

12  that page will pop up, and it will give you several options

13  for how to sign.

14  Q.      But that is not the page you worked on.  You analyzed

15  the page where the user already has an account.

16  A.      I'm not sure I analyzed the page.  No, I analyzed

17  many different ways to log in.

18  Q.      Well, this is the page that you -- this is your

19  exhibit; right?  This is your demonstrative; right?  And the

20  page is:  I have an account.  And you are showing some what

21  is some computer code from the web page for this page.  And

22  that is the page where the user already has an account.

23  A.      I disagree that is a page for which the user already

24  has an account.

25  Q.      It says, right there, I have an account?

1   A.      "Have" is clicked on but that doesn't mean the user

2   has an account.  If you click I'm a new customer, it will

3   switch over to something different.  That is just something

4   you could have showing up there.

5   Q.      Sure.  There is another page you could get, if you

6   don't have an account, and you do that by signing up; right?

7   You click here and you get a different page, sign up.  I'm a

8   new customer.  But you never talked about this page today,

9   did you?

10  A.      Well, actually I did.  I showed many different

11  versions of it.

12  Q.      No, you never showed this page that says "I am a new

13  customer."  You always showed the "I have an account page;"

14  correct?

15  A.      I don't remember.

16  Q.      You don't know whether you did or didn't?

17  A.      There were lots of images that were shown there.

18  Q.      Now, this is there your expert report.  In your

19  expert report, you said Groupon's customers, and endusers,

20  directly infringe the patents in suit, didn't you?

21  A.      That's correct.

22  Q.      Now, you talked about some percentages today based on

23  things like number of cacheable objects and 12.5 percent for

24  the '601 patent.  You are not an economist, are you,

25  Dr. Schmidt?

1   A.      No.

2   Q.      You are not an accountant, are you?

3   A.      No.

4   Q.      You are not offering a damages opinion in this case,

5   are you?

6   A.      No.

7   Q.      None of those percentages you put up are percentages

8   of Groupon's revenue that Groupon would not have gotten if

9   it somehow didn't use these patents according to you, are

10  they?

11  A.      These percentages were looked from the point of view

12  of a technical expert.

13  Q.      Right.  So they're not percentages of Groupon's

14  revenue?

15  A.      They're percentages -- in this case, percentages of

16  Groupon's cacheable objects in the context of the '967

17  patent.

18  Q.      Right.  So they're not a percentage of Groupon's

19  revenue, correct?

20  A.      Those numbers are percentage of Groupon's cacheable

21  objects, not their revenue.

22  Q.      And you offered no opinion about the percentage of

23  Groupon's revenue that is attributable to any of thee

24  patents, do you?

25  A.      I'm not making that testimony, no.

1          MR. HADDEN:  No further questions.

2          THE COURT:  Okay.  Redirect.

3          MR. OUSSAYEF:  Yes, Your Honor.

4          If we could flip to slide 188, please.

5                    REDIRECT EXAMINATION

6    BY MR. OUSSAYEF:

7    Q.     Dr. Schmidt, do you remember being asked about this

8    slide 188?

9    A.     I do.

10   Q.     Now, I want to call your attention to the claim

11   language.  Does the claim -- oops.  There we go.

12          So I want to call your attention to the claim

13   language.  Does the claim element say anything about the

14   client sending the service request here?

15   A.     No, it does not.

16   Q.     And does the Layout Service need to receive a request

17   from the client to meet this claim language here?

18   A.     No, it does not.

19   Q.     And can you send a service request to one component

20   of the network even though another component outputs the

21   result of that service request?

22   A.     Yes, absolutely.  That is part of what a service

23   oriented architecture is all about.

24   Q.     Can you explain a little bit how that happens or how

25   that can happen?

Schmidt - redirect

1   A.      Sure.  So this a technical explanation and there is

2   also more of a human explanation.

3                So in a service oriented architecture, there is

4   services, they're sometime called Frontend Services, and

5   they take the requests that come in and then they divvy them

6   up as we're seeing here to various backend services.  That

7   is literally the definition of a service in a service

8   oriented architecture, which is a concept that has been

9   around since the early 90s, and it essentially allows

10  service to be composed of other services and the service

11  that receives it can delegate how to do the work and return

12  the output.  There is also more.

13  Q.      Yes, go ahead if you have more explanation to give.

14  Is there any way to understand that kind of technical idea

15  in kind of a more easy to understand and commonsense way of

16  thinking about it?

17  A.      Sure.  Since we don't all do service oriented

18  architectures, if you go to a drive-thru, you might place

19  your order, for your service, for your hamburger and french

20  fries and soda at a microphone at one part of the

21  drive-thru.  So you place your service there.  And then you

22  will drive around, and all the different backend services,

23  the cook and the person who takes the fries from the heat

24  lamp and the person who pours the coke, those are different

25  service entities, can go ahead and create their outputs,

Schmidt - redirect

1    create the hamburgers, create the fries, create the drink,

2    and then you will actually pick up the results at some other

3    window.  You won't pick it up from the place you ordered.

4    You pick it up in the window.  That is an example of backend

5    services, taking a user request for services and then doing

6    processing and returning your results to some other place.

7    Q.    So to bring it back to slide 88.  What you are saying

8    is that the Homepage ITA can receive a service request even

9    if the Layout Service outputs the results of that service

10   request?

11   A.    Yes, that's exactly right.

12   Q.    Okay.  Now looking at this slide here, do you

13   remember counsel for Groupon was asking you about the

14   Homepage ITA, and he asked you several questions about

15   whether it was really the Homepage ITA or not?

16   A.    Yes.

17   Q.    Now, if this were a different service oriented piece

18   or component in a network and it was named a different thing

19   beside the Homepage ITA, such as, for example, the Dealpage

20   ITA and that made a request to Layout Service and backend

21   services, would that change your opinion, Dr. Schmidt?

22   A.    No, it wouldn't.  It's simply the way that service

23   oriented architectures are defined from a technical

24   perspective.

25   Q.    Okay.  Let's call up slide 214, please.

1          Now, do you remember that counsel for Groupon

2   was asking you a bunch of questions about slide 214 here?

3   A.     I do.

4   Q.     In particular, he was asking you again and again

5   about pledge ID.  Do you remember that?

6   A.     Yes.

7   Q.     And counsel for Groupon implied that there was no

8   evidence that a service request contained a pledge ID.  Do

9   you remember that?

10  A.     I do.

11  Q.     And you mentioned that there might be other slides

12  that were relevant to this.  Do you remember that?

13  A.     Yes.

14  Q.     Let's take a look at one of those slides.  So could

15  we please flip to slide 189.

16          What does Mr. Sood say about whether requests

17  contain pledge ID state information?

18  A.     So he is asked:  When Groupon's servers receive an

19  URL, how do the servers know what deal I'm buying?

20          And he says:  There is a pledge ID associated

21  with the URL.

22          And then he is asked:  So the pledge ID is

23  included in the request that's sent to the Groupon's service

24  at least?

25          And he agrees:  Yes.

1   Q.      Thank you, Dr. Schmidt.  Now if we could please turn

2   to slide 36.

3              Now, here we see claim 1 of the '849 patent; is

4   that right?

5   A.      That is correct.

6   Q.      Now, do you remember counsel for Groupon was asking

7   you over and over again about areas of the screen?

8   A.      I do.

9   Q.      Does the claim element say areas of the screen in --

10  let's look at Section 1(a).  Can you just read that claim

11  language for me?

12  A.      Sure.  It says:  "structuring applications so that

13  they may be presented, through the network, at a first

14  portion of one or more screens of display."

15  Q.      So does this claim language refer to portions of the

16  screen or portions of a screen of display?

17  A.      It refers to portions of one or more screens of

18  display.

19  Q.      In fact, it doesn't even limit it to one screen.  It

20  could be more than one screen; isn't that right?

21  A.      That's right.  And we looked at some examples in my

22  testimony where I showed the visual portion of the

23  application which can, of course, appear on multiple screens

24  of display.  One or more screens of display.

25  Q.      Do you remember counsel for Groupon asked you a bunch

Schmidt - redirect

1  of questions about the size of the areas?  Do you remember

2  that?

3  A.      Yes, I do.

4  Q.      Does this claim say anything about the size of the

5  area?

6  A.      No, there is nothing in any of the elements in this

7  claim that mention size, and there is also nothing in any of

8  the constructions, the Court's official definition of the

9  terms in the claim that mention size.

10 Q.      So were you able to analyze this claim language even

11 though you didn't precisely measure what the size of the

12 partitions or the areas were?

13 A.      Yes.  Absolutely.  That is why I didn't understand

14 the question.  Because the size isn't part of the claim.

15 It's not part of the construction.  It seemed to require

16 speculation on my part, so I didn't look at that in the

17 analysis.

18 Q.      Let's look at slide 254.

19         Now, do you remember on counsel for Groupon

20 asked you about this screen on the left side of slide 254

21 here?

22 A.      I do.

23 Q.      And he mentioned that "I have an account" there, that

24 tab has a green underline under there.  Do you remember

25 that?

1   A.      I do.

2   Q.      Now, you can click on the other part right there

3   which says "I'm a new customer," right?

4   A.      Absolutely.

5   Q.      And then you will still see the Facebook and Google

6   buttons, right?

7   A.      Yes, you will.

8   Q.      And your code will still be entirely relevant?

9           MR. HADDEN:   Objection.   He never showed this

10  document in his report.

11          THE COURT:   Overruled, but it is leading so

12  let's ask direct questions.

13  BY MR. OUSSAYEF:

14  Q.      Dr. Schmidt, if you were to look at the "I'm a new

15  customer" tab, would the code you should on the right side

16  of 254 still apply?

17          MR. HADDEN:   Objection.

18          THE COURT:   Overruled.

19          THE WITNESS:   Could you please repeat the

20  question.

21  BY MR. OUSSAYEF:

22  Q.      If you were to click on the "I am a new customer"

23  section of the web page shown on the left there, would the

24  code you are shown on the right still apply?

25  A.      Yes.   Absolutely.   That code is the code provided by

1    Groupon that triggers the single-sign-on operation in that

2    case for the Google single-sign-on.

3              MR. OUSSAYEF:  I have no further questions.

4              THE COURT:  Okay.  Thank you, Dr. Schmidt.  You

5    can step down.

6              Who is going to be next from IBM?

7              MR. DESMARAIS:  We have a few short deposition

8    clips and they're short so we can easily do it if you want

9    to continue.

10             THE COURT:  Short meaningless than 15 minutes?

11             MR. DESMARAIS:  Yes.

12             THE COURT:  Okay.  We'll at least start with one

13   of them.

14             Ladies and gentlemen, a deposition as you may

15   have gathered is a statement given under oath by a witness

16   some time prior to trial.  As you have already seen,

17   sometimes they're videotaped, and you may now be about to

18   see some portions of some reported testimony.

19             MS. SHAMILOV:  Your Honor?

20             THE COURT:  Yes.

21             MS. SHAMILOV:  I'm sorry.  We have a small issue

22   we were not provided with updated clips.

23             THE COURT:  Hold on a second.  So we certainly

24   won't go beyond 1:00 o'clock but we might get started with

25   this.

1             I'm sorry?

2             MS. SHAMILOV:  We haven't seen the updated.

3             THE COURT:  I can't hear you.  I'll see you at

4     sidebar.

5             (Sidebar conference held.)

6             (Counsel confer.)

7             THE COURT:  Are you working this out?

8             MS. SHAMILOV:  We resolved so it we're not going

9     to play that clip.

10             THE COURT:  Okay.

11             (Sidebar conference ends.)

12             THE COURT:  All right.  So IBM may call its next

13     witness.

14             MR. OUSSAYEF:  Thank you, Your Honor.

15             IBM calls by deposition Aileen Sandridge.  She

16     is the Vice President of Engineering at Groupon.

17             THE COURT:  And about how long do you estimate

18     these clips are?

19             MR. OUSSAYEF:  So this first clip here, Your

20     Honor, is six minutes and one second.

21             THE COURT:  Okay.  And it's videotaped, is that

22     right?

23             MR. OUSSAYEF:  Yes that's correct.

24             THE COURT:  We'll turn the lights down.

25             You can go ahead and play that.

1              (Video played.)

2              "Question:  Can you please state your full name

3    and address for the record?

4              "Answer:  Yes.  Aileen Juliana Sandridge.

5              "Question:  And where do you work?

6              "Answer:  I work at Groupon.

7              "Question:  And what is your title at Groupon?

8              "Answer:  VP of Engineering.

9              "Question:  With regard to the Groupon mobile

10   applications, are images ever prefetched to the user's

11   mobile device before they are displayed to the user?

12             "A Voice:  Same objection.

13             "Answer:  Yes.

14             "Question:  In what situation are images

15   prefetched to a user's device before they are displayed to a

16   user?

17             "Answer:  Sometimes images are prefetched in

18   order to improve start-up latency.

19             "Question:  Can you explain what you mean by

20   that?

21             "Answer:  To make the application start up

22   faster when you open it on your phone, we prefetch images so

23   we don't have to go over the network to get them at the time

24   when you on the application.

25             "Question:  What images are prefetched to a

1    user's device in order to start improvement start-up

2    latency?

3              "Answer:  To my understanding for both iOS and

4    Android at the time, we -- the applications prefetch some of

5    the deal images in order to improve start-up latency.

6              "Question:  In what cases would it not be

7    prefetched to the user's mobile device?

8              "Answer:  So, again, I don't know for certain.

9    I believe that if you have background permissions turned off

10   for the application on your phone, I believe that we

11   wouldn't be able to prefetch that data.  But -- so that

12   would be one example.

13             "Question:  So, in your experience, does

14   pre-fetching deals and imaging improve the start-up time?

15             "Answer:  Yes.

16             "Question:  And why is it beneficial to improve

17   the start-up time for the mobile applications?

18             "Answer:  We believe that users will have a

19   better experience if they -- if the application starts up

20   faster.

21             "Question:  Why is it beneficial for users to

22   have a better experience?

23             "Answer:  Because people don't like waiting.

24             "Question:  The Groupon mobile applications

25   cache images, correct?

1              "Answer:  Yes, I believe so.

2              "Question:  How do the Groupon mobile

3      applications determine whether or not to cache deal images?

4              "Answer:  I do not know.

5              "Question:  Okay.  But just to clarify, it's the

6      Groupon mobile application packages that cache the deal

7      images, correct?

8              "Answer:  Yes.

9              "Question:  Have you ever visited Groupon's

10     website as part of your job responsibilities?

11             "Answer:  Yes.

12             "Question:  Have you ever visited Groupon's

13     website without disabling cache as a part of your job

14     responsibilities?

15             "Answer:  Yes.

16             "Question:  Why does Groupon want to reduce

17     latency?

18             "Answer:  To improve the experience for users.

19             "Question:  And why does Groupon want to improve

20     the experience for users?

21             "Answer:  I think we believe that if users have

22     a better experience, they'll -- they'll use our website

23     more.  They're more likely to stay on the website.

24             "Question:  Does caching content on the user's

25     computer or device reduce latency?

1              "Answer:  Generally speaking, it can.

2              "Question:  Does pre-fetching content reduce

3     latency?

4              "Answer:  Again, it can.

5              "Question:  What is NOB?

6              "Answer:  Actually, it's bookings.  I'm trying

7     to remember what N and O stand for.

8              "Question:  Does --

9              "Answer:  Net operating?  Anyway --

10             "Question:  Does it stand for net operational

11    bookings?

12             "Answer:  I believe so.

13             "Question:  Okay.  What effect does reducing

14    latency have on increasing NOB?

15             "Answer:  We have had an incredibly hard time

16    actually conclusively demonstrating that there is a

17    connection.

18             We've done experiments where we've artificially

19    slowed down applications and haven't seen an impact on NOB.

20    There have been techniques that we use to try to estimate

21    it, but they're -- they're controversial and have a lot of

22    skeptics associated with it.  I don't think there's a lot of

23    confidence around any connection between the two.

24             "Question:  As an engineer who works at Groupon,

25    do you think that increasing the latency of Groupon's

Case 1:16-cv-00122-LPS   Document 409   Filed 09/18/18   Page 159 of 164 PageID #: 19368
699
deposition designations - Sood

1   website and mobile applications would decrease NOB?

2                "Answer:  I -- if it was -- if it was increased

3   enough, certainly.  If it was crawling, I think that that

4   would have impact on NOB.  At what point it starts to have

5   -- so I know that at the extreme it would.  The thing that I

6   really don't know is at what point you would actually start

7   to see an effect.

8                "Question:  Do you think that IBM is an

9   innovative company?

10               "Answer:  Probably.

11               (End of videotape.)

12               THE COURT:  How long is the next one?

13               MR. OUSSAYEF:  The next one is 4 minutes and 38

14   seconds, Your Honor.

15               THE COURT:  Can we do 4 minutes and 38 seconds?

16   Okay.  We'll do that.

17               MR. OUSSAYEF:  With that, IBM will call Varun

18   Sood.  Varun Sood is senior engineering manager at Groupon.

19               THE COURT:  Okay.  Go ahead and play it.

20               (Videotape deposition of Varun Sood.)

21               "Question:  Can you please state your full name

22   and address for the record.

23               "Answer:  My full name is Varun Sood.

24               "Question:  And where do you work, Mr. Sood?

25               "Answer:  Groupon.

1          "Question:  And what is your title at Groupon?

2          "Answer:  I'm a senior engineering manager.

3          "Question:  Mr. Sood, what are your

4   responsibilities as a senior engineering manager at Groupon?

5          Answer:  I'm responsible for providing technical

6   leadership to engineering teams at Groupon.

7          "Question:  So your responsibilities don't

8   extend to creating or developing the screens for the mobile

9   apps?

10          "Answer:  That is correct.

11          "Question:  And how does Groupon maintain that

12   information about the user?

13          "Answer:  The user information is maintained

14   through cookies.

15          "Question:  And what user information are you

16   referring to when you say that?

17          "Answer:  Every user in Groupon is given a

18   unique ID which is stored in a cookie.

19          "Question:  Now, you mentioned that the user

20   will proceed from a landing page to a deal page to a

21   checkout page to a completed transaction, is that fair?

22          "Answer:  In some scenarios.

23          "Question:  On the deal page, does Groupon track

24   any information about the deal that the user is purchasing

25   in that sequence?

1              "Answer:  Yes, it does.

2              "Question:  All right.  Other than the deal

3     name, any other information about the deal that Groupon

4     tracks on the deal page?

5              "Answer:  No.

6              "Question:  So on the deal page the user might

7     select certain options and then click the buy button and if

8     they're logged on, then they'll be sent to the checkout

9     page; is that correct?

10             "Answer:  That is correct.

11             "Question:  And on the checkout page, does

12    Groupon track any information about the deal that the user

13    is purchasing?

14             "Answer:  It does.

15             "Question:  And what information is that?

16             "Answer:  The deal name and the deal price.

17             "Question:  Any others other than the deal name

18    and deal price?

19             "Answer:  The quantity you are trying buy.

20             "Question:  How does Groupon track the deal name

21    on the checkout page?

22             "Answer:  It's associated with a pledge ID which

23    is in the URL.

24             "Question:  And how does Groupon track the deal

25    price?

1          "Answer:  The pledge ID is tied to a deal object

2     which has a price in it.

3          "Question:  Well, you said the pledge ID is tied

4     to a deal object.  Where is that deal object?

5          "Answer:  It's in the back-end systems.

6          "Question:  And where in the back-end system are

7     deal objects kept?

8          "Answer:  I'm not aware of the exact system.

9          "Question:  So the URL that's sent to Groupon's

10    server includes a pledge ID parameter that identifies the

11    deal, is that a fair characterization?

12         "Answer:  I don't know if it is a parameter or

13    part of the URL.

14         "Question:  What's the distinction you're

15    drawing there?

16         "Answer:  Parameters are separated by a question

17    mark, whereas, a part of the URL is a complete stream before

18    the question mark.

19         "Question:  Okay.  So the pledge ID is included

20    in the request that's sent to Groupon's servers, at least?

21         "Answer:  Yes.

22         "Question:  So when you're buying a goods deal,

23    it would still be a sequence of pages ultimately ending in a

24    transaction, that sequence would just include the cart page

25    which isn't on other types of deals, is that fair?

1            "Answer:  It will not also be a sequence of

2       pages, you can directly purchase a deal.

3            "Question:  What do you mean by directly

4       purchasing a deal?

5            "Answer:  If you have added a deal in the past

6       and you have abandoned the cart, then you do not go through

7       the sequence of events, you directly land on the checkout

8       flow.

9            "Question:  Do you have any knowledge about the

10      source code that runs Groupon's iOS applications?

11           "Answer:  No, I do not.

12           "Question:  Do you have any knowledge about the

13      source code that runs Groupon's Android applications?

14           "Answer:  No, I do not.

15           "Question:  Do you have any knowledge about how

16      Groupon's back-end services generate the URLs for Groupon's

17      mobile apps?

18           "Answer:  No, I do not.

19           "Question:  Have you ever had contact with IBM

20      before?

21           "Answer:  No, I have not.

22           "Question:  Are you familiar with IBM as a

23      company?

24           "Answer:  To some extent, yes.

25           "Question:  Do you think they do innovative

1  work?

2            "Answer:  It's my personal opinion that they

3  have some really good solutions out there.

4            (End of videotape.)

5            THE COURT:  Okay.  That completes that

6  deposition; correct?

7            MR. OUSSAYEF:  Yes, Your Honor.

8            THE COURT:  We'll save any others for tomorrow.

9            Ladies and gentlemen, tomorrow we expect to be a

10  full day from 9:00 to 4:30, so please be here in time for us

11  to get started at 9:00 and order lunch for you.  While

12  you're away from us, no talking about the case, no research

13  or reading about the case.  Please have a good evening.

14            (Jury exited the courtroom at 12:57 p.m.)

15            THE COURT:  Anything to discuss before we break?

16            MR. OUSSAYEF:  Not from IBM, Your Honor.

17            MR. HADDEN:  No, Your Honor.

18            THE COURT:  Have a good afternoon and evening.

19  See you tomorrow morning at 8:30.

20            (Court adjourned at 12:58 p.m.)

21

22       I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.

23

24                      /s/ Brian P. Gaffigan
                       Official Court Reporter
25                        U.S. District Court