IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

INTERNATIONAL BUSINESS MACHINES CORPORATION, : CIVIL ACTION

Plaintiff,

v

GROUPON, INC., : NO. 16-122-LPS

Defendant.

- - -

Wilmington, Delaware
Thursday, July 19, 2018
*Jury Trial - Volume D*

- - -

BEFORE: HONORABLE LEONARD P. STARK, Chief Judge, and a jury

APPEARANCES: - - -

POTTER ANDERSON & CORROON, LLP
BY: DAVID E. MOORE, ESQ.,
BINDU A. PALAPURA, ESQ., and
STEPHANIE E. O'BYRNE, ESQ.

and

DESMARAIS, LLP
BY: JOHN DESMARAIS, ESQ.,
KARIM Z. OUSSAYEF, ESQ.,
LAURIE STEMPLER, ESQ.,
KEVIN K. McNISH, ESQ.,
MICHAEL MATULEWICZ-CROWLEY, ESQ.
ROBERT C. HARRITS, ESQ.,
BRIAN D. MATTY, ESQ., and
EDWARD GEIST, ESQ.
(New York, New York)

Counsel for Plaintiff

Dale Hawkins — Registered Merit Reporter
Brian P. Gaffigan — Registered Merit Reporter

**APPEARANCES: (Continued)**

**ASHBY & GEDDES, P.A.**
**BY: JOHN G. DAY, ESQ., and**
**ANDREW C. MAYO, ESQ.**

**and**

**FENWICK & WEST, LLP**
**BY: J. DAVID HADDEN, ESQ.,**
**SAINA M. SHAMILOV, ESQ.**
**PHILLIP J. HAACK, ESQ.**
**SAPNA MEHTA, ESQ.**
**JESSICA M. KAEMPF, ESQ.,**
**ATHUL ACHARYA, ESQ., and**
**JESSICA BENZLER, ESQ.**
**(Mountainview, California)**

**Counsel for Defendants**

**- oOo -**

**P R O C E E D I N G S**

**(REPORTER'S NOTE: The following jury trial was held in open court, beginning at 8:30 a.m.)**

**THE COURT: Good morning, everyone.**

**(The attorneys respond, "Good morning, Your Honor.")**

**THE COURT: I understand there are some issues. Anything from IBM?**

**MR. OUSSAYEF: Yes, Your Honor.**

**THE COURT: Good morning.**

MR. OUSSAYEF: Good morning, Your Honor. Kareem Oussayef for IBM.

We have some objections to the demonstratives that were disclosed for the Dunham testimony, so I'd like to take Your Honor through those and show you what our objections are.

If we could pull up the Dunham demonstratives, Mr. Kelly.

MR. DESMARAIS: Just use the Elmo.

MR. OUSSAYEF: Yes. Okay.

MR. DESMARAIS: Kareem, do you want these?

MR. OUSSAYEF: So before I go into the demonstratives, Your Honor, I'll just show deposition testimony from Mr. Dunham here.

So Mr. Dunham at his deposition told us that, on line 7 here at page 90 of his deposition: Do you know one way or another?

He says: I don't know the details of the deal page. That's managed by another team.

And he goes on and say there is another team that manages the deals page.

Now, when we look at his, the demonstratives that were disclosed with him, we see that he is taking us through the claim language on various claim elements attempting to rebut Dr. Schmidt's testimony from yesterday.

THE COURT:  Remind me of who Mr. Dunham is.

MR. OUSSAYEF:  Excuse me.  Mr. Dunham is Groupon's corporate representative.  He is a fact witness, he is not an expert witness and hasn't been disclosed as one.  So what we're seeing here as the issue is even though at his deposition he says I'm not an expert in the deal page, I don't really know how it works, here he takes us through with reference to specific claim elements and how they apply under patent rules.  He takes us through various slides of Dr. Schmidt's testimony.  And, you know, I can only assume he is going to testify about why Dr. Schmidt is incorrect.

He takes you through the architecture of Groupon's system which apparently he did not know about at his deposition but perhaps he has attempted to find out and become an expert since, using documents that, this document was disclosed to us in an illegible format.

THE COURT:  Illegible.

MR. OUSSAYEF:  Illegible, exactly.  So that document did not show that you could not read Gdoop or Terada or DaaS or RaaS or any of those items in the version disclosed to us.

Then here we have an example of where apparently there is going to be a tutorial about how coding works with reference to divs and what they do.  And, Your Honor, we did

already have a situation where our fact witness tried to testify about what a div was and there was an objection that was sustained regarding the fact that he was not an expert so he couldn't talk about divs.

Next, we look here and we have another example from Dr. Schmidt's slides with apparently an X out through the global container div. This appears to be a reference to what opposing counsel argued on cross-examination or I should say examined on cross-examination regarding what would happen if you removed a div ID from Groupon's system.

And just to be clear, there has never been any disclosure about any test about what would happen if the div ID was removed, and there has never been any disclosure in any expert report regarding what would happen in that situation or anything of that nature.

Here, there appears to be another reference to Dr. Schmidt's slides. And an argument about, you know, a particular portion of the source code and what that would do.

THE COURT: In general, it looks like this is all mapping the claims on to Groupon's accused product. Is that right?

MR. OUSSAYEF: Yes, this is rebuttal to our expert. If they intend to have a rebuttal to our expert, they should bring, they have their expert. They have an

expert that has already been disclosed in this case and he has already identified certain theories.

I could go on, Your Honor. But the point here is that we have a long list of slides here that all attempt to rebut expert testimony. And it's important to realize here, Your Honor, that there is a division between fact witnesses and expert witnesses for a reason. And there are two -- the case law says there are two important reasons for it.

First, a fact witness is testifying about particular facts. So those are things like what the real world is, what exists, how things look, how things act, not about in the future hypothetically if you were to delete the global container div. If you were to change a system in the future. Here is how technology generally works. Here is a technology tutorial.

And so it's important for the jury because you want to have someone who is qualified testify about technical expertise, and it's important for the parties as well because there are disclosure rules for experts.

We based our case based on the noninfringement arguments and the validity arguments that opposing counsel presented to us and that we discovered during expert discovery and through expert reports.

If now Groupon intends to come here and present

noninfringement arguments that were not disclosed, we don't have a fair chance to react to those situations.

Furthermore, Groupon has disclosed the entire source code computer with literally thousands of source code files as a potential exhibit with Mr. Dunham.

We have no idea how he might use those live in court. He might pick any of the thousands of source code files and tell us a story about how this file affects the functioning of the system. We have no way to identify what he might do in the future.

And, primarily, one of the things that the case law specifically identifies is that if you have a corporate representative who is now being brought as someone who will now testify in expert testimony, there is no way to identify what he is going to say.

Let's see. The case of Carpenter Technology v Allegheny Technology, which is available on Westlaw at 212 WL 5507959 from the sister court in the Eastern District of Pennsylvania in the Third Circuit as well discusses a situation which is very similar to this in which a lay witness from the corporation comes and testifies about how various prior art systems makes things standard and easy to do without actually saying the word "obvious" and without actually explicitly connecting it to an expert opinion but still taking it almost all the way there.

And what the Court said there is that is not permitted. Even if you are not saying you are an expert and even if you are not saying the words "infringement" or "obviousness" or "invalidity," you are still going so close that it prejudices the parties and it makes it impossible to police the line between lay and expert testimony.

THE COURT: Okay. Thank you. I'll hear from Groupon.

Good morning.

MR. HADDEN: Good morning, Your Honor. David Hadden for Groupon.

Mr. Dunham is Groupon's senior engineering manager. He was Groupon's 30(b)(6) witness on most technical topics. He is not going to discuss claim language. He is not going to offer an opinion on anything. He is going to describe how Groupon's technology actually works.

The slide that had the claim language is a slide from Dr. Schmidt's presentation for, I'll give an example.

Dr. Schmidt got up and tried to explain what this diagram, which is from a Groupon document, discloses and describes about Groupon's systems and their operation. And he described it incorrectly.

Mr. Dunham is going to get up and explain what is exactly shown in this diagram and how Groupon's --

THE COURT: If you could use the microphone.

MR. HADDEN: I'm sorry. He is going to explain how Groupon's system works. That's the point of the diagram, and the diagram that they say was not disclosed. This is just a bad printout. We just blew up some language. This was both disclosed and it was incorporated into Dr. Schmidt's own expert report.

So he has pages in his expert report where he shows there is a Groupon document with various boxes around it. So it's an internal Groupon document that they used to train their engineers how their system is laid out. That is what Mr. Dunham is going to talk about. So he is not going to talk about claim language, he is not going to give opinion about infringement. He is not to give an opinion about obviousness or anything else. He is just going to explain how Groupon's technology actually works. And Dr. Schmidt said some things about how it works that is technically wrong. The point of this trial is to get the facts right, and Mr. Dunham is the person who knows and he is going to describe it.

THE COURT: Well, why shouldn't I view how the accused technology works as an issue of technical scientific knowledge that is only proper for experts to talk about?

MR. HADDEN: Because it's not. It's a fact issue. There are software systems at Groupon that were

developed by Mr. Dunham and his team. They operate in a particular way. Mr. Dunham is the most knowledgeable fact witness about how those systems operate. They had Mr. Filepp in here describing how Prodigy operates right?

THE COURT: What about his testimony that was shown apparently about the point he didn't know how deals work.

MR. HADDEN: That's not what the testimony said. So he talked about this with Dr. Schmidt right here, there are these different applications that serve up different pages. His team works primarily on the home page and some of the browsing pages. The specifics of how one particular page operates, he was not the most expert person on about the he answered all their questions about it. No one ever asked for more information, and he is not going to go into anything now that he was not able to answer at his deposition.

THE COURT: So that was another issue that was raised. Is there anything he is going to say about purportedly how the accused technology works that has not been disclosed prior to trial?

MR. HADDEN: No.

THE COURT: And anything that was not disclosed by the time of expert discovery?

MR. HADDEN: No. They had all the discovery

they wanted. Dr. Schmidt testified he revealed all of the source code. They deposed Mr. Dunham and two other technical witnesses. They asked them all the questions they wanted. There was never an issue about them not getting the information they needed.

THE COURT: It seemed to me that there was more than one page that listed the claim language and the Court's construction.

MR. HADDEN: To the extent there were are pages of claim language, there are just the slides from Dr. Schmidt's presentation.

THE COURT: Well, this witness isn't offered as the rebuttal expert --

MR. HADDEN: He is not going to -- I'm sorry. I don't mean to interrupt.

THE COURT: Let me ask you this. I'm definitely very uncomfortable with a fact witness or purported fact witness in any way discussing how the accused technology maps to the asserted claims.

MR. HADDEN: I understand.

THE COURT: Do you have any objection to revising these slides to delete all references to the claim language?

MR. HADDEN: That's fine. I want to keep the overall look of the slides so the jury will understand how

it relates to the testimony of Dr. Schmidt because Dr. Schmidt put up this diagram and says it does X. So I would like to be able to put up the same diagram but I'm not never going to refer to the claim language at the top. If you would like us to wipe that out, we can do that and I'm happy to do that.

THE COURT: What about the source code? What are you proposing to do with the source code?

MR. HADDEN: The only issue on the source code was, there is one slide. There is one slide that shows one of these mustache templates and he is going to put that up to show what it looks like. We're not going to do anything with the source code.

They complain because there was not, I don't know, an exhibit attached to that picture. So we said, okay, it's the source code laptop. We're not doing anything with it. We were going to put up one slide with a picture on it.

THE COURT: So you want to move the source code in through them, but you're not proposing --

MR. HADDEN: They already moved it in.

THE COURT: But you're not proposing --

MR. HADDEN: I'm not going to talk about it.

THE COURT: What about hypothetical and what would happen if we deleted the div?

MR. HADDEN: He's going to say that because he's going to explain what the div actually does, so there is a purpose for the div, but it's not the --

THE COURT: Help me understand the line between fact and expert -- hold on. In this context if I'm going to allow a fact witness to talk about what would happen if we started removing certain lines of code, presumably, correct me if I'm wrong, he's not going to testify that he ever did as a factual matter remove those lines of code and see what happened; correct?

MR. HADDEN: Yes.

THE COURT: That's correct?

MR. HADDEN: He will say he removed those lines of code.

THE COURT: And he's disclosed that before?

MR. HADDEN: No.

THE COURT: How is that consistent with the representation you made that whatever fact testimony he's going to offer has already been disclosed?

MR. HADDEN: Well, he's going to -- they deposed him, he answered all their questions, they didn't ask him about div tag, they could have and he would have explained what they did. Their expert latched on to this div tag. He made a theory it does this certain thing. It doesn't do that certain thing. Mr. Dunham is going to explain what it

**actually does and that's a fact issue.**

**THE COURT: You have an expert who presumably did whatever test he or she need to do, looked at the source code and disclosed consistent with their obligations under the rule what analysis he or she did and what opinions he or she is going to express. Isn't that all correct?**

**MR. HADDEN: That's all correct, but Mr. Dunham is the expert on how this system works. He can explain what these stages do and why the code is in there to do what it does. It is a fact issue. Dr. Schmidt said it does X and it's here for a particular reason. Now it's for the jury to decide which is right. And Mr. Dunham can explain the fact issue of how the system actually works. One feature of that is why they have div tags in there at all and he can explain that.**

**THE COURT: But further testifying and as a test I deleted the div tags or the language relating to it and here is what happened, how is that not expert testimony or something at least that needed to be disclosed?**

**MR. HADDEN: Because all he's doing is giving the context of what the div tag actually does. It's their burden to show that the div tag does what they said it does. Our guy can come in and say they said it does X. No, it doesn't, here is what it does. Here is why we put it in the page, that's a fact issue.**

THE COURT: Anything else?

MR. HADDEN: No, Your Honor.

MR. OUSSAYEF: Your Honor, opposing counsel just literally said Mr. Dunham is the expert on how the system works. That is an admission that he's coming in here to testify as an expert witness, not a fact witness. That's after he said clear as day, he's talking about Moustache templates here:

"Question: So the page we're looking at here, the deals, the deals page that comprise several Moustache templates, right?

"Answer: It may.

"Question: Do you know one way or another?

"Answer: I don't know the details of the deals page."

After telling us I don't know how Moustache templates works, now opposing counsel just said he is the expert on the system, but he is an undisclosed expert. We don't know what experiments he ran and we have no fair chance to respond.

This is directly on point of the case of EdgeCo v FastCap. It says, "A party will not be permitted to evade the strictures of Federal Rule of Civil Procedure Rule 26, essentially presenting a surprise expert witness cloaked as a lay witness."

And it says the reason for it at the bottom of this quote shown on the Elmo is to ensure that each party is given sufficient notice of an anticipated expert witness.

There is no way we could have known that Mr. Dunham was going to say I deleted part of the code. He could have said I'm going to delete any part of the code, he could have said I'm going to modify it, he could have said any number of things and we have no way of anticipating what he could have said. If he were an expert, he could have disclosed it in an expert report. Dr. Schmidt could have analyzed it, looked back and said I don't agree. But because he's a fact witness at trial disclosed the night before with slides that show experiments that we have never seen before, never been produced, never identified, we will have zero chance to understand what he's going to say and how he's go to say it.

THE COURT: I will give you another chance. At this point from what I have heard, Mr. Oussayef, what are you specifically asking me to do?

MR. OUSSAYEF: The whole presentation should be stricken and we should look at -- they should prepare a new presentation so we have a fair chance to evaluate what they're actually going to present. Anything that has claim language or experiments, the whole slide deck is about here is what Dr. Schmidt said, I'm responding to his analysis of

the claims, or here is how div tags work. I didn't experiment with div tags.

Our fact witness was not permitted to say the word div. Our fact witness was not permitted to talk about anything after the date of his invention which is -- which he might have known about, those are facts, because it was expert testimony. This goes well beyond that area that was already excluded.

THE COURT: Okay. Mr. Hadden.

MR. HADDEN: Mr. Dunham is here to explain how the Groupon system works. The one question that he pointed to said how many testimony plates are on this page. He said I'm not sure. He goes on and talked about how Mustache templates work. They put up his testimony about Moustache templates with Dr. Schmidt. They put up Mr. Dunham's testimony in the slides with Dr. Schmidt throughout purportedly relying on his testimony as to how the Groupon system works.

Now, how our system works is a fact issue. It is undisputedly a fact issue. Whether it meets the claims is an expert issue.

THE COURT: How it works compared to what their expert said, how it works compared to claims seems to me like they're opinion issues.

MR. HADDEN: I disagree on the first part. All

he's going to say is how it works. This is how it works. What their expert says about how our system works is not opinion, it's fact. Right? If Dr. Schmidt gets up and said this message goes from here to there, that's a fact. And if he's wrong, Mr. Dunham can get up and say no, the message goes from here to there.

Now we have a fact dispute for the jury. That's what Mr. Dunham is going to do. That's what trials are for. That's not opinion. Opinion is that going from here to there meets the claim. He's not going to say that. All he's going to say, it goes from here to there, Schmidt said it goes from here to there, Schmidt is wrong. That is perfectly appropriate. That's why we have people come in and talk about how systems work at trial. He's not going to talk about the claims, he's not going to give an opinion.

It was IBM's burden to come up with theory that is factually correct. They failed to do that. They said here, here is code that does Y. They are wrong. Mr. Dunham is going to come in and say no, that code does X. That's a fact dispute for the jury. That's completely appropriate. That's what trials are for.

I just don't see the issue. He's not going to give opinions, he's going to say exactly how Groupon works, why do we put this code here, what does it do?

THE COURT: That would all be fine if that's

what you walked in here to do. That's not what you walked in here to do. You prepared a slide deck, I guess disclosed last night, I assume consistent with the timing that purports to have him map claim language on to --

MR. HADDEN: No.

THE COURT: This is the exhibits that you disclosed that you have shown to me. You have described him as the expert. You have talked about experiments that have not been disclosed until last night or this morning. So you know, it might be fine and good if you walked in here to have him just give fact testimony about how the accused product works, but that doesn't look like what you were planning to do.

MR. HADDEN: The only reason there is claim language on the slide is because I'm using Dr. Schmidt's slide where he has documents from Groupon purporting to explain how they work. And Mr. Dunham is going to look at those documents and say Dr. Schmidt said it does this, does it do that? No, it doesn't do that. There is going to be no reference to the claim language.

THE COURT: Anything else?

MR. HADDEN: No.

THE COURT: Any response?

MR. OUSSAYEF: Just briefly, Your Honor, on the experiments. Because the experiments were not disclosed, we

don't even know what the result of the experiments will be. We don't know what kind of -- whether X happened or whether Y happened. We don't know how they were run. We don't know when they were run. We don't know on what version of the system it was run. We don't know whether they apply to this div tag or some other div tag. We have honestly no idea what the tests are supposedly going to show.

THE COURT: All right. Do you have other issues you're raising this morning? I'm not ready to hear it yet, I just need to figure it out.

MR. DESMARAIS: Just one brief one.

MR. OUSSAYEF: Just one brief one.

THE COURT: And you have some more depositions you're playing?

MR. OUSSAYEF: Yes, Your Honor.

THE COURT: Then what's happening the rest of this morning?

MR. DESMARAIS: We're not starting with that.

MR. OUSSAYEF: We're starting with reading discovery responses, then we'll call our next witness, Mr. McBride.

THE COURT: Okay. And then depositions or maybe not?

MR. OUSSAYEF: Then we'll call our next witness which will be Dr. Hausman and then we'll play deposition

testimony.

THE COURT: And you expect to rest today, then?

MR. OUSSAYEF: Yes, Your Honor.

THE COURT: And then is Mr. Dunham your first witness?

MR. HADDEN: No, the second witness.

THE COURT: Second witness. So we're not going to get to him at least for a few hours; is that right?

MR. HADDEN: Correct, Your Honor.

THE COURT: All right. We will come back to this. And Groupon is going to have some issues this morning, also; is that right?

MS. SHAMILOV: Yes.

THE COURT: Let's move on. I will come back to this, I promise. Let's hear IBM's next issue.

Good morning.

MS. STEMPLER: Good morning, Your Honor. Laurie Stempler of IBM. Hopefully this is just a mechanical issue. I don't think there is an objection to these slides, I want to make the direct goes smoothly with respect to Professor Hausman. There are some exhibits that have been unwieldy because they are multiple copies of the expert reports that he relied on like spreadsheets, some of the slides will look like this and have PX numbers, I'll be showing them to him during the presentation. I just want to

make sure that that is not going to draw an objection and say that he has to view things on a laptop or binders full of documents. That's really just the issue.

THE COURT: Good morning.

MS. SHAMILOV: Good morning, Your Honor. We have no issue with that.

THE COURT: No issue.

What is Groupon's issue or issues this morning? Good morning.

MS. MEHTA: Good morning, Your Honor. Sapna Mehta for Groupon. Groupon objects to a series of exhibits, proposed exhibits that IBM has proposed with respect to Professor Hausman's testimony. And these are Plaintiff's Exhibits 549 to 557. They are the Stewart survey report and appendices. And our objection is that this was an expert discovery disclosure from another case not involving Groupon and it's inadmissible hearsay.

THE COURT: Okay.

MS. STEMPLER: Your Honor, this is a report, it's really a survey that Dr. Hausman relied on in his expert report and we produced it as a document in the case and he cited it in his opening report. We're not offering it as his expert testimony or opinion, it's more like any other survey that he would have relied on for forming his opinion.

So they have known that he was relying on this for part of his opinion since October when he cited it in his opening report, and, you know, they could have sought to serve a subpoena to depose Dr. Stewart, but again, it's just like any other survey that has been used to inform Professor Hausman's opinions.

THE COURT: I'm told it was from another case. Was it your other case?

MS. STEMPLER: Correct. It was an expert report in the Priceline matter.

THE COURT: But it was disclosed to the defendants you say in a timely manner in this case?

MS. STEMPLER: It was produced in August with a Bates stamp and cited in Professor Hausman's report in October of 2017.

THE COURT: His report in this case?

MS. STEMPLER: Correct.

THE COURT: What about the hearsay objection?

MS. STEMPLER: Because he relied on it in formulating his opinion, it falls within the exception.

THE COURT: Does that necessarily mean that it gets into evidence or just that he can talk about his reliance on it?

MS. STEMPLER: I think it would be permissible to admit it into evidence, however, if it would resolve the

issue to have him look at the exhibit in the binder and talk about what it says, you know, we could do it that way, too.

THE COURT: Okay. Thank you.

Ms. Mehta, come back. Would that resolve the issue?

MS. MEHTA: Yes, Your Honor.

THE COURT: Okay. So then I think we have an agreement that he can talk about 549 and 557 I think it was, but you won't offer them into evidence; correct?

MS. MEHTA: To the extent he disclosed them in his expert report.

THE COURT: Right. He still can't express an opinion that he hasn't properly disclosed previously, but in terms of the Stewart exhibit itself, he can talk about it subject to the prior disclosures, but it's not going to be offered into evidence.

MS. MEHTA: Correct.

THE COURT: You're okay with that?

MS. MEHTA: Yes.

MS. STEMPLER: Yes, Your Honor.

THE COURT: Any other issues from Groupon?

MS. SHAMILOV: No, Your Honor.

THE COURT: We'll take a short recess.

(Brief recess taken.)

*    *    *

(Proceedings reconvened after recess.)

THE COURT: Have a seat.

The jury is all here. I do want to give you a ruling on the Dunham issue before we bring them in.

It's IBM's objection to the demonstrative slide. I am in large part sustaining the objection and these slides are going to have to be redone substantially in light of my ruling.

Specifically, I will allow Mr. Dunham to explain how the accused product, the Groupon product works, but I'm not going to allow him to testify to any experiments he has done to any hypotheticals of how the Groupon product would work if certain experiments were done or certain modifications to the code were made. He is not going to be answering hypothetical questions or offering speculation or opinion as to modifications that could be. He is not going to be permitted to compare the claims or the claim language or the Court's claim construction on the accused device. And he is not going to be talking about Dr. Schmidt.

He is not here as a rebuttal expert. He is not here to point out flaws even in the supposed factual portions of the other side's expert's testimony. He is here as I understand it to talk about as a factual matter his knowledge from his own personal experience of what the accused product is and how it works.

My ruling is based on the distinction between fact and expert testimony. Expert testimony has certain additional disclosure obligations that need to be met and which were not met here because, of course, the witness Mr. Dunham is not being offered as an expert. But that means that there are certain things he can't do that an expert who was properly and timely disclosed and disclosed his opinions could do.

I also am concerned because it appears from slides that what Groupon intended to do with Mr. Dunham would stray I think significantly across the fact expert line and would unfairly prejudice the plaintiff and therefore I do think it is important that I set very strict lines as to what the Dunham testimony is going to be. So all of that has led to my ruling here.

Any questions about that?

MR. OUSSAYEF: No, Your Honor.

THE COURT: Any questions?

MR. HADDEN: No, Your Honor.

THE COURT: All right. So you are going to have to work out the timing for revised slides, and the plaintiff is going to have an opportunity to review them so that any additional objections can be raised before Mr. Dunham takes the stand.

All right. Understood?

MR. HADDEN: Yes, Your Honor.

MR. OUSSAYEF: Yes, Your Honor.

THE COURT: All right. Let's bring the jury in.

Oh, right. A couple of just housekeeping matters.

When the jury comes in, we're going to give them the additional witness photos that I guess we were just given yesterday. I think they're the deposition witnesses. And I have a lunch meeting today at 12:00 to around 12:45 so we'll take a slightly longer lunch break today.

Okay. You can go get the jury.

(Jury returned.)

THE COURT: Good morning, members of the jury. Nice to see you all again.

A few preliminaries from me before we get started.

First, you may notice the temperature has been rather cold in here ever since we complained the other day about it being too hot. I'm hoping this is more comfortable than when it was too hot, and I hope over the course of the day we'll find that it gets to an acceptable temperature.

Today, I have a commitment during lunch so we're going to take lunch a little bit early, so we'll break around 12:00 and the lunch break may go to 12:45 or 1:00. I'll be back just as soon as I can be.

And we have some more pictures for you. Some of the additional witnesses that we hadn't given you photos of before, Mr. Looby will now give you your copy of the photos of those witnesses.

(Documents passed out to jurors.)

THE COURT: And with that, we'll turn to IBM for whatever is next. Good morning, Mr. Desmarais.

MR. DESMARAIS: Thank you, Your Honor. We'll now like to read some discovery responses. And my colleague Mr. Oussayef will do the reading.

THE COURT: That's fine.

Good morning.

MR. OUSSAYEF: Good morning, Your Honor.

Ladies and gentlemen of the jury, I will now read from some discovery responses.

The first one is shown here.

This is defendant Groupon's supplemental responses to certain IBM interrogatories. And what that means is that IBM has the opportunity to ask questions of Groupon, and Groupon has the obligation to answer those questions truthfully.

And this first interrogatory, IBM asked about Groupon's awareness of the patents in this lawsuit.

THE COURT: Is there an issue.

MS. SHAMILOV: He should be just reading. It is

 characterizing. If he is just reading, that's fine.

THE COURT: I think he is just giving some nonargument background. Go ahead.

MR. OUSSAYEF: Groupon responded to the interrogatory asking about awareness of the patents by saying: Groupon first became aware of U.S. Patent Nos. 5,769,967 and 7,072,849 via communications with IBM on November 1st, 2012. Groupon first became aware of U.S. patient No. 5,961,601 via communications with IBM on April 13th, 2012. Groupon first became aware of U.S. Patent No. 7,631,346 via communications with IBM on August 11th, 2014.

Next, we have another set of interrogatories. An question was asked about how Groupon's single-sign-on functionality worked. And here is an excerpt from the response:

If the user's service receives an ID token, it will contact a Google API endpoint if the ID token does not also contain the user's e-mail.

MS. SHAMILOV: Your Honor, may I have a sidebar on this issue?

THE COURT: All right. Bear with us, ladies and gentlemen.

(Sidebar conference held.)

THE COURT: Okay. What is the issue?

MS. SHAMILOV: The interrogatory's full answer

**is almost a page, and they're picking one sentence out of it.**

**THE COURT: Have you not all conferred -- hold on -- on what you were going to do here?**

**MR. OUSSAYEF: Yes. We fully disclosed all of this interrogatory response.**

**THE COURT: How about the highlighted portion.**

**MS. SHAMILOV: No.**

**THE COURT: I mean did you indicate to them you were going to read the highlighted portion?**

**MS. SHAMILOV: No.**

**MR. OUSSAYEF: No, Your Honor. We did not, but ...**

**THE COURT: What did you disclose? That you were going to read the whole thing.**

**MR. OUSSAYEF: Just that we would disclose the discovery responses themselves and read them.**

**MS. SHAMILOV: They were redacted so they removed the interrogatories portion they didn't need and not the whole thing.**

**THE COURT: Are you going to have to read the whole thing?**

**MR. DESMARAIS: We sent them redacted. This is with an exhibit number on it.**

**THE COURT: But are you reading everything that**

you sent them?

MS. SHAMILOV: No.

MR. DESMARAIS: Well, we can.

THE COURT: You have to.

MR. DESMARAIS: The whole paragraph is not relevant.

THE COURT: You will have to reed the whole thing.

MS. SHAMILOV: Yes, I want the whole thing.

THE COURT: Read the whole question and whole answer consistent with what you disclosed to them.

MS. SHAMILOV: Thank you.

(Sidebar conference ends.)

MR. OUSSAYEF: Ladies and gentlemen of the jury, I will now read the interrogatory question and interrogatory response.

Interrogatory No. 18. Describe in detail the sign-in use case in which an end-user's Facebook or Google credentials are used to create a new Groupon user account for the end-user at an accused instrumentality. Your response should identify all variables, attributes, authentication tokens, and/or other information used to sign in or create the new end-user account and should identify any and all documents and source code files describing, depicting, or relating to such use case.

**Subject to and without waiving any objections, Groupon responds as follows:**

**For login via Facebook where a user does not have a pre-existing account at Groupon, the login process begins when a user clicks on Facebook login button on a login or signup screen in the frontend client, Android, iOS, or Groupon web page. The frontend client uses the Facebook SDK for a login handshake with Facebook. The SDK handles the user interaction with Facebook, including presenting the user with a Facebook hosted screen or web page. If the user is not already logged into Facebook, they are prompted to login. If the user has not previously logged into Groupon via Facebook, they are prompted to grant permission to the Groupon application to access some of their Facebook public profile data. The Groupon client receives a Facebook access token back from the SDK. The Groupon frontend client calls the Groupon backend, the Groupon API/GAPI, via a post to /api/v2/oauth/facebook_authenticate with the Facebook access token which in turn passes the token to the user's service via a post to /users/V1/accounts/facebook_authentication. The user's service calls the Facebook API using the Facebook access token and gets back data from Facebook, including the Facebook user ID, e-mail address and name. If there is no existing Groupon user account with the same e-mail address as the Facebook account, a new Groupon account is created**

**with the received name and e-mail address and is linked to the Facebook user ID. The user is logged into that new account.**

**For login via Google where a user does not have a preexisting account at Groupon, the login process begins when a user clicks on a Google login button on a login or signup screen in the frontend client: Android, iOS, or Groupon welcome page. The frontend client uses the Google SDK for a login handshake with Google. The SDK handles the user interaction with Google, including presenting the user with a Google hosted screen or web page. If the user is not already logged into Google, they are prompted to log in. The Groupon client receives either a Google ID token or a Google one-time authorization code back from the SDK. The website always uses the one-time authorization codes. On Android, the Groupon application may receive an ID token without the SDK contacting a Google server. The Groupon frontend client calls the Groupon backend, the Groupon API/GAPI via post to api/v2/oauth/google_authenticate with the Google ID token or a one time authorization code as appropriate, and the GAPI in turn passes the token or code to the user's service via a post to /users/v1/accounts/google_authentication.**

**If the user service receives a one-time authorization code, it will contact a Groupon API endpoint**

to exchange the code for an ID token which will indicate a

Groupon ID for the user, the user's email address and the

user's name.  If the user's service receives and ID token,

it will contact a Google API endpoint if the ID token does

not also contain the user's email.  If there is no existing

Groupon user account with the same email address as the

Google account, a new Groupon account is created with the

received name and email address and is linked to the Google

user ID.  The user is logged into that new account.

Pursuant to Rule 33(d) information relevant to this response

may be ascertained from the source code Groupon has made

available in this case.

Investigation and discovery are ongoing and

Groupon reserves the right to supplement, amend, or modify

its responses to this interrogatory as additional facts are

learned and as otherwise appropriate."

Next, we'll read from a discovery response which

is called a request for admission.  This is where IBM can

ask Groupon to admit certain facts and Groupon has to

truthfully respond to those requests.

"Request for Admission Number 7:

"Admit that Groupon does not have any policy for

licensing patents.

"Response:  Subject to and without waiving the

foregoing objections, Groupon responds as follows:

"Groupon admits that it has no patent licensing policies."

Next there is one more interrogatory response. The Interrogatory Number 22 reads: "Identify all information, including but not limited to information about a particular user, session, deal, or transaction, that you track using cookies or using variables in a URL, and for all information identified, state whether you track that information using cookies and whether you track that information using variables in a URL."

"Subject to and without waiving any objections, Groupon responds as follows:

"In general, Groupon uses information in URLs, including query string parameters to identify resources requested by a user. Groupon uses information in cookies to track users and sessions as well as to store information about users and their habits. Detailed information regarding the information tracked in cookies is found in the source code made available by Groupon. Investigation and discovery are ongoing, and Groupon reserves the right to supplement, amend or modify its response to this interrogatory as additional facts are learned and as otherwise appropriate."

"Interrogatory number 25.

"Identify all factors that led to your decision

to require a user have a Groupon account before being able to access My Stuff, Visitor Referral, Wish List, and any other resource that can only be accessed by users with Groupon accounts."

"Response.

"Subject and without waiving any objection, Groupon responds as follows:

"Groupon requires user log in to certain pages because, for those pages, Groupon needs to be able to know about the user in order to provide the requested service to the user. Investigation and discovery are ongoing, and Groupon reserves the right to supplement, amend, or modify its response to this interrogatory as additional facts are learned and as otherwise appropriate."

And that concludes the reading at this time, Your Honor.

THE COURT: Okay. Thank you.

MR. DESMARAIS: Thank you, Your Honor. Those discovery requests are labeled with exhibit numbers, Plaintiff's 502, Plaintiff's 497, Plaintiff's 501, and Plaintiff's 504. And we would offer them now in redacted form.

MR. HADDEN: No objection, Your Honor.

THE COURT: Those are all admitted.

(The above exhibits were admitted.)

MR. DESMARAIS: Thank you, Your Honor. IBM's next witness will be Tom McBride. He is an IBM licensing executive and he'll testify about IBM's licensing policies and IBM's licenses. And his testimony goes to damages and reasonable royalty.

Thank you, Your Honor.

THE COURT: Thank you.

MR. DESMARAIS: And my colleague, Brian Matty, will do the examination.

THE COURT: Okay.

... THOMAS McBRIDE, having been first duly sworn, was examined and testified as follows ...

THE COURT: Good morning, Mr. McBride, and welcome.

THE WITNESS: Thank you.

THE COURT: You may have a seat.

And Mr. Matty, you may proceed when you're ready.

MR. MATTY: Thank you, Your Honor

DIRECT EXAMINATION

BY MR. MATTY:

Q. Good morning, Mr. McBride.

A. Good morning, Brian.

Q. Would you please tell the jury where you work?

A. I work for IBM.

Q. And where do you live?
A. I live in Montgomery, Texas which is just north of Houston.
Q. Do you have a family back in Texas?
A. Yes, I do. My wife, Sharon, two golden retrievers. We raised five children. They're all grown now and they have children of their own. And we all live in Texas.
Q. And how long have you lived in Texas?
A. We moved to Texas in 1983, so going on thirty-five years.
Q. And how long have you worked at IBM?
A. IBM considers me an employee since 1991, so that would be twenty-five years.
Q. And what group do you work in at IBM?
A. I'm in what's called the Technology and Intellectual Property Group which is a corporate function aligned with IBM Research.
Q. And when did you join that group?
A. I joined that group in 2007.
Q. What is your position in the Technology and Intellectual Property Group?
A. I'm called the licensing executive.
Q. Before we get into IBM's patent licensing I would like to talk about your background. Did you attend college?
A. I did, Southeast Missouri State University. I

**received a degree, a bachelor of science degree in mathematics.**

Q. **What did you do after college?**

A. **One of my first jobs was with the Saturn V program, the NASA Saturn V program in Huntsville, Alabama.**

Q. **Could you explain what the Saturn V program was for the jury?**

A. **Yes. The Saturn V program was the Werner Von Braun project to build a rocket to put a man on the moon. My job was as a computer programmer to build trajectory models for the Saturn V.**

Q. **How did you go from rocket science to working at IBM?**

A. **Well, I joined a small software company called Rationale Software in 1991. Rationale had a software development environment for ADA. And the ADA programing language was being used by the NASA space station program which was based in Houston. I was living in Houston at the time. Rationale was a small startup company at that time that ultimately was acquired by IBM in 2003. That's how I became to join IBM.**

Q. **Now, do you have any professional certifications?**

A. **Yes. Through the Licensing Executives Society I'm what's called a certified license professional.**

Q. **What does that mean to be a certified licensing professional?**

A. Well, in order to qualify, it's sort of like a CPA for accounting. In order to qualify you need first of all, seven years of experience. Secondly, you have to pass a certification test. And third, you have to make a commitment to continuing education taking course work, and there is a minimum requirement of hours per year.

Q. And how long have you been a certified licensing professional?

A. Four going on five years.

Q. All right. I would like to talk a little bit about IBM. How much does IBM spend annually on its research and development for its products?

A. Last year it was 5.6 billion. In previous years it's roughly that same amount. Maybe six, seven percent of total income.

Q. And why does IBM spend so much on its research?

A. Well, it really is driven by IBM's core values. And there is three of them. This one is, the first core value is innovation that matters. Innovation that matters to IBM, and innovation that matters to the world.

The investment of five to $6 billion a year is intended to drive innovation. And in the high tech business, if you're not innovating, complacency is death. You really do have to re-invent yourself. And IBM has been around over a hundred years, but only because of its

**commitment to innovation and its ability to re-invent itself, to adapt to the changing technology world.**

Q. **How does IBM's patent portfolio fit into to its commitment to innovation?**

A. **Out of innovation comes patents, lots of patents. There were over 8,000 U.S. patents last year. That doesn't count foreign patents that may be associated. For the last twenty-five years, IBM has led the world in the production of U.S. patents. And IBM views patents as strategic assets.**

Q. **Now, how does IBM's licensing of its patents fit into those views?**

A. **So, when you think of patents, you may think that patents are intended to protect markets, to create monopolies. IBM doesn't view it that way. We view patents as strategic assets to be used for the good of the industry. So we share patents and we share patents in multiple ways with others within the information technology industry.**

**The first way is that we pledge patents to standards organizations. Standards that are important not only to IBM, but also to the industry. We pledge patents to open source. Here again, open source that's important to IBM, but also to the industry.**

**One such example is the open innovation network which has a portfolio of patents to protect the Lennox operating system. The Lennox operating system is important**

to IBM but it's also important to the industry.

And, in fact, the Lennox operating system is the foundation for much of the cloud platforms that are available today.

The third thing is we share patents through assignment. We assign a lot of patents to a lot of companies that may be looking to help build their own patent portfolios, and having patents in the high tech world is an important asset, strategic asset for those companies.

Q. What are the benefits back to IBM of licensing those patents?

A. The fourth way of sharing --

Q. I'm sorry, continue.

A. -- is through cross licensing. And that's what I do. I do cross licensing as well as patent assignments.

Q. So then what are the benefits back to IBM of licensing its patents?

A. There are two primary benefits to cross licensing a patent, and also assigning patents. The first one is that IBM receives income. Income is important as a way to offset or help offset that R&D expense, which is considerable. If we didn't have that income, there would be certain jobs lost that -- certain jobs that would not exist without that income in place. We certainly don't offset the entire amount, but we offset a significant percentage of that, not

only through patents, but also through other monetization of intellectual property.

The second reason, and this is probably the most important reason, is IBM receives freedom of action. That is, we -- when we cross -- let me explain. When we cross license, what that means is that we give rights to the other party, the licensee, to all IBM patents and patent applications that are related to their business. They in turn give us the right to use all the patents and applications that they own that are relevant to our business. There is usually a fee associated with that which is the income side of it.

But as a result of this cross, the sharing of patents between ourselves, IBM now has freedom of action to build product, to go to market with product without fear of infringing the other party's patent. And if you do that broadly enough across the industry, it gives you significant freedom to build your business without infringing others, other people's inventions.

Q. Now, how many patent licenses has IBM entered into?

A. I couldn't give you an exact number, but over the past forty plus years that we have been doing this, it must be in the thousands.

Q. Do any of those licenses cover the patents in this case?

A. **Most of them do because of the nature of our cross licenses, yes.**

Q. **So, could you briefly explain to the jury what the Technology and Intellectual Property Group at IBM does to support those licensing efforts?**

A. **So, the Technology and Intellectual Property Group as I said was associated with IBM Research. As such, we manage all of the intellectual property across all of IBM, which would include patents, copyrights, trademarks. It would include hardware technology, software technology. The group also does joint development with other organizations, other companies in the information technology world. We do joint research with other companies in the technology world, and we also divest businesses, and divesting businesses, divest the intellectual property associated with those businesses. So patents is simply one piece of our overall intellectual property portfolio.**

Q. **And focusing on patent licensing, how does IBM decide which companies to approach to discuss patent licensing?**

A. **Well, with a focus on freedom of action. Certainly we're interested in working with and sharing patents with companies like ourselves who are in the information technology. Information technology is a very broad area. It certainly includes sectors like web technology, but also computer systems, software systems, networking, materials,**

**semiconductors, what you might think of as older technologies.**

**Then there are emerging new technologies like block chain, cognitive computing, augmented intelligence, natural language processing, these are emerging areas where certainly -- certainly areas that IBM is patenting in, but we know that many others are patenting in those same areas so we're certainly interested in working with companies and sharing patents in all of those areas.**

Q. **And how does IBM determine if its patent portfolio might be valuable to another company?**

A. **So what we do is, and I personally am responsible for the software sector and I also work in the web technology sector, in each of those we try to identify the big players that we want to work with. We try -- I work with patent engineers and also patent attorneys and we try to understand within each of those sectors who the big players are, what's their revenue profile, what do their patents portfolio look like, what technology areas are they in, and how does this match up with IBM's patent portfolio and can we determine if there is value from the IBM patent portfolio to the other company. And if so, what value can we see coming back in return in the form of their patent portfolio.**

Q. **And you mentioned the patent engineers. What is a patent engineer?**

A. Well, a patent engineer would be like a person with a technical background, an engineer, software developer, who also has an understanding of the unique nature of patents and how patents can be mapped to and the claims and elements of the patent mapped to products and services from another company.

Q. And I'd like to show you some demonstratives and exhibits.

MR. MATTY: Your Honor, may I approach?

THE COURT: You may approach.

(Binders passed forward.)

BY MR. MATTY:

Q. All right. Mr. McBride, if you would please look at Demonstrative PDX-5 in the binder in front of you?

A. Yes.

Q. And when you are there, will you let me know if these demonstratives will aid in your testimony today?

A. Yes.

Q. All right. Let's talk about IBM's preferred structure for its preferred licenses. I see the first point you have on slide 1 is cross license. Could you remind the jury what that means?

A. Well, that means that the agreement that we enter into is a cross license. It's mutual such that we give rights to the other party to use the IBM patents and

applications that are relevant to their business. They, in turn, give us the rights to use patents and applications they own that are relevant to our business.

Q. And moving down to the second point, I see you have there: products and patents defined by field of use term.

What does that mean?

A. Right. So when we share patents, it's impractical to list the patents, the patent numbers. I mean IBM's patent portfolio is upward of 45,000 patents and it changes every day, so it's impractical. And so what we do is, in the patent cross-license agreement, we define what we call the licensee's field of use. It's really a definition of their business. It describes their products and services. And then we say in the agreement that we're granting the right for them to use any and all IBM patents that are relevant to that definition, that definition of their business. They, in turn, do the same for us.

And IBM defines its business. We pretty much have a standard definition that we have used for a number of years. And any patents and applications they own, they grant us the right to use those that are relevant to our business.

Q. And on the third line, I see: fixed term or life of patents term. Can you explain what that means?

A. Normally, the patent cross license agreement has a

term. Usually it's five years. At the end of the five years, it would be renewed, renegotiated. Or it could be what we call a life of patent term, which means that the other party has the right to use any and all IBM patents and applications that have been filed on the date of the agreement for the life of those patents.

Now, patents you may know have a life of 20 years. But the average life of the IBM portfolio at this particular moment in time is 13.4 years. So you could say that the term of the license is 13.4 years.

Q. And finally I see: balancing payment to IBM.

Could you explain what that means?

A. Yes. So there is usually a fee consideration. What we do is we take into account the value of their portfolio to us, the value of our portfolio to them. Our portfolio being as large as it is, and robust, the balancing payment tends to favor IBM. And it's also written into the agreement.

Q. Generally, how does IBM determine the value of a patent license that it offers?

A. Well, we have a standard valuation model, we called it VOE, Vendor Objective Evidence. We've used it for years. I have been in the group for 11 years and certainly we used it during that time and even prior to that time. It's a spreadsheet. And we input certain parameters and produce

**calculations.**

**It's really helpful because, No. 1, it allows us to establish a benchmark across all licensees based upon the parameters that are input into the model.**

**And, secondly, it gives us the basis to make an initial offer. The natural question any time you approach somebody about a patent cross license is, well, how much does it cost?**

**So we typically do that work up front. It becomes the basis for an initial offer. That offer must be approved by our Vice President of the Patent Group.**

Q. **So when you start with that model and when you use that model, where do you start?**

A. **Well, we start with two things:**

**First of all, the other party's revenue over the next five years. Relevant revenue. In other words, revenue that is relevant to the IBM patent portfolio.**

**Secondly, we set a royalty rate. And then ultimately the price that is established is the royalty rate times the revenue over five years, and that's the balancing payment.**

**Now, there are adjustments that we make to the royalty rate, which we will, we can get into.**

Q. **So let's talk about those. What do you mean by an adjustment?**

A. **Well, first off, we establish a gross royalty rate, and then we make adjustments to it based on various considerations.**

**The royalty rate, gross royalty rate that we start with varies depending upon the situation.**

**If we're working with somebody where there is no knowledge of infringement or even any suspicions of infringement, then we set a royalty rate of .25. And from that, we make adjustments.**

**In the event there is a suspicion of infringement, then we may start with a higher royalty rate like .5.**

**If there is proof of, knowledge of to IBM of infringement, we start with a rate that could be anywhere between 1 and 5 percent. Usually it's 1 percent. And then we make adjustments accordingly.**

Q. **All right. So what are some of the discounts that IBM makes after determining the royalty value or the royalty rate?**

A. **So the first adjustment that we make would be, in our judgment, the value of the other party's patent portfolio to IBM. This results in us discounting the royalty rate because we clearly want to get that value in return and we want to fairly compensate the other party for the value of their portfolio.**

**We respect others, the intellectual property of others. We certainly do not want to infringe. Our goal is freedom of action. And so we set a value on their patent portfolio as an adjustment and a reduction in the royalty rate.**

Q. **And what would that discount be if there was no cross license back to IBM, to the other company's patent?**

A. **Well, there would about no adjustment. It would be, a factor that you would put in the model would be zero.**

Q. **What are some of the other discounts that IBM applies in its model?**

A. **Well, a few minor ones. No. 1 would be rather than having a running royalty over a period of time which is difficult to administer, we typically look for one upfront payment for the license which simply makes it easy and convenient. And for that, we give an additional discount or make an adjustment.**

Q. **And are there any other discounts?**

A. **Well, you know, the other thing which is very important is when we look at a licensee, their revenue may be in the U.S. but they may have revenue outside the United States.**

Q. **Now, to what extent does IBM have patents outside of the United States which are relevant to that revenue?**

A. **Maybe not. Clearly in the U.S., with the number of**

U.S. patents, it's easier to predict than it would be in some other jurisdiction in the world where IBM may not have patents but the other party may have revenue. And so we make an adjustment to the royalty rate based upon our estimate of their revenue outside the United States.

Q. And are there any other discount factors?

A. Yes. When we enter into license discussions with another party, the last thing we want, and I think the last thing they want is for this to end up in litigation. And so we reduce our royalty rate further as a way to try to avoid litigation or prolong discussions that may be contentious. And for that, we simply are willing to discount further to avoid litigation. We call that a litigation discount.

Q. Now, out of those factors you just discussed, which are the most important?

A. Well, the most important would be the license back for their patents. The goal being to achieve freedom of action, avoiding infringing their patents. And so typically that is the most heavily weighted factor that we look at, which is heavily dependent upon what we perceive as the value of their portfolio in terms of the quantity of the patent, the quality of the patents, and the technology areas in which they're inventing, and whether or not those technology areas are important or non-important to IBM.

Q. All right. So after you have the revenue and the

gross royalty rate and your discount factors, what happens next with the model?

A. Well, then I have, once it is approved, the ability to make an offer to a cross licensee. And like I said earlier, that is usually the first question, how much does it cost? So when you sit down and talk to somebody, you have the ability to give them a benchmark.

But in every case, we always say this is what we think. We're open to considering a counteroffer to see what you think. Our goal is a business resolution.

Q. All right. Now, in your licensing role at IBM, what technology or types of companies do you focus on?

A. I'm responsible for the software sector as well as web technology.

Q. And would you consider Groupon to be a web technology company?

A. Yes.

Q. All right. Now I'd like to take a look the a some of IBM's web technology licenses.

A. Sure.

Q. I'll run through a list of these and then we can come back and walk through them.

Could you look in your binder to PX-391.

A. Yes.

Q. And what is that exhibit?

A. **Well, this would be the patent cross license agreement between IBM and Facebook.**

Q. **And if you will please look at Plaintiff's Exhibit PX-394. What is that exhibit?**

A. **This would be the patent cross license agreement between IBM and Twitter.**

Q. **And if you look at Plaintiff's Exhibit PX-401. What is that exhibit?**

A. **This would be the patent cross license agreement between IBM and LinkedIn.**

Q. **And then if you look at Plaintiff's Exhibit PX-406. What is that exhibit?**

A. **This would be the patent cross license agreement between IBM and Amazon.**

Q. **And please look at Plaintiff's Exhibit PX-407. What is that exhibit?**

A. **This would be a patent assignment agreement between IBM and LinkedIn. This was done in conjunction with the patent cross license agreement that we did with LinkedIn.**

Q. **And now please look at Plaintiff's Exhibit PX-408. What is that exhibit?**

A. **This is a patent cross license agreement between IBM -- I'm sorry. This is a patent assignment agreement between IBM and Twitter. This agreement was also done at the same time we did the patent cross license agreement with Twitter.**

Q. **Just a few more. Plaintiff's Exhibit 443. What is that exhibit?**

A. **Well, this is the confidential settlement agreement between IBM and the Priceline Group which also included a patent cross license.**

Q. **And then Plaintiff's Exhibit PX-454. What is that exhibit?**

A. **This is a patent cross license agreement between IBM and Facebook which was the renewal of the first license that we already referenced.**

Q. **Then, finally, Plaintiff's Exhibit 461. What is that exhibit?**

A. **This is the patent cross license agreement between IBM and Google.**

**MR. MATTY: Your Honor, I offer PX-391, PX-394, PX-401, PX-406, PX-407, PX-408, PX-443, PX-454, and PX-461.**

**MR. HADDEN: No objection.**

**THE COURT: Those are all admitted.**

**(Above-referenced exhibits admitted in evidence.)**

**BY MR. MATTY:**

Q. **All right. Mr. McBride, let's look through some of these licenses.**

**I'm showing on the screen PX-406. Could you tell me who are the parties to this license?**

A. **IBM and Amazon.**

Q. All right. Now I'll turn to, direct you to Section 2.12 of this license between IBM and Amazon, where it says: Subject to Section 2.1.3.1, 2.1.3.2 and 2.1.3.3, Amazon, as grantor, on behalf of its and its subsidiaries, grants to IBM, as grantee, a nonexclusive and worldwide license under Amazon licensed patents. And then it goes on from there.

Could you tell me, what is your understanding of this section in this license?

A. This is where IBM is granting rights to Amazon to use IBM patents that are relevant to their business.

Q. And I'll just point back in Section 2.1.2. It says Amazon, as grantor, on behalf of itself and its subsidiaries grants to IBM.

A. Yes, certainly.

Q. What is your understanding?

A. This is a license back to IBM from Amazon to IBM, for IBM to be able to use patents that are in their portfolio.

Q. All right. And we'll look now at Section 4 of this license. What was the amount that Amazon paid for this license?

A. Yes. Amazon paid $49.8 million.

Q. Now, did IBM apply a cross license discount for that license to Amazon?

A. Yes, certainly we did that in our original offer. After that, it would have been a negotiated settlement.

**Most often the negotiated settlement is less than original offer, so we certainly would have taken into consideration the license back from Amazon.**

Q. **And did IBM apply a litigation discount for that license to Amazon?**

A. **We did in our original offer, we did end up in litigation with Amazon, but it was settled prior to trial.**

Q. **Did IBM offer a discount to Amazon for settling prior to trial?**

A. **Please ask that again.**

Q. **Did IBM apply a discount to Amazon for settling prior to trial?**

A. **Yes. It would have been a discount to arrive at a negotiated settlement.**

Q. **All right. I would like to turn now to the license in PX-394. And who are the parties to that license?**

A. **This would be IBM and Twitter.**

Q. **All right. And I'll turn to Section 2.1.2 of this license which says, "Twitter as Grantor on behalf of itself and it subsidiaries grants to IBM as Grantee a nonexclusive and worldwide license under Grantor's licensed patents."**

**Then it goes on from there. What is your understanding of this section in IBM's license with Twitter?**

A. **This would be the license back from Twitter giving IBM the right to use their patents that are relevant to our**

business.

Q. And so did IBM apply a cross license discount for that license grant from Twitter?

A. Yes, we would have used our BOE model to create an original offer. We would have applied an adjustment, discount to arrive at a price based upon a license back for this patent.

Q. Did IBM apply a litigation discount for Twitter?

A. Yes, we did.

Q. Was there any litigation between IBM and Twitter?

A. No, there was not.

Q. Look now at PX-408, which is the patent assignment agreement. And who are the parties to this patent assignment agreement?

A. This would be between IBM and Twitter.

Q. And how does this patent assignment agreement relate to the license with Twitter that we just saw?

A. As I mentioned earlier, the patent license agreement and the patent assignment agreement were done at the same time in tandem. There was one price for both. And that price I believe is reflected in the patent assignment agreement. As a result of it, in addition to getting a license, a patent cross license, Twitter purchased from IBM a certain number of patents that they now own and is part of their patent portfolio.

Q. So we'll look now at Section 3 of this agreement. What was the amount that Twitter paid for the patent assignment agreement for the patent cross license with IBM?

A. Twitter paid $36 million.

Q. All right. Let's go to the license in PX-401. And who are the parties to that license?

A. This would be IBM and LinkedIn Corporation.

Q. I'll direct you to Section 2.1 of the license, which says, "Each party, as Grantor, on behalf of itself and its subsidiaries, grants to the other party, as Grantee, a nonexclusive, royalty free and worldwide license under Grantor's licensed patents." And then it goes on.

What is your understanding of that section in this agreement?

A. This is written a little different than the other two agreements but essentially what it says is they are giving us a grant of rights to use their patents, we in turn are giving them a grant of rights to use our patents.

Q. Did IBM apply a discount for that cross license grant in PX-401?

A. In making our original offer we would have used our standard BOE model, we would have applied the appropriate adjustments.

Q. Would that have included a cross license discount?

A. A license back.

Q. Did IBM apply a litigation discount for LinkedIn?
A. Yes, we did.
Q. Was there any litigation between IBM and LinkedIn?
A. No.
Q. Let's look at PX-406 -- I'm sorry, PX-407. And I'll ask you who are the parties to this patent assignment agreement?
A. This would be IBM and LinkedIn Corporation.
Q. And how does this patent assignment agreement in PX-407 relate to the cross license we just saw in PX-401?
A. This is very similar to the Twitter situation in that the patent assignment agreement was done at the same time as the patent cross license agreement. And the price for both was included in the patent assignment agreement.
Q. I'll show you Section 3 of this agreement. What was the amount that LinkedIn paid for this patent assignment agreement and patent cross license with IBM?
A. $30 million.
Q. Let's go to PX-443. And who are the parties to the agreement in PX-443?
A. This would be IBM and the Priceline Group, which included Kayak, OpenTable, and Priceline.com.
Q. All right. I'll turn to Section 2.1.2 of this license, which says, "Priceline as Grantor on behalf of itself and its subsidiaries grants to IBM and its

**subsidiaries existing on or after the agreement date, as Grantee a nonexclusive and worldwide license under Grantor's licensed patents."**

**What is your understanding of this section of the Priceline agreement?**

A. **Yes, this would be the license back to IBM that Priceline is giving IBM a price to use its patents that are relevant to IBM.**

Q. **Did IBM apply a cross license discount for Priceline?**

A. **In making the original offer, we did.**

Q. **And did IBM apply a litigation discount to the Priceline agreement?**

A. **In making the original offer, we did, yeah.**

Q. **And then was there litigation between IBM and Priceline?**

A. **There was, yes.**

Q. **And did IBM discount for avoiding further litigation when it settled that case?**

A. **We settled for less than our original offer, so we would have certainly taken into consideration a way to achieve a mutually agreed business settlement.**

Q. **Turning to Section 3.2 of that license, what was the amount that the Priceline agreement paid for the product license agreement?**

A. **$34 million.**

Q. And then if I go to page three of the settlement agreement, I see a reference to another $6 million. What is that?

A. Well, there is currently an appeal process under which, and based upon the results of that appeal process, the Priceline Group may owe IBM another $6 million.

Q. All right. Let's go now to the license in PX-391. Who are the parties to that license?

A. IBM and Facebook.

Q. And we'll turn to Section 2.1.2 of IBM's license to Facebook. It says, "Subject to Sections 2.13 and 2.16, Facebook as Grantor on behalf of itself and its subsidiaries grants to IBM as grantee a nonexclusive and worldwide license under Grantor's licensed patents."

What is your understanding of that term in this license?

A. This would be the license back from Facebook to IBM giving IBM rights to use their patents.

Q. And so did IBM apply a cross license discount for Facebook?

A. Yes, we did.

Q. And did IBM apply a litigation discount for Facebook?

A. Yes.

Q. Was there litigation between IBM and Facebook?

A. No, there was not.

Q. **Moving to Section 4 of IBM's license with Facebook, what was the amount that Facebook paid IBM for this license in 2011?**

A. **$10 million.**

Q. **And we'll turn to PX-454. And who are the parties to this license?**

A. **This would be IBM and Facebook.**

Q. **And how does this license relate to the IBM/Facebook license that we just looked at?**

A. **The original Facebook license was a term license, and at the end of that it was renewed, so this is the renewal license for another five-year term.**

Q. **I'm showing you Section 4 of the renewal license. What was the amount that Facebook paid IBM for this renewal license in 2017?**

A. **$10 million.**

Q. **All right. Last one. If we go to PX-461. Who are the parties to that license?**

A. **This would be IBM and Google.**

Q. **I'll show you Section 2.1.2 of IBM's license with Google which says, "Subject to the terms and conditions contained in this agreement, Google as Grantor on behalf of itself and its subsidiaries, grants to IBM, as Grantee, a nonexclusive and worldwide license under Grantor's licensed patents."**

What is your understanding of that term in this license?
A. This is to grant to IBM from Google for the rights to use the Google patents that are relevant to IBM's business.
Q. And is Groupon a party to the license in PX-461?
A. No.
Q. So did IBM apply a cross license discount for Google in this agreement?
A. Certainly we did in our original offer.
Q. And did IBM apply a litigation discount for Google?
A. Yes, we did.
Q. Was there litigation between IBM and Google?
A. No, there was not.
Q. I'll turn to Section 4 of IBM's license with Google. And what was the amount that Google paid IBM for this license?
A. $35 million.
Q. All right. Now, Groupon's counsel told the jury in opening statements that Groupon is licensed to practice IBM's '346 patent because of the Facebook and Google licenses. So I want to look at a couple of the grant provisions in those licenses.

First I'll go to PX-454, which is IBM's license with Facebook. I'll show you Section 2.3, which reads, "Except as expressly provided herein, no license or immunity

is granted under this agreement by either party, either directly or by implication, estoppel or otherwise, to any third parties acquiring items from either party the combination of such acquired items with other items (including items acquired from either party hereto) or for the use of such combination."

What is your understanding of that term in this license?

A. Well, my understanding is that simply because you use Google doesn't give you the right to use any of the patents.

Q. So then I'll turn to PX-461 which is IBM's license with Google and I'll point to Section 2.3, which reads, "Except as expressly provided herein, no license or immunity is granted under this agreement by either party, either directly or by implication, estoppel or otherwise to any third parties acquiring items from either party for the combination of such acquired items with other items (including items acquired from either party hereto) or for the use of such combination."

What is your understanding of that term in this license?

A. What agreement is this, again?

Q. This is Google?

A. I misspoke earlier.

Q. So in PX-454, we saw Section 2.3 which we read, and

**what is your understanding of this section in that license?**

A. **This is the Facebook agreement?**

Q. **If we look at the cover of PX-454, who are the parties to that license?**

A. **IBM and Facebook.**

Q. **And then in Section 2.3, what is your understanding of that section?**

A. **Here, again, simply because you use Facebook does not give you the right to use IBM patents.**

Q. **So I'll switch back to PX-461 which is IBM's license with Google, and what is your understanding of Section 2.3 of that license?**

A. **Simply because you use Google does not give you the right to IBM patents, rights to use IBM patents.**

Q. **All right. Now go back to PDX-5 on slide two, I see you have a summary of the six licenses that we just walked through, and you have a column of green checks in the center column. What does that represent?**

A. **This would be the discount considerations that we made in all cases for certainly a license back as well as litigation avoidance to the extent possible.**

Q. **And those discounts for cross license and litigation avoidance were applied in each one of these six cases?**

A. **Yes.**

Q. **All right. Let's talk a little bit about the patents**

in this case and Groupon. First, how many patents for web technologies does IBM hold in its portfolio?

A. I couldn't give you an exact number, but it's probably in the thousands.

Q. And how would you characterize the four patents in this case with respect to that web technology portfolio?

A. Well, these four patents I would call similar patents. They are used widely within the web technology world. They're used widely outside of the web technology world in the building of websites, but websites that may not be revenue producing.

Q. Now, the jury has heard that Groupon first became aware of the '967 patent and the '849 patent in November 2011 and first became aware of the '601 patent in April 2012, and Groupon first became aware of the '346 patent in August 2014. How did IBM choose the patents in this case to approach Groupon with?

A. Well, first of all, we had evidence of infringement which we showed to Groupon.

MR. HADDEN: Objection, Your Honor.

THE COURT: What's the objection?

MR. HADDEN: We have a MIL on this.

MR. MATTY: Let me reask the question to make it clear.

THE COURT: Let's try it again.

BY MR. MATTY:

Q. Prior to Groupon finding out there was a patent in this case, what did IBM do to investigate Groupon's use of those patents?

A. Well, our patent engineers and patent attorneys would have investigated to determine if IBM patents were being used, we would have built the evidence of use, claim charts, and that process inside IBM is a multilevel review. First of all, the lead attorney. Secondly, the next level IP law attorney review, and a third level IP law attorney review, and to determine that to the best of our ability we believe that infringement is occurring.

Q. And when did IBM file this lawsuit?

A. We filed it in March of 2016.

Q. So I guess you're unable to conclude a license with Groupon; right?

A. Correct.

Q. Groupon's counsel said in its opening statement that IBM has a business in which IBM uses its huge stock of patents as a club to get money from other companies. Does IBM file a lot of patent lawsuits?

A. No. In the last twelve years there have been four. Amazon in 2007, which was settled prior to trial. Priceline in 2014, which was settled prior to trial. Groupon, as we know today. And then in 2018 we filed against Expedia for

the same set of patents. So four in the last twelve years. And this is the first ever that has -- first ever patent case that's gone to trial.

Q. And so why did IBM decide to file this lawsuit?

A. Well, we were hoping to achieve negotiated business resolution but were unable to.

MR. MATTY: Your Honor, I pass the witness.

THE COURT: Okay. Thank you.

Cross-examination.

MR. HADDEN: Does it make sense to take a break now?

THE COURT: Okay. Sure. We can take a break. That's fine.

Ladies and gentlemen, no talking about the case during the break. We'll get you back in a little bit.

(Jury left courtroom.)

THE COURT: We'll take a recess.

(Brief recess taken.)

* * *

(Proceedings reconvened after recess.)

THE COURT: We'll bring the jury in.

(Jury returned.)

THE COURT: All right. We are ready to proceed.

Mr. Hadden.

MR. HADDEN: Good morning. May I approach, Your

Honor? I have some documents.

THE COURT: You may approach.

(Binders passed forward.)

CROSS-EXAMINATION

BY MR. HADDEN:

Q. Now, when you are finishing the testimony, Mr. McBride, you put up, your counsel put up some numbers for some settlements and license agreements that IBM had entered with various parties. Do you recall that?

A. Yes.

Q. And those are companies like Amazon and Google and Facebook. Right?

A. Yes.

Q. Okay. And those license fees like the $35 million that Google paid, that was for a license for all of IBM's portfolio; right?

A. That is relevant to their business per the definition of their business in the contract.

Q. Right. So basically Google got the right to all 40,000 plus of IBM's patents to the extent Google needed any of those patents for its business; right?

A. Yes.

Q. Okay. And this case only involves four patents, right?

A. Right.

Q. **So however the jury decides this case, IBM could come back after Groupon for the rest of its 40,000 patents; right?**

A. **Yes.**

Q. **And on the numbers that you put up, one of them was for Amazon; right?**

A. **Yes.**

Q. **And IBM didn't give Amazon a litigation discount, did it?**

A. **Well, we were already in the litigation but as I said, the original offer would have included a litigation discount. My belief is that the settlement amount was less than the original offer.**

Q. **Okay. But the original offer that may have had litigation discount was not the number that the parties settled on, was it?**

A. **Well, the parties settled on the number that is in the agreement.**

Q. **Right. And that number was not the offer that IBM made with the litigation discount; right?**

A. **Most likely it was less.**

Q. **And, in fact, IBM sued Amazon twice; right?**

A. **Well, there were two sets of patents, yes. So two complaints.**

Q. **And IBM sued Amazon in the Eastern District of Texas**

twice; right?

A. Please ask that again.

Q. IBM sued Amazon in the Eastern District of Texas; right?

A. I assume there is a record of that. I don't know, myself.

Q. Okay. And IBM didn't assert the '601 patent against Amazon, did it?

A. I'm not familiar with the Amazon case.

Q. And Priceline didn't get a litigation discount because IBM sued Priceline?

A. We were in litigation with Priceline. However, the settlement amount was less than the original offer.

Q. Now, if I understood your VOE model, could you remind the jury what does VOE stand for?

A. It stand for Vendor Objective Evidence.

Q. Okay. If I understood what you said, you said that IBM will go to a company and demand .25 of that company's revenue even though IBM has not even a suspicion that the company is using IBM's patents; is that correct?

A. Actually it's less than .25 because the adjustments would have to be applied. Once adjustments are applied, it's less than .25.

Q. Okay. So IBM goes to companies that it has no suspicion it even uses their patents and demands .25 percent

of their revenue with some adjustments; is that right?

A. .25 percent with adjustments would constitute the original offer. As I also said, the original offer is one where we always ask for a counteroffer because we're interested in a negotiated business resolution.

Q. Okay. You referred to it as an offer but if someone comes to me and says "pay me," I would view that as a demand. You are not offering; right?

A. No, it's an offer.

Q. Now, IBM did not sell or offer for sale any products that are covered by the four patents in this suit, does it?

A. Ask that again.

Q. IBM does not sell any products that are covered by the patent that IBM is asserting in this case; correct?

A. Well, I'm not an engineer, but I believe that certainly one of the patents is used in IBM products.

Q. Okay. Could we -- you were deposed in the Priceline litigation, weren't you, Mr. McBride?

A. Yes, I was.

Q. If you look in your binder I gave you, the first tab should have your Priceline deposition. If you would look at page 28, lines 3 through 8.

"Question: To your knowledge, sir, does IBM sell or offer for sale any products that are covered by the four patents-in-suit?

"Answer: I do not believe so."

BY MR. HADDEN:

Q. And you were under oath in that deposition, weren't you, sir?

A. Right.

Q. And the four patents-in-suit in the Priceline case are the same four patents-in-suit in this case; correct?

A. Right. And at the time, I didn't know the answer but now I do.

Q. And as I think you testified earlier, part of IBM's patent business is focused on web technology companies; is that right?

A. Yes, we have done a number of licenses with web technology companies.

Q. You have a group that is going to, or at least an individual in charge of that group, Mr. Kalb, right?

A. John Kalb was responsible for the web technology group. I was helping out.

Q. And as part of your and Mr. Kalb's efforts in the Web Technology Group, IBM has approached every significant company in the web technology space asserting patents against them; right?

A. Well, we have certainly approached a number. I have no idea how many we haven't approached. There are a number of companies in the web technology space.

Q. **But you have approached every significant company in the web technology case asserting IBM's patents; correct?**

A. **Well, you would have to be more specific. I would have to know the company.**

Q. **Okay. You were deposed in this case as well, Mr. McBride, weren't you? In the Groupon case, you had your deposition taken?**

A. **Yes, I did.**

Q. **Okay. And if you look in your binder, the second tab, is your deposition in this case. If we could look at page 91, line 24 to page 92, line 7.**

**This is MT 52.**

**"Question: How many web companies has IBM approached with the Filepp patents?**

**"Answer: I couldn't give you an exact number, but you could assume that anybody in the web technology space who is significant has probably been approached by those patents, starting with Amazon in 27 -- twenty-oh-six -- twenty -- 2006, 2007."**

**BY MR. HADDEN:**

Q. **Now, IBM approached Groupon because Groupon was operating on the World Wide Web and was growing quickly. Is that true?**

A. **Yes, Groupon came to our attention in 2010 mainly because Google had made an offer to buy them.**

Q. So you thought Groupon was a valuable company, so you went after them with your patents?
A. Well, they simply came to our attention and so we investigated.
Q. And IBM has gone after all of the online travel companies, haven't they?
A. Yes, but, you know, the online travel industry has changed dramatically since 2011.
Q. That was a yes-or-no question, sir. So the answer is yes; right?
A. The answer is yes, we have investigated the online travel companies.
Q. Right. And you have accused Trip Advisor of infringing your patents; right?
A. Yes.
Q. And you have accused Expedia of infringing your patents. In fact, you sued Expedia; right?
A. Yes.
Q. And you accused Orbitz of infringing your patents?
A. Yes.
Q. And you have accused HomeAway?
A. Yes.
Q. And you have accused AirBNB?
A. Yes.
Q. You have also gone after social media companies;

**right?**

A. **Well, I wouldn't say gone after. I think we have approached them, yes.**

Q. **Well, you have accused them of infringement; right?**

A. **Well, can you be specific as to who?**

Q. **Yelp.**

A. **Yes, Yelp was put on notice for infringement.**

Q. **Okay. Twitter. You accused Twitter of infringement?**

A. **Yes.**

Q. **You accused Facebook of infringement?**

A. **Yeah, I believe they were on those also.**

Q. **You accused LinkedIn of infringement?**

A. **Yes.**

Q. **And you mentioned this with your counsel, but IBM prioritizes who it's going to go after based on how much revenue they have; right?**

A. **Well, revenue is an important consideration, yes.**

Q. **Okay. And you talked about assignments. An assignment is when you sell a patent; right?**

A. **That is correct.**

Q. **And IBM sells patents, as you talked about; correct?**

A. **Yes, we do sell patents.**

Q. **And IBM sells patents to what are called NPEs, right?**

A. **We have sold patents to nonpracticing entities, yes.**

Q. **Okay. And an NPE is a company that gets patents but**

**doesn't sell products or services?**

**MR. MATTY: Objection, relevance.**

**THE COURT: Sorry?**

**MR. MATTY: Objection, relevance.**

**THE COURT: Do you want to respond?**

**MR. HADDEN: Sure. It's important to understand the licensing business and how they deal with NPEs.**

**THE COURT: The objection is overruled. Go ahead.**

**MR. HADDEN: Thank you.**

**BY MR. HADDEN:**

Q. **Is that correct, Mr. McBride?**

A. **Could you repeat the question, please?**

Q. **Sure. An NPE is a company that gets patents but doesn't make products or services; right?**

A. **Yes, and they do not practice the patents that they own.**

Q. **Right. So they get the patents and then they use them primarily to sue people or threaten people with lawsuits; right?**

A. **One of the characteristics of a -- well, first of all, there are various kinds of NPEs, nonpracticing entities. I mean some universities are nonpracticing entities. RPX, ASD are nonpracticing entities, own patents, that are not litigious.**

There are a class of NPEs that are litigious. And IBM has sold patents to a few of those companies.

Q. Right. And those litigious NPEs, you refer to those as patent trolls; right?

A. That's the term that is typically applied, yes.

Q. And that is a term you use; right?

A. We use that term, yes.

Q. Right. And you, IBM, would sell patents to patent trolls?

A. We have sold to a few. Now, there are a lot of them out there. We are somewhat selective in who we sell to.

Q. So you pick the good trolls?

A. Say again?

Q. You pick the good trolls to sell your patents to?

A. Well, we, like I said, we're selective in who we sell patents to.

Q. And when IBM sells patents to patent trolls, IBM includes a provision in the agreement that protects IBM; right? It prevents the patent troll from coming back and suing IBM?

A. Well, that is one of the benefits to selling patents to an NPE is that we achieve some level of protection from being sued ourselves.

Q. Right.

A. And in the industry, there are really very few

**protections you have against patent trolls and so if a patent troll wants to buy a patent from us, then we insist on a covenant not to sue IBM. And we also try to achieve protections for our strategic partners and customers in doing so.**

Q. **Right. But for the rest of the world -- right? -- when you sell to the patent troll, you include protection for yourself because you know the patent troll is going to go sue and threaten other companies, those companies don't get any protection in that sale, do they?**

A. **Well, they have to protect themselves.**

Q. **Okay. Let me ask you, sir, to look in that binder I gave you to DX-27.**

**Did you find that, sir?**

A. **I did.**

Q. **Okay. Do you recognize this document, Mr. McBride?**

A. **It looks like the Project Management presentation to Netflix.**

**MR. HADDEN: I move DX-27 into evidence, Your Honor.**

**MR. MATTY: No objection.**

**THE COURT: It's admitted.**

**(DX-227 was admitted into evidence.)**

**BY MR. HADDEN:**

Q. **So DX-27, as you said, is a presentation that IBM put**

together for Netflix; is that correct?

A. That's correct.

Q. And the purpose of this presentation was to try to entice Netflix to buy some patents there IBM; is that correct?

A. Well, not exactly. What we were doing is conducting a private auction in 2013. We called it Project Maui. We sent this management presentation to Netflix as well as roughly 20 to 25 other companies that we thought might be interested in buying the patents in the portfolio. There were roughly 160 patents in the portfolio.

Q. And the patents in that portfolio that you offered to Netflix and the other companies included the two Prodigy patents that are in this case?

A. Yes, the '849 and '967.

Q. And in this presentation that you put together for Netflix, did you put together similar presentations for the other companies you were trying to get involved in the auction?

A. We did, yes.

Q. Okay. And if we look at the page that has the number in the bottom, 2393. Put that up, Brian.

So this is -- one page earlier. Sorry.

So this is kind of a description of one of the Prodigy patents that you included in this presentation,

**isn't it, Mr. McBride?**

A. **Yes.**

Q. **Okay. And then if we go to 2393, if we look at the URL that's under the image on the left, that's the website for CBS; right?**

A. **Yes.**

Q. **And so above that you have a screen shot from the CBS website with some arrows and indications on it; right?**

A. **Yes.**

Q. **So the purpose of this was to try to demonstrate to Netflix that CBS was infringing this patent; right?**

A. **Well, not so much infringing as well as they are -- they were implicated by the patent because there was no real evidence or proof presented that they were infringing.**

Q. **You say implicated by the patent. Isn't the purpose of this diagram that we see up here with the arrows to try to map CBS's website to the patent?**

A. **I'm not sure I understand your question.**

Q. **Sure. Isn't the purpose of what we see on the screen an attempt to map CBS's website to claim, which is shown on the prior page, the representative claim of the patent?**

A. **Yes. This is a common approach where essentially the buyer is always interested in who may be using the patent.**

Q. **So -- I'm sorry, I didn't mean to cut you off?**

A. **Yes. And so, therefore, you want to show them**

something that would give an indication of use.

Q. So did IBM's patent engineers prepare these demonstrations of use that were used in this presentation?

A. Yes.

Q. And they did it for I assume the other twenty-five or so companies that were involved in the auction?

A. The same presentation would have been made to those others, yes.

Q. So if we look forward in this presentation to page 2395, there is another one of these demonstrations by your patent engineers. This one is accusing, if we go to the bottom, ABC. Do you see that?

A. Yes.

Q. So IBM was telling Netflix that ABC infringed this patent; is that right?

A. We were telling them that there was some indication that ABC might be using this patent.

Q. And if we go forward to 2397, look at the URL, this is accusing a company called Aereo.com, do you see that?

A. Yes, I do.

Q. That was prepared by IBM's patent engineers as well?

A. It was.

Q. Let's go to 239. Blow up the bottom there. And this is another one where IBM is accusing Cox of infringing this patent; right?

A. Like I said, this is simply an indication that Cox may be using the patent.

Q. And similarly if we go to 2401, we blow up the bottom there, here you're accusing Hulu of using the patent; right?

A. Here again, this is showing that Hulu may be using the patent, it's not an assertion of infringement.

Q. If we go forward in this same document, do you a similar set of infringement proofs for the '849 patent? If you look at 2409, do you see that?

A. Yes.

Q. So here you have a representative claim, claim 1 of the '849 patent; right?

A. Yes.

Q. If we go to 2411, blow up the URL. Here you're mapping the representative claim to Fox; right?

A. Here we're indicating that Fox may be using the patent.

Q. And if we go to -- let's go to 2413, Brian.

Here you're accusing NBC of using the patent; right?

A. Here we're giving an indication that NBC may be using the patent.

Q. In all these cases you're just pointing to these companies' websites; right?

A. Yes.

Q. So the common factor of all these companies you're accusing is that they are on the worldwide web with these websites; right?

A. Well, these are web patents.

Q. Let's look at 2414. Here you're accusing TIVO of using the patent; right?

A. Here we're saying that TIVO may be implicated by the patent.

Q. Let's go to 2415. Blow that up. Here you're accusing Direct TV of using the patent; right?

A. There are indications that Direct TV may be using the patent.

Q. And if we go to 2416. Here you're accusing Verizon of using the patent; right?

A. There are indications that Verizon may be using the patent.

Q. And finally if we go to 2417, blow that up. Here you're accusing Cox, Cox Cable Company?

A. Yes, there were indications that Cox may be using the patent.

Q. Now, you have a personal quota of money you have to bring in to IBM or you're expected to bring in to IBM for its patents every year, aren't you?

A. I wouldn't call it a quota, I would call it an objective. My objective is cross licensing and patent

 **assignment transactions equivalent to 2.5 million a quarter.**

Q. **So that's $10 million a year?**

A. **Ten million a year.**

Q. **Let me ask you to look in your binder to PX-391. This is the Facebook agreement that you discussed with IBM's counsel. I'll give you a minute to get there. Sorry. Do you have the agreement?**

A. **I have it, yes.**

Q. **Again, this was an agreement whereby Facebook would get rights to all 40,000 plus of IBM's patents to use any of which that were relevant to its business?**

A. **That's correct.**

Q. **And for that, for a five-year term, Facebook paid $10 million?**

A. **Yes.**

Q. **If you look on the first page of that agreement, which is 373, there is a definition of Facebook licensed products. Do you see that?**

A. **I do.**

Q. **And it starts out and it says -- blow up just the first chunk of that, Brian.**

**It says, "Licensed products shall mean any software IH product that facilitates or otherwise permits the transfer or publishing of data, information or content across a communications network (wired or wireless) or**

computer network."

Do you see that?

A. Yes.

Q. That's a pretty broad definition, isn't it?

A. Yes, it's broad.

Q. And it goes on, and it talks about, "Allows analysis of data, information, or content, facilitates the manipulation of such data, information or content," then it goes on and says, "including but not limited to social networking products that allow the sharing and exchange data, information, and content via websites, applications," et cetera, do you see that?

A. I do.

Q. So this license grant through Facebook includes software that Facebook uses to share information with other websites; right? Is that correct?

A. Could you ask the question again?

Q. Sure.

The license grant, the grant that IBM gave to Facebook covered software that shared information, Facebook software that shared information with other websites; right? IBM explicitly authorized Facebook to share information with other websites using products that are licensed by IBM; right?

A. Yes, that's what it says.

Q. If we look at the last sentence in that paragraph, if we look at the very bottom, it says, "A given product may include or otherwise consist of an application program interface (API) to a Facebook licensed product or runtime component (or similar Facebook created software component)."

Do you see that?

A. I do.

Q. So IBM in its license to Facebook licensed Facebook to provide APIs; right?

A. Yes.

Q. And then it goes on and said, "And shall not cease to be a Facebook licensed product merely because it is utilized by a third party or otherwise accessed by a third party."

Do you see that?

A. I do.

Q. So IBM is saying Facebook can provide APIs to third parties and the use of those third parties does not render that not licensed. Isn't that what it says?

A. I can't comment on the not licensed part.

Q. It says that the license includes --

A. Yes.

Q. And shall not cease to be a Facebook licensed product merely because it is utilized by a third party; right?

A. Yes.

Q. So it says third parties can use the APIs that IBM

has licensed Facebook to provide, and they continue to be licensed when they're used by those third parties; right?

A. That's what it says.

Q. And Facebook provides an API to Groupon that Groupon uses to perform single-sign-on with Facebook; right?

A. I don't know how Groupon uses single-sign-on.

Q. So you don't know sitting here today, or at least you have no opinion that Groupon's use of Facebook single-sign-on is licensed or not licensed under this agreement; right?

A. I don't think I'm qualified to make that determination.

Q. So as far as you know, Groupon's use of Facebook's APIs to perform single-sign-on is a licensed activity by IBM; right?

A. I cannot make that determination.

Q. The same thing with Google, you don't have an opinion because Groupon uses Google's APIs to perform single-sign-on that somehow that is not licensed?

A. I'm not qualified to have an opinion.

Q. Now, you pointed in your testimony with IBM's counsel to provision 2.3. If we could see that, Brian, it's on page five.

A. The Facebook agreement.

Q. And if we highlight the first part of that, it says,

"Except as expressly provided herein."

Do you see that?

A. I do.

Q. What that means is that IBM is not granting additional licenses except if there is something else in this agreement that indicates they are. That's what except as expressly provided herein means; right?

A. I would think so, yes.

Q. So if other portions of this agreement, like the license to provide APIs, allows Groupon to use Facebook APIs in a licensed manner, nothing in 2.3 could be to the contrary because 2.3 expressly excludes the other provisions; right?

A. Here again, I don't think I'm qualified to render an opinion.

Q. Let's look at the Google license, which is PX-454. No, it's not. It's PX-461.

And before I get to that just so we're all clear, you don't dispute that the Facebook license includes a license to the '346 patent as being asserted here, do you? The portfolio license to Facebook includes that patent; right?

A. Yes, I would agree with that.

Q. And that's true of the Google license, too, the portfolio license to Google includes the '346 patent?

A. **Certainly.**

Q. **And again, the Google license that Google paid $35 million for, that is a license to all of IBM's 40,000 plus patents; right?**

A. **That are relevant to Google.**

Q. **So Google can use any of IBM's 40,000 patents in its business if they need them; right?**

A. **Yes.**

Q. **So let's look at page six of this agreement. And there is the same Section 2.3 that you talked about with IBM's counsel. Can we blow up the first part.**

**Again, that begins with the same language, "Except as expressly provided herein," so there are provisions in here that grant Google the rights to provide its APIs to Groupon, they are not trumped by this provision 2.3; correct?**

A. **As I said earlier, I'm not sure I'm qualified to render an opinion, but as I read the agreement, simply because you use Google doesn't give you the right to use IBM patents.**

Q. **But you're not standing here today and saying that Groupon does not have the right to use Google API for single-sign-on under this patent, are you?**

A. **They have the right to use APIs because they're probably available from Google to anybody who wants to use**

them. That doesn't mean that Google has the right to use IBM's patents.

Q. Let's be clear. IBM licensed Google this patent. If Google API is covered as a licensed product and the license provides the right for Google to provide that API to third parties, you can't sue the third party using that API, can you, Mr. McBride?

A. Certainly not.

Q. Okay. Let me ask you to look at DX-596 in your binder.

MR. MATTY: Objection, Your Honor. The same MIL that was discussed before.

MR. HADDEN: Can we have a side-bar, Your Honor?

(Side-bar discussion:)

THE COURT: All right. I don't know, is there an objection?

MR. MATTY: So I think --

THE COURT: You have to speak up.

MR. HADDEN: Can I say what the issue is because I don't want to cause an issue. We have a MIL about pre-suit communications. These exhibits I want to show him are the NDA between IBM and Groupon. I'm not going to talk about what they disclosed in the NDA, but the terms of the agreement are relevant because they explicitly say that IBM will not seek willfulness or claim willfulness and even will

not seek damages for some period. They're claiming wilfulness and seeking damages for those periods.

MR. MATTY: So I have the briefing from the MIL, and the basis of the objection is the whole reason that Groupon filed the MIL and argued for it is that the agreements were in place, they argued that because the agreements were in place nothing from the pre-suit period is relevant. And that there are provisions in here citing from their briefing arguing based on the confidential disclosure agreements that all the communications and the back and forth between the parties are subject to 408 as are the agreements themselves and that's because Groupon has stipulated to the dates of awareness which are read into the record that none of this is relevant.

THE COURT: But do you actually have an agreement with Groupon that you will not sue them for willful infringement?

MR. HADDEN: Yes.

THE COURT: Hold on.

MR. MATTY: That's certainly their interpretation that they're advancing right now.

THE COURT: Is that something I was made aware of at some point?

MR. MATTY: There was no summary judgment or it's not been raised before.

MR. OUSSAYEF: In the MIL briefing, Your Honor, you were made aware of that fact. The issue was that in between that period and the language in the NDA said that we'll not sue based on conduct arising from the period under the agreement, not that we wouldn't assert willful infringement period, and that was all raised in the MIL.

THE COURT: Was it their MIL, it was Groupon's, and I granted it?

MR. OUSSAYEF: Yes, that's correct. So now -- so now seeking to introduce just the portions of the communication between the parties that are Groupon's without allowing us to provide full back and forth between the parties would be unfairly prejudicial. It was a sword and shield situation, they invoked the shield and now they're trying to invoke the sword.

MR. HADDEN: All I want to show is the agreements to say that what they said -- Mr. Desmarais put up this timeline saying we were reckless children continuing to operate. The agreement explicitly saying we're not asking to stop operating and we will not claim wilful infringement for the experience, we are not taking about what communications were made.

THE COURT: Didn't you ask me to keep out all of these communication?

MR. HADDEN: I wanted to keep out the

communications that are subject to the NDA, the agreement itself. We are not going to seek damages or willfulness.

THE COURT: Does somebody have my order to the MIL?

MR. MATTY: We do have the order that we can grab.

THE COURT: Why don't you grab that and let me see it.

MS. SHAMILOV: I have the order, Your Honor.

THE COURT: Thank you.

MS. SHAMILOV: What you grant --

THE COURT: I'm looking at the paragraph three.

MS. SHAMILOV: Correct, with respect to MIL number one.

THE COURT: Thank you.

All right. Well, this has helped refresh my recollection. Certainly you all did tell me about the NDA and your various positions on it. It seems to me that you persuaded me to keep all of this out, and it seems selective to me, but help me understand why it wouldn't be?

MR. HADDEN: All I want is the agreement. If they're going to argue willfulness and we were willfully continuing --

THE COURT: It's been clear that they are going to argue willfulness, notwithstanding what you --

MR. HADDEN: I should be able to get the contract in as evidence that we were not willful.

THE COURT: You asked me to keep all of that out.

MR. HADDEN: What we wanted out were the communications subject to the agreement where they say --

THE COURT: But they have their competing interpretation of the agreement.

MR. HADDEN: The agreement will come in. They can compete with the interpretation of the agreement.

THE COURT: They're going to want to put in the communication about the agreement.

MS. SHAMILOV: About the amount of the negotiation of the agreement, there is no communication about that, their only communication are actual settlement.

MR. HADDEN: The agreements are what the agreements are. There are no dispute about that, they're just signed NDAs, standard NDAs.

MR. OUSSAYEF: Your Honor, this is exactly the problem, they would like to open the door to the entire MIL to give full context to the agreement we have, to go into how the agreement was entered and the full communication between the parties.

THE COURT: Why wouldn't it be adequate for you to argue about the language of the NDA without going into

**the language of the communication?**

**MR. OUSSAYEF: Because if they wanted to make a summary judgment argument, they could have done that. This is telling the jury to try to interpret an agreement without the context back and forth between the parties. It makes no sense to do that.**

**MR. HADDEN: They opened the door in their opening by saying we were willful because we knew about these patents here and continued to operate. Not saying that without having the context that there were NDAs that said Groupon, we don't expect you to stop what you're doing, we will not charge you willfulness, please proceed with your business, how can the jury only get that side of it?**

**THE COURT: I'm with IBM on this. I think this comes within the scope of my ruling. There couldn't have been any surprise to you that they were going to say in opening that you're a willful infringer. I'm afraid at this point if I were to allow the jury to hear your disputes about the legal interpretation of this NDA provision, in fairness I would have to let both sides get in their understanding of the content. And Groupon specifically asked to keep all of that out pretrial and I did so.**

**Anything else?**

**MR. HADDEN: No.**

**THE COURT: Anything else?**

MR. MATTY: No.

(Sidebar conference ends.)

THE COURT: Thank you for your patience, ladies and gentlemen. We'll continue when you are ready, Mr. Hadden.

MR. HADDEN: I have no further questions.

THE COURT: Any redirect?

MR. MATTY: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MATTY:

Q. Now, Mr. McBride, you were asked a number of questions about IBM's license with Facebook. Do you remember that?

A. I do.

Q. And counsel pointed you to Section 2.3. Section 2.3 of that agreement regarding combinations which we discuss the earlier. Do you remember that?

A. I do.

Q. Counsel pointed out that Section 2.3 notes, that it's limited to an exception: Except as expressly provided here in. Do you see that?

A. I do.

Q. And I want to show you Section 2.1.1 of that license. I'm going to read it:

Subject to Section 2.14, IBM, as grantor, on

**behalf of it and its subsidiaries grants to Facebook, as grantee, a nonexclusive and worldwide license under grantor's licensed patent?**

**Do you see that?**

A. **I do.**

Q. **What is your understanding of that section?**

A. **This is where IBM grants to Facebook a license to use IBM's patents.**

Q. **And does that grant expressly grant any rights to anyone other than Facebook?**

A. **No.**

Q. **You were asked a similar series of questions about the Google license. Do you remember that?**

A. **I do.**

Q. **I want to show you Section 2.1.1 of the Google license. This is PX-461. And I'll read that section:**

**IBM, as grantor, on behalf of itself and its subsidiary receipts grants to Google, as grantee, a nonexclusive and worldwide license under grantor's licensed patents.**

**Do you see that?**

A. **Yes.**

Q. **What is your understanding of that term?**

A. **Well, this is where IBM is granting to Google the right to use IBM patents.**

Q. **And does that section expressly grant any rights to anyone other than Google?**

A. **No.**

Q. **All right. Now, I want to talk for one second about Project Maui. You were asked some questions about a presentation from Project Maui. Do you remember that?**

A. **Yes.**

Q. **And counsel from Groupon mentioned that the '967 and '849 patents were part of that project. Do you remember that?**

A. **Yes.**

Q. **And he showed you a number of slides that had websites on them and asked if IBM was simply asserting that use of websites meets those patents. Do you remember that?**

A. **Yes.**

Q. **All right. I want to go through some slide from this presentation that he didn't show you. If you look at the page ending in 394 -- I'm sorry -- 393. First, we see one of the pages he did show you which had some pictures of a website from CBS. Do you remember that?**

A. **Yes.**

Q. **If we flip over and go to the very next slide, we see some more images here. And these images talk about things like: cached files being deleted, cached files being no longer available, and refreshing the application replaces**

**the files. Do you see that?**

A. **Yes, I do.**

Q. **So in IBM's presentation, did they just show websites as evidence of potential use of this patent?**

A. **No, we show some of the internal workings.**

Q. **I'll show you another slide. This is the page ending 3955. And this is a website from ABC. Do you see that?**

A. **Yes.**

Q. **And Groupon's counsel asked you about ABC's website in this presentation to the '967 patent. Do you remember that?**

A. **I do.**

Q. **And, again, if we go to the next slide ending in 396, you see reference to cached files again, cached files, and refreshing the application replaces the files.**

**Do you see that?**

A. **Yes, I do.**

Q. **Did IBM's presentation only includes pictures of websites to show potential use by ABC?**

A. **No, it showed the internal workings which seems to indicate that they're using the patent.**

Q. **And then for the '849 patent, you were also asked about DirecTV. Do you remember that?**

A. **Yes.**

Q. **I'll show you here a slide ending in 415 that**

**references the '849 patent and DirecTV; right?**

A. **Yes.**

Q. **And on the right, we have a web page and on the left we have it looks like a list with some files. Do you see that?**

A. **I do.**

Q. **Was IBM showing only a web page to show this patent might be used?**

A. **Well, we're also showing what is underneath the web page, the internal workings.**

Q. **And we'll go to one more. You were asked questions about Cox. Do you remember that?**

A. **Yes.**

Q. **All right. And the slide deck that Groupon's counsel didn't show you ending in 419 at the bottom, you see the Cox website; right?**

A. **Yes.**

Q. **But on the left, you see again a list of files in a window. Do you see that?**

A. **Yes, I do.**

Q. **Did IBM show only just the Cox website as evidence of potential use of the '849 patent?**

A. **No, we showed the internal workings of the website also.**

**MR. MATTY: No further questions, Your Honor.**

THE COURT: Okay. Thank you, Mr. McBride. You may step down.

MR. MATTY: And, Your Honor, I just want to confirm may Mr. McBride be excused?

THE COURT: Any objection?

MR. HADDEN: No, Your Honor.

THE COURT: Yes, you may be excused. Thank you again.

(Witness excused.)

MR. MATTY: Thank you, Your Honor.

THE COURT: Mr. Matty, if you wouldn't mind grabbing the binders here, that would be helpful.

MR. MATTY: Yes, Your Honor.

THE COURT: Does IBM have anything further?

MR. DESMARAIS: Yes, Your Honor. Before we do that, we'll read a little more discovery, if that is okay.

THE COURT: That's fine.

MR. OUSSAYEF: Ladies and gentlemen of the jury, at this time, IBM will read some statements that the parties have agreed are undisputed facts from the process of preparing for trial.

From the Proposed Final Pretrial Order.

Uncontested Facts.

IBM is a New York corporation, with its principal place of business at 1 New Orchard Road, Armonk,

**New York, 10504.**

**Groupon is a Delaware corporation with a principle place of business at 600 West Chicago Avenue, Suite 400, Chicago, Illinois 60654.**

**United States Patent Number 5,769,967 ("the '967 patent") entitled "Method For Presenting Applications in an Interactive Service," was issued August 18th, 1998 to named inventors Robert Filepp, Kennett H. Appleman, Alan M. Wolf, James A. Galambos, and Sam Meo.**

**The effective filing date of the '967 patent is July 15th, 1988.**

**IBM is the owner of all substantial rights, title, and interest in and to the '967 patent.**

**United States Patent Number 7,072,849 ("the '849 patent") entitled Method For Presenting Advertising in an Interactive Service, was issued July 4th, 2006 to named inventors Robert Filepp, Alexander W. Bidwell Francis C. Young, Alan M. Wolf, Duane Tiemann, Mel Bellar, Robert D. Cohen, James A. Galambos, Kenneth H. Appleman, and Sam Meo.**

**IBM is the owner of all substantial rights, title, and interest in and to the '849 patent.**

**The effective filing date of the '849 patent is July 15th, 1988.**

**United States Patent Number 5,961,601 ("the '601 patent") entitled Preserving State Information in a**

**Continuing Conversation Between a Client and Server Network Via a Stateless Protocol, was issued October 5th, 1999, to named inventor Arun K. Iyengar.**

**IBM is the owner of all substantial rights, title, and interest in and to the '601 patent.**

**The effective filing date of the '601 patent is June 7th, 1996.**

**United States Patent Number 7,631,346 ("the '346 patent") entitled "Method and System For a Runtime User Account Creation Operation Within a Single-Sign-on Process, in a Federated Computer Environment," was issued December 8th, 2009, to named inventors Heather Maria Hinton, Ivan Matthew Millman, Venkat Raghavan, and Shane Bradley Weeden.**

**IBM is the owner of all substantial rights, title, and interest in and to the '346 patent.**

**The effective filing date of the '346 patent is April 1st, 2005.**

**IBM filed this lawsuit on March 2nd, 2016.**

**IBM accuses Groupon's website of infringing the patents-in-suit. IBM also accuses Groupon's Android and iOS mobile applications of infringing the '849, '601, and '346 patents.**

**Groupon's website is available at www.groupon.com.**

**Groupon's mobile applications are available for**

download to Android and iOS phones.

Groupon does not have any policies for licensing patents, but evaluates requests to license patents on a case-by-case basis.

HTML stand for Hypertext Markup Language.

HTTP stand for Hypertext Transfer Protocol.

That concludes the reading of the undisputed facts.

And, Your Honor, I offer PX-1564 into evidence.

MR. HADDEN: No objection.

THE COURT: It's admitted.

(PX-1564 was admitted into evidence.)

MR. OUSSAYEF: Thank you, Your Honor.

THE COURT: Thank you.

MR. DESMARAIS: Thank you, Your Honor. Our next witness will be Professor Hausman who is an economist. And he will testify and give opinions on the damages issues which relates to IBM's Bedrock Fact No. 3. And my colleague Laurie Stempler will do the examination.

THE COURT: Thank you.

... DR. JERRY HAUSMAN, having been first duly sworn, was examined and testified as follows ...

THE COURT: Good morning, Dr. Hausman.

THE WITNESS: Good morning.

THE COURT: You may proceed when ready.

MS. STEMPLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. STEMPLER:

Q. Good morning, Mr. Hausman.

A. Good morning.

Q. Could you please tell the jury what you do for a living?

A. I'm a McDonald Professor of Economics at the Massachusetts Institute of Technology, usually called MIT, in Cambridge, Massachusetts.

Q. What is MIT?

A. MIT is one of the leading research universities, well, in the world, certainly in the United States.

Q. Why you are here to testify, Mr. Hausman?

A. I've been asked to determine what a reasonable royalty would be for Groupon's use of IBM's four patents.

Q. We'll discuss that in detail but first let's learn a little bit more about you. Where do you live?

A. Boston, Massachusetts.

Q. And do you spend all of your time in Boston?

A. No, I spend half a year at UCL and live in Los Angeles because I have a granddaughter there.

Q. Where were you from originally, sir?

A. Sorry?

Q. Where are you from originally?

A. Oh, West Virginia.

Q. I have a binder of slides of exhibits for us to look at today. Your Honor, may I approach?

THE COURT: You may approach.

(Binders passed forward.)

BY MS. STEMPLER:

Q. Professor Hausman, you have in front of you a couple binders. That I'd like to start with the one marked Volume 1, and behind the first tab are plaintiff's demonstratives marked PDX-6. Do you see those?

A. Yes.

Q. And will that aid your testimony?

A. Yes.

Q. Okay. So let's take a look at those slides.

If you look at slide 2, Professor Hausman, what is this showing here?

A. As I said, I was brought up and went to high school in West Virginia. And this is my education. I went to Brown in Rhode Island. And then I won a Marshall Scholarship and went to Oxford where I did a D. Phil which is the English equivalent of the American Ph.D.

Q. What did you study at Brown?

A. Economic History.

Q. And then what is your Ph.D. in from Oxford?

A. Economics.

Q. **You said that you got a Marshall Scholarship. What is that?**

A. **This is a competition in which they award about 25 scholarships nationwide to pay for graduate school in England.**

Q. **And how did you get that?**

A. **Oh, I entered the competition and won.**

Q. **What did you do after you got your Ph.D.?**

A. **Well, I went to MIT, which is on the right-hand side. And as you can see, I have been there since 1972. So 46 years.**

Q. **And what do you do an MIT?**

A. **Well, I stopped teaching about a year and-a-half ago, but I do Ph.D. and undergraduate supervision for courses and for research and Ph.Ds, and then I continue to do my own research.**

Q. **Do you do any work besides your work at MIT?**

A. **Yes, I also do consulting work.**

Q. **What is the nature of the consulting work that you do?**

A. **Well, the ones mentioned here are, I've been involved in patent licensing since the late 1980s for many, many companies.**

**I also have been involved in patent portfolio valuation. Sometimes companies want to sell or buy a patent**

**portfolios.**

**And, lastly, I've been involved in litigation.**

Q. **About how many times have you consulted for corporations regarding licensing?**

A. **Oh, I would say maybe 50 times altogether.**

Q. **And then you also mentioned you do some litigation consulting work. Is that where you provided expert testimony?**

A. **Yes.**

Q. **And are those in patent cases?**

A. **Part in patent cases but also in other types of cases also.**

Q. **For how many patent cases have you served as an expert in terms of patent cases?**

A. **In terms of patent cases, probably 25 times, let's say.**

Q. **In those instances, were you serving as an expert on patent damages?**

A. **Yes, I worked for both plaintiffs and defendants.**

Q. **Let's take a look at the next slide.**

**Throughout the course, have you received any awards?**

A. **Yes. So the first one is the John Bates Clark award which is given for the best economist under the age of 40, at which point I always say I wish I was still under 40 but**

that has come and gone.

I won the award for the International Econometric Society for the best paper.

The American Economic Association is an association of all U.S. and pretty much worldwide economists. I was a distinguished fellow.

And I have honorary degrees from places like the universities in China and Thailand.

Q. Let's go to the next slide.

Have you publish your work, Mr. Hausman?

A. Yes, I published probably 200 publications, including 150 research papers.

Publications on patent damages and patent licensing.

And I've been an editor, associate editor of leading economic journals.

Q. Have you authored any books?

A. Yes, there are five books listed here. I published those books. I was an editor and author of each journal.

MS. STEMPLER: Your Honor, I offer Professor Hausman as expert on patent damages.

MS. SHAMILOV: No objection.

THE COURT: He is so recognized.

BY MS. STEMPLER:

Q. So let's talk about your assignment in this case.

**What were you asked to do?**

A. **I was asked to determine how much Groupon would pay IBM to compensation IBM for infringement of the patents-in-suit.**

Q. **What did you conclude?**

A. **I concluded that Groupon would pay IBM no less than a reasonable royalty, which in this case is $166 million, for the damages period through trial.**

Q. **How many years does your reasonable royalty cover?**

A. **It's about eight years or about eight and-a-half now, I guess.**

Q. **So I'd like to talk about how you reached that number.**

A. **Sure.**

Q. **So you mentioned the phrase "reasonable royalty." What does that mean?**

A. **Well, a reasonable royalty is the amount that has been determined as I understand it by courts, which is to say that if a patent is valid and infringed, the company is using it would pay no less than a reasonable royalty. Of course, we're going to talk about how I get there.**

Q. **Okay. Great. Before we get into that, let's take a look at the next slide.**

**Can you please tell us about some of the materials that you reviewed in preparing for this?**

A. Yes. I looked at a lot of documents, both IBM and Groupon.

I looked at deposition transcripts of IBM and Groupon employees, like Mr. McBride who just testified.

I had conversations with IBM's technical expert. That's Professor Schmidt who is in the courtroom today and testified I guess yesterday.

I had conversations with IBM's licensing executive. That's Mr. McBride.

I read expert reports and then I also utilized a survey by Professor Stewart.

Q. So let's start with the documents. What kind of documents did you review in this case?

A. I looked at all the licenses involved in the case.

I looked at financial data for Groupon.

I looked at documents showing the value of the patented features.

Public information showing benefit.

Q. You also said that you reviewed deposition transcripts. Whose deposition transcripts did you view?

A. I looked at IBM licensing business and success of licensing the patents.

And then Groupon, I looked at the depositions of a number of people in Groupon's management such as financial management and people in charge of operating the business.

Q. **The next bullet point is the conversations with IBM's technical expert. What did you talk to Dr. Schmidt about?**

A. **Well, Professor Schmidt and I talked about the benefits of the patented technologies. You know, he is an engineer. At this point, I always say I teach at MIT but I'm not an engineer: So I depend on people like Professor Schmidt.**

**We also talked about Groupon's use of the patented technologies.**

**And last point is it's his view there were no noninfringing alternatives.**

Q. **And just generally, what are noninfringing alternatives?**

A. **Noninfringing alternatives mean there is another way to accomplish what the patents allow you to accomplish without using the patents so you wouldn't infringe them.**

Q. **Okay. We'll talk more about that a little bit later.**

**Going to the next slide. Slide 10.**

**You also said you spoke to Mr. McBride who just testified. What did you talk to him about?**

A. **He talked about some of this in his testimony this morning, but IBM's licensing practices.**

**How they measure the term of patent licenses.**

**How they value patent portfolios of people and their licenses, and also the licenses of people they license**

**with.**

**And discounts IBM gives to its licensees.**

Q. **I'm moving to the next slide.**

**You also mentioned you looked at some expert reports. Which reports did you review in this case.**

A. **I looked at Professor Schmidt's, and then I looked at Mr. Malackowski, who is going to be the damages witness for Groupon.**

Q. **And then you mentioned that you also reviewed a survey. What survey did you review?**

A. **Yes. This is a survey from Professor Stewart, and it looks at how people use the World Wide Web.**

Q. **So between reviewing those materials and having those conversations and reading the deposition transcripts and preparing your opinions, how much time have you spent?**

A. **Well over 100 hours. I don't know exactly but I'm sure it's over 100 hours.**

Q. **Are you being compensated for your work and analysis here?**

A. **Yes.**

Q. **What is your hourly rate?**

A. **$1,400 per hour.**

Q. **Is that the rate you charged all your clients?**

A. **Yes.**

Q. **Okay. Let's take a closer look at all your opinions.**

So the title of this slide is: License Agreement Arising From the Hypothetical Negotiation. What is a hypothetical negotiation?

A. Well, again, the courts have determined that this reasonable royalty I'm going to talk about will arise from a hypothetical negotiation between IBM who owns the patents and Groupon who uses the patents.

Q. Why do you use that to analyze patent damages?

A. Well, that is how the courts have set up the framework to do it over time.

Q. So looking at slide 12, can you please walk the jury through the terms that are on this slide?

A. Yes. So IBM owns the patents and Groupon uses the patents. So one thing you want to do is look at the scope, and the scope is a nonexclusive license to the four patents-in-suit.

All that means is, as you just heard, IBM has licensed to Amazon, Google, Twitter, and so on, so it's going to be a nonexclusive license, which means that Groupon gets to use them but not exclusively, so do a lot of other companies, and then for the duration, for the length of the patents. And two of the patents have already expired but the '346 patent won't expire until 2028.

Q. Turning to slide 15. What are we showing here?

A. Well, this is hypothetical negotiation which is used

to determine damages, estimate damages. And there is some assumptions which the courts have set up.

The first is that the patents-in-suit are valid and infringed. So that is very important. For this hypothetical negotiation, there is no disagreement, no uncertainty about whether the patents are valid, when means they're good patents, and whether Groupon infringes them. That is an assumption the courts tell you to make.

Next, IBM is a willing licensor.

Groupon is a willing licensee.

And the parties have access to equal information.

Q. And did you make those assumptions for your analysis in this case?

A. Yes.

Q. Now, at the bottom of the slide on the table, there are some miniature patents and dates. Can you tell me what those are?

A. Yes. The top three patents, the hypothetical negotiation will take place in 2008. That's when Groupon first started to infringe the patents.

Q. And what month would that be?

A. Excuse me?

Q. What month would that be?

A. I think it's November. Oh, it's November 2008 /it

**says right there.**

**And then for the patent on the bottom, the '346, that was mid-2011. That is when Groupon was starting to use the patents.**

Q. **So Professor Hausman, once you identified the timing and the parties to the hypothetical negotiation, what is the next step in your analysis?**

A. **Well, you start to look at what are called the *Georgia-Pacific* factors. And these are 15 factors which the courts have determined should be used or can be used to guide the analysis.**

Q. **Are the *Georgia-Pacific* factors the ones that we see here on slide 17?**

A. **Yes.**

Q. **Which of the *Georgia-Pacific* factors did you consider for this case?**

A. **I considered all 15 because that is what you are supposed to do.**

Q. **Turning to slide 18. What are you showing here?**

A. **Well, these are six of the 15 factors which have a neutral impact. So that means it doesn't cause a reasonable royalty to be either higher or lower.**

Q. **And on slide 19, what are you showing?**

A. **These are factors 4 and 5, which I will discuss, which create downward pressure on the reasonable royalty.**

Q. And then finally on slide 19, what do we see here?

A. These are six factors which again we'll discuss which place upward pressure on a reasonable royalty.

Q. So let's talk first about the factors that you said place downward pressure? Turning to slide 21.

What is Factor No. 4 looking at?

A. The licensor's -- that is IBM here -- established policy.

Q. Could you walk us through the analysis you did for Factor 4?

A. Sure. Well, IBM has an extensive licensing practice. You heard that from Mr. McBride IBM's patents are valuable assets that invest about $5.6 billion per year in R&D.

Then IBM expects a reasonable return on its investment. So if you're going to spend $5 billion a year, which is real money, to quote a famous statement in Congress, you've got to get some return on it. Otherwise, you won't spend the money. I mean it's not only for IBM, it's for all companies in the world. You know, people who have invested in new cellphones, again, expect to get a return on their investment.

So that's what is going on here. IMB has spent billions of dollars a year. It uses its technology for itself but it also wants to license it to get a return. So, you know, what the bottom line says is that they

**expect to receive a royalty that reflects the value of the patents-in-suit.**

**So as an economist, I want to explain this to the jury. A patent is property, just like if I owned a building here in Downtown Wilmington. And if somebody wants to use that building, they're going to pay me rent. And a royalty is like paying rent to use a patent. You don't expect to use that building for free. And you shouldn't expect, by and large, to use a patent for free. You know, you've got to pay for it. That is how life works. At least to an economist, that is how life works.**

Q. **Now, Professor Hausman, you heard Mr. McBride earlier testify about some cross-licenses. Did you review the IBM cross-licenses in this case?**

A. **Yes, I reviewed them all.**

Q. **Did you analyze those cross-licenses?**

A. **I did.**

Q. **Turning to slide 22. What conclusions did you draw from your review of those cross-licenses?**

A. **Well, as was discussed, there are dozens of companies that have taken a license. They're broad portfolio cross-licenses, and IBM receives value in return from licenses, freedom to operate.**

**And, again, I'd like to emphasize this point. I have worked for tech companies throughout the world. Most**

**of the people, I expect all of you probably all own a PC or a Mac, and a chip that goes into those, the main chip is by Intel. I consulted for Intel for years. And I pretty much consulted for all the major cellular companies in the world, and they all want freedom to operate. In other words, you don't want to come out with a new PC and then somebody turns around and says I'm going to sue and stop you from selling that. You have invested tens of millions of dollars.**

**So this freedom to operate this isn't just IBM, every big tech company I've worked for in the world, whether it is computers, cellular et cetera, software, they all want this freedom to operate. It's absolutely crucial because after you invested the tens, sometimes hundreds of millions of dollars, you don't want someone showing up and saying you have to stop selling that unless you pay me a heck of a lot of money to use my patent. That is called patent holdup, and there are hundreds of economic papers written on that.**

Q. **Now, Professor Hausman, did you use any of these cross licenses that you told us about as a benchmark for your reasonable royalty in this case?**

A. **No, because mainly you have to value the cross licenses which is very difficult to do. And secondly, those cross licenses, there is no assumption of validity infringement, so there is a lot of uncertainty typically about some of the patents.**

But here remember back a couple slides ago for the hypothetical negotiation, the assumption is validity and infringement, so these cross licenses had this different assumption which can be quite important.

THE COURT: Ms. Stempler, we have to take a break for a lunch.

Ladies and gentlemen of the jury, I don't think your lunch is here just yet. I have been assured it is on its way. You should see it soon. I will not be able to start up again until at least 12:45, so you'll have plenty of time to eat. No talking about the case during the break and we'll see you soon.

(Jury exited the courtroom at 12:01 p.m.)

THE COURT: All right. We'll check in with you as soon as I'm ready to go.

We'll take a recess.

(A luncheon recess was taken.)

THE COURT: We'll bring the jury back in.

(Jury entering the courtroom at 1:00 p.m.)

THE COURT: Good afternoon everyone. I hope lunch went well. Before we get started, I understand we have more photos of more witnesses for your binders, so I'll have Ms. Ghione pass those out to you.

Good afternoon, Mr. Hausman. Welcome back.

Ms. Stempler, whenever you're ready, you may

proceed.

MS. STEMPLER: Thank you, Your Honor.

BY MS. STEMPLER:

Q. Welcome back from lunch, Professor Hausman.

A. Thank you.

Q. So, let's start up again at slide 22, we were discussing factor four and we were talking about the IBM cross licenses. Can you remind us why you did not consider them as a benchmark or did not use them as a benchmark in this case?

A. Yes. Two reasons, main reasons. The first is there are -- they typically have cross licenses and IBM has a policy of wanting freedom to operate and I tried to explain why that is so important for technology companies for the jury before lunch. And often times, for instance with Google, IBM got to use I think it's like 28,000 patents, and so to be able to value what those patents are worth, which are worth a lot to IBM because IBM --

THE COURT: I'm sorry to interrupt you. This is my fault. Do all the jurors have the same photos? You're good? All right. I'm sorry about that. We're all good. Go ahead.

A. One of IBM's big services is providing computing power on the cloud, that's up there instead of having tens or hundreds of servers, people have things in the cloud that

**do the computing now. The biggest cloud company in the world is Amazon. Amazon is just not out there selling batteries to me or whatever, they're the biggest provider of cloud service. So IBM needs to be able to use those Amazon patents to be able to compete in the cloud. The question is how do you place a value on that? So that's one reason.**

**And then a second reason which says here the last point there is, they were all done, you know, without litigation, so there is no assumption of validity and infringement. And here, there was some uncertainly about whether they are good patents that were being infringed.**

**Here if you remember before lunch we were talking about the hypothetical negotiation. The court tells me to assume that the patents are valid and infringed so there is no uncertainty.**

Q. **Does that mean when we look at the license payments that the IBM licensees made to IBM that's not really telling the whole story?**

A. **It's not telling the whole story by far because this freedom to operate thing in my experience as I tried to explain before lunch is really very important.**

Q. **What did you conclude about the impact of factor four on the reasonable royalty?**

A. **Well, I concluded this would lead to some downward pressure on the royalty rate, reasonable royalty because**

IBM, some companies often times pharmaceutical companies, they won't license to anybody, they just want to do the drug and not have any competition. But as Mr. McBride describes, IBM wants a license to get some of its $5 billion a year back, that means that they're willing to license, that leads to lower price.

Q. Let's take a look at factor five on the next slide. What are you showing here?

A. This is commercial relationship between the parties. And on the left we have IBM, computing hardware, software, cognitive solutions, things like artificial intelligence which is becoming more and more important in the cloud which I just described. And then on the right we have Groupon and they have online customers selling discounted goods and services. They don't really compete with each other at all and because they don't compete with each other that's going to lead a lower reasonable royalty. If you're competing with somebody you're not going to give them as good a deal as if you're not competing with them.

Q. I want to move on with the factors that place upward pressure, before we do, to give some helpful context, let's take a look at the next slide. What are you showing here, Professor Hausman?

A. I'm trying to explain symbolically how Groupon works. On the left of the screen you will see they are merchants.

**Those are people selling pizza as you see in the middle. There are people selling merchandise like batteries. And there are people that provide services like massages or personal training. And there are hotels. And they want to sell to people on the right, the consumer, that's me and you. They would like us to use some of our hard earned money to buy this stuff so they can make money. That's what the economy is all about.**

**So Groupon is in the middle and they provide these discounted deals, you know, to go to a hotel in New Hampshire, that's close to Boston, you know, you get 30 percent off or 50 percent off. And Groupon takes a cut of that amount that I pay and that's how they make their profit. So this is how it all works.**

**In the middle, you have here, you have a computer screen that could be your PC at home, but actually more and more of Groupon's business now, the latest data that they put on the web says that 72 percent of their business is mobile. So actually what's going on, everybody has one of these, it's my iPhone, you might have Samsung or LG, but everybody has a smart phone now. 72 percent of the business comes from people shopping on mobile devices, most often smart phones.**

**So it's still similar, I get on, you know, I get home from work in Boston, my wife and I, I decide I don't**

want to cook, she decides she doesn't want to cook, I get on and say there is a good deal at a restaurant in the neighborhood. We get a good deal, discount, maybe we'll go. That's how it work.

Q. Does Groupon makes the goods that are sold on its platform?

A. No.

Q. Let's go back to the factors that you said place upward pressure, starting with slide 26. What did you consider for factor six?

A. This is whether the patents-in-suit generate sales of other products and services, here for Groupon.

Q. And what did you consider in your analysis of this factor?

A. They had this payment processing system which in longer exist, but they had it for a considerable amount of time during the period, and you can see that it led to $13 million in revenue. It was basically a payment processing system that other merchants could use.

Q. What about on the next line?

A. The ads, they put ads on their websites and what you do is you click on them, pretty much like Google, it's called a hyperlink, you probably heard about that before. And you go to the ad site, you go to the third-party website and you might decide to buy something there, so that led to

**$30 million in revenue.**

**And then lastly, we had coupon commissions, so this leads customers to third-party websites offering the coupons. It could be restaurants or various other things and you can see this led to over a hundred million dollars. What this says is there was a lot of other revenue generated by the patents-in-suit beyond what Groupon basically sells.**

Q. **Just to be clear, Professor Hausman, is the revenue from Breadcrumb and the third-party website ads and the coupon commissions separate and apart from the accused revenues in this case?**

A. **Yes, it's separate.**

Q. **And what did you consider, what did you conclude from analyzing factor number six?**

A. **This would lead with other things equal to a higher reasonable royalty.**

Q. **Let's take a look at factor number eight. What does that look at?**

A. **Well, this looks at profitability and commercial success of the accused products. So Groupon has been a pretty successful company, and the accused products are quite successful. Groupon is a leader in online commerce, for local online customers, I would say they're number one. But for local restaurants around where I live around here, they're probably number one. And then lastly you look at**

**the revenues and profits generated by the accused products. And all of these lead to a somewhat upward pressure on the reasonable royalty.**

Q. **On that last point, what data did you use for the revenue and the profits?**

A. **I used Groupon's accounting data that they generate and they have to file with the federal government.**

Q. **Looking at the next slide, what are PX numbers 168 through 171, 173, 375 through 378, and 1565 through 1568?**

A. **These are shown to be the accounting records, but actually it's all spreadsheets nowadays. That's how you get it. These are the data that you used to look at things like the income and the profits and all that type of stuff. The one on the far right I excluded, that's a company they purchased called Living Social.**

**MS. STEMPLER: Your Honor, I offer those exhibits.**

**MS. SHAMILOV: No objection.**

**THE COURT: These are all admitted.**

**(The above exhibits were admitted.)**

**BY MS. STEMPLER:**

Q. **Can you explain how you calculated revenue using those spreadsheets that we just saw?**

A. **Yeah. I got the sales data, people who work with me put it into a computer and the damage period in this case**

for legal reasons is defined as starting in 2010 and we looked at the detailed income statements through 2016 and these are the numbers that correspond to the data that I used.

And then for 2017 and 2018, we again got detailed income statements and these are the categories that I looked at.

Q. You also said that you used financial data from Groupon to look at their profits; is that right?

A. Yes.

Q. Have the accused products been profitable for Groupon?

A. Well, in terms -- there are two major measures. The measure that they primarily use for investment analysis that they put on their website, they have been profitable pretty much for the last five or six years, it's called adjusted EBITDA. There is another often used measure called operating profits, that they have not been profitable on until the last year or so. But their management favors and uses extensively adjusted EBITDA so that's what I'm going to use.

Q. So let's talk a little bit about those two things in detail on slide 30. First, what is EBITDA?

A. EBITDA is one of these acronyms which stands for earnings before interest, taxes depreciation and

amortization, that's where the E B, or earnings before and I T D A is interest, taxes, depreciation and amortization.

Q. What is depreciation and amortization?

A. Depreciation is mainly an accounting convention. Let's say I am running a company and I am buying a computer, the federal government on my income tax statements if I'm a company, even for individuals who have a company, you're not allowed to deduct the money right away. You deduct it over five years. So depreciation, you're not actually paying any cash out, it's an accounting convention actually the Internal Revenue Service uses. I think it has real problems. I don't think the government has kept up with, you know, computer. Companies don't keep computers by and large for five years, maybe two years nowadays. It has a lot of other problems. I have written a number of academic papers and a number of other academics have also written papers on this. I don't think it's very good for what it does, but EBITDA doesn't take it into account.

Q. You said that the measure that you were looking at was adjusted EBITDA. Can you explain the difference?

A. So EBITDA doesn't use interest, taxes, depreciation and amortization, but adjusted EBITDA, different companies have different definitions of the adjustments but the two main adjustments that Groupon makes is it doesn't use stock based compensation so if you work for a company, you often

get stock options, if the price goes up, you can cash it in. But the company isn't actually paying any cash out for those, so they exclude those.

And then they exclude acquisition related expenses. Remember I mention about acquisition, so those would be excluded as well. I'm using the exact definition that Groupon management uses.

Q. You also mentioned operating income. What is operating income?

A. I didn't hear, I'm sorry.

Q. You also mentioned operating income. What is operating income?

A. Operating income basically includes all these in that EBITDA excludes and says, you know, is my income, also called profit, greater or less than zero, so that's often used, too.

Q. Let's take a look at the next slide. Why did you use adjusted EBITDA in this case?

A. Well, two reasons. The first is, Groupon's manager, such as Mr. Schmitz whose picture is here, they say they use it, and they explain why, it's also explained in the documents. On the right, you'll see that every company has to file reports with the SEC, so that's the Securities and Exchange Commission, that's Washington, you got to explain what you're doing.

And in their annual reports, the 10(k)s, they say we find adjusted EBITDA to be best. They also report operating income, you have to, but they explain why they think adjusted EBITDA is the best measure to use.

Q. Let's take a look what they say. On slide 33, what did you learn from Mr. Schmitz's testimony?

A. As you see highlighted in yellow, he says for adjusted EBITDA, it's a better measure of cash profitability. Then at the bottom, he says it's a better way to understand the core operational results distinguished from any depreciation and amortization as well as SBC, which are noncash measures.

So what he's saying here is that he and the other management at Groupon thinks you should emphasize what's happening, you know, with cash profitability and leave these things like depreciation and amortization on the shelf as it were and not use it.

Q. Professor Hausman, can you please turn to Plaintiff's Exhibit 371 in your binder. Let me know when you're there. It's in volume one.

A. You said 371?

Q. Yes.

A. Yes, I'm there.

Q. What is this document?

A. Well, what this is, this is their SEC filing, the

10(k), which is their annual report.

MS. STEMPLER: Your Honor, I offer Plaintiff's Exhibit 371.

MS. SHAMILOV: No objection.

THE COURT: It's admitted.

(Plaintiff's Exhibit 371 was admitted.)

BY MS. STEMPLER:

Q. Now, Professor Hausman, you were saying that you looked at the SEC filings. Is this one of the SEC filings that you used to understand Groupon's preference for adjusted EBITDA?

A. The annual report or 10(k) is one of the most important documents that companies file each year with the government.

Q. If you can please turn to the page that's marked group 0024096. What is this section of Groupon's annual report addressing at the bottom there?

A. They're talking about adjusted EBITDA. They say the top, it's a non-GAAP measure where GAAP is generally accepted accounting principles. They're saying that they think this is better.

Q. Can you please read the relevant portion of the excerpt for the jury?

A. Sure. What this say, Groupon is saying we exclude depreciation and amortization because it's noncash in

**nature, and we believe that non-GAAP financial measures excluding these items provide meaningfully supplemental information about our operation performance and liquidity.**

**Our definition of adjusted EBITDA may differ from similar measures used by other companies even when similar terms are used to identify such measures. Adjusted EBITDA is a key measure used by our management and board of directors to evaluate operating performance, generate future operating plans and make strategic decisions for allocation of capital. Accordingly, we believe that adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of directors.**

Q. **And, Professor Hausman, is Groupon still making those statements about EBITDA today?**

A. **Yes. If you look on their website, the most recent investor presentation they made in May of this year, they're using adjusted EBITDA along with gross profits and free cash flow, and in the main body of it, they don't mention operating income at all.**

Q. **So, Professor Hausman, what did you conclude about your analysis of Factor 8 in the case?**

A. **Well, they had been mainly profitable based on adjusted EBITDA, so this is going to lead to a higher reasonable royalty.**

Q. So let's move on to the next two factors, 9 and 10. What do those address?

A. Well, these are advantages and benefits of the patents-in-suit.

Q. And why did you consider them together?

A. Well, as an economist, I think the two go together. If you get benefits from something, it's usually because it gives you an advantage. You know, it makes sense to me anyway.

Q. What is your evidence for the benefits and advantages of the patent?

A. Well, conversations with Professor Schmidt who testified yesterday and reading his report.

I looked at Groupon documents. I looked at deposition testimony.

And, Dr. Stewart or Professor Stewart's survey of online shoppers.

Q. Okay. So let's talk about those benefits and advantages for each of the patents. And let start with the Filepp patent.

What is your understanding, Professor Hausman, of the benefits of the Filepp patent?

A. Well it reduces the burden on the network.

It reduces usage of bandwidth. And,

It combats network bottleneck.

So what this all leads to is the accused products experience faster load times.

So most people don't like to be sitting there in front of their PC or on their cellphone waiting for the page to load. And if it takes a long time, a lot people just give up. If I am on Groupon and it takes a long time, I say the heck with it, I'm going to Amazon. It's just as easy.

And this is known throughout the industry. It's not just Groupon, you know, that this is important for. But companies like Amazon, Google, many other companies I've consulted for all agree with this point.

Q. Did you see any Groupon documents that confirm your understanding of how the patents benefit the accused product?

A. Yes.

Q. Can you please turn to Plaintiff's Exhibit 120 in your binder?

A. Okay. I'm there.

Q. What is that exhibit?

A. Well, this is a document entitled Latency, Why Should We Care.

Q. Okay. Hold on one second, Professor Hausman.

MS. STEMPLER: Your Honor, I offer Plaintiff's Exhibit 120.

THE WITNESS: Okay.

MS. SHAMILOV: No objection.

THE COURT: Okay. It's admitted.

(PX-120 was admitted into evidence.)

BY MS. STEMPLER:

Q. So let's just take a look at this together, Professor Hausman. So can you read the title again for us?

A. Yes. Latency, Why Should We Care.

Q. And then down at the bottom, there is a section that has an answer to that: Why Care About Latency? Do you see that?

A. Yes.

Q. And can you read the second and third paragraph from this document?

A. Yes. But before I do so, I'd like to explain what latency means to the jury. Maybe they know, maybe they don't know. Latency is how long it takes between when you type a command into a computer and the page loads. So low latency means things happen very quickly. That is what consumers like.

So anyway, then it says: Why Care About Latency?

In the next-to-last paragraph, it says: In a study by Wal-Mart a couple years ago, it was discovered that the effects of even one slow page in the user experience can cause a major impact. In other words, it does not matter if

**the deal page is fast if even one page in the rest of the flow is slow. In general, buyers were those who experienced pages that were two times faster than those who did not purchase. The slowest page is our weakest link in the purchase chain.**

**This study also showed that slow page speed resulted in even more significant customer impacts than immediate RPV, which is Revenue Per Visit. Perceived lack of quality, anger and frustration with the vendor. It's not just a missed sales opportunity, it is negative consumer impact we risk.**

**So what this is saying is it's just not me that gets frustrated when I'm waiting for the computer to come back with the information but a lot of customers also get frustrated and not only do they leave and you don't get that sale but they have a bad -- you get a bad reputation and they say, well, don't go to Wal-Mart because that was slow the last time. I'm going to Amazon for instance.**

Q. **So how did this influence you about the benefits of the Filepp patents?**

A. **Welt, according to what Professor Schmidt told me and what I read, this faster load time that you get from the two Filepp patents, that says that those are advantages of the patents.**

Q. **If we take a look at the next slide, slide 36.**

Professor Hausman, what are PX-56, 63, 64, 121, 379, 638, and 640?

A. These are all additional documents which demonstrate the advantages of these two patents in speeding things up.

MS. STEMPLER: Your Honor, I offer those exhibits.

MS. SHAMILOV: No objection, Your Honor.

THE COURT: They're all admitted.

(Above-referenced exhibits admitted in evidence.)

BY MS. STEMPLER:

Q. Let's go to the next slide.

You also mentioned that you reviewed some testimony from Groupon's witnesses. What testimony is shown here?

A. Well, this is Mr. Carlisle who is with management for Groupon. And he was asked: Have those badges had a noticeable effect on Groupon's revenue?

So what the badges are, when you look at a Groupon deal, oftentimes attached to that deal or that thing on your screen, it will say trending, for instance, you know, which means that a lot of other people are buying it. And these badges, Groupon has found, lead to higher sales revenue, and higher sales revenue, of course, leads to more profit which is what Groupon is in business to do.

And he saying, well, look, we're putting -- in

the middle there: And the reason that they are putting more on there is because they're having a positive impact.

Q. Now, was his testimony, some part of his testimony you considered in evaluating the benefits of the '849 patent?

A. Yes, this is from his deposition.

Q. And how did it influence your analysis of the benefits of the '849 patent?

A. Well, again, you know, it's my understanding that the '849 patent has these effects and anything that leads to higher sales and more profit gives a positive impact to Groupon.

Q. Now, you mentioned that in addition to talking to Dr. Schmidt, and documents, you also reviewed a survey. What was the survey about?

A. Well, Professor Stewart did a survey, and what he wanted to find out was people who were online shopping, you know, if you are on Amazon or if you are on Wal-Mart.com or something like that, how do you do it? How do you use it web?

Q. Can you please turn to Plaintiff's Exhibits 549 through 557 in your Volume 2 binder.

A. Okay. I'm there.

Q. And are those the survey results that you looked at?

A. Yes.

Q. So if you can turn to page 40 of that report.

A. **Yes.**

Q. **And can you explain to us how the results of this survey informed your opinion about the benefits of the Filepp patent?**

A. **Yes. Professor Stewart had a survey of 2,721 people who were using the web. And he wanted to find out what percentage of people disabled the caches, because these patents leave caches. You store the stuff on the computer so you don't -- on your own computer. So what cache means you look at an ad or so. If you want to look at it again rather than having to get it from the server over the telecommunications network again, it will be stored on your computer so you can see it right away. That speeds things up.**

**And so there is a possibility that some people may not use caches. And that little button on your iPad or your iPhone, you can disable caching, you know, if you don't want the computer to store the information for some reason.**

**But what Dr. Stewart or Professor Stewart found is only 1.7 percent disabled them. So that means that a little more than 98 percent of the people are using caches.**

Q. **How did that relate to your understanding of benefits of the Filepp patent?**

A. **Welt, since the caching speed things up, it's a benefit. And, of course, if you disable your cache, you are**

not going to get that benefit. But 98 percent of the people are getting the benefit of caches.

Q. Now, we talked about the Filepp patents. I want to move on to the '601. Turning to slide 38. What is your understanding of the benefits of the '601 patent?

A. Well, this is again from conversations with Professor Schmidt and readings things, but it keeps track of information during a conversation over networks, so it lead to a more seamless user experience. And it has advantages over what are called cookies or HTML forms.

Q. And moving on to slide 39. What are you showing here?

A. Well, this is Mr. Carlisle again testifying at his deposition. And he says: Groupon -- he is asked a question: Groupon actually found a better user experience if they keep track of user's identities using methods other than just cookies, correct?

And he answered yes.

Q. And then finally move on to the '346 patent. What is your understanding of the '346, the benefits of the '346 patent, Professor?

A. Well, this is a patent that allows you to use your Facebook or Google credentials to create a new account, user name and password. So it's an automatic creation of the account, and makes it much easier to start a new account and

then when you log in, it's much easier as well. Mainly, you don't have to create a new user name and remember a new password.

So I have so many passwords, I can barely remember them anymore. So anything that saves me from not having to remember yet another one is good for me and it's good for most users of the Internet.

Q. And why is that significant to your analysis here?

A. Well, because this is the benefits of the '346 patent. And there are documents from Groupon this leads to more sales and more profit. So that is a benefit that is going to lead to a higher royalty.

Q. So let's look at one of those documents. Can you turn to Plaintiff's Exhibit 85 in your binder?

A. Okay. I'm there.

Q. And what is this document?

A. This is a document, a Groupon document. And it's talking about the advantages, and it says: Logged in users have a higher purchase rate compared to those who are not logged in.

MS. STEMPLER: Hold on one second, Professor Hausman.

THE WITNESS: I'm sorry.

MS. STEMPLER: We're going to look at it together.

Your Honor, I offer Plaintiff's Exhibit 85.

MS. SHAMILOV: No objection.

THE COURT: It's admitted.

(PX-85 was admitted into evidence.)

BY MS. STEMPLER:

Q. Okay. So let us catch up to you.

A. Okay. Sorry. This is what my students always say. I go too fast. I apologize.

Q. So what is the title of this document?

A. Login/signup prompts.

Q. And can you continue? Read from where you started before, please.

A. Sure. It says: Logged in users have a higher purchase rate compared to those who are not logged in (+2x). They also get personalized list of deals such as recently viewed deals, customers also viewed, and are more engaged. This has been the motivation for us to give a user multiple touch points and ways (Facebook login/Google login) to log into/signup with Groupon.

Q. Thank you. So how does that inform your opinion about the benefits of the '346 pant?

A. Well, again, I'll talk my personal experience, but if I am on my iPhone, which I just showed the jury, and somebody asked me to buy them something, I have a problem which is known in the industry as fat fingers. My fingers

**actually aren't that fat, but so somehow when I try to type on the little keys on my iPhone, I end up getting some wrong letters or wrong numbers, and that says you made a mistake. You've got to do it again.**

**So I always give them two tries, not three tries. Three strikes and you are out. Two tries. If I don't get it by the second try, I'm out of there.**

**So what this does is it stops the fat fingers problem. I just say login using my Google account and it works the first time.**

**So what Groupon and many other companies have found, people who are logged in that way, they had no problem buying. What you want to do, if you are a company like this, is make it as easy as possible for people to buy. So, again, it lead to greater sales and more profit.**

Q. **Looking at the next slide, 42. What testimony did you review to inform your opinion about the benefits?**

A. **Well, this is Mr. Carlisle's deposition. Remember, he is management of Groupon, and he says: We want to make the signup process easy for customers.**

**That's what I was talking about.**

**And he also said: To improve the convenience for customers who wanted to log in that way.**

Q. **And on the next slide, what are you showing here?**

A. **This is Mr. Dunham, who is another management person.**

 He is in marketing and at Groupon. And he says: It is a way to make it easier to create a user account, yes.

Q. Moving on to slide 44.

Professor Hausman, what are Plaintiff's Exhibits 605, 56, 114 through 116, 595, 602, 603, 606, 612, 619, and 620?

A. These are all additional documents that talk about the benefits of the '346 patent.

Q. And did you rely on those documents to analyze benefits of the '346 patent?

A. Yes, I did.

MS. STEMPLER: Your Honor, I offer those exhibits.

THE COURT: Okay.

MS. SHAMILOV: No objection.

THE COURT: Okay. They're all admitted.

(Above-referenced exhibits admitted in evidence.)

BY MS. STEMPLER:

Q. Okay. So we've talked about the benefit of all the patents-in-suit. What conclusions did you draw from your analysis of the benefits, Professor Hausman?

A. These lead to higher sales or more profits for Groupon. So they're going to lead or cause upward pressure, holding other things equal for the reasonable royalty.

Q. Okay. We have a couple more factors to look at

**before we get to the final hypothetical negotiation. We'll keep marching through.**

**What does Factor 11 look at?**

A. **How do the accused products use the technology of the patents-in-suit.**

Q. **And how did you evaluate Factor 11?**

A. **Well, I depended on Professor Schmidt's analysis, although I really don't think he was using a magnifying glass. Anyway, you know, that is how you guys put it on the slide.**

**And then I also looked at Groupon data.**

**You have been watching too much Sherlock Holmes.**

Q. **All right. Looking at slide 46. What is this slide showing here?**

A. **Well, remember, we were talking about cacheable content before. That is how, what percentage of time caching is used. And so he got some Groupon data and analyzed it, mainly just counting of computer codes, and he found that 59.2 percent was cacheable content.**

Q. **And looking at the next slide, what is this showing here?**

A. **I want to figure out how much the '967 patent is used. And so this is a schematic that I had put together. So on the left, note that it's January 1st, 9:30. So we know what happened the night before.**

**But anyway, this person wakes up and gets on Groupon, and she sees pizza. Now, I'm a person who is always ready for a snack, but 9:30 in the morning is too early for pizza, at least in my view. I'm going to guess in her view, too.**

**But later that day after watching football games on TV or whatever, she thinks to herself, hey, I remembered that pizza. It look pretty good. It was a good deal. You could see $10 off and various things. That is maybe not for pizza. But anyway, it's going to a be good deal for Groupon. Anyway, it says 45 percent off for Jets Pizza.**

**So now she says I'm going to go and I want to buy that pizza. But rather than having to load all the information again, it's in her cache on her computer, she is ready to go. Just one click and then, you know, it comes up and then another click and she can buy it.**

Q. **And what was your understanding about why that was, why that mattered to your analysis?**

A. **Well, because we only -- as I understand it, the '967 patent, it's only for people who return and use the contents of the cache. If you have some cache but you don't come back to use it, it doesn't count as it were.**

Q. **And did you calculate the percentage of Groupon users who were returning?**

A. Yes.

Q. And how did you do that?

A. I took Groupon data and essentially divided the two numbers -- the total people who were using Groupon and returned visitors.

Q. Would you please turn to Plaintiff's Exhibit 1010 in Volume No. 2?

A. Okay. I'm there.

Q. What is this document?

A. Well, this is data from 2017 from Groupon. And it's looking at how people use Groupon.

MS. STEMPLER: Your Honor, I offer Plaintiff's Exhibit 1010.

MS. SHAMILOV: No objection, Your Honor.

THE COURT: It's admitted.

(PX-1010 was admitted into evidence.)

BY MS. STEMPLER:

Q. So, Professor Hausman, is this one of the documents you relied on for your opinion?

A. Yes.

Q. And what exactly is this document?

A. Well, this is looking at how customers use the Groupon websites.

Q. Could you turn to page 19 of this document?

A. Yes.

Q. **What is that showing there?**

A. **Okay. Well, what is shown is if you look at the vertical columns, you could point to them for the jury, please.**

Q. **Sorry, Professor. Are you talking at the bottom of the panel?**

A. **Yes. So, you know, it's for April 2nd to April 9th and so on. But the ones that are on the vertical axis, you know, the horizontal rows, these are by type of usage.**

**So you can see that App. That means you had people who were using an app on their iPhone or on their Android phone, Samsung, for instance.**

**Touch, that is the website for mobile.**

**And then, lastly, is Web, that is people using PCs basically.**

**And what you can see is you have different abbreviations but you have UV, UDVV, UDV, and Deal Views. And so from that, you can figure out the number of returning users just essentially by dividing. And as I remember, I get about 21 percent. It differs for each of three categories, you know, in yellow there. But they're all right around 21 percent.**

Q. **Thank you. Does this table have the data that you used to determine the percentage of returning visitors?**

A. **Yes.**

Q. Turning back to the slide. Going to slide 48. Is this just a blowup of the table that we just looked at?

A. Yes, so UDV stands for Unique Deal Views. That means just once. Deal views is total deal views.

So the way you do the arithmetic is you take deal views minus unique deal views, so that turns out to be about 9 million, and then you divide by deal views which is a little more than 45 million. You can see that is going to be around 21 percent. That is how you do the arithmetic.

Q. How did you know you should use those metrics?

A. This is from discussions with Professor Schmidt.

Q. So let's take a look at the next slide.

What are Plaintiff's Exhibit 185, 357 through 368, and 1009 through 1020?

A. Well, these are the documents, you know, for different dates that I used from Groupon to be able to calculate that number. We just looked at one date, April of 2017, but I wanted to look throughout the eight-year period.

MS. STEMPLER: Your Honor, I offer this exhibit.

MS. SHAMILOV: No objection.

THE COURT: They're all admitted.

(The above exhibits were admitted into evidence.)

BY MS. STEMPLER:

Q. Let's look at slide 50, Professor Hausman. What was

**the result of your analysis of the non-unique deal?**

A. **The difference between the three categories, the average they're all pretty close, the average is around 21 percent of returning people, those are the non-unique.**

Q. **Let's move on to the '849 patent on slide 51. What are you showing here?**

A. **Well, this is the extent of use which is calculated or estimated by Professor Schmidt and he found that it was 59.2 percent for the website and 52.7 percent for the apps.**

Q. **And are these the trending boxes that you were talking about earlier when you were talking about badges?**

A. **Yeah, these are the badges. So, like the one on the right is 50 percent off at Jiffy Lube, getting an oil change, 50 percent off is a good deal. You see that little badge which says trending, that says to consumers this is a really good deal, it's doing very well.**

Q. **Moving to slide 52. Is this the same analysis for the '849 patent that you did for the '967?**

A. **Yes. It's really the same.**

Q. **So you're looking at the percentage of returning visitors?**

A. **Yes.**

Q. **And what was the result of that?**

A. **We can see they're both 21 percent, give or take a little bit.**

Q. **Let's move to slide 53. What did you consider for the extent of use of the '601 patent?**

A. **This is again based on discussions with Professor Schmidt. This is a flow for somebody, they launched the page on the web, for instance, and then at the end, hopefully they were making orders, that's how Groupon makes money. So these are the eight steps that take place to buy something.**

Q. **How did you figure out that there were eight steps?**

A. **This is, you know, talking to Professor Schmidt, but also I have used Groupon a number of times.**

Q. **What does the arrow that just popped up there represent?**

A. **Well, this is where Professor Schmidt told me the '601 patent is used, so it's state information embedded in the hyperlink, it's one of the eight steps, so it's just going to be the extent of use is 1/8th, it could be more, but I was trying to be conservative so I used 1/8th.**

Q. **Let's move on to the '346 patent. If you could turn to Plaintiff's Exhibit 46 in your binder, please.**

A. **Okay.**

Q. **And what is that document? What is that document?**

A. **It's called social account creation data.**

Q. **And is this one of the documents you used in your analysis?**

A. Yeah, this is a Groupon document that had data.

MS. STEMPLER: Your Honor, I offer Exhibit 646.

MS. SHAMILOV: No objection.

THE COURT: It's admitted.

(Exhibit 646 was admitted into evidence.)

BY MS. STEMPLER:

Q. What did you consider to determine the extent of use of the '346 patent?

A. I looked at the total accounts and then I looked at the social registrations, those are the registrations using Facebook or Google and I divided it and I got 14 percent.

Q. Did you get that data from the document we just looked at, Plaintiff's Exhibit 46?

A. Yes.

Q. So now that we've covered the extent of use for all the patents-in-suit, can you explain to the jury how your analysis of factor 11 impacted your reasonable royalty opinion?

A. Yeah. So I'm going to use this information to apportion or allocate the use of the patents. I'm going to look at Groupon's overall revenue, but I'm going to try to figure out where the patents are used using these sata and it's called apportionment.

Q. Let's move on to factor 13. What is factor 13 considered?

A. It's a portion of profit credited to the invention, so that first word, portion, just a key part of apportionment, that what you're trying do.

Q. What did you take into account for your analysis of factor 13?

A. I considered Groupon's revenues and profits of the accused products, the products that are accused of using the patents. I looked at factor eight, the profitability of the accused products, factors nine and ten, these are all the Georgia-Pacific factors, benefits and advantages of the patents-in-suit, and factor 11 the extent of use of the patented technologies.

Q. Let take a closer look at your analysis of this factor. Going to slide 56, what were the accused revenues that you started with for the '967 patent?

A. There are $4,169,458,396, this is from as you can see on the slide, March 2010 when the damage period starts up until August of 2015 when the '967 patent expired.

Q. I see also in the box next to that date range you have a picture of a laptop and the word website, what were you indicating there?

A. That's when the '967 patent was used from discussions with Professor Schmidt, so that's why it's just the website.

Q. How were you able to calculate the accused revenues for the website?

A. **Well, this is, you know, a consultation with Professor Schmidt. We looked at the revenue from when the '967 issued and basically added it up using those Groupon accounting documents.**

Q. **And what did you do next to determine the portion of profits that were attributable to the '967 patent?**

A. **Then he multiplied by 59.2 percent, so remember, this is what Professor Schmidt calculated to be the percentage of the cached content.**

Q. **Was this the number that we were just looking at earlier when we were looking at factor 11 of the '967 patent?**

A. **Yes, this is Professor Schmidt's calculation.**

Q. **What was the next step that you took?**

A. **Well, the next step I used my calculation which is 21 percent returning visitors, so I multiplied 59.2 percent by 21 percent, and that is going to tell me the revenue associated with the patent so you can see it's only about 12 percent of the original, 16 percent times 20 percent.**

Q. **What was the revenues associated with the '967 patent?**

A. **$517,829,259. So we started off with over 4 billion and now we're down to 517 million.**

Q. **Let's keep going. What was the next step you took?**

A. **Then I used what the profit margin for the adjusted**

**EBITDA was for this period, that's the arrow down at the bottom. That's 9.1 percent. And I multiply the 517 million by that. And the profits attributable to the '967 patent are $47,092,842.**

Q. **Professor Hausman, why did you convert the revenues associated with the '967 patent to profits?**

A. **Well, for companies, profits is the bottom line. Profits are what they use to pay people, but it's also profits determine stock prices. So Groupon, you know, is on the stock market, and everybody wants the stock price to be higher. And, you know, economists will say profits are the bottom line. So that's, you know, the main factor that I would use to figure out what the reasonable royalty is.**

Q. **Now, did you perform these steps that we just walked through of calculating the accused revenue, apportioning for the extent of use and converting the revenues to profits for each of the patents in this case?**

A. **Yeah, I followed the same procedure for all four.**

Q. **Let's take a quick look at the other three. On slide 16 you have the '849 patent. What was the accused revenue for that?**

A. **This was the longer period. This goes from March up to the current time, July 24th, even a little ahead of the current time. And the accused revenue here was $11,144,491,878. So again, I go through the same**

**multiplication.**

**Now, if you point to the jury that you'll see the adjusted EBITDA margin is a little bit less, it's 8.9 percent that I multiply. And the profits attributable to the '849 patent are $118,333,137.**

Q. **And moving to slide 61, can you walk us through the same process for the '601 patent?**

A. **Yeah. The '601, note that it ends in 2016. That's when the patent expired. And this is for both websites and apps. On the right you'll see a little smartphone there. So the accused revenue is $7,609,739,453, and then I divide by eight, which is 12.5 percent, multiply by the profit margin of 8.6 percent, and my estimate of profits is $81,382,088.**

Q. **And then finally for the '346 patent, will you walk us through your calculation for that?**

A. **Yeah, again that goes up to the current time, July 2018. The accused revenue is $10,180,869,821 multiplied by the 14 percent over that, I got that from the Groupon documents, multiplied by the profit margin of 9.0 percent, and I end up with profits attributable to the '346 patent to $129,192,866.**

Q. **Now, Professor Hausman, before we move on, does your analysis of factor 13 account for Groupon's contributions to the success of its products?**

A. Yes. Because, you know, I'm using, for instance, 14 percent, but the other 86 percent of the profit that's coming from Groupon, and you know, various other people who they're buying services from.

Q. Now that we have gone through your analysis for all the four patents for factor 13, what impact did it have on your opinion for reasonable royalty?

A. This these are pretty healthy numbers. They're in the millions of dollars. This is going to lead to a higher reasonable royalty.

Q. Professor Hausman, we're now ready to talk about that last factor in the negotiation. How did you analyze factor 15?

A. This is the hypothetical negotiation, so you take the other 14 factors into account, but this is the amount a licensor and a licensee would have agreed upon at the time the infringement began. So here for three of the patents, it's 2008, the other is 2011. And you end up with this hypothetical negotiation, and you try to estimate the best way you can what kind of deal they would have ended up with.

Q. Let's talk about that. What steps did you take to analyze the hypothetical negotiation?

A. Well, I determined and discussed already the economic benefits associated with each patent, and then the next step is I have to determine how the parties would share that

**economic benefit.**

Q. **So let's walk through how did you that. What was the first thing that you considered?**

A. **Well, there are four patents and remember, a very important assumption is that they're valid and infringed. That's what makes this hypothetical negotiation different from all the other nonlitigation licenses where no one is certain that the patents are valid and infringed. Here the Court tells me, make an assumption, Professor Hausman, or anybody that's going to do the hypothetical negotiation that the patents are valid and infringed so there is no uncertainty on the table.**

Q. **And how much of a factor was this in your analysis in deciding how the parties would share that?**

A. **I think it's quite important because we know the patents are leading to increased profits or associated with increased profits, and you know, the assumption is these are good patents and that Groupon is infringing them.**

Q. **Let's move on to slide 57. Actually before we go there, which party did it benefit, the assumption of validity and infringement?**

A. **It benefits IBM because it removed all uncertainty about the invalidity of the patent and infringement.**

Q. **Looking at slide 67, what was the next item that you considered?**

A. **Well, that no one has identified any non-infringing alternatives. There is going to be a dispute about this, there always is in the patent cases. I'm going to give you the economic interpretation.**

**Groupon has known about these patents since basically 2011 or 2012. Remember, non-infringing alternatives is another way to do it, you don't have to pay the patentholder, here IBM. So that's been about seven years from 2011. To an economist it says if there are non-infringing alternatives, you would expect Groupon to have gone and done it.**

**MS. SHAMILOV: Your Honor, may we have a side-bar, please.**

**(Side-bar discussion:)**

**THE COURT: What's the issue?**

**MS. SHAMILOV: What he was just about to say is that because the Groupon did not change the systems since the older of the date someone said there was infringement. That's what he's implying.**

**THE COURT: You think he's going to say that there is infringement in his opinion?**

**MS. SHAMILOV: Well, during the opening statement counsel stated that one of the facts will be is that they didn't change their systems. If it was so easy, they would have changed it, so they did infringe. So this**

is in connection where Dr. Hausman now says to an economist they would have changed it, if it was easy to change, they would have just changed it. It means if they didn't change and knew about the patent, he's implying that there will be infringement.

MR. DESMARAIS: That's not what he said.

MR. HADDEN: Can I make one other point? Even if he's not saying that, he's saying if there was an alternative that was available, they would have used it. This comes back to the NDA issue where IBM told Groupon you don't need to change what you're doing during this time period, he's now using the fact that they didn't change it as somehow that they couldn't find an otherwise economically viable alternative. They didn't change it because IBM said you don't need to change because we're not asking you to and we're not going to charge you royalties. That's a big issue.

MS. STEMPLER: This is something that was disclosed and analyzed by Professor Haase, the absence of the non-infringing alternatives. He analyzed it for all patents and he's simply saying if there were non-infringing alternatives, then that would have been taken into account, this is nothing to do with the NDA and for the substantive communications between the parties.

THE COURT: Is he going to say anything about

**his view as to whether or not Groupon infringes these patents?**

**MS. STEMPLER: No, he's simply making the point that the absence of non-infringing alternatives is an item that favors IBM.**

**THE COURT: Okay.**

**MR. HADDEN: So there is one way you can argue because if there was an economically viable non-infringing alternative that would have been an issue in the hypothetical negotiation, we don't have an objection to that, but if he then says I looked at the real world and they didn't change their product, that is evidence that there was not a non-infringing alternative, I don't see how he can do that now when we have in the real world we didn't change our product because IBM said don't change your product.**

**THE COURT: First of all, did he disclose that his opinion was that you didn't change and, therefore, that leads him to believe that there was no non-infringing alternative?**

**MR. HADDEN: He said --**

**THE COURT: Would you be able to point me to where he disclose that opinion? Don't run away yet. Is it your belief that he did disclose that?**

**MS. STEMPLER: It is in his report, yes.**

THE COURT: Okay. We'll come back to that. But you have a further argument, I suppose, even if it is in this report.

MR. HADDEN: If it is because he's now opining that the reason we didn't change is because it wasn't available, the factors change, IBM repeatedly said in the NDA, we don't expect you to change, we're not asking you to change, we expect you to --

THE COURT: I'm going to ask you a question and whoever wants to answer can. Are you going to oppose either on cross with this witness or as part of their case that bringing out the fact, if it is a fact, that the reason that at least in part they didn't change what they were doing was reliance on this NDA.

MR. DESMARAIS: Yes, we were going to oppose that for reasons argued earlier at side-bar.

THE COURT: Doesn't this suggest that this is a little bit misleading to the jury if, in fact, they have evidence that that was one reason that they didn't change?

MR. DESMARAIS: I don't think it's relevant because regardless of what it says in that NDA, Groupon had incentive to change because by not changing, they're incurring damages, they're making the argument here that the royalty should be lower because it was a non-infringing alternative. As a matter of economics, regardless of the

NDA, the NDA doesn't say you're not going to pay damages during this time period. In fact, we're charging for damages the whole time period. They could have avoided damages entirely by changing to a non-infringing alternative. That's all Dr. Hausman said, they could have avoided damages by changing.

MR. HADDEN: Can I respond? There is several NDAs. The first one says we will not seek damages from the period 2011 to the end of 2012. All of them --

THE COURT: Do you disagree with that fact that there is an NDA that says we won't seek damages?

MR. DESMARAIS: I need to defer to Mr. Oussayef for that.

THE COURT: Let's first figure out if his opinion has even been disclosed.

MS. STEMPLER: May I go grab his report?

THE COURT: Yes. You can all step away.

So first we're trying to deal with the issue of whether the way IBM wishes or believes that Mr. Hausman will respond about the non-infringing alternative or lack thereof, where was that disclosed.

MS. STEMPLER: This is from paragraph 195 of his opening report where he says, "Indeed, although this case was filed in March 2016, Groupon still has not implemented any alleged alternative to the '849 patent in lieu of using

the technology of the '849 patent. Especially when combined with the assumption of validity and infringement of the '849, Groupon's failure to identify an available, acceptable, and cost-effective non-infringing alternative further strengthens IBM's established bargaining position relative to Groupon at the hypothetical negotiation."

I will note that this paragraph appears for the other three patents as well.

THE COURT: All right. Does that respond to --

MR. HADDEN: No. What it said is, talking about the hypothetical negotiation and the assumption of validity and infringement. That's saying at the time of the negotiation, not taking into account what happens after. I mean, the fact that --

THE COURT: So tell me again what it is you expect he's going to respond if we go forward with his opinion on non-infringing alternatives?

MS. STEMPLER: Honestly I think he's going to say he discussed it with Dr. Schmidt and he understands there are no non-infringing alternatives, and then he'll say which party that benefits.

THE COURT: You think that's all you're trying to elicit?

MS. STEMPLER: Yes.

THE COURT: Do you object to the elicitation of

the opinion that I understand based on the technical expert there are no non-infringing alternatives and that is a factor that favors IBM?

MR. HADDEN: That's fine. It's just the notion that because they didn't do something for this period that shows there are no non-infringing alternatives, that's my objection.

MS. SHAMILOV: This is what we're going to go with. I would like to strike the last comments of Dr. Hausman.

THE COURT: Do you object to that?

MS. STEMPLER: I would oppose that.

THE COURT: Let me hear what it was at this point.

(The reporter read back as requested.)

THE COURT: So you want to strike all of that?

MS. SHAMILOV: Correct.

THE COURT: What is your position?

MS. STEMPLER: Our opinion is that it was disclosed in the report and we think he should be permitted to testify, based on the sentence that I read earlier.

THE COURT: Did you hear something there that was not disclosed?

MS. SHAMILOV: I just think to be consistent with the discussion, we can reask the question and have

**Dr. Hausman respond with that in mind, which was the hypothetical negotiation.**

**THE COURT: I'm not going to order it stricken at this point. But if the testimony that comes in in response to your new question is something beyond what you indicated you expect, you'll have to object and we'll come back here.**

**MS. SHAMILOV: And just one more question for clarity, Your Honor. I was planning to bring up the NDA, where they promised not to seek damages for Dr. Hausman to ask him would he actually consider that. It's highly prejudicial otherwise. We have a promise from IBM not to seek that, then they completely blew it. It's highly prejudicial for us not to raise that with Dr. Hausman.**

**THE COURT: I note we have Mr. Oussayef here at side-bar. A representation was made for at least one year there is an NDA that indicates that IBM agrees not even to seek damages I suppose for infringement for that year. So one question that came up was, is that true, does IBM dispute that?**

**MS. SHAMILOV: It's right here.**

**MR. OUSSAYEF: Your Honor, I don't know having just seen it right now, but I don't think the proper form is in cross-examination for this.**

**THE COURT: That's a different question. But do**

you know as a factual matter, does IBM dispute that, in fact, they did contract away their right to seek damages for at least the one year that's at issue here?

MR. OUSSAYEF: I'm not sure.

MR. DESMARAIS: Maybe we can do this. I agree with Mr. Oussayef, this shouldn't be coming up now.

THE COURT: Here is what we're going to do.

MR. DESMARAIS: We can stipulate, it doesn't need to be cross-examination.

THE COURT: Here is what we're going to do. Finish the direct and then we'll take a break and talk about this at the break.

(End of side-bar discussion.)

THE COURT: Good morning. Thank you, ladies and gentlemen. We'll be ready to proceed in just a moment.

BY MS. STEMPLER:

Q. So Professor Hausman, you considered all of the proposed noninfringing alternatives -- I'm sorry. You discussed all of Groupon's proposed noninfringing alternatives with Dr. Schmidt; right?

A. Yes.

Q. Okay. And which party at the hypothetical negotiation doesn't benefit that there are no noninfringing alternatives?

A. This gives IBM better bargaining power, so it favors

**them.**

Q. **Okay. Great. Let's move on to slide 70. What was the next factor that you considered?**

A. **Well, the next factor is that the patents-in-suit are important to the accused products.**

Q. **And who does that favor at the bargaining table?**

A. **IBM.**

Q. **And why is that?**

A. **Because they own the patents-in-suit.**

Q. **What was the next factor that you considered?**

A. **The accused products are popular and commercially successful.**

Q. **And, I'm sorry. Did I cut you off?**

A. **No, it's this benefits IBM because this says that the products that are using the patents are leading to good profits for Groupon.**

Q. **Okay. Let's keep going. What is the next item you considered?**

A. **The accused products generate revenue from other Groupon products. And that's what we talked about at the very beginning, like bread crumbs.**

Q. **What does that favor?**

A. **That favors IBM because, again, the patent, the patents are being used, and then the services from those are creating more revenue and profits for Groupon.**

Q. **Moving on to the next factor. What was the next factor that you considered?**

A. **The Filepp patents led numerous companies to take a license to IBM's portfolio.**

Q. **Who does that favor at the bargaining table?**

A. **That favors IBM because that says a lot of other companies have found these valuable enough to pay for.**

Q. **Then, finally, what was the last factor you considered?**

A. **The last factor is that IBM, as Mr. McBride testified, has extensive licensing experience while Groupon only enters licenses to settle disputes.**

Q. **And who will that favor at the hypothetical negotiation?**

A. **Well, that is IBM again.**

Q. **And why is that?**

A. **Well, because they know how to do it and they have done it, you know, tens, if not hundreds of times. And so they know how to structure the bargaining and to try to get a good deal.**

Q. **Right now, the factors that you analyzed that are benefitting IBM, would Groupon have come to the table with anything to support its position?**

A. **Yes, Groupon has an important thing on its side. And that is, Groupon provides the services that generates the**

profits. They're going to pay for the royalty to IBM. If Groupon weren't there, if they had crummy services, no one wanted to buy, there would be no profits. So to my way of thinking as an economist, that is a strength of Groupon. They're saying we're the ones who are generating profits and that gives us a good bargaining position.

Q. Let's move on to the next slide. What did your analysis of the parties' bargaining position tell you about how they would agree to share economic benefit of the patent?

A. Based on all these factors, I determined that a 50/50 split would be likely the outcome of the hypothetical negotiation.

Q. Now, the top of this slide says '967, '849, and '601 patents; right?

A. Yes, that's right. That's where I determined 50/50 would be likely.

Q. Just for clarity, you are talking about 50 percent of the apportioned profits you calculated earlier with us?

A. Yes. That is not all the profits, it's just the profits that arise from the patents, the use of the patents.

Q. Let's look at slide 79. What about the '346 patent? What would the parties have agreed on there?

A. Here, I give two-thirds of the profits to Groupon and only one-third to IBM.

Q. **And why did you write a different share for the '346 patent arrive?**
A. **Well I don't think the patent is as important at the end of the day to Groupon's profits.**
Q. **What do you mean by that?**
A. **Well, it gets more customers and more sales and more profits from the use of the patent, but if it didn't use the patent, people would still sign on, just fewer people I think would do it. They would have less profits.**
Q. **So just to be clear, is it your view that the '346 patent is just not as important to Groupon's profits as the other three?**
A. **That is the idea, yes.**
Q. **Okay. Thank you. Let's go to the final slide of your presentation. Professor Hausman, what would be the reasonable royalty in your opinion for the '967 patent?**
A. **$23,546,921.**
Q. **And for the '849 patent, what is your reasonable royalty?**
A. **$59,166,569.**
Q. **And what about for the '601?**
A. **$40,691,044.**
Q. **And the '346?**
A. **$43,064,289.**
Q. **So just to be clear, this is the number that you**

**arrived at after you applied your bargaining shares; is that right?**

A. **Yes. For the three patents it's 50/50, and the last it's one-third, two-thirds.**

Q. **What is your final conclusion for the reasonable royalty in this case?**

A. **$166,46,823.**

**MS. STEMPLER: Thank you, Mr. Hausman.**

**THE COURT: That's it for the direct; correct?**

**MS. STEMPLER: Yes.**

**THE COURT: Okay. Ladies and gentlemen, I'm going to give you your afternoon break at this point. No talking about the case and we'll get you back.**

**(Jury left courtroom.)**

**THE COURT: All right. So as I indicated, let's talk about one of the issues that arose at sidebar. Others can sit or leave. And, Ms. Shamilov, do you want Mr. Hausman not in the courtroom for this discussion?**

**MS. SHAMILOV: Yes, please, Your Honor.**

**THE COURT: Okay. Mr. Hausman, we're going to ask you to take a break. Step out. I'll see you in a little bit.**

**MS. SHAMILOV: Your Honor, I would also like Mr. McBride out of the courtroom.**

**THE COURT: Mr. McBride out of the courtroom?**

MS. SHAMILOV: Yes, because there is a request I will make potentially that will implicate him.

THE COURT: Okay. Mr. McBride, if you would be kind enough to step out of the courtroom for this break, I'd appreciate it. Thank you.

(Pause.)

THE COURT: I'll note both Mr. Hausman and Mr. McBride left the courtroom. Go ahead.

MS. SHAMILOV: Thank you, Your Honor. So earlier during Mr. McBride's cross, we discussed the MIL 1 issue, and the MIL 1 that was granted by the Court was to preclude IBM from presenting referenced evidence, argument, and testimony regarding the substance of the parties' pre-suit exchanges and failure to obtain advice of counsel.

That was the only MIL that was granted with respect to pre-suit communications.

The MIL that -- IBM's MIL that was granted only to preclude Groupon from offering evidence or argument relating to opinion for advice of counsel regarding Groupon's defenses prior to this lawsuit.

So the only MIL we have that applies to pre-suit communications is Groupon's MIL 1 that says, that asked to preclude IBM from using those communications basically against Groupon in this case. That's the MIL.

Now, the NDA that we wanted to show on Mr.

**McBride, and that I would like to use with Professor Hausman, were entered by the parties, they're not subject to this MIL. Right? These are not communications. We have signed agreement. And it is certainly not something that IBM is trying to use. We're just putting it in front, want to put it in front of Mr. McBride and want to put it in front of Professor Hausman. And here is the language that is in there. And if you can see it.**

**The discloser therefore agrees that it will not seek, with respect to patents or patent applications owned by discloser, or as to which the discloser has rights, as of the date of the execution of this supplement, or as to which -- No. 2, damages relating to recipient's continued use or provision of such services, systems, processes and/or products during the period from February 14, 2012 to the final disclosure date (the period). The final disclosure date.**

**May I move this document?**

**THE COURT: Sure.**

**MS. SHAMILOV: It's December 31st, 2013.**

**So during the period from February 14th, 2012 through December 31, 2013, there is a contractual obligation for IBM not to seek damages, yet in this case Professor Hausman used that period in his calculations.**

**Furthermore, this NDA, multiple NDAs say,**

disclosure has not demanded, nor does it expect, that recipient will cease or terminate any such activities -- referring to paragraph before -- and discloser therefore agrees that it will not seek, with respect to patents or patent applications -- and it just keeps going.

And then further, the argument at the end of this paragraph, it talks about that it will not use this notice of the patent during the period as a basis for increasing or enhancing any damages sought from the recipient.

So we have NDAs that are not subject to the MIL because the MIL was very specific, besides this is not a communication and it's not what IBM was trying to use, that they, that IBM will not seek damages, and that IBM will not seek willfulness.

THE COURT: Well, does it say it won't seek willfulness?

MS. SHAMILOV: There is another --

THE COURT: Hold on.

MS. SHAMILOV: I'm sorry.

THE COURT: It doesn't say it won't seek enhanced damages.

MS. SHAMILOV: There is another NDA that I can find that says, will not seek enhanced damages by asserting willfulness.

THE COURT: So what is it that you now propose to do?

MS. SHAMILOV: So here is what I propose to do, because I do think it is highly prejudicial in light of the language of the MIL, and that this NDA were discussed and at no point did IBM came back and say, well, if you going to grant this MIL, they should also not be talking about NDA.

This is highly prejudicial for us not to be able to use. So my proposal is I would like to cross Professor Hausman on this NDA with respect to the damages period, you know, put it in front of him and have him confirm that he did not exclude this period from his damages calculation.

And I ask, to alleviate the prejudice, if Mr. McBride is still here, to brings him back on the stand for very short cross and redirect on just this issue.

THE COURT: All right. We'll hear from IBM.

MR. OUSSAYEF: Your Honor, in effect what we have here is an extremely untimely counterclaim for contract enforcement in this case at trial after the witness that they wanted to cross-examine Mr. McBride is already down from the stand.

THE COURT: Well, let's --

MR. OUSSAYEF: You don't --

THE COURT: Hold on. Let's break it down.

Let's start first with the request to cross the

**witness who is on the stand with the NDA. Apparently, he did not or they expect he will say he didn't exclude the time period for which IBM may have no right to seek damages. Do you object to that part of the request of relief?**

**MR. OUSSAYEF: Yes, Your Honor. Because that creates a trial within a trial. We would have to -- we do not believe this agreement is enforceable, and we had a story to tell about pre-suit communications. At Groupon's request, pre-suit negotiations have been MILed out and their request is now we get to use the piece we like, i.e., the supposed agreement about conduct arising from that period, not, you know, all conduct before the lawsuit but conduct arising from that period, to cross an expert on this material when it wasn't in their expert report. It wasn't in our expert report. It was not even in issue in the case. And to do that at this late stage isn't the proper remedy.**

**To cross-examine a witness on this when there is a disagreement about whether the agreement is enforceable and what it means and how to interpret it would be very prejudicial because it takes the agreement out of context of the entire pre-suit discussions and whether it is enforceable and what it means and what the contract language is.**

**THE COURT: What is the proper remedy to terminate if this agreement is enforceable?**

**MR. OUSSAYEF: I don't think there is a remedy**

at this stage. I mean afterwards if Groupon wants to, I don't know, have some kind of contract claim or something like that, I don't know what they would choose to do, but that is not an issue in this case.

This case is a patent case and we have no counterclaims on this issue. We had no disclosure in expert reports. We had nothing at summary judgment. I mean I think the proper thing is if they really thought this agreement was enforceable, why didn't we see this at summary judgment to say this period of -- it should not be willful or this period, you know, should be interpreted as falling under the contract. And to cross-examine a witness at trial is just kind of another example doing something at the last minute.

I mean even McBride, bringing him back on the stand, there is no reason why they couldn't have crossed McBride on this agreement if they really thought that it meant something. So I think right now what, it's way too late to open up a new dispute in the case that has never come up before. In fact, we even moved on summary judgment on licensing defenses and we heard nothing from defendants. And the Court granted summary judgment on licenses, and there is nothing except for the Facebook or Google license.

THE COURT: With respect to Mr. McBride, I think we had a sidebar, and I said they couldn't examine him on

**the NDA. Isn't that what happened?**

**MR. OUSSAYEF: Yes, that's right, Your Honor. And I think for the exact same reasons, we shouldn't go into cross-examining Dr. Hausman on this. It is not sword/shield example where they want to MIL out all pre-suit communications except for the ones that benefit them some that they can use them out of context.**

**THE COURT: Well, what about the argument that the MIL only really sought to exclude communications and I shouldn't see the agreements as communications?**

**MR. OUSSAYEF: The agreement is called a nondisclosure agreement because the parties weren't to disclose information. And, of course, the agreement had to be communicated to each party so that they could actually sign it. So I think it falls squarely within the MIL.**

**THE COURT: So then the plaintiffs are going to adhere to the position I presume for all purposes throughout trial that these NDAs should not be shown to the jury for any reason?**

**MR. OUSSAYEF: That's correct, Your Honor.**

**THE COURT: And you think that that is what I ruled in granting Groupon's MIL No. 1?**

**MR. OUSSAYEF: I think, my interpretation of the Court's ruling is that pre-suit discussions are not to be admitted, and that includes the NDAs. It also includes,**

you know, a lot of evidence of willfulness about how we communicated with Groupon nonstop to try to get them to engage in a license and how they rebuffed us at every turn, and how they had no noninfringement positions they came back with. And they didn't make any invalidity arguments and they delayed nonstop.

We had a whole story to tell there, and putting that out of the trial but allowing just the sliver of here is our proposed NDA without any context or any experts to interpret it or any guidance for the jury as to what the contracts mean would be, you know, totally out of context and very prejudicial to IBM at this late stage.

THE COURT: And on the flip side, though, if there is evidence that one reason Groupon didn't change its behavior after hearing from you all is they were relying on these NDAs, and you are suing them for willful intentional infringement, and they have evidence that they subjectively did not change in reliance that is in part on those agreements, how can I justify not letting the jury hear that?

MR. OUSSAYEF: That should have been something their witnesses testified to on in the depositions.

Furthermore, we had a specific interrogatory that said, you know, tell us your basis for any actions you took or didn't take. And there was nothing about these licenses. In fact, there has been nothing about this the

entire case.

THE COURT: Okay. Thank you.

Ms. Shamilov.

MS. SHAMILOV: Your Honor, I found the willfulness language, if you would like to see.

THE COURT: Sure.

MS. SHAMILOV: Here is what it says: In the event of litigation, discloser and its related companies shall not seek to enhance those damages by asserting willful patent infringement, if any, that arise during the period.

THE COURT: And some part of the period that this agreement speaks to overlaps with the case.

MS. SHAMILOV: Correct. Yes. Well, and so it's within the infringement period and the damages period. Yes, Your Honor.

So the issue that counsel just talked about sort of the communications back and forth and Groupon not agreeing to pay IBM, you know, for whatever during those communications and not putting forth noninfringement and validity argument, none of that is relating to what we are trying to do. And all we're trying to say is you signed, these are not proposed agreements, they're signatures.

IBM signed three agreements. These are not communications. These are agreements. We're not talking about going back and forth. And in this agreement, there

is this language. We're not saying, you know, it's valid and enforceable. This is the agreement. You signed this agreement, yes or no. That is for Mr. McBride. And for Professor Hausman is the parties signed this that says this particular period should not be considered but you considered it and included it in your entire damages analysis.

I think when we were discussing the MIL, when you look at the briefing, the issue was -- right? -- you cannot use the back and forth four-way communications to establish liability or just, you know, indirect infringement because it is all 408, highly prejudicial. That was the context. That is why the MIL was phrased, and that was granted to preclude IBM from using the communications -- right? -- this is different. This is different subject matter and it is not communications between the two parties with signed NDA.

THE COURT: What I'm hearing from IBM is that at least one thing is that your expert has not considered these NDAs either; is that correct? Your damages expert.

MS. SHAMILOV: Our damages expert has a completely different calculation and he hasn't considered these NDAs.

THE COURT: He is not.

(Counsel confer.)

MR. HADDEN: I was just going to say our expert proposed a lump sum. It doesn't depend on the damage period.

THE COURT: Right. But did he disclose any consideration of these NDAs?

MS. SHAMILOV: I don't believe that is in his report. But I don't think that is an issue; right? These are the NDAs that IBM produced in discovery. This is their --

THE COURT: Well, it may be relevant only in trying to figure out, you know, based on what I had understood about the MIL and my ruling and what happened this morning, and it seems the parties' positions were consistent with this. These NDAs were not part of this trial. So I'm trying to understand, is there any way that IBM should have understood before today that these NDAs, in light of my ruling, were going to have a role in this trial at all?

MS. SHAMILOV: I think so, Your Honor. Because when we briefed it, we said the communications, the back and forth between the parties have no relevance to infringement or what IBM said or how we responded with amounts and we don't infringe and all that. And we used the language from the NDAs to say why it goes back and why those back and forth should be excluded under 408. And that is why, when

**we drafted the MIL, we drafted the MIL to ask the Court to prevent IBM from using the substance of the parties pre-suit communications. Right?**

**So these are the back and forth between the parties. We would have never asked for a MIL to exclude the NDA that we specifically relied on as the reason why the back and forth.**

**THE COURT: So how about the response to interrogatories that was referenced? I mean have you all disclosed at any point in this case that the NDAs had something to do with your defense or your claims on some issue in this case?**

**MS. SHAMILOV: I'm not sure which interrogatory.**

**THE COURT: Let me ask you. I mean, do you think you could point to anywhere where you put them on notice that the NDAs were relevant to your defense or to your claims in any way in this case?**

**MS. SHAMILOV: At a minimum, it was in the MIL because Mr. Tinsley pointed out the language that IBM agreed in the agreement to not seek damages for willful infringement for certain period. At a minimum, it was there. They knew that is what we were going to be relying on because, honestly --**

**THE COURT: So you think when I go back and look at the briefing on the MIL, I will understand that you**

**intended to rely on the NDAs and put them in front of the jury and that you made a distinction between the agreements and the communications that led to the agreements?**

**MS. SHAMILOV: I believe so. Because when we were -- in the briefing we were talking about here are the agreements, and we wanted to exclude the communications pursuant to this agreement for back and forth. That is how we briefed it.**

**And, again, the MIL was not presented to preclude us from using the agreement. All that was granted was to not allow IBM to use the communication to establish willfulness, liability, indirect infringement pursuant to 408. There is nothing in the MIL that was granted that would prevent Groupon from using the agreements in the case as a defense.**

**Exclusion of it is highly prejudicial to our case considering that in this case IBM was claiming willful infringement and we have three NDAs that say they will not seek, they did not ask us to cease our activity. The fact that you don't have to stop what you are doing. And in one of them, and in several of them they said I'm going to not seek enhanced damages by asserting willful patent infringement, which they're doing here. I think exclusion of this is outside of the MIL. It's not a communication, and highly prejudicial to Groupon.**

THE COURT: Okay. You can come back if you want.

MR. OUSSAYEF: Your Honor, there was no disclosure of this late theory that the NDA somehow affects damages. The PTO, the pretrial order with the list of issues to be tried has nothing about this. The expert reports, remember that, counsel for Groupon had to respond to our damages report with their own damages report and there was nothing in there about the fact that they thought there was an agreement that limited damages in some way.

In fact, counsel for Groupon even said in the last argument that she wasn't saying that the license agreement is even necessarily valid and enforceable. Indeed, we will have no opportunity to show that, you know, the agreement isn't enforceable or that it's being interpreted incorrectly if they use it to cross-examine our expert when he hasn't had a chance to review it. And that will put the license completely out of context.

In fact looking at the language in the Elmo I think is especially appropriate because it says that arise during the period. That's the last part that's underlined on the Elmo right now.

And this was after Groupon had notice of the Filepp patents, so this NDA wasn't about notice of the Filepp patent, this was about if they engaged in discussions

**and talked about some other patents, and had some kind of discussions there, maybe there is an argument that there is some kind of fact about additional patents outside of this lawsuit. But that's not even at issue here.**

**And to simply view it in a narrow light that we're going to present our interpretation of this license after IBM has put on the majority of its case and in cross-examination of IBM's last witness, to throw it in out of context after precluding all pre-suit discussions and all willfulness discussions that we wanted to have including putting this agreement in context would be highly prejudicial.**

**There is no prejudice to Groupon. If they think we're violating some agreement, they can bring a breach of contract later in the case. There is not prejudice to them. There is significant prejudice of having a one-sided interpretation of this agreement come up in this case at this late, late stage.**

**THE COURT: So if I were to go back and look at your interrogatories, can you represent that you served one asking them to tell you what they were relying on in response to damages and in response to subjective intent to infringe, and I won't see there anywhere that they disclosed to you that we're relying at least in part on these NDA provisions?**

**MR. OUSSAYEF: That's correct. So there is two interrogatories I have in mind. One was on their calculation of damages where it wasn't identified, and the second is on reaction to knowing about the patents and anything that was done there. And those are the two interrogatories that I have in mind and it was not disclosed in response to either of those interrogatories.**

**THE COURT: Thank you.**

**Ms. Shamilov.**

**MS. SHAMILOV: Your Honor, with respect to the two interrogatories, I have the to go and check the damages one. It ask about calculation of our damages because our expert used the lump sum, so it doesn't matter sort of what period it covers, it says they would have agreed to one lump sum payment. He didn't need to sort of slice and dice the damages period.**

**THE COURT: But it's hard for me to understand how it would be fairer to go through all the trouble you go through for fact discovery, expert discovery, pretrial order, and you all have an argument that one or more years of damages is just, per se, off the table, and you don't disclose it until this morning. You know, you're saying maybe it was implicit in the MIL briefing, I'll give you that for just this moment for sake of the question, why wouldn't that be too late?**

MS. SHAMILOV: I think, Your Honor, there is an interrogatory that they can point to that says, for example, what documents or what arguments you will rely on for, you know, in rebuttal to the damages calculation, whatever it's phrased, I don't think there was an interrogatory like that. The interrogatory that Karim mentioned about what is it that you did to avoid infringement or alleged infringement, that doesn't ask for this, we just respond and said we did not change our system. That is what you ask for in an interrogatory, that is the answer I provided.

I think the issue becomes, I'm not supposed to get up or through the discovery voluntarily disclose everything I may use in the case. Discovery works, you ask for it, you get it, and then you just get the exchange of expert reports and on damages we respond to the issues that were raised, and our damages value particular sort of different methodology.

But we have two issues in these agreements. One agreement says they want to seek damages for a particular period. And three NDAs say they will not seek enhanced damages by asserting willful infringement. Those are the two issues that are here and they're somewhat separate, Your Honor.

THE COURT: Anything else?

MS. SHAMILOV: No. Thank you.

THE COURT: Mr. Oussayef, you have more?

MR. OUSSAYEF: Your Honor, we served interrogatory on damages theories. We had expert discovery on damages theories. We had a pretrial order to have a disclosure of all the theories that would be tried in this case. Throughout all of that process we heard nothing about this NDA. It's just way too late.

THE COURT: Anything else?

MS. SHAMILOV: The burden, it's not the burden on us to prove damages, the burden is them to prove damages and if our expert on damages issue setting aside the willfulness language on the agreement, if our expert decided not to slice and dice the period, and just say lump sum that's what they would have agreed to and be done with, I don't think I was supposed to go and rebut every single document out there that may relate to the issue, he just analyzed the damages in response to their report in a different way that he decided was applicable.

I'm not aware of any interrogatory that said identify documents you will rely on potentially in all of your damages, for all of your damages opinions. I'm just not aware of that interrogatory, Your Honor.

THE COURT: All right.

MS. SHAMILOV: Thank you.

THE COURT: We'll take a break.

 (Brief recess taken.)

* * *

(Proceedings reconvened after recess.)

THE COURT: Have a seat. I'm going to give you a ruling on the issues that are before me.

Let me note first for the record I'm charging time 50/50 for this discussion that we've had ever since the direct ended and for this ruling.

As I see it, the issues before me right now are whether or not to allow Groupon to call back Mr. McBride and whether to allow Groupon to cross-examine Mr. Hausman, both of those with respect these NDAs, and I have decided not to allow Groupon to do either of those things. Let me try to explain why.

I am replying in part for my ruling on the representations, the consistent representations from IBM that were I to have the time to go back and look at all the interrogatories served and the responses thereto, that I would not find at any point in those interrogatories the defendant ever disclosing to IBM that part of its defense either to damages or to the willfulness allegations was reliance in part on these provisions in the NDAs.

I understand from defendant that they acknowledge that their damages expert did not disclose in his report or I take it in his deposition that any part of

**his analysis on damages was consideration of or reliance on the NDAs.**

**My understanding -- I won't pretend that I went back and read the entirety of it, but my understanding is that the pretrial order also does not indicate in any way that Groupon is relying or that part of his defense to either damages or willfulness is a reliance on the provisions of the NDAs. At best, as I understand Groupon's position, it is that they disclosed in connection with the motion in limine briefing that they were going to rely on the NDAs for part of their defense at least on willfulness, and I suppose they might argue with respect to damages, too.**

**I have gone back and looked at the briefing on the MILs, and I just don't see that. And I don't think, it certainly wasn't how I read the briefing at the time. It's not how I read it now.**

**I did not intend, by my order on the MILs, to distinguish in such a way that would allow Groupon to rely on pre-suit communications but IBM not. And I didn't intend to distinguish between the NDAs as agreements versus all other types of pre-suit communications. To the extent that was unclear, I think I clarified it this morning in connection with the sidebar that arose with respect to I think it was Mr. McBride, but it was the witness this morning. And I am hereby further clarifying it. I have not**

seen that there was adequate disclosure in a pretrial basis by the defendant of its intent to rely in any way on these NDAs and specifically with respect to damages or willfulness.

Now, with respect to the motion in limine, at best, and I think this is entirely ambiguous if I read it in favor of Groupon, at best, there was footnote 1 at D.I. 305-2, page 3, footnote 1, where Groupon said: This motion does not intend to prevent Groupon from relying on the parties' agreement or the fact that Groupon was represented by counsel during the pre-suit negotiations at IBM; and if IBM will be allowed to rely on the pre-suit negotiations, Groupon intends to rely on them in defense to and in rebuttal of IBM's claims and positions.

So at best, that is ambiguous and indicates perhaps maybe Groupon was trying to tell us that they were reserving the right to rely on the agreements. However, how I read it, and I think it is the better reading, is, hey, if our motion in limine is denied and you allow IBM to bring in these pre-suit communications, that is, if IBM will be allowed to rely on pre-suit communications, then, but only then, Groupon intends to rely on them in defense to and rebuttal of IBM's claims and positions.

In context again, it is ambiguous. I don't read it the way Groupon might want me to, but in context, it is

 not an adequate disclosure of that position.

At bottom, my view is in general, civil trials, particularly civil jury trials, are not supposed to be exercises in surprise. That's what the rules of discovery are for. You should all pretty much know what you are going to hear from every witness at trial. You should certainly know the major themes and theories. And it is just simply too late to ask me to throw this trial in a different direction and make the NDAs part of it.

Now, it may be -- I am making no ruling on this whatsoever. It may be outside of this case, Groupon has a claim against IBM. Don't know. It may also be that Groupon has some rights they could try to assert post-trial in connection with briefing on any post-trial motion. I don't know. I'm not saying they do and I'm not saying that if post-trial Groupon seeks that relieve that IBM can't say this is an untimely request. I take no view on any of that at this point. But in terms of how this trial is going to proceed, I'm again ruling that the NDAs are out. So any questions about that or anything further on this?

MS. SHAMILOV: No, Your Honor.

THE COURT: Any questions or anything further?

MR. OUSSAYEF: No, Your Honor.

THE COURT: Okay. We'll bring the jury in.

All right. We need to bring the witness back.

(Jury entering the courtroom at 3:06 p.m.)

THE COURT: Ladies and gentlemen, we are ready to proceed. Ms. Shamilov, whenever you are ready.

MS. SHAMILOV: Thank you, Your Honor. May I approach the witness, Your Honor?

THE COURT: You may.

CROSS-EXAMINATION

BY MS. SHAMILOV:

Q. Good afternoon, Professor Hausman.

A. Hi.

Q. If Groupon does not infringe the patents-in-suit, IBM is not entitled to any damages; is that right?

A. That is correct.

Q. And if the jury finds that IBM's patents in this suit are invalid, IBM is also not entitled to any damages?

A. If they are all four invalid, you are correct.

Q. Thank you. I would like to start talking a little bit about the licenses. And I might direct you to the screen, it might help you.

We talked about Amazon's license; right?

A. Yes.

Q. And Amazon paid to IBM $49.8 million; correct?

A. Yes. It allowed IBM to use, I think they have eight or 9,000 patents. So they made --

Q. I'm sorry, that was a yes or no question.

A. **Okay. Yeah.**

Q. **Thank you.**

**And in that, according to that patent license, IBM allowed Amazon to use over 40,000 of its patents in Amazon's business, is that right?**

A. **And vice versa.**

Q. **And Amazon is a much larger company than Groupon, would you agree with me?**

A. **Yes.**

Q. **And now let's talk about Facebook. Facebook has two patent license agreements with IBM; correct?**

A. **Yes.**

Q. **And the sum total of both of those is $20 million; right?**

A. **That's correct.**

Q. **And it's also for using 40,000 plus of IBM patents in whichever way in Facebook's business; correct?**

A. **And IBM gets to use 5,000 Facebook patents.**

Q. **Thank you.**

**And Facebook is also a much larger company than Groupon; correct?**

A. **Yes.**

Q. **And Google, let's take Google. Google also has a patent license agreement with IBM; right?**

A. **Yes.**

Q. They paid $35 million for it; correct?

A. Yes.

Q. And it also covers the entirety of IBM's patent portfolio which is 40,000 plus patents for Google to use in whichever way it needs for it business?

A. And IBM gets to use 28,000 Google patents.

Q. Thank you.

Let's talk about Priceline. Priceline was a settlement agreement, correct, with IBM?

A. Yes.

Q. That is because IBM sued Priceline; is that right?

A. That's what I understand. Well, I know.

Q. You actually worked for IBM in that case; right?

A. Yes.

Q. So that case actually settled just about four weeks before trial; isn't that right?

A. That sounds right, yes.

Q. And in that case, Priceline disputed that it infringed the patents; correct?

A. Yes, there was no assumption of validity and infringement.

Q. And in that case, Priceline actually claimed that the four patents were invalid; correct?

A. Yes.

Q. And the settlement agreement if we interpret it

generously is $40 million total, there is two sets of payments, but total it's about 40 million?

A. That's my understanding, yes.

Q. And it's a cross license as well, isn't it?

A. Yes.

Q. You were deposed in the Priceline case, do you remember?

A. Yes.

Q. This is what you told -- this is your testimony in that case where counsel there asked you --

MS. STEMPLER: Objection, Your Honor.

THE COURT: Hold on. Let's take it down for a moment. What's the purpose?

MS. SHAMILOV: I just want to confirm that that's what Dr. Hausman said.

THE COURT: You can ask him first.

MS. SHAMILOV: Okay. I can do that, sure.

BY MS. SHAMILOV:

Q. You were deposed, yes, just to backtrack a little bit just for the jury?

A. Yes.

Q. In that case you were asked the value of, Priceline's value of their software; correct?

A. Yes.

Q. You actually said the word bupkis; right?

A. **That's a term of art, yes.**
Q. **And that means nothing at all; right?**
A. **Well, they had 57 patents. Pretty small?**
Q. **So that Priceline license, the value of the cross license in that particular license agreement with Priceline is zero; correct?**
A. **Well, close to zero, yes.**
Q. **So the value of the freedom to operate in the Priceline agreement is also close to zero?**
A. **Yeah.**
Q. **And Priceline is also a much larger company; is that right?**
A. **Yes.**
Q. **And so here, each of those companies paid individually a lot less, including Priceline, than what you're saying Groupon should pay to IBM. In fact, if we just total them out, which is going to be 144.8 million, that total combined is less than what you're saying Groupon should pay to IBM for just four patents; is that right?**
A. **Yeah, that's correct.**
Q. **Now, I want to talk to you a little bit about the apportionment analysis that you presented to the jury today.**
A. **Sure.**
Q. **And I'm going to use some of the slides. I think this is one of the slides you put up in front of the jury;**

right?

A. Yes.

Q. And so here you have 59.2 percent of cache content; correct?

A. Yes. Yes.

Q. That's the number you got from Dr. Schmidt; correct?

A. Yes.

Q. That is not a result of any economic analysis, is it?

A. No, it's a technical analysis.

Q. Dr. Schmidt is not an economist; right?

A. Correct.

Q. And that is not a percentage of revenue, is it?

A. No, it's a percentage of use.

Q. And then 21 percent of returning visitors, that is also not a percentage of revenue, is it?

A. No, that's a percentage of use of returning visitors.

Q. And yet you're performing a calculation on two percentages that have nothing to do with revenue and arriving at the result that's revenue, isn't it?

A. I disagree.

Q. Isn't that what you're showing there?

A. Yeah. If you take 60 percent and multiply by 20, you get about 12 percent, so that's says if you look at the bottom, it says revenue associated with use of the '967 patent, so you take 12 percent multiplied by the revenue,

and it's associated with the use of the patent.

Q. Let's look at the next slide. This is what you presented to the jury for the '849 patent and, again, the percentage of 59.2 percent of badges in the website and 52.7 of the apps, those are numbers you got from Dr. Schmidt?

A. Correct.

Q. Those are not the results of any economic calculation?

A. No, it's the use calculation.

Q. And these are not percentages of revenue, are they?

A. That's correct.

Q. Neither are the 21 percent or the 21.4 percent respectively there that you put for the websites and the apps?

A. That's correct.

Q. And again, you multiply the non- revenue percentages in arriving at the results that you say is revenue?

A. It's the amount of revenue that's associated with the use of the patents.

Q. None of these percentages are incremental revenues, would you agree with me on that?

A. I asked Groupon for incremental revenue for the use of these. I asked IBM's lawyers, of course, to ask Groupon and Groupon answered we don't have that data. There is no way I can do it. It would have been best I'll be the first

to admit as an economist, but Groupon said they didn't have the data so this is the best approximation I could come up.

Q. I'm sorry, is that a no, these are not?

A. These are not, but I specifically asked IBM to get the data from Groupon and Groupon answered we don't have the data.

Q. And for the '967 patent going back, these percentages are also nonincremental revenue; correct?

A. That is correct, Groupon said they didn't have the data.

Q. Let's look at the '601 patent. Again the 12.5 percent, that's the number you got from Dr. Schmidt; right?

A. Correct.

Q. Again, not a percentage of the revenue?

A. Right.

Q. Not incremental revenue; right?

A. Again, Groupon said it didn't have the data.

Q. And the same sets of questions about the '346 patent. The 14 percent that you put up on the slide there, that is not a percentage of revenue; right?

A. That's the amount it used which is associated with the ten billion, approximately $10 billion of revenue.

Q. I'm sorry, I didn't mean to interrupt.

A. That's okay.

Q. And that is not incremental revenue either; right?

A. **Again, Groupon said it didn't have it.**

Q. **And, in fact, you have no evidence at all to present here to tell to the jury that if Groupon did not use the '346 patent, that 14 percent of its users would not be signing up, do you?**

A. **No, I don't.**

Q. **Okay. Thank you.**

**Now, Groupon sells -- I think you testified earlier today that Groupon on its website sells deals and goods; is that right?**

A. **That's correct.**

Q. **So starting with goods, like Groupon gets revenue because people want to buy the things it's selling as goods; right?**

A. **That's half of it. People who are selling the goods want to make profits so you need both a seller and a buyer, yes.**

Q. **You were deposed in this case as well, right, Dr. Hausman?**

A. **Yeah. Sure.**

Q. **I think the tab one in your binder there is your deposition transcript from your case.**

A. **Okay.**

Q. **If I can have you turn to page 75, lines 20 through 23.**

A. **Okay.**

Q. **"Question: So starting with goods, like Groupon gets revenue because people want to buy the things it's selling as goods; right?**

**"Answer: At the price they're offered, yes."**

A. **Yes, that's what I said.**

Q. **And then IBM is not claiming that those goods, right, those batteries or headphones, whatever Groupon is selling is covered by patents; right?**

A. **That's correct.**

Q. **And if Groupon did not offer product that customers wanted to buy at good prices, they would have no or little revenue, right?**

A. **That's what I testified to about an hour ago, sure.**

Q. **Besides working with IBM on the Priceline case, you have consulted for IBM before; right?**

A. **Well, I have consulted with them, yep, once or twice, but I have also been against them.**

Q. **So you have got about what, over $140,000 for your opinions in this case for IBM?**

A. **That's for my analysis, yes.**

**MS. SHAMILOV: Thank you so much. I have no further questions.**

**THE COURT: Redirect.**

**MS. STEMPLER: Thank you, Your Honor.**

REDIRECT EXAMINATION

BY MS. STEMPLER:

Q. Professor Hausman, counsel is asking you about your extent of use analysis. In this instance, why did you start out with the accused revenues and then apportion it down through extent of use to the revenues associated with the patents?

A. Well, what I tried to figure out is, you know, the Groupon documents says that, for instance, response time is an important way to get higher sales and higher profits. And so, you know, you take one of these patents and you can't ascribe all Groupon's profits or all Groupon's revenues, that's what I was just discussing -- I'm sorry, I missed her name, who cross-examined me, I apologize.

THE COURT: Ms. Shamilov.

A. Ms. Shamilov, excuse me, that's what I was discussing with her, you attribute it, most of it to Groupon, here we're attributing 88 percent of the revenue to Groupon and 12 percent to the use of the patent, so that's what apportionment is.

Q. When you applied your extent of use in this example it's the cached content and the returning visitors, we looked at some other examples in the other patents, did you understand that to be a reasonable estimate of the extent of use from Dr. Schmidt?

A. Yes, absolutely. He did the analysis and it seemed correct for me so I used it.

Q. Under your analysis, would your analysis make sure that you only capture the revenue associated with the patent and not any of the other contributions that Groupon has made?

A. Certainly that's what I mean to do. As I said here, 88 percent of the revenues are associated with no use of the patent, only 12 percent of the revenues are associated with use of the patent for this example.

Q. Now, counsel also asked you about the Priceline settlement agreement. In that agreement, was there an assumption of validity and infringement?

A. No. In fact Ms. Shamilov, you know, basically explained things correctly in my view. And that is that Priceline was claiming that the patents were invalid, and that they were not infringed, so that means that Priceline had one, IBM would have gotten zero just like Ms. Shamilov was having me answer. IBM, of course, thought they were valid and infringed, they came to a settlement, they came to a deal.

But here it's completely different because here I'm assuming under the hypothetical negotiation that was on the screen, which I'm told to do by the Court, that the patents are valid and are infringed. So at least for my

analysis there is nothing to argue about, you know, compared to the Priceline. So I think the comparison she made at least from an economist point of view is inappropriate, but that's my view.

Q. Counsel for Groupon also asked you about a few of the other licenses with Amazon, Google and Facebook. Do you remember that?

A. Yes.

Q. Can you remind us why those cross license fees paid are not the whole story?

A. Yes. I was trying to explain this and she didn't allow me to, but let's take Google. So it's true that IBM had 40,000 patents, but Google has 28,000 patents. And so -- and Amazon has over 8,000 patents. So as I tried to explain, if IBM wants to compete on the cloud or if IBM wants to compete on artificial intelligence, Mr. McBride spoke to that, they're going to need to use these patents, so there is value going in both directions. I think her way of only looking at value in one direction, I think that's wrong. She's looking at half the story. You got to look at both sides.

Q. In a hypothetical negotiation between IBM and Groupon, how many patents did IBM get from Groupon?

A. Zero.

MS. STEMPLER: I have no other questions for

this witness. I want to clarify I'm not sure there were certain exhibits I meant to move into the record, I thought I did, but I just received a note that I might have missed some. Shall I read this?

THE COURT: I think to be safe.

MS. STEMPLER: Those were Plaintiff's Exhibit 168 through 171, 173, 375, through 378, and 1566 through 1568.

THE COURT: And you used all of those in your direct examination?

MS. STEMPLER: Yes.

THE COURT: Is there any objection?

MS. SHAMILOV: May I see the slides just so I know what -- I'm sorry. No objection.

THE COURT: No objection. They are all admitted or readmitted. You can step down. Thank you very much.

(The above exhibits were admitted.)

THE COURT: What's next from IBM?

MR. OUSSAYEF: Your Honor, at this time IBM would like to play another deposition clip.

THE COURT: Okay.

MR. OUSSAYEF: Ladies and gentlemen of the jury, IBM is now going to play a clip from a Groupon employee. He is Damien Schmitz. He is the senior director of financial planning and analysis.

THE COURT: About how long?

MR. OUSSAYEF: It is three minutes and 45 seconds.

THE COURT: All right. We will turn the lights down and once that's done, you can play.

(Videotape deposition of Damien Schmitz).

"Question: Would you please state your name and address for the record.

"Answer: Certainly. It's Damien Schmitz.

"Question: And your title and place of employment, if you will?

"Answer: Senior director FP&A for Groupon.

"Question: And FP&A is?

"Answer: Financial planning and analysis.

"Question: So what does -- what does that mean to be the global director of financial planning and analysis.

"Answer: It involves an understanding of our actual financial results, as well as forward-looking projections.

"Question: Does Groupon have any license policies that it follows when it's taking a license to technology from third parties?

"Answer: No. Groupon does not have any written or unwritten licensing policies.

"Question: What about when it's licensing its own technology to third parties? Does it have a licensing policies for that?

"Answer: No, similarly, no written or unwritten policies.

"Question: What industry practices does Groupon follow when negotiating patent licenses?

"Answer: Any decision would be made on a case-by-case basis.

"Question: Who's responsibile for negotiating licenses at Groupon?

"Answer: I believe that falls under our legal team.

"Question: And do you know why Groupon stopped using CSOI?

"Answer: We viewed EBITDA as a better measure.

"Question: And why is that?

"Answer: It's better aligned to the cash flow as described earlier.

"Question: So the quarterly financial filings report, the reconciliation of EBITDA to GAAP?

"Answer: Yes. Our management team looks at adjusted EBITDA and talks to the board about it, especially as that relates to cash-based health. And when we're -- we also are looking at the GAAP net operating income as a

**financial profitability metric and a health metric overall.**

**"So it's kind of -- you know, they're measuring different things and they're slightly different lenses overall. So we look at both.**

**"Question: So other than the adjusted EBITDA and the GAAP net operating income, are there any other measures that Groupon considers to be accurate measures of its financial status?**

**"Answer: Additionally, in our annual report filings we'll -- we have other metrics that are used to provide information on Groupon and our overall status, whether those are -- some of which are units sold, some of which is number of deals. Historically, some of that information was provided. We also look at our active customers.**

**"Question: So as of 2016, Groupon was reporting that adjusted EBITDA was a key measure to evaluate its performance of its business; right?**

**"Answer: Yes.**

**"Question: And does Groupon still believe that today?**

**"Answer: Yes, and it's reported in our -- to our board of directors as well as disclosed in our quarterly earnings."**

**(End of video deposition.)**

MR. DESMARAIS: Thank you, Your Honor. That concludes IBM's opening case.

THE COURT: Okay. Thank you very much.

MR. DESMARAIS: Thank you.

THE COURT: We'll turn to Groupon.

MS. SHAMILOV: Your Honor, we have some motions to make.

THE COURT: Sure. We'll take up those motions at the next opportunity.

MS. SHAMILOV: Our first witness will be Mr. Carlisle, but I'm not sure. Do we have issues?

THE COURT: Are there any issues?

MR. DESMARAIS: No, Your Honor.

THE COURT: So you may call Mr. Carlisle and let's turn the lights back on.

MS. SHAMILOV: Ladies and gentlemen, our first witness will be Mr. Jason Carlisle. And he is the VP of marketing at Groupon.

... JASON CARLISLE, having been first duly sworn, was examined and testified as follows ...

THE COURT: Welcome. And good afternoon, Mr. Carlisle.

THE WITNESS: Hi. Thank you.

THE COURT: Ms. Shamilov.

MS. SHAMILOV: Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MS. SHAMILOV:**

Q. **Good afternoon. Can you please introduce yourself to the jury?**

A. **Good afternoon. I'm Jason Carlisle. I'm the Vice President of Marketing at Groupon.**

Q. **Where do you live?**

A. **I live in Seattle, Washington.**

Q. **Did you grow up in Seattle, too?**

A. **I did grow up in Seattle for the most part. My dad was in the military, so we moved around a lot until about the Fifth Grade, but settled down in Seattle and grew up there with my two brothers and still live just a few blocks from the house I grew up in.**

Q. **Mr. Carlisle, we have the court reporters here. If you could slow down just a tad, it will make his life less difficult.**

A. **Sure.**

Q. **Did you venture out of Seattle for college at all?**

A. **Actually, I did not. I stated in Seattle. I went to the University of Washington and received a degree in English.**

Q. **How long have you been with Groupon?**

A. **I've been with Groupon since 2012, so about six years.**

Q. **What is Groupon?**

A. **Groupon is an online marketplace for local business. And we have -- you can access it through the website or through the mobile app.**

Q. **And is this an image of Groupon's website?**

A. **Yes, it is.**

Q. **And do all users across the country see the same website?**

A. **No, you see different things based upon where you are. So here, this is actually an example from some Wilmington businesses that shows a Mexican restaurant, you see a gym, a massage, some hotels. And these are all local businesses here in Wilmington.**

Q. **So if I were in Seattle, I would see something different?**

A. **That's right. If you are in Seattle, you are going to see things that are more relevant to the Seattle customer base. So here, you see a Seattle hotel, family fun center, Seattle Mariners game, a tanning salon. Things that are local businesses there in Seattle.**

Q. **Why does Groupon change its website depending on where it is seen?**

A. **So part of our goal at Groupon is to connect customers with local businesses in their community, so Groupon has a platform that helps both customers and local businesses.**

Q. **How does Groupon's platform help local businesses? Can you tell us a little bit more about that?**

A. **Sure. So most of the businesses that work with Groupon are small businesses. Ninety percent have less than 20 employees, and a third are -- almost a third are sole proprietors. So Groupon really helps these small businesses compete with some of the giants out there like the Amazon and the eBayes. Most small businesses don't have the resources to do that. So Groupon provides a platform that helps these businesses reach customers and retain new customers.**

Q. **What about for the customers? How does it help them?**

A. **Yes. So the customers, they like Groupon because it provides them with discounts on the deals that we sell on Groupon. And, you know, they like the deals and they like to discover new things to do in their community.**

Q. **And how do they discover things in the community? How do customers discover things in the community?**

A. **So when you are browsing Groupon, you can see the different deals that are available to you. It might be something that you hadn't considered otherwise. And so you go check out those deals and look for things that appeal to you.**

Q. **Why did you decide to join Groupon?**

A. **So I joined Groupon actually because a friend of mine**

started working there. I hadn't considered it prior to that, but then as I looked into it, I really liked how, you know, not only was it a strong technology company but also it had a good mission I felt like where we wanted to really help consumers and help local businesses.

Q. Was there anything specific about Groupon helping local businesses that drew you to Groupon?

A. Yeah. I guess, you know, when I was growing up, after high school, I worked for a few small companies. I worked for a mom-and-pop furniture shop and a small furniture company and was able to see firsthand just how hard it is for these small businesses to succeed. So working for Groupon, I fell like it was an opportunity not only to work for a tech company but to work for one that really wanted to empower these small businesses.

Q. When did Groupon launch its platform?

A. So I wasn't around when Groupon started, but I know the history. And Groupon started in 2008, launched its website out of Chicago.

Q. And why was Groupon's first deal in 2008?

A. This is actually a picture of it right here. This is a pizza restaurant that was in the same building as Groupon's headquarters.

Q. And when Groupon launched in 2008, were there other companies who were doing kind of similar things to Groupon?

A. **Groupon was actually the first company of its kind to start a local marketplace for small businesses.**

Q. **Did others follow?**

A. **Yeah, there were several companies that tried a similar business models, but none of them had really succeeded the way Groupon has.**

Q. **Why is that?**

A. **I can't say exactly why they failed. But I do know that what we do is not easy. It's hard to get the types of deals that consumers want to buy and to find merchants to fill up that marketplace, and connecting those and putting that all together in every city that we operate in is a very difficult thing to do.**

Q. **How does Groupon accomplish that?**

A. **So Groupon invests a lot of resources to help make that happen. They -- we have a large technology team that is making sure by building out the platform and making sure we stay on top of all the technological advances. We have a large team that works with merchants, and they're out there making sure that their merchants are reputable, helping them with merchants, helping the merchants structure their deals so they can be successful on the Groupon platform, and then putting all that together in a way that it appeals to consumers. That's a difficult thing to do. So that's our focus.**

Q. **How many merchants have signed up to sell their products on Groupon?**

A. **Groupon has worked with over 1 million merchants worldwide.**

Q. **What about customers? How many customers do you have at Groupon?**

A. **We have over 31 million customers in North America right now. And those are people who have bought something from Groupon in the last 12 months. And it's kind of cool to see. Most places I go now, there is someone who has heard of Groupon or has bought something on Groupon. You can see it coming up in local media.**

Q. **What do you mean it's coming up in local media?**

A. **I can give you tan example. The other day was Father's Day so I was, you know, sleeping in a little bit. My kids were making breakfast, and I was reading the local newspaper in Seattle, and it was a cartoon where the dad was getting, given the gift of some swim shorts. And the family went to the lake and went for a swim at the lake. And all the other dads that were on the beach were wearing the same swim shorts. And the dad says to the wife: Did you get this deal on Groupon? And so I thought it was interesting to see it come up. It gave me a little chuckle.**

**But it's also nice because it expresses Groupon's mission, which is be a daily habit in local**

commerce where we want customers, no matter what they want to buy, whether it's a restaurant or spa or gym or to buy a gift, that they can go to Groupon and get what they need.

Q. And is that the funny cartoon you just mentioned?

A. Yeah, that's the one.

Q. Now, what kind of -- what types of deals can customers purchase through Groupon?

A. So if you go to Groupon's website, up at the top you can see the categories, you can browse by category.

Q. I'm sorry. Is that it?

A. Oh, yeah. That is what you are showing here.

So the local deals, those are the deals that are in your neighborhood. So things like restaurants, spas, things to do, activities. Those are the local businesses that are on Groupon.

And goods, those are the physical goods we sell. Things you ship to your house, like beach chairs or luggage, those types of things.

And getaways, that is where we have our travel deals. These are things like hotel stays or cruises, vacation packages.

And then we have a couple of other promotional sections here, like deals of the day and best sellers.

Q. And I used the word deal, so did you, and I think the jurors heard that word over and over again. What are deals?

A. **So deals are what Groupon sells. Deals are the products and services that are on Groupon's platform, and that's where Groupon sells them at a discount. That is why we call them deals.**

Q. **And are deals advertisements?**

A. **No, they're not advertisements.**

Q. **Why are they not advertisements?**

A. **They're not ads because that's actually what Groupon is selling. We're like any other e-commerce platform that is out there where the products and services that we sell are the deals and they're on the site. Ads are something that is usually peripheral. Customers aren't going to the site to see ads. They're usually the banners that you see on websites. We have probably all seen them. And they -- or actually, yes, you have just shown an example.**

Q. **Yes. Okay. Does Groupon's website actually include the banner ads? I think that is what you called them.**

A. **Yes, so we do have some ads on the site. Here is an example where the deal cards, that is what you see on the right, this is most of the content here. But the advertisement is that restoration hardware there out there on the left. And if you click on that, you actually go outside of Groupon to that advertiser's website. And that is a big part of what distinguishes the ad from the content and the things that we sell.**

Q. **Can you tell us a little bit about certain things that users can see on the website, customers can see on the website that may help them discover a new deal?**

A. **Sure. So Groupon tries to put a lot of things out there on the site to help customers to decide if a deal is good or not. For example, here we have reviews for the deal. I think this particular deal has almost 2,500 ratings, and it has got 4 and-a-half stars. You can click on the ratings and see what. These are verified purchasers. These are actually people who have bought this deal and it shows what they have said about the particular deal.**

**We also have large images that we show for each merchant that works with Groupon. For the consumer, it makes sense of what they would get if they were to shop at this particular merchant.**

**And, you know, we show how many have sold and those types of things. And that is the information that we provide to customers to give them a sense of whether or not they want to buy at Groupon.**

Q. **And do merchants also generally like using Groupon's platform?**

A. **Yes, merchants really like Groupon's platform. It's a strong source of new customers for them, and they have success retaining the customers. In fact, 80 percent, nearly 80 percent of the customers that try Groupon say they**

plan to revisit the merchants that they visit.

Q. Do you have a story of a local merchant that might have shared, you might have heard of?

A. Sure. So just a few weeks ago, I bumped into an old friend and his wife. We started talking and his wife works for a company in Seattle called Eat Local. And the company makes healthy frozen foods and, in addition, they cook. They do cooking classes. And so it was, you know, I started talking to her, and she asked me what I do. And I said I work for Groupon. And she says ah. You know, we get over half the customers for our cooking classes from Groupon. So it was really cool to see my company helping her company grow.

MS. SHAMILOV: I don't have any further questions at this moment. Thank you.

THE COURT: Okay. Cross-examination.

MR. DESMARAIS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DESMARAIS:

Q. Good afternoon, Mr. Carlisle.

A. Good afternoon.

Q. So you would agree with me, wouldn't you, that Groupon is a pretty big company now; right?

A. Yes, I would say Groupon is a pretty big company.

Q. Over 6,000 employees worldwide; right?

A. That's correct.

Q. And you told us 34 million users in the U.S. this year, but if you look worldwide, it's even much bigger than that; right?

A. I think I said 31 million, but yes.

Q. I'm sorry. I misheard you. And you showed us some photos from your website. This is one of the slides you just showed us; right?

A. Yes, that's correct.

Q. And you see on the top, it has this command bar where you can click on things and go to different channels on Groupon?

A. Yes.

MS. SHAMILOV: Objection.

THE COURT: What is the objection?

MS. SHAMILOV: This is lacking.

THE COURT: He asked the question and he got the answer. Overruled. Go ahead.

BY MR. DESMARAIS:

Q. Now, you would agree with me, wouldn't you, that the idea of a command bar that you can click on to go to different applications for different channels, Groupon didn't invent that idea; right?

A. That's correct.

Q. On your website, you see the images, that we see the

photographs?

A. Um-hmm.

Q. Those get stored in the local cache on the user's computer; right?

A. I'm not sure exactly how each user's computer works.

Q. But you would agree with me, Groupon didn't invent how to download images or advertising and store it on the local cache; right?

A. We did not invent that. I think that is embedded in a lot of browsers.

Q. Now, on these command bar, you have at the top where you can click and go to the different applications or channels. That allows you to do random movement between all those different channel; right?

A. Yes.

Q. And you didn't invent at Groupon the notion that you could click on icons and randomly move through different channels, did you?

A. We weren't the first people to do that. I have seen other companies do that.

Q. And Groupon has what people call social-sign-on or single-sign-on, right? Where you can sign on through Facebook or sign on through Google, right?

A. When you say sign on?

Q. Or sign up.

A. **Or sign up, yes.**

Q. **You have that, right?**

A. **Yes.**

Q. **And you would agree with me, Groupon didn't invent that, right?**

A. **Yes.**

Q. **But you would also agree with me all these things that Groupon didn't invent, Groupon is using; right? You are using the command bar. You are storing images on cache. You are doing sign up with Google and Facebook; right? You are doing all these things?**

A. **Yes.**

Q. **But you are just using them and you didn't invent them; right?**

A. **Yes. We're using them like most e-commerce companies.**

Q. **Now, let's talk a little bit about a timeline I used in my opening.**

**Now, you know, don't you, that Groupon has been on notice of --**

**MS. SHAMILOV: Objection, Your Honor. These are all facts stipulated in the record that are uncontested facts.**

**THE COURT: They're uncontested facts and?**

**MS. SHAMILOV: When Groupon was on notice. I**

don't know how this relates. There is no disputed facts and it was outside the scope of my direct examination.

THE COURT: Mr. Desmarais, do you want to respond?

MR. DESMARAIS: Yes. I was just following up on the questions that I just had with the witness about Groupon using technology invented by others on the website, and I just want to follow the timeline of the interactions between these two parties. He is the corporate representative.

THE COURT: I'll see you all at sidebar.

Bear with us, ladies and gentlemen.

(Sidebar conference held.)

THE COURT: Your response confuses me because I think it is pretty clear at this point pre-suit communications between the parties are not part of the trial; isn't that correct?

MR. DESMARAIS: I wasn't asking her about the communications.

THE COURT: You just said I'm going to ask him about the interactions or communications between the parties. I think that is what you said.

MR. DESMARAIS: I didn't mean pre-suit. I did not mean pre-suit communications.

THE COURT: So what is the relevance or where are you going there?

MR. DESMARAIS: I was going to ask him what is Groupon's patent policy, patent licensing policy which is already in the record, and I'm going to ask him about whether they designed around, which they're pursuing in this case. And then I'm not going to ask him anything about the interactions between parties during this time.

MS. SHAMILOV: How is this cross-examination? I didn't go into any of this area in my direct. There is nothing in my direct that this relates to at all.

THE COURT: How is it not beyond the scope of her direct?

MR. DESMARAIS: He is the face of the company Groupon. He is being put up as the corporate representative. I'm not going far beyond the direct. She was asking him about who was Groupon, and what did they do, and how did they do it. And all I'm asking was are they doing it with a license or not.

MS. SHAMILOV: I just asked him about what Groupon's business is. He is not a corporate representative. He is fact witness. Direct examination was limited to what is Groupon generally business-wise. I did not open the door at all to anything regarding licensing or design-around the patent that we're asserting in the case. I didn't mention the word patent.

THE COURT: So I don't know, and you can tell me

**who also is going to be coming, but it would seem to be a relevant fact Groupon, as an entity, whether they have a licensing policy, whether they tried to design-around. Is he not --**

**MS. SHAMILOV: Well, here is going to be the issue.**

**THE COURT: Yes.**

**MS. SHAMILOV: They already played multiple depositions, including Mr. Schmitz on the video because we don't have licensing policies. It is uncontested fact read in the record earlier today that says Groupon does not have licensing policies. They also read a Groupon interrogatory response that says we don't have a licensing policy and we determine it on a case-by-case basis. That is all in the record.**

**THE COURT: Right. But hold on. Hold on. Sure, but there is no limitation on how many people I think get the same evidence.**

**MS. SHAMILOV: That's fine, but this is a VP of Marketing. They didn't ask a single question about patent licensing. First, outside his knowledge. He wasn't designated on that topic during discovery. I didn't ask him a single question about that. And now this is what is going to happen?**

**They are going to now imply that they put up**

this timeline, and the argument in the opening was we told them about these patents, they actually read interrogatory today that said Groupon became aware of this patent via communication from IBM. So the implications that are being drawn that we told you about these patents and you did not design-around it. And so in the closings, I guarantee you, counsel is going to get up and say you heard all that and they allowed the patent. They didn't design-around. And in the opening, so easy they should have done it, and yet at the same time they get up and say cannot rely on NDAs; right? They say I shouldn't. Right.

THE COURT: Your position on the NDA is clear.

MS. SHAMILOV: I understand, but this is where it is going; right? It is related to that. They're going to use the timeline, and this is completely outside. I mean I was very precise in my direct.

THE COURT: Okay. Do you want to respond?

MR. DESMARAIS: Your Honor, it's a very limited line of inquiry. They're putting design-around in the record. I have to respond to it. If they're not going to pursue they had an ability to design-around, then I don't have to prove that they didn't design-around, but I think if they're pursuing noninfringing alternatives, I have to respond.

MS. SHAMILOV: Noninfringing alternatives, Your

Honor, is not a factual issue. It's an expert opinion. We're going to have an expert here discussing about his analysis of noninfringing alternatives.

THE COURT: All right. I'm overruling the objection. This is within the scope of direct. You have a corporate witness. He hs talked about who Groupon is. He talked about some of the things he wants to highlight about who Groupon is. The other side is free to explore other aspects of who Groupon is, and you will have a chance on redirect.

MR. DESMARAIS: Thank you, Your Honor.

(Sidebar conference ends.)

THE COURT: You may proceed when you're ready.

MR. DESMARAIS: Thank you, Your Honor.

BY MR. DESMARAIS:

Q. Now, you agree, Mr. Carlisle, don't you, that Groupon has been on notice of IBM's patents prior to this lawsuit; right?

A. I don't know about that.

Q. Well, you do know that IBM and Groupon did not conclude a license agreement and that's why we're in a lawsuit; right?

A. Yes, I guess so.

Q. And you're in the marketing department at Groupon; right?

A. **That's correct.**

Q. **So I won't ask you about the individual patents, but you do know, don't you, that as we stand here today, Groupon has not tried to design around IBM's patents; right?**

A. **What do you mean by design around patents?**

Q. **I'll move on.**

**You do know that Groupon does not have a policy at Groupon about how to deal with licensing patents from outsiders, right, like IBM?**

A. **Groupon has a legal team that deals with our patents.**

Q. **But you do know that even the legal team doesn't have a licensing policy for dealing with third-party patents; right?**

A. **What do you mean by licensing policy? Sorry.**

Q. **I'll move on.**

**You at least agree, don't you, that patents are important; right?**

A. **Yes.**

Q. **And you agree as a general matter that people should respect intellectual property rights; right?**

A. **Yes.**

Q. **And you even think it's fair that a patentholder like IBM should be allowed to collect royalties if someone is infringing their patents; right?**

A. **Yes. If someone is infringing on their patents, yes.**

Q. **Now, one of the patents in this case relates to the concept of a runtime account creation using a single-sign-on or single-sign-up. Do you know that, do you know that's one of the patents in the case?**

A. **Yes.**

Q. **And Groupon's products, the website that you just told us about, is in fact set up to automatically create user accounts at runtime either through a Facebook or Google; right?**

A. **Automatically create user accounts, what do you mean by that?**

Q. **You know what an account is at Groupon; right?**

A. **Yeah. But when you say automatically, I just want to -- users come into our system and create accounts, so I wanted to understand what you mean by automatic.**

Q. **Let's step back. Let's talk about Groupon's core products and make sure we're talking about the same thing. If we look although one of the slides I used in my opening, slide 31. Would you agree with me that Groupon's core products are the website, the mobile website, the mobile apps for Apple iOS and the mobile app for Android, you would call those the core Groupon products; right?**

A. **Yes.**

Q. **And if we look at another slide I used in my opening, and in fact Professor Hausman I think just used it, from**

those core products, the way Groupon makes money is it brings consumers who want discounted deals together with merchants who are offering discounted deals; right?

A. That's right, when consumers purchase goods from Groupon, that's how Groupon makes money.

Q. Right. When there is a purchase, Groupon takes a piece of that transaction for Groupon; right?

A. There is a commission that is paid on most Groupon merchants, yes.

Q. And it's true, isn't it, that before the user or what's said up there consumer, but the consumer is the user?

A. Sure.

Q. Before the consumer or user can purchase anything from Groupon on the core products of Groupon, the user needs to have an account at Groupon; right?

A. Correct.

Q. So in general for Groupon to make money through this method off its core products, users need to create a Groupon account; right?

A. Yes.

Q. And so Groupon wants to encourage people to actually sign up and create accounts; right?

A. Yes.

Q. And one of the ways that Groupon does that to encourage users and customers to sign up and create accounts

is to make that signup process easy for them; right?

A. Yes.

Q. In fact, making signup easy is very important at Groupon, isn't it?

A. From a marketing perspective we want our site to be easy to use, yes.

Q. In fact, I think you told us at one point that you want to make signup as simple as possible; right?

A. Yes.

Q. And one of the ways that Groupon makes the signup as simple as possible in your core products is that you allow the users to create accounts using Facebook, Google and Google Plus; right?

A. Yes, we do.

Q. And that's that screen that the jury has seen where it's a Groupon screen that you can either choose to create an account or you can click on sign me up with Facebook or sign me up with Google; right?

A. I haven't seen that screen in trial here, but what you're describing is our login screen exactly, so yes.

Q. And the reason Groupon does that is it makes the creation of an account simple for users; right?

A. Yes.

Q. And it alleviates the user's need to get yet another user name and yet another password right before they go on

to Groupon and have an account?

A. That's the reason we have that.

Q. And that improves your customer user experience, doesn't it?

A. To the users who chose to use that, yes.

Q. And the customers find value in that, don't they, in this automatic signup?

A. People want the website to be easy, yes.

Q. In fact, isn't it true that signing up through Facebook and Google is one of the more popular ways your users sign up for Groupon; right?

A. I don't know the stats on that, how many people use that method versus the conventional method.

Q. I didn't ask you how many, what I asked you is it's one of the most popular ways your users sign up to Groupon, isn't it?

A. Yeah, but I don't know if it's the most popular.

Q. I didn't say the most popular, it's one of the most popular?

A. There is only two ways to, sure.

Q. It's popular with your users, isn't it, sir?

A. How do you define popular?

Q. Well, you gave a deposition in this case; right?

A. Okay. Yes.

Q. And at your deposition, didn't you say it's very

popular with our users?

A. I may have used that term, yes.

Q. So that's the way I'm using it.

A. Okay.

Q. So let's try it again. It's true, isn't it, sir, that signing up in this way is very popular with the Groupon users?

A. Yes.

Q. In fact, you get more than two times sales from those folks, don't you?

A. I don't know.

Q. Let me get some exhibits for you.

Please turn if you would in the binder to what's marked as PX-0059. Are you there, sir?

A. Yes.

Q. This is a login/sign up prompts document from Groupon; true?

A. Just give me a moment. (Witness reviewing.) Yes.

MR. DESMARAIS: Your Honor, I offer PX-59.

MS. SHAMILOV: No objection.

THE COURT: It's admitted.

MS. SHAMILOV: I believe it's already admitted.

THE COURT: Well, we'll admit it again.

MR. DESMARAIS: Thank you.

(PX-59 was admitted into evidence.)

BY MR. DESMARAIS:

Q. So this is a login/sign up prompts document at Groupon; right, sir?

A. Yes.

Q. And it says right in the first sentence, logged in users have a higher purchase rate compared to those who are not logged in, more than two times. Is that right, sir?

A. Yes. That's what it says.

Q. Would you turn to what's in your binder as PX-992. This is a Groupon users team status update. Do you see that?

A. Yes.

Q. And you spent some time running the users team, didn't you?

A. No.

Q. You were in the users team?

A. No.

Q. Do you know what this document is?

A. I'm not familiar with this document.

Q. Okay. Let me see if I can refresh you on some statistics, and if not, we'll move on. Take a look at page, at the bottom that ends 355. Do you see where it says Google login?

A. Yes.

Q. It says pre/post launch metrics for Google login

North America, suggest a 1.6 percent lift in orders on Touch, a .5 percent on desktop and Android, resulting in an annualized NOB lift of 22.4 million overall. Do you see that?

A. Yes.

Q. That's $22.4 million lift from Google login at Groupon; right?

A. That's what it says here, yes.

Q. And this was just shortly after Groupon implementing Google login; right?

A. I'm not familiar with the time, no.

Q. Take a look at the page ending 361. Do you see how it says week ending February 19th, 2016?

A. Yes.

Q. And then up at the top of next page it says Google login is enabled for a hundred percent of North American users on mobile and web. Do you see that?

A. Which page are you on?

Q. The top of the very next page, Google login.

A. Yes, I see it.

Q. Google login enabled for a hundred percent of North American users on mobile and web, do you see that?

A. Yes.

Q. That was February 19th, 2016; is that right?

A. Yes.

Q. **If we flip back to where we were just reading, that is May 13th, 2016, a few months later; right?**

A. **Yes.**

Q. **So after having added Google login to the website in the apps, so post, pre/post launch metrics for Google login North America suggest a 1.6 percent lift in orders on Touch. That Touch is when you're using the website on the phone; right?**

A. **Yes, using the website, not the app.**

Q. **A .5 percent lift on the desktop and Android; right?**

A. **Yes.**

Q. **Resulting in an annualized NOB lift of $22.4 million overall; right?**

A. **Looks like that's what they were projecting, yes.**

Q. **Just for adding signup with Google; right?**

A. **That's what it says here.**

Q. **Not even counting the signup with Facebook which was also being done on Groupon; right?**

A. **Yes.**

Q. **This was just four months, or however, a few months after it was installed; correct?**

A. **Yes.**

Q. **It's a pretty valuable idea for Groupon, isn't it?**

A. **That's what it says, yes.**

Q. **Do you know how big the lift was when you added**

**Facebook?**

A. **No, I don't.**

Q. **Now, one of the other patents in the case relates to preserving state information in a conversation between the user and a server. You're aware of that; right?**

A. **Yes.**

Q. **And you're also familiar with the fact that you can preserve state information with something called cookies; right?**

A. **Yes.**

Q. **And Groupon uses cookies on the website that you told us about; is that right?**

A. **Correct.**

Q. **It doesn't use cookies exclusively, does it?**

A. **What are you talking about? Sorry.**

Q. **Groupon doesn't use cookies exclusively on its website, does it, for preserving state information?**

A. **Exclusive, I don't understand your question. Sorry.**

Q. **Let me rephrase.**

**You know, don't you, that Groupon has made a decision to not rely solely on cookies and it also uses other methods to preserve state information on the website on their users?**

A. **I'm not familiar with all the methods that Groupon uses to preserve state information.**

Q. Listen carefully to my question because I'm not asking you about all the methods. What I'm asking you is you know, don't you, that Groupon has made the decision to not rely solely on cookies, it uses other methods to preserve state information on its website and on its mobile apps?

A. I'm not very technical, so I don't know how we could elect the methods that we preserve state information. I assume we won't rely a hundred percent on cookies because many users don't have them or don't allow them.

Q. I'm not asking you a technical question. And we can refer to your deposition if you want me to refresh you. I'm asking you just the question, and I'll ask it one more time and then we'll look at the dep.

You know, don't you, that Groupon has made the decision to not rely solely on cookies, it uses other methods to preserve state information, isn't that a fact?

A. It sounds reasonable, yes.

Q. In fact, you know that Groupon actually found a better user experience if it kept track of the user's identities using methods other than cookies, you know that, don't you?

A. No, I don't believe that I do. I'm not sure, what methods are you talking about?

Q. Should we look at your deposition? Do you remember

testifying about this at your deposition?

A. I am drawing a blank on the specific method you're talking about, sorry.

Q. I'm not -- I don't want to get into technical stuff with you, I'm just asking you what you told us at your deposition. Let me try one more time.

A. Okay. You said other methods and I want to know what method you're talking about if it's twice as good.

Q. In fact, here is the question. If you can't answer it just tell me and we will look at the deposition.

In fact Groupon actually found a better user experience if it kept track of user's identifies using methods other than just cookies. Isn't that true?

A. That may be true. I don't remember saying that, but it may be true.

Q. Let's take a look at your deposition. You have it in the book in front of you, and it's page 119, starting at line 14.

MS. SHAMILOV: Objection, Your Honor.

THE COURT: What's the objection?

MS. SHAMILOV: Counsel is planning to put the deposition transcript in front of the witness, and the witness has confirmed that was done.

THE COURT: So page 119, what lines?

MR. DESMARAIS: 14 through 20.

THE COURT: 14 through 20 and the objection is what?

MS. SHAMILOV: Counsel is planning to put the transcript in front of the witness to confirm that that's what he said. That's what I tried to do with Professor Hausman and it was objected and I was not allowed to put the transcript in front of the witness.

THE COURT: What is the basis of your objection at this point?

MS. SHAMILOV: There is no impeachment. He didn't ask the question, this is not an impeachment question. There is no question pending.

THE COURT: I thought we just went through his recollection, but Mr. Desmarais, let's start over. Ask the question again.

MR. DESMARAIS: Yes, Your Honor.

BY MR. DESMARAIS:

Q. It's true, isn't it, Mr. Carlisle, it's true, isn't it, that quote, Groupon actually found a better user experience if it kept track of user's identifies using methods other than just cookies, close quote, that's true, isn't it, sir?

A. That's what I said, yes.

Q. Okay. And Groupon wants to make it easy for customers to browse and then select and then push the buy

button on its core products, right, that process needs to be streamlined and efficient for users; right?

A. Yes, we want customers to be able to find our products.

Q. And in that buy button, when the user gets to the end and they're going to buy, Groupon embed state information in that button when it gets back to the server, the server knows what the user wants to purchase, what the option is, you know, what they selected; right?

A. I'm not, again, I'm not technical, so I don't know how we embed the information, but when you click the buy button, we want to know what products are being purchased.

Q. Do you know that Groupon uses the pledge ID in that part of the system when they click the buy button?

A. The pledge ID.

Q. Yes.

A. I'm not familiar with the pledge ID.

Q. Okay. But you do know, don't you, that ease of checkout and tracking that consumer's choice at checkout is important to Groupon and it is important to the customer. You do know that, though; right?

A. Yes, we want checkout to be easy.

Q. Now, one of the other patents in this case is a method of presenting applications in an interactive service. You are aware that that is one of the patents in the case,

**right?**

A. **Presenting applications in an interactive service, yes.**

Q. **And you don't doubt that Groupon is an interactive service; right? You interact with customers and they interact with merchants and it's an interactive service?**

A. **It depends on how you interpret interactive service but, yes, we do interact with customers. Customers interact with Groupon's website and services.**

Q. **And in that interaction, you would agree, wouldn't you, that the ability to store data such as text files and images and advertising on the user's machine in the browser, in the cache, that would help decrease the amount of time it takes to load the pages or the app; right?**

A. **Yes.**

Q. **And Groupon does that. It employs the cache to help its core products load faster. You know that; right?**

A. **Yes, I believe all websites do.**

Q. **Groupon does it because it knows its users want the websites and the apps to work fast; right?**

A. **Yes. From a marketing experience, we want our website to be quick and responsive to customers.**

Q. **In fact, you want them to work as fast as possible; right?**

A. **I want them to be quick. Yes.**

Q. **Because if they don't load quickly, you know as a marketing guy that your users get frustrated and then they leave the web page and they don't buy from Groupon; right?**

A. **Yes.**

Q. **In fact, you would go so far as to say that the faster you're able to load the pages on the website and on the apps, the more revenue Groupon makes from the visitors who are looking at the pages; right?**

A. **I want pages to be fast, and the faster they are -- we make more money by being responsive. Yes.**

Q. **Yes. There is a direct relationship in your view between the fastness of the loading of those pages and the revenue Groupon makes; right?**

A. **Yes.**

Q. **In fact, Groupon actually studies how much more money it can make based on how fast the core products load their pages; right?**

A. **I haven't been involved in those studies.**

Q. **Whether you have been involved in them or not, you know that Groupon has done studies that figure out exactly how much more money they make based on how fast the pages load; right?**

A. **I'm assuming that is something teams have looked into.**

Q. **Take a look in your binder, if you would, at**

**Plaintiff's Exhibit 62. 62 is a Product Engineering Review at Groupon; right?**

A. **Yes.**

Q. **And it's from August 2016?**

A. **Yes.**

Q. **And on the next page is the agenda. Do you see that?**

A. **Yes.**

Q. **And it has -- one of the items they're going to talk about is called a latency update. Do you see that?**

A. **Yes.**

Q. **And latency really means how fast your pages are loading; right?**

A. **Or how slowly, yes.**

Q. **Yes, right. Fair point. And then if we jump to the page ending 68005, we see they're going to have the latency update starts on that page; right?**

A. **Yes.**

Q. **And on the very next slide, there is an executive summary. Do you see that?**

A. **Yes.**

Q. **In the executive summary, it says: Since January, we've reduced the deal page TP50 latency on web by .37 seconds. Do you see that?**

A. **Yes.**

Q. **And just by that .37 seconds faster speed, we saw an**

average improvement of -- oh, I'm sorry -- (-14%) and saw an average improvement of .67 seconds.

Sorry. Misread that. The next one is where I was going.

Just from those small fraction of a second increases, we calculated that this translates into a $146 -- what is that? -- million per year, right, sir? $146 million per year by a fraction of a second increase in speed? Did I read that correctly, sir?

A. Yes.

Q. So Groupon really wants those web pages to load fast from the cache, don't they?

A. Yes.

Q. And that was just one year, right? $146 million in one year additional revenue from speeding up the loading of the pages.

A. Additional NOB. Yes.

Q. Yes, that is what NOB is right. Net Operating.

A. Total sales.

Q. Total sales, right. Is it fair to say you a get a significant benefit from loading the stuff from the cache, sir?

A. Yes.

Q. And the same is true on your mobile apps, right? That was the web we just looked at. The same is true on

mobile apps; right?

A. I'm sorry. Can you repeat the question? What is true on mobile apps?

Q. Let's take a look. Turn in your binder to Plaintiff's Exhibit 63. This is another business review or product engineering review; right?

A. Yes.

Q. And if we just jump to the app latency deep dive on the page ending 68637. 68637.

A. Yes.

Q. So that $140 million yearly savings was for the website. Now, if we look at the apps, this says: Improving the TP90 on the iPhone deal page from 27.4 seconds to 2 seconds -- again just .4 seconds improvement, right? -- would result in a $35 million lift in annual NOB.

And NOB again is revenue; right?

A. Yes.

Q. And improving the TP90 on the Android deal page from 3.2 seconds to 2 seconds would result in a $42 million lift in annual revenue; right?

A. That is what it says here, yes.

Q. So by loading the images from cache on the website and the two mobile apps, you have got $140 something million and another $70, almost $80 million. You are talking about over, significantly over $200 million, almost two

and-a-half -- $200 and a half million annual lift, right?

A. Well, what you are saying here is from cache. This is saying just speed in general. It doesn't say anything about caching. And you are saying NOB, not profit. So revenue, our profit is a fraction of our NOB and sales. But ...

Q. But it's yearly; right?

A. Per year, yes.

Q. So it's fair to say speeding up these apps at these websites is pretty important at Groupon; right?

A. Yes.

Q. Now, one of the other patents in the case is about a method for presenting advertising in an interactive service; right? You know that; right?

A. Yes.

Q. And that is why you talked about advertising on your direct testimony; right?

A. Yes.

Q. Let's take a look in the binder, if you would, at Plaintiff's Exhibit 60.

This is one of the Groupon web pages that we have been using at the trial so I'll use it even though it's maybe a little bit updated. But you recognize that as a Groupon website; right?

A. Yes.

Q. **And these things that show like the pizza and the fitness classes and the Jiffy Lube, you call those Groupon deal cards; right?**

A. **Yes.**

Q. **And Groupon shows these deal cards on the website to drive people to buy the deals; right?**

A. **Yes.**

Q. **And Groupon uses the location of the customer, sometimes they figure out where the customer is and they try to show them what the customers are going to want that are in the location of the customer; right?**

A. **Yes, that's correct.**

Q. **And Groupon tracks the type of deals customers buy and then modifies what they show, right?**

A. **We try to present the most relevant deals to consumers, so, yes.**

Q. **And you track the characteristics of the consumer, too. You might track their age or their sex or other characteristics about them and tailor deals based on that stuff too; right?**

A. **When we have that information, we try to use it, yes.**

Q. **And this ability to drive deals through images based on people's characteristics or location or whatever is important to Groupon's business; right?**

A. **Yes, there wouldn't be a business if we didn't have**

products on the shelves, so yes.

Q. And then you put these little things on the corner of the deal cards. You call these things badges where this is trending, trending, trending; right? You call those badges?

A. Yes.

Q. And in Groupon's view, badges is something that makes these deals stand out; right? Sort of encouraging people to buy them; right?

A. Yes.

Q. Promoting them, if you will, in your words; right?

A. Yes, we offer information to try to make the deal stand out.

Q. And you are doing that to promote the deals; right?

A. We're doing that to give consumers more information about the deals, yes.

Q. And if you look at Plaintiff's Exhibit 64, please.

This is talking about badges, right?

A. Yes.

Q. And if we look at it on the overhead.

Adding badges to promote these deals on Groupon was a tremendous success and provides almost -- what is that, $18 -- my eyes are so bad -- $18.7 million in incremental revenue by just introducing them on to search and discovery.

Do you see that?

A. Yes.

Q. So just by adding promotions to promote these deals, in one year Groupon made an additional $18.7 million; right?

A. Well, this looks like it's an estimate of that. But from an earlier test, yes.

Q. But at the end of the day, these images, these deals and the badging, you are trying to get the customer to purchase what Groupon is displaying; right?

A. That is why we try to use nice images and things that people will purchase, yes.

Q. And you will agree with me, won't you, that the deal cards and the badges are actually -- and these are your words -- promoting Groupon's deals, aren't they?

A. Yes, the deal cards are there to promote what we do.

Q. And because you are promoting products, services, events, you would agree with me, wouldn't you, that those are advertisements?

A. No, I would not, sir.

Q. You wouldn't?

A. No. And I'm happy to explain why.

Q. That's okay. I'll ask the questions and then we can move forward, because I knew you were going to say that.

So last night I looked on Google what the definition of "advertisement" is. Let's take a look.

If you put "advertisement definition" in Google,

the very first definition that pops up is this one: An advertisement is a notice or announcement in a public medium promoting a product, service, or event.

Do you see that, sir?

A. Yes.

Q. And we can go down and look at other definitions, too. We can look at Merriam-Webster. Merriam-Webster says the same thing: Presenting to the public to help sell a product or to make an announcement.

We can look at the Oxford English Dictionary. It says the same thing: A notice or announcement in a public medium promoting a product, service, or event.

Do you'd see that, sir?

A. Yes.

Q. And there is no doubt you are promoting your deals with your images and your badges; right, sir?

A. Those are the images and deals. Images of the deals we sell in the store. So those are the things that people are buying.

Q. Now, you also advertise your products generally, right? Groupon advertises its products?

A. On the product sites, yes.

Q. Like Facebook, for instance?

A. Correct.

Q. And you advertise products on radio?

A. **Yes.**
Q. **TV?**
A. **Yes.**
Q. **Through e-mail?**
A. **So.**
Q. **Push notifications.**
A. **E-mails and push notifications, those are merchandising messages that Groupon send out.**
Q. **And Groupon tests its website; right?**
A. **Sorry.**
Q. **Groupon tests its websites and its mobile apps and its touch; right?**
A. **Yes.**
**THE COURT: Mr. Desmarais, I have the jury for about one more minute. You are not that close to finishing, are you?**
**MR. DESMARAIS: I actually will be finished in less than a minute, Your Honor.**
**BY MR. DESMARAIS:**
Q. **And Groupon operates an e-commerce space; right?**
A. **Yes.**
Q. **And in fact, you're a local e-commerce player, you call yourself; correct?**
A. **That's correct.**
Q. **And the local e-commerce is over a trillion dollars**

**worldwide. That is the fact; right?**

A. **Yes, if you are working with every merchant worldwide.**

Q. **And Groupon considers Amazon to be a competitor; right?**

A. **Yes.**

Q. **And you consider Facebook to be a competitor; right?**

A. **Competitor. A competitive risk.**

Q. **And you consider Google to be a competitor; right?**

A. **Again, competitive risk. Yes.**

Q. **And you know, sir, don't you that Amazon, Facebook, and Google all took licenses to these IBM patents. You know that, don't you?**

A. **I heard that they licensed a broad array of patents from IBM.**

Q. **But Groupon has not, correct?**

A. **That's correct.**

**MR. DESMARAIS: No further questions.**

**THE COURT: Thank you.**

**Is there going to be any redirect.**

**MS. SHAMILOV: There will be. And it will be longer.**

**THE COURT: All right. Then we'll hold off in until the morning.**

**Just hold there for a moment, Mr. Carlisle.**

Ladies and gentlemen of the jury, that is the time of our time together today. Tomorrow, we only have you from 9:00 until 1:00 so there won't be lunch, but we'll let you start your weekend at 1:00 o'clock.

But tonight, please, no talking about the case, no research or reading anything related to the case. Enjoy your evening. We'll see you tomorrow morning.

(Jury left courtroom.)

THE COURT: All right. Mr. Carlisle, you may step down. We'll see you tomorrow.

THE WITNESS: Okay.

THE COURT: I have another matter I have to go attend to. So the motions, if you want to argue them or whatever, we'll do that tomorrow morning at 8:30, but what should we expect tomorrow? And it's a short day.

MS. SHAMILOV: We have Mr. Dunham next. We might have demonstrative issues to resolve. I assume you want us to preserve our JMOL 50(a) tomorrow morning, 8:30 tomorrow.

THE COURT: That's what I meant to say: Motions at 8:30 in the morning, but in terms of Mr. Dunham.

MS. SHAMILOV: There might be two more witnesses. We have three more fact witnesses to call. I don't think we'll have -- we won't be able to fit them all in tomorrow. It's a short day.

**THE COURT: Right. Okay. We'll see you at 8:30 tomorrow morning. Have a good evening.**

**(Proceedings adjourn at 4:34 p.m.)**

**I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.**

**/s/ Brian P. Gaffigan**
**Official Court Reporter**
**U.S. District Court**