1                   IN THE UNITED STATES DISTRICT COURT

2                   IN AND FOR THE DISTRICT OF DELAWARE

3                                 - - -

   INTERNATIONAL BUSINESS MACHINES
4  CORPORATION,                         :   CIVIL ACTION
                                        :
5            Plaintiff,                  :
   v                                    :
6                                        :
   GROUPON, INC.,                        :
7                                        :   NO. 16-122-LPS
            Defendant.
8                                 - - -

9                          Wilmington, Delaware
                           Monday, July 23, 2018
10                         *Jury Trial - Volume F*

11                                - - -

12  BEFORE:  HONORABLE LEONARD P. STARK, Chief Judge, and a jury

13  APPEARANCES:                 - - -

14           POTTER ANDERSON & CORROON, LLP
             BY:  DAVID E. MOORE, ESQ.,
15                BINDU A. PALAPURA, ESQ., and
                  STEPHANIE E. O'BYRNE, ESQ.
16
17                and

             DESMARAIS, LLP
18           BY:  JOHN DESMARAIS, ESQ.,
                  KARIM Z. OUSSAYEF, ESQ.,
19                LAURIE STEMPLER, ESQ.,
                  KEVIN K. McNISH, ESQ.,
20                MICHAEL MATULEWICZ-CROWLEY, ESQ.
                  ROBERT C. HARRITS, ESQ.,
21                BRIAN D. MATTY, ESQ., and
                  EDWARD GEIST, ESQ.
22                (New York, New York)

23                     Counsel for Plaintiff

24
   Dale Hawkins                      Brian P. Gaffigan
25 Registered Merit Reporter         Registered Merit Reporter

```
 1    APPEARANCES:   (Continued)

 2
                    ASHBY & GEDDES, P.A.
 3                  BY:   JOHN G. DAY, ESQ., and
                          ANDREW C. MAYO, ESQ.
 4
                          and
 5
                    FENWICK & WEST, LLP
 6                  BY:   J. DAVID HADDEN, ESQ.,
                          SAINA M. SHAMILOV, ESQ.
 7                        PHILLIP J. HAACK, ESQ.
                          SAPNA MEHTA, ESQ.
 8                        JESSICA M. KAEMPF, ESQ.,
                          ATHUL ACHARYA, ESQ., and
 9                        JESSICA BENZLER, ESQ.
                          (Mountainview, California)
10
                              Counsel for Defendants
11

12

13

14

15

16

17

18

19

20

21

22                               - oOo -

23                        P R O C E E D I N G S

24              (REPORTER'S NOTE:  The following jury trial was

25    held in open court, beginning at 8:38 a.m.)
```

```
 1                    THE COURT:  Good morning.

 2                    (The attorneys respond, "Good morning, Your

 3         Honor.")

 4                    THE COURT:  So is there anything from IBM this

 5         morning?

 6                    MR. OUSSAYEF:  Yes, Your Honor.

 7                    THE COURT:  Okay.  Good morning.

 8                    MR. OUSSAYEF:  Good morning, Your Honor.  Karim

 9         Oussayef for IBM.

10                    The first issue this morning concerns the

11         argument we had last Friday about a template file.  And you

12         might remember there was a visualization of that and how

13         defendants were permitted to use that visualization based on

14         a representation that "this is a file produced, a template

15         file, a template file that is just opened with a web

16         browser.  I didn't -- there is no manipulation done

17         whatsoever to the actual file."

18                    And on the right here, on page 1006 of the trial

19         transcript:  "He could have expected it.  He would have just

20         opened up this file with a browser.  For example, he could

21         have used Explorer."

22                    And then, the representation that there was

23         absolutely no manipulation to the file.

24                    So, and down here, that it was just like any

25         other HTML file.
```

1           Well, that didn't sound right us to.  So this

2    weekend, we went to inspect the source code, and it turns

3    out if you open it up in a browser, it does not appear how

4    it looked in the slides that Groupon presented.  You have to

5    change the file extensions.  You have to change the name

6    file.  And when you open it up in a browser and that is when

7    you get the appearance.

8           This is important because we did not have the

9    opportunity to change files under the protective order.  And

10   we do not have the opportunity to know that the files would

11   be manipulated in that way.

12          We brought this to the attention of Groupon and

13   Groupon withdrew the slides that these -- the images that

14   they were going to rely on.  And the only thing I would ask,

15   Your Honor, is that we not by charged with the time that we

16   spent arguing against a representation that turned out not

17   to be true.  And I think we're on track, Your Honor, to

18   finish the trial in mid this week, probably Wednesday or

19   maybe probably Wednesday.  So I don't think that will affect

20   the trial schedule.  But frankly, Your Honor, it's a little

21   bit unfair that we spent an hour and-a-half arguing against

22   this template issue when, in fact, the representations that

23   you just had to open it up or did not turn out to be true.

24          THE COURT:  Okay.

25          Good morning.

1    MS. SHAMILOV:  Good morning, Your Honor.  I do

2  not believe my misrepresentations were not true.

3    THE COURT:  Wait.  Did you say your

4  misrepresentations?

5    MS. SHAMILOV:  Oh, sorry.  That what I said was

6  not true.  There was, the contents of the files were not

7  changed.

8    THE COURT:  Hold on.

9    MS. SHAMILOV:  Okay.

10    THE COURT:  You believe what you what you said

11  was true.

12    MS. SHAMILOV:  Yes.

13    THE COURT:  Okay.

14    MS. SHAMILOV:  On Friday, there were a whole

15  bunch of objections to Mr. Davis's demonstratives not just

16  relating to that issue that Your Honor overruled on every

17  single claim.

18    Then on Friday, you also gave me a really good

19  idea how to tweak the demonstratives, so the slides we're

20  objecting to on Friday were actually updated so they're not

21  objecting to anything in Mr. Davis's demonstratives that

22  were disclosed for today.

23    The representation that they couldn't change or

24  save files, they actually created a whole bunch of files on

25  the source code laptop by comparing various files.  That the

1  fact that you could open the template files with the web

2  browser was disclosed in our expert report.  They knew that

3  those were web browser files.  They were disclosed in the

4  expert report and explained that they were web browser

5  files.  The expert knows and is presumed to know how to open

6  web browser files, you know, HTML files in the web browser.

7            I'm just not sure I understand the issue.  I

8  certainly don't agree that we should be charged for time

9  arguing a whole bunch of issues that they have raised with

10  Mr. Davis's demonstratives.

11            THE COURT:  Did it turn out you have to change

12  the extensions on the files?

13            MS. SHAMILOV:  You had to sort of, you had to

14  change the HTML extension to be able to open with the

15  browser, but that was precisely disclosed in our expert

16  report, and they knew that.

17            THE COURT:  Well, they night have known that,

18  but did I know that?  I mean my understanding and my

19  recollection is you were telling me and persuaded me all you

20  do is open this.

21            MS. SHAMILOV:  Yes.

22            THE COURT:  But it sounds like that is not true.

23            MS. SHAMILOV:  Well, I didn't manipulate the

24  files.  I didn't change the account.  I don't have access or

25  nobody on our team has access to any tools that -- on --

1  that IBM's counsel or their expert had.

2          THE COURT:  How about on your end?  Do you have

3  to change the extensions in order to get that image that you

4  wanted to show?

5          MS. SHAMILOV:  You mean on the source code

6  laptop?  When you look at the source code laptop, so you

7  would look, there is a whole bunch of .HTML files and .CPP

8  files.  Both of those sets of files our expert explained are

9  HTML files and there is a make file.  There is a file in the

10  source code laptop that goes through and says everything

11  that CPP is open in the browser with .HTML.

12          So I didn't change any file.  There was no

13  compilation.  I didn't do anything to manipulate the file.

14  It was also used as a demonstrative.  Counsel raised an

15  issue that they haven't seen, you know, that kind of

16  representation on the slide.

17          IBM has used demonstratives in this case that we

18  have never seen in discovery at all including, for example,

19  the game that Mr. Filepp talked about.  That was never

20  disclosed to us.  They used it as a demonstrative.  It was

21  never raised as an issue.  We weren't planning to move any

22  of these renderings into evidence.  That is sort of what,

23  the nature of the argument on Friday.

24          I didn't -- there was no program ran, no nothing

25  to manipulate the contents of the file to make it show

 1   something that is not in the file.  That when I was

 2   describing it on Friday, that is what we did is just open

 3   the file with the browser.  It is consistent with how you

 4   would open a .CPP file in a browser described in the report

 5   and in the source code file itself.

 6              And these exhibits, the exhibits that the

 7   demonstratives that were at issue on Friday are not in the

 8   set anymore because we tweaked them.  There was something

 9   you said on Friday that gave me a different idea, and that

10   is what we did.  It had nothing to do with the issues on

11   Friday.

12              THE COURT:  Okay.  Is there anything else?

13              MS. SHAMILOV:  Not on this issue.  Thank you.

14              THE COURT:  Sure.

15              MR. OUSSAYEF:  Your Honor, the representations

16   to the Court was absolutely no manipulation.  They changed

17   the file extensions.  We were not permitted to do that under

18   the protective order, and we should not be charged with the

19   time arguing against a representation that turned out not to

20   be true.

21              THE COURT:  It wasn't the only thing that we

22   talked about for that hour and-a-half, was it?

23              MR. OUSSAYEF:  No, Your Honor.  You know, my

24   memory is a little bit foggy as to where the issues were.  I

25   think there was a substantial back and forth.  And it was me

1    at the podium and then I think it was Ms. Shamilov and

2    Mr. Hadden back and forth.  You know, it was kind of me

3    against two for a long period of time.

4              THE COURT:  Okay.  Did you have more to say on

5    this?

6              MS. SHAMILOV:  Just one quick thing.  There is

7    nothing in the protective order, Your Honor, that prevents

8    sort of redoing files or opening them with anything.  We

9    haven't changed them and they did create new files and

10   compared files and ran sort of comparison tools on the

11   laptop computer.  So that was definitely within the

12   protective order.  There was nothing done on our side in

13   violation of the protective order.

14             THE COURT:  Right.  But the issue that was

15   raised this morning is whether you were entirely truthful

16   with me.  And I haven't heard an explanation.  That I hear

17   you say you were --

18             MS. SHAMILOV:  Right.

19             THE COURT:  -- but I don't understand how I

20   could reach that conclusion.  I'm not saying you intended to

21   mislead me, but I'm afraid I was mislead.

22             MS. SHAMILOV:  I'm sorry, Your Honor, for that.

23   I didn't intend to mislead you at all.  Because there was a

24   whole bunch of sort of -- there were three sets of

25   demonstratives.  Two of them were .HTML files.  So you just

1    opened, literally the two files you would open in a browser

2    and you would see the exactly just like that.  And those

3    were the pages that they have objected to.  There was no

4    extension changed from those.

5            One of those was a .TTP file to open it in HTML.

6    Again, none of the contents of the files were changed.  You

7    just did it, you know, the extension was .HTML to open it

8    with a web browser, which the other two files were.  So

9    there was only one slide that was referred to the file where

10   .HTML had to be put in there, but the other two were exactly

11   that .HTML file.  It did not change.  There was no extension

12   changes.  They were not HTML, you would open it, you would

13   see it just exactly like that.

14           And, again, I apologize.  When I was talking

15   about no manipulation of the files, I meant the contents

16   were not done because counsel reached out.  And when they

17   got up and talked about compiling and doing something to

18   these files, which we have no ability to do whatsoever, we

19   have no tools that were not available to IBM to do it,

20   literally just the contents of the files viewed in a web

21   browser like Notepad type of thing.  So when I was

22   discussing no manipulation, I was adamant about no running

23   any software.  And I definitely did go intend to mislead the

24   Court and I apologize sincerely if that took place.

25           THE COURT:  Anything further on this?

1          MR. OUSSAYEF:  Nothing further on this issue,

2    Your Honor.

3          THE COURT:  Give me a moment.

4          (The Court and Law Clerk confer.)

5          THE COURT:  All right.  So I am going to

6    shift some of the time from last Friday's discussion.

7    Specifically, a half hour.  So the half hour that was

8    charged to IBM will now be charged to Groupon, plus the time

9    this morning so far that we have used from both sides to

10   discuss this issue and for me to say hopefully as little as

11   possible about why I'm doing this.

12         I'm doing this because I am persuaded that what

13   I was told was not entirely accurate.  I don't say that

14   anyone intended to mislead me, but I was, as I think I

15   indicated, struggling a little bit to understand the

16   technological dispute, and I did rely heavily on my

17   understanding which I think turns out to be incorrect that

18   absolutely nothing had to be done in order to see the

19   display the way defendant at that time at least proposed to

20   show it.  That evidently was not entirely true.  And I

21   think it's reasonable to think that had that statement and

22   statements like it not been made, we, at a minimum, could

23   have gotten to the bottom of the dispute more quickly.

24         So that's my ruling on that issue, and we'll put

25   that one behind us.

1        Any other issues from IBM this morning?

2        MR. OUSSAYEF:  Yes, Your Honor.

3        So the next issue, Your Honor, is that per the

4    protective order, slides are due to be disclosed to the

5    other side by 7:00 p.m.  We got a bunch of slides last night

6    at I think it was 8:30 or 9:00 p.m., which is fine.  We

7    understand that sometimes there are issues that happen.

8        But this morning, 12 hours after the deadline to

9    disclose slides, we got a whole new bunch of slides, some of

10   them that were never disclosed to us previously.  And, you

11   know, the total of slides is about 250 slides, and we do not

12   have any indication of exactly what changed.  And all I

13   would ask, Your Honor, is to enforce the pretrial order

14   which says you should disclose slides at 7:00 p.m.  So all

15   the new slides that are disclosed this morning at 7:30 a.m.

16   that we really don't have a chance to review, we would ask

17   that Groupon not be permitted to rely upon those slides.

18       THE COURT:  Does this stretch across multiple

19   witnesses or just one witness?

20       MR. OUSSAYEF:  It's primarily the Weissman

21   expert slides.

22       THE COURT:  All right.

23       MS. SHAMILOV:  Good morning, Your Honor.  We did

24   provide the slides last night late.  We were having -- it

25   was a weekend, there was a server update back home, we were

having technical issues, we informed the counsel, we

apologized.  We actually ran, I don't know if it's with a

hard disk.  The protective order allows updates to the

demonstratives and said as soon as reasonably -- as soon as

you reasonably know that the demonstratives would be

changed, provide it to the other side.  We did.  We just

made cosmetic changes.  We identified the slides --

THE COURT:  I'm sorry, did you tell them which

ones?

MS. SHAMILOV:  We told them there was an email

that went back this morning identifying which slides were

changed and other things were cosmetic changes.

THE COURT:  Did you add new ones this morning?

MS. SHAMILOV:  There were no new slides added,

there was just edits to the slides that were provided.  When

IBM called its expert witness, they did disclose 300 slides

to us, updated slides at 4 o'clock in the morning, which in

my view there is no difference between 4 o'clock and 7

o'clock, many of my team members are sleeping.  That was

done with their expert report when they served slides and

they gave us 300 updated slide deck at 4 o'clock in the

morning.  The protective order specifically allows changes

to the demonstratives and disclosure of those.  We

identified the slides that were changed.  I'm not sure the

specific slides that counsel is talking about.

1          THE COURT:  All right.  Well, I guess we're

2     going to have to spend time on this.  Mr. Oussayef, give me

3     an example of where you think they disclosed something new

4     at 7:00 this morning.

5          MR. OUSSAYEF:  Yes, Your Honor.  We are still

6     going through the slides right now, but it is not true that

7     there are no new slides.  There are new slides.

8          THE COURT:  Can you show me one, at least?

9          MR. OUSSAYEF:  Here is a new slide.  This has a

10    whole bunch of exhibits that were not disclosed to us last

11    night.  For example, DX-58, DX-1678, DX-526, DX-643, et

12    cetera.

13         THE COURT:  Let's be precise here.  You're

14    showing me DDX-501.  It's the materials Dr. Weissman

15    considered and you're saying, I take it, that they gave you

16    an earlier version of this slide that said he considered

17    other things, but not all of these?

18         MR. OUSSAYEF:  This entire slide is new.  And

19    furthermore, we were supposed to disclose both exhibits and

20    slides.  And there were exhibits that were not disclosed to

21    us last night that are now on this slides.  And at 7:30 this

22    morning, they disclosed new exhibits with new prior art.

23         THE COURT:  That's not something you have

24    mentioned yet to me.  Maybe that's a separate issue; right?

25    Right now we're talking about demonstratives.

1                    MR. OUSSAYEF:  Yes, Your Honor.

2                    THE COURT:  So your representation is if we look

3       at the 8:30 p.m. slide deck, no slide at all about what he

4       considered?

5                    MR. OUSSAYEF:  Correct.

6                    THE COURT:  All right.

7                    MR. OUSSAYEF:  Here is another.

8                    THE COURT:  Let's start with one.

9                    Ms. Shamilov, is this true?

10                   MS. SHAMILOV:  That is true, Your Honor.  I

11      understand there was a meet and confer where the counsel

12      said some of the slides do not identify exhibit numbers and

13      so we created this slide to put the exhibit numbers to be

14      clear which exhibits that we're talking about.

15                   THE COURT:  And that might be a great practice,

16      but you just told me a minute ago there were no new slides.

17                   MS. SHAMILOV:  That is one thing when counsel

18      told me there were some changes to your slides, specifically

19      in response to the meet and confer process that took place,

20      and you know, the things considered -- I mean, I can scrap

21      the slide, the things considered was they knew about it,

22      it's just a demonstrative and the exhibits were disclosed,

23      we just put it on the slide because counsel said you don't

24      have exhibit numbers on the slide, so we did this in

25      response to the meet and confer.

1    THE COURT:  That might all be great and if they

2  wanted to accept that accommodation, that's fine, but

3  they're here to tell me that you included new slides as late

4  as two hours ago and a minute ago you told me you didn't,

5  and now, of course you're acknowledging you did.  Why

6  shouldn't I just say no new slides, you got the slides you

7  had 8:30 last night?

8    MS. SHAMILOV:  Well, first of all, because I

9  think one, that would be prejudicial because they did --

10  they changed their slides and gave us new slides.

11    THE COURT:  Maybe you should have objected.  You

12  didn't object; right?

13    MS. SHAMILOV:  I didn't object because I didn't

14  think because the protective order the allows modification

15  of the slides and you can disclose them once we modified.

16  That's what we did.  I think if a party does one thing and

17  it's fine, I think it's unreasonable to then get up and we

18  did this and now you're doing something else.

19    THE COURT:  We can't turn back time.  I don't

20  know if they created new slides at 7:00 a.m.  No one told me

21  they did.  It's clear that you, your side did.  So I guess

22  the question again is, why not hold you to the slides that

23  you disclosed at 8:30 last night?

24    MS. SHAMILOV:  Because I think the protective

25  order allows modifications and disclosure of updated slides,

1    that's what the parties agreed to.

2              THE COURT:  An alternative is we could spend

3    time going slide by slide for what you're calling a

4    modification, and if in fact I find that they're new, I'm

5    going to strike them.  If you persuade me they're

6    modifications, maybe we'll keep them, but I'm not sure it's

7    fair to charge IBM all the time it would take to do that.

8              MS. SHAMILOV:  That's fine.  I do not know at

9    this time which slides IBM believes are new.  We are not

10   going to call Dr. Weissman until this afternoon.  Maybe it's

11   best for IBM to say what's new and we can narrow the dispute

12   that way.

13             THE COURT:  Mr. Oussayef, is that a practically

14   available or reasonable approach?

15             MR. OUSSAYEF:  Your Honor, we're trying to

16   prepare for the rest of what will proceed today.  We think

17   the most efficient approach would be that they're stuck with

18   the slides that they disclosed last night.  These slides are

19   entirely new.

20             THE COURT:  What about the argument that that's

21   not fair because you were treated differently when it was

22   your case?

23             MR. OUSSAYEF:  There is no example of us adding

24   a new slide at any time in this case after the disclosure

25   deadline.  We did modify slides in response to their

1    objections, and in those situations when they said we don't

2    want you to have the internet show us a little, this type of

3    globe, we want to look at a different globe, as an

4    accommodation we made changes to slides directly responsive.

5    But we never asked for a new slide with a bunch of exhibits

6    on it.

7              THE COURT:  All right.  If we go back to their

8    8:30 slides, do I have objections that I have to deal with

9    with respect to those?

10             MR. OUSSAYEF:  Yes, Your Honor, but that narrows

11   things down because now we can --

12             THE COURT:  Are you prepared to argue those now?

13             MR. OUSSAYEF:  Yes, Your Honor.

14             THE COURT:  I'm striking the slide deck of 7:00

15   a.m. this morning and the defendants can use the slides they

16   served last night at 8:30 p.m. consistent with the order

17   that's in place here subject to any objections.  So if we

18   have objections, let's go to those now.

19             MR. OUSSAYEF:  Yes, Your Honor.  One point of

20   clarification, too, I ask that the new exhibits that were

21   disclosed this morning at 7:30 should also be stricken.

22             THE COURT:  Are there new exhibits that you

23   propose to use with Dr. Weissman that were not disclosed?

24             MS. SHAMILOV:  I do not believe there were new

25   exhibits that were disclosed in the email of exhibits that

1    we will be walking through.  I do not know at this time what

2    exhibits IBM believes are new, I can double-check.  And the

3    exhibits that Dr. Weissman is going to use with his

4    testimony were acknowledged and are in the slide from 8:30.

5                THE COURT:  You'll have to meet and confer and

6    see if you can identify any that are new this morning.

7                MR. OUSSAYEF:  I have the list right here of new

8    exhibits.

9                THE COURT:  Go ahead and read that list into the

10   record.

11               MR. OUSSAYEF:  DX-58.  DX-1678.  DX-526.

12   DX-643.  DX-648.  And DX-649.  That's all we were able to

13   identify since 7:30 this morning, but those are all new

14   exhibits.

15               THE COURT:  So to be clear, if the defendant

16   intends to show those exhibits to Dr. Weissman and move them

17   into evidence through him, then you have to meet and confer

18   and if there is an objection, you'll have to bring it up

19   again before we get to Dr. Weissman's testimony.

20               MR. OUSSAYEF:  Thank you, Your Honor.

21               THE COURT:  Other issues I guess with the

22   demonstratives for Dr. Weissman that you got last night?

23               MR. OUSSAYEF:  Yes, Your Honor.

24               So last night we got a slide deck and we have

25   claim construction arguments that are being made in the

1    slide deck that we think are inappropriate.

2              So here we have an excerpt -- so the slide

3    numbers have all changed since disclosure last night.  My

4    understanding is they have put together, but just for

5    clarify this is on the slide deck identified as DDX-500 at

6    slide 56.

7              THE COURT:  This is about what you have received

8    about 8:30 p.m. last night?

9              MR. OUSSAYEF:  That's correct.  This is an

10   excerpt from the file history, and here this is, you know,

11   reiterating claim construction arguments that the parties

12   made.  And as you'll see here, Your Honor, there is an

13   argument about whether the screen and advertisements are

14   presented separately, applications and advertising are

15   separate entities.  That's the second quote here.  So the

16   argument here is I'm going to walk through the prosecution

17   history and I'll tell you how to understand the claims and

18   advertising has to be separate from applications.  That's an

19   argument that was made during claim construction that

20   Groupon lost.

21             And furthermore, it creates undue prejudice if

22   we're having experts act as pseudo judges telling the jury

23   here is how the claim should be interpreted.  We think all

24   discussions of claim construction and how the claims should

25   be construed should be reserved for Your Honor and not the

1    province of experts.

2              THE COURT:  Well, do you have more,

3    Mr. Oussayef?

4              MR. OUSSAYEF:  No, I do not.

5              THE COURT:  That's the only issue?

6              MR. OUSSAYEF:  No, I have other issues as well.

7    I can walk through some more if you like.

8              THE COURT:  How many do you think you have?

9              MR. OUSSAYEF:  So, there are at least two other

10   issues.

11             THE COURT:  All right.  Let's go to the others

12   and then, of course, we'll let Groupon respond.

13             MR. OUSSAYEF:  Okay.  The next issue is

14   regarding slide 67.  So in this slide there is an argument

15   about non-infringement regarding claim 8 and the argument is

16   about storing a predetermined amount of the advertising data

17   in a store established at the speculative reception systems.

18   That's a claim element that their expert did not even

19   address, never mind the specific argument that is discussed

20   here, which appears to relate to scrolling testimony.

21             Your Honor might remember that there was

22   testimony from a witness about how you could scroll

23   infinitely long through the mobile application.  That's

24   something that was not addressed in their expert report.

25   This entire element was not addressed by their expert in

1    their expert report.  So this, too, should be precluded.

2              Another issue, Your Honor, is that for -- so

3    those are relating to the Filepp patents, the '849 and the

4    '967.

5              The final issue here is on slide 111 of their

6    slides concerning the '601 patent.  In here we have their

7    expert, Dr. Weissman, and he is walking through various

8    claim elements using a file that was not something that he

9    walked through the claim elements for.  So to be clear, this

10   file is what we had a kind of dispute about on Friday.

11   Davis we understand will testify about this file.  Their

12   expert did not use that file to walk through the claims.  He

13   did cite to this file once in the background section of his

14   report, but he used a different file called user-review.cpp

15   to say hey, this file meets all of the claim elements.  Now

16   he's switching gears and he's relying on this file.

17             There is no citation here as to exactly what

18   file this is, but fair to say this is not a file that he

19   relied on to walk through the claim elements.  So there was

20   never a comparison, there was never a comparison between

21   this file and the recursively embedding step or the

22   identifying step or any other step in the claim language, so

23   it's a change in theories and our expert doesn't have an

24   opportunity to develop theories or respond because this is

25   an entirely new theory that is addressed here.

1        THE COURT:  Okay.  Thank you.  We'll hear from

2   Groupon.

3        MR. HADDEN:  Good morning, Your Honor.  Let me

4   start with the prosecution history.  This is something that

5   was addressed in Dr. Weissman's report.  And there is

6   nothing here that is contrary to the Court's claim

7   construction.  One of the arguments between the experts in

8   this case is whether the same image can be part of an

9   application and also advertising.  That's a factual dispute.

10  And there was a claim construction issue that went to that.

11       These statements that IBM made to the patent

12  office are relevant because it pointed out that advertising

13  is separate and has to travel separately through the

14  reception system in the application which goes to the

15  factual dispute as to whether the same image with be both an

16  advertisement and an application.

17       Applicant went on to say that, in fact, the key

18  to the entire invention was the separate treatment and the

19  dichotomy between applications and advertising.  That goes

20  to the factual issue as to whether the same image can be an

21  advertisement and an application in this case.  And that is

22  not a claim construction issue, that's a factual issue.

23  We're not arguing about claim construction.

24       The top quote does not say anything about that

25  the areas of the screen has to be separate, which was the

1    claim construction issue that they were referring to.  All

2    it says is that advertising and applications are separately

3    displayed.  That again goes to the question of whether or

4    not the exact same content can be both an advertisement and

5    application and which is a contested factual issue in this

6    case.  I don't think there is anything improper about this

7    slide.

8              THE COURT:  When asked, Dr. Weissman will say he

9    was aware of the Court's claim construction and applied it?

10             MR. HADDEN:  Yes.  Absolutely, Your Honor.

11             The second issue raises the problem with what

12   IBM is asking for, the scrolling slides and the slide that

13   they said is beyond the scope.  We removed the slides.  That

14   was part of the update that we provided in the middle of the

15   night and this morning in response to their meet and confer.

16   They're objecting to slides that we have already taken out

17   and not letting us put in replacement slides to address

18   their objections.  It's unfair and it's improper.  We pulled

19   the slide that they objected to as we're supposed to do in

20   the meet and confer process to eliminate the disputes that

21   we can and now they're saying you can't put in the

22   replacement that doesn't have the objectionable content.

23             On the final point, the template slide, and this

24   is from Dr. Weissman's report under this ordering, he goes

25   through the ordering process on the Amazon website in 1995,

1    cites to and explains that same template.

2              Now, when he -- the file that they're referring

3    to is highlighted right here in his discussion in the

4    report.  Now, he used a different web page as an example to

5    show that the links were embedded with the state

6    information, but he also explained that exactly the same

7    program works on all these template files and it works the

8    same way in all of them.

9              This is fully disclosed.  There is no

10   difference.  We can swap out that slide for a different web

11   page, but they all work the same.  And it was fully

12   disclosed in his report.

13             THE COURT:  Okay.

14             MR. HADDEN:  Thank you.

15             THE COURT:  On issues one and three, I'm

16   overruling the objection.  With respect to the claim

17   construction, the expert is going to say that he applied the

18   Court's claim construction.  And, of course, I'll instruct

19   the jury to follow my claim construction and not to follow

20   any contrary claim construction that they might hear from

21   the experts.  And I don't think under 403 that the balance

22   would favor preventing the defendant's expert from applying

23   the construction consistent with the way he has done so

24   evidently throughout this case, and including in his expert

25   report.

1          And on objection three, which related to

2   something around slide 111, an expert doesn't have to use

3   the exact same words or even the exact same examples that

4   they previously disclosed.  The fact is he did disclose or

5   reference the file he wants to use.  It seems to me

6   substantively consistent and at minimum a reasonable

7   elaboration on the opinion he disclosed to use this file for

8   the purpose he plans to use it for.

9          Now, with respect to slide 67, Mr. Oussayef, I

10  do want you to come back.  If it is the case that they

11  timely disclosed slides at 8:30 at night, you have already

12  said you're willing to treat that as timely, and you raised

13  an objection and their response to the objection is to

14  create a new slide, then it seems to me I should allow them

15  to do that.  They're trying to accommodate your objection.

16  Do you disagree with that?

17          MR. OUSSAYEF:  So, no, Your Honor.  That is not

18  what I -- I don't disagree with that.  I just had no chances

19  to review and saw they withdrew that slide.  So given that

20  they withdrew that and they're not going to argue that claim

21  element for claim 8, which wasn't disclosed in their expert

22  report, I have no objection to them not presenting that

23  slide.

24          THE COURT:  Sure.  But it seems to me I think

25  we're also being told there is some new slide.  I assume you

1       can identify it for us real quickly.

2               MR. HADDEN:  Sure.  I can, Your Honor.

3               There are other examples of this.  This is why

4       the ruling that we're stuck with at 8:30 kind of doesn't

5       work, because they have other objections where we modified

6       the slides to accommodate their objections.

7               So I understand the issue with brand new slides.

8       It had nothing to do with what was disclosed at 8:30.  If I

9       could ask if we have a period to meet and confer to figure

10      out what the issues are.  Because, for example, this is

11      another one where we had slides that talk about you will

12      hear more about it today.  You heard some about it on

13      Friday, the different flows through the single-sign-on

14      process, and went through all four flows that Mr. Breen is

15      going to talk about.

16              They objected and said one of those was not

17      described in Dr. Weissman's report.  So we said, okay,

18      you're right.  We took that flow out.  To do that, we had to

19      change our slides to show only the three that Dr. Weissman

20      is going to talk about.

21              There are issues like that where this notion

22      that we're stuck with the slides that they objected to but

23      we can't put in the replacement to fix their objections just

24      doesn't seem workable.

25              THE COURT:  Here is -- I mean there is a number

1  of problems here, but one is it takes a lot of time and it's

2  going to come out of one or both of your sides for me to

3  draw a line between a new slide and a modification -- a

4  modification in good faith based on a meet and confer, which

5  it sounds like this one is.  You went from four images to

6  just three images after realizing the fourth image wasn't

7  properly disclosed.  That seems like something that

8  reasonably happens and you should be allowed to do.

9           Creating a whole new slide that was not shared

10  in a timely manner and only given two hours before trial

11  begins in the morning seems unfair and unduly prejudicial.

12  But if you all can't figure that out and work it out

13  yourself, you are going to have to continue as we are now

14  using your time, which I'm willing to do.  The jury is

15  probably happy to sit there not in the jury box, but I don't

16  know if that is really the best use of your time.

17           So, Mr. Oussayef, what do you suggest?

18           MR. OUSSAYEF:  Your Honor, I think that is a

19  clear bright line between new slides versus modifying

20  existing slides in good faith in response to our objections.

21  And I'm confident the parties can deal with that bright line

22  that Your Honor has identified.

23           THE COURT:  Even with respect to Dr. Weissman

24  who is evidently coming on the stand today?

25           MR. OUSSAYEF:  I mean I think that we'll have to

1    work hard.  And we might have -- hopefully, we don't have

2    issues but we might have issues at lunch.  But, you know, if

3    there is no new -- I mean as long as there are no new slides

4    and everything they are talking about is a good faith

5    reaction to what we said and it's just modifying an existing

6    slide, then we can work it out.

7                THE COURT:  Okay.  I trust you are all going to

8    work that out.  You will have to let me know if you don't,

9    but I hope not to hear from you, but if you need my help,

10   you will let me know.

11               MR. HADDEN:  Thank you, Your Honor.

12               THE COURT:  Any other issues, IBM?

13               MR. OUSSAYEF:  Yes, there is an objection to

14   some deposition designations.

15               THE COURT:  Is that the letter from yesterday?

16               MR. OUSSAYEF:  Yes, that's correct.

17               THE COURT:  You don't need to spend time on

18   that.

19               MR. OUSSAYEF:  Thank you, Your Honor.

20               THE COURT:  Any issues that Groupon wanted to

21   raise this morning?

22               MS. SHAMILOV:  Just one question, Your Honor.

23               THE COURT:  Okay.

24               MS. SHAMILOV:  On the letter that was filed

25   yesterday where we were intending to play the clip today, I

 1    wasn't sure if Your Honor would resolve it.

 2              THE COURT:  Yes.  This is the same letter Mr.

 3    Oussayef just mentioned?

 4              MS. SHAMILOV:  Yes.

 5              THE COURT:  Okay.  I'll tell you now.

 6              So how we're all talking about the same letter.

 7    It's with respect to one of the inventors, Iyengar.

 8              MS. SHAMILOV:  Correct.

 9              THE COURT:  Each side had one objection to the

10    other side's objections.  We're sustaining both sets of

11    objections.

12              With respect to IBM's objections to around pages

13    40 to 42, I agree with IBM that the 403 balance strongly

14    suggests that I should exclude this testimony.  It seemed to

15    me that the witness didn't understand the question in the

16    way that I think had as much to do with the question as the

17    witness may not being responsive on anything Groupon would

18    think is relevant.  Any minimal probative value is strongly

19    outweighed by the risk of unfair prejudice.  So I'm

20    excluding that and therefore sustaining IBM's objection.

21              And then I'm sustaining Groupon's objection to

22    around pages 31 to 32.  It does seem to me improper use of

23    the deposition from a case that didn't even involve Groupon

24    and where Groupon was not present.  So we'll split that last

25    minute with each side.

```
 1                    Is there anything else before we bring the jury

 2     in today?

 3                    MR. OUSSAYEF:  No, Your Honor.

 4                    THE COURT:  No.

 5                    No?

 6                    MR. HADDEN:  No Your Honor.

 7                    THE COURT:  All right.  We'll take a short

 8     break, and we'll come back with the jury.

 9                    (Brief recess taken.)

10                    *     *     *

11                    (Proceedings reconvened after recess.)

12                    THE COURT:  The jury is ready.  We'll bring them

13     in.

14                    MR. DAY:  Your Honor, I have some witness

15     pictures to add to the binder.

16                    THE COURT:  Okay.  You can pass those up.

17                    (Documents passed forward.)

18                    (Jury returned.)

19                    THE COURT:  Welcome back, ladies and gentlemen.

20     Nice to see you all.  I hope you enjoyed the weekend.  We

21     are ready to proceed in just a moment.

22                    We have some more photos for you of some

23     witnesses to pass out.

24                    (Documents passed out.)

25                    THE COURT:  Welcome back.
```

Breen - direct

1           MR. HAACK:  Thank you, Your Honor.

2           THE COURT:  You may recall the witness.

3           MR. HAACK:  Your Honor, Groupon calls Mr. Jim

4   Breen.

5           THE COURT:  Okay.  Good morning, Mr. Breen.

6   Welcome back.  I hope you had a nice weekend.  I remind you

7   that you remain under oath.

8           THE WITNESS:  Of course.

9           ... JAMES P. BREEN, having been previously

10  sworn, was examined and testified further as follows ...

11          THE COURT:  Mr. Haack, you may proceed.

12          MR. HAACK:  Thank you, Your Honor.

13          DIRECT EXAMINATION (Continued)

14  BY MR. HAACK:

15  Q.    Mr. Breen, I'd like to start today by just kind of

16  refreshing the jury since we had a weekend in between your

17  testimony.  Can you just give us a quick recap of your job

18  responsibilities at Groupon?

19  A.    Yes.  I'm currently Senior Engineering Manager with

20  the financial engineer development team.  I was formerly

21  manager of the users team for Groupon.

22  Q.    Thank you.  And last week we spoke about Facebook

23  sign-up with Groupon.  Do you remember that?

24  A.    Yes.

25  Q.    And I'd like to hit a couple of high points with the

Breen - direct

1   jury about that.  How, when a user is at the Groupon login

2   page, how does the user sign up with Facebook -- sorry, sign

3   up at Groupon with Facebook?

4   A.    The user clicks on a sign up with the Facebook button

5   which will result in the SDK sending a request to Facebook

6   servers.  And there is an interaction with the Facebook

7   servers and the browser where the user is prompted via a

8   couple dialogs, which are pages from Facebook's website, to

9   collect the e-mail address and password on the user's

10  Facebook account, at which point that information is sent to

11  Facebook, and Facebook eventually responds with the access

12  token to the browser.

13          MR. HAACK:  Your Honor, may I approach the

14  witness?

15          THE COURT:  You may freely approach.

16          (Documents passed forward.)

17  BY MR. HAACK:

18  Q.    Now, Mr. Breen, could you turn to the tab marked

19  DX-388 in your binder?

20  A.    Yes.

21          MR. HAACK:  Your Honor, this is a document that

22  was mistakenly admitted under a wrong number last week, it

23  was 388.  We admitted it as DX-38.  I would like to show it

24  to the jury real quickly and have it admitted into evidence.

25          THE COURT:  Sure.

Breen - direct

1    BY MR. HAACK:

2    Q.    Is this a document about the access tokens we were

3    discussing on Friday with Facebook, Mr. Breen?

4    A.    Yes, it is.  This is documentation from the Facebook

5    developer's website about their access tokens.

6                MR. HAACK:  Your Honor, we would like to offer

7    it into evidence.

8                THE COURT:  This is 388.

9                MR. HAACK:  388.

10               THE COURT:  Any objection?

11               MR. DESMARAIS:  No objection.

12               THE COURT:  388 is admitted.

13               (DX-388 was admitted into evidence.)

14   BY MR. HAACK:

15   Q.    Mr. Breen, can you turn to the tab in your binder

16   marked PX-1090?

17   A.    (Witness complies.)

18   Q.    Do you see that in front of you, Mr. Breen?

19   A.    I do.

20   Q.    Do you recognize this document?

21   A.    Yes.  This is also a document from the Facebook

22   developer's website.

23   Q.    And this is documentation that you and other

24   engineers at Groupon used to build Facebook sign up?

25   A.    Yes.

Breen - direct

1   Q.      And this document says:  At this point in the flow,

2   the person is authenticated and logged in.  Your app is now

3   ready to make API calls on their behalf from the browser.

4            Would you explain what that means to the jury

5   very quickly?

6   A.      It means that once the access token has come back

7   from Facebook, it can be used to make API calls to Facebook.

8   Q.      And what is an API call?

9   A.      An API call is -- an API is software that runs on

10  Facebook servers, and it allows other systems to interact

11  with data on the Facebook servers.

12  Q.      So in this case, it would be -- would Groupon be one

13  of the other servers?

14  A.      Yes.

15  Q.      Getting information from Facebook?

16  A.      That's correct.

17  Q.      And do these access tokens have any data in them

18  about a user?

19  A.      No, not that is physical to Groupon in any way.

20  Q.      Is any data visible to Facebook at all in an access

21  token?

22  A.      No.

23  Q.      And we also spoke some about Google sign in last

24  week; right?

25  A.      Yes.

Breen - direct

1    Q.      And there are two different login flows for Google by

2    Groupon; correct?

3    A.      That's correct.

4    Q.      And I believe last week we described one of those

5    flows.  Can you remind the jury what that one was?

6    A.      It was the one time code flow.

7    Q.      And, Mr. Breen, would you turn to Defendant's Exhibit

8    642.

9    A.      (Witness complies.)

10   Q.      And do you recognize this document, Mr. Breen?

11   A.      I do.

12   Q.      And what is this document?

13   A.      This is a page of documentation from Google's

14   website for developers describing some of the process for

15   single-sign-on with Google.

16   Q.      And is this document that engineers at Groupon used

17   at Google sign in?

18   A.      Yes.

19              MR. HAACK:  Your Honor, we would like to offer

20   Defendant's Exhibit 642 into evidence.

21              MR. DESMARAIS:  No objection.

22              THE COURT:  It's admitted.

23              MR. HAACK:  Thank you.

24              (Defendants's Exhibit No. 642 was admitted.)

25   BY MR. HAACK:

Breen - direct

1  Q.      And in the one time codes we discussed on Friday, do

2  those one time codes from Google have any information about

3  a user?

4  A.      They do not.

5  Q.      And is there any information at all that Groupon can

6  get out of that one-time code?

7  A.      No.

8  Q.      And what does Groupon do with the one-time code?

9  A.      Once the one-time code has passed through the user

10 browser in the Groupon servers, Groupon will make an API

11 call to Google API to exchange the one-time code for a

12 one-time authentication code for an access token.

13 Q.      And does the access token have any data about a user

14 in it?

15 A.      It does not.

16 Q.      And can Groupon read any data in the access token?

17 A.      No.

18 Q.      What is your finding with the access token flow?

19 A.      Groupon is able to make another API call to Google

20 with the access token to retrieve information from Google's

21 account.

22 Q.      I would like move on, there is a third flow we didn't

23 get to on Friday; right, Mr. Breen?

24 A.      Yes.

25 Q.      What is that flow called?

Breen - direct

1    A.       It's the Google ID token flow.

2    Q.       And the ID token, how does that flow start?

3    A.       It starts the same way that the on flow starts with

4    the use of a clicking the sign up with Google button, and

5    when it does this, the Google SDK that's been downloaded

6    into the browser will send a request to Google servers and

7    Google responds, that response triggers a pop up dialogue

8    box as part of Google's website where they can enter their

9    email address which sends another request back to Google's

10   servers.  And Google sends a response back to the browser.

11            This new dialogue box with that response allows

12   you to enter the password with the email address and that is

13   sent out to Google's servers.  The response comes back for a

14   certain pop up page that has the user confirmed which is the

15   Google account, their sign in Google accounts they would

16   like associated with Groupon.

17   Q.       Just to pause it, this is if you had more than one

18   account with Google, this let's you pick which Google

19   account to use?

20   A.       If you're signing in with more than one Google

21   account at that point, you're selecting which one to use.

22   Q.       What happens after that?

23   A.       The submission of that page will send another request

24   back to Google and Google will generate an ID token and send

25   that back to Google's SDK browser.

Breen - direct

1    Q.      And then what?

2    A.      So then the browser will send that ID token to

3    Groupon's servers, and this token is different than the

4    other ones.  This token had a signature on it that Groupon

5    can use to verify the account did come from Google and the

6    data in it is valid.

7    Q.      What is the data in the ID token?

8    A.      Groupon is able to obtain the Google user ID, user

9    name and email address for the token.

10   Q.      And when you say obtain it for the token, do you mean

11   directly from within the token?

12   A.      Yes.

13   Q.      So there is not an additional call back to the Google

14   servers?

15   A.      No.

16   Q.      And Mr. Breen, could you turn to the tab marked

17   DX-209.  Let me know when you're there.

18   A.      I'm there.

19   Q.      Mr. Breen, do you recognize Exhibit 209?

20   A.      Yes.

21   Q.      What is 209?

22   A.      This is a part of the documentation from Google's

23   website for developers that talks about how to build Google

24   sign in for Android with the use of a back-end server.

25   Q.      If you could turn to the fourth and last page of

Breen - direct

1    Exhibit 209, please.  There is a section there on the end

2    that says create an account or session.  Do you see that,

3    Mr. Breen?

4    A.    Yes.

5    Q.    And what is this?  What is this documentation from

6    Google instructing developers who want to use ID token sign

7    in to do?

8    A.    It's instructing them that they can -- using the --

9    using the data obtained vis-à-vis the token they can see if

10   there is an existing account in their database in which case

11   they can log in as that, otherwise they can create a new

12   account, create a new user record for the information in the

13   token.

14   Q.    So this is Groupon -- sorry, this is Google

15   documentation telling users of Google sign in like Groupon

16   that they can make new user accounts with the ID token?

17   A.    Yes.

18             MR. HAACK:  Your Honor, I would like to offer

19   Defendant's Exhibit 209 into evidence.

20             MR. DESMARAIS:  No objection.

21             THE COURT:  It's admitted.

22             MR. HAACK:  Thank you.

23             (Defendant's Exhibit No. 209 was admitted.)

24   BY MR. HAACK:

25   Q.    And Mr. Breen, now, we talked about a couple of

Breen - direct

1    different login flows from Google, both the ID token and the

2    one-time code.  Which flow does the Groupon website use?

3    A.      The Groupon website uses the ID token flow.

4    Q.      And what about what did it used to use?

5    A.      It used to use the one time code.

6    Q.      And why did Groupon make that switch?

7    A.      It made the switch because the one-time code flow

8    required API calls from Groupon servers to Google servers,

9    and those API calls were not performing well.  They were

10   very slow or they didn't succeed.  We discussed this with

11   Google, Google engineers in hopes they would improve the

12   performance of the API calls on their side, but their

13   recommendation was to change and use the ID token flow

14   instead of the one-time code flow.

15   Q.      And as part of the building and maintaining of this

16   feature, does Groupon often talk to people at Google about

17   the feature?

18   A.      Periodically.

19   Q.      And does Groupon use the one-time code flow anymore?

20   A.      No, it does not.

21   Q.      And was there ever a period of time where any of the

22   Groupon website or mobile applications used both the

23   one-time code and an ID token?

24   A.      Yes, there was.

25   Q.      And when was that?

Breen - direct

1   A.       When the feature was initially implemented in early

2   2016, the mobile apps used a combination of those.

3   Q.       And when you say a combination, what do you mean?

4   A.       They started out with an ID token and attempted to

5   follow the ID token flow in order to log the user into an

6   existing account.  And if that -- if the ID token cannot be

7   used to login user into an existing account, the clients

8   fell back to the one-time code flow in order to be able to

9   create a new account.

10  Q.       So at that point, ID tokens were only used to login

11  users; is that right?

12  A.       That's right.

13  Q.       And then the one-time code flow is always used to

14  create new user accounts?

15  A.       That's correct.

16  Q.       Did Groupon have to go through any registration

17  process to be able to use Facebook's sign in or login

18  feature?

19  A.       Yes, Groupon had to go through the developers, Google

20  developers' site for developers to basically create a new

21  app or a project in the Google developer console that would

22  then have an app ID and an app seeker that could be used.

23  That setup has to be done before you can integrate with

24  Google login.

25  Q.       And that developer console is something that Google

Breen - direct

1  is running?

2  A.     I'm sorry?

3  Q.     That developer console that you mentioned, that's

4  something at Google?

5  A.     Part of Google's website for developers.

6  Q.     And did Groupon have to do something similar with

7  Facebook?

8  A.     Yes.  Groupon developers had to go to the Facebook

9  website for developers and create a new application in there

10  with an app ID and app secret and other configurations

11  necessary to set up in advance.

12  Q.     And just to kind of switch back to a kind of little

13  higher level here, we discussed multiple ways that a

14  potential Groupon user can sign up for Groupon.  Once that

15  person has an account, does it matter how they created the

16  account?

17  A.     No, it does not.

18  Q.     Can they sign in using any of those methods once they

19  have the account?

20  A.     Yes, they can.

21  Q.     And that includes accounts being created by Facebook?

22  A.     Yes.

23  Q.     And accounts created by Google?

24  A.     Yes.

25  Q.     And do Groupon users have to use Facebook or Google

Breen - direct

1  at all to use Groupon?

2  A.    No, they do not.  They can sign up directly with

3  Groupon and then sign in directly with Groupon.

4  Q.    And then Mr. Breen, I would like to look at one more

5  document, Defendant's 210.  And do you recognize Exhibit

6  210?

7  A.    Yes.

8  Q.    What is Exhibit 210?

9  A.    210 is a piece of documentation from the Google

10  website for developers describing how to retrieve

11  information for a sign in user.

12  Q.    Like the other Google documents we discussed, that is

13  the type of documentation that Groupon engineers used to

14  build the feature we're discussing?

15  A.    Yes.

16          MR. HAACK:  Your Honor, we would like the offer

17  Exhibit 210 into evidence.

18          MR. DESMARAIS:  No objection.

19          THE COURT:  It's admitted.

20          MR. HAACK:  Thank you.

21          (Defendant's Exhibit No. 210 was admitted.)

22          MR. HAACK:  I pass the witness.

23          THE COURT:  Okay.  Cross-examination.

24          MR. DESMARAIS:  Thank you, Your Honor.  John

25  Desmarais for IBM.  Good morning.  Good morning, ladies and

1    gentlemen.

2                        **CROSS-EXAMINATION**

3    BY MR. DESMARAIS:

4    Q.     And good morning to you, Mr. Breen.

5    A.     Good morning.

6    Q.     Now, you took us through last week and this morning

7    several animations with communication back and forth between

8    Groupon and Facebook and Google.  Do you recall that?

9    A.     Yes.

10    Q.     And in each instance, after all the back and forth,

11    either Facebook or Google, depending on who you were

12    communicating with simply sent back to Groupon the user

13    email address and possibly their name and some other

14    identifying information about the user; right?

15    A.     Yes.

16    Q.     And all the back and forth ended up sending this

17    email address and the name of the user, all the back and

18    forth is simply to verify that it was Groupon communicating

19    and to verify the user to sort of prevent fraud or spoofing

20    or something like that, that back and forth is for

21    authorization before they disclose the email and the name?

22    A.     The back and forth is the way it's described by

23    Groupon and Google to obtain that information.

24    Q.     The point of it is to get authorization before they

25    disclose the name?

Breen - cross

1  A.      Authorization provided by the user.

2  Q.      They're trying prevent spoofing or fraud or

3  disclosing the name and email address to somebody that isn't

4  Groupon or somebody that isn't the user; right?

5  A.      That's part of the process.

6  Q.      At the end of the day, at the end of the day, Groupon

7  is getting the user's email and their name; right?

8  A.      Yes.

9  Q.      And if we look at the documents that you reviewed,

10  let's start with 388.  388 is one of the documents you just

11  reviewed for us; right?

12  A.      Yes.

13  Q.      And this one relates to the Facebook login; right?

14  A.      That's correct.

15  Q.      And if we turn to page two, it tells us on page two

16  all platforms follow the basic strategy to get a user token.

17  Do you see that?  Do you want me to blow it up?  Do you see

18  it?

19  A.      Sure, if you could make it a little bit bigger, that

20  would be great.

21  Q.      It says all platforms follow the basic strategy to

22  get a user token.  Do you see that?

23  A.      I do see that.

24  Q.      And then shows us the strategy; right?  It says the

25  client requests access and permissions, do you see that?

Breen - cross

1    A.      Yes.

2    Q.      And then the user authenticates.  Do you see that?

3    A.      Yes.

4    Q.      And then access token is returned to client.  Do you

5    see that?

6    A.      Yes.

7    Q.      The very first thing that happens is the client

8    requests access and permissions in this document; right?

9    A.      Yes.

10   Q.      And the client in this case is Groupon; right?

11   A.      I think the client includes the SDK.

12   Q.      But it's Groupon because the user is the person using

13   Groupon; right?

14   A.      I believe the client is the web browser which

15   includes the Facebook SDK.

16   Q.      They're distinguishing between the user and the

17   client, aren't they?

18   A.      The user is the person and the client is the web

19   browser.

20   Q.      It's the same for the Google application; right?

21   A.      For the Google application, the web browser is the

22   client.

23   Q.      And is the very first thing that happens in Google is

24   the web browser reaches out to Google; right?

25   A.      The first thing is that the user clicks the sign on

Breen - cross

1   to Google button.

2   Q.      You talked to us about DDX-302, didn't you?

3   A.      Yes.

4   Q.      Just to be clear, this is at the Groupon.com domain;

5   right?

6   A.      Yes, it is.

7   Q.      And Groupon created what we're looking at there;

8   right?

9   A.      This is the page on Groupon's website.

10  Q.      And Groupon engineers wrote the code that created

11  that, what we're looking at; right?

12  A.      Yes.

13  Q.      And as an initial matter, you have shown it, a red

14  circle on the I'm a new customer, do you see that?

15  A.      Yes.

16  Q.      And at the bottom we see sign up with Facebook or

17  sign up with Google application; right?

18  A.      That's right.

19  Q.      If instead I had the red circle on I have an account,

20  we would still see Facebook and Google at the bottom; right?

21  A.      We would see buttons that say sign in with Facebook

22  and sign in with Google.

23  Q.      So regardless of whether you are on "I have an

24  account" or "I am a new customer," you still have access to

25  clicking the button for Facebook or clicking a button for

Breen - cross

1    Google, right?

2    A.    Yes.

3    Q.    Now, if we go to this, if we look a little more at

4    this page, it talks about you see the Groupon banner at the

5    top; right?

6    A.    What banner are you referring to?

7    Q.    The Groupon sign in at the top.

8    A.    Okay.  Yes.

9    Q.    We see that it has personalized e-mails to Groupon,

10   right?  Right, sir?

11   A.    I see the text you have highlighted.

12   Q.    Yes.  You see Groupon's terms of use and privacy

13   statement; right?

14   A.    I see that highlighted.

15   Q.    In fact, it takes multiple teams at Groupon, teams of

16   software engineers to work on this page; right?

17   A.    There are certain frontend teams that worked on this

18   page.

19   Q.    You said at your deposition that there are multiple

20   teams that work on this page, didn't you?

21   A.    There are multiple teams that work on the entire

22   Google and Facebook sign in process.  This is the front end

23   of that for the website.

24   Q.    And the page we're looking at, just to perfectly

25   clear, this page is generated by Groupon code written by

Breen - cross

1    Groupon engineers; right?

2    A.      Not all of it.  Facebook SDK and Google SDK are

3    downloaded into this page.

4    Q.      I'm talking about the Groupon, the sign in for great

5    deals, the personalized Groupon e-mails, the terms of use

6    and the privacy statement.  All of that is created by

7    Groupon software engineers and it's rendered for us to see

8    on the Groupon website by Groupon code; right?

9    A.      Those page elements are, yes.

10   Q.      Let me do this here.

11           And you call that the sign in page; right?

12   A.      I call that the sign up page.

13   Q.      The sign up.  You call that the sign up page?

14   A.      Yes.

15   Q.      Now, it's created by Groupon engineers, rendered on

16   the Groupon website using Groupon code; right?

17   A.      The entire, the entire page is not, no.

18   Q.      Other than the button that says Facebook and the

19   button that says Google, it's rendered by Groupon code;

20   right?

21   A.      There are JavaScript libraries downloaded into that

22   page that are not Groupon code.

23   Q.      Fair point.  Let me rephrase.  Groupon engineers

24   created the software that renders that page, and that

25   process may have taken other snippets of code from other

Breen - cross

1    places and incorporated them into the Groupon code; right?

2    A.    No, they're not incorporated into the code.   They're

3    downloaded separately.

4    Q.    They're downloaded separately because Groupon

5    software engineers put in the code that they should be

6    downloaded separately; right?

7    A.    It's the browser that downloads the libraries.   There

8    is a reference to them.

9    Q.    So, sir, you are not denying that it's Groupon

10   engineers and software engineers that create and make the

11   sign up page displayed at the Groupon website, are you?

12   A.    Groupon engineers do implement the user experience.

13   Q.    I'm sorry.   What was that again?

14   A.    Groupon engineers do implement the user experience

15   with the sign up page.

16   Q.    Thank you.   Now, at some point, as we talked about,

17   when a user is trying to sign up or sign in, either way, if

18   they click on the Facebook button or the Google button,

19   we'll see all the communications we talked about, but what

20   happens is, as we have already said, Groupon receives the

21   e-mail address of the user and the name of the user; right?

22   A.    That's correct.

23   Q.    And the Groupon engineers, the Groupon software

24   engineers have written the code at Groupon on the Groupon

25   servers that receive that e-mail and name and stores it in

Breen - cross

1    the Groupon database; right?

2    A.      It will only store it in the database if it's

3    creating an account, but yes.

4    Q.      So I've written receiving an identifier.  And that's

5    done by the Groupon code.

6    A.      Yes.

7    Q.      Right, sir?

8    A.      At the following instructions provided by Facebook

9    and Google, yes.

10   Q.      That's not what I asked you.  At Groupon, Groupon

11   software engineers wrote code that receives an e-mail or

12   name or both and they store it in the Groupon database;

13   right?

14   A.      Yes, they do that because that is what Facebook and

15   Google tells them to do.

16   Q.      But it's Groupon engineers that wrote the code;

17   right?

18   A.      Yes.

19   Q.      And it's Groupon engineers that decided whether to

20   store it in the database, right?

21   A.      No, we didn't decide.  We're following instructions

22   provided by Facebook and Google.

23   Q.      Now, after you receive the e-mail and the name,

24   Groupon software engineers created software that, as you

25   already said, stores that name in a database and then they

Breen - cross

1    use it to create a new Groupon account; right?  So Groupon

2    wrote software to take that e-mail, take that name and

3    create an account.  And that account has unique ID created

4    by Groupon, the e-mail address and the name, a Groupon

5    timestamp, and a Groupon registration; right?

6    A.    That's correct.

7    Q.    And the Groupon engineers wrote the code to do that

8    and to store that new account in a Groupon database; right?

9    A.    Yes.

10   Q.    So I wrote:  Creating a new account based on the

11   identifiers.  Do you see that, sir?

12   A.    Yes.  What identifiers are you referring to?

13   Q.    The ones that were received from either Facebook or

14   Google.  Right?  Right sir?

15   A.    I'm not sure what the question is.

16   Q.    You asked what are identifiers, and I'm saying the

17   ones received from Facebook or Google.  The e-.mail?

18   A.    The name is not used as an identifier.

19   Q.    So I'll make it single:  Creating a new account based

20   on the identifier.  Do you see that, sir?

21   A.    Yes.

22   Q.    And that is what we just talked about is done by

23   code, by computer code written by Groupon engineers for

24   Groupon.  And that account is stored in a Groupon database;

25   true?

Breen - cross

1  A.     Yes.

2  Q.     I already checked yes.  And I think -- let me show

3  you some exhibits.

4              MR. DESMARAIS:  May I approach, Your Honor?

5              THE COURT:  Yes.

6              (Binders passed forward.)

7  BY MR. DESMARAIS:

8  Q.     Turn if you would, to Plaintiff's Exhibit 1888.

9  Excuse me.  I'm sorry.  Let's start with 1174.

10  A.     PX-11 --

11  Q.     1174.

12  A.     Are they in order?

13  Q.     Yes.  You can see it on the screen if you can't find

14  it in the book, Mr. Breen.

15              And this is a portion -- what we're seeing on

16  the screen in Exhibit 1174 is Groupon's source code; right?

17  A.     Sir, if you can give me a second to take a look.

18              Yes, it appears to be Groupon's source code.

19              MR. DESMARAIS:  I offer Plaintiff's

20  Exhibit 1174, Your Honor.

21              THE COURT:  Any objection to 1174?

22              MS. SHAMILOV:  No objection, Your Honor.

23              THE COURT:  No objection?

24              MS. SHAMILOV:  No objection.

25              THE COURT:  It's admitted.

Breen - cross

1          **(PX-1174 was admitted into evidence.)**

2     **BY MR. DESMARAIS:**

3     Q.      **And we can see on line 66 this is the code that**

4     **creates a Facebook linked account; correct?**

5     A.      **The method name highlighted there is:  Create**

6     **Facebook linked account.**

7     Q.      **And this code is written by Groupon software**

8     **engineers, and it runs in the Groupon user service on the**

9     **Groupon servers; right?**

10    A.      **That's correct.**

11    Q.      **And it creates the new account based on the**

12    **identifier; right?**

13    A.      **This code is creating an account based on parameters**

14    **patched into this method.**

15    Q.      **And new account is already stored, as you told us, on**

16    **the Groupon database; correct?**

17    A.      **It succeeds in creating an account that is in the**

18    **database.**

19    Q.      **And we have code like this for Google, too; right?**

20    A.      **I don't know if it's exactly like this.**

21    Q.      **A portion of it is at Plaintiff's Exhibit 1188, so**

22    **let me show you that now.**

23            **You recognize this as some Groupon source code;**

24    **right?**

25    A.      **I do.**

Breen - cross

```
 1    Q.      And this one relates to Google; right?

 2    A.      Yes, it does.

 3    Q.      But to be clear, it's Groupon's source code written

 4    by Groupon engineers and it's executed by Groupon's user

 5    service; right?

 6    A.      This code is, yes.  But this code doesn't create an

 7    account.

 8    Q.      But this is a portion of the code relating to Google

 9    login, isn't it, sir?

10    A.      It is related to Google login.

11    Q.      And another portion of the code will create a Google

12    account; right?

13    A.      We don't create Google accounts.

14    Q.      I'm sorry.  It will create a Groupon account that

15    gets stored on the Groupon service; right?

16    A.      It will insert a record, yes.

17    Q.      And that, the code that does that is written by

18    Groupon software engineers, and the code is executed by

19    Groupon's user services, and the account is stored in the

20    Groupon database; right?

21    A.      Yes, by following instructions provided by Google.

22    Q.      Now, Groupon doesn't pay Facebook or Google for

23    sending the user's e-mail address; right?

24    A.      No.

25    Q.      And Groupon doesn't pay Facebook or Google for
```

Breen - cross

1    creating accounts for Groupon customers, right?

2    A.      Not to my knowledge.

3    Q.      Now, you know the patent in this case, the '346

4    patent relates to this sign up operation and creating new

5    accounts; right?

6    A.      To the best of my understanding.

7    Q.      If we just look at the title of the '346 patent.

8            MR. HAACK:  Objection, Your Honor.  It's outside

9    the scope of direct.  I didn't say anything about any

10   patents.

11           THE COURT:  Mr. Desmarais.

12           MR. DESMARAIS:  His direct was about what was

13   done by Google and what is done by Facebook.  All I'm doing

14   is redirecting on what is done by Groupon.

15           THE COURT:  And how does the patent have

16   something to do with that?

17           MR. DESMARAIS:  The title of the patent is

18   Method and System For a Runtime User Account Creation and,

19   I'm going to use that to ask him about the account creation,

20   just to focus.

21           MR. HAACK:  Your Honor, that seems awfully

22   prejudicial.  He is take grabbing some words to talk about

23   how Groupon works when the witness hasn't seen anything

24   about this patent.

25           THE COURT:  Which patent is this?

Breen - cross

1              MR. DESMARAIS:  This is the '346 patent, Your

2      Honor.  I'm just trying to show why the testimony is

3      relevant.

4              THE COURT:  I don't think you need the patent.

5      I'm going to sustain the objection.

6      BY MR. DESMARAIS:

7      Q.      You understand, sir, don't you, that the patent in

8      this case that you are here to testify about is about

9      runtime creation of new accounts; right?

10              MR. HAACK:  Same objection, Your Honor.

11              THE COURT:  Sustained.  We're not talking about

12      the patent at this time, Mr. Desmarais.

13      BY MR. DESMARAIS:

14      Q.      Well, let me ask it this way.  When you design

15      products at Groupon, sir, isn't it true that you and the

16      other folks at Groupon make it a practice not to review

17      other people's patents to make sure they aren't using the

18      technology in those patents; correct?

19              MR. HAACK:  Also outside the scope.

20              THE COURT:  All right.  I'll see counsel at

21      sidebar.

22              (Sidebar conference held.)

23              THE COURT:  All right.  So that was another

24      outside the scope objection?

25              MR. HAACK:  Yes, Your Honor.

Breen - cross

1           THE COURT:  What is your view about where the

2   line is here and what is outside the scope?

3           MR. HAACK:  All he has talked about is how --

4           THE COURT:  Speak up.

5           MR. HAACK:  -- how Facebook works, how they

6   interact with Google -- and, I'm sorry, Groupon and how it

7   interacts with Google and Facebook, and that is outside

8   the scope of the direct.  It's the functioning of the

9   technology.

10          THE COURT:  But why?  You could view it as

11  development of the technology and the steps that go into

12  the development.  And wouldn't it be pertinent to that

13  whether they consider whether others have patents as they're

14  developing their source code, et cetera?

15          MR. HAACK:  I don't think unless there is some

16  indication the witness has given that he is or is not part

17  of the process or should or should not be doing that, how

18  that is relevant to how the technology works.

19          THE COURT:  Mr. Desmarais.

20          MR. DESMARAIS:  I agree with the statement that

21  Your Honor just made which is it is directly relevant to the

22  patent and it's also relevant to his testimony on direct

23  about all of this is being done by Google, all of this is

24  being done by Facebook, Groupon has no responsibility here,

25  and I think it's my job to expose that as not true.  The

Breen - cross

1   patent in this case goes directly to what this witness

2   testified about on direct, about how the product was

3   designed and what are the steps of the product and whether

4   it is Groupon's responsibility or Google or Facebook's

5   responsibility.

6              MR. HAACK:  Your Honor.

7              THE COURT:  Yes.

8              MR. HAACK:  Your Honor, whether or not it is

9   true what Google or Facebook tell Groupon has nothing to do

10  with an IBM patent.  He didn't testify about the patent.  He

11  didn't testify he looked at the patent.  He didn't look at

12  this patent.  He just talked about the interactions with

13  him -- sorry, "him" being Groupon and third parties.

14             THE COURT:  But the question I think Mr.

15  Desmarais wants to explore, the topic is in designing your

16  user interface and how you interact with other third parties

17  such as Facebook or Google, do you take into account patents

18  that may be out there?  Why isn't that relevant and also

19  within the scope of the direct that was all about what is

20  your product, how does it work, how did you develop it?

21             MR. HAACK:  I mean it's just has nothing to do

22  with the product development process.  It has nothing to do

23  with the functioning of the technology.

24             THE COURT:  I disagree.  I will overrule the

25  objection.  You can explore this.

Breen - cross

| 1 | (Sidebar conference ends.) |

THE COURT:  You may proceed when you are ready.

MR. DESMARAIS:  Thank you, Your Honor.

BY MR. DESMARAIS:

Q.    As I was asking you, Mr. Breen, more generally, it's true, isn't it, that when you and the others at Groupon are working on developing software for Groupon, you don't review other people's patents to make sure you aren't using technology covered by those patents; right?

A.    Like almost every software engineer, we're not trained in how to find out how patents work.

Q.    Right.  But my question is you don't look at other patents and try to avoid them.  You make a policy not to do that; right?

A.    There is no policy about that, no.

Q.    But you don't do it as part of your job when you are designing new products; right?

A.    Not normally, no.

Q.    And so if there was a patent out there that was about runtime creating, at runtime creating a new account based on an identifier, you wouldn't even know about that; right?

A.    If we didn't use the patent, we wouldn't find that patent.

Q.    If you were told about that patent, if you were told about that patent, would you have taken it into account?

Breen - cross

```
 1   A.       I'm not sure what taking it into account means.

 2   Q.       Isn't it true, sir, that at your deposition you told

 3   us that Groupon has made no attempts to avoid the '346

 4   patent?

 5   A.       I don't recall saying that, no.

 6   Q.       At your deposition is in your book and I would look

 7   at line -- excuse me, page 212, line 9.

 8   A.       I'm sorry, what part of my book?

 9   Q.       Page 212, line 9.  And I'm going to ask you whether

10   you were asked the follow questions and whether you gave the

11   following answers.

12            MR. HAACK:  Is this an impeachment or just

13   having him read his deposition?

14            THE COURT:  I'm not sure.

15            MR. DESMARAIS:  It's an impeachment, but I can

16   make it more clear if you would like, Your Honor.

17            THE COURT:  Make it more clear.

18   BY MR. DESMARAIS:

19   Q.       Mr. Breen, now that you have your deposition in front

20   of you, let me ask you this question, it's true, is it not,

21   that Groupon has not made any attempt to design any of its

22   website, its mobile website or its mobile applications to

23   get around the patents in this case?

24   A.       Like I said, I don't know.

25   Q.       And that's true, isn't it, sir, you just don't know?
```

1    A.       I'm not aware of everything that happens at Groupon.

2              MR. DESMARAIS:  Thank you, Your Honor.  No

3    further questions.

4              THE COURT:  All right.  Redirect.

5              MR. DESMARAIS:  Your Honor, I probably should

6    have marked my demonstrative.  The next one in order is

7    Plaintiff's Demonstrative Number 7.

8              THE COURT:  Okay.

9              MR. DESMARAIS:  I don't have a sticker.

10             THE COURT:  Just for the record, Plaintiff's

11   Demonstrative 7 is what Mr. Desmarais has been marking up on

12   the yellow pad during the cross-examination.

                         REDIRECT EXAMINATION

13

14   BY MR. HAACK:

15   Q.       Mr. Breen, Mr. Desmarais put a checkmark next to

16   Groupon's code on the signup page.  Do you see that here on

17   Plaintiff's Demonstrative Number 7?

18   A.       Yes.

19   Q.       And there is some Groupon code on the signup page;

20   correct?

21   A.       Yes.

22   Q.       Is there other code on the Google signup page -- I'm

23   sorry, strike that.  Is there other code on the Groupon

24   signup page?

25   A.       Yes.

Breen - redirect

1    Q.      What is that code?

2    A.      Some of that code is the Google SDK and the Facebook

3    SDK.

4    Q.      Where does the Google SDK come from?

5    A.      It comes from Google's servers.

6    Q.      How does it get on to the browser?

7    A.      The browser downloads it from Google's servers.

8    Q.      How does the browser know to download it on to

9    Groupon's servers?

10   A.      There is a reference to it in the -- there is a link

11   to it in the page.

12   Q.      Mr. Breen, if you look at your witness binder, the

13   white one and turn to PX-1045.

14   A.      Yes.

15   Q.      And do you recognize this document?

16   A.      I do.

17   Q.      On the first page of this document, there is a

18   section that says load the Google platform library.  That is

19   the SDK you're talking about?

20   A.      Yes, it is.

21   Q.      What does it say right underneath that?

22   A.      You must include the Google platform library on your

23   web pages that integrate Google sign?

24   Q.      This is an instruction from Google?

25   A.      Yes.

1   Q.      Does Facebook follow that instruction?  Sorry, does

2   Groupon follow that instruction?

3   A.      Yes, we do.

4   Q.      And this next line starts at script SRC, can you tell

5   us and the jury what that is?

6   A.      Sure.  The script tag is a part of HTML, it's what

7   builds the web page and the SRC is identifying the source of

8   that script, basically telling the browser where it

9   downloaded that file from.  And the URL is the value of that

10  source, that API at Google.com, JS platform JS web page

11  which is an URL on one of Google's website.

12  Q.      Is this similar to how SDK gets into the browser?

13  A.      Yes.

14  Q.      Is that also at Facebook's direction?

15  A.      Yes.

16          MR. HAACK:  Your Honor, I would like to offer

17  Plaintiff's Exhibit 1045 into evidence.

18          THE COURT:  Any objection?

19          MR. DESMARAIS:  No, Your Honor.

20          THE COURT:  It's admitted.

21          (Plaintiff's Exhibit No. 1045 was admitted.)

22  BY MR. HAACK:

23  Q.      So Plaintiff's Demonstrative 7 here isn't really

24  accurate, then, is it, sir?

25  A.      No, the signup page is not entirely Groupon code.

Breen - redirect

1            MR. DESMARAIS:  I'm not sure he should be

2    writing on my demonstrative.

3            THE COURT:  I'm not sure about that.  But we'll

4    note that an X was just marked next to the first check.

5            MR. HAACK:  I'll refrain in the future, Your

6    Honor.

7    BY MR. HAACK:

8    Q.    And the next line of Mr. Desmarais' exhibit is

9    receiving an identifier.  Do you see that?

10   A.    No, I don't.

11   Q.    You certainly do not.

12            Now, do Google user -- I'm sorry, do Groupon

13   user accounts have a user ID?

14   A.    Yes.

15   Q.    And where does that user ID come from?

16   A.    Groupon generates it.

17   Q.    Does Groupon generate a user ID when a user signs up

18   with Facebook?

19   A.    Yes.

20   Q.    Do they generate their user ID when a user signs up

21   with Google?

22   A.    Yes.

23   Q.    And this last bit, creating a new account based on

24   the identifier.  Could you flip to Defendant's Exhibit 208,

25   Mr. Breen.

Breen - redirect

1  A.      Okay.

2  Q.      And on this document, this is a Facebook document

3  again; correct?

4  A.      Yes, it is.

5  Q.      And the first paragraph here labeled number one

6  account creation, what is Facebook telling users of the

7  login feature like Groupon that they can do?

8  A.      They can create an account in their own app.

9  Q.      And Groupon has received similar instructions from

10  Google; correct?

11  A.      Yes.

12  Q.      Now, we talked a little bit earlier, Mr. Breen, about

13  Groupon's interactions with both Facebook and Google

14  relating to this feature.  Do you remember that?

15  A.      Yes.

16  Q.      At any point in that discussion did anyone from

17  Facebook say hey, you guys shouldn't look at these patents?

18  A.      Did you say should or should not?

19  Q.      Should.

20  A.      No, no one said you should look at these patents.

21  Q.      No one mentioned patents at all?

22  A.      No.

23  Q.      What about from Google?

24  A.      Nobody from Google said we should look at patents.

25  Q.      Did anyone from Facebook mention that Groupon might

Breen - redirect

1    need a license to use this feature?

2    A.      No.

3    Q.      What about Google?

4    A.      No.

5    Q.      And Mr. Breen, you mentioned you don't read patents

6    typically when you're building a product.  Why is that?

7    A.      I'm not trained as an attorney and I don't know how

8    to find relevant patents.

9    Q.      And then I would like to return to one other thing

10   that we discussed earlier, which is -- I'm sorry, you

11   discussed it with Mr. Desmarais.  He put up a diagram to

12   talk about both the user and the client.  I want to clarify

13   your understanding what would be what in that figure.  So in

14   a figure like that, you as one of the engineers who

15   developed features like this, how who you understand the

16   user to mean?

17   A.      The user would be the person who is visiting the

18   website.

19   Q.      And what about the client?

20   A.      The client is a browser.

21   Q.      And in the case of Facebook sign on that browser,

22   does it include Facebook code?

23   A.      Yes.

24   Q.      And what code in that browser makes those requests to

25   Facebook that Mr. Desmarais talked to you about?

1   A.      Facebook SDK.

2   Q.      Is that also the same with Google?

3   A.      Yes.

4               MR. HAACK:  No more questions, Your Honor.

5               THE COURT:  Okay.  You may step down, Mr. Breen.

6   Thank you very much.

7               MR. HAACK:  Release the witness?

8               THE COURT:  Any objection?

9               MR. DESMARAIS:  No, Your Honor.

10              THE COURT:  Okay.  You are also released,

11  Mr. Breen.

12                  (Witness excused.)

13              THE COURT:  Groupon may call its next witness.

14              MR. HADDEN:  Groupon calls Arun Iyengar.  He's

15  the IBM inventor on the '601 patent.  IBM did not bring him

16  as a witness, so we are calling him by deposition.

17              THE COURT:  Okay.  About how long is the

18  deposition testimony you intend to play?

19              MR. HADDEN:  I think it's ten to fifteen

20  minutes, Your Honor.

21              MS. SHAMILOV:  It's seven now because after

22  today's discussion.

23              THE COURT:  Seven minutes.  We'll turn the

24  lights down, please.

25                  (Video deposition of Arun Iyengar:)

1       "Question:  Good morning, Dr. Iyengar.  Could

2   you state and spell your name for the record?

3       "Answer:  Arun Iyengar.  A-R-U-N, I-Y-E-N-G-A-R.

4       "Question:  Where do you work, Dr. Iyengar?

5       "Answer:  IBM.

6       "Question:  I am handing you a document I'm

7   marking as Iyengar Exhibit 1.  I think Exhibit 1 is the '601

8   patent.  Do you recognize that?

9       "Answer:  I do.

10      "Question:  That's a patent in which you're the

11  sole inventor; is that right?

12      "Answer:  That is correct.

13      "Question:  And it's a patent that you are here

14  to testify about today on behalf of IBM; correct?

15      "Answer:  That is correct.

16      "Question:  I would ask you to look in Exhibit

17  1, the '601 patent, to column four.  It is around line 13.

18  There is a heading a little bit above that and it says, 'The

19  HTTP protocol and the Worldwide Web.'

20      "Do you see that?

21      "Answer:  I see that line.

22      "Question:  And below that, it says, 'The most

23  compelling application of the present invention is for

24  browsing the Worldwide Web via the HTTP protocol.'

25      "Do you see that?

1    "Answer:  I see it.

2    "Question:  Why is browsing the web the most

3    compelling application of your invention?

4    "Answer:  The patent application, the primary

5    motivation behind it was for people using web applications.

6    "Question:  Right after the text, we look at you

7    -- the patent cites a Hypertext transfer protocol including

8    a URL.  Do you see that?

9    "Answer:  I see it.

10   "Question:  And it lists as the first author T.

11   Berners-Lee.  Do you see that?

12   "Answer:  I see it.

13   "Question:  Is that a reference to Tim

14   Berners-Lee?

15   "Answer:  That is correct.

16   "Question:  And Tim Berners-Lee is the person

17   who invented the Worldwide Web at CERN in Switzerland;

18   correct?

19   "Answer:  Is that a statement or question?

20   "Question:  It's a question.

21   "Answer:  He is often credited as being one of

22   the key inventors of the web.

23   "Question:  Do you have any reason to dispute

24   that?

25   "Answer:  Tim Berners-Lee deserves considerable

designations - Iyengar

1    credit for his many contributions to the web.

2              "Question:  The next sentence in the patent goes

3    on and says, 'In other words, a web browser can be used to

4    access information from servers all over the world by simply

5    pointing and clicking on Hypertext links.'

6              "Do you see that?

7              "Answer:  I see that.

8              "Question:  Is that a true statement?

9              "Answer:  Within the context of the patent, I

10   think that's a proper statement.

11             "Question:  So if we go back to your definition

12   of conversation at or around column seven, line 20, so if

13   I'm on page PI, and it has a series of links, and if I click

14   on one of those links, I will go to page PI plus one, and

15   the conversation will continue; right?  We agreed to that,

16   correct?

17             "Answer:  Right.

18             "Question:  So now if that page PI, if some of

19   the links on that page do not have state information, and I

20   clicked on one of those links, I would still go to page PI

21   plus one.  So the conversation would continue, but the state

22   information would be lost; right?

23             "Answer:  I don't -- yeah, when you say a link

24   having -- a link having state information, that -- as I

25   said, that just is unclear, it's unclear what you mean by

1    that, a link having state information.  So the request is

2    too imprecise and unclear for me to address.

3                "Question:  What don't you understand about a

4    link having state information?

5                "Answer:  What you mean by that term.

6                "Question:  Do you recall providing any prior

7    art when this patent was being prosecuted?

8                "Answer:  So the major piece of prior art, sure,

9    I was -- the two ones were HTML forms, and at that time it

10   was known as Netscape, you know, Netscape had invented

11   cookies, so sure.

12               "Question:  You didn't invent referrer fields,

13   did you.

14               "Answer:  I did not invent referrer fields.

15               "Question:  Okay.  And do you refer --

16               "Answer:  And to repeat my previous statement, I

17   did not invent the web, either.

18               "Question:  I appreciate that.  Do referrer

19   fields solve the problem of maintaining state on the web?

20               "Answer:  Referrer fields do not.  It's a

21   totally separate problem.

22               "Question:  And is it a fair statement to make

23   that today, the dominant mechanism for maintaining state on

24   the web is cookies?

25               "Answer:  Well, in many cases, I think that --

1  yeah, cookies are -- it would depend on the application, but

2  certainly cookies really come to mind when people think

3  about state preservation, sure.

4          "Question:  Does IBM use cookies to maintain

5  state on its website?

6          "Answer:  So I have not even definitively looked

7  at how IBM manages its website.  But it certainly, given the

8  number of websites that IBM has, they almost certainly are

9  using cookies in certain circumstances, because they have --

10  it's not just their home page for their www.IBM.com.  There

11  are a whole set of other pages and applications, and within

12  that slew of things, they are certainly using cookies to a

13  large extent.

14          "Question:  Are you aware of any websites that

15  IBM operates that use your method of dynamic argument

16  embedding to preserve state?

17          "Answer:  I am not.

18          "Question:  To your knowledge, are there any IBM

19  products that your invention was used in?

20          "Answer:  I am not aware of any IBM products

21  which use my invention.

22          (End of videotape.)

23          THE COURT:  Is that it?

24          MS. SHAMILOV:  That is it, Your Honor.

25          THE COURT:  All right.  What's next?

```
 1              MS. SHAMILOV:  Your Honor, we have another
 2    witness that will go for a while.  I'm not sure if this is
 3    the right time to take a break.
 4              THE COURT:  We'll give the jury a break at this
 5    time.  No talking about the case.  We'll get you back in a
 6    little bit.
 7              (Jury leaving the courtroom at 10:30 a.m.)
 8              THE COURT:  All right.  We'll be in recess.
 9              (Brief recess taken.)
10              *     *     *
11              (Proceedings reconvened after recess.)
12              THE COURT:  Anything before we bring the jury
13    in?
14              MR. DESMARAIS:  No, Your Honor.
15              MR. HADDEN:  (Shaking head no.)
16              (Jury returned.)
17              THE COURT:  All right.  We are ready to proceed.
18    Groupon will call its next witness.
19              MS. SHAMILOV:  Thank you, Your Honor.  Good morning.
20              Ladies and gentlemen, Groupon calls as its next
21    witness Mr. Paul Davis who is a founding developer of
22    Amazon.com website.
23              THE COURT:  Okay.
24              ... PAUL DAVIS, having been first duly sworn,
25    was examined and testified as follows ...
```

Davis - direct

```
 1                THE COURT:  Good morning, Mr. Davis.  Welcome.

 2                MS. SHAMILOV:  Your Honor, may I approach the

 3     witness?

 4                THE COURT:  You may.  Yes.

 5                (Binders passed forward.)

 6                     DIRECT EXAMINATION

 7     BY MS. SHAMILOV:

 8     Q.    Good morning, Mr. Davis.

 9     A.    Good morning.

10     Q.    Would you please introduce yourself to the jury?

11     A.    Hi.  My name is Paul Davis.

12     Q.    What do you do, Mr. Davis?

13     A.    I am a software developer.  I live just outside of

14     Philadelphia.  And I started a company that creates software

15     for recording, editing, and mixing music.  And that's what I

16     do for a living now.

17     Q.    Sir, you are a software engineer?

18     A.    Yes, I am.

19     Q.    How long have you been a software engineer?

20     A.    I've been a programmer for about 35 years.

21     Q.    If my math is right, that is going back to the 80s?

22     A.    Yes, that's correct.

23     Q.    Are you the founder and developer of Amazon.com's

24     website?

25     A.    Yes, I am.
```

Davis - direct

1  Q.      Before we get to that and talk about the website, can

2  you please tell us a little bit about your background and

3  your education?

4  A.      Yes, sure.  I'd be happy to.

5          So I was first introduced to computers by my

6  stepdaughter when I was in my early teens, and probably in

7  the late 70s.  I didn't start doing anything with computers

8  myself really until I was at college where we began to have

9  access to small computers to work on.

10         My undergraduate degree was in, was actually in

11  biochemistry and molecular biology, nothing to do with

12  computers at all, but I got interested in a new field of

13  computational biology which attempts to use computers to try

14  to solve or investigate biological questions and moved on

15  from my undergraduate degree to a graduate program which

16  specifically was computational biology.

17         It only took a year for me to realize I was a

18  lot more interested in software and computer and that sort

19  of thing than in the biology or the biological research that

20  I was doing.  So I left of the graduate program and took a

21  job as a software developer, and I have been doing that ever

22  since.

23  Q.      Did you grow up in London, and the education you

24  mentioned was in the U.K.?

25  A.      Yes.  I grew up in London, and I did my undergraduate

Davis - direct

1    degree at Fort Worth (phonetic) on the south of England.

2    And my undergraduate program was at the European Molecular

3    Biology Lab in Haverford, Germany.

4              After I left that program, I went back to

5    England for about a year and-a-half and then move moved to

6    the U.S.

7              After a couple of moves, I ended up in Seattle.

8    Q.    Once you were in Seattle, what did you do then?

9    A.    I worked for a couple of small companies when I first

10   arrived in Seattle, and then took a job in the Computer

11   Science and Engineering Department at the University of

12   Washington.

13   Q.    And when were you working on the Computer Science and

14   Engineering Department at the University of Washington?

15   A.    I started working there in 1990.

16   Q.    And how long were you there?

17   A.    I was there for about four years.

18   Q.    And what did you do at the universities?

19   A.    My official job title there was Systems Programmer

20   II.  I had a variety of responsibilities there.  The primary

21   one when I arrived was being assistant administrator for a

22   couple of large scale computers that the department used for

23   research.  I was involved a little bit incorporating systems

24   research myself.

25              But in 1993, I got assigned the task of getting

Davis - direct

1    the Computer Science Department on to what was then brand

2    new World Wide Web, and that became the bulk of my job from

3    that point on up until I left.

4    Q.    How did you add the Computer Science Engineering

5    Department to the World Wide Web?  What do you mean about

6    that?

7    A.    Well, we, the department had heard about the World

8    Wide Web and concluded that they ought to be on it.  They

9    were a computer science department and it was supposed to be

10   a computer science thing.  So I was tasked with setting up a

11   web server for the department, and that meant using a web

12   server.  We used a web server called HTTP which was written

13   by Tim Berners-Lee.

14            We used a web browser within the department.

15   That was the first graphical browser called Mosaic.  And it

16   was written by a team of people.  And we used standards part

17   of the web as they are now called HTTP and HTML, and that

18   technology was the stuff I brought together and configured

19   and administered and headed up the website for the

20   department.

21   Q.    When you did that and set up a website for the

22   Department of Computer Science, how many websites did the

23   university have already?

24   A.    There was only one other website at the University at

25   that time.  That was run by the Business Department, but it

Davis - direct

1    wasn't a public website.  It was only for use by the members

2    of the Physics Department for their own purposes.

3            So the Computer Science Department's website was

4    the first one at the University of Washington.  In fact, as

5    far as I know, it was the first one in the Pacific Northwest

6    to be accessible to the public.

7    Q.    You mentioned Tim Berners-Lee.  We heard this name

8    already throughout the trial.  Who is Tim Berners-Lee?

9    A.    Tim Berners-Lee was a computer scientist who worked

10   at CERN in France.  It's a European particle physics

11   research lab.  When he was working at CERN, he was

12   interested in ways of distributing and sharing information

13   in ways that even wasn't possible, it wasn't easy at that

14   time.  And as part of the interest in that, he developed

15   both the first web server and the first web client and also

16   the specifications that actually made up the World Wide Web.

17   They describe how the whole thing was supposed to work.

18   Q.    Did Tim Berners-Lee patent the World Wide Web?

19   A.    No, he do not.

20   Q.    Do you know why not?

21   A.    Sure.  I mean Tim Berners-Lee has talked a lot about

22   this during his career, and he felt very early on and

23   continues to feel that the World Wide Web could only really

24   reach its full potential if it was available for everyone to

25   use without having to pay license fees or sign agreements

Davis - direct

1   and so on and so forth.  So it was very important to him

2   really from the start of his work on the web that the

3   technology he was creating would be freely available for

4   anyone to use for whatever purpose they wish.

5   Q.      Did he dedicate his technology to the public?

6   A.      Yes, he did.  In 1993, he got the agreement of his

7   employer, CERN, the physics research lab, to dedicate all of

8   the technology and intellectual property that he created in

9   connection with the web into the public domain so they

10  became free for anyone to use for any purpose at all.

11  Q.      So you mentioned the HTTP and HTML specifications

12  that he used to generate, to create the website at the

13  University.  How did you use these standards?

14  A.      Well, these two standards are sort of the core of

15  what makes the web work.  So HTTP is a protocol or a

16  specification for the types of messages and types of

17  requests and response that are exchanged between a web

18  browser and a web server.  An HTML is a specification or a

19  standard that describes how to create web pages or how to

20  have a certain kind of appearance, have a certain layout and

21  certain content on them.  So they're both totally

22  fundamental to how the web works, how the web site works, so

23  we would use those all the time for the department's

24  website.  Obviously, our web server used HTTP as did our web

25  browsers to talk to each other and all the pages that we

Davis - direct

1    would create were all using HTML to construct them and lay

2    them out and give them a certain kind of appearance.

3    Q.      Now, when you were using these standards to build a

4    website at the of Washington, did you encounter any

5    limitations with these standards?

6    A.      Well, when we started using the web in the

7    department, we would just using it to display things like

8    faculty and research interest or list of events that were

9    going on in the department or map of the building and so

10   forth.  And for those kinds of things, the web as it was

11   back then was completely adequate for what.

12           But after a short period of time, both myself

13   and other people in the department started to get interested

14   in what else do we do with the web?  More dynamic things,

15   more interesting kind of interactions.  When we stopped to

16   do think about that, we began to realize there was a fairly

17   fundamental problem with the technology of the web as it was

18   right then.

19   Q.      What was the problem?

20   A.      Well, the problem is that web servers at least, you

21   know, as they existed back then had kind of amnesia.  Every

22   time that a web browser would send them a request for a

23   page, they would forget everything that had come before.

24           So if a user were sitting in front of your web

25   browser and you linked on a link and that sent a request

Davis - direct

 1    back to the web server and you got a page back.  And if you

 2    had a link on the web, you clicked on that, that that would

 3    send another request to the web server.  The web server sees

 4    the two requests completely disconnected from each other.

 5    They had no clue whatsoever that, oh, the person was looking

 6    at the page the first time and he clicked on the link and

 7    now they decided to move on to this next page.  It just saw

 8    each request as a completely independent unrelated thing.

 9    You know, there was no continuous, no continuous interaction

10    at all.

11    Q.      Was there a name to this amnesia problem that you

12    just described?

13    A.      Yes.  In the software world, we referred to HTTP,

14    which is the protocol defining these requests or responses,

15    as a stateless protocol.

16    Q.      Why do you refer to that?  Why did you refer to that

17    as the stateless protocol?

18    A.      It's mostly to contrast what we called stateful

19    protocol.  So a stateful protocol is where messages are sent

20    from one to the other and both ends are keeping track of

21    what happened so far, so at any time they both understand

22    what has already happened and they might conceivably modify

23    what they doing in response to what has already happened.

24             If you -- so we would call that a stateful

25    protocol because both ends keep state.  HTTP, by contrast,

Davis - direct

1    neither end at that time would keep any state at all.  It

2    would just forget, and so we call that a stateless protocol.

3    Q.      How did you solve this statelessness problem of HTTP

4    on the website you were building for the University of

5    Washington in 1993?

6    A.      Well, I realized, after not much consideration

7    really, that what we needed to make happen was there would

8    be some piece of information that would go back and forth

9    with each request from browser to the server, with each

10   response from the server back to the web browser that would

11   be constant throughout the whole time that you were

12   interacting with it.  So each time you clicked on a link and

13   it would send a request back to the server, this piece of

14   information would go with it.  And when you got the page

15   back, the information came back.  Now both sides have some

16   way to actually keep track of what has happened so far.

17   Q.      Now, how did you -- was there a name for this piece

18   of information you have just described?

19   A.      Yes.  We called it a session ID.

20   Q.      Now, where did you put this session ID in your

21   website that you created for the University of Washington?

22   A.      So, there were two places that we need to make sure

23   that the session ID would show up.  So if you are looking at

24   a web page, there are two types of entities on the page, two

25   things on a page where we needed to make sure there was a

Davis - direct

1      session-up.

2                    The first of them would have been links that

3      sent a request back to the server where you got the page

4      from, things that you just click on and you get a new page.

5      And second one was if there was a form on the page.  Most

6      of you have probably filled out a form on a web page.  There

7      would probably be some buttons to make choices, perhaps a

8      field to type in and press a button to submit.

9                    We also had to make sure when you press the

10     submit button and it sends a message back to the server,

11     that would also contain the session ID that we had generated

12     for you.

13     Q.      And did you patent your solution that you just

14     described, that you developed at the University of

15     Washington in 1993?

16     A.      No, I did not.

17     Q.      Why didn't you patent it?

18     A.      I think that some ideas and some inventions are just

19     better off if they're freely available for everyone to use.

20     And I think if you think about the Internet as a whole, if

21     that had been patented, we would live in a very different

22     world now and one that was not as good as one we live in, I

23     think.  And this was an idea that I thought fell into the

24     same category.

25     Q.      When did you leave your job at the University of

Davis - direct

1   Washington?

2   A.      I left it in the fall of 1994.

3   Q.      And what did you do next?

4   A.      I went to work for Amazon.com.

5   Q.      Can you explain to us how you got to be employed by

6   Amazon.com in 1994?

7   A.      Sure.  So Jeff Bezos, the founder of Amazon.com, had

8   already made the decision he was going to start his new

9   company in Seattle.  And he had been trying to figure out

10  how to recruit people.  He had a contact in his previous job

11  that put him in touch with a member of the faculty at the

12  University of Washington in my department.  That faculty

13  member knew that I was the web guy in the department and

14  Jeff was looking for web people, so he forwarded on Jeff's

15  e-mail to me.  And I thought, well, this sound interesting,

16  at least more interesting in my university job at that

17  point.

18          So I met with Jeff, you know, I think three

19  times during the summer, and we talked about ideas for what

20  the life was going to be and what the company was all about.

21  And by the fall of 1994, I had agreed to work at his new

22  company.

23  Q.      So when you started your work at Amazon.com in 1994,

24  who else was already working there?

25  A.      Well, obviously Jeff was there.  His wife McKenzie

Davis - direct

1    worked part-time doing some accounting stuff for what was a

2    very small company.  There was one other programmer, Michele

3    Kaplan who Jeff had hired in parallel with me, and then

4    myself.  So I generally think of myself and describe myself

5    as the second employee at Amazon.

6    Q.    And where were Amazon's offices back there in 1994?

7    A.    As legend tells it and fact as well, we were in a

8    converted garage on the side of the house that Jeff was

9    renting in Bellevue, Washington.

10   Q.    I would like to draw your attention to one of the

11   documents that's in your binders.  It should be one with a

12   tab that's DX-0399.  Let me know when you're there, please?

13   A.    Yes, I have that before me.

14   Q.    Have you seen this document before?

15   A.    Yes, I have.

16   Q.    And what is this document?

17   A.    It's a copy of my employment with Amazon.com.

18         MS. SHAMILOV:  Your Honor, I like to move

19   DX-0399 into evidence.

20         THE COURT:  Any objection?

21         MR. OUSSAYEF:  No, Your Honor.

22         THE COURT:  It's admitted.

23         (DX-0399 was admitted.)

24   BY MS. SHAMILOV:

25   Q.    I think we can probably view it on the screen which

1  may be easy for everybody in the room.  Is this the first

2  page of the agreement that you just found in your binder?

3  A.     Yes, it is.

4  Q.     Let's start at the top, please.  What is the date on

5  this agreement?

6  A.     The agreement was dated November 4th, 1994.

7  Q.     And there is a name there.  Is that your name?

8  A.     Yes, Paul Barton-Davis.  At the time I signed this

9  agreement, my last name was Barton-Davis.

10 Q.     The top of the agreement says it's an agreement

11 between you and Cadabra, I think.  Do you see that?

12 A.     I do.

13 Q.     What's Cadabra?

14 A.     Cadabra was the name that Jeff had originally

15 incorporated his company under.  Within a few months of me

16 starting work there that name was changed.

17 Q.     What was it changed to?

18 A.     It was changed to Amazon.com.

19 Q.     Is Cadabra, Inc. and Amazon.com the same company?

20 A.     Yes, they're the exact same company.

21 Q.     What is the origin of Cadabra?

22 A.     My recollection is not completely clear.  My

23 recollection is Jeff got this name from abracadabra.  I know

24 that there was some talk that it sounded a bit too much like

25 a cadaver, a dead body, so it didn't seem like an ideal

Davis - direct

1    mate, so we changed to Amazon.com.

2    Q.      Makes sense.  If I could have you turn to page -- it

3    should have numbers in there -- Davis 0012 in the employment

4    agreement.  Let me know when you're there, please?

5    A.      Okay.  I'm on that page now.

6    Q.      Do you see there an Appendix B on that page?

7    A.      Yes, I do.

8    Q.      There is something there called stateless CGI

9    compatible WWW backends, and there is some text in there.

10   What is this about?

11   A.      This is a description of the technique that I just

12   described to you that I had implemented while I was at the

13   University of Washington so it was possible to have stable

14   interactions with a web server.

15   Q.      Why is this in your employment agreement?

16   A.      I had developed this app at the University of

17   Washington and it seemed reasonably obvious to me of what I

18   knew of our plans at Amazon were that we would face a very

19   similar problem at Amazon.  And I didn't want the company to

20   be able to claim this as their own exclusive intellectual

21   property, so I created an appendix to my agreement that

22   contained a description of this and a few other techniques

23   and they were added to my employment agreement with the

24   stipulation that if Amazon used any of these techniques,

25   they wouldn't be able to claim them as their own

Davis - direct

1   intellectual properties.

2   Q.      Is that because you wanted others to use it for free?

3   A.      Yes, absolutely.

4   Q.      Let's talk about that first version of Amazon.com

5   website.  Who built the website back in '94 and '95?

6   A.      It was built by myself and Mr. Kaplan.

7   Q.      When did the Amazon.com website launch?

8   A.      It opened to the public in July 1995.

9   Q.      Did you test the website before it became public in

10  July of 1995?

11  A.      Yes, we did.  We ran a test for between one and two

12  months.  We did a friends and family test.  We basically

13  invited a bunch of friends and a bunch of family to come and

14  use our private version of the website and see how it works,

15  check the ordering process, all the people searching the

16  web.  We wanted to get feedback from people to make sure

17  that it actually functioned in the way that we intended.

18  Q.      Why did you test the website?

19  A.      Any time that you do software development, it's

20  always a good idea to have people test it who are not the

21  people who are developing it because you often will uncover

22  things that you hadn't realized yourself.  You do a lot of

23  things on assumptions and ideas about how things should

24  work.  And we wanted to make sure there weren't bugs and

25  other problems that we had overlooked.  We wanted to do that

Davis - direct

1    before we opened to the public.

2    Q.     How did you open to the public in July 1995?

3    A.     Really it was very simple.  We already had a web

4    address, but if you visited it before we opened, there would

5    have been nothing there, some message like under

6    construction or something like that.  We opened, we just

7    made it when you went to that address you actually got our

8    real website that we had developed.

9          And the other component of it was to make sure

10   that we got listed on the new website pages.  It might seem

11   a little bit crazy at this point in time, but at that time

12   there was a page that came out every day that had a list of

13   all the new websites in the world, really all the new

14   websites in the world just on one page.  And at that time

15   that was the primary way that people found out about what

16   new websites had been created.  So it was very important to

17   us to make sure that we were on that page.  And as luck

18   would have with a name like Amazon, we were in alphabetical

19   order so we were quite close to the top of page.  And so

20   those two steps and we were open for business.

21   Q.     Did people visit the website when you launched in

22   July of 1995?

23   A.     Absolutely.  We began to get orders immediately after

24   we opened.  I think within a couple of months we had sold

25   books to all fifty states and countries around the world, we

Davis - direct

1    got emails from people in South America, Southeast Asia,

2    thanking us for making it possible to gets books that they

3    couldn't get.  I set up a bell on one of the computers to

4    ring each time we got a sale so we would know we were

5    actually selling books.  And after two weeks that thing was

6    going off so much that we had to turn it off.  It was

7    incredibly annoying and irritating.

8    Q.    Let's look at the screen.  Here is, we can see

9    DDX-404.  What is this that we are looking at on that

10   screen?

11   A.    This is an early version of Amazon's home page from

12   1995.

13   Q.    Can you give us an overview of what a user could do

14   back in July 1995 on Amazon.com?

15   A.    Sure.  Well, the primary function of the website

16   obviously was to be able to look for books.  That was all

17   that Amazon sold at that point, find books and buy them,

18   there was a place you could search catalogs and when you

19   were in the catalog you could say I would like to put this

20   in my shopping cart.  We had some recommendations for

21   people, books in particular categories on different topics.

22   There was a way to go and check on status of orders if you

23   had already made, check, you know, whether they had shipped,

24   and when they would ship.

25          You could also go in and check your account,

Davis - direct

1   change payment information, your name, address and so on and

2   so forth.  All of those things are pretty much added up to

3   what the website was at that point in time.

4   Q.      Did you encounter the same statelessness problem that

5   you encountered at the University of Washington when you

6   developed the website at Amazon.com in 1995?

7   A.      Yes, we ran into exactly the same problem.

8   Q.      How did you solve it in '95 at Amazon?

9   A.      I solved it at Amazon the same way I had solved it at

10  the University of Washington.

11  Q.      How did you do that?

12  A.      Once again, we needed to make sure that any time

13  there was an exchange between a customer's web browser and

14  our web server that was involved where state was needed to

15  be maintained, that we maintain some information session ID

16  in both the request and the response that came back.

17  Q.      What would happen if a session ID was not in a

18  communication between a client and a server that required

19  session ID?

20  A.      If there was no session ID in either the request or

21  response, and there was something happening where we needed

22  to maintain state, then the website would just break.  For

23  example, if a user had put books in their shopping cart and

24  now it chooses to order them, somehow they get their browser

25  to send the request, and they didn't a session ID, we would

 1    have no clue what was in the shopping card, we would not

 2    know who they were, it was a request out of nowhere saying I

 3    would like to buy some books.  What books?  If the session

 4    ID went missing for any of this type of ongoing interaction

 5    on the website, the session ID was missing, then the site

 6    would break.  These people wouldn't be able to order

 7    anything.  They wouldn't be able to have a shopping cart.

 8    The entire website would be useless.

 9    Q.    Well, let's talk a little bit about that checkout

10    process.  How I could buy a book on Amazon and complete the

11    order in July of 1995.  And I think you have some slides

12    here a that may help you; right?

13    A.    Yes, we do.

14    Q.    What do we see here?  What would happen, I guess, on

15    this slide?

16    A.    So the whole process would start with the user,

17    perhaps the potential customer starting by typing in our web

18    address at the web browser.  He would then send an HTTP

19    request to Amazon's web server.  The HTTP request at this

20    point has no session ID, because there isn't a session ID,

21    it's a brand-new user of the website.  Our web server could

22    detect there was no session ID, generate a new one and would

23    attach that to the response that is sent back to the web

24    browser.  It sees the page and all of the links and the form

25    on the page they were looking at would all have the session

Davis - direct

1   ID present.  They might then click on some more stuff and

2   each time that they would click on a link, there would be a

3   new request that would go back to the server.  It would have

4   a session ID attached to it each time.

5   Q.     Now, you mentioned that the session ID gets assigned

6   at the Amazon server.  Was there a program that did that at

7   the server back then?

8   A.     Yes.  So there was a web server run on our machine

9   and within the web server there was the software that we run

10   and that was responsible for managing the whole system.

11   Q.     What was the name of that software?

12   A.     That software was called Obidos.  It was named after

13   a town on the Amazon River.

14   Q.     So was that a service writing on the web server?

15   A.     Yes, that was a service that ran inside of the web

16   server that we were using at that time.

17   Q.     Let's talk a little bit about that checkout process.

18   What would I need to click on, if you will, to start

19   checking out if I assumed I already added some books in my

20   cart to buy?

21   A.     So you would be on a page on the website, pretty much

22   all pages would have a link or a button that you could click

23   somewhere that would say buy items now.  And when you click

24   on that button, we would send an HTTP request back to the

25   server which would have the session ID in it, and the server

Davis - direct

1    would know that it was in a path back to first page of the

2    ordering process, there would be three pages in total.  They

3    would send back as a new HTML page with a session ID present

4    within it.

5    Q.    Let's talk a little bit in detail about what happens

6    at the server in response to a user clicking on the buy

7    items.  Now, what do we see here on the slide, there is some

8    code seems to be flying from the Amazon server on the right

9    to the left of the screen?

10   A.    I appreciate that none of you can read any of this.

11   If you could see it, you wouldn't want to.  This is the

12   source code of part of the file that has a key function of

13   the website that we called Cat Sub.  And Cat Sub is really

14   the core of how Amazon servers worked at that point to send

15   HTML pages back to you if you were a customer and using the

16   website.

17         What Cat Subs would do -- let me back up a

18   moment.  You need to remember here we're talking about

19   dynamic web pages.  If the web page that you want to serve

20   to somebody is just a list of names or dates or a list of

21   cities around the world or a picture, obviously that can

22   just be stored in a file to the web server and when the

23   person sends a request for it, send it back to file, there

24   is no real complicated technology required.

25         But we're building a dynamic website where the

Davis - direct

1    pages that would come back to you are the customer, the

2    contents would vary depending on what you have already done,

3    if you logged in, if you already put books in the shopping

4    cart, they needed to indicate that.

5              So the pages that we would send back to you they

6    needed to have some of that content to be dynamic, it has to

7    be more qualified depending on what is taking place, that's

8    why we had to maintain state.  Your server isn't going to

9    send back just a file to the computer, it's go to take what

10   we call a template file and it's going to make some changes

11   to that template file and send it back to you and that's

12   what we will be showing you in the web browser.

13   Q.    With this function Cat Sub, was that part of the July

14   1995 system at Amazon.com?

15   A.    Yes, it was a really central part of how the website

16   worked in July of '95.

17   Q.    And was this -- is this the function that would

18   process the template files that you just mentioned?

19   A.    Yes, this function will be called from inside the web

20   server, it will be given a name of a template file, some

21   arguments that were basically the information that needed,

22   that might need to be substituted on the page, and would

23   then consent to the file, do the substitutions and send the

24   information back.

25   Q.    Is the template file sort of a mockup of a web page

Davis - direct

1  that would be returned back to the user?

2  A.    Yes, it was a mockup with the placeholders where we

3  could insert specific information for this customer or for

4  this user.

5  Q.    I would like to walk through an exemplary user file

6  that this Cat Sub function might have processed in July of

7  1995.  Is that all right?

8  A.    Yes.

9  Q.    So I think what is this image that's really hard to

10  see, what does it represent on the left?  What is it?

11  A.    This is the template called order form page one.  And

12  it's the first page of a three-page process of actually

13  ordering books after you put them in your shopping cart at

14  Amazon.  And this template would have been processed by our

15  software and the result of that processing would have been

16  sent by the web server back to the user web browser.

17  Q.    How would they do this, would it start at the top of

18  the file?

19  A.    It would start reading the file and it would read

20  each character of the file and move all the way down.  And

21  when it found things that it recognized where oh, I have

22  work to do here, it would stop, do some work and carry on

23  reading and output directly to the file.

24  Q.    Let's look at the first chunk of the files so we

25  understand what's going on.  What is this that's shown?

Davis - direct

1   A.      DDX-407 which appears to be the first portion of the

2   template file that you just described.  As you may be able

3   to tell, this is an HTML file that has HTML tags for marking

4   up the text.  At the very top of it its says H2 which is a

5   title mockup instruction.  It says Finalizing our Order is

6   Easy.  There is some regular text below that that would show

7   up in the page that the user will receive, you can place

8   your order online, so on and so forth.  Elsewhere on the

9   page, there is a variety, there is a couple of links and

10  there is a form specification, this whole page is a form

11  because we're going to have you as the user input some

12  choices and information and we have some links that might be

13  for the user as well.

14  Q.      There are three boxes that appear on the slide.

15  What's that first box that says form method post action,

16  what is that?

17  A.      This is the HTML tag that tells the web browser what

18  comes after me is a form.  The action statement is what will

19  be sent back to the web server to tell it what to do, how to

20  submit this form.  And at the end of it, there is four --

21  there is dollar sign, curly brace, open curly brace, zero,

22  close curly brace.  I'm going to pronounce it in all zeros

23  because it's easier to say.

24          The Cat Sub function would know that any time it

25  saw dollar zero as it was reading through this file it

1    should replace that with session ID that is in use for this

2    user.  So when that gets back to that user browser, the

3    similar zero would have been replaced by some text that

4    represents the session ID.

5    Q.      And the dollar zero is that, what's shown on the

6    screen, similar sign, two curly brackets that kind of look

7    like Mustaches, I guess, and a zero?

8    A.      Yes, correct.

9    Q.      There are two other boxes on this slide.  Can you

10   explain to the jury what those are?

11   A.      Both of these lines are just regular HTML link

12   specifications.  The first one will be displayed with a text

13   why this is safe which is sort of down there to the second

14   line.  If you go back to the HREF property of this link, you

15   can see, I hope you can see there is a dollar zero inside of

16   it.

17          Again, when our software processes the template,

18   it will replace the dollar zero with the session ID so we

19   end up on the user browser that link has the session ID

20   record as part of the link and then there is a second

21   version of that, exactly the same content except for the

22   text, why this takes longer, and it points to a separate

23   page.

24   Q.      What did this HREF in the code mean?

25   A.      HREF is a HTML, it's part of the HTML specification

1    or standard which indicates, it's technically called a URL,

2    it's basically the web address that should be given back to

3    the browser when the user clicks on that link.

4    Q.      So what would happen when this chunk of the filed of

5    this HTML file would be processed, would get to the user's

6    computer and would be professed by the web browser, what

7    would it look like?

8    A.      I think we have a rendering of the top part.

9    Q.      Is this what is depicting the part that we just

10   talked about what it would look like to the user?

11   A.      That's right.  You can see here in the template we

12   had H2 finalizing the order is easy, we have a bold font

13   with the title saying you can place your order online.  And

14   below that is the start of the form, and the first thing

15   that the customer need to answer is how they are going to

16   pay for their order, we present them with two choices, a

17   credit card or a check.

18   Q.      And now I think there are two links on this section

19   of the page right now?

20   A.      Yes, that's right.  There are two links shown in blue

21   text and underlined, which is the convention that the web

22   browsers had at that time.

23   Q.      Are these the links that responded to the HREF

24   statements in HTML you described?

25   A.      Yes.

1   Q.      Would these two links have session ID embedded in

2   them?

3   A.      Yes.  As we saw in the template file, the actual URL

4   for these links had a dollar zero in the template which

5   means the page the browser was seeing, there would be a

6   session ID as part of that link.

7           So if the user was paying by credit card, and

8   again it may seem hard to remember at this point, but in

9   1995 most people were terrified of using their credit card

10  online, we had a page that would explain why it is okay to

11  do this.  If there was a click on that link, they would be

12  taken to another page with the session ID, and the page they

13  would get back would again have the session ID in it.

14          It is absolutely critical to us that we maintain

15  that session ID for all of the user interactions with us.

16  So why does it say that?  We take you to another page to

17  explain this and install that.  The browser would still have

18  the session ID at that point.

19          The second choice was paying by check.  There is

20  a second link there:  Why this takes longer.  Again, if

21  they're interested in that question, then they can click on

22  that link.  This link has been preprocessed to have the

23  session ID in it, and they would end up on a new page, and

24  it would explain to them why it takes a little bit longer to

25  pay by check.  And again when we are on that page, the

1   session ID is around so you can keep track of the state.

2   Q.      Let's maybe walk through one more file so we can see

3   how the web page would be built.

4   A.      Okay.

5   Q.      So now moving on the second chunk of this HTML on the

6   left.  What is this?

7   A.      So the second set of information that we needed to

8   collect from people as part of the ordering process was

9   e-mail address.  The simple thing is to ask them what their

10  e-mail address is.  And we give a little input box and you

11  see on the web page somewhere where you type in your name or

12  e-mail or something.  So you get a box like that.

13          Remember, the user might already be logged in

14  and they might already have given their e-mail address from

15  their past interactions with us.  And if we had that, we

16  want that to show up in the box already.  So we indicate,

17  hey, we know your e-mail already.  And perhaps they might

18  change it, but at least the one they had given us before

19  would be there.

20          So there is a line right in the middle of this

21  block that says "my e-mail address is" ... and a spot

22  followed by a HTML tag input that says we're going to put

23  one of these text boxes you type into.  At the end of this

24  HTML tag, you will see once again dollar sign curly brace,

25  2, close curly brace, another placeholder.

1   So software, when it would see this, it would

2   know, oh, I have to see if I have an e-mail address to this

3   person.  And if I do, substitute it here.  And if I don't,

4   then just leave it blank.

5   Q.    So how would this chunk of the template file and

6   process sent to the user and processed by the web browser

7   look on the screen?

8   A.    So we have a slide for this.

9   So this is the next section.  Again, we just ask

10  them what is your e-mail address?  My e-mail address is ...

11  and you can see there is a little input box.

12  Now, in this particular example, this is what a

13  user would see if we didn't have their e-mail address.

14  If we did have their e-mail address because they

15  were already logged in and we knew it, we would have

16  prefilled that box in with their e-mail address.

17  Q.    And so would the software, this function and the

18  service running on Amazon's server do sort of process the

19  other chunks in this file --

20  A.    Yes.

21  Q.    -- one at a time?

22  A.    It would read all the way through the file, deal with

23  each session as it goes looking for these placeholders,

24  deciding it should substitute for the placeholders.  And

25  eventually when it processes the whole file, that all would

1  be sent back to your web browser so that you can see the

2  final page.

3  Q.      And is this sort of the result, the resulting web

4  page that the user may see?

5  A.      Yes.  So this is the final full page with all these

6  four sections where we ask what the choice is, and then a

7  fifth step where there is a button you can press.  When you

8  press the button, that submits the whole form and sends it

9  back to the web server.

10           I mentioned early there was a specification at

11  the top of this file which had dollar zero in it.  When they

12  press this button, the form action statement they actually

13  used has been changed and it has a session ID in it.  So

14  when they click this button and the HTTP request is sent to

15  the web server, it goes with the session ID as well as the

16  other information that they added.

17  Q.      So in July of 1995, was there a web page on

18  Amazon.com that looked exactly like this?

19  A.      It probably wouldn't have looked precisely like this,

20  pixel for pixel, but this is, you know, an accurate

21  rendering of what the user would have seen on the first page

22  of the order process.

23  Q.      And there are some links on this page that I would

24  like you to explain.  I think you already explained the

25  links in the first step which is why this is safe and why it

Davis - direct

1    takes longer; correct?

2    A.      Yes, I did.

3    Q.      And these included session IDs, is that right?,

4    embedded in them?

5    A.      Yes, they did.

6    Q.      And you also talked about the button that the user

7    would click to submit the order; am I right?

8    A.      Yes.

9    Q.      And that button would also include session ID

10   embedded in it?

11   A.      Yes, it would.

12   Q.      There are two other links on the web page or I think

13   there are.

14            What is this?  I think it says skip to step 5.

15   I know it is a little lard to say.  But it says, is this

16   order a gift?  In parentheses, you can skip to step 5.  And

17   skip to step 5 is underlined?

18   A.      Yes, that is another link.  Now, this link is a

19   little different than the others.  The image, you are

20   looking at this on a tall screen where you can see the whole

21   page, but you are on a page where you could maybe see down

22   to the first line of this gift order section and it's not a

23   gift order.

24            So I just want to skip over this section, so I

25   click on that link.  This link, unlike the others I

Davis - direct

1    discussed, this doesn't send a request back to the web

2    server.  This is a link that tells your web browser -- can

3    you scroll the page so that I can see the point that is

4    indicated?

5              So if you had been looking at this on a small

6    screen and let's say the bottom third to a half of the page

7    was off the bottom of your screen, you clicked on that link.

8    Your web browser would have scrolled the page up to make

9    sure that step 5 was visible to you.  No interaction with

10   the web server.  This is all, all internal to your web

11   browser.

12   Q.    Thank you.  I think there is something else here

13   in blue and underlined.  And I do think it is sort

14   incomprehensible from this area here.  But it says:  Though

15   we have tried hard to make this form easy to use, we know

16   that it can be quite confusing the first time.  If you have

17   any difficulty send an e-mail to help at Amazon.com or just

18   call the number.

19             Do you see that to the screen?

20   A.    Yes, I can see it.

21   Q.    How did Amazon.com -- and that is in blue and

22   underlined kind of similar to the other links we talked

23   about.  Why is that?

24   A.    So this is another link.  Somewhat like the last one,

25   this is a link that also has nothing to do with sending an

Davis - direct

1  HTTP request back to a web server.  If you click on this

2  link, at least in 1995, what would have happened is if your

3  web browser would have started up with some e-mail

4  application, perhaps another HREF or one of the other tools

5  around.  And it would have started off, you write an e-mail

6  message and the to address would have already been prefilled

7  with help at Amazon.com.

8           So, once again, clicking on this link does not

9  send a request back to the web server.  It asks your web

10  browser, can you please make it possible for me to send some

11  sort of e-mail to this address?  And the exact way that the

12  web browser does that is up to the browser, and that is

13  changed over time.  If you use Gmail, for example, right now

14  you click on this, probably you open a new tab in your

15  browser.  But in 1995, the way a browser would have done

16  that, you would have styled up an entirely separate page to

17  write the e-mail.

18  Q.    And just to be clear, eventually an e-mail may get to

19  the Amazon.com server that the user may send?

20  A.    Presumably, yes.

21  Q.    But not when the user clicks on?

22  A.    Not when the user clicks on that link.

23  Q.    So what would happen if, in July of 1995, I would

24  click on this button to continue with my order?

25  A.    So this would send the completed form with a session

1   ID back to Amazon web server.  We process that and realize,

2   oh, now you need to see page 2 of the order process, which

3   is fairly simple.  It just shows what items you are ordering

4   and change the quantities, specify the shipping address.

5          There would be another button you can press that

6   would send that data back to Amazon's web server with a

7   session ID, and say, okay, now we need page 3.  Send that

8   page back.

9          Page 3 was basically you can't change anything

10  about your order right now but click here to actually buy

11  stuff.  And if you click that, we now have an actual order

12  from the customer.  It would go into the backend of that

13  computer system, and we start processing that, ordering

14  books, arranging people to see what you order.

15  Q.     Now, is the ordering process that you just described,

16  is that how it works, the ordering process works in July of

17  1995 on Amazon's website?

18  A.     Yes, it is.

19  Q.     How can you be so sure?

20  A.     Because I am the person who wrote the code and ran

21  the web server and the website on which this all functions.

22  Q.     If I could draw your attention in the pocket of your

23  binder there, there are two CDs, and the first disk is

24  marked DX-375.  Do you see that?

25  A.     I do.

Davis - direct

1   Q.      Did you inspect this disk?

2   A.      Yes, I did.

3   Q.      What is on that disk?

4   A.      There is a copy of the Amazon.com source code for the

5   website from June of 1995.

6   Q.      Did you recognize the source code when you reviewed

7   it?

8   A.      Yes, I did.

9   Q.      Was that the code you wrote when you were at Amazon

10  in 1995?

11  A.      Yes, that's the code.  It is the code that I wrote

12  while I was at Amazon.

13  Q.      And based on your inspection, do you believe that

14  that is the code that was on the site at that time running

15  it?

16  A.      I'm absolutely confident that that is the website --

17  that is the source code that was on the website at that

18  time.

19              MS. SHAMILOV:  Your Honor, I'd like to move

20  DX-375 into evidence under seal.

21              MR. OUSSAYEF:  No objection.

22              THE COURT:  It's admitted under seal.

23              MS. SHAMILOV:  Thank you.

24              (DX-375 was admitted into evidence under seal.)

25  BY MS. SHAMILOV:

Davis - direct

1   Q.      There is a second disk I think there as well, and

2   that should be marked DX-376.  Do you see that?

3   A.      I do.

4   Q.      And did you inspect that?

5   A.      Yes, I did.

6   Q.      And what is on that disk?

7   A.      This is a copy of the Amazon source code from June of

8   1996.

9   Q.      Now, when did you leave Amazon?

10  A.      I left in March of 1996.

11  Q.      So did you recognize any files on that disk, DX-376?

12  A.      I recognize almost all of the files on that disk.

13  Q.      You talked about the template files.  Which disk was

14  the template files?

15  A.      They are on the June.

16  Q.      Did you recognize the template files that you

17  reviewed?

18  A.      Yes, I did.

19  Q.      And does that disk include source code that you wrote

20  while employed at Amazon?

21  A.      Yes, it does.

22  Q.      Does that disk include source code that was running

23  the website that you wrote -- that you were running while

24  you were at Amazon?

25  A.      The 1996 disk?

Davis - direct

1    Q.      Yes.

2    A.      Yes, it does.

3            MS. SHAMILOV:  At this time, I would like to

4    move into evidence DX-376, Your Honor, under seal as well.

5            MR. OUSSAYEF:  No objection.

6            THE COURT:  It's admitted.  Under seal.

7            (DX-376 was admitted into evidence under seal.)

8    BY MS. SHAMILOV:

9    Q.      Now, the template files that you inspected on, at

10   DX-376, did those template files matched the template files

11   that you used in 1995?

12   A.      They were substantively the same or identical.

13   Q.      Were there any template files on the DX-375 disk?

14   A.      No, there were not.

15   Q.      Was there a reason why the template files were not

16   included on, are not on the 1995 disk?

17   A.      Yes, there is.

18   Q.      What is that?

19   A.      When Mr. Kaplan and I were developing the website, we

20   followed fairly standard software development practices,

21   which is to use some or all of the developed system.  So as

22   you create the source code, you keep the software and make

23   changes to it, extending it, fixing problems.  You keep a

24   record of all these changes so you can look back and see

25   what changed and keep track of different versions.  And it

1    was obvious to us that, you know, the source code, the

2    software we're writing was important, and we needed to have

3    that in the version control system, which we did right from

4    the beginning.

5            The template files early on at least just seemed

6    to us like, oh, it's just a bunch of text files.  They're

7    not important.  They're not the things that we programmers,

8    you know, count on and do stuff with, so we didn't bother to

9    a add them to the version of the control system initially.

10           Once the website went live, and we began to have

11   to make checks just to an actual live running system, we

12   started to realize actually the template files are really

13   important because as we change the template files, we change

14   what users will see in their browsers.  And so we realized,

15   oh, really these template files, they need to be managed in

16   the same way that we control source code.  They're just

17   essential to the whole system.  So I believe some time in

18   late 1995, we added them to the virtual control system and

19   managed them the same way that we did the source code.

20   Q.    Now, is there anything in the source code on the June

21   of 1995 disk that told you or confirmed that the template

22   files were in fact used in 1995 on Amazon's website in July?

23   A.    Yes, absolutely.  I mean throughout the source code,

24   well throughout the source code that is involved with the

25   web server and so forth, you can find calls to the cat sub

1   that I mentioned earlier where it is provided with a name of

2   the file, the template file and instead of arguments, and

3   once you understand the source code, you can find dozens of

4   places where cat sub is used to process named template file

5   and send the results back to the user.  And a substantial

6   number of those cases, even the names of the files, the

7   template files in 1995 is the same as a file that exists on

8   the, in the 1996 version.

9   Q.      Now, you mentioned earlier we talked about sort of

10  session IDs and Amazon's July of 1995 website that were

11  embedded in links.  Were there any links that had a request

12  go between the client and the server that did not include

13  session ID at that time?

14  A.      There was some links that did that.  They were not a

15  part of this ordering, this ordering process however.

16  Q.      So did all the links that send a request from the

17  user's browser to Amazon's server in July of 1995 that

18  required session maintenance of state maintenance, if you

19  will, include a session ID?

20  A.      Yes, all the links that required state maintenance at

21  that time did not -- all of the links that required state

22  maintenance would have a session ID in them.  And the reason

23  that I know that to be true is because if they did not have

24  the session ID, then it just wouldn't work.  We lost track

25  of the user shopping cart.  We would have lost track of

Davis - direct

1   where they were in the ordering process, and so on and so

2   forth.

3   Q.     So if there were requests that got received by the

4   server that had a bad session ID, would the user be notified

5   that they have to do something about it?

6   A.     Yes.  For example, one thing we noticed that happened

7   in the early days was something you might have given a link

8   into their -- they were browsing Amazon and they had copied

9   a link out of their browser and sent it to a friend or

10  family member, and that person came back and, well, maybe

11  they themselves came back and used a link at a later type.

12  Well, we had to manage session ID.  They didn't last

13  forever.  And perhaps we would look at it and say, huh, we

14  don't have any record of this anymore.  We had to tell the

15  user what was happening, and we would show them a page or

16  explain why they needed to start over.

17  Q.     And is this one of those pages?

18  A.     Yes.  So once again this is generated from a template

19  file which we have in yellow on the left.  After it had been

20  processed, they would see this page to indicate, yes, you

21  did give us a session ID but it's not valid any more, so we

22  need to start a new session.  And when they clicked on the

23  link there, there are two links that say please start a new

24  session.  The whole process I described to you earlier would

25  start, it would start over, and it would be set up with a

1   brand new session ID that would work for them.

2   Q.      Now, in July of 1995, did Amazon.com's website use

3   cookies?

4   A.      No, it did not.

5   Q.      Why not?

6   A.      So cookies were, at that time, still a very new

7   technology.  The idea had been briefly floated by somebody I

8   think toward the end of 1993.  There was a discussion going

9   on in 1994 about exactly how cookies were supposed to work.

10  It was a very new technology, and there was a lot of

11  uncertainty in the World Wide Web community of users and

12  developers about the implications of using them.

13          Now, remember, with the traditional interaction

14  between the web browser and a web server, you click on a

15  link, it sends a message to the web server, the web server

16  sends back a page, we're done.  What cookies introduced was

17  you asked for a page, the web server send it back and it

18  says, oh, by the way, I'd like to create a file on the disk

19  of your computer.  And at that time, a lot of people were

20  very wary of this.  They thought there was security

21  implications.  There was privacy implications.  There was a

22  lot of disquiet about the whole notion.

23          We discussed this quite extensively, the

24  three of us, Kaplan, Jeff Bezos and myself, and we decided

25  that although certainly this technology seemed promising as

Davis - direct

1    a way of maintaining state, it wasn't viable for us as a

2    brand new e-commerce company at that time to use this

3    technology because we feared there would be backlash or

4    people saying, oh, they use cookies.  We don't want to use

5    their website.

6    Q.    Thank you, Mr. Davis.  Have you testified at a trial

7    before, Mr. Davis?

8    A.    Yes, I have.

9    Q.    When was that?

10   A.    It was in 2009.

11   Q.    Where was that?

12   A.    It was actually right here in this courthouse

13   building.

14   Q.    And what was the nature of your testimony there?

15   A.    My testimony then concerned once again the exact same

16   material that I have spoken with you today, how Amazon

17   maintains state on its website in 1995.

18   Q.    Did you review source code of how Amazon.com website

19   worked in July of 1995 in connection with that other case?

20   A.    Yes, I did.

21   Q.    And the source code that you inspected and reviewed

22   in connection with your testimony today, how does that

23   relate to the code that you were using in 2009?

24   A.    It's the same code.

25   Q.    And in that case in 2009, did you also review the

1    codes, the template files that you talked about today?

2    A.    Yes, I did.

3    Q.    And how did the template files you reviewed there

4    compare to the template files you discussed today?

5    A.    They are the same files.

6    Q.    Now, are you getting paid for your time here today,

7    Mr. Davis?

8    A.    No, I'm not.

9    Q.    Have you received any payments for your help in this

10   case?

11   A.    Well, I had to put in a notable amount of time into

12   preparation for this case which takes me away from my normal

13   job, so I have charged my normal consulting fee for the time

14   that I have spent consulting, reviewing source code and so

15   on in preparation for your trial.

16   Q.    What is your regular consulting fee?

17   A.    $350 an hour.

18   Q.    How many hours have you spent approximately on this?

19   A.    About twenty hours.

20   Q.    Have you issued any invoices?

21   A.    No, I have not.

22   Q.    Do you plan to any issue any invoices?

23   A.    Yes, I will issue an invoice later this summer.

24   Q.    And to whom would you send that invoice?

25   A.    I send that to I assume Groupon's lawyers or Groupon

Davis - direct

1      itself.

2      Q.      What would you do -- what will you plan to do with

3      the money that you get when you issue an invoice?

4      A.      The amount that I receive in compensation for the

5      time I spent working I will donate to the Electronics

6      Frontier Foundation.

7      Q.      What is the Electronics Frontier Foundation?

8      A.      The Electronic Frontier Foundation is a foundation

9      that is trying to try to work for digital privacy, access to

10     technology and innovation.

11     Q.      Why did you select that nonprofit organization over

12     many others?

13     A.      When I was asked to participate in this case

14     originally, I wasn't all that interested in the idea.  I

15     don't particularly enjoy testifying and it takes a whole

16     bunch of time and I have other things to do in life.  Part

17     of my initial feelings about this is I don't know why I want

18     to do this.  I have no particular interest in the outcome of

19     the case.  I have no connection with IBM or Groupon.  I

20     don't even really know the full scope of the case.  Part of

21     any instinct was to say no, I'm sure you can do this without

22     my testimony.  But then a suggestion was made to me by my

23     brother actually that why don't you participate in the case

24     anyway, and you can take your compensation for the time that

25     you did spend working on it and donate that to some

Davis - cross

1    charitable organization.

2            MS. SHAMILOV:   Thank you, Mr. Davis.   I don't

3    have anymore questions.   I may have more, but right now I

4    pass the witness, Your Honor.

5            THE COURT:   Okay.   Cross-examination.

6                         CROSS-EXAMINATION

7    BY MR. OUSSAYEF:

8    Q.     Good morning, Mr. Davis.

9    A.     Good morning.

10   Q.     So I would like to first start with a demonstrative

11   that we looked at during your direct testimony.   Now, I just

12   want to make sure we're all on the same page here.   This is

13   not actually a picture of Amazon's website that someone took

14   back in 1995 that we're now viewing today, is it?

15   A.     No, it is not.

16   Q.     This is a mockup of the Amazon website; right?

17   A.     It's a mockup of a particular part of what one of the

18   pages would have looked like.

19   Q.     Right.   Someone created this image recently; right?

20   A.     I'm not sure which part of the image you're referring

21   to.

22   Q.     Well, the back part that says Amazon.com at the top,

23   it looks like a browser maybe and then it says Finalizing

24   Your Order with the background in gray.   That's the part I'm

25   talking about.

Davis - cross

1   A.      Yes, that's correct.

2   Q.      Who created this image?

3   A.      Someone in Groupon's legal team.

4   Q.      So Groupon's lawyers created this image?

5   A.      I believe, yes.

6           MS. SHAMILOV:  Objection, Your Honor.

7   Misleading.

8           THE COURT:  Overruled.

9   BY MR. OUSSAYEF:

10  Q.      So you didn't create the image yourself; right?

11  A.      That's correct.

12  Q.      And this isn't an image from back in the day from

13  Amazon, either, is it?

14  A.      No, it's not.

15  Q.      Now, this is based on an Amazon file that you see on

16  the left; right?

17  A.      That's correct.

18  Q.      And that file -- well, what file is that?

19  A.      That file is a template file for -- called

20  order-form-page-1.

21  Q.      And that file is order-form-page-1.cpp; right?

22  A.      No, that's not correct.

23  Q.      What is it?

24  A.      There is an aspect of the generation template files I

25  haven't explained so far.  If you would like me to explain

Davis - cross

1    that, I will.

2    Q.      No, that's all right.  I just want to know whether

3    this is order-form-page-1.cpp?

4    A.      It is not.

5    Q.      It is a different file than order form page one.cpp,,

6    is that what you're telling us?

7    A.      That's correct, it is order-form-page-1.html.

8    Q.      There is no order form page one.cpp on the CDs that

9    you were just talking about, is there?

10   A.      I'm not totally certain of that.

11   Q.      Right.  Someone had to change this file from dot CPP

12   to dot HTML; right?

13   A.      Can we go back and actually look at that in my binder

14   a moment?

15   Q.      I just want to -- I'm just asking a simple question

16   here, which is, someone had to change the file that's on the

17   CD to create what we see here on this slide, this mockup;

18   right?

19           THE COURT:  Is there an objection?

20           MS. SHAMILOV:  I object.  The witness asked to

21   see the document.

22           THE COURT:  I think it's up to counsel if he

23   wants him to look at the document.  You'll have a chance to

24   redirect.

25   BY MR. OUSSAYEF:

Davis - cross

1    Q.      I'll have you answer the question pending, sir?

2    A.      Without being able to read the exact text of the file

3    on the left, I can't answer your question.

4    Q.      Did you read the text on the left before you started

5    testifying?

6    A.      I have read the contents of order-form-page-1.html

7    and I have also seen order-form-page-1.cpp and I have seen

8    those both before testifying.  Which one of those two is on

9    the left I would need to inspect them line by line, there

10   would be differences between the two of them with how the

11   dot CPP file is going to transfer in.

12   Q.      Are you telling me you don't know what file is on the

13   left of this slide here?

14   A.      I'm telling you it could be either one of those two

15   files, one is a direct result of the other, and for the

16   purposes of my testimony it would make no difference which

17   of the two was on the left.

18   Q.      One of those files is on the CD's, but the other file

19   is not on that CD, is it?

20   A.      That's correct.

21   Q.      And now, the file, again, if we go back and talk

22   about order-form-page-1.cpp, that's not from 1995, is it?

23   A.      It's not from 1995.

24   Q.      It's from 1996, isn't it, sir?

25   A.      It is from 1996, but it's substantially similar to

1    the file that we had been using in 1995.

2    Q.     But it's actually from 1996; true.

3    A.     Correct.

4    Q.     And you were asked a lot of questions about Amazon's

5    website in 1995 with these slides, weren't you?

6    A.     Yes, I was asked questions.

7    Q.     Now, we'll get back to the source code and what's

8    actually on the CD's in a moment, but for a moment I would

9    like to take a little detour and ask you a couple of

10    questions to help understand Amazon's system in a little

11    more detail in case Groupon's expert, Dr. Weissman, talks

12    about the Amazon system.  Is that alright with you?

13    A.     Sure.

14    Q.     In the 1995 time frame, Amazon did not have any

15    performance issue embedding and storing state information on

16    its servers.  True?

17    A.     We didn't measure that type of measure in that time

18    frame.

19    Q.     In fact, you know Amazon did not have any performance

20    issues in embedding and storing state information on its

21    servers; true?

22    A.     I have testified in my deposition that we were not

23    aware of those problems and we had much larger problems that

24    we had to pay attention to.  We did not measure what type of

25    performance we got because it was just not a concern to us

Davis - cross

1  at that point.  Perhaps there were problems, perhaps there

2  weren't, we didn't measure it.  We were not aware of any.

3  Q.     In fact, in the 1995 time frame, there was no

4  motivation for Amazon to embed or store state information at

5  the customer's computer; true?

6  A.     We didn't perceive that to be a useful way to spend

7  our development resources.

8  Q.     That's not what I asked, though, sir.  I asked you a

9  very specific question, which is in the 1995 time frame,

10  there was no motivation for Amazon to embed or store state

11  information at the customer's computer; true?

12  A.     Are you asking me whether we personally experienced

13  that motivation or whether it existed in some theoretical

14  sense?

15  Q.     I'm asking whether there was any motivation at all in

16  any sense?

17  A.     We were aware that there were a wide range of things

18  that we could have done to improve the performance of our

19  system, but the specific caveat of things that you are

20  talking about weren't things that we were interested in

21  doing because the payoff on them would be so small.

22  Q.     Could we please play the deposition clip from Davis

23  109:18 to 110:13.

24          "Question:  So based on the constraints that

25  existed in the 1995 time frame, Amazon wasn't motivated to

1   try to save --"

2                   THE COURT:  Stop the video.  What's that?

3                   MS. SHAMILOV:  Not the same question, Your

4   Honor.

5                   THE COURT:  Not the same question, so you

6   object?

7                   MS. SHAMILOV:  This is not impeachment.

8                   THE COURT:  What's the page?

9                   MR. OUSSAYEF:  It'S 109:18 to 110:13.

10                  THE COURT:  I'll overrule the objection.  You

11  can go ahead and play it.

12                  "Question:  So based on the constraints that

13  existed in the 1995 time frame, Amazon wasn't motivated to

14  try to save server resources or increase performance by

15  storing state information at the customer's computer instead

16  of on the server side?

17                  "Answer:  There -- yeah, there was -- we were

18  entirely focused on customer experience, and because we were

19  focused on the customer experience and because there was no

20  way of that changing our computer infrastructure would

21  really have helped that in any significant way for the

22  majority of customers, it -- it was not -- it was not a

23  thing that we spent much time looking at.  It's obvious from

24  the history of the company since then that as bandwidth has

25  gone up, that it became -- that it did become significant.

Davis - cross

 1    The company radically overhauled how things were done in

 2    subsequent years, but at that time there would have been no

 3    motivation for it."

 4              Were you asked that question and did you give

 5    that answer?

 6    A.    That was my answer.

 7    Q.    So let me ask you a little bit about your deposition

 8    now that we have seen a clip from it.  Groupon's lawyers

 9    represented you at your deposition; right?

10    A.    That's right.

11    Q.    And when you had your deposition taken, you had not

12    seen any of the patents in this case; true?

13    A.    That's true.

14    Q.    And that's because you have a general rule of never

15    looking at software patents; true?

16    A.    That's a substantial part of the reason why, yeah.

17    Q.    And even though you hadn't read IBM's patents, you

18    already thought one of them was invalid at your deposition,

19    didn't you?

20    A.    I don't believe I indicated that I thought it was

21    invalid at my deposition.

22    Q.    So let's play the deposition clip at 28:19 to 29:6.

23              "Question:  Do you have any opinions about

24    whether the patents in the lawsuit between IBM and Groupon

25    are valid?

Davis - cross

1    "Answer:  I haven't reviewed the patents in

2    question, so I'm not aware of in any detail of -- of what

3    they contain.  The information I -- I have received about

4    them suggests that -- that I would call at least one --

5    well, no.  I received some loose outline information

6    regarding one of the patents.  I haven't read the patent.  I

7    don't know the title or anything else about it.  What I have

8    been in -- informed of about it suggests that it -- that I

9    would regard it probably as -- as invalid."

10    Were you asked that question and did you give

11    that answer?

12    A.    I was asked that question, and I gave that answer,

13    but I don't --

14    Q.    Okay.  That's all I'm asking, sir.

15    So what we just saw is that you didn't even know

16    the name of the patent, but you thought it was invalid;

17    true?

18    A.    My answer said I thought based on the information I

19    had been given about the patent, not the patent itself, that

20    it was probably invalid.  I made no comment on the patent

21    itself.

22    Q.    Right, you had no comment on the actual patent

23    itself?

24    A.    Absolutely.

25    Q.    That's because the lawyers for Groupon described the

1  patent to you in a way that made you think it was invalid;

2  right?

3  A.     Actually, I'm not even sure that they described to me

4  in any detail what was in the patent.  What they described

5  to me or actually the interactions that we had about the

6  work that I did at Amazon in 1995 and there have been

7  remarks on the way that have suggested that one of the IBM

8  patents in this case touches upon that work, and had a

9  filing date after I did the work that I have described to

10 the jury.

11 Q.     Groupon's lawyers described to you this patent in a

12 way that made you think it was invalid; right?  That's how

13 they described it to you?

14 A.     I don't think it's accurate to say that they

15 described the patent to me.

16 Q.     Let's play the deposition clip from 29:17 to 20?

17        "Question:  And who described you this patent in

18 a way that made you think it was probably invalid?

19        "Answer:  That would have been the lawyers for

20 Groupon."

21        Were you asked that question and did you give

22 that answer?

23 A.     Yes, I did.

24 Q.     So now, you reviewed Amazon source code at Fenwick &

25 West 's office; right?

Davis - cross

1     A.      That's correct.

2     Q.      And those are the lawyers for Groupon, Fenwick & West

3     is the law firm; right?

4     A.      Yes, that's correct.

5     Q.      And your basis for saying that Fenwick & West got the

6     source code from Amazon is based on what Groupon lawyers

7     told you; right?

8     A.      It's partially based on that and partially based on

9     the fact that I seen the source code at two previous cases I

10    have been involved in and the fact that I wrote the source

11    code.

12    Q.      But of course, you have no idea how Fenwick & West

13    got the source code from Amazon, do you?

14    A.      I have -- I was not informed about every single step

15    along the way.  The two disks that are in my binder I

16    believe that have been entered into evidence now were both

17    signed by me on August 6th, 2009.  They're from a previous

18    case.  And in that case I was well aware of the process by

19    which the information on these disks had been generated.  I

20    have become important more aware of that because I have been

21    back in Wilmington, and it's strange being back in the same

22    town jogs your memory.  Most of the details to the case in

23    2009 were not on my mind previous.  And when I came back

24    here, I remember the meeting I actually had with at the time

25    Amazon's lawyers in the Hotel DuPont where they were

Davis - cross

1    staying, and I at that time was walked through the exact

2    process by which this had been extracted from Amazon's

3    machine.  I was even given personal access to the source

4    code depository that they were taken from and was able to

5    provide more insight to the Amazon employee that extracted

6    that data.

7              These particular disks that I signed in 2009, I

8    have a very solid understanding of where they came from, an

9    understanding that I did not have some months ago because I

10   had not come back to Wilmington and been reminded of that

11   process.

12   Q.    Sir, I would appreciate if you just answer my yes and

13   no questions yes and no so we move things along.  We do have

14   a limited time here.  With that in mind, let me ask you

15   another question.  The source code you reviewed was

16   organized into a June 1996 folder and a June 1995 folder;

17   right?

18   A.    Yes, that's correct.

19   Q.    But you have no idea who organized the Amazon source

20   code into a June 1995 folder and a June 1996 folder; true?

21   A.    The disks that I signed that are in my folder were

22   produced by an Amazon employee that I met in 2009.  I cannot

23   give you that person's name, but I met the employee who is

24   responsible for creating these files.

25   Q.    Sir, that's not my question.  My question was, you

Davis - cross

1    have no idea who organized the Amazon source code into a

2    June 1995 folder and June 1996 folder; true?

3    A.      They were organized by the Amazon employee I just

4    mentioned here.

5    Q.      Okay.  Let's watch the deposition clip at 97, 3

6    through 9.

7            "Question:  Who was responsible for organizing

8    the Amazon source code into the "all files June 1995" and

9    "all files June 1996" --

10           "Answer:  I have no idea."

11           Were you asked that question and did you give

12   that answer?

13   A.      I did.

14   Q.      Okay.  So that's all I'm asking you, sir.  So let me

15   ask you another question.

16           You know it wasn't Amazon who created those

17   folders; true?

18   A.      I don't know why you would ask me that question.

19   Q.      I'm trying to get an answer, sir.

20   A.      I don't know how to answer that.  Can you rephrase

21   that question, please?

22   Q.      It wasn't Amazon who created the 1995 folder and the

23   1996 folder; true?

24   A.      The process I was involved in in 2009 that generated

25   these disks involved an Amazon employee.

Davis - cross

1  Q.      Okay.  Let's see the clip at 98, 19 to 21.

2          "Question:  It wasn't Amazon in the 1995/1996

3  time frame, right?

4          "Answer:  That's correct."

5          Were you asked that question and did you give

6  that answer?

7  A.      That is the answer.  The answer I gave.

8  Q.      Okay.  So just to be clear, you left Amazon in March

9  of 1996; right?

10 A.      That's correct.

11 Q.      Okay.  So here we have the June 1995 folder on the

12 Elmo, the March 1996 date when you left Amazon, and the June

13 1996 date of the other folder.  Do you see that?

14 A.      I do.

15 Q.      Okay.  So you don't know for sure that the June 1996

16 folder was the source code actually running on Amazon's

17 website at the time; right?

18 A.      Not, not in any strict legal sense, no.

19 Q.      Okay.  So I'll put a question mark here on June 1996

20 then.  So let me ask you another question.

21         You don't know what changes were made between

22 the time you left in March of 1996 and June of 1996; true?

23 A.      I wasn't there when those changes were made.  Since I

24 have been provided access to the source code, it's possible

25 for me to say what changes whether made.

Davis - cross

1    Q.    Right.  You don't know what changes were made because

2    you weren't at Amazon at the time; true?

3    A.    I didn't say that.  I said I didn't work at Amazon

4    when those changes were made.  Because I have been provided

5    with the source code from both of these folders, because I

6    can inspect the source code, it is possible for me to

7    identify what changes were made.

8    Q.    You were not at Amazon in April, May, or June of

9    1996; right?

10   A.    That's correct.

11   Q.    And you don't know what changes happened in, for

12   example, June of 1996, do you?

13   A.    I wasn't there when those changes were made, but,

14   again, I have been provided with source code as part of this

15   case, and as part of that review, I'm able to identify

16   changes that were made from earlier versions of the code.

17   Q.    Let's look at the clip at 118, 24 to 119, 2.

18             It's 118, 24 to 119, 2.

19             "Question:  And you don't know what changes

20   happened to the Amazon source code in June of 1996?

21             "Answer:  That's correct."

22             Were you asked that question, and did you give

23   that answer?

24   A.    Yes, I did.

25   Q.    Okay.  So now we've been looking at kind of this end

Davis - cross

1    of the June 1996 end of this timeline, so let me ask you

2    about the 1995 folder.  There is no way for you to prove

3    that what you reviewed from the 1995 folder was actually

4    running on Amazon's website in 1995; true?

5    A.    I don't know what you mean by the word "prove" in

6    that question.

7    Q.    I'm asking if you can prove that this source code

8    in the 1995 folder was actually on Amazon's website at the

9    time.

10   A.    I wrote the code, and I ran the website.  And I ran

11   the computers on which the website ran.  I am the evidence

12   of what Amazon was doing in June of 1995.

13   Q.    You don't have any way of showing that what was on

14   the June 1995 folder was actually running on Amazon at the

15   time; true?

16   A.    I am telling you that I wrote the code that did that,

17   and I ran the server on which it ran, and the source code in

18   June 1995 folder is what ran Amazon website in June of 1995.

19   Q.    Let's look at the clip at 94, 24 to 95, 9.

20         "Question:  In fact, you weren't there in June

21   of 1996, right?

22         "Answer:  I'm -- I'm -- I'm --

23         "I'm backing up and saying, even if you ask me

24   this about 1995, when I did work there, I would not be able

25   to prove to you that the source code marked -- or I think

Davis - cross

1    there are more files from 1995, I couldn't prove to you that

2    that was used on the web server."

3                 Were you asked that question and did you give

4    that answer?

5    A.      I was, but I'd like to explain that answer.

6    Q.      That's okay.  I'll continue ask the questions, sir.

7                 And you know, don't you, sir, that the 1996

8    folder contained functionality related to state information

9    that the 1995 folder did not; true?

10   A.      Yes, that's correct.

11   Q.      Okay.  So let me ask you a couple more questions

12   about the 1995 templates.  So you would agree with me that

13   you would certainly have to consider the content of the

14   Amazon templates to figure out whether Amazon embedded state

15   information in all hyperlinks in a template file; right?

16   A.      Yes, that's correct.

17   Q.      Okay.  Now, I do want to take a look at one of your

18   demonstratives here and make sure I got it right.  So here

19   we're looking at the part of the file we were talking about

20   earlier with the e-mail link.  Do you see that there?

21   A.      Yes, I do.

22   Q.      Let me zoom in a little bit.

23                 THE COURT:  DDX-413, is that right?

24                 MR. OUSSAYEF:  Yes, that is my understanding.

25   BY MR. OUSSAYEF:

Davis - cross

1    Q.      And now if we look at this, it says:  Send e-mail to

2    A HREF equals, and then it has an e-mail address; right?

3    A.      That's correct.

4    Q.      Okay.  And I think you testified to this on direct

5    but I just want to make sure.  This is a link, right?

6    A.      As you were setting up this question, you used the

7    term hyperlink and whether I could be sure all hyperlinks

8    had a session ID.  You just asked me now about whether it is

9    a link.  And if you wanted to me answer a question about it,

10   I want to make sure you are, in fact, differentiating

11   between those two things.

12   Q.      Sure.  That makes sense.  So let me ask you, is this

13   a hyperlink that we see here?

14   A.      In technical terms, no, it is not a hyperlink.

15   Q.      Wouldn't you agree, sir, that you can tell that

16   something is a hyperlink by the "syntactic" form of it?

17   A.      By some part of the syntactic form, yes, you can.

18   Q.      Right.  And, in particular, what you can tell by

19   looking at the syntactic form is if it has a left angle

20   brace A space HREF equals, and then a string of characters.

21   You can tell that is a hyperlink; right?

22   A.      No, that is incorrect.

23   Q.      Let's take at look at your deposition at 150, 12

24   through 18.

25               "Question:  And what in particular in the

1    syntactic form?

2              "Answer:  Left angle brace, A, space, HREF,

3    equals a string of characters that do not include a right

4    angle brace, unless quoted, followed by a right angle brace.

5    That is the syntactic definition of an HTML hyperlink.

6              "Question:  Got it.

7              Were you asked that question and did you give

8    that answer?

9    A.    I did.  I'd like to explain that, too.

10   Q.    No, I prefer to keep asking questions just so we make

11   sure that we focus on the issues since I have limited time

12   here.

13             THE COURT:  And, Mr. Davis, so you know, the

14   other attorney will have a chance to ask you additional

15   question, if she wishes.

16             THE WITNESS:  I understand.

17             THE COURT:  Go ahead.

18   BY MR. OUSSAYEF:

19   Q.    So here what we have by your definition is a

20   hyperlink; true?

21   A.    The definition that you just played for my deposition

22   took place at a point where we were debating what the

23   difference between links and hyperlinks were.

24   Q.    Sir, I'm just asking if what we're seeing here meets

25   your definition of a hyperlink.

Davis - cross

1  A.      It meets a definition I gave in my department.  We

2  were discussing what a hyperlink and link were.

3  Q.      So it meets the definition of hyperlink that you gave

4  in your deposition, and it doesn't have any state

5  information in it, does it?

6  A.      That is correct.

7  Q.      Okay.  So now just to be clear, this, what we're

8  looking at here on the Elmo right now, this is from 1996 but

9  you don't have any copies of templates from 1995; true?

10  A.      That's correct.

11  Q.      They're not on the CDs that you were looking at

12  earlier; right?

13  A.      That is correct.

14  Q.      And there is no way to know for sure what any

15  template files in 1995 look like; right?

16  A.      Are you questioning my memory of these template

17  files?

18  Q.      I'm asking, you know, if you want to think back to

19  the deposition that you had, there is no way to know for

20  sure what any template files from 1995 look like; true?

21  A.      I can't put a template file in front of you from

22  1995.  You are asking me whether I know what a template

23  files looked like.  I know what template files looked like

24  in 1995.

25  Q.      In fact, you testified that there is no way to know

Davis - cross

1    for sure what any template files in 1995 look like; true?

2    A.    In terms of presenting you with a copy of it, that is

3    correct.

4    Q.    Okay.  And that is because they're missing; right?

5    A.    That is correct.

6    Q.    Okay.  And you would agree with me that the 1995

7    templates embedded state information in almost all

8    hyperlinks but not all hyperlinks; true, sir?

9    A.    You, once again, are conflating or you are forcing

10   me into this term "hyperlink" and asking me to make a

11   generalized comment about the term "hyperlink" when I

12   believe that hyperlink is a very specific term with a

13   statement I made about that is accurate.  But the way you

14   have asked me that question, if I answer it the same way, it

15   will be inaccurate.  So either I get to distinguish between

16   what I mean by hyperlink and what I mean by a link or I

17   can't really answer that question fairly.

18   Q.    So let me ask you an easier question.  You testified

19   at your deposition that the 1995 templates embedded state

20   information in almost hyperlinks but not all hyperlinks;

21   true?

22   A.    I believe you're quoting from my testimony, so

23   obviously yes.

24           MR. OUSSAYEF:  I have no further questions.

25           THE COURT:  Redirect.

1        MS. SHAMILOV:  Thank you, Your Honor.

2                REDIRECT EXAMINATION

3    BY MS. SHAMILOV:

4    Q.    Mr. Davis, thank you.  I only have a few more

5    questions, if I can do this.

6                Counsel asked you some questions about the

7    slides that you were discussing and about the templates

8    files on the left.  Do you recall that?

9    A.    Yes, I do.

10   Q.    And you walked through that template file in chunks.

11   Do you recall that?

12   A.    I do.

13   Q.    And you built the website.  Do you recall that?

14   A.    Ies.

15   Q.    And you mentioned file form-page-1.CPP.  Do you

16   recall that?

17   A.    Yes, I do.

18   Q.    And is that the file you asked to review but were not

19   given a copy of?

20   A.    Yes, it is.

21   Q.    Let me show you on the Elmo, see if I can do this.

22                What does it say on the very top?

23   A.    It has the full path to this file which ends in

24   form-page-1.CPP.

25   Q.    Is that the file you mentioned you wanted to review?

Davis - redirect

1    A.    Yes, it is.

2    Q.    Let's look at the very first chunk of this.

3          Can you see that well enough?

4    A.    Yes, I can.

5    Q.    Okay.  Now, this chunk starts at the left, line 7.

6    What does it say?

7    A.    Line 7 has the H2, finalizing your order is easy.

8    Q.    And there is highlighted there, I highlighted for

9    each of you and the jury the three lines here:  line 14 of

10   this file, 24 through 25, and 27 through 29.  Do you see

11   that?

12   A.    Yes, I do.

13   Q.    Are these the lines of code that you have

14   specifically talked about during your testimony when I was

15   asking you questions?

16   A.    Yes, they are.

17   Q.    And let's look at line 24 and line 28 of this file

18   that you wanted to review to be able to answer counsel's

19   question.

20          Is this the "why this is safe" link that you

21   talked to the jury about when the user clicks on a credit

22   card and wanted to know why it would be safe to use a credit

23   card?

24   A.    Yes, it is.

25   Q.    And what about this, "why this takes longer?"  Is

1    that the second link you were talking about to the jury?

2    A.    Yes, that is the link that I described here.

3    Q.    And these two links have the dollar sign zero that

4    you discussed earlier today; correct?

5    A.    Yes, the placeholder is present in all of these

6    links.

7    Q.    Now --

8                THE COURT:  Hold on.

9                MS. SHAMILOV:  I'm sorry.

10               THE COURT:  Were you done answering the

11   question?

12   A.    The placeholders are present in both links and in the

13   forms statement as well.

14   Q.    And these are the links that you said get substituted

15   with session IDs; correct?

16   A.    Yes, that's correct.

17   Q.    Okay.  So these are the exact two lines that you

18   already discussed with respect to that slide earlier today?

19   A.    Yes, they are.

20   Q.    And, in fact, this chunk, is this an identical chunk

21   from the file that you put up on the slide?

22   A.    Yes it is.

23   Q.    Now, was that depiction of the slide and the walk

24   through that you did through a template file that does CPP

25   page 1 file, is that accurate?

Davis - redirect

1    A.      It's completely accurate.

2    Q.      Okay.  Counsel also asked you to talk a little bit

3    about an image that you filled on Amazon.com and described

4    here.  Do you recall?

5    A.      Yes, I do.

6    Q.      I asked you during the direct if that was the exact

7    web page at Amazon.com, didn't I?

8    A.      Yes, I believe you did.

9    Q.      What did you respond with?

10   A.      I believe I indicated that wasn't actually a

11   screenshot of or an exact pixel representation of the page

12   that you would have seen in 1995 but was, you know, a fairly

13   good rendering of what a user would have seen at that point

14   in the ordering process.

15   Q.      Counsel asked played a few deposition clips; right?

16   A.      Yes.

17   Q.      Okay.  And I think it looked like to some of them,

18   you wanted to explain what you meant in your deposition.  Is

19   that right?

20   A.      That's correct.

21   Q.      Let's do that.  But before we do that, there was a

22   question that counsel put in front of you.  I don't have

23   access to counsel's video, I'll have to do it on paper.  I'm

24   sorry about that.  But this was the question right here on

25   the bottom that counsel asked you:  "And you don't know what

1 changes happened to the Amazon source code in June of 1996,

2 do you?"

3       And you responded with "that is correct" on line

4 2.

5       Do you see that?

6 A.    Yes, I do.

7 Q.    And that is the clip that counsel played for you?

8 A.    Yes, it is.

9 Q.    Let's look at what you said in your next question and

10 answer.  This is what counsel had, and I believe you wanted

11 to explain.

12       The question was:

13       "Question:  And you're saying it would be simple

14 for you to determine whether the source code was the same in

15 1995 or 1996, but you didn't actually go through that

16 process prior to talking to Dr. Weissman, did you?

17       "Answer:  I did go through -- through that

18 process."

19       "Question:  When?

20       "Answer:  Several years before, on two different

21 occasions."

22       Do you see that?

23 A.    I do.

24 Q.    That is your trying to explain to the jury and you

25 were not given a chance to do?

Davis - redirect

1   A.      Yes, it is.

2   Q.      Now, you also mentioned there were some questions you

3   were not able to answer at your deposition that you were

4   able to answer today and you mentioned something about a

5   trip to Wilmington and DuPont Hotel.  Can you explain that a

6   little bit more?  What did you mean by that?

7   A.      The clip of me in the deposition in which I said I

8   had no idea, I couldn't provide a detailed accounting of

9   where the source code came from took place in November of

10  last year and it was an honest answer at that time.  I

11  wasn't certain precisely what the process was by which this

12  source code had been generated.

13          But having been down to Wilmington in connection

14  with the trial, you know, coming back to a place jogs your

15  memory and in remember being here in 2009, specifically

16  being in the Hotel DuPont.  I don't know if you local are

17  but you know it's a fairly memorable hotel, and I remember

18  the specific meeting that I had up in the lawyer Suite there

19  with the lawyers there and with the Amazon software engineer

20  and we did go through the process.

21              MR. OUSSAYEF:  Objection.  Hearsay, Your Honor.

22              THE COURT:  Overruled.

23              THE WITNESS:  We actually sat down with all of

24  Amazon source code for a very extended period of time.  He

25  gave me access to the source code repository, and I actually

looked through it on my own.  We talked how he pulled the

files out of the repository, how he sort of collected them

to together in these, in two separate folders.

All of these details are things that back in

November 2017, I did not recall.  And I wouldn't have

recalled them really until, I don't know, perhaps a month

ago when I first came back into Wilmington.  Having been

here, that, that process is a very clear memory to me now,

which is why my answer to the question of I don't know where

the source code came from or how it was produced is

different now than it was in November of last year.

Q.     Now, counsel also played a deposition clip that,

where he asked you, you know, can you prove that the code

from June of 1995 that is on the CDs in front of you

actually ran the website?  And I believe you said you cannot

prove that in that deposition clip.  Do you recall that?

A.     I do.

Q.     And in response to that clip, you wanted to explain

what it is the context of that video.  And can you please

explain what you wanted to tell the jury?

A.     I actually asked IBM's counsel, I wasn't certain what

he meant by "proof" and during my deposition when he was

asking me can I prove it, my assumption was that proof in

this case meant I can bring up new evidence, maybe a file or

some sort of, something other than my own account of what

Davis - redirect

1  took place.

2          I didn't feel at that point that I needed proof

3  in the sense that he was asking me.  However, I actually

4  was the person, as I said multiple times.  I wrote the code

5  that ran the website.  There were three of us running that

6  company for the first several months of its existence.  I

7  know what files were.  I know what was in the template

8  files.  I understand the entire statement.  The entire

9  statement of the system I already developed at the

10  University of Washington and I did it at Amazon.

11          So I'm sitting here today telling you that the

12  source code I reviewed as part of this case is the source

13  code that ran on Amazon's web server at that time.

14          I also tried to explain to counsel during my

15  deposition when this clip wasn't played really what I meant

16  by this.  For example, I think if you asked anyone to prove

17  this particular piece of source code runs a particular

18  website like, you know, Facebook or Google or anything else,

19  and you say can you prove that this was the source code that

20  actually runs this website, it would be very difficult to do

21  that even for a website that is running right now with the

22  source code right now.

23  A.     So can I prove it in the sense that I got one file

24  with some other piece of property, I don't have that, we

25  didn't keep records like that.  Can I prove it to you in the

1   sense that I was there and responsible for maintaining this

2   file, writing the code, running the website, I was that

3   person and I'm here before you today to say this is the

4   source code that ran the website at that time.

5   Q.     Now, how sure are you that the template files were

6   used in 1995?

7   A.     I'm -- they were a fundamental part of the website in

8   1995.

9   Q.     And the templates that were used in 1995, did you

10  create them?

11  A.     Yes, I did.

12  Q.     And did they look in 1995 substantially similar to

13  the template file copies we have from the 1996 collection?

14  A.     They were substantially similar and in a few cases

15  identical.

16  Q.     And the code that we have from July of 1996 after you

17  left, when you inspected that, did you recognize that code,

18  parts of it at least?

19  A.     There were very large parts of the code in June 1996

20  which is substantially similar or identical to the code in

21  June 1995 case and also similar to the way I would have left

22  things when I left in March of 1996.  So although there were

23  changes to the code before when I left in March and when

24  these files were essentially snapshot, all of that code is

25  stuff that I participated in writing and I recognize and

Davis - redirect

1  understand.

2  Q.      Did that code on the June 1996 CD in front of you run

3  the website of Amazon when you left in the spring of 1996?

4  A.      What would have been running in the spring of 1996

5  would have been something fairly close to what we see on the

6  June 1996 version.  There may have been a number of changes

7  that took place in those two or three months in between

8  them, but you know, it's substantially and in particular in

9  relation to the state management thing that I spoke about,

10  it would have been the same.

11  Q.      So the state management process that you described to

12  us with respect to the checkout for example in July of 1995,

13  were there changes to that particular process between July

14  of 1995 source code and the June of 1996 source code that

15  you reviewed?

16  A.      Amazon had begun to experiment with cookies by that

17  time, but the state management system that was in use still

18  even in June of 1996 was still using the technique, the

19  solution that I had described to you earlier.

20  Q.      And your inspection of the source code confirmed

21  that?

22  A.      Yes, it does.

23  Q.      You also wanted to explain the difference between

24  hyperlink and link and it seemed like you were very adamant

25  about the difference and you were not given an opportunity

Davis - redirect

1   to do that.   Can you please explain to the jury what you

2   mean by hyperlink versus a link?

3   A.      So when Tim Berners-Lee invented the web, his initial

4   thoughts about this involved simply a set of linked

5   documents, there would be a document and another document

6   that was closely related to it and you could click and see

7   the other document.   He quickly realized that you could

8   rapidly extend this to documents on other computers, you

9   click on this link and it brings you to a page somewhere

10  else.   And taking the technology before he started working

11  this, that type of connection between two documents was

12  already being referred to as a hyperlink.

13          Now, in web development, people would

14  differentiate between a hyperlink and link.   I talked to you

15  during my testimony about how there was what we would call a

16  link which said skip to step five, but I also described to

17  you how a user clicked on that link there was no HTTP

18  request sent to any web server anywhere, and yet if you were

19  sitting in front of that page talking to a colleague or a

20  family member or a friend, you would say hey, click on that

21  link.   That is a fundamentally -- what happens when you do

22  is that fundamentally different than when you click on a

23  link that results in a request going back to a web server

24  and you go to a web page, those would be called hyperlinks

25  because they jump outside of the document and they go to a

1    web server running on another computer.

2              Similarly the messaging link that I described,

3    when you click on that, there is no request sent to a web

4    server, there is no web page that shows up.  That's a link

5    which when you click on tells the browser, can you pick

6    something up from that.  It's not a hyperlink.  A hyperlink

7    is when you click on it, it results in a request being sent

8    to a different computer and that computer sends you back a

9    response.

10             So in Amazon's website in 1995 and pretty much

11   any modern website you will find a mixture of these things

12   which people locally might call links, you might call

13   hyperlinks, but it's very important functionality wise to

14   differentiate between links and hyperlinks.  Hyperlinks go

15   off to another computer.

16             Amazon state management system, it was vital to

17   us every time there was a link that came back to the server

18   it had a session ID in it.  Do we have a session ID to skip

19   to stage five?  We didn't.  Did we need session IDs to start

20   a management session, we didn't.  All the hyperlinks that

21   went back to our server and were part of that state

22   management session had session ID.  Yes, we had some links,

23   not hyperlinks that would cause the web browser to do

24   various things, we didn't need session ID for those.

25             I really wanted to explain the difference

```
 1    between these two.  And in fact in my deposition, the clip

 2    that you saw, I discussed this difference at some length

 3    with IBM's counsel.

 4              MS. SHAMILOV:  Thank you, Mr. Davis.  I have no

 5    further questions, Your Honor.  May I ask that the witness

 6    be excused at this time?

 7              THE COURT:  In just a moment he'll be excused.

 8    First I want to let the jury go for lunch.  No talking about

 9    the case and we'll get you back here after lunch.

10              (Jury exited the courtroom at 12:30 p.m.)

11              THE COURT:  All right.  Any objections with

12    excusing Mr. Davis?

13              MR. OUSSAYEF:  No, Your Honor.

14              THE COURT:  You may step down and you are

15    excused.  And we will take a lunch break.

16              (Witness excused.  A luncheon recess was taken.)

17              THE COURT:  Anything before I bring the jury in?

18              MR. OUSSAYEF:  Yes, Your Honor.  We haven't

19    gotten the latest deck that I think Groupon intends to

20    present.  It may have been uploaded, but we haven't been

21    able to download it yet to see it, so we can object live,

22    perhaps, but there is at least one issue where we know there

23    is a problem.

24              THE COURT:  Is this for the next witness?

25              MR. OUSSAYEF:  I don't know.
```

1                MR. HADDEN:  Yes, Your Honor, we're going to

2  read some uncontested facts but then we go to the next witness.

3                THE COURT:  What is the status of the slides?

4                MR. OUSSAYEF:  Do you have it on like a physical

5  media that we could see, maybe?

6                THE COURT:  A couple of you who are looking at

7  this, step out into the hallway maybe.  How much stuff do

8  you have to read.

9                MR. HADDEN:  Not much, but I think we need to at

10 least get started.

11               THE COURT:  We'll get started with the jury.  If

12 need be you'll just have to object as it comes up.

13               MR. OUSSAYEF:  There is one set of slides that I

14 can bring up right now.

15               THE COURT:  All right.  Mr. Hadden, are you

16 going to be arguing?

17               MR. HADDEN:  I will be presenting the witness,

18 so I can argue this, too, I guess.  I don't know what the

19 issue is.

20               MR. OUSSAYEF:  I think it might be a mistake.

21 It's just something that came up.  You can play this here.

22 It's just this claim element here, the objection was

23 sustained based on it not being in the expert report.  I'm

24 not sure if this was inadvertent with having this claim

25 element presented again.

```
 1              MR. HADDEN:  I think the agreement was we would

 2    not talk about predetermined aspect, we did not --

 3              THE COURT:  So there were a lot of objections we

 4    talked about this morning.  I definitely recall you saying

 5    your view was this element was not discussed or adequately

 6    disclosed.  It is unclear to me what Groupon's position is

 7    on that.  I guess Mr. Hadden, you ought to come back.  Is it

 8    your contention that the witness has disclosed an opinion on

 9    non-infringement based on this?

10              MR. HADDEN:  Yes, Your Honor, in particular, he

11    did focus on the predetermined aspect, he explained that

12    this comes back to the '849 issue generally, this step

13    requires storing information using a computer, that's not

14    done by Groupon, it's done by a browser caching or not

15    caching.

16              THE COURT:  His opinion is that Groupon does not

17    do that?

18              MR. HADDEN:  Correct.

19              THE COURT:  Because the user does it.

20              MR. HADDEN:  Correct.

21              THE COURT:  Okay.

22              MR. HADDEN:  And that's in his report.  I can

23    give you the page number.

24              MR. OUSSAYEF:  For that element in particular, I

25    don't see it as being in the report at all.
```

1    THE COURT:  I'm sorry?

2    MR. OUSSAYEF:  I don't see claim 8, this last

3    element being in the report at all.

4    THE COURT:  Okay.  Well, we'll find out where it

5    is.

6    MR. HADDEN:  It's paragraph 172, further, even

7    if Groupon performed a characterization of respective

8    reception system users, blah, blah, the alleged storing,

9    i.e., caching of advertising objects or advertising objects

10   identifications is based on this characterization.  For

11   example, Dr. Schmidt does not support the theory that the

12   characterization would enable/disable caching nor is

13   involved in setting the lifetime of cached HTTP response.

14   That's what he's talking about.

15   MR. OUSSAYEF:  I can address that right here,

16   Your Honor.  So that section if we look what claim that it

17   relates to claims 13 and 16 of the '849 patent which

18   requires storing.

19   THE COURT:  Claims 3 and 16; right?

20   MR. OUSSAYEF:  Sorry, yes, 3 and 16.

21   THE COURT:  Is there a separate area where it

22   talks about claim 8?

23   MR. OUSSAYEF:  This whole section, this header

24   where the highlighted portion is shown is not mentioned in

25   claim 8 at all.

1               MR. HADDEN:  Your Honor, so it refers back to

2      common elements.  Paragraph 184, he says Dr. Schmidt

3      concedes that caching can be disabled on nonmobile devices,

4      Schmidt 99, the alleged caching or storage limitations

5      applies to asserted claims 1, 2, 3, 8, 9, et cetera.

6               MR. OUSSAYEF:  So if the argument is specific to

7      disabling caching, that's fine.  I did not understand that

8      argument to be about disabling caching.  If the only thing

9      he's going to talk about is disabling caching, what is

10     disclosed in paragraph 184, then that's fine.  But that

11     doesn't apply to the specific element identified, but I

12     don't have a problem with mentioning that.

13              THE COURT:  Is he talking only about disabling

14     caching, Mr. Hadden?

15              MR. HADDEN:  He's going to explain that Groupon

16     does not control the storing which is required and the

17     caching did not meet that requirement.

18              THE COURT:  And is he linking that to that

19     element that we saw highlighted with the slide?

20              MR. HADDEN:  Yes.

21              THE WITNESS:  Your Honor, that is the storing

22     element of claim 8.

23              THE COURT:  You do or you do not object to that?

24              MR. OUSSAYEF:  If it's going to be limited to

25     what's in the report here about disabling caching for that

1  element of claim 8, then that's fine, Your Honor.  As long

2  as it's not talking about predetermined or any other part of

3  the claim that's not discussed here, that's fine.

4           THE COURT:  Well, if you think he's going beyond

5  that, then you'll object at the time.  But based on what I

6  have heard, I'm overruling the objection as made and we'll

7  charge all this time to IBM.

8           Anything further before I bring the jury in?

9           MR. OUSSAYEF:  No, Your Honor.

10          THE COURT:  Let's bring the jury in.

11          (Jury entering the courtroom at 1:21 p.m.)

12          THE COURT:  Ladies and gentlemen, we are ready

13  to move on.

14          What is next from Groupon?

15          MR. HAACK:  Your Honor, we would like to read

16  some of the undisputed facts in the pretrial order into the

17  record.

18          THE COURT:  You may do so.

19          MR. HAACK:  Ladies and gentlemen, you saw IBM

20  read undisputed facts into the record earlier this week.

21  We're just adding some more for Groupon.

22          First, the '967 patent expired on August 18,

23  2015.

24          Number 13.  The '601 patent expired on June 7,

25  2016.

1       Number 24.  U.S. Patent Number 4,575,579,

2   entitled Identifying Arrangement For Videotex System with

3   Public Terminals, issued to Gerhard J. Simon and Gerhard

4   Schneider from a patent application filed on November 29,

5   1983.

6       Number 25.  U.S. Patent Number 6,016,484,

7   System, Method and Article of Manufacture For Network

8   Electronic Payment Instrument and Certification of Payment

9   and Credit Collection Utilizing a Payment, issued to

10  Humphrey Williams, et al., from a patent application filed

11  on April 26, 1996.

12      Number 26.  U.S. Patent Number 7,680,819,

13  Managing Digital Identity Information, issued to Joseph

14  Andrew Mellmer, et al, from a patent application filed on

15  September 27, 2000.

16      And finally, number 27.  U.S. Patent Number

17  7,137,006, Method and System For Single Sign on User Access

18  to Multiple Web Servers, issued to Michael L. Grandcolas

19  from a patent application filed on September 22, 2000.

20      Your Honor if I may, I would like to offer this

21  exhibit into evidence.

22          THE COURT:  Does it have a number?

23          MR. HAACK:  Defendant Exhibit 0672.

24          THE COURT:  Any objection?

25          MR. OUSSAYEF:  No objection, Your Honor.

Weissman - direct

1    THE COURT:  It's admitted.

2         (Defendant's Exhibit No. 0672 was admitted.)

3         MR. HAACK:  Thank you, Your Honor.

4         MR. HADDEN:  Groupon calls its next witness, Dr.

5    John Weissman who is an expert in distributed software

6    systems and the Worldwide Web.

7         THE COURT:  Thank you.

8         ... DR. JOHN WEISSMAN, having been duly sworn

9    was examined and testified as follows ...

10        THE COURT:  Good afternoon, Mr. Weissman.

11   Welcome.

12        THE WITNESS:  Thank you.

13        MR. HADDEN:  May I approach, Your Honor?

14        THE COURT:  You may.

15        MR. HADDEN:  Thank you.

16                    DIRECT EXAMINATION

17   BY MR. HADDEN:

18   Q.   Good afternoon, Dr. Weissman.

19   A.   Good afternoon.

20   Q.   Could you introduce yourself to the jury?

21   A.   Yes, I did.  My name is John Weissman.  I'm a

22   professor of computer science at the University of

23   Minnesota.

24   Q.   And do you have a specialty in computer science,

25   Dr. Weissman?

1   A.      Yeah.  My specific area of expertise is distributed

2   software systems, so I build software systems that run

3   across networks like the internet, those software systems

4   involve web protocols and the systems include mobile

5   devices, and cloud computers.

6   Q.      Can you describe your educational background to the

7   jury?

8   A.      Sure.  So I received a bachelor in distributed

9   mathematics and computer science in Carnegie Mellon

10  University in 1984.  Then I worked in the industry for

11  fourteen years.  Then I received a masters degree in

12  computer science from the University of Virginia in 1989.

13  And I also obtained a few years of industry experience.

14  Then I went and received my Ph.D. from the University of

15  Virginia in 1995.

16  Q.      And have you published any papers in the field of

17  distributed software system?

18  A.      Yes.  So one of the parts of my job is to publish.

19  And I publish in only highly reviewed peer reviewed

20  composition journal.  I have published over a hundred

21  articles in journals, typically in the top tier societies in

22  my field which is CM and IEEE.  And I have also authored a

23  number of book chapters as well.

24  Q.      Have you won awards for your academic achievements?

25  A.      I have won several awards, I have won several best

1   paper awards.   These are papers that are the best published

2   at a particular conference which is already taking 20

3   percent of its paper.   I have also received a teaching

4   award.   I received the Early Career Investigator from the

5   National Science Foundation.   I am also a senior member of

6   IEEE, the computer society which represents a certain

7   distinguished reviewers in the field.   And I have also been

8   a visiting fellow at the University of Edinburgh in the

9   United Kingdom.

10              MR. HADDEN:   I offer Dr. Weissman as an expert

11  in distributed software systems and the Worldwide Web.

12              MR. DESMARAIS:   No objection.

13              THE COURT:   So recognized.

14              MR. HADDEN:   Thank you.

15  BY MR. HADDEN:

16  Q.    Dr. Weissman, what were you asked to do in this case?

17  A.    I was asked two things.   First I was asked to

18  evaluate in response to IBM's allegations that the four

19  patents-in-suit that we have heard about, '967, '489, '601

20  and '846 were infringed by Groupon products.

21  Q.    Were you asked to analyze anything else in this case?

22  A.    Yes.   I was also asked to evaluate the validity of

23  those same four patents in light of the prior arts.

24  Q.    And what materials did you consider in reaching your

25  opinions?

1  A.      The materials I considered are first of all the

2  patents, and that would include the specification of the

3  patents, they describe what they are, the claims of the

4  patents, the Court's claim constructions which help give

5  guidance as to the meaning of the terms and claims, the file

6  history which is the back and forth between in this case IBM

7  and the patent office prior to the patent getting awarded.

8  I also reviewed deposition testimony from the inventors of

9  the patents.

10         Then I looked at Groupon, accused Groupon

11  products.  I looked at Groupon source code, Groupon

12  documents.  I also ran and installed Groupon products on my

13  own to test how they're used.  Also Groupon documentation.

14         In addition, I looked at the deposition

15  testimony of Groupon technical representatives that you have

16  heard about.  And additionally, I looked at the report of,

17  opening report of Dr. Schmidt which makes the case of

18  infringement against Groupon.

19  Q.      And did you look at any third-party source code?

20  A.      In addition as part of my validity analysis I looked

21  at source code for the Amazon system that we heard about,

22  and also in the materials considered for Groupon, I also

23  looked at Groupon source code.

24  Q.      Did you look at any prior art patents?

25  A.      Yes, I did.

1   Q.      And prior art publications?

2   A.      I also looked at prior art publications.

3   Q.      And how about prior art systems?

4   A.      I looked at a number of prior art systems that we

5   have heard about today.

6   Q.      Did you look at files in the PTAB relating to patents

7   in case?

8                MR. DESMARAIS:  Objection, Your Honor.

9                THE WITNESS:  Yes I did.

10               THE COURT:  Sustained.

11  Q.      Have you also been here throughout the trial,

12  Dr. Schmidt -- I knew I was going to do that once --

13  Dr. Weissman?

14  A.      I have.

15  Q.      And you heard Dr. Schmidt testifying?

16  A.      I have.

17  Q.      Did you hear the inventors who are here testifying?

18  A.      Yes, I did.

19  Q.      Did you hear Groupon's technical witness testifying?

20  A.      Yes, I did.

21               MR. HADDEN:  I would like to move into evidence

22  the materials that he cited.  Should I read off the exhibit

23  numbers Your Honor?

24               THE COURT:  You'll now read off the exhibit

25  numbers?

1               MR. HADDEN:  Yes.

2               MR. DESMARAIS:  I don't have that in front of

3    me, Your Honor, so it would be hard for me to follow.

4               MR. HADDEN:  In the binder.  I can give you a

5    list if you want.  PX 1 through 8 of the patents and file

6    histories.  Any objection?

7               MR. DESMARAIS:  That's PX 1 through 4?

8               THE COURT:  8.

9               MR. HADDEN:  No, 8.

10              MR. DESMARAIS:  Those are the certified files.

11   No objection.

12              THE COURT:  Those are admitted.

13              MR. HADDEN:  And then documents and testimony,

14   that would be DX-202, DX-375, DX-376, DX-387, DX-391,

15   DX-392, DX-397, DX-399, DX-482, DX-648, DX-649, PX-49,

16   PX-106, I'm sorry, PX-49, PX-106, PX-963, PX-964, PX-966,

17   PX-967, PX-969 through 970, and PX-1544 to PX-1555.

18              THE COURT:  Any objection?

19              MR. DESMARAIS:  I think we need to hold our

20   response on that, Your Honor, because we don't have that in

21   front of us.  We can approach at the side-bar if you want to

22   discuss it.

23              THE COURT:  It's different than what was in the

24   binder or what was disclosed here maybe?

25              MR. DESMARAIS:  Yes.  If you want to talk about

1   it at side-bar, we can, Your Honor.

2           THE COURT:  We will have a side-bar, ladies and

3   gentlemen.  Please feel free to stand up and move around.

4           (Sidebar conference held.)

5           THE COURT:  All right.  So you are not sure that

6   this is what was disclosed?

7           MR. DESMARAIS:  Right.  I just need to check.

8   It was a long list.  We don't have a slide that has the --

9           THE COURT:  Right, because you weren't allowed.

10          MR. DESMARAIS:  Yes.

11          THE COURT:  You objected.

12          MR. DESMARAIS:  So if we can do it?  If we can

13  check those numbers at the break, then I will have no

14  objection.

15          MR. HADDEN:  That's fine.

16          MR. DESMARAIS:  But we did get exhibits that

17  were objectionable.  I don't know if they're on the list or

18  not.  We need to check.  I just need somebody to check is

19  all.

20          THE COURT:  Right.  Okay.  Someone will check,

21  but, you know, if he is going to use them, he is going to

22  use them.

23          MR. DESMARAIS:  If he is using it, then I will

24  know as I see it; right?  So it won't be an issue.

25          THE COURT:  And you made a reference to the

1    PTAB.  You are not planning to talk about the PTAB?

2                    MR. HADDEN:  No, no.

3                    THE COURT:  Okay.  Is there anything else?

4                    MR. DESMARAIS:  The strange thing about this, we

5    objected twice to the PTAB.

6                    THE COURT:  I don't know why he did it.  It was

7    a stray reference.  You are not going there?

8                    MR. HADDEN:  No, it was just on the slide I was

9    reading.

10                    THE COURT:  All right.

11                    (Sidebar conference ends.)

12   BY MR. HADDEN:

13   Q.    Hello again, Dr. Weissman.

14                    THE COURT:  Let me say for the record I'm not

15   ruling on the admissibility of those exhibits right now, but

16   you may proceed.

17                    MR. HADDEN:  Okay.  Thank you, Your Honor.

18                    I'd like to move in the publicly available

19   documents that Dr. Weissman also reviewed.  These are DX-36

20   to DX-54, DX-58, DX-146, DX-157, DX-160, DX-167, DX-338 to

21   DX-374, DX-377 to DX-386, DX-388 to DX-390, DX-394 to

22   DX-396, DX-442, DX-452, DX-525 to 527, DX-643, DX-645,

23   DX-646, DX-655, DX-658, and DX-665.

24                    MR. DESMARAIS:  We'd like to handle this the

25   same way.

Weissman - direct

1          THE COURT:  We'll handle them the same way, so

2    there is no ruling just yet.

3    BY MR. HADDEN:

4    Q.     What were the conclusions you reached in your

5    analysis regarding infringement of this case, Dr. Weissman?

6    A.     My conclusion is that IBM has not met its burden of

7    proof on proving infringement of Groupon against the four

8    patents-in-suit.

9    Q.     Okay.  And what was your conclusion regarding

10   validity of the patents-in-suit?

11   A.     My conclusion is that the patents are invalid under

12   the prior art.  And I will talk today about two of the

13   patents as a clear example of that.

14   Q.     And the two are the '601 and '346; is that correct,

15   Doctor?

16   A.     That's correct.

17   Q.     Thank you, Dr. Weissman.  So let's start with the

18   '967 and '849 patents which we have been referring to as the

19   Prodigy patents.

20          Can you tell the jury what the field of

21   technology that those patents related to?

22   A.     Sure.  So the Prodigy patents flow out of this

23   technology called videotex which we see depicted over here.

24   And videotex was early days of online services, grew out of

25   the consumer industry, and the goal was to provide simple

Weissman - direct

1  services to users on terminals, things like stock quotes,

2  weather, maybe very early games.

3          And the essential technology of videotex was

4  screen based.  So you had a single central server typically

5  that owned the content and often controlled the content.  It

6  would deliver a screen of information at a time to the user

7  screen, almost like watching a slide show or watching

8  television.

9          And one of the key aspects of videotex system

10  is that the videotex central server was in control.  The

11  user sat and viewed the material that was shown, had limited

12  interaction, but, you know, essentially got a screen full of

13  information at a time.

14  Q.    How does Prodigy relate to videotex?

15  A.    So Prodigy grew out of that same videotex technology,

16  and Prodigy is essentially videotex technology relying on a

17  central server.  In this case, it's a server that IBM

18  controls with a database of information that IBM would

19  deliver to client computers.  And so Prodigy is still based

20  on videotex technology.

21  Q.    Is Prodigy also a screen based system?

22  A.    Prodigy is also a screen based system.  So Prodigy

23  still controlled the user's screen.

24  Q.    So in what respect did Prodigy differ from the prior

25  traditional videotex?

Weissman - direct

1　　A.　　　Yes.　So, you know, one of the problems of videotex

2　　was as I mentioned, this online dial up connection so the

3　　network was very slow.　And, furthermore, because you had a

4　　single server, single central host delivering all the

5　　content screen by screen, this often meant things were quite

6　　slow for the many users that were connected to the system.

7　　And so the purpose of Prodigy was to try to speed up that

8　　performance.

9　　　　　　　And another goal was to make information have

10　　greater clarity to the user.　So the key idea of Prodigy was

11　　to divide the screen into a number of areas and also divide

12　　the information that the user was going to receive into

13　　smaller bits of information that would fit into those areas.

14　　The idea being that as we see it depicted here, that we can

15　　retrieve smaller pieces of information as needed across the

16　　network and so provide what we hopefully would be faster,

17　　more efficient performance for the user.

18　　　　　　　And as we're seeing here, the screen was

19　　decomposed into four partitions and those were filled with

20　　applications:　a header at the top, politics, an

21　　advertisement in the third partition that says cruise scan

22　　has the guaranteed lowest prices, and a command screen at

23　　the bottom.

24　　Q.　　　How was Prodigy able to control what was on the

25　　user's screen?

1  A.       Prodigy controlled on the user's screen because it

2  was a closed system.  So Prodigy was run by IBM.  IBM had a

3  central database.  IBM delivered the information that was

4  requested by the user at the terminal.  So IBM controlled

5  that information.  IBM, because it knew about the screen,

6  could size that information appropriately so it could fit

7  into those partitions.  So IBM was in charge of what the

8  user saw, the screens of information.

9  Q.       And what does Prodigy have to do with the World Wide

10 Web?

11 A.       Prodigy has very little to do with the World Wide

12 Web.

13 Q.       Why do you say that, Dr. Weissman?

14 A.       Well, as I just described, videotex and Prodigy are

15 screen based technologies.  Okay?  Admittedly, Prodigy did

16 make an adjustment to videotex by breaking up the screen,

17 but it was essentially still screen based.

18          The web differs in a number of important ways,

19 so much so I would argue it is a revolution compared to what

20 Prodigy was based on.

21          No. 1, Prodigy grew out of this sort of online

22 services dialup very early pre-web kinds of applications and

23 services whereas the web was developed by computer

24 scientists, people like Tim Berners-Lee and high

25 technologists that were motivated by the many innovations

1  that were happening in the computer science field.  We'll

2  talk more about those things like caching, breaking up

3  content into objects, that sort of thing.

4         So in fact if you look at the early web, if you

5  look at the first couple of years, what you will notice are

6  the web pages that you see are mostly computer science

7  departments or national laboratories.  So it grew out of a

8  completely different community.

9         The second point I'd like to make is the web is

10  not screen based but document based.

11  Q.     What does that mean, "document based," Dr. Weissman?

12  A.     This is sort of the fundamental core aspect of

13  the web.  The web is designed to be an open system with

14  millions of servers providing documents in which those

15  documents could be interlinked.  And the goal of the web is

16  to provide not a closed system but a growing and expanding

17  system, so we could have more web servers, more content,

18  have more interlinking of that content.

19         So it sounds like a pretty big job, but what is

20  brilliant about the web is what the web provided was a few

21  simple pieces in order to make that happen.

22  Q.     What were those pieces, Dr. Weissman?

23  A.     So as shown here, we heard a lot this past week.  One

24  piece was the Hypertext Transfer Protocol which is a way for

25  a user at a browser to request a page of information.  So

1  this is simply the protocol by which I can ask for something

2  and then get something delivered back to me, that content of

3  that web page.

4          The second piece was HTML, Hypertext Markup

5  Language which is a language that allows authors of content

6  to describe their web pages and then hopefully make them

7  available on the web servers.

8          So the web really for these two simple pieces of

9  protocol, as long as everybody followed it, people could add

10  content at will and grow documents and enable those

11  documents to interconnect with each other.

12          A final piece I'll mention very briefly is the

13  use of something called URLs, which is a way that the user

14  can name or refer to a web document as it were.

15  Q.      Now, both HTML and HTTP started out with the words

16  hypertext.  What is hypertext?

17  A.      Well, hypertext refers to this kind of core idea that

18  a document contains reference to other documents.  That's

19  the hyper.  And I think most of us would agree that that is

20  probably the most compelling aspect of the web is you don't

21  get a document in isolation.

22          You know, in videotex, you've got a screen that

23  was sort of isolated from anything else.  It was you were

24  playing a game or looking at stock quotes.

25          The web, you get a document through a window as

1  you are looking via these hyperlinks.  By simply clicking, I

2  can go somewhere else and somewhere else.

3  Q.      Can you have a hypertext in a screen-based system?

4  A.      Well, so, you know, web pages are what are delivered

5  to a browser; right?  So the web only cares about the

6  delivery of documents to web browsers.  The web isn't

7  concerned about screens and where things fall on a screen.

8  That is up to a browser and up to a user to decide based on

9  what they do, where things show up on a screen.

10  Q.      And why is it important to the web that it provides

11  documents and not screens?

12  A.      Yes.  So remember in the videotex system, it was

13  really slow.  Part of the reason it was really slow is this

14  server was having to build the entire screen.  There was a

15  lot of data in a screen of information.  And so the servers

16  were bogged down and they were fairly slow because they had

17  to build an entire screenful of information at a time.

18          The web, in contrast, that would completely bog

19  the web down.  Imagine a popular website like CNN or

20  Amazon.com.  If it had to spend its time drawing on

21  everybody's screen, it wouldn't be useable.  So the web is

22  actually pretty lightweight.  Servers just deliver

23  documents, and the browsers and the users figure out

24  essentially where those things show up on the user's screen.

25  Q.      This shows here our illustration of the web.  Would

1   this sort of interlinking of information be possible on a

2   screen-based system?

3   A.      Not at all.  Because once you got information on

4   your screen, it wasn't connected to anything other than what

5   was already located at the user's terminal or at a Prodigy

6   server.  There was no way to reference anything else because

7   there was nothing else.  It was a closed system.

8   Q.      So does the fact that the web is a web depend on the

9   fact that it's based on documents, not screens?

10  A.      Correct, based on documents which can come from

11  anywhere, and any document can refer to any other document

12  as long as the document knows the address or name of that

13  other document.

14  Q.      Now, we've heard some discussion in this case of

15  caching.  Can you explain what caching is, Dr. Weissman?

16  A.      So caching is an odd idea in computer science.  There

17  is caching at many different levels of computer systems.

18  Caching is particularly useful in a distributed system

19  because it's expensive in time to go across a network to get

20  information.

21          So the idea behind caching, and it was described

22  in this paper, the seminal paper by Doug Terry, was that mid

23  requests for information across networks generally, once you

24  get that information, you store it locally so that if the

25  user makes another request and wants to look at that

1    information again, it's available on the local machine and I

2    can avoid going across the network and waiting for it to

3    come again.

4    Q.    Now, we just looked at the diagram from the Terry

5    paper you just mentioned.  Can you just explain what it is

6    showing here?

7    A.    Yes.  So at the top, the first box says cache lookup.

8    So here --

9    Q.    Could I stop you just there?  When it say cache

10   lookup, what is the cache that it's really talking about?

11   A.    Right.  So the cache in this case would be a place to

12   store things.  So this would be storage local to the

13   computer that the user is using.

14   Q.    Okay.  Thank you, Dr. Weissman.  Go ahead.

15   A.    Okay.  So the user requests some piece of data.  And

16   the first thing we go in a cache based system is we look and

17   see is it in the cache?  Have I retrieved it before?  And if

18   it is in the cache, that is wonderful.  That is a decision

19   point I check, is it in the cache?  And if it is, I try to

20   use the data.  I get it very quickly because it is local.

21        If it is not in the cache and that is the "no"

22   branch on the right, I have what is called:  query the

23   server.  I have to go out to a server across the network and

24   spend a lot more time to get the data.

25   Q.    What happens if it is in the cache?  What does Terry

Weissman - direct

1    say you do next?

2    A.    Well, if it is in the cache, you try to use that

3    data.  You might take an initial step to decide is the data

4    valid?  When you retrieve information and store it in a

5    cache, if that information were to change at the server,

6    then it's a possibility that the data can come out of that

7    cache.  If you retrieve something on Tuesday, say Tuesday's

8    weather and now it's Wednesday, well, Tuesday's weather is

9    no longer valid.  You have to go back to the server to get

10   Wednesday's weather.  So this is just asking, you know, can

11   we determine whether the data is valid?  And if it is not,

12   then we are going to have to query the server to get the

13   data again.

14   Q.    So did Mr. Filepp invent the idea of caching

15   information locally?

16   A.    He did not.  Nor this possibility of having to get

17   the data again because it was out of date.

18   Q.    So the idea of using local information and if it is

19   not up-to-date or there, going and asking this server, is

20   that something that was well known before Prodigy?

21   A.    That is as old in the hills as distribute systems

22   even as long as I have been working on them and even before.

23   Q.    And what are we showing here, Dr. Weissman?

24   A.    So here we are showing another seminal paper on a

25   system called Andrew, a Distributed Personal Computing

Weissman - direct

1   Environment.

2            And I was fortunate enough to be an

3   undergraduate at Carnegie Mellon just down the road in

4   Pittsburgh when this was being developed.  And Andrew is a

5   distributed personal computing environment.

6            What Andrew was a collection of was called

7   virtual workstations, so now we're getting into an era where

8   we had more than dumb terminals available to us.  We had

9   actually powerful machines, PCs, for example, or sometimes

10  called workstations in that era.

11           So Andrew was a distributed work system that

12  employed the use of more powerful machines together in a

13  network, and these workstations could retrieve data across

14  this network to a file system, but these workstations had a

15  lot of capability.  They could do computation, they could

16  store data, because this was a much more powerful system.

17  Q.      These workstations are not the dumb terminals that we

18  saw in IBM's slide?

19  A.      They are not.  These are full fledged computers.

20  Q.      And this is March 1986; is that right, Dr. Weissman?

21  A.      That is when the paper was published.  The system was

22  in development in the 1980s, early 1980s.

23  Q.      Did the Andrew system also cache information locally

24  at those workstations?

25  A.      Yeah.  That was a core aspect of Andrew.  Whenever

1    a user tried to open a file, Andrew would fetch the entire

2    file across the network and store it locally in the belief

3    the user would want to keep accessing or access all parts of

4    that file.

5    Q.     Is that why it is described here where it says Venus

6    checked the cache for the presence of a valid copy?

7    A.     It is.  So Venus is software are running at the

8    workstation.  So Venus would check the timestamp when the

9    data was retrieved.  It would ask the server has the data

10   changed?  Has somebody updated the file?

11          And if it has not, if the user has the most

12   up-to-date version, wonderful, then we'll open the local

13   file and avoid having to go to the server to get the file.

14   Q.     And so Andrew also would look at the local

15   information, use the computer first and only go to the

16   server if needed?

17   A.     Right.  If the server told the Venus client, oh,

18   yeah, I have a new version on the database on what you have

19   and the server knew that, Venus would say I have Tuesday's

20   file.  The server would say, oh, there is a Wednesday

21   version.  In that case, then the Venus software would

22   invalidate the local copy and then have to fetch a new copy

23   from the server.

24   Q.     So let's go back now and talk a little bit more about

25   the '967 patent?

Weissman - direct

1                   What is shown in Figure 3a?

2    A.      So Figure 3a is showing how in this patent the screen

3    is decomposed with a number of partitions or areas of the

4    screen, each holding different things.

5    Q.      And are the screen partitions the same as the

6    information that is shown in this partition?

7    A.      No, the partitions are, as you can see, an area of

8    the screen.  And then those partitions would be filled with

9    information.

10   Q.      And --

11   A.      So --

12   Q.      All right.  If I look here on the slide I put up.

13   And I'm sorry for the spin.  Can you explain what that quote

14   is from the patent?

15   A.      Yes.  So the screens are broken down into these

16   partitions which are, as the patent describes, addressable

17   partitions, meaning they have a location.  So you could

18   address a position at a partition.  It has a coordinate.

19   Think of it as a two-dimensional coordinate.

20   Q.      And what is buying shown here?

21   A.      What is being shown here are that partitions can

22   contain different types of information.  They have a header

23   partition, you can have a body partition, window partitions,

24   ad partitions for advertising, and even a partition that

25   contains commands shown at the bottom.

Weissman - direct

1   Q.      And how in the Prodigy patent are these screens

2   partitions constructed?

3   A.      Yes.  So the patent describes in fact that partitions

4   are created from units of data called objects and, in fact,

5   objects are also the units of data that would fill the

6   partitions.  But the units of data that create the screen

7   areas in the partitions are described as page format

8   objects.  And that is depicted over here on the screen.

9           And so as it says here, the page format object

10  defines the screen partition, locations and size.

11  Q.      So if we relate Figure 3a to 502, what would the page

12  format object tell us about how to lay out the screen in 3a?

13  A.      Well, you would have in this particular screen a

14  number of different page format objects that correspond to

15  the different areas of the screen.  So you would have the

16  page format object for the header partition, for the body

17  partition, the ad partition, so on and so forth.  And you

18  can tell the system where essentially to create that

19  partition based on the information such as location and

20  size.

21  Q.      Now let's look at the claims.  Before we get there,

22  did you apply the Court's claim constructions in your

23  analysis to the patents in this case?

24  A.      Yes, I followed the Court's claim constructions.

25  Q.      If we look at claim 1, it's got a lot of words.  You

1    have highlighted a couple of the steps in red.  Why is that?

2    A.    What I would like to talk about are the method steps

3    that are highlighted in steps B and C.

4    Q.    And now for IBM to prove, meet its burden of proof of

5    showing that Groupon infringes its claim, what did IBM have

6    to show?

7    A.    IBM to meet its burden of proof for infringement

8    would have to show that Groupon performs all of the elements

9    of this claim A, B and C.  So it is language that Groupon

10   doesn't perform steps B and C, so therefore it does not

11   infringe claim 1.

12   Q.    So if the jury is convinced that Groupon does not

13   perform one of these steps, can IBM meet its burden of

14   proving infringement?

15   A.    You cannot.  If I can show that Groupon does not

16   perform B or C or B and C, there is no infringement.

17   Q.    You have highlighted B and C in red.  Do you agree

18   with Dr. Schmidt's analysis of the other elements at claim

19   A?

20   A.    I do not.  I want to focus on B and C.

21   Q.    Now, if we start with the two key requirements here,

22   we have the Court's construction.  So if we start with B, it

23   requires a first area for presenting applications.  Is that

24   right?

25   A.    That's correct.

Weissman - direct

1  Q.      And what is your -- what did Dr. Schmidt identify as

2  the first area of presenting applications?

3  A.      Well, as Dr. Schmidt talked about -- he presented by

4  showing an image of a Groupon web page on a screen, and he

5  drew a red box around the entire web page, and referred to

6  that first area as the entire application, the application

7  first area was the entire screen.

8  Q.      So did Dr. Schmidt say that the applications in the

9  first area were the same thing?

10  A.      Yes, he did.

11  Q.      Does that make sense given the language of the claim?

12  A.      It does not.

13  Q.      Why not?

14  A.      Well, the claim requires that you have first area for

15  presenting applications, as well as second area for

16  presenting a plurality of command functions.  Secondarily,

17  it must be the case that the partition is generated and then

18  the application is placed in that partition.  Applications

19  as we'll see do not generate areas for presenting

20  themselves.

21  Q.      So what do we see here?

22  A.      So what we see here is what we might think of as what

23  it means to partition a screen.  I'm showing the overhead

24  screen and we have drawn a red box at the top and a red box

25  below.  And so this is what one would think of as partition

Weissman - direct

1   or screen area.

2   Q.      Does Groupon generate those red lines?

3   A.      Groupon does not generate those red lines.  All

4   Groupon does is deliver a web page, and the red lines were

5   superimposed on top of that web page.

6   Q.      Does Groupon require that or control where any of the

7   information in the web page is shown on the screen?

8   A.      No, so Groupon adjust the web page to the browser.

9   What we're illustrating here is by moving the browser

10  window, by zooming in, by scrolling, what I am clearly

11  showing is that application content can be detected on

12  different areas of the screen.

13  Q.      And when I or when you show the zooming or scrolling,

14  is Groupon doing any of that?

15  A.      Groupon does not.  Groupon just delivers like any

16  website web page, it is the browser and the user that is

17  deciding what content they want to see.  So the user decides

18  how this information is essentially mapped to the screen

19  with the browser, so I move the browser around, I can

20  resize, I can scroll.  Groupon's web page has no idea where

21  it's going to end up on this screen.

22  Q.      Is that division of labor between a web server

23  providing a web page and what the browser does to look at

24  parts of it important in the web?

25  A.      Those are essential.  As you can imagine, web servers

Weissman - direct

1   or Groupon or others are quite busy just serving documents.

2   They can't spend their time figuring out what everybody's

3   screen likes and how to basically decompose all that content

4   so it fits snuggly into their screen rather than deliver the

5   documents, and it is up to the user and the browser to

6   figure out how they want to -- what parts of the screen

7   should that be viewed in.

8   Q.      Here I think we're showing the same effect in a

9   computer screen.  So, again, is Groupon controlling any of

10  the changes I make to how this looks in the screen?

11  A.      No, Groupon delivers the entirety of the web page and

12  it is up to the user in concert with the browser to figure

13  out how that information is placed on the screen.  The user

14  is in complete control.  This is very much very different

15  than what we saw in Videotex.

16  Q.      If a user changes the view of their browser so that

17  the entire web page is shown like this, is Groupon

18  generating an area in which that web page is displayed?

19  A.      It is not.

20  Q.      And the same here, if the user has their browser set

21  so that a portion of the web page is displayed like this, is

22  Groupon determining an area of the screen for displaying the

23  area of the web page?

24  A.      No, it is not.  Groupon is just delivering the web

25  page and Groupon's job is done.  It is up to the browser, it

Weissman - direct

1    is up to the user based on what they want, it is based on

2    the browser window, where it is, as to how things get put on

3    the screen.  Remember, the claims were talking about screen

4    areas.

5    Q.    In fact, does Groupon even know if the user looks at

6    the web page like this or like this?

7    A.    Groupon has no idea what the user, how they're

8    viewing the content.

9    Q.    If we look now at Dr. Schmidt's analysis of this

10   element, what does Dr. Schmidt say Groupon does to perform

11   the generating at least a first partition or as the Court

12   has construed it, at least a first area for presenting

13   applications?

14   A.    So, Dr. Schmidt is showing two things.  So the left

15   he's showing the human language which is what we see on the

16   screen.  And on the right he's pointing to the computer

17   language where the HTML is associated with what we're seeing

18   on the screen.

19   Q.    Can I just stop you there.  In this slide where

20   Dr. Schmidt is talking about computer language, is that

21   actually the web page he's pointing to?

22   A.    Yes, he is.

23   Q.    So that's the HTML, or at least a portion of this

24   HTML document that Groupon would send to the browser?

25   A.    On the right is an example of an HTML or a web

Weissman - direct

1   document that Groupon would send to a browser.  And so web

2   pages being sent, and so of course it doesn't make sense for

3   a web page to define where it shows up on the screen for

4   reasons we described.  But what is being pointed to in the

5   web page are a number of div containers, a number of div

6   tags, for example, global container as providing evidence of

7   generating a partition for presenting applications.  A div

8   tag has really nothing to do with the area of the screen.

9   Div tags don't specify location or anything related to area.

10  At best a div tag would be associated with how to format

11  content within that web page.

12  Q.    And this HTML that he points to here including the

13  div tag, is that part of what he's already said is the

14  application?

15  A.    Yes, he is.

16  Q.    So does that make sense, that what generates the area

17  for the application be displayed is the application itself?

18  A.    No, it doesn't make sense to say that the application

19  is generating its own area.  If you remember, read the claim

20  language of generating a partition for presenting

21  applications, we have partition generated and then how to

22  choose applications, you don't have an application and say

23  it's generating its own area of on the screen, it doesn't

24  happen.

25  Q.    Is the fact that this particular div tag, global

1  container by Groupon, does that have any significance as to

2  what it does?

3  A.      That's just a name that any -- that you can get the

4  div tag, you can give it the name Fred or John or anything

5  else, it's a just a name so you can refer to it.  Unless you

6  refer to it in something called a style sheet or some

7  styling directive it will have no effect at all.  So the

8  name in quotes means nothing.

9  Q.      Has Dr. Schmidt ever identified any style sheet or

10  code that refers to the global container div tag?

11  A.      No, he has not.

12  Q.      Just to help the jury understand what div tags are,

13  what are you showing here, Dr. Weissman?

14  A.      So on the left I'm showing what we're referring to,

15  the computer language, this is what you would see on a

16  browser.  And corresponding to that is the HTML or web page

17  shown on the right which would be a server that would be

18  requested by the user at the browser on the left and

19  rendered or shown on the screen.  What we're showing is what

20  the user would see when that HTML document is retrieved.

21  Q.      So just to be clear, this thing on the right is just

22  a very simple web page, it could be sent to a browser by web

23  server; correct?

24  A.      Exactly.

25  Q.      This is what it would like if you had it on your

Weissman - direct

1    screen at that website?

2    A.       Just a very simple Hello World is all you see.

3    Q.       Here we're adding a div tag; is that right,

4    Dr. Weissman?

5    A.       Yes, we are surrounding that text with a so-called

6    div tag.  You can give a div tag a name.  You can give it

7    any name you want.  Suppose we do that, we change the web

8    document on the right, and then we have a browser retrieve

9    it.  Notice there is no effect at all.  There is no change

10   to what you see.  There is no partitions, there is no

11   changes whatsoever.  And the reason is that this particular

12   div tag is not referenced anywhere else, so it doesn't do

13   anything.

14   Q.       So what if we add a reference to it?

15   A.       So here is an example of what you can do with a div

16   tag is you could say div tag, hello, I'm going to associate

17   some style reference.  Any time I see a div tag called

18   hello, anything within that tag is styled by the information

19   shown up above.

20           So what this effectively says is when you see a

21   div tag below, anything inside that tag is call it red, has

22   a bold font and is underlined.  You see now a difference in

23   the format.  What you still don't see is a screen area, you

24   see a styling and the changing of the look of the content.

25   Q.       So if you add a reference to the div tag, you can

Weissman - direct

1   change something about how it's presented, but div tags

2   being part of the HTML don't affect the screen area?

3   A.      It doesn't affect where you see something on a

4   screen.  Again, that's subject to what the user is doing

5   with the browser.  You can change the formatting, the fonts,

6   the colors.

7   Q.      Dr. Schmidt hasn't shown even anything like this that

8   would use the global container div tag to change how a web

9   page is presented, has he?

10  A.      I'm not aware.

11  Q.      If we go back to Dr. Schmidt's analysis, has

12  Dr. Schmidt shown that Groupon generates at least a first

13  partition for presenting applications?

14  A.      No, he has not.

15  Q.      So, at this point, can IBM meet its burden of proving

16  infringement?

17  A.      Since he has not shown that Groupon's websites

18  perform this method step, we can say even at this point that

19  IBM has not met its burden of proof of infringement of claim

20  1.

21  Q.      Let's look at the next element you have highlighted.

22  Can you read what this is?

23  A.      Yes.  So the step C says generating concurrently with

24  the first partition at least a second partition for

25  presenting a plurality of command functions.

1    Q.      Is this the Court's claim construction, the second

2    partition over here?

3    A.      Yes, it is.

4    Q.      What does that require?

5    A.      It requires two things, it requires a second area on

6    the screen, and it requires that that second area then

7    enable a presentation for a plurality of command functions.

8    Q.      If we look back at the patent, is there an example of

9    this second area in the patent?

10   A.      Yes, highlighted at the bottom of 3A, the patent

11   gives examples of commands and you can see them next, back,

12   path, menu, these are commands that cause one to move around

13   different screens of information.

14   Q.      What has Dr. Schmidt identified as meeting this

15   requirement?

16   A.      Dr. Schmidt is pointing again to the same web page,

17   but he's pointing to a div tag within that same web page

18   that contains a number of -- we'll talk about in a moment --

19   hyperlinks.  What Dr. Schmidt is saying is these commands

20   are part of the application, they're part of the first area.

21   Q.      Does that make sense given the claim language?

22   A.      It does not.  There needs to be a second partition.

23   But the second partition is this entire web page, the global

24   container, the entirety of the page, it's looking inside

25   that page and finding this other div tag.  But that's still

Weissman - direct

1  the content of the application under the mapping done in the

2  prior step.

3  Q.      And again, does this div tag, this header identified

4  here, does that generate an area on a user's screen?

5  A.      As we showed in the first claim step, div tag in

6  itself doesn't generate an area at all, it doesn't have an

7  associated area on the screen.

8  Q.      So can the user scroll down like this and not even

9  have that portion of the page displayed?

10 A.      Yeah.  So again, what you see on the screen is under

11 user control.  And you don't have these partitions on the

12 screen anymore, you can scroll and notice that command

13 partition which was at the top is now gone.  So it's not on

14 the screen.  So it can't be a second area, it's not even on

15 the screen.

16 Q.      Now, you were here when Dr. Schmidt testified?

17 A.      Yes, I was.

18 Q.      And I asked him about this seemingly inconsistency,

19 and he answered the application contains a first area and a

20 second area and that code hasn't disappeared.  Do you see

21 that?

22 A.      Yes, I did.

23 Q.      What is wrong with what Dr. Schmidt is saying here?

24 A.      Well, the claims require the application, first the

25 application, a first area, he's saying the application

Weissman - direct

1  contained a first area and a second area, and the claims

2  require you have a first area for applications and a second

3  area for commands.

4  Secondarily, I would say that screens don't have

5  non-digital portion, the screen is what you see, that hasn't

6  changed since unfortunately Videotex, that's still the same,

7  what you see is the screen.

8  Q.    Now, in his answer, Dr. Schmidt seems to be equating

9  divisions within an application to divisions or partitions

10  on a screen.  Is that a correct way to read this patent?

11  A.    No, it is not.  The patent is clear that there is a

12  first area for applications and a second area for presenting

13  command function.  And there is language in the claim that

14  also provides further support for that, this idea the back

15  of the claim is generating a second area, these are meant to

16  be first and second area, not one area.

17  Q.    If we look actually in the specification, which I

18  have put up on the screen, it says each page is formatted,

19  255, with a service interface having page partitions, 250,

20  260, 280, 290.  Those match the numbers for the figure that

21  you showed earlier?

22  A.    Yes, it does.

23  Q.    If we go back to this step, doesn't the patent say

24  these are not to be confused as application partitions, do

25  you see that?

Weissman - direct

1     A.     **Right.  It says pretty clearly, each page is**

2     **formatted with a service interface having page partitions**

3     **and the different partitions are identified in that figure,**

4     **250, 260, 280, 290, not to be confused with application**

5     **partitions.  The patent is expressing an application that**

6     **these are different.**

7     Q.     **So the page or screen partitions which can be found**

8     **in 3A, those would divide up the screen?**

9     A.     **Yes.**

10    Q.     **The application partitions, that is information that**

11    **would be mapped into these screen areas?**

12    A.     **Yeah, referring here to the content that would be put**

13    **into an application page.**

14    Q.     **Isn't Dr. Schmidt doing exactly what the patent said**

15    **not to do, confusing application partitions with screen**

16    **partitions?**

17    A.     **I agree, the patent is clear that these are separate**

18    **processes.**

19    Q.     **So if we go back to the Court's claim construction**

20    **and kind of put this in context, what's the first thing we**

21    **have to have?**

22    A.     **You have to have a couple things based on the claim**

23    **language and the Court's constructions, you have to have a**

24    **first area, and you have to have a second area.  And the**

25    **first area is for presenting applications, and the second**

Weissman - direct

1   area is for presenting a plurality of command functions,

2   commands.

3   Q.      So is it right that according to the Court's claim

4   construction, you have to have two screen areas and two

5   things, one to put in each area?

6   A.      That's how I would understand the Court's claim

7   construction.

8   Q.      This is an analogy.

9   A.      Okay.

10  Q.      Can you explain how this kind of might help explain

11  what's required here?

12  A.      Yes.  So this probably will take us all back to

13  elementary school.  So imagine you pick up an empty tray and

14  that tray has these partitions or these areas, and then

15  lunch in this case can be placed, the contents can be placed

16  in those different partitions.  One doesn't understand that

17  if I have lunch, therefore I must have a tray with

18  partitions.  These are separate ideas, separate concepts.

19  And the patent appreciates that.

20  Q.      So if Dr. Schmidt just says that we have lunch and

21  that we have applications and commands, is that enough to

22  show that we have a tray?

23  A.      It's not.  If I have lunch, I don't have necessarily

24  partitions or in this case a tray, right, I just have

25  content.

Weissman - direct

1    Q.      Dr. Schmidt also said that these links up in the top

2    are the command functions.  Do you recall that?

3    A.      Yes, I do.

4    Q.      Now, are there links in other places on this page?

5    A.      As we said, the whole purpose of the web is to make

6    documents hyperlinked.  So there is links everywhere.

7    Q.      So basically if a user scrolls down this page they

8    would find links from top to bottom; is that right?

9    A.      The links from top to bottom to make it easier to

10   find what you need and find what you need in many different

11   ways.  I point out again that these types of links are what

12   is being pointed to as the entire application, the entire

13   first area.

14   Q.      So all the links on this page from the ones

15   Dr. Schmidt circled all throughout the page are just

16   hyperlinks within a web page; is that right?

17   A.      That's correct.

18   Q.      If we go back to element C, has Dr. Schmidt shown

19   that Groupon performs this step of generating concurrently

20   with the first partition at least a second partition for

21   presenting a plurality of command functions?

22   A.      IBM has not met its burden of proof with this claim

23   step.

24   Q.      If we go back, looking at your chart now with the two

25   elements not crossed out.  Has IBM met its burden of proving

Weissman - direct

1    that Groupon infringes this claim?

2    A.    As we say here, I say here, IBM has not met its

3    burden of proof that the Groupon website performs claim 1 of

4    the '967 patent.

5    Q.    And was Dr. Schmidt's analysis of the mobile website

6    any different than his analysis of the desktop website?

7    A.    It was largely the same, the same concept of the

8    first area was the application and the second area was --

9    and that was represented by a global div.  And the second

10   area was just a div within that, but it's still the same

11   single application.

12   Q.    In fact, didn't Dr. Schmidt say that Groupon

13   purportedly infringes in the same way?

14   A.    That is exactly what we said he represented earlier.

15   Q.    So if Dr. Schmidt was wrong about the desktop

16   website, is he also wrong about the mobile website?

17   A.    Then he would be wrong about the mobile website.

18   Q.    So let's go to, there is one other claim that IBM is

19   asserting in this patent.  It's claim 2.

20         Now, claim 2 is a dependent claim.  Can you

21   explain what that requires to the jury.

22   A.    Yes.  So a dependent claim contains additional

23   limitations, but a dependent claim relies on an independent

24   claim, and for a dependent claim to be infringed, every

25   aspect of the independent claim must also first be

1  infringed.

2          And because as I just stated IBM has not met its

3  burden of proof that Groupon's website and mobile website

4  perform the steps of method of claim 1, it cannot be held to

5  infringe claim 2.  It depends on claim 1.

6  Q.    Because they didn't infringe claim 1, it

7  automatically --

8  A.    If it didn't --

9          THE COURT REPORTER:  Sorry.  One person at a

10 time, please.

11 BY THE WITNESS:

12 A.    They didn't infringe claim 1 so they cannot infringe

13 claim 2.

14 Q.    Let's look now at the other Prodigy patent, the '849

15 patent.

16          And did you apply the Court's constructions for

17 these terms?

18 A.    Yes, I did.

19 Q.    So we've kind of put them in, substituted them in

20 claim 1; is that right?

21 A.    Yes, we did.  Yes, I did.

22 Q.    So let's talk about the first step:  formatting

23 applications so they may be presented to the network at a

24 first area of one or more screens of display.

25          Do you see that?

Weissman - direct

1    A.    Yes, I do.

2    Q.    Did Dr. Schmidt essentially do the same thing he did

3    for the '967 patent on this claim?

4    A.    Yes.  For this patent and this claim element, he used

5    the same argument that he used in the '967 patent.

6    Q.    So, again, he said that the first area is generated

7    by the global container div which is part of the application

8    web page?

9    A.    Yes, he pointed to the entire web page basically

10   starting with the global div and satisfying the first

11   portion.

12   Q.    And so is Dr. Schmidt's analysis wrong for the same

13   reasons as you --

14   A.    For the same reasons.  It is not associated with an

15   area of the screen.

16            THE COURT:  Doctor, if you would wait until the

17   question is completed?  It will be easier for the court

18   reporter.

19            MR. HADDEN:  Sorry, Your Honor.

20   BY MR. HADDEN:

21   Q.    Let's look at the next element, Dr. Weissman.

22            What does step B require?

23   A.    Step B says:  formatting advertising for potential

24   use with a plurality of applications, through the network,

25   at a second area of one or more screens of display

1  concurrently with applications.

2  Q.    So what has Dr. Schmidt pointed to that Groupon does

3  to perform this claim step?

4  A.    So again he is pointing to a secondary, a portion of

5  the very same web page, the entire application.  In this

6  case, that contain deal images.  And for the same reason,

7  this is the secondary.  This is the application is the first

8  area, so there is no second area.

9  Q.    So is Dr. Schmidt pointing to some div tags within

10 the application web page?

11 A.    Yeah.  He is pointing again to a div tag within the

12 global div tag.  But, again, div tags were just used to

13 format web, web content.  They have no location.  They don't

14 point to any location on the screen or area on the screen.

15 Q.    So it even make sense to say that, that a second

16 portion of one or more screens of display is the application

17 is displayed on the first portion?

18 A.    No, it does not.

19 Q.    Did it make sense to say that the application

20 displayed in a second portion of the screen are the same

21 images that are of the application displayed in a first area

22 of the screen?

23 A.    No, it does not.  The images can't, are not part of

24 the first area and the second area.  That makes no sense.

25 Q.    And did Dr. Schmidt identify anything that refers to

1    this div tag that causes it to generate an area of the

2    screen?

3    A.      No.  As we said, div tags don't generate an area of

4    the screen but there is nothing even that refers to that div

5    tag.

6    Q.      So is Dr. Schmidt's mapping of this claim correct?

7    A.      In my opinion, it is not; and IBM has not met its

8    burden of proof with this claim step.

9    Q.      Do we have another lunch tray problem here?

10   A.      We have another lunch tray problem.  In this case,

11   before we needed applications and command functions to fit

12   into the different elements of our elementary school tray.

13   Now we need applications and advertising to fit in different

14   elements of our tray.  So, again, what is being pointed to

15   is an entire web page or an entire bunch of lunch, and that

16   does not give us a tray.  We don't have screen areas.

17   Q.      Is there another problem with Dr. Schmidt's mapping

18   that equates the same images with the application and

19   advertisements?

20   A.      Yes.  So what I am going to explain here is that

21   IBM, in the prosecution of his patent, in the back and forth

22   communications that you do at the Patent Office, made some

23   statements to try to get the patent awarded, to show how it

24   was novel and different.

25              So IBM made a statement in that back and forth

1  which I'll read.  It says:  The display screen of a

2  reception system is configured so that applications are

3  presented at a first part of the screen and advertising is

4  presented separately and concurrently at a second part of

5  the screen.

6              And this comports with, in my view, the claim

7  language, first area and second area.

8  Q.    Is this description of its invention that IBM made to

9  the Patent Office to get its patent consistent with what

10 Dr. Schmidt is saying in this case?

11 A.    Dr. Schmidt is saying that, you know, that the

12 application is potentially the first area and second area.

13 So it is not consistent.

14 Q.    Did Dr. Schmidt also say the application and the

15 advertising are the same content?

16 A.    Yes, he is pointing to the same content:  deal images

17 for both application content and also for advertising.

18 Q.    What else did IBM tell the Patent Office about this

19 patent to try to get it allowed?

20 A.    IBM as you can see here, in drawing a distinction

21 between the content, said that applications and advertising

22 are separate entities, and they travel separately to the

23 reception system.

24 Q.    And this separate treatment of advertising and

25 applications, was that an important part of the '849 meant?

Weissman - direct

1    A.      Yes.  So that was a real important part of Prodigy --

2    the '849 and the Prodigy system.  I mentioned with videotex,

3    things were really slow getting a screenful of information

4    at a time.  So the special treatment of advertising in which

5    only a small object or ad can be downloaded while the user

6    was doing other things was a way to eliminate distraction

7    and improve performance for Prodigy system.

8            So this idea that you could prefetch a little

9    bit, prefetch advertising while the user is doing other

10   things and not even using the network was really important

11   to the performance goals of the patent.  And that is what is

12   stated here.

13   Q.      So the application would be the application that the

14   user requested, and the advertisement would be the separate

15   things that were prefetched?  Is that --

16   A.      Yes, the application is what the user was really

17   wanting to do.  We saw Dr. Filepp talk about playing games

18   and things like that.  And the ads come in in this other

19   partition, and often the user, you want to have those, have

20   those there, particularly when they slowed the system down.

21   So these are separate.  As it says here, the intention here

22   was that these be separate.

23   Q.      Let me go to the next thing that IBM told the Patent

24   Office.  What did they say here?

25   A.      IBM is saying here, and I'll read the rejection.  The

1   Patent Office first rejected the claim on this claim.  And

2   then IBM replies:  The rejection is based on equating

3   applications and advertising, thus ignoring the distinction

4   underlying the entire invention (which is based on the

5   dichotomy of applications and advertising).

6           They're saying this is a special treatment.

7   These are different things, and the patent is supposed to be

8   about that.

9   Q.    And so IBM is saying that the distinction between

10  advertising and applications was the key to the invention;

11  right?

12  A.    That is effectively what has been said.

13  Q.    And that distinction is something that Dr. Schmidt is

14  ignoring in his analysis; is that correct?

15  A.    He doesn't appreciate this distinction.

16  Q.    So at this point, can IBM meet its burden of proving

17  that Groupon infringes this claim?

18  A.    No, it cannot.

19  Q.    Let's go to the last element which as construed

20  requires the pre-fetching of advertising objects.

21          I think you talked about this just a minute ago

22  about the separate treatment of advertising and they're

23  prefetched; is that right?

24  A.    Yes, I did.

25  Q.    Now, we see on this slide, Dr. Schmidt is referring

1  to caching; right?

2  A.    Well, to satisfy this claim step, what Dr. Schmidt is

3  pointing to is the web page that is downloaded and that web

4  page contains a number of images that will be stored locally

5  or cached.  And he is using that, and some of those images

6  are not yet visible because of what the user has decided to

7  view based on scrolling and the size of the browser window

8  and so forth.

9         So what Dr. Schmidt is doing is equating the

10 caching of objects with pre-fetching.  But that is not what

11 pre-fetching means.  Prefetching means having a system,

12 completely separate from any user request, go across the

13 network to fetch an object.  So it's, as in the patent, when

14 the user is doing other things that they are more interested

15 in, the system can go out to IBM servers and say give me the

16 next advertisement.

17        That is not what is happening here.  The content

18 has already been fetched.  It's sitting on the user's

19 machine.  When it gets viewed is strictly based on what the

20 user decides or when they, how they scroll.  So this is just

21 caching, not pre-fetching.

22 Q.    And does Groupon actually store these images on the

23 user's computer?

24 A.    Additionally, caching is a core property of the web

25 browser.  So, actually, Groupon is not practicing the

Weissman - direct

1    caching step.  It is the browser that is in control of

2    caching.

3    Q.      And is caching images a standard thing on the web?

4    A.      It's an important part of the web.  Its browsers are

5    equipped to do that.

6    Q.      So has Dr. Schmidt shown that Groupon selectively

7    stores advertising objects whose storage is established at

8    the reception system?

9    A.      No, he has not.

10   Q.      So in summary, Dr. Schmidt's analysis of Groupon's

11   website, has IBM met its burden of proving that Groupon

12   performs each of these steps?

13   A.      No, they have not.  IBM has not met its burden of

14   proof in, as we talked about before, performing any of the

15   method steps that are highlighted in red and therefore

16   cannot infringe claim 1 of the '849.

17   Q.      So let's talk now about Dr. Schmidt's analysis of

18   Groupon's mobile website and mobile apps.  Does Dr. Schmidt

19   establish that Groupon's mobile apps and mobile website

20   generate the required first and second areas?

21   A.      No, he does not.  As we see here, again he is boxing

22   the entire web page -- the entire, excuse me, the entire

23   screen, entire application with a single large red box, and

24   that is the first area.  But then the second area is just

25   within that same application in the blue box.

Weissman - direct

1  Q.      So he is again saying that basically all the

2  information that is in the application is also the

3  advertisements in the second area?

4  A.      That is correct.  So the application contains these

5  deal images, so everything is in the first area.

6  Q.      And to be clear, Groupon doesn't generate these red

7  boxes, does it?

8  A.      It does not.  The boxes have been drawn after the

9  fact.

10  Q.      In fact, what Groupon provides would extend far

11  beyond this screen; right?

12  A.      Presumably, there is more content in this web page

13  that is not seen, yes.

14  Q.      And on the mobile apps, I think we saw Mr. Dunham, he

15  can keep scrolling essentially forever?

16  A.      Yes, there is what is called infinite scroll.  You

17  can keep looking at more and more content.

18  Q.      So that is not an area of the screen that is

19  generated by Groupon, is it?

20  A.      It is not.  It is really up to the users and the

21  browser -- I'm sorry, how the user interacted with this

22  mobile device --

23  Q.      Again --

24  A.      -- in scrolling.

25  Q.      -- Dr. Schmidt is equating the applications with the

Weissman - direct

1   advertisements which IBM said they had told the Patent

2   Office you couldn't do?

3   A.      Right.  In this first area showing the large red box,

4   he is pointing to deal images, so evidently they're part of

5   the application, and somehow additionally they're also part

6   of the first area and also part of the second area.  So

7   there is a distinction between application and so-called

8   ads.

9   Q.      Is this logically consistent in your view?

10  A.      It is not consistent.

11  Q.      Do we have the same food tray problem here we had on

12  the website?

13  A.      We do have the same food tray issue.

14  Q.      So has IBM met its burden of proving that Groupon's

15  website, mobile applications perform the steps of claim 1 of

16  the '849 patent?

17  A.      It has not met its burden, as required.

18  Q.      Let's talk about the last element.

19          Now, in this slide, Dr. Schmidt is pointing to

20  this URL and this item in the header.  Can you explain what

21  these are?

22  A.      Yes.  So what is being shown here, on the right panel

23  and boxed in red, is a request URL.  And this is for a

24  particular resource, particular item.  And that is, for

25  example, maybe one of the deal images shown on the left.

1  Q.      And this blue, what is this?

2  A.      So the response to that request is shown in the kind

3  of larger gray box on the bottom.  So this is the response

4  to that request for that URL.  And it is showing a number of

5  headers, and the one that is boxed is a cache control header.

6  Q.      So Dr. Schmidt is pointing to the same ability to

7  cache the images here as meeting this requirement of the

8  claim?

9  A.      Yes, he is.

10 Q.      In fact, he says on the slide, right?, the

11 differences between Groupon's selectively storing

12 advertising objects for its mobile web spite and mobile apps

13 and for its desktop website do not affect infringement of

14 the '849 patent.

15         Do you see that?

16 A.      Yes, I do.

17 Q.      Is he essentially acknowledging that if this theory,

18 the website fails, this theory fails, too?

19 A.      Yes, he does.

20 Q.      So in sum, for Groupon's mobile website and mobile

21 applications, has IBM met its burden of proving

22 infringement?

23 A.      No, it has not.

24 Q.      Now, there is another claim, claim 8, which is kind

25 of different than the others.  It has some different

Weissman - direct

1    requirements.  Can you just kind of give us a high level

2    understanding what claim 8 is?

3    A.      Yes.  So claim 8 has a couple of things.  It has

4    establishing characterization for users based on compiled

5    data; so information about a user, a header for example; and

6    then structuring advertising so it can be supplied to or

7    stored at the reception system for presentation to users in

8    accordance with those characterizations.  So this is some

9    kind of specialization of information.

10          And so the Court goes on to say:  wherein

11   structuring advertising supplying to the reception system

12   and storing a predetermined amount of the advertising data

13   in a storage system at the respective reception systems.

14          So this is talking about caching information.

15   Q.    This is talking about the storing of the

16   advertisements at the user's computer so they can be

17   displayed on the different Prodigy pages?

18   A.      Yes, it is referring to storing information locally

19   so that if it's needed again, it can be brought up and

20   shown.

21   Q.    And is the idea of targeting advertisements in a

22   videotex system something that Mr. Filepp or Prodigy

23   invented?

24   A.      No, they're not new in the patent.  As I mentioned,

25   videotex kind grew out of this online advertising.  It's a

Weissman - direct

1  pretty important driver to monetize these new systems.  So

2  this Alber reference, which is prior art, 1985, describes

3  that one of the motivations for videotex would be the

4  service provider can perform detailed analysis to the

5  consumers so they characterize consumers buying habits and

6  interests.  This information can then be used to further

7  target advertisements.  So not only advertising but actually

8  targeting it based on characterizations.

9  Q.     And has Dr. Schmidt shown that Groupon performs this

10  step?

11  A.     No, he has not, for a number of reasons.  One is what

12  is being pointed to here is caching, and caching is not --

13  caching is done by the system, it is not under Groupon's

14  control.

15  Q.     Are the deal images advertisements?

16  A.     The deal images were pointed to as meeting the first

17  area as to the entire application, so deal images, part of

18  the first area, part of it is the application, so if you're

19  not part of the second area, then you're not advertisements.

20  Q.     So has Dr. Schmidt carried IBM's burden of proof that

21  Groupon performs this step of the claim?

22  A.     No, he did not.

23  Q.     So, as overall with respect to claim 8, has IBM and

24  Dr. Schmidt met their burden of proving infringement?

25  A.     No, they have not.

Weissman - direct

1   Q.      What's your overall conclusion with respect to

2   infringement of the two Prodigy patents?

3   A.      My conclusion is IBM has not met its burden of

4   infringement for either the asserted claims in the '967 and

5   the '849 patent.

6   Q.      Let's talk about the next --

7           THE COURT:  Before we move on, I'm going to give

8   the jury a break.  No talking about the case and we'll be

9   back here in a little bit.

10          (Jury exited the courtroom at 2:40 p.m.)

11          THE COURT:  All right.  We'll be in recess.

12          (A brief recess was taken.)

13          THE COURT:  Bring the jury back in.

14          (Jury entering the courtroom at 3:08 p.m.)

15          THE COURT:  Welcome back.  We're now ready to

16  move to next patent.

17          Mr. Hadden, you may continue.

18          MR. HADDEN:  Thank you, Your Honor.

19  BY MR. HADDEN:

20  Q.      Dr. Weissman, before the break we were just starting

21  to talk about the '601 patent.  Can you at a high level just

22  kind of introduce us to what the '601 patent is all about?

23  A.      Yes.  At a high level the '601 patent refers to a

24  problem that's common in communicating with systems, open

25  networks, for example, the web which was stateless, which

 1    means that the web server doesn't remember the next request,

 2    even from the same user.

 3             And so for many applications for the web, there

 4    is a need to actually find a way to preserve state in spite

 5    of the stateless protocol to enable a conversation to

 6    continue for certain applications.

 7    Q.      And you were here for Mr. Davis's testimony, were

 8    you?

 9    A.      Yes, I was.

10    Q.      And was this the same kind of issue that he faced at

11    Amazon.com?

12    A.      Yes, this was exactly the problem that Amazon was

13    facing.

14    Q.      And does the '601 patent describe a way to work

15    around that property of the worldwide web?

16    A.      The '601 provides one way of doing it, yes.

17    Q.      And kind of at a high level, can you explain what

18    that way is?

19    A.      Sure.  So at a high level, the conversation between a

20    web client, a user and a browser and a web server is really

21    a sequence of requests and responses back and forth as

22    you're getting hyperlink going back and forth.  So one way

23    to -- and remember each request shows up at the server with

24    a brand-new connection the server doesn't remember.  So one

25    way to keep that dialogue going is to embed in each URL,

1  each next sort of request to the server, add some extra

2  information.  And Paul Davis referred to that as a session,

3  which is a unique identifier which uniquely identifies you

4  interacting with that website.

5          If I interact with that website, I get my own

6  unique identifier just by putting that little bit of extra

7  information in an URL, we can preserve state.

8  Q.    In the patent, does it talk about session ID as an

9  example of state information?

10  A.    Yeah the example that the patent describes in the

11  specification is session ID, client ID, things that uniquely

12  identify the conversation.  And this follows the

13  construction of the Court which is state information is

14  information about a conversation between a client and a

15  server.  This is information that tells you about the

16  conversation, who is in this conversation, what is unique

17  about this conversation.

18  Q.    And does the '601 patent ever describe items that a

19  user may put in their shopping cart as state information?

20  A.    It never refer to resources or items or web pages

21  themselves as state information.

22  Q.    I think we saw a video clip of the inventor,

23  Mr. Iyengar, Dr. Iyengar earlier talking about cookies as

24  being an alternative.  Is that what the patent says, too?

25  A.    The patent does describe alternatives.  One of the

Weissman - direct

1    alternatives that is mentioned is cookies.

2    Q.       Were cookies prior art to this patent?

3    A.       Cookies were prior art.  They developed as part of

4    Netscape early web technology and they were kind of

5    well-known in the art.

6    Q.       Just to go back and kind of illustrate what happens

7    on the web, can you explain what this example, what's going

8    on?

9    A.       Yes.  So the user has visited a particular website.

10   This is Enjoy Wilmington, the user may request for that page

11   across the network for the web server and that page is

12   returned and that's what we're seeing on the screen.  The

13   server forgot, it doesn't keep track of who it's talking to,

14   the server forgot that information.  So now what the user

15   decides to do on this particular page is click a hyperlink.

16   This is a new request made to the server.  So that's what

17   the user is about to do.  And this is request for a web, a

18   resource web page, Parking in Wilmington.

19   Q.       So the user clicked on this link, Parking in

20   Wilmington; is that right?

21   A.       The user is going to click on that link, yes.

22   Q.       What the user clicks on this link, is this the

23   request that gets sent to the web server?

24   A.       That is potentially the request that goes to the web

25   server, and the web server will service that request, but

1  the web server has no way of knowing that this was the user

2  that just visited Wilmington, it just shows up as an

3  independent request.

4  Q.      Is part of this request that gets sent to the server

5  the URL?

6  A.      This is the URL.  This is a request for particular

7  resource.  This is not state information, this is a request

8  for a particular page or a particular resource.

9  Q.      If we look at the end of this, it has Parking in

10  Wilmington.  Do you see that?

11  A.      Yes, I do.

12  Q.      Is that state information?

13  A.      That's not state information, that's a URL.  It's

14  part of a resource that the URL is pointing to.  This is

15  essentially the web page that the user is requesting.

16  Q.      That information, they're just telling the web server

17  that the user wants to see the page for Parking in

18  Wilmington?

19  A.      Yeah, that is just a way of describing, naming the

20  resource that the user is looking for, which is that

21  particular page, Parking in Wilmington.

22  Q.      And does this information, Parking in Wilmington,

23  depend on anything else the user has done up to that point

24  in the Wilmington website?

25  A.      Right.  As we described, the web protocol has no

1    memory, it's memory less, the prior request which was

2    presumably for this Enjoy Wilmington page that we're seeing

3    in front of us is not at all concerned with this next

4    request even though the user is clicking on that same page,

5    the web design state was for a variety of reasons, so a

6    brand new connection is made to the web server and it had no

7    association between Parking in Wilmington and Enjoying

8    Wilmington.

9    Q.      So if any user came -- go back.  Any user came to the

10   Wilmington website and clicked Parking in Wilmington, would

11   this same request get sent to the web server?

12   A.      Absolutely.  This is just a URL.  Anybody can type

13   that same URL in the browser window and they would go to the

14   same page.

15   Q.      And when the user sends this to the server, what

16   happens?

17   A.      The server gets that request in HTTP and serves that

18   request by returning the content of that page to the user's

19   browser and that's what we're showing here.  This is the

20   Parking in Wilmington page.

21   Q.      And what we see up here in the browser window, how

22   does that relate to the request that led to this page?

23   A.      What we're seeing in the browser window is a request

24   for this particular web resource or web page, and you can

25   see the URL in the top window, and that has come -- been

Weissman - direct

1   delivered to the web browser and that contains the content

2   you see shown here.

3   Q.     So this URL, including the Parking in Wilmington,

4   that's basically just an identifier of this web page?

5   A.     Yeah, it's a way to name the web page.  It's a way to

6   basically, you know, if we give a web page a name, it gives

7   me that, it's a way to identify the page.

8   Q.     And putting the name or some identifiers of the web

9   page in the URL, is that just the way the web works?

10  A.     That's just how to name a web page.  That's just the

11  way the web is.  That's a definition of stateless protocol.

12  Q.     If we want to maintain state and we want to use

13  cookies, how would that work?

14  A.     Okay.  So now what we want is when we send a request,

15  we want to be able to track information that's -- that

16  uniquely identifies the user or the browser at this

17  computer.  And so we -- and we want the server to remember

18  that for the next request, that was the point of what we're

19  trying to do is have the server have a memory of who they're

20  dialoguing with.

21              And so what a cookie is is that when the request

22  is sent over to the server, in the case of Groupon, this is

23  how Groupon works, the server is going to generate a unique

24  session identifier, something that uniquely identifies that

25  I'm the one in this interaction with Groupon.  If you were

1   to go to Groupon, you would get your own session as well.

2   So that is generated and it's put in something called a

3   cookie which contains that unique session ID and other

4   information.  When the request is sent back, when the

5   response is sent back to the browser and you display the web

6   content, the cookie travels with it, and the browser is

7   going to store that cookie locally on the client machine.

8           And the purpose of that is so at this moment in

9   time, Groupon or the server knows about all the session IDs

10  it generated, now that the client knows.  So when the client

11  makes another request, a next request to the web server, the

12  web browser attaches the cookie back to that request and so

13  the server can match up the session ID and say ah-ha, I was

14  talking to you just a moment ago, and that's the way the

15  conversation, information about the conversation can be

16  passed back and forth in this little bit of information

17  called cookie.

18  Q.      What can the web server do knowing who it's talking

19  to that it couldn't do without cookies or some alternative?

20  A.      So now what the web server is going to do is build an

21  association between session ID and individual customers.

22  So, for example, associating them with shopping carts, for

23  example.  So then a request comes in from session ID 10-8,

24  the server can immediately know this is John I have been

25  talking to and here is the shopping cart.  Here is Bill, the

Weissman - direct

1    person I have been talking to and here is his shopping cart.

2             All I do is pass this unique identifier with

3    this request and the server associates that with the

4    individual party they're speaking with.  This is a very

5    simple way to track information about the conversation.

6    Q.      So is the session ID essentially in this instance a

7    way to identify what browser the server is talking to?

8    A.      Essentially identifies the browser, the user at that

9    particular browser.

10   Q.      Now, if we go to the claim and start walking through

11   this, what does the first step require?

12   A.      The first step of claim 51 requires receiving a

13   service request including state information versus the

14   stateless protocol.

15   Q.      And we had the Court's construction of state

16   information here.  Do you see that?

17   A.      Yes, I do.

18   Q.      Did you apply that construction in your analysis?

19   A.      Yes, I did.

20   Q.      Is that construction consistent with your

21   understanding in the field of what state information is?

22   A.      That is my understanding of the meaning of that term

23   and in particular in the claim stated in the patent, the way

24   the patent works.

25   Q.      And if we look at element A, it says receiving a

1   service request including state information; right?

2   A.    Yes.

3   Q.    So is this just any web request, or does it have to

4   be a special web request?

5   A.    Well, this is talking about receiving a service

6   request, which we're in the context of the web, so that's a

7   request for a web document or a web resource, but it also

8   must include state information as an additional requirement.

9   Q.    If we look at how Dr. Schmidt mapped this claim, and

10  this is -- there is a lot going on in this slide so we may

11  have to break it up a little bit.  But if we focus on state

12  information which is the requirement he has highlighted in

13  yellow and underlined, and I'm not sure the jury will have

14  any chance of seeing this, but we'll blow it up.  What is he

15  pointing to in this request as being the state information?

16  A.    The user has clicked this piece of jewelry, and so

17  they're expressing an interest in this.  So in the box which

18  you start to see underlined in red and yellow highlighted is

19  the URL that is associated with that resource with that page

20  that's been requested.  And so what is being highlighted

21  there is a portion of that URL, so this is akin to the

22  Wilmington home page or the Wilmington parking page, it's

23  just part of the URL.

24  Q.    If we just kind of show this in a larger screen, is

25  this where Dr. Schmidt starts with the sending of the

1   request?

2   A.      Yeah, the user is starting with this screen which I

3   guess is -- I can't really tell you what screen it is.  It's

4   goods.  And the user is going to click on this pendant, I

5   think.

6   Q.      If the user comes to the goods page at Groupon and

7   clicks on this particular pendant, is this the request that

8   will be sent to the web server?

9   A.      So by clicking on that pendant, the user is

10  essentially saying give me that web resource, give me that

11  page, I want to see that.  By clicking on the URL

12  corresponding to that web page of that resource, it is sent

13  an HTTP request, a web protocol to the Groupon server.

14  Q.      The part of this URL that Dr. Schmidt said was state

15  information, was this part of the GG, collection custom My

16  Three Treasures; right?

17  A.      It's identifying a particular deal of the many deals

18  that are there.

19  Q.      Isn't this what Dr. Schmidt pointed to the slide as

20  being --

21  A.      Dr. Schmidt is pointing to that one part of the URL

22  which is effectively the web page.

23  Q.      And if any user came to the Groupon Goods page and

24  clicked on that picture of the necklace to get more

25  information on it, would this same request be sent?

Weissman - direct

1    A.      Yeah.  If any user clicked -- visited this page and

2    then clicked on this pendant, the identical web request

3    would be generated.

4    Q.      So nothing in this request that Dr. Schmidt pointed

5    to would depend on who that user was?

6    A.      This is not information about a conversation.  This

7    is a request for this particular web resource.

8    Q.      Does anything in this portion of the URL that

9    Dr. Schmidt pointed to depend on what the user had done

10   previously on Groupon's website?

11   A.      No, it does not.  Anybody can pick up this URL, type

12   it in their address bar, and they will get the exact same

13   page back.  So it clearly doesn't depend on anything any

14   user did before.

15   Q.      So is this information about a conversation between

16   the user, the server, and the client?

17   A.      No, it is not information about a conversation.

18   Q.      And I think you made this point already.  But is this

19   just the same as the Wilmington Parking Garage?

20   A.      It is the same as the Wilmington Parking Garage.

21   Q.      This is just identify what web page the user wants to

22   see next?

23   A.      Exactly.  Any user can do this, and it doesn't depend

24   on anything the user did before.

25   Q.      So at this point in the interaction between the

1    user's client and Groupon, are we still in a stateless

2    protocol?

3    A.      We are still running a stateless protocol.

4    Q.      So when the page comes back, we get to this page.

5    That's the next page that Dr. Schmidt points to in his

6    analysis?

7    A.      Yes, that's correct.

8    Q.      Okay.  And this, if we look, and I don't know if it

9    is possible to see, but again in the browser window, what we

10   see is the same URL that we saw on the link; right?

11   A.      Yes, it will show up in the address window as that

12   URL you requested.

13   Q.      So that is just like in the Wilmington Parking Garage

14   example?

15   A.      Same thing.

16   Q.      So to start with, has Dr. Schmidt proven that this

17   information in that request is state information?

18   A.      No, he has not.  This is not information about a

19   conversation between a client and a server.

20   Q.      So has Dr. Schmidt shown that IBM can meet its burden

21   with respect to this element of the claim?

22   A.      No, he has not.

23   Q.      Let's go back to our claim.  If we look at the next

24   element:  identifying all continuations in an output from

25   said service.

1        You see the Court has construed this term,

2   "continuations."  Can you explain what that means in the

3   Court's construction?

4   A.    Yes, so "continuations" is given a very specific

5   meaning.  It is:  a new request which a client may send to a

6   server, such as, for example, a hyperlink.

7        So this is clicking a link and making the next

8   request on a page.

9   Q.    If you look at these two elements or steps, rather,

10  together, we have "receiving a service request" and we have

11  "an output from said service."

12       Can you explain to the jury how those have to be

13  related?

14  A.    Yes.  So this is "at" language.  So in method step B,

15  it refers to said service.  What that means is earlier in

16  the claim, you must look for a service to which this is

17  associated.  So we find that in step A.  That is, the

18  service request that is receiving the state information.

19  That corresponds to the "said service" in step B.  So the

20  same service that is requested by the server, particularly

21  Wilmington parking information, what have you, that is the

22  request.  And "output from said service," that is the

23  service we're talking about.

24  Q.    So in step B, Groupon does things like identifying

25  continuations in an output.  The output has to be the output

Weissman - direct

1  from the service that requested step A; is that right?

2  A.    That is correct.  That is required.

3  Q.    Let's look at how -- let's see.  So if the request

4  that Dr. Schmidt starts with is a request for the detail

5  page on the necklace, what is the output from that requested

6  service?

7  A.    It is what the user sees.

8  Q.    So it's this page?

9  A.    It's a response.

10  Q.    Now, in fact, did Dr. Schmidt agree with this in his

11  deposition?

12  A.    So he is asked whether he agreed that the service is

13  identified or what a user can request, like to look at a

14  local deal; isn't that right?

15        And at the bottom, I won't read it all, he says:

16  So that's the service that they're requesting.

17        So he is agreeing.

18  Q.    So when a user request's a deal like the necklace or

19  pizza, and they get the page back, Dr. Schmidt is agreeing

20  that is the service and the output that they're looking for;

21  right?

22  A.    Yes, he is.  And I'm in full agreement with DWR

23  Schmidt.

24  Q.    You agree with that?

25  A.    I do.

Weissman - direct

1    Q.      But now we go to Dr. Schmidt's analysis of this

2    claim.   Is that what he identifies as the output from said

3    service?

4    A.      No, it is not.  So now Dr. Schmidt is pointing to

5    another service, the layout service as meeting the claim

6    step of an output from said service.  So now we introduced a

7    second service which is not what the user requested which is

8    improper mapping.

9    Q.      And is the output from the layout service the web

10   page that the user requested?

11   A.      No, it is not.

12   Q.      Now, if we go to this diagram, series of diagrams

13   from Dr. Schmidt's report, what, in the context of this

14   Groupon diagram, what would be the service that the user

15   requests when they click on that link to the necklace?

16   A.      Yeah.  So it's a mouthful, so let me walk you

17   through.

18   Q.      Yes, walk us through.

19   A.      Sure.  So we have the user sitting there at the

20   terminal.  And they are requesting Groupon.com, so that is

21   the home page.  And so that is the request that is being

22   made.  And it gets passed through a router to identify the

23   application and that is going to actually produce that home

24   page.

25               So that that is that Homepage ITA shown in the

1    middle.  And the job of the Homepage ITA application is to

2    effectively service as that request and return the output,

3    return the response corresponding to that.

4             In doing that, we heard the term "service

5    oriented architecture" earlier in the trial.  The Homepage

6    ITA does use some other services to help it with various

7    aspects, so it calls various so-called backend services to

8    help with that process.

9             One of those services is a layout service which

10   is a fairly generic service that is used by many different

11   applications to help format a web page that ultimately comes

12   back.

13   Q.    Okay.  So is the request for that necklace going to

14   these backend services?

15   A.    It is not.  The request goes to the ITA or Homepage

16   ITA or the Dealpage ITA if a deal is being requested.  And

17   that request is not passed to the backend services.  It is

18   simply that the Homepage ITA application will ask those

19   services to provide some bill of health, maybe some little

20   bit of HTML or something that would help constructing an

21   entire response going back.

22   Q.    So is this mustache template that Dr. Schmidt

23   identified, is that the output from the service request in

24   the first step of the claim?

25   A.    No, it can't be a mustache template.  It is just a

1    template, and it is not the output that goes back at all to

2    the client.

3    Q.     And I know this diagram says Homepage ITA.  Is there

4    a corresponding Dealpage ITA that would provide the output

5    that requests the necklace?

6    A.     Yes, there is any number of these sort of I Tier

7    Applications that Mr. Dunham spoke about that.  Remember,

8    this is a request for Groupon.com, so this would be the

9    Homepage ITA.  If you are looking for the necklace, you are

10   going to go to a Dealpage ITA, so on and so forth.  So there

11   is a number of these I Tier services, and many share the

12   backend services because they do kind of generic things.

13   Q.     So if we can just kind of look at this diagram.  What

14   are you showing here?

15   A.     What I'm showing here is that the output from said

16   service, the said service is the Homepage ITA.  That is what

17   www.groupon.com is being destined for.  That is going to

18   build the response for that resource and return that.  That

19   is the output from said service.

20   Q.     And in the case of the request for a deal, would this

21   be the Dealpage ITA?

22   A.     That would be a different ITA.  That would be the

23   Dealpage ITA, if it is a request for a deal.

24   Q.     And the output from that it shows here as HTML;

25   right?

1    A.      Correct.  That is the response is the HTML page that

2    comes back from the user and we render on the browser.

3    Q.      And the same thing for the Dealpage ITA, the result

4    would be the page with the details on the necklace?

5    A.      Yeah.  You get the page that corresponds to that

6    particular deal.  That would come back from the Dealpage

7    ITA.

8    Q.      So is Dr. Schmidt's analysis of this element and

9    mapping to the output of the requested service correct?

10   A.      It is not.

11   Q.      In addition, once we find the output of the service,

12   this claim requires identifying all continuations; is that

13   right?

14   A.      That is correct.  And, remember, continuations, we

15   refer to new requests that the client can issue to the

16   server.

17   Q.      Now, Dr. Schmidt said that the output from the

18   services is this little box here.  Do you recall that?

19   A.      Yes, I do.

20   Q.      And that is not correct, is it?

21   A.      That is not correct.  As we just spoke about, the

22   output from the service that is requested is the entirety of

23   the web page, not a small little box piece of outlook page.

24   Q.      As we heard from Mr. Dunham, this little box doesn't

25   come from the layout service?

Weissman - direct

1   A.      That is what Mr. Dunham testified to, yes.

2   Q.      But even if that little box did come from the layout

3   service, contrary to what Mr. Dunham said, does Groupon

4   identify all continuations in that little box?

5   A.      So he does it in two ways.  One is as I just

6   described, if one were to look at the output that comes

7   back, there are, you know, a number of hyperlinks which are

8   not at all identified.  He is just focusing on the box in

9   red.

10           Additionally, identifying the identifying step,

11  Dr. Schmidt is pointing to the processing of the mustache

12  template.  As we highlighted in yellow, that is looking for

13  placeholders and replacing them with values.  But the claims

14  require identifying continuations, that is identifying

15  hyperlinks.  Mustache template processing is just doing a

16  string replacement, and it is not, it is not identify HREF.

17  Even though HREF is highlighted there, it is just looking

18  for stuff inside of those funny curly braces.

19  Q.      Let's take out the D step.

20           If the service requested was the necklace page,

21  is this the output from that service?

22  A.      That is the output portion of it.

23  Q.      Yes.  And did Dr. Schmidt show anywhere where Groupon

24  identifies all the continuations in this?

25  A.      No, he did not.  He just focused on the buy -- the

1    hyperlink associated with the buy button.

2    Q.      And did Dr. Schmidt provide any evidence that

3    Groupon embeds any state information in all these other

4    continuations on the output?

5    A.      He did not provide any evidence of that here.

6    Q.      So if we go to the second point you are making I

7    think about the templates.  When this said URL, is this

8    actually a continuation?

9    A.      So the word "URL" there is just, it's embedded in the

10   string.  It can be whatever you want it to be.  What makes

11   that a continuation potentially is the HREF, hypertext

12   reference.

13          The mustache template is not looking for HREFs,

14   it is looking for things inside the curly braces.  So any

15   number of templates in this mustache templates in this

16   example.  So the word "URL" doesn't mean anything special.

17   It's just a variable that gets replaced.

18   Q.      If we go back to our claim.  We have another part of

19   this element B.  Can you explain what this describing?

20   A.      Yes.  So this requires identifying all continuations

21   in an output that is identifying all the hyperlinks,

22   hypertext links in an output of said service and then

23   recursively embedding the state information in all

24   identified continuations, in response to said request.

25   Q.      And the Court has construed the recursively embedding

1   step; right?

2   A.      Yes, they have.  And to explain what that means is so

3   you have identified the continuation, for example, URL.  And

4   this requires that you modify the URL, you change it to

5   include that state information.

6   Q.      If we can go back to what Dr Schmidt points to for

7   this step, which is this is from his slide.  What is he

8   showing here?

9   A.      What Dr. Schmidt is showing in this example is that

10  the replacement that is being done for that particular

11  hyperlink is the URL shown in the box below.  And, in fact,

12  the URL is not being modified at all.  We have the URL in

13  the box below.  It's just being asserted into that HREF.  So

14  there is no modification of the URL.  We're not changing

15  the name or any of the pieces of the URL.  We're just

16  substituting a variable for a full URL path.

17  Q.      And Dr. Schmidt underlines some pieces of this URL in

18  red.  Do those pieces get added or embedded as part of this

19  processing?

20  A.      They do not.  They're not embedded, and there is no

21  modification of the URL.  We just take that entirety of what

22  you see in the second yellow box and just pushed into and

23  replaces that variable called an URL.  So they're not

24  modifying anything.

25  Q.      Thank you.  And did Dr. Schmidt identify code that

Weissman - direct

1    would modify this URL?

2    A.      He had simply identified the code that built an URL

3    and referred to the mustache template replacement, but he

4    didn't show any code that actually modified the URL.

5    Q.      So has Dr. Schmidt carried IBM's burden of proof with

6    respect to this step of the claim?

7    A.      He has not.

8    Q.      Now, if we go back to step B, just to summarize.

9            Has IBM met its burden of proving that Groupon

10   performs this step of the claim?

11   A.      No, it has not.

12   Q.      And just to kind of go through, it seems like there

13   are a lot of things wrong here.  Did Dr. Schmidt and IBM

14   identify the correct output from said service?

15   A.      No.  As I described earlier, I described earlier the

16   output he's pointing to is not from the service that's been

17   requested that was providing state information step A, it's

18   some other service that's being used on the backend to help

19   with the processing.

20   Q.      Did Dr. Schmidt identify or show that Groupon

21   identified all continuations in the correct output from said

22   service?

23   A.      No.  All that Dr. Schmidt focused on was one small

24   piece of an output, there were many other continuations,

25   many other items throughout the page that were not

Weissman - direct

1    identified.

2    Q.     Did Dr. Schmidt show that Groupon modified all of the

3    continuations in the correct output?

4    A.     No, there was no continuations modified.  It was

5    simply built a URL that was substituted into a variable.

6    See the URL itself was never modified.

7    Q.     Did Dr. Schmidt identify modifying any continuations?

8    A.     No, he did not.

9    Q.     Let's go to the last element here.  Can you explain

10   what this wherein clause requires and how it fits with the

11   Court's constructions?

12   A.     Yes.  So step C says communicating a response

13   including the continuations and embedded state, wherein the

14   continuations enable another service request and one of the

15   continuations must be invoked to continue the conversation.

16   This means that what is being mapped to the continuations,

17   that is the only way one can continue this conversation.

18   Q.     And has Dr. Schmidt shown that this requirement is

19   met?

20   A.     No, he has not.  So you recall, he is simply pointing

21   to go he buy button as satisfying this step.  There are many

22   ways to continue the conversation.  There are many other

23   hyperlinks that we referred to earlier throughout this page.

24   There are many ways to continue the conversation.  Now, they

25   may not have embedded state, but they continue the

Weissman - direct

1    conversation with the server.

2    Q.      So in sum, with respect to Groupon's website and

3    mobile website, has Dr. Schmidt carried IBM's burden to show

4    that Groupon perform all these steps?

5    A.      No, he has not.

6    Q.      Has he shown that Groupon performs any of these

7    steps?

8    A.      No, he has not.

9    Q.      Let's go to -- let's talk now about Dr. Schmidt's

10   analysis of Groupon's mobile application.

11           What does Dr. Schmidt say is the request that

12   includes state information in its mapping to the mobile

13   application?

14   A.      So, he's pointing at a fairly hard to read URL, and

15   he's underlining various aspects of that URL, including a

16   deal ID as satisfying the requirement of state information.

17   Q.      And are these things that Dr. Schmidt is underlying

18   state information under the Court's construction?

19   A.      No, the Court's construction is state information

20   about a conversation, these are just parts of the URL, these

21   are just requests for a specific deal or deal option.

22   Q.      Is this basically the same issue that Dr. Schmidt got

23   wrong in his analysis of the website and using clicks on the

24   necklace?

25   A.      It's the same argument.

1    Q.      So has Dr. Schmidt carried his burden of showing that

2    Groupon performs the receiving step with respect to its

3    mobile applications?

4    A.      No, he has not.

5    Q.      So let's look at the next step, the identifying step.

6    This one looks different than the website?

7    A.      Yes, it does.

8    Q.      Can you explain what's going on in Dr. Schmidt's

9    diagram and what he says is the identifying?

10   A.      So, what's different from the mobile applications is

11   they return JSON which is a data format which contains some

12   information which is going to be processed by the client.

13   What Dr. Schmidt is pointing to is various options that may

14   be selectable by the user as satisfying this element.

15   Q.      If we go to the next step or the next portion of that

16   step of the claim, this is the recursively embedding; right?

17   A.      Yes.

18   Q.      So has Dr. Schmidt shown that Groupon modifies those

19   identified continuations in his analysis of the mobile app?

20   A.      No, he does not.

21   Q.      Can you explain what he's pointing to and why it

22   doesn't show that?

23   A.      There are a couple of problems.  One is if you look

24   in the JSON code, it's a little hard to see.  For example,

25   one of the pieces of so-called state information, the GA,

1    the part, the Farm Kitchen is already contained in the buy

2    URL that is contained in each of those JSON responses, that

3    is a modified URL that has no embedding there.

4              The other thing that is being shown is a deal

5    option ID.  But this was not -- so we have to embed into

6    these URLs state that was provided with the original

7    request.  So there is no deal option ID provided with the

8    original request.  This is simply added modified locally at

9    the mobile devices, it's not part of the original request,

10   it's not state information.

11   Q.    Let me put this in a little more context.

12   Dr. Schmidt is saying here that this embedding happens on

13   the user's device; is that right?

14   A.    That's correct.

15   Q.    Is that what he said in the website mapping?

16   A.    Yes.

17   Q.    Let me ask a better question.  Where did Dr. Schmidt

18   say the embedding took place when he was analyzing the

19   website?

20   A.    On the website, the embedding step was Dr. Schmidt

21   said that it occurs on the Groupon server.  And now

22   Dr. Schmidt for the mobile apps, it's occurring on the

23   mobile apps itself.

24   Q.    And when the client receives continuations shown here

25   before the modifying step, do they already include these

1  pledge IDs?

2  A.    Yes, they do.

3  Q.    So is it correct when Dr. Schmidt says that these are

4  modified to embed this information?

5  A.    In URL it's hard to see in JSON box, already contain

6  deal -- the pledge IDs, so you can't point to that as

7  embedding state as the next step, it's already in the URLs.

8  Q.    We're just showing that here.  So I guess this goes

9  to your first point, that what he's pointing to is not the

10  information that was in the request to service; is that

11  right?

12  A.    Yes.  If you remember back in step A, the initial

13  request that the user sends for a deal, for example,

14  includes state information, and that's the state information

15  that gets me passed essentially the step B to do the

16  embedding.  He's pointing to state, alleged states that

17  never passed with the request.

18  Q.    And I guess the next issue is that these were not

19  actually modified; is that right?

20  A.    That's correct.  The embedding step requires

21  modification of the URLs.

22  Q.    And finally, Dr. Schmidt pointed to this as opposed

23  to these as an example of a modified continuations.  Why is

24  that not right?

25  A.    Well, this is -- in order for it to modify URLs,

Weissman - direct

modify the continuations, you would have to put state in all

of those continuations.  And there is not -- you can take a

pledge ID, that's not putting all possible continuations.

Q.      Now, did Dr. Schmidt agree in his deposition that the

state information is already in the modified continuations?

A.      Yeah, he's asked the question, where does the code

modify all identifications to include state information and

what is the state information that gets included.  And he

says, so the state information is the state information

which is information that's encoded in the original

unmodified continuation.

Q.      Isn't that acknowledging that the precursor embedding

step are not being performed?

A.      The embedding step requires modification of the URL.

What he is saying is it's already in the modified

continuation.

Q.      With respect to the mobile apps, has IBM carried its

burden to prove that Groupon performs the modified all

continuations step?

A.      No, it has not.

Q.      Let's look at that time last step.  We're

highlighting some different language here.  Can you explain

what the requirement of step C is here?

A.      Yeah.  So step C requires as a final step,

communicating a response, this is a response that turns up

Weissman - direct

1    after the request.  This includes continuations and

2    embedding state information.  And we see in this clause

3    before, wherein the continuations enable another service

4    request and one of the continuations must be invoked to

5    continue the conversation, this is the communicating a

6    response.

7    Q.    Just to be clear, at this point in the claim,

8    according to Dr. Schmidt's analysis, everything is already

9    on the user's device; is that right?

10    A.    Right.  The only network communication referred to

11    here is communicating a response that's responsive to the

12    request, and that travels on the networks and that's not

13    even received by the mobile device, and then his mapping is

14    where you do some additional processing, then you can't

15    communicate a response again to the mobile device, it's

16    already on the mobile device.

17    Q.    And so essentially Dr. Schmidt is somehow saying that

18    communicating from one part of the application to something

19    displayed on the screen is meeting this step?

20    A.    Essentially communicating from one part of the mobile

21    device to maybe a display manager is somehow meeting

22    communicating a response, the response pairs up with the

23    request, and that's a network communication, so this can't

24    meet that limitation.

25    Q.    And if we look at -- this is from claim 54 which

Weissman - direct

1  depends from claim 51.  And does this language make clear

2  that the communicating has to be to the client?

3  A.    Yes.  So claim 54 helps us understand that it says in

4  response to said step of communicating the output to the

5  client, remember said step means it's already been stated.

6  In this claim 51 inherits from 51, so this is the -- saying

7  this output saying this is what's communicated to the

8  client, there is one communication.

9  Q.    Has Dr. Schmidt shown that the output after all the

10  processing that's continuations, is communicated to the

11  client?

12  A.    No, he has not.

13  Q.    And that's because it's already on the client?

14  A.    It's already on the client.

15  Q.    So if we can now on the final element of claim 51,

16  has IBM met its burden by showing Groupon's mobile apps

17  perform each step of this claim?

18  A.    No, they have not.

19  Q.    Has Dr. Schmidt shown that Groupon's mobile apps

20  perform any of the steps of this claim?

21  A.    No, they have not.

22  Q.    Now, claim 54 as we just talked about depends from

23  claim 51; is that right?

24  A.    That's correct.

25  Q.    So what would IBM have to show to carry its burden to

1  prove that Groupon infringes claim 54?

2  A.     Well, in order to claim infringement, 54 is a

3  depending claim which depends on independent claim 51, so

4  IBM would have to show that you infringed claim 54, they

5  also infringe claim 51, which was always described met their

6  burden to 51, so they cannot meet their burden to claim 54.

7  Q.     In addition, if we look at how does that claims

8  relate, can you kind of explain how this said embedding step

9  relates back to the original state information, claim 51?

10  A.     Yes.  As we described earlier, we receive a service

11  request initially, and that includes state information,

12  that's the state information that we're talking about that's

13  going to get embedded.  We see that in step B of I guess 50,

14  51.  If we turn to claim 54, what it describes is that the

15  embedding step is going to be done in the client based on

16  use of dynamically downloaded code, but that's done in

17  response to the said step of communicating up to the client.

18  Q.     If we look at what Dr. Schmidt says for this

19  additional element, are these pledge IDs he's pointing to

20  here, said state information that needs to be embedded?

21  A.     No.  Because the pledge IDs would have had to have

22  accompanied the original request for the deal, and they did

23  not.  So they cannot be the claim of state in claim 54.

24  Q.     So with respect to Groupon's website and mobile

25  website, has Dr. Schmidt carried his burden of proving that

Weissman - direct

1    Groupon performs each of these steps?

2    A.     No, he has not.

3    Q.     Did he point out that Groupon performs any of the

4    steps?

5    A.     No, he has not.

6    Q.     Finally, let's go to claim 54 and the mobile apps.

7    Again, this is just the analysis you provided and performed.

8    A.     This is the same problem.  The state, the way the

9    claims are structured, has to be the same state.

10    Q.     And for claim 54, Dr. Schmidt put up this slide as

11    showing the dynamically downloading and performing this

12    embedding step.  Do you recall that?

13    A.     Yes, I do.

14    Q.     Can you explain what he is pointing to there?

15    A.     What he is pointing to is the JSON code as satisfying

16    the step of dynamically downloading computer code.

17    Q.     And that's the same JSON that is in the continuations

18    that he pointed to?

19    A.     Yes, it is.

20    Q.     And do those continuations in JSON code that he has

21    pointed to include this what he said was state information

22    in the original request?

23    A.     This has the same problem.  What he is pointing to

24    for what is embedded is not the state that was included with

25    the first service request from the user.

Weissman - direct

1   Q.      So going back to our claim now focusing on Groupon's

2   mobile applications.  Has Dr. Schmidt and IBM met their

3   burden to prove that Groupon performs each step of this

4   claim?

5   A.      No, he has not.

6   Q.      Has he shown that Groupon performs any step of the

7   claim?

8   A.      No, he has not.

9   Q.      Let's switch gears and go to the last patent, which

10  is the '346 patent.

11          And can you explain what language you are going

12  focus on in this claim, Dr. Weissman?

13  A.      Yes, the '346 patent.  I'm going focus on step A

14  which is the triggering step triggering a single-sign-on

15  operation on behalf of the user in order to obtain access

16  to a protected resource that is hosted by the second system.

17  Q.      Okay.  So the Court has construed "single-sign-on

18  operation."  Have you applied this construction in your

19  analysis?

20  A.      Yes, I have.

21  Q.      So let's look at what Dr. Schmidt has pointed to for

22  this step.  First, what is this screen and what does it

23  provide the user?

24  A.      This is a login screen which gives the user a variety

25  of ways of authenticating to the system.

Weissman - direct

1   Q.      And by providing this web page, has Groupon triggered

2   a single-sign-on operation on behalf of the user?

3   A.      It has not.  For one, you, as shown up at the top,

4   the user already has a Groupon account, and so the user

5   can just directly log into Groupon.  It does not trigger

6   single-sign-on.

7   Q.      Okay.  And could a user -- does this trigger either a

8   Facebook single-sign-on operation or a Google single-sign-on

9   operation?

10  A.      So if you click on --

11  Q.      According to the page itself.

12  A.      No, the page itself doesn't trigger anything.  The

13  user has to take an action in order for anything to happen.

14  Q.      And to infringe this claim, Groupon has to be the one

15  that is triggering; right?

16  A.      This is a method claim Groupon has been accused of

17  infringement.  Groupon has to perform this step.

18  Q.      So if the user is triggering, Groupon can't infringe

19  the claim; right?

20  A.      The user, Google, Facebook, a combination, then

21  Groupon is not liable.

22  Q.      Now, if we look at, this just shows the user can

23  choose any of the methods from this page; is that right?

24  A.      Correct.

25  Q.      So if we look at the additional information

Weissman - direct

1   Dr. Schmidt provided, he provided this what he says is

2   computer language.  What is this code that Dr. Schmidt has

3   shown here?

4   A.     What Dr. Schmidt is showing I guess in case of the

5   Google, the Google button is that the code indicates that if

6   a user clicks that button, then Google code is going to be

7   booked.

8   Q.     So what exactly does this code do as part of -- well,

9   strike that.  Does this code trigger anything?

10   A.     No.  All this code is doing is making an association.

11   That code is basically saying if the user clicks that

12   button, then the browser should call a particular set of

13   code which has been described by Mr. Breen as Google code,

14   Google API code.

15   Q.     So it may have been to clarify some of what was

16   discussed with Mr. Breen.  So does the user's browser have

17   code from Facebook and Google that is running in the

18   browser?

19   A.     Yes.  So as Dr. Breen, Mr. Breen described, the

20   browser, we all fetch code from Facebook and Google that

21   would be invoked by the browser when a user clicks.

22   Q.     So even though this is a Groupon web page, where it

23   says Groupon at the top, there is actually code on the

24   user's computer that has come from Facebook and Google; is

25   that right?

Weissman - direct

1    A.       Correct.

2    Q.       Okay.  And is it that code from Facebook and Google

3    that gets invoked when the user clicks on one of these

4    buttons?

5    A.       When the user clicks one of those buttons, the

6    browser is invoking that code to collectively trigger the

7    single-sign-on.

8    Q.       And when the browser takes that indicational click

9    and it triggers either the Google or the Facebook code, is

10   it the Google or Facebook code that then talks to Google or

11   Facebook?

12   A.       Yes, it is.

13   Q.       So is it fair to say that all of this code that

14   Dr. Schmidt pointed to does is connect a click essentially

15   to that button?

16   A.       It connects the click so that when that button is

17   clicked, Facebook or Google code is going to be called.

18   Q.       Is it a conduit between the Facebook code and the

19   user's click?

20   A.       Yes, it just makes an association.  It is not a verb.

21   It is not taking an action.  It is just saying if it's like

22   Athens, then this is the code that gets called.  So the user

23   has to click and the browser will invoke the appropriate

24   Facebook or Google code in the browser, in the page.

25   Q.       So is Dr. Schmidt correct that that bit of code that

Weissman - direct

1    connects the user's click to Facebook or Google triggers

2    anything?

3    A.      No, he is not.

4    Q.      And I'm sorry.  We did that with Google.  Is the

5    Facebook situation the same as the code that Dr. Schmidt

6    is pointing to triggering a single-sign-on operation at

7    Facebook?

8    A.      Yes, the code is the same.  It's the same idea.  He

9    is pointing to a button which potentially is just an

10   association between a user clicking and calling code that

11   the browser is going to call that is provided by Facebook.

12   Q.      So if we go back to claim 1, has IBM met its burden

13   of proving that Groupon triggers a single-sign-on operation?

14   A.      No, Groupon does not trigger single-sign-on

15   operation.

16   Q.      So given that Groupon does not perform that step, has

17   IBM met its burden of proving that Groupon performs claim 1?

18   A.      IBM has not met its burden that Groupon performs this

19   method step.

20   Q.      So let's look at claim 5, which is another one of

21   these dependent claims; is that right?

22   A.      That is correct.

23   Q.      So in addition to the fact that Groupon doesn't

24   perform claim 1, are there other things that Groupon doesn't

25   do with respect to claim 5?

1  A.      Yeah.  So that first element or first step is not

2  performed or IBM has not met its burden to show that Groupon

3  performs that additionally.

4          And what it is, it says:  In response to a

5  determination at the second system that the second system

6  does not have sufficient user attribute information to

7  complete creation of a user account for the user at the

8  second system.

9          So there had to be a determination establishing

10  certain conditions.

11  Q.      Can you kind of step back and put this claim into a

12  little context what is going on and what this determination

13  needs in the claim?

14  A.      Yes.  So we're in a situation where the user wants to

15  access a resource at a particular system, a second system.

16  And in order to do that, even in the case of single-sign-on,

17  the user still has to have an account at the second system.

18  And so in this claim, and claim 1 as well, that we're going

19  to create an account for the user where an account does not

20  already exist.

21          So in order to do that, we have to have

22  information about the user.  And what this claim is saying

23  is if we determine that at that second system where we

24  need to click the account we don't have enough information,

25  sufficient information to determine that, then we have to

Weissman - direct

1    obtain that information, create the user's account.

2    Q.    Now, if we look at how this works or the

3    single-sign-on works at Groupon, we heard from Mr. Breen

4    this morning that there are several different scenarios or

5    flows; is that right?

6    A.    That's correct.

7    Q.    So to analyze this particular claim, we're going to

8    have to go through each of these flows; is that right?

9    A.    Yes, we are.

10   Q.    Sorry about that.  So let's start with Facebook since

11   that is probably the most popular one.

12         What happens -- and this is kind of refreshing

13   the jury about what they heard from Mr. Breen.  What happens

14   when a user clicks on this continue -- well, let's start

15   here.

16         Is this a page that is provided by Groupon or by

17   Facebook?

18   A.    So when the user clicks on the Facebook option, as we

19   said, the click is triggering an execution of code that is

20   local to the browser provided by Facebook which is going to

21   call the Facebook servers to deliver this page.  So this web

22   page is provided by Facebook.

23   Q.    Okay.  And even though it has the G on it, that's a

24   Facebook page, is that right?

25   A.    It's my understanding that is a Facebook page.

Weissman - direct

1  Q.      What happens when the user clicks on the continue

2  button here?

3  A.      The browser communicates request to the Facebook

4  servers again.  And Facebook, in response to that, will

5  return an access token which will allow the system to get

6  them to show information.

7  Q.      And so the access token gets to Groupon by being sent

8  from Facebook to the user; is that right?

9  A.      Yes.  Facebook sends the access token to the browser,

10  and then a token is passed up to the Groupon servers.

11  Q.      And does Groupon determine whether or not the access

12  token has sufficient user attributes to create an account?

13  A.      The access token is what Mr. Breen described as the

14  page identifier.  It's a random set of bits that Facebook

15  generates to make an association but, in itself, it gains no

16  information.  Groupon can't make heads or tails of it.

17  Q.      Is that what abate means?

18  A.      That is what that means, yeah.  So it contains no

19  information as far as Groupon is concerned.

20  Q.      So once Groupon had the access token, what happens?

21  A.      Well, it can use that access token as sort of like a

22  ticket, and then Facebook, Facebook knows something about

23  it.  It knows this is the user that has logged into

24  Facebook.  And so what it can then return is information

25  about the user's account on Facebook.

Weissman - direct

1  Q.      So before getting the information it needs to create

2  the account in exchange for the access token, does Groupon

3  ever make a determination whether it has sufficient

4  information to create an account?

5  A.      No, it has no information, so it just always

6  passes the access token to give me all the information.

7  There is no determination.

8  Q.      If we go to the Google flows.  Let's start with what

9  Mr. Breen described as the one time code flow.

10         How does that work?

11 A.      So that works in a particular way, so Google is

12 selected for looking in, and that request then reaches

13 Google's server which returns this one-time code, we have

14 seen these on our phones, we get special numbers, something

15 like that, so we get a -- that's sent from Google to the

16 browser.

17 Q.      So before we get there, is this a page that's

18 provided by Google?

19 A.      That page is generated by Google.

20 Q.      The user picks an account, that request goes to

21 Google?

22 A.      That request goes to Google.

23 Q.      It sends this auth code, how does that get to

24 Groupon?

25 A.      That authorization code, one time code gets sent back

Weissman - direct

1    to the browser.

2    Q.      Does the browser then send it to Groupon?

3    A.      That browser then passes that up to Groupon.

4    Q.      Does that auth code contain any user information that

5    Groupon can access?

6    A.      No, this is a random generated code good for a

7    certain period of time, so there is no information at all.

8    Q.      Does Groupon ever determine whether that auth code

9    contains sufficient information to create a user account?

10   A.      Mr. Breen testified that it doesn't contain any

11   information.

12   Q.      Once Groupon has that auth code?

13   A.      It sends that to Google servers and Google servers

14   return -- getting closer -- returns the access token back to

15   Groupon servers.

16   Q.      And again, does Groupon determine whether or not that

17   access token has sufficient user attributes to create an

18   account?

19   A.      Like the Facebook access token it's opaque, it

20   doesn't contain any information, so then that is

21   subsequently passed again to Google to get information back

22   to the user.

23   Q.      And once Groupon gets the information, does it

24   determine whether that information is sufficient?

25   A.      No, either the user has an account or they don't.

1  There is no additional communications.

2  Q.     Let's go to the last Google flow, the ID token that

3  Mr. Breen talked about.  I think he talked about two flavors

4  of this, but I think because Dr. Schmidt only accused one,

5  you're only going to talk about the first one.  Is that

6  right?

7  A.     That's right.

8  Q.     I think this is the way you used to work, can you

9  explain what happens here, again, we're starting from the

10 Google screen, Google Web page provided by Google; is that

11 right?

12 A.     Yes.  Google login has been selected and the browser

13 communicates with Google and Google delivers this page which

14 let's the user pick an account, they can pick any of their

15 accounts to do this.  A request is made to the Google server

16 and they get back an ID token, which Mr. Breen described as

17 a signed token.

18 Q.     And then that token is forwarded to Groupon servers?

19 A.     Yes.

20 Q.     And does Groupon look in that token to determine

21 whether it has sufficient information to create an account?

22 A.     So that token contains information in the clear, and

23 Groupon first checks to see whether or not it has an account

24 for that user.  And if it does, it can log the user in.

25 Otherwise, it does not.

Weissman - direct

1    Q.      So if Groupon gets this token, it does have

2    information; is that right?

3    A.      That's correct.

4    Q.      And Groupon uses that information to see if Groupon

5    already has an account; is that right?

6    A.      Correct.  And if the user has an account, we're done.

7    If they don't, then I have the same flow we saw.

8    Q.      So Groupon never looks in that token, says, oh, it

9    has some information, but not quite enough, can you ask for

10   more and create an account?

11   A.      It either says oh, I have an account or I have

12   nothing.  And it sends the authorization code to ultimately

13   obtain.

14   Q.      So if we go back to -- if we go back to claim 5,

15   what's your conclusion with respect to the determination

16   requirement of that step?

17   A.      In either the Facebook or in either of the Google

18   flows that have been accused, the method step is not

19   attached.  IBM has not met its burden that Groupon performs

20   a method step.

21   Q.      So just to summary on claim 5, has IBM met its burden

22   of proving that Groupon performs every step of this claim?

23   A.      No, they have not.

24   Q.      And was Groupon -- was IBM's analysis and

25   Dr. Schmidt's analysis of the '346 claims the same for the

1  website, mobile website and the mobile applications?

2  A.    He testified that they worked pretty much the same

3  way.

4  Q.    So your conclusion with respect to the claims of the

5  '346 patent applies across all of the website and the mobile

6  website and the mobile applications?

7  A.    Yeah, IBM hasn't met its burden that shows that

8  Groupon website or mobile applications or mobile website

9  perform the method steps of claim 5, they really don't

10  infringe claim 5.

11  Q.    Let's now switch gears a little bit.  We have done

12  infringement for all four patents.  Let's talk now about the

13  validity of the two patents that you're opining on.  And

14  just to set the record, now we have the burden of proof; is

15  that right?

16  A.    Yes, we do.

17  Q.    So if we start with the '601 patent and we heard a

18  lot about IBM's -- about Amazon.com website in 1995 from

19  Mr. Davis.  Have you analyzed how that website relates to

20  the '601 patent?

21  A.    Yes, I have.  I was provided access to source code,

22  discussion with the inventor, Mr. Davis, that sort of thing.

23  Q.    So if we start with the claims now, did the Amazon

24  website in 1995 provide a computerized method for preserving

25  state information as required by the first part of this

Weissman - direct

1  claim 51?

2  A.     Yes, they do.

3  Q.     And how do you know that?

4  A.     Well, I know that by looking at the source code and

5  seeing how it works.  And seeing that that requirement was

6  met.  And also in discussions with Paul Davis.

7  Q.     So just to kind of step back and put it into context,

8  does the Amazon website work essentially the way that the

9  '601 patent describes as far as embedding a session ID in

10  links or hyperlinks?

11  A.     Yes, at high level it works exactly the same.

12  Q.     So as Mr. Davis described when a user request a page,

13  responsive page would include these session IDs the state

14  information; right?

15  A.     The server recognizes a new conversation, generate a

16  session ID uniquely identifying information about that

17  conversation and it would return that, the HTTP response in

18  the form of embedding and sending back in the hyperlinks.

19  Q.     So in this kind of mockup, we don't know if this is

20  the actual screen, but it was the screen at some early days

21  at Amazon.com, that is your understanding?

22  A.     That's my understanding.

23  Q.     So at this point, would these links that are shown on

24  this screen have the user session ID embedded in them?

25  A.     That's my understanding of how it works.

1   Q.      And so if we go to the next step, receiving a service

2   request including state information, how did that work in

3   the 1995 Amazon site?

4   A.      Well, for any hyperlink that is subsequently

5   requested, I can tell from the code that I looked at and in

6   conversations with Mr. Davis that that carried the session

7   ID with it, so that is carrying state information with the

8   request.

9   Q.      So the URL that would be under this button would

10  include the user session ID already?

11  A.      The URL has the session ID, has an embedded URL.

12  Q.      So does Amazon perform the receiving a service

13  request step of claim 51?

14  A.      Yes, it does.

15  Q.      Again, you reviewed the Amazon source code in your

16  analysis?

17  A.      Yes, I did.

18  Q.      If we look at the next step, the identifying all

19  continuations, can you explain how Amazon performed that

20  step?

21  A.      Sure.  We have heard a little bit about Mustache

22  templates and other types of templates before.  Amazon does

23  something similar.  So when a request is sent to a web

24  server with that embedded session ID, Amazon server runs

25  some code that processes templates associated with that

Weissman - direct

1    request to ensure that that session ID is placed in each and

2    every hyperlink that is going to be returned in the output.

3    Q.      Is this the Amazon code that runs on the Amazon

4    server that does that embedding?

5    A.      This is the template processing function.  I think we

6    heard it earlier Cat Sub, not a very friendly name, but the

7    purpose of that function is to, you know, modify the

8    template and insert information.

9    Q.      We have heard a lot about templates and we heard

10   about substituting things.  Can you kind of step back and

11   explain in a little bit higher level why someone like Amazon

12   is creating dynamic web pages would use templates and how

13   they would get processed?

14   A.      Yes, great question.

15           So as I think Paul Davis said, as different

16   users interact with the system, buy different books, you're

17   going to generate different looking web pages for the

18   different requests, so you're not going to have a single

19   file that returns a web page, you have to build those pages.

20           And for many of the pages they're going to have

21   a lot of similarity, they're going to say hello, thank you

22   for coming to Amazon, there will be a lot of common things.

23   It's very nice to put those in a template.  You don't have

24   to keep regenerating them.  You have a template that has

25   most of what you need.  There is someplace where we have to

Weissman - direct

1   insert dynamic information specific to the conversation.  If

2   you ask the weather today, you might have a lot of common

3   things that come on a weather page, but you have to insert

4   the current weather.  Templates are a great way of saying

5   here is stuff that is expected that maybe won't change and

6   identify some variable that has to change in the final

7   output that goes back.

8   Q.    So is it accurate that the templates would be

9   essentially personalized for the user who made the request

10  as part of this processing?

11  A.    Yes, they can be personalized, and of course, because

12  they belong to the session ID, they're personalized to the

13  conversation.

14  Q.    So this code that you're showing here is not the

15  template, but this is the code that would operate to do that

16  customization?

17  A.    That's the code that takes the template as input and

18  takes values for the placeholders and does that replacement.

19  Q.    So this is DX-376.  I think this is one of the

20  documents from the old Amazon system that Mr. Davis

21  testified about.  Is that correct?

22  A.    That's correct.

23  Q.    And what is this order-form-page1.cpp?

24  A.    This is a template that corresponds to

25  order-form-page1.

Weissman - direct

1   Q.      And if we look at this template, can we see where

2   there are continuations that would get identified at Amazon?

3   A.      Yes.  So remember continuations and new request if

4   from a client to a server, for example, hyperlink.  And if

5   you notice -- and hyperlinks are the HREFs.  And those

6   contain placeholders.  The placeholders we see for dollar

7   zero which is a special placeholder which is for session ID.

8   So the template processing function is looking for

9   essentially the HREFs and replacing the dollar sign zero as

10  Mr. Davis said with session IDs.

11  Q.      Just stepping back, Mr. Davis talked about some links

12  on the page that didn't cause requests to be sent back to

13  the server.  One example he had was a link that would skip

14  you down the page if you were not interested in gift

15  wrapping.  Do you recall that testimony?

16  A.      Yes, he was referring to what are called anchors.

17  Q.      Would an anchor link that moved you down the page

18  like that be a continuation under the Court's construction?

19  A.      No, because as I just described, continuation is a

20  new request sent from a client to the server to continue the

21  conversation.  So links or hyperlinks, you can call them

22  either way, that just referred to another corner of the same

23  page, are not continuations, they're just links or

24  hyperlinks.

25  Q.      How about the continuation, the link that Mr. Davis

1  talked about that would be the mail to link, it would launch

2  a mail application on the user's computer, would that link

3  be a continuation under the Court's construction?

4  A.    No, it's not a continuation, because it's not a new

5  request from the client to the server to start the

6  conversation, it's doing a side line saying now I want to

7  send some mail and that will pop up mail application, I'll

8  do some mail and then I'm back where I was, so I haven't

9  made a new request to the server, I have just decided to run

10 this other program.

11 Q.    So as far as the requirement that Amazon identify and

12 embed state information into all continuations, are those

13 mail to links and anchor links relevant?

14 A.    They are not, they're not continuation, they're not

15 new requests from a client to a server, they're links or

16 hyperlinks, but they're not continuations.

17 Q.    If we look at these continuations that are part of

18 this order form template, can you explain what the dollar

19 zero is that Dr. Schmidt -- or that Mr. Davis talked about?

20 A.    Yes.  So the first box is what's called a post, this

21 is what you do in a form and that generates a request back

22 to the server so it could qualify as a continuation as well

23 as the HREFs.  Dollar zero is the dollar and then a number,

24 dollar curly brace number, close curly brace are the

25 template variables and they're numbered, zero, one, two, et

Weissman - direct

1    cetera, zero always means session ID, very special meaning,

2    and that is the state, the state we're referring to.  This

3    identifies -- this is information about the conversation, so

4    wherever we see continuations, that is new requests from

5    client to server in these Amazon templates, we see dollar

6    zero embedded in the URL.

7    Q.    And so that other program we saw, Cat Sub, would do

8    something with this dollar zero?

9    A.    So the job of Cat Sub would be to take this entire

10   template as input, Mr. Davis had stepped through it looking

11   for dollar signs, and then associating with dollar signs the

12   number with a parameter of that field.  The first one, which

13   is the zero, is always a session ID.

14   Q.    And if we go down here, we have another continuation

15   with a dollar sign zero; is that right?

16   A.    That's correct.  All the hyperlinks that refer back

17   to the server contain dollar zero.

18   Q.    If we step to this entire template, the output that's

19   being processed by Cat Sub?

20   A.    Cat Sub processes the template, replace the values,

21   and the output of that is hopefully going to become the page

22   that's returned.

23   Q.    Can you confirm that all of the continuations in this

24   template give the session ID embedded to that dollar sign

25   zero variable?

Weissman - direct

1    A.       Yes, in this template and in other templates I saw.

2    Q.       So does the Amazon.com system in 1995 meet, perform

3    the identifying all continuations step?

4    A.       Yes, it does.

5    Q.       And we heard Paul Davis explain that this template is

6    actually from 1996.  You understood that; right?

7    A.       Yes, I did.

8    Q.       Did you talk to Mr. Davis and confirm that the

9    templates from 1995 were substantially the same?

10   A.       That's my understanding of that, yes.

11   Q.       And the source code that you looked at that steps

12   through the template and makes the embedded session ID, is

13   that code from 1995?

14   A.       Yeah, the 1995 code and the 1996 code are virtually

15   the same.  They process the templates in the same way.

16   Q.       Can you tell from the 1995 code that the templates in

17   1995 are processed in the same manner?

18   A.       Yes, I can.

19           MR. HADDEN:  I think this would be a good place

20   to stop, Your Honor.

21           THE COURT:  That's fair enough.

22           Ladies and gentlemen, that completes your time

23   together today.  Tomorrow expect another full day starting

24   around 9:00 and going 4:30.  No talking about the case or

25   reading or researching about it.  We'll see you tomorrow.

1        Thank you.

2                    (Jury leaves the courtroom at 4:30 p.m.)

3                    THE COURT:  You may step down.  Thank you.

4                    I just wanted to talk about a few things,

5        counsel.  Anyone who wants to can leave or sit.

6                    I did see that the jury instructions were

7        submitted, so we'll start looking at that.  I figure we may

8        have time to talk about the objections some time tomorrow.

9        I'll have a better idea tomorrow morning, but just be

10       prepared that it could be some time tomorrow.

11                   I guess, Mr. Hadden, why don't you tell me first

12       just what is your sense as to what is in store for tomorrow,

13       trying to think through the rest of the week?

14                   MR. HADDEN:  Yes, I think we'll probably be done

15       with --

16                   THE COURT:  You can --

17                   MR. HADDEN:  Oh, Dr. Weissman.

18                   THE COURT:  Dr. Weissman, you are not stuck

19       there.

20                   MR. HADDEN:  Thanks.  Relax.

21                   (Dr. Weissman leaves witness stand.)

22                   MR. HADDEN:  I think we'll be done with

23       Dr. Weissman in 40 more minutes tomorrow.  And then we'll be

24       calling Mr. Malackowski, our damages expert.

25                   THE COURT:  Okay.

1             **MR. HADDEN:  I think that will be it.  Then**

2    **we'll rest.**

3             **THE COURT:  That's it for your case.  Do we know**

4    **yet?  I assume there is at least some rebuttal case from the**

5    **plaintiff.**

6             **MR. DESMARAIS:  Yes, Your Honor.  We disclosed**

7    **at a minimum Dr. Schmidt to be recalled, and then we**

8    **disclosed potentially, if needed to respond to damages,**

9    **Professor Hausman, but, you know, I don't know that we'll**

10   **really need to do that.  And then we have designated the two**

11   **inventors just in case the date of invention kind of thing**

12   **comes up, but I don't think we'll need that.**

13            **But we'll be ready to go tomorrow afternoon with**

14   **Dr. Schmidt, and we may do real short inventors, inventor**

15   **testimony, and I guess possibly Professor Hausman, but I**

16   **think we'll finish tomorrow afternoon.**

17            **THE COURT:  That's what I was going to ask.**

18   **Will there be potentially evidence tomorrow afternoon?**

19            **MR. DESMARAIS:  Certainly, IBM's evidence will**

20   **be.**

21            **THE COURT:  Then there is a possible Phase IV.**

22            **MR. HADDEN:  Yes.  We'll see what Dr. Schmidt**

23   **says.  I mean we may have something short, but I think it**

24   **will be relatively short.**

25            **THE COURT:  Okay.  That presents an interesting**

1   situation just because Wednesday is a half day, so I don't

2   know if you have thought yet about how much time you will

3   likely want to want for closing arguments, assuming you have

4   left.  Any thoughts?

5              MR. DESMARAIS:  Whatever I have left, Your

6   Honor.

7              THE COURT:  Okay.

8              Mr. Hadden, any thoughts?

9              MR. HADDEN:  An hour to an hour and-a-half.

10  About everything I have left, hopefully.

11             THE COURT:  Well, we'll know better tomorrow.

12  It would be great if we could do the jury instructions and

13  the closings all on Wednesday.  I probably can have the jury

14  deliberate even if I'm busy with other things in the

15  afternoon but we'll just have to see.

16             I don't want to interrupt the closings, so it

17  may be that Wednesday turns out to be short day and we'll

18  just go to Thursday, but we'll decide that tomorrow.

19             Finally, with respect to the latest deposition

20  objections, there are two of them.  I do need a little help

21  on them.  I don't know if folks are prepared to argue that

22  are around.  It relates to Mr. Carlisle and Ms. Pomeroy.

23             For IBM, is that you Mr. Oussayef for both of

24  them?

25             MR. OUSSAYEF:  Yes, I can argue both of them.

1    THE COURT:  How about for Groupon?

2    MR. HADDEN:  I'm not the person, but I can fake,

3    if need be.

4    THE COURT:  Well, how about we hear from Mr.

5    Oussayef on both, and then you do your best.  And if you

6    feel prejudiced in your response, then I can defer decision

7    until tomorrow.

8    But Mr. Oussayef.

9    MR. OUSSAYEF:  I'll say that I'm in the same

10   boat, so hopefully we'll be on the same playing field here.

11   Your Honor, with respect to Mr. Carlisle, the

12   deposition testimony we designated is directly relevant to

13   something that came up in Groupon's case-in-chief which is

14   that they elicited testimony about his opinions about the

15   patents.

16   So in response to that, we designated testimony

17   about his awareness or lack thereof of the patents to

18   address the fact that there was I think maybe even an

19   objection was sustained on that, but there was a response

20   that came up.  I'm not sure how exactly that played out.

21   THE COURT:  And I didn't get a chance to look.

22   My recollection was there was an objection but I don't

23   recall if I sustained it or overruled it.

24   MR. DESMARAIS:  Yes.  As I -- I don't remember

25   exact what your ruling was, but I do remember in the

1    redirect testimony, the very last question they said:  Why

2    do you need to change your product or something like that?

3    And he said because we don't infringe the patents.

4            I objected and said he never read the patents.

5    I don't remember what your ruling was but he had already

6    answered it.  I asked to strike and you denied the motion to

7    strike.  So it's now in evidence that this witness said we

8    don't infringe, and so we wanted to play this response

9    saying he never even read the patents.

10           THE COURT:  Right.  So it seemed to me if I -- I

11   don't remember what I said on the objection, but it sounds

12   correct that I didn't strike it.

13           So I suppose this might be a request for

14   reconsideration of that.  But it seems to me if I didn't

15   strike it, Mr. Carlisle is gone, why would we bring back Mr.

16   Carlisle at this point even by way of designation?

17           MR. OUSSAYEF:  Well, because it would be direct

18   -- it would give context to the entire, you know, his

19   testimony.  So to the extent -- let's say that happened on

20   their direct examination, and we could have cross-examined

21   him and said you haven't read the patent.  But the fact that

22   that testimony was elicited and probably shouldn't have been

23   on redirect given that it's testimony that, you know, the

24   objection was sustained, it makes sense to have the full

25   context of the facts which is that he hasn't read the

1    patents.

2              THE COURT:  All right.  As you may or may not

3    recall, I guess Groupon wants to actually read back that

4    answer from the trial transcript if I allow you to do what

5    you want to do.  Do you want to talk about that?

6              MR. OUSSAYEF:  I mean at some point, it becomes

7    infinitely regressive.  We have a sustained objection to

8    testimony that was answered already on the record.  You

9    know, I would submit that it doesn't make sense to put that

10   answer back on the record if the objection was already

11   sustained to the question.  Just the context would make the

12   most sense.

13             THE COURT:  Okay.  And then while you are there,

14   Ms. -- I said Pomeroy.  Maybe it is Pomerod, Pomeroy?

15             MR. OUSSAYEF:  Pomeroy.  Yes, Your Honor.

16             THE COURT:  Pomeroy.  Excuse me.  What is the

17   status from IBM's perspective?  Is some of her testimony

18   coming in without objection or is it all objected to?

19             MR. OUSSAYEF:  My understanding is that there

20   is -- you know, I'm not sure exactly what the status of

21   Groupon's objections were given the meet and confer, but I

22   think that we designated some testimony, they had some

23   counters.  I think there are like objections on both sides,

24   although I'm not sure exactly what Groupon's objections are,

25   but that's my understanding.

1    THE COURT:  And they had a declaration they

2    referenced.  Do you understand they are trying to get that

3    declaration in?

4    MR. OUSSAYEF:  No, my understanding is neither

5    party is trying to get a declaration in.

6    THE COURT:  All right.  Mr. Hadden, do you want

7    to take a shot.

8    MR. HADDEN:  Yes, I'll take a shot.

9    THE COURT:  Okay.

10   MR. HADDEN:  So the first one on Mr. Carlisle,

11   you know, they requested him.  They released him, and he is

12   gone.  This notion they now get to play his deposition seems

13   to me to just be an end runaround your rule that you don't

14   get a recross.  So I don't see a basis for doing that.

15   On Ms. Pomeroy, so unfortunately, we flew her

16   out here with her little kid thinking that we needed her for

17   further authentication, whatever their issue was.  They then

18   told us in front of Your Honor that their only issue with

19   the authenticity of the Amazon code was whether it was

20   actually Amazon code from 1995.  So given that being their

21   issue, we told Ms. Pomeroy that she could go home because

22   she has no knowledge of that.  Her knowledge is how the code

23   came from Amazon in 2007 and how it has been maintained in a

24   vault at our office since then.

25   So when they told us their only issue was

1  whether it came from Amazon in '95, I said fine, if it is

2  irrelevant to any issue, then I'll send her home.  They

3  agreed.  She went home.  So I don't understand what the

4  point is of playing her deposition now when they already

5  told us that the only issue was what happened in Amazon in

6  '95 and how that code was collected about which she has no

7  knowledge.

8          THE COURT:  So is it Groupon's position that

9  nothing, none of her testimony is coming in?

10          MR. HADDEN:  Right.  That is why we let her go

11  home.  Once they told us the only issue was whether the code

12  was Amazon code in 1995, she was no longer relevant.

13          THE COURT:  And you are not trying to get in a

14  declaration?

15          MR. HADDEN:  No, I'm not trying to get in

16  anything.  I don't see any issue that requires her knowledge

17  about how she had preserved a code in a vault at our office.

18          THE COURT:  Okay.  Thank you.

19          MR. OUSSAYEF:  Your Honor, it's not the case

20  that we agree that we didn't need any testimony.  The way

21  the facts played out is that a week before trial, she was

22  disclosed as a surprise witness that we took the --

23          THE COURT:  Yes, but that is all.

24          MR. OUSSAYEF:  -- deposition --

25          THE COURT:  There is a lot of writing here about

1    surprise and prejudice.

2              MR. OUSSAYEF:  Okay.

3              THE COURT:  I dealt with all that.  That is all

4    history.

5              MR. OUSSAYEF:  Okay.

6              THE COURT:  I don't think what they did was

7    unfair.

8              MR. OUSSAYEF:  Okay.

9              THE COURT:  It was my impression what you all

10   were telling me, Ms. Pomeroy can go home.  This is no longer

11   an issue.  Why was that a misunderstanding, I guess?

12             MR. OUSSAYEF:  Well, the fact is there is a

13   question of authenticity at issue.  And my question is that

14   Groupon brought Mrs. Pomeroy to prove up the authenticity.

15             It turned out in her deposition she had no facts

16   about authenticity to offer at all and, in fact, negative

17   facts from Groupon.  And then once that turned out to be the

18   case, we wanted to designate her deposition testimony to

19   show that there is serious questions about whether this code

20   actually is the code that Groupon purports it to be.  That

21   is why we designated here.

22             THE COURT:  Well, you had her here.  She was in

23   court.  We all agreed we would take her out of order, and

24   then you said let her go.  We should have understood that

25   you were going to play a deposition?

1    MR. OUSSAYEF:  No, no, no.  We never said let

2  her go.  She flew back without our understanding that she

3  was going to fly back.  I mean ...

4    THE COURT:  That's not consistent with my

5  recollection, but I'll double check the transcript.  But I

6  thought we were all very clear that you were letting her go.

7  Because she was here.  I was told she was here with a young

8  child or she left the young child at home.  Let's take her

9  out of order.

10    MR. OUSSAYEF:  Your Honor, in any case, it was

11  not our understanding that we would not have available her

12  testimony, one way or another.  So I guess that is what I'm

13  putting before Your Honor.

14    MR. DESMARAIS:  I would encourage Your Honor to

15  check that because I have zero recollection of IBM saying

16  she should go home.  I think what happened was we had an

17  argument about her declaration and ultimately they said

18  they're dropping her.  We didn't say send her home.  It

19  wasn't our decision.  We didn't participate in that.

20    THE COURT:  Well, I will certainly double check.

21  I don't think we talked about the status of the deposition

22  transcript, but I think it was certainly my impression, and

23  I'll double check whether I had a fair basis for that

24  impression, that no one any longer thought Ms. Pomeroy had

25  anything relevant to say about this trial but I'll certainly

1    go back and check.

2              Did you want to say anything else about Mr.

3    Carlisle?

4              MR. OUSSAYEF:  No, Your Honor.  I think we've

5    pretty much summed it up.

6              THE COURT:  All right.  Mr. Hadden, anything

7    further?

8              MR. HADDEN:  No, just that my recollection

9    matches yours, and I think it will be borne out.

10             THE COURT:  Well, I will take a look at the

11   transcript.

12             That is all I had for you.  Anything else from

13   the plaintiff?

14             MR. OUSSAYEF:  No, Your Honor.

15             THE COURT:  Defendant?

16             MR. HADDEN:  No, Your Honor.

17             THE COURT:  Have a good evening.

18             (Proceedings adjourn at 4:43 p.m.)

19

20        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

21

22                       /s/ Brian P. Gaffigan
                         Official Court Reporter
23                         U.S. District Court

24

25