1           IN THE UNITED STATES DISTRICT COURT

2           IN AND FOR THE DISTRICT OF DELAWARE

3                         - - -

INTERNATIONAL BUSINESS MACHINES
4  CORPORATION,                          :  CIVIL ACTION
                                         :
5            Plaintiff,                   :
   v                                      :
6                                         :
   GROUPON, INC.,                         :
7                                         :  NO. 16-122-LPS
            Defendant.
8                         - - -

9                    Wilmington, Delaware
                     Tuesday, July 24, 2018
10                   *Jury Trial - Volume G*

11                        - - -

12  BEFORE:  HONORABLE LEONARD P. STARK, Chief Judge, and a jury

13  APPEARANCES:              - - -

14           POTTER ANDERSON & CORROON, LLP
             BY:  DAVID E. MOORE, ESQ.,
15                BINDU A. PALAPURA, ESQ., and
                  STEPHANIE E. O'BYRNE, ESQ.
16
17                and

             DESMARAIS, LLP
18           BY:  JOHN DESMARAIS, ESQ.,
                  KARIM Z. OUSSAYEF, ESQ.,
19                LAURIE STEMPLER, ESQ.,
                  KEVIN K. McNISH, ESQ.,
20                MICHAEL MATULEWICZ-CROWLEY, ESQ.
                  ROBERT C. HARRITS, ESQ.,
21                BRIAN D. MATTY, ESQ., and
                  EDWARD GEIST, ESQ.
22                (New York, New York)

23                    Counsel for Plaintiff

24

25  Dale Hawkins                    Brian P. Gaffigan
    Registered Merit Reporter       Registered Merit Reporter

1    APPEARANCES:   (Continued)

2
                  ASHBY & GEDDES, P.A.
3                 BY:   JOHN G. DAY, ESQ., and
                        ANDREW C. MAYO, ESQ.
4
                        and
5
                  FENWICK & WEST, LLP
6                 BY:   J. DAVID HADDEN, ESQ.,
                        SAINA M. SHAMILOV, ESQ.
7                       PHILLIP J. HAACK, ESQ.
                        SAPNA MEHTA, ESQ.
8                       JESSICA M. KAEMPF, ESQ.,
                        ATHUL ACHARYA, ESQ., and
9                       JESSICA BENZLER, ESQ.
                        (Mountainview, California)
10
                            Counsel for Defendants
11

12

13

14

15

16

17

18                           - oOo -

19                   P R O C E E D I N G S

20           (REPORTER'S NOTE:  The following jury trial was

21    held in open court, beginning at 8:34 a.m.)

22           THE COURT:  Good morning.

23           (The attorneys respond, "Good morning, Your

24    Honor.")

25           THE COURT:  Are there any issues from IBM this

1   morning?

2           Good morning.

3           MS. STEMPLER:  Good morning, Your Honor.  Laurie

4   Stempler for IBM.

5           Last night, the defendant is disclosed two

6   Exhibits, DX-655 and 656, to use with their damages expert

7   Mr. Malackowski.  Those are the complaints that IBM filed

8   against Amazon in 2006.  They're not cited in his report,

9   they're not relevant, and so we have objected to them.

10          THE COURT:  Okay.

11          MS. SHAMILOV:  Your Honor, we do not intend to

12  use those two exhibits, so I don't think this an issue.

13          THE COURT:  You do not.

14          MS. SHAMILOV:  Do not.

15          THE COURT:  All right.  Then you are not going

16  to use them.

17          MS. SHAMILOV:  Correct.

18          THE COURT:  All right.  That takes care of that.

19          Any other issues from IBM?

20          MR. OUSSAYEF:  Not from IBM, Your Honor.

21          THE COURT:  How about from Groupon?

22          Good morning.

23          MS. KAEMPF:  Good morning, Your Honor.  Jessica

24  Kaempf for Groupon.

25          IBM disclosed last night that they intend to use

1  source code from Dr. Iyengar, the inventor of the '601

2  patent.   They intend to introduce these facts through their

3  expert.   There are several issues with that:

4         First, that source code hasn't been

5  authenticated; and nor has a foundation been laid for that.

6  And as you know, IBM has taken the position that source code

7  isn't authenticated just by saying this is what it is.   So

8  that is the first issue, that it needs to be authenticated.

9         But a bigger issue here is that Dr. Schmidt has

10  no personal knowledge about this source code.   He is going

11  to get up here and say, that he is going to try to tell the

12  purported invention story, and he is going to rely on --

13  everything he relies on is hearsay.

14         And we talked about this in the summary judgment

15  briefing that the inventor testimony with the source code

16  is not enough.   It's legally insufficient to establish an

17  earlier invention date.   And it's certainly not enough when

18  it comes through an expert who has no personal knowledge.

19         So for them to introduce it through their expert

20  and try to tell the jury that there is an earlier invention

21  date is prejudicial.

22         THE COURT:   All right.   Speaking about the jury,

23  somebody had better shut the backdoor because jurors might

24  be walking by at any moment.

25         Thank you.

1          Good morning.

2          MR. OUSSAYEF:  Good morning, Your Honor.  Kareem

3   Oussayef for IBM.

4          What I'm hearing from Groupon is it hasn't

5   been authenticated yet so you can't introduce an witness to

6   authenticate it.

7          That is exactly what Dr. Schmidt intends to do.

8   He disclosed in an expert report that he reviewed the source

9   code, and he looked at it to make sure there was indicia of

10  authenticity.  He looked at the dates on the files.  He

11  tested the files.  He made sure that the files actually

12  supported the invention date; and he looked at the metadata

13  files.

14         Those are all things within the province of his

15  expert opinions, and we'll prove to the Court that it is

16  authentic.  And the way we dealt with it, with defendant's

17  source code was that we had the witnesses actually come in

18  and testify.  We withheld our objections to authenticity to

19  the point at which we know what, how the evidence will

20  actually come in regarding those issues.  And I will submit

21  to Your Honor we can do the exact same thing here.

22         With regard to hearsay, there is an exception

23  here because we're talking about an expert witness and what

24  he is going to testify about is all going to be within his

25  knowledge.  He is not going to tell, you know, he is not

1  going to talk about things that are outside of his personal

2  knowledge.

3          THE COURT:  And there is a contention this will

4  not be enough to establish an earlier I guess priority date.

5  Do you agree with that?

6          MR. OUSSAYEF:  No.  I mean, Your Honor, IBM

7  believes this will be sufficient to establish an earlier

8  invention date.  In fact, the issue here is reduction to

9  practice.  And with reduction to practice, when you actually

10  have the source code in hand that does what the invention

11  is, it's like if we were to think of a physical system like

12  bringing in the object that embodies the system.

13          And the case law that talks about it's not

14  enough for an inventor to just rely on, hey, I invented it

15  as of this date, I conceived it as of this date doesn't

16  apply when you have the thing itself that actually does the

17  invention when you are talking about reduction to practice.

18          THE COURT:  Okay.  Thank you.

19          Do you want to come back and reply?

20          MS. KAEMPF:  Your Honor, the source code that

21  they produced is incomplete; and we know that at least from

22  what he said in the Priceline case.  We personally have not

23  gotten any -- you know, we have not talked to him about the

24  source code, but his representations are that it is

25  incomplete.  They also didn't produce native files.  So we

1     haven't run it.  I assume, you know, I don't, I don't

2     believe that Dr. Iyengar has actually run it.

3              And with respect to hearsay, FRE 703 says he can

4     form an opinion based on it but he can't introduce it.

5     They're trying to introduce this -- or, I'm sorry.  FRE 703

6     says you can form an opinion based on hearsay but you can't

7     introduce that hearsay.  It's not an end-around to be able

8     to get the source code through an expert.  They have got to

9     improve there is some hearsay exception, and here there is

10    not.

11             THE COURT:  And I'm not hearing that this was

12    not adequately disclosed.  That is, you don't have an

13    objection that this was not adequately disclosed; correct?

14            MR. HAACK:  Actually, Your Honor, that is not

15    exactly true.  Counsel mentioned metadata.  IBM never

16    produced native files or metadata to Groupon.  The source

17    code they produced in this case were, you know, just the

18    images of the source code produced through a production

19    database like any other production.  So we have never soon

20    this metadata, we don't have it.  And in his expert report,

21    Dr. Schmidt refers to metadata but cites no file, no code.

22    He just says metadata says this without support.

23            THE COURT:  All right.  So the objection isn't

24    to the opinion and the testimony, it's to the admission of

25    the source code?

1    　　　　　　MR. HAACK:  It's to both.  I was going to

2    address the later issue in a minute, the second issue about

3    the testimony in just a minute.

4    　　　　　　THE COURT:  Oh.  Well, why don't we deal with

5    all the Iyengar stuff together.

6    　　　　　　MR. HAACK:  Sure.

7    　　　　　　THE COURT:  Is there more than what you just

8    have both said?

9    　　　　　　MR. HAACK:  I guess a related issue, this is an

10   demonstrative that we objected to last night.  This

11   relates -- oops.

12   　　　　　　(Elmo settings adjusted.)

13   　　　　　　MR. HAACK:  So what we can talk about in

14   response, it says:  File storage data for Dr. Iyengar's code

15   shows that it predates the patents in suit.

16   　　　　　　Presumably, this file storage is the same

17   metadata counsel referenced a minute ago.  And the exhibit

18   numbers listed here are the image only production version,

19   not native version of the files.  IBM never produced those

20   native versions to us.  We never had an opportunity to

21   inspect or rebut this alleged metadata.

22   　　　　　　THE COURT:  Okay.  Any other Iyengar issues?

23   　　　　　　MS. KAEMPF:  Yes, I'll just add with respect to

24   the testimony, we think it is prejudicial for them to be

25   allowed to get up there and still try to tell the invention

1   story and not have the documents in front of the jury.  I

2   mean documents obviously shouldn't get in because it's

3   hearsay, and also he has no authentication for it.  But for

4   him to also get up and try to still tell the story is

5   prejudicial, I mean he is also not an expert in earlier

6   invention date.

7             THE COURT:  All right.  And this is my mistake.

8   I keep referring to this as the Iyengar testimony but they

9   propose to do it through Dr. Schmidt; correct?

10            MS. KAEMPF:  That's right.

11            THE COURT:  All right.  Mr. Oussayef, do you

12  want to come back?

13            MR. OUSSAYEF:  Your Honor, I'll start where

14  Groupon's counsel left off.  We're not going to have

15  Dr. Schmidt come in here and say, you know, it was a dark

16  and stormy night and Mr. Iyengar was thinking about this

17  stuff, and he thought, oh, this would be a great idea and

18  that is what he was doing at the time.

19            So we're not going to tell any kind of invention

20  story like that.  We're simply going to have Dr. Schmidt who

21  disclosed in his expert report that he was going to talk

22  about the specific code files, he applied them specifically

23  to the claims.  He talked about metadata which was disclosed

24  in this case.  There is no disclosure issue here at all.

25            THE COURT:  Well, I understand your assertion,

1   but what do I do?  They tell me they never got the metadata.

2   So I guess tell me how and when you disclosed the metadata.

3              MR. OUSSAYEF:  So we produced the Iyengar files

4   with the associated metadata during discovery in the normal

5   course of discovery.  The metadata they're referring to is,

6   Your Honor, if you think about like a Word document or

7   something like that, if you click on the Word document,

8   you go to properties, you can see the last data was modified

9   or the last data created, that kind of stuff.  So that

10  associated metadata is attached to certain files.

11             So for e-mails back and forth, for example,

12  sometimes there is metadata about what other e-mails are

13  associated with that e-mail chain.  That kind of metadata

14  was produced in the normal course of things.  And,

15  furthermore, our expert specifically, as we just heard,

16  talked about metadata in his expert report and why it was

17  relevant.

18             THE COURT:  The metadata that you want to talk

19  about today is the metadata that you disclosed?

20             MR. OUSSAYEF:  Yes, Your Honor.

21             THE COURT:  There is some other type of metadata

22  that you didn't disclose but he is not going to talk about

23  that?

24             MR. OUSSAYEF:  No, all the metadata has been

25  disclosed and all the metadata has been discussed in

1433

1   Dr. Schmidt's report.  There is no area that hasn't been

2   disclosed.  There is nothing that hasn't been disclosed.

3                  THE COURT:  You seem to understand -- they

4   clearly told me they didn't get the metadata, and you seem

5   to understand what they're talking about.  Is there some

6   other set of metadata that they would have cause to say we

7   didn't get?

8                  MR. OUSSAYEF:  There is nothing that I

9   understand.  I mean I understand what metadata is.  And I

10  understand they're saying they didn't get it.  But we did

11  produce it to them, so it's possible that they looked at the

12  file and they didn't understand that there are properties to

13  that file, but it all pops up in the database when you open

14  the files.

15                 So the only thing I can think of is they didn't

16  actually review the metadata associated with this file and

17  now they're saying that it's unexpected.  But our expert put

18  it in his report that this file, which was produced with

19  metadata, is authentic and one of the reasons, not the only

20  reason, is that there is metadata that says it was last

21  modified on this date which supports the invention date of

22  our inventor.

23                 THE COURT:  All right.  So when they say this is

24  beyond the scope, you can point to where he talked about

25  metadata?

1    MR. OUSSAYEF:  Yes, Your Honor.

2    THE COURT:  Okay.  Thank you.

3    Come back.

4    MR. HAACK:  Your Honor, I can be clear about the

5    metadata we're talking about.  So I'm sure counsel will

6    correct me if I'm wrong, but files on a file system have

7    dates associated with them in the file like the last, when

8    it was created, when it was last modified and so on.  The

9    version of the source code that counsel produced to us was

10   produced as like essentially scanned images, not the

11   original files in which we could actually inspect the

12   metadata.

13        If counsel believes, otherwise I encourage them

14   to tell us when and how they produced it.  We checked the

15   production files.  We checked the database.  There is no

16   production whatsoever.

17        And so given that, the fact that Dr. Schmidt

18   says without any support, without citing to any document,

19   metadata confirms my opinion, I don't see how that is

20   testimony the jury should be hearing.

21        THE COURT:  All right.  Mr. Oussayef, come on

22   back.

23        Did you produce the native file?

24   MR. OUSSAYEF:  We didn't produce the native

25   files, Your Honor, but we still produced the metadata

1  associated with the files.  So there is two ways you can

2  produce a file.  You can either produce the Word document

3  itself, for example, or you can produce the image of the

4  Word document and the extracted metadata from that document.

5       THE COURT:  So did you produce something

6  equivalent to an image of the metadata?

7       MR. OUSSAYEF:  Yes, that's right, Your Honor.

8       THE COURT:  All right.  Mr. Haack, is that

9  correct?

10      MR. HAACK:  Your Honor, what we got was a

11  database from IBM that lists information about the

12  documents, the actual -- we didn't get an image of the

13  metadata or the actual metadata itself sufficient for us to

14  actually put it in front of an expert or some sort of

15  analyst who can actually look at that and see what is

16  correct.  The Dr. Schmidt references file storage data, all

17  we have is essentially, you can imagine like an Excel

18  document that says Bates number one, here is some

19  information about it.  We don't have anything where we can

20  look at this files they purport to be relying on and say is

21  the data in this sort of table correct.

22      THE COURT:  You have a database, if I understand

23  correctly, that has the data for the particular document and

24  has the metadata for that document; is that right?

25      MR. HAACK:  I guess from our perspective, Your

1   Honor, this is something that there is no way -- like, so

2   these types of file creation dates are the kind of things

3   where if we are given a chance to analyze the files

4   themselves, we can ascertain the data, the sort of data that

5   accompanied the production was accurate or correct.

6          THE COURT:  Putting aside whether it's accurate,

7   your argument I thought was they never gave it to us.  Now I

8   understand they did give it to you, but in a format that

9   you're unhappy with now in part because you don't know

10  whether it's reliable.

11         MR. HAACK:  So I guess the distinction between

12  what counsel is saying and what I am saying is that for

13  something like this we're trying to authenticate a document

14  based on file metadata.  What we got is something that shows

15  essentially like -- I guess the problem is we don't know

16  what it shows.  It could be anything.  These export

17  processes for these discovery systems, these discovery basis

18  routinely have fields that get unused or get extracted in

19  unknown ways to us.  What we have is a process with no

20  insight into the process and none of the original data

21  underlying that process.

22         THE COURT:  All right.  Anything else?

23         MR. HAACK:  No, that's it, Your Honor.

24         THE COURT:  I'm overruling all of these

25  objections.  I have the representations from plaintiffs that

1    they produced everything that they intend to use with, I

2    guess it's Dr. Schmidt.  He is going to authenticate what he

3    has relied on.  He's going to testify that he found

4    sufficient indicia of authentication in the materials that

5    he reviewed.  He is an expert who can rely on this sort of

6    material.  Again, it appears that it was disclosed in

7    production, in discovery that is to the defendants.

8                  The concerns I'm hearing today sound like

9    they're discovery type disputes.  If you wanted this

10   material in a different format or you thought you couldn't

11   query it in a way you wanted to or your expert was somehow

12   limited, I think the morning of trial of the rebuttal

13   testimony of the expert is too late to raise that type of

14   complaint.  It certainly seems relevant to disputed facts

15   including at least reduction to practice.

16                  I'm not persuaded from what I have heard that

17   purported testimony is beyond the scope of what the expert

18   disclosed.  He disclosed reliance on metadata.  And I don't

19   find that there is anything unfair or prejudicial about the

20   demonstratives or about offering the evidence as substantive

21   evidence based on the authentication that we expect.

22                  Any questions about that?

23                  MR. HAACK:  No, Your Honor.

24                  THE COURT:  Any questions?

25                  MR. OUSSAYEF:  No, Your Honor.

1    THE COURT:  Anything else from Groupon this

2    morning?

3         MR. HADDEN:  No, Your Honor.

4         THE COURT:  Okay.  In terms of the deposition

5    issues that were discussed late yesterday and with the

6    letter of July 23rd which I think is yesterday, first with

7    respect to Mr. Carlisle, Groupon's objection to the Carlisle

8    deposition designations is sustained.  I did go back and

9    look at the transcript.  I overruled the plaintiff's

10   objection at the end of the redirect testimony.  I did not

11   strike the statement from Mr. Carlisle.  And then

12   Mr. Carlisle was excused without any objection from

13   plaintiff.  I'm standing by the rulings.  Mr. Carlisle is

14   not going to be recalled.  He was here, I made the rulings I

15   made, and we all let him leave, so we're done with

16   Mr. Carlisle and, therefore, I'm sustaining the objections

17   and that makes IBM's objection to the trial transcript moot,

18   meaning we're of course not going to reread that portion of

19   the trial transcript.

20        With respect to witness Pomeroy, I'm sustaining

21   Groupon's objections there as well.  She was here.  I went

22   back and looked at the transcript as well on this one.  She

23   was here.  We discussed accommodating her schedule.  The

24   defendant very clearly said they were not going to call her.

25   And we all agreed that she could leave.  Most particularly

1   the plaintiff raised no concerns about her leaving.  The

2   plaintiff said nothing about therefore we're going to rely

3   on her deposition testimony.  It appeared to me, and I think

4   quite reasonably appeared to me that this issue was done

5   with, that the plaintiff had nothing further to say about

6   these authentication issues because the witness was here and

7   we let her go.

8           Further, I'm not at all sure at this point in

9   this case that her testimony would be at all relevant.  And

10  I certainly think that playing her deposition would raise

11  substantial 403 concerns, particularly when she was here,

12  again, was ready to provide live testimony.  We have talked

13  about her and this issue going back to at least the pretrial

14  conference.  And again, I think it was reasonable on my part

15  and on the defendant's part to think that the plaintiffs

16  were finally dropping this authentication argument when they

17  let her get on the plane and leave.  So that objection of

18  Groupon's is sustained.

19          Any questions about that?

20          MR. OUSSAYEF:  No, Your Honor.

21          THE COURT:  Any questions?

22          MR. HADDEN:  No, Your Honor.

23          THE COURT:  We'll take a recess until the jury

24  is ready for us.

25          (A brief recess was taken.)

Weissman - direct

1          THE COURT:  The jury is all here.  We'll bring

2      them in in a second.  I will be available when we finish

3      today at 4:30, or whatever time we finish if it's sooner, to

4      talk about jury instructions.  And I don't charge time for

5      that.  But whoever is going to talk about jury instructions

6      and verdict sheets should be here at the end of the day.

7          MR. DESMARAIS:  You don't require all counsel to

8      be here for that, Your Honor?

9          THE COURT:  No, it's whoever you want to be

10     here.

11          (Jury entering the courtroom at 9:06 a.m.)

12          THE COURT:  Good morning, members of the jury.

13     Nice to see you all as always.  We are ready to get started.

14          Dr. Weissman, good morning to you.  You remain

15     under oath, of course.

16          THE WITNESS:  Yes.

17          THE COURT:  Good morning, Mr. Hadden.  You may

18     proceed when ready.

19                    DIRECT EXAMINATION

20     BY MR. HADDEN:

21     Q.     Good morning, Dr. Weissman.

22     A.     Good morning.

23     Q.     Can you just remind us where we were when we left off

24     yesterday?

25     A.     We were talking about the Amazon.com 1995 system, and

Weissman - direct

we were looking at step B of claim 51 in the '601 patent.

Q.    And I think we had completed step B; is that right,
Dr. Weissman?

A.    Yes.

Q.    Moving on to step C.  Can you explain what step C is?

A.    Step C is communicating a response that is returning
an output that's associated with the request that is
received in step A.  That includes the continuation that is
the new request, next request that the client may send.  And
the embedded state information in those requests were in the
continuations enable another service request and one of the
continuations must be invoked to continue the conversation.

Q.    And did the Amazon 1995 system perform that
communicating a response step?

A.    Yes, it did.

Q.    So how would that work in the Amazon system?

A.    Well, requests is made from a user on the Amazon
website.  The request is sent over to the Amazon server, and
an HTTP response is sent back across the network containing
the response, the outputs of that request.

Q.    And how do you know that the response that comes back
meets the other requirements of that communicating step?

A.    Because we looked at how that output was produced.
We looked at those template files and we saw the
placeholders in those template files and we saw that every

1   place a hyperlink or a new request is generated in that

2   output we saw that state information in the form of a

3   session ID, the dollar sign zero variable was placed in that

4   position, so every hyperlink, every new request contains a

5   session ID state information.

6   Q.      And you referred to hyperlinks and new requests.  Are

7   those the same things or what's required to have the state

8   information?

9   A.      So the claim requires continuation, so hyperlink is

10  just an example, so this is a request between the client to

11  the server to continue the conversation.

12  Q.      So did Amazon in 1995 perform the communicating step

13  of step C of the claim?

14  A.      Yes, Amazon performed step C.

15  Q.      And you determined that by looking at the Amazon

16  source code for 1995?

17  A.      Yes, I did.  Looking at the Amazon source code and

18  also speaking with Mr. Davis.

19  Q.      So what's your conclusion with respect to claim 51 in

20  the Amazon system in 1995?

21  A.      The Amazon.com practices all the limitations of this

22  claim 51 of the '601 patent.

23  Q.      Was the Amazon.com system for 1995 considered by the

24  patent office when it allowed the '601 patent?

25  A.      No, it was not.

Weissman - direct

1    Q.      So what is your conclusion as to the validity of

2    claim 51?

3    A.      My conclusion is that the '601 patent claim 51 is

4    invalid in light of Amazon.com 1995.

5    Q.      Now, if we look at claim 54, which I think as we

6    discussed is one of these dependent claims, can you just

7    explain to the jury at kind of a high level what the

8    difference is between claim 51 and claim 54?

9    A.      Yes.  So claim 54 is a dependent claim.  And we

10   talked about the embedding step as claim 51, that is

11   changing the continuation to include state.  This element is

12   requiring, or this step that is the embedding step actually

13   be performed on the client so that code is downloaded to the

14   client that actually performs the embedding step in response

15   to the said step of communicating the output to the client.

16   Q.      This the Amazon system, what would the client be?

17   A.      The client would be the end user sitting at their

18   browser.

19   Q.      In Amazon, was the embedding step at the client or at

20   the server?

21   A.      It was performed at the server.

22   Q.      So are there other documents that would have been

23   described performing operations like that at the client?

24   A.      Sure.  In that time period a person of ordinary skill

25   would understand that there are places to perform operations

1    on the Web, clients and servers, and Williams is such a

2    reference that a person of ordinary skill would know about.

3    And it describes a very common way to do client side

4    processing and that is the use of languages such as Java.

5    This is very important when we're trying to deliver dynamic

6    Web pages to the client, so the ability to change the pages

7    even at the client is very important.  We talked yesterday

8    about the pages that are going to be served are generally

9    dynamic, that they contain up-to-date information, so the

10    client is one place that a person of ordinary skill

11    understands one can do that modification so to speak.

12    Q.    So you are essentially saying that that cat sub

13    program that we saw could have been performed at the client?

14    A.    The equivalent functionality of cat sub which does

15    the -- if you recall the embedding modification, that can

16    be done in certain language such as Java which is a very

17    powerful programming language.

18    Q.    And does Williams describe using Java to perform

19    those types of operations on a client?

20    A.    Yes, it talks about Java and a specific type of Java

21    programs called Java applets which are especially designed

22    to operate inside browsers such as Netscape back in that

23    time frame.

24    Q.    So what is your conclusion with respect to the

25    combination of Amazon.com in 1995 and Williams with respect

1    to claim 54, the dependent claim?

2    A.    My assessment is that Amazon.com, in light of

3    Williams, practices method step B.

4    Q.    And was Williams considered by the Patent Office

5    before the '601 patent was allowed?

6    A.    No, it was not.

7    Q.    Now, you talked a little bit about a person of

8    ordinary skill in the art.  What is your opinion of what a

9    person of ordinary skill in the art would have been at the

10   time of this '601 patent?

11   A.    Sure.  So when doing a validity analysis, in looking

12   at prior art, you have to do this from the perspective of

13   what a person of ordinary skill who knows something about

14   the technology, how they would -- what they would do, how

15   they would be motivated to understand the invention and the

16   area.

17          So my analysis of the subject matter in the

18   patent, and what I understand a person of ordinary skill to

19   have to know, would be someone who has at least a degree in

20   either computer science or computer engineering or something

21   related technology and have an additional two years of

22   school, maybe graduate school, maybe working in the industry

23   or have some exposure to the area such as operating systems,

24   distributed systems, networking and file systems.  These are

25   the concepts that we see in the '601 patent.

Weissman - direct

1    Q.      And would a person of ordinary skill in the art, as

2    you describe them in 1996, have known that they could use

3    Java on the client side to perform these types of

4    operations?

5    A.      That was certainly well known.  These are persons of

6    ordinary skill or the students that I teach as a professor.

7    They have a bachelor's degree and they're in graduate school

8    or they come from industry.  Many times, they come back to

9    get a master's degree.  So these are students that I teach,

10   and these are students that I know have this understanding.

11   Q.      So why would that person of ordinary skill in the art

12   have been motivated to combine the Amazon.com system for

13   1995 with Williams in order to perform step 54?

14   A.      Sure.  So Java, Java applets, client-side processing

15   were extremely well known and very popular because it

16   off-loaded some of the processing from the server to the

17   client.  Remember, the servers are starting to get very

18   popular.  The web is taking off.  The more you can do

19   locally the better.

20           In particular, if you are doing processing on

21   the browser, you can respond to the user very quickly.  You

22   don't have to go all the way back to the server.  The user

23   types in the information.  You have seen this in a form.

24   You know, you type in the age and the computer says that is

25   incorrect.  That is done very quickly because the code is

Weissman - direct

1  waiting on the client.  So the benefits of client-side

2  processing to speed things up both in terms of response to

3  the user as well as offloading some processing at the web

4  servers was well known and very popular in this sort of time

5  frame, and still is for that matter.

6              And Java is a programming language which is

7  designed to run on any computer.  That's one of the special

8  features of Java.  And so this was well known to a person of

9  ordinary skill.  These are technologies that I would have

10  taught to those students.

11  Q.     And I think you were here when Mr. Davis testified

12  and was asked whether off-loading resources from the service

13  at Amazon was a concern for him at that point.  Do you

14  recall that testimony?

15  A.     I remember that testimony.

16  Q.     Did the fact that, in the particular Amazon system at

17  the time that Mr. Davis was working on it, that off-loading

18  from the server was not his main concern, does that change

19  your opinion on the motivation to combine?

20  A.     No, it doesn't.  Amazon is just one system.  He is

21  just one person.  I'm doing an analysis putting myself in

22  the mindset of a person of ordinary skill and looking at

23  web-based systems, and that are server based and whether

24  they would be drawn to the benefits of client-side

25  processing, there would be a motivation to do that.  And in

Weissman - direct

1    my opinion, there would be such a motivation.

2    Q.    So given that motivation to combine Williams and what

3    a person of ordinary skill in the art would have known, what

4    is your conclusion with respect to the validity of claim 54?

5    A.    My conclusion is that claim 54 is invalid with

6    respect to Amazon 1995, Amazon website and in light of

7    Williams.

8    Q.    Move on to another piece of prior art.  What is this

9    book, Spinning the Web?

10   A.    So this is a reference book or a textbook which

11   describes kind of the fundamental basic use of web

12   technology and how to work with those applications.

13   Q.    Is that what the book explains its purpose is?

14   A.    Yes, that is what the preface says.  It is anybody

15   that wants to serve information on the web, it tells you

16   first how to use the web, how to fetch and figure and

17   administer web servers.  And it goes on to describe actually

18   how to write web programs additionally.

19   Q.    And is this from the preface of the book?

20   A.    Yes.  So this is the author at the beginning of the

21   book, writing his thoughts on the book.  And he dates that

22   December 1995.

23   Q.    And what does this record show?

24   A.    What this is showing is that the book, the prior

25   preface indicated the book was written in 1995.  And the

Weissman - direct

1   date of publication, when the book actually went to presses,

2   shown as February 23rd, 1996.  So this is the kind of public

3   catalog for that.

4   Q.    And, generally, what does Spinning the Web describe

5   with respect to the '601 patent?

6   A.    The Spinning the Web reference teaches how one can

7   basically perform all the method steps of the '601, claim 51

8   in the '601 patent.  How the preserve state information

9   using stateless protocols such as web, HTTP or services are

10  sent from clients to servers.

11  Q.    So let's just walk through the claim elements and

12  look at Spinning the Web.

13          So for the first element, as you mentioned, it

14  talks about preserving state in this via stateless protocol.

15  Is that described in Spinning the Web?

16  A.    Yes, it does.  So this paragraph makes pretty clear

17  that servers are stateless.  It is using the HTTP protocol.

18  And as we'll go through, I'll showed you that the book also

19  shows one how to preserve state in spite of the fact that

20  the HTTP protocol is stateless.

21  Q.    So does Spinning the Web describe the preamble of

22  claim 51?

23  A.    Yes, it does.

24  Q.    Okay.  If we go to the first actual step in the

25  method.  Remind us again what this step requires.

Weissman - direct

1  A.       So this step requires receiving a service request.

2  So this is, for example, user in a browser making a request

3  for a web page, for example, and that request has to include

4  state information.  We talked about state information a lot

5  yesterday.  That this is information about a conversation.

6  And this has to be done via stateless protocol.

7  Q.       And this is the construction of "state information"

8  that you applied in your analysis?

9  A.       Yes, it does.

10  Q.       So how does Spinning the Web describe this

11  requirement?

12  A.       So Spinning the Web indicates that a special number

13  is included, a special value in all new requests or

14  continuations, URLs that the client will see after it

15  connects.  And all document request to the server contains

16  the document number in the URL.  And it says this is good.

17  This means the server, that is the program running on the

18  server can recognize to whom they are sending data by

19  looking at their URL and extracting the unique number

20  assigned to this client.  So disclosing session ID to the

21  client that uniquely identifies, that identifies information

22  about a conversation.

23  Q.       Just to be clear for the jury, does Spinning the Web

24  refer to this identifier as a client ID?

25  A.       It does.

Weissman - direct

1  Q.      And is that essentially the equivalent of the session

2  ID we saw on Amazon?

3  A.      Yes, they're equivalent.  And the patent also talks

4  about both of those as well.  All you need is something that

5  uniquely identifies a particular user interacting with the

6  user.  You can call it a client, you can call it a session

7  ID.  It doesn't really matter what you call it.

8  Q.      What does Spinning the Web describe about how it uses

9  that client ID here?

10  A.      Well, Spinning the Web indicates that it is important

11  to maintain state.  That is one of the things we need to do

12  for certain types of web applications.  That is to serve

13  documents that depend on what happened before.  So this is

14  what stateless is not giving us that we need to provide.  So

15  we need a way to maintain state, and we're going to do that

16  by encoding the state in the requested URL, and those URLs

17  are returned by the server in a document.

18          So the way that Spinning the Web describes, you

19  saw yesterday there are several ways to maintain state.

20  Spinning the Web is going to describe a specific way which

21  is encoding the state, embedding the state in the requested

22  URL.

23  Q.      And Spinning the Web talks about encoding the state

24  in the requested URL.  Is that the same as embedding the

25  state in that URL?

Weissman - direct

1    A.      Yes, it is.  We call that embedding.  In claim

2    construction, it's modifying a continuation.  For example,

3    hyperlink is modifying.  So putting the client ID in the

4    URL, modifying the URL satisfies that.

5    Q.      So does Spinning the Web describe step A?

6    A.      Yes, Spinning the Web performs step A.

7    Q.      So let's look at the next step.  And if you could

8    remind the jury what generally is happening with this step?

9    A.      Yes.  So in this step, when the service is executed,

10   an output is produced, you know, while the output is sort of

11   in progress, you, before it goes back to the client, you

12   identify all continuations.  Okay?  So you have to locate

13   all new requests that are being maintained in what you are

14   returning.

15          So that you then embed the state information to

16   all of those continuations in response to the request.  So you

17   get a request, you return an output from that request.  And

18   every place where the user can continue the conversation,

19   every hyperlink that you click, every one of those has to

20   carry this unique identifying state information.  That is the

21   way the conversation will go back and forth.

22   Q.      And does Spinning the Web perform, did you apply the

23   Court's construction of "continuation?"

24   A.      Yes, so a continuation, as I said, is a new request

25   which a client may send to a server, such as, for example, a

Weissman - direct

hyperlink.  So you need to look for the hyperlinks.

Q.    And how does Spinning the Web perform that step much

embedding the state information and all of those potential

continuations?

A.    So, as I will show, Spinning the Web relies on its

going to generate a response in a HTML document.  It's going

to use these, you have seen templates before which are sort

of blueprints for what is going to be returned, it's HTML

text and tags.  But because these are dynamic pages, they

are going to have special placeholders.  And in Spinning the

Web, they use a special string, three hash marks.  We saw I

in Amazon, it uses dollar sign.  Same idea.  So a special

indicator of this is a place you need to replace this

information with actual client ID or session ID.

Q.    So just to be clear, that three hashmarks in Spinning

the Web, is that the equivalent of the dollar sign zero Mr.

Davis talked about when he --

A.    Yes, he --

        THE COURT REPORTER:  I'm sorry.  One person at a

time, please.

        THE COURT:  Doctor, you have to wait until the

question is over.  Let's try that again.

        MR. HADDEN:  Sure.

BY MR. HADDEN:

Q.    Is the three hashmarks we see in the Spinning the

Weissman - direct

1    Web, is that the equivalent of the dollar zero that Mr.

2    Davis testified about in the Amazon templates?

3    A.      Yes, they are the same thing.

4    Q.      So what do we show here, Dr. Weissman?

5    A.      So here we're showing a HTML program, HTML document

6    that a user may request.  And so it's, you know, HTML, we

7    have seen this kind of thing before, and we see HTML tags.

8    And I'd like to focus on the lines of the code that say

9    HREF.  Those are hyperlinks.  So when this page is returned,

10   the user is going to see text that they can click on to

11   continue the conversation to go to the next request.

12           And what we notice is that in these URLs, we see

13   the three hashmarks.  So these are placeholders for values

14   that are going to be put in there and returned.  And, in

15   particular, what we'll see these are going to be client IDs

16   that are state information that is going to be returned back

17   to the server.

18   Q.      And this template file, the placeholders you show

19   here, this is actually from the book; is that right?

20   A.      This is a code that is in the book, yes.

21   Q.      So does the book actually include a sample of an

22   on-line store?

23   A.      Yes, this is just part of that.  So the book provides

24   examples of the shopping cart and other examples.  And so

25   this is sort of an excerpt from that.

1   Q.     And did the book include actual server side code that

2   would process these templates?

3   A.     Yes, it does.  So what has to happen, of course, is

4   that when this page is requested, it has templates, we have

5   to process the template as we have done, as we have shown in

6   other situations.  So there has to be code that replaces the

7   ### with client ID.

8   Q.     And does the book explain that this works so that all

9   of the continuations have that client ID?

10  A.     Yes, it does.  It clearly states here, and the code

11  confirms this if you read it, the client ID is included in

12  all URLs in the version of store.html.  So if you are

13  building a shopping cart, the client ID has to be in every

14  URL, every next request.  And that makes sense because we're

15  trying to maintain a shopping cart back and forth for that

16  user.

17  Q.     And what do we see here, Dr. Weissman?

18  A.     So here is a piece of code that is, fairly similar to

19  the cat sub that we saw in Amazon.  So you just need some

20  code at the service that if you are using templates that

21  can process the templates to replace any variables with

22  appropriate values.  So it's not the most friendly looking

23  code, I admit.  But what this is basically showing you in

24  the highlight is the pattern match and replace.  So what

25  this says is every place you see ###, replace it with the

Weissman - direct

1  client ID, and then print everything which means generate

2  and return the output.

3  Q.      So just to give a little context.  This c.pl, what is

4  that?

5  A.      That is a Perl script and that is running at the

6  server.

7  Q.      And that program is included in the Spinning the Web

8  book?

9  A.      That is part of the book, yes.

10 Q.      And this what we have here is just an excerpt from

11 that program; is that right?

12 A.      Yes, it is.

13 Q.      And this client ID would be specific to each user

14 that comes to the superseding indictment; is that right?

15 A.      That's correct.  The book describes that the client

16 ID is generated when the server detects.  This is the first

17 time the user shows up at the website.  It generates a

18 particular value and keeps track of that.  And that is what

19 it will put in here.

20 Q.      So if we go back, what is the effect on this at the

21 template of running that code c.pl that we just looked at?

22 A.      So the effect of running that c.pl processing this

23 template is to locate, identify the ### that was what the

24 pattern matching is doing and simply replace them with the

25 value of the client ID.  So it is going to leave the rest of

Weissman - direct

1  the text intact.  So we leave this page as is but simply

2  replace the highlighted, the four highlighted areas with the

3  value of the dollar sign client ID.  That just says put in

4  the value for that area.

5  Q.      So does the c.pl perform the embedding process in the

6  template?

7  A.      Yes, it does.

8  Q.      Is that essentially same as what the cat sub does at

9  Amazon when it processes the Amazon templates?

10  A.      The same idea.  You have the same template which is

11  an input to a program.  The program processes that template

12  and makes a substitution.  Same idea.

13  Q.      And after the c.pl process in this template replaces

14  the hashmark when this specific client ID, what does the

15  program in the Spinning the Web do?

16  A.      It returns the information to the client.

17  Q.      It's a Web page at that point?

18  A.      It is a Web page.  You can see it's HTML.  What we

19  need to do is get rid of the hash, hash, hash, that's what

20  the c.pl does first, then the page is returned with client

21  IDs.

22  Q.      Now, just to be clear, once this gets returned to the

23  user, and these hashes are replaced with client ID, what

24  happens if the user selects any of these links on the page?

25  A.      So the user is going to get the output of this, or

Weissman - direct

1  this page back and what they'll have available to them, you

2  see four hyperlinks there, you see four things with

3  underlines, things you can click.  The important thing is

4  that those URLs contain as a parameter after the question

5  mark a client ID, a unique number.

6  Q.    So after this template is processed by c.pl and then

7  returned to the user, these would all be continuations with

8  embedded state information?

9  A.    Yes, just imagine, hash, hash, hash, it's number of

10 23, the server notes that reference to user, Bill, on this

11 website.  So that's what's returned.

12 Q.    Does Spinning the Web describe using this in the

13 context of adding items to the shopping cart?

14 A.    This is part of a shopping cart example.

15 Q.    What are you showing here, Dr. Weissman?

16 A.    So, if you remember on the previous piece of code,

17 that file store file that's returned contains embedded

18 hyperlinks as we just described.  One of those links is to

19 another Web document, cart.pl, so if you look at say the

20 third, there we go, the third hyperlink there, the user

21 would click on that.  What the user is requesting is

22 basically the shopping cart, cart.pl.  And it will be passed

23 that client ID.  This is a different program now we're

24 looking at cart.ph.  This is a program that's going to

25 generate the Web page for the cart.

Weissman - direct

1            And we notice that this program is going to

2    return a Web output.  This is the next step.  And the print

3    statements are basically going to output HTML to the client

4    when they click on the shopping cart or the cart program.

5    And notice that wherever we are generating hyperlinks,

6    HREFs, continuation, we are including within them the client

7    ID again, so that same session ID, the same client ID is

8    going back again to the client, so it's going back and

9    forth.

10           So if the client were to click on any of these

11   hyperlinks to look specifically at maybe they want to pay or

12   do other operations, clicking hyperlinks, the state

13   information is already embedded in there and then it will go

14   back to the server.  The server doesn't remember anything.

15   The server receives a request, okay, client ID again, 23, I

16   know who you are.

17   Q.     Does this shopping cart page work essentially the

18   same way as the Amazon.com shopping cart that we looked at?

19   A.     It works in very similar way.

20   Q.     So does Spinning the Web describe the step B, the

21   identifying all continuations, et cetera?

22   A.     Yes, it does.

23   Q.     Now, let's look at the last step.  And again, remind

24   us what's required in this step?

25   A.     So this step is communicating a response.  This is

1  the response that links up with the request that the user is

2  making.  The user including the continuation to the

3  hyperlinks and embedded state information, that's the client

4  ID, whereas the continuations enable another service request

5  and one of the continuations must be invoked to continue the

6  conversation.

7  Q.    So, how does Spinning the Web describe this element?

8  A.    As it says clearly here, the script that we looked at

9  generates output, both scripts do, generate output which the

10  server interprets, does any processing on it to replace the

11  hashes, and then sends it back to the client.  So this is

12  disclosing that the client, the output is being sent back to

13  the client.

14  Q.    What does the print everything indicate here?

15  A.    Print everything says output the Web page.

16  Q.    So focusing on the last part of claim C where it

17  talks about wherein the continuations enable another service

18  request and one of the continuations must be invoked to

19  continue the conversation.

20  A.    Yes.

21  Q.    Explain how Spinning the Web shows that that is

22  satisfied?

23  A.    Well, the only way to continue the conversation in

24  Spinning the Web is to click one of those hyperlinks.

25  That's the only way that the client can issue a new request,

1  continue the shopping cart operation.  And we have shown, I

2  have shown previous, in previous material that every

3  hyperlink that's going to go back will contain the client in

4  the embedded state.

5  Q.    Is that what Spinning the Web is saying right here?

6  A.    All document requests to the server contain this

7  identifying number in the submitted URL.  It's saying in

8  words and every hyperlink that we looked at in that shopping

9  cart example were shown to contain client identifier.

10 Q.    When it says the client identifier can be propagated

11 through whatever other pages are displayed, is that saying

12 the client ID is in all links and all pages in Spinning the

13 Web?

14 A.    It is in all links and all pages, back and forth.

15 Q.    So what's your conclusion with respect to element --

16 step C in Spinning the Web?

17 A.    My conclusion is that Spinning the Web discloses how

18 to perform step C.

19 Q.    So overall, what's your conclusion with respect to

20 claim 51 and whether it's valid or not in light of Spinning

21 the Web?

22 A.    My conclusion is that claim 51 on the '601 patent is

23 invalid in light of Spinning the Web.

24 Q.    Again, was Spinning the Web considered by the patent

25 office before the '601 patent was allowed?

Weissman - direct

1    A.      No, it was not.

2    Q.      Let's go to the dependent claim, claim 54.  Now, when

3    we went through claim 51, where was the embedding step being

4    performed in our Spinning the Web example?

5    A.      In the Spinning the Web example what we saw was a

6    session program, c.pl was executed on the template, that was

7    at the server once it received a request.

8    Q.      And Spinning the Web doesn't include an example where

9    those same steps are performed on the client, does it?

10   A.      It doesn't give an explicit example, but it talks

11   about technologies to enable this.

12   Q.      Let's look at this.  So what does Spinning the Web

13   describe with respect to the ability to perform actions like

14   this on the claim?

15   A.      So Spinning the Web describes that increasingly Java

16   is available and enables the server to send the Java program

17   to be executed by the client.  And that program can, it says

18   fetch information, interact with the user locally, and

19   talked about when it described can be used to make it

20   efficient for the user to interact with the Web page and

21   display animations.

22   Q.      Is Spinning the Web describing the same idea that

23   these types of processes can be performed on the client

24   using Java that we saw in Williams?

25   A.      Yes, Spinning the Web is describing that Java is a

1    way to do processing on the client side.  And a person of

2    ordinary skill in understanding how Java and also Java

3    script works would then be able to use those in off-loading

4    processing to the client.

5    Q.      What are you showing here from Spinning the Web?

6    A.      So here is another similar language, Java script,

7    another client side programing language.  And what Spinning

8    the Web is indicating is that it is actually likely to be

9    built and it is built into many browsers.  And it's little

10   bit simpler language than Java, but it is the same idea.

11            And what he's describing here is that pieces of

12   the Web page, the links, the paths, the searches, these are

13   all available to Java script program at the client.  So if

14   the Java script program wanted to modify the links, locate

15   the links, embed the links, there is a very simple interface

16   to allow them to do so.  This is giving you a roadmap of how

17   you might modify URLs, for example, at a client.

18   Q.      And is your opinion as to why it would be obvious to

19   one of skill in the art to use Java script to perform these

20   types of operations that you mentioned with respect to

21   Williams the same with respect to the Java script in Java

22   and Spinning the Web?

23   A.      Yes, it is.  Spinning the Web discloses Java script.

24   Java shows the pieces that you would need to do this, and

25   the benefits, and the person of ordinary skill would be able

Weissman - direct

1   to apply them in my opinion.

2   Q.      And the benefits from doing that would be the same as

3   the benefits that you just discussed with respect to

4   Williams and the Amazon system?

5   A.      The same benefits.

6   Q.      What's your conclusion with respect to claim 54 and

7   Spinning the Web?

8   A.      My conclusion is that claim 54 is invalid in light of

9   Spinning the Web and the knowledge of the person of ordinary

10  skill.

11  Q.      Let's move on to the last patent -- before we get

12  there.  So in summary, what's your opinion with respect to

13  the validity of the '601 patent?

14  A.      The '601 patent is not valid based on Amazon 1995

15  website and in light of Spinning the Web.

16  Q.      And to be clear, was any of the prior art, the Amazon

17  systems, Spinning the Web or Williams discussed or

18  considered by the patent office?

19  A.      No, they were not.

20  Q.      So if we go to the last patent, '346.  We have here

21  the Court's claim constructions.  And did you apply the

22  Court's claim constructions in your validity analysis of the

23  '346 patent?

24  A.      Yes, I did.

25  Q.      And what is this diagram showing?

Weissman - direct

1    A.      This is the diagram from the patent which is

2    describing single-sign-on operations and the ability to

3    create accounts dynamically.

4    Q.      And do you recall Dr. Hinton's testimony at trial and

5    her deposition regarding this figure and Liberty Alliance?

6    A.      Yes, I do.

7    Q.      And could you explain what the conclusion you draw

8    from that is?

9    A.      The conclusion is that Liberty Alliance performs all

10   of the steps that are basically in the background here.  And

11   really what's left is this one piece creating a new account

12   for the year.  So the patent --

13           THE COURT:  Excuse me a second, Doctor.  One of

14   the jurors needs a pen.

15           Thank you.  Sorry to interrupt, go ahead.

16           THE WITNESS:  Sorry.  So most of the steps here

17   are performed by Liberty Alliance and that's been

18   acknowledged by Dr. Hinton.  One piece that is different is

19   this creating new account.

20   Q.      And if you could remind the jury what Liberty

21   Alliance was?

22   A.      Liberty Alliance was a standard for single-sign-on.

23   Q.      Was it a standard that Dr. Hinton used in her work on

24   the single-sign-on system and IBM?

25   A.      The Liberty Alliance was described by Dr. Hinton as

1    something they used in building their system.  It's a

2    well-known single-sign-on standard.

3    Q.     So if we look at -- go back to claim 1 and look at

4    the preamble of the claim, what's your analysis of that with

5    respect to Liberty Alliance?

6    A.     Liberty Alliance discloses the preamble.

7    Q.     So one of the requirements of the preamble is

8    federated computing environment.  Do you recall that?

9    A.     Yes.

10   Q.     Did Liberty Alliance describe a federated computing

11   environment?

12   A.     Yes, it has.  It uses the word federated, but

13   moreover federated is described as, you know, enabling a set

14   of entities to form -- to be able to exchange information

15   about user without any prior knowledge or relationships.

16   And that is exactly what is disclosed here.

17   Q.     And that is kind of one of the main purposes of

18   Liberty Alliance?

19   A.     Absolutely.

20   Q.     And is that described here in the Liberty Alliance

21   doctrine we're looking at?

22   A.     Yes.  It uses the term circle of trust is a

23   federation of service providers and identity providers.

24   Q.     This is the Liberty ID-FF Architecture Overview; is

25   that right?

Weissman - direct

 1    A.      Yes.  This book comes from the Liberty Architecture

 2    documents.

 3    Q.      What is your conclusion with respect to whether or

 4    not Liberty Alliance describes the preamble of claim 1?

 5    A.      My conclusion that Liberty Alliance discloses the

 6    preamble.

 7    Q.      If we look at the next step which is the first sort

 8    of action step, it requires triggering a single-sign-on

 9    operation and it continues.  Do you see that?

10    A.      Yes, I do.

11    Q.      Is that described in Liberty Alliance?

12    A.      Yes, it is.

13    Q.      This is the same Liberty architecture overview that

14    we saw in the last slide; is that right?

15    A.      This is the same document.

16    Q.      What does this diagram show?

17    A.      This diagram is showing a single-sign-on initiation.

18    So the user is -- selects the preferred identity provider

19    and then user attempts to access a service and they are

20    redirected to the identity provider to help for login and

21    access the service.

22    Q.      Is this another example from the same Liberty

23    Alliance document that describes triggering a single-sign-on

24    operation?

25    A.      Yes.  So here the user, the identity provider that's

Weissman - direct

1    described in this example is the airlines, the airlines is

2    the major one here.  And the user is logged in to airline.

3    And then the user tries to access a protected resource, say

4    a car rental website to rent a car, and that triggers, it

5    says here seamless single-sign-on, so that the user will be

6    able to be logged in because they have credentials at

7    Airline.Inc.

8    Q.    So does Liberty Alliance describe the triggering the

9    single-sign-on step A?

10   A.    Yes, it does.

11   Q.    Let's go to the next step.  Can you explain what step

12   B requires?

13   A.    Yes.  Step B requires that you receive from the first

14   system that's the identity provider at the second system,

15   that's whatever server the user wanted to access the

16   resource, and an identifier associated user.

17   Q.    Is that shown in this Liberty Alliance standard?

18   A.    Yeah.  What it's showing here is that the user has an

19   account on Airline.com, they are using Airline.com which is

20   the identity provider.  And they want to access Hotel.com

21   and what is being shown here is that when that happens, the

22   airline sends a handle to the hotel with a user name.  So

23   the identity provider is sending an identity identifier.  In

24   step D it says the hotel receives that handle to recognize

25   the user as Jean123.

Weissman - direct

1    Q.      A handle is kind of an odd term for this.  Why is

2    that called a handle?

3    A.      It's a handle because it can be used for further

4    communications.

5    Q.      So this is essentially the name, if you will, that

6    the airline and the hotel will refer to that user by?

7    A.      Yeah.  It's sort of like an opaque set of information

8    that the airline knows refers to that user.

9    Q.      And why is it an opaque handle instead of just the

10   user's name?

11   A.      Because the system is generating unique identifiers

12   that can be put across the entire circle of trust.

13   Q.      If we look at this slide, is this describing that

14   same opaque handle or user identifier?

15   A.      Yes, this describes that the opaque user handle

16   serves the name to the service provider and identity

17   provider used in referring to the user when communicating.

18   Q.      So what's your conclusion with respect to whether

19   Liberty Alliance describes the receiving step B?

20   A.      My conclusion that Liberty Alliance does perform

21   method step B.

22   Q.      Now, with respect to the last step, the creating user

23   account, do you rely on Liberty Alliance for that step?

24   A.      I do not.

25   Q.      So where that is step of creating a user account in a

Weissman - direct

1    single-sign-on process described?

2    A.      It's described in two additional references, a patent

3    by Sunada, Xerox patent and a patent by Mellmer, a Novell

4    patent.

5    Q.      Let's look first at Sunada.  What is shown in this

6    figure?

7    A.      Sunada is showing a network environment very similar

8    to what we have seen before.  An identity provider which is

9    called an SSO server which tracks identities for all

10   participants that are in this circle of trust.  And it's an

11   internet network so we're talking about a system where

12   individual websites don't necessarily have relationships

13   with each other at all.

14              And he's showing a number of Web applications or

15   website boxes if you will that are located at different

16   places in the network.

17   Q.      So just to orient ourselves, you said SSO server.

18   That's the same as the identity provider in the patent?

19   A.      In Sunada it plays that role.

20   Q.      And the Web application, are these the equivalent of

21   the service providers in the patent?

22   A.      These are the service providers.  These are what's

23   running the website.

24   Q.      So these would be the websites that the user is

25   trying to single-sign-on into?

Weissman - direct

1    A.      Yes, like Hotel.com or Airline.com.

2    Q.      And the client would be the user?

3    A.      Those are the users trying to make reservations for

4    airlines, et cetera.

5    Q.      Does Sunada say all of these are within the same

6    enterprise?

7    A.      He does not.  He's saying here, you can have a

8    variety of networks such as the internet.

9    Q.      And he says that there are many Web applications; is

10   that right?

11   A.      Yes, many Web applications, many other servers and

12   the like.

13   Q.      And in the figure one, is all this performed on one

14   computer?

15   A.      It is not necessarily performed on one computer.

16   Q.      In fact, the network could be the internet?

17   A.      He says it's the internet, so I would take this to

18   mean the Web applications are running on different

19   computers.

20   Q.      Now, what does this figure from Sunada show with

21   respect to creating a new user account in a single-sign-on

22   process?

23   A.      So Sunada in figure three in this patent is

24   describing a situation where a user wants to access an

25   affected resource, he checks is the user already plugged

Weissman - direct

1    into the identity provider of the SSO, if it's not, he's

2    going to ignore that branch and go down.  The identity

3    provider knows about this user and can identify that user.

4              Then what is done in the blue box is at the

5    service provider, the service provider needs to have a user

6    account, sort of that car rental website, need a user

7    account, even though the user has logged into the airline

8    account.  Does the user account exist?

9              So this is where Sunada really picks up over

10   Liberty Alliance.  So you don't have an account, so that is

11   the no branch going down.  So now we want to create an

12   account with the user.  The user never created an account

13   before at this particular service provider.  So to obtain

14   the attributes that we need associated, we get them from the

15   SSO server.  So the provider has information and now we

16   obtain those attributes.

17   Q.    Can I just stop you for one second?

18              When this talks about attributes, what are

19   those?

20   A.    Those are information, identity information

21   credentials about the user.

22   Q.    So that is information about the user that is being

23   requested?

24   A.    Yes, those are attributes about the user that the

25   identity provider knows already.  So the service provider.

Weissman - direct

1  Q.      And what happens after that?

2  A.      Well, the service provider wants to attempt to

3  create an account for the user, and it's checking whether

4  the information that it has, it's determining whether the

5  information is adequate.

6  Q.      So --

7  A.      So we may have especial requirements for creating an

8  account.   An identity provider has some information.   It

9  gets that information.   And this particular site is

10  checking, is that enough to create an account?

11  Q.      So if I understand this right, the user doesn't have

12  an account, the service provider will get information about

13  the user from the identity provider or the service SSO?

14  A.      Right.

15  Q.      And then it checks whether the information it got

16  from the identity provider is sufficient to create the

17  account; is that --

18  A.      It has some attributes --

19          THE COURT:  Doctor, you have to wait until the

20  question is over.  Could you state that question again.

21          MR. HADDEN:  Sure.

22  BY MR. HADDEN:

23  Q.      So after the service provider gets the information

24  about the user from the identity provider in this

25  rectangular step, is the diamond here, the service provider,

Weissman - direct

1    determining whether that information it got from the

2    identity provider is enough to create a user account?

3    A.        Yes, it is.  It has some information.  It obtains

4    some attributes, and it is determining whether that is

5    sufficient.  And that is what is being determined or

6    processed in the diamond box.

7    Q.        And then we again have two paths; right?

8    A.        Correct.

9    Q.        So if we follow the "yes" path, that means if the

10   service provider has gotten enough information, it can then

11   be provided to create an account?

12   A.        Yes, the "yes" branch is I have enough information.

13   I can create an account.

14   Q.        And what happened at the next step?

15   A.        We continue on in the decision box, and these are

16   just the final steps.  And the last box says we provide the

17   service to the client.  So now the client, the user, is able

18   to access the protected resource.

19   Q.        And in the next box, I think there is kind of a

20   strange translation from the Japanese, but it says:  Judge

21   that the authority of the accessing user be that of a login

22   user.

23             What does that mean?

24   A.        I think they're just checking again that the user is

25   the one that requested service that is now logged in.

Weissman - direct

1   Q.      And the final step is what?

2   A.      And the last step is to, now that we have the user,

3   we judged them, their authority, logged them in, we have an

4   account, now we can provide the service to that client.  We

5   can let them have the welcome page.

6   Q.      So now the person can access, for example, their car

7   rental account because they have created one and they have

8   been signed in?

9   A.      Yes.

10  Q.      So what is your conclusion with respect to whether or

11  not Sunada describes the creating a user account in step C?

12  A.      My conclusion is that Sunada does perform this method

13  step.

14  Q.      Let's look at the other reference that you talked

15  about that creates the accounts at runtime.  What is the

16  Mellmer patent about?

17  A.      So the Mellmer patent is describing a system called

18  DigitalMe, which is kind of identity management system

19  which operates in a fairly similar manner, what we have

20  been talking about.  So we have different users.  We want

21  to establish common, kind of common identities for them,

22  store those identities and enable users to be able to be

23  logged in seamlessly to any system to access resources in

24  a federation.

25  Q.      And is this kind of the general architecture of the

Weissman - direct

1    Mellmer DigitalMe system?

2    A.     It shows just a piece of that.  This is showing

3    things like web servers which are the sites that contain

4    the resources that are being requested.

5              So web server, for example, this is one of the

6    service providers.  And what we're showing here is that web

7    server can request and communicate with identity server.  So

8    we have identity server at the bottom.  That is what we're

9    referring to earlier.  And so the web server can communicate

10   with the identity server to obtain identity information if

11   it needs that for, say, accounts.

12   Q.     And this zero-byte client, what is this?  Is that the

13   user's browser?

14   A.     Yes, that would be coming from the user browser side.

15   Q.     Now, what does this Figure 34 from Mellmer describe?

16   A.     So this is exactly analogous to what we just looked

17   at in Sunada.  So the user is at this other website, wants

18   to go in that website and access the resource, the web page.

19   And the website requires an account.  So we asked the

20   question, you know, does the user haven an account on this

21   site.

22   Q.     Can I stop you one second there?  We have seen a lot

23   these kind of diamonds in flow charts like this.  Does that

24   have a specific meaning in the flowchart when you see a

25   diamond like that?

Weissman - direct

1    A.      Yes.  What a diamond means is that the program is

2    making an assessment.  It is determining whether something

3    is true or not true.

4    Q.      In this case, the diamond was deciding the user

5    doesn't have an account at the service provider; correct?

6    A.      Correct.  The user does not have an existing account

7    yet.

8    Q.      And so what does Mellmer do in that case?

9    A.      So what Mellmer does, similar to what Sunada does, is

10   we then go to the identity provider to get information about

11   the user or hopefully creating an account for the user.  So

12   DigitalMe is the name of kind of the identity provider.

13   Q.      And is this unique ID, does that identify the user

14   that the identity provider sends to the service provider in

15   Mellmer?

16   A.      Yes, it provides information about the user.  So

17   the user has already logged into DigitalMe.  And you can,

18   Mellmer, the service provider ask DigitalMe, this server,

19   tell me something about the user, provide credentials you

20   might know about.

21   Q.      So what is your conclusion with respect to whether or

22   not Mellmer describes the last step C, creating user account

23   in claim 1 of the '346?

24   A.      Can we go back to the previous?

25   Q.      Sure.  Sorry about that.

Weissman - direct

1  A.      Yeah.  So -- and I want to talk about the box in

2  brown.

3  Q.      Sure.

4  A.      So the user, so the second site, the service provider

5  gets information about the user, that's this unique ID;

6  checks whether it's federated, that's the triangle box.  Is

7  the site prepared to share information?  And, finally, in

8  brown, the site creates the user account.

9          So the second site, service provider, is able to

10  create a new account for the user.

11  Q.      So does Mellmer describe step C?

12  A.      Yes, it does.  Mellmer describes how to perform step

13  C.

14  Q.      Now, because we have a combination here of liberty

15  Alliance with either Sunada or Mellmer, how would a -- who

16  would be a person of ordinary skill in the art with respect

17  to the field of this patent?

18  A.      So, again, in making a judgment about, you know,

19  validity, you have to put yourself in the mindset of

20  somebody back in that time frame and look at the subject

21  matter of the patents saying, okay, in this technology area,

22  what would this person need to know?

23          And similarly to the '601 patent, this is a

24  person that has technical background, a degree, computer

25  science, computer engineering, electrical engineering, some

1    similar technology or degree, but additional experience,

2    either working experience or graduate school.  And, in

3    particular, the skills that they would need are related to

4    distributed systems, Internet software, and so on.

5               So this patent is about logging on users and

6    distributed environments.  So this is the kind of skill set

7    that students or a person of ordinary skill would have to

8    have.  And as I said earlier, I taught students with exactly

9    that skill level as a professor.

10   Q.    Let me just skip down here.

11              So why would that person of ordinary skill think

12   to combine the Liberty Alliance with either Sunada or

13   Mellmer?

14   A.    Well, a person of ordinary skill would first

15   understand that Liberty Appliance is a standard that the

16   industry was buying into and being promoted very heavily.

17   And I think Dr. Hinton testified to that as well.  So they

18   would have an awareness of standards such as this where they

19   would be drawn to a standard like this.

20   Q.    And why are standards like Liberty Alliance important

21   in this realm of single-sign-on technology?

22   A.    So single-sign-on, the whole purpose is to build

23   larger and larger federations of trust so that user can

24   access more and more websites, more and more service

25   providers, and to enlarge that benefit.  So if I have a

Weissman - direct

website, I'm a service provider and I enable the user to

seamlessly login using an identity provider without having

to type that information, that is a real advantage.

So there is a real incentive for service

providers to new websites to want to buy into this and

participate and run the same protocols that everybody else

is running.

Q.    And is that what you are describing here as the

benefits about these standards?

A.    Yes, I can just state those.

So interoperate with compatible network, so I

call roll the system.

Avoid duplicating efforts.  We already described

the way that the single-sign-on works.  Obviously, you want

to leverage that.

And, in particular, the communications standards

that Liberty Alliance already provides.  It already had

protocols for doing that.  You don't have to write that

code.

Step item 4, as I mentioned, more and more

entities in this network.  So everybody benefits by

everybody being in the network; right?  And now I could have

a user account and have it work all over.

This is the basic SSO kind of benefit.  I just

have to have a identity provider account and I get

Weissman - direct

1    seamlessly logged into all these other sites.

2    Q.      And, in fact, did IBM and Dr. Hinton refer to Liberty

3    Alliance because it was the standard or one of the main

4    standards?

5    A.      Yes, she does.  So she is sort of asked about having

6    pre-established standards being important to new systems

7    that people want to deploy.  And she was indicating that

8    prior to standards such as Liberty Alliance or other ones,

9    there was no real way to interoperate.  And if two parties

10   want to talk, they wanted a website to talk to another one,

11   they would have to necessarily write-up a custom protocol,

12   that takes some work.  So there is a real incentive.

13   Q.      And, again, did Dr. Hinton confirm that Liberty

14   Appliance is one of the main standards at the time?

15   A.      Yes, she did.

16   Q.      And did Dr. Hinton confirm she is to rely on Liberty

17   Alliance, which I think is shorthanded here as ID-FF, at IBM?

18   A.      Yes, Dr. Hinton is indicating here that when IBM was

19   building their single-sign-on systems, within that, they

20   were explicitly interested in targeting SAML and ID-FF as

21   single-sign-on protocols.  They wanted IBM to be able to

22   interact, to interoperate with other services, service

23   providers.

24   Q.      Going back.  Would adding account creation to Liberty

25   Alliance break the Liberty Alliance standard?

Weissman - direct

1    A.    No, it would not.  The reason is that you take a

2    standard and we don't modify the standard.  The standard is

3    intact.  You simply use the standard to build a better

4    system, more intraoperable system of your own.  So I don't

5    change the standard, I just adopt the standard.  I use its

6    protocols.  And I could add other features that are outside

7    the standard.  So it doesn't change the standard.

8    Q.    And, in fact, isn't that what IBM and Dr. Hinton did?

9    A.    Certainly, IBM used Liberty Alliance and certainly

10   added other features to their TFIM system.  They didn't

11   break the Liberty Alliance standard.  That stays as it was.

12   That doesn't change, but you can add things around it, but

13   still other people can use the standard.  It doesn't change

14   the standard.

15   Q.    Okay.  Let's go back and talk about the last claim,

16   claim 5 of this patent.

17         So before you get there, just to summarize your

18   opinion with respect to claim 1 of the '346 patent.  What is

19   your opinion?

20   A.    My opinion is that Sunada and Mellmer, with Liberty

21   Appliance, renders steps B and C invalid.

22   Q.    Is the claim, the entire claim invalid based on this

23   combination?

24   A.    Yes, it is.

25   Q.    And were the Liberty Alliance specifications provided

Weissman - direct

1    to the Patent Office in this case?

2    A.      They were not.

3    Q.      Was Sunada considered by the Patent Office in this

4    case?

5    A.      It was not.

6    Q.      Was Mellmer considered by the Patent Office before

7    the '346 patent was allowed?

8    A.      It was not.

9    Q.      None of the prior art that you have discussed was

10   considered by the Patent Office when it allowed the '346

11   patent?

12   A.      That is my understanding.

13   Q.      So let's look at the last claim.  And, again, this

14   is one of these dependent claims.  So let's start with the

15   first added requirement.  What does this describe, Dr.

16   Weissman?

17   A.      This is describing, this is a dependent claim off of

18   claim 1, and with claim 1 you are trying to create a new

19   account for the user.  Claim 5 is a limitation on that, and

20   that says:  in response to a determination at the second

21   system -- I think is the service provider -- that the second

22   system does not have sufficient user attribute information.

23           So they indicate how information is obtained

24   from the identify provider.  Here it is saying there is not

25   enough information to create the account.  It might require

Weissman - direct

```
 1    some different very special things.  So it doesn't have
 2    sufficient user attribute information to complete creation
 3    of the user account for the user at this second system, at
 4    the service provider.
 5              So what it is indicating is we then send a
 6    request message from the second system, the service
 7    provider, to the first system, the identity provider.  To
 8    obtain, to retrieve user attribute information, to retrieve
 9    additional information.
10    Q.    And does the prior art you looked at describe this
11    step?
12    A.    Yes, it does.
13    Q.    So let's start with Sunada.  What is shown in the red
14    box that Sunada describes?
15    A.    So, remember, the triangle is the decision point.  So
16    Sunada is determining:  Is information necessary for
17    creating the user account here?
18              So we're calling the prior steps, Sunada does
19    have some attributes already, but then determining is it
20    enough so a determination is made?
21              And as we saw earlier, if it has enough, we're
22    in great shape.  We just drop down and create user account.
23              However, if we don't have enough information,
24    that is the arrow shown on the right.  And we have to obtain
25    additional information.
```

Weissman - direct

1    Q.        Now, in Sunada, this area goes over and it talks

2    about asking the user to enter missing information; is that

3    right?

4    A.        That's correct.  That's one of the ways Sunada

5    discloses that additional attribute information to be

6    obtained.

7    Q.        Does Sunada also describe that the identity provider

8    stores attribute information?

9    A.        Yeah.  When the user first interacts with the

10   identify provider in the step above, the determining step,

11   Sunada obtains attributes, attribute association from the

12   SSO service.  So Sunada has disclosed that it does obtain

13   attributes, is able to obtain attributes from the identity

14   provider.

15   Q.        And how about Mellmer?  Does Mellmer describe the

16   service provider obtaining attributes from the identity

17   provider?

18   A.        Yes.  So in this excerpt here, this excerpt comes

19   from a portion of Mellmer which is describing different ways

20   to integrate accounts with DigitalMe with the single-sign-on

21   system.  And Mellmer is saying here is the partner site,

22   this is the service provider, could collect consumer

23   information such as name, e-mail address, et cetera, when

24   necessary, via a DigitalMe API or identity server.

25                So let's kind of unpack this.  So the

Weissman - direct

1   information that is being talked about here is the name

2   e-mail address, et cetera.  This is various types of

3   information that are necessary typically to create accounts.

4   So that is the kind of information that is being described

5   here.

6              He goes on to say:  When necessary.  So there

7   are times when you might have information but you don't have

8   this information.  You don't have all of this information.

9   So he is describing that Mellmer recognizes this may happen

10  and there need to be a provision for it.

11             And, finally, when I need that information,

12  "via," meaning I can acquire that information from the

13  identity server.

14  Q.    If we look at -- so is it your -- what is your

15  opinion with respect to whether or not this first additional

16  step of claim 5 of the '346 is described in Sunada and

17  Mellmer?

18  A.    I believe both Sunada and Mellmer practice this

19  method step.

20  Q.    Okay.  And what does the next and last step require?

21  A.    So the last step requires receiving at the second

22  system from the first system a response message that

23  contains the user attribute information -- so this is

24  receiving additional information that we need -- is employed

25  by the second system to complete creation of a user account

Weissman - direct

1    for the user at the second system.

2              So the prior steps said we just recognize that

3    we need more information.  And we send a request for it to

4    the identity provider.

5              And the last step is saying now we have received

6    it, and now once we have it, we can then create an account.

7    Q.    And does Liberty Appliance describe the service

8    provider receiving this additional information from the

9    identity provider?

10   A.    Sure.  So Liberty Alliance, the standard protocol

11   that, one of the features it has, it describes that identity

12   providers can also act out as attribute providers, providing

13   additional attributes, and can do so to service providers

14   such as an example here is the bank.

15   Q.    And in Sunada, does Sunada describe this a service

16   provider can receive user information from the identity

17   provider?

18   A.    Yes.  Because as we talked about in the box in red,

19   we obtain attributes from the SSO server.

20              So Sunada says we receive attributes.

21   Q.    So what is your conclusion with respect to the last

22   step of claim 5, the receiving at a second system?

23   A.    My conclusion is that Sunada in combination with

24   Liberty Alliance or Mellmer in combination with Liberty

25   Alliance practice and perform this method step.

1  Q.      And is your opinion with respect to why a person of

2  ordinary skill in the art would look at Sunada or Mellmer

3  and Liberty Alliance the same with respect to claim 5 as you

4  expressed in claim 1?

5  A.      Yes, it is.  They're in the same field.  These are

6  single-sign-on systems trying to make things more convenient

7  for users and one would look to the others.

8  Q.      What is your overall conclusion with respect to claim

9  5 in the '346 patent?

10  A.      That claim 5 is invalid.

11  Q.      Again, none of the prior art that you discussed was

12  considered by the patent office when considering claim 5; is

13  that correct?

14  A.      That is correct.

15          MR. HADDEN:  I have no further questions.  Pass

16  the witness.

17          One just housekeeping matter.  I read in a lot

18  of exhibits yesterday.  I think there is no longer an

19  objection, is that right.

20          MR. DESMARAIS:  That's correct, Your Honor.

21          THE COURT:  So all those exhibits that were

22  listed yesterday will be admitted.

23          MR. HADDEN:  Thank you, Your Honor.  Thank you,

24  Dr. Weissman.

25          THE WITNESS:  Thank you.

Weissman - cross

1    THE COURT:  Do you want to take a break or go

2  right into the cross?

3    MR. DESMARAIS:  It's Your Honor's preference.

4    THE COURT:  I'll look to the jury.  Break, no

5  break?  Break.  Okay.  We will take a break.  No talking

6  about the case and we'll get you back for cross.

7    (Jury exited the courtroom at 10:17 a.m.)

8    THE COURT:  All right.  We'll be in recess.

9    (A brief recess was taken.)

10    THE COURT:  We'll bring the jury in.

11    (Jury entering the courtroom at 10:34 a.m.)

12    THE COURT:  We are ready to proceed with

13  cross-examination.

14    Mr. Desmarais, good morning.

15    MR. DESMARAIS:  Good morning, Your Honor.  Thank

16  you.  John Desmarais for IBM.  Good morning, ladies and

17  gentlemen.

18                    CROSS-EXAMINATION

19  BY MR. DESMARAIS:

20  Q.    And good morning to you, Dr. Weissman.

21  A.    Good morning.

22  Q.    Now it's true, isn't it, that this isn't your first

23  time as an expert, you have been frequently been asked to be

24  an expert witness in lawsuits like this; right?

25  A.    I have been asked a number of times.

Weissman - cross

1    Q.      And one of your prior cases for Facebook you were

2    representing the accused infringer in that case; right?

3    A.      I was representing the defense.

4    Q.      The accused infringer; right?

5    A.      Yes.

6    Q.      And also in Actifio versus Delphix you worked on that

7    case and you worked again for the accused infringer; right?

8    A.      Yes, I did.

9    Q.      In the case of Ancora versus Apple, again, you worked

10   on that case and you worked for accused infringer?

11   A.      Right.

12   Q.      The same for BMC versus ServiceNow, you worked for

13   the accused infringer?

14   A.      Yes, I did.

15   Q.      Same as Ericsson and Apple, you worked for the

16   accused infringer; right?

17   A.      Yes, I did.

18   Q.      And in Good Technologies versus Airwatch, again, you

19   worked for the accused infringer; right?

20   A.      Yes, I did.

21   Q.      If we look at Intellectual Ventures versus Capital

22   One, you worked again for the accused infringer; right?

23   A.      Yes, I did.

24   Q.      And lastly, again for Motorola and Microsoft, in that

25   case you worked again for the accused infringer; right?

1  A.      Yes, I did.

2  Q.      And in many of those cases like this case, you served

3  expert reports, didn't you?

4  A.      Many of those cases I did.

5  Q.      And it's fair to say that every time you have given

6  an opinion on behalf of an accused infringer, you have

7  either concluded the patents were invalid or the patents

8  were not infringed or they were both not valid and not

9  infringed; right?

10  A.      In the reports I have written, I have cast those

11  opinions.

12  Q.      And here again for Groupon, you're representing the

13  accused infringer, and once again, you concluded all the

14  patents are invalid and infringed -- not infringed; right?

15  A.      I did a thorough analysis and reached that

16  conclusion, yes.

17  Q.      Now, I want to talk a little bit about your thorough

18  analysis.  So I'm glad you brought that up.  Let's take a

19  look at a timeline.  So I have been building this timeline

20  during the case.  You probably saw it because you have been

21  sitting there every day.  Right?

22  A.      I have been sitting here, yes.

23  Q.      So we already know that Groupon had notice from IBM

24  of the '967 and '849 back in November 2011.  You were here

25  for that testimony; right?

Weissman - cross

1    A.      Yes, I was.

2    Q.      And the '601 in April 2012, and you were here for

3    that testimony; right?

4    A.      Yes, I was.

5    Q.      And then August 2014 for the '346; right?

6    A.      Yes.

7    Q.      And then ultimately because the parties didn't

8    conclude a license, the complaint was filed in this case on

9    March 2016; right?

10   A.      That's what it was filed.

11   Q.      And do you know, though, that the very first contact

12   that Groupon made to hire you to be their expert was August

13   7th, 2017; right?

14   A.      I don't remember the exact date, but it was the

15   summer 2017.

16   Q.      You can look at your deposition.  You don't have any

17   doubt that it was August 7th?

18   A.      I have no reason to dispute you.

19   Q.      So let's put that on our slide.  That was first

20   contact; right?

21   A.      Yes.

22   Q.      And that was a telephone call, and at the point you

23   got that telephone call, you didn't know anything about this

24   case or anything about these patents; right?

25   A.      That was my first contact about the case.

Weissman - cross

1    Q.      In fact, you described it as an orientation call,

2    right, to learn what the case was about; right?

3    A.      They explained the subject matter, what was being

4    accused, the patents broadly.

5    Q.      And then you agreed to write an expert report on

6    whether the patents in this case were valid or not; right?

7    A.      No.  I agreed to engage in an agreement with Groupon

8    that we were going to look at materials.

9    Q.      You ultimately concluded the patents were invalid in

10   a report dated October 6th, 2017; is that right?

11   A.      I'm not recalling the exact date.  We can see it from

12   my report, but after doing the analysis, yes, I concluded

13   invalidity.

14   Q.      Well, we can look at the cover page of your report on

15   invalidity and it's dated October 6th, 2017, and that's your

16   signature; right?

17   A.      Thank you for jogging my memory.  Yes.

18   Q.      So am I right, then, that from ground zero of

19   receiving an orientation call and knowing nothing about the

20   case and knowing nothing about the patents, in less than two

21   month's time, your thorough analysis invalidated all the

22   claims in all the IBM patents; is that right?

23   A.      Well, I'm an expert in the subject matter.

24   Q.      That wasn't my question, sir.  Am I right about the

25   timing?

1   A.      I spent -- after that orientation call, I spent two

2   months, that's correct.

3   Q.      In fact, it was a little bit less, one day less;

4   right?

5   A.      One day less.

6   Q.      All right.  The patent is invalid on October 6th,

7   2017; is that right?

8   A.      That was my conclusion, yes.

9   Q.      And then you wrote a non-infringement report in this

10  case, too; right?

11  A.      Yes, I did.

12  Q.      And that was on November 3rd, 2017.  Do you see that?

13  A.      Yes, I do.

14  Q.      That's your signature; right?

15  A.      It is.

16  Q.      And that report as we have on the timeline is

17  November 3rd.  Let me to go our timeline.  But before I do,

18  you, of course, concluded that none of the patents were

19  infringed by any of the Groupon products; right?

20  A.      My analysis of the claims I found that none of them

21  infringed.  I want to add one other comment.  There is some

22  exposure prior to that August phone call.  I forgotten that

23  I had worked on the IPR that did involve the subject matter.

24  Q.      So on November 3rd, you concluded no patents

25  infringed by any Groupon products; right?

Weissman - cross

1  A.      Of the asserted claims that were made, I analyzed

2  those subset of claims and determined that they were not

3  infringed by what was being accused of Groupon, yes.

4  Q.      It's fair to say that because you were first working

5  on validity of the patents, you didn't actually start work

6  in earnest on the non-infringement issues until October

7  15th, 2017; isn't that true, sir?

8  A.      Well, I wouldn't characterize it that way, because

9  when I do validity analysis I want to have a full scope of

10  the case, so I was well acquainted with what was being

11  accused and did some analysis at that time.  But it's true

12  that the bulk of the analysis did occur after the report.

13  Q.      So it would be great if you don't mind if you listen

14  closely to the questions I ask and answer them the way that

15  I asked them, if that's okay, just so we can speed through

16  this.

17          Let me ask you again what I asked you, which is,

18  it's fair to say, isn't it, that you didn't begin to work in

19  earnest on your non-infringement opinions until October

20  15th, 2017?

21  A.      Yes, most of the work occurred after October 17.

22  Q.      So from the time you began in earnest working on

23  non-infringement to concluded that no Groupon products

24  infringed any IBM patents was three weeks; right?

25  A.      As I said, I looked at the materials as part of the

Weissman - cross

1  invalidity report, so I had looked at it as well as the post

2  October 15thhhh /STKPWHRERD.

3  Q.     Let's try again.  The question was from the time you

4  began in earnest working on the non-infringement report to

5  your conclusion that no Groupon products infringed any IBM

6  patents was three weeks; right?

7  A.     Approximately three weeks.

8  Q.     And am I right, sir, that to prepare the reports that

9  no Groupon products infringed any IBM patents, you didn't

10  talk to a single employee at Groupon about how the Groupon

11  products worked, did you?

12  A.     I did not.  The Groupon website is simple Web

13  technology, and I had complete understanding of how the

14  system worked based on the disclosures I had, source code

15  and documents.

16  Q.     The answer to my question is yes, to prepare your

17  report that none of the Groupon products infringed any of

18  the IBM patents, you didn't speak to a single Groupon

19  employee about how the products worked; true?

20  A.     Yes, I had no need to.  In fact, I prefer to do an

21  independent analysis first where I can completely look at

22  the material on my own.

23  Q.     Let's talk about that.  Because it's true, isn't it,

24  that you didn't review all of the Groupon source code, did

25  you?

Weissman - cross

1   A.       I reviewed the source code -- that's true, the source

2   code germane to what is being accused.

3   Q.       You reviewed only the Groupon source code that the

4   Groupon lawyers gave you to review; true?

5   A.       That is not true.  I also reviewed the source code

6   that was referred to in the Schmidt report which lays out

7   the alleged infringement case.

8   Q.       Fair point.  You reviewed Dr. Schmidt's report about

9   the source code he cited; right?

10  A.       I reviewed Dr. Schmidt's report to show infringement

11  of the claims.  I looked at that evidence.  I looked at

12  additional source code, that was source code evidence, I

13  looked at additional source code evidence provided --

14  Q.       Let's just be clear.  The only source code you

15  reviewed is source code Dr. Schmidt provided and source code

16  provided to you by the Groupon lawyers; isn't that a fact?

17  A.       That's correct.  I asked the Groupon lawyers to

18  provide me the code that was relevant to the claims and I

19  determined that it was.

20  Q.       And it's true, isn't it, that you also gave opinions

21  in your report that all of Groupon's prior products, prior

22  to today, none of those infringed any of the IBM patents;

23  correct?

24  A.       That's correct.

25  Q.       But it's true, isn't it, sir, that the code that the

Weissman - cross

1    Groupon lawyers gave you did not give you the ability to go

2    back in time and look at the old Groupon code; isn't that

3    true?

4    A.    I had that ability if I needed it, but I didn't need

5    to do that.

6    Q.    And you didn't do that to render your opinions that

7    none of the Groupon products infringed in the past either;

8    right?

9    A.    I didn't need to do that.

10   Q.    And it's true for the mobile apps, right, you

11   concluded that all of the prior mobile apps didn't infringe,

12   but you didn't have that prior mobile app code and you

13   didn't look at it; right?

14   A.    Based on the evidence that I had, it was sufficient

15   for me to draw my conclusions.

16   Q.    Just to be clear, without speaking to any Groupon

17   employees about how the products work today or in the past

18   and without looking at any code in the past, you concluded

19   that none of the websites and none of the mobile apps

20   infringed ever; right?

21   A.    The burden was IBM's and they did not meet their

22   burden.  And I have sufficient source codes and sufficient

23   documents to make that determination.

24   Q.    You would agree that as we see on the timeline from

25   first contact to validity reports to beginning in earnest of

1   non-infringement and to the infringement reports, that's a

2   pretty quick pace; right?

3   A.      It's what it is.  You can see the timeline.

4   Q.      You agree it's a quick pace; right?

5   A.      I have a lot of resources available to me to work on

6   things.  I wouldn't say it's quick or not.  It was what it

7   was.

8   Q.      Let's take a look at a section of your invalidity

9   report for a minute.  This is your October 6th report, and I

10  want to flip in particular to page 243.  Do you see that

11  section, sir?

12  A.      Yes, I do.

13  Q.      That was where you talk about a person of ordinary

14  skill in the art being motivated to combine, much like the

15  kind of testimony you gave earlier; right?

16  A.      Let me read it.

17          (Witness reviewing.)  Fairly similar.

18  Q.      In this section you're giving an opinion on the

19  validity of the patents; right?

20  A.      In this section I'm simply opining that a person of

21  ordinary skill would have been motivated to combine it.

22  Q.      This is your report we're looking at; right?

23  A.      Certainly this is my report.

24  Q.      And you signed it?

25  A.      Absolutely.

Weissman - cross

1    Q.     But you know sir, don't you, that this entire

2    paragraph, the whole thing, was copied verbatim from someone

3    else's report?  In fact, it was somebody you didn't even

4    know, somebody you never met; right?

5    A.     Well, so I looked at a lot of documents and there has

6    been a lot of material written about these patents, and this

7    was a cut and paste error.  The intent was to modify this

8    and put it in my own words, but this was a typo in the

9    report.

10   Q.     A typo?  It's an entire paragraph rendering a

11   validity opinion and it is word for word copied from

12   somebody else's report who you never even met; right?

13   A.     Well, it was pasted in inadvertently as a placeholder

14   because it described well what I agreed with, what I wanted

15   to say, and it missed my review and didn't get removed.

16   That was a typo.

17   Q.     It was pasted by Groupon's lawyers into something

18   that you claim is your report; true?

19   A.     I don't recall whether I put it in or Groupon, which

20   might look at the report and put in.  The intent was to

21   remove that and basically cite to it or put it in my own

22   words, it just didn't get done.  But I agree with all of the

23   arguments of that paragraph.

24   Q.     But you will agree, wouldn't you, sir, that the

25   Groupon lawyers wrote sections of your report here and

Weissman - cross

1  there, didn't they?

2  A.     I wouldn't put it that way.  The report was authored

3  by me.  My name is on the report.  Any expert reports there

4  is a lot of legal language.  I'm not a lawyer, so lawyers go

5  through and add various pieces of legal language.

6  Q.     I thought I put it just the way you put it at your

7  deposition, but let me try again.  The Groupon lawyers wrote

8  sentences from your report here and there, didn't they, sir?

9  A.     As I just said, they may have written the meaning of

10  legal terms which is common in any expert report,

11  boilerplate material.

12  Q.     So the answer to my question is yes, these guys over

13  here all throughout your report here and there were writing

14  it for you; right?

15  A.     That's not correct.  They didn't write any of the

16  opinions, any of the motivation, any of the analysis.  They

17  may have wordsmithed a word, they may have inserted, they

18  did insert some legal definitions of terms that I am not an

19  expert in, but the report is, the substance of the report is

20  mine.

21  Q.     So you saw paragraph that you didn't write that was

22  copied word for word from somebody else; right?  That was an

23  opinion we just looked at, wasn't it?

24  A.     That was a disclosure of information that

25  inadvertently got pasted in.  I agreed with it.  And it was

Weissman - cross

1  a typographical error.  It should not obviously have been

2  put there.

3  Q.    It was an opinion, it says a person of ordinary skill

4  in the art would have been motivated to combine, and then it

5  goes on for an entire paragraph of what a person of ordinary

6  skill would have been motivated to do.  And that's your job,

7  you're the person of skill, you're supposed to be coming up

8  with those opinions, not these guys and not some guy who you

9  never met who you copied this from; right?

10  A.    Absolutely.  These are my opinions.  And this excerpt

11  characterized what I felt.  And it should not have been put

12  in in that way.  It should have been written in my own

13  language.  But partly it was -- it slipped and it was a

14  typographic error, admittedly.

15  Q.    Let's talk a little bit about the Filepp patents,

16  switch gears a little bit.  Now, you and Mr. Hadden here

17  talked yesterday about this global container div in the HTML

18  code.  Do you remember that?

19  A.    Yes, I do.

20  Q.    And you were here in court when Mr. Hadden, Groupon's

21  counsel, was cross-examining Dr. Schmidt about the global

22  container div; right?

23  A.    Yes, I was.

24  Q.    Let's take a look at that cross-examination for a

25  second.  So Mr. Hadden asked IBM's expert, Dr. Schmidt, the

Weissman - cross

1    following question:

2              "Question:  So if I'm right and I can delete

3    that global container div tag from the Web page and the Web

4    page remained exactly the same in my browser, you haven't

5    shown that that global container div tag defines an area of

6    the screen?"

7              Do you see that?

8    A.    I do.

9    Q.    And Dr. Schmidt said:

10             "Answer:  I don't know that I agree with that."

11             And Mr. Hadden pressed him.  He asked him again:

12             "Question:  If I can take out and the page looks

13   exactly the same, how can you say that that global container

14   div tag is what it is, generating a first area of the user

15   screen?"

16             And Dr. Schmidt again pressed and said:

17             "Answer:  I need to try it out and see, but I'm

18   not agreeing."

19             You were here for this; right?

20   A.    These are the words that he said.

21   Q.    And Mr. Hadden pressed him again a third time:

22             "Question:  But if I'm right, let's assume I'm

23   right, assume I'm right that I can delete the global

24   container div tag from the HTML and the page looks exactly

25   the same in the browser, you would agree with me then that

Weissman - cross

1    you have failed to prove that that global container div tag

2    generates a first area on the user screen; right?"

3            And Dr. Schmidt again says:

4            "Answer:  Again, I don't subscribe to your

5    assumption."

6            You were here for all of that; right?

7    A.    I was here.

8    Q.    And you know, sir, don't you, that it was Mr. Hadden

9    that was wrong?

10   A.    I do not agree with your statement.

11   Q.    Well, Mr. Hadden told us in that questioning exactly

12   what to do; right?  At the top of the page, he says:

13           "Question:  But, I mean, that's easy to do,

14   right, you have your Chrome browser, you go to the view

15   source, you can delete this and see if the page remains the

16   same."

17           And Dr. Schmidt said:

18           "Answer:  I could do that."

19           Right?  Let's look at what that looks like if

20   you do exactly what Mr. Hadden said.

21           MR. HADDEN:  Objection, Your Honor.  He's now

22   testifying, he's going to show the experiment that I didn't

23   show.

24           THE COURT:  Isn't he asking an expert question?

25           MR. DESMARAIS:  I'm going to show him something

Weissman - cross

1    and ask him a question.

2              MR. HADDEN:  Same objection.  I don't know what

3    he's going to show him.  I had asked to do this and it was

4    objected to.

5              THE COURT:  I'll see you all at side-bar.

6              (Side-bar discussion:)

7              THE COURT:  I guess the objection is they

8    weren't allowed to do this on direct so you shouldn't be

9    allowed to do it on cross.

10             MR. DESMARAIS:  I don't know why he wasn't

11   allowed to do it on direct.

12             THE COURT:  Remind us then.

13             MR. HADDEN:  I was told I couldn't do it.  You

14   said no experiments.

15             THE COURT:  Remind me.

16             MR. HADDEN:  It was Phil Dunham.  I was going to

17   go over it and you said we couldn't do it.

18             THE COURT:  I remember there was a fact witness.

19   You didn't ask if you could do it with your expert, did you?

20             MR. HADDEN:  You told us we could do no

21   experiments that weren't in the expert reports.

22             THE COURT:  Well, first of all, we haven't had

23   this discussion in the context of an expert, have we?

24             MR. HADDEN:  They objected to Mr. Dunham was

25   acting like an expert, they said this wasn't disclosed in

1    our expert reports so we couldn't do it.  And I couldn't do

2    it with Mr. Dunham, either.  It's not disclosed in

3    Dr. Schmidt's report.  I don't see how he gets to get up and

4    do it on behalf of Dr. Schmidt in cross-examination.

5              THE COURT:  My recollection is I thought you

6    were trying to do things with a fact witness that had to be

7    done through an expert.  And one reason for that distinction

8    is that there are disclosure obligations for experts that

9    are even more sensitive than for a fact witness.  And I do

10   recall in that context saying you can't show experiments and

11   engage in hypotheticals and speculation with a fact witness.

12   I don't recall you ever asking could I show a particular

13   experiment with my expert.  I think you have conceded you

14   didn't ask if you could do that.

15             MR. HADDEN:  You already told me if the

16   experiment was not disclosed in the report, I couldn't do

17   it.

18             THE COURT:  Well, first of all, we had the

19   discussion in the context of Mr. Dunham and not in the

20   context of Dr. Weissman, through there are other

21   restrictions as you well know of what you can do with an

22   expert.  You can't do anything beyond the scope of what you

23   disclosed.

24             MR. HADDEN:  That's what they're trying to do.

25             THE COURT:  We're getting there.  You agree with

Weissman - cross

1    that; right?

2             MR. HADDEN:  I agree with that, yes.

3             THE COURT:  All right.  So the fact that you

4    couldn't do it on direct with this witness, I don't even

5    know that you're contending that you did previously disclose

6    this with this expert; correct?

7             MR. HADDEN:  I did not, that's why I didn't do

8    it.

9             THE COURT:  All right.  So what you could have

10   done with Mr. Dunham or with this expert on direct I think

11   is irrelevant at this point.  We're on cross-examination.

12   There are different rules.  What's the basis for objecting

13   that this is improper cross-examination?

14            MR. HADDEN:  Because this experiment was not

15   disclosed in Dr. Schmidt's report.  He didn't do it.

16            THE COURT:  Okay.  But we don't have Dr. Schmidt

17   on the stand, we have Dr. Weissman.  What makes this

18   improper cross-examination?

19            MR. HADDEN:  Because he's performing -- he's

20   testifying essentially as an expert.  He's performing an

21   experiment that I don't know what it is.  It's not disclosed

22   in the expert report.  You told us we couldn't talk about

23   experiments.  Why does he get to get up and do it as a

24   lawyer?

25            THE COURT:  You're not helping your case by over

1    generalizing about what I said.  I didn't say you couldn't

2    talk about experiments.  That's not a fair characterization

3    of what the ruling was.  My ruling was based on the issue

4    that was before me.

5         But in any event, what is the limitation on

6    cross-examination?  The counsel is clearly not testifying.

7    I mean, you could colloquially say you all do that on cross.

8    We all know as a legal matter, testimony, the evidence is

9    whatever comes out of in this case your witness's mouth.  He

10   doesn't have to agree with anything that he hears from

11   Mr. Desmarais, but where is this improper cross-examination?

12        MR. HADDEN:  I think it's improper because

13   essentially he's trying to get in something that's not in

14   Dr. Schmidt's expert report.  He's going to get up there and

15   ask Dr. Schmidt has he done this, he said no, now he's going

16   to try to do it on the fly in front of my expert.  I don't

17   know what he's going to do and it's never been disclosed.

18        THE COURT:  Mr. Desmarais.

19        MR. DESMARAIS:  On direct, Mr. Hadden got this

20   witness to testify on global container div tag, criticize

21   Dr. Schmidt's opinion on the global container div tag and

22   had testimony about how it works and I was cross-examining

23   on this.  I just asked him if he relied on this, he

24   testified he does, and now the evidence is what he just

25   said.  I want to get to that because he's wrong.  And he put

 1     this in issue.  I didn't put this in issue.

 2                 THE COURT:  You want to respond?

 3                 MR. HADDEN:  Yes, it's an undisclosed experiment

 4     that's not in Dr. Schmidt's report.  If Dr. Schmidt wanted

 5     to tell me that it won't change it, he could have, but he

 6     doesn't get to do experiments that were not disclosed by his

 7     expert.

 8                 THE COURT:  Are you proposing to do this with

 9     Dr. Schmidt?

10                 MR. DESMARAIS:  No.

11                 THE COURT:  I don't see it as improper

12     cross-examination, so the objection is overruled.

13                 You may proceed when you are ready.

14                 MR. DESMARAIS:  Thank you, Your Honor.

15     BY MR. DESMARAIS:

16     Q.    Is it -- okay.  So let's see what happens when you

17     delete the global container div tag and see if the screen

18     stays the same as Mr. Hadden asserted to Dr. Schmidt.

19                 (Demonstration given.)

20                 See what's happened when we deleted the global

21     container div tag, sir?  Did you see what happened,

22     Dr. Weissman?

23     A.    It went by real quick.  Let's do it again.

24     Q.    Okay.  Let's do it again.

25                 (Demonstration given.)

1           Did you notice, sir, that the entire screen

2    disappeared when we deleted the global container div tag?

3    A.      It's very possible that you deleted the tag and not

4    the closing tag at the bottom so you have an error and

5    nothing is being shown.

6    Q.      You saw that the screen disappeared; right?

7    A.      To delete the tag, you have to delete the opening tag

8    and the corresponding closing element much that tag.   So

9    it's not completely clear to me.   You might be looking at

10   just a broken web page.

11   Q.      You saw what happened when we deleted the global

12   container div tag and you sue this screen disappear, didn't

13   you, sir?

14   A.      It's a little hard to see what you did.   But as I

15   said, if you just delete the opening tag for the div, you

16   have to delete the slash closing tag, you have to delete the

17   entirety.   And I can't really tell if what you did was in

18   the entirety, or you may have just broken the web page.

19   Q.      You will agree with me we don't see anything on the

20   screen; right?

21   A.      Because you didn't properly delete the div tag.   When

22   you deleted the opening part, you didn't delete the close

23   and it is improper syntax on a web page.

24   Q.      Let's continue on in your opinions about the Filepp

25   patents.   Now, you know, don't you, that noninfringement

Weissman - cross

1    arguments have to be based in the claim language; right?

2    A.      Absolutely.

3    Q.      And that's one of the reasons you showed us this

4    slide.  This is the '967 patent, and you put the Court's

5    claim language up on top; right?  On the side.

6    A.      Yes, I did.

7    Q.      Now, there were a couple of things.  I went through

8    your testimony from yesterday.  There were a couple of

9    things that I didn't find in the claim language, so I want

10   to review those with you now.  Let's look at the transcript

11   from yesterday, particularly on page 1329.  And you are

12   talking about '967, claim 1, and this is page 1329, line 17,

13   or starting on 15.

14          You say:  Secondarily, it must be the case that

15   the partition is generated and then the application is

16   placed in that partition.

17          Do you see that, sir?

18   A.      Yes, I do.

19   Q.      Now, if we look back at the claim language, it says

20   here:  generating at least a first partition for presenting

21   applications; right?

22   A.      Yes, it does.

23   Q.      It doesn't say generating a first partition and then

24   later presenting applications.  That's not what it says;

25   right?

1   A.      Well, what it says is, what it says literally is what

2   I described it meant.  So it means generating a partition

3   and you present applications.  One has to happen before the

4   other.

5   Q.      Right.  In your opinion, in order for there to be

6   noninfringement of this claim element, you have to generate

7   a first partition and then later present an application;

8   right?  That's your opinion.

9   A.      It's not my opinion.  It is rooted in the claim

10  language.

11  Q.      So in your opinion, the word "for" means "and then

12  later?"

13  A.      You have to generate at least a first partition for,

14  for a purpose to have the first partition, and the purpose

15  is presenting applications.  Right?  To me, it's very clear.

16  Q.      And now you said the same thing about the next

17  element.  And this is on page 1337 starting on line 4.

18          You said:  It requires two things.  It requires

19  a second area on the screen, and it requires that that

20  second area then enable a presentation for a plurality of

21  command functions.

22          That's your opinion; right?

23  A.      Yes, sir.

24  Q.      That is why you don't, or Groupon doesn't infringe;

25  right?

1    A.      That is the claim requirement.  That is in the claim

2    language.

3    Q.      All right.  Let's take a look at the claim

4    language.  So if we look at the claim language:  generating

5    concurrently a first partition.  Do you see that?

6    A.      I do.

7    Q.      At least a second partition; right?  It doesn't say

8    "on the screen;" right?  Those words are not in the claim;

9    right?

10   A.      A partition is construed as an area of the screen.

11   Q.      "Partition" is construed as "area."  Do you see that,

12   sir?

13   A.      Area, yes.

14   Q.      So we can change "partition" to "area."  It doesn't

15   say "area on the screen" in the claim language, does it?

16   A.      Well, you are saying an area for presenting.  I think

17   the meaning of that, of course, is an area on the screen.

18   Where else would you be presenting?

19   Q.      And the claim further doesn't say, instead of "for,"

20   it doesn't say "and then later" presenting a plurality of

21   command functions, does it, sir?

22   A.      A person of ordinary skill in reading this claim

23   set would understand that you generate a partition for

24   presenting.  So you have the partition, then you present in

25   that partition.

1    Q.      Let's keep going because there is a couple other

2    things that I found interesting in your opinions that don't

3    appear in the claim language.

4              If we look on slide, excuse me, on transcript,

5    page 1341, at line 3, you testified:

6              "Answer:  You have to have a first area and you

7    have to have a second area."

8              "Question:  So is it right that according to the

9    Court's claim construction, you have to have two screen

10   areas and two things, one to put in each area?

11             "Answer:  That's how I would understand the

12   Court's claim construction."

13             Do you see that testimony?

14   A.      Yes.

15   Q.      And then right under that, you went and gave us the

16   high school lunch tray analogy; right?

17   A.      Right.

18   Q.      And you went and you showed the jury this, which

19   shows separate and distinct nonoverlapping areas; right?

20   A.      It shows separate and distinct areas, or separate

21   areas at least.

22   Q.      Now, if we go back to the claim language, let's make

23   sure we're clear about this.  The claim says:  generating at

24   least a first partition for presenting applications.  Right?

25   A.      Yes, it does.

Weissman - cross

1  Q.      And then it says:  generating concurrently.  So

2  "concurrently" means just around the same time; right?

3  A.      Yes, it does.

4  Q.      So generating around the same time with that first

5  partition at least a second partition -- which the Court has

6  construed as area.  Right?

7  A.      Yes.

8  Q.      For presenting a plurality of command functions.

9  Right?

10  A.      Yes.  The first area and the second area.

11  Q.      Right.  You have got a first area and a second area

12  and they generate concurrently; right?

13  A.      Yes, they are.

14  Q.      Now, unlike the lunchroom tray that has distinct

15  areas, first of all, this, the claim language and the

16  Court's construction does not require that these areas be on

17  a fixed portion of the screen.  You would agree with that,

18  right?  The claim language and the Court's construction do

19  not require the first area and the second area to be on a

20  fixed portion of the screen.

21  A.      I would agree that it's not required to be fixed but

22  it's clear that it is a first area and a second area.

23  Q.      Right.  And you will agree also, won't you, that this

24  language in the Court's construction does not preclude that

25  the areas can overlap; right?  So unlike your lunchroom tray

Weissman - cross

```
 1    that has distinct sections, this claim language in the

 2    Court's construction does not preclude those sections

 3    being -- does not require those sections to be fixed and it

 4    does not require that those sections cannot overlap; isn't

 5    that true?

 6    A.      They can overlap, but there still must be a first

 7    area and a second area that can be referred to.

 8    Q.      And they can overlap; right?

 9    A.      They could overlap but they cannot be the same.

10    They're not the same.

11    Q.      So let me give you --

12    A.      A first and a second.

13    Q.      Let's make a practical example that I thought of last

14    night to sort of convey to the jury why these areas can

15    overlap.  Let me give you an example.

16            I've got my backyard, and that is a particular

17    area of my home.  I have a backyard area.  And in my

18    backyard, I like to barbecue.  I have an area of my backyard

19    where I barbecue; right?

20    A.      Sure.

21    Q.      Well, you don't know that, but assume with me that I

22    like to barbecue in my backyard.  Okay?

23    A.      Okay.

24    Q.      So I have a barbecue area, and that barbecue area is

25    in my backyard area, and there is nothing wrong with that,
```

1   and these claims don't preclude it, and the Court's claim

2   constructions don't preclude that.  Isn't that a fact, sir?

3   A.      What IBM and Dr. Schmidt are pointing to is that the

4   barbecue area is also in the backyard area.

5   Q.      And there is nothing wrong with that.  The claim

6   doesn't preclude it and the Court's claim construction

7   doesn't preclude it.

8   A.      I don't agree with that interpretation.

9   Q.      Let me ask you this very clearly, sir.  Isn't it a

10  fact that there is nothing in that claim and nothing in

11  this Court's construction that precludes the areas from

12  overlapping?

13  A.      The claim requires that there are, there is a first

14  area and a second area.  They're not the same area.

15  Q.      Just like my backyard example; right?

16  A.      I don't believe the backyard area is met by the

17  claims.

18  Q.      Did you read the patent, sir?

19  A.      I absolutely did.

20  Q.      Did you see Figure 3A that shows a body partition and

21  a window partition within the body partition, just like my

22  backyard?

23  A.      Well, the distinction here is the window partition

24  pops up.  It's not sitting inside the body partition or

25  sitting inside anything.  It's another area.  It's a popup.

Weissman - cross

1   Q.      That's nowhere in the claim and nowhere in the

2   Court's claim construction, is it, sir?

3   A.      Are you asking is the word "popup" in the claim

4   construction?  I'm saying the patent does not disclose one

5   area contained in another.  That's a popup window.

6   Q.      Hold on a second.  Are you trying to tell this jury

7   that this area is not inside this area?  Because that looks

8   awfully like my backyard barbecue.  Is that what you are

9   telling the jury?

10  A.      (Pause.)

11  Q.      I think they understand you.  It's okay.  You don't

12  have to answer.

13          Now, let's talk about claim 8 of the '849

14  patent.  You gave us some testimony about claim 8.

15          Now, I just want to clarify, I think you will

16  agree with me but I looked everywhere in claim 8 of the '849

17  and I did not find the word "partition" or "area."  So you

18  will agree with me, right?, that your noninfringement

19  arguments relating to area has nothing to do with claim 8 of

20  the '849 patent; right?

21  A.      It doesn't mention area, but other claims talk about

22  advertising.  To be advertising, it would be in an area of

23  the screen.

24  Q.      That's not my question.  Focus on my question,

25  please, because I would like to get through this quickly.

Weissman - cross

1    Claim 8, your opinions about area and partition have nothing

2    to do with claim 8 of the '849 because the claim term

3    "partition" does not appear in this claim anywhere; true?

4    A.     It's true that the claim "partition" doesn't appear

5    but advertising appears in claim 1 in an area.  And what is

6    being pointed to at the end is that advertising or deal

7    images are in the application in the first area.

8    Q.     I'm not talking about claim 1, I'm talking about

9    claim 8.  Do you or do you not agree that the word

10   "partition" does not appear in claim 8?  It's a simple

11   question.

12   A.     Okay.  I agree with that.

13   Q.     Okay.  Let's talk a little bit about caching.  We

14   heard a lot about caching.  Caching is a word of art that

15   simply means storing; right?

16   A.     Yes, it does.

17   Q.     And you argued yesterday in your testimony that

18   Groupon does not infringe the patents that have a storing

19   element because Groupon doesn't control the caching.  Do you

20   remember testifying in that way?

21   A.     Yes, I do.

22   Q.     Now, Dr. Schmidt testified that all modern browsers

23   on user computers are set on default to allow caching to

24   happen.  That's in his expert report.  And in your expert

25   report, you do not dispute that; right?

Weissman - cross

1    A.      That is correct.

2    Q.      And, in fact, you, yourself have visited Groupon's

3    website in the past and you noticed on your computer the

4    website was caching on to your computer; right?

5    A.      I noticed that, yes.

6    Q.      And you would also agree with me, wouldn't you, for

7    things like iPads, it's impossible for the users to disable

8    caching, isn't it?

9    A.      My understanding is that is not possible, yes.

10   Q.      And, in fact, for all of the mobile apps in this

11   case, you don't dispute that users cannot disable their

12   cache; right?

13   A.      They cannot, but that is not something in Groupon's

14   control.   That's just the way that the system works the

15   cache.

16   Q.      Right.   They cache.   In all the mobile apps that are

17   relevant in this case, they all cache; right?

18   A.      That's true, they cache.

19   Q.      And the users can't stop it; right?

20   A.      Users can't disable it, but Groupon doesn't mandate

21   it.   It's what the system does.

22   Q.      And you know the system does that because Groupon

23   sets the cache control parameters; don't you, sir?

24   A.      For the cache control parameters to have an effect

25   on caching, the cache must be enabled which is not something

Weissman - cross

1    that Groupon can control.

2    Q.    Groupon sets the cache control parameters that

3    instructs the browsers to cache and instructs the mobile

4    apps to cache; isn't that fact, sir?

5    A.    I disagree that the cache control header instructs

6    the browser to cache.  The cache control header says if

7    caching is enabled, which is not something Groupon can

8    control, here is how long I would like you to store the

9    information.  That is all the header means.

10   Q.    Were you asked this question, and did you give this

11   answer at your deposition, sir.

12   A.    I would have to see.

13   Q.    All right.  Well, let me ask you.  Let's just set up.

14   Let me just ask you exactly what I asked you at your

15   deposition.  If you want to see it, I'll let you.

16          MR. HADDEN:  Can he have the deposition?

17          MR. DESMARAIS:  Well, I just want to ask him a

18   new question, and we'll see if he needs to see the

19   deposition.

20          MR. HADDEN:  If it is impeachment, he needs a

21   copy of the deposition.

22          MR. DESMARAIS:  I don't know if I'm going to

23   impeach him.  I'm going to ask him the question.

24          THE COURT:  I'll let him ask the question.

25   BY MR. DESMARAIS:

1  Q.      Don't you agree, sir, that in the HTTP protocol, the

2  cache control general header field is used to specify the

3  directives that must -- M-U-S-T, in capitals -- be obeyed by

4  all caching mechanisms along the request response chain?

5  Don't you agree with that?

6  A.      Yes, but what that means is if caching is enabled,

7  then those headers have an affect on how caching is done.

8  Those headers do not say you must cache.

9  Q.      And you know for a fact that in all of the mobile

10  apps, all of the caches are set to cache and they can't

11  be changed by the user; right?

12  A.      But that is not something that Groupon has any

13  control over.

14  Q.      Groupon sets the cache control parameter to cause

15  those mobile apps to cache; true?

16  A.      Caching is enabled as a property of the system.

17  Q.      That wasn't my question.  Groupon sets the cache

18  control parameters that causes those mobile apps to cache;

19  true?

20  A.      I don't agree with that.  All the cache control

21  headers say is how long, if at all, it is going to be, but

22  the system has to be already in a mode where it does that.

23  Q.      Groupon tells the mobile apps how long to cache;

24  true?

25  A.      Yes, but that is not the same thing as telling them

Weissman - cross

1    to cache.

2    Q.     And they tell the web browsers how long to cache,

3    don't they?

4    A.     Telling the browser how long to cache only takes

5    effect if caching has been enabled, which is something that

6    Groupon has no control over.  On the website, for example,

7    users can disable.  Even if they couldn't, Groupon does not

8    control.

9    Q.     Now, you know, don't you, that on the mobiles, the

10   mobile apps, Groupon has a feature.  One of the claim terms

11   that you talked about in your direct is pre-fetching and

12   Groupon has a feature in their mobile app called

13   pre-fetching; right?

14   A.     There is a feature that would prefetch information if

15   the user has enabled data on their mobile device.  But I

16   would also add that what is being prefetched or not is

17   advertisements because those have already been disclosed as

18   part of the application.

19   Q.     Sir, that wasn't my question.  Please listen to my

20   question.  Groupon has a feature on its apps called

21   pre-fetching; right?

22   A.     There is code that will prefetch under certain

23   conditions, but whether it takes affect requires the user on

24   the mobile device to enable data.

25   Q.     So if a user is using their device, it's going to

Weissman - cross

1  prefetch.  You were here when Ms. Sandridge testified from

2  Groupon who said Groupon prefetches, weren't you?  You were

3  in court for that, weren't you?

4  A.    I heard her testimony.  But again, to elaborate on

5  that, this requires the user has to enable data in order for

6  caching to, pre-fetching to be applied.

7  Q.    Right.  If the user turns off their phone or throws

8  it in the garbage, it's not going to prefetch but if they're

9  using it and it's getting data, Groupon sends the images

10  down and they prefetch according to what the app is designed

11  to do; right?

12  A.    The user has to enable data download, has to enable

13  data in order for pre-fetching to be applied.

14  Q.    Now, let me ask you this.  Maybe you will agree with

15  me here.

16        In your expert reports, with regard to all the

17  Groupon mobile products, all of them, every product in this

18  case that is mobile, isn't it a fact that in your report,

19  you didn't given any basis to dispute Groupon's pre-fetching

20  and how it meets the "selectively storing" claim element in

21  IBM's patents.  It's not in your report.  You didn't dispute

22  it, did you?

23  A.    I talked about in order for prefetching --

24  Q.    That's not what I asked you, sir.  Please listen to

25  my question.  In your report, with regard to all of the

Weissman - cross

1    mobile products in this case, you didn't give my basis for

2    why Groupon's prefetching didn't meet the "selectively

3    storing" element in IBM's patents.  That opinion is not in

4    that report, is it?

5    A.    The report contains opinions about caching and who is

6    in control and that would apply to pre-fetching.

7    Q.    Let's take a look at your deposition.  I'll direct

8    you to --

9              MR. HADDEN:  He doesn't have the deposition.  If

10   he is going to impeach them, he needs to get them.

11             THE COURT:  He is working on that.

12             (Binders passed out.)

13             MR. HADDEN:  Thank you.

14             MR. OUSSAYEF:  May I approach the witness, Your

15   Honor?

16             THE COURT:  You may.

17             (Binder passed forward.)

18             MR. DESMARAIS:  My I approach the witness, Your

19   Honor?

20             THE COURT:  You may.

21             MR. DESMARAIS:  So I would like to take a look

22   at page 192, lines 5 to 10, and maybe we could play the

23   video if nobody objects.

24             MR. HADDEN:  Did he ask the question?

25             THE COURT:  I don't know if you asked the

Weissman - cross

1    question.  Remind us, do it again.

2                 MR. DESMARAIS:  I'm happy to do it again, Your

3    Honor.

4                 THE COURT:  Do it again.

5    BY MR. DESMARAIS:

6    Q.    So, sir, am I right that there is no rationale or

7    basis for why you believe the mobile applications

8    pre-fetching feature does not meet the selectively storing

9    element in your expert report; true?

10   A.    I'm answering as it says here, you know, it's not

11   literally in the report which I'm not disputing with you,

12   but I have a rationale and that was what I was trying to

13   explain.

14   Q.    But all I was asking you was you didn't put any

15   rationale or basis for non-infringement of the selectively

16   storing element for the mobile apps in your expert report,

17   did you?

18   A.    Pre-fetching --

19   Q.    Answer my question yes or no, please.  You said this

20   in your deposition did you not.  Are you changing your

21   testimony?

22   A.    I am not.  It says it's not literally in the report,

23   but there is a rationale for the report.

24   Q.    Well, that's not what it says.  Let's play the clip

25   at 192:5 through 10.

Weissman - cross

1            "Question:  So there is no rationale or basis

2    for why you believe the mobile application's pre-fetching

3    feature does not meet the selectively storing element in

4    your expert report; true?

5            "Answer:  It is not literally in this report,

6    that I can recall, but I have a rationale for it."

7            That was your question and answer, right, sir?

8    A.      Yes, it was.

9    Q.      Now, you talked on your direct about the Amazon

10   system.  Do you recall that?

11   A.      Yes, I do.

12   Q.      And you're arguing that the Amazon system invalidates

13   the '601 patent; right?

14   A.      Yes, I am.

15   Q.      Now, you know in the '601 patent, there has to be an

16   output, right, you identify all continuations in an output?

17   A.      The claims require that an output is processed, yes.

18   Q.      And the output has to be generated before the

19   identifying and embedding steps; right?

20   A.      The output is in progress, right, you have to add an

21   output in order to modify it and the final output returns,

22   so the output is being kind of created in process.

23   Q.      Let me ask you that again.  The output has to be

24   generated before the identifying and embedding steps; right,

25   sir?

1    A.      The output does have to be generated, but that is an

2    output in progress of being modified, an output is modified

3    and then it's going to be returned, so yes.

4    Q.      And you believe the claimed output as you argued it

5    about Amazon is the HTML page that's sent to the user;

6    right?

7    A.      Right.  The HTML page is --

8    Q.      That's just a yes or no question, sir.

9    A.      Yes, it is the HTML page.

10   Q.      And according to you, the identifying and the

11   embedding steps in the Amazon system occur prior to the

12   output being generated by the Amazon system.  Isn't that a

13   fact?

14   A.      Well --

15   Q.      Yes or no, sir?

16   A.      Repeat the question.

17   Q.      According to you, the identifying and embedding steps

18   in the Amazon system occur prior to the output being

19   generated; right, isn't that what you testified to?

20   A.      The final output being generated, yes.

21   Q.      And you testified at your deposition that therefore

22   the steps of claim 51 of the '601 patent are not being done

23   in the same order in the Amazon system; right?

24   A.      I testified to that, but I would like to explain

25   more.  There is one output that is --

1   Q.      Hold on, sir, the question is yes or no.

2   A.      Yes, I did.

3   Q.      And, in fact, you said at your deposition at -- let

4   me just ask you.  You said at your deposition the order you

5   presented in your anticipation invalidity analysis may not

6   meet claim 51 of the '601 patent.  That's what you testified

7   to; right?

8   A.      That's what I testified to and I can explain my

9   answer more fully if you would like.

10              THE COURT:  If he wants, he'll ask you.

11  Q.      And just to be clear, your opinion on the Amazon

12  system is an anticipation system which means it has to be

13  identical; right?

14  A.      Every element has to be identical.

15  Q.      You don't have an obvious opinion, you're not

16  offering one in your expert report and you didn't offer it

17  in your direct testimony; right?

18  A.      Obviousness in combination to one of the elements.

19  Q.      But for Amazon on claim 51, you're going with

20  anticipation in your expert report; right, sir?

21  A.      Yes, I'm saying Amazon performs the steps.

22  Q.      And if they're in the wrong order, it is not

23  anticipation; right?

24  A.      That would be true, but they're not in the wrong

25  order.

Weissman - cross

1    Q.      All right.  Let's take a look at what you said at

2    page 409, lines 18 to 25.  If we could play that, please.

3                "Question:  Now, the Amazon 1995 system, it

4    happens in the wrong order?  First you do the identifying

5    embedding steps, and then you generate the output?

6                "Answer:  Let me just check one thing.  The

7    order that we present may not meet claim 51."

8                You were asked that question and you gave that

9    answer, didn't you, sir?

10   A.      Yes, I did.  And I would like to explain it more

11   fully if I can.

12   Q.      No.

13               Let me ask you this.  In order to do your

14   invalidity analysis for the Amazon system, you actually

15   looked at the Amazon code from 1996; right, and also from

16   '95, but '96 as well; right?

17   A.      I looked at both, yes.

18   Q.      And you based your analysis of invalidity on these

19   things called template files; right?

20   A.      Template files are an important part.

21   Q.      And you saw the template files in the 1996 system;

22   right?

23   A.      The template files were in the 1996 system, but I saw

24   the code that operated on the 1995 system.

25   Q.      But the template files are a critical part of your

1   invalidity analysis for the Amazon code; right, you were

2   relying on the template files to invalidate the claims;

3   right?

4   A.      The template files together.

5   Q.      Yes or no, sir?

6   A.      Not solely.

7   Q.      But they're required for your analysis; right?

8   A.      They're required for my analysis, absolutely.

9   Q.      Let just be a hundred percent clear so the ladies and

10  gentlemen of the jury understand this.  The Amazon 1995

11  code, you need the '95 code because that's the code that

12  predates the '601 patent; right?

13  A.      That is the code that predates the patent.

14  Q.      So the '96 code is nice, but you need the '95 code;

15  right?

16  A.      The '95 code is what we show.

17  Q.      And there is not a single, not one, not a single,

18  there are zero template files in that 1995 code, true or

19  false?

20  A.      As Paul Davis explained, they were not archived with

21  the system, but the code that processed the templates was

22  there in the 1995 code.

23  Q.      Please answer my question, sir.  There is not a

24  single template file which is required for your invalidity

25  analysis in that 1995 code, is there?

Weissman - cross

1    A.      That is true.  I have 1996 templates which Paul Davis

2    testified as these were what we had in the 1995 system.

3    Q.      The 1996 Amazon system is too late to invalidate the

4    '601 patent, isn't it, sir?

5    A.      You need the 1995 system to invalidate the patent.

6    Q.      Now, you testified on direct about the '346 patent,

7    that the Liberty Alliance system was not presented to the

8    patent office.  Did I hear you right on that?

9    A.      That's my understanding is that it was not presented

10   in a separate reference.

11   Q.      Who told you that?

12   A.      I don't recall seeing it as described in the patent

13   specification or application as included.

14   Q.      Did you read the patent?

15   A.      I absolutely read the patent.

16   Q.      Let's read it together.  This is the '346 patent;

17   right?

18   A.      Yes, it is.

19   Q.      In the section called Background of the Invention, so

20   we're like on the first page; right?

21   A.      Yes, first page.

22   Q.      In the middle of the second column on the very first

23   page, the inventor describes to the patent office that

24   various prior art single-sign-on solutions, e.g., such as

25   those described in the Liberty Alliance ID-FF

Weissman - cross

1    specifications, require that a user have an authenticatable

2    account at both the -- then it goes on and on and on.  Do

3    you see that, sir?

4    A.    I do.

5    Q.    So when the patent office -- when the patent office

6    granted the '346 patent, the inventor had described the

7    Liberty Alliance references right in the background of the

8    patent that the patent office was examining, isn't that a

9    fact?

10   A.    They're mentioned in the patent.  My understanding is

11   they were not provided as separate prior art that the patent

12   examiner should look at separately.

13   Q.    But the patent office had it right in their face when

14   they were reviewing the application, didn't they, sir?

15   A.    My understanding is there is a process that they

16   follow which is to provide the prior art.

17   Q.    You agree with me it's described in the background of

18   the invention that the patent office is examining, right,

19   sir?

20   A.    It's mentioned.

21   Q.    Let me ask you just a couple of questions on damages

22   before I wrap up.

23          You know that we're going to hear next from

24   Groupon's damages expert; right?

25   A.    I know you're going to hear from him at some point

Weissman - cross

1  today.

2  Q.      And he says in his report that he spoke to you, and

3  he spoke to you about non-infringing alternatives; right?

4  A.      Yes, he did.

5  Q.      And he says in his report that when he talks about

6  non-infringing alternatives, he uses this thing called a

7  cost approach.  And he says that, "Properly applied, the

8  cost approach considers out-of-pocket expenditures as well

9  as risks, lost sales, and other adverse economic impacts

10  connected with the alternative technology."  Do you see

11  that?

12  A.      Yes, I see that.

13  Q.      And he says he spoke to you to do his non-infringing

14  alternative analysis; right?

15  A.      Yes, he did.

16  Q.      Now, you know, sir, don't you, that you did

17  absolutely no analysis, zero analysis, on the out-of-pocket

18  expenditures, risks, lost sales, or adverse economic impacts

19  of any of the alternative design around, you didn't do that?

20  A.      I'm not an economist.  What I did tell him is these

21  were trivial changes.

22  Q.      That wasn't my question, sir.  My question was you

23  didn't do any of that analysis that he says is proper in a

24  non-infringing alternative analysis; right?

25  A.      My job is to do a technical analysis and provide --

Weissman - cross

1    Q.      It's just a yes or no question, sir.  You didn't do

2    it; right?

3    A.      I didn't do a cost analysis, no.

4    Q.      Now, for the '849 and '967 patents, you're suggesting

5    that you could disable the browser caching as a

6    non-infringing alternative; right?

7    A.      That's correct.

8    Q.      I think we already established, let's make sure it's

9    perfectly clear, that non-infringing alternative cannot be

10   done in any of the mobile apps; correct?

11   A.      A different technique would be used in the mobile

12   apps.

13   Q.      You can't do that one in the mobile apps?

14   A.      You can't do that with the mobile website.  We might

15   be able do it with the mobile applications as Groupon has.

16   Q.      You testified you cannot turn off the cache with the

17   mobile application, the user cannot do that; right?

18   A.      Yes, I did.

19   Q.      Now, with respect to the '601 patent, you're arguing

20   that a non-infringing alternative would be just to switch to

21   cookies or hidden forms; right?

22   A.      Yes, Groupon is already using those technologies.

23   Q.      And again, you'll agree with me, wouldn't you, that

24   that has absolutely nothing to do with the mobile apps

25   because you can't use those alternatives with the mobile

1    apps; right?

2    A.    Cookies are not used with the mobile apps, that's

3    true.

4              MR. DESMARAIS:  No further questions, Your

5    Honor.

6              THE COURT:  Redirect.

7                    REDIRECT EXAMINATION

8    BY MR. HADDEN:

9    Q.    Hello again, Dr. Weissman.

10   A.    Hello.

11   Q.    Are the opinions in your reports your opinions?

12   A.    They're my opinions.

13   Q.    And the timeline for preparing your reports in this

14   case, was that set by the Court?

15   A.    It was set by the Court.

16   Q.    So the fact that you had three weeks to respond to

17   Dr. Schmidt's infringement report, that three-week period

18   was set by the Court; is that right?

19   A.    Those were the dates set by the Court.

20   Q.    So there were hundreds of pages of reports that were

21   created in this case on both sides, weren't there?

22   A.    There certainly were.

23   Q.    And that was done in a very short period, and that

24   period was set by the Court; is that right?

25   A.    It was done by both sides in a very short period.

Weissman - redirect

1    Q.      And you have served as an expert as IBM's counsel

2    pointed out in other cases; is that correct?

3    A.      Yes, that's true.

4    Q.      In every case where you served as an expert for

5    either the patentholder or the defendant, do you only agree

6    to participate if you agree that they have the right

7    position?

8    A.      No, I engage with them, there is no assumption of

9    validity or non-infringement or anything, there is no -- I

10   do an independent analysis and reach my conclusions.

11   Q.      Have you been asked to provide opinions on behalf of

12   patentholders in the past?

13   A.      I have.  I have worked on the other side.

14   Q.      Let me show you something that IBM's counsel put up.

15   He was asking you whether the first and second area --

16           MR. DESMARAIS:  Your Honor, if I might.

17           MR. HADDEN:  I'm not going to mark on it.

18           MR. DESMARAIS:  That's what I wanted to make

19   sure, because yesterday my artwork got defaced.

20   BY MR. HADDEN:

21   Q.      IBM's counsel asked you whether or not the areas or

22   implied that the areas were not on the screen.  Do you

23   remember those questions?

24   A.      I think I do, yes.

25   Q.      If we look up a little higher in this, doesn't it say

1    that -- it says the screen display including a plurality of

2    partitions, do you see that?

3    A.    I do.

4    Q.    So isn't it true that the partitions that are

5    described later, the disputed areas, are areas of that

6    screen display?

7    A.    That's true.

8    Q.    So the notion that the areas that you point to are

9    not areas of the screen, that's incorrect; right?

10   A.    That is incorrect, yes.

11   Q.    Now, with respect to IBM's counsel showed you this

12   figure three from the Prodigy patents.  I don't think you

13   actually got a chance to explain what this window partition

14   is.  Can you explain what that box represents in this figure

15   in the Prodigy patents?

16   A.    Yes.  So the window partition as I was trying to say

17   is not contained in the body partition, it's a pop up, it

18   comes and goes.

19   Q.    So is it correct, Dr. Weissman, that the body

20   partition and the ad partition, those areas stay on the

21   screen; is that right?

22   A.    That's true.

23   Q.    So this pop up which is not one of the partitions

24   created by the page format?

25   A.    Correct.

1   Q.      That doesn't sit inside the body partition, does it?

2   A.      It doesn't sit inside because it briefly is displayed

3   to get information.

4   Q.      So that's just overlay, it's a temporary overlay on

5   top; right?

6   A.      It's on top.

7   Q.      This is not IBM's counsel barbecue in his backyard;

8   right?

9   A.      That is not.

10   Q.      Now, you were asked about your opinions regarding

11   pre-fetching in the Groupon mobile applications.  Do you

12   recall that?

13   A.      Yes, I do.

14   Q.      And didn't you provide opinions in your

15   non-infringement report where you analyzed some of the code

16   that Dr. Schmidt relied on for his opinion regarding

17   pre-fetching?

18   A.      Yes, I did talk about his code.

19   Q.      Isn't it true that you pointed out that the code that

20   Dr. Schmidt relied on was either experimental or

21   conditionally invoked, do you recall that?

22   A.      Yes, I do.  So the pre-fetching in some cases was

23   only executed at all conditionally.

24   Q.      And have you learned since your deposition in this

25   case that, in fact, that conditional code is no longer used

Weissman - redirect

1  a least on the Apple iOS devices?

2  A.    That is my understanding.

3  Q.    There is no pre-fetching anymore on Apple phones

4  because it didn't work well; right?

5  A.    That's correct.

6  Q.    And in your opinions in your report and throughout

7  this case, have you ever opined that advertisements are

8  pre-fetched by any Groupon device?

9  A.    No, I haven't.

10  Q.    You were asked about claim 8, which talks about

11  storing, "Predetermined amount of advertising."  Do you see

12  that?

13  A.    Yes, I do.

14  Q.    Is it your opinion that Groupon meets that

15  requirement?

16  A.    No, they don't.

17  Q.    You were here for Mr. Dunham's testimony.  Did you

18  hear Mr. Dunham explain a number of deals a user sees when

19  they're browsing the website or scrolling through the mobile

20  app, that's not predetermined by Groupon, is it?

21  A.    No, it depends on what the user does, whatever user

22  pages are visited that will determine what is brought down

23  and what is cached.

24  Q.    Even if a user enables caching, Groupon doesn't

25  predetermined a limit of what images will be cached, do

1    they?

2    A.    It's solely up to what the user is doing.

3    Q.    You were asked about the '346 patent and whether or

4    not Liberty Alliance was disclosed.  Do you recall that?

5    A.    Yes, I do.

6    Q.    And IBM is correct there is a reference to Liberty

7    Alliance in the specification?

8    A.    That's correct.

9    Q.    And, in fact, when I questioned Dr. Hinton, we talked

10   about that as well; correct?

11   A.    That's my recollection.

12   Q.    And you knew that was there, didn't you?

13   A.    I saw it in the patent.

14   Q.    But what's not here if we look at the references

15   cited, do you see that, Dr. Weissman?

16   A.    Yes.

17   Q.    Now, that is the section of the patent that describes

18   the materials that the Patent Examiner reviewed in examining

19   the patent; right?

20   A.    Yes.

21   Q.    And is there anywhere in that list, any of those

22   details, Liberty Alliance technical specifications we saw in

23   your direct?

24   A.    I don't see any, no.

25   Q.    So none of those technical specifications were

Weissman - redirect

1    provided to the Patent Office by IBM; is that correct?

2    A.      That is what it says.

3    Q.      And you reviewed the file wrapper for this patent

4    as well, that is, the prosecution history, and those aren't

5    discussed in there at all, are they?

6    A.      No, they weren't.

7    Q.      And they weren't provided by IBM, were they?

8    A.      No, they were not.

9    Q.      Now, there is some discussion about claim 51 in the

10   ordering of steps and whether or not Amazon meets that

11   ordering.  Do you recall that?

12   A.      I do.

13   Q.      And you wanted to clarify.  Let's just put claim 51

14   up so we can see what the sort of ambiguity is.

15           Now, if we look at 51, we have gone through this

16   several times today.

17           You receive a service request, right?  And then

18   in the next step, you have to identify all continuations in

19   an output from said service; right?

20   A.      That is correct.

21   Q.      So can you explain -- well, can you explain what the

22   issue is with what output refers to in this claim?

23   A.      Yes.  So there is a bit of confusion.  And on the

24   deposition is you clearly have to have an output to have

25   something produced so you can identify continuations, but

1   then you are communicating that final output in the final

2   step.

3               So I just was trying to clarify this is an

4   output in progress.  You have like a web page with

5   templates, and that is what you are going to return.  But

6   before you do that, you have to identify and embed and make

7   it have complete page values in it, session IDs in it and so

8   forth, state information.  And then it is finally

9   communicated.  So ...

10  Q.      So it is really just an issue with the way the claim

11  is written; right?  You have an output, you do something to

12  it, and then you return it; is that right?

13  A.      That's correct.

14  Q.      So you can't say that the output can only be the last

15  thing that the actually gets sent to the user.  Otherwise,

16  it wouldn't make any sense to modify in the other step;

17  right?

18              MR. DESMARAIS:  He is leading, Your Honor.

19              THE COURT:  He is leading.  Sustained.

20  BY MR. HADDEN:

21  Q.      Can you explain what the issue is there?

22  A.      Yes.  So clearly identifying and embedding has to

23  happen prior to communicating the response, communicating to

24  the output.  So you need to have, you know, something upon

25  which to identify continuations and modify them.

1          So this is essentially an output that is being

2   computed in progress.  You get an initial output of the

3   output, and then you modify that in turn, and that is what

4   the claim is saying.

5   Q.     Let's talk about the global container experiment that

6   we saw.

7          Now, can you see what is on the screen,

8   Dr. Weissman?

9   A.     Not very well, no.

10          MR. HADDEN:  Okay.  Brian, is there a way we can

11  zoom in to the global container?  There we go.  Right here.

12  BY MR. HADDEN:

13  Q.     Okay.  So can you see that, Dr. Weissman?

14  A.     Yes, I do.

15  Q.     Is that the global container div tag that we talked

16  about?

17  A.     Yes, it is.

18          MR. HADDEN:  Brian, can you delete that?  Can

19  you show the screen?

20          (Demonstration takes place.)

21  BY MR. HADDEN:

22  Q.     Now, did the screen change?  Did the page change?

23  A.     It looks like it's still on the web page there.

24  Q.     And it's the same page we saw?

25  A.     It's the same web page.

1           MR. HADDEN:  Can you scroll down the web page?

2    BY MR. HADDEN:

3    Q.      So did deleting that div tag change the area in which

4    this page is displayed?

5    A.      It didn't change anything.

6           MR. HADDEN:  Okay.  Now, can you go back, Brian?

7           Brian, can you show what IBM's counsel actually

8    deleted in there, what they showed the jury?  There we go.

9    BY MR. HADDEN:

10   Q.      So do you see what is highlighted here, Dr. Weissman?

11   A.      Yes, I do.

12   Q.      So what is it that IBM showed the jury when they did

13   their little experiment?

14   A.      They showed that they deleted the opening div tag.

15   Q.      What else did they delete?

16   A.      They deleted a highlighted code.

17   Q.      Yes.  So they didn't just delete the div tag, they

18   deleted a whole bunch of the children and the JavaScript you

19   just referred to; right?

20   A.      That's what they did, yes.

21   Q.      So that is not actually deleting the div tag itself,

22   which is what we talked about; right?

23   A.      That is deleting more than that, yes.

24          MR. HADDEN:  So let's go back and do what we

25   talked about, so if the div tag is really what creates the

| | |
|---|---|
| 1 | area of the screen.  Let's delete it again, Brian. |
| 2 | BY MR. HADDEN: |
| 3 | Q.      And nothing has changed; correct? |
| 4 | A.      That's correct. |
| 5 | Q.      And that is consistent with your understanding that |
| 6 | div tags themselves don't do anything to generate the area |
| 7 | of the screen; right? |
| 8 | A.      Right.  As I testified yesterday, they do not. |
| 9 | Q.      What IBM showed was not deleting the div tag but |
| 10 | deleting all -- can you just show the deleting? |
| 11 | So they deleted all of this; right? |
| 12 | A.      They deleted additional things, it looks like, yes. |
| 13 | MR. HADDEN:  No further questions. |
| 14 | THE COURT:  Okay.  Thank you, Dr. Weissman.  You |
| 15 | may step down. |
| 16 | I'll ask counsel if you would come retrieve the |
| 17 | binders, please. |
| 18 | MR. DESMARAIS:  Yes, Your Honor. |
| 19 | THE COURT:  What is going to be next? |
| 20 | MS. SHAMILOV:  Mr. Malackowski is going to be |
| 21 | next, and it will be quite awhile. |
| 22 | THE COURT:  All right.  I think it's a good time |
| 23 | to take a break.  I have been advised that lunch has arrived |
| 24 | for the jury.  So enjoy your lunch, and we'll get you back |
| 25 | in a little while. |

```
 1                      (Jury left courtroom.)

 2                      THE COURT:  We will be in recess.

 3                      (Lunch recess taken.)

 4                      *      *      *

 5                      12:33 p.m. - Afternoon Session

 6                      THE COURT:  We'll bring the jury in.

 7                      MS. SHAMILOV:  Your Honor, I have a question, if

 8      I may.

 9                      THE COURT:  Come to the podium so we can hear

10      you.

11                      MS. SHAMILOV:  Mr. Malackowski is intending to

12      use a board.  I ask permission to place an easel where I

13      thought may be best for the jury.  May I point to where I

14      can put it?

15                      THE COURT:  Sure.  Where would you propose to do

16      it?

17                      MS. SHAMILOV:  The board is not very big, and if

18      I may place it here?  Would that be okay?  Because he is

19      also going to be writing on it.

20                      THE COURT:  Any objection?

21                      MR. DESMARAIS:  (Shaking head no.)

22                      THE COURT:  No objection?  Sure, that's fine.

23                      MS. SHAMILOV:  Thank you.

24                      THE COURT:  All right.  We'll bring the jury in.

25                      (Jury returned.)
```

Malackowski - direct

```
 1              THE COURT:  Good afternoon, everyone.  Welcome
 2    back.
 3              We're ready to proceed.  And Groupon will call
 4    its next witness.
 5              MS. SHAMILOV:  Thank you, Your Honor.
 6              THE COURT:  Good afternoon.
 7              MS. SHAMILOV:  Ladies and gentlemen, Groupon
 8    calls as its next witness, Mr. Malackowski who will be
 9    addressing the issue of damages.
10              THE COURT:  Okay.
11              ... JAMES EDWARD MALACKOWSKI, having been first
12    duly sworn, was examined and testified as follows ...
13              THE COURT:  Good afternoon, Mr. Malackowski.
14              THE WITNESS:  Good afternoon.
15              THE COURT:  You may proceed.
16                       DIRECT EXAMINATION
17    BY MS. SHAMILOV:
18    Q.    Good afternoon.
19    A.    Good afternoon.
20    Q.    Can you please introduce yourself to the jury?
21    A.    Yes.  My name is James Malackowski or "Jim."  I
22    traveled here today from Chicago where I live with my
23    family.  I have a son in college and a daughter.
24    Q.    Mr. Malackowski, what is your role in this case?
25    A.    So I have been asked by Groupon to come and provide
```

Malackowski - direct

1    my opinion, if you in fact find that these patents are valid

2    and not infringed, as to what would be the appropriate

3    measure of damages.

4    Q.      Before we get to your analysis, can you please

5    describe to us your educational background, your experience?

6    A.      Yes.  So I went to school at the University much

7    Notre Dame where I studied Accounting and Philosophy.  And I

8    graduated with a Bachelor Degree in Business Administration.

9    Q.      And what did you do after you graduated?

10   A.      So following graduation, I moved to Chicago and I

11   began to work on accounting matters in litigation.

12   Basically, calculating damages for lawsuits with a

13   concentration or a focus on patent litigation, just like we

14   have here today.

15   Q.      And did you work at a particular firm doing that?

16   A.      So I started out at a firm that was a spin-off of an

17   accounting firm called Peterson & Co.

18           And in three years, a client asked me to

19   evaluate a patent outside of litigation for a business

20   transaction.  And that wasn't the business that this

21   consulting firm was in, and so at age 25, I left and I

22   started what was the country's first intellectual property

23   appraisal practice.  So we valued IP or patents for

24   litigation and also for a business sale or an investment.

25   We started with five people, and that business grew to

1    almost 300.  I sold that business, and then I started my

2    current firm about 15 years ago.

3    Q.      And what is your current firm?  Can you tell us about

4    it?

5    A.      My current firm is called Ocean Tomo.  It's kind of a

6    funny name but "Ocean" refers to the fact we're global in

7    nature, our clients are global, and "Tomo" is an Asian word

8    for intellectual.  So today I work for Ocean Tomo, and we

9    have 70 professionals in this type of work.

10   Q.      What is your role in Ocean Tomo?

11   A.      So I am the Chief Executive and Chairman of the firm.

12   So that means I have some administrative oversight

13   responsibility, but most of my time, the vast majority of my

14   time is spent doing client work, client engagements like

15   this.

16   Q.      Can you give us -- Bless you, Your Honor.  Can you

17   give us an example of some of your clients?

18   A.      Sure.  So we have been very fortunate.  We work with

19   some of the largest, most well-known companies.  Apple, for

20   example, is someone I worked with many times.

21           We work with smaller companies.  I just finished

22   a project with Milwaukee Tool which makes power tools.  It

23   was over the batteries in the power tools.

24           Then I work for high tech, biotech, or

25   pharmaceutical clients as well.

1    Q.      And as part of your job, do you negotiate patent

2    licensing agreements?

3    A.      Absolutely.  So in that respect, I have assisted

4    clients in negotiating patent licenses or the sale of

5    patents.  And then when my firm licenses technology, I'm

6    obviously involved in that as well.

7    Q.      And how many license agreements have you negotiated?

8    A.      So where I have been either the lead negotiator or a

9    member of a very small team, dozens of times over my career.

10   It's not infrequent.

11   Q.      And then do you also review patent license

12   agreements?  Do you analyze them as part of your job?

13   A.      Yes.  So because of our concentration on patented

14   technology, in most cases I will be asked to review any

15   agreements that exist in the industry.  Sometimes it's just

16   one or two, sometimes it may be a hundred.  So if you go

17   over my career, it is no exaggeration to say I reviewed

18   5,000 patent licenses over the last 30 years.

19   Q.      Do you have any certifications --

20   A.      I do.

21   Q.      -- relevant to your employment?

22   A.      I do.  Most importantly, I am a Certified Public

23   Accountant.  That was my core study, and I have been a CPA

24   for 30 plus years.

25           I'm also a certified valuation expert.

1       I'm certified in forensic accounting.  That's

2   the study of historical numbers as opposed to current or

3   going forward numbers.

4           And then I'm a Certified Licensing Professional.

5   So someone who is certified in technology transfer.

6   Q.    Now, is the Certified Licensing Professional

7   certification, is that the highest level of certification

8   you can get in the field?

9   A.    In the field of technology transfer, it is.

10  Q.    Is there an organization overseas for that particular

11  certification?

12  A.    There is, creatively named the Certified Licensing

13  Professional Organization.  And it's the body that regulates

14  the examination and requirements to become certified.

15  Q.    Have you been involved in that organization?

16  A.    I was.  I was actually fortunate in that they asked

17  me -- this was more than a decade ago -- to be the Chairman

18  of their Board of Governors, so to have oversight

19  responsibility for the organization.

20  Q.    Have you received any awards for your work?

21  A.    I have received awards that are, some are designated

22  for me, personally.  More importantly, a number of awards

23  for the firm.  So we've again been recognized in our industry.

24  Q.    What are some of the personal awards you received?

25  A.    Well, there is a lot of the, you know, youngest

person under 50 list or under 40 or 45 list, that sort of
thing, leaders in the field.

Probably the personal award that I felt
strongest about is I was asked to be one of 18 individuals
worldwide to address the global economic forum agenda on
intellectual property matters.  And that was really
impressive because of the other people that were asked,
the heads of the Patent Offices from around the world, for
example.

Q.    Are you involved in any professional activities
outside of your firm?

A.    Yes.  Historically I have been involved in the trade
associations for our industry, so I was past president of
the largest organization in our field called LES.  When I
was president, we had 10,000 members in thirty-two countries
focused on training and policy regarding technology
transfer.

And then more recently because I have kids as I
mentioned, I'm focused on that intersection between
innovation or technology and children, so I'm on the board
of the Children's Research Hospital in Chicago where I chair
the Technology Transfer Committee.  And then I'm also on the
board and have been for a very long time for the National
Inventors Hall of Fame.  So we know what the sports hall of
fame or the music hall of fame.  There is the same thing for

Malackowski - direct

1    inventors.  We recognize them, but we also teach children

2    innovation through summer camp.  So last year we put 200,000

3    kids through a summer camp program.  So that's the thing

4    that I'm probably most proud of.

5    Q.      Have you been recognized as an expert witness

6    previously before this case at a court?

7    A.      Yes, I have written reports more than a hundred

8    times.  I have sat in a chair like this or in front of the

9    International Trade Commission or international arbitrations

10   more than fifty times as an expert.

11   Q.      And have you testified or consulted for Groupon

12   before this case?

13   A.      No, I have not.

14   Q.      And how much are you being paid for your work on this

15   case?

16   A.      So Ocean Tomo bills Groupon on an hourly basis for

17   our time.  It ranges from a high, my rate, of $795 to about

18   $190, associates in the firm are kind of in between.

19   Q.      And is your compensation dependent on the opinions

20   you render in this case as well?

21   A.      No, it's not dependent on what we say or the outcome

22   of the case.  We have been asked to give our opinions

23   independently.

24              MS. SHAMILOV:  Your Honor, at this time I would

25   like to proffer Mr. Malackowski as an expert in patent

1    damages and patent licensing.

2              MR. DESMARAIS:  No objection.

3              THE COURT:  He's so recognized.

4              MS. SHAMILOV:  Thank you.

5    BY MR. HADDEN:

6    Q.    Let's talk a little bit about the damages.  Where do

7    you begin when determining damages in a case like this?

8    A.    So in order to start calculated patent damages, you

9    have to begin with a set of assumptions.  And the first

10   assumption we make is that the patents are found valid and

11   they're found infringed by you.  If either wasn't true, if

12   you find they're not valid or not infringed there are no

13   damages and you don't need anything that I have to say.

14   Q.    Now, the Court gave -- the Judge gave the jury some

15   instructions before the case started, before this trial

16   started.  Did you review those instructions?

17   A.    I did.  There were three elements related to damages

18   that I took note of.  First is the purpose of damages is to

19   put IBM back in the position they would have been but for

20   the infringement.  Second, that damages are not intended to

21   punish Groupon, they're a measure of fair compensation.  And

22   third, the way you determine that fair compensation is

23   what's called a hypothetical negotiation.  Obviously Groupon

24   and IBM haven't worked out an agreement, if they did, we

25   wouldn't be here again, so we have to go back in time and

1  try to determine what would have happened.

2  Q.      And before we get there, have you reviewed materials

3  that the parties provided in this case to each other?

4  A.      Excessively.

5  Q.      Did you prepare slides to help your testimony today?

6  A.      I did.

7  Q.      Maybe we can -- what materials did you consider?

8  A.      So the first slide talks about them at sort of a high

9  level.  Maybe we can go to the first column.  In virtually

10  all my work, I start by looking, reviewing, studying the

11  patents, read them on my own, but also consult with the

12  technical expert or others that have an understanding of

13  what they cover from a business perspective.

14          Second, I look at the records of the case.  So

15  here I had the opportunity to review documents from

16  IBM/Groupon, the depositions that you have seen on the

17  screen or with the other witnesses, and the expert reports.

18          And then lastly, I do my own research, so I go

19  to look at industry articles, SEC or governmental financial

20  filings, and then I look to the patent landscape to get a

21  better understanding of how the patents here fit into the

22  marketplace.

23  Q.      Were there any specific documents -- I think you

24  prepared this.  Are these exhibits that would be part of the

25  trial evidence here today that you reviewed?

Malackowski - direct

1    A.      Yes.   These are the exhibits that I considered

2    specifically and they're broken into the three categories on

3    the screen, licensing documents, financial records and

4    license agreements.

5               MS. SHAMILOV:  Your Honor, at this time I would

6    like to move all these exhibits into evidence.  It will take

7    a little time reading them, but for the record I have to.

8               THE COURT:  I think you have to.

9               MS. SHAMILOV:  So those, I will a group them by

10   PX and DX exhibits.

11              THE COURT:  That's fine.

12              MS. SHAMILOV:  PX-130, 153, 374, 391, 401, 406

13   through 407, 443, 454, 461 and 621, I would like to move all

14   of those into evidence.

15              THE COURT:  Any objection?

16              MR. DESMARAIS:  I don't think so, Your Honor.  I

17   was unable to follow, but what's on the slide, we have no

18   objection.

19              THE COURT:  Okay.  They're admitted.

20              (The above exhibits were admitted.)

21              MS. SHAMILOV:  And then the DX exhibits, the

22   numbers are 207, 215, 217R, 219, 220, 221R, 223, 225 to 228,

23   231R, 232R, 233, 234, 236R, 237, 249, 277, 283, 285 to 286,

24   288 to 289, 291 to 302, 304 to 308, 310 to 311, 313, 315,

25   317 to 321, 323 to 328, 330, 332, 334 to 337, 406, 411, 423,

1    436 to 438, 513, and 659.  I hope I got that right.

2              THE COURT:  Assuming that you did get those

3    right and they're what's listed there, any objection?

4              MR. DESMARAIS:  On that assumption, no, Your

5    Honor, no objection.

6              THE COURT:  Then we'll admit them.

7              MS. SHAMILOV:  Thank you Your Honor mark.

8              (The above exhibits were admitted.)

9    BY MS. SHAMILOV:

10   Q.    Now that that's done, going back to, were you in the

11   courtroom when Dr. Hausman, IBM's damages expert, was

12   testifying, I believe it was last week?

13   A.    I was.  Dr. Hausman and I have known each other for

14   more than twenty-five years and I was here for his

15   testimony.

16   Q.    And he describes this concept of reasonable royalty,

17   do you recall?

18   A.    He did.

19   Q.    What is a reasonable royalty?

20   A.    So it's two records and it's actually important that

21   we look at them uniquely.  So what is a royalty?  Very

22   simple.  A royalty is the amount that someone would pay to

23   use a patent right.  Dr. Hausman talked about it's like rent

24   for an apartment, exactly right.

25              The second term is reasonable, it can't just be

Malackowski - direct

1    an unbounded amount of money, it has to be reasonable in the

2    context of what willing parties would have agreed to.  And

3    that's the more challenging portion of the analysis.

4    Q.    How do you analyze that particular point that you

5    just mentioned?

6    A.    The Court instructed us that we start with a

7    hypothetical negotiation at the time of first infringement,

8    and so I have prepared a demonstrative that explains how

9    that works in this case.

10   Q.    But before we get there, did Dr. Hausman talk

11   about -- I believe he talked about the hypothetical

12   negotiation last week to the jury; correct?

13   A.    He did.

14   Q.    And do you have to add something to his description?

15   A.    Well, so it's important that you assume the patents

16   are valid and infringed at the time.  In this case there are

17   four patents, three of them issued in 2008, one was pending

18   at that time and issued a few years later.  In my opinion

19   because of industry practice, you can negotiate for all of

20   them at one time, and Dr. Hausman also confirmed that that

21   would change the analysis.

22   Q.    You asked for a slide, I think this is the next slide

23   in your presentation.  What does this show?

24   A.    Yes.  So we're here in 2018 obviously.  And obviously

25   IBM and Groupon have not reached an agreement or then we

Malackowski - direct

1    wouldn't be here.  But the key to remember is we're not to

2    determine what these parties would agree to today or

3    tomorrow, we have to go back in time to that time of first

4    infringement in 2008.  And that's critical because things

5    were different then.

6    Q.    How were they different?

7    A.    Well, the most significant difference is that Groupon

8    as a company is just starting out.  They're just launching

9    their website.  So one of the most important questions that

10   you'll have to decide as a jury is if IBM and Groupon sat

11   down in 2008 to strike a deal, would that deal look more

12   like what Dr. Hausman suggested which is that Groupon would

13   pay 30 to 50 percent of its profits every time a patent is

14   used forever, or would it look more like what the market

15   does generally which is to determine an upfront fee and pay

16   it once for use of the patents.

17            As you'll see, I think the evidence clearly

18   shows it should be the one-time fee, and Dr. Hausman looks

19   at each patent separately indefinitely.

20   Q.    So you already told us you were here when Dr. Hausman

21   testified last week it sounds like.  Do you agree with the

22   opinions that Dr. Hausman expressed?

23   A.    No.  Although we agree on many of the basic

24   methodology questions, the conclusions are very different.

25   I have prepared a chart that highlights the conclusions of

1    where we differ.

2    Q.    Before we get there, did you review all of the

3    materials Dr. Hausman reviewed?

4    A.    Yes, I reviewed everything that Dr. Hausman reviewed

5    plus in addition to that, I did my own study of the patent

6    records, for example.  I also went to some of the financial

7    documents on file with the SEC to confirm or to check

8    information that I saw on what Dr. Hausman reviewed.

9    Q.    And can you tell us what are the specific points in

10   Dr. Hausman's analysis that you disagree with?

11   A.    There are.  I don't know for efficiency if it makes

12   sense, I can click through them probably pretty well and

13   there is a chart that I have that shows them.

14            MS. SHAMILOV:  May I approach the witness?

15            THE COURT:  Sure.  You're going to have to ask

16   questions, but you can give him a clicker if you want.

17            MS. SHAMILOV:  May I set up the easel?

18            THE COURT:  Sure.

19            MS. SHAMILOV:  Thank you.

20   BY MS. SHAMILOV:

21   Q.    We put up a board there with four points and you also

22   have something on the screen.  Where should we look?

23   A.    Let's start with the each of the four points

24   individually.  The first concern I have with Dr. Hausman's

25   work is that he overstates revenue.  We'll talk about this

Malackowski - direct

1   in some detail, but what Dr. Hausman does is he assesses

2   each patent one at a time looking at the total profitability

3   of Groupon each time and then adds them together.  And as a

4   result of using that technique, he really is double counting

5   the profitability.  And I'll describe that in detail.

6   Q.      What is the next point that you want -- that you

7   disagree with?

8   A.      Not only is he double counting the revenue as I just

9   mentioned, but he's also inflating the rate of profit that

10  he applies to the Groupon revenues.  Imagine this, instead

11  of looking at a dollar, he looks at four dollars.  And

12  instead of looking at ten percent of a dollar, he might look

13  at 20 percent of $4.  And you can see how that's going to

14  get you a much bigger number than if you look at things the

15  way the industry does.  And we'll talk about that in detail.

16  Q.      There are four points on our board.  What's the third

17  point?

18  A.      The third point is that he fails to properly value

19  each patent.  And so even if we assume that Dr. Hausman

20  correctly identified the revenue associated with each of the

21  four patents uniquely, once he determines that revenue, he

22  stops and he takes 30 to 50 percent of the profit.  He

23  doesn't try to understand what percentage of the profit is

24  due to the patents specifically as to price, cost savings,

25  extra customers, and as a result of that, again, he's over

1  counting, creating the higher damage number than is

2  necessary.

3  Q.      What is the fourth point?

4  A.      The fourth point is he ignores what the market tells

5  us that there is a lot of evidence as to what these patents

6  are worth generally, and that's not taken into account.

7  Q.      Let's talk about each of those one at a time.  Let's

8  start with the first one.  How does Dr. Hausman overstate

9  Groupon's revenue?

10 A.      So, I went back to the financial statements and I

11 totaled the Groupon revenue for the period as to what's at

12 issue here.  So from March of 2010 to July of 2018,

13 Groupon's U.S. relevant revenue was $11 billion.

14          So Dr. Hausman starts by looking at the '967

15 patent, and Dr. Hausman decides that the revenue associated

16 with the '967 patent is 4.2 billion.

17          Dr. Hausman then goes back and says let me look

18 at the '849 patent and basically he assumes all of that

19 revenue is relevant.  Then he goes back to the '601 patent

20 and determines that 7.6 billion was relevant.  And finally,

21 he looks to the '346 patent and again determines that it's

22 almost all relevant.

23          But the problem is is that Dr. Hausman's

24 starting point is $33.1 billion worth of revenue and as soon

25 as you multiply that by percentages of profits and

Malackowski - direct

1  percentages of sales, you get a grossly exaggerated number

2  and that's the double counting error that I referred to.

3  Q.      And is double counting a historic shorthand for the

4  first point on your board?

5  A.      It is.  So as a CPA, if you say "double counting,"

6  the bells go off.  Everybody knows that that is a problem.

7  Q.      Maybe you can write that on the board, for the jury

8  to make a correlation?

9              MS. SHAMILOV:  If that is all right, Your Honor.

10             THE COURT:  You may step down.  Sure.

11             THE WITNESS:  Thank you.

12  BY THE WITNESS:

13  A.      That is a good shorthand explanation as we talk

14  through that point.

15  Q.      So let's move on to the next point.  Why do you

16  disagree with Dr. Hausman's consideration of Groupon's

17  profitability?

18  A.      If you review Dr. Hausman's testimony or report, as

19  he explained, he referred to what he called adjusted EBITDA,

20  which is an accounting method you will find in the

21  accounting records.  What EBITDA is, is a measure of cash

22  flow.  It doesn't consider money that you spent historically

23  on servers or software development, it simply is looking

24  at what you have to spend going forward.  Because how that

25  is recorded in the accounting books are things like

Malackowski - direct

1   depreciation and amortization expenses and Dr. Hausman

2   ignores those.

3                Alternatively, what I think you need to look at

4   is the bottom line profit, the operating profit of the

5   business that considers all those items.  And when you

6   compare those over this time period, the difference is

7   dramatic.  Dr. Hausman's analysis of adjusted EBITDA results

8   in approximately $1 billion worth of cash flow, but it

9   ignores all the expenses required to get there.  And when

10   you consider those, Groupon actually lost money.  As of July

11   17th, a year ago, they were more than $100 million

12   cumulatively in the red over their existence.

13   Q.      Well, that is through July 2017.  We're in July 2018.

14   How does the current situation compare to what you just put

15   up on the slide?

16   A.      That is a fair question.  The last year has been

17   better for Groupon.  They have in fact been profitable in

18   the last year.  So if you go through the most recent

19   information, the EBITDA drops to right around $1 billion,

20   and the loss is almost eliminated.  So they're pretty much

21   at break even at this point.

22   Q.      So just to be clear, is EBITDA kind of like my

23   paycheck, it says what I have earned but I always -- what I

24   put in the bank is always less than that?

25   A.      Yeah, that is a good way to think about it.  EBITDA

Malackowski - direct

1    is more like your gross pay because you only pay your taxes

2    once a year, and it doesn't account for those expenses that

3    you have to set aside and eventually pay.  So we need to

4    look more at what I would say is net pay, not the gross pay

5    numbers.

6    Q.    But didn't Dr. Hausman get the EBITDA number from

7    Groupon's documents, Groupon's public disclosures about its

8    financial situation?

9    A.    He did.  He made a fair point that Groupon reports in

10   its financial statements EBITDA or cash flow, and they also

11   report operating profit.  Those are used for two different

12   reasons.  EBITDA is used largely for investors who are

13   thankful that somebody else paid for the equipment and just

14   want to know what the cash is going to be going toward in

15   the short term, and operating profit is what the accountants

16   in the longer term looks for and what the stock market looks

17   for.

18   Q.    How do you know you were right or Dr. Hausman is

19   right?  How do we figure that out on this point?

20   A.    Well, Dr. Hausman teaches us how we can figure it

21   out.  He just didn't finish.

22         So he explained that for companies, profit is

23   the bottom line.  Profits are what they use to pay people,

24   and it is profit that determines stock prices.  And Groupon

25   is on the stock market so you can look there and find the

Malackowski - direct

1    answer.

2    Q.      And did you do that?

3    A.      I did.

4    Q.      And so what did that show?

5    A.      So I looked over the relevant period that I had data

6    for, for Groupon.  And I started by looking at what the

7    market itself did, the NASDAQ market.  No surprise, the

8    market has been very successful over the recent period.

9    This chart shows that it in fact more than doubled.

10           I then went back and looked at Groupon for

11   the same period of time.  And Groupon, since 2011, has lost

12   90 percent of its value.  And what that tells me is that

13   investors do look to the fact that Groupon has either lost

14   money or made no money.  They are not focused on the fact

15   that there is an adjusted EBITDA accounting piece of data

16   that shows a billion dollars worth of earnings.

17           So I take comfort in the fact that by looking at

18   operating profit, we're looking at the bottom line you need

19   to consider in a negotiation.

20   Q.      So is there a shorthand for point number two you put

21   there on your board?

22   A.      Yes.  The point that I would write on the board is

23   that bills must be paid.  You can't simply ignore the

24   software development and the servers because they were paid

25   yesterday and are now amortized.

Malackowski - direct

1    Q.      Would you mind writing that down on the board?

2    A.      That's fine.

3    Q.      Now, let's turn to the third point.  Can you please

4    explain to us why in your opinion Dr. Hausman fails to

5    properly value its patents?

6    A.      Yes.  Without jumping ahead, I refer to this as the

7    hatchback car problem.  I'll explain that.  So let me start

8    with what Dr. Hausman did.

9            Dr. Hausman again looked at each of the four

10   patents in this case individually.  He then, working with

11   Dr. Schmidt, made two adjustments in order to determine the

12   portion of those revenues that he thought related to these

13   patents.

14           So in the first example for the '967, you can

15   see he took a 59 percent adjustment and a 21 percent

16   adjustment.  But that is just to get you to what we would

17   call the smallest saleable patent practicing unit, or SSPPU.

18   And he repeated that for the '849, he repeated that for the

19   '601, and he repeated it for the '346.

20           The problem is that does not relate to

21   additional revenue or incremental revenue associated with

22   the patents.  This revenue is not a result of these patents.

23   And we know that from Dr. Schmidt's testimony, himself.

24   Q.      How do we know that?

25   A.      Because that is what he said.  He, at trial last

1  week, confirmed that he offered no opinion about the

2  percentage of Groupon's revenue that was attributable to the

3  patents.  And that is what creates the problem.

4  Q.    So can you give us an example, a specific example

5  with respect to one of the patents, why that becomes an

6  issue?

7  A.    Sure.  And it's true for all of these patents, the

8  percentages might help you determine the sales at issue but

9  they don't give you profitability.  And we can start with

10 the last patent we referred to which was the '346.  You

11 remember that the '346 had a deal with the sign up from

12 Facebook or the sign up from Groupon.

13 Q.    Google, I think you meant to say.

14 A.    I meant Google.  Sorry.  And using Dr. Hausman's

15 analysis, he calculated that 14 percent of Groupon users

16 initiated their account in this way.  But you have to

17 understand from a common sense what that means.  If you

18 don't have a Groupon account and you see a product that you

19 want to buy because you were surfing on the web and you go

20 to buy that product, as you are checking out, you get this

21 option to be a little more efficient in making your account.

22         Dr. Hausman assumes that without that option,

23 everyone who made the decision to purchase that product

24 today and every product they would ever buy in the future,

25 they would just walk away from Groupon and never buy

Malackowski - direct

1    anything.

2                 That assumption is not correct.  It doesn't even

3    make common sense, frankly.  And that results in the

4    overstatement to his analysis.

5    Q.       Does Dr. Hausman have any evidence to support his

6    opinion that 14 percent of customers would not purchase from

7    Groupon if there was no sign up with Facebook or sign up

8    with Google on the page?

9    A.       He does not.  In fact, he was asked that exact

10   question at trial last week.  He was asked:  In fact, have

11   you no evidence at all to tell the jury that if Groupon did

12   not use the '346 patent, that 14 percent of its users would

13   not be signing up?

14                 Answer:  No, I don't.

15                 The problem is his calculations presume that all

16   of them would have gone someplace else, and that is why

17   they're overstating it.

18   Q.       I think you kind of alluded to that already.  Is

19   there a simple way to remember this?

20   A.       So I'm a car guy, and so I like car analogies.  So I

21   refer to this as the hatchback problem.

22   Q.       What is the hatchback problem?  Can you explain?

23   A.       Yes.  So assume that you had a patent on a hatchback

24   mechanism of a car and you asked Dr. Hausman to use his

25   method to calculate damages.  Well, the first thing that he

1   would do is go to Dr. Schmidt and said let's eliminate all

2   the trucks because we're only looking at cars.  No problem.

3   The next thing he would do is let's eliminate all the

4   non-hatchbacks.  No problem.  I agree with that as well.

5          And what that leaves Dr. Hausman with is the

6   total revenue associated with hatchback vehicles.  But what

7   it doesn't tell you is to what extent the patent on the

8   hatchback was the reason people bought the car, or to what

9   extent the patent on the hatchback resulted in a greater

10  price.

11         That is the missing link in Dr. Hausman's

12  analysis.  And it's of great concern because we know in a

13  car, for example, there are many patented technologies.

14  There is know-how.  There are all kinds of innovation.  And

15  we know in this case there are at least three other patents

16  because Dr. Hausman repeats the same calculation three more

17  times.

18         And so to sort of finish the analogy,

19  Dr. Hausman fails to take the smallest saleable patent

20  practicing unit, it's a term we use in this business, and

21  determine how much of that revenue, apportion that revenue

22  to the patent.  And it ignores the other patents in this

23  case or other contributions that are made.

24  Q.    So is there another way of thinking about writing on

25  the board there the hatchback problem?

1    A.      I would call it the hatchback problem.

2    Q.      Can we just add that to the board?

3    A.      (Witness complies.)  And maybe so I don't have to get

4    up, I can write the next one?

5    Q.      Yes, why don't you do that so we don't go back and

6    forth, so you can write your shorthand for number four.

7    A.      (Witness complies.)

8    Q.      And what did you write there for number four?

9    A.      For the last point, I wrote:  Listen to the market.

10           The last point was that Dr. Hausman, in my

11   opinion, ignores what others have paid to use IBM patents.

12   In other words, he hasn't listened to the market.

13   Q.      Can you explain that?  What do you mean by that?

14   A.      So this case is somewhat unusual in the work that I

15   have done in that there are so many data points of actual

16   license agreements that IBM has negotiated and signed with

17   third parties.  On the screen, I show 42 different

18   agreements that were made part of the record of this case

19   that I studied.  And in my opinion, Dr. Hausman doesn't

20   reconcile his work to what the market is telling us.

21   Q.      How did Dr. Hausman's conclusion that he told us

22   about last week in this case about damages compare to the

23   license agreements that IBM entered with that entity?

24   A.      So he was asked about that on cross-examination.  So

25   I'm going to limit, as an example, that discussion.

1  So here I'm just showing four of those 42

2  agreements.  And you have heard this before, but a brief

3  recap.  You have the Amazon agreement that was for $49.8

4  million.  But it wasn't a license for four patents, it was a

5  license for more than 45,000 patents.

6  Facebook:  $20 million, 45,000 patents.

7  Google:  $35 million, 45,000 patents.

8  Priceline:  $40 million, 45,000 patents.

9  When you just take those four and you add them

10 together, some of the largest companies in the web space,

11 in total it was $144.8 million that was paid.  But in

12 comparison, Dr. Hausman has concluded that for just four

13 patents, just for Groupon, that a royalty would be $166

14 million.  And now we can understand why that is.  Because he

15 has overstated the revenue, he has overstated the profits,

16 and he doesn't apportion to the patents at issue.

17 Q.    Now, there were -- you just discussed four licenses.

18 You mentioned there were 42.  Are there licenses that IBM

19 granted that were less than the numbers you just showed,

20 less than $20 million, less than $35 million?

21 A.    You know, that is a great question.  So the second

22 thing that stands out from this chart aside from the fact

23 there is a lot of agreements is if you go back and look at

24 the amount that was paid, almost half, 20 of the 42

25 agreements, the total amount paid was less than $5 million.

Malackowski - direct

1  Q.      Thank you.  Let's talk a little bit about your

2  analysis.  How did you approach the issue of damages in this

3  case, and how did you analyze it?

4  A.      So if we start fresh, I started by looking at these

5  same agreements, and the process that I went through is

6  called the market approach.  If you have ever bought a house

7  or a car, a used car or obviously a used house, how do you

8  determine how much you should pay for it?  Well, you call a

9  realtor and say what are other houses selling for, or you

10 look online and you see what other cars are sold for.  And

11 that may be a perfect comparable or you may have to make

12 some adjustments.

13         The house you are looking at is three bedrooms,

14 the comparable is four bedrooms.  So you are not going to

15 pay that much, for example.  And at a general level, that

16 is exactly what I did.  I started by looking at the

17 agreements and first determining if there were any that were

18 structurally unrelated.

19         So I want to value this house in my example.  I

20 don't want to value an apartment building.  In the IBM

21 agreements, there are some that are so different than what

22 we're doing here, you can't consider them.  For example,

23 that the include the sales of hundreds of patents.  We're

24 not talking about selling patents here.

25         And then I further said, okay, once we eliminate

1     the structural concerns, let's look at comparables that are

2     close and determine if we need to just make adjustments for

3     a bedroom, a pool, or some difference.  And so that is

4     generally the approach that I followed which resulted in a

5     subset of the agreements.

6           There are 12 agreements that I determined could

7     be used in this analysis.

8     Q.     Now, did you review documents other than the licenses

9     to try to analyze the agreements?

10     A.     Yes, two sets of data became really helpful in this

11     work.  The first set is IBM keeps really good records.  So

12     for these agreements that I showed, I was able to find the

13     IBM documents, all the negotiation papers or many of them

14     that describe how they got to the numbers that they got to.

15     And then I was also able to go back where I was missing

16     certain pieces of data and find that through the U.S. Patent

17     and Trademark Office database or the public securities

18     files.

19     Q.     Did you also review documents that IBM provided

20     generally about its licensing program?

21     A.     Yes.  So let's step up one level.

22           So we know the agreements that IBM negotiated.

23     We know the result.  We know on top of that, all the

24     communication, the negotiation that lead to that result.

25     And then at the top of that pyramid, we know that IBM has a

 1    policy and sets forth its practice for that whole process.

 2    And so we could look from that, too.

 3    Q.    So to understand the process of you have eliminated

 4    at least on this slide a whole bunch of agreements, can you

 5    give us an example of one that you eliminated and explain

 6    why you did that?

 7    A.    Yes.  So I eliminated, for example, IBM's agreement

 8    with LinkedIn.  That was an agreement that was for $30

 9    million.  But I determined that it was structurally

10    different.  It was like the apartment building.  And why?

11    Because that agreement included the sale by IBM to LinkedIn

12    of over 800 patents.  That makes it a very different

13    contract than what we're dealing with here.

14           That said, I would know, even with the sail much

15    800 patents, $30 million is a whole lot less than what

16    Dr. Hausman wants for four patents.

17    Q.    Now, going back to the agreement that you outlined,

18    so how many agreements did you determine were comparable to

19    the hypothetical negotiation that we had to analyze here?

20    A.    So, I took the twelve agreements that I had focused

21    on and I narrowed it down to seven.  And why I narrowed it

22    down to seven is because each of these seven agreements

23    actually included the four patents-in-suit.  So from a

24    technology perspective, I could take confidence that I was

25    comparing apples and apples.  In many cases I don't even get

Malackowski - direct

1    seven agreements.  This was a pretty good starting set to

2    look to.

3    Q.      Was there a common payment structure in these

4    licensing agreements that you're showing us here, the seven?

5    A.      There was.  Every one of these agreements was based

6    upon a lump sum fixed fee royalty.  But frankly that was

7    true of all forty-two, that is the practice of this

8    industry.

9    Q.      All forty-two agreements are lump sum?

10   A.      Yes.

11   Q.      Okay.  Thank you.

12           So, can we go through an example of adjustment

13   that you just mentioned?

14   A.      Yes.

15   Q.      Actually, I think, is there a preference that IBM has

16   for these lump sum payments that you just said are in all

17   forty-two agreements?

18   A.      Well, it didn't surprise me that they were all lump

19   sum agreements.  That's not at all unusual.  I did some

20   investigation to understand why that would be, is it just

21   coincidence.  It's not.  Mr. McBride was here last week and

22   he explained that's what IBM wants.  That's typically what

23   they look for is one upfront payment.

24           And that's really important because remember our

25   job, we have to go back to 2008 to a hypothetical that never

Malackowski - direct

1  existed and try understand what these companies would want.

2  And what we know is that Groupon would rather pay a one-time

3  fee and be done, and we know that IBM would rather accept a

4  one-time fee.

5         So that right there gives us an strong evidence

6  that that should be the basis of our damage claim, not the

7  ever growing royalty of Dr. Hausman.

8  Q.    Is Dr. Hausman's opinion a lump sum?

9  A.    Well, his calculation resulted in a number, but don't

10  be confused by that, that's not a lump sum.  It's based upon

11  a percentage of revenue that keeps growing over time.

12  Q.    Let's talk about these adjustments you mentioned.

13  What adjustment did you make in your analysis?

14  A.    So in looking at the IBM licenses supporting

15  documents and licensing testimony and policy, and

16  understanding what of that material is relevant to a

17  hypothetical negotiation, I determined that there are six

18  adjustments that we at least need to consider when we look

19  at each of those seven agreements.

20  Q.    Can you -- what are the generally high level, what

21  are the adjustments, can you walk us through this, please?

22  A.    Yes.  So the first adjustment relates to the license

23  term.  How long is the agreement good for?  And what you'll

24  find in the IBM policy and practice is it generally breaks

25  into two categories, either you're going to get a license

1   for five years, or you're going to get a license for the

2   life of the patents, LOP, life of patent.

3           As you can see in the highlighted block at the

4   top, if you're getting a life-of-patent license, the rate is

5   1.9 times or two times, almost double what it would be for a

6   five-year license.  So that is fact from the IBM files that

7   I took.

8           And so just to summarize that, if I want to

9   license a patent and we all agree it's worth a dollar for

10  five years, if I want to say I want to use it for the rest

11  of the life, then I pay $2.

12  Q.    What about at just number two?

13  A.    The second adjustment deals with corporate

14  relationship.  In select cases, IBM was licensing people

15  that it did business with whether they were customers or

16  partners, and not surprising when you cut a deal with

17  someone that you're in business with, they ask for and give

18  them a discount.  And here is an example where there was a

19  partner discount that was for 33 percent.

20          In our hypothetical negotiation, Groupon is not

21  a customer, Groupon is not a partner, they don't get this

22  discount.  So if I ever see it, I back it out.  I have to

23  raise the amount of damages to account for it.

24  Q.    And what about your next adjustment, number three?

25  A.    The next adjustment is whether or not there would be

1   a cross license.  And Dr. Hausman spent a lot of time

2   talking about the cross license issue and throws his hand up

3   and says it can't be adjusted.  I disagree with that.

4          First I learned from Mr. McBride's deposition

5   that there are principles that IBM uses to account for cross

6   licenses.  And it exist within a range, so he explains.  And

7   if they have a huge portfolio, they get a 70 percent

8   discount.  If they have no patents at all, it would be zero.

9          From that data point, I was able to go through

10  other documents in the record and find examples that are

11  pretty much consistent with that range.  So I found that,

12  for example, if you have around 50 patents, IBM will give

13  you a 10 percent discount in order to have rights to those

14  50 patents.  If you have 500 patents, IBM will give you a 25

15  percent discount in order to have rights to those 500

16  patents.

17         So I don't disagree with Dr. Hausman that this

18  is an important issue, but it can be accounted for and

19  frankly this is what a certified licensing professional does

20  day in and day out, this is core of the business.

21  Q.     Let's talk about your next adjustment, number four.

22  A.     This is the most important one from a quantitative

23  standpoint.  It's also the simplest.  It has to deal with

24  the size of the company and the revenue that would be

25  considered under a license.  And it's simply a recognition

1    that companies that have more revenue that are using the

2    patents should pay a bigger lump sum, and that is pretty

3    much in proportion.  That's not surprising.

4    Q.    And what about adjustment number five that you

5    applied in your analysis?

6    A.    Well, adjustment number five is that you also have to

7    consider the fact that we're only talking about U.S. damages

8    and U.S. patents.  And so even if we compare IBM licensing

9    global revenue to Groupon's global revenue, we have to focus

10   on that we don't just focus on Groupon's U.S. revenue.

11   That's something that I did as well.  I broke out Groupon's

12   U.S. dollars.

13   Q.    And I think we're up to your last adjustment, number

14   six.  What is that adjustment that you applied in your

15   analysis?

16   A.    The last adjustment has do with the portfolio effect,

17   that most all of the comparable agreements that we're

18   looking at are for the entire portfolio of 45,000 plus

19   patents.  This hypothetical has to be limited to four

20   patents.  This one is interesting.  At first I thought well,

21   just take four, divide it by 45,000 and we come up with a

22   really, really tiny percentage to apply, but that's not what

23   IBM does.  Basically what IBM does is say you either kind of

24   get all of it, or we're going to give you a 50 percent

25   discount.  They call it -- there is a two times adjustment

1    for patents in other domains, other patents.

2            That's a very favorable factor for IBM.  The

3    fact that I didn't take four and divide it by 44,000, I took

4    one and divided it by two, it is to IBM's great benefit.

5    Q.    Bringing this back to your house analogy, is this

6    similar to comparing what square footage is?

7    A.    It would be like looking at a comparable house that's

8    45,000 square feet and buying a house that's 4,500 square

9    feet and only reducing the price of the mansion by half.

10   Q.    Can you maybe walk us through and give us an example

11   of how you applied these six adjustments to a particular

12   license and what was your conclusion with respect to

13   analyzing the license?

14   A.    Yes.  So the first example I selected was Priceline.

15   Frankly we heard a lot of testimony about Priceline because

16   that's a case that went to trial very recently, so it's a

17   current data point.  It's settlement agreement, IBM sued

18   Priceline over the same four patents at issue in this case.

19   Priceline paid a $40 million lump sum payment, but we have

20   to understand what Priceline got a license to.  It got a

21   license to all 45,000 patents.  It got a license to

22   worldwide patent portfolio.  And it got a license for the

23   entire life of those patents.

24   Q.    Why is that important?

25   A.    Because now when we start the adjustment, we have to

```
 1    take those specific agreement terms into consideration.  So

 2    number one, license term, I just told you Priceline was for

 3    the full term of the license, but you know what, a lump sum

 4    payment at a hypothetical is the same, it's for the full

 5    life of the patent.

 6            Actually there is no adjustment here.  If this

 7    was the end of the story, I would say Groupon had to pay $40

 8    million.  But it's not the end of the story.

 9    Q.    What's the next point of the story?

10    A.    The next point of the story is their corporate

11    relationship.  Again, no relationship with Priceline, no

12    relationship with Groupon, no adjustment.

13    Q.    Are we still at $40 million at this point?

14    A.    We're still at 40 million.

15    Q.    What did you have to do next?

16    A.    Next we have to look at whether or not there was a

17    cross license.  In the hypothetical negotiation, Groupon is

18    not going to grant IBM any rights that Groupon has, that's

19    not part of this case at all.  But in the Priceline

20    agreement, Priceline actually owned 59 patents that it

21    allowed IBM to use.  And as a result, there is a potential

22    that IBM gave Priceline a discount, a discount that Groupon

23    is not entitled to.  So actually, I have to increase the

24    amount that Groupon would pay by ten percent, I'm now at $44

25    million if we stop at this point.
```

Malackowski - direct

1   Q.      What's your next step because I don't think you

2   stopped at this point?

3   A.      Well, I didn't.  I investigated the Priceline patents

4   and whether that license did affect that $40 million.  And

5   Dr. Hausman was asked about that last week, and he was

6   asked:

7              "Question:  So that Priceline license, the value

8   of the cross license in that particular license agreement

9   with Priceline is zero; correct?

10              "Answer:  Well, close to zero, yes."

11              So by my adjusting up by ten percent, I'm giving

12   the benefit to IBM, a benefit that Dr. Hausman doesn't think

13   I need to give them.

14   Q.      What's the next adjustment that you applied in your

15   analysis of this specific license?

16   A.      So the next adjustment is the one that I told you was

17   the most important.  And this is the adjustment for the size

18   of the company.  Priceline as a company is much larger than

19   Groupon.  It is 3.6 times larger than Groupon.  And so

20   obviously Groupon should not have to pay, and IBM's policy

21   confirms they should not have to pay the same amount.

22              So I just took the ratio of worldwide revenue

23   and I needed to decrease the $40 million as a result.

24   Q.      Before you move on.  You have here Groupon's revenue

25   of 21.7 billion, but I thought earlier you showed a smaller

1  number, 11 billion.

2  A.      Good catch.  This is worldwide revenue, and when I

3  showed you the 11.1 billion from the beginning, that was

4  limited to the relevant U.S. revenue.  In fact, that's the

5  next adjustment that we have to adjust Groupon's revenue

6  from global to U.S., and you can see we're talking it down

7  by just more than half.

8  Q.      Thank you.  What about your next adjustment, number

9  six?

10 A.      Well, then the final adjustment is to recognize that

11 Groupon is only getting the license to four patents, not

12 45,000, and we're going to use the very IBM favorable factor

13 and just reduce it by half, not reduce it by 99.9 percent,

14 four divided by 44,000.

15 Q.      What is the conclusion of your analysis with respect

16 to just this license only?

17 A.      When I follow all these steps, what happens is that

18 $40 million payment, when you work through the hard numbers,

19 suggest that Groupon should pay 3.5 million.  In other

20 words, if the only piece of evidence in this entire case was

21 the Priceline document, it would be my opinion that the

22 Groupon royalty should be 3.5 million.

23 Q.      And just so I understand when you say the only piece

24 of evidence was the license, you also mean to include -- you

25 also mean to include the actual documents that IBM has about

1  it?

2  A.    Yes, of course.  And the actual revenues against

3  them.

4  Q.    Before we move on, this was a settlement agreement;

5  is that right?

6  A.    It was.

7  Q.    Because IBM sued Priceline; right?

8  A.    They did.

9  Q.    And you were here last week and I think Dr. Hausman

10 testified that that settlement agreement was entered just

11 about four weeks before the trial was set in that case.  Do

12 you recall that?

13 A.    Yes, I do.

14 Q.    So the parties did not go through with trial there?

15 A.    They did not.  I believe Dr. Hausman explained that

16 Groupon has been the first company to stand up and go to

17 trial.

18 Q.    Maybe if you don't mind, let's do this exercise for

19 one more agreement so they can understand a little more what

20 you did and how you analyzed those seven?

21 A.    Okay.  Before you go to the next one, let's all keep

22 in mind, this agreement started at 40 and ended up at 3.5

23 because I think that will be a good comparison when we look

24 at the next one.

25 Q.    Okay.  Let's look at the next one.

Malackowski - direct

1    A.    So the next one I picked was Comcast.  Comcast was an

2    agreement for $10.5 million.  It again covered the entire

3    portfolio, worldwide sales for the life of the patent.

4    Q.    And again, why is that important?

5    A.    Because those are the adjustments that we'll have to

6    take into account when we look to what Groupon would have

7    paid.

8    Q.    Let's look at your adjustments.  Can you walk us

9    through your adjustments for this license?

10   A.    Yes.  Number one, both the Comcast agreement and the

11   Groupon hypothetical will be for the life of the patent, no

12   adjustment.  Number two, Comcast received a partner

13   discount, that was that document that I showed you earlier.

14   Groupon is not going to get a partner discount.  And so we

15   have to adjust the baseline, and we actually increase the

16   comparable significantly to account for that.

17   Q.    So at this point in your analysis, Groupon would be

18   paying more than Comcast?

19   A.    Yes, more than 15 million as compare to their ten.

20   Q.    What was the next step in your analysis of this

21   particular license?

22   A.    The next step is to look at a cross license, and what

23   we find in the Comcast agreement is IBM received rights to

24   518 patents.  That equates to approximate 25 percent

25   discount.  Groupon is not going to get that discount,

Malackowski - direct

1    either, so now we need to increase the baseline even more,

2    another 30 percent to account for that.

3    Q.       And what did you do next?  What is step four?

4    A.       Step four is we have to account for revenue.  Here

5    the companies are reasonably close in size on a worldwide

6    basis, so it's not as significant an adjustment, but Comcast

7    is still a bigger company so we would reduce the baseline.

8    Q.       And step five?

9    A.       Step five is the same.  We have to adjust Groupon's

10   revenue to U.S.

11            And step six is the same, we have to take into

12   account it's only four patents.

13   Q.       What's the conclusion of this one?

14   A.       When you pull all that together and you run through

15   the analysis of the Comcast agreement would suggest that as

16   a benchmark it would be five $5.2 billion.  In other words,

17   that's what it tells you that Groupon should pay ignoring

18   any other evidence that we discussed.  But what I think the

19   teaching point is, remember when we started the Priceline we

20   started at 40 and we ended up at 3.5.  Here we only started

21   at ten and we end up at about half that, 5.2, more than we

22   ended up with at Priceline.  Why is that important?  It's

23   important because it illustrates that these are very fact

24   specific calculations that are grounded in IBM's historical

25   licensing fee and negotiation, they're not a general rule of

1    thumb, it's a very particular analysis.

2    Q.     Did you perform this step of analysis for all those

3    agreements that you found comparable for this situation

4    here?

5    A.     I did.  So if you look at the agreements that I found

6    to be comparable, and you run through each of them for the

7    same factors, you can see in the far right column the 3.5

8    million for Priceline we discussed, the 5.2 million for

9    Comcast, and then the other figures which range from 5.4 to

10   2.2 million.  And importantly, it's a pretty tight range.

11   There is consensus around the two to $5 million figure.  And

12   remember, also, that of the 42 agreements, 20 of them were

13   less than five million in total even before adjustment.  So

14   that gave me comfort that this analysis makes sense.  It

15   appears reasonable.

16   Q.     Did you do anything else to confirm that this is

17   reasonable?

18   A.     Yes.  Aside from looking at the overall history of

19   the agreements, there were a couple of agreements I wanted

20   to study in particular because there was something unique

21   about them.

22   Q.     What were those agreements?

23   A.     The first one was the Maxim agreement.  And let me

24   explain why Maxim was -- probably special is not the right

25   word but worth listing about.  Maxim was the only agreement

1   that I found that wasn't for 45,000 patents.  It was for

2   seven patents.  And two of the seven patents were the '967

3   and the '849.  So patents that were at issue in this case.

4           And the lump sum payment that was agreed to

5   between IBM and Maxim for seven patents was $2 million.  And

6   so that again is a pretty good reasonableness to keep in

7   mind when you are thinking about what Groupon and IBM have

8   agreed to in a hypothetical.

9   Q.    Did you do anything else beside looking at the Maxim

10  Integrated agreement to confirm those ranges you just showed

11  to us a minute ago seemed reasonable and were reasonable?

12  A.    Yes.  So the last thing that I did is there was a

13  lot of discussion regarding Amazon and Google.  Those are

14  obviously very, very large companies. And so I went through

15  some of the same analysis looking at the cross license

16  impact and the size adjustment.  And here, the size

17  adjustment is by far the most important thing.  It's because

18  obviously Amazon and Google are some of the largest

19  companies in the world.  And when you run through the same

20  analysis, it shows that even those agreements would suggest

21  a benchmark much just over $1 million.

22  Q.    And this adjustment that you told us with that you

23  performed with those seven agreements, did you apply these

24  adjustment during the other agreements of those 42?

25  A.    Well, ultimately I looked at everything.  And so this

Malackowski - direct

1    shows you the 12 agreements I started with plus Google and

2    Amazon, and I highlighted on the screen the seven that I

3    focused on.  But here again, my takeaway is even if I

4    broadened the work to include kind of a broader data set,

5    it's still all very consistent.  It gives me comfort in the

6    conclusions.

7    Q.      And so what is your range?

8    A.      So --

9    Q.      Well, yes, how did the analysis of your numbers

10   compare to Dr. Hausman's opinion we heard last week?

11   A.      Yes.  So my range of the seven agreements range from

12   $2.2 to $5.4 million, very consistent across the board.

13   That is nothing like what Dr. Hausman suggests for four

14   patents.

15   Q.      Now, Dr. Hausman last week talked about these

16   *Georgia-Pacific* factors.  I haven't heard you mentioning

17   them.  Did you perform the *Georgia-Pacific* factors analysis?

18   Did you analyze the factors that Dr. Hausman analyzed?

19   A.      Yes.  So you might recall Dr. Hausman talking about

20   the *Georgia-Pacific* 15 factors.  *Georgia-Pacific* was the

21   name of a case from I think 1972, and it's something that

22   damages experts and licensing experts use in virtually

23   every example.  And so they are clearly something that I

24   considered.

25           The 15 factors, I won't go through them all

1   here.  I did consider every one.

2            You have heard me talk about, for example, No.

3   1, royalties received by the patent owner or IBM.

4            You heard me talk about No. 3, the type of

5   rights that would be granted, rights for the life of the

6   patent.

7            You heard me talk about No. 4, the patent owner,

8   IBM policies.

9            You heard me talk about No. 7, the duration of

10  the patent, et cetera.

11           There are two of these, however, that I haven't

12  really focused on that I thought were worth drawing out.

13  Q.     So what are these two?  What is the first one of the

14  two that you think is worth talking about?

15  A.     The first one is *Georgia-Pacific* Factor No. 5, the

16  commercial relationship between the parties.

17           And you can just imagine in a hypothetical,

18  Groupon is launching a brand new website.  That website

19  doesn't compete with IBM.  And so that is going to be to

20  Groupon's benefit.

21           And then the last one is *Georgia-Pacific* Factor

22  No. 13, improvements added by Groupon.

23           And we heard lots of testimony over the last

24  week about all the work that it takes to put together a

25  really good platform.  And Groupon would argue aggressively

Malackowski - direct

1    that it shouldn't have to pay 50 percent of its profits

2    related to one patent, 50 percent related to the second

3    patent, 50 percent related to the third patent, 33 percent

4    related to the fourth patent, because when you add that up,

5    if those four patents are on the same sale, it's 183 percent

6    of profit.  You can't have it.

7    Q.    So what is your conclusion in this case?

8    A.    My conclusion is that the parties would have agreed

9    to a reasonable royalty between $3 and $5 million, and where

10   it ends up within this range really depends on how many

11   patents they find to be valid and infringed.

12   Q.    Now, if the jury finds that Groupon does not infringe

13   any of the patents asserted by IBM in this case, what would

14   be the reasonable royalty analysis?

15   A.    If there is no infringement, it's zero.  If there is

16   invalidity of all the patents, it's zero.

17   Q.    And so IBM is not entitled to receive damages on an

18   invalid patent?

19   A.    Of course not.

20            MS. SHAMILOV:  Thank you.  Pass the witness at

21   this time.

22            THE COURT:  Okay.  Cross-examination.

23            MR. DESMARAIS:  Yes, Your Honor.  Thank you.

24            THE COURT:  Do you want the display there or

25   somewhere else?

 1          MR. DESMARAIS:  Yes, I will move it down.  Thank

 2    you, Your Honor.

 3          THE COURT:  Feel free to do so.

 4          (Display is taken down.)

 5                    CROSS-EXAMINATION

 6    BY MR. DESMARAIS:

 7    Q.     Good afternoon, Mr. Malackowski.

 8    A.     Good afternoon, sir.

 9    Q.     I won't keep you too long because time permitting,

10    we'll have Professor Hausman come back and explain where you

11    two differ in greater detail, but I do have a few questions

12    for you at least.

13          The hypothetical negotiation is supposed to,

14    and I think you said this on your direct, it's supposed to

15    arrive at a number that IBM and Groupon would have arrived

16    at had they actually sat down at a negotiating table

17    together and cut a deal; right?

18    A.     I agree with that.

19    Q.     And during the negotiation that we talked about in

20    that way, the hypothetical negotiation, the parties are

21    supposed to assume the patents are valid and infringed;

22    right?

23    A.     Yes, sir.

24    Q.     And if we look at -- let's see.  Let me turn the

25    projector on.  There we go.

1    This is a slide that was used by Professor

2    Hausman.  And what he talked about in the first step was to

3    try to determine what was the economic benefit associated

4    with the patents that Groupon got by using the patents.  Do

5    you remember Professor Hausman's testimony in that regard?

6    A.    I remember what he said.  I obviously disagree, but I

7    do remember.

8    Q.    Right.  But there is nothing wrong fundamentally with

9    that approach.  Putting aside whether you agree with his

10   answer, you do agree that it's a fundamentally sound

11   approach to determine the economic benefit associated with

12   the patent that Groupon got by using it; right?

13   A.    I agree that would be a valid consideration.  Yes,

14   sir.

15   Q.    And then assuming we could do that, assuming you

16   could do it or Professor Hausman could do it and you can

17   get at a number that Groupon benefitted by using the patent,

18   it's also a very sensible thing from the point of view of

19   economics, the second step that Professor Hausman did, which

20   was once we isolated the benefit group got, then the parties

21   could negotiate, okay, it's my patent, you are using it,

22   I'll let you use it.  Let's figure out how to split that

23   benefit.  You should keep some of the benefit and I should

24   get some of the benefit.  That is a sound economic approach

25   to getting to a reasonable royalty, isn't it?

Malackowski - cross

1    A.      It's a sound consideration but not in the fact you

2    also have to consider what effect it would have on IBM.  The

3    Court instructed us at the beginning of the trial that we

4    have to put IBM back in the same place.

5    Q.      Understood.  But it is an economically a sound

6    approach; right?

7    A.      It is a consideration.  I have no problem with that

8    as a theoretical consideration.

9    Q.      Now, it's true that you didn't use this approach, you

10   used a different approach; right?

11   A.      At a general level, we talk about this as an income

12   or profit approach as opposed to looking at a market

13   approach.  And although there is some overlap, I agree with

14   you that you can distinguish them.

15   Q.      Okay.  And this is a funny coincidence, but like you,

16   I also had in mind a real estate analogy.  And I prepared

17   these.  And I think actually it's really funny because I

18   actually had the pool in one, I put a pool in one of the

19   houses just like you said on the direct, so I think you and

20   I are communicating.

21   A.      Maybe you have been reading my stuff.

22   Q.      Yes.  If you are trying to figure out -- I put a

23   yellow box around that house.  If you are trying to figure

24   out how am I going to pay for that house, you look at the

25   other houses in that neighborhood and you try to find what

1  real estate agents and I think even what you called you

2  tried to find houses that are comparable; right?

3  A.      Yes, sir.

4  Q.      And what that means is you are supposed to look at

5  houses that are roughly the same size, roughly in the same

6  neighborhood, and with roughly the same features; right?

7  A.      I wouldn't have any disagreement to doing that in a

8  real estate context.  Roughly the same size is a very

9  different connotation in patent licensing.  We don't talk

10  about square feet, but I get it.

11  Q.      Okay.  Let's just put a word on it, and I think you

12  used the word, too.  You are trying to find things that are

13  comparable or another way of saying that it is proper to

14  compare to; right?

15  A.      And that you can adjust for any differences, true.

16  Q.      Exactly.  So in the real estate context, if you are

17  looking at a house that is sort of the same but one has four

18  bedrooms and another has three, a real estate agent can sort

19  of handicap, okay, for one extra bedroom, it will be this

20  much more so we can adjust and then we'll see, and that is a

21  fair thing to do?

22  A.      I agree.

23  Q.      If a house has a pool like I put there in the bottom

24  center, well, that house might be a little more valuable, so

25  we'll adjust for one house having a pool and another house

Malackowski - cross

1    not having one.  These are things that people can talk about

2    and making adjustments for; right?

3    A.      Agreed.

4    Q.      And that is what you talked about in your direct.

5    That is what you were trying to do with the licenses you

6    looked at; right?

7    A.      Well, that is what I did using the IBM teachings,

8    yes.

9    Q.      But one of the key principles of doing this sort of

10   analysis, and this is true in real estate and it's true in

11   patent estate, the thing you are comparing to has to in fact

12   be something that is a fair comparison and it has to be

13   something that can be actually adjusted for.  You would

14   agree with that; right?

15   A.      Again, sure.

16   Q.      Now, after looking at the IBM licenses, in your

17   report you showed us this figure, I think this is Figure 8

18   from your opening report, I believe.  Does that look

19   familiar to you?

20   A.      It is Figure 8.

21   Q.      Yes.  Now, in your analysis in your opening report,

22   you chose to focus on these license agreements from Figure

23   8, and there are 11 of them in this Figure 8; right?

24   A.      Right.  I referred to my testimony to 12, and that is

25   only because Priceline occurred after these 11.  But that is

1    the basis of the 12.

2    Q.      Right.

3    A.      Those 11 plus Priceline.

4    Q.      Right.  And we'll come to Priceline in a moment.  I

5    just want to go through in your report.  Okay?

6            Now, the money we see here is not the money that

7    they paid but that is the money that you downward adjusted

8    to in your analysis; right?

9    A.      That is the result of the comparison that I did, yes.

10   Q.      And if we look at what they actually paid, it looks

11   more like that.  Those are the amounts that the licensees

12   paid and the years for which they got coverage from IBM's

13   portfolio; true?

14   A.      It looks exactly like that.  That is I believe

15   accurate.

16   Q.      Thank you.  I try to be accurate.  So Maxim paid $2

17   million, Comcast $10 and-a-half million, Infosys $14,

18   Facebook, $20, et cetera.  And Wipro was the other, $17

19   and-a-half million; right?

20   A.      Right.  Yes.  I talked about, for example, Comcast

21   $10.5 as one of my illustrations.

22   Q.      Now, we were talking about the real estate analogy;

23   right?  If you are looking to buy a house in say Beverly

24   Hills, California where all the stars live, you don't look

25   for comparables, say, for instance, on a farm in Iowa;

Malackowski - cross

1    right?

2    A.    I wouldn't thing that would be a good way to do that.

3    Q.    I have a picture of that.  If you are trying to

4    figure out what does this house in Beverly Hills cost, don't

5    hold me to the fact that that is actually Beverly Hills

6    because I'm not 100 percent sure of that, but that's the

7    point.  You wouldn't go looking in middle Iowa in farm

8    country and say, well, this house cost X.  Let me make some

9    adjustments for the fact that I have a lot of land, I got

10    some cows.  I'll adjust up, he has a pool.  That is far from

11    comparable.  And if your real estate agent came to you and

12    said they were doing that, you would say that is not fair.

13    That house is not comparable to what I'm trying to own.

14    Wouldn't you say that?

15    A.    I think so far, you and I are in complete agreement.

16    Q.    That happens from time to time.  Okay.  So now if we

17    go back to -- here we go.  So if we go back to this one, let

18    me talk first about these 11.

19    Now, every one of these 11 is a cross license;

20    right?

21    A.    I believe that is true.  As Mr. McBride explained,

22    they seek a cross license in every agreement.

23    Q.    So in this case, in the hypothetical negotiation

24    between Groupon and IBM, it is not a cross license, is it?

25    A.    Of course not.  That was one of the specific

1   adjustments I made.

2   Q.      It's a one way license on four patents; right?

3   A.      They refer to it as a one way naked patent license on

4   four patents.

5   Q.      And every one of the licenses that you have put in

6   your Figure 8, every single one of them was a settlement

7   without litigation; right?

8   A.      They did not necessarily involve litigation.  I don't

9   know if it's fair to call them settlements.  I don't know

10  what.

11  Q.      That is a fair point.  Let me rephrase.  I didn't

12  mean to use a loaded word.  Every one of those is a

13  voluntary license agreement that had nothing to do with

14  litigation; right?

15  A.      Exactly.

16  Q.      Whereas here we're in the middle of a lawsuit.  We're

17  in fact having a trial right now; right?

18  A.      Well, that is factually true but we shouldn't punish

19  Groupon for the legal expenses associated with the lawsuit.

20  That makes these even better, not worse.

21  Q.      Oh, hold on a second.  Don't get too fast.  Because

22  here, Groupon has to assume that they infringe the patents

23  and that the patents are valid.  They can't make any

24  arguments to lower the negotiation rate because the patents

25  are weak or don't fit or are invalid.  They have to stand

Malackowski - cross

1     up and say I took your property and I'm using it and it's

2     valid, now what do I owe you?, whereas in this context,

3     these people signed up voluntarily and you know for a fact,

4     sir, don't you, that every single one of them made a fuss at

5     the negotiation about, oh, I don't infringe; oh, your

6     patents are invalid; and that is how you have a negotiation

7     and IBM lowers the price as a result of that and they reach

8     a deal.  Right?

9  A.     That was a really long question.

10  Q.     But we're communicating.

11  A.     But when you look at this issue of litigation there

12     are two things you need to take into account:  One is do you

13     take, do you factor in the cost of trying this case of all

14     these people and expensive lawyers?  No, because you are not

15     going to punish them.  The second you take into account is,

16     is there a risk that these patents aren't really valid and

17     infringed and therefore I should pay less.

18            If you're negotiating over seven patents like

19     Maxim was, I'll agree with Mr. Desmarais, that is something

20     you should think about.  But when you are negotiating for

21     45,000 patents, that factor goes away because IBM says,

22     look, you may not infringe these four but I'll just bring

23     out four more and four more.  And the odds that you infringe

24     something in 45,000 is essentially 100 percent, so the

25     discount is gone.

Malackowski - cross

1  Q.      But, you know, from the records you looked at about

2  these licensees, that in every single instance, it was just

3  a few patents that drove the negotiation, and it was just a

4  few patents that got the deal done.  It was not 45,000.

5  A.      No, that is not true.  In those negotiations, people

6  always start with an example list.  They call it the proud

7  list.  But at the heart of those negotiations is the freedom

8  to operate as Mr. McBride talked about, and I'm not cutting

9  a deal with IBM to know they're going to knock on my door

10  tomorrow with four more patents.  It is patent peace.  So in

11  implicit in every one of these is the portfolio release

12  which is why this discount isn't appropriate.

13  Q.      But if you listen my question, sir.  My question is

14  at the negotiation table, in each of these instances, they

15  were talking about a handful of patents.  IBM gave them

16  claim charts and they responded.  You know that, don't you,

17  sir?

18  A.      I listened very carefully to your question.  The

19  premise of your question is not true.  Even though they may

20  have used claim charts on a few patents, the negotiation

21  documents talk about the portfolio.

22  Q.      Of course they do.

23  A.      Of course they do.

24  Q.      They're portfolio licenses.

25  A.      Exactly.

Malackowski -cross

1   Q.      That's the point.

2   A.      Exactly.

3   Q.      Right.

4   A.      Exactly.

5   Q.      The difference is here between IBM and Groupon, the

6   parties have to assume the patents are valid and infringed.

7   That's the law, isn't it?

8   A.      Of course it is.  So there is no discount for

9   validity.  There is no penalty for litigation.  And just

10  like these portfolios, there was no discount in my opinion

11  for the probability that somewhere within 45,000 patents,

12  IBM wouldn't have something that this company wanted.  That

13  is the basis of their licensing business is the portfolio,

14  the big guy at the table model.

15  Q.      So just to recap and then we're going to continue.

16  Every one of these is a cross license.  The license in this

17  case isn't; right?

18  A.      True.

19  Q.      Every one of these is a voluntary license deal

20  between responsible companies, not a litigation like this

21  one; right?

22  A.      True.

23  Q.      True?

24  A.      Yes.

25  Q.      Every one of those was a negotiated settlement and

Malackowski -cross

1    here under the law we have to assume the patents are valid

2    and infringed; right?

3    A.      Well, it's still a negotiation, a hypothetical

4    negotiation, but we do have to assume they're valid and

5    infringed.

6    Q.      And another big difference you can see here on the

7    right is these, many of these were for different terms, some

8    of as short as four years, five years, some of them ten,

9    twelve years, so there is varying terms in the stuff that

10   you found comparable to what we're negotiating here in this

11   courtroom; right?

12   A.      True.

13   Q.      And another difference between the eleven that you

14   looked at and what we're doing here is you did no analysis

15   when you looked at those eleven in figure 8 to determine

16   what was the extent of actual use of IBM's patents, whereas

17   in this case, we know full well the extent of use, we have

18   had expert testimony, we've seen how Groupon is using them,

19   we've seen how extensive they're using them, we're seeing

20   the products they're using them, whereas you didn't have

21   that data for these eleven; right?

22   A.      No, I disagree.  In the portfolio of reports, they

23   talk about the fact that IBM identified the applicable

24   revenue.  IBM made the position that the 45 percent of your

25   business in total, not this part of your business, it's

Malackowski -cross

1    equivalent, we're only talking about what the patents cover.

2    IBM can't ask for a license on things that aren't covered by

3    patents, that would be inappropriate.

4    Q.    What I'm asking you is when you looked at the revenue

5    of these companies, you did not isolate the extent of use?

6    A.    I didn't because IBM did for them.

7    Q.    You didn't do it was what my question was.

8    A.    I didn't have to, no, I did not.

9    Q.    Now, if we look at one of your worksheets, let's take

10    out the -- actually, we can look at, you talked about the

11    cross-licenses, right, and you tried to adjustment for the

12    cross-licenses.  Here is your, I believe your Facebook

13    analysis.  This is your appendix 8, Facebook agreement

14    analysis; right?

15    A.    It appears to be, yes, sir.

16    Q.    So you corrected for -- when you looked at the

17    Facebook, you corrected for term length, cross license,

18    worldwide revenue, and portfolio license; is that right?

19    A.    Yes, sir.

20    Q.    Now, when you adjusted for the cross-license, so at

21    step three, do you see that?

22    A.    I do.

23    Q.    Now --

24    A.    There is a footnote for step three, but I can't see

25    the notes.  Maybe you can slide it up just so I can check.

Malackowski -cross

1    Q.      Sure.

2    A.      No, the other way.

3    Q.      Now, when you adjusted for the cross-license, when

4    you looked across all the different patents, you did not do

5    in your report, you did not do an analysis of what is the

6    cross-license worth to IBM in any sort of technical sense,

7    you didn't do an analysis of, for instance, if it was

8    Facebook, is that an actual valuable license to IBM or is it

9    Maxim, is that a valuable license to IBM, you really did a

10   ratio of the number of patents they had in their

11   cross-license portfolio; is that right?

12   A.      I want to make sure I understand your question.  If

13   you're asking did I review the 1,300 plus patents to

14   understand whether they apply to IBM's products, no, because

15   IBM teaches us that these negotiations are conducted based

16   upon the size of the portfolio, because it's impractical for

17   IBM to do the same thing when they negotiate.

18           Some of these portfolios are 30, 40,000 patents.

19   Nobody sits down and says let's start with number one.

20   Q.      Hold on a second.  Let's stay to the question and

21   we'll come to what I want to talk about.  The question was

22   in your analysis, when you're looking at the different

23   agreements, Amazon has a certain portfolio, Facebook has a

24   certain portfolio, Maxim, the other companies have different

25   portfolios, all you did to adjust for the portfolio was

Malackowski -cross

1  math, you looked at how many patents one company had, how

2  many patents the other company had, and you did a ratio

3  without regard to what those patents were?  That was my only

4  question.

5  A.      It was different by patent count according to IBM's

6  policy.

7  Q.      So, for example, if there was a negotiation that IBM

8  was having with a competitor or another company and they had

9  very important patents to IBM to get back, that's not part

10 of your analysis here, because you didn't do that analysis

11 in your report; correct?

12 A.      Well, it's not an explicit part of the analysis, but

13 it is implicit.  If you recall Mr. McBride's testimony, the

14 way they selected who they generally approached is if they

15 think they're using IBM patents or they want those patent

16 rights back.  So IBM in essence pre-qualifies and they'll

17 approach Facebook because they want a right to Facebook's

18 patents because they want a freedom to operate vis-à-vis

19 Facebook, so it's baked into the selection process.  But I

20 did not, certainly did not look at 1,300 or 20,000 patents.

21 Q.      Just to put a finer point on it, because you're

22 telling this jury that you're determining the value of the

23 license in this case by adjusting these licenses for the

24 cross-licenses that IBM got back.  I just want to make sure

25 that we're clear that you gave the same value per patent on

1  the cross-license to Facebook and Maxim and GoDaddy as if

2  IBM had no care whatsoever whether they were getting a

3  patent from GoDaddy or a patent they cared about from

4  Facebook; right?

5  A.     So technically the answer to your question is no,

6  that's not true, because it's not the same per patent.  It's

7  more of an algorithmic curve.  I get your point.  Let's not

8  confuse anybody.  When IBM negotiates and they want a

9  cross-license, they don't read all the patents of the other

10 guy.  They say how many do you have?  We have a policy if

11 you got this many, you get this discount.  I did the same

12 thing.

13 Q.     So what you're telling the jury is if IBM is

14 negotiating with Amazon and they have artificial

15 intelligence portfolio and a data analytics portfolio and a

16 cloud computing portfolio, and all four square in IBM's

17 business and IBM needs those patents, that IBM is going to

18 give the Amazon portfolio in a cross-license the same value

19 that it gives GoDaddy when they don't need a single one of

20 GoDaddy's patents, is that what you're telling the jury?

21 A.     I'm telling you that's what IBM does.  Your example

22 is extreme.  They're approaching companies where they feel

23 they have a need, IBM makes the adjustment based upon their

24 formula, based upon patent count.

25 Q.     Let's continue on with your analysis here.  So you

Malackowski -cross

1    looked at what did you say, 49 license agreements?

2    A.    42.

3    Q.    42 license agreements.  Now, you chose -- of all of

4    those 42 IBM license agreements, you chose these ones as the

5    ones you wanted to do your expert analysis on as the most

6    comparable; right?

7    A.    It's kind of like your full question, yes, I did,

8    because many of these are in the Web space so they're

9    comparable to Groupon, so they were part of the selection

10   process.

11   Q.    That's what we're talking about.  We're going to get

12   there.  From a size point of view, the largest one you have

13   on your list -- you got to choose, right, you made this

14   list; right?

15   A.    Well, I didn't make the list.  I didn't choose in the

16   sense that I cherry picked, I looked for every agreement

17   that was in the Web space or had sufficient documentation to

18   allow us to understand how it was negotiated.  I didn't

19   leave anything out.

20   Q.    And the largest one on your list is Facebook for 20

21   million; right?

22   A.    There is Priceline which is 49.8, that's the last

23   agreement, but the largest on that list is Facebook.

24   Q.    There is at least one agreement in that list that you

25   looked at that's over a hundred million dollars; right?

Malackowski -cross

1  A.      **There is an agreement with a German company that's**

2  **over a hundred million but it's not a simple license, it's a**

3  **supply agreement, so it includes a materials contract, and**

4  **therefore, and it doesn't break it out, so you can't use it.**

5  **And Dr. Hausman agrees with that.**

6  Q.      **So you left out that one that's over a hundred**

7  **million; right?**

8  A.      **I left it out because it's supply agreement largely.**

9  Q.      **And there is a couple of around 50 million and**

10  **they're not on our list; right?**

11  A.      **Well, we could go through them.  I didn't**

12  **intentionally leave any out because they were large.  In**

13  **fact, I included Priceline and Google and others to show**

14  **that when you make the right adjustments they all come out**

15  **to be about the same for Groupon.**

16  Q.      **You left out Twitter, you left out Time Warner, there**

17  **is many that you left out; right?**

18  A.      **A lot of those I left out because they were patent**

19  **purchase agreements, they weren't just licenses.  If IBM is**

20  **selling LinkedIn, for example, 800 patents, that's a**

21  **fundamentally different agreement than letting someone use**

22  **800 patents because there is much more value associated with**

23  **ownership.**

24  Q.      **What I want to talk about is you selected -- these**

25  **are the ones you selected and you left the large agreements**

Malackowski -cross

1    in the pile; right?

2    A.      I didn't intentionally leave any agreement in the

3    pile because of size.  I selected the agreements because of

4    industry and documentation.

5    Q.      Let's talk about industry because I think you

6    mentioned you tried to choose the Web tech page; right?

7    A.      I definitely did seek any of the Web tech patents.

8    Q.      Let's see what these guys do.  I added to the left,

9    on the left what these guys actually do.  Maxim is a

10   semiconductor company; right?

11   A.      It is, you recall that Maxim was not part of any core

12   analysis but was a reasonableness check in part for that

13   very difference that it wasn't an IT service company, it was

14   a semi-conductor.

15   Q.      And Comcast is in telecommunications; right?

16   A.      True.

17   Q.      And Web MD is in health information services; right?

18   A.      Yeah, but they're both Web based businesses at least

19   in part.

20   Q.      Infosys is in consulting and outsourcing; right?

21   A.      It is.

22   Q.      Facebook, I'll give you is probably considered Web

23   tech.  GoDaddy is while also a Web related company, it's a

24   domain name registration company; right?

25   A.      Well, and Groupon is a product sales company and

1   Facebook is a social networking company, but they're all Web

2   based platforms.  This technology speaks to the platform, it

3   doesn't speak to whether you use it for finding a date or

4   buying a product or getting a job, so these issues don't

5   change the comparative.

6   Q.     Cognizant, Wipro, Tech Mahindra and HCL are all IT

7   service companies?

8   A.     True.

9   Q.     And Convergys is a customer and information company;

10  right?

11  A.     True.

12  Q.     Were you here when we heard testimony from Groupon,

13  Mr. Carlisle, where he told you that the big Web tech

14  competitors are Google, Amazon, Facebook?

15  A.     I was either here or I read it, but I'm familiar with

16  that.

17  Q.     And there are other licenses in that pile he looked

18  at that are Web tech, Amazon, Twitter, Google, Priceline,

19  LinkedIn, those are all Web tech; correct?

20  A.     They are, and if they had elements that would allow

21  me to compare them, I certainly would have used them.

22  Q.     So in your analysis, you found more comparable

23  semiconductors and IT services than the actual Web tech

24  companies that are the competitors with Groupon.

25  A.     That is a misleading question, that is not the case.

Malackowski -cross

1   What I found comparable were agreements that were Web tech

2   were the type of IT services that would actually use this

3   technology and that had information available.  If I want to

4   price my house and look at the neighbor's house but he won't

5   let me go inside and count the bedrooms and see if there are

6   bathrooms or what the cabinets look like, I can't use it as

7   a comparable, the information isn't available.

8   Q.    IBM's Web tech licenses, the ones that are directly

9   competitive with Groupon, the only one that you included in

10  your list is Facebook which is the cheapest one at $20

11  million.

12  A.    I don't understand that to be a question because

13  we're really clear on what's in and what's out.  I don't

14  think Facebook is a competitor to Groupon, but it is a Web

15  tech company.

16  Q.    Were you here when Mr. Carlisle from Groupon

17  testified that Facebook was a competitive threat to Groupon?

18  A.    I don't recall saying that it was a competitive

19  threat.

20  Q.    Let's talk about your Facebook analysis.  We started

21  that and we didn't finish it.  So I put up on the screen

22  your analysis of Facebook, and you did adjust and I

23  highlighted for the -- actually, no, that's not what I want

24  to highlight, the cross-license adjustment, which is this

25  one.  That's your cross-license adjustment I circled in

Malackowski -cross

1    blue; right?

2    A.    It is.

3    Q.    Now, Facebook paid $20 million for the license;

4    right?

5    A.    It did.

6    Q.    And IBM got back a cross-license; right?

7    A.    True.

8    Q.    If I read your math here, you valued the

9    cross-license back at 46 million; right?

10   A.    True, that would be to IBM's benefit in my analysis.

11   Q.    I just want to make sure the jury appreciates that,

12   because you just underscored what I told them in opening,

13   which was --

14   A.    I'm sorry, I didn't hear that.

15   Q.    You underscored what I told the jury in opening.  I

16   want to make sure they didn't miss it.  In opening I told

17   them the price of the license is just part of the story,

18   they paid 20 million in cash, and you said the cross-license

19   that came back is worth an additional 46 to IBM; right?

20   A.    I agree with that.  I agreed with that point in

21   opening, too.

22   Q.    So more than double what Facebook actually paid?

23   A.    Yes.

24   Q.    So the cross-license is it fair to say are hugely

25   valuable to IBM?

Malackowski -cross

| 1 | A. | I don't dispute that you have to account for it. |

2   Q.     And in the hypothetical negotiation we're doing here

3   between IBM and Groupon, there is no cross coming back to

4   IBM?

5   A.     Of course.

6   Q.     Now in the next line under the cross-license, that's

7   where you adjusted for revenue; right?

8   A.     Yes.

9   Q.     And you dropped your comparable by 90 percent because

10  of the revenue adjustment; right?

11  A.     Well, Facebook is one of the largest companies

12  around, so, yes, it dropped in accordance with IBM teaching.

13  Q.     But you did that direct comparison between Groupon

14  and Facebook based on revenue because in your view they have

15  similar businesses and similar platforms?

16  A.     No, because that is what IBM teaches us to do, to

17  adjust -- we learned from the IBM documents that the license

18  they agreed to is based in part on the size of the company

19  very explicitly.

20  Q.     Excuse me one second.  I'm just looking at your

21  deposition because I thought you told us --

22  A.     What page?

23  Q.     254.  Let me just ask you the question.  Maybe you

24  misunderstood my question.

25         Why did you decide you were able to -- why did

Malackowski -cross

1    you decide that in the case of Facebook you were able to use

2    all other worldwide revenue as impacted revenue, why is

3    that, sir?

4    A.    I answered in response to this line of conversation

5    that talked about implicated revenue specifically that just

6    generally the similarity of the Facebook versus Groupon

7    business model and platform I saw no reason to reduce the

8    Facebook number further, meaning not further than the

9    teaching of the IBM adjustment.

10   Q.    Right.  That was my question.  So you made a 90

11   percent reduction in this comparable license, 90 percent,

12   because in your view Facebook's business and Groupon's

13   business are essentially comparable --

14   A.    No, you're misreading it.  I made a 90 percent

15   adjustment.  I didn't then go ahead and adjust it even more

16   because they were or were not competitive, because that's

17   not what IBM teaches.

18   Q.    But what you didn't do, what you didn't do and where

19   your analysis went off the rails with a 90 percent

20   adjustment is you didn't look at the Facebook revenue and

21   determine whether it was impacted by the patents in the same

22   way that Groupon revenue was, you didn't do that analysis.

23   It's not in your report, did you?

24   A.    One question.  I don't think it went off the rails.

25   I did consider that because we know from IBM that the basis

Malackowski -cross

1   of that agreement was to look for companies where their 45

2   patents would be implicated.  And that's the same thing

3   that's happening here.  Dr. Hausman didn't look at each of

4   those transactions and say use sign in, used caching, used

5   state, he just talked about what generally speaking revenues

6   would be implicated.  What I have done is an apples and

7   apples comparison to the teaching of IBM's licensing policy.

8   Q.    Let's talk about apples to apples.  Facebook has an

9   external messaging business, Groupon doesn't; right?

10  A.    There is no --

11  Q.    Yes or no, sir?

12  A.    There is no need to compare Facebook to Groupon.  You

13  only compare IBM and Facebook and IBM and Groupon.

14  Q.    Facebook has an external messaging business, Groupon

15  does not, sir?

16  A.    I'll accept this.

17  Q.    Facebook has an integral business, Groupon doesn't?

18  A.    I'll accept that.

19  Q.    Facebook has an What's App business, Groupon doesn't?

20  A.    I'll accept that.

21  Q.    Facebook has Oculus, a virtual reality business,

22  Groupon doesn't?

23  A.    I'll accept that.

24  Q.    Facebook has a Map Face Tracking animation company,

25  Groupon doesn't; right?

Malackowski -cross

1   A.      I'll accept that.

2   Q.      Nonetheless, you treated the Facebook revenue as this

3   impacted in the same way that the Groupon revenue, so when

4   you did your comparable, you dropped the revenue by 90

5   percent without any analysis of whether it was actually

6   impacted by the patents?

7   A.      I can repeat myself.  The comparison between these

8   third-party companies is not relevant.  What is relevant is

9   how does IBM determine the amount it charges these companies

10  and we know it determines it based upon general implicated

11  revenue.  They don't offer a different rate if it's virtual

12  reality versus one of the other things you listed.  So for

13  me in this case I'm trying to listen to the teaching of the

14  IBM policy and apply it so even that's the result of the

15  hypothetical.

16  Q.      One of the other things you talk about in your report

17  is non-infringing alternatives.  Do you recall that, sir?

18  A.      Yes, sir.

19  Q.      And you believe that the non-infringing alternatives

20  in this case will keep the rate down; right?

21  A.      So I believe in the report I considered what's called

22  the cost approach so you and I just talk about market and

23  income cost as the third, and I do believe that based upon

24  what I understand the alternatives to be from Dr. Weissman,

25  you asked him about that an hour ago that that would be

Malackowski -cross

1    another reason why the royalty would be reduced.  But I

2    haven't specifically made a quantitative adjustment for it.

3    Q.     In fact, nobody in this case did, because you were

4    here when Dr. Weissman just testified; right?

5    A.     I was.

6    Q.     Right.  And he didn't study what it would cost to do

7    these design-arounds, he didn't study what the effect on

8    Groupon's business would be to do the design-arounds, and we

9    know Groupon has known about the patents since 2011 and they

10   haven't designed around; right?  Nobody has done any

11   analysis on design-arounds in this case, have they, sir?

12   A.     There are like four questions there, so I will take

13   them one at a time.

14          Dr. Weissman did consider the design-arounds,

15   and he determined that from a technical point of view they

16   could be implemented without substantial changes to the

17   business.

18          Dr. Weissman did not address the economics.  I

19   considered the economics and said if there is no change to

20   the business, there is no change to the business.

21   Therefore, there would be no reduction in sales or profits.

22          To me, that indicates the royalty would be

23   lower.  But it is true that people have known about this and

24   Groupon has not changed for many years, and that is because

25   companies like Groupon are frankly challenged with patents

Malackowski -cross

1    all the time and you can't simply jump up and change your

2    product every time asserts a patent if you don't believe

3    that patent to be valid.  And, obviously, Groupon is

4    claiming with some vigor their view that it is not.

5    Q.      Were you here when Dr. Weissman testified?

6    A.      Yes, sir.

7    Q.      So you heard him say that the design-arounds he

8    proffered didn't apply to the mobile business, didn't apply

9    to the mobile apps.  You heard him say that; right?

10   A.      I heard his testimony in that regard when he answered

11   your specific questions, yes.

12   Q.      Okay.  Just so we're clear.  Now, you talked a little

13   bit about Groupon.  Groupon is a big company, isn't it, sir?

14   A.      I would consider them a large company, yes.

15   Q.      And they have experienced rapid growth over the

16   years; right?

17   A.      Rapid revenue growth.  Not profit unfortunately.

18   Q.      And I think you cited in your expert report a Forbes

19   article from 2010 that said they were one of the fastest

20   growing companies of all time; right?

21   A.      From a revenue perspective, I believe that is true.

22   Q.      And they're compared -- and I think you did this in

23   your report, and that is one of the things you cited in your

24   report, they're compared with eBay and Amazon and Yahoo and

25   AOL and Google?

Malackowski -cross

1    A.    Fair enough.

2    Q.    And even by the second year of Groupon's existence,

3    so back in 2010, they were valued at over $1 billion; isn't

4    that right, sir?

5    A.    I don't recall specifically.  But that sounds like it

6    could be true.

7    Q.    And they're in cities across the country and they're

8    worldwide now?

9    A.    Yes, sir.

10   Q.    And I think we have established they have I think

11   over 6,000 employees; right?

12   A.    I think that was part of the testimony earlier in

13   this trial.

14   Q.    And a couple years ago, they sold their billionth

15   Groupon?

16   A.    I think that was also part of the record.

17   Q.    And they're a public company now; right?

18   A.    They are.

19   Q.    And you know that in their public company filings and

20   the way they manage their business is using adjusted EBITDA;

21   right?  It's a simple question, sir.  It's not asking --

22   A.    It's not a simple question.  So you are asking me do

23   they report EBITDA in their filings?  Yes, they do.  Do they

24   manage their overall business using EBITDA?  I would say

25   that is one of a very large number of accounting metrics

Malackowski -cross

1      that they look to, but not the most important.

2      Q.      And as of February of this year, Groupon told its

3      shareholders its EBITDA and gross profit are going to ramp

4      up; right?

5      A.      Yes, I stated that within the last year, they have

6      begun to generate profitability, and that that negative

7      accumulative $100 million loss is almost gone.

8      Q.      And as we already established, you were here when Mr.

9      Carlisle testified that Facebook is -- excuse me -- Groupon

10     is competitive or sees as a competitive threat Amazon,

11     Google, and Facebook; right?

12     A.      Generally, yes.

13     Q.      And those three companies in that order on a

14     voluntary basis in a cross-license arrangement paid IBM $50

15     million, $35 million, and $20 million; right?

16     A.      For 45,000 patents.

17     Q.      And you want to say that it's fair and reasonable

18     that Groupon should pay $3 to $5 million?

19     A.      Of course, you remember Mr. McBride said if they paid

20     $3 to $5 million here, IBM could come back and ask them for

21     more for the other 44,996 patents.

22     Q.      You don't have any evidence that Groupon infringes

23     any other IBM patents, sir?

24     A.      I don't have evidence that Groupon infringes any of

25     thee four.  I'm simply assuming they do.

1          MR. DESMARAIS:  Thank you.  No further

2    questions.

3          THE COURT:  Okay.  Redirect.

4          MS. SHAMILOV:  Just a few questions, Mr.

5    Malackowski.

6                    REDIRECT EXAMINATION

7    BY MS. SHAMILOV:

8    Q.    Let's talk a little bit about the hypothetical

9    negotiation.  Counsel for IBM was trying to make a point I

10   think that all these other licenses do not apply because

11   they were voluntary deals where here it's not.  Now, let's

12   talk about that.

13         A hypothetical negotiation is that a construct

14   that the law requires you to apply?

15   A.    It does.

16   Q.    And in the hypothetical negotiation, does the law

17   require you to assume that the parties entering into and

18   negotiating a voluntary deal?

19   A.    Absolutely.  Specifically, a willing buyer and

20   willing seller.

21   Q.    And what does a willing buyer and willing seller in a

22   hypothetical negotiation mean?

23   A.    In particular, and from a practical standpoint, it

24   means that you don't penalize either party because of, for

25   example, the cost of litigation, saying if you don't take a

Malackowski - redirect

1  license, even though my patents may only be worth $3

2  million, it will cost you to take $10 million to defend it,

3  so you have to pay more.

4  Q.     So the law requires you to perform this analysis of a

5  hypothetical negotiation, imaginary negotiation, and analyze

6  what would the parties Groupon and IBM do if they were

7  negotiating a voluntary deal at that time; correct?

8  A.     Yes.

9  Q.     And so there is no difference between this particular

10  voluntary deal negotiation that you have to apply in this

11  case and voluntary deal negotiations or agreements that you,

12  you know, analyzed and compared; is that right?

13  A.     No, that is absolutely right.  I pointed out to

14  counsel that that actually made these better comparables,

15  not lesser comparables.

16  Q.     Let's talk about the adjustments you made.  Did you

17  make up those adjustments?  Were these adjustments your

18  ideas to apply them?

19  A.     No, both of the adjustments themselves and the

20  quantitative methods, I learned from reading and studying

21  the IBM practice and history.  I did not create those.

22  Q.     So the adjustments you made for the cross license,

23  that cross license adjustment, you did that in the way that

24  IBM's own licensing policies says you should do?

25  A.     Of course.

Malackowski - redirect

1    Q.      And how does the IBM licensing policy tell you to

2    take into consideration the cross license component of a

3    particular licensing negotiation?

4    A.      So Mr. McBride testified that at a general level, you

5    need to take that into account because that is an important

6    part of the agreement.  It is very valuable.  And then when

7    you look to the negotiation history, you can find specific

8    numeric examples of, if you have 50 patents, this is what it

9    is worth.  If you have 500 patents, this is what it is

10   worth.  If you have a huge number of patents, I don't

11   believe they define huge but thousands of patents, this is

12   what it is worth.

13   Q.      Let's talk a little bit about this point that IBM's

14   counsel was making or trying to make that you have to --

15   that you didn't analyze the impact on the revenue by the

16   patents at issue in the licensing of those licenses you

17   looked at versus here.  Do you recall that?

18   A.      I do.

19   Q.      So the revenue impacted by the four patents at issue

20   here, is that different from the revenue impacted by the

21   45,000 patents at issue in the other license agreements?

22   A.      It's different quantitatively.  The 45,000 patents

23   implicate a whole lot more of revenue which is why those are

24   worth tens of millions of dollars.  In theory, the theory is

25   the same which is why they make for comparables.

Malackowski - redirect

1   Q.      And again the adjustments you made with respect to

2   revenue, those are the adjustments that IBM itself says it

3   makes when it approaches licensing negotiations; is that

4   right?

5   A.      That is right.  The IBM policy is to look at the size

6   of the implicated revenue.

7   Q.      You didn't make that up?

8   A.      Of course not.

9   Q.      Now, let's talk about, counsel mentioned Facebook,

10  Amazon, and Google as potential threats, competitive

11  threats, if you will, to Groupon.  Do you remember that?

12  A.      I do.

13  Q.      Did you look at all of those three license

14  agreements?

15  A.      I showed them all on the screen.  I adjusted them

16  appropriately and showed they are all within or actually

17  lower than my range.

18          MS. SHAMILOV:  Can we see slide 54 of Mr.

19  Malackowski's presentation?

20          (Elmo settings adjusted.)

21          Sorry.  There we go.

22  BY MS. SHAMILOV:

23  Q.      Is this the slide you discussed earlier today?

24  A.      Yes, for Amazon and Google.  And the result is as I

25  just mentioned.

Malackowski - redirect

1  Q.      IBM's counsel suggested you did not consider licenses

2  in the $50 million range.  Is that true?

3  A.      No, I tried to point that out to him.

4  Q.      Is the Amazon license that you have considered and

5  analyzed adjusted to around $50 million?

6  A.      It is.

7  Q.      Were there any licenses out of those 42 licenses more

8  expensive than $49.8 million?

9  A.      The only thing that would be even relevant to think

10 about is that German supply agreement, which was over $100

11 million, but that is because it was a supply agreement.  As

12 far as patent licenses, no.

13 Q.      So just so I understand, out of the 42 licenses, if

14 you take out, there was one that was $102 million license;

15 is that right?  The license was for $102 million.

16 A.      Yes, that is the German supply agreement.

17 Q.      What does it mean to be a supply agreement?

18 A.      Well, it was part of the larger business transaction

19 that they will have a relationship between the companies

20 separate and apart from the patent license, but you also get

21 a patent license.

22 Q.      So the companies agreed to provide services, certain

23 technological services as part of agreement?  Is that what

24 you were telling me?

25 A.      Correct.

Malackowski - redirect

1    Q.      So did you consider that as your comparable because

2    of that service component?

3    A.      You couldn't break it out to determine the value of

4    the patents.

5    Q.      So if you take that $102 million out of the 42 that

6    you compared, what is the most expensive license left?

7    A.      The one you have on the screen:  $49.8 million.

8    Q.      So Amazon's license, the most expensive license which

9    is $49.8 million, you considered?

10   A.      I think Amazon may be the biggest company on the

11   planet now.  That is the most.

12   Q.      Just so I understand then, Dr. Hausman's damages

13   analysis or conclusion in this case, how much larger is that

14   than the most expensive license IBM ever granted?

15   A.      More than three times.

16   Q.      Does the cost approach you discussed about

17   design-arounds affect your license comparisons?

18   A.      No, it's the completely separate approach.

19   Q.      Does it change your overall conclusion?

20   A.      No.  If you asked me to factor it in, that would

21   push, feature the low end of my range, $3 million.

22   Q.      I only have one more question.  Can I have my clicker

23   back?

24   A.      Yes.

25           MS. SHAMILOV:  All right.

1           THE COURT:  All right.  Just bear with us for a

2    moment.

3           It's a time for your break, ladies and

4    gentlemen.  No talking about the case.  We'll get you back

5    here in a little bit.

6           (Jury left courtroom.)

7           THE COURT:  Thank you, Mr. Malackowski.  You may

8    step down.  What is going to be next after the break?

9           MR. HADDEN:  Groupon is going to rest at this

10   point.

11          There is one housekeeping issue.  I understand I

12   misread some of the exhibits with Dr. Weissman.  If I could

13   just get agreement from IBM's counsel, we'll submit those

14   in.

15          THE COURT:  Provided you reach agreement during

16   break, you can make that clear on the record before you

17   rest.

18          And we are we still planning on the two

19   witnesses for the rebuttal.

20          MR. DESMARAIS:  Yes, I think we will do

21   Dr. Schmidt first, and then Professor Hausman.  And then we

22   may be done at that point, depending on how those two go.

23          THE COURT:  Okay.

24          MR. DESMARAIS:  So I think we can do that this

25   afternoon.

```
 1              THE COURT:  Okay.  You think we have under an
 2    hour and-a-half of testimony, including the cross.
 3              MR. DESMARAIS:  I don't know what the cross is
 4    going to be, but our direct will be under that.
 5              THE COURT:  Okay.  Well, we will see where we
 6    are.  We will be in recess.
 7                   (Brief recess taken.)
 8                   *      *      *
 9                   (Proceedings reconvened after recess.)
10              THE COURT:  All right.  We'll bring the jury in.
11                   (Jury returned.)
12              THE COURT:  Welcome back.
13              I'll turn to Groupon.  What is next?
14              MR. HADDEN:  Your Honor, just a housekeeping
15    matter and then Groupon rests this phase of the case.
16              We have agreement I think with IBM now that
17    the exhibits I read in with Dr. Weissman as well as the
18    following are admitted.  These are DX-338, DX-374, DX-377 to
19    386, DX-388 to 390, DX-394 to 396.
20              THE COURT:  No objection to those?
21              MR. DESMARAIS:  No objection.
22              MR. HADDEN:  Thank you, Your Honor.
23              THE COURT:  Those are admitted.
24                   (Above-referenced exhibits are admitted.)
25              THE COURT:  Okay.  And Groupon rests?
```

 1             MR. HADDEN:  Yes, Your Honor.  Okay.

 2             THE COURT:  Okay.  Thank you.  Back to IBM.

 3             MR. DESMARAIS:  Yes, Your Honor.  For the

 4   record, we will be making some motions that we can take up

 5   at the end of the day.

 6             THE COURT:  Okay.

 7             MR. DESMARAIS:  With that, we'd like to begin

 8   our rebuttal case.  And my colleague Mr. Oussayef will do

 9   that.

10             THE COURT:  Okay.  Good afternoon.

11             MR. OUSSAYEF:  Good afternoon, Your Honor.

12   Ladies and gentlemen of the jury, IBM now calls Dr. Schmidt

13   to respond to the expert opinions of Dr. Weissman.

14             THE COURT:  Good afternoon, Dr. Schmidt.

15   Welcome back.

16             THE WITNESS:  Good afternoon, Your Honor.

17             THE COURT:  You are under oath of course.

18             THE WITNESS:  Yes.  Thank you.

19             ... DR. DOUGLAS CRAIG SCHMIDT, previously sworn

20   under oath, was examined and testified further as follows ...

21                       DIRECT EXAMINATION

22   BY MR. OUSSAYEF:

23   Q.    Good afternoon, Dr. Schmidt.

24   A.    Good afternoon.

25   Q.    I understand we have some demonstratives for your

1  rebuttal testimony as well; is that right?

2  A.    That's direct.

3  Q.    Okay.  Would that assist you in your testimony?

4  A.    It would.

5         MR. OUSSAYEF:  Your Honor, may I approach?

6         THE COURT:  You may.

7         (Binder passed forward.)

8  BY MR. OUSSAYEF:

9  Q.    Dr. Schmidt, I'd like to begin with something that

10 Dr. Weissman testified to on redirect.  Do you remember he

11 was asked questions about the deadlines that the Court set

12 for expert opinions in this case?

13 A.    Yes.

14 Q.    And he said that the Court set certain deadlines, and

15 that is true; right?

16 A.    That is correct.

17 Q.    Now, did the Court set a deadline for or a time

18 for when the experts had to begin working on their expert

19 reports?

20 A.    Not that I'm aware.

21 Q.    Okay.  And how long have you been working on the

22 patents in this case doing your analysis?

23 A.    So for this particular case, I began April 2017,

24 although I have looked at the patents prior to that starting

25 the summer of 2016.

Schmidt - direct

1  Q.      So you spent a lot more than just a few weeks doing

2  your analysis?

3  A.      That's correct.

4  Q.      Okay.  So we have some various slides here that we'll

5  go through.  And can we start with the other slide deck

6  first, please?

7          And, Dr. Schmidt, what we've done here is put

8  together some of Groupon's slides and some of IBM's slides;

9  is that your understanding?

10 A.      That is correct.

11 Q.      So I'll call out the numbers at the bottom of the

12 slides, either DDX or PDX.  DDX will refer to Groupon's

13 exhibits and PDX will refer to IBM's exhibits, and

14 specifically slide deck 4, just for the record, for

15 clarification.

16 A.      Okay.

17 Q.      So, first, let's start with this first slide which is

18 DDX-511.  Now, do you remember defendant's slide here

19 showing this image from the patent?

20 A.      I do.

21 Q.      And can you tell me what we see here in the window

22 partition 275 here?

23 A.      We see a diagram from the '849 patent or the '967

24 patent, Figure 3a which shows the screen broken up in

25 different partitions.

1   Q.      Can partitions appear in other partitions when you

2   look at Figure 3a?

3   A.      Yes.  As we see the window partition, 275 is inside

4   or enclosed within the body partition of 260.

5   Q.      And we saw an ad that was played during the Filepp's

6   direct testimony and also during the opening.  Do you

7   remember that ad from Prodigy?

8   A.      I do.

9   Q.      Okay.  And did that ad from Prodigy show windows

10  popping up in the screen?

11  A.      Yes, it did.

12  Q.      It didn't look like the static nonmoving screen that

13  Dr. Weissman showed us, did it?

14  A.      No, it didn't.

15  Q.      In fact, I think we have a video here from that.

16  Let's play PX-1168, starting at 102, please.

17                  (Video played.)

18  Q.      Can you tell us what we're seeing here?

19  A.      So we're seeing windows showing up inside of the

20  partitions as we go through the travel tips to booking trips

21  portion of the advertisement.

22  Q.      Thank you, Dr. Schmidt.  So those, those various

23  parts pop-up and then go, disappear from the screen from

24  time to time when using Prodigy?

25  A.      That's correct.

Schmidt - direct

1    Q.      Now, let's go ton to the next slide.  Let's go back

2    to the slide deck here.

3            Now, the first thing that counsel for -- or

4    that Dr. Weissman talked about was here on DDX-527, his

5    noninfringement opinions.  Now, let's talk about the

6    "generating at least a first partition for presenting

7    applications."

8            Do you remember Dr. Weissman was talking about a

9    lot about first partition of the screen?

10   A.      Yes.

11   Q.      Does the claim here at 1(b) say anything about areas

12   of the screen?

13   A.      No, it just talks about generating at least a first

14   partition for presenting application.

15   Q.      Does this element 1(b) say anything about the screen

16   at all?

17   A.      No, it doesn't.

18   Q.      Let's move on to -- now this is a slide here on

19   PDX-132.  Can you remind us what computer language you have

20   that lined up with the human language for the "generating at

21   least a first area" part of the claim?

22   A.      Sure.  On the left-hand side, I'm showing the

23   human language part, which is where Groupon shows its

24   applications, and on the right-hand side, I'm showing the

25   HTML code that include the formatting portions, includes the

1    content of the application that is used to generate that

2    first area for showing application.

3    Q.      And we saw competing experiments about deleting the

4    div here.  So if you want to do the experiment correctly, do

5    you delete just the name of the div or do you release the

6    whole div?

7    A.      What you need to do to do it correctly you need to

8    start with the part less than div ID=global-container,

9    greater than, and everything down to closing div at the

10   bottom which is also highlighted in red which says less

11   than/div greater than, that's the portion that's used to

12   generate the application.

13   Q.      Indeed that's what you showed here with the entire

14   area boxed in red?

15   A.      That's correct.

16   Q.      And what did we see when that experiment when it was

17   performed in court?

18   A.      The application disappeared.

19   Q.      So does that support your opinions about generating a

20   first area for presenting applications?

21   A.      Yes, that's correct.

22   Q.      Does it even make sense to say that all of the code

23   on Groupon's website if you deleted it, nothing would

24   happen?

25   A.      I'm sorry?

Schmidt - direct

1   Q.      Well, if we had all the code on Groupon's Web site

2   and we deleted all of that, does it even make sense that

3   that wouldn't have any effect on the website?

4   A.      That would make no sense.

5   Q.      Let's go on to the next argument that Dr. Weissman

6   presented which was generating concurrently.  And here does

7   element 1 C here say anything about area of the screen?

8   A.      No, it doesn't use that term.

9   Q.      Does it even mention the screen here?

10  A.      No, it doesn't.

11  Q.      So now if we look on slide PDX, I believe this is

12  another slide from your PDX deck, can you remind us again

13  about what HTML performs the generating concurrently

14  element?

15  A.      So here we're looking at the blue portion on the

16  right-hand side, that blue box where I have highlighted the

17  HTML code, including part starts less than div class equal

18  header V2, down at the bottom you see another less than/div

19  greater than, that's what generates the portion of the

20  screen, the partition in the second area which we see on the

21  left-hand side inside the blue box with the red command bar

22  functions.

23  Q.      And Dr. Schmidt, do you remember this slide, DDX-536

24  showing a whole bunch of hyperlinks outside of the command

25  bar?

Schmidt - direct

1   A.    I do.

2   Q.    Do links outside of the command bar have anything to

3   do with your infringement analysis?

4   A.    No, they don't.

5   Q.    And if we look at PDX-139 here and looking at the

6   various links here, does the claim language say anything

7   about hyperlinks?

8   A.    No, it talks about command functions which are

9   selectable to commit movement between applications.

10  Q.    Did Dr. Weissman talk about the other hyperlinks

11  being selectable to allow movement between applications?

12  A.    I don't believe so.

13  Q.    So looking at claim 1 of the '967 patent, has

14  anything at trial that you have seen changed your opinion

15  that Groupon performs claim 1 of the '967 patent?

16  A.    No, it has not.

17  Q.    And now let's look at claim 2 of the '967 patent.

18  Has anything you seen at trial change your opinion about

19  claim 2 of the '967 patent?

20  A.    No, I don't believe that was discussed.

21  Q.    In fact, no one even disputed the specific element

22  found in claim 2, did they?

23  A.    That's correct.

24  Q.    Let's look at the '849 patent.  So first I would like

25  to ask you, so this is Dr. Weissman's opinion here about

Schmidt - direct

1    elements 1A, B, and C.  Let's start with element 1A.  Can

2    you tell us does this -- what is the -- how does the

3    language so that they may be presented impact your analysis?

4    A.      It's simply saying they could be presented, it's

5    possible to present it.

6    Q.      Does the claim language here say an area of the

7    screen or an area of one or more screens of display?

8    A.      It says first area of one or more screens of display.

9    Q.      Is the claim language about one or more screens of

10   display consistent with Dr. Weissman's opinion that

11   everything has to be just on one screen and constrained to

12   one screen?

13   A.      No.

14   Q.      Let's look at PDX-53.  This is one of the slides that

15   you presented.  Can you remind us about how Groupon formats

16   applications?

17   A.      Sure.  As we saw earlier, it uses HTML, as you can

18   see in the red box on the right-hand side, that HTML

19   includes formatting directives, it includes content, it

20   includes the information that allows the application to be

21   formatted so they can present it at the first or screen

22   that's being displayed.

23   Q.      Looking at PDX-58 here, about the structuring

24   advertising, can you remind us of what your opinion is here

25   with respect to the second area?

Schmidt - direct

1    A.       This slide is also showing how a second area is being

2    formatted for advertising to display the advertising in one

3    or more screens of display concurrently with the

4    application.  And you can see on the right-hand side we see

5    the HTML code that describes how to do that, describes how

6    to format it, and on the left-hand side I'm showing you what

7    it looks like when Groupon's code is displayed.

8    Q.       Looking at DDX-556, we have another side from

9    Dr. Weissman, and there is a big red X here.  If you look

10   under the X, do you see it says first way of pre-fetching?

11   A.       Yes, I see that.

12   Q.       Did Dr. Weissman even address the second or third way

13   of pre-fetching that you talked about?

14   A.       No, he didn't talk about any of the pre-fetching.

15   Q.       Let's talk a little bit about pre-fetching.  Looking

16   at PDX 64, can you remind us what the first way of

17   pre-fetching was?

18   A.       The first way of pre-fetching was that Groupon

19   pre-fetched HTTP responses to the user's computer before the

20   images were actually displayed.

21   Q.       Looking at PDX-65, can you remind us of the second

22   way of pre-fetching?

23   A.       The second way of pre-fetching was after going off to

24   some other pages, coming back to the local deals page again,

25   the image is redisplayed and pre-fetched.

Schmidt - direct

1    Q.       Looking at PDX-66, can you remind us of that way of

2    pre-fetching?

3    A.       The third way that Groupon pre-fetches through their

4    desktop application browser by having what's called carousel

5    ads where the images are downloaded and stored in the cache

6    on the left-hand side and then as the user clicks through

7    the tabs on the carousel ads, it will display them after

8    they have been downloaded.

9    Q.       And then looking at PDX-78, can you remind us, was

10   there any special way of pre-fetching for the mobile

11   applications?

12   A.       Yes, the mobile applications and the code is shown

13   here, Ms. Sandridge talked about this at her deposition,

14   they demonstrate a more aggressive form of caching where

15   applications were started, they'll go out and aggressively

16   pre-fetch the images and store them on the mobile devices.

17   Q.       What did Dr. Weissman say about whether he even

18   addressed this in his expert report?

19   A.       He hadn't looked into that.  He didn't have an

20   opinion.

21   Q.       Now, looking at PDX-73, has anything at this trial

22   changed your opinion that Groupon performs claim 1 of the

23   '849 patent?

24   A.       No.

25   Q.       So now looking at DDX-564, this is Dr. Weissman's

1     analysis of the '849 patent, claim 8.  And in particular he

2     focuses on the last element, but did he really talk about

3     this element very much at all?

4     A.      No, he did not.

5     Q.      Does this claim, claim 8, say anything about areas,

6     partitions, or anything of that nature?

7     A.      No, it does not.

8     Q.      So do any of Groupon's arguments about those things

9     have anything to do with claim 8?

10    A.      No, they don't.

11    Q.      So now let's talk about this last part that

12    Dr. Weissman talked about in passing, because this talks

13    about storing a predetermined amount of advertising data in

14    a store.  So let's check out, first I would like to talk

15    about Dr. Weissman's DDX-565.  So looking at this, he cites

16    a reference to some system from 1985.  Do you see that?

17    A.      I do.

18    Q.      Does the fact that someone did targeting

19    advertisement in the past in some other way than what was

20    patented have anything to do with infringement at all?

21    A.      No, it doesn't.

22    Q.      And how are you supposed to figure out how, whether

23    something infringes, can you remind us of that?

24    A.      You have to take a look at the claims and the claim

25    constructions and analyze those in terms of the product.

Schmidt - direct

1  Q.     Let's look at the claim for that particular claim

2  element.  Can you remind us looking at PDX-105 how Groupon

3  performs the storing set.

4  A.     So in the case as we talked about before, Groupon

5  sets the cache control header for all the HTTP responses

6  that it sends to the users and, therefore, stores a

7  predetermined amount of advertising sata, namely on the

8  amount of data that's requested to come down, Groupon sends

9  and also the cache control header values, too.

10  Q.     And then looking at PDX-69, what does Mr. Dunham say

11  about the impact of the cache control headers on whether

12  something will be stored or not?

13  A.     He thinks that the caching instructions that are

14  delivered in the headers in the HTTP response.

15  Q.     What does he say about what they do?

16  A.     They are used to cache the advertisements at the

17  user's device.

18  Q.     Now, is it fair to say that all of your pre-fetching

19  and storing evidence the pre-fetching we looked at before

20  applied to storing for this element or claim 8 of the '849

21  patent as well?

22  A.     Yes, that's correct.

23  Q.     So, do you remember that Dr. Weissman talked about

24  the word predetermined briefly in his redirect?

25  A.     I do.

Schmidt - direct

1  Q.      And he talks about the endless scrolling feature that

2  Mr. Dunham talked about for the mobile app.  Do you remember

3  that?

4  A.      Yes, that's correct.

5  Q.      Does that apply to Groupon's website?

6  A.      No, Groupon desktop and laptop website don't have

7  endless scrolling.  They send a request and get a

8  predetermined amount of data back.

9  Q.      That feature has nothing to do with the last element

10 of the '849 patent?

11 A.      Not for the desktop.

12 Q.      For the mobile applications, did you analyze the

13 so-called infinite scrolling feature?

14 A.      Yes, I did.

15 Q.      And what did you find about that feature?

16 A.      That features works essentially the same way it works

17 with a desktop version.  What happens there is when a user

18 request a page like a deals page, it sends a request over to

19 Groupon.  Groupon sends back a predetermined number of

20 advertising links such as the deals page or the local deals

21 page, and included in that, it's typically on mobile devices

22 10 to 15 so per JSON card.  That JSON card comes back to the

23 mobile device.  As Groupon detects it there that they're

24 showing the images that are in the card, they go pre-fetch

25 the next chunk, essentially pre-fetches a predetermined

Schmidt - direct

1  amount repeatedly as the user scrolls down.

2  Q.    Now looking at PDX-106, is there anything in this

3  trial that changed your opinion that Groupon infringes claim

4  8 of the '849 patent?

5  A.    No.

6  Q.    Now, let's talk about claim 51 of the '601 patent.

7  So, Dr. Weissman talked a lot in his direct examination

8  about receiving requests from clients.  Do you remember

9  that?

10  A.    That's correct.

11  Q.    Does the claim here, element A here talk about

12  receiving a request from a client?

13  A.    No, it doesn't.

14  Q.    And is this -- so let's look at the next slide here,

15  and on DDX-577, we have one of the slides that Dr. Weissman

16  presented.  And it's the receiving a service request

17  including state information.  Do you remember he talked

18  about your opinions about state information?

19  A.    I do.

20  Q.    Can you remind us of what you have identified here as

21  state information and why that's state information?

22  A.    Sure.  What's identified here is the unique deal ID,

23  called deal permalink in this case, although it has other

24  names, it's essentially the part that's underlined in red

25  and it's used to uniquely identify the particular field

Schmidt - direct

1    which is My Three Treasures pendant deal in this case.

2    Q.    So we see the Court's construction of state

3    information.  Can you remind of us of that construction?

4    A.    Sure.  It's information about a conversation between

5    a client and a server.

6    Q.    If a client and a server are having a conversation

7    about what the user wants to buy and something identifies

8    what they want to buy, is that information about the

9    conversation?

10   A.    Yes.

11   Q.    So now let's look at the next slide.  And this is

12   PDX-189.  Did you see any other evidence besides the

13   permalink which is state information included in a request?

14   A.    Yes, so Mr. Sood also talked about pledge IDs being

15   included in the requests, he agreed pledge IDs are included

16   in the request that are sent to Groupon server.

17   Q.    Did Dr. Weissman talk about pledge IDs at all?

18   A.    I don't believe so, no.

19   Q.    Now, looking at here DDX-582, and the second part

20   that Dr. Weissman challenges, the identifying all

21   continuations in the output step, let's take a look at the

22   evidence here.

23           First of all, Dr. Weissman on DDX-584 shows a

24   quote from you.  And do you see that quote here on slide

25   DDX-584?

Schmidt - direct

1  A.    I do.

2  Q.    Now, up top you're talking about a detecting step; is

3  that right?

4  A.    The question was asking about a detecting step, that

5  is correct.

6  Q.    Is that at issue in any claims in this case?

7  A.    No, that's not in claim 51 or claim 54.

8  Q.    And the quote also talks about services that a user

9  of Groupon can request.  Does claim 51 refer to requests

10 from users?

11 A.    No, it doesn't.

12 Q.    So does this quote that Dr. Weissman relied on have

13 anything to do with the claims we're discussing here?

14 A.    No, it does not.

15 Q.    So now looking at DDX-586 here, so it's a little hard

16 to read because Dr. Weissman put a lot of red boxes and X's

17 here.  Let's see if we can figure it out.  You were asked

18 some questions on whether the home page ITA or the deal page

19 ITA processed certain requests.  Do you remember that?

20 A.    I do.

21 Q.    Now, are there any differences between those two

22 ITA's that affect your infringement analysis?

23 A.    No, they are not.

24 Q.    Do those ITA's use the same backend services?

25 A.    Yes, they do.

Schmidt - direct

1    Q.      Did Mr. Dunham dispute that?

2    A.      No, he didn't.

3    Q.      In fact, do you remember Dr. Weissman talking about

4    in his redirect that the home page ITA and the deal ITA

5    functioned in the same way?

6    A.      I do.

7    Q.      Did Dr. Weissman dispute your opinions about where

8    the output comes from?

9    A.      No, he did not.

10   Q.      Let's take a look at an excerpt from Dr. Weissman's

11   report.  So on paragraph 223, can you tell me what he says,

12   Dr. Weissman says about your opinions reading here on

13   paragraph 223?

14   A.      You might enlarge it.  It says Dr. Schmidt states

15   that I Tier applications, including the deal page, parsed

16   templates output from the layout service to populate the

17   templates and create HTML files for Web pages in Groupon's

18   website.

19   Q.      What does he say about that?

20   A.      He cites where I said that, and he says, I agree.

21   Q.      Now, I looked that Dr. Weissman's report a lot and I

22   didn't see a lot of places where he agreed with you, but

23   this must be one of the few places where he agreed with you;

24   is that right?

25   A.      That's right.

1  Q.     So now let's look at the slides here.  So going back

2  to this diagram with the bunch of X's, now there seems to be

3  a little bit of disconnect about whether the ITA can receive

4  a service request even though another -- even though there

5  is a backend server that outputs the result of that request.

6  You gave us an analogy on your redirect, but can you help us

7  under what your opinion is in that regard?

8  A.     Sure.  First from a technical point of view in this

9  particular case as many people talk about, Groupon uses a

10 so-called service oriented architecture where there are

11 multiple services to carry out user request for information

12 or resources.  The example I used from every day life was

13 going through a drive-thru at a fast food restaurant where

14 the location you place your order, for example, you go and

15 you speak into the microphone and you order your hamburger

16 and fries and a drink and whatnot.  The place you place the

17 order is not the same thing that does the order.  The

18 services that are running the background, the cooks and so

19 on that are cooking the hamburger and assembling the drinks

20 and giving you your meal, those aren't the same services and

21 it's also to pick up the result at a different place.

22 Q.     So here the home page ITA can receive a service

23 request even though the output from that service request

24 comes from a backend server?

25 A.     That's correct.

Schmidt - direct

1    Q.      So let's move on here to the next element that

2    Dr. Weissman disputes.  This is element 1B.  So here on

3    slide PDX 200, can you just remind us of what your opinion

4    is regarding the recursively embedding step here?

5    A.      Recursively embedding is applying a process on one or

6    more times to each identified continuations, to modify all

7    identified continuations.

8    Q.      Dr. Weissman opined that changing the URL, that's the

9    part in the little brackets here, is not modifying the

10   hyperlink.  What's your -- do you agree with him there?

11   A.      No.  As you can see there, HREF, what's happening is

12   shown underneath that portion, the Mustache portion with the

13   URL inside of it is modified to create what we see

14   underneath it which includes the deal permalink and a pledge

15   ID.  In this particular case those are post information that

16   refers to the same deal, pledge ID and the deal permalink

17   are state information that identify the same deal.

18   Q.      So the big yellow box we see here all goes into where

19   we see URL; is that right?

20   A.      That's correct, yes.

21   Q.      Now, can you remind us of what state information is

22   included when there is a modification to the hyperlink here?

23   A.      So, we can see, it may be a little hard to see, the

24   GG-HAS collection My Three Treasure, that is right part of

25   the information.  You see a pledge ID starts with 45, that's

Schmidt - direct

1    also state information.  Those things happen to refer to the

2    same item which is the My Three Treasures pendant.

3    Q.     Is it possible to represent the same state

4    information in two different ways by using different

5    variable names or different content?

6    A.     Sure.  That's how Groupon does it.

7    Q.     So now let's look to the next slide.  The next

8    element that Dr. Weissman addresses is wherein the

9    continuations enable another service request and one of the

10   continuations must be invoked to continue the conversation.

11   So now looking at this slide, DDX-596, do you see there is a

12   whole bunch of arrows here that Dr. Weissman has pointed

13   out?

14   A.     I do.

15   Q.     Can you remind us, was the conversation we're talking

16   about when the user is going through the process of buying

17   something?

18   A.     They're starting out by indicating an interest in a

19   particular good, in this case the My Three Treasures

20   pendant.  And then they're getting back continuation, it

21   includes embedded state information that allows them to

22   continue the conversation in this case by clicking the buy

23   button.

24   Q.     So if the user clicks on the home button or the

25   Groupon logo or something like that, do they continue on to

1     actually purchase what they're trying to buy?

2     A.     No, that would not be continuing, the conversation

3     would start some new conversation or do something different.

4     Q.     Okay.  So let's look at DDX-598 here.  So now it

5     looks very similar, so just to orient us.  This is for the

6     mobile applications.  So the first element that Dr. Weissman

7     addressed for the mobile applications is again the receiving

8     step, so let's take a look at that.

9          Now, in this slide, DDX-600, Dr. Weissman takes

10     issue with the request for the mobile applications.  Can you

11     remind us why there is state information in this request?

12     A.     Sure.  It's a little hard to see in this rendition,

13     but essentially there is a ga -- which stands for

14     getaways -- .farm-kitchen-2.  That is state information that

15     indicates the particular getaway deals that is being

16     considered here.

17     Q.     And now looking at claim 51, the next element that

18     Dr. Weissman addresses, the identifying step.  So now

19     looking at DDX-603.  Can you remind us how identification

20     happens with Groupon 's mobile applications?

21     A.     So what happens is the options are sent back from

22     Groupon's server on the web servers on the right, and those

23     options contain JSON data which has deal and options data.

24     And that those continuations are then identified by the

25     mobile app code.

Schmidt - direct

1   Q.      So let's look at the last element, which is, let's

2   see, it looks like on slide DDX-609, Dr. Weissman talks

3   about the communicating step.

4           So let's look at DDX-610.  Do you remember

5   Dr. Weissman's opinions about the communicating step here

6   about being within the mobile phone here?

7   A.      I do.

8   Q.      And now, is there any -- can you remind us of your

9   opinions about how the communicating step happens here?

10  A.      Sure.  So after Groupon's app goes through and does

11  the recursive embedding of the continue -- the identified

12  continuations into the click handlers -- you might go back a

13  couple slides.  It's easier to see that here.

14          So if you take a look at the client on the

15  left-hand side, the continuations that are downloaded are

16  then going to be recursively embedded into the click

17  handlers such that when someone clicks on one of those

18  buttons, something will happen.  So that is where it kind of

19  starts.

20          So now let's go back to the other part here.

21  Q.      Now, we're back on DDX-610?

22  A.      Right.  So after the identifying and recursively

23  embedding has happened, the application which did that work

24  now has to be able to show the user what has happened as a

25  result of setting up those click handlers and doing the

Schmidt - direct

1   continuations, identification, and embedding.

2           What happens is the app will end up sending

3   that information on a local device across a boundary between

4   one process, it will communicate that to the actual user

5   display, something called a display manager process.  And

6   that is how that responds, to include continuations and

7   embedded information are communicated.

8   Q.    Is it common in computer science for communications

9   to happen intradevice, within a device, as opposed to

10  interdevice, between devices?

11  A.    Absolutely.  That has been going on even longer than

12  networking.

13  Q.    So then looking at the '601 patent, claim 58.

14  Dr. Weissman talks about state information and how that has

15  to continue through the claims.  So let's take a look at

16  your opinion and discuss how that happens on DDX-616.

17          Can you remind us what is going on here for the

18  website for the dynamically downloading and performing

19  embedding there, what your opinion is here?

20  A.    Sure.  So, again, it's a little hard to see from his

21  rendition, but there is essentially a link there and as the

22  user is selecting the different options, that link is being

23  updated in order to be able to selectively embed the

24  information into that link.

25  Q.    And you remember --

Schmidt - direct

1   A.      State information.

2   Q.      -- counsel for Groupon asked you questions about the

3   pledge ID, and he said you haven't shown there is a request

4   that include the pledge ID.  Did you see testimony from Mr.

5   Sood on that point?

6   A.      I did.

7   Q.      And who is Mr. Sood, if you can remind us?

8   A.      Mr. Sood was one of Groupon's engineers who

9   testified, who gave a deposition in the case.

10  Q.      Now, looking at DDX-620, can you remind us what

11  your opinions are with regard to the Groupon's mobile

12  applications in claim 54 here?

13  A.      Yes.  So the opinion is that Groupon's mobile

14  application will download the code, which in this case is

15  the JSON code which includes information about the deals and

16  the options and so on.  And then the client uses that code

17  to perform the embedding step.

18  Q.      So then looking at PDX-207.  Has there been anything

19  at this trial that changes your opinion that Groupon

20  infringes claim 51 of the '601 patent?

21  A.      No.

22  Q.      And how about for claim 54 of the '601 patent?

23  A.      No.

24  Q.      So now looking at DDX-629.  Here, for the '346

25  patent, claim 1, what is the -- you know, elements does

1  Dr. Weissman address for claim 1?

2  A.     So he focuses on claim 1(a), the triggering a

3  single-sign-on operation on behalf of a user.

4  Q.     And does Dr. Weissman address any of the other steps?

5  A.     No, he does not.

6  Q.     So let's talk about Item 1(a).  Can you remind us,

7  looking at PDX-251, how Groupon performs the triggering

8  step?

9  A.     Sure.  So a user wants to access protected resource,

10  purchase a deal, access their profile, and so on, then they

11  first need to be logged in.  And as you can see in the

12  diagram shown in the middle, if the user selects to sign up

13  with social sign in, Groupon or with Facebook, then the code

14  that Groupon provides will be what is used to trigger that

15  login process or signup process.

16  Q.     So looking at PDX-252.  What does Mr. Dunham say

17  about the triggering step?

18  A.     He agrees that if the user tries to purchase a deal

19  but they're not logged in, that triggers a login process.

20  Q.     Did Dr. Weissman reference Mr. Dunham's testimony on

21  this point?

22  A.     No, he did not.

23  Q.     In your experience as a computer scientist, would you

24  want to analyze a system without considering what the

25  engineers say about that system?

Schmidt - direct

1    A.      Not if I wanted to understand what it did.

2    Q.      Now, looking at PDX-253.  Does Mr. Dunham say that

3    Groupon actually designs this website to do that triggering

4    step?

5    A.      Yes, he agrees that Groupon designed its website

6    because users have to be logged in to purchase deals.

7    Q.      Now, looking at PDX-254 here.  Can you remind us of

8    what you are showing here with the Google code or with the

9    Google+ login button code that Groupon writes on the right

10   here?

11   A.      Sure.  So what you see on the right-hand side inside

12   the red box is code that Groupon provides that is downloaded

13   into the web browser.  And their code, when the user clicks

14   the button, the code that they provide is what will go ahead

15   and trigger the social sign in using Google.

16   Q.      Did Dr. Weissman show us any Google or Facebook code

17   that does this?

18   A.      Not that I recall.

19   Q.      So let's look at slide PDX-255 here.  Can you remind

20   us of what you are showing here with Facebook?

21   A.      This is showing essentially what we saw before except

22   now the person has selected to login with Facebook.  That is

23   what the icon says.  And so what is shown on the right-hand

24   side, when they do that, then the code shown on the right,

25   inside the blue, which again is code that Groupon writes,

1  Groupon provides, Groupon has downloaded into the browser,

2  will then go ahead when the user clicks the button.  The

3  code that Groupon provides will trigger the social sign in,

4  using in this case the Facebook login.

5  Q.      So now let's move on to claim 5.  So here, Dr.

6  Weissman addressed the "in response to a determination"

7  step.  So let's take a look at the evidence here.

8            What did Mr. Dunham say about this element of

9  claim 5?

10 A.      He says that the token it receives from Google once

11 it is decrypted does not have the user information that we

12 need, then in that case the Groupon user service need to

13 make an API call to Google.

14 Q.      How does Groupon determine whether the token has the

15 information a user needs?

16 A.      He describes it as by decrypting it using Google's

17 public key.

18 Q.      Now, we saw a lot of squares bouncing back and forth

19 during Dr. Weissman's testimony.  Did he address this

20 statement from Mr. Dunham?

21 A.      No, he did not.

22 Q.      And what are you showing here on PDX-279 here?

23 A.      This is code that again Groupon provides.  This is

24 code that is running in their backend, their servers, the

25 second system.  And this is the code that Groupon writes

1   to send a request to Google to retrieve user attribute

2   information.

3   Q.      Did Dr. Weissman address this code in his analysis?

4   A.      No, he did not.

5   Q.      And then looking at PDX-280 here.  Did you show

6   additional testimony from Mr. Dunham for the Facebook login

7   as opposed to the Google login?

8   A.      Yes.

9   Q.      And does Mr. Dunham also say that there is a two step

10  process to retrieve user information?

11  A.      That is correct, yes.

12  Q.      And on PDX-282, can you remind us what you're seeing

13  here with this Groupon code?

14  A.      This is the Groupon code that their servers run in

15  order to send a request message to Facebook to retrieve user

16  attribute information.

17  Q.      Did Dr. Weissman even address this code here we see

18  on PDX-282?

19  A.      No, he did not.

20  Q.      So looking at PDX-271.  Has anything in this trial

21  changed your opinion that Groupon infringes claim 1 of the

22  '346 patent?

23  A.      No.

24  Q.      And what about claim 5 of the '346 patent?

25  A.      No.

Schmidt - direct

1   Q.      So now let's move on to the other slide deck, if we

2   could bring that up and change gears.

3            So in addition to the infringement issues, you

4   also analyzed validity in this case as well; right?

5   A.      The validity of the patent, yes, that's correct.

6   Q.      Okay.  And let's take a look at this first slide

7   here.  Can you tell us an overview of what your opinions are

8   with respect to the '346 patent and validity?

9   A.      Sure.  It's my opinion that the '346 patent is valid.

10  Q.      So let's discuss the references that were brought up

11  for the '346 patent.  So what is your opinion about

12  Dr. Weissman's discussion of Sunada with the Liberty

13  Alliance?

14  A.      So it's my opinion that Sunada in combination with

15  the Liberty Alliance specification does not render the '346

16  patent obvious.

17  Q.      So let's start with PDX-4 here.  Did the Liberty

18  Alliance specifications discuss runtime account creation?

19  A.      No, they did not.

20  Q.      And what does Dr. Weissman say about runtime account

21  creation with the Liberty Alliance specification?

22  A.      He agrees it's fair to say the Liberty Alliance

23  specifications don't disclose runtime account creation.

24  Q.      Is that consistent with what Dr. Hinton said?

25  A.      Yes, she said the same thing.

Schmidt - direct

1   Q.      Let's look at PDX-5 here.  So let's just have an

2   overview.  So Dr. Weissman talks about the Sunada reference.

3   Can you tell us a little bit about the Sunada reference?

4   A.      Sure.  This is a patent filed in Japan, and it issued

5   on October -- or, I'm sorry, it was filed on October 28th,

6   2004.  And it talks about a system for being able to do

7   single-sign-on operations.

8   Q.      Let's look at PDX-6.  First I want to ask you, what

9   is the importance of the dates here?  So Dr. Hinton talks

10  about a particular time when she came up with the idea and

11  we looked at Sunada with the October 2004 date.  What is the

12  relevance of all that?

13  A.      So what is relevant here is Dr. Hinton talks about in

14  this particular testimony that she and her team conceived

15  the idea of the '346 patent by no later than 15th of April,

16  2004.  So that is about six months before the Sunada

17  reference.

18  Q.      So if Dr. Hinton does it first, does it even matter

19  what Sunada says?

20  A.      No.

21  Q.      Okay.  So let's take a look at Dr. Hinton's

22  testimony.  What does she say on the left here of slide

23  PDX-6?

24  A.      She is essentially asked when she had the complete

25  idea of the '346 invention in mind.

Schmidt - direct

1            And she says the absolute latest would have been

2    the 15th of April.  And that is 2004, as you can see on the

3    other side.

4            And that date comes from the system design

5    document level zero document we were talking about earlier.

6    Q.    And that is what you were referring to in PX-39?

7    A.    That is correct.

8    Q.    So now looking at PDX-7 here.  Can you tell us about

9    what the inventors did once they had the idea for the '346

10   patent?

11   A.    Sure.  They worked to so-called reduce it to

12   practice.  And she talks about that in the context of the

13   PRPQ, which was a document as you can see that was published

14   in July of 2004 as part of the or was the Federated Identity

15   Manager Installation Guide.  And that was when they had

16   reduced the concept, which they had back in April, conceived

17   to practice in July.

18   Q.    And there, you are referring to PX-774, 808 through

19   817; is that right?

20   A.    That's correct.

21   Q.    And then we also want to talk about whether they were

22   doing work during that entire time.  Can you tell us whether

23   you reviewed any documents on that aspect?

24   A.    Yes, I reviewed testimony from various depositions

25   from IBM employees, and they talk about how they worked, a

Schmidt - direct

1    team of about four or five engineers worked for them nine

2    months to be able to diligently reduce the '346 patent to

3    practice, and along the way did an extensive amount of

4    testing to make sure the features worked the way they

5    expected them to do.

6    Q.       In your experience as a computer scientist, why is it

7    important to do testing when you are developing your product?

8    A.       Because inevitably things won't work when you first

9    try them, so you have to test them to try to demonstrate

10   that you have identified error paths, mistakes that users

11   might have, inconsistencies with the specification and so

12   on.

13   Q.       And here you are referring to PX-739, 741, and 782

14   through 795; is that right?

15   A.       That's right.

16           MR. OUSSAYEF:  Your Honor, I offer those

17   exhibits.

18           MR. HADDEN:  No objection.

19           THE COURT:  They're admitted.

20           (Above-admitted exhibits admitted in evidence.)

21   BY MR. OUSSAYEF:

22   Q.       So we talked a little bit about the dates and how Dr.

23   Hinton came up with her idea first, so let's talk a little

24   bit about what Sunada actually says.

25           So does Sunada disclose a federated computing

Schmidt - direct

1    environment as set forth in the claims of the '346 patent?

2    A.    No, he does not.  He discloses something that is

3    called a single system.

4    Q.    And can you tell us again what the Court's definition

5    of a "federated computing environment" is?

6    A.    Sure.  It's "a set of the distinct entities such as

7    enterprises, organizations, et cetera, institutions, that

8    cooperate to provide a single-sign-on, ease-of-use

9    experience to a user, wherein the enterprise need not have a

10   direct, pre-established, relationship defining how and what

11   information to transfer about a user."

12   Q.    And how can you tell that Sunada discloses a single

13   system as opposed to a federated computing environment?

14   A.    There are several ways.  First, every time he refers

15   to his invention, he talked about a system.  And then he

16   also has a quote here which I have underlined toward the

17   bottom where he says that web applications 2 and 3 and the

18   SSO service 1 may be separate constitutions, but in the

19   actual existence, they may be included in the same server.

20   So they can actually be bundled together and put in a single

21   computer.  So that is clearly not, you have a federation in

22   the term that the Court has used in the construction.

23   Q.    Okay.  So when we saw the diagram that Dr. Weissman

24   was talking about for Sunada with the network and all these

25   different elements, here, he is saying that the actual

Schmidt - direct

1  components that run this system are in the same system; is

2  that right?

3  A.       That is one way they could be configured, yes.

4  Q.       Then looking at PDX-10 here, did you see any other

5  evidence that Sunada is a single system as opposed to

6  multipart system?

7  A.       Yes.  So these are some documents that relate to

8  the Sunada patent, and they talk about how his invention was

9  essentially something that was called -- it was used

10  something to enhance, and they called DocuShare which is an

11  account management system that Xerox had created back in the

12  day in order to be able to keep track of documents you might

13  have within one enterprise or one company.

14  Q.       And you are referring here to PX-954?

15  A.       PX-954 is the description of the account management

16  system.  And DX-0378 talks about DocuShare being an account

17  system.

18              MR. OUSSAYEF:  Your Honor, I offer PX-954.

19              MR. HADDEN:  No objection.

20              THE COURT:  It's admitted.

21              (PX-954 was admitted into evidence.)

22  BY MR. OUSSAYEF:

23  Q.       So now, next, I'd like to talk about motivation to

24  combine.  So because Dr. Weissman is saying that you combine

25  the Liberty Alliance with Sunada, we have to think about

Schmidt - direct

1    whether someone would actually do that in the day.  Did you

2    take a look at that in rendering your opinions?

3    A.    Yes, I did.

4    Q.    And what was your conclusion when you looked at that?

5    A.    There is a number of reasons why it would make no

6    sense to combine the Sunada reference with the Liberty

7    Alliance specifications.

8    Q.    And can you run us through those reasons and help us

9    understand why those wouldn't be combined?

10   A.    Sure.  First, it requires combining many references:

11   Five references.  The four Liberty Alliance specs with

12   Sunada.

13        Second, the Liberty Alliance specification

14   actually teaches away or it describes not to use runtime

15   account creation.  And the Liberty Alliance specification

16   accounts had to be pre-established at the various service

17   providers.

18        Moreover, the runtime account creation

19   mechanisms that are described in high level in the Sunada

20   patent would actually break the Liberty Alliance

21   specification because they were not designed to be used with

22   creating accounts dynamically.

23        Then some other interesting reasons why they

24   wouldn't be motivated to combine is a person of ordinary

25   skill in the art or a POSITA wouldn't have thought to

Schmidt - direct

1    combine a document management system, a single document

2    management system for an enterprise with a federated system.

3    That is sort of apples and oranges.

4            And then another reason is the Sunada reference

5    teaches that the service provider should go to other

6    sources for additional information about the user, including

7    the user themselves, rather than going back to the

8    authentication server.

9    Q.    So now let's talk about claim 5.  What is your

10   opinion about Sunada in combination with the Liberty

11   Alliance for claim 5?

12   A.    So it is my opinion that Sunada in combination with

13   the Liberty Alliance specification does not render claim 5

14   obvious.

15   Q.    Now, looking at PDX-13 here.  Here, can you tell us

16   what you are showing here with reference to DX-378?

17   A.    Sure.  So this is a diagram from the patent, the

18   Sunada patent.  It is very hard to read, I apologize, but

19   inside that red box -- and this is something that

20   Dr. Weissman walked through earlier.  It says basically if

21   you need to get additional information about the user --

22   that is what that diamond says there.  Then if you need

23   additional information, what the patent discloses is ask the

24   user to provide the information.  It doesn't say go back to

25   a first system to get it.  It says ask the user.  And, in

1  fact, there is nothing in the Sunada reference that would

2  even make any sense about a second system or a first system

3  as is described in the claims for the patent.

4          Because there is no first system or second

5  system, there is only a single system, so first and second

6  system makes no sense.

7  Q.    Now, Dr. Weissman had an opinion that sure, the

8  reference says this, but you could do it in a different way.

9  Did he show any disclosures in the reference that say you

10 could do it in a different way by going to another system?

11 A.    No, that's not disclosed in an efficient way.

12 Q.    Looking at PDX-14 here, can you tell us what your

13 showing here with reference to the Liberty Alliance?

14 A.    So this is essentially showing that this is something

15 from Dr. Weissman's reports that shows that -- it purports

16 to show that the Liberty Alliance specifications allow use

17 of requests and response messages to get attribute

18 information about various identity providers and service

19 providers.

20          I think the key thing to note here is that this

21 couldn't happen in the steps that are disclosed in this

22 claim in the '346 patent because the Liberty Alliance

23 specification requires preexisting accounts, so it doesn't

24 make any sense to pull information for the user as part of

25 the account creation because, of course, the accounts have

1    already had to have been created.

2    Q.    Now, looking at -- now let's change gears and talk

3    about the Mellmer reference, another reference that

4    Dr. Weissman referred to.  What's your opinion about

5    combining Mellmer and Liberty Alliance?

6    A.    So my opinion is that combining the Mellmer patent

7    with the Liberty Alliance specifications does not render the

8    '346 patent obvious.

9    Q.    Looking at PDX 16, what are you showing here in the

10   slide?

11   A.    This is just giving you a sense of what the Mellmer

12   patent is actually about, it's about managing digital

13   identity information in a network like the worldwide web.

14   Q.    Is that what you're showing here in the claims on

15   PDX-17?

16   A.    Right.  So this is basically showing that Mellmer

17   doesn't disclose, it doesn't even disclose single-sign-on at

18   all, and instead the claims are about managing personal

19   information online.

20   Q.    Now, looking at PDX-18, can you take us through the

21   flow and tell us what's going on here with the red boxes?

22   A.    Sure.  These are two figures that are related to each

23   other in the patent.  And in our patent figure 31 on the

24   left and figure 34 on the right.  We'll go through each step

25   in a second.  The key point to notice is that Mellmer

Schmidt - direct

1       requires two authentications.

2                    First, as you can see in the red box in figure

3       31, you have to log in to the DigitalMe platform.  And once

4       you're logged in, then you do some other steps, and after a

5       new account is created, then the user has to again do a

6       second authentication by picking something called a MeCard

7       which is a way that it's able to transfer information about

8       authenticating the user to the actual system that's being

9       logged into.  So you can see this isn't single-sign-on, it's

10      actually two steps for authentication.

11      Q.      So now looking at DX -- looking at PDX-19, I should

12      say, can you tell us a little bit more about that first step

13      there?

14      A.      Yeah.  This is just kind of zooming in on filling 31

15      which is the part on the left hand of the board, it's

16      showing a quote from the specification that says, "If the

17      user hasn't logged into a DigitalMe account, then the

18      DigitalMe service prompts for DigitalMe user name and

19      password."

20      Q.      What happens in the second step here we see on PDX

21      20?

22      A.      After the user is already signed in, in this case

23      when they get further along the user will be authenticated

24      at the partner site by associating a MeCard with an

25      AccessCard.  And these are terms from the patent from the

1    DigitalMe invention.  And as you can see there, the

2    underlined red part it says that the server, the piece of

3    code that a DigitalMe will provide, will construct an

4    AccessCard that's shown on the left-hand side, prompt the

5    user to associate a MeCard and reissue the post on behalf of

6    the user.  Once again the user is performing a second

7    authentication.

8    Q.     The whole purpose of the '346 patent was to make the

9    user bother less and do fewer things?

10   A.     Single-sign-on, not multiple sign on.

11   Q.     Looking at PDX 21, how does this relate to the claim

12   constructions the Court has given us?

13   A.     This is reiterating what the Court said is meant by

14   single-sign-on which is this authentication process where

15   the user is subsequently not required to perform another

16   authentication operation during a particular user session.

17   Q.     Looking at PDX-22, what's your opinion about Mellmer

18   in combination with the Liberty Alliance for claim 5?

19   A.     It also is the case that Mellmer in combination with

20   Liberty Alliance doesn't render claim 5 obvious.

21   Q.     Looking at PDX-23, does Mellmer discuss at all making

22   a determination or requesting additional attribute

23   information?

24   A.     No, as you can see from the flow from left to right

25   on the bottom, the user is in control of this.  There is no

Schmidt - direct

1   second system that's making a request back to a first

2   system.  Instead the user is kind of pushing this

3   information and controlling the flow.

4   Q.      So looking at PDX 24, would Liberty Alliance work

5   combining that with Mellmer?

6   A.      No.  For the same reason we talked about before, the

7   Liberty Alliance does not create accounts on the fly, so

8   they already have to be an account created.

9   Q.      On PDX-25, would there be any reason to combine

10  Mellmer with Liberty Alliance?

11  A.      No, some of the reasons are the same as before,

12  multiple references being combined, Liberty Alliance is

13  teaching away from even doing runtime account creation in

14  the first place.  You have to recreate the accounts.  If you

15  try to add runtime account creation using certainly the

16  things that are described in Mellmer, that would break the

17  Liberty Alliance specification.  It would destroy the

18  operability.  Mellmer is not even a single-sign-on system,

19  it's a multi sign on system.  Why would you combine that

20  with a single-sign-on system.

21          The other point that I talked about in claim 5,

22  the user always has control of the information that gets

23  shared.  It's not shared without the user's consent, so

24  there is no second system that's pulling the information

25  from some first system.

Schmidt - direct

1   Q.      So looking at slide 26, I want to talk a little bit

2   about secondary consideration.  Those are things that you

3   considered to see if there is other indications that

4   something is nonobvious other than just the other factors we

5   previously considered.  Is that your understanding?

6   A.      That's correct.

7   Q.      What did you find in your analysis of secondary

8   considerations looking at PDX-26?

9   A.      So as we saw earlier, various companies that we

10  talked about, Google, Facebook, Twitter, LinkedIn, so on,

11  have taken licenses to this patent.

12  Q.      If they took a license, what does that mean for

13  whether there is any indications for whether the patent is

14  obvious?

15  A.      So they must have felt it was providing a value to

16  take the patents.

17  Q.      What other secondary considerations did you consider?

18  A.      Several others.  So Groupon has obviously had

19  commercial success.  Part of that success is we talked about

20  before is that users who log in are twice as likely to buy

21  and so the '346 patent makes that login process more

22  seamless and lightweight.

23          There is also the continued commercial success

24  of the IBM federated information manager or TFIM system

25  which is where the original disclosure got its start and its

Schmidt - direct

1   reduction to practice.  And then also other approaches teach

2   away from this approach, the Liberty Alliance as we seen

3   taught not to create account sign on.

4   Q.     Let's switch gears and talk about the '601 patent.

5   What's your opinion about the '601 patent here?

6   A.     So the first thing, the '601 patent is valid.

7   Q.     And let's start with the Amazon 1995 code.  What's

8   your opinion there?

9   A.     Amazon 1995 does not anticipate claims 51 and 54 of

10  the '601 patent.

11  Q.     So now looking at PDX-29 here, can you tell us a

12  little bit about what we're seeing here?  There is a lot of

13  colors.  There is a lot of file names here.  What are you

14  showing here with the 1995 repository on the left and then

15  the 1996 repository on the right?

16  A.     So first of all, the parts that are colored in yellow

17  that are highlighted in yellow, those are the templates that

18  we have been talking about, the HTML templates that have

19  been at issue for several days now.  What we see is every

20  one that's colored red under the 1995 repository were places

21  where there were no templates, so there were no templates

22  that were produced in this case that came from the 1995 time

23  frame.  Where there are templates, they come from 1996, so

24  you can see that there were templates in 1996, that's what

25  you can see.

Schmidt - direct

1      You also see with green that when Dr. Weissman

2 did his analysis, he was actually performing his analysis on

3 the 1996 version of the order form page one template.  Of

4 course he had to do that because there was no 1995 version.

5 And yet he was taking a look at the 1995 implementation of

6 Catsub, the funny name we talked about the other day, it

7 doesn't make sense to compare and contrast and combine

8 sources from difference versions.

9 Q.     So if you took someone's software from one date and

10 someone's software from years later on a different day or

11 even months later on on a different date and you tried to

12 put them back together, would that work, would that code

13 actually run there?

14 A.     It's really hard to say, probably not.  It's

15 difficult to compare things that are not the same or at

16 least that have not been tested together or so on.

17 Q.     Are there any templates at all that are in the 1995

18 repository here?

19 A.     No, no templates were in the 1995 repository.

20 Q.     Let's look at PDX-30 here.  Can you remind us of what

21 we have seen in terms of the evidence of the 1995 templates

22 or lack there of I guess I should say?

23 A.     So as we saw in the previous slide, there simply were

24 no template files in Amazon's website in the June 1995

25 source code repository.  They weren't there.  And because of

1  that, Dr. Weissman doesn't cite anything from the 1995

2  source code repository that's a template file because they

3  weren't there, he agrees with that.

4         And we also saw that Mr. Davis doesn't know

5  where any of these template files from the June 1995 time

6  frame actually are.

7  Q.    Let me take you to slide 33 here.  Even if we were

8  able to find some template files from 1995, what does

9  Mr. Davis say about whether they embed state information in

10  all continuations?

11  A.    So he says that they almost all were embedded, but he

12  said there were some links that didn't have state ID's or

13  state information in them and he said those occurred as a

14  result of us discounting certain customer behavior.

15  Q.    Looking at PDX-34 here, does Dr. Weissman actually

16  say that there are some links where state information wasn't

17  embedded in his expert report?

18  A.    Yes, that's correct.

19  Q.    Now, let's look at PDX-35 here.  What's your opinion

20  about Amazon 1995 and Williams with respect to claim 54?

21  A.    So it's my opinion that the Amazon 1995 source and

22  Williams do not invalidate claim 54 of the '601 patent.

23  Q.    So looking at PDX-36, what do we see here with

24  Mr. Davis' testimony?

25  A.    So what he was basically talking about was that the

1    performance -- they didn't have any performance issues with

2    respect to storing state information on the Orical database

3    or on databases at Amazon when he was there in the 1995 time

4    frame.

5    Q.      So just to set the table here a little bit,

6    Dr. Weissman's opinion is that you have to combine Amazon

7    and the Williams reference together, and that someone would

8    have a motivation to do that and that's why the patent is

9    invalid.  Is that consistent with Mr. Davis' testimony?

10   A.      No, it's not.

11   Q.      Looking at PDX-37, what does he say specifically

12   about why there was no motivation to combine?

13   A.      So the real issue here is as Dr. Weissman talked

14   about before, there would be a motivation to move processing

15   from the server down to the client.  And the reason that he

16   gave was that it would make things run faster.  But if you

17   take a look at Mr. Davis' testimony in his deposition, he

18   said there wasn't any performance bottleneck.  He said that

19   moving programs off the server somewhere else to save a

20   client wouldn't have improved performance and the bottleneck

21   that they faced in those days was actually sending

22   information over the network, not processing on the server

23   side.  So in that sense downloading the code from the server

24   to the client would quite likely create even a bigger

25   bottleneck.  Now you're overloading code over the server to

1    the client, if there wasn't a bottleneck in the first place

2    on the server, the bottleneck there was is moving data

3    across the network would make it even slower, so it didn't

4    make any sense to try to combine the Williams reference with

5    what Amazon was doing and that's not what they did.

6    Q.    And Dr. Weissman says well maybe Amazon wasn't

7    motivated to do it, but maybe someone else would be

8    motivated to do it.  Has he identified anyone else who would

9    be motivated to do that?

10   A.    No, he did not.

11   Q.    Now, let's look at -- just to recap, so is it your

12   opinion that either Amazon or Amazon combined with the

13   Williams would not invalidate any claim of the -- of the

14   '601 patent?

15   A.    In particular the claim we're talking about here, the

16   downloading claim 54.

17   Q.    And then looking at PDX-38, can you tell us just an

18   overview of what your opinion here is for Spinning the Web?

19   A.    So the Spinning the Web reference is not prior art to

20   the '601 patent.

21   Q.    So once again, are you saying that if IBM did it

22   first, then what the Spinning the Web reference says doesn't

23   matter because you have to look at who did it first?

24   A.    That's correct.

25   Q.    So let's take a look at PDX-39 here.  You show a

1    bunch of code here.  Can you give us a little bit of context

2    for what code you were looking at and why that's relevant in

3    this case?

4    A.    Yes.  This is code, this is pictures of the code that

5    was created by Dr. Iyengar who is the inventor of the '601

6    patent.  And what I'm showing here in these exhibits, I'll

7    read the numbers off in a second, are the metadata or the

8    time stamps when these files were created for the purposes

9    of being snapshot and reviewed for future posterity,

10   preserved for future posterity.

11   Q.    What is metadata?

12   A.    Whenever you create a file, you may know this

13   already, but if you create a file, a Microsoft word file,

14   the Ocusystem refers when the file was created and also when

15   the file was last accessed, so that's just giving it a fancy

16   term, metadata, so it's information about the files.

17   Q.    What were these files and how do they relate to the

18   '601 patent?

19   A.    These are files that Dr. Iyengar wrote that described

20   his reduction to practice or his embodiment of this patent

21   which he developed back in January and February 1996,

22   depending on which file there was.  We see there is eight

23   different files that contain a source code, we'll go over

24   some of it in a second, but this was the code that had the

25   implementation that he used when he was inventing and

1   reducing the patent to practice.

2   Q.     And are there also dates in the files themselves that

3   corroborate the date of when Mr. Iyengar came up with his

4   invention?

5   A.     There is also dates in the file, and they're also

6   around the same time frame.

7   Q.     And these are the files that you reviewed are PX-828,

8   829, 830, 832, 833, 836, 838, and 839; is that right?

9   A.     That's correct.

10          MR. OUSSAYEF:  Your Honor, I offer those

11   exhibits.

12          MR. HADDEN:  I object.

13          THE COURT:  You do or you do not?

14          MR. HADDEN:  I do.

15          THE COURT:  You do object to these?

16          MR. HADDEN:  Yes.

17          THE COURT:  Something other than what we

18   discussed before?

19          MR. HADDEN:  I object to them as uncorroborated

20   evidence of being offered to prove the conception.

21          THE COURT:  All right.

22          Mr. Oussayef.

23          MR. OUSSAYEF:  I believe this is something we

24   discussed previously and I think it has been corroborated by

25   our expert in multiple different ways through his testimony

1   on metadata on those, through testimony on the documents.

2          THE COURT:  Is this different than what we

3   discussed before?

4          MR. HADDEN:  Just that there is no evidence

5   these documents were shown to anybody but the inventor at

6   the time that they're purported to be invented.

7          THE COURT:  I overrule the objection and the

8   documents are admitted.

9          (The above exhibits were admitted.)

10  BY MR. OUSSAYEF:

11  Q.     So, let's continue where we were.  So looking at

12  PDX-40 here, can you tell us what your analysis was of Dr.

13  Iyengar's code with respect to receiving a service request?

14  A.     Sure.  This is a part code, this is one of the files

15  we looked at.  This is convert.c.  this code that Dr.

16  Iyengar wrote receives a service request that includes state

17  information, and if you look at the highlighted part,

18  basically what's happening is we're getting a request for a

19  particular file, and highlighted there is the state

20  information about the file name and arguments that are

21  associated with the file and so on.  And this is indicating

22  that the request is coming in, and that request is going to

23  include state information so it's query string contain and

24  it says I file name equal FOO, ampersand ARGL equals 100

25  ampersand ARG 2 equals 30.

Schmidt - direct

1   Q.      In the upper left-hand corner there what do you see

2   for the name?

3   A.      Run Iyengar.

4   Q.      Is that inventor of the '601 patent?

5   A.      That's correct.  You can see the date here is early

6   February, 1996.

7   Q.      And even though this, what we're seeing here is in

8   the comment section, there is also code that you reviewed

9   that supports the analysis of receiving a service request;

10  is that correct?

11  A.      That's correct.

12  Q.      Looking at PDX-41 here, can you tell us what we see

13  here with respect to identifying all continuations in an

14  output?

15  A.      This is code that's further down in that file.  And

16  in the convert.c file this is the code that's identifying

17  all continuations in an output from service.  And so in this

18  particular case you can see it's looking at each of the

19  characters one at a time, checking to see if they say HREF,

20  in upper case or lower case which is HREF looking for

21  hyperlinks or continuations that we talked about before.

22  Q.      So if you read the letters down, you can see the HREF

23  that shows that is a hyperlink?

24  A.      That is correct.

25  Q.      What could we see on PDX-42 here for the embedding

Schmidt - direct

1    state information?

2    A.      So this is yet another part of the convert.c file.

3    In this part, what is happening is, as we see from the

4    comments it says handle and HTML hyperlink, what's going on

5    there, is that argument list that we talked about before,

6    the thing that had the I file name, equals 100, R-2 equals

7    200, that's being embedded, that state information is being

8    embedded into the identified continuation.

9    Q.      And then looking at PDX-43 here, what code did you

10   analyze for communicating an output?

11   A.      What's being shown here is taking what we just

12   embedded and the continuations that are identified in the

13   embedded and then displaying them and you can see the call

14   to function display URL and it passes in the file name and

15   the argument list containing the state information, it says

16   this function displays the file while passing parameters to

17   hyperlinks, so it's communicating the output to display.

18   Q.      Now that we have talked about Mr. Iyengar's invention

19   date, let's talk a little bit more about the substance of

20   Spinning the Web.  Is it your opinion that Spinning the Web

21   does not anticipate or render obvious claims 51 or 54 of the

22   '601 patent?

23   A.      That's correct.

24   Q.      Did you test the Spinning the Web code to see what

25   happened looking at PDX-45 here?

1   A.      Yes.

2   Q.      What did you find when you ran it?

3   A.      It doesn't really do anything.  It essentially

4   prompts the user and then gives it a chance to click on

5   things, but it doesn't provide any service.  It doesn't do

6   anything interesting.

7   Q.      So what does it say at the top when you ran the code?

8   A.      It says Welcome to the Nothing Store.

9   Q.      And then what does it say at the bottom in italics?

10  A.      Nothing Productions.

11  Q.      Interesting.  Okay.  So now let's take a look at

12  PDX-47 here.

13          Now, Dr. Weissman opined there is a disclosure

14  of Java, so therefore, Spinning the Web can invalidate the

15  patent.  Does disclosure of Java and Spinning the Web have

16  anything to do with dynamically downloading as discussed in

17  claim 54?

18  A.      It certainly doesn't explain how that works, it just

19  mentions that Java is a language that can be used in

20  conjunction with Netscape and it can be used to fetch

21  information, interact with user, locally, so on, display

22  animations, but it doesn't disclose how to do it.  It just

23  talks at a very high level.

24  Q.      If we look at secondary considerations of nonobvious,

25  once again if we think about what you know, for the '601

1   patent, are there any other indications that the patent is

2   not obvious based on other factors besides just the

3   references themselves, do you see anything there?

4   A.      So as we talked about before, various other companies

5   have taken licenses, Google, Facebook, Twitter, LinkedIn, so

6   on, indicating that this approach has been successful.

7   Groupon has been successful in using the ability to use

8   embedded information in their product and also there is

9   other ways in which the prior art and alternative approaches

10  taught away from this approach such as using cookies as an

11  alternative method.

12  Q.      So just wrapping up, Dr. Schmidt.  What is your

13  opinion about validity in general with respect to all the

14  patents in this lawsuit?

15  A.      The patents that we talked about are indeed valid

16  patents.

17              MR. OUSSAYEF:  I have no further questions.

18              THE COURT:  Okay.  Cross-examination.

19                      CROSS-EXAMINATION

20  BY MR. HADDEN:

21  Q.      Good afternoon, Dr. Schmidt.

22  A.      Good afternoon, Mr. Hadden.

23  Q.      Let's talk about who did first.  Let's start with the

24  '601 patent.  If we look in Spinning the Web -- which is

25  this book; right?

1    A.    That's correct.

2    Q.    If we look in the preface, signed by author Yuval

3    Fisher.  Do you see that?

4    A.    I do.

5    Q.    It's December of 1995.  Do you see that?

6    A.    I do.

7    Q.    Now, that is before Dr. Iyengar even started working

8    at IBM; is that right?

9    A.    So that's the date that is before February 8th or

10   February 1996.

11   Q.    Right.  So this --

12   A.    However --

13              THE COURT REPORTER:  Excuse me.  One at a time.

14   A.    -- this is not a publication.

15   BY MR. HADDEN:

16   Q.    The question is who did it first.  So if we're

17   looking at who did it first, Mr. Fisher had completed the

18   book in 1995 before Dr. Iyengar even started working at IBM;

19   is that correct?

20   A.    I have no evidence of that.

21   Q.    You don't know when Dr. Iyengar started at IBM?

22   A.    No, I have no evidence that that was done before the

23   dates that Dr. Iyengar had.

24   Q.    We have the book, and Dr. Fisher wrote in the preface

25   that he wrote this in December 1995, and that is three

1  years -- three months before any of the files you pointed

2  to; right?

3  A.      The book was not published then.  You showed a

4  publication date.  Dr. Weissman showed a publication date

5  later.

6  Q.      I understand that.  But the question is who had the

7  idea first.  And we have Mr. Fisher who wrote this entire

8  book, right?  And he was done with it three months before

9  Dr. Iyengar wrote the code you cited in your report; right?

10  A.      I have no evidence of when it was published.

11  Q.      And that code that you are relying on is one, two,

12  three, four pages.  This is the code that you put throughout

13  your slides.

14  A.      That's correct.

15  Q.      That's fair.  And you have no evidence that that code

16  was actually run by anybody even before the publication date

17  of this book, do you?

18  A.      No.

19  Q.      You don't.  Right.  And you don't know if there was

20  actually ever enough code to perform the steps in the '601

21  patent, claim 51 before the publication date of this book;

22  do you?

23  A.      I'm sorry.

24  Q.      Sure.

25  A.      Repeat the question.

1    Q.      Sure.   These three pages by itself are not going to

2    perform the steps of claim 51 of the '601 patent; right?

3    A.      I don't agree with that.

4    Q.      You think the three pages of code are going to

5    perform every element of claim 51.   Is that your testimony?

6    A.      That's right.

7    Q.      Just by themselves, this three pieces of paper

8    compiled would do that?   Is that your testimony?

9    A.      It discloses elements that are in that claim.   Yes.

10   Q.      That wasn't my question.   The question was did you

11   perform the steps?   These are method claims.   You understand

12   that, don't you?

13   A.      I do.

14   Q.      And to reduce a method claim to practice, you have to

15   perform those steps; right?

16   A.      That's correct.

17   Q.      Okay.   And you have no idea that Dr. Iyengar or

18   anybody else performed the steps of claim 51 before this

19   book was published, do you?

20   A.      Well, in his deposition, he talks about -- well,

21   so --

22   Q.      That wasn't a question.

23           THE COURT:   Hold on.   One at a time.   D.

24           Do you want a yes or no?

25           MR. HADDEN:   I want a yes or no.

1    THE COURT:  Try to answer yes or no.  What is

2    the question again?

3    BY MR. HADDEN:

4    Q.    You have no evidence that anybody, including

5    Dr. Iyengar, ever performed the steps of claim 51 before

6    this book was published; correct?

7    A.    No, that's not correct.

8    Q.    What evidence do you have that anybody performed the

9    steps of claim 51, actually performed them, before February

10   23rd, 1996?

11   A.    So in Dr. Iyengar's deposition testimony, he talked

12   about using the invention in something called a coyote

13   virtual store, virtual mall.  He gave a couple names.

14   Q.    Did you bring any evidence here to the jury to show

15   that that performed the steps of claim 51 before February of

16   1996?

17   A.    I was answering your question from before that.  That

18   is what gave me the indication that was the case.

19   Q.    Did you bring any evidence before this jury that

20   anybody performed the steps of claim 51 before this book was

21   published in February of 1996?

22   A.    (Shaking head no.)

23   Q.    No.

24   A.    Other than what I just said.

25   Q.    Now, you talked about the Amazon prior art for a bit.

1   Now if we look at the slides on that.  The only substance

2   that you provided this jury that would suggest that what

3   Dr. Weissman said about Amazon invalidating this patent was

4   this one slide.  And in this one slide, you point to three

5   types of links that you say did not include the session ID

6   or embedded state information; is that correct?

7   A.      That is correct.

8   Q.      Right.  And if we look at these, the first one is

9   anchor links, and both Mr. Davis and Dr. Weissman talked

10  about those.  Do you recall that testimony?

11  A.      I do.

12  Q.      And you were here for that testimony?

13  A.      I was.

14  Q.      And anchor links do not send a request from the

15  client to the server, do they?

16  A.      Their hyperlink --

17  Q.      That's a yes-or-no question.

18  A.      They are hyperlinks that do not send it.

19          THE COURT:  Doctor, try to answer.

20  BY MR. HADDEN:

21  Q.      Can I get a yes-or-no answer?  Anchor links do not

22  send requests from the client to the server?  Yes or no.

23  A.      That's correct.

24  Q.      So anchor links are not continuations under this

25  Court's construction, are they?

Schmidt - cross

1  A.      That's correct.

2  Q.      Right.  So they are irrelevant to any analysis as to

3  whether the Amazon prior art invalidates this patent; right?

4  A.      That's correct.

5  Q.      Sure.  So let's go to the second one.  Mailto.  The

6  mailto links do not send a request from the client to the

7  server, does it?

8  A.      No, it does not.

9  Q.      Okay.  So mailto links are also not within the

10  Court's construction of "continuation" and are irrelevant

11  for any determination as to whether or not Amazon

12  invalidates that patent; is that correct?

13  A.      That's correct.

14  Q.      So we go to the last one.  Links on help pages

15  related to associated bookstores.

16          If you go on and read this, Mr. Davis testified

17  that those links did not exist in 1995; is that correct?

18  A.      In the code that we don't have access to.

19  Q.      It's a yes-or-no question.  Didn't Mr. Davis testify

20  that the associated bookstores did not exist in 1995 and

21  there are no such links on the page; correct?

22  A.      That's correct.

23  Q.      Yes.

24  A.      Although we have no way of being able to know that

25  because that code was not delivered to us.

Schmidt - cross

1    Q.      So if we believe Mr. Davis, you have provided no

2    evidence that would contradict Dr. Weissman's conclusion

3    that the Amazon system in 1995 invalidates claim 51;

4    correct?

5    A.      Assuming we -- yes, assuming we agree with Mr. Davis.

6    Q.      Thank you.  So the '601 patent is invalid, Spinning

7    the Web is prior art; right?

8    A.      No, I don't agree with that.

9            THE COURT:  That wasn't a question, was it, Mr.

10   Hadden?

11           MR. HADDEN:  It was close to a question.

12   BY MR. HADDEN:

13   Q.      Let's talk about Sunada.  You similarly said that

14   Dr. Hinton had the idea first; right?

15   A.      That's correct.

16   Q.      Is that what he said?

17   A.      Yes.

18   Q.      And you said that Sunada wasn't filed until 2004.  Is

19   that what you said?

20   A.      That was the date I saw.  October 28th, I believe.

21   Q.      Okay.  Let's look at Sunada.  If we look at the

22   filing date of Sunada; is this right?  It is right here.

23   Filing date:  March 31st, 2003.  Do you see that?

24   A.      I do.

25   Q.      That is over a year before Dr. Hinton claims she had

1   this idea; right?  Isn't that right?

2   A.      That is correct.

3   Q.      So who had the idea first, Sunada or Dr. Hinton?

4   A.      I don't know how to read the dates for the Japanese

5   patents.  I don't know whether they go by filing date or

6   whether they go by publication date.

7   Q.      It's not a question whether they go by date.  This

8   was filed over a year before you say Dr. Hinton had the

9   idea; right?

10  A.      According to that date, it was filed over a year.

11  But I don't know what that means in Japanese patent law.

12  Q.      What, do you think in Japanese patent law you date

13  the document before it was filed?

14  A.      I don't know how Japanese patent law works.

15  Q.      Do you have a dispute this was filed in Japan in

16  March of 2003, over a year before Dr. Hinton comes to have

17  the idea?

18  A.      I am not in a position to know how Japanese patent

19  law works.

20  Q.      You got up here and said she had the idea first as

21  the patent owner?

22  A.      I'm sorry.

23  Q.      You got up here and testified to the jury that

24  Dr. Hinton had the idea first and that was wrong, isn't it?

25  A.      Again, I'm not sure how to interpret a Japanese

Schmidt - cross

1    patent.

2    Q.      Okay.  Let's look at, you had the demonstratives.

3            Sir, you got up here and you said that

4    Dr. Hinton showed this diagram; right?  And this talks about

5    the Federated Identity Installation Guide, Version 5.1 PRPQ.

6    Right?

7    A.      That is correct.

8    Q.      And you are using that as the date you are claiming

9    there was an actual reduction to practice; is that right?

10   A.      That's correct.

11   Q.      Okay.  And as we heard Dr. Hinton testify, the

12   claimed runtime account creation was not enabled in that 5.1

13   PRPQ version of the product; right?

14   A.      It was available but not documented.

15   Q.      That is not what she said.  She said it was disabled.

16   A.      I don't recall her saying disabled.  I know she said

17   it wasn't documented.

18   Q.      So you have no evidence that anybody ever used a

19   Federated Identity Manager that was available as Version 5.1

20   PRPQ to perform the steps that are required in the '346

21   patent, did you?

22   A.      I do.

23   Q.      What evidence did you provide to the jury that

24   anybody used this 5.1 PRPQ version in which the claim

25   functionality was not enabled to perform the steps of the

1  '346 patent?

2  A.    So I actually think that was the following slide is

3  the testing discussion.

4  Q.    Okay.  So you provided this slide.  This is the slide

5  that provides the evidence to the jury?

6  A.    That is correct.

7  Q.    Okay.  So all you say in this slide is that TFIM

8  required extensive testing; right?

9  A.    That is correct.  I explained how testing is an

10  important aspect of developing software to prepare it for

11  release.

12  Q.    Sure.  And the TFIM had lots of functionality; right?

13  A.    I'm sure it did, yes.

14  Q.    Well, it must have if they were selling a version of

15  it in which the claimed functionality that is at issue in

16  this case was not even enabled; right?  It must have done

17  other stuff; right?

18  A.    I'm sure that is the case.

19  Q.    And do you have any evidence that any of this testing

20  that you are pointing to would be documents related to the

21  runtime account creation as it is performed in the '346

22  patent?

23  A.    Sure.

24  Q.    Where is that evidence that you provided this jury?

25  A.    So Dr. Hinton talked about that when she was

 1    describing about how they went about being able to release

 2    the PRPQ, but that has to go through extensive testing in

 3    order to be released.

 4    Q.      That wasn't my question.  Listen carefully.  And I

 5    asked Dr. Hinton the same question, and she said she had no

 6    documents that would show what was tested.  Have you seen

 7    any -- have you provided this jury any documents that show

 8    that the claimed runtime account creation functionality

 9    which was not even enabled in the product was tested in any

10    of this --

11    A.      I believe it was --

12                THE COURT:  Hold on.

13                Are you done with the question?

14                MR. HADDEN:  I am.

15                THE COURT:  Go ahead.

16    BY MR. HADDEN:

17    Q.      Have you shown that?  Have you provided any document

18    to this jury that would show that the runtime account

19    creation feature was tested?

20    A.      So I heard Dr. Hinton talk about that, and I heard

21    testimony earlier.

22    Q.      That wasn't the question.  Did you provide any

23    documents that would show that to this jury?

24    A.      So I described how the testing was used.

25    Q.      So you have not provided any documents that show that

Schmidt - cross

1  IBM, during this period of time, tested the runtime account

2  creation feature; correct?

3  A.     I believe the PRPQ is one document that shows that.

4  Q.     So you are saying that the Federated Identity Manager

5  Installation Guide, the version of the product in which the

6  feature was not enabled, proves that it was tested.  Is that

7  your testimony?

8  A.     Yes, and I believe it was enabled.  It just wasn't

9  documented.

10  Q.     Do you have any test -- do you have any evidence

11  other than this installation guide to show what was actually

12  tested?

13  A.     So that is the evidence I'm relying on.

14  Q.     Nothing else?

15  A.     Well --

16  Q.     You have no other evidence?

17  A.     Well, discussions from Dr. Hinton aside.

18  Q.     Have you provided any evidence to this jury that the

19  steps that are required -- and again, '346, that is another

20  method claim that requires performing steps.  Have you

21  provided any evidence to the jury that those steps were

22  performed before October 2004?

23  A.     Yes.

24  Q.     Other than this guide for the product that was not

25  enabled, what else?

Schmidt - cross

1   A.      So the guide where the product was enabled, that had

2   been enabled but not documented, but, yes, that is the

3   document we're talking about.

4   Q.      But that is a piece of paper.  I'm asking for

5   evidence that the claim steps were actually performed.  You

6   provided that evidence?

7   A.      Again, that is what the testing process would have

8   done before the PRPQ was released.

9   Q.      We just went around in a circle on that.  You just

10  testified you have no evidence of a document that shows that

11  the account creation was tested; correct?

12  A.      Again, I believe that that is what that document

13  shows.

14  Q.      You're switching documents on me, sir.  Do you have a

15  document that describes performing the steps of the claim as

16  a test that was actually done by IBM in this period?

17  A.      That would be the Version 5.1 of the PRPQ.

18  Q.      This is in an installation manual.  That is not a

19  test.  Are you testifying that this shows testing?

20  A.      Sure.  It's the thing that was released along with

21  the PRPQ which was the result of the testing process.

22  Q.      You are not listening to my question.  I'm not asking

23  what you think the result of the testing process is.  I'm

24  asking for a document that actually shows that IBM performed

25  the steps of the claim of the '346 patent before October of

Schmidt - cross

1    2004.   Have you seen any document that actually shows that

2    those steps were performed?

3    A.      Yes.

4    Q.      And can you point me to that document?

5    A.      That would be Version 5.1 of the PRPQ from July 2004.

6    Q.      All right.  So all you are pointing to is the

7    installation manual, and you are assuming that somehow that

8    means that IBM performed the steps of the claim.  That is

9    your testimony?

10   A.      That plus the testimony from Dr. Hinton from earlier.

11   Q.      And did you hear Dr. Hinton's testimony that she has

12   no document that actually shows the testing?

13   A.      I thought she was referring to the PRPQ.

14   Q.      Do you have a document that Dr. Hinton doesn't have?

15   A.      No, she referred to the PRPQ.

16   Q.      And she testified she had no document that actually

17   showed the testing of this feature occurred.  Do you recall

18   that testimony?

19   A.      I don't recall her saying that.

20              THE COURT:  Do you have more than two minutes,

21   Mr. Hadden?

22              MR. HADDEN:  I do.  Should we break?

23              THE COURT:  We'll have to wait until the

24   morning for the rest of it.

25              MR. HADDEN:  Okay.

1       THE COURT:  Ladies and gentlemen, before we

2   break let me just update you on where we are.  My

3   expectation is that we will complete the evidentiary portion

4   of the trial tomorrow.  We may also get to at least the

5   beginning of those final jury instructions that I mentioned

6   to you.  They're going to be much longer than the

7   preliminary instructions so I don't know if I will get

8   through all of them tomorrow.  I may not even get started on

9   them since hopefully we're only here until 1:00 o'clock

10  tomorrow.  But in all events, I anticipate we'll do closing

11  arguments on Thursday, and so you can expect you will be

12  begin your deliberations some time on Thursday.

13       But we're not there yet.  So while you're away

14  from us, no talking about the case, no research or reading

15  or anything.  And please be here to start at 9:00 tomorrow,

16  and we'll be done by 1:00 tomorrow.

17       Have a good evening.

18       (Jury left courtroom.)

19       THE COURT:  Dr. Schmidt, you may step down.

20       If the plaintiffs wanted to put their motion on

21  the record, now would be a good time.  And the rest of you

22  can sit or leave or whatever, and then we'll take a short

23  break, and then we'll talk about the jury instructions and

24  verdict sheet.

25       MR. DESMARAIS:  Thank you, Your Honor.  John

1    Desmarais for IBM.

2              And we have an agreement with the parties that

3    we will just make the motions pro forma now and reserve

4    actually making them in substance until the post-trial

5    briefs.

6              So at this point, all I'll say in general is

7    that IBM moves for judgment as a matter of law on all of

8    Groupon's validity defenses, and on its license defense and

9    IBM moves for a directed verdict or judgment as a matter of

10   law on infringement and willful infringement.

11             That being said, so that is just to sort of

12   preserve the record, and we have an agreement with Groupon

13   no one is going to argue waiving anything, and we will file

14   all the detailed bases in the post-trial briefs.

15             That being said, there are specific issues that

16   I do think need to be resolved before the jury charge.  One

17   is Groupon apparently has dropped its validity challenge to

18   the '967 patent and the '849 patent.  So we would move for

19   judgment as a matter of law on those and ask Your Honor to

20   actually enter that prior to the jury getting the case.

21             Secondarily, on the substantive issue that they

22   haven't conceded but I believe they wholly failed to prove

23   is their license defense.  They have a defense to the '346

24   patent that says because IBM has a license with Google and

25   Facebook, that somehow licenses Groupon.

1    They put in no evidence.  The only evidence in

2  the case is we put in, IBM put in the two license agreements

3  with Google and Facebook.  And our witness, Mr. McBride went

4  throughout the provision in those agreements that explicitly

5  says there is no license.  This is just an example of that.

6    Each agreement is exactly the same:  Except as

7  expressly provided herein, no license or immunity is granted

8  under this agreement by either party, either directly or by

9  implication, estoppel or otherwise to any third parties

10  acquiring items from either party or for the combination of

11  such acquired items with other items.

12    That same provision is in both the Google

13  agreement and the Facebook agreement.  Moreover, Mr. Breen

14  testified, and I took him through this on his direct, that

15  this is not the one I created.  This is what I recreated for

16  today.

17    And the second step of the Hinton patent, which

18  is receiving an identifier, and the third step creating a

19  new user account based on the identifier.  Mr. Breen

20  testified that those two steps are done in Google code --

21  excuse me -- in Groupon code written by Groupon engineers.

22  The Hinton patent has three steps:  starting the operation,

23  receiving the identifier, and creating the account.

24    So Groupon has conceded, it's own witness

25  conceded that two of the three steps of the Hinton patent

1    are done in Groupon code by Groupon, and they put on no

2    witness that implied license and exhaustion requires proof

3    that the claim elements are a material part of the claim

4    is done in the third-party product that you're claiming a

5    license through.  They put on no evidence.  Their technical

6    expert Dr. Weissman didn't mention it.

7              So there is no evidence on this claim, and  it

8    shouldn't be taken from the jury prior to the jury getting

9    the case.  Thank you, Your Honor.

10             MR. DESMARAIS:  Thank you, Your Honor.

11             THE COURT:  Okay.  Mr. Hadden.

12             MR. HADDEN:  Sure.  I think Mr. McBride

13   acknowledged on cross-examination that there are other

14   provision that were not trumped by the one that IBM's

15   counsel picked out and that they in fact included a license

16   to the use of the API by third parties and that's exactly

17   what Groupon is doing in using Facebook's APIs and software

18   development kits in exactly the way that Facebook instructs.

19   So there is those licensed uses under the agreements.  I

20   don't believe there is a factual dispute whether they are

21   not.

22             THE COURT:  First off, I take it -- well, talk

23   about the validity challenge to the two patents.

24             MR. HADDEN:  I'm not disputing that.  We didn't

25   put on an invalidity case on those two patents.

1    THE COURT:  You don't oppose me granting

2  judgment as a matter of law of no invalidity on those two

3  patents?

4    MR. HADDEN:  They should be off the verdict

5  form, I don't disagree.

6    THE COURT:  I take it other than that, you do

7  oppose the motion?

8    MR. HADDEN:  I oppose everything.

9    THE COURT:  What about the lack of your side

10  putting in Your own evidence on this license defense?

11    MR. HADDEN:  It's an issue, we got the evidence

12  we need about the license from Mr. McBride and Mr. Breen put

13  in the evidence regarding how Groupon uses the license

14  Facebook API and software development kits to perform the

15  steps of the claim.

16    THE COURT:  Okay.  Mr. Desmarais, let me just

17  say I do hereby grant judgment as a matter of law of no

18  invalidity on the two patents that we have been discussing.

19  I will ask that the parties work together in a timely matter

20  and submit an order that I can sign.  Do you want to talk

21  about the license defense anymore, go ahead.

22    MR. DESMARAIS:  Let me show you Mr. Breen's

23  testimony.

24    THE COURT:  You can do that, but my recollection

25  is that there are other provisions in the agreement -- first

1   off, I don't know that there is any requirement that they

2   present their own evidence in their own case in chief, but

3   there is enough evidence already in the record from which a

4   reasonable juror could find for their defense, it doesn't

5   matter what it came out.

6            MR. DESMARAIS:  I'm not disputing that.

7            THE COURT:  There is this provision, there are

8   competing provisions in the agreement, so, you know, unless

9   you can persuade me no reasonable juror can possibly not

10  think that that other provision meant what the defendants

11  are arguing, you're free to use the time, but you have

12  already dropped the one argument.  The fact that they didn't

13  elicit their own evidence, I think that's irrelevant.

14           MR. DESMARAIS:  Not necessarily.  There is two

15  that's right they have to prove.  They have to prove one

16  that there is a license that they're going to take refuge

17  in, but secondly, they have to prove that the claim elements

18  are done on that third-party license, Google or Facebook.

19  And they haven't put any proof on that.

20           So yes, they can prove their case through us,

21  but they have put on no proof that the three elements in the

22  claim are done on the Google application API or the Facebook

23  API, so regardless what the licenses say, they have to prove

24  that those things are done on the API.

25           And Mr. Breen was their only witness and he said

1  the opposite.  What he said was:

2          "Question:  That's not what I asked you.  At

3  Groupon, Groupon software engineers wrote code that receives

4  an email or name or both and they store it in the Groupon

5  database; right?

6          "Answer:  Yes, they do that because that is what

7  Facebook and Google tells them to do."

8          So this is not they bought something from

9  Facebook and Google, he's saying that they told us to do it,

10  but he's admitting that Groupon did it on their own.  That's

11  the second step of the claim.  And the third step of the

12  claim is the same:

13          "Question:  It's Groupon engineers that wrote

14  that code?

15          "Answer:  Yes.

16          "Question:  Now after you receive the email and

17  the name, Groupon software engineers created software that

18  as you already said stores that name in a database and then

19  they will use it to create a new Groupon account, right?  So

20  Groupon wrote the software to take that email, take that

21  name and create an account.  And that account has unique ID

22  created by Groupon, the email address and the name, a

23  Groupon time stamp and a Groupon registration, right?

24          "Answer:  That is correct."

25          That's the third element in the claim.  The

1   claim has three elements.  Mr. Breen, their only witness

2   admitted the second and third elements are done by Groupon

3   engineers on Groupon software.  His defense is Facebook told

4   me to do it.  He doesn't say Facebook sold me an API that I

5   just implemented which is what would be required for there

6   to be a license, regardless of what the terms in the license

7   say.  So Groupon put on no evidence that says a material

8   part of the claim which is what the law requires, a material

9   part of the claim is being done by something I bought from

10  Google or something I bought from Facebook.

11           THE COURT:  The license has to be transferred

12  for financial consideration, it can only be through a say.

13           MR. DESMARAIS:  No, it doesn't have to be

14  purchased, but they have to get the software, they have to

15  get the thing from Google or Facebook and they got nothing,

16  they created, their own engineers created it their selves,

17  they admitted that, there is no proof to the contrary, it's

18  not even argument, they have no proof to the contrary, they

19  have two of the three claim elements.

20           They dispute the first claim element which is

21  triggering the start of the process, but the Google API and

22  the Facebook API only send the email, they don't do two of

23  the three claim elements and they put in no evidence to the

24  contrary.  If you just look at the law and apply it to the

25  record that's undisputed, the case shouldn't go to the jury.

1    THE COURT:  Mr. Hadden, you can come back if you

2    want.

3    MR. HADDEN:  I disagree with Mr. Desmarais'

4    statement about the claim and the testimony.  What he's

5    pointing to is not what maps the claim elements.  We seen

6    these flows down a zillion times and they all use code from

7    Facebook or Google that's in the user's browser and they use

8    the Facebook or Google API and they process the tokens that

9    are generated by Facebook and Google in exactly the same way

10   Facebook and Google teach including to create accounts.  So

11   there is at least a factual dispute whether the substance of

12   the claim is really being performed by Facebook and Google,

13   and it's clear that API's and software development kits are

14   licensed product under the IBM licenses.  The fact that they

15   give them away for free doesn't change the fact that they're

16   still licensed products.

17   MR. DESMARAIS:  On that last point, Mr. Hadden

18   said there is a factual dispute on whether it's being mapped

19   to the claim.  No, there isn't.  They didn't put in any

20   evidence.  No witness at this trial mapped those flows to

21   the claims of the '346 patent to say this is all done by

22   Google and Facebook, therefore, it's licensed.  These were

23   fact witnesses going through those flows and Weissman,

24   Dr. Weissman did not map those flows to the three claim

25   elements and say therefore license.  He didn't mention

1    license on the stand.

2              MR. HADDEN:   He did mention license, but he

3    didn't need to, he explained how just like Mr. Breen did how

4    the process works at Groupon and how they use the Google and

5    the Facebook APIs.

6              THE COURT:   All right.   Well, I'm going to

7    reserve judgment on this portion of the plaintiff's motion

8    and, in fact, on all portions of the plaintiff's motion

9    other than what I have already ruled on which is the

10   undisputed portion regarding the validity challenge that is

11   dropped with respect to the two patents.   The defendant is

12   free to go ahead and make its argument with respect to the

13   license defense since I'm not taking it out of the case.

14             MR. HADDEN:   One issue on our side, Your Honor,

15   whether we can get a judgment that they have dropped all the

16   claims that were in their pretrial statement that they're

17   going to assert and didn't assert.

18             THE COURT:   Is it asserted claims or is it

19   indirect infringement theories or is it something else?

20             MR. HADDEN:   I think it's just asserted claims.

21             MS. SHAMILOV:   Instead of sixteen there are

22   eight.   And there were more than that before I started --

23             THE COURT:   I think the plaintiffs have been

24   clear, you're only asking the jury for a verdict on the

25   eight or whatever claims that we have been talking about?

1      MR. DESMARAIS:  Yes.

2      THE COURT:  Do you oppose judgment as a matter

3  of law of non-infringement on the other claims that were

4  mentioned on the pretrial order but no evidence has been

5  presented on them?

6      MR. DESMARAIS:  We presented no evidence and

7  similarly if we're going to get into that sort of

8  micromanagement for all the art that they disclosed and

9  didn't rely on, I don't know that we need to that.  We don't

10  enter judgment as a matter of law, we just sort of move on.

11      THE COURT:  I'll leave it to you al to confer on

12  what if anything you want me to stay or sign with respect to

13  the narrowing of the case.

14      Anything else before we take a short recess?

15      MR. HADDEN:  Not from us.

16      THE COURT:  No, Your Honor.

17      MS. SHAMILOV:  I know Your Honor said today we

18  are going to go through the jury instructions.  I want to

19  propose something that maybe it would be more beneficial for

20  the Court, since tomorrow we have two more experts testimony

21  to finish, I think the parties can probably narrow the

22  disputes even further if we meet and confer today.  I know

23  that it's a short day tomorrow.

24      THE COURT:  I think we're going to have to start

25  talking about them today because I hope I'm in a position to

1   start reading them tomorrow.  We'll take a short recess and

2   then we'll come back.

3              (A brief recess was taken.)

4              THE COURT:  Have a seat.  The clock is off.  I

5   have basically about an hour so I'm hoping we can cover

6   everything in that time.  We'll see where we are.

7              What we're going to do is I will direct to you

8   the area of where I know I most need help and then if there

9   is any time left, I'll let you raise other issues, otherwise

10  some further discussion may have to be deferred.  So we'll

11  see.

12             The first is it looks like this document, I'm

13  going to work primarily from DI-379 which was the July 23rd,

14  I guess that was yesterday's version of the proposed jury

15  instructions.  It looks like it was filed under seal, I

16  didn't know why that was.  Is there any objection to

17  unsealing that document?

18             MR. GEIST:  Your Honor, it was filed under seal

19  due to counsel for Groupon was unsure they needed that.

20             THE COURT:  Is there an issue?

21             MS. KAEMPF:  There is no objection.

22             THE COURT:  I'll have you all file as soon as

23  you can an unsealed version of that.

24             The first one I wanted to get your views on

25  starts at page 29, but basically what to do about the

implied license defense and whether this should go to the

jury or not.  I guess the plaintiff is now arguing perhaps

for the first time that this is not an issue for the jury.

Why don't I get someone here from IBM first.

The suggestion is that it wasn't until Saturday that you

suggested that it shouldn't go to the jury.  Help me

understand that's correct.

MR. GEIST:  Good evening, Your Honor.  Edward

Geist for IBM.  And Your Honor, we had included a footnote,

you may not -- we included a footnote in the original filed

jury instructions that were filed a while ago noting this

need not go to the jury based on Your Honor's decisions and

determinations including summary judgment and otherwise.

That's essentially what this is.  It is something that could

go to the jury to be clear, it's at Your Honor's discretion

for an advisory verdict or if the parties agree it can go to

the jury as an advisory verdict under the federal rules.  It

is an issue that could go to the jury, we don't see a reason

for it to go to the jury in this instance.

THE COURT:  And your contention is you preserve

the right for me to not give it to jury by an earlier

submission of jury instructions?

MR. GEIST:  Yes, Your Honor.  I don't know that

this is an issue that could be waived in the sense that it's

an equitable issue, meaning that it's reserved for the Court

1    to determine.  Also, beyond being an equitable issue as

2    opposed to a matter of law like for example exhaustion that

3    would be determined by a jury, it's also a question of law

4    and it would be reviewed as a question of law if Your Honor

5    made a determination subsequent to any jury verdict.

6                    THE COURT:  Let me hear from Groupon then.

7                    MS. SHAMILOV:  Hi, Your Honor.  I think under

8    the pretrial files, the footnote on page 29 says there are

9    issues of law that were submitted by IBM, there were

10    submissions of fact that were submitted by IBM, our

11    preliminary jury instructions said that the license issue is

12    something we would be deciding.  On Sunday this is the first

13    time we saw from IBM, we were under the impression that we

14    were all consenting that the jury will do that and we put

15    the case forward with that in mind.

16                    In terms of where that -- so on page 29 is an

17    issue of infringement.  So there are two disputes with

18    respect to the implied license, whether one, where it gets

19    to be said during the jury instructions, or whether it goes

20    to the jury.  Setting aside whether it goes to the jury

21    because we have a specific section on it, the reason why

22    it's on page 29 because one of the earlier versions of IBM's

23    verdict form did not have it as a separate question and they

24    said it would be subsumed in the infringement question.  So

25    that's why it is in every infringement instruction, but it

1   doesn't have to be there, so we can drop it there.

2           THE COURT:  On the competing versions of the

3   verdict form now, do you call it out as a separate question?

4           MS. SHAMILOV:  Now they do, as of Sunday the

5   parties exchanged and it does call it.

6           THE COURT:  Do you agree that it is a question

7   for the Court ultimately to decide what I have to decide now

8   is whether to get an advisory verdict?

9           MS. SHAMILOV:  So the exhaustion is not.  There

10  are two issue.  The exhaustion the jury can decide.  The

11  implied license is an equitable defense, but it can go to

12  the jury by the parties' consent.  It will be an advisory

13  verdict.  Here the parties all along were operating under

14  the impression of an implied agreement if you will, it will

15  go to the jury, the jury will be instructed, we put on the

16  case that way, the question should be on the verdict form

17  and whichever the answer is we can decide what to do with

18  this, but it should be on the verdict form.

19          THE COURT:  And therefore the jury should be

20  instructed?

21          MS. SHAMILOV:  Yes.

22          THE COURT:  Do you have more to say about this?

23          MS. KAEMPF:  Addressing whether this can go to

24  the jury and whether the jury can render a verdict that is

25  not an advisory verdict but any typical verdict that is

1    permitted under FRCP 39(c) if the parties consent and that's

2    what happened here through the pretrial process, IBM has

3    represented that this is an issue going to the jury as

4    Ms. Shamilov stated.

5              THE COURT:  What about the earlier version of

6    the jury instructions, is there some sort of reservation of

7    the plaintiff's rights to do otherwise?

8              MS. KAEMPF:  That is not coming to mind.  I know

9    that we talked about equitable issues and we have an agreed

10   upon MIL about not talking about equitable issues like

11   injunction and treble damages and inequitable conduct.

12   Implied license has been in the case and they do not mention

13   that, so it was really our understanding that this was an

14   equitable issue.

15             THE COURT:  Okay.

16             MS. KAEMPF:  I was also going to say an issue

17   with rendering an advisory verdict is they want -- they're

18   willing to let the jury give an advisory verdict, but

19   they're saying that the jury should not deduct -- they

20   should not consider that if there is a license decision that

21   they should deduct that damages amount.

22             So say, for example, the jury comes back and

23   finds a license, they award damages for all four patents

24   because they're not supposed to consider the license when

25   doing damages, and then you accept the advisory verdict,

1    it's unclear how you would be able to deduct that amount

2    because the jury is going to return one number.  And, you

3    know, our position on damages is that the hypothetical

4    negotiation included all four patents so there is no way --

5    we don't have a patent-by-patent damages number.

6         THE COURT:  As of now, neither side asked me to

7    break out the damages question patent by patent; right?

8         MS. KAEMPF:  That's correct.

9         THE COURT:  So you know, I think you're all

10   taking the risks that we may have to do damages again

11   depending on, you know, what the other outcomes are.  But

12   I'm not sure that anything turns on that point on whether or

13   not I decide now if this verdict is advisory or not.  I'm

14   not seeing how the one necessarily helps me with the other.

15        MS. KAEMPF:  All I'm saying is that it's, it's

16   very prejudicial for the jury to return an advisory verdict

17   but then return a damages number that might disregard that

18   license, the license defense.

19        THE COURT:  I see.  You're understanding is that

20   the plaintiff is asking me to ask the jury to find damages

21   with the '346, with respect to the '346 even if they would

22   advise me, through an advisory verdict, even if they were to

23   advise me there was a license.

24        MS. KAEMPF:  Right.

25        THE COURT:  In your view I should tell the jury

1    don't find damages on the '346 if you find there is a

2    license; right?

3              MS. KAEMPF:   Correct.

4              THE COURT:   Let me bring IBM back.   My thought

5    is that I should get the advisory verdict.   You all didn't

6    do a very good job of letting me or the defense know that

7    you weren't consenting to that, but in any event, you can

8    all fight about in posttrial briefs whether the advisory

9    verdict is an actual verdict or if it's just advice to me

10   and whether you waive or could waive or consent or didn't

11   consent, but that I don't need to resolve those things

12   today, but you tell me why that's not the right way to go

13   if, in fact, it isn't.

14             MR. GEIST:   Just to, I just wanted to make clear

15   based on what was just said.   It is true that our original

16   proposed verdict form did not include a question on this,

17   which was I think part of the issue.   Also we objected to

18   inclusion of the license defense statements, there were at

19   least two of them we objected to in the preliminary

20   instruction as well.   That aside, going on to how to deal

21   with it if we are putting the question of implied license to

22   the jury, the issue with asking them not to render a verdict

23   for damages with respect to the '346 patent if they find

24   implied license is ultimately the question rest with Your

25   Honor.   And if you determine that there is no implied

1  license and they have not found damages for that, then

2  obviously we need a new trial on damages for the '346

3  patent.

4         But additionally, by making that request to

5  them, meaning requesting them to reduce the amount, we won't

6  necessarily know what happened, meaning the verdict that we

7  get could be confusing in the sense that what is included in

8  the actual damages amount.

9         THE COURT:  Okay.  Well, as I suggested in my

10  questioning, and I am going to put the implied license

11  question before the jury, I am not making a decision today

12  whether that's an advisory verdict or something more than

13  that.  The jury won't be told one way or the other.  And I

14  very likely will need your assistance with briefing and

15  looking more carefully at the law if it's a ripe dispute

16  following the trial as part of posttrial motions.

17         But I think as I suggested, it's my

18  understanding that everyone was in agreement that licenses

19  were an issue for this trial.  I think we discussed it at

20  the pretrial conference.  I think I tried to make clear

21  there is a dispute over what this trial is about, and I

22  certainly as part of the preliminary instructions kept in

23  things relating to the license and, therefore, defendants

24  reasonably had presented a case with respect to license.  It

25  would be prejudicial to take that away on the argument that

 1    the plaintiff never meant for it to get that far when that

 2    was not clear, at least to me.

 3           And so that's how we will proceed in that

 4    regard.  I might have some more questions about implied

 5    license as we go forward, but I had failed to mention I have

 6    a question at page 12 on the 30(b)(6) deposition testimony.

 7    It's unclear to me from your objections, do you want me to

 8    list for the jury who the 30(b)(6) witnesses were that they

 9    heard from?  Do you not want me to list, and if so, who am I

10    listing?

11           Ms. Shamilov, you can address it first.

12           MS. SHAMILOV:  Yes, Your Honor.  I think we will

13    be -- in the sense to compromise, we will be fine if we list

14    the name of the folks.  There were tons of video deposition

15    played, not all of them were 30(b)(6).  We're fine with this

16    instruction so long as we list Mr. Carlisle, Breen, Dunham

17    and Schmitz.

18           THE COURT:  Carlisle, Breen.

19           MS. SHAMILOV:  Carlisle, Breen, Dunham and

20    Schmitz.  The very last two lines on that footnote on page

21    12, the four individuals there.  So if you add that in, I

22    think that this instruction should be fine with us.

23           THE COURT:  Okay.  Does IBM have an objection to

24    me identifying in this instruction that those four

25    individuals just named are the 30(b)(6) witnesses that the

1  jury heard from?

2          MR. GEIST:  If Your Honor is so inclined, I

3  think that's fine with IBM.  We can confer with opposing

4  counsel to determine if there were any other witnesses.  I

5  have to check on what happened in the last two days or since

6  this was submitted.  But otherwise, no, other than it seems

7  like it's taking a little time.

8          MS. SHAMILOV:  Just to be clear, Your Honor, we

9  do need to add the 30(b)(6)s from IBM.  And I don't have

10  that list, but I'm sure we can just exchange it.

11          THE COURT:  I'll be giving you a time for some

12  time tonight probably where you can get back to me on some

13  of these things because we're going to try to get these

14  instructions ready as best as we can.

15          Thank you for that.  And I am inclined and do

16  plan to include a 30(b)(6) instruction.

17          Let's next talk about joint infringement or

18  multiple parties combined to infringe.  This comes up around

19  page 37.  Let me hear again from IBM first.  Do you think

20  you presented testimony evidence to support a multiple

21  infringement theory and if so, what is it?

22          MR. GEIST:  Your Honor, we do.  And that

23  included, for example, testimony by our expert witness,

24  Dr. Schmidt about, for example, the benefits to customers of

25  making use of the systems and also for the particular claims

1    and the activities that they performed.

2              And we also heard testimony from both experts

3    and fact witnesses about how these products function,

4    meaning that -- and that is discussed as far as where

5    certain steps could occur, so, for example, whether it's at

6    a user device or on a server.

7              THE COURT:  So, for instance, at page, top of

8    page 38, Groupon would have me, if I'm going to say anything

9    about multiple parties combined, which I think their

10   position is I shouldn't say anything, but if I say

11   something, they want me to point out that the third parties

12   provide services such as caching, content, delivery network,

13   advertising, selection and provision services.

14             Evidently, you disagree with that limitation; is

15   that correct?

16             MR. GEIST:  That's correct, Your Honor.

17             THE COURT:  So why is that?  And what evidence

18   did you present at trial of third parties doing something

19   relevant other than those acts?

20             MR. GEIST:  The acts listed here you mean, Your

21   Honor?

22             THE COURT:  Yes.

23             MR. GEIST:  So like I was saying before, storing

24   occurs for caching, which Your Honor has heard throughout

25   the trial.  That caching occurs at the user device.  So

1    whether that is a phone or if it's on a user's computer, if

2    they're using a web browser, for example.  So that is a

3    place where the storing occurs.  And that is something I

4    have on a user device potentially.

5           And also I note that their argument for trying

6    to limit what the jury can consider with respect to

7    attributed infringement, I'll call it.  They're just looking

8    at an example provided in our expert's report.  The expert

9    report, of course, includes discussion of.

10          THE COURT:  Right.  But as this point, I can

11   only focus on what the jury has heard.  So you have given me

12   an example of caching.  That is already called out in the

13   limitation that the defendants would have me say.

14          MR. GEIST:  In that case, I think I was not

15   clear enough, Your Honor.  The caching that is being talked

16   about here, that is not in a content delivery network.  That

17   is a server that is between potentially Groupon's servers

18   and then the actual user devices.  Caching that has been

19   discussed at trial and discussed by the different experts

20   and fact witnesses is other caching that occurs directly on

21   the user's device.  So that would be, for example, their

22   phone or computer as opposed to the other servers.

23          So the evidence that the jury has heard has been

24   about the user's device, it's my understanding, and that is

25   different from on a content delivery network.  That is the

1  transport in between that has been shown in, for example,

2  demonstratives as the cloud.

3           THE COURT:  All right.  Thank you.  Let me hear

4  from Groupon.

5           And I guess, first off, should I have read your

6  reference to caching to be as limited as plaintiffs believe?

7           MS. KEMPF:  We believe that this caching

8  reference, the third-party caching reference, that refers to

9  what, the only theory for joint infringement that they have

10  in their expert report.  And so that is why we put in that

11  language about the third-party, about the specific third

12  party.

13           THE COURT:  So that is a content delivery

14  network caching?

15           MS. KEMPF:  Yes.

16           THE COURT:  But what about users?

17           MS. KEMPF:  Users was, that's a completely new

18  theory that was never disclosed in their infringement

19  contentions.

20           THE COURT:  Was it presented at this trial?

21           MS. KEMPF:  It was not presented at this trial.

22  The only person who testified, the only person who mapped

23  evidence or produced evidence to the patent claims was

24  Dr. Schmidt.  He did zero mapping about, you know, if

25  Groupon doesn't perform this element, then a user performs

1    this element.  That never happened.

2                So what IBM is intending to do is say that, you

3    know, maybe the jury could consider someone's brief

4    reference to a user as meeting an element.  That is

5    completely prejudicial.  I mean the issue of infringement

6    was talked about amongst the experts.  They were the ones

7    that did the mapping and there was no mapping done by their

8    expert.

9                And I know you mentioned that when you are

10   talking about the trial record, but I think throughout this

11   trial, we have been talking about late disclosed theories

12   and trial by surprise, and that, you know, those sort of

13   things.  And this is one thing that we feel like has been a

14   trial by surprise.

15               THE COURT:  Right.  My point in that regard here

16   would just be if, without objection, for instance, they

17   presented this theory through their expert at trial, then I

18   might need to instruct the jury on it.  But your contention

19   is they haven't presented this theory and had they, you

20   would have objected because you think they never disclosed

21   it previously.

22               MS. KEMPF:  That's correct.

23               MS. SHAMILOV:  If I may add to that, Your Honor.

24               So the issue is, and I think the sentence that

25   may make it clear.  If you look at page 39, the very last

1    sentence in the instruction of IBM's proposal says they want

2    to add that the third parties perform the claim steps.

3    Right?

4            There was actually no testimony and counsel did

5    not identify anywhere Dr. Schmidt or any other witness got

6    up and said if Groupon does not perform a step, this

7    particular element of the claim, then this particular third

8    party does so.

9            With respect to caching on the user's devices

10   that counsel mentioned, we had repeated testimony and

11   repeated cross-examination questions that it is Groupon that

12   caches because it is Groupon that says caching control

13   parameters.

14           There is no testimony, and they wouldn't be able

15   to point to any where anyone got up, any witness got up and

16   said if this particular -- I think Groupon performs all

17   these elements.  This one, if they don't, then this is the

18   third party that does it, and this is how they do it.

19           Dr. Schmidt mapped all the claim elements just

20   to Groupon's system and obviously benefits of using a system

21   that they accused of infringement to customers.  I mean that

22   is not an argument for joint infringement.  The fact that

23   users may benefit from using our system, that is a damages

24   question.  That is not mapping any claim elements to sort of

25   a joint enterprise.

1       And the problem will be, because there was no

2    testimony put forth to say it is a third party and this is a

3    third party that does it.  If we add all these instructions,

4    we basically just confusing the two issues that in the

5    jury's mind they wouldn't even know what infringement really

6    means.  It is just going to confuse them and say, well,

7    customers use it.  They benefit from it.  That means Groupon

8    infringes and just that is not the legal standard.

9                THE COURT:  Okay.  Thank you.

10               You can come on back.

11               MR. GEIST:  I'm going to have to strongly

12   disagree.

13               First on the law, joint enterprise is not a

14   requirement for attributed infringement, I'll call it, under

15   Travel Sentry and that line of cases.  That is one prong of

16   a two prong case that is direction and control and requires

17   other elements, including benefits to the users.  That is

18   why I mentioned that earlier, Your Honor.

19               Also, throughout this trial, both parties

20   have presented, for example, the users devices on their

21   demonstratives and discuss those with the jury to show this

22   is where the website is, this is where the storing happens

23   for the images, for example, that are getting cached.  That

24   has been discussed throughout this trial by both sides.

25   There is certainly evidence in the record of that.

1            I strongly dispute that that has not been

2  discussed at all.

3            As another example, Dr. Schmidt discussed

4  Ms. Sandridge, her testimony regarding testing.  The reason

5  why he talked about that is because they put forward an

6  argument in their slides showing users can disable caching

7  in some circumstances.

8            The argument there was, hey, the user changes

9  this and therefore it doesn't happen.  Well, the fight was,

10  hey, in most cases it does.  In fact, the vast majority of

11  the cases.  That was a fight that was had on the record

12  between the experts and also with fact witnesses.

13            And like I said, we identified Ms. Sandridge's

14  testimony about testing and testing that caching which

15  happens on those devices.  The reason that is relevant is

16  because they actually control those directly, and we can,

17  for those, it may be a potential issue, but for the other

18  users, there is a potential issue where those users have on

19  their devices that does the actual storing potentially.

20            THE COURT:  Has anybody provided testimony that

21  the third parties are performing claim steps?

22            MR. GEIST:  Yes, Your Honor.  When they

23  discussed how those actual steps occur, they show where that

24  occurs on the user devices in some circumstances before the

25  actual caching, before storing.

1    THE COURT:  Did Dr. Schmidt or anyone else map

2  the claim limitations or any of tem to the third parties?

3    MR. GEIST:  Your Honor, they mapped the claim

4  elements to the fact what occurs in this technology.  So

5  that include, for example, if they're storing at the user

6  devices there.  And like I said, there was also the fight

7  over whether caching was being enabled or disabled.

8    THE COURT:  All right.  Ms. Shamilov, do you

9  want to respond?

10    MS. SHAMILOV:  Yes.  And the last question is

11  the right question to ask.  And the right answer would have

12  been, yes, Dr. Schmidt said this particular third party, for

13  example, a customer, performs this step.

14    Where it is performed, right, Dr. Schmidt's

15  testimony was it is Groupon's code that runs on mobile

16  devices, Groupon's code that runs on the computer that

17  performs those elements of the claim.  It is all about

18  Groupon.

19    There is absolutely nothing, and counsel

20  couldn't point to anything.  I would love to see the

21  testimony where Dr. Schmidt said if Groupon's code does not

22  do this, then this third party customer does this particular

23  element of the claim.  There is no testimony on that.

24  Everything was about what Groupon's code does.

25    THE COURT:  I mean, it's almost always I should

1    say the case where a finding of infringement would likely

2    require expert testimony but it's probably not always the

3    case.

4              Does your position rise or fall on whether an

5    expert ever said that a third-party user is performing some

6    of the claim or is it broader than that and there isn't

7    evidence here from which a reasonable jury could find?

8              MS. SHAMILOV:  I don't think it needs to be an

9    expert, but there has to be testimony that maps a particular

10   claim element to a party that does it.

11             The only testimony referred to this trial was

12   it is was Groupon's technology, Groupon's HTML code,

13   Groupon's mobile applications.  The only party for providing

14   the technology that does, you know, that runs, that does it.

15   There was no identification by anyone of a third party

16   performing a particular step.

17             And it doesn't have to be Dr. Schmidt to say

18   that.  Nobody said that.  Nobody said a customer or a third

19   party or any party X performs this step if Groupon does not

20   perform it.  It was all about what Groupon does.

21             Thank you.

22             THE COURT:  Okay.  One second.

23             Anything further on this from Groupon?

24             MS. KEMPF:  Just addressing the legal standard.

25             So the legal standard for joint infringement is

from Akamai.  You know, to prove joint infringement, you

have to prove that it was either joint enterprise or that

there was direction or control.  And to prove direction or

control, you have to prove they conditioned, that Groupon

conditioned a benefit or participation in an activity based

on performance of a step and that it establishes,

establishes the time or manner of that performance.

So IBM's counsel has referenced the Travel

Sentry case I believe today, and then also I think their

references the SiRF case from 2010.  Both of those cases

don't, you know, they reference -- I'll put this up for an

example.

I believe that they're referencing this

language:  That an actor infringes vicariously by profiting

from direct infringement.

That is not the standard.  The standard is:

Participation in an activity or receipt of a benefit upon

performance.  That is the joint infringement standard.

So I guess just to clarify that it's not.

THE COURT:  In your view, Travel Sentry didn't

change this Akamai standard.

MS. KEMPF:  Yes, that is my view.

THE COURT:  Okay.

MS. KEMPF:  Then as far as the SiRF case, the

SiRF case, I believe Your Honor considered that in the

```
 1    Priceline case, and you found that that case does not say

 2    that a third party can perform a step, and that qualified as

 3    infringement.  You said that, you know, if there is claim

 4    language that is not a claim element and a third party, a

 5    third party performs that, that could be sufficient, but

 6    when a claim element is a claim element, a third party

 7    performance of that is not sufficient for direct

 8    infringement.  And I believe that is what, how to interpret

 9    that in this case.

10              THE COURT:  Okay.  Back to IBM.

11              MR. GEIST:  Your Honor, I'd like my colleague to

12    be able to address one point, and then I will try to address

13    the remaining argument, if I may.

14              THE COURT:  Sure.

15              MR. MATULEWICZ-CROWLEY:  Your Honor, it's

16    Michael Matulewicz-Crowley for IBM.

17              I wanted to note, during Dr. Schmidt testimony,

18    if we were to go back and look at the demonstratives and

19    look at the transcript, Groupon is correct that he did first

20    say that Groupon is performing the storing step even when it

21    occurs at the user's device.

22              He then went on to say, though, yes, users can

23    disable cache.  But there was testimony from Aileen line

24    Sandridge, the Vice President of Engineering at Groupon,

25    that she and other Groupon employees have tested the Groupon
```

1  website with cache enabled of.

2          The point of that testimony, what Dr. Schmidt

3  said there was that, okay, even if -- there is a joint

4  divided infringement thing here.  Even if the user being

5  able to disable cache has an issue of control, in those

6  instances, Groupon is controlling whether the cache is

7  enabled or disabled because it is Groupon employees who are

8  making the decision as a part of their employment.  I mean

9  that is I think very clearly in the testimony and, you know,

10  evidence and testimony of joint infringement mapping to at

11  least the storing step for the '849 patent.

12          THE COURT:  Okay.

13          MR. MATULEWICZ-CROWLEY:  Thank you, Your Honor.

14          MR. GEIST:  And then I'll try to address the

15  other arguments that were made, Your Honor.

16          So getting back to the central point that Your

17  Honor brought up.

18          They are saying that they don't think that

19  Dr. Schmidt said the words "acted as an agent" or something

20  like that.  He might not have said those words but he did

21  put in the evidence and the evidence is before the jury.

22          Moreover, opposing counsel just argued the other

23  side of this issue with respect to their license defense

24  which they did not have any testimony on from their expert

25  and they admitted it.  Not that he didn't put in those

particular words, he literally did not address the issue.

And they believe that that issue should go to the jury as

well.

Here, our expert did address the issue.  He

might have not have said the words "agent."  Those words are

not required.

And you heard Ms. Kaempf come up and tell you

the standard isn't joint enterprise, counsel said earlier.

Instead, benefits do matter.  That was the original

argument.  That is why we're talking about benefits during

the trial.  It is not just relevant to damages here, it is

also relevant to the other issue.

Now, stepping back.  Counsel also mentioned the

SiRF case.  The SiRF case is unrelated to this issue.  Those

are separate lines of cases.  Attributed infringement, that

is the Travel Sentry line of cases that also include Akamai.

The SiRF case is direct infringement with the

one party.  That is a different theory, and that there, the

standard is whether you dictate it.  That is a separate

issue from contributed infringement here under Travel

Sentry.

THE COURT:  Okay.  Just briefly.

MS. SHAMILOV:  Yes, Your Honor.  I think Michael

just reiterated what happened at the trial.  Dr. Schmidt got

up and said Groupon does all of this and Groupon also checks

1   this.  So even if the user disables it, it is Groupon that

2   directly infringes because Groupon tests it.  It was all by

3   Groupon.  So this is one of the instructions that isn't --

4   that IBM proposes in this very issue, and here is the issue:

5   Groupon profits from the third parties direct infringement.

6            There are no third party that identifies

7   throughout this trial for a direct infringer other than

8   Groupon.

9            THE COURT:  Okay.  I'm going to have you all

10  have a chance to look at the testimony and put it in context

11  for me in writing later tonight.  We'll talk about the

12  details of that before we break for the evening.

13            Let's move on, though.

14            On exhaustion, patent exhaustion at page 44.

15  You have all sorts of disputes.  I guess my question is, at

16  times you are citing to models.  The Federal Circuit Bar

17  Association, I think, and the AIPLA.  Is there not a model

18  instruction on patent exhaustion that you could just agree

19  on and that I could use?  Whoever wants that.

20            MS. SHAMILOV:  It likes like there is not a

21  clear one that we can start with.

22            THE COURT:  Right.

23            MS. SHAMILOV:  I think that is the issue.  I do

24  have -- there is one sentence we can strike that we propose,

25  for example, the verdict form be changed.  Right?  Because

1  we are now asking infringement questions separate from the

2  patent exhaustion applied license, so we don't need to say

3  you cannot find infringement.  So those, we can strike, but

4  unfortunately there is no one clean starting point, Your

5  Honor.

6          THE COURT:  Okay.  And you do agree with that, I

7  guess?

8          MR. GEIST:  Your Honor, I believe here we used

9  as a starting point the prior instruction in a previous

10  case, not from Your Honor but from a different court.  I

11  think that might be an option here if you would like us to

12  go back and try again with this.

13          Our overall issue, however, with the proposed

14  instructions from Groupon, that they seem directed instead

15  of at what the law is and quoting from the cases is to say

16  this is the legal issue that the jury is being asked to

17  decide, instead focuses on what their contentions are.

18          THE COURT:  I can deal with that issue on my

19  own, but thank you for that.

20          All right.  Let's move on.

21          Invention dates, page 55.  At least in the

22  footnote, there is a dispute over whether this instruction

23  should be given with respect to the '601 or just with

24  respect to I guess the '346.

25          MS. SHAMILOV:  Both.  They should be given to

1    both because of what happened today.

2         THE COURT:  So you are comfortable with IBM's

3    proposal; is that right?

4         MS. SHAMILOV:  With respect to just adding the

5    '601 patent, yes.

6         THE COURT:  Well, let's see.  I think that was

7    the nature of the dispute here.

8         MS. SHAMILOV:  Yeah.  There are, you know, there

9    are dates, I think there are obviously the same flip issue.

10   They mentioned contention of dates.  We don't need to recite

11   those.  I think to the extent there is a dispute whether

12   '601 should be recited, we are fine with it being recited.

13        THE COURT:  I guess there was also an issue,

14   you're proposing at the very end, there must be independent

15   corroboration, and I guess that is objected to.  I guess if

16   that is objected to, let me hear from IBM.

17        MR. HARRITS:  Robert Harrits on behalf of IBM.

18        Your Honor, yes, we do object to that.  Their

19   instruction actually we believe is incorrect on the law.

20   While it is true that an inventor's oral testimony is

21   required to be corroborated, that is not the case for

22   documents.  And the cases that defendant Groupon actually

23   cites say that exclusively.

24        THE COURT:  But I don't think that -- I didn't

25   understand at least that to be the dispute.  They want me to

1    say IBM must not only put forward evidence from the inventor

2    but must independently corroborate it, as I will explain to

3    you in the following sections.

4           That is not objectionable, is it?

5           MR. HARRITS:  We find it slightly objectionable

6    to the fact that it implies that any evidence that IBM has

7    put in, whether it is a document for an inventor or

8    something else, requires corroboration, which we do not

9    believe is correct.  A document itself doesn't require

10   actual corroboration is our point with that, Your Honor.

11          THE COURT:  Okay.  Maybe that -- I was going to

12   say maybe that dispute comes up elsewhere.  I do see maybe

13   at the bottom of 57 in a footnote there is a dispute maybe

14   about whether the jury can believe the inventor's own

15   documents as corroborating evidence.  But I'm not quite sure

16   where that actually plays into.  I guess where it plays into

17   it, a dispute of actual claim language.  At 57, Groupon's

18   proposal there, would you agree that that is where this

19   dispute comes up?

20          MR. HARRITS:  I believe it comes up also in the

21   fact that the way in which the instruction on page 55

22   implies.  That what then carries over to 57, the fact that

23   you have said both, it seems to imply that both need to be

24   corroborated when that is not necessarily the case.

25          THE COURT:  Okay.  Let me hear from Groupon.

1  What is the authority for the view that an inventor can

2  corroborate, him or herself, with their own documents?

3              MR. ACHARYA:  Athul Acharya for Groupon, Your

4  Honor.

5              In fact, Brown against Barbacid case, which is

6  our cite here, says precisely the sentence annotated by

7  footnote 6:  An inventor's own unwitnessed documentation

8  does not corroborate an inventor's testimony about inventive

9  fact.

10             And I can put that up on the Elmo, if you would

11  like.

12             THE COURT:  Sure.

13             (Placed on Elmo.)

14             THE COURT:  So is that what you are relying on?

15             MR. ACHARYA:  Yes, Your Honor.

16             THE COURT:  Which case?

17             MR. ACHARYA:  Identa.

18             THE COURT:  Identa.

19             MR. ACHARYA:  Yes, Your Honor.

20             THE COURT:  Cited in your next footnote.  Let me

21  bring IBM back and address Bamra and Identa.

22             MR. HARRITS:  Your Honor, once again, Your

23  Honor, this goes to whether or not it corroborates the

24  witness's testimony.  Our issue is more of the documents

25  themselves do not require corroboration, documents

1  themselves are not required to be corroborated.  That says

2  actually at the very beginning after the case that they are

3  citing here, the physical evidence such as their notebooks

4  do not require corroboration.  We're not disputing

5  necessarily that the testimony doesn't corroborate and the

6  fact that the evidence such as the STK zero and the things

7  came in through the witness's testimony, the way in which

8  Groupon's instruction is drafted would possibly confuse the

9  jury into believing that the actual physical documents and

10  source code that is coming into evidence requires additional

11  corroboration whereas it is only the testimony that requires

12  corroboration.

13         THE COURT:  So let's break down.  Do you object

14  to the statement 57, but an inventor's own unwitnessed

15  documentation does not corroborate an inventor's testimony

16  about inventive facts?  That again was on 57.

17         MR. HARRITS:  I believe we're okay with that,

18  Your Honor.

19         THE COURT:  Okay.  And then do you -- the rest,

20  the only thing else that I think I see in dispute there is

21  you must assess the totality of circumstances, all of the

22  pertinent evidence to determine whether inventor testimony

23  and documentation is sufficiently corroborated to prove a

24  particular conception date.  Do you object to that?

25         MR. HARRITS:  I believe we would have an

 1    objection regarding the fact that it seems to imply that the

 2    documentation requires corroboration which is not what the

 3    case law indicates.

 4              THE COURT:  But you don't disagree that you must

 5    assess the totality of the circumstances?

 6              MR. HARRITS:  I believe just with regards to the

 7    testimony itself if I remember correctly.  So I think as

 8    long as it's referring to the testimony, we would not oppose

 9    that, Your Honor.

10              THE COURT:  If I strike "and documentation" from

11    that second sentence, you wouldn't have an objection to

12    that?

13              MR. HARRITS:  I believe that's correct, Your

14    Honor.

15              THE COURT:  All right.  Would Groupon object to

16    me striking "and documentation" from the second of your

17    objected to sentences?

18              MR. ACHARYA:  Yes, Your Honor.  The sentence

19    that counsel pointed to goes to the content of the physical

20    evidence and to be sure, the content of the source code

21    files, for example, might not require corroboration, but the

22    date of invention is a separate fact that is not the content

23    of the files, and Groupon's position is that it does indeed

24    require corroboration just like any other facts about the

25    invention.

1          **MS. SHAMILOV:  I think, Your Honor, there are**

2  **two quotes that may be helpful on the screen.  The inventive**

3  **right about, inventive facts must not rest alone in the**

4  **testimonial evidence from the inventor himself, but goes on,**

5  **an inventor's own unwitnessed documentation does not**

6  **corroborate an inventor's testimony about inventive facts.**

7  **Those two things go together.  You cannot just have the**

8  **inventor talk about it, that's not enough.  And you also**

9  **cannot have inventor talk about it and have documents if**

10  **they're not corroborated.**

11          **THE COURT:  If the documents themselves do not**

12  **have to be corroborated.**

13          **MS. SHAMILOV:  That's not what the statement**

14  **says on left, it says that you do not require corroboration**

15  **to demonstrate the content of the document, i.e., what the**

16  **document says, but you cannot have unwitnessed**

17  **documentation.  Basically what it says here on the right is**

18  **you cannot have testimony from the inventor get up and say I**

19  **invented it and then have a document that is inventor's**

20  **document only, that is not corroborated.  That is legally**

21  **insufficient.  You have to have something more than the**

22  **inventor's document.**

23          **In this case, for example, we have Mr. Iyengar**

24  **and Mr. Iyengar's source code which is insufficient legally**

25  **to corroborate their invention date because it's**

1    unwitnessed.

2             THE COURT:  Did you want to add anything else?

3             MR. ACHARYA:  No, Your Honor.

4             THE COURT:  Just briefly if you want to respond.

5             MR. HARRITS:  Your Honor, I think they're trying

6    to confuse the issue.  The documents do not require

7    corroboration and they do have independent corroboration,

8    both Mr. Iyengar's source code has the metadata associated

9    with it which does necessarily come from his writing.  And

10   there is other documents that Ms. Hinton brought into

11   evidence such as the PRPQ installation guide.  And they're

12   attempting to confuse the issue whether documents require

13   corroboration or the testimony needs corroboration.

14            THE COURT:  Okay.  Let's move on.  Sorry to run

15   out of time.  On page 61, there is a dispute at footnote 75

16   about Groupon having a prior invention theory.  Is there now

17   a dispute about what prior invention theory we're talking

18   about?

19            MR. ACHARYA:  Your Honor, it's Amazon's system,

20   Paul Davis' testimony of the 1995 system.

21            THE COURT:  That's the only prior invention

22   theory argument that you put forward; right?

23            MR. ACHARYA:  Yes, Your Honor.

24            THE COURT:  Is there some uncertainty about

25   that?

1    MR. HARRITS:  Yes, Your Honor.  Groupon has, in

2    fact, never actually disclosed the idea that Mr. Davis was a

3    prior inventor and prior invented this.  They have talked

4    extensively about how Amazon, it's the Amazon source code.

5    They never disclosed a prior invention theory, and we're

6    particularly concerned with the fact that they brought in

7    evidence of the Washington University website which was

8    never disclosed in anything prior to trial.

9            THE COURT:  But they're not using that to

10   invalidate the patent and we had a back and forth about that

11   and I let them do it.

12           MR. HARRITS:  I understand.  Our concern is they

13   have actually never argued that Amazon anticipates a system

14   because it was a prior invention.  They have never mentioned

15   prior invention in Dr. Weissman's report.  They never

16   mentioned 102(g) in Dr. Weissman's report.  And now they

17   have brought in a new prior invention by Mr. Davis that

18   including this instruction when Dr. Weissman never included

19   it would confuse the jury and confuse the issue.

20           THE COURT:  You're concerned that the jury might

21   think they can invalidate your patent based on the

22   University of Washington system?

23           MR. HARRITS:  And that fact that Mr. Davis

24   supposedly had that invention he brought into Amazon.  We

25   also saw testimony from the employment agreement that

1  actually says that was not Amazon's invention.  They're

2  saying Amazon invented it, Amazon invented it.  Oh, wait,

3  Mr. Davis invented it, which was never disclosed.

4          THE COURT:  All right.

5          MS. SHAMILOV:  I'm not sure I understand what

6  the issue was.  We obviously said Amazon system anticipates,

7  Paul Davis was here saying so you designed it, invented it

8  at the University of Washington and what he brought to

9  Amazon.  That is not an invalidity theory.  The expert did

10 not map it to the claims.  It's always been in the case that

11 there was someone at Amazon who wrote the code.  Paul Davis

12 was deposed, he's it, Dr. Weissman discussed it in his

13 report, Paul Davis and this, so this should definitely stay.

14         THE COURT:  Thank you.  How about indefiniteness

15 at 77, that's gone?

16         MS. SHAMILOV:  That's gone.

17         THE COURT:  So we're going to delete the

18 indefiniteness instruction.  Let's talk about the verdict

19 sheets.  I guess, and I'm grateful for this, there is really

20 not that much in dispute at this point, but I guess where to

21 place the license and exhaustion questions and whether to

22 ask for a verdict on willfulness simply based upon a finding

23 of infringement, those seem to be two of the points that

24 were still in dispute.

25         Ms. Shamilov, you got up first.

1    MS. SHAMILOV:  I'm tired of sitting, that's the

2    reason.

3    THE COURT:  I can understand.

4    MS. SHAMILOV:  So I think that in terms of the

5    placement of the licensing section, the questions, IBM's

6    verdict form just completely breaks apart the logical way

7    for the jury to deliberate is to talk about infringement,

8    what it is that the technology is doing and who is doing

9    what, and then talk about licensing, whether whatever they

10   just discussed, right, it's Facebook SDK, Google, whatever,

11   whether that was licensed or not.

12   IBM proposes that they talk about infringement

13   and then they talk about invalidity completely sort of

14   separate issues and factual decisions and then the return

15   and discuss about implied license.

16   I understand why they're doing it because they

17   don't want the jury to find the license exhaustion, they

18   want to break up the deliberation, it's just not a logical

19   flow of how we want the jury to address this issue.

20   To the extent the willfulness is at the end, we

21   would obviously prefer the willfulness to be at the end.  As

22   a compromise I'm fine moving it up if the licensing stays up

23   as well.

24   THE COURT:  Do you object to me asking the jury

25   to make a finding on willfulness as long as they find

infringement, because if I understand correctly, I read your

form as saying don't reach willfulness if you find for us,

Groupon on invalidity, or even on license.  Whereas I think

the plaintiffs even if the jury wants to invalidate all the

patents, I think they're asking for a finding on willfulness

triggered solely by a finding of infringement.

            MS. SHAMILOV:   I think we need to do it our way.

The only reason why we want the jury to answer the

willfulness question is so then Your Honor can decide

whether there should be enhanced damages.  But if the jury

found the patent invalid or the rights to assert it were

exhausted, you would never need to discuss enhanced damages.

So I think the willfulness discussion should be, you know,

if you found the patent infringed and invalid and not

exhausted so we have some damages number there.  Otherwise

what's going to happen we can have a discussion, there is no

damages and then we're talking about wilfulness on certain

patents.  We think it's a much clearer and it's unnecessary

for them to do because Your Honor would never get to the

enhanced damages, and the sole purpose of this question is

just for that.

            THE COURT:  All right.  And on damages, right

now both sides are in agreement, and I don't want to create

a dispute, but I feel I have to ask, no one is asking that

we breakdown patent by patent what the damages are.  And the

1   evidence is mostly in on this, but should I be considering

2   some sort of breakdown to maybe help everyone out on

3   posttrial motions?

4          MS. SHAMILOV:  The problem is you won't be able

5   to do that because our damages expert took the stand today

6   and left.  And he never said what his opinion is per patent.

7   So we presented the evidence with the question as it was

8   written in both verdict forms by both parties.  It's too

9   late to go and now redo it because we don't have an opinion

10  from a damages person separating by patent, so I don't think

11  we can do that, Your Honor.

12         THE COURT:  Okay.  All right.  I want to hear

13  from IBM.

14         MR. GEIST:  I'll take the last issue first.  The

15  reason they didn't put on a per patent number is they didn't

16  have a per patent number in their report.  That wasn't a

17  consequence, it wasn't in the verdict form, it's a

18  consequence of what opinions their expert offered at all in

19  this case.

20         Your Honor, the issue of requesting willfulness

21  if there is infringement, for us, if there is an issue and

22  this does end up being appealed, we don't want to have to

23  come down and do a willfulness trial only.  In our opinion

24  the safest way for everybody and not to take the Court's

25  time needlessly in the future potentially would be to get a

1   verdict now and not have to come back and instruct and try

2   another case to a jury.

3           THE COURT:  How about the placement of the

4   license related questions, the logic of where you want to

5   put it.

6           MR. GEIST:  Well, Your Honor, we put

7   infringement and then willfulness because those questions

8   are connected.  After that whether it's invalidity or the

9   affirmative defenses, I don't think that we have an issue

10   with either ordering.

11           THE COURT:  Okay.  Thank you.  Anything else on

12   this?

13           MS. SHAMILOV:  Nothing in additional, but for

14   the placement of willfulness and what the condition is since

15   it's really just for Your Honor to decide it should be at

16   the end of the verdict form.

17           THE COURT:  It does seem like there are

18   scenarios at least in which we could all save ourselves

19   having to retry willfulness if we have a verdict on it as

20   opposed to not having a verdict.  I don't know, you know, we

21   can all think of them, right, if at the end of an appellant

22   process I guess patents are found to be infringed and not

23   invalid, but they weren't I guess found infringed here, and

24   so anyway, I mean there is some scenario, why not save

25   yourself that possible new trial risk?

1    MS. SHAMILOV:  I'm actually not sure where that

2    would come up because in the scenario you just mentioned,

3    there will be no facts on willfulness.  If the jury found

4    non-infringement and somehow on appeal it got reversed,

5    clearly the jury wouldn't have found willfulness, right.  So

6    if Your Honor would like to do it that way, then the

7    willfulness I think should go at the very end.

8    THE COURT:  I'm less concerned now with the

9    placement than just whether or not what should trigger

10    asking the jury to make a finding on willfulness.  And I

11    think it really as I think about it has more to do with

12    invalidity, if they find infringement and they find

13    invalidity, do we want to know what they thought about

14    whether the infringement was willful or would we rather not

15    know.

16    MS. SHAMILOV:  I don't want to know.

17    THE COURT:  Do you oppose finding out because I

18    suppose to play it out, if I were to on a posttrial motion

19    disagree with an invalidity finding or if the Federal

20    Circuit were to, you know, disagree with an invalidity

21    finding, now we have infringement of a not invalid patent

22    and we had a trial on willfulness, but we don't know what

23    the jury thought on willfulness, that seems to be the

24    scenario.

25    MS. SHAMILOV:  I'll be fine if the willfulness

1 question goes at the end we can ask for willfulness.  I have

2 big concerns having the willfulness questioning right after

3 infringement before they deliberate on invalidity and

4 everything else because that necessarily goes into the

5 jurors sort of deliberation of whether the infringement was

6 willful.  So if we're going to remove these conditions, the

7 willfulness question has to go at the end after damages,

8 otherwise we're poisoning the jury's deliberations because

9 they won't get to the actual defense and sort of the other

10 positions of Groupon to necessarily get to the willfulness.

11 If you put the willfulness question at the end, Your Honor

12 is concerned about all these scenarios with what we do

13 after, we can remove the conditions, but that should be the

14 very last question.

15             THE COURT:  Anything further from IBM on this?

16             MR. GEIST:  Just as far as placement, in our

17 opinion it makes sense to have the two related questions

18 back to back.  So that would be our position there.  And

19 obviously we think that it makes more sense for the jury

20 when they're determining the facts on infringement to

21 continue to determine the facts of infringement and see if

22 they thought those facts made it willful or not willful.

23             Also, they just sat through a two-week trial, so

24 they'll have the facts in front of them.  It's not a

25 question of whether they're discovering new facts by reading

1    the verdict form, they're just coming to their decisions.

2              THE COURT:  So you have addressed my concerns.

3    In a moment I'll give you a chance to raise anything else

4    just briefly that you think might be pressing, but here is

5    where I think I need help.  The 30(b)(6) witnesses, I'm

6    hopeful you'll agree on the list of them, so I'm going to

7    need that from you tonight so I can plug it into the

8    instructions.

9              And then much more substantively, I'm uncertain

10   what to do with this multiple infringement question that may

11   in part turn on it, but I would at least like to be focused

12   on what was said.  I'm not sure that there needs to be

13   expert testimony specifically mapping, but I would like to

14   be able to focus on what was said, what is it that the

15   plaintiff would point me to that a reasonable jury could

16   under the law as it exist could use to find what it is the

17   plaintiffs are arguing that they could find.

18             So I need something in writing and I need it

19   tonight because I'm hopeful still to read these instructions

20   tomorrow.  I can give you all to 10:00 p.m. to give me

21   something in writing.  I hope you can build into the

22   four-hour process some sort of meeting and conferring.  If

23   you can't, get me your separate submissions by 10 o'clock to

24   the chambers email address.

25             Any questions about that?

1                 MS. SHAMILOV:  No, Your Honor.

2                 MR. GEIST:  Your Honor, how many pages would you

3       like?

4                 THE COURT:  As few as possible.  I won't put a

5       limit on it, because you can feel free to address the law,

6       too.  I have your arguments in the footnotes, but to the

7       extent you want to add something more focused based on our

8       discussion, that's fine.  But the main thing I'm looking for

9       is the portions of the evidentiary record you're relying on,

10      because none of us can remember with total clarity exactly

11      what was said.

12                MS. SHAMILOV:  I'm not sure, when would we be

13      able to get the transcript from today?

14                THE COURT:  Right.  I don't know the answer to

15      that.

16                MR. DAY:  They generally have it by 7:00.

17                THE COURT:  I don't always keep them here until

18      6:00.  How long after we all stop talking do you think

19      you'll have today's transcript even in rough form.

20                THE REPORTER:  We'll get it to you by 7 o'clock.

21                THE COURT:  Okay.  Provided we stop talking.

22                MS. SHAMILOV:  I suppose Your Honor doesn't want

23      responses to this, I'm just envisioning one party taking

24      chunks from the transcript and the other taking something

25      else and that is creating more problems for you.

1    THE COURT:  Be prepared to address it at 8:30

2    tomorrow morning.  I'll take the benefit of whatever you can

3    get me by 10:00 tonight so I can start thinking about it at

4    least.

5         I have got a few more minutes and then I'll let

6    the court reporters do their work.

7         But, any other things that are pressing that IBM

8    would want me to focus on in these instructions?

9         MR. GEIST:  Well, Your Honor, I don't know which

10   way you are going with the willfulness standard or burden --

11   standard you are applying.  We would like the opportunity to

12   argue it if you happen to be going the other way.

13        THE COURT:  Yes.  Go ahead, briefly, because I

14   probably am going the other way.

15        MR. GEIST:  Okay.  So, Your Honor, I think a

16   good summary of some of the arguments on this comes from

17   Judge Burke's decision recently.

18        THE COURT:  Right.  But I think it's entirely

19   inconsistent with your position, isn't it?

20        MR. GEIST:  I don't think that is true, Your

21   Honor.

22        THE COURT:  Sorry.  Doesn't he say that the

23   language that you want in really goes to enhancement and not

24   to willfulness?

25        MR. GEIST:  Sorry, Your Honor.  I think Your

1    Honor decided this.  I don't think I need to argue this.

2              So IBM's position is subjective willfulness is

3    the standard.

4              THE COURT:  Right.  Okay.  So I just got you

5    confused with Groupon.  Sorry about that.

6              MR. GEIST:  No problem at all, Your Honor.

7    Thank you.

8              THE COURT:  So I'm going your way.  But let me

9    hear if Groupon wants to, you know, tell me the opposite.

10             MS. SHAMILOV:  Actually, I think I'm a little

11   lost.

12             THE COURT:  Yes.  Understandably.

13             So I think the way this dispute is, is I have

14   previously instructed juries about "characteristic of a

15   pirate," et cetera.

16             On reflection, my thought now is that a lot of

17   that language really goes to enhancement, and it is for the

18   Court and probably not best given to the jury in the form of

19   an instruction because it doesn't really go to willfulness.

20             And Judge Burke, in a pretty thorough R&R

21   recently that I think we discussed maybe at the Rule 50

22   motions, right?, has said something consistent with that.

23   Though this may be the first time since he has written that

24   that I have had to decide what it means for jury

25   instructions.

1           So I'm inclined to take the plaintiff's view

2    here which would not go into characteristics of a pirate,

3    some of the other adjectives there, but if you want to talk

4    about that, go ahead.

5           MS. SHAMILOV:  No, I understand.  I guess my

6    question would be what adjective would Your Honor use in the

7    construction?

8           THE COURT:  Well, I think the plaintiff proposed

9    recklessness.

10          MS. SHAMILOV:  They're saying reckless and/or

11   willful, which I don't think is helpful because how can you

12   say it is willful if it is reckless and/or willful.  Are you

13   defining willful as willful?  So that is why some of the

14   other adjectives kind in the reckless bucket help the jury

15   understand what it is.

16          So we were obviously fine with reckless.  I

17   don't think the parties dispute that.  I don't think you can

18   say "and/or willful."

19          THE COURT:  What page is this at?

20          MS. SHAMILOV:  I'm on page 46, Your Honor.

21          THE COURT:  Thank you.  So recognizing your

22   preference is the willful, wanton, et cetera.

23          MS. SHAMILOV:  Right.

24          THE COURT:  But put that aside.  I understand

25   that is your preference.

1   MS. SHAMILOV:  Sure.

2   THE COURT:  What would be wrong if I'm not

3   inclined to go in your way with just striking "and/or

4   willful", so it was at least reckless, meaning acted despite

5   a risk of infringement, et cetera.

6   MS. SHAMILOV:  So state of mind is subjective.

7   I'm not sure "or so obvious that it should have been known"

8   should be part of this.

9   That would be one phrase.  I mean I just don't

10  know if Your Honor already came up with a phrase that you

11  would prefer going forward.  I just, there is some, you

12  know, language issues with what exactly IBM proposed, so I'm

13  not comfortable with this language instead of the pirate

14  language.  And I'm fine, you know, I understand the pirate

15  language is going in.

16  THE COURT:  Let me ask you this.  Do you think

17  between now and 10:00, you might make some progress on that?

18  MS. SHAMILOV:  Yes.  Sure.

19  THE COURT:  Okay.  Why don't you work on that,

20  given what I said about my inclination.  Okay?  And put that

21  in your submissions at 10:00 tonight.

22  Was there anything else of equally pressing

23  nature?

24  MR. GEIST:  Not unless Your Honor wants any

25  more.

1                   **THE COURT:  How about from Groupon?**

2                 **MS. SHAMILOV:  Just one very quick question.  I**

3    **just went through all the final jury instructions.  We had**

4    **an argument early on with the preliminaries of whether we**

5    **should tell the jury about a method claim, what method**

6    **claims are.  All the claims at issue here are method claims.**

7             **So now in the final jury instructions, we talk**

8    **about you have to perform the steps, but we never really**

9    **have one that talks, defines the method claim for which I**

10   **think might be helpful to them.  We propose that particular**

11   **language in the preliminaries which is a statement of the**

12   **law.  And Your Honor may want to include that.  So that**

13   **would be one thing that I think may helpful.**

14                **THE COURT:  Okay.  Does IBM have a view on that?**

15                 **MR. GEIST:  Yes, Your Honor.  I'm just going to**

16   **put up the language from the actual proposed construction.**

17                **THE COURT:  From the proposed preliminary**

18   **instruction, or is it --**

19                 **MR. GEIST:  This is the proposed final.  It is**

20   **in here.**

21                **THE COURT:  Tell me where it is.**

22                 **MR. GEIST:  Page 33.**

23                **THE COURT:  Thank you.**

24                 **MR. GEIST:  And it's the first full paragraph.**

25   **There is actually a statement that method claims are said to**

1  cover a method or a process and include each of the steps

2  recited in the claim which may be referred to as claim

3  steps.  So there is already an instruction.

4          THE COURT:  That part is agreed upon; right?

5          MR. GEIST:  That is correct, Your Honor.

6          THE COURT:  Then they propose one more sentence,

7  and you propose some additional sentences.

8          MR. GEIST:  Yes, Your Honor.  Those are

9  disputed, but my point is that instruction on what method

10  steps are, that is sort of agreed to here.  There is dispute

11  over additions to that.  And if Your Honor would like to

12  take argument now, I can do that.

13          THE COURT:  Let me just ask, Ms. Shamilov, I

14  don't have the preliminaries in front of me.

15          MS. SHAMILOV:  Yes, we didn't read it in the

16  preliminaries.  It got struck you down because there was

17  two competing proposals for different proposals and the

18  parties compromised to not argue either.  I can go back and

19  check.  This may be okay because there are other direct

20  infringement.  We're not going to read those.  We don't have

21  a separate instruction on method claims are this.

22          THE COURT:  Okay.

23          MS. SHAMILOV:  Because this is stuff in flux.

24  It's unclear.  But as you are going through it, I just

25  wanted to point out that may be something to think about.

1    THE COURT:  I'll go back and look at what you

2  all submitted with the preliminaries.

3    MS. SHAMILOV:  Sure.  And that would be the

4  disputed preliminaries are the ones that have the language

5  in there.

6    THE COURT:  All right.  Well, I think we should

7  call it a night at least for our time together.  We'll look

8  for your submissions at 10:00 o'clock tonight.  Be here at

9  8:30 tomorrow, and depending on how long the evidence takes

10  and how much there is to do on the instructions, mu hope is

11  that I will get the instructions done by some time tomorrow

12  morning and at least start reading them but worst comes to

13  worst, I'll read them at 9:00 o'clock on Thursday.

14    MS. SHAMILOV:  Just very quickly, Your Honor.

15    THE COURT:  Yes.

16    MS. SHAMILOV:  Do you expect the closings to

17  start tomorrow?

18    THE COURT:  No.

19    MS. SHAMILOV:  Thursday.

20    THE COURT:  Yes.  Let's make that very clear.  I

21  assume that would be everyone's preference.

22    MS. SHAMILOV:  Definitely ours.

23    (Ms. Stempler nodding yes.)

24    THE COURT:  And I see plaintiffs nodding also.

25    So closing would be Thursday morning, no matter

1   what happens tomorrow.  It's just a matter of I will, I plan

2   to read almost all of the instructions before the closings.

3   So depending on how tomorrow goes, I may or may not have to

4   be reading on Thursday before we get to closings.

5           Okay.  Have a good evening.  We'll see you

6   tomorrow.

7               (Proceedings adjourned at 6:02 p.m.)

8

9       I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

10

11                           /s/ Brian P. Gaffigan
                            Official Court Reporter
12                           U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25