```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
    INTERNATIONAL BUSINESS MACHINES
 4  CORPORATION,                         :  CIVIL ACTION
                                         :
 5            Plaintiff,                  :
    v                                     :
 6                                        :
    GROUPON, INC.,                        :
 7                                        :  NO. 16-122-LPS
              Defendant.                  :
 8                              - - -

 9                       Wilmington, Delaware
                        Wednesday, July 25, 2018
10                      Jury Trial - Volume H

11                              - - -

12  BEFORE:  HONORABLE LEONARD P. STARK, Chief Judge, and a jury

13  APPEARANCES:              - - -

14            POTTER ANDERSON & CORROON, LLP
              BY:  DAVID E. MOORE, ESQ.,
15                 BINDU A. PALAPURA, ESQ., and
                   STEPHANIE E. O'BYRNE, ESQ.
16
                   and
17
              DESMARAIS, LLP
18            BY:  JOHN DESMARAIS, ESQ.,
                   KARIM Z. OUSSAYEF, ESQ.,
19                 LAURIE STEMPLER, ESQ.,
                   KEVIN K. McNISH, ESQ.,
20                 MICHAEL MATULEWICZ-CROWLEY, ESQ.
                   ROBERT C. HARRITS, ESQ.,
21                 BRIAN D. MATTY, ESQ., and
                   EDWARD GEIST, ESQ.
22                 (New York, New York)

23                    Counsel for Plaintiff

24

25  Dale Hawkins                    Brian P. Gaffigan
    Registered Merit Reporter       Registered Merit Reporter
```

1    APPEARANCES:   (Continued)

2
                ASHBY & GEDDES, P.A.
3               BY:   JOHN G. DAY, ESQ., and
                      ANDREW C. MAYO, ESQ.
4
                      and
5
                FENWICK & WEST, LLP
6               BY:   J. DAVID HADDEN, ESQ.,
                      SAINA M. SHAMILOV, ESQ.
7                     PHILLIP J. HAACK, ESQ.
                      SAPNA MEHTA, ESQ.
8                     JESSICA M. KAEMPF, ESQ.,
                      ATHUL ACHARYA, ESQ., and
9                     JESSICA BENZLER, ESQ.
                      (Mountainview, California)
10
                           Counsel for Defendants
11

12

13

14

15

16

17

18

19

20

21

22                         - oOo -

23                   P R O C E E D I N G S

24              (REPORTER'S NOTE:  The following jury trial was

25   held in open court, beginning at 8:39 a.m.)

1       THE COURT:  Good morning.

2           (The attorneys respond, "good morning, Your

3    Honor.")

4       THE COURT:  Before we get back to jury

5    instructions, any issues from IBM about anything that was

6    going to happen today?

7       MR. OUSSAYEF:  No issues from IBM, Your Honor.

8       THE COURT:  And from Groupon?

9       MR. HAACK:  One short issue, Your Honor.

10      THE COURT:  Okay.  Good morning.  Come on up.

11      MR. HAACK:  Good morning.  Phil Haack for

12   Groupon.

13          Your Honor, we had one request that was a

14   demonstrative that plaintiff used during this trial.  I'm

15   going to put it on the Elmo here.

16          I requested the exhibit number be redacted off

17   of this so the jury isn't confused as to the difference

18   between an exhibit and the demonstrative that was used.

19          So you will see there is several exhibit numbers

20   on here.  Plaintiffs have sort of written off PDX next to

21   it.  But our position is it's still pretty confusing to the

22   jury.  They're not going to be clear on the difference

23   between PX and PDX.

24      THE COURT:  Well, what we're looking at is

25   PDX-1600, a demonstrative, which is a markup of PX-103; is

1    that correct?

2              MR. HAACK:  I think it's PX-1600 and then the

3    PX-103, and then PDX, the PX has been crossed off and PDX

4    written next to it.

5              THE COURT:  Okay.  So you just want this to be

6    designated as a demonstrative exhibit.

7              MR. HAACK:  And we were also asking for the PX

8    labels to be redacted to avoid jury confusion.

9              THE COURT:  Okay.  Is there an objection to

10   this?

11             MR. OUSSAYEF:  Your Honor, we don't think there

12   is any risk of confusion.  The jury saw that there was an

13   exhibit with a PX-103 and then it was marked up during

14   testimony.  We're not going to say this is an exhibit and it

15   won't go back to the jury, so we don't think there is any

16   confusion on this issue.

17             THE COURT:  Well, I think there is confusion on

18   the issue.  What is the prejudice to just obscuring the

19   exhibit labels and saying this is -- it's been given a

20   demonstrative number, hasn't it?

21             MR. OUSSAYEF:  Yes, Your Honor.  In that case,

22   we have no objection to redacting that.

23             THE COURT:  Let's redact the exhibit labels

24   and you are certainly free to say as you saw, this is PX

25   whatever but it's marked up and now it's called PDX

1  whatever.

2       MR. OUSSAYEF:  Thank you, Your Honor.

3       THE COURT:  Okay.  Is there anything else from

4  Groupon?

5       MR. HAACK:  Sorry.  One quick clarification,

6  Your Honor, since you said labels.  There is also a

7  handwritten PX on page 3 of the demonstrative.

8       THE COURT:  And I don't remember, did counsel

9  handwrite that during?

10      MR. HAACK:  I believe so.  I was not here that

11 day, but that was my understanding.

12      MR. OUSSAYEF:  Yes, Your Honor.  It was

13 handwritten because the witness was testifying that PX-1224

14 corresponded to the buy button here.  So it's a markup.

15 It's not meant to be a sticker or anything of that nature.

16      THE COURT:  Well, we will redact that as well

17 for the same reason.

18      MR. OUSSAYEF:  All right.

19      MR. HAACK:  Thank you, Your Honor.  Nothing

20 else.

21      THE COURT:  All right.  Then let's talk about

22 jury instructions.

23      We got a series of letters last night.  I don't

24 know if there has been any further meeting and conferring

25 this morning or any developments, but does somebody from IBM

```
 1    want to come up and tell me where you think the remaining

 2    disputes are that you might want to help me with?

 3                 Good morning.

 4                 MR. GEIST:  Good morning, Your Honor.  Edward

 5    Geist for IBM.

 6                 So if Your Honor is asking about --

 7                 THE COURT:  We'll stop the clock now, so go

 8    ahead.

 9                 MR. GEIST:  Thank you.  If Your Honor is asking

10    about the letters that went in, there has been no more

11    agreement between the parties since the letters went in.

12                 THE COURT:  But we are in agreement on the

13    30(b)(6) witnesses that I should list; correct?

14                 MR. GEIST:  That is correct.  The list was an

15    exchange between the parties.

16                 THE COURT:  And it seemed like you all came

17    pretty close to an agreement on the willfulness language.

18                 MR. GEIST:  I would say close, but there is one

19    particular issue we have with the proposal by Groupon.

20                 THE COURT:  Do you want to focus me on that

21    again?

22                 MR. GEIST:  That "and" here, Your Honor.  A-n-d.

23    So the "and" is incorrect.

24                 THE COURT:  Come back to the microphone so we

25    can all hear you.
```

1    MR. GEIST:  So the "and" is incorrect and not

2    included.  We provided a secondary construction if Your

3    Honor is not inclined to take our original proposed

4    instruction.

5    THE COURT:  I think it was "and/or willful" that

6    was a little bit confusing.  It was unclear what you meant

7    by that.

8    MR. GEIST:  Yes, Your Honor.  So given Your

9    Honor feels that is confusing, we provided secondary or

10   backup instruction here.  This one does not include the

11   "and" language except the "reckless" part.  Instead, it has

12   the parties agreed language up until that, and then Groupon,

13   just the Supreme Court's statement of the Seagate test.  So

14   there shouldn't be any guess about whether it's the correct

15   test.  Both parties included that in their proposed

16   instruction.  Ours doesn't include the "reckless" and which

17   we say is incorrect and not based on the case law.

18   THE COURT:  Okay.  I will hear from Groupon on

19   just the 30(b)(6) and the willfulness and then we will move

20   on to the attributed infringement.

21   I think on 30(b)(6), there is an agreement.

22   MS. SHAMILOV:  There is an agreement, Your

23   Honor.

24   So what you see here that we did in our letter,

25   the parties had an agreed language, as the Groupon proposes

1  and what we have added.  I just heard counsel say they have

2  an issue with "and."  But everything before Groupon

3  proposes, the parties already agreed, and so what we propose

4  here is following your instruction and just adopting the

5  language from Judge Burke's order.  And we can, you know,

6  remove "and."  That seems to be to be the issue.

7            THE COURT:  What is wrong with their second

8  alternative:  To prove willful infringement, IBM must prove

9  that Groupon acted despite a risk of infringement that was

10  either known or so obvious that it should have been known to

11  Groupon?

12            MS. SHAMILOV:  Yeah.  So I think there are two

13  issues with that.  One is it misses recklessness which the

14  parties agreed in our proposed construction the "reckless"

15  word to be there.  And it also, I think that the risk

16  language, right?, that is not in Judge Burke's order because

17  it is confusing.  Sure, that may be case law but it is a

18  subjective test.  So the language we proposed tracks that

19  exactly, just removes that what is the risk language.  That

20  it is unclear and unnecessary because ours says:  And

21  Groupon knew or should have known that its conduct amounted

22  to infringement of the patents.

23            THE COURT:  All right.  Anything else on that?

24            MR. GEIST:  I'll just note, Your Honor, that the

25  "and" was not agreed.  I'll show you the instructions as

1    they went in.

2              The "and/or willful," Your Honor, is right here.

3    That was the "and/or willful" was part of IBM's proposed

4    construction that Groupon objected to.

5              THE COURT:  All right.  And Groupon requests

6    that I change all the references to direct infringement to

7    simply be infringement.  Do you oppose that?

8              MR. GEIST:  No, Your Honor.

9              THE COURT:  Okay.  Then we will make that

10   change.

11             All right.  Then let's talk to attributed

12   infringement.  We'll here from IBM first.

13             And I guess let me start, where I'm seeing the

14   issue is I need to understand what claim limitation is it

15   that a reasonable jury could find that Groupon did not

16   perform but that a user, an enduser using the phone or their

17   mobile device or a computer performed at the direction and

18   control of Groupon.  Do you agree that that is the

19   appropriate question I should be asking in resolving this

20   dispute.

21             MR. GEIST:  Your Honor, with the caveat that the

22   direction and control test has been clarified through Travel

23   Sentry to have an explanation that is implicated in our

24   memo.

25             THE COURT:  We can come to that explanation in a

 1    moment.  But focusing on my question then, tell me which

 2    claim limitation it is or claim limitations that you say a

 3    reasonable juror, based on evidence presented in court,

 4    could reasonably find Groupon didn't do this, the enduser

 5    did, and they did it at the direction and control of

 6    Groupon.

 7              MR. GEIST:  Your Honor, we turned to identifying

 8    in our memo the storing step that has been in the '967

 9    patent.

10              THE COURT:  So, for instance, I have claim 1 of

11    the '967 in front of me.

12              MR. GEIST:  Sorry, Your Honor.  '849.

13              MR. OUSSAYEF:  No, both.

14              MR. GEIST:  And the '967.

15              THE COURT:  We can do whichever within you want.

16    Which one do you want to do?

17              MR. GEIST:  '967, Your Honor.

18              THE COURT:  '967, claim 1?

19              MR. GEIST:  Sorry, Your Honor.  I'm getting a

20    copy of the patent.

21              THE COURT:  That's fine.

22              MR. OUSSAYEF:  So, Your Honor, there is, in the

23    '967 patent, there is not an explicit storing step.  It

24    says:  The objects being retrieved from the objects stored

25    in the respective reception system or if unavailable from

1    the objects stored in the respective reception system, then

2    from the network.

3              I'm reading towards the end of element 1(a).

4    That I believe has already been decided in the Priceline

5    case.  That is not an active step.  So the more relevant

6    element here we're talking about is the '849 patent which

7    has a selectively storing element.

8              So if we look at the '849 patent, and we look at

9    claim 1, element 1(c) is selectively storing.  So that is

10   the claim element which we have substantial evidence for in

11   the record.  So to be clear, IBM's primary argument is that

12   Groupon directly infringes by performing the storing step or

13   dictating the performance of the storing step under SiRF.

14             But as a backup, in eventuality that Groupon

15   argues it is the users that do that, then our argument is

16   that there is direction and control of the users performance

17   of the selectively storing step here.

18             THE COURT:  And so I really didn't get from

19   the letter last night what the evidence is from which a

20   reasonable juror could conclude that they could map element

21   1(c) of the '849 patent to the evidence and conclude, hey,

22   Groupon doesn't do this but the enduser does selectively

23   store advertising objects at a store established at the

24   reception system.  So help me see where that is.

25             MR. OUSSAYEF:  Okay.  So, Your Honor, the

1    evidence is the following:

2          First, there is evidence that the -- so the

3    direction or control step has been construed or has been

4    interpreted by Akamai and then Travel Sentry as to a

5    question as to whether Groupon conditions a benefit upon

6    performance of the step, on whether Groupon sets the manner

7    and timing of that step.

8          So first let's break down those steps.

9          First is the benefit.  Do the users benefit

10   from caching?  Yes, the users do benefit from caching.

11   Dr. Schmidt testified the users benefit from caching because

12   when the user has caching enabled, in that situation, the

13   user does not have to go to the network to get the content,

14   so they get it more quickly.  That is the benefit.

15          What is the condition here?  The condition

16   here -- and I'm looking at the middle paragraph here on page

17   2 of the memo, in bold here:  Groupon conditions the receipt

18   on that benefit on the user having caching enabled.

19          So if the user has caching enabled, then the

20   cache control directives make caching actually happen.  So

21   to the extent that is interpreted as the user doing the

22   storing step as opposed to Groupon setting the storage

23   parameter and controlling the storing step, then in that

24   scenario, the users -- Groupon conditions the benefit of

25   caching on users actually having caching enabled.

1    So that is kind of the first prong of Akamai,

2    that Groupon conditions the benefit of caching, the faster

3    speed, on the users performing the storing step under

4    Groupon's interpretation.  That, you know, when the cache

5    control directives are sent down and the user has caching

6    enabled, that is when caching occurs and the user gets a

7    benefit.

8    So that's the conditioning of benefit.

9    So next the question is does Groupon control the

10   manner and timing of that caching and the answer there is

11   there is substantial evidence here as well.  And that is the

12   next paragraph in this memo here.  And the evidence here

13   which we show is that there is evidence of the manner

14   because the particular images that gets sent down to the

15   user's computer with the cache control directives that tell

16   the user's computer to cache are decided by Groupon.  So for

17   every image there is a cache control directive associated

18   with that image that says cache this, store this.

19   And Groupon controlled the timing of that

20   because -- and this is towards the bottom of this paragraph,

21   Dr. Schmidt explains that the cache control header describes

22   a specific directive, and also how long that advertising

23   object will be stored at the user's computer.  So all the

24   parts of Akamai are met, there is a benefit, there is a

25   condition of that benefit on having caching enabled, there

1  is a control over the manner and the timing in which that

2  storing step happens by Groupon.

3          And furthermore, I think it's important that

4  Travel Sentry, which is a recent case from the Federal

5  Circuit in 2017, concerns a situation in which the Federal

6  Circuit says we need to take a broad view over what the

7  condition is, what the benefit is and what the activity in

8  question, i.e., here caching is, in order to ensure we're

9  really giving meaning to the direction and control test.

10          THE COURT:  If the benefit is simply that the

11  service works slightly faster, isn't that too broad of a

12  view?

13          MR. OUSSAYEF:  Not at all, Your Honor.  In fact,

14  in the Travel Sentry case which involved locks on luggage

15  and the fact that the TSA, the Travel Security Agency, got a

16  benefit from using a lock which they didn't have to break

17  the lock, they could just open it with this invention, the

18  benefit there was that the TSA would have a better

19  reputation in the world which is pretty ephemeral, but still

20  the Federal Circuit found that idea of the benefit was

21  sufficient.

22          Here I would say the benefit is huge here.  We

23  have testimony from Aileen Sandridge, their witness that we

24  played by deposition who testified that reducing latency

25  improves the experience for users.

1                    And furthermore, we have evidence from documents

2     in Groupon saying, and Your Honor might remember this, that

3     when the users don't see a fast experience, the whole brand

4     is tarnished because they're waiting there to try to make it

5     load and they're like this website is not a good website.

6                    Furthermore --

7                    THE COURT:  It is true, however, that

8     Dr. Schmidt did not opine even as an alternative if you

9     think that Groupon doesn't selectively store, you should

10    find my further opinion is that the user does it, that's

11    correct, isn't it?

12                   MR. OUSSAYEF:  He did not explicitly say that

13    infringement is an alternative to the user.  But by the same

14    token, the evidence here supports the fact that users could

15    be found to be under the direction of control of Groupon.

16                   I would further submit, Your Honor, this is

17    similar to the license issue.  The license issue, we have no

18    evidence, expert testimony at all on the entire issue of any

19    claims in this case.  And yet Groupon argued yesterday that

20    that should still go to the jury based on, you know, two

21    minute cross-examination of one of our witnesses.  Here we

22    have plenty of expert testimony.  And even though he might

23    not have said the explicit words of attributed infringement,

24    I would say saying those magic words in front of the jury is

25    not the question, the question is whether the evidence

1    supports the law.

2              THE COURT:  Thank you.

3              Ms. Shamilov.

4              MS. SHAMILOV:  Your Honor, there are two issues

5    here.  One is the last question that you just asked which

6    counsel didn't really answer is where did the expert or

7    anyone at trial here say Groupon could have done the

8    selective storing, but if it doesn't users do it in this

9    way.  There is nothing on that front.

10             And second issue is the law, the way that

11   counsel just told you what the law says, that's just wrong.

12   The benefit here is the Travel Sentry case that they're

13   relying on, there has to be evidence that a third party

14   hoping to obtain access to certain benefits can only do so

15   if it performs certain steps identified by the defendant,

16   and does so under the terms prescribed by the defendant.

17             So it is not enough to say if you use this

18   system, you get some benefit of it.  To me the joint

19   infringement standard under Akamai, what has to happen and

20   what they have to show is that Groupon tells its users, you

21   can use my system, but you can only use my system if you

22   enable caching, if you selectively store, right.  And the

23   Travel Sentry case goes even further and just says the mere

24   guidance or instruction is insufficient to show conditioning

25   under Akamai, the conditioning of the benefit.  So we don't

1    even have here an instruction or a guidance that Groupon

2    does.   There is no evidence here that was put forth in front

3    of the jury that says Groupon tells customers you can only

4    use the system.   It has to be an agency or relationship for

5    all of this to work.   It is not enough that the system has

6    some benefits of to it.

7                    THE COURT:   Are you saying the only benefit can

8    be you can use Groupon or you can't use Groupon?

9                    MS. SHAMILOV:   No, what I'm saying it has to be

10   a condition that Groupon tells its customers that to get the

11   benefit, whatever benefit you get from using my system, you

12   will only get this benefit if you perform this specific step

13   of the claim element.

14                   THE COURT:   Can being able to use Groupon more

15   quickly, can that potentially be the type of benefit that

16   would satisfy the test?

17                   MS. SHAMILOV:   No, the benefit on its own is not

18   enough.

19                   THE COURT:   I understand that.   But just looking

20   for a moment at the benefit part, could faster access

21   potentially be a satisfactory benefit?

22                   MS. SHAMILOV:   In the hypothetical if there is a

23   situation where the user said, the system provider says if

24   you do this particular step, my system will run faster for

25   you, so to get faster performance, you have to do this

1  particular step and if you don't, you will not get the

2  benefit of faster performance.  Sure, in that situation I

3  think that will work.  But that's not the situation here.

4           THE COURT:  Right.  So which part of that is

5  missing here?

6           MS. SHAMILOV:  What's missing here is we have no

7  evidence whatsoever, or even suggestion that Groupon tells

8  its customers to enable caching, for example, taking the

9  specific factual example that they say is really the only

10  thing at issue.  They say the selectively storing is

11  performed by having data and images stored in cache, the

12  cache, the cache is enabled, then Groupon system stores it

13  in cache.  But what's missing here is there is nothing that

14  -- Groupon does not tell its customers enable caching.

15  There is nothing that -- Groupon does not set any condition

16  or any requirement for the customers to do anything to be

17  able to use Groupon system and then get whatever, faster

18  performance.

19           THE COURT:  So are you saying there is evidence

20  from which the jury could find that if the user enables

21  caching, they will get the benefit of faster access to

22  Groupon, but there is no evidence that Groupon ever tells

23  the end users that?

24           MS. SHAMILOV:  Correct.  So what we're saying is

25  if the user enables caching, then the system will cache and

whatever benefits which really relates only to the damages

issue, you know, the system will run faster.  But Groupon

does not direct.  So if the user enables caching, their

argument and the only evidence they put forth is that

Groupon infringes, because Groupon stores stuff in that

cache.

There is no where in the evidence that says

third parties store anything in the cache.  Their whole

theory of infringement and evidence before it was if the

user enables caching, it is Groupon that stores information

in the cache.  And to meet the joint enterprise, there must

be that specific directive.

That word condition, they are also playing --

the word condition in all of these lines of cases means I am

conditioning your use of my system and your ability to

benefit from it under your performance of this particular

step and that step is the step of the claim.

It is not enough to say that in the system, it

said if something is enabled, if caching parameters are

enabled, then I'm going to perform this storing step.  That

is not the condition language in the law.

The condition has to be I am conditioning your

performance, right, your ability to benefit from my system

on your specific performance of the claimed step.  That is

what happened in Travel Sentry, that is what happened in

1    Akamai.  In both of those situations there were contractual

2    obligations --

3            THE COURT:  Does the end user have to be aware

4    that they're being directed and controlled to do that?

5            MS. SHAMILOV:  There has to be an instruction,

6    yeah, there has to be an instruction that tells the user,

7    otherwise, the condition has to be you must perform X and if

8    you don't perform X, you will not get benefit Y.  If they

9    are we're missing that particular directive, if we're

10   missing that particular instruction, then Groupon is not

11   directing and controlling the action.  There still has to be

12   an agency relationship.  The law did not change.  Right?

13   You have to have an agency relationship between users and

14   Groupon.  But even setting that aside, they cannot point to

15   anywhere in the record where anyone says that it's third

16   party, i.e., users that store, right, that selectively

17   store.  That element is not there.

18           We provided an Exhibit A where for that

19   selectively storing where Dr. Schmidt said Groupon does

20   this, Groupon stores, Groupon performs this step.  So we're

21   missing multiple things.  We're missing one that users

22   actually selectively store.  We're missing that Groupon

23   tells users you will only benefit, but you can only use my

24   system if you selectively store and if you don't selectively

25   store, you won't benefit.  We're missing that chunk.  And

1    we're missing anything from which the jury can determine

2    there was some agency relationship, which is required,

3    right, under Akamai and Travel Sentry.

4              And Travel Sentry did not change the law.

5    Travel Sentry really just applies Akamai and this common law

6    attribution language that they're adding from the copyright

7    law, that is not what Travel Sentry did.  The law is what

8    Akamai said, Travel Sentry applies it.  Travel Sentry

9    consistently said, even the mere guidance or instruction to

10   do so is not enough.

11             We don't have any evidence of any guidance or

12   any instruction.  There is no evidence that Groupon said

13   anything to its customers about Web browsers caching being

14   enabled or disabled.

15             THE COURT:  Okay.  Thank you.

16             MR. OUSSAYEF:  Your Honor, it is simply untrue

17   that there needs to be an agency relationship here.  This is

18   the Akamai case here.  It says to determine if a single

19   entity directs or controls the acts of another, we consider

20   general principles of vicarious liability.  In the past we

21   have held that an actor is liable for infringement if it

22   acts through an agent or contracts with another.  We

23   conclude that on the facts of this case, liability under

24   271(a) can also be found when an alleged infringer

25   conditions participation or activity or received a benefit

1  upon performance of step or steps of a patented method and

2  establishes the manner or timing of that performance.

3          This is an alternative test attributable

4  infringement, not just joint contractual agency

5  relationships, but also receiving a benefit.  The other

6  thing that's important to realize in this Akamai test here

7  is that it's performance of step or steps of a patented

8  method.  So contrary to what counsel of Groupon is arguing,

9  it's not whether users can use Groupon service or not by

10  having caching enabled, it's whether performance of a step

11  or steps of a patented method, i.e., storing is performed.

12  That is the key thing to look to.

13          Next on the issue of whether there is actually

14  an instruction to do it or a directive, the language

15  Groupon's counsel used is there is no directive here.  But

16  Dr. Schmidt explained and I quote, the cache control header

17  describes the specific directive to cache.  That's as clear

18  as it gets.

19          And finally, on the issue --

20          THE COURT:  Well, there is no awareness by the

21  user that they're being directed, is there?  There is no

22  evidence of that.

23          MR. OUSSAYEF:  Nor is there a requirement under

24  the law that there needs to be an awareness of the

25  directive.  In the instance -- so caching is enabled by

1    default.  And in the instance where the user goes in and

2    decides to disable caching, they would have to be aware of

3    what caching does.  That's the only way you would know

4    what's going on.

5              Furthermore, on the point that well the user

6    does not -- there is no evidence that the user actually does

7    it, actually there is evidence on the transcript, this is

8    Dr. Weissman, where he discusses that images would be cached

9    if a user enables caching.  That's Dr. Weissman saying I

10   don't think Groupon does the storing step, I think the users

11   do it instead, which is exactly what we're talking about.

12             And furthermore, Groupon's own counsel argued

13   whatever cache control headers Groupon sets will only be

14   effective if the user is caching.  The user decides that.

15             So in the situation in which the user is the one

16   performing the storing step, under Akamai's direction or

17   control test, not the joint liability, the contractual one,

18   but under the test which talks about conditioning a benefit

19   on performance of a step, it is clearly met by the evidence

20   right now.

21             THE COURT:  What is the evidence that Groupon is

22   instructing an end user with respect to cache, is it all

23   just -- I guess your argument is it's all just happening in

24   the code, Groupon isn't consciously doing it other than they

25   put it in the code.  The user isn't consciously aware that

1  they're being directly controlled, but their computer is

2  being directed and controlled and that's enough.

3        MR. OUSSAYEF:  Well, certainly, Groupon is aware

4  of this.  And there is testimony at this trial that Groupon

5  explicitly sets the cache control parameter that is sent

6  down to the user.

7        Furthermore, if we think about the way the

8  browser is configured, by default, caching is enabled, and

9  the only situation which is disabled is when the user

10  explicitly goes into the setting and decides to disable it.

11  So it doesn't seem to make sense that the user would not be

12  aware of what caching directions are doing if they decide to

13  fiddle with the settings themselves and turn it off.  In

14  that situation, they're clearly aware, too.

15        So everyone is aware of what is going on but,

16  furthermore, there is no requirement in the case law that

17  there needs to be a separate instruction separate from the

18  cache control parameters, some kind of discussion between

19  the parties about this kind of behavior.

20        THE COURT:  All right.  Well, we'll hear from

21  Groupon one more time.

22        MS. SHAMILOV:  So the issue is not whether there

23  is something in Groupon's code that sets control parameters

24  to store information and caching.  The issue here is does

25  Groupon tell its users enable caching?  You must enable

1    caching in your web browser.  Because if you do not do that,

2    I won't be able to cache; right?  It is not the issue of

3    store; right?  They has to be an instruction from Groupon to

4    users to do something, enable caching.  So counsel gets up

5    and says, well, you cannot -- you know, if enabled by

6    default and all that.  That is their argument that Groupon

7    does it, right?  That is the direct infringement.  There has

8    to be something.

9             The issue here is, is there evidence where

10   Groupon requires its customers or users to enable caching to

11   be able to use the system.

12            And I never thought there has to be contractual

13   relationship.  There doesn't have to be contractual

14   relationship.  The law is clear, Akamai, Travel Sentry, you

15   don't have to have a contract, but you have to have an

16   instruction requiring another party to say you have to do X,

17   which is what the claim requires, and if you don't do X, you

18   will not benefit from using my system.  There is no evidence

19   on that front at all.

20            THE COURT:  Well, why isn't it the cache control

21   parameters that Groupon puts in its source code?

22            MS. SHAMILOV:  So the cache control parameters

23   only work when the caching is -- when the system caches.  So

24   that just happens by Groupon's code.  That is direct

25   infringement argument.  There is no joint infringement

1    there; right?  They just say if the control parameters are

2    set, stuff gets cached.  That is how it works.

3              THE COURT:  Why couldn't a reasonable juror view

4    that as this is Groupon directing and controlling endusers

5    that if they want benefit of faster access to Groupon, they

6    at a minimum better not turn off caching.

7              MS. SHAMILOV:  But the cache control parameters

8    has nothing to do with whether caching is enabled and

9    disabled.  The setting of the cache control parameters that

10   we talked about at trial is not directing whether the users

11   for caching is enabled or disabled.  That is not what

12   caching control parameters do.  The caching control

13   parameters simply say store this image in X and store it for

14   this length of time.  It doesn't require caching to be

15   enabled or not.  So the user disables caching, those

16   accurately parameters will still be there.  It's just

17   nothing will happen.

18              So what needs to happen, so the control

19   parameters do not require caching to be enabled for anything

20   to be cached, right?  So the user, for that, if Groupon

21   wanted to make sure everything is cached, it would have to

22   tell the customers you cannot visit our website.  If you

23   want to, you know, perform well, you must enable caching.

24   That is the instruction.  There has to be an explicit

25   instruction, and that is what the case law requires.

1   Telling another party to do something, right?, specifically

2   do something.

3          There is nothing that you -- Groupon does not

4   require its users to do anything.  It just says, right?  It

5   just has a system out there, users can go visit it, users

6   can disable caching, users can do whatever.  They can

7   disable cookies, right?  There is no -- Groupon does not

8   require endusers to do anything at all to be able to visit

9   the website and use it.

10          THE COURT:  Okay.  Thank you.

11          If you are going to be brief, I'll give you one

12   last time.

13          MR. OUSSAYEF:  Just briefly, Your Honor.

14          I think that last statement by Groupon's counsel

15   shows the issue here.  The test is not whether Groupon

16   prevents users from accessing its website based on the cache

17   control parameters.  The test is whether the performance of

18   that step is what is being conditioned to get that benefit,

19   and the cache control directives show that.  They're called

20   directives, so they direct and control the users actions and

21   it meets the Akamai test four square.

22          THE COURT:  All right.  Thank you.  I know that

23   the jury is all here, so I can figure out how we're going to

24   proceed today.  Let's talk about where we think we are.

25          We are on cross; correct?

1    MR. HADDEN:  Yes, we have a little more cross of

2  Dr. Schmidt.

3    THE COURT:  And then we are still expecting to

4  bring back the damages expert.

5    MR. DESMARAIS:  Yes.  Very briefly.  Very

6  briefly.

7    THE COURT:  Have you decided yet if you will

8  have anyone else?

9    MR. DESMARAIS:  We're not going to call anyone

10  else.

11    THE COURT:  Are you going to call anyone?

12    MR. HADDEN:  We're going to call Dr. Weissman,

13  very briefly.

14    THE COURT:  And I'm sure you have seen the

15  updated time.  We're at the moment holding an hour in the

16  bank --

17    MR. DESMARAIS:  Yes.

18    THE COURT:  -- for plaintiffs, which would mean

19  we're going to, we would plan to cut you off at 52 minutes,

20  as best we can tell.

21    MR. DESMARAIS:  We're going to come in under

22  that, Your Honor.

23    THE COURT:  You're going to come in under that.

24    MR. DESMARAIS:  Yes.

25    THE COURT:  All right.  You are not asking to

 1    make a withdrawal from the bank.

 2              MR. DESMARAIS:  I'm definitely not taking a

 3    withdrawal from the bank.  What I'm hoping to do is add

 4    15 minutes.

 5              THE COURT:  All right.  And I'm guessing --

 6              MR. HADDEN:  My bank is full.

 7              THE COURT:  You are going to be fine, I'm sure.

 8              I think what is going to happen is we will have

 9    at least many of the jury instructions, if not all of them,

10    for you some time this morning so that ideally you can have

11    some member of your team reviewing them particularly for

12    typos and if there is anything new that you see in there

13    that is objectionable so we can take that up at a break

14    before we print them, but I'm still hopeful of starting to

15    read them to the jury some time today, but I am only

16    available until 1:00.

17              So we will be in recess.

18              (Brief recess taken.)

19              *      *      *

20              (Proceedings reconvened after recess.)

21              THE COURT:  All right.  So I was going to tell

22    you about the jury instructions for a couple of minutes.

23    Then we'll just need time for this.  And we're making copies

24    of.  Momentarily, we'll have two copies for each side so

25    that you can hopefully look at them.  And, again, I'll give

1   you a chance to tell me if there are any new objections or

2   any typos before I start reading them to the jury hopefully

3   later today.

4           Hopefully, non-controversially, we added the

5   30(b)(6) witnesses you hopefully agreed on.  We changed

6   references from direct infringement to just be infringement.

7           In terms of willfulness, we've gone with the

8   modification of Groupon's proposal from yesterday.  We've

9   deleted "and" and replaced it with "that is."  So we will be

10  telling the jury, we will be mentioning "reckless," and then

11  we will say "that is Groupon knew or should have known that

12  its conduct amounted to infringement of the patent."  I

13  think that is a correct statement of where the law is and is

14  not confusing to the jury.

15          With respect to attributed infringement, I want

16  to at least say I think this is a difficult question.  It's

17  a tough call.  We've gotten several letters, lots of

18  argument over multiple days, and I have struggled with it,

19  but ultimately I've decided to go with something closer to

20  what IBM has proposed, meaning that there is going to be an

21  instruction on attributed infringement.

22          We're willing to let plaintiff make the argument

23  that, you know, an enduser may reasonably be found to have

24  performed the selectively storing step.  If the jury finds

25  that Groupon did not perform it, it would have been, I think

1    it's fair to say, far far better for the jury and for me if

2    we actually had an expert way out and clearly mapped as an

3    alternative the performance of this technical claim step on

4    to an enduser.  It's acknowledged by all that that did not

5    happen.  That has made it difficult, but I still do think

6    that a reasonable juror, taking all the evidence in a light

7    most favorable to the plaintiff, even in a contingent

8    manner, applying the law as I understand it to be, and as

9    will be set out in the instruction, could find that the user

10   gets the benefit of faster access to Groupon and that that

11   access is conditioned on having caching enabled at the

12   user's device and that Groupon directs and controls that.

13            The way they get to that is tricky because

14   it's nothing that Groupon is saying, that is, Groupon as an

15   individual or as a -- no person is saying this to a person

16   at the user level.  But a reasonable juror, again, taking

17   everything completely in the light most favorable to the

18   plaintiff, could say that Groupon's source code is talking

19   to the enduser's device and directing and controlling that

20   if you want this benefit of faster access, you have to

21   enable caching.

22            Again, it's a highly technical theory.  No

23   expert has talked about it in front of the jury.  But under

24   the law, and under the standard that I think I should be

25   applying, I am going to instruct the jury on this.

1    So are there any questions about any of that

2  before we bring the jury in?

3    MR. DESMARAIS:  No, Your Honor.

4    THE COURT:  Any questions?

5    MR. HADDEN:  No, Your Honor.

6    THE COURT:  All right.  We'll bring the jury in.

7  And while we're doing that, we can pass out to each side two

8  copies of the instructions.

9    (Jury returned.)

10    THE COURT:  Good morning, ladies and gentlemen

11  of the jury.  Welcome back.

12    Good morning, Dr. Schmidt.

13    THE WITNESS:  Good morning, sir.

14    THE COURT:  You, of course, are still under

15  oath.

16    THE WITNESS:  Yes.

17    ... DR. DOUGLAS CRAIG SCHMIDT, previously sworn

18  under oath, was examined and testified further as follows ...

19    THE COURT:  Ladies and gentlemen, I know we're

20  starting late, but we are on the schedule that I had

21  outlined yesterday.  And we are going to finish the evidence

22  some time this morning, and I probably will be able to begin

23  at least reading the instructions to you.  But in any event,

24  you will be done by 1:00 today.

25    All right.  Good morning, Mr. Hadden.

1    MR. HADDEN:  Good morning, Your Honor.

2    Good morning, Dr. Schmidt.

3    THE WITNESS:  Good morning, Mr. Hadden.

4    CROSS-EXAMINATION (Continued)

5    BY MR. HADDEN:

6    Q.    Yesterday, when you testified, you didn't dispute,

7    did you, that Sunada described runtime account creation?

8    A.    That is correct.

9    Q.    And what you disputed was that Sunada operated in a

10   federated computing environment; is that right?

11   A.    That's correct.

12   Q.    And you did that based on the fact that Sunada in the

13   patent application described the invention as a system; is

14   that correct?

15   A.    That was one of the reasons.  That's correct.

16   Q.    And you highlighted the underlined system various

17   places in the abstract of Sunada and other places?

18   A.    That's correct.

19   Q.    And that's what's shown in the slide here?

20   A.    Yes.

21   Q.    Now, you don't dispute, do you, that the '346 patent,

22   Dr. Hinton's patent, described a federated computing

23   environment, do you?

24   A.    That's correct.

25   Q.    You don't dispute that?

Schmidt - cross

1   A.      Dr. Hinton's patent discloses that, yes.

2   Q.      And if we look at the first sentence of the

3   background of Dr. Hinton's patent, can you just read what is

4   highlighted there?

5   A.      The present invention relates to an improved data

6   processing system.

7   Q.      The fact that Sunada described its invention as a

8   system doesn't mean that it doesn't operate in a federated

9   computing environment, does it, Dr. Schmidt?

10  A.      Yes, the way he describes his system does not talk

11  about federated computing environment, it gives examples of

12  a system that can run on a single server and he never

13  mentions trust or anything else about federated computing

14  environment.

15  Q.      Let's look at what you pointed to indicate that it

16  runs on a single server.  You have the highlighted language

17  in red, it says may be included in the same server?

18  A.      That's right.

19  Q.      You didn't highlight the language right before that,

20  did you?  And what does that say, Dr. Schmidt?

21  A.      The above mentioned example shows the Web

22  applications 2 and 3 and the SSO server 1 as separate

23  constitutions.

24  Q.      Right.  So right above what you highlighted, Sunada

25  actually says that the identity provider and the service

Schmidt - cross

1    provider could all be separate; right?

2    A.    They say they could run on separate servers, that's

3    correct.

4    Q.    In fact, that's what Sunada shows in figure 2, isn't

5    it?  If we look at figure 2, this is the figure that's

6    Sunada is talking about in that language we just saw, it

7    shows an SSO server over here; right?

8    A.    That's correct.

9    Q.    And that's the same as the identity provider in this

10   system; right?

11   A.    That's correct.

12   Q.    And then it has a Web application 2 up here; right?

13   A.    Yes.

14   Q.    And that's the same as the service provider in this

15   system; right?

16   A.    That's correct.

17   Q.    And it's got another Web application down here,

18   number three, right, that's another service provider?

19   A.    That's correct.

20   Q.    And all those service providers can talk to the

21   single-sign-on server to perform single-sign-on operations;

22   right?

23   A.    Yes, within a single system, that's correct.

24   Q.    And the clients over here are the users of this

25   system who can benefit from that single sign on through

Schmidt - cross

1  these Web applications and the identity provider; right?

2  A.     Through the Web applications and the SSO server,

3  that's correct.

4  Q.     And doesn't Sunada explain as we see here, they are

5  communicable with many clients, many Web applications, and

6  many other servers and the like; right?

7  A.     That's correct.

8  Q.     So there --

9  A.     In a single system.

10  Q.     There can be a whole lot of these different Web

11  applications, right, different websites, they can all talk

12  to the single-sign-on server; right?

13  A.     Yes, within a single system.

14  Q.     And, in fact, Sunada explains this network in the

15  middle can be the internet; right?

16  A.     That's correct.

17  Q.     So what Sunada is describing is a whole bunch of

18  websites communicating over the Web to talk to an identity

19  provider and a bunch of users?

20  A.     Correct, in a single system.

21  Q.     That's not on a single computer, is it?

22  A.     That's not a single computer, it's in a single system

23  as he describes.

24  Q.     We talked a bit about Spinning the Web yesterday.

25  And as Dr. Weissman explains, this is a Web page template

Schmidt - cross

1    from the book Spinning the Web.  Is that true, Dr. Schmidt?

2    A.       That is correct.

3    Q.       And each of the continuations in this template has

4    one of these hashmark, hashmark, hashmark symbols.  Is that

5    true, Dr. Schmidt?

6    A.       That's correct.

7    Q.       In Spinning the Web, there is a program that replaces

8    each of these hashmark, hashmark, hashmark symbols with the

9    client ID for the user; isn't that right, Dr. Schmidt?

10   A.       That's correct.

11   Q.       In fact, the actual code which is included in that

12   book, this is a part of that code, the program called c.pl;

13   isn't that right?

14   A.       That's correct.

15   Q.       The code here we're showing in the slide is the

16   actual lines of code that does that, putting that state

17   information into each of those hyperlinks; isn't that right,

18   Dr. Schmidt?

19   A.       That's correct.

20   Q.       You talked with IBM's lawyer about '967, claim 1.

21   And you testified that these elements for generating at

22   least a first partition and the second partition that the

23   claim language doesn't say it's on the screen.  Do you

24   remember that testimony?

25   A.       I said the word screen doesn't appear in claims B and

Schmidt - cross

1   C.

2   Q.      But screen clearly appears in the element A, doesn't

3   it?  The screen display including a plurality of partitions;

4   isn't that correct?

5   A.      The term screen display is unconstrued.

6   Q.      I'm not talking about whether it's construed or not,

7   but it's describing that the partitions are partitions of

8   the screen display; right?

9   A.      It says that the screen display includes a plurality

10  of partitions.

11  Q.      And the partitions that are being called out in B and

12  C are some of those plurality of partitions of the screen

13  display; right?

14  A.      Elements B and C talk about generating a first area

15  or first partition for presenting applications in a screen

16  of display, that's correct.

17  Q.      It doesn't say in a screen of display, it says the

18  screen display including a plurality of partitions; right?

19  Plurality means more than one; right?

20  A.      Plurality means more than one.

21  Q.      So you have to have more than one partition on your

22  screen display according to element A; right?

23  A.      No, it's simply saying that the screen of display,

24  the screen display, those terms are not construed so they

25  mean essentially the same thing, that you have to be able to

1   have a first partition that's generated --

2   Q.      You're not answering my question.  I'm not asking

3   about B or C, I'm asking about the very clear language that

4   says the screen display including a plurality of partitions.

5   Do you see that language?

6   A.      I do.

7   Q.      We just agreed that plurality means more than one;

8   right?

9   A.      There are first area and second area.

10  Q.      That's not my question.  You agree that plurality

11  means more than one?

12  A.      I do.

13  Q.      It says here the screen display including more than

14  one partition, isn't that what it says?

15  A.      It says the screen display including a plurality of

16  partitions, that's what that says.

17  Q.      Right.  And of that plurality, that more than one

18  partition, it has to also include a first partition and a

19  second partition; right?

20  A.      That's not what the claim elements B and C are

21  saying.

22  Q.      So you're telling me that the first partition in

23  claim B is not one of the plurality of partitions in the

24  screen display in claim A, is that your testimony?

25  A.      I'm telling you the first partition, the first area

Schmidt - cross

1   is generated on a screen display, I agree with that.

2   Q.      Very simple question.  We have a screen display

3   including a plurality of partitions.  Then we call out a

4   first partition, step B.  Isn't it true, Dr. Schmidt, that

5   the first partition is one of those screen display

6   partitions that's described in step A?

7   A.      No.  The claims say what the claims say.  They're

8   construed in a certain way.  I have been consistent in my

9   analysis of how the claims map to what Groupon said in their

10  testing.

11  Q.      It's your testimony that a first partition is not one

12  of the screen display partitions described in step A?

13  A.      The first partition appears in the a screen display.

14  Q.      And it's one of the plurality of screen display

15  partitions described in step A, isn't it?

16  A.      So in B and C, we see that there are two areas, two

17  partitions construed as this area by the Court, so there are

18  two areas, and the code is able to generate the first

19  partition or first area for presenting applications, and a

20  second partition or second area for presenting a plurality

21  of command functions.

22  Q.      And both of those partitions are among the screen

23  display partitions described in step A?

24  A.      It appears on a screen of display, that's correct.

25  Q.      Thank you.

1    Now, yesterday you put up this slide again from

2    your original testimony.  Do you recall that?

3    A.    I do.

4    Q.    And what you're showing here on the right, that is

5    this Mustache template for the buy button that you have in

6    red on the left; isn't that right?

7    A.    That's correct.

8    Q.    And in your testimony last week, you relied on this

9    Mustache template as being the output from the layout

10   service.  Do you recall that?

11   A.    That's correct.

12   Q.    And that you point to as the output on the requested

13   service that then gets its continuations identified and

14   modified; right?

15   A.    What I'm showing there is the output from the layout

16   service, that's correct.

17   Q.    And you were here when Mr. Dunham testified that, in

18   fact, this Mustache template was a buy button was not the

19   output from the layout service, do you recall that

20   testimony?

21   A.    I do recall that.

22   Q.    In fact, Mr. Dunham testified that in fact that

23   particular Mustache template that is used to create that buy

24   button is part of the source code in the deal page ID

25   application.  Do you recall that testimony?

Schmidt - cross

1  A.     I heard him say that, but that was inconsistent with

2  the evidence I examined, the documentation and

3  Dr. Weissman's testimony.

4  Q.     Well, let's follow-up on that.  So it's your

5  testimony now that Mr. Weissman's understanding of his

6  source code is incorrect?

7  A.     Mr. Weissman, I'm sorry?

8  Q.     Mr. Dunham's understanding of Groupon's source code

9  is incorrect, that's your testimony?

10  A.    It was my understanding at his deposition he was not

11  familiar with the source code.

12  Q.    That wasn't my question.  My question was, is it your

13  testimony that Mr. Dunham's testimony regarding Groupon's

14  source code is incorrect?

15  A.    I heard him testify several different things.

16  Q.    Let's focus on this specific issue.  Mr. Dunham

17  testified that this particular template does not come from

18  the layout service, that it's part of the deal code source

19  code, deal page source code, do you recall that testimony?

20  A.    I heard him say that.

21  Q.    You have no reason to dispute that testimony, do you?

22  A.    Sure.

23  Q.    Okay.  So let's look at the slide that Mr. Dunham

24  showed.  And this shows more of the title of that source

25  code file that you didn't show; right?  You just showed this

Schmidt - cross

 1    part at the end that you have in yellow.  You didn't blow

 2    out for the jury the rest of the title, did you?

 3    A.      It's hard to see.  It's there, but it's not expanded.

 4    Q.      So it's not readable by the jury, is it?

 5    A.      It would be hard to read that.

 6    Q.      So the jury couldn't see the rest of the title.  But

 7    if we look at what it actually says, it's file tab?

 8    A.      It does.

 9    Q.      The file tab says source code first highest level

10    tree is deal; right?

11    A.      It says that.

12    Q.      And Mr. Dunham testified that that means that this

13    source code comes out of the deal page application, didn't it?

14    A.      I don't recall him saying that exact word.

15    Q.      Well, he did.  Do you have any reason to dispute that

16    this file path where it says deal indicates that this source

17    code is from the deal page application?

18    A.      It may be part, it may be in that path, but it

19    doesn't mean that it's not served by the layout service.

20    Q.      You know that IBM's counsel reviewed the source code,

21    Groupon's source code again last weekend, aren't you?

22    A.      I believe I heard that.

23    Q.      And you could have gone with them to check whether or

24    not Mr. Dunham's testimony was correct, couldn't you?

25    A.      I could have.

Schmidt - redirect

1   Q.      And you didn't, did you?

2   A.      I did not.

3   Q.      This isn't the only work that you're doing for IBM,

4   is it, Dr. Schmidt?

5   A.      That's correct.

6   Q.      So you worked for IBM on the Priceline case, didn't

7   you, Dr. Schmidt?

8   A.      I did.

9   Q.      And you're going to be working for IBM on the Expedia

10  case, too, aren't you, Dr. Schmidt?

11  A.      I don't know.  I haven't been retained.

12          MR. HADDEN:  I have no further questions.

13          THE COURT:  Redirect.

14          MR. OUSSAYEF:  Just briefly, Your Honor.

15                  REDIRECT EXAMINATION

16  BY MR. OUSSAYEF:

17  Q.      Dr. Schmidt, do you remember the questions you were

18  asked about whether the Mustache template comes from the

19  layout service?

20  A.      I do.

21  Q.      Can you remind us -- I apologize for the lighting.

22  It's a little hard to read.  But can you remind us what

23  Dr. Weissman said about your opinions on this issue?

24  A.      So he said, and I quote, "Dr. Schmidt said that the I

25  Tier application, including the deal page, parsed templates

1    output from the layout service to populate the templates and

2    create HTML files for Web pages in Groupon's website."  And

3    then he cites my report.

4                 And his next statement is, "I agree."

5                 MR. OUSSAYEF:  I have no further questions.

6                 THE COURT:  You can step down, Dr. Schmidt.

7    Thank you.

8                 THE WITNESS:  Thank you.

9                 THE COURT:  Mr. Desmarais, what's next?

10                MR. DESMARAIS:  Thank you, Your Honor.  IBM

11   recalls its damages expert, Professor Hausman, to answer

12   Groupon's damages expert.

13                THE COURT:  Okay.  Good morning, Professor

14   Hausman.  Welcome back.

15                THE WITNESS:  Thank you.

16                THE COURT:  Of course you remain under oath as

17   you know.

18                THE WITNESS:  Sure.

19                ... DR. JERRY HAUSMAN, having been previously

20   duly sworn, was examined and testified further as follows ...

21                THE COURT:  Ms. Stempler.

22                MS. STEMPLER:  May I proceed?

23                THE COURT:  You may.

24                        DIRECT EXAMINATION

25   BY MS. STEMPLER:

1    Q.      Good morning, Professor Hausman.   Welcome back.

2    A.      Thank you.

3    Q.      Mr. Malackowski, Groupon's damages expert, testified

4    here yesterday.   Were you in the courtroom for that?

5    A.      Yes.

6    Q.      And he presented an analysis where he made some

7    adjustments to a handful of IBM's cross-licenses that he

8    selected.   Does that method of using cross-licenses that IBM

9    entered into with other companies make sense as a way to

10   determine a reasonable royalty here?

11   A.      No.

12   Q.      Can you explain why not?

13   A.      There was a discussion when he testified on direct

14   and on cross that he's looking for comparables.   Remember we

15   had this whole thing about houses.   You get a house and one

16   has an extra bedroom or whatever.   You need to do something

17   similar here for licenses.   I believe that there are two

18   reasons that his group are not comparable.   The first time I

19   testified last week, I'm not going to go into detail again,

20   is that you have to look at the cross-licenses.   For

21   instance, IBM needs to have cross-licenses with Amazon as

22   Mr. McBride testified to be able to offer cloud service and

23   artificial intelligence.   IBM has invested hundreds of

24   millions and billions of dollars.   And the companies that

25   Mr. Malackowski was looking at don't have patents like that.

Hausman - direct

1　　They're not like Amazon, biggest on the cloud.  So I went

2　　through that, and I won't do that again.

3　　　　　　　But what I would like to point out is his

4　　comparable companies have very different services and depend

5　　on IBM's patents in a much different way than Groupon.  So

6　　pretty much Groupon, the only way you could use Groupon is

7　　to either with your PC, iPad or smart phone, iPhone or

8　　Android, like the Samsung phone.

9　　　　　　　Let's turn to his first company.  It was

10　　Comcast.  So for better or worse, I am a Comcast subscriber,

11　　and I presume that some of you on the jury are as well.  So

12　　what does Comcast sell?  Comcast sells cable TV.  It sells

13　　internet.  And it sells telephone service.  So it's not

14　　selling pizzas, it's not selling batteries, but that is only

15　　part of it of.

16　　　　　　　If you're a Comcast subscriber, I'm assuming

17　　that some of the jury are, when you sign up for Comcast, you

18　　typically do not do it over the internet.  You do not use

19　　the IBM patents.  You call up because representatives you

20　　talk to wants to know what speed do you want for the

21　　internet.  But more importantly, do you want HBO, do you

22　　want, you know, this package, do you want that package, do

23　　you want the sports package, and in principle you could do

24　　it all over the internet, but by far the large majority of

25　　people who sign up for Comcast do so over the phone.

Hausman - direct

Q.      So, Professor Hausman, just to clarify, can you
explain what you are saying about the comparability of the
Comcast license?

A.      Sure.  So Comcast, it does have a website, I agree.
And a very small proportion of people use it, but most
don't.  Just, I was going to finish.  When your Internet
stops working, which mine does periodically and often, I do
not get on Comcast website and try to get it fixed.  I call
up Comcast and say, okay, you know, your Internet is down,
would you please fix it.  Okay?  I can't watch Netflix when
the Internet goes down or I can't do my academic research at
home.  And so Comcast uses, makes much more use of the
phone, and so although it uses the IBM patents probably,
they're much less important.

        To Groupon, they're crucial because everybody
issues those patents or did before they expired.  So in my
view, you can't compare Comcast with the patents that are
less important and say I want to use the price that Comcast
pays as an indicator for the price that Groupon should pay.
And if you looked at those, they're approximately ten
companies Mr. Malackowski used, that was pretty of true for
all of this as was pointed out on cross-examination.

        Maxim, people aren't buying stuff off the
Internet for them.  They're a service provider, and so on.

        Infosys, they're a service provider which is

Hausman - direct

1  located in India.

2         And so the comparables aren't comparable in my

3  view.

4  Q.     Okay.  And now regarding the other reason that you

5  mentioned, Mr. Malackowski told us that he made some

6  adjustments for the discounts that were provided to some of

7  the licensees.  Did he adjust for all of the discounts that

8  IBM gives to its licensees?

9  A.     No.

10  Q.     What were the most significant discounts that he

11  ignored?

12  A.     The biggest one which he completely ignores is

13  litigation discount.  So he takes a look at those licenses,

14  which he agreed, which is a fact, that they were all

15  voluntarily entered into and says, well, I'm going to assume

16  that in litigation, Groupon is going to get the same deal.

17  But there is a huge risk in litigation.  I mean you, the

18  jury, could decide some of those patents aren't good.  I

19  mean it's your decision.  And IBM is taking that risk.

20  Q.     So, Professor Hausman, just to clarify, did the

21  licensees that Mr. Malackowski was using as comparability,

22  did they receive those discounts?

23  A.     Yes, they all did.

24  Q.     And will Groupon receive that discount at the

25  hypothetical negotiation?

Hausman - direct

```
 1   A.      No.  Because under the hypothetical negotiation, as

 2   he and I agreed, the assumption is that the patents are

 3   valid and infringed, so there is no risk.

 4              So I would just like to give the jury a brief

 5   example of this.  If I'm an advisor for a company that is

 6   developing a new delivery treatment for diabetes type II,

 7   which, you know, is a horrible disease and very expensive.

 8   So a company is worth, let's say, about $50 million, but

 9   nobody knows whether they're going to get government

10   approval.  There is this huge risk.  But if we get

11   government approval from the Food and Drug Administration,

12   then the company is going to be worth over $1 billion, that

13   so many people have diabetes type II.  So once the

14   government approves it, the risk has been removed.

15              Similarly here, in the hypothetical negotiation,

16   there is no risk.  The patents are assumed to be valid and

17   infringed.  There is no risk about the patents whatsoever.

18   So a risk can be very important in economics and carry a

19   very large price tag, as in my example.

20   Q.      Okay.  Great.  So I want to move on because we don't

21   have much time.  Let's move on to Mr. Malackowski's

22   statements about your method.

23              The first one is he states that you overstate

24   Groupon's revenue.  Is that true?

25   A.      No.  As I testified, I allocate the revenue and, yes,
```

1  here is one of my demonstratives last week.

2          So I start off with $4 billion of accused

3  revenue but I make two adjustments.  And when I am done

4  adjusting the revenue, it is only 12 piles big, it's about

5  $500 million, so it goes down by 88 percent.

6  Q.    Okay.  So let's just look at this for one minute.

7  This is slide 56 from PDX-6.  Is this $4.2 billion the

8  revenue Groupon earned from the accused website from

9  March 2010 through August 2015?

10  A.    Yes.

11  Q.    And is it your opinion that IBM should get a

12  percentage of this revenue?

13  A.    No, it should only get a percentage of revenue

14  associated with the use of the patent.

15  Q.    Okay.  So that is slide 59 that is up there from

16  PDX-6.  Here, can you just remind us of how you got to the

17  revenue associated with the '967 patent that you see here?

18  A.    Yes.  Would you please straighten that for the jury?

19  That slide.  I'm sorry.

20          So, yes, based on Dr. Schmidt's research,

21  59.2 percent is cached content.  And then remember I did

22  21 percent returning visitors by using Groupon's data.  And

23  so if you multiply those two together, you get about

24  12 percent.

25          So you start off with $4 billion, but as you can

Hausman - direct

1    see, I only end up with $517 million.  We just went smaller.

2    Q.    Did you do that for each of the patents?

3    A.    Yes.

4    Q.    So if we look at this slide from Mr. Malackowski's

5    presentation.  This is slide 7.  Were you actually -- when

6    you added up the revenues associated with each of the

7    patents, is that really $33 billion?

8    A.    No, he didn't take any of the allocation into

9    account.  Actually, if I remember correctly, it was less

10   than $11 billion.  It is closer to $3 billion, if I remember

11   right.

12   Q.    So are you double counting revenue for profits?

13   A.    No, I'm just looking at what the revenue is

14   associated with the patent, not the total revenue.

15   Q.    Let's move on to the next point.  He also said that

16   you inflate Groupon's profitability because you used

17   adjusted EBITDA.  Were you making up the profits that you

18   used or were they actual Groupon earnings?

19   A.    No, they're actually adjusted EBITDA.  And he said

20   something that is very interesting.  He agreed that Groupon

21   uses adjusted EBITDA for investors.  If they use it for

22   investors, they better be telling the truth or the

23   Securities Exchange Commission, who is the government

24   agency, is going to get extremely upset.  You are not

25   allowed to mislead investors in this country.

 1   Q.      So is adjusted EBITDA that you used the same adjusted

 2   EBITDA that Groupon reports every quarter to its investors,

 3   its internal management, and the SEC?

 4   A.      Yes, and puts on its website each quarter.

 5   Q.      So are you inflating any profits?

 6   A.      No, I'm just using what Groupon's management is

 7   doing.

 8   Q.      Okay.  Let's move on to the next item that he

 9   criticized.  He talked about your use of apportionment and

10   he gave that example of the hatchback car.  Do you remember

11   that?

12   A.      Yes.

13   Q.      And he said that you were basing your royalty on the

14   entire car.  This is slide 59 again from your presentation

15   last week.

16           Are you taking the royalty for the whole car?

17   A.      No.  Again, I'm starting off with the revenue,

18   reducing it by 88 percent.  So I'm probably down to a hubcap

19   on his hatchback.

20   Q.      Is this a way for you to determine the specific

21   revenue for patent and ensure your royalty would only

22   account for the revenues associated with each patent?

23   A.      Yes, that is what apportionment does.

24   Q.      So is there actually a hatchback problem here?

25   A.      Well, I don't know that much about hatchbacks, but I

1    certainly valued correctly each patent.

2    Q.      Okay.  So let's go to the last criticism.

3           You recall that he complained that you were not

4    listening to the market; right?

5    A.      Yes.

6    Q.      And that concerned his point that he thought you

7    should have used the IBM cross-licenses as a starting point

8    like he did to determine a reasonable royalty; right?

9    A.      Yes.

10   Q.      Can you remind us why the IBM cross-licenses are not

11   the right benchmark for reasonable royalty here?

12   A.      Yes, there are three reasons.  The first you have to

13   value the cross-licenses.

14   Q.      Okay.

15   A.      The second is that litigation discount and, you know,

16   removing the risk of the hypothetical negotiation.

17          And the third is companies like Comcast and

18   Maxim are just not comparable to Groupon.

19   Q.      And so given the differences between the

20   cross-licenses between IBM and other companies and the

21   hypothetical negotiation here between IBM and Groupon, using

22   what other companies paid IBM outside of litigation is

23   actually not the right measure, is it?

24   A.      Yes.  Using his hatchback analogy, I thought he

25   was -- his method is like comparing a hatchback to a Tesla

1    electric car.  They're just not comparable.

2    Q.      So to wrap up, Professor Hausman.  Do you stand by

3    the original method that you used to calculate a reasonable

4    royalty in this case?

5    A.      Yes.

6    Q.      And does your reasonable royalty account for the

7    value that each patent brings to the accused Groupon

8    products?

9    A.      Yes.  But in the slides, you can see I do it

10   separately for each patent.

11   Q.      Did any of Mr. Malackowski's criticisms change your

12   opinion?

13   A.      No, I still have it at $166,468,823.

14              MS. STEMPLER:  Thank you.  I pass the witness.

15              THE COURT:  Thank you.  Cross-examination.

16              MS. SHAMILOV:  Thank you, Your Honor.

17                        CROSS-EXAMINATION

18   BY MS. SHAMILOV:

19   Q.      In guess it's still morning.  Good morning,

20   Dr. Hausman.

21   A.      Good morning.

22   Q.      I just have a few questions.

23   A.      Sure.

24   Q.      I don't know if the jury can see, but here is a phone

25   with a Comcast app on it.  And you can actually watch movies

1  on your phones, Dr. Hausman.  Did you know that?

2  A.      Yes, I do.

3  Q.      And Netflix, too.

4          And also you said, you said you wanted to

5  address the first agreement that Dr. Malackowski discussed

6  yesterday and you said that was Comcast.  Did I hear

7  correctly?

8  A.      Yes.

9  Q.      But that was not the first agreement he discussed, is

10  it?

11  A.      Well, I think there was a chart that was put up, and

12  if my memory is correct, Comcast was the first.

13  Q.      Actually, the first agreement he discussed was

14  Priceline's agreement; isn't that true?

15  A.      Well, I am talking about a chart that was put up

16  and Comcast was first on the chart.  I do agree that he

17  discussed Priceline.

18  Q.      So actually the first agreement -- the chart was at

19  the very end of his presentation; correct?

20  A.      Yes.

21  Q.      Yes.  So the first agreement he started with was

22  Priceline?

23  A.      Okay.

24  Q.      Yes.  Is that right?

25  A.      Yes.  I'm not disagreeing.

Hausman - cross

```
 1    Q.      Yes.  And Priceline is a web company; right?

 2    A.      Yes.

 3    Q.      They have a website?

 4    A.      Yes.

 5    Q.      That is the only way you can use Priceline; right?

 6    A.      They can use a telephone but mainly on the web, yes.

 7    Q.      Okay.  So there is no distinction between Priceline

 8    and Groupon that you were trying to draw between Comcast and

 9    Groupon; correct?

10    A.      But there is an important distinction, and that is

11    that Priceline license was settlement of litigation.  It's

12    different from Comcast, and it's different from Groupon.

13    Q.      Well, that is a great point.  Let's talk about that.

14    A.      Sure.

15    Q.      Were you here when Mr. McBride was in the courtroom?

16    A.      Yes.

17    Q.      Now, you heard his testimony?

18    A.      Yes.

19    Q.      You heard his testimony that -- and you agree with

20    me, right? -- that the Priceline was the settlement

21    agreement because IBM sued Priceline; correct?

22    A.      Yes.

23    Q.      And they settled about four weeks before trial;

24    correct?

25    A.      Yes.
```

1    Q.      Do you recall Mr. McBride saying that the settlement

2    agreement dollar figure was actually less than the original

3    offer IBM made to Priceline before it sued it?

4    A.      Yes.   That is not atypical.

5    Q.      Okay.   So the settlement, the value, the dollar

6    figure of that Priceline agreement is actually less than any

7    litigation discount; correct?

8    A.      No.

9    Q.      How come?

10   A.      Because many things go into prelitigation offers.

11   You have to look at them.   You know, it was going to be an

12   offer without litigation, without IBM having to spend

13   millions of dollars on the litigation.   And so you'd have to

14   take all that into account.

15   Q.      You have used the hypothetical negotiation construct

16   the same as Mr. Malackowski did; right?   You both applied

17   the hypothetical negotiation construct in your analysis;

18   correct?

19   A.      Yes.

20   Q.      Right.   And the hypothetical negotiation contract --

21   A.      Construct.

22   Q.      -- the way you do it is the law tells you how to do

23   it; right?

24   A.      It guides you, I would say.

25   Q.      Right.   And you do it before, at the time first

1    infringement occurred or right before the infringement

2    occurred; correct?

3    A.    Yes.

4    Q.    You do it at the time as if no litigation took place

5    whatsoever.

6    A.    Yes.

7    Q.    Right?

8    A.    But you could also foresee the future if you do it

9    early on.  But the Book of Wisdom says you can foresee the

10   future.

11   Q.    Of course.  But if you are going to negotiate and

12   agree on an agreement in the hypothetical negotiation, there

13   will be no litigation in the future; correct?

14   A.    That is true.

15   Q.    Okay.  So the law requires you to apply the analysis

16   in this case where you cannot take into consideration the

17   possibility of litigation; correct?

18   A.    That's correct.

19   Q.    Okay.  So the litigation discount is irrelevant to

20   the hypothetical negotiation analysis that the law requires

21   you to apply?

22   A.    No, that is incorrect.  If you do it like Mr.

23   Malackowski did, and want to use comparable contracts, you

24   know, that come later than that.  So there is a litigation

25   discount baked into those and you have to take that into

1    account.  But I agree with you at the time of the

2    hypothetical negotiation, since patents are assumed to be

3    valid and infringed, you are not going to litigate.

4    Q.    Okay.  And then the adjustments that Dr. Malackowski

5    talked about and applied yesterday, those are the

6    adjustments that IBM itself uses; correct?

7    A.    In part, yes.

8    Q.    So all of them IBM uses; correct?

9    A.    Yes, but he left out other ones.

10   Q.    Let's talk about this adjusted EBITDA, a mouthful

11   that you were talking about.  You used that measure as a

12   measure of profit; correct?

13   A.    That is Groupon, yes.

14   Q.    Do you remember this slide, Dr. Hausman, that you put

15   in your -- that you used to show that the adjusted EBITDA is

16   the right measure of profitability, and that is why you used

17   it?  Do you remember that?

18   A.    Yes.

19   Q.    And did you prepare this slide?

20   A.    Well, I told him I wanted to use his testimony.  I'm

21   not going to prepare it.  I mean he had a graphic

22   presentation and prepared some slides.

23   Q.    But you looked at it and you approved it?

24   A.    I think I added it to my report as well, yes.

25   Q.    Those are not complete questions and answers, are

1    they?

2    A.    No.   I was just trying to, you know, basically

3    capture this notion of what he was talking about.

4    Q.    So you cropped, phrased it from their own questions,

5    their own answers that is the pages of deposition testimony

6    of Mr. Schmidt to put this slide together?

7    A.    Yes.

8    Q.    And if you actually look at deposition testimony that

9    you decided to admit, it makes clear that Groupon reports

10   its gross profits separately from adjusted EBITDA numbers;

11   isn't that true?

12   A.    I testified it reports both, but it emphasizes

13   certainly on this website and its report to the SEC and

14   investors adjusted EBITDA.   But it does have to do both.   I

15   mean the law requires it.

16   Q.    But you excluded this in answering a portion of Mr.

17   Schmidt's answer in where he makes a distinction between

18   adjusted EBITDA and gross profit, didn't you?

19   A.    Well, if you use gross profit, the profit margin is

20   46 percent rather than 10 percent.   So if you want to use

21   that, I'll end up with even higher damages.   Yes, I did

22   exclude it.

23   Q.    So you --

24   A.    Gross profit is even higher profit margin than

25   adjusted EBITDA.

Hausman - cross

1    Q.      But you have excluded specific portions of his answer

2    that made a distinction between profit and EBITDA, didn't

3    you?

4    A.      I didn't put his whole testimony.  I agreed it would

5    have been pages.

6    Q.      And you did that --

7    A.      Excuse me.  Pages and pages.

8    Q.      And did you that to convince the jury to accept your

9    inflated damages number, didn't you?

10   A.      No.  I'm saying if you go to his -- go to the website

11   and you look, they don't even mention operating profits,

12   which Mr. Malackowski thinks he should have used on their

13   website and their report to investors, their latest report

14   as I testified last week.  The only thing they really talk

15   about is free cash flow, gross margin, and adjusted EBITDA.

16   Operating profits which Mr. Malackowski showed the jury

17   yesterday are not even mentioned.

18            MS. SHAMILOV:  Thank you, Dr. Hausman.  I have

19   no further questions.

20            THE COURT:  Thank you.

21            Redirect.

22            MS. STEMPLER:  No further questions, Your Honor.

23            THE COURT:  Okay.  Thank you, Professor Hausman.

24   You may step down.

25            THE WITNESS:  You're welcome.

 1                    THE COURT:  Who is next?

 2                    MR. DESMARAIS:  IBM rests its case, Your Honor.

 3                    THE COURT:  Okay.  Thank you.

 4          Back to Groupon.

 5                    MR. HADDEN:  Yes, Your Honor.  Groupon recalls

 6     Dr. Weissman.

 7                    THE COURT:  Okay.

 8                    ... DR. JOHN WEISSMAN, having been duly sworn

 9     was examined and testified further as follows ...

10                    THE COURT:  Good morning, Dr. Weissman.

11                    THE WITNESS:  Good morning.

12                    THE COURT:  Welcome back.  You remain under

13     oath.

14                    THE WITNESS:  Yes.

15                    ... DR. JOHN WEISSMAN, having been previously

16     sworn was examined and testified further as follows ...

17                    THE COURT:  Please proceed, Mr. Hadden, when

18     ready.

19                    MR. HADDEN:  Sure.

20                         DIRECT EXAMINATION

21     BY MR. HADDEN:

22     Q.    Good morning, Mr. Weissman.

23     A.    Good morning.

24     Q.    Just a few questions to follow-up with what

25     Dr. Schmidt testified yesterday.  With Dr. Schmidt, IBM's

 1   lawyer put up this diagram yesterday when they were talking

 2   about the Mellmer reference which relates to the account

 3   creation and the single-sign-on process.  Do you recall

 4   that?

 5   A.     Yes, I do.

 6   Q.     And Dr. Schmidt made two points about Mellmer.  The

 7   first was he said the Mellmer is about digital identity and

 8   not single-sign-on.  Do you recall that?

 9   A.     Yes, I do.

10   Q.     Is that correct?

11   A.     Digital identity is a cornerstone of single-sign-on.

12   In fact, if you looked at Liberty documents, Liberty ID, the

13   ID is in the title of the document.  So identity is

14   cornerstone to single-sign-on because you are trying to

15   establish common identity so that you can log users into

16   different sites.

17   Q.     Okay.  And what was the name of the product that

18   Dr. Hinton talked about that IBM built to perform

19   single-sign-on?

20   A.     It was the TFIM system.

21   Q.     What does TFIM?

22   A.     Titillated Federated Identity Management.  So

23   identity is in TFIM as well.

24   Q.     In fact, doesn't Mellmer describe a single-sign-on

25   process?

 1    A.      Yes, he does.  Mellmer describes sort of two things:

 2    a digital identity management and information management.

 3    Q.      Okay.  And the other point that Dr. Schmidt made with

 4    respect to Mellmer is he said it wasn't single-sign-on

 5    because there were two different authentication processes,

 6    two red boxes.  Do you recall that?

 7    A.      Yes, I do.

 8    Q.      Now, is this box down here that the user picks a

 9    meCard, is that an authentication process?

10    A.      No, it's not.  So this goes to the idea that Mellmer

11    has for the two parts to it.  Principally, digital identity

12    management, this is the single-sign-on process.  Mellmer

13    also has an additional small piece which is enabled personal

14    information or what we call profiles for business cards.

15    And those are called meCards.

16            So, for example, you might have a multiple

17    profiles as an individual.  You have one identity but

18    multiple profiles.  So you might have a profile for

19    professional life in everything you do.  I might have one

20    for being a professor.  I might have another one for being,

21    say, a consultant.  I might have another one that expresses

22    my interest in the great outdoors.

23            And so what Mellmer describes is when you

24    establish an account and an account is created at a second,

25    at a second site, you have the possibility of associating to

Weissman - direct

1    that site one of your profiles.  And that is called a

2    meCard.  So if I were to print an account maybe at a bank,

3    I might look to have my professional profile.  If I were

4    instead to create an account at LL Bean or some outdoor

5    place, I might want them to have my outdoor profile.  So I

6    get a choice of what information I want them to see.

7                So what is being boxed in the second box to the

8    right is really the user, of all their profiles, picks the

9    one they want that service provider to have.

10   A.     This is not an authentication option because

11   authentication actually by Court's construction is

12   validating credentials for user.  Nothing is being

13   validated, the user, just says use this profile and that is

14   what the cite is going to use.

15   Q.     And the other box in red where it says log in to

16   DigitalMe, is that like we saw with Mr. Breen where Facebook

17   or Google would provide a screen for the user to login

18   before the rest of the process goes through?

19   A.     Yes.  So the first box, login in DigitalMe, this is

20   logging into the identity provider.  This is the only

21   authentication step that's happening.

22   Q.     Thank you.

23                You recall IBM's counsel put up this slide

24   yesterday with Dr. Schmidt as well.  And he suggested that

25   you were mixing and matching files in a way that would

1  suggest to be inappropriate.  Can you -- did you mix and

2  match files?

3  A.      No, I didn't mix and match files at all.  So what I

4  had in front of me, and Mr. Davis testified similarly is we

5  had source code from 1995 and we had source code from 1996.

6  And I did a separate analysis of each of those sets of

7  source code.  I didn't combine them in any way, I didn't try

8  to build a system and combine pieces of them.  I did a

9  separate analysis.  And what I determined is that germane to

10  the patents, the patent issue which is the management of

11  state using session ID, identifying embedding that and

12  identifying continuation, the way the state was managed and

13  processed in both the 1995 code and the 1996 code was

14  identical.

15          Additionally how that state was used, for

16  example, for things like the order flow, for how that state

17  was manifesting templates was also identical to two code

18  basis.  And most importantly, what is common between the two

19  code basis is the code that processes the template files,

20  these are the things that get, the session ID embedded

21  within them to enable the conversation to continue, that

22  code, the so-called Cat Sub function which is really hard to

23  read, appeared in both '96 code and '95 code.

24          And the parameters that that code took as inputs

25  were the same in the 1995 and 1996 systems.

Weissman - cross

1   Q.      And did your own analysis of the code confirm the

2   testimony we heard from Mr. Davis about how the Amazon.com

3   site operated in 1995?

4   A.      Yes, it did.  I did my own analysis.  I have the full

5   source tree available to me, and it comported with what he

6   told me as a developer.

7               MR. HADDEN:  Thank you.  No further questions.

8               THE COURT:  Cross-examination.

9                       CROSS-EXAMINATION

10  BY MR. OUSSAYEF:

11  Q.      Good morning, Dr. Weissman.

12  A.      Good morning.

13  Q.      Now, you are opining that someone would combine the

14  Liberty specification with Mellmer; is that right?

15  A.      That's right.

16  Q.      So you understand that Dr. Schmidt presented a series

17  of reasons why someone would not combine Mellmer with the

18  Liberty Alliance specification; right?

19  A.      I was here for that testimony.

20  Q.      And you didn't address any of those reasons on your

21  testimony here today, did you?

22  A.      Today I didn't talk about the combination, yes.

23  Q.      So you didn't talk about the fact that Liberty

24  Alliance teaches away from on-the-fly run count creation,

25  did you?

1    A.      I disagree with that statement, but I didn't testify

2    to it today.

3    Q.      And you understand that when you're relying on

4    obviousness, you need to consider secondary consideration of

5    nonobviousness?

6    A.      That's part of it.

7    Q.      You didn't testify to that today, did you?

8    A.      I didn't testify today, but I don't agree with that.

9    Q.      So, for example, you didn't testify about Dr. Schmidt

10   and his opinion that because Google, Facebook, Twitter and

11   LinkedIn, among many others signed a license with IBM, that

12   is an indication that they thought the patents were valid,

13   you didn't testify about that, did you?

14   A.      I didn't testify.  I disagreed with that conclusion.

15   I reached a different one.

16   Q.      You didn't talk about any of the other secondary

17   considerations Dr. Schmidt testified about, did you?

18   A.      I talked about them in the report.  I didn't talk

19   about them today.

20   Q.      You believe that Spinning the Web was publicly

21   available when it was published on February 23rd, 1996;

22   right?

23   A.      That's when it was publicly available, though clearly

24   the ideas in the book were disclosed in 1995.

25   Q.      And your opinions on Spinning the Web is based on

Weissman - cross

1    when it was publicly available; right?

2    A.      My opinions are based on the content of the book

3    which describes what it does.  And that was my analysis was

4    based on the content of the book, not based on anything

5    else.

6    Q.      Let me try it one more time.  Your opinion on

7    Spinning the Web is based on when Spinning the Web was

8    publicly available, not on dates before; right?

9    A.      My opinion is based on the content of the book.  My

10   analysis doesn't -- if you look at my mapping of the claims,

11   it looks at the content of the book.

12   Q.      Can we play deposition testimony on 486:7 through 14.

13           "Question:  Just to make sure we're all on the

14   same page, your opinions based on the Spinning the Web

15   reference, are opinions about public availability, right?

16   Saying the Spinning the Web reference invalidates the '601

17   patent because it was publicly available, right?

18           "Answer:  Well, my understanding is, to qualify

19   as prior art, it must be publicly available."

20           Were are you asked that question and did you

21   give that answer?

22   A.      Yes, I gave that answer.

23   Q.      Okay.  Now, you understand that Dr. Schmidt tested

24   this Spinning the Web code; right?

25   A.      That's my recollection, yes.

Weissman - cross

1  Q.      And you didn't test the Spinning the Web code, did

2  you?

3  A.      I did not.  I didn't need to.  It's very simple web

4  code.

5  Q.      It's so simple, if you look on here, it says Welcome

6  to the Nothing Store and there is nothing on the Web page;

7  right?

8  A.      This is one of the, you know, error flows that you

9  can see if things are not set up right.

10 Q.      But you wouldn't know that because you didn't test

11 Spinning the Web, would you?

12 A.      I was looking at the code and I wasn't surprised to

13 see that from looking at the code.

14 Q.      While we're on the subject, you never tested or tried

15 to run the Amazon source code from 1996, did you?

16 A.      No, I didn't feel I needed to do that.

17 Q.      And you never tried to run the Amazon code from the

18 1995 folder either, did you?

19 A.      I didn't need to do that.  These were deployed system

20 and Paul Davis testified these were not in operation.

21 Q.      In fact, it would have been impossible to run the

22 Amazon code in the 1995 folder because there are files

23 missing?

24 A.      I didn't try to do it, so I can't answer that.

25 Q.      Now, you testified a little bit about this document

Weissman - cross

1    that Dr. Schmidt put together showing all the changes

2    between the 1995 files and the 1996 files; right?

3    A.       What was the question?

4    Q.       You testified about this document that Dr. Schmidt

5    prepared comparing the 1995 files with the 1996 files?

6    A.       Earlier in this conversation, yes.

7    Q.       And during that conversation, you didn't point out

8    any errors in this showing the differences between the

9    files; right?

10   A.       I didn't point out any errors.  My point simply was I

11   didn't mix and match, I did a separate analysis of '95 and

12   '96.

13   Q.       So your testimony is that the 1995 code according to

14   you worked the same as the 1996 code; right?

15   A.       That is my testimony, yes.

16   Q.       And you're saying it managed state in the same way?

17   A.       They do session IDs in the same way.

18   Q.       According to you it embeds state information the same

19   way; right?

20   A.       That is true, because the template processing code is

21   identical in 1995 and 1996.

22   Q.       So according to you it worked all in the same way,

23   that's what you're telling us; right?

24   A.       Substantially in the same way, and that was confirmed

25   with what I saw in the code and my conversations with Paul

1    Davis, the developer.

2    Q.      Let's take a look at your expert report, because I

3    notice this when I was reading this last night.  So here on

4    paragraph 22, you say, "I searched the HTML templates

5    available in the Web source directory," do you see that?

6    A.      I do.

7    Q.      That's the 1996 code you're talking about; right?

8    A.      I believe so, right.

9    Q.      Because there are no templates in the 1995 folder;

10   right?

11   A.      The 1995 code used templates for the processing but

12   the actual templates are 1996.

13   Q.      So what you're talking about here is the 1996 code;

14   right?

15   A.      Well, these are templates, these are actually code,

16   these are just data files.

17   Q.      You're talking about a 1996 template; right?

18   A.      I'm talking about templates in 1996 that were also

19   used in 1995.

20   Q.      And you say I found that every link back to the

21   Amazon.com Web server included the session ID placeholder.

22   That's important because that's what you rely on for the

23   recursively embedding step; right?

24   A.      Yeah.  To clarify what I'm saying there is every

25   hyperlink continuation contains a session ID.

1   Q.      But then you say except for the following; right?

2   A.      That's what it says.

3   Q.      So let's see what you're referring to.  Because then

4   you say well, except for the following links that didn't

5   include that session ID parameter, you said anchor links?

6   A.      Anchor link is not a continuation.  It does not refer

7   to a new request for a client server.  It jumps into the

8   same document.

9   Q.      You say a mailto link as well; right?

10  A.      I said that, but it's not a continuation.  That is

11  not necessarily a continuation.

12  Q.      Down here you explained what you're just telling the

13  jury right now, as I explained, in your opinion, anchor and

14  mailto links are not continuations; right?

15  A.      That's correct.

16  Q.      You also mentioned links on help pages; right?

17  A.      Those are mentioned, yes.

18  Q.      But then you say, wait a second, this program did not

19  exist in 1995, and therefore those links would not have

20  existed at the time of the 1995 prior art system.  That's

21  what you say; right?

22  A.      That's what it says there.

23  Q.      So you say everything worked the same except for the

24  part where the Amazon code didn't embed session ID to some

25  of the links.  True?

Weissman - cross

1   A.      As I say there, Paul Davis testified and described

2   that the affiliate bookstore was an option that wasn't

3   available in 1995.  The systems operate substantially the

4   same way.

5   Q.      Substantially the same except for the part where it

6   didn't embed state information in every link; right?

7   A.      No, except for this affiliate bookstore which was not

8   available in 1995, so it's not an issue.

9   Q.      But you didn't actually review the 1995 templates

10  because they weren't there; right?

11  A.      The 1995 templates were as Paul Davis described the

12  same as in the 1996 code.

13  Q.      It is a fact, sir, that you don't know how many of

14  the continuations Amazon actually embedded state information

15  into in 1995; true?

16  A.      Yes.  It's not important to know how many, simply

17  that they had a process by which all would be replaced.

18  Q.      My question was a little bit more simple, though.

19  You don't know how many of the continuations Amazon actually

20  embedded state information into in 1995, true?

21  A.      The actual numbers, I don't.  Actual numbers are not

22  important.  It's that all were placed.

23              MR. OUSSAYEF:  I have no further questions.

24              THE COURT:  Okay.  Redirect.

25              MR. HADDEN:  Just briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. HADDEN:

1    Q.      On that last point, Dr. Weissman, do you recall
2    Dr. Schmidt's testimony yesterday that if the jury believes
3    Paul Davis, then claim 51 is invalid?
4    A.      I remember that testimony, yep.
5    Q.      And we went through those exact examples from your
6    report where Dr. Schmidt confirmed that none of those links
7    were continuations under the Court's construction.  Do you
8    recall that?
9    A.      We did go through it also yesterday.
10   Q.      And didn't Dr. Schmidt also testify that none of that
11   information was therefore at all relevant to the analysis in
12   this case?
13   A.      This is the point we agree.
14   Q.      And on that last point, wasn't IBM's counsel
15   essentially asking you count up all of the links that could
16   have existed on the Amazon website in 1995?
17   A.      That was my interpretation of the question.
18   Q.      Is that at all relevant to your analysis in this
19   case?
20   A.      The actual number is not relevant at all.
21   Q.      What's important is how they were processed; right?
22   A.      The proces in which all were placed in a particular
23   template.

Weissman - redirect

1    Q.     And you reviewed and showed the jury the code that

2    does that processing, didn't you?

3    A.     Yes, I did.

4    Q.     Going to this notion that you didn't opine about

5    combining Mellmer with Liberty Alliance, do you recall that?

6    A.     I remember a question about it.

7    Q.     Now, when you and I had our first conversation about

8    Liberty Alliance and Mellmer, didn't you walk through

9    exactly why there was motivation to combine this?

10   A.     I offered a motivation that these are from the same

11   area, they both talk about identity management, one picks up

12   where the other takes off.  This is exactly what a person of

13   ordinary skill would do.

14   Q.     In fact, it's not just what a person of ordinary

15   skill would do, it's what Dr. Hinton did, isn't it?

16   A.     Dr. Hinton described that Liberty Alliance was relied

17   upon in the system.

18   Q.     And adding account creation to Liberty Alliance in

19   the IBM system didn't break the Liberty Alliance standard,

20   did it?

21   A.     No, they testified standard sits here, you add

22   features here, the standard stays the same, that code

23   doesn't change, no one modifies the standard, someone else

24   can use it, but you can leverage it and use it.

25   Q.     The same would be true if combining the account

1  creation from Mellmer with the Liberty Alliance standard,

2  wouldn't it?

3  A.    Absolutely.  Mellmer, you just use Liberty Alliance

4  protocol, it wouldn't change them.

5  Q.    And the same would be true of combining Sunada with

6  Liberty Alliance, wouldn't it?

7  A.    Yes.

8  Q.    Have you seen any evidence that anybody took a

9  license to the '346 patent because they wanted a license to

10  that patent instead of the 40,000 other patents that IBM was

11  licensed?

12  A.    I have seen no specific evidence presented in this

13  trial.

14          MR. HADDEN:  No further questions.  Thank you.

15          THE COURT:  Thank you.  You may step down.

16          Anything further, Mr. Hadden?

17          MR. HADDEN:  No, we don't.

18          THE COURT:  Okay.  All right.  Ladies and

19  gentlemen, that completes the evidentiary portion of the

20  trial.  I'm going to give you a break at the moment.  Still

21  no talking about the case and we'll get you back here in a

22  little bit.

23          (Jury exited the courtroom at 10:36 a.m.)

24          THE COURT:  All right.  So it does take a little

25  bit of time to print about twenty copies of that long

1  document.  How much time do you all think you need to confer

2  with those who have been reviewing them and let me know of

3  any further issues?

4  MR. DESMARAIS:  Just five or ten minutes, Your

5  Honor.

6  THE COURT:  Okay.  We'll check back with you in

7  about ten minutes and then we'll see if there is anything

8  further that needs to be done.

9  MR. MOORE:  Your Honor, one quick thing.

10  Mr. Day and I have been talking about how we would get

11  exhibits back to the jurors.  One of the issues, there are a

12  lot of exhibits that were admitted in native form, video,

13  source code.  I think we're going to negotiate some sort of

14  plan where we would bring a computer and flash drive for

15  those.  We need to confer a little bit more.  Is that going

16  to be okay with Your Honor?

17  THE COURT:  Most likely.  We're not going to

18  need that to be worked out mechanically until tomorrow, so I

19  would ask you to also bring Mr. Looby into your discussion

20  at some point.

21  MR. MOORE:  We will do that.

22  THE COURT:  Thank you.  We will be in recess.

23  (A brief recess was taken.)

24  THE COURT:  Have you had a chance to review the

25  jury instruction, any further issues, typos, anything

1    further we should discuss?

2              MR. GEIST:  Your Honor, Edward Geist for IBM.

3    I'll start with just a couple of typos we found.  The first

4    one is on page 14, there is a missing space --

5              MR. DESMARAIS:  You have to put the diagram up.

6              THE COURT:  You got to speak into the

7    microphone.  I can't hear you.  You can just tell me where

8    it is.

9              MR. GEIST:  On so on page 14 there is just a

10   missing space before '601 over here.

11             THE COURT:  Okay.  Thank you.

12             MR. GEIST:  And then on page 24, just now there

13   are the two asserted claims from the '967, or there are no

14   remaining asserted claims, we have to change from a claims

15   to a claim there.

16             THE COURT:  On '967, it should be the remaining

17   claim of the '967?

18             MR. GEIST:  Yes, Your Honor.

19             THE COURT:  If Groupon has any objection to

20   these changes.

21             MR. HADDEN:  Nothing so far, Your Honor.

22             THE COURT:  Okay.

23             MR. GEIST:  Okay, Your Honor.  Now on to the

24   harder parts, probably.

25             THE COURT:  Okay.

1     MR. GEIST:  The first one is on page 29 here.

2  Your Honor adopted an instruction I believe proposed by

3  Groupon.  It says the claim steps, the statement of the law

4  from the case is a step or steps of the claimed method or

5  the patented method.  So the issue is that when you say --

6     THE COURT:  Are you proposing I change it to a

7  step or steps?

8     MR. GEIST:  Yes, Your Honor.

9     THE COURT:  I don't know, is that an easy one?

10     MS. SHAMILOV:  That's an easy one.

11     THE COURT:  You agree with that?

12     MS. SHAMILOV:  Sure.

13     THE COURT:  That was at the bottom of 29.  Well,

14  is it in multiple places on that page?

15     MR. GEIST:  We only found it in one place on the

16  page.

17     THE COURT:  Was it at the very bottom of 29.

18     MR. GEIST:  Yes, Your Honor, second line from

19  the bottom.

20     THE COURT:  Any Groupon condition participation

21  in an activity or receipt of a benefit upon performance of a

22  claimed step or steps by third parties, you're a okay with

23  that.

24     MR. GEIST:  We're okay with that, Your Honor.

25     THE COURT:  And Groupon is okay with that?

1             MS. SHAMILOV:  Yes, Your Honor.

2             THE COURT:  Thank you.

3             MR. GEIST:  And then, Your Honor, page 30, Your

4       Honor adopted the implied license proposals from Groupon.

5       We object for the reasons stated previously and --

6             THE COURT:  Actual the prior objections are

7       still in the record, we're just focused on anything new that

8       I may have done.

9             MR. GEIST:  Your Honor, the next one is on page

10      33, and I think that this one will also be in agreement by

11      the parties.  Here it's a list of what was actually

12      presented for invalidity by Groupon.  They have a list

13      that's been exchanged between the parties of what is

14      remaining.  It differs from what was in the previously

15      submitted final instructions.

16            THE COURT:  Thank you.  Tell me what I can

17      strike from this list if you agree to striking something.

18            MR. HADDEN:  The first one, we can strike that.

19            MS. SHAMILOV:  I have it here.  I can read it.

20            THE COURT:  Come on up, please.

21            MS. SHAMILOV:  Can you tell me what the page is?

22            THE COURT:  Page 33.

23            MS. SHAMILOV:  So you would strike number one

24      and number two, Your Honor.

25            THE COURT:  You agree with that, IBM agrees with

1    that?

2              MR. DESMARAIS:  Yes, Your Honor.

3              MS. SHAMILOV:  On number three, we would say

4    claim 51 is anticipated by a book called Spinning the Web.

5              THE COURT:  Just claim 51, not 54?

6              MS. SHAMILOV:  Correct.  Then four -- let me

7    know if I'm going too fast.

8              THE COURT:  Let me see if there is any -- do you

9    need to confer?

10             MS. SHAMILOV:  Your Honor, we're good on that

11   one.

12             THE COURT:  So, some of these are going to be

13   applicable 51 and 54 and at least one is only applicable 51;

14   is that correct?

15             MS. SHAMILOV:  Yes, it will be, it lists them by

16   claim.

17             THE COURT:  Okay.  So then I propose we say

18   Groupon asserts that claims 51 and/or 54, since this list is

19   going to be sometimes 51 and sometimes 54, sometimes both.

20   Do you agree with that?

21             MR. HADDEN:  That is fine, Your Honor.

22             MS. SHAMILOV:  That is fine.

23             THE COURT:  Is IBM okay with that?

24             MR. GEIST:  Yes, Your Honor.

25             THE COURT:  Is IBM fine with what will now be

1  No. 1 saying claim 51 is anticipated by the book, Spinning

2  the Web?

3              MR. GEIST:  Yes, Your Honor.

4              MR. OUSSAYEF:  Yes.

5              THE COURT:  All right.

6              MS. SHAMILOV:  Then the next says claim 54 is

7  obvious in light of Spinning the Web or in light of Spinning

8  the Web and Williams.

9              MR. OUSSAYEF:  That is different from what we

10  have.  I don't think you had Williams.

11              THE COURT:  All right.  If you all ...

12              (Counsel confer.)

13              THE COURT:  All right.  I will give you all a

14  moment after we're done with everything else to confer and

15  see if you can agree on this list.

16              MS. SHAMILOV:  And we'll print the list for you,

17  Your Honor.  If that is ...

18              THE COURT:  I'm going to need you to print it.

19  I need you to be able to tell me it.

20              MS. SHAMILOV:  Okay.

21              THE COURT:  But skipping past 33 and 34.  What

22  is next from IBM?

23              MR. GEIST:  Your Honor, the next one is on page

24  41.  And this is the anticipation section.

25              THE COURT:  Okay.

1   MR. GEIST:  And here, Your Honor, you adopted

2   Groupon's proposed construction.  We ask that here it says:

3   "has submitted prior art."  There is a dispute over whether

4   the Liberty Alliance standards were before the Patent Office

5   or not before the Patent Office.  This implies that the

6   Court has taken a position on that issue.  We ask that they

7   change it to "at least some."

8   THE COURT:  "Groupon has submitted at least some

9   prior art that was not considered?"

10   MR. GEIST:  Yes, Your Honor.

11   THE COURT:  All right.  What does Groupon think?

12   MR. HADDEN:  Yes, we object.  The patent

13   references are the patent references.  They're not there, so

14   it is not in issue.

15   MR. GEIST:  And that is the dispute, Your Honor.

16   THE COURT:  All right.  This is the one that is

17   referenced in the specification but not cited in references

18   considered; is that right?

19   MR. HADDEN:  Correct.

20   THE COURT:  All right.  I will think about that

21   for a moment.  Give me one second.

22   All right.  Go ahead.

23   MR. GEIST:  Next, Your Honor, is on page 47.

24   And here, this is with respect to damages.

25   THE COURT:  Okay.

1            MR. GEIST:  And here, Your Honor, it's just that

2    there is a repetition with respect to when to award damages.

3    There were two different places where it discussed the '346

4    patent below.  Here in the second paragraph, it says:  "For

5    the '346 patent, you should also not consider damages if you

6    find that it is not exhausted or licensed."

7            In the first paragraph, there is a similar

8    statement provided:  "If you consider it has been exhausted

9    or licensed, you shouldn't consider damages."  We think it

10   should be one or the other.

11           THE COURT:  Does Groupon have a view?

12           MS. SHAMILOV:  Yes, Your Honor.  I think what

13   part of what you have here is correct because the first

14   paragraph tells the jury at what point we'll be discussing

15   damages and then explain to them the specifics for the '346.

16   Right?  If you are going to admit the implied license in

17   the first paragraph, we need to rewrite the paragraph

18   because they will only get discussions of damages in certain

19   circumstances if all those three things are either met or

20   not.

21           THE COURT:  Yes, I thought it was helpful to

22   have a specific instruction on the '346.  We've got

23   something similar, you will see on the verdict sheet, just

24   to make sure that the jury understands under what

25   circumstances to get to damages.

1    MR. GEIST:  And then, Your Honor, the next is on

2  page -- I'm going to jump back.  I'm sorry.  On page -- I'll

3  come back to that.

4    Sorry.  The next one is on page 51.  This is

5  with respect to the relevant factors for reasonable royalty.

6    And here, Your Honor, the parties had competing

7  proposals.  And this is with respect to the *Georgia-Pacific*

8  factors.

9    Your Honor adopted both proposals.  IBM's

10  proposal was the *Georgia-Pacific* factors themselves

11  whereas Groupon had proposed that the Court split the

12  *Georgia-Pacific* factors in some way with a restatement

13  of them.  So they had some restated upfront and then a

14  sentence saying the following are the *Georgia-Pacific*

15  factors with an abbreviated list of factors.

16    As it stands now, there is a repetition because

17  all of the 15 factors were included in IBM's proposal.  And

18  then there is additional statements that Groupon had

19  proposed that are adopted in between.

20    So that would be starting at No. 3.

21    THE COURT:  Right, I understand.

22    What does Groupon think?

23    MS. SHAMILOV:  I'm actually not seeing the

24  repetition.  Can you show me where it appears on the top are

25  repetition on the bottom?

1          MR. GEIST:  So the first two here, those are

2    *Georgia-Pacific* factors, and then there is the three

3    statements I believe that were proposed by Groupon.

4          That the value of the claimed invention

5    contributes to the website mobile application is getting

6    at the *Georgia-Pacific* factors, valued factors other

7    than the claimed invention contributes, getting at the

8    *Georgia-Pacific* factors but not directly stating them.

9          There is another one:  And you may also consider

10   evidence on any of the following factors which you may have

11   heard referred to as the *Georgia-Pacific* factors.  We

12   believe that statement is inaccurate because it omits some

13   of the *Georgia-Pacific* factors, but our proposal was to

14   adopt the Court's previous language that just had the 15

15   *Georgia-Pacific* factors in a row for this instruction.

16          THE COURT:  Are you saying that this redundant

17   list doesn't actually include all of the *Georgia-Pacific*

18   factors?

19          MR. GEIST:  Certainly all of the *Georgia-Pacific*

20   factors are not included below the statement that says the

21   following list are the *Georgia-Pacific* factors.

22          THE COURT:  Okay.  What does Groupon think I

23   should do?

24          MS. SHAMILOV:  I think Your Honor can -- I mean

25   I'm not -- I haven't compared the list, but if Your Honor

1    wants to read all 15?  I don't think it is necessary,

2    right?, to read 15 factors.  There is no inconsistency.

3              THE COURT:  I think the issue was you all had

4    asked me to call out a few of them and tailor them to the

5    case.

6              MS. SHAMILOV:  Correct.  And that is what this

7    does.

8              THE COURT:  Right.  So if I -- I guess if you

9    want to point out, if you want to point out the two that are

10   missing from the *Georgia-Pacific* factors, I can add those.

11   And I'm not troubled by the redundancy.  I thought it was

12   helpful to call out some that the jury had heard mostly

13   about.  So Groupon would be okay with that?

14             MS. SHAMILOV:  Yes, I have no objection to the

15   list after "you may also consider these factors" and listing

16   all 15 factors there.  That is just fine.

17             THE COURT:  Are you able to tell me which two

18   are missing?  And if not, I'll give you a minute to look

19   them up.

20             MR. GEIST:  One and 2, Your Honor.

21             THE COURT:  You have to tell me what they are.

22             MR. GEIST:  Sorry.

23             So from the Court's current construction, it's

24   the first and second numbered paragraphs.

25             THE COURT:  So you are just asking me to move

1   those two down to be Nos. 1 and 2 down below the

2   *Georgia-Pacific* factors?

3           MR. GEIST:  Yes, Your Honor.

4           THE COURT:  Is there any objection to that?

5           MS. SHAMILOV:  I think, Your Honor, if we're

6   going to call out some that are helpful, which we did at the

7   top, I don't understand why my ability to --

8           THE COURT:  That's fine.  I'll do it twice.  I

9   will move 1 and 2 down to on the first two *Georgia-Pacific*

10  factors.  They will also appear as 1 and 2 on the things I'm

11  calling out they may want to consider.

12          MS. SHAMILOV:  Sure.

13          THE COURT:  Okay.  Is there anything else about

14  that?

15          MR. GEIST:  Not about that other than preserve

16  our objection, Your Honor.

17          THE COURT:  Right.

18          MR. GEIST:  And now jumping back -- I'm sorry,

19  Your Honor --

20          THE COURT:  Okay.

21          MR. GEIST:  -- to page 30.  This is again

22  implied license.  I don't think I mentioned this the first

23  time through.  But catch me if I'm wrong on that.

24          So this just includes in the bottom sentence, a

25  statement that if they find implied license, they must find

1    that Groupon does not infringe.

2              Our understanding, Your Honor, it is our current

3    intention, we haven't seen the verdict form, is that --

4              THE COURT:  There is a question on implied

5    license.  Groupon, I think you agreed I could take that

6    sentence out?

7              MS. SHAMILOV:  I actually have it flagged to

8    change it, Your Honor.  I think it should have that language

9    that "Groupon does not infringe the '346 patent" should

10   really just be the same language when it says "you must find

11   for Groupon on this issue" so just use that phrase there

12   also.

13             THE COURT:  Do you disagree with that?

14             MR. GEIST:  Other than our disagreement with the

15   section generally, Your Honor, no.

16             THE COURT:  All right.  So we'll change at page

17   30, it will say "then you must find for Groupon on this

18   issue."

19             MR. GEIST:  Yes, Your Honor.

20             THE COURT:  Is there anything else?

21             MR. GEIST:  Not from IBM, Your Honor.

22             THE COURT:  Is there anything from Groupon?

23             MS. SHAMILOV:  Yes, just a couple issues.

24             One on infringement on page 26, second line.

25             You say that "IBM must prove all steps of the

1  claimed method performed, dictated by, or attributable to

2  Groupon."  I think it should say "performed or attributable

3  to Groupon.  "Dictated" is not in any case law on this case,

4  and the only cases they cite, SiRF, the word "dictated" is

5  used to describe the accused system.  It's not the standard

6  so it should say "performed or attributable."

7           THE COURT:  Does IBM disagree with that?

8           MR. GEIST:  We do, Your Honor.  That is not

9  directly the standard that was used in the SiRF case by the

10 Federal Circuit in 2010 and since been used by other courts.

11          THE COURT:  All right.  I'm going to go with

12 Groupon on this.  The theories we're presenting to the jury

13 are the performed or the attributable infringement as we

14 agreed or as I ruled earlier today.

15          MR. GEIST:  Understood.  And I obviously will

16 preserve our objection on that issue.

17          THE COURT:  Obviously, yes.

18          MS. SHAMILOV:  There was also --

19          THE COURT:  And just -- I'm sorry.  Does

20 "dictated" only appear on that one place on the second line?

21          MS. SHAMILOV:  That is where I found it.

22          THE COURT:  Okay.

23          MS. SHAMILOV:  There is also an issue here

24 because the way this is written right now, it implies that

25 the "performed or attributable" language applies to all

1    infringement issues, and it doesn't, so that basically

2    confuses the infringement theories on all the patents.

3              I think we need to break it up and we have an

4    instruction on page 29, right?, that deals with it, and I

5    think that is where the word needs to go to be more

6    accurate.

7              THE COURT:  So you would have me actually delete

8    reference to "attributable" at page 26.

9              MS. SHAMILOV:  Correct.

10             THE COURT:  All right.  What does IBM think of

11   that?

12             MR. GEIST:  We think that is incorrect, Your

13   Honor.  The statement that is being included is the

14   statement for direct infringement.  This is the standard for

15   direct infringement for a method claim, as Your Honor has

16   found.

17             THE COURT:  I'm going to keep the reference to

18   "attributed" at page 26.  I think the totality of the

19   instructions will make it clear as well as probably the

20   arguments that the attributable infringement theory only

21   applies to the particular patents.

22             MS. SHAMILOV:  On 29, I thought this morning we

23   agreed that there has to be claim element for which this

24   applies, and counsel said it applies to claim elements in

25   '849 patent but we're listing '967 here.  So we think this

1    should really only be with respect to the '849 patent based

2    on discussion this morning.

3                    THE COURT:  Is IBM asking for attributable

4    infringement for both the '849 and '967?

5                    MR. GEIST:  Yes, Your Honor.  As Mr. Oussayef

6    discussed this morning, there is that portion of the '967.

7                    THE COURT:  All right.  His argument, such as it

8    was, was much stronger on the one patent than the other but

9    my finding was meant to apply to both of those.

10                   MS. SHAMILOV:  I, just for the record, will

11   preserve the objection to that.

12                   On 32 on willful infringement.  Willful

13   infringement is always sort of a confusing concept for the

14   jury, because it is an extra thing to infringement.  So

15   we had -- I think we need to point out, which is case law,

16   that mere infringement is not enough.  And I think it is

17   important for the jury to know that just because they found

18   infringement doesn't mean that there is necessarily willful

19   infringement.  And I don't think there is anything in this

20   instruction without that, that should be noncontroversial

21   phrase.

22                   THE COURT:  Something to the effect of just

23   because you may have found Groupon infringes does not mean

24   they willfully infringe?

25                   MS. SHAMILOV:  Correct.

1    THE COURT:  Does IBM object to that?

2    MR. GEIST:  That's fine, Your Honor.

3    THE COURT:  Okay.  Ms. Shamilov, do you want to

4    propose where I add that sentence?

5    MS. SHAMILOV:  Yes.  I think I would propose it

6    at the end of the first paragraph.  However, a finding -- a

7    mere infringement is not -- a finding of mere infringement

8    is not enough to find willfulness.

9    MR. GEIST:  Your Honor, we do find that language

10   objectionable.  The language Your Honor enunciated earlier,

11   that we're okay with that.

12   And as far as proposal for where to put it, I

13   think it makes sense, Your Honor, after the statement about

14   whether an accused infringer's knowledge of the patents is

15   sufficient, I think you could also say that "infringement

16   itself is not sufficient," followed by "if sufficient, does

17   not invalidate."

18   THE COURT:  All right.  What I'm going to do is

19   create a new paragraph what is now before the last paragraph

20   which is a single sentence.  So it would be the third

21   paragraph of the instruction will say:  "However, just

22   because you may have found Groupon infringes does not mean

23   Groupon willfully infringes."

24   MS. SHAMILOV:  Thank you, Your Honor.

25   THE COURT:  All right.  Anything further you

1    want to say about that?

2              MR. GEIST:  No, Your Honor.

3              THE COURT:  Okay.

4              MS. SHAMILOV:  And then my last thing.  On page

5    39, we were describing prior art, there is a 102(g)

6    instruction.  And we are talking about the Amazon system and

7    that date is first.

8              THE COURT:  Right.  I thought that was the issue

9    yesterday that we, at least IBM argued he never disclosed a

10   prior invention defense.  And it's just an anticipation

11   defense.

12             MS. SHAMILOV:  There is plenty of support in our

13   expert report talking about full data and the word validity

14   contentions, the issues of law with the pretrial order we

15   submitted lists 102(g) there.  There were certainly, there

16   are certainly disclosures of full data, doing it first, and

17   then whatever he did mapping to the claim.  I am not sure if

18   I was in court for that discussion.  I didn't remember.

19             THE COURT:  I think it was late yesterday.  I

20   think you were but, Mr. Oussayef, I think was here, too.

21   Your contention I think is that they never disclosed the

22   prior art invention theory; right?

23             MR. OUSSAYEF:  That's correct, Your Honor.

24             THE COURT:  I was persuaded by that, right or

25   wrong, so that is why we took the prior invention out.  Not

1  adequately disclosed.

2       MS. SHAMILOV:  I think these are all the issues

3  I saw, Your Honor.

4       THE COURT:  Okay.  So you all are going to work

5  on 33, the Invalidity - Generally, and there was one issue

6  of anticipation that I need to think about.

7       So how long will you need to figure out this

8  list of prior art?

9       MR. GEIST:  Your Honor, the parties exchanged

10  e-mails and it came directly from them what should be on the

11  list that we thought should be agreed to.  It should not

12  take that long.

13       THE COURT:  We'll check back in a couple

14  minutes.

15       MS. SHAMILOV:  Thank you, Your Honor.

16       (Brief recess taken.)

17            *       *       *

18       (Proceedings reconvened after recess.)

19       THE COURT:  All right.  So Mr. Looby handed me a

20  list of the prior art references I understand that is agreed

21  to.  Is that correct?

22       MR. GEIST:  That's correct, Your Honor.

23       MS. SHAMILOV:  Yes, Your Honor.

24       THE COURT:  So he will make that change.  And

25  then on Anticipation, I'm not making a finding on whether

1  the prior art was or was not considered by the PTO, and I

2  didn't intend to.  So we're going to rewrite that second

3  paragraph of Anticipation, page 41.

4            It will say in relevant part:  Groupon contends

5  that some of the asserted claims of the patents-in-suit are

6  invalid for anticipation.  Groupon must convince you of this

7  by clear and convincing evidence.  Groupon contends that it

8  has presented in this trial prior art that was not

9  considered by the Patent Office during prosecution of the

10  patents-in-suit.  In deciding the issue of invalidity, you

11  may take into account whether the prior art was not

12  considered by the Patent Office when it issued the

13  patents-in-suit.

14            Any questions about that or anything further on

15  that?

16            MR. GEIST:  No, Your Honor.

17            THE COURT:  Questions?

18            MS. SHAMILOV:  No, Your Honor.

19            THE COURT:  All right.  So we're going to make

20  all these changes and then start printing.  And as soon as

21  that is done, we'll grab the jury and come in and read the

22  instructions.  We will be in recess.

23            (Brief recess taken.)

24            *     *     *

25            (Proceedings reconvened after recess.)

1            **THE COURT:  I have the final instructions.  I'm**

2   **going to bring the jury in to read them.  Any issues before**

3   **we do that?**

4            **MR. OUSSAYEF:  No, Your Honor.**

5            **(Discussion off the record.)**

6            **THE COURT:  We're ready to bring the jury in.**

7   **Do you have copies for the parties?  We'll bring the jury**

8   **in.**

9            **(Jury entering the courtroom at 11:47 p.m.)**

10           **THE COURT:  All right.  Welcome back, ladies and**

11  **gentlemen.  Mr. Looby is going to hand you each your very**

12  **own copy of the document called final jury instructions.**

13  **It's 59 pages, plus the table of contents.  It took me a**

14  **little while to finish those up and to make copies for**

15  **everyone, but we are now ready for me to read them to you.**

16  **What I'm going to do is read to you through page 54 between**

17  **now and 1:00 p.m., unless I get too tired or 1:00 p.m.**

18  **arrives before I get to page 54, in which case I'll finish**

19  **in the morning.  But I'll definitely be letting you go by**

20  **1:00 p.m. today.**

21           **And once I have read through page 54, tomorrow**

22  **morning you will hear from counsel.  The plaintiff gets to**

23  **make a closing argument and then the defendant, and then**

24  **plaintiff gets to make a rebuttal argument.**

25           **Once that's all done, I'll read you the last few**

1    pages of these instructions and I will give you a verdict

2    sheet tomorrow which will show you the questions that we

3    need you to answer, and I'll read that to you as well

4    tomorrow.  Once all that is done, the case will be submitted

5    to you for your deliberations and that will be some time

6    tomorrow.

7                So, with that background, again, feel free to

8    follow along as I'm reading to you if you wish.  I am going

9    to start on page one of these instructions.  One is General

10   Instructions.

11               1.1.  Introduction.

12               Members of the jury, now it is time for me to

13   instruct you about the law that you must follow in deciding

14   this case.  Each of you have been provided a copy of these

15   instructions.  You may read along as I deliver them if you

16   prefer.

17               I will start by explaining your duties and the

18   general rules that apply in every civil case.  Then I will

19   explain some rules that you must use in evaluating

20   particular testimony and evidence.  Then I will explain the

21   positions of the parties and the law you will apply in case.

22   And last, I will explain the rules that you must follow

23   during your deliberations in the jury room, and the possible

24   verdicts that you may return.

25               Please listen very carefully to everything I

1 say.

2          You will have a written copy of these

3 instructions with you in the jury room for your reference

4 during your deliberations.  You will also have a verdict

5 form which will list the questions that you must answer to

6 decide this case.

7          1.2.  Jurors' Duties.

8          You have two main duties as jurors.  The first

9 is to decide what the facts are from the evidence that you

10 saw and heard in court.  Deciding what the facts are is your

11 job, not mine, and nothing that I have said or done during

12 this trial was meant to influence your decision about the

13 facts in any way.  You are the sole judges of the facts.

14          Your second duty is to take the law that I give

15 you, apply it to the facts, and decide under the appropriate

16 burden of proof which party should prevail on any given

17 issue.  It is my job to instruct you about the law, and you

18 are bound by the oath you took at the beginning of the trial

19 to follow the instructions that I give you even if you

20 personally disagree with them.  This includes the

21 instructions that I gave you before and during the trial,

22 and these instructions.  All of the instructions are

23 important, and you should consider them together as a whole.

24          Perform these duties fairly.  Do not guess or

25 speculate, and do not let any bias, sympathy or prejudice

1    you may feel toward one side or the other influence your

2    decision in any way.

3              1.3.   Evidence Defined.

4              You must make your decision based only on the

5    evidence that you saw and heard here in court.  Do not let

6    rumors, suspicions, or anything else that you may have seen

7    or heard outside of court influence your decision in any

8    way.

9              The evidence in this case includes only what the

10   witnesses said while they were testifying under oath

11   (including deposition transcript testimony that has been

12   played by video or read to you), the exhibits that I allowed

13   into evidence, and the stipulations to which the lawyers

14   agreed.

15             Certain charts and graphics have been used to

16   illustrate testimony from witnesses.  Unless I have

17   specifically admitted them into evidence, these charts and

18   graphics are not themselves evidence, even if they refer to,

19   identify, or summarize evidence, and you will not have these

20   demonstratives in the jury room.

21             Nothing else is evidence.  The lawyers'

22   statements and arguments are not evidence.  The arguments of

23   the lawyers are offered solely as an aid to help you in your

24   determination of the facts.  Their questions and objections

25   are not evidence.  My legal rulings are not evidence.  You

should not be influenced by a lawyer's objection or by my ruling on that objection.  Any of my comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked.  I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see.  And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record.  You must completely ignore all of these things.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.  Make your decision based only on the evidence, as I have defined it here, and nothing else.

1.4.   Direct and Circumstantial Evidence.

During the preliminary instructions, I told you about "direct evidence" and "circumstantial evidence."  I will now remind you what each means.

Direct evidence is simply evidence like the testimony of an eye witness which, if you believe it, directly proves a fact.  If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of

circumstances that indirectly proves a fact.  If someone

walked into the courtroom wearing a raincoat covered with

drops of water and carrying a wet umbrella, that would be

circumstantial evidence from which you could conclude that

it was raining.

It is your job to decide how much weight to give

the direct and circumstantial evidence.  The law makes no

distinction between the weight that you should give to

either one, nor does it say that one is any better evidence

than the other.  You should consider all the evidence, both

direct and circumstantial, and give it whatever weight you

believe it deserves.

1.5.  Consideration of Evidence.

You should use your common sense in weighing the

evidence.  Consider it in light of your everyday experience

with people and events, and give it whatever weight you

believe it deserves.  If your experience tells you that

certain evidence reasonably leads to a conclusion, you are

free to reach that conclusion.

1.6.  Statements of Counsel.

A further word about statements of counsel and

arguments of counsel.  The attorneys' statements and

arguments are not evidence.  Instead, their statements and

arguments are intended to help you review the evidence

presented.

1    If you remember the evidence differently from

2    the way it was described by the attorneys, you should rely

3    on your own recollection.

4    1.7.   Credibility of Witnesses.

5    You are the sole judges of each witness's

6    credibility.  You may believe everything a witness says, or

7    part of it, or none of it.  You should consider each

8    witness's means of knowledge; strength of memory;

9    opportunity to observe; how reasonable or unreasonable the

10    testimony is; whether it is consistent or inconsistent;

11    whether it has been contradicted; the witness's biases,

12    prejudices, or interests; the witnesses' manner or demeanor

13    on the witness stand; and all circumstances that, according

14    to the evidence, could affect the credibility of the

15    testimony.

16    In determining a weight to give to the testimony

17    of a witness, you should ask yourself whether there is

18    evidence tending to prove that the witness testified falsely

19    about some important fact or whether there was evidence that

20    at some other time the witness said or did something, or

21    failed to say or do something, that would different from the

22    testimony he or she gave at the trial in person or by

23    deposition testimony played by video or read to you.  You

24    have the right to distrust such witness's testimony and you

25    may reject all or some of the testimony of that witness or

give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness is not telling the truth.  People may tend to forget some things or remember other things inaccurately.  If a witness has made a misstatement, you must consider whether it was an innocent lapse of memory or an intentional falsehood, and that may depend on whether it concerns an important fact or an unimportant detail.

One more point about the witnesses.  Sometimes jurors wonder if the number of witnesses who testified makes any difference.  Proof of a fact does not necessarily depend on the number of witnesses who testified about it.  Unless I instruct you otherwise, the testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary if after all the evidence you believe that single witness.

Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the number.

1.8.  Expert Witnesses.

Expert testimony is testimony from a person who has a special skill or knowledge in some science,

profession, or business.  This skill or knowledge is not
common to the average person but has been acquired by the
expert through special study or experience.

In weighing expert testimony, you may consider
the expert's qualifications, the reasons for the expert's
opinions, and the reliability of the information supporting
the expert's opinions, as well as the factors I have
previously mentioned for weighing testimony of any other
witness.  Expert testimony should receive whatever weight
and credit you think appropriate given all the other
evidence in the case.  You are free to accept or reject the
testimony of experts, just as with any other witness.

1.9.  Deposition Testimony.

During the trial, certain testimony was
presented to you by the playing of video excerpts from a
deposition.  The deposition testimony may have been edited
or cut to exclude irrelevant testimony as the parties have
only a limited amount of time to present you with evidence.
You should not attribute any significance to the fact that
the deposition videos may appear to have been edited.

Deposition testimony is out of court testimony
given under oath and is entitled to the same consideration
you would give it had the witnesses personally appeared in
court.

1.10.  Rule 30(b)(6) Deposition Testimony.

In this case, there were certain witnesses identified as "Rule 30(b)(6) witnesses" for the parties. They are:  Robert Filepp, Heather Hinton, Thomas McBride, and Arun Iyengar for IBM; and Jason Carlisle, Phillip Dunham, Jim Breen, Damien Schmitz, and Jan Krems for Groupon.  These Rule 30(b)(6) witnesses were designated to speak at their deposition on certain topics on behalf of the entities which designated them as Rule 30(b)(6) witnesses. Rule 30(b)(6) witnesses are required to testify about information known or reasonably available to the designated entity related to those particular topics.  For answers within the designated topics, the entity is bound by the answers provided by its Rule 30(b)(6) witness.

If these witnesses also provided testimony outside of their designated topics based on their personal knowledge and/or provided their personal opinions in addition to testifying to factual information on behalf of the designating entities, the designating entities are not bound by answers that provide personal knowledge and/or personal opinions that are outside of the designated topics.

1.11.  Demonstrative Exhibits.

During the course of the trial, you have seen many exhibits.  Many of these exhibits were admitted as evidence.  You will have these admitted exhibits in the jury room for your deliberations.  The remainder of the exhibits

1    (including charts, PowerPoint presentations, and animations)

2    were identified to help illustrate the testimony of the

3    various witnesses.  These illustrative exhibits, called

4    "demonstrative exhibits," have not been admitted, are not

5    evidence, and should not be considered as evidence.  Rather,

6    it is the underlying testimony of the witness that you heard

7    when you saw demonstrative exhibits that is in evidence in

8    this case.

9                   1.12.  Use of Notes.

10               You may have taken notes during trial to assist

11   your memory.  As I instructed you at the beginning of the

12   case, you should use caution in consulting your notes.

13   There is generally a tendency I think to attach undue

14   importance to matters which one has written down.  Some

15   testimony which is considered unimportant at the time

16   presented, and thus not written down, takes on greater

17   importance later in the trial in light of all the evidence

18   presented.  Therefore, your notes are only a tool to aid

19   your own individual memory, and you should not compare notes

20   with any other jurors in determining the content of any

21   testimony or in evaluating the importance of any evidence.

22   Your notes are not evidence, and are by no means a complete

23   outline of the proceedings or a list of the highlights of

24   the trial.

25               Above all, your memory should be the greatest

asset when it comes time to deliberate and render a decision in this case.

### 1.13.   Burdens of Proof.

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof."  In a patent case such as this, there are two different burdens of proof that are used.  The first is called "preponderance of the evidence."  The second is called "clear and convincing evidence."  I told you about these two standards of proof during my preliminary instructions to you and I will now remind you what they mean.

IBM contends that Groupon has infringed claims 1 and 2 of the '967 patent, claims 1 and 8 of the '849 patent, claims 51 and 54 of the '601 patent, and claims 1 and 5 of the '346 patent.  A party asserting patent infringement has the burden of proving infringement by a preponderance of the evidence.  A preponderance of the evidence is evidence that, when considered in light of all of the facts, leads you to believe that what that party claims is more likely true than not.  To put it differently, if you were to put the parties' evidence on opposite sides of a scale, the evidence supporting IBM's claims must make the scales tip somewhat toward its side.  If it does not, and the scale remains equal or tips the other way, then IBM failed to prove its

infringement claims.

Groupon denies that it has infringed and contends that the asserted claims of the '601 and '346 patents are invalid.  A party challenging the validity of a patent has the burden of proving that the patent is invalid by clear and convincing evidence.  Clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.  Proof by clear and convincing evidence is, thus, a higher burden than proof by a preponderance of the evidence.

Some of you may have heard the phrase "proof beyond a reasonable doubt."  That burden of proof applies only in criminal cases and has nothing to do with a civil case like this one.  You should therefore not consider it in this case.

That takes us to Section 2.  The Parties and Their Contentions.

2.1.  The Parties.

I will now review for you the parties in this action, and the position of the parties that you will have to consider in reaching your verdict.

As I have previously told you, the plaintiff in this case is Internet Business Machines Corporation.  I will refer to the plaintiff as "IBM" or "Plaintiff."  The defendant in this case is Groupon Inc.  I will refer to the

1    defendant as "Groupon" or "Defendant."

2              2.2.   The Parties' Contentions.

3              There are four patents at issue in this case:

4    United States Patent Nos. 5,796,967; 7,072,849; 5,961,601;

5    and 7,631,346.   You may have heard the lawyers and witnesses

6    in this case refer to the IBM's patents as the '967 patent,

7    the '849 patent, the '601 patent, and the '346 patent, or

8    collectively as the patents-in-suit.

9              Copies of the '967, '849, '601, and '346 patents

10   have been given to you.

11             IBM contends that Groupon's website and mobile

12   website infringe claims 1 and 2 of the '967 patent.   IBM

13   also contends that Groupon's website, mobile website, and

14   mobile applications infringe claims 1 and 8 of the '849

15   patent, claims 51 and 54 of the '601 patent, and claims 1

16   and 5 of the '346 patent.   Specifically, IBM contends that

17   Groupon directly infringes the asserted claims of the '967,

18   '849, '601, and '346 patents.   IBM also contends that

19   Groupon's infringement was willful.   IBM further contends

20   that it is entitled to damages to compensate IBM for

21   Groupon's infringement of the '967, '849, '601, and '346

22   patents.

23             Groupon denies that it infringes any asserted

24   claim of the '967, '849, '601, and '346 patents, and that

25   any infringement was willful.   Groupon also contends that

the asserted claims of the '601 and '346 patents are invalid

for several independent reasons and that any alleged use of

the '346 patent is licensed and IBM has exhausted its right

to assert that patent.  Groupon contends that IBM is not

entitled to recover any damages in this case.

2.3.   Summary of the Patent Issues.

I will now summarize the patent issues that you

must decide and for which I will provide instructions to

guide your deliberations.  Here are the issues you must

decide:

1.  Whether IBM has proven by a preponderance of

the evidence that Groupon is liable for infringement of one

or more of the asserted claims.

2.  Whether Groupon has proven by a

preponderance of the evidence that it had an implied license

to practice the '346 patent and/or that IBM's rights to

assert the '346 patent against Groupon were exhausted by

virtue of IBM's license to Facebook and/or Google.

3.  Whether IBM has proven by a preponderance of

the evidence for each patent that the infringement, if any,

was willful.

4.  Whether Groupon has proven by clear and

convincing evidence that one or more asserted claims of the

'601 and/or '346 patents are invalid.

5.  If applicable:  What amount of damages, if

any, IBM has proved by a preponderance of the evidence.  (I

will explain later the circumstances under which you would

need to decide damages.)

I will provide more detailed instructions on

each of the issues you must decide elsewhere in these jury

instructions.

Section 3 is called The Patent Claims.

3.1.  Patent Laws.

At the beginning of the trial, I gave you some

general information about patents and the patent system and

a brief overview of the patent laws relevant to this case.

I will now give you more detailed instruction about the

patent laws that specifically relate to this case.

3.2.  Patent Claims Generally.

Throughout the trial, and in my instructions,

you have heard of about the patent "claims" and the

"Asserted Claims."  Before you can decide many of the issues

in this case, you will need to understand the role of patent

"claims."  The patent claims are the numbered paragraphs at

the end of each patent.  The claims are important because

the words of the claims define what a patent covers.  Only

the claims of a patent can be infringed.  The claims are

intended to define, in words, the bounds of the purported

invention.  Therefore, the description in a patent

specification of a preferred embodiment does not necessarily

define the full scope of the patent claim.  The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent as coverage.  Each of the asserted claims must be considered individually.

Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim.  Therefore, what a patent covers depends, in turn, on what each of its claims covers.  You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.

37.3.  Construction of the Claims.

It is the Court's duty under the law to define what the patent claims mean.  As I instructed you at the beginning of the case, I have made my determinations, and I will now instruct you on the meaning of the claim terms. You must apply the meaning that I give in each patent claim to decide if the claim is infringed or invalid.  You must accept my definitions of these words or groups of words in the claims as being correct.  You must ignore any different definitions used by the witnesses, including expert witnesses, or the attorneys.

You are advised that the following definitions

for the following terms or groups of terms must be applied:

With the '967 patent for the claim term "object" or "objects," the construction is "data structure or structures."

"Application" or "applications," the construction is "information events composed of a sequence of one or more pages opened at a screen."

For the claim term "the objects being retrieved from the objects stored at the respective reception system, or if unavailable from the objects stored at the respective reception system, then from the network," the construction is "the objects being retrieved from the objects stored at the respective reception system, or, if the current versions of the objects are not present from the objects stored at the respective reception system, then from the network."

The claim term "permit random movement" has the construction "allow navigation to other applications at the user's behest.

The claim term "at least one procedure for navigating to a new application/a plurality of different procedure (sic) for navigating to a new application" has the construction "at least one procedure for moving to another application/a plurality of different procedures for moving to another application."

The claim term "computer network/the network"

1  has the construction "two or more interconnected computers."

2         The claim term "command function" or "command

3  functions" is construed as "a function that enables the user

4  to interact with the reception system and other elements of

5  the network."

6         The claim term "a first partition for presenting

7  applications" has the construction "a first area for

8  presenting applications."  And,

9         The claim term "a second partition for

10 presenting a plurality of command functions" has the

11 construction "a second area for presenting a plurality of

12 command functions."

13         For the '849 patent, the claim term "object" or

14 "objects" has the construction "data structure or

15 structures."

16         The claim term "application" or "applications"

17 has the construction "information events composed of a

18 sequence of one or more pages opened at a screen."

19         "selectively storing advertising objects at a

20 store established at the reception system" has the

21 construction, "pre-fetching advertising objects and storing

22 at a store established at the reception system in

23 anticipation of display concurrently with the applications."

24         The claim term "structuring advertising in a

25 manner compatible to that of the applications so that it may

be presented" has the construction "formatting advertising

for potential use with a plurality of applications."

            The claim term "computer network/the network"

has the construction "two or more interconnected computers."

            The claim term "structuring applications so that

they may be presented through the network at a first portion

of one or more screens of display, structuring applications

so that they may be presented at a first portion of one or

more screens of display" has the construction "formatting

applications so that they may be presented through the

network at a first area of one or more screens of display,

formatting applications so that they may be presented at a

first area of one or more screens of display."  And,

            The claim term "at a second portion of one or

more screens of display concurrently with applications" has

the construction "at a second area of one or more screens of

display concurrently with applications."

            Turning to the '601 patent.

            The claim term "recursively embedding the state

information in all identified continuations" has the

construction "applying a process one or more times to each

identified continuation to modify all identified

continuations to include state information."

            The claim term "continuation" or "continuations"

has the construction "a new request which a client may send

1    to a server, such as, for example, a hyperlink."

2            The claim term "all continuations in an output

3    from said service" has the construction "all new requests

4    which a client may send to a server, such as, for example, a

5    hyperlink, in an output from said service."

6            The claim term "stateless protocol" has the

7    construction "a protocol where every request from a client

8    to a server is treated independently of previous

9    connections."

10           The claim term "client" has the construction "a

11   computer which issues commands to the server which performs

12   the task associated with the command."

13           The claim term "conversation" or "conversations"

14   has the construction "a sequence of communications between a

15   client and server in which the server responds to each

16   request with a set of continuations and the client always

17   picks the next request from the set of continuations."

18           The claim term "state information" has the

19   construction "information about a conversation between a

20   client and a server."

21           Finally, the '346 patent.

22           "The preamble of claim 1."  For that, you are

23   told "the preamble limits the claim."

24           For the term "federated computing environment,"

25   the construction is "a set of distinct entities, such as

1  enterprises, organizations, institutions, et cetera, that

2  cooperate to provide a single-sign-on, ease-of-use

3  experience to a user, wherein the enterprises need not have

4  a direct, pre-established, relationship defining how and

5  what information to transfer about a user."

6           The claim term "single-sign-on operation" or

7  "single-sign-on operations" has the construction "an

8  authentication process whereby the user is subsequently not

9  required to perform another authentication operation during

10  a particular user session."

11          And the claim term, "user authentication" has

12  the construction, "the process of validating a set of

13  credentials that are provided by a user or on behalf of a

14  user."

15          For any words in the claims for which I have not

16  provided you with a definition, you should apply the plain

17  and ordinary meaning to a person of ordinary skill in the

18  art.

19          3.4.   Open Ended or Comprising Claims.

20          The beginning portion or preamble of several of

21  the Asserted Claims has the word "comprising."  The word

22  "comprising" means "including the following but not

23  excluding others."  A claim that uses the word "comprising"

24  or "including" is not limited to products or processes

25  having only the elements that are recited in the claim, but

also covers products or processes that have additional
elements that are not recited in the claims.

### 3.5.   Independent and Dependent Claims.

This case involves two type of patent claims:
independent claims and dependent claims.  An "independent
claim" sets forth all of the requirements that must be met
in order to be covered by that claim.  Thus, it is not
necessary to look at any other claim to determine what an
independent claim covers.  In this case, claim 1 of the '967
patent is an example of an independent claim.  You know this
because it mentions no other claims.  Accordingly, the words
of claim 1 of the '967 patent are read by themselves in
order to determine what claim 1 covers.  The remaining claim
of the '967 patent is a dependent claim.

A dependent claim does not itself recite all of
the requirements of the claim, but refers to another claim
to for some of its requirements.  In this way, the claim
"depends" on another claim.  A dependent claim incorporates
all of the requirements of the claim or claims to which it
refers.  The dependent claim then adds its own additional
requirements.  To determine what a dependent claim covers,
it is necessary to look at both the dependent claim and any
other claims to which it refers.  Here, for example, claim 2
of the '967 patent is a dependent claim.  You know this
because it refers to independent claim 1 by stating "The

method of claim 1 further comprising..." Accordingly, the words of claims 1 and 2 are read together in order to determine what claim 2 of the '967 patent covers.

I'm now at Section 4 called Infringement.

4.1.  Infringement Generally.

I will now instruct you on how to decide whether IBM has proven that Groupon has infringed the asserted claims of the patents-in-suit.

Infringement is assessed on a claim-by-claim and product-by-product basis.  Therefore, there may be infringement as to one claim but no infringement as to another, or infringement by one product and not by another. If, as here, a patent owner asserts multiple patent claims against the same product or method, then you must compare each claim separately against the product or method to determine whether the product or method infringes that individual patent claim.

In this case, IBM asserts that Groupon directly infringes the patents-in-suit.  In order to prove infringement, IBM must prove that the requirements for infringement are met by a preponderance of the evidence, i.e., that it is more likely than not that all of the requirements of infringement have been proved.

4.2.  Infringement.

To prove infringement by Groupon of a claim, IBM

must prove by a preponderance of the evidence that all steps

of a claimed method are performed by or attributable to

Groupon.  The presence of other steps beyond those claimed

does not avoid infringement, as long as each and every

claimed step is performed.

You must determine, separately for each Asserted

Claim, whether a claim is directly infringed.  If you find

that an asserted independent claim on which other claims

depend is not infringed, there cannot be infringement of any

dependent claim that refer directly or indirectly to that

independent claim.  If you find that an independent claim

has been infringed, then you must decide, separately,

whether the accused technology performs the additional steps

of the asserted dependent claims that depend from the

independent claim to determine if the accused technology

infringes the dependent claims.

All asserted claims in this case are method

claims.  Method claims are said to cover a method or a

process that includes each of the steps recited in the

claim, which may be referred to as "claim steps."

Infringement of a method claim occurs only when each step of

the method claim is actually performed.  Offering a system

or service does not itself infringe a method claim.  In

order for a method claim to be infringed, IBM must prove

that each step of the claimed method is actually performed,

1   not merely that a system or service has been offered that is

2   capable of performing the claimed method.

3            IBM asserts the following claims and contends

4   that the following infringes them.

5            For the '967 patent, the asserted claims are 1

6   and 2, and the accused product is Groupon's Website.

7            For the '849 patent, the asserted claims are 1

8   and 8, and the accused products are Groupon's Website and

9   Groupon's Mobile Applications.

10            For the '601 patent, the asserted claims are 51

11   and 54 and the accused products are Groupon's Website and

12   Groupon's Mobile Applications.  And for the '346 patent, the

13   asserted claims are one and five, and the accused products

14   are Groupon's website and Groupon's mobile application.

15            4.3.   Infringement - Knowledge of the Patent and

16   Intent to Infringe are Immaterial.

17            Someone can directly infringe a patent without

18   knowing of the patent or without knowing that what they are

19   doing is an infringement of the patent.  They also may

20   directly infringe a patent even though they believe in good

21   faith that what they are doing is not an infringement of any

22   patent.  A patentee need not always have direct -- a

23   patentee need not always have direct evidence of

24   infringement, as infringement may be established by

25   circumstantial evidence.

**4.4.   Infringement - Acts of Multiple Parties Must Be Combined to Meet All Claim Limitations.**

Infringement occurs where all steps of the claimed method are performed by, or are attributable to, a single party.  Where more than one party is involved in practicing the steps, you must determine whether the acts of one are attributable to the other such that a single party is responsible for the infringement.  There are two situations where there may be infringement if no single party performs all of the steps of a claimed process but more than one party performs every step of the process:  (1) the parties have formed a join enterprise or (2) one party directs or controls the other party's performance of the claim steps.

In this case, IBM alleges that if Groupon does not perform all steps of the claimed methods of the '849 patent and '967 patent, Groupon is still liable for infringement of those patents because any steps that it does not itself perform are attributable to Groupon, even if they are performed by another party.  IBM alleges that Groupon and third parties collectively infringe claims 1 and 8 of the '849 patent and claims 1 and 2 of the '967 patent.  IBM does not allege that Groupon infringes any of the '346 and '601 patents through any actions taken by third parties.

For infringement through combined acts of

1 multiple parties to be proved, IBM must prove by a

2 preponderance of the evidence (1) that all steps of the

3 claimed process were performed in the United States and (2)

4 that the acts of third parties are attributable to Groupon

5 either because Groupon and the third parties have formed a

6 joint enterprise or because Groupon directs or controls the

7 acts of the third parties.

8       To prove that Groupon directed or controlled the

9 acts of third parties, IBM must prove (1) that Groupon

10 conditions participation in an activity or receipt of a

11 benefit upon performance of a claim step or steps by third

12 parties and (2) that Groupon established how or when the

13 claimed step or steps were performed.

14       4.5.   Implied License.

15       I will now instruct you on determining whether

16 Groupon has an implied license to practice the '346 patent.

17 You must determine whether IBM's licenses with Facebook and

18 Google grant to Groupon an implied license to use and

19 provide access to Facebook's and Google's sign-on/sign-up

20 technologies.

21       To prevail on the defense of implied license,

22 Groupon must prove by a preponderance of the evidence that

23 IBM's licenses to Facebook and Google authorize Facebook

24 and/or Google to distribute their sign-on/sign-up technology

25 to third parties, such as Groupon, and allow those third

1    parties to use those sign-on/sign-up technologies in a

2    manner that may practice the '346 patent.  If you find that

3    IBM's licenses to Facebook and Google authorize such

4    conduct, then you must find for Groupon on this issue.

5                    4.6.  Patent Exhaustion.

6              I will now instruct you on determining whether

7    IBM's rights to assert the '346 patent against Groupon are

8    "exhausted," and thus barred under the doctrine of patent

9    exhaustion.  If IBM's rights are exhausted, then Groupon

10   cannot be found to infringe the '346 patent.  You must

11   determine whether IBM's rights are exhausted as a result of

12   its licenses with Facebook and Google.

13             To prevail on the defense of patent exhaustion,

14   Groupon must prove that the following by a preponderance of

15   the evidence:

16             First, that IBM's licenses to Facebook and/or

17   Google authorize Facebook and/or Google to provide their

18   sign-on/sign-up technology to third parties.

19             And second, that Facebook's and/or Google's

20   sign-on/sign-up technologies substantially embody the '346

21   patent by including all the inventive aspects of the method

22   patented in the '346 patent.  To "substantially embody" the

23   '346 patent, the sign-on/sign-up technologies need not

24   include all requirements of the patented method, so long as

25   it includes all inventive aspects.

Groupon must prove both of these elements to prevail to this defense of patent exhaustion.  If Groupon does not prove any one of these elements, you must reject Groupon's affirmative defense and find for IBM on this issue.  If you find that Groupon has proven both of these elements, you must find for Groupon on this issue.

### 4.7.  Willful Infringement.

If you have decided that Groupon has infringed any claims of the patents-in-suit you must go on and address the additional issue of whether or not this infringement was willful.

To prove willful infringement of a patent, IBM must prove by a preponderance of the evidence that Groupon had knowledge of the patent and that Groupon's conduct was at least reckless, that is, that Groupon knew, or should have known, that its conduct amounted to infringement of the patent.  An accused infringer's knowledge of a patent, without more, is insufficient to establish willfulness.  To determine whether Groupon acted willfully, consider all of the facts.  In determining whether IBM has proven that Groupon's infringement was willful, you must consider all of the circumstances and assess Groupon's knowledge at the time the challenged conduct occurred.

However, just because you may have found that Groupon infringes does not mean that Groupon willfully

infringes.

If you do decide there was willful infringement, that decision should not affect any damage award you give in this case.

Now on Section 5.  Invalidity.

5.1.  Invalidity Generally.

The law presumes that the Patent and Trademark Office acted correctly in issuing the patent.  This presumption puts the burden on Groupon of proving invalidity by clear and convincing evidence on a claim-by-claim basis; that is, you must be left with an abiding conviction that the asserted claims of the patents-in-suit are invalid. This burden may be more difficult to meet when the accused infringer attempts to rely on prior art that was before the patent examiner during prosecution.

Patent invalidity is a defense to patent infringement.  Even though the Patent Office examiner allowed the claims of a patent, you have the ultimate responsibility for deciding whether the claims of the patent are proven to be invalid.  I will now instruct you on the rules you must follow in deciding whether or not any asserted claim is invalid.

A patent may be invalid if the claims were not new and/or were obvious at the time when the patent was filed.  A patent cannot take away from the public what was

already known or used by others, or what would have been

obvious to those of skill in the art at the time the

invention was made.

Groupon assert that claims 51 and/or 54 of the

'601 patent are invalid because,

1.  Claim 51 is anticipated by a book called

"Spinning the Web";

2.  Claim 54 is obvious in light of Spinning the

Web;

3.  Claim 51 is anticipated by Amazon.com's

website as launched in 1995, which I will refer to as

"Amazon"; and

4.  Claim 54 is obvious in light of Amazon and

U.S. Patent No. 6,016,484 to Humphrey Williams, which I will

call "Williams".

Groupon asserts that claims 1 and 5 of the '346

patent are invalid because:

1.  They are obvious in light of the

specifications published by the Liberty Alliance Project,

which I will refer to as "Liberty Alliance," and Japanese

Patent Application Akira Sunada, which I will call Sunada;

and.

2.  They are obvious in light of Liberty

Alliance and U.S. Patent No. 7,680,819 to Joseph Mellmer,

which I will call "Mellmer".

### 5.2.   Level of Ordinary Skill.

Patent invalidity defenses are evaluated from the perspective of a hypothetical "personal of ordinary skill in the art."  The hypothetical person of ordinary skill in the art is presumed to be aware of all the prior art at the time of the invention.  You are to determine the level of ordinary skill in the art to which the claimed invention pertains at the time the claim invention was made. In deciding what the level of ordinary skill in the relevant field is, you should consider all the evidence introduced at trial, including but not limited to the (1) levels of education and experience of other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; and (5) the sophistication of the technology.

### 5.3.   Invention Date.

The date of an invention is presumed to be the filing date of the patent application.  In this case, however, IBM contends that the inventions claimed in each of the '601 patent and '346 patent is entitled to an earlier invention date.  In particular, IBM contends that claims 51 and 54 of the '601 patent (with a filing date of June 7th, 1996) are entitled to an invention date before February 23rd, 1996, and claims 1 and 5 of the '346 patent (with a

filing date of April 1st, 2005) are entitled to an invention date of April 2004.

For IBM to be entitled to an earlier invention date for the '601 patent and '346 patent, it must prove by a preponderance of the evidence, on a claim-by-claim basis, that the invention was conceived as of the earlier date it seeks and that the inventors were diligent in reducing the invention to practice.  IBM must not only put forth evidence from the inventor, but must independently corroborate it, as I will explain to you in the following sections.  It remains Groupon's ultimate burden to prove, by clear and convincing evidence, that the prior art reference predates IBM's invention date.

5.4.  Conception.

IBM bears the burden of producing evidence supporting an earlier invention date by a preponderance of the evidence.  Groupon must prove, by clear and convincing evidence, that any prior art predates the invention date of the '346 and '601 patent.  "Conception" means the formation in the mind of an inventor of a definite and permanent idea of the complete and operative invention, such that, if the idea were communicated to a person of ordinary skill in the art, he or she would be able to make the invention without undo research or experimentation or the exercise of inventive skill.  This requirement does not mean that the

inventor has to have a prototype built or have actually

explained the invention to another person.  But there must

be some evidence beyond the inventor's own testimony that

confirms the date on which the inventor had the complete and

operative idea.  In other words, the testimony of an

inventor is not sufficient, standing alone, to prove an

conception date.  An inventor must provide independent,

corroborating evidence in addition to his own oral

testimony.  For example, conception may be proven when the

claimed invention is shown in its complete form by drawings,

a written description or other document, disclosure to

another person, or other forms of evidence presented at

trial.  But an inventor's own unwitnessed documentation does

not corroborate an inventor's testimony about inventor

facts.  Conception must include every feature or limitation

of the claimed invention.

> 5.5.  Reduction to Practice.

IBM must prove the reduction to practice date by

a preponderance of the evidence.  Groupon must prove, by

clear and convincing evidence, that any prior art predates

the invention date of the '346 and '601 patent.  "Reduction

to practice" means an invention is sufficiently developed to

show that it would work for its intended purpose.  To

demonstrate a reduction to practice of a method claim, IBM

must demonstrate that the method was actually performed.  An

inventor can show he was diligent in reducing an invention

to practice if he or others acting at his direction engaged

in reasonably continuous activities to reduce the invention

to practice.  As with proof of the conception date, that

diligence must be proven by evidence in addition to the

inventor's testimony.

### 5.6.  Prior art.

Prior art is the legal term used to describe

what others had done in the field before the invention was

made.  Prior art is the general body of knowledge in the

public domain, such as articles, products, or other patents,

before invention was made.  The prior art need not have been

available to every member of the public, but it must have

been available, without restriction, to that segment of the

public most likely to avail itself of the prior art as

contents.  Prior art includes any of the following items

received into evidence during trial:

1.  Any product that was publicly known or used

by others in the United States before an invention was made;

2.  Patents that issued more than one year

before the filing date of the patent, or before the

invention was made;

3.  Publications having a date more than one

year before the filing date of the patent, or publicly

accessible in the United States before the invention was

made;

      4.   Any product that was in public use or on sale in the United States more than one year before the patent was filed;

      5.   United States patents that were filed by another before the invention was made, or U.S. patent applications that were filed by another before the invention was made and were subsequently published.

      I apologize for typos with the new numbers there.

      A printed publication must have been maintained in some tangible form, such as printed pages or Internet publications, and must have been sufficiently accessible to persons interested in the subject matter of its contents. Information is publicly accessible if it was distributed or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter exercising reasonable diligence can locate it.  If the information was accessible, there is no requirement to show that particular members of the public actually received it. The disclosure of the claimed invention in the printed publication must be complete enough to enable one of ordinary skill in the art to use the invention without undue experimentation.

      To show that the use of the system was "public,"

the use must have been accessible to the public prior to the

filing date of the patents.  For the system to be publicly

known, the knowledge must be publicly accessible and it must

be such to enable one with ordinary skill in the art to

practice the invention.

5.7.  Anticipation.

In order for someone to be entitled to a patent,

the invention must actually be new.  In general, an

invention is new when the identical invention as claimed has

not been used or disclosed before.  If the claim is not new,

we say that it was "anticipated" by prior art.  Prior art is

the general body of knowledge in the public domain, such as

articles or other patents before the claim was made.  A

claim that is "anticipated" by the prior art is not entitled

to patent protection.  Anticipation must be proved on a

claim-by-claim basis.

Groupon contends that some of the asserted

claims of the patents-in-suit are invalid for anticipation.

Groupon must convince you of this by clear and convincing

evidence.  Groupon contends that it has presented in this

trial prior art that was not considered by the Patent Office

during the prosecution of the patents-in-suit.  In deciding

the issue of invalidity, you may take into account whether

the prior art was not considered by the Patent Office when

it issued the patents-in-suit.  Prior art that differs from

the prior art considered by the Patent Office may carry more

weight than the prior art that was considered and may make

Groupon's burden of showing that it is highly probable that

a patent claim is invalid easier to meet.  However, Groupon

always retains the burden of establishing invalidity by

clear and convincing evidence.

To anticipate a claim, each and every element in

the claim must be present in a single item of prior art, and

arranged or combined in the same way as recited in the

claim.  You may not combine two or more items of prior art

to find anticipation.  In determining whether every one of

the elements of the claimed invention is found in the prior

art, you should take into account what a person of ordinary

skill in the art would have understood from his or her

review of the particular item of prior art.

To anticipate the invention, the disclosure in

the prior art reference does not have to use the same word

as the claim, but all of the requirements of the claim must

be there, either stated expressly or inherently, so that

someone of ordinary skill in the art to which the claimed

invention pertains, looking at that one reference, could

make and use the claimed invention.  Thus, for purposes of

anticipation, you should consider that which is expressly

stated or present in the item of prior art and also that

which is inherently present.  Anticipation by inherent

disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation.  Inherency may not be established by probabilities or possibilities.  The mere fact that a certain thing may result from a given set of circumstances is not sufficient.

In addition, in order for a prior art reference to anticipate a claim, it must enable a person of ordinary skill in the art to make and use the invention without undue experimentation.  The prior art reference must be sufficiently described to place the public in possession of the invention such that persons of skill would know how to practice or carry out the claimed method in light of the reference.  For purposes of anticipation, a prior art printed publication is presumed to be enabling.  IBM bears the burden of proving nonenablement of prior art by a preponderance of the evidence.  Groupon bears the ultimate burden to show anticipation by clear and convincing evidence.

5.8.  Obviousness.

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention

1   was made.

2          Groupon may establish that a patent claim is

3   invalid by showing, by clear and convincing evidence, that

4   the claimed invention would have been obvious to persons

5   having ordinary skill in the art at the time it was made.

6          In determining whether a claimed invention is

7   obvious, you must consider the level of ordinary skill in

8   the field of the asserted patents that someone would have

9   had at the time the invention was made, the scope and

10  content of the prior art, and any differences between the

11  prior art and the claimed invention.

12         Keep in mind that the existence of each and

13  every element of the claimed invention in the prior art

14  does not necessarily prove obviousness.  Most, if not all,

15  inventions rely on building blocks of prior art.  In

16  considering whether a claimed invention is obvious, you may,

17  but are not required to, find obviousness if you find that

18  at the time of the claimed invention there was a reason that

19  would have prompted a person having ordinary skill in the

20  art to combine the known elements in a way the claimed

21  invention does, taking into account such factors as:

22         1.   Whether the claimed invention was merely the

23  predictable result of using prior art elements according to

24  their known function(s);

25         2.   Whether the claimed invention provides an

obvious solution to a known problem in the relevant field;

   3. Whether the prior art teaches or suggests the desirability of combining elements claimed in the invention;

   4. Whether the prior art teaches away from combining elements in the claimed invention;

   5. Whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; and

   6. Whether the change resulted more from design incentives or other market forces.

   To find it rendered the invention obvious, you must find that the prior art provided a reasonable expectation of success.  Obvious to try is not sufficient in unpredictable technologies.

   In determining whether the claimed invention was obvious, consider each claim separately.  Do not use hindsight, i.e., consider only what was known at the time of the invention.

   In making these assessments, you should take into account any objective evidence (sometimes called secondary considerations) that may shed light on the obviousness or not of the claimed invention, such as:

   a. Whether the invention was commercially

1  successful as a result of the merits of the claimed

2  invention (rather that the result of design needs or

3  market-pressure advertising or similar activities);

4          b.   Whether invention satisfied a long felt

5  need;

6          c.   Whether others had tried and failed to make

7  the invention;

8          d.   Whether others invented the invention at

9  roughly same time;

10          e.   Whether others copied the invention;

11          f.   Whether there were changes or related

12  technologies or market needs contemporaneous with the

13  invention;

14          g.   Whether the invention achieved unexpected

15  results;

16          h.   Whether others in the field praised the

17  invention;

18          i.   Whether persons having ordinary skill in the

19  art of the invention expressed surprise or disbelief

20  regarded the invention;

21          j.   Whether others sought or obtained rights to

22  the patent from the patent holder; and

23          k.   Whether the inventor proceeded contrary to

24  accepted wisdom in the field.

25          In considering whether the claimed invention was

obvious, you must first determine the scope and content of

the prior art.  The scope and content of the prior art for

deciding whether the invention was obvious includes at least

prior art in the same field as the claimed invention.  It

also includes prior art from different fields that a person

of ordinary skill in the art would have considered when

trying to solve the problem that is addressed by the

invention.

Where the parties challenging the validity of

the patent is relying on prior art that was not considered

by the PTO during examination, you may consider whether that

prior art is significantly different and more relevant than

the prior art that the PTO did consider.  If you decide it

was different and more relevant, you may weigh that prior

art more heavily when considering whether the challenger has

carried its clear-and-convincing burden of proving

invalidity.

5.8.1.  Obviousness -- Hindsight is Not

Permitted.

The question of obviousness is simple to ask but

difficult to answer.  A person of ordinary skill in the art

is presumed to have knowledge of the relevant prior art at

the time of the patentee's invention.  If you find the

available prior art shows each of the elements of the claims

in suit, you must determine whether it would then have been

obvious to a person of ordinary skill in the art to combine

or modify these elements in the same manner as the claims in

suit.  The difficulty that attaches to all honest attempts

to answer this question can be attributed to the strong

temptation to rely on hindsight while undertaking this

evaluation.  It is wrong to use the patents-in-suit as a

guide through the maze of prior art references, combining

the right references in the right way so as to achieve the

result of the claims in suit.  Rather, you must cast your

mind back to the time of the invention and consider only the

thinking of one of ordinary skill in the art, guided only by

the prior art and what was what was known in the field.

Section 6 is Patent Damages.

6.1.  Damages Introduction.

If you find that Groupon has infringed any valid

claim of the patents-in-suit, and, if applicable, that

Groupon does not have an implied license to that claim or

that IBM's rights to assert that claim against Groupon have

not been exhausted, you must then consider what amount of

damages to award to IBM.  I will now instruct you about the

measure of damages.  By instructing you on damages, I am not

suggesting which party should win this case, on any issue.

On the other hand, if you find that all of the

asserted patent claims in each patent are either invalid or

not infringed, then you should not consider damages in your

1    deliberation.  For the '346 patent, you should also not

2    consider damages in your deliberations if you find that

3    Groupon had an implied license to practice that patent or

4    IBM has exhausted its rights to assert it against Groupon.

5           The damages award must be adequate to compensate

6    IBM for the infringement.  Your damages award, if you reach

7    this issue, should put IBM in approximately the same

8    financial position that it would have been in had the

9    infringement not occurred.  It is not meant to punish

10   Groupon.

11          IBM has the burden to establish the amount of

12   its damages by a preponderance of the evidence.  In other

13   words, you should award only those damages that IBM

14   establishes that it more likely than not suffered.  While

15   IBM is not required to prove the amount of its damages with

16   mathematical precision, it must prove them with reasonable

17   certainty.  You may not award damages that are speculative,

18   damages that are only possible, or damages that are based on

19   guesswork.  The damages award should be based on sound

20   economic proof.

21          In this case, IBM seeks a reasonable royalty.  A

22   reasonable royalty is defined as the money amount IBM and

23   Groupon would have agreed upon as a fee for use of the

24   invention, not now, but at the time prior to when the

25   infringement again.

1    I will now give you more detailed instructions

2  regarding damages.

3    6.2.   Date Damages Begin and End.

4    The damages period may or may not coincide with

5  the date of the first infringement.   That is so because

6  patent law limits damages to a six-year period before the

7  filing of the complaint for infringement.   IBM filed this

8  lawsuit on March 2nd, 2016.   The '967 patent expired on

9  August 18th, 2015; the '601 patent expired on June 7th,

10  2016; and the '849 and '346 patents have not expired.

11  Therefore, the maximum periods over which IBM may recover

12  damages are as follows:

13    For the '967 patent:   from March 2010 through

14  August 18th, 2015;

15    For the '601 patent:   from March 2010 through

16  June 7th, 2016.

17    For the '849 patent:   from March 2010 through

18  trial, and

19    For the '346 patent:   from July 2011 through

20  trial.

21    6.3.   Reasonable royalty --  Generally.

22    A royalty is a payment made to a patent holder

23  in exchange for the right to make, use, or sell the claimed

24  invention.   A reasonable royalty is the amount of royalty

25  payment that a patent holder and the alleged infringer would

1  have agreed to in a hypothetical negotiation taking place

2  at a time prior to when the infringement first began.   In

3  considering this hypothetical negotiation, you should focus

4  on what the expectations of the patent holder and the

5  infringer would have been if they had entered into an

6  agreement at that time, and if they had acted reasonably in

7  the negotiations.   You should assume that both parties to

8  the hypothetical negotiation believed the patent to be valid

9  and infringed and that both parties are willing to enter

10  into a license.   You should also assume that the patent

11  holder and the infringer would have acted reasonably and

12  would have entered into a license agreement.

13          Having that in mind, you may consider any

14  relevant fact in determining the reasonable royalty for use

15  of the patented invention.   The reasonable royalty you

16  determine must be a royalty that would have resulted from

17  the hypothetical negotiation, and not simply a royalty

18  either party would have preferred.

19          The reasonable royalty award must be based on

20  the incremental value that the patented invention adds to

21  the end methods.   When the infringing products have both

22  patented and unpatented features, measuring this value

23  requires a determination of the value added by the patented

24  features.

25          6.4.   Reasonable Royalty -- Relevant Factors.

1    In determining the reasonable royalty, you

2    should consider all the facts known and available to the

3    parties at the time the infringement began.  Some of the

4    kinds of factors that you may consider in making your

5    determination are:

6    1.  The royalties received by IBM for the

7    licensing of the patent-in-suit, proving or turning to prove

8    an established royalty.

9    2.  The rates paid by Groupon for the use of

10   other patents comparable to the patents-in-suit.

11   3.  The value that the claimed invention

12   contributes to Groupon's website or mobile applications.

13   4.  The value that factors other than the

14   claimed invention contributes to Groupon's website or mobile

15   applications.

16   5.  Comparable license agreements, such as those

17   covering the use of the claimed inventions or similar

18   technology.

19   You may also consider evidence on any of the

20   following factors, which you may have heard referred to as

21   "Georgia-Pacific" factors:

22   1.  The royalty received by IBM for the

23   licensing of the patent in suit, proving or tending to prove

24   an established royalty.

25   2.  The rate paid by Groupon for the use of

other patents comparable to the patents-in-suit.

3.   The nature and scope of the license, as exclusive or nonexclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.   IBM's established policy and marketing program to maintain its rights to exclude others from using the patented invention by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.   The commercial relationship between IBM and Groupon, such as whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6.   The effect of selling the patented product in promoting sales of other products in Groupon; the existing value of the invention to IBM as a generator of sales of its nonpatented items; and the extent of such derivative or convoyed sales.

7.   The duration of the patent and the term of the license.

8.   The established profitability of the product made under the patents-in-suit, its commercial success, and its current popularity.

9.   The utility and advantages of the patented

property over the old modes or devices, if any, that had

been used for working out similar results.

      10.   The nature of the patented invention; the

character of the commercial embodiment of it as owned and

produced by IBM; and the benefits to those who have used the

invention.

      11.   The extent to which Groupon has made use of

the invention; and any evidence probative of the value of

that use.

      12.   The portion of the profit or of the selling

price that may be customary in the particular business or in

comparable businesses to allow for the use of the invention

or analogous inventions.

      13.   The portion of the realizable profit that

should be credited to the invention as distinguished from

non-patented elements, the manufacturing process, business

risks, or significant features or improvements added by the

infringer.

      14.   The opinion testimony of qualified experts.

      15.   The amount that IBM and Groupon would have

agreed upon (at the time the infringement began) if both had

been reasonably and voluntarily trying to reach an

agreement; that is, the amount which a prudent licensee --

who desired, as a business proposition, to obtain a license

to manufacture and sell a particular product embodying the

1    patented invention -- would have been willing to pay as a

2    royalty and yet be able to make a reasonable profit and

3    which amount would have been acceptable by a prudent

4    patentee who was willing to grant a license.

5              No one factor is dispositive and you can and

6    should consider the evidence that has been presented to you

7    in this case on each of these factors.  You may also

8    consider any other factors which in your mind would have

9    increased or decreased the royalty the infringer would have

10   been willing to pay and the patent holder would have been

11   willing to accept, acting as normally prudent business

12   people.

13             And finally for today, 6.5.  Reasonable

14   Royalty -- Timing Considerations.

15             Damages are not based on a hindsight evaluation

16   of what happened, but on what the parties to the

17   hypothetical license negotiation would have agreed upon.

18   Nevertheless, evidence relevant to the negotiation is not

19   necessarily limited to facts that occurred on or before the

20   date of the hypothetical negotiation.  You may also consider

21   information the parties would have foreseen or estimated

22   during the hypothetical negotiation, which may under certain

23   circumstances include evidence of usage after infringement

24   started, license agreements entered into by the parties

25   shortly after the date of the hypothetical negotiation,

1  profits earned by the infringer, and non-infringing

2  alternatives.

3          All right.  I think we are one past one o'clock.

4  I apologize.  But I have completed the instructions that I

5  am going to read before we hear closing arguments.  We'll

6  start tomorrow morning with closing arguments.  And as I

7  say, you will get the case tomorrow.

8          You don't have it yet, so no talking about the

9  case, no research or reading about anything related to case,

10  and be here ready to start at nine o'clock tomorrow morning.

11  Have a good night.

12          (Jury exited the courtroom at 1:01 p.m.)

13          THE COURT:  We will docket the verdict sheet

14  this afternoon.  Look it over.  If you have any typos or

15  further objections, we can talk about them at 8:30 tomorrow

16  morning.

17          Anything else before we break for the day?

18          MR. DESMARAIS:  Just two questions, Your Honor.

19  I believe I have about an hour-and-a-half for closing.  Is

20  that consistent with Your Honor?  I would like to be able to

21  plan.

22          THE COURT:  Mr. Looby will let you know very

23  shortly.

24          MR. DESMARAIS:  The second question is what is

25  your practice once the jury has the case, do the lawyers

1    stay in the courtroom or do we leave.

2              THE COURT:  You're free to leave as long as you

3    stay near by and we need to reach you.

4              MR. DESMARAIS:  Thank you.

5              THE COURT:  Questions or issues?

6              MR. HADDEN:  No questions.

7              THE COURT:  We'll see you tomorrow at 8:30.

8              (Court recessed at 1:02 p.m.)

9

10        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

11

12                        /s/ Brian P. Gaffigan
                          Official Court Reporter
13                         U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25