## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 16-122-LPS |
| GROUPON, INC., | ) ) ) | |
| Defendant. | ) | |

## GROUPON'S POST-TRIAL MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Of Counsel:

Edward R. Reines
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com

Mark A. Perry
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.,
Washington, DC 20036-5306
(202) 887-3667
mperry@gibsondunn.com

Dated: September 19, 2018

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant Groupon, Inc.*

# TABLE OF CONTENTS

**Page**

I.   NATURE AND STATE OF THE PROCEEDINGS ....................................................... 1

II.   SUMMARY OF ARGUMENT .................................................................................. 1

III.   THE WILLFUL INFRINGEMENT VERDICT SHOULD NOT STAND ....................... 2

    A.   There Is No Evidence Groupon Intentionally Infringed ....................................... 2

    B.   At A Minimum, A New Trial On Willful Infringement Is Warranted .................. 4

IV.   THE $82.5 MILLION DAMAGES VERDICT SHOULD NOT STAND ....................... 5

    A.   IBM's Usage Analysis Failed To Apportion Damages Properly .......................... 6

    B.   IBM Failed To Support Its Profit Splits ............................................................. 9

    C.   IBM Ignored Elementary Royalty Stacking Principles ...................................... 10

    D.   Hausman Failed To Account For The Most Probative Evidence ........................ 11

    E.   IBM's Damages Request Improperly Skewed The Damages Horizon ................ 12

V.   IBM WRONGLY RECOVERED FOR ALREADY-LICENSED ACTIVITY .............. 13

VI.   THE RECORD DOES NOT SUPPORT THE INFRINGMENT VERDICT .................. 14

    A.   No Reasonable Jury Could Have Found That Groupon's Website Infringes Claims 51 and 54 of the '601 Patent ................................................................... 14

    B.   No Reasonable Jury Could Have Found That Groupon Infringes The '967 or '849 Patents .................................................................................................. 17

    C.   No Reasonable Jury Could Have Found That Groupon Infringes Claims 1 And 5 Of The '346 Patent .................................................................................. 18

VII.   THE INVALIDITY OF THE '346 PATENT REQUIRES A NEW TRIAL .................. 19

VIII.   CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Blanche Road Corp. v. Bensalem Twp.*,
  57 F.3d 253 (3d Cir. 1995)........................................................................4

*ePlus, Inc. v. Lawson Software, Inc.*,
  760 F.3d 1350 (Fed. Cir. 2014)................................................................19

*Evonik Degussa GmbH v. Materia, Inc.*,
  305 F. Supp. 3d 563 (D. Del. 2018) ..........................................................3

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*,
  879 F.3d 1332 (Fed. Cir. 2018)..............................................................6, 9

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018)..............................................................6, 8

*General Electric Co. v. Joiner*,
  522 U. S. 136 (1997) .................................................................................9

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  136 S. Ct. 1923 (2016)...............................................................................4

*Integra Lifesciences I, Ltd. v. Merck KgaA*,
  331 F.3d 860 (Fed. Cir. 2003)..................................................................10

*Intellectual Ventures I LLC v. Symantec Corp.*,
  234 F. Supp. 3d 601 (D. Del. 2017), *aff'd*, 725 F. App'x 976 (Fed. Cir.
  2018)..........................................................................................................2

*Intellectual Ventures I, LLC v. Canon Inc.*,
  104 F. Supp. 3d 629 (D. Del. 2015) ..........................................................5

*Kayak Software Corp. v. International Business Machines Corp.*,
  No. IPR2016-00609, Paper 42 (based on Mellmer), No. IPR2016-00608,
  Paper 67 (based on Sunada) (P.T.A.B. Aug. 7, 2017)...............................19

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012).....................................................................11

*Norian Corp. v. Stryker Corp.*,
  363 F.3d 1321 (Fed. Cir. 2004)..................................................................4

*Norman v. Elkin*,
        849 F. Supp. 2d 418 (D. Del. 2012) ...............................................................5

*Novamedix, Ltd. v. NDM Acquisition Corp.*,
        166 F.3d 1177 (Fed. Cir. 1999)....................................................................13

*Plastic Omnium Adv. Innovation & Research v. Donghee Am., Inc.*,
        No. CV 16-187-LPS, 2018 WL 2316637 (D. Del. May 22, 2018) ...............................2, 3

*Power Integrations, Inc. v. Fairchild Semi. Int'l, Inc.*,
        No. 2016-2691 (Fed. Cir. 2018)......................................................................6

*Promega Corp. v. Life Technologies Corp.*,
        875 F.3d 651 (Fed. Cir. 2017)...................................................................6, 14

*ResQNet.com, Inc. v. Lansa, Inc.*,
        594 F.3d 860 (Fed. Cir. 2010)......................................................................11

*Uniloc USA, Inc. v. Microsoft Corp.*,
        632 F.3d 1292 (Fed. Cir. 2011)....................................................................10

*United Artists Theatre Circuit, Inc. v. Twp. of Warrington*,
        316 F.3d 392 (3d Cir. 2003).........................................................................5

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
        503 F.3d 1295 (Fed. Cir. 2007)................................................................15, 20

*VirnetX, Inc. v. Cisco Systems, Inc.*,
        767 F.3d 1308 (Fed. Cir. 2014)......................................................................9

*WesternGeco LLC v. Ion Geophysical Corp.*,
        837 F.3d 1358 (Fed. Cir. 2016).......................................................................3

*Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*,
        609 F.3d 1308 (Fed. Cir. 2010).......................................................................6

## STATUTES AND RULES

Fed. R. Civ. P. 50 & 59 ...................................................................................1

## I.      NATURE AND STATE OF THE PROCEEDINGS

On August 8, 2018, the Court entered judgment on the jury's verdict awarding IBM $82.5 million for infringement of four patents. DI 389, 398. Pursuant to the Court's guidance (DI 398, 399), Groupon respectfully moves for JMOL or a new trial. FRCP 50 & 59.

The jury verdict cannot stand. In addition to serious problems with the liability verdict, IBM's damages theory flies in the face of well-established Federal Circuit precedent that safeguards against run-away jury verdicts such as this one. The Court should vacate the jury award and enter judgment of no damages, or, if not, order a remittitur to $3.5 million, which is the most supported by the trial record. At worst, the Court should order a new trial.

## II.     SUMMARY OF ARGUMENT

Willful infringers are "pirates" who intentionally trespass upon the intellectual property rights of others. IBM did not come close to proving that Groupon pirated any patented inventions. Instead, IBM improperly painted Groupon as a holdout for exercising its right to a jury trial, and took advantage of an evidentiary ruling to deceive the jury about the parties' pre-suit conduct. The ensuing finding of willful infringement has to be set aside.

IBM's damages theory was flawed from start to finish. IBM's expert made basic errors that have been rejected by the Federal Circuit three times this year alone. Among other things, he failed to apportion the value of the patents-in-suit, confusing usage with apportionment to the point where he allocated more than all the profits for many of the accused transaction to IBM and none to Groupon, and then misrepresented his analysis to the jury. He also ignored the comparable licenses entered into by IBM, opining that a hypothetical negotiation with Groupon would have resulted in a much higher royalty than any actual IBM license in the record. These are not mere credibility

issues, but fundamental analytical flaws that require reversing or reducing the damages award, or at minimum granting a new trial on damages.

In addition, there are other problems with the jury's award. The infringement findings are premised on erroneous claim constructions, and unsupported by (or against the great weight of) the evidence. And the '346 patent, in particular, is both subject to a license defense that remains to be resolved by this Court and invalid (as the PTAB has ruled with respect to an asserted claim), independently necessitating a new trial.[1]

## III.    THE WILLFUL INFRINGEMENT VERDICT SHOULD NOT STAND

IBM dressed up a run-of-the-mill patent infringement dispute as a willful infringement case by portraying Groupon as a scofflaw-holdout company that had the temerity to try this case while other companies settled. IBM's false narrative ignored its pre-suit promise not to allege willful infringement and not to ask Groupon to change its website. There is no evidence that Groupon infringed the patents-in-suit with the requisite bad intent, and thus JMOL is warranted. In the alternative, Groupon respectfully requests a new trial on willfulness.

### A.    There Is No Evidence Groupon Intentionally Infringed

IBM premised its willfulness case on Groupon's knowledge of the patents. Tr. 1027:7–22. But "pre-suit knowledge alone is not sufficient to support a finding of willful infringement." *Intellectual Ventures I LLC v. Symantec Corp.*, 234 F. Supp. 3d 601, 612 (D. Del. 2017), *aff'd*, 725 F. App'x 976 (Fed. Cir. 2018); *see Plastic Omnium Adv. Innovation & Research v. Donghee Am., Inc.*, No. CV 16-187-LPS, 2018 WL 2316637, at *11 (D. Del. May 22, 2018). "Willfulness necessarily involves knowledge of the patent <u>and</u> of infringement." *Evonik Degussa GmbH v.*

---

[1] In confining the parties to 20 pages for all post-trial motions, the Court recognized its familiarity with the case and the issues. DI 397. Accordingly, this motion highlights key points and evidence for the Court's attention, but Groupon's prior submissions and the evidence in the trial record are also relied upon to support this motion and incorporated by reference herein.

*Materia, Inc.*, 305 F. Supp. 3d 563, 577 (D. Del. 2018) (emphasis in the original).

Willful infringement requires proof that an infringer acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer. *WesternGeco LLC v. Ion Geophysical Corp.,* 837 F.3d 1358, 1362 (Fed. Cir. 2016). IBM did not submit the typical proof of willfulness such as internal documents from an infringer suggesting it knew it was very likely it was infringing or real proof that infringement was "so obvious." Instead, IBM relied on three facts to attempt to carry its burden: (1) the existence of other licenses to its portfolio; (2) that Groupon did not design around the patents; and (3) Groupon's absence of a patent licensing policy. Tr. 1030:25–1031:15, 1931:8-14, 1950:1–1952:9. These are not sufficient, alone or in combination, to prove that Groupon knew or should have known of its risk of infringement.

First, IBM's portfolio licenses with unrelated companies selling different products says nothing about what Groupon knew or should obviously have known about infringement. *Plastic Omnium*, 2018 WL 2316637, at *11. Companies cross-license portfolios for a variety of reasons; only Groupon's conduct was at issue here. Second, that Groupon did not design around IBM's patents is exculpatory, not inculpatory: Groupon did not change its products because it believed they were non-infringing. Defendants are not automatically willful infringers when notified of a patent. *Cordance Corp. v. Amazon.com, Inc.*, 639 F. Supp. 2d 406, 417 n.52 (D. Del. 2009). Third, that Groupon did not have a patent licensing policy has no bearing on whether there is knowledge of infringement. Although evidence of failure to comply with an *existing* licensing policy might be relevant, *the absence* of a policy is not evidence of willful infringement. The Patent Act does not require particular patent or licensing models.

Infringement was highly contested, with facts and expert testimony on both sides. Although the jury ultimately sided with IBM, this was exactly the sort of close case that falls far short of

willfulness. The non-infringement arguments set forth below and the trial record confirm the reasonableness of Groupon's non-infringement positions. "Willful infringement is not established by the simple fact of infringement." *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332 (Fed. Cir. 2004).

As the Supreme Court recently reiterated, "the most culpable offenders [are] the 'wanton and malicious pirate[s]' who intentionally infringe[] another's patent—with no doubts about its validity or any notion of a defense—for no purpose other than to steal the patentee's business." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). No reasonable juror could have found on the record evidence that Groupon pirated IBM's patented inventions or otherwise infringed with bad intent. JMOL of no willfulness should be entered.

### B.    At A Minimum, A New Trial On Willful Infringement Is Warranted

IBM improperly painted Groupon as a wrongdoer based on a false premise. In three non-disclosure agreements, IBM agreed it would not assert willful infringement for the covered period, and IBM represented that Groupon did not need to stop providing its services. Groupon's Offer of Proof, DI 374 at 1–2. Despite these agreements, IBM exploited the Court's decision to bar the documents from evidence and presented the jury with a black-and-white choice: "it's either willful infringement or it ain't cheap and easy to design around these patents," and it must be willful infringement "[b]ecause if it was cheap and easy to design around the patents, they would have done it in 2011 or 2012." Tr. 230:4–7. IBM should not be permitted to profit from the exclusion of evidence by making arguments known to it (and its counsel) to be untrue. *See Blanche Road Corp. v. Bensalem Twp.*, 57 F.3d 253, 264 (3d Cir. 1995) (ordering a new trial "to assure fairness and due process" when plaintiff's counsel introduced improper evidence prejudicial to defendants and the improper assertions made it "reasonably probable" the verdict was influenced by the statements),

*abrogated on other grounds, United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003); *Intellectual Ventures I, LLC v. Canon Inc.*, 104 F. Supp. 3d 629, 659 (D. Del. 2015) (granting a new trial where the court had excluded evidence and a party "overstepped the bounds" of how related testimony could be used).

IBM also misused evidence of its existing licenses to improperly prejudice the jury. IBM argued that its portfolio-wide licenses were not comparable for determining a royalty because it was unclear which patents were at issue. Tr. 825:18–25; *see also* Part IV. E *infra*. But, at the same time, IBM urged the jury to find willful infringement because those same licenses *did* exist and Groupon allegedly ignored what they taught about infringement. Tr. 1031:11–13, 1951:18–19. If IBM can ignore these licenses in its damages analysis because they were allegedly so incomparable as to be irrelevant, how can Groupon's having "heard [its competitors] licensed a broad array of patents from IBM," Tr. 1951:8–16, reasonably support a showing of willful infringement? IBM cannot have it both ways.

Thus, in the event the Court declines to enter JMOL of no willfulness, the jury's verdict of willful infringement "is against the clear weight of the evidence," and "a new trial must be granted to prevent a miscarriage of justice." *Norman v. Elkin*, 849 F. Supp. 2d 418, 422 (D. Del. 2012).

## IV.    THE $82.5 MILLION DAMAGES VERDICT SHOULD NOT STAND

The jury's $82.5 million damages award is legally untenable because IBM's damages theory violates basic legal principles and is unsupported by the record in five fundamental ways. The damages award should be overturned and IBM awarded nothing because it waived damages by knowingly pursuing such a legally defective theory. *See Promega Corp. v. Life Technologies Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) ("a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid

damages theory"); *Finjan, Inc. v. Blue Coat Systems, Inc*., 879 F.3d 1299,1312 (Fed. Cir. 2018) (district court must determine whether party presenting defective damages theory waived damages or can pursue a new theory at a new trial). In the alternative, this Court should order a remittitur to the $3.5 million established by Groupon's expert, which is "the maximum amount sustainable by the proof," or order a new damages trial. *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.,* 609 F.3d 1308, 1322 (Fed. Cir. 2010).

### A.   IBM's Usage Analysis Failed To Apportion Damages Properly

Apportionment is such an important legal check on over-sized patent damage awards that, so far this year, the Federal Circuit has already overturned three large verdicts because apportionment was disregarded during and after trial. *See Finjan,* 879 F.3d 1299 (Fed. Cir. 2018) ($39.5 million verdict); *Exmark Mfg. Co. v. Briggs & Stratton Power Prods.,* 879 F.3d 1332 (Fed. Cir. 2018) ($24 million verdict); *Power Integrations, Inc. v. Fairchild Semi. Int'l, Inc*., No. 2016-2691 (Fed. Cir. 2018) ($140 million verdict). In *Finjan*, for example, the patent owner argued that it had properly apportioned by including only 4% of the infringer's revenue because the infringing feature of the software product was only used by 4% of the web traffic through the accused device. 879 F.3d at 1310-1311. The Federal Circuit overturned the verdict because limiting the revenue to the feature that used the accused technology failed to acknowledge the other non-patented contributions to that feature: "Further apportionment was required to reflect the value of the patented technology compared to the value of the unpatented elements." *Id.* at 1311.

The apportionment safeguard against oversized verdicts is especially critical here because IBM included revenues for the sale of ***unpatented*** goods and services based on a few patented technologies. Yet Groupon's business relies on a plethora of features core to its internet presence, as well as the contributions of thousands of talented employees who make its clever business model

work – none of which was considered as part of apportionment. Tr. 1562:22-1563:2 ("He doesn't try to understand what percentage of the profit is due to the patents specifically as to price, cost savings, extra customers, and as a result of that, again, he's over counting, creating the higher damage number than is necessary."); Tr. 923:24-924:25 ("It's hard to get the types of deals that consumers want to buy and to find merchants to fill up that marketplace, and connecting those and putting that all together in every city that we operate in is a very difficult thing to do."); Tr. 924:14-25 ("we have a large technology team that is making sure by building out the platform and making sure we stay on top of all the technological advances…. and then putting all that together in a way that it appeals to consumers. That's a difficult thing to do.").

IBM's damages theory confused *usage* of a patent as part of a particular transaction with *apportioning* the value of the patent relative to other contributions to a transaction for which the patent is used. Hausman was explicit that his attempt to apportion was based simply on the usage of the patents. Tr. 859:15-23 (extent of usage the basis for "apportionment"); 862:15-18 (methodology involved "apportioning for the extent of use and converting the revenues to profits for each of the patents"). He testified that apportionment is ensuring that the "royalty would only account for the revenues associated with each patent." Tr. 1814:13-23. A patent-by-patent breakdown proves that IBM disregarded basic principles of apportionment. For the '346 Patent (account creation), Hausman concluded the "extent of [patent] use" was 14% because that is the share of Groupon accounts opened using social registrations such as Facebook or Google. Tr. 859:7-23. He stated he would "use this information to apportion or allocate the use of the patents." *Id.* He took total revenue of over $10 billion for the relevant period, "multiplied by the 14 percent," and used a 9% profit rate to arrive at the "profits attributable to the '346 patent to $129,192,866." Tr. 863:15-22. All that Hausman did, at best, is eliminate sales having nothing to do with infringement. This is not

apportionment. *See Finjan,* 879 F.3d at 1311 (apportionment requires the valuation of contributions outside of the patents-in-suit). And suggesting that all Groupon profits earned from the 14% of accounts created via third parties are "attributable" to the '346 Patent is legally unsustainable and invited the jury to err via confusion.

For the '967 and '849 Patents (caching patents), Hausman concluded that, because of the claim requirements, the "extent of use" could only include transactions where customers returned **and** used cached content. Tr. 853:18-22 ("[T]he '967 patent, it's only for people who return and use the contents of the cache."); Tr. 857:17-19 (analysis is the "same" for '967 and '849 Patents). He assumed 21% of customers were returning and 59.2% of the content cached. Tr. 855:16-22 (21% returning); Tr. 861:5-9 (59.2% cached content). For both patents, Hausman multiplied revenue by "59.2 percent by 21 percent, and that is going to tell me the revenue associated with the patent." Tr. 861:14-19. Again, this is not apportionment at all—even though Hausman misleadingly told the jury it was. This usage analysis only eliminates transactions IBM admits do not involve the '967 and '849 Patents. Of course, such revenue should not be included. But Hausman fails to apportion value to the patents for transactions involving this patents given all the other contributions to such sales.

For the '601 Patent (state information), Hausman's extent of usage analysis characterized the Groupon check-out process as an eight-step process, assigned the '601 Patent to one of those steps, and divided the revenue by eight. Tr. 858:1-8. Hausman's attempt to label this an apportionment analysis fails because, among other things, by confining his analysis to eight steps, it improperly assumes that the entire value of the Groupon sale is attributable to these eight steps. Hausman's analysis ignores the massive value Groupon adds to the sale outside these eight steps.

Hausman's supposed apportionment via his usage analysis is legally inadequate. For three

patents, he only removed sales revenue for transactions unrelated to IBM's patents. That "usage" calculation merely recognizes non-infringement; it is not apportionment. For the '601 Patent, he arbitrarily limited the contributions to the profits to an eight-step process that is part of the check-out process, which is a tiny fraction of the overall contributions to the sales revenue. As a matter of law, IBM was required to apportion its damages claim to the value of the patents. But Hausman manifestly did not do so. As a result, the damages verdict should not stand.

### B.      IBM Failed To Support Its Profit Splits

IBM arbitrarily set its profit "split" at half for three patents and one-third for the other. Hausman's legally erroneous "ipse dixit" failed to tie the profit split to specifics in the record and is an independent legal problem with the verdict. *See General Electric Co. v. Joiner*, 522 U. S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Hausman performed no calculation, much less a quantitative or comparative analysis to support his conclusory assertion that "[b]ased on all the factors" the parties would agree to a profit split. Tr. 877:7-13. He did not identify even one instance where IBM applied this kind of profit split. This is exactly the type of unsupported opinion that the Federal Circuit has found legally insufficient. *See, e.g.*, *Exmark,* 879 F.3d at 1349 (reversing a verdict because the patentee's expert failed to "explain how she calculated a 5% royalty rate using these [Georgia Pacific] factors"); *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1332-1333 (Fed. Cir. 2014) (rejecting a theory starting from a 50%/50% profit split despite the expert's 10% adjustment); *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1317-1318 (Fed. Cir. 2011) (holding the "25 percent rule" was an improper profit split method even if used merely as a starting point).

Hausman's defense of his conclusory leap was that the supposed split was of already

"apportioned profits" and only those "profits that arise from the patents." Tr. 877:14-21. But as explained above, Hausman's apportionment analysis was fatally flawed. Importantly, Hausman does not contend that his profit split involved apportionment. Nor could he because he never accounts for Groupon's many contributions to its sales.

IBM's profit split opinion is conclusory and thus legally insufficient to support the verdict.

### C.     IBM Ignored Elementary Royalty Stacking Principles

Compounding the legal problems identified above, Hausman failed to account for the royalties that IBM has already allocated to itself for each patent. *See Integra Lifesciences I, Ltd. v. Merck KgaA*, 331 F.3d 860, 871-872 (Fed. Cir. 2003), vacated on other grounds 545 U.S. 193 (2005) (requiring the consideration of "stacking royalties" on remand). For both the '967 and '849 Patents, Hausman considered the same revenue associated with transactions involving caching and returning customers. He split the profits for every single one of those sales at least twice: once for each patent. Hausman thus awarded IBM more than *100%* of the profit for every transaction involving those patents: 50% for the '967 Patent, 50% for the '849 Patent and even more for the '601 Patent. Further, when such a transaction also involved third party account creation (implicating the '346 Patent), IBM took *four* different royalties for a single sale that far exceeded Groupon's entire profit for that sale. Tr. 1592:21-1593:6 ("[I]f those four patents are on the same sale, it's 183 percent of profit."). Hausman did this without acknowledging that he was taking multiple "splits" of profit from the same sale such that IBM enjoyed all the profit or more for a sale, and Groupon none or a loss. Not only is Hausman's failure to consider royalty stacking itself an independent legal problem warranting JMOL, but it vividly shows that Hausman failed to perform even a basic apportionment analysis that takes into account IBM's other asserted contributions to Groupon's profit, much less Groupon's many contributions to its own profit.

### D.    Hausman Failed To Account For The Most Probative Evidence

IBM's reasonable royalty analysis dismissed wholesale the only relevant, comparable evidence: the prior licenses to the asserted patents. "Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).

The Federal Circuit held in *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010) that a settlement license to the patents-in-suit must be considered when it is the "most reliable license in this record." Here, the Priceline agreement is the most probative evidence of a reasonable royalty in this record. The same four patents asserted here were central to that license because they were also asserted in litigation, just as in *ResQNet*. Tr. 1582:10-23. And Priceline's payment of $40 million pursuant to that license is comparable and easily adjusted for the circumstances of this case to evidence a reasonable royalty. First, even though there was a cross-license to Priceline's patents, Hausman admitted that Priceline's cross-licensed patents were worth "close to zero." Tr. 1584:7-10. Second, Priceline is 3.6 times the size of Groupon. Tr. 1584:14-23. That size difference along with other factors (such as the inclusion of other IBM patents in the Priceline license), when properly considered, results in a reasonable royalty of $3.5 million, as shown at trial. Tr. 1584:1-1586:17.

Hausman dismissed the Priceline agreement and all the prior licenses because, he argued, they did not presume validity and infringement and the math in adjusting for cross licenses was supposedly too hard. Tr. 825:18-826:4. This would lead to the absurd result that any license that does not specifically presume infringement and validity would be per se non-comparable. That cannot be, particularly where (as here) the patent-holder is a licensing entity that derives much of its

revenue from royalty streams. IBM relied on these same licenses to help IBM in the hypothetical negotiation (Tr. 876:1-7) and to support its willfulness case (Tr. 1031:11-13, 1951:6-19). As noted above, IBM cannot have it both ways. As Groupon's expert showed, seven of IBM's licenses (including Priceline) were comparable and could be adjusted to reflect useful data points, ranging from $2.2 to $5.4 million, in the reasonable royalty analysis. Tr. 1573:1-16, 1576:17-1577:10, 1578:12-1582:9, 1582:10-1583:12, 1584:1-1586:17, 1586:25-1591:14. Hausman's neglect of the Priceline license and his misuse of the comparable licenses more generally is legal error that misled the jury and requires setting aside the damages verdict.

### E.    IBM's Damages Request Improperly Skewed The Damages Horizon

The $82.5 million verdict was the product of a skewed damages horizon and is unsupported by competent evidence. It is legally improper to use inflated damages and revenue numbers in this way. *See CSIRO v. Cisco Systems, Inc.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015) (improper to "skew the damages horizon for the jury") (quoting *Uniloc*, 632 F.3d at 1320).

IBM distorted the damages picture for the jury by improperly using Hausman's model to request more than $160 million and invoking irrelevant rhetoric about its $5 billion R&D budget unrelated to the patents-in-suit. Tr. 823:9-17 ("IBM's patents are valuable assets that invest about $5.6 billion per year in R&D."); Tr. 829:1-6 ("IBM wants a license to get some of its $5 billion a year back."). IBM also unfairly suggested that, absent a large award, all kinds of fantastic IBM gifts to humanity may not arrive. Tr. 2045:23-2046:6 ("Don't you want new medicine? Don't you want people to go to the moon? Don't you want people to do quantum computing?"). Hausman's inclusion of all Groupon's revenue in his calculation was also prejudicial. For example, for the '346 Patent, Hausman included "$10,180,869,821" of Groupon revenue despite acknowledging that 86% of transactions do not involve use of the patent and none of the goods or services for which the $10

billion was paid was patented at all. Tr. 863:15-22. IBM's skewing of the damages horizon is another legal error.

In sum, IBM's trial presentation pushed for damages to punish Groupon, which went beyond the bounds of section 284, and is based on a legally improper damages model. JMOL should be granted and IBM should take nothing because it failed to support its damages claim. Alternatively, the verdict should be reduced to $3.5 million or a new trial ordered.

## V.    IBM WRONGLY RECOVERED FOR ALREADY-LICENSED ACTIVITY

The Court reserved whether it was responsible for adjudicating Groupon's "implied license" defense. It should do so because Groupon agreed that the jury would render an "advisory verdict," and IBM acknowledged it was for the Court. Tr. 1715:10-15 (Groupon: "It will be an advisory verdict."); Tr. 1713:24-1714:1 (IBM: "[I]t's an equitable issue, meaning that it's reserved for the Court to determine."). Moreover, interpreting licenses is a legal question for the Court. *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1180 (Fed. Cir. 1999).

IBM does not deny it licensed the '346 Patent to Facebook for its sign-in technology. PX-0454; Tr. 794:18-23. At trial, IBM's witness, Mr. McBride, vaguely argued that "simply because you use Facebook does not give you the right to use IBM patents." Tr. 770:8-9. But he admitted that the Facebook license "says third parties can use the APIs that IBM has licensed Facebook to provide, and they continue to be licensed when they're used by those third parties." Tr. 792:25-793:3. In the end, IBM seemed to argue that §2.1.1 does not give third parties rights because it is a license to Facebook. Tr. 802:23-803:8.

IBM's flawed analysis focuses on the wrong provision. Section 2.1.3(a) of the Facebook license specifies that each Facebook product, such as its sign-in software, "remains" licensed when used by third parties for the IBM patents that would be infringed. PX-0454. That eliminates IBM's

argument that the license somehow was not intended to benefit third party users of Facebook technology. And without Groupon's use of Facebook's sign-in software there would be no infringement. The "first system" required throughout the claim is the Facebook system. Tr. 614:4-8. IBM also pointed to an "anti-combination" provision (§2.3) that it apparently contends nullifies the broad third party license grant. But IBM overlooks that §2.3 culminates by stating: "*provided, however, to the extent a third party is implementing or using a Grantee Licensed Product Distributed by Grantee, such use is not excluded by this Section 2.3.*" PX-0454.

Every aspect of this safe harbor provision is satisfied. Groupon was a third party implementing Facebook's sign-in software, which is undisputedly a Grantee Licensed Product Distributed by Grantee. Because IBM licensed Facebook's product, the verdict is defective. Sales made by Facebook log-in customers are impliedly licensed and IBM's patent rights are exhausted because the Facebook sign-in technology substantially embodies the inventive aspects of the patent. JMOL is proper because IBM failed to include a way to carve out these licensed sales even though it knew that it was asking this Court to decide this issue and that it might lose. *Promega,* 875 F.3d at 666. At a minimum, a new trial on damages is warranted because the jury's verdict "does not reveal the means by which the jury calculated damages" such that removing the sales covered by Facebook's license would be "difficult, if not impossible, to correct without retrial." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007).

## VI.  THE RECORD DOES NOT SUPPORT THE INFRINGEMENT VERDICT

### A.  No Reasonable Jury Could Have Found That Groupon's Website Infringes Claims 51 and 54 of the '601 Patent

The jury's implicit finding that Groupon's website performs the "identifying *all* continuations in an output from said service" and "recursively embedding the state information in *all* identified continuations, in response to said request" limitations of claim 51 is unsupported by

substantial evidence and against the great weight of evidence.

There is no dispute as to the accused aspects of Groupon's website. The alleged "service request" is made from the user's computer by the user clicking on a hyperlink associated with a Groupon offering. Tr. 575:16-577:15, 627:21-628:20 (Schmidt); *id.* 1366:25-1369:3, 1373:19-22 (Weissman). This request is received and processed by Groupon's Homepage ITA service. *Id.* 631:11-19, 633:25-634:2, 635:11-15 (Schmidt); *id.* 1371:9-1372:2, 1373:19-1374:3 (Weissman); PX-0176 at GROUP258391. Responsive to the user's request, the Homepage ITA service constructs and returns a web page to the user. PX-0176 at GROUP258396; Tr. 1372:3-25, 1373:25-1376:7 (Weissman). Finally, at least some of the hyperlinks in the web page returned to the user by the Homepage ITA service do ***not*** include embedded state information. Tr. 1381:9-1382:5.

IBM focused solely on one piece of the resulting page that Dr. Schmidt identified as being generated from a "Mustache template," as shown in red in Appendix A at ii. PDX-004 at 195; *see also* Tr. 582:14-586:11 (Schmidt). As Dr. Weissman explained, "there were many other continuations, many other items throughout the page that were not identified." Tr. 1380:20-1381:1.

No reasonable jury could have found from these undisputed facts that Groupon "identif[ies] ***all*** continuations in an output from said service" and "recursively embed[s] the state information in ***all*** identified continuations, in response to said request" as required by claim 51. According to IBM's theory, the claimed "service request" corresponds with a user's request for a web page, made by clicking on a hyperlink. Because the request is for a web page, the Homepage ITA, which creates the web page, is therefore the requested service and the web page output from Homepage ITA is the claimed "output from said service." The web page output includes hyperlinks, outside of the area generated by the Mustache template, that do not have embedded state information.

Dr. Schmidt argued that the claimed "output from said service" is not the web page from the

Homepage ITA, but is somehow the Mustache template transmitted from the Layout Service to the Homepage ITA. But this theory contradicts Dr. Schmidt's undisputed testimony that the claimed "service request" is a request *from the user's computer to Homepage ITA*. Tr. 628:6-9. Thus, Homepage ITA—not the Layout Service—is the requested service, and the web page delivered by Homepage ITA—not the Mustache template delivered by the Layout Service to the Homepage ITA—is the output of said service.

Contradiction aside, Dr. Schmidt's theory fails as a matter of law because the claim requires "identifying all continuations in an output from said service." As Dr. Schmidt admitted, the Mustache template is exactly that—a template—and does not contain any hyperlinks. Rather, the template contains placeholders for hyperlinks, as signified by the letters "url" in the figure from Dr. Schmidt's demonstratives. Appendix A at iii; PDX-004 at 195; Tr. 580:12-23, 582:21-584:7 ("Q. What is the URL with the two curly braces mean? A. *So this is a placeholder that will be filled in* with embedded state information – I'll show you that in a second – to actually provide a way to access this particular deal by the client when they click the buy button that shows up in the screen on the left-hand side."). Thus, by Dr. Schmidt's own testimony, the Mustache template contains *no hyperlinks* (i.e., "continuations"). *See also* Tr. 1378:6-17 (Dr. Weissman testifying that "the word 'URL' doesn't mean anything special. It's just a variable that gets replaced."). Because the Mustache template contains no continuations when it is delivered from the Layout Service to Homepage ITA, Groupon could not have "recursively embedded" any state information into continuations in the Mustache template. Indeed, even when the "url" placeholder is replaced with a working hyperlink, it is replaced with a hyperlink that already includes the alleged state information, without modifying the hyperlink. Tr. 585:10-586:5 (Schmidt); Tr. 1379:6-24 (Weissman). At no point does Groupon identify all continuations in the Mustache template (because

there are none) and recursively embed state information into them.

### B.   No Reasonable Jury Could Have Found That Groupon Infringes The '967 or '849 Patents

Groupon is entitled to JMOL of no infringement of the '967 and '849 Patents or alternatively a new trial. (Groupon also maintains and reiterates its position that the Court misconstrued the partition/portion limitations, and others, before trial.)

First, no reasonable jury could have found that Groupon's website performs the step of "generating at least a first partition for presenting applications," as required by claims 1 and 2 of the '967 Patent, or the step of "structuring applications so that they may be presented, through the network, at a first portion of one or more screens of display," as required by claim 1 of the '849 Patent. For example, IBM failed to show Groupon's web page includes multiple applications that can be displayed by the same partition/portion. IBM also failed to show that Groupon's web page includes multiple applications displayed in the same partition/portion.

Second, IBM provided no proof that Groupon's website includes partitions "constructed from objects, the objects being retrieved from the objects stored at the respective reception system, or if unavailable from the objects stored at the respective reception system, then from the network," as required by claims 1 and 2 of the '967 Patent. For example, IBM failed to prove that the HTML div, which IBM accused of comprising the claimed partition, is constructed from objects. At trial, IBM identified page images and the shopping cart icon as being the claimed objects, but these items are used to construct the web page (i.e., the application), not the HTML div (i.e., the partition). Tr. 528:13-529:3.

Third, there is no proof that Groupon's website performs the step of "selectively storing advertisement objects to a predetermined storage criterion at a store established at the reception system," as required by claim 1 of the '849 Patent. For example, IBM failed to prove that

Groupon's website pre-fetches and stores advertising objects. The Court construed "selectively storing advertisement objects" to mean "pre-fetching advertising objects and storing at a store." While IBM adduced evidence that a user's computer stores objects at a store when accessing Groupon's website, there is no evidence that those objects were *pre-fetched*, as that term is understood in the art and used in the Court's claim construction. Tr. 1350:19-1351:21. IBM also failed to prove that Groupon directs or controls the end user's performance of the "selectively storing" step. The Court found in the *Priceline* case that, with respect to Priceline's website, the user performs the storing step because the user has the ultimate power to disable the cache controls. Groupon's website works identically in this regard. Tr. 1351:22-1352:2 ("Additionally, caching is a core property of the web browser. So, actually, Groupon is not practicing the caching step. It is the browser that is in control of caching."). Because the user's web browser, not Groupon, directs or controls the caching of content, IBM failed to show that Groupon directs or controls the end user's performance of the "selectively storing" step.

Fourth, no reasonable jury could have found that Groupon stores a "predetermined advertising amount," as required by claim 8 of the '849 Patent. For example, IBM failed to adduce evidence at trial that the amount of content stored from Groupon's website is "predetermined," as that term is understood in the art and used in the '849 Patent.

### C. No Reasonable Jury Could Have Found That Groupon Infringes Claims 1 And 5 Of The '346 Patent

IBM failed to prove that Groupon's website or mobile applications perform, or direct or control the performance of, the step of "triggering a single-sign-on operation on behalf of the user in order to obtain access to a protected resource that is hosted by the second system," as required by claims 1 and 5 of the '346 Patent. For example, the evidence adduced at trial demonstrates that the accused Facebook and Google single sign-on operations are triggered by the end user clicking on

the corresponding social login button. Tr. 610:13-612:11, 1391:9-1392:13. IBM had no theory of attributed infringement for this claim element and offered no evidence that the user's decision to click the social sign on button is directed or controlled by Groupon.

## VII.    THE INVALIDITY OF THE '346 PATENT REQUIRES A NEW TRIAL

The jury found that Groupon infringed claim 1 of the '346 patent and awarded damages as an undifferentiated lump sum. DI 389. Yet the PTAB has invalidated that claim because it is anticipated. *Kayak Software Corp. v. International Business Machines Corp.*, No. IPR2016-00609, paper 42 at 30 (based on Mellmer), No. IPR2016-00608, paper 67 at 31 (based on Sunada) (P.T.A.B. Aug. 7, 2017). If the Federal Circuit affirms either of the PTAB's final written decisions before this case is conclusively final, the infringement verdict cannot stand. *ePlus, Inc. v. Lawson Software, Inc.*, 760 F.3d 1350, 1355-57 (Fed. Cir. 2014) (vacating damage award after patent office canceled infringed claim). Likewise, the damages verdict cannot stand. *Id.* A "single verdict on damages . . . does not reveal the means by which the jury calculated damages," requiring a new trial on damages. *Verizon Servs.* 503 F.3d at 1310. Indeed, IBM's damages theory for the '346 patent focused exclusively on claim 1 of the '346 patent, so claim 5 cannot support the verdict. *See, e.g.*, Tr. 847:19–851:8, 858:19–859:11.

PTAB proceedings aside, Liberty Alliance with Mellmer teaches all the limitations of claims 1 and 5, and no reasonable jury could have found otherwise. IBM's Dr. Hinton admitted Liberty Alliance teaches the limitations of claim 1, except for "creating a user account." Tr. 400:6-402:16, 407:21-410:8, 1464:20-1465:19. Moreover, Groupon established that Liberty Alliance teaches each of these limitations. *Id.* 1464:20-1469:22; DX-0645 at 6, 13-15, 22, 33, Fig. 2; DX-0383 at 16-17. Mellmer teaches "creating a user account." Tr. 1476:15-1478:13; DX-0379 at 24:27-37, 25:60-26:2, Figs. 34 and 39. Mellmer also describes the limitations of dependent claim 5: "in response to a

determination at the second system," Tr. 1485:15-1486:13; DX-0379 at 25:60-26:2, 27:44-48; and "receiving at the second system." Tr. 1487:21-25; DX-0379 at 27:44-48. Liberty Alliance also teaches this final limitation. Tr. 1487:7-14; DX-0383 at 19. As explained by Dr. Weissman, a skilled artisan would have been motivated to combine Mellmer with Liberty Alliance and had a reasonable expectation of success in doing so. Tr. 1479:10-1482:14, 1488:1-7. The '346 patent is invalid and thus the verdict cannot stand.

## VIII.   CONCLUSION

For the foregoing reasons, Groupon respectfully requests that the Court grant judgment as a matter of law in its favor or, in the alternative, a new trial.

ASHBY & GEDDES

OF COUNSEL:

/s/ *John G. Day*

Edward R. Reines
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 803-3000
edward.reines@weil.com

Mark A. Perry
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.,
Washington, DC 20036-5306
(202) 887-3667
mperry@gibsondunn.com

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendant*

Dated:  September 19, 2018